## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | CIVIL ACTION NO. 07-12064-JLT |
| v. | ) | |
| | ) | |
| TODD CARTA, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

## RESPONDENT'S PRETRIAL MEMORANDUM

I.    INTRODUCTON

Todd Carta is a man who, at 41, pled guilty to a child pornography offense in federal

District Court in Connecticut.  After his plea on April 9, 2002, the government consented to his

release on conditions.  He complied with all terms of his release and returned to court on October

8, 2002 for sentencing.  Because he substantially assisted authorities in the prosecution of

someone else, the government filed a motion under U.S.S.G. § 5K1.1, and Judge Dominic

Squatrito downwardly departed from his guideline range, which was 92 to 115 months, to 60

months' incarceration.   Although he has a significant criminal history involving relatively petty

(and non-sexual) crimes for which he has done jail time, this represents his first extended term of

imprisonment.

While in Bureau of Prisons custody, Mr. Carta participated in the BOP's sex offender

treatment program at Butner, North Carolina for approximately eight months.  During his

participation, he divulged his entire sexual history, which included approximately a dozen illegal

sexual encounters with teenagers, some of which occurred in the context of long-term

relationships, in addition to sexual relationships with both adult men and adult women.  Mr.

Carta now acknowledges the relationships he had with teenagers were exploitative and

inappropriate in addition to being illegal.  They were, however, without force.  There is no

allegation in any record that Mr. Carta interfered with a pre-pubescent child, except for

inappropriate sexual behavior which occurred when he himself was a child.  There is no

allegation in any record that Mr. Carta was violent during any of these encounters.

The issues in this trial are whether Mr. Carta can  be said to be currently so mentally

disordered as to justify potentially lifetime civil commitment, and if so, whether the government

can show by the requisite standard of proof that any such disorder will lead to "serious difficulty"

in controlling his behavior, a finding which the Supreme Court has held is necessary to maintain

the precarious constitutional status of Sexually Dangerous Person ("SDP") proceedings, and

prevent them from becoming simple mechanisms for unconstitutional preventive detention.

The principal diagnosis in this case is "hebephilia."   As the government has noted in its

trial brief, Mr. Carta was diagnosed a hebephile by the expert the government retained, Amy

Phenix, based on the crimes he admitted to in treatment, and his attraction to teenagers.

Hebephilia does not appear in the Diagnostic and Statistical Manual IV - Text Revision "DSM-

IV."[1]   Rather, hebephilia as a term denoting a mental disorder involving attraction to sexually

mature youth is a diagnosis which is only used only by government experts in sexually dangerous

---

[1] Although couched in the catch-all "paraphilia - not otherwise specified" category, hebephilia is
unlike any of the listed examples of rare paraphilias which the DSM gives as examples that are
appropriate for including under the "not otherwise specified" category, all of which have
themselves been extensively empirically studied and validated.

2

person commitments.  While this diagnosis has been proffered by state experts and accepted in

state SDP proceedings, this Court should not be overly influenced by that fact.  The SDP

courtroom is widely acknowledged to be one where the "science" of psychology gives way under

the pressures exerted by the adversary system and public safety imperatives.  See generally

Robert Prentky & Eric Janus, et. al., *Sexually Violent Predators In The Courtroom: Science on*

*Trial*, 12 Psy. Pub. Pol & Law, 357, 364 (2006) (in a seminal overview of the science and law in

this area, noting "increasing tendency...for experts to stretch or distort the science—to introduce

bad science—in response to the strong advocacy pressures inherent in SVP proceedings.")

(hereinafter "Science on Trial.")  The authors of Science on Trial, include law professor Eric

Janus, author of Failure to Protect: America's Sexual Predator Laws and the Rise of the

Preventive State (2006), and four of the most pre-eminent and prolific researchers and scholars in

the field of sex offender research.   According to the authors:

> Testimony about mental disorder serves a critical gatekeeping function in SVP
> cases. If those evaluated under the SVP laws are truly mentally disordered, the
> legitimacy of their selection for this extraordinary form of legal incarceration is
> strengthened. The distinction between those who are subject to preventive
> detention and those who are not at least has the appearance of some validity; it is
> not simply a political choice by those with the power to make the  choice. When
> the law relies on bad science, such as individually defined mental  disorder, this
> external touchstone is severely compromised ... The introduction of  new mental
> disorders and the distortion of standard mental disorder categories undercuts the
> legitimacy of science and limits its ability to provide a sound and objective
> touchstone in the fight to understand and reduce sexual violence.

