# Exhibit A

Westlaw.

**H**

Only the Westlaw citation is currently available.
United States District Court, D. Massachusetts.
UNITED STATES of America, Petitioner,

v.

Jeffrey SHIELDS, Respondent.
**Civil Action No. 07-12056-PBS.**

Feb. 26, 2008.

Mark J. Grady, Mark T. Quinlivan, Jennifer C. Boal, Timothy Q. Feeley, United States Attorney's Office, Boston, MA, for Petitioner.

John G. Swomley, Swomley & Associates, Page Kelley, Judith H. Mizner, Federal Defender's Office, District of Massachusetts, Boston, MA, for Respondent.

**MEMORANDUM AND ORDER**

SARIS, District Judge.

\*1 Respondent Shields has moved to exclude the government's expert testimony on whether Defendant "suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released."[18 U.S.C § 4247(a)(6)]. An evidentiary hearing was held on November 26 and 27, 2007, and extensive post-trial briefs and submissions were filed. At this hearing, Dr. Niklos Tomich, PsyD. and Dr. Daniel Kriegman, PhD. testified. As a trial is scheduled for March 17, 2008, a prompt decision is required. After review of the parties' submissions, the Court rules as follows:

1. The actuarial risk assessments (RRASOR, STATIC-99, and any adjusted actuarial approach, including the "guided clinical method" and the "adjusted actuarial method") are reliable under the standards set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Among other things, these assessments are generally accepted as a reli-

able methodology within the relevant scientific community and they have been subject to peer review. *See, e.g.,* Gov't Mem. in Supp. Admis. Evidence, Exs. A & B. Courts which have addressed this issue have found these methods to be reliable. *See e.g., In re Commitment of Simons,* 213 Ill.2d 523, 618-620, 290 Ill.Dec. 610, 821 N.E.2d 1184 (Ill.2004) ("[W]hether or not actuarial risk assessment is subject to *Frye,* there is no question that it is generally accepted by professionals who assess sexually violent offenders and therefore is perfectly admissible in a court of law. As of this writing, experts in at least 19 other states rely upon actuarial risk assessment in forming their opinions on sex offenders' risk of recidivism ... we were unable to identify any state outside of Illinois in which expert testimony based upon actuarial risk assessment was deemed inadmissible on the question of sex offender recidivism.")

However, the government shall not use the term "high risk" in reference to a score on a STATIC-99 test without explaining its meaning in statistical terms (e.g., "Respondent scored a 6 on the STATIC-99. Individuals with this score have been found to re-offend at 39 percent over 5 years, 45 percent over 10 years, and 52 percent over 15 years. These percentages are group estimates; they do not directly correspond to the recidivism risk of an individual offender.") (*See* Gov't Ex. 3, STATIC-99 Coding Rules, Revised-2003, Appendices 6 & 7.)

2. Dr. Tomich is qualified to testify. He holds a Psy.D. in Clinical Psychology from the Chicago School of Professional Psychology and has been licensed to practice psychology in the Commonwealth of Massachusetts since 1989. He is a "Qualified Examiner" in Massachusetts court proceedings and has testified on over 100 occasions in sexually dangerous persons cases, and over approximately 300 occasions in mental health cases. While the Respondent may challenge Dr. Tomich's qualifications on cross-examination, he is qualified to testify as to his own assessment of Respondent

Case 1:07-cv-12064-PBS   Document 93-2   Filed 02/05/09   Page 3 of 28

Slip Copy                                                                      Page 2
Slip Copy, 2008 WL 544940 (D.Mass.)
(Cite as: 2008 WL 544940 (D.Mass.))

and the assessment tools that he utilized in rendering his opinion. He will not, however, be permitted to testify about statistical matters.

\*2 3. Dr. Tomich opines that Mr. Shields has a mental disorder called hebephilia. The government has not provided persuasive expert evidence that there is a mental illness, abnormality, or disorder named hebephilia. The peer-reviewed literature provided by the government defines hebephilia as "a sexual attraction to pubescent children."(Gov't Mem. in Supp. Admis. Evidence, Ex. C, at 2 n. 1.; *see also id.*, Ex. D, at 2.) While this literature may establish that hebephelia is generally accepted in the field as a group identifier or label, it does not establish that hebephilia is generally accepted as a mental disorder by professionals who assess sexually violent offenders. In fact, both sides agree that the attraction of an adult male to a pubescent adolescent is not, without more, indicative of a mental disorder.[FN1] The government relies on Dr. Dennis Doren, who states that "a significant portion of adult men show sexual arousal to adolescents."(Gov't Mem. in Supp. Admis. Evidence at 12.) In Dr. Doren's view, a person only shows the characteristics of "hebephilia" when he repeatedly seeks sexual contact with adolescents "despite the ongoing risk of legal consequences and inability to maintain such relationships on a long-term basis due to the adolescents' growing beyond the age range of interest." *Id.* at 13, 290 Ill.Dec. 610, 821 N.E.2d 1184. When Dr. Tomich made his diagnosis of "hebephelia," he defined the term as "a diagnostic term that is indicative of a deviant pattern of sexual arousal to adolescent individuals under the age of consent."Tomich Rep. 13. However, the government does not point to any peer-reviewed literature recognizing either Dr. Doren's or Dr. Tomich's diagnostic definition of a mental disorder called hebephilia. Significantly, the American Psychiatric Association considered *and rejected* hebephilia as a diagnostic category for a mental disorder. Nov. 26, 2007, Tr. at 252. Moreover, there is no expert testimony in this record that psychiatric experts generally accept this definition of hebephil-

ia as a mental disorder.

> FN1. The issue here is not whether adult sexual contact with minors is illegal (it is), but whether mere attraction to a pubescent minor is a mental disorder.

The government argues that, in some circumstances, hebephilia falls within a category within the DSM-IV: Paraphilia Not Otherwise Specified (Paraphilia-NOS).[FN2] As a threshold matter, Dr. Tomich does not specifically diagnose Mr. Shields with Paraphilia NOS; his diagnosis is limited to pedophilia and hebephilia. While the government's position may be true in some circumstances, this Court has an inadequate record for determining how the psychiatric community determines what may properly be included within the Paraphilia NOS category. The government never submitted Dr. Doren's book, which is apparently not peer-reviewed. This book is the lone source cited by the government for the proposition that some kinds of hebephilia fall within Paraphilia NOS. It does not suffice.

> FN2. The DSM-IV describes "Paraphilia Not Otherwise Specified": "This category is included for coding Paraphilias that do not meet the criteria for any of the specific categories. Examples include, but are not limited to, telephone scatlogia (obscene phone calls), necrophilia (corpses), partialism (exclusive focus on part of the body), zoophilia (animals), coprophilia (feces), klismaphilia (enemas), and urophilia (urine)."*See* Resp't. Reply at 5 n. 5 (quoting DSM-IV-TR at 576 ("302.9 Paraphilia Not Otherwise Specified.")).

The Court reserves the right to write a full opinion if required.

D.Mass.,2008.
U.S. v. Shields
Slip Copy, 2008 WL 544940 (D.Mass.)

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 544940 (D.Mass.)
**(Cite as: 2008 WL 544940 (D.Mass.))**


END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# Exhibit B

**H**

United States District Court, D. Hawai'i.
UNITED STATES of America, Petitioner,
v.
Jay ABREGANA, Respondent.
**Civ. No. 07-00385 HG-BMK.**

Aug. 22, 2008.

**Background:** United States sought to have defendant civilly committed as "sexually dangerous person" under Adam Walsh Child Protection and Safety Act.

**Holdings:** The District Court, Helen Gillmor, Chief Judge, held that:

(1) defendant had engaged or attempted to engage in sexually violent conduct or child molestation, but

(2) defendant was not sexually dangerous to others.

So ordered.

