```
 1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MASSACHUSETTS
 2
      * * * * * * * * * * * * * *
 3    UNITED STATES OF AMERICA      *
                                    *
 4              vs.                  *        CIVIL ACTION
                                    *        No. 07-12064-JLT
 5    TODD CARTA                     *
                                    *
 6    * * * * * * * * * * * * * *
```

```
 7              BEFORE THE HONORABLE JOSEPH L. TAURO
                    UNITED STATES DISTRICT JUDGE
 8                           DAY TWO
                          NONJURY TRIAL
 9
      A P P E A R A N C E S
10
                OFFICE OF THE UNITED STATES ATTORNEY
11              1 Courthouse Way, Suite 9200
                Boston, Massachusetts 02210
12              for the United States
                By:  Eve A. Piemonte Stacey, AUSA
13                   Jennifer C. Boal, AUSA

14

15              FEDERAL DEFENDER OFFICE
                408 Atlantic Avenue, Suite 328
16              Boston, Massachusetts 02210
                for the defendant
17              By:  Page Kelley, Esq.
                     Ian Gold, Esq.

18

19
                                    Courtroom No. 22
20                                  John J. Moakley Courthouse
                                    1 Courthouse Way
21                                  Boston, Massachusetts 02210
                                    February 10, 2009
22                                  10:10 a.m.

23
                       CAROL LYNN SCOTT, CSR, RMR
24                        Official Court Reporter
                       One Courthouse Way, Suite 7204
25                      Boston, Massachusetts 02210
                            (617) 330-1377
```

1                              **I N D E X**

2

**WITNESS:**            **DIRECT**   **CROSS**   **REDIRECT**   **RECROSS**

3

4   AMY PHENIX, Resumed

5    By Ms. Boal         4(Con't.)              63
     By Mr. Gold                    36

6

7   LEONARD BARD

8    By Mr. Gold        67
     By Ms. Stacey                 146

9

10                     * * * * * * * * * *

11

12                          **E X H I B I T S**

13   **GOVERNMENT'S:**                              **IN EVD.**

14

15       No. 6   Cross-Validation Studies of      8
                 the Static-99

16

17       No. 5   2003 Static-99 Coding Manual    10

18       No. 26  U.S. District Court Record      65

19   **DEFENDANT'S:**

20       No. 10  CV of Dr. Bard                  76

21       No. 9   Report of Dr. Bard dated 7/8/08 77

22

23

24

25

1                     **P R O C E E D I N G S**

2          **THE COURT:**  Good morning, everybody.

3          **THE CLERK:**  All rise for the Honorable Court.

4          **THE COURT:**  Sit down, please.

5          Are we were all set to go?

6          (Whereupon, the Court and the Clerk conferred.)

7          **THE CLERK:**  Scheduling issue?

8          **MS. KELLEY:**  May we talk just a brief moment about

9     scheduling, Your Honor?

10          **THE COURT:**  Sure, go ahead.

11          **MS. KELLEY:**  My understanding is this is the

12     government's final witness.

13          **THE COURT:**  Final witness?

14          **MS. BOAL:**  Yes, Your Honor.

15          **THE COURT:**  Okay.

16          **MS. KELLEY:**  We have Dr. Bard who is ready to go

17     here.  I don't think the cross of this witness is going to

18     take even all morning.  I don't know how much more direct

19     there is.

20          I have two brief witnesses who are coming, driving

21     in from Connecticut tomorrow.  And I have asked them to be

22     here at ten o'clock tomorrow.

23          **THE COURT:**  Okay.

24          **MS. KELLEY:**  So I don't think they will even take

25     up the whole morning, although I guess it is conceivable.

1    But I think that is our last witness.

2            Mr. Carta has not totally made up his mind whether

3    he wants to testify but --

4            **THE COURT:**  What you are saying to me is you think

5    the case will be over tomorrow?

6            **MS. KELLEY:**  It could be, yes, sir.

7            **THE COURT:**  That is fine.  We never mind when

8    counsel are very efficient, that is good.

9            So we are all set to proceed now?

10           **MS. BOAL:**  Yes, Your Honor.

11           **THE COURT:**  Okay.

12           Good morning again.

13           **THE WITNESS:**  Good morning, Your Honor.

14                   **AMY PHENIX, Resumed**

15              **DIRECT EXAMINATION, (Cont'd.)**

16   BY MS. BOAL

17   **Q.**  Dr. Phenix, when we had left off yesterday, we were just

18   about to start discussing the third element of the statute.

19           Do you have an opinion based on a reasonable degree

20   of professional certainty as to whether as a result of

21   Mr. Carta's serious mental illness, abnormality or disorder,

22   he would have serious difficulty in refraining from sexually

23   violent conduct and/or child molestation if released?

24   **A.**  I do.  I believe that he would.

25   **Q.**  And how did you go about reaching that opinion?

1   **A.**   It was a stepwise process.  I scored a couple of

2   actuarial instruments that measure the probability of sexual

3   rearrest or reconviction in the future, both the Static-99

4   and the Minnesota Sex Offender Screening Tool Revised.

5   **Q.**   And, Dr. Phenix, could you just explain to us what is an

6   actuarial instrument?

7   **A.**   Right.  An actuarial instrument, in this case predicting

8   future sexual reoffense, is a list of risk factors that have

9   been established in the research.  When present, increase

10  the risk of future sexual reoffense.

11          Each one of these factors on the list is weighed

12  statistically for its contribution to sexual reoffense.  In

13  other words, I don't make a judgment of how much each factor

14  contributes to reoffense.  Statistically that's determined.

15          Some factors contribute significantly more than

16  other factors.  You can add up those statistical weights and

17  come up with an overall score.  And that score is in the

18  low, moderate or high range relative to how other offenders

19  scored on that instrument.

20  **Q.**   Why do psychologists in your field use actuarial

21  instruments?

22  **A.**   We use actuarial instruments because we predict more

23  accurately who is most likely to go on to commit a new sex

24  offense than if we used, for example, our experience or our

25  clinical judgment without turning to the science that has

1   established these risk factors.

2   **Q.**  How do you use actuarial instruments in your

3   evaluations?

4   **A.**  I score actuarial instruments and look at the overall

5   risk level that that individual poses compared to other sex

6   offenders in the developmental and cross-validation sample.

7         I look collectively at more than one actuarial

8   instrument to see if I have converging evidence about risk

9   level.  If not, I can examine the difference, the items, for

10  example, on the different actuarial instruments to make a

11  determination about what I believe the overall risk level

12  is.

13  **Q.**  What, if any, is the most commonly used actuarial

14  instrument?

15  **A.**  That would be the Static-99.

16  **Q.**  Who developed that instrument?

17  **A.**  Doctors Karl Hanson and David Thorton.

18         **THE COURT:**  What is it?  Static?

19         **THE WITNESS:**  Static-99.

20         **THE COURT:**  Spell that for me.

21         **THE WITNESS:**  S-T-A-T-I-C.

22         **THE COURT:**  Just the way it sounds.  Okay.

23  BY MS. BOAL

24  **Q.**  And has the Static-99 been cross-validated?

25  **A.**  Yes, it has been tested on other examples of sex

1    offenders 63 times since it was developed in 1999.

2    **Q.**  And if you'd turn to tab 6 of the exhibit binder, do you

3    recognize that document?

4    **A.**  Yes.

5    **Q.**  And what is that?

6    **A.**  That would be the list of all of the validations at

7    least up until about six months ago of the Static-99 and

8    various samples of sex offenders throughout the world.

9         **MS. BOAL:**  Your Honor, at this time --

10        **THE COURT:**  What do you mean by "validation"?

11   Explain that.

12        **THE WITNESS:**  Cross-validation is conducted to

13   determine how well an instrument that has been developed

14   works on various other sex offenders so when you develop an

15   actuarial instrument, it's developed on a certain group of

16   sex offenders, in this case three samples from Canada.

17        And generally that instrument is going to work

18   pretty well for those sex offenders.  It was developed on

19   those sex offenders.  But if you apply that instrument to a

20   different group of sex offenders you may find that, well, we

21   usually find it doesn't work as well.  It's called shrinkage

22   of the predictive accuracy.

23        So we want to test it out on many, many different

24   types and groups of sex offenders in different jurisdictions

25   and different countries to make sure that when I use it on a

1    sex offender in my case load, an individual, that it's

2    going -- you feel more confident that that predictive

3    accuracy applies to the individual I am evaluating.

4         So the more it's cross-validated on different

5    groups of sex offenders, the more confidence you can have

6    that it works on the sex offender you're evaluating.

7    **Q.**  And, Dr. Phenix -- oh, I'm sorry.

8         **MS. BOAL:**  Your Honor, we would move into admission

9    Exhibit 6.  And we understand there is no objection.

10        **THE COURT:**  Okay.  It comes in.

11        **(Government's Exhibit No. 6 received in evidence.)**

12   BY MS. BOAL

13   **Q.**  And the more cross-validation, you were mentioning that

14   you had more confidence.  And is there a confidence interval

15   for the Static-99?

16   **A.**  Yes, there are error rates for the Static-99 and other

17   actuarial instruments.  For example, for each on the

18   Static-99 and MnSOST-R there are cutoff scores.  In the case

19   of Static-99 the score one through six.

20        For each cutoff score there is a range of risk,

21   low, medium or high, with six being in the high range, one

22   being in the low range, and an associated probability of

23   future sexual reoffense if you get that cutoff score.

24        However, that would be the probability of sexual

25   reoffense, the true probability of sexual reoffense for the

1     sample on which it was developed.  In other words, after

2     fifteen years for our old rates 52 percent of those with a

3     score of six went on to be convicted of a new sex offense.

4     But those are statistics specific to that sample.

5          Now, when I use it on a sex offender, the

6     instrument, and I get a score of six, it's not likely that

7     that individual's probability, true probability of sexual

8     reoffense is exactly the same as the developmental sample.

9     It could be, if it's a similar sex offender, it could be a

10    bit off.  It could be a bit below.  So there is an error

11    rate.  It's not likely to fall right on the predicted rate

12    for the developmental sample.

13         And that error rate, that band of error around each

14    probability of sexual reoffense is called a confidence

15    interval.  So that we, it's 95 percent likely that if I

16    apply that instrument to another sex offender outside the

17    developmental sample, that their score will be in the

18    ballpark of what the developmental sample received.

19    **Q.**  Has the Static-99 gained acceptance in the psychological

20    community?

21    **A.**  Yes.

22    **Q.**  What role, if any, have you played with respect to the

23    use of the Static-99?

24    **A.**  I am one of the authors of the coding rules of how to

25    score the Static-99 in a clinical case.

1   **Q.**  If you could turn to Exhibit 5 in the binder in front of

2   you.

3          And do you recognize that document?

4   **A.**  Yes.  Those are the Static-99 Coding Rules Revised, that

5   we revised in 2003.

6          **MS. BOAL:**  Your Honor, I would move into admission

7   Exhibit 5.  And I understand there is no objection.

8          **THE COURT:**  Okay.  It comes in.

9          **(Government's Exhibit No. 5 received in evidence.)**

10  BY MS. BOAL

11  **Q.**  And you used the Static-99 with respect to Mr. Carta; is

12  that correct?

13  **A.**  I did.

14  **Q.**  And what does the name "Static-99" refer to?

15  **A.**  "Static" means that it is a collection of static risk

16  factors.  Static risk factors are generally historically

17  based, for example, number of prior sex offenses, having

18  offended against a male victim.  These are all historic

19  factors.  They're not changeable except they can go up if a

20  person reoffends.  But you can't remove those risk factors

21  because they have occurred in the past.

22  **Q.**  And what does the 99 refer to?

23  **A.**  That it was developed and released in 1999.

24  **Q.**  And what does the Static-99 consist of?

25  **A.**  It consists of ten risk factors, static or unchangeable,

1    historical risk factors that are very well established in

2    the research literature that when present indicate a higher

3    risk of future sexual reoffense.

4    **Q.**  Can you describe the contents of the Static-99

5    questionnaire?

6    **A.**  Yes.  There is two clusters of factors that we know

7    predict future sexual reoffense.  The first is factors, and

8    the strongest are factors that have to do with the presence

9    of sexual deviance, factors such as prior sex offenses,

10   having male victims, having non-contact sex offenses.

11        And there is another group of factors that also

12   when present increase the risk of future sexual reoffense

13   and those would have to do with criminality, antisocial

14   behavior, factors like the presence of non-sexual violence,

15   assault and the like.

16   **Q.**  And how is the Static-99 scored?

17   **A.**  Each of the ten items has a score.  Nine of those items

18   are scored zero to one.  So if a factor is not present, it's

19   a zero.  If the factor is present, it's a one save for one

20   factor which is weighted three times the rate of the other

21   factors and that is the presence of prior sex offenses,

22   having been essentially adjudicated of a sex offense and

23   then going on to reoffend in the future.  The score for that

24   item is zero to three.

25   **Q.**  What is the average score in the Static-99?

1    **A.**   3.2.

2    **Q.**   What score did you give Mr. Carta on the Static-99?

3    **A.**   A six.

4         **THE COURT:**   3.2, when you say "average," what does

5    that mean, "average"?

6         **THE WITNESS:**   The score can range on the Static-99

7    from zero, being the lowest risk, to a score of twelve.   The

8    score of six to twelve has the same risk level, high risk

9    level.

10        So if you average, if you average the score of all

11   of the sex offenders in the developmental and first

12   validation sample, the average score was a 3.2 in the

13   moderate range of risk.

14        Most sex offenders, if you look at large samples of

15   sex offenders, will have scores in the low range or the

16   moderate range and much fewer will have scores in the high

17   range.

18   **Q.**   And you have --

19        **THE COURT:**   Before there was, before you invented

20   or worked on this static -- what do you call it -- analysis

21   for want of a better term, was there something that preceded

22   it?

23        **THE WITNESS:**   Yes.   Having been doing this long

24   enough to have done that before there were actuarial

25   instruments to evaluate sex offenders, before there were

1    actuarial instruments, we used what was called an

2    empirically guided method.

3            We did have research that had identified the risk

4    factors.  They had not been developed into an actuarial

5    instrument that had statistical weights and risk levels.  So

6    we just had a list of risk factors that we knew when present

7    predicted future sexual reoffense.  The more that were

8    present, the higher risk I would have judged.  And if less

9    were present, then I would have considered them lower risk.

10           **THE COURT:**  Sort of a clinical judgment?

11           **THE WITNESS:**  It was a guided clinical judgment.

12   Clinical judgment, pure clinical judgment would be not using

13   any of the risk factors established in the research.  It

14   would just be my experience, for example, having worked with

15   sex offenders what I think about what a person tells me,

16   what I think their risk might be.

17           There I don't look at any established risk factors

18   that we know predict future sexual reoffense.  And actually

19   that method has not been recommended anyway since, gee, the

20   late '80s.

21           And beginning in about 1990 we had our first

22   actuarial instrument for non-sexual violence and we had

23   established risk factors for sexual reoffense in about 1995

24   when we began to use the list, although it wasn't

25   statistically weighted.  And our first actuarial instrument

1    was developed by Dr. Hanson in 1997.

2         **THE COURT:**  But it is sort of a clinical judgment

3    as to what weight you give to these -- well, in the first

4    place, to include these twelve or whatever it is factors,

5    that is a clinical judgment I guess; isn't it?

6         **THE WITNESS:**  Actually, no, those factors were

7    established in a large meta-analytic study which was able to

8    identify statistically what would predict future sexual

9    reoffense.  What was correlated or what had an association

10   statistically with future sexual reoffense.

11        If I did not use any of those factors established

12   in the research, it would be a truly clinical opinion.

13        **THE COURT:**  What about the weight from one factor

14   to another?

15        **THE WITNESS:**  The weights are established

16   statistically.  In other words, all of the offenders that go

17   on to reoffend that are followed in the community -- that's

18   how we established these -- if an offender had the presence

19   of prior sex offenses, for example, statistically they were

20   three times more likely to reoffend than if they did not

21   have that factor.

22        So in that way we can statistically weigh the

23   factors.  In the old days I had to weigh them myself.  And I

24   would have had more error in weighing that.  I would have

25   weighed that in a similar way as I weighed all the other

1    risk factors because I didn't know the statistical weights.

2           But when we then had actuarial instruments

3    available, then we can weigh them correctly for what they

4    actually do contribute to future sexual reoffense.  And our

5    predictions are better as a result of that.

6           **THE COURT:**  Okay.  Thank you.

7           Go ahead.

8    BY MS. BOAL

9    **Q.**  You testified that Mr. Carta had received a score of

10   six; is that correct?

11   **A.**  That's correct.

12   **Q.**  And how you scored the instrument appears on page 29 of

13   your report that has been admitted in evidence as Exhibit 1;

14   isn't that correct?

15   **A.**  Yes.

16   **Q.**  Okay.  What is the significance, if any, of a score of

17   six on the Static-99?

18   **A.**  A score of six is in the high range.

19   **Q.**  And what does a score of six mean in terms of risk of

20   recidivism?

21   **A.**  There are probabilities associated with a risk of six.

22   They have changed since my original evaluation to the

23   current range of risk for a score of six.  And there are

24   estimates for five years and estimates for ten years after

25   release to the community.

1          For five years the estimate would be a probability

2     of sexual rearrest or conviction of 13.4 percent to 27.7

3     percent.  And in ten years you see those probabilities go up

4     the longer an individual remains in the community, the

5     probabilities would be 16.7 percent to 37.3 percent on the

6     high side.

7     **Q.**  And where do these percentages come from?

8     **A.**  These percentages resulted from a huge validation of the

9     Static-99 on 18 samples of sex offenders, over 6,000 sex

10    offenders.  The instrument was validated on them and these

11    would be the probabilities of reoffense associated with ten

12    of those samples.

13    **Q.**  Does the percentage risk of recidivism that you just

14    discussed underestimate risk?

15    **A.**  Yes.

16    **Q.**  Why?

17    **A.**  Well, first of all, we know that most sex offenses go

18    undetected.  Certainly you can see from examination of the

19    case of Mr. Carta that there was significant sex offending

20    that was undetected that we did not know about had it not

21    been for his admissions.

22          So we know that the true rate of sexual reoffense

23    is higher than detected sex offending.

24    **THE COURT:**  Let me -- I am interrupting you and

25    forgive me, but I want to make sure I understand.

1          He scores a six?

2          **THE WITNESS:**  Correct.

3          **THE COURT:**  And that equals what in a percentage

4     basis?  Thirteen to what?

5          **THE WITNESS:**  There are five-year rates and then

6     there are ten-year rates.  So if he is out for five years in

7     the community, he's similar to a group who would have a

8     probability of sexual reoffense on the low side of 13.4 and

9     on the high side of 27.7 percent.

10         **THE COURT:**  And what does that mean?

11         **THE WITNESS:**  That means that --

12         **THE COURT:**  You are talking about 27 percent.  27

13    percent compared to what?

14         **THE WITNESS:**  If we release a hundred sex offenders

15    with this score, okay, after five years we can expect that

16    about on average of those hundred that 13 and a half to 27

17    and a half of those sex offenders would commit a new sex

18    offense in five years.

19         Now, the ten-year figures go up because any time,

20    because sex offending tends to happen much more slowly than

21    non-sexual violence.  And so over the years that an offender

22    is released to the community, you will see those rates

23    continue to gradually increase.

24         So the rate is higher.  If those hundred sex

25    offenders are out for ten years, you can expect that 16.7 of

1    them to 37.3 of them will go on to commit and be detected of

2    another sex offense that would be arrested for or convicted

3    of.

4    **Q.**  And, Dr. Phenix, you were telling us about why those

5    percentages underestimate risk.  And you had mentioned that

6    it doesn't capture all of the reoffenses.  And is there

7    another reason why it underestimates risk?

8    **A.**  Yes, we used to have projected probabilities for up to

9    fifteen years in the community.  So in terms of this statute

10   and what I am predicting as I am predicting the probability

11   of sexual reoffense for Mr. Carta at any time in the rest of

12   his life, okay, and that would be longer than a ten-year

13   period.

14        So these probabilities end at ten years and that

15   rate would continue to gradually increase after a ten-year

16   prediction.

17   **Q.**  You also scored Mr. Carta on the MnSOST-R.  And what is

18   the MnSOST-R?

19   **A.**  It is an another actuarial instrument that predicts

20   sexual reoffense.  It was developed in the Department of

21   Corrections in Minnesota to improve the accuracy of

22   predicting sexual reoffense.  And it's been used fairly

23   widely, not as widely as the Static-99.  It has somewhat

24   different items.  And it also gives a range of risk for a

25   future sexual rearrest but in a six-year period, okay, at

1    the end of six years.

2    **Q.**  How did you score Mr. Carta on the MnSOST-R?

3    **A.**  I scored him, gave him an overall score of five.

4    **Q.**  And what is the significance, if any, of a score of

5    five?

6    **A.**  A score of five on this instrument is in the moderate

7    range.

8    **Q.**  Did you originally score Mr. Carta higher on this

9    instrument?

10    **A.**  Yes.

11    **Q.**  And does the change in the score affect your overall

12    opinion?

13    **A.**  No.

14    **Q.**  And why is that?

15    **A.**  That's because I believe that, I have said that I rely

16    most strongly upon the Static-99.  It's been tested and

17    validated most often.

18         I believe that his range of risk may be wider from

19    moderate to high as a result of the change of score on the

20    MnSOST-R.  But I believe that there are additional factors

21    that cause me to continue to believe that he will reoffend

22    sexually.

23         **THE COURT:**  What about the age factor?  The prior

24    witness I think mentioned that Mr. Carta wants a little less

25    active social life, if you can call it, he wants to stay

1    home and sit in front of the fireplace.  That was not the

2    testimony but that was the impression I got.

3             Now, does that affect your judgment?  I mean, is he

4    apt -- at ten years the percentages go up but does that

5    comport with your experience as to what might be the effect

6    of age on his libido and his interest?

7             **THE WITNESS:**  Right.  We have actually seven age

8    studies.  Since 2002 we have some new research that has

9    helped us to better understand the effect of aging on sexual

10   reoffense.  And these studies have conflicting findings.

11            There are a few of the studies which indicate after

12   approximately age thirty that there is a gradual decrease

13   overall throughout the aging of the individual, a decrease

14   in sexual reoffense.

15            There is a greater decrease in those two studies or

16   three studies from approximately age fifty where it begins

17   to drop more dramatically to age sixty.

18            We are unclear -- and after age sixty there is a

19   significant drop in sexual reoffense in these particular

20   studies.  We're unclear at this time as to the etiology, why

21   there is this greater reduction after age fifty.  We don't

22   have death certificates on these individuals.  We don't know

23   if they have died and not had the opportunity to reoffend.

24   We don't know the effect of degenerative disease on

25   individuals, health problems on their mobility.

1          We do know that the drop in sexual reoffense is

2     greater for individuals who rape compared to those who

3     commit child molestation, where there is a more pervasive

4     higher risk throughout that persons' life compared to those

5     who commit rape.

6          There is another study that indicates that there is

7     no significant drop in sexual reoffense through the middle

8     years.  And that would be from the thirties to the sixties,

9     until age sixty, that there is no significant reduction for

10    individuals who are motivated by paraphilic disorders or

11    sexual deviance.  For individuals who are primarily just

12    antisocial, violating rights of others but don't have

13    paraphilic conditions, there is a more significant drop

14    earlier in their life.

15         So we don't have confirmed data that can guide us

16    in the middle years.  And so I allow for little reduction in

17    the middle years until age sixty in which I would consider

18    that a much stronger risk factor.

19         Furthermore we have a new actuarial instrument, the

20    Static-2002, that was released after I completed this

21    evaluation that includes a better evaluation of age, zero to

22    three points depending upon the individual's age.

23         Each one of these actuarial instruments actually

24    has a score for age so there is a reduction in risk if a

25    person is over 25 on the Static-99 and there is a reduction

1    in risk on the MnSOST-R if the individual is thirty or over.

2    And I have allowed in my scoring for those age reductions.

3    **Q.**  In your opinion what effect, if any, has age had on

4    Mr. Carta?

5    **A.**  You know, I believe that there is a modest reduction for

6    Mr. Carta as a result of his age.  I don't base that on his

7    statements about him wanting to be at home, being more of a

8    homebody which would be associated with maturity.  I don't

9    know about that because he tends to associate with much

10   younger individuals when he is in the community.  And that

11   would not be associated with being at home in a more mature,

12   stable kind of way.

13          But I base that reduction on the data, okay.  But I

14   don't, I do not adjust significantly down for age because he

15   is still in the middle years.  He is approaching age 50, I

16   believe he is 48 now.  And that is -- at age 50 is when we

17   start to see, even in the first two studies I talked about,

18   a reduction in overall risk.  So it's a number of years

19   before I would attribute significant reduction to age.

20   **Q.**  And does the fact that he committed sexual offenses in

21   his thirties and forties affect your opinion at all?

22   **A.**  That affects my opinion.  It also I think is quite

23   evident with Mr. Carta that his sexual interest while he was

24   in the SOTP Program indicates that his libido has not been

25   significantly reduced and he remains very sexually

```
 1    interested and actually preoccupied.

 2    Q.  Did you consider protective factors?

 3    A.  I did.

 4    Q.  And what are protective factors?

 5    A.  Protective factors are factors that, I've talked about

 6    factors that increase an offender's risk of sexual

 7    reoffense.  Protective factors would actually decrease an

 8    offender's risk of future sexual reoffense.

 9    Q.  And did you apply the protective factors in Mr. Carta's

10    case?

11    A.  Yes, I did.

12    Q.  Okay.  And what was the result?

13    A.  None of these factors were present for Mr. Carta in

14    terms of the protective factors.  He has not been offense

15    free in the community for ten years.  The longer an offender

16    remains sex offense free or free of a serious offense,

17    non-sexual violence in the community, the less likely they

18    will go on to reoffend.  Because most of that offending

19    happens in the first five years.

20          So he has not been in the community sex offense

21    free for ten years without reoffending.  Furthermore,

22    offenders who are more elderly who have less than fifteen

23    years left in their lifespan, if you look at tables,

24    lifespan tables, may have reduced risks simply because your

25    prediction is only for five years or three years perhaps.
```

1    That wouldn't be the case here with him being 48 years of

2    age.

3            And further there is a reduction -- and this is

4    considered on the MnSOST-R -- there is a reduction risk for

5    offenders who have completed a cognitive behavioral sex

6    offender treatment program, the very type of treatment

7    program that he dropped out of in SOTP.

8    **Q.**  What -- excuse me -- what, if any, role did the

9    information from Mr. Carta's treatment records from Butner

10   play in your opinion?

11   **A.**  Well, they, as they relate to his risk, he did not

12   complete that treatment program.  He struggled actually

13   quite a bit as we heard from Dr. Wood in earlier testimony,

14   that he had a number of difficulties.