 Id. (emphasis supplied).[2]

---

[2] The government's expert in this case, Amy Phenix, has herself engaged in what the authors here
would term "bad science" in arguing for the civil commitment of a female sex offender. Her
opinion arguing that the female sex offender would likely reoffend sexually was thrown out by
the Missouri Court of Appeals for this reason.  In re Angela Coffel, 117 S.W.3d 116, 128

The two federal courts that have been confronted with the diagnosis of hebephilia in SDP

cases have simply rejected it as a basis for commitment.  In United States v. Shields, the district

court found based on the testimony in that case that hebephilia was not a valid diagnosis.  United

States v. Shields, 07-12056-(PBS), Dkt. No. 98, available at 2008 WL  544940 (D. Mass.

February 26, 2008) (finding that "[w]hile [the] literature may establish that hebephilia is

generally accepted in the field as a group identifier or label, it does not establish that hebephilia is

generally accepted as a mental disorder by professionals who assess sexually violent offenders.")

In United States v. Abregana, 574 F. Supp.2d 1145 (D. Hawaii 2008) the district court assumed

the diagnosis of hebephilia was valid, but found a mental disorder which expressed itself as

consensual sexual encounters with minors not to be a "serious" mental disorder for purposes of

the statute.[3]  Both decisions are attached hereto as Exhibits A and B.

---

(Mo.App.2003) (stating that "Dr. Phenix has never diagnosed or counseled female sex offenders.
She could not have had any formal training in the assessment of female sex offenders because no
one has performed any research to support such training. Thus, the factors Dr. Phenix considered
in forming her opinion of the likelihood that Angela would reoffend sexually are based on
"clinical expertise" that is simply nonexistent. They are simply unproven and untested
assumptions that enjoy no widespread acceptance in the psychological community.").

[3]An important issue in these cases is the *degree* of harm posed, which informed the Abregana
court's decision finding hebephilia not to be a "serious" disorder within the meaning of the
statute.  While Mr. Carta disavows any interest and desire in ever again engaging in relationships
with men younger than their mid-20s, and acknowledges that the sexual interactions he did
engage in with young people were abusive in an important sense, it is important to note his
pattern was to engage in sexual relationships with willing young people, who often invited or
initiated sexual contact.  It has been documented that engaging in so-called age-discrepant
relationships is not uncommon among gay men, and a body of growing empirical literature has
demonstrated that age-discrepant sexual encounters are not necessarily traumatic and do not
necessarily result in lasting psychological harm to the willing victims.  See Bruce Rind, Gay and
Bisexual Adolescent Boys' Sexual Experiences With Men: An Empirical Examination of
Psychological Correlates in a Nonclinical Sample, Archives of Sexual Behavior, 345 (2001).
Some researchers theorize that one reason this is so may have to do with the fact heterosexual
and homosexual age-discrepant relationships are informed by different dynamics.  Jessica

The issue is not whether sexual interest in adolescents exists; the question is whether such a sexual interest can, or should, be classified as a "mental disorder."  The court appointed examiner and the government expert in this case disagree on this fundamental point.  This substantial disagreement extends to the broader field of psychology, and taps readily into broader social issues.  The classification of symptoms as a disorder is a political act--one need merely recall that, until very recently, the American Psychiatric Association designated homosexuality a mental disorder.[4]

The government in its trial brief mischaracterizes the import of the psychological literature which makes reference to hebephilia.  All of the literature on which the government relies, separating out so-called hebephiles as a discriminable group, was available to the court in the <u>Shields</u> case, except the 2008 article by Ray Blanchard: Ray Blanchard, et. al, <u>Pedophelia,</u>

_____

Stanley, et al., <u>Gay and Bisexual Men's Age-Discrepant Childhood Sexual Experiences, Journal of Sex Research</u>, 380 (2004) (finding "the development of young men's sexuality differs from that of heterosexual men, given the lack of social support for their orientation and the lesser availability of same-age sexual partners.")