West Headnotes

**[1] Mental Health 257A 454**

257A Mental Health
    257A IV Disabilities and Privileges of Mentally Disordered Persons
        257A IV(E) Crimes
            257Ak452 Sex Offenders
                257Ak454 k. Persons and Offenses Included. Most Cited Cases

Term "child molestation," as used in Adam Walsh Act, does not require showing of physical acts of violence, rather, term was intended to encompass broad variety of sexually exploitative acts directed at minors. 18 U.S.C.A. § 4247(a)(5).

**[2] Mental Health 257A 454**

257A Mental Health
    257A IV Disabilities and Privileges of Mentally Disordered Persons

            257A IV(E) Crimes
                257Ak452 Sex Offenders
                    257Ak454 k. Persons and Offenses Included. Most Cited Cases

United States demonstrated that defendant for which civil commitment was sought engaged or attempted to engage in sexually violent conduct or child molestation, as required to show that defendant was "sexually dangerous person" under Adam Walsh Act; incident where defendant exposed his genitals to 12-year old child, and for which he was convicted of fourth-degree sexual assault under Hawai'i law, constituted act of child molestation, as did defendant's prior acts of oral and anal sex with 15-year old child. 18 U.S.C.A. § 4247(a)(5); HRS § 707-730.

**[3] Mental Health 257A 454**

257A Mental Health
    257A IV Disabilities and Privileges of Mentally Disordered Persons
        257A IV(E) Crimes
            257Ak452 Sex Offenders
                257Ak454 k. Persons and Offenses Included. Most Cited Cases

United States failed to demonstrate that defendant for which civil commitment was sought was sexually dangerous to others, as required to show that defendant was "sexually dangerous person" under Adam Walsh Act; extent of defendant's hebephilia did not constitute serious mental disorder, and there was no showing that defendant would have serious difficulty in refraining from sexually violent conduct or child molestation if released. 18 U.S.C.A. § 4247(a)(5, 6).

**\*1146** Helen H. Hong, U.S. Department of Justice, Washington, DC, Lawrence L. Tong, Office of the United States Attorney, Honolulu, HI, for Petitioner.

Pamela J. Byrne, Office of the Federal Public Defender, Honolulu, HI, for Respondent.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND DECISION

HELEN GILLMOR, Chief Judge.

### I. INTRODUCTION

On July 27, 2007, Petitioner United States of America initiated this proceeding, seeking to have respondent Jay Abregana ("Abregana") civilly committed as a "sexually dangerous person" under section 302(4) of the Adam Walsh Child Protection and Safety Act, Pub.L. No. 109-248, Title III, § 302(4), 120 Stat. 620 (July 27, 2006), codified at 18 U.S.C. § 4248 ("the Adam Walsh Act"). Under 18 U.S.C. § 4247(a)(5), " 'sexually dangerous person' means a person who has engaged or attempted to engage in sexually violent conduct or child molestation and who is sexually dangerous to others [.]" A person is "sexually dangerous to others" if he suffers from a serious mental illness, abnormality, or disorder, as a result of which he would have "serious difficulty in refraining from sexually violent conduct or child molestation if released." 18 U.S.C. § 4247(a)(6).

To order such commitment, the Court must conclude, after an evidentiary hearing at which the government bears the burden of proof by clear and convincing evidence, that an individual is a sexually dangerous person as defined by the Adam Walsh Act. If a court finds that the government has satisfied that burden, the individual must be committed to a suitable facility for mental treatment until he is *1147 determined to no longer be sexually dangerous to others. 18 U.S.C. § 4248(d).

Abregana filed five motions challenging the constitutionality of the Adam Walsh Act. The Court rejected the challenges by an Order filed contemporaneously with this decision.

Pursuant to 18 U.S.C. § 4247(d), the Court conducted an evidentiary hearing in this matter on June 23-26, 2008. The Court heard the testimony of Dennis M. Doren, Ph.D., an expert retained by the

United States, and of Luis Rosell, Psy.D. and Howard E. Barbaree, Ph.D., experts retained by Abregana. The Court also received various exhibits in evidence, including the assessment reports of Drs. Doren, Rosell and Barbaree, their *curriculum vitae*, their scoring sheets on risk actuarial instruments, and various records concerning Abregana's criminal record, past criminal conduct, and revocations of supervised release.

At the conclusion of the hearing, the Court took the matter under advisement, and the parties were authorized to submit proposed findings of fact and conclusions of law. The parties' submissions have now been filed and reviewed by the Court.

The Court having considered the foregoing evidence, makes the following findings of fact, conclusions of law, and decision. To the extent any findings of fact are more properly characterized as conclusions of law, or any conclusions of law are more properly characterized as findings of fact, they shall be so construed.

The Court finds it has not been proven by clear and convincing evidence that Abregana is a sexually dangerous person who would have serious difficulty in refraining from committing acts of child molestation, if released, pursuant to 18 U.S.C. § 4248(d). He is therefore discharged.

### II. FINDINGS OF FACT

A. Abregana's Criminal Record, the Prior Revocations of Supervised Release, and the Federal Bureau of Prisons Certification

1. Abregana was born on * */* */1970, and was 38 years of age at the time of the evidentiary hearing. Ex. 1.[FN1]

> FN1. In accordance with the court's privacy rules, the month and date of Abregana's birth have been redacted.

2. On November 25, 2000, Abregana exposed his genitals to a 12 year old boy in a movie theater in Hilo, Hawaii. Ex. 14, at bates stamp no. 697. Abregana saw the boy and some of his family at the theater. Abregana asked whether the boy wanted to sit with him, and the boy agreed. *Id.* at 699. While sitting with the boy, Abregana exposed his penis, and used his vibrating pager to stimulate himself. The boy's aunt reported the incident to the Hawaii County Police Department. *Id.* at 698. At that time Abregana was initially charged with an offense, but the charge was dismissed without prejudice when authorities were unable to locate him for service of the complaint. *Id.* at 696.

3. On February 27, 2001, Abregana sent sixteen diskettes containing child pornography to an undercover United States postal inspector. Ex. 1, p. 5. The diskettes were found to contain 221 images of prepubescent, adolescent and what appeared to be teenaged boys engaged in sexually explicit conduct. *Id.* On August 28, 2001, postal inspectors executed a search warrant at Abregana's residence. The postal inspectors recovered diskettes, including five diskettes which contained child pornography. The images recovered included **1148** thirteen images of Abregana engaged in oral copulation with a 15 year old boy. *Id.*

4. Abregana was arrested by postal inspectors on August 28, 2001, and has been in custody, or on supervised release, since that date. Ex. 1, p. 1; *see also* Transcript of Proceedings ("Tr.") 6/24/08 at 140.

5. On September 12, 2001, a federal grand jury returned an indictment charging Abregana with one count of transporting child pornography, and one count of possessing child pornography, violations of 18 U.S.C. §§ 2252(a)(1) and (a)(4). Ex. 1, p. 3. On November 5, 2001, Abregana pled guilty to the charge of transporting child pornography, pursuant to a plea agreement under which the possession charge was dismissed. *Id.* On March 25, 2002, the Court sentenced Abregana to 44 months of imprisonment, to be followed by a term of supervised release of three years. Ex. 2, pp. 2-3.

6. On May 1, 2002, Abregana pled *nolo contendere* to a charge of sexual assault in the fourth degree, a violation of Hawaii Revised Statutes § 707-733, a misdemeanor. Ex. 14, at bates stamp no. 694. Abregana was in federal custody at the time, but was brought before a Hawaii state court pursuant to a writ of *habeas corpus ad prosequendum* for purposes of entering the plea. *Id.*, pp. 12-16. The charge grew out of the November 25, 2000, incident in which Abregana exposed himself to a 12 year old boy. Abregana was sentenced to one year in jail, to run concurrently with the federal sentence imposed for the transportation of child pornography. *Id.*, at bates stamp no. 694; Ex. 11 at pp. 1-2.