15           This is a person that in my opinion was more

16   focused on meeting his needs, his sexual needs, his being

17   aroused to these younger males in the program.  He was very

18   preoccupied with that.  That always interferes with being

19   able to focus on his treatment needs which are extensive

20   because he has had a lifelong paraphilic condition.

21           So I don't see him as having accomplished the

22   necessary goals in treatment.  For example, this is a person

23   who does not have a relapse prevention plan when he's

24   released to the community.  He doesn't know, he cannot

25   manage his precursors to offending.  He's not clear about

```
 1    his reoffense cycle which I believe he was actively engaged
 2    in while he was in that program.  He was unable to intervene
 3    even with significant counseling from Dr. Wood and others.
 4    So I don't see him having made significant treatment gains.
 5    He would not have a reduction risk associated with that.
 6    Q.  And, in fact, what, if anything, does the research tell
 7    us about the risk for reoffense if someone does not complete
 8    a sex offender treatment program?
 9    A.  It's higher than individuals who do.
10    Q.  Did you read Dr. Bard's report before you issued your
11    report?
12    A.  Yes.
13    Q.  Okay.  And in Dr. Bard's reports there are some
14    statements from Mr. Carta saying that he feels that he's low
15    risk.  Do you remember that?
16          THE COURT:  That he is low risk?
17          MS. BOAL:  That he is low risk, yes.
18    A.  Yes, I saw that.
19    Q.  And what, if any, role did that information play in your
20    opinion?
21    A.  Yes.  I think Mr. Carta believes what he says, that he
22    believes he is low risk.  And I think he believes that
23    because he has little insight and understanding into his
24    deviant sexual arousal into how difficult it will be for him
25    to intervene in that, how difficult it will be for him to
```

1    avoid boys, youngsters when he is out in the community, to

2    manage himself by not focusing on pornography.

3          I think he grossly underestimates how difficult it

4    will be for him to stop himself from offending in the

5    future, although I have no reason not to believe that he

6    actually thinks he can manage himself.  The problem with

7    that is if he goes to the community thinking I'm very low

8    risk, I can manage myself, and he doesn't have the skills

9    and abilities to do that, it just sets the stage for him to

10   be unsuccessful.

11   **Q.**  Did you also consider dynamic factors?

12   **A.**  I did.

13   **Q.**  What are dynamic risk factors?

14   **A.**  Dynamic risk factors are factors that are changeable.

15   In other words, you can, they're present, you can engage in

16   treatment to lower your risk by improving your dynamic risk

17   factors.

18   **Q.**  What dynamic risk factors did you consider?

19   **A.**  I considered a number of dynamic risk factors

20   established in the research.  The first would be the

21   presence of significant social influences.  Also intimacy

22   deficits, sexual self-regulation.

23         **THE COURT:**  What does that mean, "intimacy

24   deficits"?

25         **THE WITNESS:**  Intimacy deficits is measured by a

1   number of subfactors.  In other words, how well can a person

2   establish meaningful relationships that meet their needs and

3   maintain those relationships over time.

4        We know sex offenders who live in an intimate

5   relationship with a partner have reduced risk for future

6   sexual reoffense.  And so the goal is for that individual to

7   establish and maintain relationships.  And if they have

8   problems doing that, then higher risk is associated with

9   that.

10  **Q.**  And what do you know about Mr. Carta with respect to

11  that factor?

12  **A.**  In terms of intimacy deficits, I think he has

13  significant intimacy deficits.  If we just look at his past

14  history of relationships, we see an early marriage for him

15  that lasted only eight months and his wife left him so that

16  marriage was not able to be sustained.

17       He talked in the records about not having had a

18  relationship for twenty years.  Furthermore, he talked about

19  being very lonely.  And that was part of the reason that he

20  sought out these teenagers, these boys to be with in more of

21  a relationship.

22       And in terms of intimacy deficits, if you look at

23  who are you choosing for a partner.  Is it a person that

24  conceivably could be a person that you could sustain and

25  maintain a relationship over time.

1          So his next partner, known partner, well, he had a

2    girlfriend with whom he had quite a blowup at the end.  He

3    broke her windshield.  He put nude pictures of her in her

4    brother's mailbox.  It was a chaotic and difficult

5    relationship.  And then he went on to form a relationship

6    with a 17-year old boy.  And that too ended up in a fight

7    where the police were involved and a relationship that was

8    wholly inappropriate because of this boy's age and maturity.

9    **Q.**  So how does Mr. Carta's intimacy deficits affect his

10   risk?

11   **A.**  Well, we know one thing that he did in terms of dealing

12   with his intimacy deficits in the community and that was to

13   get involved in chat rooms with boys.  To put an

14   advertisement out for a boy that was, you know, 14 to 18.

15   So he is seeking relationships in wholly inappropriate and

16   illegal ways as a result of his intimacy deficits.

17   **Q.**  You mentioned significant social influence as a dynamic

18   risk factor.  What is that?

19   **A.**  We know an established risk factor for both sex

20   offending and non-sexual violence is the people that a

21   person associates with in the community.  So if they're

22   associating with appropriate pro social individuals, then

23   it's more likely that they, their values will follow in the

24   same way.

25          If you're associating with other sexual offenders,

1    criminal offenders, or just don't have any healthy social

2    support in the community, you're more at risk to sexually

3    reoffend.

4    **Q.**   What do you know about Mr. Carta with respect to that

5    factor?

6    **A.**   Mr. Carta has had lifelong problems with developing and

7    maintaining interpersonal relationships with his -- as a

8    result of his character dis -- personality disorder.  It's

9    difficult for him.  He needs people but he pushes them away

10   with his anger and his retaliation.

11        So we know in terms of his relationships that he --

12   they ended in retaliation and anger.  And his family

13   members, the people he should be closest to, he threatened

14   to kill his mother.  He threatened to kill his daughter,

15   okay.

16        And he had a relationship or an affair with his

17   daughter's boyfriend when they were living in the house.  So

18   he has a very difficult time in a two-way relationship, a

19   give and take in a two-way relationship that would allow him

20   to have supportive individuals on a long-term basis in the

21   community that could help him to not reoffend.

22   **Q.**   So how does that affect his risk?

23   **A.**   I believe that that places him at the higher end of the

24   risk range that I previously talked about.

25   **Q.**   Is sexual self-regulation a dynamic risk factor that you

1   considered?

2   **A.**   It is.

3   **Q.**   And what is that?

4   **A.**   That is how well a person manages their sexual arousal

5   and sexual interest.  So for sex offenders

6   characteristically that's a problem, particularly for

7   individuals with paraphilias because they have deviant

8   sexual fantasies and urges and drives.  This factor looks at

9   how well they manage themselves in terms of sexual

10   preoccupation, how do they handle that because oftentimes

11   for sex offenders they are -- they have a higher sex drive

12   and are more sexually preoccupied.

13          Some sex offenders reoffend or have more deviant

14   arousal when they have difficulty coping or feel

15   overwhelmed.  That's another consideration in this factor.

16          And, furthermore, offenders with a more established

17   deviant sexual arousal pattern are just by nature on this

18   factor higher risk.

19   **Q.**   What do you know about Mr. Carta that is relevant to

20   this factor?

21   **A.**   I know that he has had a compulsive sexual preoccupation

22   with pornography and seeking out boys for sexual activity.

23          And his compulsivity we talked about was measured

24   by the amount of hours that he spent prior to being

25   incarcerated, you know, 12 to 14 hours a day.  His

1    masturbatory habits were way above average for his age, two

2    to three times a day, in his early forties at the time;

3    ignoring his hygiene; not working in order to indulge

4    himself in the use of pornography.

5            So he has a clear problem with sexual preoccupation

6    that I believe has persisted for him, not in the same way

7    obviously because that's unavailable to him while locked up

8    or incarcerated.

9            But he finally has the opportunity for an intensive

10   inpatient treatment program where he can address these

11   important issues to help him be successful in the community.

12   And what does he do?  He becomes preoccupied with his sexual

13   attraction to these young men in the program which does not

14   bode well for what would be his behavior in the community.

15   **Q.**  So how does that affect his risk?

16   **A.**  It places him at the higher range of risk.

17   **Q.**  And is another dynamic risk factor lack of cooperation

18   with supervision?

19   **A.**  Yes.

20   **Q.**  And what does that mean?

21   **A.**  We know offenders that, particularly in the community

22   that have violated conditions of release, parole, probation,

23   conditional release, are at higher risk for future sexual

24   reoffense.

25           And in looking at Mr. Carta's past criminal

1    history, I was able to see that he had been given at various

2    times, in terms of sentencing, he had been given community

3    release or probation or parole.  And that there were at

4    least three incidents when he violated those conditions.  So

5    he hasn't had -- he has had problems following community

6    supervision once released to the community.

7              On the positive note, however, while he had

8    difficulty in the, with therapeutic issues in the SOTP, he

9    did -- he had few violations within the institution.  A

10   couple of more minor violations, one when he was threatened,

11   threatening to strike back at the other person by throwing

12   hot oil on them.  But by and large he was not a person who

13   was continuously violating rules of the institution or the

14   treatment program.

15   **Q.**  Is general self-regulation another dynamic risk factor

16   that you considered?

17   **A.**  Yes, it is.

18   **Q.**  And what does that mean?

19   **A.**  General self-regulation is measured by a couple of

20   factors.

21             First of all, the person's impulsivity.

22   Individuals who primarily use drug and alcohol act out in

23   impulsive ways.  For example, their sexual interests are

24   higher risk.  People who have poor problem solving, who

25   don't think about the consequences of their behavior are at

1    higher risk for future sexual reoffense.

2    **Q.**   What do you know about Mr. Carta that is relevant to the

3    general self-regulation factor?

4    **A.**   You know, I think that he -- I don't think his sex

5    offending was particularly impulsive but I think that he

6    gets very caught up emotionally in situations.  It's part of

7    his personality disorder.  He can fly off the handle and act

8    impulsively, get angry, go into a rage, certainly not think

9    through the consequences of his behavior.  I think that that

10   is a trait of his, that is a long-term problem of his.

11          And furthermore I think that we see evidence of his

12   problem solving skills in the SOTP Program, I come back to

13   that.  I think that was an important time for him where he

14   could have invested himself in something that he clearly

15   needs to be safe in the community and chose not to follow

16   through with that program and focus on what was important.

17   **Q.**   What does this mean for Mr. Carta's risk to recidivate?

18   **A.**   I think that that means he has significant treatment

19   needs which places him at the higher end of the

20   probabilities that I talked about.

21   **Q.**   Is cluster B personality disorder also a dynamic risk

22   factor that you considered?

23   **A.**   No longer.

24   **Q.**   How, if at all, did the consideration of the dynamic

25   risk factors that we've just discussed affect your

1    conclusion regarding Mr. Carta's sexual dangerousness?

2    **A.**   I considered those dynamic risk factors to be indices of

3    treatment gains.  And for individuals who had been in

4    intensive treatment in the community and the penal system

5    who had done well in treatment, a two-year intensive

6    treatment program, those individuals had the lower

7    probabilities that I talked about in the range of risk for

8    five years and ten years.

9         Individuals who dropped out of treatment, who were

10   unsuccessful in treatment, tended to have the higher risk

11   range which I talked about for five and ten years.  And I

12   think that those dynamic factors make it pretty clear that

13   this is a person who has not really made significant

14   treatment gains.  Well, we know that because he dropped out

15   of treatment.

16        And, hence, I see that as evidence that he is more

17   similar to sex offenders that in ten years had a probability

18   of risk of about 37 percent.

19             **MS. BOAL:**  May I have a moment, Your Honor?

20             **THE COURT:**  Sure.

21             (Whereupon, counsel conferred.)

22   BY MS. BOAL

23   **Q.**  Dr. Phenix, did you form an opinion to a reasonable

24   degree of professional certainty as to whether Mr. Carta is

25   a sexually dangerous person?

1    **A.**   Yes.

2    **Q.**   And what is your opinion?

3    **A.**   I believe that he is.

4    **Q.**   Has anything changed for Mr. Carta since he committed

5    his last offense?

6    **A.**   No.

7          **MS. BOAL:**   I have no further questions, Your Honor.

8          **THE COURT:**   Do you have cross?

9          **MS. KELLEY:**   Your Honor, we'd like to use the ELMO.

10   Mr. Gold is going to do the cross but we just need to get it

11   set up, if that is all right.

12         **THE COURT:**   I am going to share with you something

13   that my staff knows.   I haven't got the foggiest idea what

14   you are talking about.

15         (Laughter.)

16         **MS. KELLEY:**   Okay.   It is the ELMO (indicating).

17         **THE COURT:**   I am pointing to all my geniuses here

18   (indicating).

19         (Laughter.)

20         **THE COURT:**   Make sure it works, go ahead.

21         (Pause in proceedings.)

22         **MS. KELLEY:**   Can we take a very short recess, Your

23   Honor?

24         **THE COURT:**   All right.

25         **MS. KELLEY:**   Thank you.

1           (Recess.)

2

3           **THE CLERK:**  All rise for the Honorable Court.

4           **THE COURT:**  Please be seated.

5           Are you all set now?

6           **MR. GOLD:**  Yes, Your Honor.

7           **MS. KELLEY:**  Yes, Your Honor.

8           **MR. GOLD:**  May I proceed, Your Honor?

9           **THE COURT:**  Please.

10                    <u>CROSS-EXAMINATION</u>

11   BY MR. GOLD

12   **Q.**  Good morning, Dr. Phenix.

13   **A.**  Good morning.

14   **Q.**  You testified yesterday that the statute, the first

15   prong of the statute requires a finding that someone has

16   committed sexually violent conduct and child molestation; do

17   you recall that?

18   **A.**  Or child molestation, I believe so.

19   **Q.**  Or child molestation?

20   **A.**  Yes.

21   **Q.**  Now, you I think stated when you testified in the

22   deposition in this matter that you didn't find definitions

23   for those terms in the statute; right?

24   **A.**  Correct.

25   **Q.**  And so you as a forensic psychologist defined them?

1   **A.**   I defined them as best I could, yes.

2   **Q.**   In your definition of those two terms all child

3   molestation is sexually violent conduct; is that fair to

4   say?

5   **A.**   It certainly was fair to say in this case.

6   **Q.**   Well, we went through Mr. Carta's offenses in some

7   detail.  Do you remember that?

8   **A.**   I do.

9   **Q.**   And you characterized all of those offenses as child

10   molestation except one; do you recall that?

11   **A.**   Yes.

12   **Q.**   And one of them you said was sexually violent conduct?

13   **A.**   Correct.

14   **Q.**   And that was the incident in which he is with some guy

15   in his van when he was following the Grateful Dead.  He said

16   he thought he was getting signals from this guy.  He started

17   to fondle the guy.  The guy woke up and he stopped; right?

18   **A.**   Right.

19   **Q.**   That's the factual description that we have from him?

20   **A.**   (Witness nodded.)

21   **Q.**   So with the exclusion of that incident, all the

22   incidents of sexual interaction with young people you

23   characterized as sexually violent conduct; right?

24   **A.**   Correct.

25   **Q.**   And that was because of the harm that it does to the

1    children; right?

2    **A.**   Yes, and the nature of hands-on sex offenses toward

3    these children.

4    **Q.**   And/or adolescents in this case; right?

5    **A.**   Children are adolescents, yes.

6    **Q.**   And so with that definition in mind, there is no, there

7    is no child molestation that is not also sexually violent

8    conduct; is that fair to say?

9    **A.**   That would be fair to say.  I mean, I'd have to look at

10   any particular situation.  But certainly in general I would

11   say that.

12         **THE COURT:**  You would feel that way even if there

13   were consent between Mr. Carta and somebody else?

14         **THE WITNESS:**  Right, because for child molestation

15   I don't believe there can be consent.

16         **THE COURT:**  Well, I take it that you get to child

17   molestation because of the sex or the circumstances?  In

18   other words, his question to you seemed to be that, lead to

19   the answer that whenever there was sexual activity you

20   considered that to be violent.

21         **THE WITNESS:**  Yes.  With children and young

22   teenagers, yes.

23         **THE COURT:**  Okay.

24   BY MR. GOLD

25   **Q.**   And "children" is defined from you as anyone under the

1    age of 18; right?

2    **A.**   Well, "child" would be defined in the state as under the

3    age of 18.   But there are ages of consent, for example, that

4    would indicate that an individual 16 or over could consent

5    to sexual activity.

6            **THE COURT:**   How does that affect your opinion, if

7    at all?

8            **THE WITNESS:**   You know, I consider the age of

9    consent.   That is more of a legal issue for me.   And I look

10   at the clinical aspects of that.

11           Clinically the younger the individual, the more,

12   potentially the more damage or harm it could cause that

13   person.

14           So if a person is of the age of consent and they

15   are consenting, then I would not consider that sexually

16   violent behavior.

17   BY MR. GOLD

18   **Q.**   You -- just to have this straight, for your definition

19   of child molestation, you interpreted this statute as a

20   forensic psychologist, "child" meant everyone under 18;

21   right?   Or anyone under the age of legal consent depending

22   on what the jurisdiction said?

23   **A.**   It would be the latter.   Anyone under the age of legal

24   consent.   And I would consider each situation individually.

25   But I did consider the age of legal consent in the state

1    where it occurred.

2    **Q.**  So, for example, sexual interaction with a 16-year old

3    where the age of consent was 17 would be child molestation

4    by this definition; right?

5    **A.**  It could be considered child molestation, yes.

6    **Q.**  Well, the definition that you used when you did your

7    evaluation, that's the definition; right?

8    **A.**  Correct.

9    **Q.**  And even though there is no force in a hypothetical

10   interaction with a 16-year old below the age of consent,

11   that would be sexually violent conduct based on the way you

12   interpreted that term; right?

13   **A.**  Force in the sense that he held them down, tied them

14   down against their protest, yes, it would still be sexually

15   violent.

16        If a person gets a child intoxicated as he did in

17   order to have sexual activity with them or they were

18   intoxicated, then that is a form of force, you know, so it

19   wouldn't just be instrumental violence or force.  I would

20   consider the circumstances of each offense.

21   **Q.**  So I understood your testimony yesterday to be that all

22   sexual interactions with teenagers and adults were

23   necessarily sexually violent conduct.  Is that not your

24   testimony today?

25   **A.**  No.  No.

1            (Whereupon, counsel conferred.)

2    BY MR. GOLD

3    **Q.**  Well, all sexual interaction between teenagers below the

4    age of consent and adults is sexually violent conduct?

5    **A.**  Okay.  I termed all sexual activity with teenagers below

6    the age of consent to be child molestation and sexually

7    violent.  I only opined for an adult that it would be

8    sexually violent if there was non-consent involved.

9    **Q.**  I'm sorry.  And my colleague told me I mangled that

10   question, and I did.  But --

11            **THE COURT:**  Why don't you do it again.

12   BY MR. GOLD

13   **Q.**  The question is is all sexual contact between an adult

14   and a minor, a legal minor for your understanding of this

15   statute sexually violent conduct?

16   **A.**  Yes.

17   **Q.**  And is that also child molestation?

18   **A.**  It's child molestation if the individual is under the

19   age of consent.

20   **Q.**  So you did a risk assessment in this case?

21   **A.**  I did.

22   **Q.**  And you testified about the actuarial instruments; do

23   you recall that?

24   **A.**  Yes.

25   **Q.**  And you said that this has been an issue in the field of

1   psychology for a while, the accuracy of predictions of

2   future behavior; is that fair to say?

3          **MS. BOAL:**  Objection.  I believe that

4   mischaracterizes the testimony.

5          **THE COURT:**  Well, she can speak to that.  He is

6   asking her a question.  If she doesn't agree with it, she

7   will say so.

8   **A.**   It has been an issue, the accuracy of prediction, yes.

9   **Q.**   And the accuracy of prediction of future behavior,

10  particularly violent future behavior has been a concern in

11  the field of psychology?

12  **A.**   Yes.

13  **Q.**   And the field has responded by trying to develop

14  empirical instruments which better predict future behavior;

15  is that fair to say?

16  **A.**   Yes.

17  **Q.**   Now, and you testified that the actuarials were part of

18  this movement; right?

19  **A.**   Yes.

20  **Q.**   And you said that the first actuarial was an actuarial

21  called the RRASOR; right?

22  **A.**   Yes.

23  **Q.**   And that is a -- well, I just -- are you using a pure

24  actuarial method?

25  **A.**   Yes.

1  **Q.**  And that method is characterized by scoring these

2  instruments and then delivering the results to a fact

3  finder; right?

4  **A.**  Yes.

5  **Q.**  And in this case you scored two actuarials; right?

6  **A.**  Correct.

7  **Q.**  And those were the MnSOST-R and the Static-99; right?

8  **A.**  Yes.

9  **Q.**  Now, the Static-99 you said had ten items?

10  **A.**  Yes.

11  **Q.**  It's been around since 1999?

12  **A.**  Yes.

13  **Q.**  And it has been validated a bunch of times?

14  **A.**  Correct.

15  **Q.**  Now, and when you said it's been validated a bunch of

16  times, you were talking about studies where it was shown to

17  be of moderate predictive accuracy; right?

18  **A.**  Yes.

19  **Q.**  And when we talk about moderate predictive accuracy, we

20  talk about the ability of these instruments to break people

21  into groups of risk in relation to each other; right?

22  **A.**  Yes.

23  **Q.**  But that doesn't tell us anything necessarily about the

24  raw recidivism rates; right?

25  **A.**  Well, there are associated raw recidivism rates.

1    **Q.** Well, when you talk about a cross-validation, you are

2    talking about the instrument being valid or validated in its

3    ability to discriminate between high, medium and low risk;

4    right?

5    **A.** Yes.

6    **Q.** But you don't get anything from that study about what

7    high risk actually means?

8    **A.** Yes, you do.  You get probabilities associated with that

9    sample for reoffending.

10   **Q.** And that sample can be different from sample to sample;

11   right?

12   **A.** Oh, sure, yes.

13   **Q.** And in the development samples that you talked about

14   there were recidivism rates associated with those

15   development samples?

16   **A.** Yes.

17   **Q.** And what you talked about next is that those samples,

18   those recidivism rates are overstatements of risk now that,

19   in light of current research; right?

20   **A.** Right, the original samples are higher than the current

21   samples.

22   **Q.** And so the current samples are lower so high risk

23   basically has a somewhat different meaning than it used to

24   have; right?

25   **A.** It has different probabilities associated with sexual

1    rearrest, yes.

2    **Q.**   Right.   So, I mean, and the high, medium and low are

3    essentially arbitrary labels that are put on this data after

4    you collect it; right?

5    **A.**   Well, they're not arbitrary at all.   The high risk

6    offenders reoffend at greater rates than the low risk

7    offenders.

8    **Q.**   Right.   But someone's high could be people who

9    recidivate at ten percent and someone's low could be lower

10   than that; right?

11   **A.**   That's possible.

12   **Q.**   Right.   And so a high in this case gives us that figure

13   that you talked about, that range?

14   **A.**   Yes.

15   **Q.**   That range was 13.4 to 27.7 percent; right?

16   **A.**   In five years.

17   **Q.**   In five years?

18   **A.**   Yes.

19   **Q.**   So in that five-year period, now, that range is based

20   on, there is a high and a low risk sample; right?

21   **A.**   There are.

22   **Q.**   And you put Mr. Carta toward the high end of that

23   sample?

24   **A.**   I did.

25   **Q.**   And you do that because of a number of reasons, those

1    factors that you talked about; right?

2    **A.**   Yes.

3    **Q.**   But, in fact, there are no explicit guidelines for

4    evaluators such as you to determine when to put someone in

5    the low or the high risk; right?

6    **A.**   Well, I think there is fairly explicit guidelines.  It

7    involves some judgment.  And that is which sample is he most

8    like.  Is he most like the low risk sample who completed two

9    years of intensive treatment and did well in treatment or is

10   he a person who has not completed treatment in the past?  Is

11   the person just by nature of being referred for evaluation

12   for these proceedings, that he was selected out of a group

13   because of certain risk factors he has?

14         So he comports with I believe the higher end of the

15   risk range.

16   **Q.**   Well, it's the rate of sexual offending, the overall

17   rate of sexual reoffense is low; right?

18   **A.**   For low risk offenders it is.

19   **Q.**   No, for all offenders high and low together.  For

20   example, the Department of Justice Study, are you familiar

21   with that?

22   **A.**   I am.

23   **Q.**   And that study shows a low overall recidivism rate after

24   three years for all sex offenders; right?

25   **A.**   Three years is way too short of a follow-up to examine

1    sex offending.

2    **Q.**   But what's that it shows; right?

3    **A.**   Well, sure, in three years because most sex offenses

4    happen at five years to ten years so naturally that's not

5    going to capture the most sex offenses.  So naturally that

6    would be low but I think it's misleading.

7    **Q.**   Well, so is your testimony that -- you scored two

8    actuarial instruments in this case?

9    **A.**   Correct.

10   **Q.**   One was the Static and that said high risk; right?

11   **A.**   Right.

12   **Q.**   And one was the MnSOST-R and that said moderate; right?

13   **A.**   Right.

14   **Q.**   Now, the RRASOR is another actuarial instrument; right?

15   **A.**   It is.

16   **Q.**   And it was scored by evaluators in this case; right?

17   **A.**   I would have to refresh my memory on that.

18   **Q.**   You don't recall if it was scored?

19   **A.**   I don't recall, no.

20   **Q.**   Would looking at a particular document refresh your

21   memory as to whether it was scored in this case?

22   **A.**   Yes, if that was the scoring, it would.

23   **Q.**   Would you care to refer to your own report?

24   **A.**   Yes, if I could get a page number.

25          (Pause in proceedings.)

1      **THE COURT:**  Tell her what page number, Mr. Gold.

2      (Pause in proceedings.)

3  **A.**  On page 21 Dr. Ferraro administered the RRASOR and she

4  had a score of two.

5  **Q.**  Thank you, Dr. Phenix.

6      So a score of two is moderate risk; right?

7  **A.**  Correct.

8  **Q.**  And that is another actuarial instrument in which you

9  did not employ here?

10  **A.**  I didn't employ it because it is not supposed to be used

11  anymore.

12  **Q.**  You did not employ it?

13  **A.**  I did not.

14  **Q.**  And there are -- and Monica Ferraro employed it?  Right?

15  **A.**  She did, yes.

16  **Q.**  And it is an instrument which has been validated;

17  correct?

18  **A.**  Yes, many times.

19  **Q.**  And it is -- and you're familiar with Dr. Doren; right?

20  **A.**  I am.

21  **Q.**  And Dr. Doren advocates -- you testified earlier that

22  there are two pathways to sexual offending, deviance and

23  antisociality; right?

24  **A.**  Yes.

25  **Q.**  And Dr. Doren advocates scoring the RRASOR and the

1    Static because the Static measures antisociality while the

2    RRASOR loads on the sexual deviance pathway; is that

3    correct?

4    **A.**  Dr. Doren believes that.

5    **Q.**  And so he is one clinician who believes that the RRASOR

6    continues to be useful and provide useful information?