[4] The history of the Paraphilia-NOS-nonconsent diagnosis, a diagnosis often applied to repeat rapists in these proceedings, illustrates the political pressures which have always impinged on the process of diagnosis creation.  A version of this diagnosis was purportedly rejected from inclusion in the Diagnostic and Statistical Manual due to resistance from feminist or other interest groups involved in the DSM development process, because those groups feared it might lead to the exoneration of rapists in criminal cases as not responsible.  Now, in the wake of the SDP/SVP regimes which require a diagnosis of a mental abnormality in order to effectuate committment, Paraphilia-NOS-nonconsent has re-emerged as a means of characterizing rapists, although with little of the rigor which would be expected to obtain if formal diagnostic criteria had been developed.  Thomas K. Zander, <u>Civil commitment without psychosis: The law's reliance on the weakest link in psychodiagnosis</u>, 1 Journal of Sexual Offender Civil Commitment: Science and the Law, 17– 82 (2005).  This diagnosis, in addition to the very broad variant of "hebephilia" endorsed by Dr. Phenix here, has been popularized by Dennis Doren, a Ph.d. Psychologist at the Sand Ridge Treatment Facility in Wisconsin, in a now somewhat dated book marketed to state and government SDP evaluators called *Evaluating Sex Offenders* (2002).

 Hebephilia, and the DSM-V, Archives of Sexual Behavior (2008).  The government, in its trial

brief, states that this article *resolves* the issue before the court in <u>Shields</u>, but this is not so.   In the

article, a group of scientists *propose* hebephilia as a diagnosis to the APA, which is currently in

the process of revising the DSM; this proposal succinctly shows is that hebephilia is *not* currently

an accepted diagnosis.  If the published critiques and replies to the article are any indication,

hebephilia's future as an accepted diagnosis is anything but assured.[5]   If the committee which has

been convened by the APA to revise the sexual disorders sections of the DSM considers the

proposal, it will presumably continue to subject the concept to a thorough peer-review process,

which might lead to its inclusion or exclusion, the specification of diagnostic criteria, and the

like.

   In any event, the hebephilia these authors propose is not the same diagnostic concept

which the government's expert appears to be employing.  It is simply unclear what the authors of

the article would make of the hebephilia of Dr. Phenix, which encompasses sexual interest in

"post-pubescents" adolescents.   The research study specifically excludes attraction to sexually

---

[5] Dr. Barbaree, one of the authors of Science on Trial noted above, testified in the <u>Abregana</u> case.
His testimony effectively demonstrates the difficulties in this area.  Dr. Barbaree noted he had
"been reading the other night a chapter that I'd written with some colleagues, and in a section that
I didn't write but my colleagues did there is an argument for the hebephilia being an actual
disorder.  I honestly think that it's questionable whether it's a real disorder.  There is quite a
prevalent interest in the general population in this age group of individuals.  We've done, and I've
published in the past, studies where we've tested volunteers from the general population in their
sexual responses to individuals of that age range, and you get -- a significant proportion of the
general population show  significant responses.  So I guess I'd argue that it's -- it is  a descriptive
term that can be applied to a particular sexual  interest.  Whether it constitutes a mental disorder
or not, I'm  not sure.  And I would say in comparing the seriousness of  hebephilia with other
paraphilias -- for example, ... with pedophilia or sexual sadism --...the degree of pathology is
much less than with the other paraphilias." <u>United States v. Abregana</u>, 07-civ-00385 (HG) Dist.
HI, Tr. June 25, 2008, at 37-38 (attached hereto as Exhibit C).

mature youth, which they regard as normal, and focus on pubescence only.   See Id. at 2 (defining pubescence as "generally" 11 or 12 to 14 or 15, and not 15 to 19, noting "few would want to label erotic interest in late- or even mid-adolescents as a psychopathology.")  The authors describe a fixated interest in sexually "immature" persons *during* the period of pubescence, as warranting further study by the APA, either as a diagnosis in itself, or as an extension of the pedophilia diagnosis as it currently exists (which is applied to sexual interest in "pre-pubescents").   Again, their proposal has engendered numerous and vigorous commentary in the peer-reviewed journal Archives of Sexual Behavior, suggesting that hebephilia's future as a diagnosis is anything but assured.