7. Following the sentence in the child pornography case, Abregana was transferred to Butner Federal Correctional Institution ("FCI"), a Bureau of Prisons ("BOP") facility which offers a sex offender treatment program. Respondent disputes whether he was in the treatment program when he was expelled but the Court does not agree. The documentation from the facility confirms that he was expelled from the sex offender treatment program on November 4, 2002 as a "treatment failure." Ex. 15; Tr. 6/23/08 at 96-98. The expulsion was based on incidents where Abregana performed fellatio on five inmates. *Id.* The Court finds the testimony of Dr. Rosell about this incident credible. He was the only testifying examiner in this proceeding who interviewed Abregana, and he reports that Abregana admitted performing these sex acts as a means of being transferred out of Butner FCI and its sex offender treatment program. Tr. 6/24/08 at 152-54. Abregana was returned to the Federal Detention Center in Honolulu, Hawaii, where he served the remainder of his sentence. *Id.* at 154.

8. On November 30, 2004, Abregana was released from custody, and began his three year term of supervised release. Ex. 3, bates stamp 120. Under the conditions of his supervised release, Abregana was required to submit to drug testing, participate in a

sex offender assessment and treatment program, and answer questions from the Probation Office truthfully, and was prohibited from having any contact with a minor under the age of 18 years without the approval of the Probation Office. Ex. 2, pp. 3-4.

9. On June 14, 2005, the Court revoked Abregana's term of supervised release based on various violations of his conditions of release. The Court sentenced Abregana to 20 months in jail, to be followed by a second term of supervised release of 16 months. Ex. 4, pp. 3-4. The violations underlying the revocation included Abregana's failure to report for drug testing on four occasions, and his failure to report for sex offender treatment on one occasion. *Id.*, p. 2. Abregana also admitted that he had sexual contact with a minor in April 2005. The circumstances surrounding*1149 the sexual contact with the minor were as follows:

a. On April 9, 2005, a United States probation officer saw Abregana loitering at the men's bathroom at the center stage area of the Ala Moana Shopping Center in Honolulu, Hawaii. The probation officer saw Abregana stand in front of the stalls, look into the stalls, and enter the stalls periodically. The probation officer found the activity suspicious, and reported it to mall security personnel. Ex. 3, bates stamp nos. 122-23.

b. When later confronted by a probation officer about this behavior, Abregana denied engaging in any inappropriate behavior. After consultation with Abregana's sex offender therapist, Abregana was instructed to take a polygraph examination. Abregana underwent the examination, and was asked whether he had been alone with a minor, or had sexual contact with a minor. Abregana answered negatively to both questions, and was found by the polygraph examiner to be deceptive. Ex. 3, bates stamp no. 123.

c. Following the polygraph examination, Abregana admitted to the probation officer that he had engaged in the behavior prohibited by his terms of supervised release. Abregana admitted

that, in April 2005, he had met a 17 year old minor near the center stage at Ala Moana shopping center. According to Abregana's initial report to the probation officer, the minor had touched his (Abregana's) penis through his clothing. A week later, Abregana met the minor again, and the two of them went to the Neiman Marcus men's room, where Abregana masturbated the minor's penis. Ex. 3, bates stamp no. 123. (On April 28, 2008, as part of a psychological assessment in this civil commitment matter, Abregana was interviewed by Dr. Rosell, and admitted that the encounter involved oral sex with the minor. Tr. 6/24/08 at 158.)

10. On November 17, 2006, Abregana was released from custody, and began a second term of supervised release. Ex. 5, bates stamp no. 133. Under the conditions of his supervised release, Abregana was required to submit to drug testing, and was prohibited from possessing a computer, from viewing pornography, and from having any kind of contact with children under the ages of 18 years. Ex. 4, pp. 4-5.

11. On April 12, 2007, the Court revoked Abregana's term of supervised release based on several violations, and sentenced him to a term of imprisonment of four months. Ex. 6. The violations included Abregana's failure to appear for drug testing, his possession of a computer, his viewing of pornography, and his contact with three minors through e-mail communications. The facts concerning the contact with minors (and which Abregana admitted) were as follows:

a. In March 2007, Abregana obtained possession of a laptop computer, and used it for e-mail access. Ex. 5, bates stamp no. 134.

b. E-mails in Abregana's account contained 39 photos of nude males, 24 of which were sexually explicit. *Id.*

c. Abregana created a profile in www.buddiespace.com, claiming to be 14 years of age,

and using someone else's photograph. On March 21, 2007, Abregana sent e-mails to three boys whose profiles said they were 10, 12 and 14 years of age. In the e-mails, Abregana asked about their interests, whether the boys had girlfriends, and whether they could send photographs of themselves. *Id.*, bates stamp nos. 134-35.

12. Just prior to the completion of his federal sentence on July 20, 2007, the BOP certification review panel certified Abregana*1150 as a "sexually dangerous person" in accordance with the provisions of the Adam Walsh Act, 18 U.S.C. § 4248(a). The BOP certification indicated that Abregana was then in custody at the Federal Detention Center in Honolulu, Hawaii, serving his sentence for the supervised release revocation. Upon receipt of the certification, the United States Attorney's Office for the District of Hawaii filed this action, seeking this Court's determination that Abregana is a sexually dangerous person as defined by the Adam Walsh Act. As a result of the certification, Abregana's release was stayed, and he has remained in BOP custody pursuant to 18 U.S.C. § 4248(a).

13. The Court finds that the information that is not in dispute as to Abregana's prior criminal conviction and his behavior while on supervised release provided probable cause for his being held while the parties prepared for the hearing to determine if Abregana was a sexually dangerous person requiring civil commitment.

### B. *Abregana's Mental Disorder*

14. The evaluators in this case were provided with a variety of records concerning Abregana's criminal record and offenses, his violations of supervised release, his progress during sex offender treatment, and his institutional adjustment while incarcerated. At the evidentiary hearing, the Court heard testimony from Drs. Doren, Rosell and Barbaree concerning whether Abregana met the statutory criteria for civil commitment under the Adam Walsh Act.[FN2] The parties did not challenge the qualifica-

tions of any of these three individuals to conduct a psychological assessment of Abregana, or to opine on whether he meets the criteria for confinement under the Adam Walsh Act. The Court having reviewed the *curriculum vitae* of Drs. Doren, Rosell and Barbaree, and having heard their testimony, finds that each such individual was qualified by education and experience to offer expert testimony in this matter.

> FN2. On September 24, 2007, the Court appointed Carol Tyler, Psy.D, to examine Abregana to determine whether he met the commitment criteria under the Adam Walsh Act. Dr. Tyler thereafter submitted a report and supporting data to the court and the parties. Dr. Tyler was not called to testify at the evidentiary hearing, however, and her reports were not offered in evidence. The Court therefore did not consider Dr. Tyler's report in making these findings of fact, conclusions of law, and decision.

15. Based on the information available to him, Dr Doren formed the diagnostic impression that Abregana has the mental disorder of Paraphilia, Not Otherwise Specified ("NOS"). Tr. 6/23/08 at 70-73. Under the Diagnostic and Statistical Manual, Volume IV, Text Revision (DSM-IV-TR), a paraphilia means that (1) the person experiences recurrent and intense fantasies, urges and/or behavior involving sexual arousal to something other than consenting adult sexuality, (2) the condition has existed for a period of at least six months, and (3) it causes subjective distress or impairment in social or occupational functioning. Ex. 7, p. 7, Ex. 12, p. 1. The DSM-IV-TR lists specific, individually delineated diagnoses that fall under the major category of paraphilias. Some of the specifically delineated paraphilias include pedophilia (sexual arousal to prepubescent children); sexual sadism (arousal caused by the infliction of pain) and voyeurism (arousal caused by peeping at strangers). At the end of the diagnostic category, DSM-IV-TR provides for the diagnosis of paraphilia NOS, 302.9, which

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

applies to paraphilias that are not specifically identified. Tr. 6/23/08 at 81-83; Ex. 12, p. 576.