7    **A.**  He does, but the authors of the instrument do not.

8    **Q.**  And Dr. Ferraro who is working for the Bureau of Prisons

9    thinks the same thing; right?

10   **A.**  I don't know what she thinks.  I mean, she used it.  At

11   the time she apparently thought it was useful.

12   **Q.**  Well, so, but that is an actuarial instrument that

13   indicates moderate risk and one of the reasons it does is

14   because Mr. Carta has no prior sex offenses according to the

15   scoring rules of that instrument; right?

16   **A.**  That would be true.

17   **Q.**  And so -- and the RRASOR actually was imported into the

18   Static-99; right?

19   **A.**  It was.  That's why I wouldn't administer it again.

20   **Q.**  Well, having prior sex offenses in this context is

21   having a sex offense being sanctioned, being sanctioned in

22   some way such as a prison sentence and going on to reoffend

23   again; right?

24   **A.**  Correct.

25   **Q.**  Now, you advocated using multiple actuarials yourself;

1    right?

2    **A.**   Yes.

3    **Q.**   And there was a study in 2005 by a researcher named

4    Michael Seto.   Are you familiar with that about combining

5    actuarial instruments?

6    **A.**   Yes.

7    **Q.**   And the finding of that study was that combining them

8    didn't actually increase predictive accuracy; right?

9    **A.**   Yes.

10   **Q.**   But the single best instrument in that study with its

11   particular circumstances was, in fact, the RRASOR; right?

12   **A.**   It was.   That was an old study.

13   **Q.**   Now, you also advocate scoring the Static-2002 in

14   evaluations such as this; right?

15   **A.**   I have started using that, yes.

16   **Q.**   And, in fact, you have -- now, you said on your direct

17   testimony that the Static-2002 came out while you were --

18   while this case was pending; right?

19   **A.**   Correct.

20   **Q.**   And the Static-2002 you said -- this was in the context

21   of the Court's questions about age -- accounts for age in a

22   more refined way than the Static-99; right?

23   **A.**   Right.

24   **Q.**   And the Static-2002 is developed by the same group as

25   the Static-99; right?

1    **A.**   Yes.

2    **Q.**   And the instrument is supposed to be theoretically an

3    improvement over the Static-99; right?

4    **A.**   That's the hope, yes.

5    **Q.**   And you are -- but you did not score it in this case;

6    right?

7    **A.**   No, it was released after I conducted this evaluation.

8    **Q.**   Well, now, the purpose of these evaluations is to give

9    an accurate and full assessment to the Court; right?

10   **A.**   Yes.

11   **Q.**   And you are advocating the use of this more refined

12   instrument as part of accurate and good assessments for

13   courts?

14   **A.**   I think it's useful to use.  It has the same predictive

15   accuracy as the Static-99 but I think it's useful, yes, to

16   see multiple actuarials.

17   **Q.**   Well, in fact, the studies that are coming out about the

18   Static-2002 right now are very promising; is that a fair

19   characterization?

20   **A.**   Well, there is only one validation of the Static-2002.

21   And it's just slightly better but not statistically

22   significantly better than the Static-99 at this I point so

23   it will be --

24   **Q.**   Something about its variability is better, right?  The

25   variability of the results that you get when you look at it

1    is a little bit more, they're more stable I think they say

2    about the Static-2002 as a promising feature of it?

3    **A.**  I don't recall that.

4    **Q.**  Well, you did a deposition in this case; right?

5    **A.**  I did.

6         **THE COURT:**  Explain to me, how is one better than

7    the other?

8         **THE WITNESS:**  The measure of being better than the

9    other or worse would be the measure of predictive accuracy.

10   It's called the receiver operator characteristic curve and

11   is a statistical measure.  And the higher the, what I'll

12   call the ROC, the closer to one that that statistic is, then

13   the better that instrument is able to discriminate between

14   offenders who get low scores and high scores.

15        And so the higher the predictive accuracy, that

16   statistic, then the more confidence you would have that that

17   is an accurate, more accurate measure of who will go on to

18   reoffend.

19   BY MR. GOLD

20   **Q.**  Now, these instruments are meant to be scored in the

21   field, right, so they're designed to be simple?

22   **A.**  They are.

23   **Q.**  And they're designed to be able to be scored by

24   probation officers and people in a variety of contexts;

25   right?

1    **A.**   Yes.

2    **Q.**   And you go and give trainings about using various of

3    these instruments; right?

4    **A.**   I give trainings on the Static-99.

5    **Q.**   Now, I'm going to put a document up on the screen.  Can

6    you tell me if you see it when I get it into focus.

7         And the title of this document is, "Proposed

8    Considerations for Conducting Sex Offender Risk Assessment:

9    Draft 11/09/2008," with Amy Phenix and Dale Arnold listed as

10   the authors.

11        Do you recognize that document?

12   **A.**   Yes.

13   **Q.**   And are you an author of that document?

14   **A.**   I am.

15   **Q.**   And that document is a --

16        (Pause in proceedings.)

17   **Q.**   Now, this document has markings on it and those are

18   mine; right?

19   **A.**   Yes.

20   **Q.**   Now, this is basically advice to people in this field

21   about how to do risk assessments; right?

22   **A.**   Well, it was advice to a small training group I work

23   with but it seems to have wider distribution.

24   **Q.**   But it certainly is advice that you thought was good to

25   give at the time; right?

1    **A.**   Oh, I think it's good advice, yes.

2    **Q.**   Okay.  And so one of the things it says there in the

3    part I circled as interesting to me is that a score of seven

4    is now more consistent with how we used to think about a

5    score of six; right?

6    **A.**   Right.

7    **Q.**   And one thing about these new samples is they're large

8    enough that you have recidivism rates for scores higher than

9    six now?

10   **A.**   Right.

11   **Q.**   Right.

12          And so it used to be that with the old Static-99

13   you had six plus; right?

14   **A.**   Yes.

15   **Q.**   And everyone there is in high risk.  But now you have

16   meaningful results for six, seven, eight and up; right?

17   **A.**   All the way up to ten, yes.

18   **Q.**   Right.  And so Mr. Carta now scores a six; correct?

19   **A.**   Correct.

20   **Q.**   Now, this document is dated in November of 2008; right?

21   **A.**   Yes.

22   **Q.**   Now, you did a deposition in this case in December of

23   2008; right?

24   **A.**   Right.

25   **Q.**   And you did not update your report to add the

1    Static-2002?

2    **A.**   I did not update my report.

3    **Q.**   So you do not know right now sitting here what the

4    Static-2002 risk estimate for Mr. Carta would be?

5    **A.**   I do not, no.

6    **Q.**   But the instrument -- do you recognize this document?

7    **A.**   Yes.

8    **Q.**   And this is the coding form for the Static-2002; right?

9    **A.**   Yes.

10   **Q.**   And so given that it's relatively simple and that you

11   are familiar with the records, we can probably score these

12   items right now.  Could you?

13   **A.**   I'm sorry?

14          **MS. BOAL:**  I object, Your Honor.  I don't think she

15   can --

16          **THE COURT:**  You want her to --

17          **MR. GOLD:**  I want to score the instrument.

18          **THE COURT:**  Go ahead.

19   BY MR. GOLD

20   **Q.**   So the first item is age of release.  That's 35 to 49.9;

21   right?

22   **A.**   Right, a score of one.

23   **Q.**   And when he is 50, he will score a zero there.  And

24   that's how, we were talking about how the instrument is more

25   sensitive to age?

1    **A.**   Yes.

2    **Q.**   Now, prior sentencing occasions for sexual offenses,

3    that would be zero; correct?

4    **A.**   Yes.

5    **Q.**   Any juvenile arrest for a sex offense, that would also

6    be zero; right?

7    **A.**   Right.

8    **Q.**   Rate of sexual offending.  This would also be zero;

9    right?

10   **A.**   Right.

11   **Q.**   And so the subscore here is one and that leads to a

12   persistence of sexual offending score of a one; right?

13   **A.**   Correct.

14   **Q.**   Now, deviant sexual interests is the next category.  Any

15   sentencing occasions for noncontact sex offense.  That would

16   be a one, a yes; right?

17   **A.**   Right, pornography.

18   **Q.**   Any male victim, that's a yes?

19   **A.**   One.

20   **Q.**   Young unrelated victims, does not have two or more

21   victims less than twelve.  So that is a zero; right?

22   **A.**   As far as we know, yes.

23   **Q.**   As far as we know.  And that's what we are dealing with

24   here, what we have evidence for?

25   **A.**   Right, his report at 13 years and above.

1    **Q.**  Now, relationship to victims.  Any unrelated victims,

2    that is a --

3    **A.**  Yes.

4    **Q.**  Yes, a one.  Any stranger victims, you scored that on

5    the Static as a zero.  Would that be the same coding here?

6    **A.**  Yes.  Albeit, you know, I know very little about the

7    victims in this case.

8    **Q.**  Now, any prior involvement with the Criminal Justice

9    System.  I imagine that would be a one?

10   **A.**  Yes.

11   **Q.**  Prior sentencing occasions for anything.  That would be

12   fourteen or more sentencing occasions; correct?

13   **A.**  I have no idea.  I'd need a moment to count.

14   **Q.**  Oh, sure.

15          (Pause in proceedings.)

16   **A.**  Yes.  It would be a one.

17   **Q.**  A one or a two?

18   **A.**  Wait a minute.

19          I'm sorry, a score of two.

20   **Q.**  Now, any community supervision violation.  You say you

21   found one in the records so that's --

22   **A.**  Yes.

23   **Q.**  -- one?

24   **A.**  One.

25   **Q.**  Years free prior to index sex offense.  That says more

1    than 36 months free prior to committing the sexual offense

2    that resulted in the index conviction and more than 48

3    months free prior to index conviction?

4    **A.**   It would be a one because he was arrested after the

5    fight with Fred I believe.  So that he was incarcerated,

6    then released and then reincarcerated for the pornography

7    offense.

8    **Q.**   Well, but the fight with Fred that he was arrested for

9    was not a sexual offense?

10   **A.**   It says years free in the community prior to the index

11   sex offense.  Okay.  The index sex offense would be the

12   arrest for pornography.

13   **Q.**   Right.

14   **A.**   Right.  Okay.  And how many months was he free in the

15   community prior to that where he was not incarcerated for

16   another offense?

17   **Q.**   Well, it says more than 36 months free prior to

18   committing sexual offense that resulted in the index

19   conviction.  So that is the child pornography offense?

20   **A.**   The index offense is the child pornography offense.

21   **Q.**   He committed that before he was arrested; right?

22   **A.**   Oh, he committed that for years before he was arrested.

23   **Q.**   Right.  And so before he began doing the child porn

24   offense he had never done any time for a sexual offense;

25   right?

1   **A.**   It's not time for a sexual offense.   It's the amount of

2   time in the community with no prior criminal arrests or

3   being incarcerated prior to that.   Free in the community

4   without being incarcerated is that item.

5   **Q.**   Right.

6   **A.**   Okay.   And in 2001 he had sixty days in jail for

7   possession of marijuana.   And so clearly he didn't have 36

8   months free in the community prior to committing -- being

9   arrested for the sexual offense.

10   **Q.**   Well, we will give that a one for now.

11   **A.**   All right.

12   **Q.**   I'd like to return to it later just to make sure that we

13   have those facts exactly right.

14          Now, any prior non-sexual violence sentencing

15   occasion.   Now, you scored him a one on the Static for

16   having the reckless burning conviction?

17   **A.**   Right, arson.

18   **Q.**   So you would be the same here?

19   **A.**   We would.

20   **Q.**   So the general criminality raw score here is one, two,

21   three, four, five, six, which gives him three points?

22   **A.**   Correct.

23   **Q.**   And I wasn't doing this before on the sheet so let me do

24   it now.

25          So according to our scoring on this right now, he

1    has an eight?

2    **A.**   That's right.

3    **Q.**   Which places him again not in the highest risk category

4    but in the moderate, high risk category; right?

5    **A.**   That's right.

6    **Q.**   So there is another one of these instruments.  And this

7    one is more refined than the Static-99 in terms of its risk

8    categories; right?

9    **A.**   This is not more refined than the Static-99 in terms of

10   its risk category.

11   **Q.**   Well, it has more risk categories; right?

12   **A.**   I don't know what you mean.

13   **Q.**   Well, you said that the Static-99 says Mr. Carta is high

14   risk; right?

15   **A.**   That's right.

16   **Q.**   And there is no extra high risk in the Static-99; right?

17   There is just low, low moderate, high moderate and high;

18   right?

19   **A.**   Right.  And these are very similar categories as the

20   Static-99.  I see no difference in these categories.

21   **Q.**   Well, except that there is a higher one that Mr. Carta

22   does not fit into; right?

23   **A.**   Well, he is not high risk on this.  He would have to

24   have one more point.  But he is high risk on the Static-99.

25   I mean, this is just a fact.  And they're similar

1    categories.

2    **Q.**  Well, but you yourself say that converging evidence

3    allows you to be more confident in your risk assessment;

4    right?

5    **A.**  Yes, I agree with that.

6    **Q.**  And so we have a moderate risk assessment from the

7    MnSOST-R; right?

8    **A.**  Right.

9    **Q.**  We have a moderate high from the Static-2002; right?

10   **A.**  Right.

11   **Q.**  We have a high from the Static-99; right?

12   **A.**  Right.

13   **Q.**  And we have a low moderate for the RRASOR; right?

14   **A.**  I don't use the RRASOR and I will not testify to that.

15   **Q.**  Well, it is an actuarial instrument; right?

16   **A.**  It's an actuarial instrument that's been replaced by the

17   Static-99.

18   **Q.**  Well, it's an actuarial instrument that was scored by

19   other -- so you don't -- by other clinicians in this field;

20   right?

21   **A.**  Another clinician in, let's see, 2007 scored the RRASOR.

22   But I'm not going to testify to the results of that because

23   I don't believe that's appropriate to use.

24   **Q.**  But there are clinicians who disagree with you such as

25   Dr. Doren; right?

1    **A.**  Dr. Doren disagrees with me.

2    **Q.**  And just one other thing about the MnSOST-R.  In this

3    document that I put up here, you mention here -- and this is

4    down where I said in the depo, New unpublished Minnesota

5    data indicates old probabilities of sexual rearrest are

6    inflated; right?

7    **A.**  Yes.

8    **Q.**  Now, there are new norms coming out for this as well;

9    right?

10   **A.**  There will be.

11   **Q.**  And they're not out yet?

12   **A.**  No.

13   **Q.**  And so your advice to other people doing this work is

14   report those results with caution; right?

15   **A.**  To report the risk level because the relative risk level

16   we know is accurate but not to report the probabilities of

17   sexual reoffense until the new rates come out.

18   **Q.**  Well, these risk levels come from the underlying data;

19   right?  That's where they come from; right?

20   **A.**  They come from a number of people who reoffended in the

21   sample.

22   **Q.**  So we can't tell what a person means by high risk

23   without the numbers underlying it; right?

24   **A.**  No, actually it's relative risk.  So those categories

25   are relative risk.  So the people who scored high risk

1    scored higher than those who had moderate and those who had

2    low in all of these instruments.  It still ranks relative

3    risk accurately.

4    **Q.**  Right, but if this instrument was only, if the high risk

5    category reoffended at a 14 percent rate, right, and that

6    was the best it could do, then that may be all well and good

7    in terms of determining risk but it might not be high enough

8    risk for a particular purpose; right?

9    **A.**  True.

10           **MR. GOLD:**  I have nothing further.

11           **THE COURT:**  No more cross?

12           **MR. GOLD:**  No more cross.

13           **THE COURT:**  Any redirect?

14                        **REDIRECT EXAMINATION**

15   BY MS. BOAL

16   **Q.**  Dr. Phenix, why don't you use the RRASOR?

17   **A.**  I don't use the RRASOR because it was the first

18   instrument developed.  It has four items and those items

19   were included in the Static-99.  So when you score the

20   Static-99, you're essentially double dipping.  You're using

21   those risk factors on the RRASOR twice to assess risk.

22           And, furthermore, the researchers in this field

23   believe that the best instrument is the instrument that

24   measures both of those clusters of factors, sexual deviance

25   and antisociality.  And the RRASOR is only a measure of

1   sexual deviance.

2   **Q.**  All right.  You just scored the Static-2002.  Does that

3   score affect your opinion in any way?

4   **A.**  It does not change my opinion.

5           **MS. BOAL:**  Nothing further, Your Honor.

6           **THE COURT:**  Anything else?

7           **MR. GOLD:**  Nothing.

8           **THE COURT:**  You are excused, Doctor.  Thank you.

9           **THE WITNESS:**  Thank you, Your Honor.

10          (The witness was excused.)

11          **MS. BOAL:**  Your Honor, we do not have any more

12  witnesses, the government doesn't; but at this time we'd

13  like to move into evidence Exhibit 30 which is the certified

14  records of conviction.  And I believe it's also the plea

15  agreement and the statement of conduct in the federal

16  offense.  And I understand there is no objection to that.

17          **THE COURT:**  No objection?

18          (Pause in proceedings.)

19          **MS. BOAL:**  I think the number may have changed.

20          I apologize, Your Honor.  Counsel is correct, it is

21  not 30.  It is Exhibit 26.

22          **THE COURT:**  Okay.  You got the right number, 26, is

23  that it?

24          **MS. KELLEY:**  We have no objection to Exhibit 26.

25          **THE COURT:**  Okay.  It comes in.

1          **(Government's Exhibit No. 26 received in evidence.)**

2          **MS. BOAL:**  The government rests, Your Honor.

3          **THE COURT:**  Okay.

4          (Pause in proceedings.)

5          **MS. KELLEY:**  Your Honor, we would like to make one

6     motion before we begin our case.  If I could just put this

7     (indicating) up for ease of discussion.

8          I'd like to move at this time for the Court to rule

9     that the hebephilia diagnosis that was proffered by the

10    government's expert does not meet the Daubert standard.  She

11    did not testify that hebephilia has met these specific

12    criteria that are set up.  She didn't talk about hebephilia

13    being in any peer reviewed literature.  That hasn't been

14    provided to the Court.

15         My understanding is she said it's a term used to

16    diagnose people.  It's a term that is used sometimes in

17    court.  But the government has not provided sufficient

18    information to Your Honor to find that this so-called

19    diagnosis meets the legal standard.

20         And we'd ask, Judge, that you so rule and strike

21    her testimony.

22         **MS. BOAL:**  Your Honor, you should not grant that

23    motion.  It is questionable whether a clinical diagnosis is

24    even the proper subject of a Daubert challenge.  It is not a

25    methodology as the actuarial instruments that might be a

1    proper subject of a <u>Daubert</u> challenge, it has not been

2    tested.  This is not a methodology.  This is a clinical

3    diagnosis.  And Dr. Phenix testified that it is regularly

4    used in the field.  It is accepted in the field.  It is not

5    without controversy.  We are not saying otherwise.  But it

6    is accepted in the field.  We put in a number of state court

7    decisions that rely on that diagnosis in finding that

8    someone is a sexually dangerous person.

9         And we attached peer reviewed articles which

10   Dr. Phenix testified about in her testimony that established

11   that it is a separate diagnosable condition.

12        **MS. KELLEY:**  Well, I don't recall her testifying

13   about any peer reviewed articles in detail --

14        **THE COURT:**  I don't recall it either.

15        **MS. KELLEY:**  -- that establish this diagnosis.

16        **MS. BOAL:**  Well, she mentioned it in her testimony

17   that there was a 2008 recent article by Blanchard.  And that

18   article is attached as the submission, as one of the

19   submissions in the government's trial brief.

20        **MS. KELLEY:**  Well, in fact, that article proposes

21   that it be a diagnosis in the DSM-IV-TR but -- or DSM-V I

22   suppose coming out.  But that article does not, in its

23   proposing such a diagnosis does not establish it as a

24   diagnosis.  People could propose whatever they please.

25        Hebephilia does not appear in the DSM.  Dr. Phenix

```
 1    tried to slip it in under this paraphilia NOS diagnosis.  It
 2    doesn't fit there.  It doesn't belong there.  And the
 3    government has not made a sufficient basis to show that
 4    that's anything but some kind of crack diagnosis used to try
 5    to, just for purposes of these proceedings.  So I don't
 6    think the government has met --
 7              THE COURT:  I am going to deny it without
 8    prejudice.  I may revisit it as I am working on my opinion
 9    but for the present I am going to deny it without prejudice.
10              Go ahead.  Are you ready to start?
11              MR. GOLD:  We are, Your Honor.  At this time we
12    would call Dr. Leonard Bard, the court examiner.
13              THE COURT:  All right.
14                         LEONARD BARD, Sworn
15              THE CLERK:  Thank you.  You may be seated.
16                         DIRECT EXAMINATION
17    BY MR. GOLD
18    Q.  Good morning, Dr. Bard.
19    A.  Good morning.
20    Q.  Dr. Bard, what is your profession?
21    A.  I am a clinical and forensic psychologist.
22    Q.  And how long have you been a psychologist?
23    A.  I have been licensed as a psychologist in the
24    Commonwealth of Massachusetts since 1985.
25    Q.  Now, did you bring a copy of your curriculum vitae with
```

1   you?

2   **A.**   I did.  I have it in my bag if you need it (indicating).

3   **Q.**  Dr. Bard --

4          **MS. KELLEY:**  I'm going to just provide him with a

5   copy of the exhibits.

6          **THE COURT:**  Of the exhibits?

7          **MS. KELLEY:**  Yes.

8          **MR. GOLD:**  Our exhibits, yes.

9          (Pause in proceedings.)

10         **THE WITNESS:**  Thank you.

11  BY MR. GOLD

12  **Q.**  Dr. Bard, where did you get your Ph.D?

13  **A.**  I received my Ph.D in clinical psychology in 1984 from

14  the University of Miami.

15  **Q.**  And what did you focus on when you were a student there?

16  **A.**  It was a degree in clinical psychology.  I've worked

17  with the chairman of the department, a psychologist named

18  Theodore Millon, M-I-L-L-O-N, who is one of the most well

19  known, excuse me, well known individuals in the field of

20  personality disorders.

21  **Q.**  And during the course of your Ph.D study did you do any

22  practicums or things of that nature?

23  **A.**  Yes.

24  **Q.**  And what were those?

25  **A.**  I did practicums at the University of Miami in the

1    counseling center, in a local clinic and I did my

2    predoctoral internship at the Boston V.A. Medical Center.

3    **Q.**   And did you end up at the Massachusetts Treatment Center

4    while a student?

5    **A.**   I actually, my first involvement at the Mass. Treatment

6    Center occurred while I was in college.  I was involved in

7    an honors thesis that I wrote working on sub typing of sex

8    offenders.  My advisor at Brandeis had received federal

9    funding to do research at the Treatment Center.  And I was

10   part of that early on.  And after I received my Ph.D I came

11   back and was involved again.

12   **Q.**   Well, Dr. Bard, what is the Massachusetts Treatment

13   Center?

14   **A.**   Massachusetts Treatment Center is the facility in the

15   Commonwealth of Massachusetts that houses individuals who

16   have been adjudicated as sexually dangerous persons under

17   Mass. General Laws, 123(a).

18   **Q.**   And how long has it been there?

19   **A.**   The original law was passed I believe in 1959 so there

20   has been a law on the books since that time.

21   **Q.**   And is it a place where research on sex offenders is

22   conducted?

23   **A.**   Not any more.

24   **Q.**   Was it in the past?

25   **A.**   Yes.

1    **Q.**  Now, you said your first experience at the Treatment

2    Center occurred when you were an undergraduate?

3    **A.**  Yes.

4    **Q.**  And then you went back?

5    **A.**  I did.

6    **Q.**  Under what circumstances?

7    **A.**  After I received my Ph.D I was hired at the Treatment

8    Center as a psychologist.  I was doing part-time clinical

9    work and part-time research.  I was a member of the intake

10   and observation team at the Treatment Center working with

11   newly committed patients and doing individual therapy, group

12   therapy, psychological testing, case consultation and

13   supervision.

14           I was also a member of a research team which was

15   being federally funded by both the National Institute of

16   Mental Health and the National Institute of Justice to

17   identify subtypes of sexual offenders.

18   **Q.**  And did that work result in a published article?

19   **A.**  The research team at the Treatment Center has published

20   many articles and book chapters from 1987 basically till the

21   present time.  I was the author of the first article we

22   published in '87, or the lead author.

23   **Q.**  And are you -- the colleagues that you had at that time,

24   do they continue in this field?

25   **A.**  Some of them do.

1    **Q.**  And do you continue to associate with those colleagues?

2    **A.**  Yes.

3    **Q.**  On a professional basis?

4    **A.**  Professionally and personally, yes.

5    **Q.**  Now, we took you up to your experience at the Treatment

6    Center.  How long were you employed at the Treatment Center?

7    **A.**  I was involved clinically there from 1984 until 1986.  I

8    was involved in the research team for probably another five

9    years.

10   **Q.**  And when you were doing this, did you work at the

11   Treatment Center?

12   **A.**  Yes.

13   **Q.**  You had an office there?

14   **A.**  Yes.

15   **Q.**  After that period working with the research team, what

16   did you begin to do next?

17   **A.**  Well, I took a job as a forensic psychologist at

18   Bridgewater State Hospital doing court-ordered forensic

19   evaluations in the areas of competency and criminal

20   responsibility, civil commitment in aid to sentencing.

21   **Q.**  And approximately how long did you do that?

22   **A.**  I was at Bridgewater State Hospital for about three

23   years.  During that time I also joined a private practice in

24   Fall River, Massachusetts as a psychologist.  There were two

25   psychiatrists and myself there.  And I did that on a

1    part-time basis from 1987 until 1993.

2    **Q.**  And what did you do there as part of that private

3    practice?

4    **A.**  General psychological practice, psychotherapy,

5    psychological testing, evaluations, couples therapy, family

6    therapy.  And I was also being called for various private

7    forensic cases at that time.

8    **Q.**  Now, did you maintain a relationship with the

9    Massachusetts Treatment Center during this period?

10   **A.**  Well, after I left the employ of the Treatment Center I

11   was appointed as what is called a qualified examiner.  And a

12   qualified examiner at that time was appointed by the

13   Department of Mental Health.  And that basically allowed me

14   to do evaluations for the Commonwealth on the areas of

15   sexual dangerousness and the need for commitment.

16   **Q.**  And so a qualified examiner, was that an appointment or

17   how did you become a qualified examiner?

18   **A.**  It's an appointment.  It has, according to Mass. General

19   Laws, 123(a), a qualified examiner is a licensed

20   psychiatrist or psychologist who has two years of experience

21   with the diagnosis, treatment or evaluation of sex offenders

22   and who is appointed by at that time who is the assistant

23   commissioner for mental health.

24   **Q.**  Now, as a qualified examiner, were you -- what was your

25   work?

1    **A.**  My work was to conduct sexually dangerous person

2    evaluations for the Commonwealth.

3    **Q.**  And you testified exclusively for the Commonwealth at

4    that time?