If the testimony of Amy Phenix is deemed admissible, respondent anticipates the evidence will show that any such diagnosis, even if generally accepted (which it is not), is too amorphous to do the work of separating out the mentally disordered from the "merely" criminal, as Justice Kennedy has stated Supreme Court precedent requires.  Kansas v. Hendricks, 521 U.S. 346, 373 (1997) (Kennedy, J. concurring).  It is anticipated that the experts will agree that sexual interest in sexually developed adolescents is not uncommon.   Engaging in these sexual relationship with people in this age group is illegal, but the sexual interest motivating the crimes is not the product of "abnormal" drives.   They are, the literature shows, entirely normal.

Even assuming Dr. Phenix's diagnosis of hebephilia is accepted in this case, the DSM-IV specifically warns that no diagnosis carries any necessary implication as to the degree of volitional control a patient has over his behavior.  Mr. Carta is at an age when anti-social behavior and sexual behavior of all types declines in severity, a general trend which is evident in him.  He is also not a sexual recidivist—one who has committed sex crimes, been sanctioned,

and then gone on to re-offend.

Both experts in the case have engaged in risk assessment.  Testimony of this nature is typically taken in state SDP proceedings to answer the statutorily imposed question of whether a respondent is "likely" to re-offend.  Respondent submits this evidence is relevant, even though the federal statute contains no explicit "likelihood" element, as a showing of actual dangerousness in addition to a qualifying mental disorder is a constitutional requirement of long standing.  Foucha v. Louisiana, 504 U.S. 71 (1992).

One of the generally agreed upon findings in the psychological literature is that predictions of future violence or other types of behavior based on "clinical judgment" are inaccurate even when, or especially when, they seem plausible and convincing.  In response to this, the field, over the past decade or so, has moved continually toward empiricism: risk factors with proven associations with re-offense have been isolated, and have been subsequently combined into risk assessment instruments.  Research has been conducted looking at the effect of age as a factor which mitigates risk of re-offense.  This research as a whole demonstrates that Mr. Carta is not likely to re-offend if released.

II.   LEGAL PRINCIPLES

In order for Mr. Carta to be found to be a sexually dangerous person, the government must prove the following by clear and convincing evidence:

(1)    That Mr. Carta has engaged in or attempted to engage in sexually violent conduct or child molestation;

(2)    That Mr. Carta suffers from a "serious mental illness, abnormality, or mental disorder" and

(3)    That the serious mental illness, abnormality, or mental disorder Mr. Carta suffers from

results in Mr. Carta having "serious difficulty in refraining from sexually violent conduct or child molestation if released."

(4)     Either as a subsidiary inquiry to the "serious difficulty in refraining" inquiry or as an independent element, whether Mr. Carta is actually dangerous, that is, whether he can be shown to be highly likely to re-offend if released.

The Court must find that the government has proven that Mr. Carta is a "sexually dangerous person" by clear and convincing evidence.  The clear and convincing standard of proof is an intermediate standard which lies somewhere between beyond a reasonable doubt and a preponderance of the evidence.  Addison v. Texas, 441 U.S. 418, 425 (1979).  The standard "has been described as 'demanding' . . .[it is] met only when a party can place in the ultimate factfinder an abiding conviction that the truth of its factual contentions are 'highly probable'" . . . [T]his is the case only when "the material [one party] offered instantly tilted the evidentiary scales in [its favor] when weighed against the evidence [the other party] offered in opposition." Goldman v. Winn, 565 F.Supp.2d 200, 229 (D. Mass. 2000) (internal citations omitted).