16. In this case, Dr. Doren diagnosed Abregana as having hebephilia, a paraphilia involving sexual arousal to post-pubescent**1151** adolescents; i.e., teenagers or minors having secondary sex characteristics. Tr. 6/23/08 at 73. Dr. Doren concluded that this condition was causally related to Abregana's history of sexual offenses, and also a causal factor for any difficulty which he has from refraining from sexual reoffending. Ex. 7, p. 7.

17. In his report, and during his testimony, Dr. Doren cited information which supported the foregoing diagnosis. Ex. 7, pp. 8-10; Tr. 6/23/08 at 79-87. Broken down into sexual fantasies, sexual urges and sexual behaviors, three of the possible types of characteristics of a paraphilia under the DSMIV-TR criteria, the information cited by Dr. Doren included the following:

    a. *Sexual fantasies.* Abregana made statements to an examiner on January 10, 2007, resulting in a report stating that he usually fantasized about sexual contact with a minor boy named "D" [FN] or his ex-girlfriend, and that he was sexually attracted to both males and females, but was particularly interested in adolescent boys. Abregana had consistently referred to "D" as his boyfriend. Abregana had consistently admitted to examiners having a relationship with "D" while "D" was between 13-15 years of age, and Abregana was 29-31 years of age. Abregana also acknowledged that he and "D" had a sexual relationship which began at least by the time the boy was 15 years old. (The Court notes that Dr. Rosell later corroborated this evidence, testifying that Abregana admitted to him that he had engaged in oral and anal sex with "D" when the boy was 15 years old.) Abregana was also recorded in an interview as being attracted to young boys, and said he would fantasize about them when he saw them in public places. Ex. 7, p. 8; Tr. 6/23/08 at 80-81.

    [FN] Consistent with the court's privacy rules, the minor will be referred to only by his first initial.

b. *Sexual urges:*

    i. On November 29, 2006, Abregana was administered an instrument called the Abel Assessment of Sexual Interests ("AASI"). The results indicated that Abregana's primary attraction was to adolescent females, and his secondary attraction was to adolescent males. These results differed from those obtained during a December 31, 2004 AASI test, where Abregana showed an interest in both adults and adolescents, with his primary interest being in adults. Dr. Doren regarded the 2006 results as being more significant, as they were more recent findings. Ex. 7, p. 8; Tr. 6/23/08 at 81-83.

    ii. On February 2, 2001, Abregana sent an e-mail to an undercover postal inspector in the child pornography investigation leading up to his 2002 conviction. Abregana said he had seen the agent's message in the "underaged preteen sex club," and that, "I have the same interests as you[.]" Ex. 7, p. 8, Tr. 6/23/08 at 81-82.

    iii. In a different e-mail on February 2, 2001, Abregana said he had thousands of pictures of persons "ages 8-14." Ex. 7, p. 9; Tr. 6/23/08 at 81-82.

    iv. On February 9, 2001, Abregana asked the inspector, "You don't [sic] have anything in the age ranges 12-14, do you?" Ex. 7, p. 8, Tr. 6/23/08 at 82.

    v. On August 28, 2001, during the execution of a search warrant of Abregana's residence, postal inspectors recovered computer disks containing 57 images of prepubescent, adolescent and teenage-appearing boys engaged in sexual activity. Tr. 6/23/08 at 85.

**1152** c. *Sexual behaviors:*

i. While 30 years old, Abregana exposed his penis to a 12 year old boy in a movie theater, which resulted in a criminal conviction. Ex. 7, p. 9; Tr. 6/23/08 at 83.

ii. Abregana acknowledged his prior relationship with "D," starting from when the boy was 12 or 13, and continuing until age 15 or 16. Ex. 7, p. 9; Tr. 6/23/08 at 83-84. (Dr. Rosell testified that, based on a review of available records, he concluded that "D" was not the same boy to whom Abregana exposed himself in the theater in 2000. Tr. 6/24/08 at 145-48.)

iii. On January 10, 2007, Abregana admitted to an examiner that in 2004 he had sexual contact with males, some of whom may have been under the age of 18. As Abregana was not released from custody until November 30, 2004, these reported sexual contacts occurred within one month of his release, in spite of a condition of supervised release which prohibited contact with children under the age of 18. Ex. 7, p. 9; Tr. 6/23/08 at 86.

iv. In April 2005, while on the same term of supervised release, Abregana had sexual contact on two occasions with a 17 year old boy. Ex. 7, p. 9. This contact constituted one of the violations which caused Abregana to be sent back to prison. Tr. 6/23/08 at 86.

v. While on a later term of supervised release, Abregana obtained a computer, and had electronic contact with three boys who were 10, 12 and 14 years of age. Abregana had this contact while using a profile which claimed that he was 14 years old, and contained a photograph of someone else. These acts also constituted violations of his term of supervised release, and led to a return to prison. Ex. 7, pp. 9-10; Tr. 6/23/08 at 86-87.

18. Dr. Doren found that some of the evidence could be interpreted as supporting a diagnosis of pedophilia. The DSM-IVTR identifies as pedophilia as involving arousal to prepubescent children, typ-

ically under the age of 13 years. Ex. 7, p. 10. Dr. Doren opined, however, that Abregana's interests were more consistent with a problematic sexual interest in adolescents than with a specific interest in prepubescent children. *Id.* Dr. Doren was unwilling to presume that the 10-12 year olds in whom Abregana had expressed interest were prepubescent, i.e., lacked secondary sex characteristics. Dr. Doren thus opined that the diagnosis of paraphilia NOS i.e., hebephilia, was more accurate for Abregana, particularly as he both exposed himself to a 12 year old boy, and had sexual contact with 15 and 17 year old boys. Tr. 6/23/08 at 91-92. Dr. Doren based his opinion in part on Abregana's history, which showed he was "not really discriminating in that sense," and that "all of the ages are good enough." *Id.* at 70-71.

19. Dr. Doren testified that the foregoing sexual urges, fantasies and behavior have caused Abregana significant distress or impairment in social, occupational or other important areas of functioning. Tr. 6/23/08 at 87-88; Ex. 12, p. 1. The behavior has caused Abregana to be incarcerated on three occasions. In addition, hebephilic individuals are interested in relationships with adolescents, who by definition grow to become adults in a few years. As a relationship with an adolescent is necessarily time limited, Dr. Doren opined that Abregana suffers from an impairment in his ability to maintain intimacy with anyone. Tr. 6/23/08 at 88.

20. Dr. Doren testified that Abregana's mental disorder is serious, both because it has caused him significant problems and has been treatment resistant. Tr. 6/23/08 *1153 at 95; Tr. 6/24/08 at 81. Neither of the other experts, Dr. Rosell and Dr. Barbaree consider Abregana to suffer from a serious mental disorder.

21. Dr. Doren noted that Abregana has been in sex offender treatment programs three times, once at Butner FCI and twice while on supervised release. Abregana was expelled from Butner FCI's program because he had sexual contact with inmates, and he twice had his supervised release revoked for vari-

ous violations including having sexual or other prohibited contact with minors. *Id.* at 96. As a result, Dr. Doren concluded that Abregana's "investment in treatment has been minimal[.]" *Id.*

22. Dr. Luis Rosell, one of Abregana's retained experts, disputed Dr. Doren's diagnosis. In Dr. Rosell's opinion Abregana has an adult antisocial behavior, a "V-code" under the DSM-IV-TR, rather than a mental disorder. Tr. 6/24/08 at 98-99. Dr. Rosell agreed that Abregana has an attraction to adolescents, but testified that hebephilia is not listed as a sexual deviance in the Diagnostic and Statistical Manual of Mental Disorders (DSMIV-TR) or in some other important literature in the field. *Id.* at 99-103.