5    **A.**  No, I was also called occasionally by the defense.

6    **Q.**  Depending on how your opinion came out?

7    **A.**  No, I was called by the defense to do an evaluation

8    separate from the ones I was doing for the Commonwealth.  I

9    was not called into court obviously if I was not in favor of

10   the respondent.

11   **Q.**  But as a qualified examiner you could be called by

12   either side; right?

13   **A.**  Yes.

14   **Q.**  And you also had a private practice doing these

15   evaluations?

16   **A.**  At that time my private practice consisted to a large

17   degree of more general psychological services.  And I would

18   do an occasional forensic evaluation.

19   **Q.**  Well, how long in total did you serve as a qualified

20   examiner?

21   **A.**  From 1987 until 1999.

22   **Q.**  And why did you stop?

23          **MS. STACEY:**  Objection.

24          **THE COURT:**  What is the objection?

25          **MS. STACEY:**  I think he is going to go into an area

1   of how qualified examiners are appointed, Your Honor.

2          **THE COURT:**  Well --

3          **MS. STACEY:**  It is not relevant to this.

4          **THE COURT:**  Well, I don't know whether it goes

5   towards his credibility; but I will assume that is why he is

6   asking it.  So I will let you have it.  Go ahead.

7   **A.**  At some point prior to 1999 the jurisdiction of the

8   Treatment Center went from the Department of Mental Health

9   to the Department of Correction.  And in 1999 the Department

10  of Correction hired a subcontractor to find qualified

11  examiners and to do those evaluations.  And I was not asked

12  to join that.

13  **Q.**  And since that time have you continued to do these types

14  of evaluations?

15  **A.**  Yes.

16  **Q.**  And you basically do it for a living?

17  **A.**  In the past two years I have been doing only forensic

18  work.  Before that as I indicated, I had a practice in Fall

19  River which we did a number of things, mostly therapy and

20  psychological testing.

21  **Q.**  Now, do you do these types of evaluations only in the

22  state of Massachusetts?

23  **A.**  No.

24  **Q.**  Where else do you do them?

25  **A.**  I have been called to do similar kinds of evaluations in

1    New Hampshire, New York and Washington.

2    **Q.**   Do you have experience treating sex offenders?

3    **A.**   I do.

4    **Q.**   And what does that experience consist of?

5    **A.**   I began treatment at the Mass. Treatment Center in the

6    '80s.   I continued that treatment to a lesser extent at

7    Bridgewater State Hospital.   And I have done outpatient

8    treatment of sex offenders from the time I began my practice

9    in '87 up until about 2006.

10   **Q.**   Now, just to be clear about your current work, Dr. Bard,

11   are you called exclusively by the defense in these cases?

12   **A.**   When I have been doing sexually dangerous person

13   evaluations I have only been called by the defense since I

14   was no longer considered a qualified examiner.   I have been

15   called by the courts and by DA's in other areas such as

16   competencies.

17   **Q.**   And with respect to this particular area, do you find no

18   one sexually dangerous?

19   **A.**   No, I find many individuals sexually dangerous.

20   **Q.**   Well, are you then called by the Commonwealth or how

21   does that work?

22   **A.**   I have not been called by the Commonwealth.   The work I

23   do for the defense is protected information so even when I

24   do find someone sexually dangerous I have not been called.

25   **Q.**   So you're hired to do an assessment?

1    **A.**  Yes.

2    **Q.**  And then if you don't find someone, "clear" someone I

3    guess is the term you use?

4    **A.**  Yes.

5    **Q.**  Then you're not hired?

6    **A.**  I'm not called into court.  I am hired to do an

7    independent evaluation either way.

8    **Q.**  Do you have in front of you our binder of exhibits?

9    **A.**  I do.

10   **Q.**  And do you have it turned to Exhibit No. 9?

11   **A.**  I do now.

12   **Q.**  And that is a copy of your CV?

13   **A.**  No, that is a copy of my report.

14   **Q.**  Oh, I'm sorry, Exhibit 10.

15   **A.**  Yes.

16          **MR. GOLD:**  Your Honor, I would seek to move

17   Dr. Bard's CV into evidence.

18          **MS. STACEY:**  No objection.

19          **THE COURT:**  All right.  It comes in.

20          **(Defendant's Exhibit No. 10 received in evidence.)**

21   BY MR. GOLD

22   **Q.**  Dr. Bard, how did you come to be involved in this case?

23   **A.**  I was appointed by the court to do an independent

24   evaluation of Mr. Carta.

25   **Q.**  Now, during your preparation of this case were you

```
1    allowed to have contact with the parties?
2    A.   Until the past week I was told that I could only be in
3    contact with everybody at once so my contacts were basically
4    emails which were addressed to everybody on the case.
5    Q.   And then since the Court granted an order allowing us to
6    have conversations, we have been talking about the case?
7    A.   Yes, we have.
8    Q.   Now, did you arrive at an opinion in this case?
9    A.   I did.
10   Q.   And did you arrive at the opinion to a reasonable degree
11   of professional certainty?
12   A.   I did.
13   Q.   And did you draft a report outlining your conclusions?
14   A.   I did.
15   Q.   I turn your attention to Exhibit 9.
16   A.   Yes.
17   Q.   And that is a copy of the report that you drafted?
18   A.   It is.
19        MR. GOLD:   We move the report into evidence.
20        MS. STACEY:   No objection.
21        THE COURT:   It comes in.
22        (Defendant's Exhibit No. 9 received in evidence.)
23   BY MR. GOLD
24   Q.   Dr. Bard, you have been sitting in the courtroom
25   listening to the testimony and the arguments in this case.
```

1    I am going to ask you first what's wrong with this diagnosis

2    of hebephilia?

3    **A.**  Many things.  First it is not a paraphilia.  Paraphilia

4    as was referenced in the DSM-IV involves a pattern of

5    behavior involving children or non-consenting individuals.

6    I would be hard pressed to define adolescents as children.

7            And the issue of non-consent according to the

8    editors of the Diagnostic Manual only applies to such

9    paraphilias as sadism, exhibitionism and voyeurism.  That's

10   No. one.

11           No. two, it is not in the DSM-IV.  Therefore, it is

12   not generally accepted by the psychiatric and psychological

13   community.

14           The DSM-IV lists a number of paraphilias.  They

15   then go on to paraphilias NOS, not otherwise specified.  And

16   they give examples which are very low in frequency but they

17   exist -- and I believe Dr. Phenix also alluded to this --

18   sexual arousal to corpses, animals, feces, urine, enemas.

19           The fact that hebephilia, if that's what we want to

20   call it here, doesn't even make it into a list involving

21   such bizarre paraphilias as that indicates that it is not

22   accepted.  A recent textbook called *Sexual Deviance* which

23   goes through basically as much deviance as you want doesn't

24   even list hebephilia in the table of contents or the index.

25   It is simply not recognized.

1                No. three, hebephilia cannot be defined.  There are

2       a number of people who have proposed it.  They have each

3       proposed different kinds of things.  One says that it

4       involves any sort of adolescent kind of arousal.  Another

5       one says it has to be the preferred arousal through

6       adolescents.  We don't know if it should be limited to any

7       particular age.  We have heard the numbers 13 to 17 bandied

8       about.  Is anyone proposing that arousal to a sexually

9       mature 17-year old is somehow pathological?  What about a

10      16-year old?  What about a 15-year old?  Where is that line?

11              The problem with the diagnosis, there is no line.

12      The only line that exists in the DSM is prepubescent versus

13      everybody else.

14              Arousal to prepubescent children is pedophilia, a

15      recognized diagnosis.  No one argues that.  Anything else is

16      not a paraphilia based on age.  There are 13-year olds who

17      look like 18-year olds.  There are 18-year olds who look

18      like 13-year olds.  What are we supposed to do with that?

19      Do we base it on age?  Do we base it on body type?  We base

20      it on sexual maturity.  That's the third thing.

21              No. four, there is evidence and there was research

22      that normal adults who have no sexual offending histories

23      and no proclivities find sexually mature adolescents to be

24      arousing.  You would be saying that anyone who finds Miley

25      Cyrus in any way attractive would be considered a hebephile.

1    She just turned sixteen.  Last month you would be considered

2    a hebephile, now you're not.  It doesn't make any sense.

3         There have been opinions that it should be related

4    to the age of consent, that a non-consenting person, that

5    that is a pathology.  Well, the age of consent in

6    Massachusetts is 16.  I'm told the age of consent in New

7    York is 18.

8         So one who is involved sexually with the same

9    individual, a 17-year old girl in Massachusetts is normal

10   and in New York is not just because the law says that?  In

11   France it's 15.  In Spain it's 14.  Are we going to diagnose

12   geographic pathology?  It makes no sense at all.

13        Six, shouldn't we also include a difference in age

14   as being a factor here, which has not been told, which has

15   not been mentioned.  How about a 17-year old who has

16   consenting sexual relations with a 15-year old?  I doubt

17   anyone is going to call that sexual violence but maybe if

18   the person is 25, maybe it is that.  Maybe if the person is

19   50.  There is no criteria.  That's the biggest problem with

20   this whole diagnosis.  No one has ever set down criteria

21   that you can assess and evaluate.

22        That's what the DSM-V does.  It gives you diagnoses

23   that are the result of research in the field and consensus

24   among experts.  We don't have any of that.

25        And, finally, just to address the articles that

1    have allegedly found hebephilia to be a paraphilia, there

2    are none.  There are is one group in Canada who is the only

3    people publishing anything about this.  They have done such

4    important research as looking at the difference in left and

5    right handedness of hebephiles, height of hebephiles, IQ of

6    hebephiles in an attempt to isolate, excuse me, that group.

7         It fails in every conceivable way.  Both of those

8    authors are on the editorial board of the journal that keeps

9    publishing their findings.  They have not used controlled

10   groups in their research.  In their most recent article they

11   have eliminated 60 percent of the proposed samples because

12   they didn't meet their criteria so they just threw out half

13   the sample, probably because it wouldn't have helped them at

14   all.

15        And they have only used particular stimuli in order

16   to guarantee that anyone who was aroused to any teenagers

17   would fall into their categories.

18        That article that was mentioned, what was omitted

19   was that there were five replies to that article published

20   as well tearing it apart on these, for these reasons and

21   more.  It is not generally accepted.  It is accepted by a

22   group in Canada.  And it's accepted by individuals who do

23   sexually dangerous person evaluations for the government.

24   Those are the people who accept this.

25   **Q.**  Well, Dr. Bard, we have heard testimony that the

1    criteria for paraphilia NOS have been met in Mr. Carta's

2    case; is that not true?

3    **A.**   In my opinion they certainly have not.

4    **Q.**   Well, what are the criteria for paraphilia NOS?

5    **A.**   Well, there aren't any.  That's the problem.  It

6    involves a paraphilia but we don't know what it is or we are

7    not saying what it is.  And you can actually invent anything

8    you want as long as you say it's so.  Paraphilia NOS, fill

9    in the blank.

10   **Q.**   Well, could you say paraphilia NOS, homosexuality for

11   example?

12              **MS. STACEY:**  Objection.

13              **THE COURT:**  What is the objection?

14              **MS. STACEY:**  It's not relevant, Your Honor.

15              **THE COURT:**  Overruled.

16   **A.**   One could, one shouldn't and I hope that no one does.

17   But there are certainly some people out there who consider

18   homosexuality to be deviant even though the American

19   Psychiatric Association does not.

20              Clearly the number of individuals who vote for laws

21   banning marriage for homosexuals clearly indicates that a

22   lot of people think it is abnormal so I'm sure it's

23   possible.  I have not seen it but it would, it would

24   probably be considered paraphilia by some individuals.

25   **Q.**   Now --

1          **MS. STACEY:**  Move to strike the last part, probably

2    would be considered.  It's entirely speculative.

3          **THE COURT:**  Denied.

4    BY MR. GOLD

5    **Q.**  Dr. Bard, did you testify that sexual interest in

6    adolescents is not deviant?

7    **A.**  I am testifying that sexual interest in pubescent

8    adolescents, those who have achieved sexual milestones, who

9    show secondary sex characteristics is not deviant.

10          Acting on that arousal is illegal if the individual

11   is not over the age of consent.  We don't pathologize based

12   on the law.  We pathologize based on what we know in the

13   research.  And there is nothing in the research that says

14   that attraction to adolescents is in any way, shape or form

15   deviant.

16   **Q.**  Well, this has actually been studied in the literature?

17   **A.**  Well, as I indicated, they have done plethysmograph

18   evaluations measuring sexual arousal to adolescents and

19   normal adults, depending on their preference, have found

20   adolescent males and/or females to be as sexually arousing

21   as adults.  It is everywhere.

22          I mean, to think that normal people are not

23   attracted to healthy adolescents who radiate the kind of

24   youth and beauty that all of us seek in some way or another

25   is absurd.

```
 1            So here again, sexually mature adolescents are like
 2     everybody else.  Sexually immature adolescents, they are
 3     not.
 4     Q.  Well, now, you evaluated Mr. Carta in this case.
 5     Mr. Carta has had -- has admitted to many interactions with
 6     teenage boys and has said that his preferred body type is of
 7     a certain type.  Do you recall that?
 8     A.  Yes.
 9     Q.  Doesn't that make him deviant in some way?
10     A.  No.
11     Q.  Why not?
12     A.  Again, if Mr. Carta is taken at his word, and virtually
13     all the information that we have about his sexual history
14     comes from him, there is hardly anything in the files that
15     comes from third parties so we have to rely on what he has
16     been saying.
17            He is attracted to sexually mature adolescents,
18     those who can participate sexually, who can achieve
19     erections, those who are, show secondary sex
20     characteristics.
21            He is not aroused to prepubescent children.  He has
22     been very clear about that with everyone who he has talked
23     to.
24            Just because he prefers a certain body type, that's
25     not associated with age.  He was involved with a 17-year
```

1   old, you know, in a relationship.  Is that deviant?  It's an

2   adolescent.  It's legal.  If someone was 25 and had that

3   same body type, I'm sure Mr. Carta would be aroused to them

4   too.

5         And by his own admission the vast majority of his

6   sexual partners have been adults.  So this is not someone

7   who is fixated anyplace.  This is not like the pedophile who

8   only seeks out six-year olds.  This is someone who is

9   looking for young people.  Not immature people, young

10  people.

11        There are many other people just like that out

12  there.  They have used better judgment than Mr. Carta has.

13  They have not sought to go below the age of consent.  That's

14  what makes Mr. Carta's behavior illegal and it should be

15  punished and it certainly has been.

16        But, again, not -- we have no images and no

17  pictures of any of Mr. Carta's sexual partners.  We don't

18  know what they looked like.  We have his admission that he

19  did these things and his admission of what they were like

20  sexually, physically.  And based on that I cannot say that

21  his sexual contact with these individuals, while illegal,

22  while harmful, while exploitative, was deviant.

23  **Q.**  Dr. Bard, stepping back a little bit, when you do these

24  evaluations, how do you go about them?

25  **A.**  Well, in practical terms I like to read as much as I can

1    about the individual beforehand.  I like to review as many

2    documents as I can.

3          I then conduct the interview.  Sometimes more than

4    one.  And then I read more, because there is always more

5    information.

6          And then I try to put together all the information

7    I have, both from the individual who I have evaluated and

8    from the records that are available to me to try to create a

9    picture in my mind as it were, an image of who this person

10   is and how he got to where he is at this time.

11         I try to find, I try to see if the individual meets

12   any relevant diagnoses.  And I say "relevant diagnoses"

13   because I sometimes don't include diagnoses that don't

14   appear to be as important even though the individual may

15   actually meet those criteria.

16         And in doing the risk assessment portion of the

17   evaluation, I employ what is considered an adjusted

18   actuarial approach beginning with one or more actuarials.

19   And then, because we know that actuarials have limitations,

20   also identifying relevant dynamic factors, things that have

21   been talked about before, some of which are valid, some of

22   which are not, an individual's age, an individual's

23   participation in treatment.

24         And then I look at the particular statute to see

25   what I am being asked to actually opine about.  Each of the

1    states where I have done these evaluations has slightly

2    different and sometimes very different definitions of a

3    sexually dangerous person, of a sexually violent predator.

4           And in this case I read the law that discussed what

5    a sexually dangerous person is.  Unfortunately it's not very

6    well defined.  And I tried to apply my clinical findings to

7    that.

8    **Q.**  Now, you mentioned that part of the early part of this

9    process is doing an interview.  Why is that important?

10   **A.**  Well, I think you can gain information from an interview

11   that you simply can't get anywhere else, both in terms of

12   historical information that may or may not be written down,

13   but also to get an impression of where the individual is

14   right now.

15          One of the most important things since we're being

16   asked to opine about an individual's dangerousness now, not

17   in the past, but now, is that we have to assess the

18   individual now.  We have to see where he is now compared to

19   how he has been described in the past.  Do we see any

20   changes?  Is he consistent in the way he describes?

21          So you get a great deal of information from an

22   interview.

23   **Q.**  Well, do you ever do an evaluation without doing an

24   interview?

25   **A.**  Very rarely.  I tend to decline those evaluations in

1    general.  And when I do them, it's almost always because the

2    individual has refused to meet with anybody.  And when I do

3    that, I put a section in my report consistent with the

4    ethics of the American Psychological Association that

5    basically indicates that my findings cannot be considered as

6    certain as if I had the chance to interview the person.

7    That's a hallmark of ethics.

8    **Q.**  Well, why is that a hallmark of ethics?

9    **A.**  Because I think psychologists realize that we simply

10   cannot be as certain of our own conclusions when we only

11   have a limited source of data.  We want to get as much as we

12   can.

13          In those situations where we either don't or we

14   can't, we have to qualify that.  That's good practice.

15   **Q.**  Now, you mentioned that at some point in your process

16   you look at the statute that you are being called upon to

17   give an opinion about.  Did you put the statute in your

18   report?

19   **A.**  I did.

20   **Q.**  And could you describe your understanding of the

21   elements of the statute that you had when you did the

22   evaluation?

23   **A.**  Well, according to what I have seen, the federal law

24   says that a sexually dangerous person means a person who has

25   engaged or attempted to engage in sexually violent conduct

1    or child molestation and who is sexually dangerous to

2    others.

3            It goes on to define what sexually dangerous is,

4    that the person suffers from a serious mental illness,

5    abnormality or disorder as a result of which he would have

6    serious difficulty in refraining from sexually violent

7    conduct or child molestation if released.

8            Unfortunately the term "sexually violent conduct"

9    and "child molestation" are not defined.

10   **Q.**  We have gone over Mr. Carta's history a number of times

11   but did you undertake for yourself to define "sexually

12   violent conduct"?

13   **A.**   I tried.  It is difficult because one of the things that

14   a forensic psychologist does or should do is to apply their

15   clinical experience and training to what the question that

16   the law is asking.  And the more specific the question is,

17   the better we can apply it to.

18           So when you have a question of mental illness in

19   Massachusetts, it's defined specifically:  A substantial

20   disorder of thinking, mood, perception, orientation, memory

21   that results in, blah blah blah.  It's much easier.  This is

22   not.

23           Sexually violent conduct to me involves force,

24   plain and simple, force.  Child molestation is a descriptive

25   term.  The way I interpret it is that any sexual contact

1   with someone who cannot consent.  That's the only way I can

2   define it.

3   **Q.**  The next element in the statute -- and you found

4   evidence of child molestation in the records here Mr. Carta

5   admits to?

6   **A.**  Mr. Carta is very open about talking about the kinds of

7   behaviors that he engaged in in the past, that he was

8   involved in the sexual abuse of numerous underage people who

9   could not give legal consent.

10  **Q.**  Did you arrive at an opinion as to whether Mr. Carta

11  meets the second prong of the statute?

12  **A.**  I did.

13  **Q.**  And what is that opinion?

14  **A.**  I could not find any serious mental illness, abnormality

15  or disorder as a result of which he would have serious

16  difficulty in refraining from that kind of conduct.

17  **Q.**  How first did you undertake to interpret the term

18  "serious mental illness, abnormality or disorder"?

19  **A.**  Well, I think the only way that we can interpret that is

20  to try and do the best diagnostic assessment that we can

21  using the *Diagnostic and Statistical Manual* from which most

22  of the psychologists and psychiatrists are trained.

23          So the first part is to see whether or not the

24  individual meets the diagnostic criteria here.  And in these

25  kinds of evaluations, only a certain subset of diagnoses

1    have any relevance at all.  Obviously the more sexually

2    oriented diagnoses since what we're talking about is

3    someone, whether he can control his sexual impulses, and to

4    a lesser extent a personality disorder, usually antisocial.

5           While there are others that may affect certain --

6    that may affect someone's conduct or control of conduct in

7    certain cases, those are very rare.

8    **Q.**  Did you consider any paraphilia diagnoses when you did

9    this evaluation?

10   **A.**  I considered all of them.  I looked to see what kind of

11   sexual difficulty or deviancy or whatever you want to call

12   it the individual has displayed, if any, and see if that

13   corresponds to any of the known and accepted disorders in

14   the *Diagnostic Manual*.

15   **Q.**  Now, we've heard your testimony, a good portion of your

16   testimony about hebephilia.  Are you saying that Mr. Carta

17   has no problems in a mental health sense?

18   **A.**  Not in the least.

19   **Q.**  Well, what's going on here with Mr. Carta?

20          **MS. STACEY:**  Your Honor, I am going to object at

21   this point.  He is going beyond what he set out in his

22   expert report.  He has diagnosed him with nothing in his

23   expert report.

24          **MR. GOLD:**  Well, I am not calling for a diagnosis.

25   I am calling for --

1          **MS. STACEY:**  What's going on here.  Have you

2     diagnosed mental disorders --

3               (Whereupon, counsel are talking simultaneously.)

4          **THE COURT:**  Let's point it out to me in the expert

5     report and then you rephrase.

6     BY MR. GOLD

7     **Q.**  Are you saying by not diagnosing Mr. Carta that he has

8     no behavioral problems?

9     **A.**  I am not saying that at all.

10    **Q.**  Does Mr. Carta have behavioral problems?

11         **MS. STACEY:**  Objection, Your Honor.

12         **THE COURT:**  I will let him have that.

13    **A.**  Mr. Carta has a great number of problems:  Emotional,

14    psychological, behavioral.  But none of them rise in my

15    opinion to the level of a diagnosis at the present time.

16    **Q.**  Are you saying that there could have been a diagnosis in

17    the past?

18    **A.**  I think I may have written in my report that he clearly

19    would have met the diagnosis of an antisocial personality

20    disorder in the past.  But I don't believe that he meets it

21    at this time.

22    **Q.**  Well, we have heard diagnoses of Mr. Carta in this case.

23    I believe there were five of them.  Do you recall hearing

24    that testimony?

25    **A.**  I do.

1   **Q.**  Do you agree with the diagnosis of Mr. Carta as being

2   cannabis dependent?

3            **MS. STACEY:**  Objection.

4            **THE COURT:**  What is the objection?

5            **MS. STACEY:**  Again, it's beyond the expert report

6   and he is now commenting on the credibility of the witness,

7   which is for this Court.

8            **THE COURT:**  No, I don't think he is commenting on

9   the credibility.  I think he is just asking whether he

10  agrees with the particular observation.

11           I am going to let him testify.  Go ahead.

12  **A.**  I don't really find it relevant at this time.  He may

13  have shown it in the past.  Mr. Carta was very open about

14  acknowledging daily use of marijuana.  He hasn't used it

15  obviously in a long time because he has been incarcerated,

16  although it's certainly possible for individuals to use

17  while incarcerated.

18           But I think that goes back to my point earlier is

19  that I don't include things that I don't see -- that I don't

20  think are particularly relevant to the question here.

21           Mr. Carta had an alcohol problem.  Mr. Carta had a

22  marijuana problem.  Mr. Carta had an LSD problem.  I don't

23  think any of those led him to offend in the way that he did.

24           **THE COURT:**  But the issue here, one of the issues

25  is whether or not he is likely to repeat that sort of

1    behavior.

2         **THE WITNESS:**  Right, exactly.

3         **THE COURT:**  The fact that he doesn't do it because

4    he is confined, is that a factor for you, that he is unable

5    to have access?

6         **THE WITNESS:**  Not really because I don't think that

7    he needed those substances in order to offend.  There are

8    some individuals who only offend when they are drinking or

9    high, that that sufficiently lowers their inhibitions.  I

10   don't see that here.

11        I think Mr. Carta offended because he wanted to

12   offend.  And there was no particular need for those

13   substances.  He may have used those substances but I don't

14   see them as being directly related to his risk.

15        **THE COURT:**  But, I mean, right now he is in a

16   supervised status.

17        **THE WITNESS:**  Even in the past though I don't --

18        **THE COURT:**  In jail there is only so many things he

19   can do.  He is not in a position to be able to offend just

20   because he feels like it.

21        **THE WITNESS:**  Yes and no.  I have evaluated enough

22   individuals over the years who have offended while they have

23   been incarcerated, who have used marijuana while they have

24   been incarcerated and alcohol and done all sorts of things.

25   That goes to a different issue here.  And I talk about that

1    more in terms of dynamic factors.

2         But I just don't think that his use of substances

3    was the critical element here and that substances by itself

4    do not make anybody offend.

5         **THE COURT:**  Go ahead.

6    BY MR. GOLD

7    **Q.**  You said you considered a diagnosis of personality

8    disorder?

9    **A.**  Yes.

10   **Q.**  And could you explain again or explain why you do not

11   find he presently suffers from antisocial personality

12   disorder?

13   **A.**  Well, in order to suffer from any sort of personality

14   disorder -- well, let me back up, if that's okay.

15        A personality disorder is a diagnostic category in

16   a diagnostic manual that is coded separately from the more

17   traditional, what we call Axis I diagnoses, things like

18   depression and anxiety, things like that.

19        Personality disorders are in Axis II.  They are

20   conceived as an underlying, longstanding way that the

21   individual deals with the world around him.  And that has to

22   be longstanding in nature and has to be current at this time

23   because that's exactly what it is.  It does not change

24   easily.  So we are looking for a longstanding pattern.

25        And the *Diagnostic Manual* gives us ten or eleven

1    specific personality disorders ranging from dependent

2    personality disorder.  Let's say someone has a longstanding

3    pattern of looking for someone to take care of them and they

4    have a hard time asserting themselves.

5          And in even in those kinds of situations where it

6    would benefit them to assert themselves, they can't do it or

7    they won't do it.  When that becomes a problem for them,

8    that leads to the diagnosis of a personality disorder.

9          You can have dependent personality disorder,

10   narcissistic, antisocial, schizoid, compulsive, histrionic,

11   any one of them depending on the clinical presentation.

12         Having said that, Mr. Carta clearly met the

13   criteria for antisocial personality disorder.  He has a

14   history of symptoms of a conduct disorder before the age of

15   fifteen.  He has a long history of disregard for the rights

16   of others.  A long criminal history, substance abuse, poor

17   employment, poor relationship quality, he's got it all.