A.     Sexually Violent Conduct or Child Molestation

Mr. Carta's consensual sexual acts with post-pubescent minors do not constitute "child molestation".  Congress did not define either Sexually Violent Conduct or Child Molestation in enacting the Adam Walsh Act.  However, the legislative history does not support the inference that Congress intended that a person who had engaged in only non-violent consensual conduct with post-pubescent teenagers would be deemed a "sexually dangerous person" subject to potentially indefinite civil commitment.  The Bureau of Prisons has issued its own regulations defining the term "child molestation" as "any unlawful conduct of a sexual nature with, or sexual exploitation of, a person under the age of 18 years."  This definition would encompass any

consensual conduct with a person under the legal age of consent in any state (i.e. statutory rape), a standard which varies across jurisdictions.

Mr. Carta notes that the definition of "child molestation" proposed by the government is extremely broad.  For example, the government's definition of "child molestation" in the context of civil commitment would encompass more crimes than the statutory definition of "sex offense" for the purpose of the Sex Offender Registration and Notification Act, which Congress also enacted as part of the Adam Walsh Act.  See 42 U.S.C. 169211(5)(C) (excepting from the definition of "sex offense" consensual acts between an adult and a minor if the minor was at least 13 years old and the adult was not more than four years older than the minor).   Thus, using the Bureau of Prisons definition of "child molestation," which the Government is proposing for this case, an individual could be eligible for potential lifetime civil commitment by engaging in conduct that would *not subject him to sex offender registration*.[6]  This anomalous result indicates that the definition of "child molestation" proposed by the government is unnecessarily broad. Mr. Carta suggests that, consistent with the principles of statutory construction, the word "child" be given its common-sense everyday meaning of a person who has not yet reached puberty.

B.      Serious mental illness, abnormality, or mental disorder

A diagnosis of a "serious mental illness, abnormality, or disorder" is a statutory and

---

[6]      The government notes that, because the BOP regulations define "child molestation" to include sexual *exploitation* of a child a person under 18 years of age, Mr. Carta's convictions for transporting child in violation of 18 U.S.C. § 2252A would arguably fall under this definition. See Government's Trial Brief, at n. 3. Thus, the government argues for a definition of "child molestation" which could conceivably subject an individual to potentially lifetime civil commitment without an offense that involved physical contact between the individual and a child.  Respondent argues that this is further evidence that the definition of "child molestation" proposed by the government is unduly broad.

constitutional prerequisite to commitment as a sexually dangerous person. <u>Kansas v. Hendricks</u>, 531 U.S. 346, 369 (1997). Because the diagnosis is a constitutional requirement, the legitimacy of the civil commitment proceeding hinges on the scientific integrity of the diagnostic decision. <u>See</u> <u>Kansas v. Hendricks</u>, 521 U.S. 346, 373 (1997) (Kennedy, J. concurring)  (cautioning that "if it were shown that mental abnormality is too imprecise a category to offer a solid basis for concluding that civil detention is justified, our precedents would not suffice to validate it.")  For the reasons stated above, the evidence will show Mr. Carta, while he has undoubtedly displayed sexual interest in teenagers, does not currently suffer from a "serious mental illness, abnormality, or mental disorder," sufficient to justify his potentially life-time civil commitment.

C.      <u>Serious difficulty in Refraining</u>

The requirement that the government prove that Mr. Carta is currently suffering from a serious mental illness, mental abnormality, or mental disorder that results in "serious difficulty refraining from sexually violent conduct or child molestation" is a direct legislative enactment of the principle of volitional impairment enunciated in <u>Kansas v. Hendricks</u>, 521 U.S. 346 (1997) and <u>Kansas v. Crane</u>, 534 U.S. 407 (2002).  <u>See</u> H.R. Rep. No. 109-218(I) Section-by-Section Analysis and Discussion §511.

The "serious difficulty" requirement  is intended to distinguish the "dangerous sexual offender whose mental illness, mental abnormality or mental disorder subjects him to civil commitment, from the dangerous, but typical, recidivist convicted in an ordinary criminal case who, having been convicted and punished for one crime, proceeds through his own free choice to commit another." <u>Kansas v. Crane</u>, 534 U.S. 407, 413 (2002); <u>Kansas v. Hendricks</u>, 521 U.S. 346, 360 (1997).