23. According to Dr. Rosell's diagnosis Mr. Abregana has a limited nonsexual criminal history, an adequate work history and no significant substance abuse problem. Dr. Roswell believes Abregana does not meet the criteria for pedophilia or any paraphilia, and that there is no evidence of a personality disorder that would predispose Abregana to future acts of sexual violence or result in serious difficulty refraining from sexually violent conduct or child molestation.

24. Dr. Howard Barbaree, Abregana's other retained expert, agreed with Dr. Doren's diagnosis of hebephilia. Tr. 6/25/08 at 32, 24. Dr. Barbaree testified that hebephilia is known in the field as indicating a sexual interest in post-pubescent individuals. *Id.* at 35. Dr. Barbaree noted there is controversy over whether hebephilia is a valid diagnosis. While hebephilia is not included in the DSM-IV-TR, Dr. Barbaree agreed that there are authorities in the field who consider it a mental disorder, and that it has been part of the literature for a number of decades. *Id.* at 36-37. Dr. Barbaree agreed that he coauthored a chapter in a text which characterizes hebephilia as a mental disorder. *Id.* at 37.

25. While he agreed in part with Dr. Doren's diagnosis, Dr. Barbaree testified that the degree of pathology of hebephilia is much less than that of

other paraphilias, such as pedophilia or sexual sadism. According to Dr. Barbaree, "in the broad spectrum of individuals who suffer from a paraphilia, hebephiles would be among the less serious of them." Tr. 6/25/08 at 40. Dr. Barbaree acknowledged, however, that Abregana has acted upon his sexual interest in adolescents, and thus has shown "more serious involvement in that sexual interest." *Id.* at 38, 82.

26. Dr. Barbaree's actuarial assessment found that Mr. Abregana is below "average" among sex offenders included in research samples described in the scientific literature in terms of his risk for recidivism.

27. Based on his review of the documents listed at the beginning of his report, and based on his actuarial assessment of Mr. Abregana, Dr. Barbaree does not believe that Mr. Abregana meets the criteria for civil commitment in the Adam Walsh Act (18 U.S.C. §§ 4247 and 4248).

28. The Court having considered the foregoing testimony, as well as the supporting documentation, finds that Abregana suffers from the mental disorder of paraphilia NOS within the meaning of the DSM-IV-TR. The Court further finds **\*1154** that Abregana's specific paraphilia is hebephilia, which involves an intense arousal to adolescents. In Abregana's case, there is controversy among the experts whether the mental disorder is "serious." It is true it has caused significant distress and impairment in his life, but the Court cannot conclude it has been proven by clear and convincing evidence that his condition reaches a level of serious mental disorder.

*C. Abregana Has Not Been Proven to Have "Serious Difficulty In Refraining From" Sexually Reoffending*

29. Dr. Doren also conducted an assessment of whether Abregana's mental disorder of hebephilia would cause him "serious difficulty in refraining

from sexually violent conduct or child molestation" if released. Dr. Doren began his analysis by using risk assessment instruments which employ an actuarial method for estimating a person's degree of sexual recidivism risk. The instruments reflect a set of risk factors known to correlate with recidivism, and the scoring is used to develop probability statements about the likelihood of reoffending. Tr. 6/23/08 at 102-3.

30. Dr. Doren used three different risk assessment instruments: (a) the Rapid Risk Assessment for Sexual Offense Recidivism (RRASOR); (b) the Static-99, and (3) the Minnesota Sex Offender Screening Tool-Revised (MnSOST-R). Based on the evidence produced by the parties, the Court describes the three instruments as follows:

a. The RRASOR consists of four items concerning a person's prior sex offenses, his age, whether he has had a male victim, and whether he has had a victim outside of his family. Tr. 6/23/089 at 104-5. The scale goes from 0-6, with higher numbers representing a greater risk of recidivism. *Id.* at 106-7. A score of 6 is extremely rare, and was not found to exist in the developmental study. *Id.* at 107.

b. The Static-99 is a brief actuarial instrument designed to estimate the probability of sexual and violent recidivism among adult males who have been convicted of at least one sexual offense against a child or non-consenting adult. Ex. 9, p. 20. The Static-99 combines the four items on the RRASOR with six other items from a different instrument. *Id.*; Tr. 6/23/08 at 111-12; Ex. 7B, p. 3. The scoring on the Static-99 ranges from 0-12, with 12 at the high end of risk, although no one has been known to score a 12. Ex. 7, p. 12.

c. The MnSOST-R was developed in Minnesota to provide for a formal and uniform process to identify high-risk sex offenders at the time of their release from prison. Ex. 9, p. 22. The screening tool consists of 16 questions. Ex. 7B, pp. 4-5.

31. Dr. Doren assigned Abregana a score of 4 on the RRASOR. Tr. 6/23/08 at 107. This score translates into recidivism rates of 32.7 and 48.6 percent in five and 10 years, respectively. Ex. 7B, p. 2. Dr. Doren is aware of one study which has considered the recidivism rates associated with RRASOR scores beyond 10 years. That study indicated that a RRASOR score of 4 was associated with a 57 percent recidivism rate in 17 years. Tr. 6/23/08 at 109. These rates represent the rates by which offenders were *reconvicted* for new sexual offenses after being released. Tr. 6/23/08 at 108. Dr. Doren also testified about the *rearrest* rate for offenders, but the Court does not believe that rearrest is sufficiently probative that it should be considered in the analysis conducted by the Court.

32. Dr. Doren gave Abregana a score of 5 on the Static-99. Ex. 7A, p. 1; Ex. 7B, p. 3. Based on the original developmental**1155** study, this score statistically corresponds with a 33, 38 and 40 percent likelihood of Abregana being *reconvicted* for a new sex offense within five, ten and 15 years of his release. Ex. 7, p. 12; Tr. 6/23/08 at 117-18.

33. Dr. Doren gave Abregana a score of +6 on the MnSOST-R scale. Ex. 7, p. 12; Tr. 6/23/08 at 118. This score put Abregana in the medium risk category under the scale. *Id.* at 134.

34. Due to the differences of opinion on how to treat certain information, Dr. Rosell and Dr. Barbaree scored Abregana differently from Dr. Doren. Drs. Rosell and Barbaree gave Abregana a 3 on the RRASOR, versus the 4 assigned by Dr. Doren. Ex. J. Drs. Rosell and Barbaree gave Abregana a 3 on the Static-99, as opposed to the score of 5 assigned by Dr. Doren. Ex. I.

35. Drs. Doren, Rosell and Barbaree agreed on the scoring of nine of the 10 items on the Static-99, and three of the four items on the RRASOR. Tr. 6/23/08 at 128. The sole item on which they disagreed was on the scoring of Abregana's "prior sex offenses." Tr. 6/24/08 at 168-70. In calculating Abregana's prior sex offenses, the evaluators were required to

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

determine the "index offense" for purposes of the instruments. The Static-99 Coding Rules (Revised 2003), which are also applicable to the RRASOR, Tr. 6/23/08 at 128-29, provide, "[t]he Index offence is generally the most recent sexual offence ... [and] could be a charge, arrest, conviction, or rule violation." Ex. 7D, p. 18. The coding rules define "sexual offence" as follows:

For the purposes of a STATIC-99 assessment a sexual offence is an officially recorded sexual misbehaviour or criminal behaviour with sexual intent. To be considered a sexual offence the sexual misbehaviour must result in some form of criminal justice intervention or official sanction. For people already engaged in the criminal justice system the sexual misbehaviour must be serious enough that individuals could be charged with a sexual offence if they were not already under legal sanction.

Ex. 7D, p. 13. A "criminal justice intervention" includes a parole or probation violation. Id. Moreover, "[a]n offense need not be called 'sexual' in its legal title or definition for a charge or conviction to be considered a sexual offence." Id.