18         The question is does he have it now.  And I know

19   that he's been incarcerated so you don't expect the same

20   kind of behaviors while incarcerated but you -- but because

21   personality disorders don't just change no matter if you're

22   incarcerated or not, you would expect to see the same

23   pattern, at least in some ways.

24         And when we look at Mr. Carta's behavior while he

25   is incarcerated, he doesn't show that.  He's had one pseudo

1    fight where -- I don't even know if it was a fight.  He was

2    threatened by somebody else.  He made one threat in anger.

3         He's participated in a year-long program called

4    CODE, although he had some difficulties.  He decided he

5    wanted to leave a couple of times because it was too

6    difficult.  He persisted.  He voluntarily asked for the sex

7    offender treatment.  We know he had some problems there.

8         The information that Mr. Carta related to me is not

9    consistent with that is in the files.  I don't know what is

10   right or what's not.  But I don't think it is as simple as

11   saying that he was hanging out with younger guys.

12        He has been in Devens for the past couple of years.

13   No problems over there.  Simply put, he is not showing the

14   same pattern.  It might be the result of age.  It might be

15   the result of incarceration.  Up to certain a point it might

16   be the result of maturity.

17        When you speak to Mr. Carta as I did, he is able to

18   look at himself now, and I don't recall seeing that anywhere

19   else, he can look back and see and acknowledge, and in his

20   words, that he was a terrible person.  His words.  He did a

21   lot of terrible things.  He doesn't argue that.  He

22   expressed a great deal of remorse and shame for what he has

23   done.  That's consistent with his behavior while he's been

24   in sex offender treatment.

25        He reported all of the offenses that we are now

1    talking about.  Every single one of them comes from him.   If

2    he shuts up, if he doesn't participate in sex offender

3    treatment, he's not here today.  There is no way he's here

4    today.  He acknowledges all these things.

5            He tries to understand, and it's very difficult

6    work.  Anyone who has done sex offender treatment knows.

7    And I think Dr. Wood said it's two steps forward, one step

8    back.  I'll tell you sometimes it's one step forward and

9    eight steps back.  It's very difficult work for everybody

10   involved.

11           And the fact that he opened up so quickly to

12   somebody and acknowledged, by his own admission, terrible

13   things tells me something about him, that he is not the same

14   person.  That he's not hiding behind things.  And he admits

15   it's hard to talk about things in the CODE Program that he

16   did and that he passed in 2003.  He has a hard time talking

17   in groups, probably because he's a sex offender, he doesn't

18   want to talk about these things.

19           But antisocial people don't do that.  They don't

20   cry about what they have done.  They don't want to accept

21   responsibility for what they have done.  They don't express

22   shame and guilt for what they have done.  They certainly

23   don't admit to countless offenses where they have never been

24   charged.  So I don't think that he fits the criteria for

25   antisocial personality disorder at the present time,

1    although he does meet many of those criteria.

2    **Q.**  Did you consider a diagnosis of borderline personality

3    disorder?

4    **A.**  Yes.

5    **Q.**  What is that?

6    **A.**  Borderline personality disorder was defined well by

7    Dr. Phenix.  It's a pattern of unstable and intense

8    interpersonal relationships, rapid vacillating affect,

9    instability.  Mr. Carta showed some of those signs.  He has

10   one suicide attempt.  It happened in his twenties.  He has

11   certainly acted terribly when he has been perceived to be

12   abandoned by others.  Those flyers, the things he sent out

13   to get back at others are all signs of that.

14           Here again I don't see that now at all.  What he

15   has done now is when things get tough, instead of acting

16   out, he tries to pull out.  In sex offender treatment he

17   tried to pull out a couple of times and eventually was

18   successful.

19           In the CODE Program he tried to pull out a couple

20   of times but he was unsuccessful.  His therapist at the time

21   worked very closely with him and convinced him to get back

22   in.

23           I suspect that Mister -- I'm sorry -- I suspect

24   that -- excuse me.

25           I suspect that his therapist at Butner would have

1  done the same thing but he was going off service.  And I

2  think that was the primary reason that Mr. Carta eventually

3  pulled out.

4         But to answer your question I don't see anywhere

5  near the kind of evidence for borderline personality

6  disorder.

7  **Q.**  Let me just interrupt.  What did you mean by "off

8  service"?

9  **A.**  When you do a rotation as an intern, it's for a certain

10 amount of time, usually six months.  I was at the V.A.

11 Hospital and we had the same thing.  You do six months over

12 here and six months over there.

13        So I think that his therapist at the time who was

14 going off service after six months at the end of February,

15 coincidentally or not, that is when Mr. Carta decided to

16 finally leave.  And he doesn't have anybody to sit down with

17 him and talk him back in.

18        But that's a very different kind of dynamic as

19 someone who when he was injured in the past would retaliate

20 and get back at people.  He did not show that.  And you can

21 certainly do those kinds of things even if you're

22 incarcerated, in prison.

23 **Q.**  Well, did you consider a diagnosis of not otherwise

24 specified personality disorder?

25 **A.**  The problem with not otherwise specified in general is

1    that it's a waste basket category.  That's what we call it

2    because you can throw anything into it.  You don't have to

3    have specific criteria.

4         I think what Dr. Phenix did was she used the NOS

5    only because she felt that he had met the criteria for two

6    different personality disorders.  Rather than going through

7    each of them, she said NOS but antisocial and borderline.

8         (Whereupon, counsel conferred.)

9    BY MR. GOLD

10   **Q.**  Now, is personality disorder standing alone in your

11   opinion sufficient to commit someone under this statute?

12         **MS. STACEY:**  Objection.

13         **THE COURT:**  Overruled.

14   **A.**  Actually I think that it can in certain circumstances.

15   If you have an individual who is clearly antisocial and has

16   continued his antisocial behavior at the present time, and

17   part of that antisocial behavior all along has been sexually

18   violent behavior, yes, I think so.

19   **Q.**  Now, so you found no mental disorder in this case?

20   **A.**  I found no -- I did not diagnose him with anything in

21   the DSM-IV and I did not find anything that would fit the

22   law's provision of a mental illness, abnormality or disorder

23   the result of which you would have serious difficulty

24   controlling, serious difficulty in refraining from sexually

25   violent conduct or child molestation.

1          That is why even though I did not put it in my

2     report, I acknowledge that Mr. Carta has a substance abuse

3     problem.  And he could probably be diagnosed as such.  But

4     that doesn't result in difficulty refraining from sexually

5     violent conduct.

6     **Q.**  Well, do you consider substance abuse in the risk

7     portion of your analysis?

8     **A.**  I do and I don't.  The research is clear that there is

9     no correlation, there is no relationship between substance

10    abuse and a risk of reoffending.

11         However, if someone has demonstrated a pattern of

12    behavior where they act out sexually every time they get

13    intoxicated, then you would be a fool not to consider that.

14    **Q.**  After the mental disorder prong, if there is no mental

15    disorder, isn't that the end of the case?

16    **A.**  Well, it's the end of the case in theory; but in

17    practice I do a risk assessment in all of my cases.  Just

18    because I don't think there is a mental disorder, that

19    doesn't mean anyone else does so I do a risk assessment

20    also.

21    **Q.**  And what question are you answering with the risk

22    assessment?

23    **A.**  The risk assessment is just what it sounds like, what is

24    the risk of this individual committing future sexual

25    offenses.

1    **Q.**   Is that the same question as determining serious

2    difficulty refraining from behavior?

3    **A.**   No, it's not.   We can only, because what serious

4    difficulty implies is some sort of a volitional impairment.

5    And we have a, medical professionals have a very difficult

6    time assessing volitional impairment.

7         The question is always can the individual control

8    himself and he chooses not to or can he not control himself

9    at all.   And in most cases frankly we don't know so we look

10   towards someone's behavior in the past but that only tells

11   us a certain amount because, again, we're looking at an

12   individual's mental state right now.   So that is a very

13   difficult thing to assess.   We are much better at doing a

14   risk assessment.

15   **Q.**   Does the DSM say anything about volitional impairment?

16   **A.**   It does.

17   **Q.**   And what does it say?

18   **A.**   The DSM is very clear.   And it says that just because

19   someone can meet the criteria for any disorder, it doesn't

20   tell us a thing about the individual's control of his

21   behavior.

22         So that goes even for pedophilia, an individual who

23   has shown repeated instances of sexual arousal, urges and

24   behaviors toward children, prepubescent children, what the

25   DSM is saying is that you can't infer that this individual

1    has difficulty controlling themselves just because they meet

2    that.

3    **Q.**  How do you go about doing the risk assessment part of

4    your opinion?

5    **A.**  As I indicated, I begin with the results of one or more

6    actuarial tools.  And I do that because the actuarial tools

7    that Dr. Phenix described are simply the best single

8    predictors that we have.  They're far better than clinical

9    judgment and they are in my opinion substantially better

10   than just relying on a list of risk factors.

11          So I begin with the results of an actuarial.

12   However, we know that actuarials have limits.  For example,

13   they are based almost always on historical or static

14   factors.

15          For most individual what that means is if, for

16   example, I gave Mr. Carta a five on this Static-99, he gets

17   a five now.  If he gets released into the community, he gets

18   a five.  Next year he gets a five.  Ten years down the road

19   he gets a five.  When he is 95 years old and lying in a

20   hospital bed and can't move his arms, he gets a five.  It

21   only tells us so much.

22          So that's why I look at the actuarials as the

23   beginning point of my assessment and then I incorporate what

24   the researchers told us is important in terms of dynamic

25   factors, things that may change.  I basically look, the way

1    I think about this is that the actuarials take us up until

2    his most recent conviction.  They told us most of the

3    information that we need to know about Mr. Carta in the

4    past.  It doesn't tell us anything since his most recent

5    conviction because it's all based on the past, based on his

6    offending.  So we have to look at what's going on in this

7    individual's life since that time.

8          For Mr. Carta let's say it's 2001.  Where has he

9    been, what's he been doing, has he been involved in

10   treatment, how did he do, has he been in control of his

11   behavior, how did he do.  What information about his recent

12   behavior, his thinking, his emotions, how can we bring that

13   up-to-date.

14         And that is how I conceive of what I do here.  I

15   begin with actuarials and I incorporate relevant and

16   empirically derived information that brings my evaluation up

17   to the present time.

18   **Q.**  Now, what did you do in this case with respect to the

19   actuarials?

20         **THE COURT:**  Tell me, how long are you going to be

21   with him on direct?

22         **MR. GOLD:**  If Your Honor means am I going to finish

23   before one?

24         **THE COURT:**  Yes.

25         **MR. GOLD:**  No.

```
1              THE COURT:  I not trying to hurry you.

2              MR. GOLD:  Oh, no, I would say 45 minutes to an

3     hour.

4              THE COURT:  Okay.  Then why don't we recess.  I

5     have an FBI wiretap that is coming in in five minutes so

6     instead of being five minutes late for it I will be on time.

7              So why don't we recess now.  And we have a

8     sentencing --

9              THE CLERK:  At 2:15.

10             THE COURT:  We will see you at 2:30.  We have a

11    criminal matter at 2:15.  Okay.

12

13             (Luncheon recess.)

14

15

16

17

18

19

20

21

22

23

24

25
```

1          **AFTERNOON PROCEEDINGS**

2          **THE COURT:**  Okay.  Are we all set to go?

3          **MR. GOLD:**  Yes.

4                **LEONARD BARD, Resumed**

5          **DIRECT EXAMINATION, (Cont'd.)**

6     BY MR. GOLD

7     **Q.**  Good afternoon, Dr. Bard.

8     **A.**  Good afternoon.

9     **Q.**  When we left, you were just about to get into the risk

10    assessment portion of your opinion.  You said you had used

11    an adjusted actuarial approach?

12    **A.**  I did.

13    **Q.**  Why did you use that approach?

14    **A.**  Again, I'm sorry, I used an actuarial as the basis of

15    the risk assessment because it is simply the best single

16    instrument or the best way that we have at the present time

17    to assess risk.  But because, excuse me, because of the

18    limitations of the actuarials which I think I went through

19    before, the fact that they're based only on historical data

20    and they don't account for anything more recent than his

21    most recent offense, we have to look at more dynamic or

22    changeable things to adjust the original estimate of the

23    actuarial.

24    **Q.**  Well, Dr. Bard, where did these actuarials come from?

25    We heard testimony earlier today that clinicians or

1    psychologists in your field used to use clinical judgment?

2    A.   Yes, I was actually one of those who began doing this

3    work in the '80s.  And all we had to go on back then was our

4    clinical judgment and our knowledge of working with sex

5    offenders.  And it wasn't very much.

6         And over time we began to learn a little bit more.

7    And I think Dr. Phenix summarized that very well, that we

8    began to learn about risk factors but we didn't know what to

9    do with them.  And it was only in the 1990s, in the mid '90s

10   that we began to use actuarial tools that were developed

11   specifically for these kind of assessments and that those

12   actuarial tools were based on the research findings, the

13   findings that certain risk factors contributed to risk of an

14   individual committing another offense.

15        And they were combined statistically.  And what

16   came out on the other end were various kinds of actuarial

17   tools which were then cross-validated with various

18   populations.  And as the use of actuarials grew and the

19   validity of them were shown in different settings, we became

20   more confident in using them in order to make predictions of

21   what is considered moderate predictability.

22   Q.   Now, has the accuracy of the actuarials been studied?

23   A.   Yes.

24   Q.   And how is that done?

25   A.   It involves -- again, I believe Dr. Phenix discussed

1    this.  It involves following individuals in the community

2    after discharge, seeing who offends, who does not offend.

3    It yields various statistical ways of analyzing this which I

4    will not go into but they are successful in separating out

5    those individuals who are at higher risk from those

6    individuals at lower risk.

7    **Q.**  Now, the Static-99, how did you score that instrument?

8    **A.**  I scored the Static-99 with a range of zero to twelve.

9    I gave Mr. Carta a five.

10   **Q.**  And are you aware of other scorings in the records in

11   front of you?

12   **A.**  I am.

13   **Q.**  And did you differ with those scorings?

14   **A.**  My difference with Dr. Phenix and Dr. Ferraro was on one

15   item and that was the item of whether or not the individual

16   has been convicted of any non-sexual violence in the past.

17   **Q.**  And do you have any indication of what -- how did you

18   score that item?

19   **A.**  I did not find a separate conviction for non-sexual

20   violence according to the coding rules.

21   **Q.**  Well, were you, did you consider coding Mr. Carta with

22   non-sexual violence because of the reckless burning

23   conviction?

24   **A.**  Yes, I did consider that.  And I checked the coding

25   rules.  And the coding rules talk about arson but nothing

1    else.  And it was my opinion that given the nature of that

2    offense it was not the same thing.

3    **Q.**  And so what does a five on the Static-99 mean?

4    **A.**  Well, that's a very good question and it's a complicated

5    answer.

6         The first thing that it tells us in terms of the

7    category that the authors of the tests have done is that it

8    puts him in the moderate high risk.  But moderate high risk

9    doesn't tell us a thing about the individual's actual risk

10   of reoffense.

11        And as Dr. Phenix has indicated, there have been

12   new information published in the past three months that has

13   changed the way we look at this test and the various numbers

14   that it yields.

15        Going back a little bit, the developmental sample

16   that this test originated from yielded fairly high

17   recidivism rates for individuals who scored four, five or

18   higher.  In the past fifteen years what we have seen though

19   when we have actual data on recidivism, whether it is from

20   the National Institute of Justice or various jurisdictions,

21   Ohio followed their released sex offenders for a period of

22   time and Florida followed theirs.  And the bottom line is

23   that the numbers that we got were much lower than what the

24   test would have thought.

25        So Hanson to his credit has revised his risk

1    estimates based on 6,000 offenders that were released in the

2    '90s rather than the old samples which were released in the

3    '50s, '60s, '70s and '80s.  And as a result the risk

4    recidivism rates have gone down dramatically.

5          So what in the past, what I would have said is a

6    score of five yields a recidivism rate of 33 percent over

7    five years but that's no longer accurate.  What a five means

8    now is approximately, and I'm using a midpoint, is about a

9    19 to 20 percent recidivism rate which is a decrease of over

10   a third.

11         So what a five means now is very different of what

12   a five meant then.  And that's just the beginning of a risk

13   assessment.

14         But to answer your question, it places Mr. Carta at

15   a risk, not him in particular but he falls into a group who

16   as a group have recidivated at a rate of approximately 20

17   percent over five years to about 30 percent over ten years.

18         Again, I think it's important to note that we don't

19   have a precise estimate for Mr. Carta or any other

20   individual.  We simply don't have that information.  What we

21   do in these kinds of cases is we talk about group recidivism

22   rates.  For example, when we say that in five years, if you

23   release a hundred offenders who have scored a five,

24   approximately twenty of them will have been rearrested for a

25   sex offense which means eighty of them will not.

1          If we knew which of those two groups Mr. Carta

2    would fall in, this would be very easy work.  But we don't

3    know that obviously and there is no way to know that.  So

4    all we can say is that in his group the risk of recidivism

5    was twenty percent over five years.

6    **Q.**  Now, so if the percentage of recidivism doesn't directly

7    apply to Mr. Carta, are the numbers important?

8    **A.**  Yes, the numbers are important because this is how we

9    make predictions in all the areas, whether it is meteorology

10   or life insurance or anything else, we never know how long

11   someone will live.  We don't know.

12         We know that there are things that affect someone's

13   longevity:  Smoking, weight, family history, a whole bunch

14   of other things.  And we use those or the insurance industry

15   uses those to create a profile of an individual.  And they

16   use that to know how much to charge for someone's life

17   insurance.

18         If they're wrong and the individual -- if they're

19   wrong and the individual dies earlier, then they have to pay

20   up more.  Here we are looking at something else.  We are

21   looking at risk of reoffense but it's the same general idea.

22         We know various risk factors.  In terms of groups

23   we know that, for example, a group that Mr. Carta falls into

24   may recidivate at 20 percent over five years.  We know

25   another group that he falls into, individuals who are 48

1    years old may recidivate at a lower rate.  We know that

2    another group perhaps that, just to pick something else, who

3    have male victims would recidivate at a certain rate.

4           So what we try to do is to create the best judgment

5    that we can based on group data and apply it to any one

6    individual.  It's not precise.  We will never be able to say

7    that Mr. Carta's risk of recidivism is 23.8 percent or any

8    other number.  We simply don't know that.

9    **Q.**  You scored the two other actuarials.  Why did you do

10   that?

11   **A.**  Well, at the time I did this evaluation which is back in

12   July, my habit was to use all three of these actuarials

13   because it was my opinion that you got more information from

14   different actuarials and that these different actuarials

15   looked at different aspects of sexual offending.  I think

16   that's the way it's been discussed.  Some of them look more

17   at the antisocial piece of it.  Some of it look more on the

18   sexual deviancy side of it.

19          Since that time I must say that I have changed

20   that.  And I, in cases beginning back in November I used the

21   Static-99 only.

22   **Q.**  Now that you've changed your method, do you, are you

23   still able to interpret for us the results of the actuarials

24   that you have in your report?

25   **A.**  Yes, I can certainly interpret it but I don't

1      necessarily have as much faith in those as I had in the past

2      based on certain information that I had about these tests

3      that have come out.

4      **Q.**   Well, the RRASOR in specific, what was the score there

5      and how would you interpret it?

6      **A.**   Well, on the RRASOR Mr. Carta got a score of two.   The

7      range is from zero to six.   And I think that is still a

8      valid test and it gives me information about the

9      individual's range of sexual deviancy as opposed to other

10     actuarials which look more at antisocial.

11          So I think it's certainly a valid thing and I may

12     use that not formally the way I have now but I would still

13     look at those items to see where the individual scores and

14     where he gets points.

15     **Q.**   And what's the relationship of this instrument, the

16     RRASOR to the Static-99?

17     **A.**   Well, the RRASOR was the original actuarial developed by

18     Karl Hanson and his associates.   It consists of four items.

19     Does the individual have a prior sexual offense.   That means

20     has he ever been charged or arrested, sanctioned and

21     reoffended.   It looks at whether or not there are any male

22     victims, whether there are any unrelated victims.   And it

23     looks at age.   Those four items which are relatively simple

24     were found to be much better predictors than anybody

25     thought.

1        However, Hanson in an effort to be more

2    comprehensive took those four items and added them to

3    another risk scale in 1999 and developed this Static-99.  So

4    the RRASOR are four items that are now currently part of the

5    Static-99.

6    **Q.**  Well, is there any particular reason of significance to

7    you that the rates or score is low?

8    **A.**  Well, it says something about that on the sexual

9    deviancy piece of it, particularly because this test is very

10   weighted toward any prior sex offenses because we know that

11   is one of the most important factors when you do these kinds

12   of evaluations.  Has an individual offended, been sanctioned

13   and then did it again.  It says something about the

14   individual's ability to control their impulses after they

15   have already been caught.

16       And that is a very different kind of dynamic than

17   someone who committed five or eight or how many offenses

18   before he was caught.  In general if someone committed two

19   or three offenses and were caught each time and kept

20   offending, then that individual in general terms would

21   probably be considered higher risk than someone who may have

22   offended thirty times without ever being caught.

23   **Q.**  You said you got new information about the MnSOST-R?

24   **A.**  Yes.

25   **Q.**  What was that information?

1    **A.**  Well, it appears that like Hanson, the author of the

2    MnSOST-R is aware that his original test was overpredicting

3    recidivism.  So that the estimated risk categories that he

4    gave were also way too high.  Unlike Dr. Hanson, he has not

5    yet chosen to publish that.  They're out there.  He is aware

6    of them.  And from what I have been made aware of, he has

7    enclosed them in a chapter in a book which is not yet out.

8    And until that chapter comes out, he refuses to share them.

9        I have a problem with that as a professional.  If

10   people are going to use a test and we are expected to use

11   this test that has enormous consequence for any individual,

12   and there are new norms that tell us very different things

13   presumably about the individual and we don't know what they

14   are, then I can't use this test much.

15       I can use it the way Dr. Phenix talked about it:

16   Low, moderate or high risk.  But that doesn't say anything

17   about the relative risk of any one person.

18       So even though I scored the MnSOST-R and he gets a

19   zero which puts him in the low range, that's all I'm going

20   to say about it.  He's in the low range and I don't know

21   anything else.

22   **Q.**  And are you using that instrument currently in the

23   evaluations that you do?

24   **A.**  I am not using it at the present time.  I will wait

25   until the new norms comes out.  I will see how they hold up

1    and after that I will reassess.

2    **Q.**   So having looked at the actuarial information, do we

3    have a risk assessment before doing anything else?

4    **A.**   We have the beginnings of a risk assessment.

5    **Q.**   And where are we now?

6    **A.**   Well, where we are is that Mr. Carta based on the

7    actuarial tools that we have, the beginning point is that he

8    is in the moderate risk range.  But there are things that we

9    still have to do to the actuarial, particularly regarding

10   age that have not been accounted for yet.

11   **Q.**   Well, let's move to age, Dr. Bard.  Has there -- does

12   age affect risk?

13   **A.**   Enormously.

14   **Q.**   How do you know that?

15   **A.**   Because I read the research.  Because the research is

16   consistent because all the research in the area which has

17   been summarized in a recent chapter in a book called *Sexual*

18   *Deviance* talk about the five studies on age that show the

19   same general pattern, that there is a peek of recidivism

20   risk in the twenties, that it goes down gradually until

21   about the age of fifty, a substantial drop at fifty and an

22   even more substantial drop at sixty.  That's what we know.

23          That is in all of the research in the area, all of

24   the valid research in the area, and it is accepted.  Hanson

25   has done research.  Barbaree has done research.  Others have

1    done research.  Age is a significant factor that needs to be

2    included in every risk assessment.

3    **Q.**  Well, you mentioned two names, Hanson and Barbaree.

4    We've heard the Hanson name several times but could you tell

5    us who those two people are?

6    **A.**  Karl Hanson, as you have all heard, is the, is one of

7    the most foremost researchers of sex offender recidivism.

8    One of the authors of the RRASOR and the Static-99 and the

9    Static-02 as well and has done a great deal of research in

10   the past six or seven years on age.

11         Howard Barbaree is another researcher from Canada

12   who has done a great deal of research in the area.  And he

13   is the author of the chapter I mentioned that summarizes the

14   findings on age.

15   **Q.**  And, Dr. Bard, I'm holding up a book.  Do you recognize

16   it?

17   **A.**  That is a book that is entitled Sexual Deviance.  It's

18   the second edition by Laws and O'Donohue.  It is a textbook

19   by two very well respected researchers in the area.

20   **Q.**  And is it a standard reference in the field?

21   **A.**  I believe it is, yes.

22   **Q.**  Do you have in the binder that we have up before you an

23   exhibit tab 17.  Not in the government binder but in the

24   other binder?

25   **A.**  Yes.

1    **Q.**  And do you recognize what is copied in that section of

2    the binder?

3    **A.**  Yes, this is the chapter called, *"Sexual Deviance Over*

4    *the Lifespan Reductions in Deviant Sexual Behavior in the*

5    *Aging Sex Offender"* by Howard Barbaree, that's

6    B-A-R-B-A-R-E-E, and Ray Blanchard.

7    **Q.**  And is this the article or the research that you were

8    just referring to?

9    **A.**  Yes.

10   **Q.**  And is this research that you typically rely on --

11          (Whereupon, counsel conferred.)

12          **MS. STACEY:**  I'm sorry, Your Honor, the

13   documents -- I don't have these documents.

14          **MR. GOLD:**  For the record, Your Honor, this was

15   among the set of documents we provided to the government on

16   a CD.  And I thought we provided it in our binder today but

17   we are having a little --

18          **THE COURT:**  That is okay.  Take your time.

19          (Pause in proceedings.)

20          **THE COURT:**  Got it?

21          **MS. STACEY:**  Thank you, Your Honor.

22          **THE COURT:**  Okay.

23   BY MR. GOLD

24   **Q.**  Dr. Bard, you said you relied on this research, among

25   other research, in doing your assessment in this case?

1    **A.**  Yes.

2         **MR. GOLD:**  Your Honor, we would seek to introduce

3    this chapter, chapter one of the textbook *Sexual Deviance* as

4    an exhibit in this case.

5         **MS. STACEY:**  Your Honor, we would object to it.  He

6    referred to it.  I think he can certainly testify as to what

7    he referred to --

8         **THE COURT:**  I don't think you get the book.  I

9    think you get the testimony.  So he can tell us what he

10   relies on.

11   BY MR. GOLD

12   **Q.**  Well, what does this chapter do, Dr. Bard?

13   **A.**  Well, what this chapter does is it summarizes the

14   research on aging.

15   **Q.**  And what was that research on aging that it summarized?

16   **A.**  Well, it summarizes five different studies that have

17   been conducted from 2002 until 2006, all of which have the

18   same general pattern of reduction in recidivism rates with

19   age.