The diagnosis of a mental abnormality or disorder does not resolve the question of volitional impairment.  In other words, simply because an individual is diagnosed with a mental abnormality or disorder, that fact alone does not imply that he or she lacks control over the behaviors that may be associated with the disorder.  The DSM-IV makes this clear, stating "the fact that an individual's presentation meets the criteria for a DSM-IV diagnosis does not carry any necessary implications regarding the individual's degree of control over the behaviors that may be associated with the disorder."  See DSM-IV-TR at p. xxxiii.

III.    WITNESSES

Todd Carta intends to call three witnesses: Cour-appointed examiner Dr. Leonard Bard; United States Probation Officer Paul Collette; and Dr. Randall Wallace.[7]

Dr. Leonard Bard examined Mr. Carta and conducted a review of his records.  Dr. Bard noted (consistent with the government's expert Dr. Phenix) that Mr. Carta did not meet the DSM-IV-TR criteria for pedophila.  Dr. Bard noted that previous evaluations of Mr. Carta conducted at the Bureau of Prisons listed a "diagnosis" of "hebephilia" or "sexual arousal to adolescents".  In Dr. Bard's opinion, as detailed in his report, "hebephilia" is not a valid diagnosis.  Dr. Bard also noted that, although Mr. Carta met some of the criteria for both antisocial and borderline personality disorder, he did not meet the full criteria for any personality

---

[7]    As detailed in Respondent's Reply to Government's Motion in Limine to Exclude Witness Testimony [D.85], the government has objected to the fact that respondent appears on his witness list as a potential witness. Counsel for respondent has notified the government that they do not anticipate calling him at trial.  However, counsel also have informed the government that they do not know if, at the close of case, Mr. Carta might decide to testify, in which case counsel believe he would have the right to testify on his own behalf. The government previously moved to depose Mr. Carta and the Court denied the motion, without any discussion of whether Mr. Carta intended to testify. It is counsel's position that if Mr. Carta chooses to testify, that is his right, and he is not required to make that decision at this time.

disorder.  Consequently, Dr. Bard will testify that Mr. Carta does not suffer from a "serious

mental illness, abnormality, or disorder."  In addition, Dr. Bard also is expected to testify that Mr.

Carta would not have "serious difficulty in refraining from sexually violent conduct or child

molestation" based on 1) factors in Mr. Carta's history that indicate that he does not suffer from a

volitional impairment; and 2) the results of three empirically-developed actuarial tools which

indicated that Mr. Carta scored similar to individuals with low to moderate rates of recidivism.

Dr. Bard is also expected to testify regarding the limitations of actuarial instruments used to

"predict" recidivism.

United States Probation Officer Paul Collette is the specialist for United States Probation

in Connecticut on the supervision of sex offenders.  He will testify to the specific conditions of

release that Mr. Carta will be subject to and the particular ways in which the probation

department monitors sex offenders.  He will also testify about technological innovations that

have developed since Mr. Carta was sentenced in 2002 which the Probation Department could

impose on Mr. Carta, such as GPS monitoring and computer tracking programs.

Dr. Randall Wallace works for the Center for the Treatment of Problem Sexual Behaviors

in Connecticut.  This is the treatment program that United States Probation contracts with in

Connecticut, and is the program Mr. Carta will be required to attend as a condition of his

supervised release.  Dr. Wallace will inform the Court concerning the type of treatment program

this is, what the requirements of it are, and its specific restrictions, which are much more

stringent than Mr. Carta's conditions of supervised release.  He will also inform the Court how

the treatment providers communicate freely with United States Probation and what happens to

supervisees who violate the conditions of the treatment program.

13

TODD CARTA
By his attorney,

/s/ Page Kelley
Page Kelley
B.B.O. #548237
Federal Defender Office
408 Atlantic Avenue, 3rd Floor
Boston, MA  02110
Tel: 617-223-8061

February 5, 2009

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on February 5, 2009.

/s/ Page Kelley
Page Kelley