36. Applying the foregoing rules, Dr. Doren determined that the acts underlying Abregana's supervised release revocation in June 2005, constituted the index offense for purposes of Static-99 and RRASOR scoring. Dr. Doren testified the conduct met the coding criteria because: (a) it was officially recorded sexual behavior; (b) it resulted in a criminal justice intervention, namely, revocation of supervised release; (c) the conduct was serious enough that it could have resulted in a charge of lewdness under Hawaii state law; and (d) it was the most recent sex offense committed by Abregana. Using the April 2005, conduct underlying the June 2005, revocation as the index offense, Dr. Doren determined that Abregana had two prior convictions, namely, the 2001 conviction for transportation of child pornography, and the 2002 conviction for fourth degree sexual assault. These convictions resulted in a score of 2 on the prior sex offenses

item on the Static-99 and RRASOR.

37. Drs. Rosell and Barbaree did not consider the April 2005 conduct as a sex offense, and thus did not use it as the index offense for scoring purposes on the Static-99 and RRASOR. They instead considered the 2002 fourth degree sexual assault the index offense. Drs. Rosell and Barbaree further determined that the sexual assault conviction and the 2002 child pornography conviction formed a "cluster" *1156 of offenses, as a result of which Abregana had no prior sex offenses for purposes of the two instruments.

38. The Court having heard the conflicting testimony, and having reviewed the coding rules, the underlying evidence, and the demeanor of the witnesses, finds Dr. Doren's scoring on the Static-99 and RRASOR to be most persuasive. The Court finds that the April 2005, incidents leading to Abregana's supervised release revocation involved two encounters between Abregana and a 17 year old boy. The first encounter occurred at the men's restroom near center stage at Ala Moana Shopping Center. The second encounter occurred at the men's restroom in Neiman Marcus at Ala Moana Shopping Center. The encounters involved sexual contact which, by Abregana's admission, included oral sex. The Court finds that each of the encounters occurred in a public restroom, at a location where the activity might have been seen by others, and that the activities could have caused others to be affronted or alarmed. The Court thus finds that the conduct could have resulted in a charge under Hawaii Revised Statutes § 712-1217, which provides:

Open Lewdness. A person commits the offense of open lewdness if in a public place the person does any lewd act which is likely to be observed by others who would be affronted or alarmed.

The Court notes that, under the Static-99 and RRASOR scoring rules, the only question is whether such an offense "could" have been charged, not whether it was actually charged or whether it would have resulted in a conviction.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

39. Dr. Doren's scoring on the MnSOST differed from that of Drs. Rosell and Barbaree. While Dr. Doren had a score of +6, Dr. Rosell had a score of 0, and Dr. Barbaree a score of +1. The three evaluators agreed on 12 of the 16 items. Tr. 6/23/08 at 129-30. The difference in their scores was based on how they rated item 6 (whether Abregana had committed multiple acts on the single victim in a charged offense), item 9 (whether the victim of any sex offense was a stranger), item 10 (whether there was evidence of antisocial behavior while an adolescent), and item 14 (whether Abregana had been recommended for chemical dependency treatment). Ex. K. The conflicting testimony on the scoring of these items reflects the difficulty of evaluating Abregana's behaviors.

40. The Court finds the difference among the experts to be reflective of the difficulty of psychiatric diagnosis. As the United States Supreme Court states in *Addington v. Texas*, 441 U.S. 418, 99 S.Ct. 1804, 1811, 60 L.Ed.2d 323, "Psychiatric diagnosis, ... is to a large extent based on medical 'impressions' drawn from subjective analysis and filtered through the experience of the diagnostician. This process often makes it very difficult for the expert physician to offer definite conclusions about any particular patient." The Court sees value in the multiple opinions, pointing out the variation in analysis that can arise even when the facts are agreed upon.

41. Some examiners choose to interpret multiple findings by averaging them. Although Dr. Doren does not believe this to be the appropriate approach, an averaging of his results of the three risk instruments which he computed translates into a 29-30 percent rate of reconviction within five years, and a 41-43% risk of reconviction within ten years. Tr. 6/23/08 at 139-40; Ex. 7, p. 15. The ten year figures represent his calculation of the risk of reconviction. Dr. Doren's opinion also included calculations on the risk of rearrest. He incorporates both reconviction and rearrest figures in his analysis and concluded that Abregana "more probably

than not" will reoffend within ten years. *Id.* at 140.
*1157 The Court, as stated earlier, will not include rearrest statistics in its analysis of risk. The Court concludes that there is insufficient evidence upon which it can conclude that Abregana is more likely than not to reoffend within ten years.

42. Dr. Barbaree presented different calculations concerning the risk of recidivism. Dr. Barbaree used five, rather than three, risk instruments. In addition to the RRASOR, Static-99 and MnSOST-R used by Drs. Doren and Rosell, Dr. Barbaree used the Violence Risk Appraisal Guide (VRAG) and the Sex Offender Risk Appraisal Guide (SORAG). The VRAG is designed to measure the risk of violent recidivism. Tr. 6/25/08 at 85. The SORAG was developed as a modification of the VRAG, to assess the risk of violent offenses in sex offenders. *Id.* at 86-87. Dr. Barbaree considers it best to include these test results in order to predict the likelihood of recidivism on Abregana's part. Dr. Barbaree acknowledged, however, that there is literature indicating that no combination of risk instruments provides a consistent advantage over the predictive accuracy of the single best actuarial scale. Tr. 6/25/08 at 88-89. He further testified that only 8.8 percent of evaluators always use the VRAG, and 14.7 percent of evaluators always use the SORAG, for purposes of conducting civil commitment evaluations. *Id.* at 90-91. By contrast, more than half of the evaluators *never* use either the VRAG or SORAG in civil commitment evaluations.

43. The Court, having considered the testimony concerning the risk instruments, and the frequency with which they are employed, discounts the significance of the VRAG and SORAG results in this matter. The VRAG and SORAG are designed to measure violence, not sexual deviancy. As Abregana suffers from a sexual deviancy, and has no documented history of violence, the court finds that the inclusion of the VRAG and SORAG are not relevant.

44. Dr. Doren presented an alternative method of determining whether Abregana will sexually re-

Case 1:07-cv-12064-PBS   Document 93-2   Filed 02/05/09   Page 17 of 28

574 F.Supp.2d 1145
574 F.Supp.2d 1145
(Cite as: 574 F.Supp.2d 1145)

Page 12

offend. This method involves the use of an "interactive" approach which considers whether Abregana's ability to stop himself from reoffending is compromised in a way which is serious. Dr Doren looked to the BOP's definition of the Adam Walsh Act language concerning whether an individual has "serious difficulty in refraining from sexually violent conduct or child molestation if released." Under the BOP definition, found at 28 CFR § 439.75, an examiner is to consider, among other things, a person's inability to appreciate the wrongfulness, harmfulness or likely consequences of engaging in the proscribed behavior, the person's score on the risk assessment tools, evidence of a person's inability to control conduct, and evidence of completion of, or a failure to complete, a sex offender treatment program. Ex. 7 at pp. 4-5.

45. Applying the foregoing factors, Dr. Doren found that Abregana has never been recorded as considering the 15 year old boy with whom he had a sexual relationship to be a "victim." Ex. 7, at p. 17. Dr. Rosell, the only testifying expert who interviewed Abregana, reported that Abregana has come to see the minor he previously viewed as his boyfriend as some one he had hurt by his actions, and as someone he did not want to cause anymore harm. Tr. 6/24/08 at 180. Dr. Doren and Dr. Rosell came to different conclusions as to whether Abregana has shown attributes which suggest he would have difficulty avoiding sexual offending when living in the community. Ex. 7, p. 17.