20        It also talks about some of the physiological

21   findings.  For example, we know that males lose

22   approximately one percent of free testosterone every year

23   after the age of forty.  Since we know testosterone is

24   associated both with sexual arousal and aggression, then any

25   reduction in testosterone must be seen as having a reduction

1    in the possibility of sexual aggression.  That's not saying

2    that 50-year olds are incapable of acting aggressively and

3    sexually.  It just says that the reductions in testosterone

4    are a significant factor which should considered.  That is,

5    when I got this, why there was a significant reduction in

6    recidivism with age.

7          Other possible explanations have to do with

8    increased -- I'm sorry -- decreased opportunities to

9    reoffend, increased self-control.  Older individuals have

10   been found to have better self-control than younger men.

11   Sickness, all of those things.

12         We can't say with a hundred percent accuracy why

13   there is this finding.  The findings are clear that and have

14   been replicated that there is a decline in recidivism with

15   age.

16   **Q.**  Has this been looked at with actual populations of

17   actual people?

18   **A.**  Yes.

19   **Q.**  And we've heard testimony that the research evidence is

20   mixed.  Is that your opinion?

21   **A.**  No, my opinion is that it is very clear.  When you have

22   five separate independent studies that all show the same

23   pattern as clearly illustrated in this chapter, that I

24   really don't see any uncertainty here.  I think age has a

25   clear influence on risk.  And, in fact, Karl Hanson has

1    devoted an entire paper to combining the actuarial

2    assessments with age.  So it's clear that he sees that

3    clearly also.

4    **Q.**  Well, now, you discuss in your report an adjustment you

5    made to the Static-99 risk estimate for age.

6    **A.**  Yes.

7    **Q.**  Could you discuss that.

8    **A.**  Hanson in a 2006 article describes how to adjust the

9    results of the actuarial with age.  It's entitled, *"The*

10   *Static-99 Predict Recidivism Among Older Sexual Offenders."*

11   And basically he gives a chart how to adjust the results of

12   the actuarials.

13          So, for example, following this chart an individual

14   who is between 40 and 50 at release who scored in the

15   moderate high range, the group recidivism rates are 13.8

16   percent over five years.

17          Again, I'm not saying that's Mr. Carta's recidivism

18   rate but that's what the group that he's in, that's their

19   recidivism rate.

20   **Q.**  Well, now, did you see evidence of the aging process in

21   Mr. Carta that was clinically important to you?

22   **A.**  Well, yes and no.  My impressions of whether Mr. Carta

23   seems older are pretty irrelevant at the present time.

24          What is important is that when we're trying to make

25   predictions about somebody, we look to the group that he

1   falls into.  He's 48 years old.  It doesn't matter to me if

2   he feels like he is 42 or 52.  He is 48.

3        By the time he gets off of probation he is 51.  So

4   that tells us something about the relative risks based only

5   on age.  Age is not the most important factor in this case

6   but it's definitely a factor that needs to be considered

7   along with all the other ones.

8   **Q.**  You mentioned this, and we will talk about this a little

9   bit more but I think it's useful to, you said he would be on

10  probation?

11  **A.**  Yes.

12  **Q.**  And that's for three years?

13  **A.**  Yes.

14  **Q.**  And is that a factor that you consider when you do these

15  evaluations?

16  **A.**  It is a protective factor that I consider, yes.

17  **Q.**  What's a protective factor?

18  **A.**  A protective factor is a factor that can serve to

19  decrease the risk of someone's risk.

20  **Q.**  Now, a protective factor is the type of thing that comes

21  next.  Now, we've started out at a moderate level of risk

22  according to these instruments.  And then we made an age

23  adjustment?

24  **A.**  I made an age adjustment based on the research in the

25  area.  That puts him at a relative -- I think a

1    significantly lower risk, especially since the numbers that

2    I am using are based on the original estimates which were

3    even higher than the ones we have now.  So anyway you look

4    at it the risk is substantially lower.

5             And then you're right, that's before I looked into

6    the dynamic factors.

7    Q.  Well, a substantial part of your report is devoted to

8    these dynamic factors.  What are they in general?

9    A.  The dynamic factors as has been indicated earlier are

10   changeable factors as opposed to the historical factors on

11   the actuarials which will never change assuming that

12   Mr. Carta doesn't do anything else.

13            Dynamic factors are changeable factors.  And,

14   again, the way I understand this is to bring the evaluation

15   up to the present time to see what has happened in

16   Mr. Carta's life since his most recent offense, things that

17   may change or may not have changed.  And that is an

18   important part of any assessment.

19   Q.  Well, now, the Static, could you just explain that

20   again, the Static scores never change?

21   A.  They never change because they're based on what

22   Mr. Carta has already done.  He has offended against a male.

23   That will not change.  He has offended against an unrelated

24   victim.  That will not change.  Assuming again that he

25   doesn't do anything to change that.

1          The only thing he may do to reduce that is if he

2     goes out and he is involved in a relationship for more than

3     two years, that would reduce it.

4          But in terms of the other factors, they are

5     historical.  They don't change, no matter what he does in

6     treatment or out there.

7     **Q.**  And where do you get this body of dynamic factors that

8     you look to?

9     **A.**  In the research that other individuals have basically

10    come to the same conclusion, that actuarial tools and

11    actuarial factors only take us so far.

12         If we're going to commit people who are at high

13    risk on actuarials, then they will never get out because

14    they'll always have high risk on actuarials.  That says that

15    something is wrong here, that we have to look to other

16    factors other than those that the actuarials include.

17         And the research has looked at various factors and

18    independently come up with four, five basic things.  And

19    some of these were addressed earlier:  General

20    self-regulation, sexual self-regulation, attitudes that

21    might be considered tolerant of sexual offending and

22    intimacy problems.  Along with those are participation in

23    treatment and age.

24    **Q.**  Well, let's discuss those then one by one.  But first I

25    wanted to ask, where do you look for the evidence for these

1    factors?   Throughout the course of his life?

2    **A.**   Well, up to a point, yes, you look through the course of

3    his life.   But in particular, you want to see has there been

4    a change or is he continuing to act in a certain way.

5            As an example, if you look at general self-control,

6    there is no doubt Mr. Carta had a great deal of difficulty

7    with that early on.   He's got multiple arrests, multiple

8    incidents of contact with the criminal justice system.   The

9    kind of behaviors that were described earlier, getting back

10   at people and being angry and getting into fights and

11   substance abuse and all those things.   We know that was a

12   factor that led at some degree to where he is now or to his

13   most recent offense.

14           So has anything changed?   Mr. Carta has been

15   incarcerated for seven years --

16   **Q.**   Dr. Bard, excuse me for interrupting but the Court asked

17   earlier, and I think it's important now, is there a problem

18   with the fact that Mr. Carta has been in prison to your

19   assessing something like general self-regulation?

20   **A.**   It's not a problem.   We still look at what his behavior

21   has been.   But obviously since he is in a controlled

22   environment, you are not going to see the same kinds of

23   behavior that you saw in the past.

24           But individuals who lack self-control display it in

25   lots of different ways.   You would expect to see a pattern

1    of fighting while incarcerated, substance abuse while

2    incarcerated, problems getting along with others while

3    incarcerated, threats, all sorts of non-sexual behavioral

4    problems.  And frankly we don't see that here.

5    **Q.**  Is Mr. Carta's participation in what's known as the CODE

6    Program significant to you in this regard?

7    **A.**  It is.

8    **Q.**  And what is the CODE Program?

9    **A.**  The CODE Program is a program that is offered by the

10   Federal Bureau of Prisons.  It is a one-year program that

11   looks at various treatment areas such as criminal thinking,

12   family issues, substance abuse and making good choices.

13        While it is not the same as sex offender treatment,

14   there is a great deal of overlap because most good sex

15   offending treatment will include all of these things and

16   more.

17        Mr. Carta participated in the CODE Program, I

18   believe at Allenwood but I'm not a hundred percent sure, and

19   he completed a one-year program in 2003.  He looked at

20   issues like risk management, criminal thinking, relapse

21   prevention.  Again, things that sex offender work also has

22   to deal with.

23        He persisted in this program despite wanting to

24   drop out at times, feeling it was too hard for him, feeling

25   he just didn't want to do it, didn't want to talk in groups.

1    **Q.**   Dr. Bard, is that similar to the behavior that he

2    exhibited in the SOTP Program?

3    **A.**   It is.

4    **Q.**   Is that significant to you?

5    **A.**   It is.

6    **Q.**   In what way?

7    **A.**   Because this seems to be his pattern in that he is no

8    longer someone who is acting out, who is getting into fights

9    and doing bad things.  But he still is resistant to a

10   certain point because he has never had the opportunity to

11   talk about these things.  To put someone in a group setting

12   who has never talked about his problems before and say okay,

13   open up, it's a very hard thing.  It takes time.

14          Again, just like the sex offender treatment, it's

15   two steps forward, one step back, and sometimes a lot more.

16          So it's not surprising that Mr. Carta had a hard

17   time.  What is surprising is given what you would expect

18   from an antisocial kind of guy in the past was that he

19   didn't revert to that sort of behavior but he persisted.

20   And he was able to allow his therapist to sort of talk him

21   back in, which basically she couldn't talk him back in

22   unless he wanted to.  But he needed that reassurance and

23   that support.  And he was able to complete a fairly

24   intensive residential treatment program.  And I give him a

25   lot of credit for that.

1    **Q.**  When you're talking about him being talked back in, this

2    is your review of the records regarding the CODE Program?

3    **A.**  Yes.

4    **Q.**  And he went through something similar at the SOTP

5    Program?

6    **A.**  Yes, he did.

7    **Q.**  Now, you have heard testimony -- you've heard testimony

8    about Mr. Carta's dropping out of the SOTP?

9    **A.**  Yes.

10   **Q.**  And you have reviewed the documents about it and have

11   spoken with Mr. Carta about it?

12   **A.**  I have.

13   **Q.**  How do you interpret that -- well, what is your

14   understanding of what happened first?

15   **A.**  My understanding is that there were a number of factors

16   that were going on at the time.  Before Mr. Carta chose to

17   leave the program he had definitely been cautioned about

18   hanging out with these younger looking twenty something

19   inmates.  It seems that he was able to deal with that fairly

20   well.  They developed a plan for him to avoid them.  And he

21   could only associate with older individuals or those

22   individuals who had reached a certain level in their

23   programming.

24          Unfortunately, at least according to what Mr. Carta

25   and I talked about, and the records up to a point, is that

1    Mr. Carta was having a hard time doing that because there

2    weren't a lot of people to talk to.  He was having a hard

3    time being there, a hard time dealing with the intensive

4    nature of the program.

5          What's interesting is that he didn't get caught up

6    on what most offenders get caught up on which is admitting

7    what he had done.  That's the single biggest obstacle in any

8    sex offender treatment, to have the offender admit to all of

9    the deviancy, which is the word that they use, that he has

10   done.

11         Mr. Carta was very upfront about that from early

12   on.  What he apparently had a hard time with was the intense

13   interpersonal nature of that program, living on the same

14   unit as all these guys and having issues there.

15         Mr. Carta told me that the final --

16         **MS. STACEY:**  Objection.

17         **THE COURT:**  What?

18         **MS. STACEY:**  Mr. Carta told me.

19         **THE COURT:**  Well, I take it this is a verbal act.

20   It is not coming in for the truth.

21         This is a conversation you had with him?

22         **THE WITNESS:**  Yes.

23         **THE COURT:**  I will let it in just for the verbal

24   act.  Go ahead.

25   **A.**  Mr. Carta told me that the final breaking point was that

1    he called out another individual, basically identified him

2    as someone who was doing something problematic.  As a result

3    of that, Mr. Carta feels that that other individual was

4    terminated.  And he felt very badly about that.  And that

5    was the final thing.

6         He also talked about, which is verified by

7    Dr. Wood, was that Dr. Wood, at that time Mr. Wood, was

8    going off service.  Again, it was feeling alone, feeling

9    isolated, feeling abandoned.  These are all valid

10   therapeutic issues that happen in treatment all the time.

11   But there wasn't anyone there to help him deal with that.

12   He made a choice.  He left treatment and that was his

13   choice.

14        But that doesn't negate the work that he did in

15   acknowledging what he had done, something he had never done

16   before.  In my experience that is one of the most important

17   things that actually happens in terms of treatment.  The

18   individual has to publicly acknowledge all the bad things he

19   has done.  It is not easy to do.

20   BY MR. GOLD

21   **Q.**  Did you review other documents or other things that

22   Mr. Carta did while he was incarcerated?

23   **A.**  Yes.

24   **Q.**  And did that program participation contribute to your

25   opinion?

1    **A.**   Yes, absolutely.   Mr. Carta was very active in many

2    other areas.   He got his GED while he was incarcerated.   He

3    participated in computer-aided drafting, a release

4    preparation program, a substance abuse phase of the program,

5    information processing, computer skills, another prerelease

6    program, starting your own business.   He was very active in

7    all of these things.

8              Again, antisocial types of people, you wouldn't

9    expect them to be that involved.   You would expect

10   resistance and interference and throwing obstacles in the

11   way.   And that simply did not happen here.

12   **Q.**   And, Dr. Bard, I see that you're looking through some

13   records.   Are those records from the Bureau of Prisons?

14   **A.**   Yes.

15   **Q.**   And are those records that you reviewed in performing

16   this evaluation?

17   **A.**   Yes.

18   **Q.**   Now, we've talked about dynamic factors.   The first one

19   was general self-regulation?

20   **A.**   Yes.

21   **Q.**   The next one that you have listed in your report is

22   sexual self-regulation?

23   **A.**   Yes.

24   **Q.**   And, again, Dr. Bard, I ask you how do you assess

25   something of that nature in a controlled environment like

1    the prison?

2    **A.**   It's a combination of information that I got from

3    Mr. Carta and a review of the files.   Just because people

4    are incarcerated doesn't mean they don't sexually act out.

5    Whether it's with sexual activity among residents, sexual

6    activity with staff, I have evaluated individuals who are

7    found to have in their possession pornography, child

8    pornography, individuals who were writing child pornography

9    and mailing it out, individuals who would expose themselves

10   to females, individuals who were masturbating frequently

11   while certain officers would come by, individuals who would

12   watch television shows with children in them, individuals

13   who would save magazines with pictures of children.

14           There are unfortunately ample ways to display that

15   you do not have control of sexual impulses while

16   incarcerated.

17   **Q.**   And so as a factor that has been empirically validated,

18   this was not something that you found present in this case?

19   **A.**   Exactly.

20   **Q.**   The next factor --

21   **A.**   May I add one more thing?

22           Because Mr. Carta was in the community for a period

23   of time as well, I also looked at his behavior there.   I

24   believe he was in the community for about eight months prior

25   to being incarcerated after his arrest.   He was out on

1    bond --

2    **Q.** Dr. Bard, let me stop you just to get these facts a

3    little bit clearer for the Court because they may not be.

4    But when you say he was free in the community eight months,

5    what are you talking about?  What sequence of events?

6    **A.** After his arrest -- I'm not sure that I have the exact

7    dates either.  But after his arrest, I believe he was out in

8    the community for several months, was then charged with the

9    federal offense.  I believe he was incarcerated for about

10   two months and was released on bond for approximately five

11   or six months, during which time he cooperated with the

12   government, that's documented, and having another individual

13   who I believe was planning to adopt a child from overseas in

14   order to abuse him or use him for child pornography.  He

15   helped to have this individual arrested.  As a result his

16   sentencing guidelines were reduced from about 91 months, if

17   my memory is correct, to about 60.

18        So clearly he was participating in a proactive way

19   while he was out there.  More than that, he was involved in

20   sex offender treatment while was in the community.

21        And most importantly from my assessment he was able

22   to control his sexual behaviors.  There were no reports of

23   any sexual contact with minors or anything else.  Obviously

24   he was on bond, it's not the same thing.  But Mister -- but

25   if someone can't control their sexual impulses, then it

1    doesn't matter if they're on bond or not, they're going to

2    act out.

3           And, again, I have evaluated individuals who have

4    been on parole -- I'm sorry -- on bail for a sex offense who

5    offended again.  So these things do happen.

6    **Q.**  Did you find any evidence of a violation of any kind

7    while he was out on bond?

8    **A.**  None.

9    **Q.**  The next factor that you list are attitudes supportive

10   of sexual assault.  What are those?

11   **A.**  Well, these are what we call -- and I believe Dr. Wood

12   talked about this yesterday -- cognitive distortions.  These

13   are ways that offenders rationalize what they have done in

14   order to allow them to keep doing it.  They think such

15   irrational thoughts like what I'm doing isn't really so bad,

16   I'm not forcing anybody, I'm teaching these children about

17   sex, I'm not really hurting them, all of these

18   rationalizations that offenders use.

19          One hopes that in the course of time or treatment

20   that the individual can set aside that sort of irrational

21   thinking and develop a much more realistic appraisal of the

22   harm that he has caused.

23          And when I interviewed Mr. Carta, he was certainly

24   able to talk about that.  In contrast to what I heard

25   Dr. Wood talk about here earlier was that he continued to

1    maintain those cognitive distortions when he was at Butner.

2         So somehow he has learned along the way what he has

3    done was truly harmful.  What he has done had longterm

4    consequences to his victims, victims' families and everybody

5    else.

6         And there is no evidence I have seen in the records

7    that he continues to hold any of those cognitive distortions

8    at this time.

9    **Q.**  Well, there is references in the documents to him

10   struggling with issues around cognitive distortions?

11   **A.**  That's what treatment does.  That's the whole idea.  If

12   people would learn this overnight, it would be great; but

13   that's not how things work.  From many individuals these are

14   entrenched beliefs.  Someone does not get to where Mr. Carta

15   was having offended against multiple people for, over a long

16   period of time without rationalizing this, without, in other

17   words, deluding himself into believing that what he is doing

18   is okay.  And it's not okay.  It's clearly not okay.

19        And Mr. Carta is realizing that and has now

20   realized that he did terrible things.

21   **Q.**  Is Mr. Carta's disciplinary history while incarcerated

22   significant?

23   **A.**  Yes.

24   **Q.**  What did you see in his disciplinary history?

25   **A.**  Well, when we're looking to gauge someone's behavior

1    while incarcerated, the individual is under pretty much

2    24-hour observation in some settings.  So any misstep,

3    anything bad that he does is written down, whether it's

4    being out of place or engaging in fights or sexual activity.

5           And when you look at Mr. Carta's history, his

6    discipline history, it is remarkable for the lack of, both

7    qualitatively and quantitatively, any real problems.  In

8    particular, Mr. Carta has been held at Devens now for about

9    two years I believe.  Post sentence.  He's finished his

10   sentence.  He's happy about this.  He's very happy about

11   this in some ways.  An angry antisocial person would let

12   others see that.  He's not doing that.  He's dealing with

13   it.

14          He understands why he is there.  He doesn't like

15   why he's there.  He doesn't agree with this.  But he is not

16   acting out.  It would make anybody angry to sit in prison

17   for two more years.

18          But the important thing for me is how is he

19   handling it.  And he has shown that he is not that same

20   person who would have done anything and everything in the

21   past.

22   **Q.**  You list treatment participation as a significant

23   dynamic factor?

24   **A.**  Yes.

25   **Q.**  Now, is it a risk factor for someone to drop out of

1  treatment the way Mr. Carta did?

2  **A.**  It's a risk factor when someone has dropped out or been

3  terminated, yes.

4  **Q.**  Now, when you were discussing treatment, would you -- do

5  you think Mr. Carta derived anything from the treatment?

6  **A.**  Absolutely.

7  **Q.**  What type of things do you think he derived from the

8  treatment?

9  **A.**  Well --

10  **MS. STACEY:**  Objection.  Again, this is beyond the

11  scope of the report, Your Honor.

12  **THE COURT:**  Is it in the report?  Show it to me if

13  it is.

14  **MR. GOLD:**  Does Your Honor have -- do we have a

15  copy of the binder?  We don't.

16  **THE COURT:**  You don't have to give me a whole

17  binder.  Just put your finger on the sentence that you think

18  covers your question.  If it is there, then you get the

19  question.  Otherwise you don't.

20  **MR. GOLD:**  Can I read it out loud, Your Honor?

21  This is the exhibit we moved into --

22  **THE COURT:**  Go ahead.

23  **MR. GOLD:**  -- evidence.

24  Bottom of page 13, "According to available

25  records," Dr. Bard writes, "for a period of time Mr. Carta

1    was a motivated participant in the Sex Offender Treatment

2    Program that was offered to him.   Reports from his

3    therapists were positive.   And a review of the treatment

4    notes suggest that he took the work seriously.   While he did

5    choose to terminate treatment in 2006, the circumstances of

6    that termination are not clear to this examiner.   Mr. Carta

7    was able to apply much of what he learned to himself but it

8    remains unclear if he will be able to translate that

9    knowledge into observable behavior if released into the

10   community."

11          So that is --

12          **MS. STACEY:**   That's the sum total.   So when he got

13   out of treatment, that's not included in here.

14          **THE COURT:**   Oh, I think it is.   I think it is a

15   little bit of a stretch but I think he is entitled to it.

16          Go ahead.

17   BY MR. GOLD

18   **Q.**   Dr. Bard, what do you think Mr. Carta derived from his

19   participation in the treatment program at Butner?

20   **A.**   Well, I think the first thing to note is that he

21   participated in this voluntarily.   He didn't have to.   He

22   volunteered to do this.   I think that's a positive.

23          Secondly, as I have said before, and as everywhere,

24   all of the offending that we're talking about today comes

25   because Mr. Carta decided to be open and honest with the

1    folks down there.  That is an enormous change for somebody

2    who has held all of this inside of him.

3            Third, he did complete the first few phases of

4    treatment, as I wrote, that says that he was perceived

5    positively.  Dr. Wood who was here yesterday talked about

6    Mr. Carta taking an active approach and being genuine and,

7    you know, opening up and really trying hard even though he

8    was having problems at various times.  That's a positive

9    thing.

10           He is able to recognize what he has done.  When I

11   talked about the attitudes that are tolerant of offending,

12   that's not there anymore.  And that's probably because he

13   was able to look at his behavior.  He completed that history

14   questionnaire which goes through everything.  It makes you

15   look at what you have done.  Again, it forces you to look at

16   your life and see where you are and how you got there.  And

17   for some individuals that can be a very painful but

18   ultimately a very productive thing.  I think in general that

19   is what he got out of that.

20   **Q.**  Dr. Bard, I want to turn your attention to the exhibit

21   in the binder that, the government's binder that we opened

22   earlier to 26.

23   **A.**  Yes.

24   **Q.**  And what is that document that is there?

25   **A.**  It is the United States District Court sentence with the

1    conditions of probation.

2    **Q.**   And what in general terms is your understanding of

3    the -- well, do you consider probation and things like that

4    when you do a risk assessment?

5    **A.**   Yes, of course.

6    **Q.**   And why?

7    **A.**   Because what we know about reoffending and dangerousness

8    in general, it's not just the function of the person.  It's

9    the function of the person in a certain situation.

10        If Mr. Carta sat here for the rest of his life, he

11   would not offend.  There is supervision around.  So that's

12   an extreme example obviously but it's the situation that has

13   to be considered as well.

14        So when you try to judge risk, it often helps to

15   see what are the individual's plans for release.  Does he

16   have probation conditions that will substantially restrict

17   his behavior that will cause him to have a much easier time

18   of dealing with issues if they occur.

19        So when you look at probation supervision, that's

20   great.  When you look at the specific conditions here that

21   Mr. Carta will participate in, mental health treatment as

22   approved by Probation, shall participate in sex offender

23   treatment as approved by Probation, shall participate in

24   substance abuse treatment as approved by Probation, shall

25   not be allowed in the company of any child under the age of

1  18 without another person being there, that he shall be

2  subject to random searches of his person, residence,

3  property, vehicle, all those things, that he will report

4  where he is at all times.  He has to register as a sex

5  offender.  That he will be subject to periodic unannounced

6  visits and examinations of a computer and any related

7  equipment and they might have software, I'm sorry,

8  monitoring software on it.

9       And that he is restricted from loitering around

10 areas attractive to minors, including but not limited to

11 shopping centers, malls, restaurants and theaters unless

12 accompanied by a preapproved adult.

13      Those are very strict conditions.  Mr. Carta is

14 aware of that.  He is aware that if he violates it, he could

15 be subject to reconfinement and this whole process all over

16 again.  I think that serves as an enormous protective

17 factor.

18      So even if we hypothesize that Mr. Carta wants to

19 get out just because he can't wait to find another teenager,

20 this is going to make it extremely difficult for him to do

21 so assuming that's what is in his mind, which I don't

22 believe it is.

23 **Q.**  Are you aware of whether he has mandated sex offender

24 treatment on the outside?

25 **A.**  Yes, that's here.

1   **Q.**  And is that important?

2   **A.**  Yes.

3   **Q.**  Now, do you see his failure in treatment as being a

4   diagnostic kind of indicator for failure in future

5   treatment?

6   **A.**  No, I see it as being a risk factor as I said.  That's

7   what the research tells us.  But Mr. Carta has three more

8   years of treatment before him in a strictly monitored

9   setting with in some ways greater consequences for him if he

10   fails this time than before.  The loss of his freedom, the

11   loss of his liberty, going back to prison, having possibly

12   to go through the same process with civil commitment again,

13   that is an enormous consequence.  I think that's on his

14   mind.

15          I think he is tired of this.  I don't think he

16   wants to live the rest of his life in prison.

17   **Q.**  So, Dr. Bard, the way you conceive of this is you have

18   done an empirical risk assessment.  Is this part of it?

19   **A.**  Yes.

20   **Q.**  And what you're talking about sounds like simple

21   deterrence; is that --

22   **A.**  I don't think there is anything wrong with deterrence.

23   If an individual knows that a certain behavior will result

24   in a swift and immediate consequence, the principles of

25   learning tell us they don't do that.  You know, you don't

```
1    put your hand over a fire and get burned and keep doing it.

2    People learn.  And that's, again, an obvious example.

3            But Mr. Carta has learned.  He's learned what he

4    did was both wrong and harmful.  He has learned that he has

5    lived a life that has been, in his words, terrible.  And he

6    is motivated to change that.

7    Q.  Dr. Bard, we heard testimony earlier today about

8    intimacy deficits being a factor which is a real problem for

9    Mr. Carta.

10   A.  Yes.

11   Q.  Do you agree with that?

12   A.  I do.

13   Q.  Do you see that as a problem for him going forward?

14   A.  It may be.  I think that is probably the one dynamic

15   factor that I see as the most potentially difficult for him.

16   I think the other ones that I looked at he's shown

17   significant changes in a positive way.

18           Here partially because he has been incarcerated,

19   it's tough to form meaningful intimate relations while

20   you're incarcerated but he's never had that.  And I think

21   that's something he wants.

22           I think when Dr. Wood talked about Mr. Carta

23   wanting to live with someone in front of a fire, I think

24   that's what he wants.  He wants to connect with somebody.

25   It's what everybody wants on some level.  He's never been
```

1  able to have that, for a variety of reasons, some of which

2  are his responsibility and some of which unfortunately

3  occurred to him.  But that is going to be a goal for him.