46. All the experts believe a primary protective risk factor which would reduce Abregana's risk of reoffending is successful completion of a sex offender treatment *1158 program. Dr. Doren does not believe Abregana has received enough treatment to reduce his risk of recidivism. Research in the field suggests that persons who fail to complete sex offender treatment programs are associated with a higher recidivism risk than those persons who have never received any treatment. Tr. 6/23/08 at 144. Abregana told Dr. Rosell that he knows the basics of treatment, and presents a "zero" percent change

of reoffending. Dr. Doren believes persons who do not view themselves at risk often fail to take safeguards to protect against reoffending.

47. Dr. Barbaree testified that sex offender treatment is designed to reduce the likelihood of the commission of sexual crimes, and to teach offenders how to avoid risk and agreed that Abregana has not progressed far in treatment. Tr. 6/25/08 at 99-100. Dr. Barbaree testified, however, that he did not believe it was probable that Abregana would continue to do the acts he had done in the past. *Id* at 111-1.

48. The Court, having heard this testimony, finds that the interactive approach is helpful in measuring Abregana's risk of sexual recidivism, and may be considered in addition to the probability analysis previously discussed.

49. The Court, having considered all of the testimony and evidence including the expert reports and their conflicting diagnosis and prognosis, finds that Abregana has not been proven by clear and convincing evidence to be a sexually dangerous person who would have serious difficulty in refraining from committing acts of child molestation, if released.

### III. *CONCLUSIONS OF LAW*

1. Respondent Jay Abregana was in the custody of the BOP on July 20, 2007, when the BOP certified him to be a "sexually dangerous person" under 18 U.S.C. § 4248(a).

2. Petitioner United States has the burden of proving that Respondent Jay Abregana is a "sexually dangerous person" as defined by 18 U.S.C. § 4247(a)(5). In order to fall within the definition of "sexually dangerous person", Section 4247 requires two primary determinations: (1) that the person has engaged or attempted to engage in sexually violent conduct or child molestation; and (2) that the person is sexually dangerous to others. See 18 U.S.C. § 4247(a)(5). Under Section 4247(a)(6), defining

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

"sexually dangerous to others", the second determination requires two findings: (a) that the person "suffers from serious mental illness, abnormality, or disorder" and (b) as a result of the serious mental illness, abnormality, or disorder, the person "would have serious difficulty in refraining from sexually violent conduct or child molestation if released."

3. The meaning of the term "child molestation" is clear from the plain language of the statute and congressional intent. *See Tenuto Inc. v. United States*, 528 F.3d 703, 707 (9th Cir.2008). The term child molestation means any unlawful conduct of a sexual nature with, or sexual exploitation of, a person under the age of 18 years. Such a definition is consistent with the broad purpose underlying the Adam Walsh Act, which was to protect children from all forms of sexual exploitation. See preamble to Adam Walsh Act, P.L. 109-248, 120 Stat. 587 (July 27, 2006), codified at 42 U.S.C. § 16911.

[1] 4. Consistent with its July 8, 2008, Minute Order and the Order ruling on the Respondent's five Motions filed contemporaneously with this Order, the Court concludes that the term "child molestation" as used in the Adam Walsh Act does not require a showing of physical acts of violence, but that the term was intended to **\*1159** encompass a broad variety of sexually exploitative acts directed at minors.

[2] 5. In order to satisfy its burden, the United States must initially prove that Abregana "has engaged or attempted to engage in sexually violent conduct or child molestation." As set forth in the Court's Order filed contemporaneously with this decision, the Court need not reach the issue as to what burden of proof applies to this determination because, even if the higher "beyond a reasonable doubt" standard applies, the government has met that burden under the facts of this case. The Court concludes, as a matter of law, that the November 25, 2000 incident where Abregana exposed his genitals to a 12 year old boy, and for which he was convicted of fourth degree sexual assault under Hawaii state law, constituted an act of child mo-

lestation. The Court also concludes, as a matter of law, that Abregana's prior acts of oral and anal sex with a 15 year old, while Abregana was 30 or 31 years of age, constituted acts of child molestation. Such acts constituted first degree sexual assault under Hawaii Revised Statutes § 707-730 (criminalizing sexual penetration with a person between the ages of fourteen and sixteen years, if the offender is more than five years older, and not married to the victim).

[3] 6. With respect to the second required element, the United States must prove, by clear and convincing evidence, that Abregana is "sexually dangerous to others." The Court finds that the United States has not proven, by clear and convincing evidence, the two factors necessary to find that Abregana is "sexually dangerous to others."

7. The United States has not proven that Abregana "suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released." 18 U.S.C. § 4247(a)(6). The Court first considers evidence as to whether Abregana "suffers from a serious mental illness, abnormality, or disorder". The evidence shows that Abregana suffers from a mental disorder-"Paraphilia Not Otherwise Specified"-and that Abregana's specific paraphilia is hebephilia, which involves the sexual arousal to adolescents. Based on the evidence presented at the hearing, however, the Court does not find that the extent of Abregana's hebephilia constitutes a *serious* mental disorder. While in Dr. Doren's opinion, Abregana's mental disorder is serious, neither of the other two experts, Dr. Rosell and Dr. Barbaree, consider Abregana to suffer from a serious mental disorder. There is insufficient evidence that Abregana currently suffers from any other serious mental disorder. The Court cannot conclude that the United States has proven, by clear and convincing evidence, that Abregana's condition, while of great concern, is so serious that he will continue to reoffend.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

8. Even assuming that the United States had proven that Abregana suffers from a "serious mental illness, abnormality, or disorder", the Court finds that the United States has not proven, by clear and convincing evidence, that Abregana "would have serious difficulty in refraining from sexually violent conduct or child molestation if released." The United States Supreme Court precedent makes clear that the "serious difficulty" language does not require total or complete lack of control, but does require that it must be difficult, if not impossible, for the person to control his dangerous behavior. *See Kansas v. Crane,* 534 U.S. 407, 411, 122 S.Ct. 867, 151 L.Ed.2d 856 (2002) (citing *Kansas v. Hendricks,* 521 U.S. 346, 358, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997)). The conflicting evidence concerning the probability of Abregana's reoffending cannot support a finding that he would have "serious difficulty"**1160** in refraining from child molestation. These are difficult questions that require clearer and more convincing proof than is available in the circumstances before the Court.

9. The Court, having considered all of the testimony and evidence, including the expert reports and their conflicting diagnosis and prognosis, finds that the United States has not proven, by clear and convincing evidence, that Abregana would have serious difficulty in refraining from committing acts of child molestation.

The Court orders that Abregana be discharged.

IT IS SO ORDERED.

D.Hawai'i,2008.
U.S. v. Abregana
574 F.Supp.2d 1145

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# Exhibit C

1

```
1                    IN THE UNITED STATES DISTRICT COURT

2                       FOR THE DISTRICT OF HAWAII

3                                          )
     UNITED STATES OF AMERICA,             )  CV 07-00385 HG
4                                          )
              Petitioner,                  )  Honolulu, Hawaii
5         vs.                              )  June 25, 2008
                                           )  1:30 P.M.
6    JAY ABREGANA,                         )
                                           )  Further Evidentiary Hearing
7             Respondent.                   )
                                           )
8    _____)

9
                        TRANSCRIPT OF PROCEEDINGS
10                 BEFORE THE HONORABLE HELEN GILLMOR
                   CHIEF UNITED STATES DISTRICT JUDGE
11

12   APPEARANCES:

13   For the Government:          LAWRENCE L. TONG
                                  Office of the U.S. Attorney
14                                PJKK Federal Bldg.
                                  300 Ala Moana Blvd. Ste. 6100
15                                Honolulu, HI 96850

16   For the Respondent:         PAMELA J. BYRNE
                                  Office of the Federal Public
17                                Defender
                                  PJKK Federal Bldg.
18                                300 Ala Moana Blvd. Ste. 7104
                                  Honolulu, HI 96850
19
     Official Court Reporter:    Debra Kekuna Chun, RPR, CRR
20                                United States District Court
                                  300 Ala Moana Blvd. Ste. C285
21                                Honolulu, HI 96850
                                  (808) 534-0667
22

23

24
     Proceedings recorded by machine shorthand, transcript produced
25   with computer-aided transcription (CAT).
```