4  And that's going to be something that he needs to focus on.

5  **Q.**  Now, at one time you asked Mr. Carta what kind of risk

6  he thought he posed.  Do you remember that?

7  **A.**  Yes, I believe that is in my report.

8  **Q.**  And does the fact that Mr. Carta said he posed a low

9  risk, is that clinically significant to you?

10  **A.**  No.

11  **Q.**  Is that an indicator that he poses a high risk?

12  **A.**  No.

13  **Q.**  Why not?

14  **A.**  Well, it is not all that dissimilar from my opinion.  I

15  think he's a low to moderate risk.  So if he thinks he's a

16  very low risk, that's his opinion.

17          What would concern me is if he says he was at no

18  risk.  There are plenty of individuals I have seen who say

19  that and they are fooling themselves because individuals who

20  have offended in the past are a relatively higher risk to

21  reoffend in the future.  It's not saying that they will or

22  that they won't.  But they have to acknowledge that the risk

23  is there and it's probably always going to be there.

24  **Q.**  Thank you, Dr. Bard.

25          **MR. GOLD:**  No further questions.

1              **CROSS-EXAMINATION**

2    BY MS. STACEY

3    **Q.**  Dr. Bard, you testified that Mr. Carta is not the same

4    person today; is that correct?

5    **A.**  In my opinion he has shown significant changes from the

6    way he has described in the past to the way he is at the

7    present time, yes.

8    **Q.**  In fact, all that's changed at this point is the time

9    that Mr. Carta has spent in prison; correct?

10   **A.**  No, absolutely not.

11   **Q.**  Well --

12   **A.**  His attitudes have changed.  His behavior has changed.

13   His thinking has changed.

14   **Q.**  All while he was in prison?

15   **A.**  At some point along the way, yes.  But, you know, I

16   would say after his arrest, either during the time he was in

17   the community or while he's been in prison.

18   **Q.**  And you're aware of the body of research that says that

19   time in prison alone doesn't change behavior or reduce risk

20   of reoffense; right?

21   **A.**  I am aware of that.

22   **Q.**  And you are aware that Mr. Carta is still attracted to

23   13-year old boys; right?

24   **A.**  I think that Mr. Carta will always have an attraction

25   for adolescents --

1    **Q.**  The question, Dr. Bard, is is he still attracted to

2    13-year old boys?

3    **A.**  I don't think he is still attracted to 13-year old boys.

4    **Q.**  You don't think so despite the fact that he has listed

5    his personal preference as 13- to 17-year old boys?

6    **A.**  That's not what he has done in fact.  In the course of

7    his treatment back in 2005 and 2006 he was asked which

8    children he is most attracted to.  He wasn't asked who he is

9    most attracted to.

10           It's like, you know, it's sort of like asking when

11   was the last time you hit your wife, you know.  It was a

12   forced choice:  Younger children or older children.

13           He picked older ones.  That's not the same thing.

14   **Q.**  And none of these records document that he suddenly is

15   no longer attracted to 13 but only attracted to 16, 17, 18?

16   **A.**  I don't think there is much difference between certain

17   13s, 14s, 15s and 16s.  It depends on how they look.

18           The problem is just the fact that Mr. Carta acted

19   on them in the past.  He is aware of what he has done.  He

20   is aware of the consequences now that he was not aware of in

21   the past.  And I think that he will be able to control any

22   urges he has.

23           I don't pretend that he's going to walk out of here

24   and never think about adolescents.  I think he's going to

25   control it.

1    **Q.**   And the fact that he's acted on it in the past, sought

2    out 13-year old boys for sexual contact, that is the

3    deviance; isn't it?

4    **A.**   The deviance is that if he sought out prepubescent

5    children, that's deviant.  If he's attracted to adolescents,

6    adolescence nowadays begins at eleven or twelve depending on

7    the physical changes, if he's attracted to physically mature

8    adolescents, that is not deviant.  No one says that is.  And

9    the fact that he has acted on it is criminal.

10   **Q.**   And in the age range question -- you reviewed all the

11   documents in this case?

12   **A.**   Every page.

13   **Q.**   The Personal History Questionnaire is the document that

14   I was referring to when I asked you about Mr. Carta's

15   preferred age range for children.  Do you recall that being

16   in there?

17   **A.**   I recall it.  I don't recall it exactly but I do recall

18   it.

19   **Q.**   And do you recall the question being asked, What is your

20   preferred age range, and then there are blanks that he gets

21   to put in the age range?  Do you recall that?

22   **A.**   I don't recall that offhand.

23   **Q.**   Well, I ask you to turn to Exhibit 27, Bates page 1030.

24   **A.**   One seven, I'm sorry?

25   **Q.**   1030.

1    **A.**   Thank you.

2          (Pause in proceedings.)

3    **Q.**   Have you found that page, Dr. Bard?

4    **A.**   Yes.

5    **Q.**   And am I reading this correctly?

6          The question, "What is your preferred age range?";

7    Right?

8    **A.**   Yes.

9    **Q.**   And then is says, "Male:  Younger, blank, oldest,

10   blank."

11         Do you see that?

12   **A.**   Youngest and oldest, yes.

13   **Q.**   Right.

14         And he listed the youngest as 13 years old; didn't

15   he?

16   **A.**   Yes.

17   **Q.**   That's not how did you beat your wife; is it?

18   **A.**   No.  No, it's not.  And the oldest is 28.

19   **Q.**   Twenty-eight, absolutely.  But he did list the youngest

20   as 13 years old; didn't he?

21   **A.**   Based on what he has done in the past, that's what he

22   has done, yes.

23   **Q.**   Does it ask about a past preferred age range or a

24   current preferred age range?

25   **A.**   It actually doesn't say either of them.

**Q.**  It simply asks what is your preferred age range; doesn't it?

**A.**  Yes.

**Q.**  Now, you say that he has come forward and been more open since he has been in prison; is that your testimony?

**A.**  Absolutely.

**Q.**  And the records though, in fact, show that he has done just the opposite; don't they?

**A.**  Absolutely not.

**Q.**  Well, if you take a look at these Personal History Questionnaires, doesn't he divulge less in his update than he did the first time he filled one out?

**A.**  I did not compare the two.  But I can tell you that when you asked me whether he's disclosed more, before he went to prison he disclosed zero.  Absolutely zero.  So anything that he does while in prison is more.

**Q.**  Sure.  And then so he fills out the first Personal History Questionnaire and he is divulging something so that's more; right?

**A.**  Yes.

**Q.**  And then he fills out the Personal History Questionnaire Update; right?

**A.**  Yes.

**Q.**  And you heard Dr. Wood testify that that update is because during treatment these sex offenders realize they

1    have more victims and they want to disclose more; right?

2    **A.**   That's what he said in general.   That's not what he said

3    about Mr. Carta though at all.

4    **Q.**   And do you know that to be wrong?

5    **A.**   All I know is that what he said up here was that he

6    doesn't know why Mr. Carta was asked to fill that out

7    because he admitted so much upfront.   That I remember

8    hearing.

9    **Q.**   And then as a clinician, if filling out a second

10   Personal History Questionnaire he is divulging less than he

11   did the first time, isn't that a risk factor for you?

12   **A.**   No, of course not.

13   **Q.**   So let me give a concrete example.   If you go to the

14   first Personal History Questionnaire where he is asked about

15   the average number of hours he spent per week watching child

16   pornography, and that's at Bates 1106.

17           Have you found that?

18   **A.**   Almost.

19           Yes.

20   **Q.**   And at that time he said, and it is toward the bottom,

21   the average number of hours he spent viewing child

22   pornography was 70.   Do you see that, Dr. Bard?

23   **A.**   Yes.

24   **Q.**   Okay.   Then he completes a Personal History

25   Questionnaire.   I ask you to turn to Bates page 1032.

1   **A.**  Yes.

2   **Q.**  And he is asked for the average number of hours per week

3   he spent viewing child pornography and now it's five.  Do

4   you see that?

5   **A.**  Yes.

6   **Q.**  So that's certainly not being more forthcoming; is it?

7   **A.**  Actually if you read before that, it changes things.  In

8   the first case he's admitting it from age 38 on.  And

9   perhaps at that time he wasn't looking at much much more.

10  But here he talks about age 30 on so perhaps he was asked to

11  average it over the entire length.  I don't know.

12  **Q.**  Well, why don't we go to Bates page 1106.

13  **A.**  Yes.

14  **Q.**  And on that particular page he is asked what the peak

15  number of hours he spent per week watching child

16  pornography.  And he lists that as one hundred hours;

17  doesn't he?

18  **A.**  Yes.

19  **Q.**  And in his Personal History Questionnaire at Bates page

20  1032 he now lists that as ten hours.  Do you see that?

21  **A.**  Yes, he does.

22  **Q.**  That's not more forthcoming; is it?

23  **A.**  It doesn't look like it.

24  **Q.**  Now, you based your statements about how Mr. Carta has

25  changed and the victims that he's had, you base that on

1   self-reports by Mr. Carta; don't you?

2   **A.**   Everything we have is based on Mr. Carta's self-report.

3   There is not a single episode of sexual abuse that we can

4   talk about except for the incident with Fred's brother that

5   is documented in the files.

6   **Q.**   But there is no forensic psychologist in your field that

7   could say for certainty that he knew everything based only

8   on a self-report; is there?

9   **A.**   Of course not.

10   **Q.**   In fact, self-reports are the least reliable method of

11   information; isn't it?

12   **A.**   Not in this case obviously.

13   **Q.**   You did take Mr. Carta's report into consideration up to

14   only a certain point though, his self-reports; right?

15   **A.**   I don't know what you mean.

16   **Q.**   Well, isn't it your experience that when people are

17   talking to you, most people are trying to give you a good

18   impression of themselves?

19   **A.**   Oftentimes, yes.

20   **Q.**   Now, you do agree that Mr. Carta has engaged in acts of

21   child molestation in the past; don't you?

22   **A.**   I do.

23   **Q.**   And child molestation is certainly something that is

24   sexually dangerous to others; isn't it?

25   **A.**   It is.

1   **Q.**  And Mr. Carta has admitted that when he was 11 to the

2   time he was 13 he sexually abused two children; didn't he?

3   **A.**  Yes.

4   **Q.**  And he admitted that he's been or has had several

5   contacts with adolescent males?

6   **A.**  Again, this is all through his self-report, yes.

7   **Q.**  And he admitted that; correct?

8   **A.**  Yes.

9   **Q.**  And Mr. Carta was aware that these adolescent boys

10  couldn't give consent to engage in sex acts with him; wasn't

11  he?

12  **A.**  I doubt that at the age of 13 he had any idea about any

13  of that.

14  **Q.**  Well, Mr. Carta was aware; wasn't he?

15  **A.**  He was aware now or was aware then?

16  **Q.**  I ask you to turn to your report to page 5.

17          And I read, "He was aware that many of those boys

18  could not give legal consent to engage in sexual activity

19  but insists he never forced or coerced anyone to engage in

20  any kind of sexual contact with him."

21          Did I read that right?

22  **A.**  Yes.

23  **Q.**  So he was aware that they couldn't consent; wasn't he?

24  **A.**  Not at the time.  That's not my meaning here.  My

25  meaning is that he is aware that those boys could not

1    consent and it's a crime but that he never forced anybody.

2    I sincerely doubt that any 15-year old has any idea what the

3    age of consent is anywhere.

4    **Q.**  But you're not talking about Mr. Carta at 15 in this

5    paragraph; are you?

6    **A.**  No, I'm talking about him now.

7    **Q.**  As an adult, that's right.

8         And as an adult he told you he had numerous sexual

9    contacts with adolescent males; correct?

10   **A.**  Yes, absolutely.

11   **Q.**  And he denies interest in prepubescent boys; correct?

12   **A.**  Correct.

13   **Q.**  And you have no way to know whether that is true or not;

14   do you?

15   **A.**  Again, this is an individual who has given as much

16   information as you can possibly imagine that is not

17   documented.  There are no reports of any interest in

18   prepubescent children.  He has never acknowledged that.  I

19   have no reason to doubt him here.

20   **Q.**  You have no reason to doubt it despite the fact that he

21   had prepubescent children in his child pornography

22   collection?

23   **A.**  I have no reason to doubt it because he has given so

24   much damaging information about himself that I have to

25   believe that what he is saying is genuine.

1    **Q.**   Okay.

2    **A.**   For me to say otherwise is to believe him when he is

3    saying bad things and not believe him when he says other bad

4    things.

5    **Q.**   So as he's denying an interest in prepubescent boys, he

6    tells you that he's focused his attention on developing

7    relationships with teenage boys from the ages of 13 to 19;

8    isn't that right?

9    **A.**   Yes.

10   **Q.**   And then you next say that he's aware these boys

11   couldn't consent?

12   **A.**   Yes.

13   **Q.**   So you're talking about him presently; right?

14   **A.**   Yes.

15   **Q.**   Now, Mr. Carta also acknowledged his substance abuse

16   problems to you; didn't he?

17   **A.**   He did.

18   **Q.**   And, in fact, he admitted to acting out sexually when he

19   was using these substances?

20   **A.**   Some of them, yes.

21   **Q.**   And so earlier today when you testified that substance

22   abuse wasn't an issue, that would be incorrect; wouldn't it?

23   **A.**   No, that's not incorrect.  That was not why he acted

24   out.  That may have made it easier for him to act out at

25   certain points but certainly he acted out plenty of time

1    when he was not using.

2    **Q.**   So if he's out in the community and he has access to

3    alcohol, isn't alcohol a disinhibitor for him?

4    **A.**   It is a disinhibitor.  It would certainly be a risky

5    situation for him but that's not saying that that is what

6    caused him to offend.

7    **Q.**   Before 1997 when he, before he returned to Connecticut

8    he became involved with child pornography on the Internet;

9    is that right?

10   **A.**   I believe I wrote that he began to get involved to a

11   certain extent, yes.

12   **Q.**   And during the same time, the child pornography is not

13   enough, he is also starting a relationship with a 13-year

14   old boy; right?

15   **A.**   Whether it's enough or not, he did have a relationship

16   with a 13-year old.

17   **Q.**   Okay.  And that 13-year old boy was in California;

18   wasn't he?

19   **A.**   Yes.

20   **Q.**   And then he brought that boy back to Connecticut with

21   him; right?

22   **A.**   No, he did not bring the boy back.  At least that's not

23   what he told me.

24   **Q.**   So, again, you're basing it on Mr. Carta's self-report?

25   **A.**   There is no other reports.

1    **Q.**  Did you look at all the documents that were given to

2    you, Dr. Bard?

3    **A.**  I did.

4    **Q.**  And did you see the indication in the police report

5    about the police -- parents of that boy filing with the

6    police complaints that he had brought this boy back to

7    Connecticut?

8    **A.**  I saw that, yes.

9    **Q.**  So you are aware?

10   **A.**  I don't necessarily accept that.  I know that the boy

11   came to Connecticut.  Mr. Carta indicates that the boy came

12   on his own.  He was invited but he did not bring him there.

13   **Q.**  So when faced with an official police record and

14   Mr. Carta's self-report, you chose Mr. Carta's self-report?

15   **A.**  An official police record does not guarantee truth.

16   **Q.**  Although many of the coding manuals say that's what

17   you're supposed to use when you're coding over a

18   self-report; don't they?

19   **A.**  When you are talking about criminal history, yes.

20   **Q.**  You don't even mention in your report that there was any

21   police involvement regarding that 13-year old boy; do you?

22   **A.**  No, I don't believe I did.

23   **Q.**  And in your report you note that Mr. Carta acknowledged

24   he was aroused by post-pubescent teenage boys, especially

25   those in the 16- to 17-year old age range; is that right?

1    **A.** Yes.

2    **Q.** And in that sentence you don't say the 13s, 14s or 15s;

3    do you?

4    **A.** This is what he told me.  If you read it, this is what

5    he told me.  I am reporting what he said here.

6    **Q.** Okay.  So despite -- but you don't know that there is

7    inconsistency between what he is telling you and what the

8    records show; do you?

9    **A.** I believe it's incredibly clear.  Earlier in that page I

10   talked about relations with teenage boys from 13 to 19.  I

11   think it's clear in the entire file Mr. Carta has offended

12   against 13 and up and he is attracted to adolescent males.

13   I don't know how much clearer we can be.

14   **Q.** He has offended to ages 13 and up; correct?

15   **A.** Yes.

16   **Q.** And he is still attracted to age 13 and up; isn't he?

17   **A.** He says that he is not.

18   **Q.** And that's what you're choosing to believe?

19   **A.** We have no objective way of knowing if he's telling the

20   truth or not.  There has been no phallometric testing.  And

21   he indicates that as a result of treatment and maturity he

22   is no longer attracted to that age group.

23   **Q.** So despite the fact that his victims were 13, 14, and

24   15, you're picking only the 16- and 17-age range as his

25   current arousal?

1    **A.**   No, I am not saying that at all.  It doesn't have to do

2    with age.  He is aroused by post-pubescent adolescent males.

3    And what he tells me and, again, I have no way to verify

4    this, he is also interested now in older individuals who

5    have the capacity to have a relationship.

6    **Q.**   And you credit that despite the fact that he wasn't

7    hanging with the older guys in the Sex Offender Treatment

8    Program; right?

9    **A.**   Twenty somethings are not thirteens.  They are adults.

10   They look like adults and they act like adults.

11          If he leaves here and gets involved with a 24-year

12   old, is that deviant?

13   **Q.**   But, Dr. Bard, that wasn't the question.  The question

14   is he now tells you he's attracted to older men, yet you

15   know he was hanging around with younger men in the Sex

16   Offender Treatment Program and you don't note that

17   inconsistency in your report; do you?

18   **A.**   My older men comment has to do with the same age as

19   those younger men back then.  Twenties, that's what he is

20   talking about now.

21   **Q.**   But you are saying twenties but, in fact, your report

22   says twenties to thirties; doesn't it?

23   **A.**   Yes.

24   **Q.**   But yet all the records, the treatment records, therapy

25   notes, the psychosexual evaluation and discharge report, all

1    of them said they were 19 or 20; right?

2    **A.**   I believe Dr. Wood talked about 20-year olds, 21, 22 --

3    **Q.**   Certainly no one --

4    **A.**   -- 23.

5    **Q.**   -- said 30; did they?

6    **A.**   No one said 30 but he acknowledges arousal in that form

7    that you showed me from 13 to 28.

8    **Q.**   So, again, that's confusing the issues, Dr. Bard.

9         In describing who he was attracted to in the Sex

10   Offender Treatment Program in your report you wrote 20s to

11   30s; correct?

12   **A.**   This is what he told me, yes.

13   **Q.**   That's right.  And the record said 19 to 20 was the age

14   group of who he was attracted to; correct?

15   **A.**   But we are talking about different things.

16   **Q.**   Dr. Bard, did the records of who was attracted in the

17   Sex Offender Treatment Program say he was attracted to 19-

18   and 20-year olds?

19   **A.**   I don't recall.  If you want to show me that.

20   **Q.**   You didn't note a discrepancy, did you, in your report

21   between those records and what he told you?

22   **A.**   There is no discrepancy.

23   **Q.**   Now, Mr. Carta admitted to you that he performed oral

24   sex on a 15-year old boy after he got into a fight with his

25   then 17-year old partner; right?

1   **A.**  Correct.

2   **Q.**  And after that child porno collecting became an

3   obsession for Mr. Carta; correct?

4   **A.**  Yes, I believe so.

5   **Q.**  And at one point in time he had downloaded 50,000

6   images; correct?

7   **A.**  Correct.

8   **Q.**  And included in those images were images of prepubescent

9   boys?

10   **A.**  Yes.

11   **Q.**  Now, in your report that you wrote you didn't assume

12   anything; did you?

13   **A.**  I'm sorry?

14   **Q.**  In your report did you make any assumptions?

15   **A.**  I tried to base my reports on the information I have.

16   **Q.**  And one of the things you spoke about was the Open

17   Hearth Program in Connecticut; do you recall that?

18   **A.**  Yes.

19   **Q.**  And I believe Mr. Carta told you he was going to live at

20   Open Hearth?

21   **A.**  Yes.

22   **Q.**  And he told you he wouldn't be able to leave the

23   facility, that he would be employed there?

24   **A.**  Yes.

25   **Q.**  He had to earn community access; is that right?

1    **A.**   Yes.

2    **Q.**   You never called Open Hearth; did you?

3    **A.**   No, I did not.

4    **Q.**   And Mr. Carta never told you that Open Hearth is a

5    homeless shelter; did he?

6    **A.**   Well, it's a transitional housing program.  I assumed

7    that was similar to that.

8    **Q.**   You don't say homeless shelter here; do you?

9    **A.**   No, I don't.

10   **Q.**   And at a homeless shelter you don't have to earn

11   benefits to live in the community; do you?

12   **A.**   No, you don't.

13   **Q.**   Now, in your report you say -- and I believe it's at

14   page 13, Dr. Bard -- that Mr. Carta has no fixation on

15   children.  Do you recall saying that?

16          **THE COURT:**  I am sorry, I missed that.

17          **MS. STACEY:**  I'm sorry.

18   BY MS. STACEY

19   **Q.**   In your report you say that Mr. Carta has no fixation on

20   children?

21   **A.**   Yes.

22   **Q.**   And what that should read for you is no fixation on

23   prepubescent children; isn't that right?

24   **A.**   No.

25   **Q.**   Well, do you remember being deposed in this case,

1    Dr. Bard?

2    **A.**   Yes, I do.

3    **Q.**   And do you remember being asked about that section?

4    **A.**   Offhand I don't.

5    **Q.**   Okay.

6         **MS. STACEY:**   May I approach?

7         **THE COURT:**   Yes.

8    BY MS. STACEY

9    **Q.**   I have handed you a copy of your deposition transcript.

10   I ask that you turn to page 140 of that transcript.

11        I'm sorry, 114.   114.

12   **A.**   Okay.

13   **Q.**   And the question at the bottom of page 113, "QUESTION:

14   He has fixated on post-pubescent children; right?

15        "ANSWER:   Right, I think I should probably have

16   said prepubescent children."

17        Do you see that answer?

18   **A.**   That's not all of it.

19   **Q.**   Well, no, I can read the whole paragraph.   You go on

20   about his attraction --

21   **A.**   No, I don't.

22   **Q.**   -- to post-pubescent children.

23   **A.**   But even with the post-pubescent, he hasn't fixated on

24   them because he's had other sexual contact, period actually.

25   This is wrong.   Then I said, With some pedophiles, for

```
 1    example, they only seek out young children.  They're

 2    terrified of having adult relationships.

 3             What I'm saying is that it's not a fixation and

 4    that's clear in here too.

 5    Q.  Well, when you corrected this at your deposition, you

 6    said that that line should read "prepubescent children;"

 7    didn't you?

 8    A.  But the next line I'm saying but even with the

 9    post-pubescent he hasn't fixated on them.  I can't be any

10    clearer.  It's not fixation if you've had adult

11    relationships.

12    Q.  In your whole life?

13    A.  In your whole life.

14    Q.  So it's not a fixation that despite having the adult

15    relationships in the past, the only age group that he is now

16    sexually attracted to and having relationships with are

17    13-year old boys?

18    A.  Who says that's the only age group that he is attracted

19    to and having sexual relationships with?  He indicated --

20    Q.  Thirteen to nineteen.

21    A.  That's not true.  Mr. Carta has had relationships with

22    males and females, adults and adolescents.

23    Q.  That's in the past, that's right, Dr. Bard?

24    A.  He is not having sex with anybody now.  All we're

25    talking about is the past.
```

1    **Q.**   Dr. Bard --

2    **A.**   That I know of.

3    **Q.**   Right.  We don't know; isn't that fair?

4    **A.**   All we know is from what is in the files and from what

5    Mr. Carta told me.  And according to them both he hasn't

6    been seen or observed and he has indicated that he is not

7    sexually active.

8    **Q.**   Now, he's certainly employed many cognitive distortions;

9    hasn't he?

10   **A.**   In the past he has, yes.

11   **Q.**   Well, even through his current treatment at Butner

12   didn't he employ cognitive distortions?

13   **A.**   Up to a certain point, yes.

14   **Q.**   Okay.  And when you interviewed with Mr. Carta, he

15   estimated that he had had a number of sexual partners in

16   his -- he estimated that he had had 30 to 40 sexual

17   partners; isn't that right?

18   **A.**   Yes.

19   **Q.**   And of those reports he admitted that at least, well,

20   that eight were below the age of 16; isn't that right?

21   **A.**   Yes.

22   **Q.**   Now, what's clear to you I think you've said is that

23   Mr. Carta has a preference for adolescent boys; is that

24   right?

25   **A.**   In the past he has shown that, yes.

1    **Q.**  In your opinion Mr. Carta is a hypersexual person; isn't

2    he?

3    **A.**  Yes, he was.

4    **Q.**  Is he still today?

5    **A.**  I don't have evidence of that.  When I talked to him, he

6    acknowledged masturbatory activity while he's been

7    incarcerated; but the frequency of that has gone from in the

8    past two or three times a day at a maximum to current time,

9    to currently being one or two times a week which is

10   certainly well within the normal limits.

11       So obviously he's incarcerated but there is simply

12   no evidence that he remains, that he remains hypersexual at

13   this time.

14   **Q.**  Okay.  But for a person like Mr. Carta they look to have

15   their needs met sexually; don't they?

16   **A.**  That has been his pattern in the past, yes.

17   **Q.**  And his pattern has also been that he uses sex, excuse

18   me, he uses sex as a means of coping; hasn't he?

19   **A.**  Absolutely he has, yes.

20   **Q.**  And you would consider a sexual relationship with

21   someone in the 13- to 19-year old age range as child

22   molestation if a crime was committed and the individual

23   couldn't give consent; wouldn't you?

24   **A.**  If there was a lack of consent, yes.

25   **Q.**  And so we're clear, in the images that were downloaded

1    on the child porn, when I say prepubescent children, those

2    children were younger than 12; weren't they?

3    **A.**   Yes.

4    **Q.**   That's the definition of prepubescent children?

5    **A.**   Pretty much.

6    **Q.**   You have no idea how many of the children in this child

7    pornography collection had prepubescent children in it; do

8    you?

9    **A.**   I don't have any idea.

10   **Q.**   You know that there was no adult pornography in there;

11   right?

12   **A.**   Actually I don't.  I would assume that there was not but

13   I don't know that.

14   **Q.**   And saving thousands of images of child pornography is

15   also evidence of a pattern of hypersexuality; isn't it?

16   **A.**   Well, I think you have to look at the reason he was

17   saving some of it was for his own gratification, some of it

18   which was to obtain other images.  But, yes, it was

19   definitely a compulsion at that time.

20   **Q.**   And the fact that he's calling it an obsession, that is

21   evidence of his hypersexuality; isn't it?