2

1                                    INDEX

2

3    EXAMINATION

4    Witness Name                                          Page

5    Howard E. Barbaree

6        Direct By Ms. Byrne .....................................  3

7        Voir Dire By Mr. Tong...................................  33

8        Cross By Mr. Tong.......................................  78

9        Re-Direct By Ms. Byrne................................  101

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

```
1    WEDNESDAY, JUNE 25, 2008              1:40 O'CLOCK P.M.
2              THE CLERK:  Civil 07-00385HG, United States of
3    America versus Jay Abregana.  This case is called for a Further
4    Hearing.
5              Appearances, please, Counsel, for the record.
6              MR. TONG:  Good afternoon, Your Honor.  Larry Tong
7    for the United States.  With me is Miss Ann Yuuki of our
8    office.
9              THE COURT:  Good afternoon.
10             MS. BYRNE:  Good afternoon, Your Honor.  May the
11   record note the presence of Mr. Abregana, along with
12   Miss Wright and Pamela Byrne.
13             THE COURT:  Good afternoon.
14             Okay.  And you have a witness on the stand.
15             MS. BYRNE:  Yes, we do.
16             THE COURT:  If you would rise, sir.  And if we could
17   have the witness sworn.
18        (Witness sworn.)
19             THE CLERK:  Please be seated.
20             State your full name, sir, and could you please spell
21   your last name for the record.
22             THE WITNESS:  Howard Errol Barbaree, B-a-r-b-a-r-e-e.
23                       DIRECT EXAMINATION
24   BY MS. BYRNE:
25   Q    What is your occupation?
```

1   characteristics.  That paraphilia is, of course, known as

2   pedophilia.

3           So I think -- now, I think it's important to note

4   here that there is a controversy in the field about the

5   diagnosis of hebephilia, whether there really is such a

6   diagnosis.  It's not included in the DSM.  Specifically,

7   there's no mention of hebephilia in the DSM, but there are some

8   authorities in the field who talk about this disorder, and it's

9   been part of the literature for a number of decades.

10          Part of the reason it's controversial, I think, is

11  that there is a widely recognized similar sexual interest in

12  the general population in individuals who are quite young,

13  below the age of consent in most jurisdictions, but who have

14  developed or are developing secondary sexual characteristics.

15  The fashion magazines and other displays in the media are, I

16  think, an indication of that.  So I think that in the

17  professional literature there's a controversy about whether

18  this is an actual mental disorder or whether it's a variation

19  in sort of normal responses or variation in normality.

20          MS. BYRNE:  Your Honor, may I question, or are you

21  continuing on?  Let me know when I can begin.

22          THE COURT:  Well, so your diagnosis is paraphilia and

23  also hebephilia.

24          THE WITNESS:  Hebephilia.  That's one diagnosis.

25  What I think Dr. Doren has done is taken the diagnosis that's

1    mentioned in the DSM: paraphilia not otherwise specified.

2    This is a category of diagnosis in the DSM that allows

3    clinicians to make a diagnosis when the individual symptoms

4    don't fit exactly the criteria for other diagnoses. And so

5    Dr. Doren has taken that diagnostic category from the DSM and

6    then added the descriptor hebephilia.

7            But it is true that hebephilia is a -- is a

8    paraphilia that's discussed in the literature, and there are

9    some authorities in the field that believe it's an actual

10   disorder.

11           THE COURT: Okay. You may inquire, Miss Byrne.

12    BY MS. BYRNE:

13   Q   And your feeling is what? Is it an actual disorder or

14   not?

15   A   Subject to being hoist by my own petard here because I've

16   just -- I just was reading the other night a chapter that I'd

17   written with some colleagues, and in a section that I didn't

18   write but my colleagues did there is an argument for the

19   hebephilia being an actual disorder.

20           I honestly think that it's questionable whether it's

21   a real disorder. There is quite a prevalent interest in the

22   general population in this age group of individuals. We've

23   done, and I've published in the past, studies where we've

24   tested volunteers from the general population in their sexual

25   responses to individuals of that age range, and you get -- a

1    significant proportion of the general population show

2    significant responses. So I guess I'd argue that it's -- it is

3    a descriptive term that can be applied to a particular sexual

4    interest. Whether it constitutes a mental disorder or not, I'm

5    not sure.

6           And I would say in comparing the seriousness of

7    hebephilia with other paraphilias -- for example, comparing it

8    with pedophilia or sexual sadism -- it's seriousness -- it's --

9    the degree of pathology is much less than with the other

10   paraphilias.

11   Q    As applied -- Dr. Doren testified that, somewhat similar

12   to you, that there is a segment of the population that are

13   non-offenders that are attracted to adolescents, but in

14   Mr. Abregana's case he had it to a degree that was

15   pathological. What is your opinion on that?

16   A    I suppose that you could make the argument that there may

17   be significant numbers of individuals in the general population

18   who have a sexual interest in individuals in that age range but

19   who never act on it. Mr. Abregana has and so, therefore, that

20   would indicate a more serious -- more serious involvement in

21   that sexual interest.

22   Q    When you compare pedophilia with hebephilia, do you have

23   an opinion as to which are more likely to be seriously harmed

24   if there is an offense -- offender -- if they're offended

25   against?

```
1            THE COURT:  What are you talking about?
2            MS. BYRNE:  Pardon?
3            THE COURT:  Who's being harmed?
4            MS. BYRNE:  That's the question.
5      Q    Oh, what do you consider a pedophilia -- a person -- what
6      age --
7            THE COURT:  Well, I don't understand your question
8      and I raise -- I say that because your question -- I'm not sure
9      who you're talking about being harmed.
10           You stand, Mr. Tong, and you wanted to say something?
11           MR. TONG:  I was just going to object to the
12     relevance since nobody's diagnosed him as being a pedophile.
13           THE COURT:  I think that's a good point, and I think
14     that your question is confusing and you may want to think for a
15     moment before you form another question.
16     BY MS. BYRNE:
17     Q    On this broad sprec--- sorry.  Broad spectrum of
18     paraphilias and sexual offenders, do you place hebephilia above
19     or below other paraphilias?
20     A    Thank you for the question.  And I think going back to the
21     act itself where we're talking about the seriousness of a
22     mental abnormality, this issue becomes kind of central.
23     Comparing pedophilia with hebephilia, hebephilia is --
24           THE COURT:  I think we just didn't compare -- would
25     you say what you said again.
```

1          THE WITNESS:  I think going back to the act, the act

2    requires that we consider the seriousness of hebephilia.  And

3    it seems to me you can only consider the seriousness of

4    hebephilia in relation to other diagnoses that might be applied

5    to individuals in this class.  So I understand --

6          THE COURT:  I've got to stop you because I think

7    you're not being responsive to the question, and I am

8    interested in the question.  And in terms of the task that I

9    have before me the question in this broad spectrum of

10   paraphilia and sexual offenders who you place in hebephilia, do

11   you place them above or below other paraphiliacs?  Nothing

12   about pedophilia.

13         THE WITNESS:  Okay.  In the broad spectrum of

14   individuals who suffer from a paraphilia, hebophiles would, in

15   my view, be amongst the less serious of them.

16   BY MS. BYRNE:

17   Q    I'd like to change our topic and go back to the risk

18   assessment, and I'd like -- we had a discussion yesterday about

19   base rates which was really confusing.  I'm wondering if you

20   can, in a sentence or two, define what base rates are and why

21   they're important for the judge to understand.

22   A    Sure.  Thank you.  A base rate is very simple, I think, to

23   explain.  If we were to consider all of the sex offenders who

24   are incarcerated or have been incarcerated in Hawai'i, and we

25   look -- we follow them after their release from detention and