22   **A.**   I think we have plenty of evidence, yes, and that's just

23   one piece of it.

24   **Q.**   But Mr. Carta has completed absolutely no treatment to

25   manage this hypersexuality; has he?

1    **A.**  Well, completion of treatment is a funny thing because

2    for many sex offenders there is no end to treatment.  He has

3    participated in some limited amount of treatment but he

4    certainly has not completed anything.

5    **Q.**  And do you keep up-to-date on sex offender research,

6    Dr. Bard?

7    **A.**  I do.

8    **Q.**  And you testified that the research doesn't support

9    attraction to pubescent teenagers as deviant; is that right?

10   **A.**  That's right.

11   **Q.**  But you are aware, aren't you, of research with

12   penile -- with penile plethysmograph results that show

13   arousal in normal men stops at about age 15?  Are you aware

14   of that research?

15   **A.**  I don't think I have seen any research that has put any

16   age range on that.

17   **Q.**  You're not aware of the research that talks about normal

18   male arousal trailing off at 14 and down?

19   **A.**  Again, I cannot recall any specific age numbers.  But if

20   we're talking -- we know that normal men are aroused to

21   adolescents.

22   **Q.**  And this research says normal men's arousal doesn't go

23   younger than 15; does it?

24   **A.**  Again, I don't know.  I don't know any specific age

25   where it certainly goes from aroused to not aroused.  I

1    think it depends more on what the person looks like than

2    age.

3    Q.  You're not aware of the research that says normal men

4    when monitored on the penile plethysmograph, that the PPG

5    results show no arousal to 12- or 13-year olds?

6    A.  Well, to prepubescent children I am aware that there is

7    no arousal.  But we're not talking about that here.

8    Q.  Well, a 13-year old is not prepubescent; right?

9    A.  Well, again, that's one of the big problems here.  There

10   are 13-year olds who look like prepubescent kids.  And there

11   are 13-year olds who look like 18 and over.  It depends on

12   the body.  It depends on the sexual development.  That's

13   what makes individuals aroused, not their age.

14   Q.  Well, then, if Mr. Carta is telling you that he has a

15   preference for children 13 to 19, he could be telling you he

16   has an interest in prepubescents then; right?

17   A.  That's not what he is saying.  He is saying the age

18   range has been this but he has made it very clear to

19   everyone he has talked to that he has no interest in

20   prepubescent children.  And it's the individuals who are

21   pubescent that he finds attractive.

22   Q.  But that's not supported by the records; is it?

23   A.  Of course it is.

24   Q.  Did you review the psychosexual evaluation and the

25   discharge report that talk about his attraction to boys who

1    are in the midst of pubescence?

2    **A.**   I read that.

3    **Q.**   And the midst of pubescence and these adolescent age

4    group are the children who are starting to show the

5    secondary signs of puberty; right?

6    **A.**   That's not what I would consider in the midst of, no.

7    **Q.**   Well, the people he said he was attracted to, they were

8    young looking; right?

9    **A.**   Yes.

10   **Q.**   And they had just started developing hair or penile

11   function; right?

12   **A.**   No.  Not that they had just started that, no.

13   **Q.**   In any case, you don't like the diagnosis of hebephilia,

14   Dr. Bard, but you'd agree that it's used; right?

15   **A.**   I would agree that it's used as a descriptive term.  It

16   is not a diagnosis.

17   **Q.**   The diagnosis is paraphilia NOS?

18   **A.**   The diagnosis that was offered in this case?  Yes.

19   **Q.**   And in the past you have seen diagnoses of paraphilia

20   NOS with a descriptor of hebephilia in non-civil commitment

21   proceedings; haven't you?

22   **A.**   I have not.

23   **Q.**   You never saw that --

24   **A.**   I have never seen it --

25   **Q.**   And you did see it --

1   **A.**   -- before these cases.

2   **Q.**   And you didn't see it in Dr. Wood's psychosexual

3   evaluation when he was purely treating him not seeking to

4   civilly commit him?

5   **A.**   I saw it over there but that's been in the context of

6   civil commitment laws.  Before that the term is rarely ever

7   used.

8   **Q.**   So you did see it in Dr. Wood's evaluation; right?

9   **A.**   Yes.

10  **Q.**   And that was for the Sex Offender Treatment Program;

11  right?

12  **A.**   In 2006, yes.

13  **Q.**   And he was Mr. Carta's treatment provider; right?

14  **A.**   Yes.

15  **Q.**   And you'll admit that it's used; wouldn't you?

16  **A.**   A lot of incorrect things are used.  That doesn't make

17  it valid.

18  **Q.**   You're familiar with the *Diagnostic and Statistical*

19  *Manual*, DSM-IV?

20  **A.**   I am.

21  **Q.**   It's relied upon by medical professionals and

22  professionals in your fields?

23  **A.**   It is.

24  **Q.**   And it talks about paraphilia, doesn't it, as a

25  diagnoses?

1    **A.**  Yes.

2    **Q.**  And the elements of a paraphilia, the essential features

3    of a paraphilia are recurrent, intense sexually arousing

4    fantasies, sexual urges or behaviors.  That is part of it;

5    right?

6    **A.**  That is.

7    **Q.**  And you'd admit that Mr. Carta has all of those things;

8    right?

9    **A.**  Yes.

10   **Q.**  And those arousing fantasies, urges or behaviors involve

11   nonhuman objects, the suffering or humiliation of one's self

12   or one's partner, or children or other non-consenting

13   persons that occur over a period of at least six months;

14   isn't that right?

15   **A.**  That's what it says.

16   **Q.**  It's called "Criterion A"?

17   **A.**  Yes.

18   **Q.**  And Mr. Carta meets those elements right there; doesn't

19   he?

20   **A.**  He does not.

21   **Q.**  Well, you agreed that he had recurrent, intense sexually

22   arousing fantasies, sexual urges or behaviors; right?

23   **A.**  Yes.

24   **Q.**  And they did involve children; right?

25   **A.**  No.

1    **Q.**  They did involve non-consenting persons over a period,

2    all over a period of six months?

3    **A.**  That is not what non-consent means there.  The author of

4    DSM has written an article to clarify that.  And he writes

5    it is only supposed to be used, the original intent was for

6    things like exhibitionism, voyeurism and sadism.

7    **Q.**  Okay.  That might be the intent --

8    **A.**  Period.

9    **Q.**  -- of the use that you are testifying for --

10   **A.**  No.

11   **Q.**  -- it has nothing to do with the issue of consent; does

12   it?

13   **A.**  I will read you an article written by Allen Frances, et

14   al.  Dr. Frances is one of the editors of *DSM-IV Task Force*.

15   **Q.**  Okay.

16   **A.**  "The term non-consenting person was meant to apply only

17   to exhibitionism, voyeurism and sadism."

18           That is what the definition of non-consent in that

19   book means.  When you alter that, that is, to assign it to

20   people who offend against teenagers who cannot give legal

21   consent or to adults in terms of what some people call

22   rapism, you are bastardizing that book and making it

23   invalid.

24   **Q.**  Okay.  So that's your testimony as to the non-consenting

25   piece.  But you'll admit that there is children involved in

1    that sentence; right?

2    **A.**   I am not defining child --

3    **Q.**   And you're not defining a 13-year old as a child?

4    **A.**   The way the DSM talks about children is in context of

5    pedophilia, that's all.  And it talks about them in terms of

6    prepubescent.

7    **Q.**   And that's the only time you can refer to someone as a

8    child?

9    **A.**   The only diagnosis that involves children is that one.

10   **Q.**   Does the definition of a child as contained in the

11   DSM-IV say a child is exclusively a prepubescent child?

12   **A.**   It is implied because that is the only diagnosis that

13   involves a child.

14   **Q.**   And that implication is your interpretation of DSM-IV;

15   right?

16   **A.**   I think it's the majority of clinicians' interpretation.

17   **Q.**   Now, when you talked about normal men being aroused

18   to -- and just to finish up on paraphilia.  The paraphilia

19   NOS, or not otherwise specified, it says the categories

20   included for coding paraphilias that do not meet the

21   criteria for any of the specific categories; isn't that

22   right?

23   **A.**   It does.

24   **Q.**   And then it lists a number of examples after that?

25   **A.**   It does.

1   **Q.**  And it's your testimony that hebephilia, paraphilia NOS

2   with a descriptor of hebephilia is invalid because it's not

3   listed here; right?

4   **A.**  I'm saying it's invalid because there is no empirical

5   evidence that it exists as opposed to the things in there.

6   **Q.**  Because you would agree that the paraphilia NOS

7   descriptions here, they say, they include but they're not

8   limited to these examples; right?

9   **A.**  Right.  The way I was taught, those are the more common

10   ones.

11   **Q.**  Now, normal men you testified are aroused or attracted

12   to adolescents; right?

13   **A.**  Yes.

14   **Q.**  And by "normal men," they don't act on their arousal

15   over decades of time with children who are 13; do they?

16   **A.**  True enough.

17   **Q.**  And they don't, normal men don't selectively pursue a

18   13- to 19-year old age group for sex; do they?

19   **A.**  No, they don't.

20   **Q.**  Now, you would agree that, again, you don't use it, but

21   that paraphilia NOS with a descriptor of hebephilia exists

22   in the field; right?

23   **A.**  Again, certain people have used it.  It is an invalid

24   diagnosis.

25   **Q.**  In your opinion?

1   **A.**   In most people's opinion, which is why it's not in the

2   DSM.   If it was accepted by most people, it would be in the

3   DSM.   That's how it works.

4   **Q.**   Well, you're aware of literature on hebephilia; right?

5   **A.**   No, there is no literature on hebephilia.

6   **Q.**   You testified earlier today about a number of articles

7   that talked about IQ's and handedness and height of

8   hebephiles as compared to pedophiles?

9   **A.**   The research has been done by the same group in Canada

10  looking, trying to justify the inclusion of hebephilia.   No

11  one else is doing research on it.   It's not written in

12  textbooks.   It's nowhere except there.

13  **Q.**   And that's your testimony?

14  **A.**   And it's only been done in the past five years.

15  **Q.**   Okay.   Well, I'd like to refer you, are you familiar

16  with the book *Sex Offenders* that was published in 1965 I

17  believe?

18  **A.**   I'm sure I've seen it along the way.

19  **Q.**   And that textbook contains the definition for

20  hebephilia; doesn't it?

21  **A.**   I'm sure it also has the definition of a homosexual.

22  **Q.**   They refer to an article, in fact, there is an article

23  by Bernard C. Glueck, Jr. published in 1955?

24  **A.**   He was the only person who came up with that, that's it.

25  And then it lie dormant for 25 to 30 years.

1    **Q.**  So Mr. Glueck was the only one, these people in Canada

2    were the only ones, that's at least two that have talked

3    about hebephilia; right?

4    **A.**  It doesn't matter if someone has talked about it.  It

5    hasn't been accepted.  The same way that it was proposed

6    then, homosexuality was.  That doesn't mean it's valid.

7    **Q.**  And, in fact, the hebephilia descriptor by Mr. Glueck in

8    his, published in this book in 1965, *Sex Offenders*, it's a

9    12- to 15-year old age group; isn't it?

10   **A.**  I don't know offhand.

11   **Q.**  Okay.  You will agree that Mr. Seto is someone who is

12   respected in the field as a researcher; right?

13   **A.**  I do.

14   **Q.**  And are you familiar with his 2008 book on *Pedophilia*

15   *and Sexual Offending Against Children*?

16   **A.**  I have not seen that actually.

17   **Q.**  So you're not aware then that he discusses hebephilia in

18   this book?

19   **A.**  I'm not aware of that, no.

20   **Q.**  Okay.  And, in fact, hebephilia is described, used to

21   describe the sexual preference for pubescent children.

22   You're not familiar with that?

23   **A.**  I am not familiar with that.  If that's what he is

24   saying, then that is a very different kind of criteria.

25   **Q.**  And unlike pedophiles, hebephiles are attracted to

1    children who show some signs of secondary sexual development

2    such as the emergence of pubic hair and initial development

3    of breasts in girls; are you familiar with that?

4    **A.**   I'm not.  I have not seen that.

5    **Q.**   But Mr. Seto is certainly someone who is respected and

6    known in the field of sex offending?

7    **A.**   Yes, Dr. Seto is, absolutely.

8    **Q.**   You also know about Dr. Doren and you respect him in the

9    field; don't you?

10   **A.**   I do not.

11   **Q.**   You don't respect him but you know him?

12   **A.**   I know him.

13   **Q.**   Okay.

14   **A.**   I know of him.  I don't know him.

15   **Q.**   Dr. Doren published a *Manual for Civil Commitments* I

16   think in 2002.  Are you familiar with the manual?

17   **A.**   I am.

18   **Q.**   And you are familiar that in this manual he discusses

19   relevant types of paraphilia NOS with a descriptor of

20   hebephilia; right?

21   **A.**   He does.

22   **Q.**   And there is several paragraphs on ways to diagnose

23   paraphilia NOS with hebephilia; right?

24   **A.**   There are ways to diagnose in order to find people

25   sexually dangerous.

1    **Q.**  Well, you might not agree with his outlook but will you

2    agree that this book is published and that he's an accepted

3    person in the medical field?

4    **A.**  I will agree that that book was published in order to

5    facilitate civil commitment.  It is surprising that before

6    civil commitment laws came out, none of this was being

7    published.

8    **Q.**  You have no idea about the need for publications on

9    hebephilia prior to civil commitment laws; do you?

10   **A.**  Excuse me?  I have no -- I'm sorry, I didn't hear you.

11   **Q.**  Strike that.

12        And just while we are talking about Dr. Doren,

13   you're familiar with it, when he talks about hebephilia, he

14   talks about this selective pursuit of sexual contact with

15   adolescents and seeking contact despite the consequences.

16   Would you agree that that's at least the definition of

17   hebephilia as it's out there?

18   **A.**  There is no definition.  That's the problem.  If there

19   was a specific definition, we could test it.  If we could

20   test it, we could know if it was valid.  But there is none.

21   **Q.**  Now, you testified when determining about the CODE

22   Program and being a protective factor for Mr. Carta, you

23   testified that that was something that was significant to

24   you; right?

25   **A.**  I don't think I called that a protective factor.

1   **Q.**  Did you testify that this completion of the CODE Program

2   was something that was significant to you?

3   **A.**  Yes, but I don't think I described it as a protective

4   factor.

5   **Q.**  And it was -- other than mentioning that he participated

6   in this CODE Program in passing, is CODE listed anywhere

7   else in your report?  Other than one line on page 6?

8   **A.**  I don't think so.

9   **Q.**  And CODE helped him so much, wouldn't you have expected

10  him to have done better in sex offender treatment?

11  **A.**  No, not necessarily.

12  **Q.**  Now, you have treated sex offenders before?

13  **A.**  I have.

14  **Q.**  I think the last, you testified the last time you

15  treated them was 2006?

16  **A.**  Correct.

17  **Q.**  And in general eight months, which is the amount of time

18  Mr. Carta stayed in treatment, in general that's not enough

19  time for sex offender treatment; is it?

20  **A.**  Not enough time for what?

21  **Q.**  To complete and succeed in sexual offender treatment.

22  **A.**  To complete most programs, no, it's not enough time.

23  **Q.**  Okay.  And, you know, most programs wouldn't say you've

24  completed in eight months; would they?

25  **A.**  It depends on the program.  I'm sure there are some

```
 1    programs that go eight months.  But I will tell you in

 2    general that that's not usually enough.

 3                  (Pause in proceedings.)

 4            MS. STACEY:  If I can just have a minute?

 5                  (Pause in proceedings.)

 6            MS. KELLEY:  Could we just see the Seto book?

 7                  (Pause in proceedings.)

 8    BY MS. STACEY

 9    Q.  I'd ask you to turn to page 69 of your deposition.

10    Question -- I'm sorry.

11    A.  Yes.

12    Q.  Line 5, "QUESTION:  And why is it that you can't imagine

13    that he had successfully completed it?"

14            Did I read that correctly?

15    A.  Yes.

16    Q.  And is the "it" referring to sex offender treatment?

17    A.  Yes.

18    Q.  "ANSWER:  Because I don't think most programs would say

19    that someone has completed treatment in eight months."

20            Do you recall saying that?

21    A.  I don't remember saying it but it's here so.

22    Q.  Okay.  Now, you testified that Mr. Carta's withdrawal

23    from the Sex Offender Treatment Program was a case where

24    Mr. Carta saw things differently from his therapist; isn't

25    that right?
```

1     **A.**   I don't think I said that.  I think there were -- I

2     think I was talking about a number of different factors that

3     were going on at the time.

4     **Q.**   Do you -- well, you think there was a number of

5     different factors going on.  Did you ever -- you never tried

6     to contact Dr. Wood to find out why he quit the Sex Offender

7     Treatment Program; did you?

8     **A.**   No, I didn't.

9     **Q.**   And I think you testified today that for a number

10    reasons, including the fact that his therapist left, do you

11    remember?

12    **A.**   Yes.

13    **Q.**   And there are no records that support that he left the

14    treatment program because his therapist left; are there?

15    **A.**   Well, there are records that indicate that Dr. Wood was

16    leaving and that Mr. Carta was having a hard time with that.

17    **Q.**   Well, the same records say actually that Mr. Carta said

18    it was fine and he trusted them to do the thing that was

19    best for him; didn't he?

20    **A.**   That's what it said in there, yes.

21    **Q.**   And, in fact, you testified that he didn't have a lot of

22    people to talk to in the Sex Offender Treatment Program?

23    **A.**   Right.

24    **Q.**   But you're aware that there were a hundred people in

25    this program; right?

1    **A.**   Yes, I am aware of that.

2    **Q.**   And you also testified that he left the Sex Offender

3    Treatment Program and Dr. Wood was leaving and he had nobody

4    else to talk to; do you remember that testimony?

5    **A.**   I think I said something like that.

6    **Q.**   But you're certainly aware that he was assigned another

7    therapist; wasn't he?

8    **A.**   I don't know if he ever reached that point because he

9    terminated.

10   **Q.**   And he had general therapy sessions during his time at

11   the Bureau of Prisons; didn't he?

12   **A.**   He had group therapy sessions, that what Dr. Wood was --

13   **Q.**   That was in sex offender treatment.   Now I'm talking

14   about general therapy.

15        Do you recall seeing treatment notes, I'm depressed

16   or if they have a headache or if they're having any problems

17   in the prison population, there is someone they can go to?

18   **A.**   While he's at Butner?

19   **Q.**   Yes.

20   **A.**   I think I remember seeing some notes about that but I'm

21   not that certain.

22   **Q.**   Now, you know, however, that Mr. Carta left the

23   treatment program because the records say he couldn't handle

24   the treatment; right?

25   **A.**   In general terms, yes.

1   **Q.**  And he couldn't take the feedback; right?

2   **A.**  Yes.

3   **Q.**  And he didn't want that restriction about the fact that

4   he couldn't hang with the younger men in the program; do you

5   remember that?

6   **A.**  I don't recall seeing that.  I think that was a factor

7   earlier but I don't think it was a factor at the end.

8   **Q.**  Well, if you could turn to Exhibit 27, Bates page 955,

9   which is Dr. Wood's discharge report.

10  **A.**  Yes.

11  **Q.**  I'm trying to direct you as best I can.

12       So do you see the last paragraph, it's a rather

13  lengthy paragraph?

14  **A.**  Yes.

15  **Q.**  And it discusses the fact that he's impulsively

16  submitting at least two reports to withdraw that he quickly

17  regrets and withdraws himself?

18  **A.**  Yes.

19  **Q.**  And other participants start reporting that Mr. Carta is

20  focusing his attention on the younger members; is that

21  right?

22  **A.**  Yes.

23  **Q.**  And he's covertly fueling their dissatisfaction by

24  reinforcing antisocial attitudes and deviant sexual beliefs?

25  **A.**  I don't know what that means.

1    **Q.**   You don't know --

2    **A.**   I don't know what that means.

3    **Q.**   Okay.  Did I read that right?

4    **A.**   Yes, you read it right.  I don't know what it means.

5    **Q.**   And when confronted in the community meeting about this

6    behavior, Mr. Carta became enraged and verbalized wanting to

7    quit again?

8    **A.**   Yes.

9    **Q.**   And he spent the next several weeks after that point

10   actually attempting to get revenge on this person that

11   confronted him; right?

12   **A.**   That's what it says.

13   **Q.**   And so I can keep going on with those examples but those

14   are the reasons he left the Sex Offender Treatment Program;

15   isn't it?

16   **A.**   Those are some of them.

17   **Q.**   And you don't note any of those in your report; do you?

18   **A.**   I don't remember if I wrote any of that or not.

19           No, I didn't write about that much, no.

20   **Q.**   Now, you testified earlier today that Mr. Carta wanted

21   to quit the treatment because something he said or he had

22   confronted someone and caused other people to get kicked out

23   of the treatment; is that right?

24   **A.**   That's what he told me was the last straw as it were.

25   **Q.**   And that's not in your report; is it?

1    **A.**   Actually it is in here.

2    **Q.**   I apologize.

3    **A.**   The bottom of page six, top of page seven, "Mr. Carta

4    reported, however, that he decided to leave treatment after

5    another resident was terminated from treatment and after his

6    individual therapist told him he was leaving."

7    **Q.**   Right.  Nothing about terminated from treatment because

8    of Mr. Carta; right?  People get terminated for all reasons;

9    don't they?

10   **A.**   Yes.

11   **Q.**   And so if someone that Mr. Carta is sexually attracted

12   to gets kicked out of treatment, that is equally plausible

13   from what you wrote in your report; isn't it?

14   **A.**   It certainly could be.

15   **Q.**   But your report doesn't say it's because he confronted

16   someone; does it?

17   **A.**   Well, that's --

18   **Q.**   It says he quit because someone else quit?

19   **A.**   He quit but I may not have written that in my report.

20   It was in my notes and I certainly, I think we talked about

21   that in the deposition.

22   **Q.**   The fact that someone's therapist is leaving, that's not

23   a reason to leave sex offender treatment; is it?

24   **A.**   No, it was a bad reason.

25   **Q.**   And lying in treatment, that can minimize treatment;

1  right?

2  **A.**  It can.

3  **Q.**  And minimization can impede treatment; right?

4  **A.**  It can too.

5  **Q.**  And Mr. Carta has engaged in both lying and

6  minimization; hasn't he?

7  **A.**  In terms of behaviors there possibly, not in terms of

8  his sex offending.

9  **Q.**  I will ask you to turn to page 85 of your deposition.

10  Line 10.

11  **A.**  Yes.

12  **Q.**  "QUESTION:  In Mr. Carta's case do you know whether he

13  engaged in any instances of lying and minimization?"

14      Did I read that correctly?

15  **A.**  Yes.

16  **Q.**  "ANSWER:  I am sure he has.  I don't think there is a

17  sex offender on the face of the earth who does not minimize

18  things at certain times."

19      Have I read that accurately?

20  **A.**  Yes.

21  **Q.**  And then you go on to talk about the reports, the child

22  pornography reported and the 15-year old and the fact that

23  everything you have comes from him?

24  **A.**  Well, you're summarizing it obviously but, yes.

25  **Q.**  That's right.

1          And you are aware that Mr. Carta while engaged in

2     sex offender treatment refused to acknowledge that his

3     hanging with these younger members patterned his offense

4     cycle?  Are you aware of that?

5     **A.**   Yes, I'm aware of that.

6     **Q.**   That's not in your report; is it?

7     **A.**   It's not a relevant factor in terms of his risk of

8     reoffense.

9     **Q.**   And in terms of Mr. Carta's success in treatment, he

10    refused to listen to staff suggestions that he not hang with

11    the younger members of the program; right?

12    **A.**   According to what Dr. Wood stated yesterday, that's not

13    accurate.

14    **Q.**   Well, you weren't there; were you, Dr. Bard?

15    **A.**   I am not sure what you're asking me.  I am replying what

16    Dr. Wood said who was there and that they developed a way

17    for him to avoid those individuals that he participated

18    with.

19          So what you are asking me and what I'm answering,

20    if you don't like what I'm saying, that's fine, but I am

21    replying what the evidence is in this case.

22    **Q.**   Right.  And the question simply was that you just said

23    it wasn't accurate that he couldn't take the feedback.

24          And so my question to you is you have the therapist

25    records; right?

1   **A.**  I have the therapist's records and his testimony here.

2   But you didn't ask him about feedback.  You asked him about

3   hanging with those guys.

4   **Q.**  Well, I'm asking you now, Dr. Bard.  You were aware that

5   in treatment he refused to listen to the feedback of peers

6   and staff; right?

7   **A.**  At times, yes.

8   **Q.**  And you're aware that he had frequent interpersonal

9   conflicts in treatment?

10  **A.**  Yes, I wrote that actually.

11  **Q.**  And Mr. Carta while he was in treatment denied

12  wrongdoing and was often defensive; wasn't he?

13  **A.**  True.

14  **Q.**  Now, earlier today you testified --

15          **THE COURT:**  Okay.  It is 4:30.  I think that we

16  have had enough.

17          How much longer are you going to be?

18          **MS. STACEY:**  I would hope no more than an hour,

19  Your Honor.

20          **THE COURT:**  And then you have two witnesses

21  tomorrow; is that it?

22          **MS. KELLEY:**  Yes, we do.

23          **THE COURT:**  You wanted to -- did we agree that you

24  could put them on first thing?  Is that what you asked for

25  this afternoon?

1      **MS. STACEY:**  I have no knowledge of that, I'm

2   sorry.

3      **MS. KELLEY:**  Well, I didn't --

4      **THE COURT:**  Well, you were here.

5      **MS. KELLEY:**  I did ask if they could come, I asked

6   them to come at ten o'clock tomorrow morning.  And one is a

7   sex offender treatment provider that if you release

8   Mr. Carta will be providing him with sex offender treatment

9   for the Connecticut Probation Office, Federal Probation

10   Office.

11      **THE COURT:**  Did you make that -- maybe I am

12   overstating it.  I thought that you were asking to put them

13   on out of order.

14      **MS. KELLEY:**  Oh, I see.  I'm sorry, I misunderstood

15   you.

16      **THE COURT:**  So we will suspend with the cross, put

17   them on and they can go on their way.

18      **MS. STACEY:**  I have no objection to that.  I wasn't

19   sure --

20      **THE COURT:**  All right.  Talk it over, figure it

21   out, but that is fine by me if that is what you want to do.

22   We will see you tomorrow at ten o'clock.

23      **THE CLERK:**  Court is in recess.

24      (WHEREUPON, the proceedings were recessed at 4:30

25      p.m.)

C E R T I F I C A T E

       I, Carol Lynn Scott, Official Court Reporter for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

       /S/CAROL LYNN SCOTT

_____

CAROL LYNN SCOTT
Official Court Reporter
John J. Moakley Courthouse
1 Courthouse Way, Suite 7204
Boston, Massachusetts 02210
(617) 330-1377