1              UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS
2
   * * * * * * * * * * * * * *
3  UNITED STATES OF AMERICA      *
                                 *
4           vs.                  *        CIVIL ACTION
                                 *        No. 07-12064-JLT
5  TODD CARTA                    *
                                 *
6  * * * * * * * * * * * * * *

7             BEFORE THE HONORABLE JOSEPH L. TAURO
                 UNITED STATES DISTRICT JUDGE
8                      **DAY THREE**
                      **NONJURY TRIAL**
9
   A P P E A R A N C E S
10
            OFFICE OF THE UNITED STATES ATTORNEY
11          1 Courthouse Way, Suite 9200
            Boston, Massachusetts 02210
12          for the United States
            By:  Eve A. Piemonte Stacey, AUSA
13               Jennifer C. Boal, AUSA

14

15          FEDERAL DEFENDER OFFICE
            408 Atlantic Avenue, Suite 328
16          Boston, Massachusetts 02210
            for the defendant
17          By:  Page Kelley, Esq.
                 Ian Gold, Esq.
18

19
                              Courtroom No. 22
20                            John J. Moakley Courthouse
                              1 Courthouse Way
21                            Boston, Massachusetts 02210
                              February 11, 2009
22                            10:10 a.m.

23
                 CAROL LYNN SCOTT, CSR, RMR
24                  Official Court Reporter
                 One Courthouse Way, Suite 7204
25               Boston, Massachusetts 02210
                      (617) 330-1377

**I N D E X**

| **WITNESS:** | **DIRECT** | **CROSS** | **REDIRECT** | **RECROSS** |
|---|---|---|---|---|

DR. RANDALL KENT WALLACE

| By Ms. Kelley | 3 | | 43 | |
| By Ms. Stacey | | 36 | | 44 |

PAUL COLLETTE

| By Ms. Kelley | 45 | | 69 | |
| By Ms. Boal | | 62 | | |

LEONARD BARD, Resumed

| By Ms. Stacey | | 73 | | 132 |
| By Mr. Gold | | | 111 | |

* * * * * * * *

CLOSING ARGUMENT BY MS. KELLEY..................PAGE 134

CLOSING ARGUMENT BY MS. STACEY..................PAGE 155

* * * * * * * * *

**E X H I B I T S**

| **DEFENDANT'S:** | IN EVD. |
|---|---|

No. 11A Resume of Dr. Wallace ...........9

No. 11  Documents .....................14

**GOVERNMENT'S:**

No. 28  Disciplinary Record............101

1              P R O C E E D I N G S

2         **THE COURT:**  Good morning, everybody.

3         **COUNSEL:**  Good morning, Your Honor.

4         **THE COURT:**  Sit down, please.

5         (Whereupon, the Court and the Clerk conferred.)

6         **THE COURT:**  Okay.  Where are we?

7         **MS. KELLEY:**  Good morning, Your Honor.

8         I thought we would, with the Court's permission, we

9    would go out of order at this time.  Dr. Bard's cross is not

10   yet complete but I would like to call Dr. Randall Wallace

11   who is here from Connecticut.

12        **THE COURT:**  Okay.  No objection I take it?

13        **MS. STACEY:**  There is no objection, Your Honor.

14        **THE COURT:**  All right.

15        **MS. KELLEY:**  I expect the probation officer to be

16   here at eleven so hopefully that will run smoothly.

17        **THE COURT:**  Okay.

18        **MS. KELLEY:**  So Mr. Carta calls Dr. Randy Wallace.

19        **THE COURT:**  Okay.

20        **THE CLERK:**  Right up here (indicating), sir.

21           **DR. RANDALL KENT WALLACE, Sworn**

22        **THE CLERK:**  Thank you.  You may be seated.

23                 **DIRECT EXAMINATION**

24   BY MS. KELLEY

25   **Q.**  Good morning, Dr. Wallace.

1    **A.**  Good morning.

2    **Q.**  If you can just sit down and move yourself up toward

3    that microphone but not too close.

4            Could you state your full name for the record,

5    please.

6    **A.**  Dr. Randall Kent Wallace.

7    **Q.**  And what type of doctor are you?

8    **A.**  I'm a licensed psychologist.

9    **Q.**  And where do you work, sir?

10   **A.**  I work in Connecticut.  I work for an agency called the

11   Connection, Incorporated.

12   **Q.**  If a person were to be released to federal supervised

13   release in Connecticut and as a condition of their

14   supervised release they had to attend sex offender

15   treatment, what agency contracts with the state of

16   Connecticut -- with the Federal Probation Office there for

17   sex offender treatment for such a person?

18   **A.**  Our agency.

19   **Q.**  And can you just give the full name of that part of your

20   agency?

21   **A.**  The Connection, Incorporated is a large organization

22   that has forty some different programs.  The program that I

23   work for is called the Center for the Treatment of Problem

24   Sexual Behavior.  That's the specific program that would

25   contract or does contract with Probation.

1    **Q.**  And can I just take a step back and ask you a little bit

2    about who you are.

3            What is your educational background?

4    **A.**  Well, I'm a licensed psychologist.  I worked with, in

5    the sexual perpetration field for over twenty years.  I've

6    worked really the gambit of preadolescent, juvenile, adult,

7    done evaluations, treatment, and I do polygraph examinations

8    also.

9            In terms of specific jobs, the last few jobs I was

10   the assistant clinical director down at the Massachusetts

11   Treatment Center for a few years.  And I basically oversaw

12   the prison component.  They had the civil commitment and the

13   prison component and I oversaw the prison component of that

14   for treatment services.

15   **Q.**  Excuse me.  When you say you oversaw the treatment

16   services at the Mass. -- this is the Bridgewater Treatment

17   Center for sexually dangerous persons?

18   **A.**  Yes.

19   **Q.**  And what exactly were your duties there?

20   **A.**  Mostly I did two things.  I directly supervised -- there

21   were different phases.  I directly supervised two of the

22   phases and then I oversaw the administrative part of the

23   entire prison part of it.  So meetings with the Department

24   of Corrections, policies, procedures, those types of things.

25   **Q.**  And in that job were you involved yourself in providing

1    therapy to individuals?

2    **A.**   Yes.   Pretty much I've always had some clinical function

3    all along.

4    **Q.**   And when you say "all along," how many years have you

5    spent providing sex offender treatment to people?

6    **A.**   Over twenty.

7    **Q.**   And other than the time at the Mass. Treatment Center,

8    what other types of work have you done?

9    **A.**   Well, I worked at the Connection, Incorporated.   I'm

10   actually in my second stint there.   So I think it's a little

11   over five years cumulatively.   And I have done private

12   practice.

13         When I was originally at the Connection,

14   Incorporated I oversaw their juvenile program which is a

15   statewide outpatient evaluation and treatment program.   For

16   a year and a half I was doing private practice where I was

17   doing mostly evaluations, some treatment but mostly

18   evaluations.

19         I worked, going backwards now, I used to work on

20   the -- I'm a West Coast guy so I was working in Oregon for

21   several years and I worked in a private practice agency,

22   facilitating the groups primarily.   Also doing

23   plethysmographs and evaluations.

24   **Q.**   And when you say "plethysmographs," what type of test is

25   that?

1    **A.**   A plethysmograph is a sexual arousal testing.  It's not

2    used out in this area very much anymore.  In fact, it's not

3    really common anymore for some -- there is a variety of

4    reasons it's not used as much.  It's used still quite a bit

5    in Canada but it's not used as much here.

6         But basically it's, you're showing audio and video

7    stimulus and you're measuring arousal levels.

8    **Q.**   And can you just explain briefly to Judge Tauro what you

9    do you now at the center where you work now?

10   **A.**   There's a couple of things that I do right now.  My

11   hands-on function right now is oversee the agency which is

12   essentially state probation.  It's called Court Support

13   Services Division.  What they do, they have developed a new

14   program to do polygraphs on all of the sexual offenders so I

15   am overseeing that program which is just getting started.

16   So we're doing, we're going to be doing about 1100 -- no,

17   about 2,000 exams a year, polygraphs, so I'm developing and

18   overseeing that program right now.

19        Then the other function I've always had while at

20   the Connection or at the Center For Treatment of Problem

21   Sexual Behaviors specifically is part of their management so

22   overseeing, you know, a few years ago we developed a

23   treatment curriculum or identified one so I was part of that

24   committee doing policies and procedures, staff supervision,

25   that type of thing.

1    **Q.**  And I ask you to look at your resume that's in front of

2    you.  Is you that your resume?

3    **A.**  Yes.

4         **MS. KELLEY:**  Your Honor, I'd like to move that

5    Dr. Wallace's resume go into evidence.

6         **THE COURT:**  Any objection?

7         **MS. STACEY:**  Your Honor, I do object.  And that,

8    again, I'm renewing the objection to this witness's

9    testimony and that he wasn't disclosed.  And his testimony

10   is entirely speculative because he doesn't know Mr. Carta

11   and Mr. Carta has never treated with him.  So he's testified

12   to his background.  I don't see any need for the rest of it

13   to come in.

14        **THE COURT:**  What is the --

15        **MS. KELLEY:**  I'm not asking him to be qualified as

16   an expert.  I just --

17        **THE COURT:**  Why didn't you put him on your list?

18        **MS. KELLEY:**  Well, he is on the witness list.  I

19   did not -- we had another, the director of the center on our

20   witness list.  His father became critically ill.

21        **THE COURT:**  Is this the one where you moved to

22   substitute?

23        **MS. KELLEY:**  Yes, I moved to substitute Dr. Wallace

24   who is another administrator there.

25        **MS. STACEY:**  He was disclosed after the discovery

1  ended, Your Honor.

2  **THE COURT:**  All right.  That is okay.  I will let

3  him testify.  Go ahead.  Yes, that comes in.

4  **MS. KELLEY:**  Thank you.  I'll mark this later.

5  Thank you.

6  **(Defendant's Exhibit No. 11A received in evidence.)**

7  BY MS. KELLEY

8  **Q.**  Okay.  I'm going to ask you to look at some materials

9  that are there in the binder in front of you.  Do you

10  recognize those?

11  **THE COURT:**  Just to orient me, where does he plug

12  in?  Is this -- let me tell you what my question is so you

13  know what I am pondering.

14  If I decide that the government has proved its

15  case, as I understand it, the respondent would be put in

16  custody of some state agency; is that right?

17  **MS. KELLEY:**  No, sir.

18  **THE COURT:**  Is this the fellow that is going to be

19  in charge of that?  Or does he stay a federal prisoner?

20  **MS. KELLEY:**  Well, it is very interesting that you

21  raise this question.  If you commit --

22  **THE COURT:**  I like to be interesting.  Go ahead.

23  (Laughter.)

24  **MS. KELLEY:**  If you commit Mr. Carta, no one knows

25  what will happen to him because as has been litigated

1     extensively before Judge Wolf, the government has no plan.

2     He will be the first person in the United States committed

3     under this law.  And the Treatment Center down at Butner,

4     which is a Federal Treatment Center, is gone.  No one will

5     seek treatment now that this law is in place, they'd have to

6     be a fool.

7          They have reopened some kind of program, an SOTP

8     program at Fort Devens that is some different model I think

9     than they had at Butner.

10          But if Your Honor is interested in what is going to

11    happen to people who get committed, I just would like to

12    echo that interest.

13          **MS. BOAL:**  Your Honor, that's a completely

14    misleading statement as to what happened in front of Judge

15    Wolf.

16          **THE COURT:**  Well, I am certainly going to want to

17    know.

18          **MS. BOAL:**  Right, I understand, Your Honor.  But

19    pursuant to 4248(d), if the Court commits the person, the

20    person goes to the custody of the Attorney General.

21          The plan of the Bureau of Prisons right now -- and

22    we put a document to this effect in front of Judge Wolf --

23    is to go to, North Carolina.  They have developed a separate

24    pod or part of the community there to handle people that are

25    committed under 4248.

 1          There is also a provision that the Attorney General

 2     shall try to have the state assume responsibility.  If the

 3     state can't assume responsibility, then the Attorney General

 4     has the custody of the person.

 5          **MS. KELLEY:**  I would just like to say in the

 6     context of 4246 commitments it's my understanding states

 7     never assume custody of these people.

 8          **MS. BOAL:**  That's not correct.  Judge Saris has a

 9     person that was released to the state in a case in front of

10     her.

11          **THE COURT:**  All right.  Well, let's keep going with

12     him.

13          **MS. KELLEY:**  Well, if I could just explain where he

14     does fit in because --

15          **THE COURT:**  Go ahead.

16          **MS. KELLEY:**  -- this is the program that is in

17     place and waiting for Mr. Carta if you release him.  And not

18     only would I like to proffer it to Your Honor --

19          **THE COURT:**  In other words, if I release him as

20     opposed to order him held?

21          **MS. KELLEY:**  Right.  If you find that he is not

22     sexually dangerous under 4248 and discharge him, this is

23     where he will go for treatment.  Because he has three years

24     of supervised release, a condition of it is that he must

25     attend sex offender treatment.  And Dr. Wallace is a

1  representative of the organization that will provide that

2  treatment.  They can track the federal probation.

3       **THE COURT:**  He is in Connecticut?

4       **MS. KELLEY:**  He is in Connecticut.  And the reason,

5  that's where Mr. Carta is from.  That's where he was going

6  to be released to when he was taken to and moved again.  He

7  was I think two weeks from his release date to Connecticut

8  and had plans in place to go there.  That's where his family

9  is from.  That's where he is going to go.

10       And so we also have a probation officer here to

11  talk about the type of supervision they provide and what

12  conditions he would be living under.  It is relevant not

13  only because I am sure Your Honor would like to know what

14  happens to this guy if I release him but it's also highly

15  relevant to the risk assessment because, as Dr. Bard said

16  yesterday, you don't just say is he dangerous now sitting

17  here in this room.  You say is he dangerous if released.

18  That's what the statute says.

19       And in order to assess that you have to look at the

20  conditions and restrictions that he will be living under.

21  Because there is very good information that people who are

22  strictly supervised do not reoffend at the same rate that

23  people who are just walking the street do.

24       And I think you will hear both from Dr. Wallace and

25  from Paul Collette, the sex offender specialist in the New

1  Haven, Connecticut office, that they have an unbelievably

2  tight --

3        **MS. BOAL:**  Objection, Your Honor.  If we are going

4  to have testimony, let's have the testimony and not put it

5  in through counsel.

6        **THE COURT:**  Well, I take it this is in the form of

7  an amended opening statement.  I will hear it anyway.  It

8  gives me some guidance.  No matter how I decide the case,

9  you want me to at least understand what the issues are.  So

10  I appreciate the help.

11        All right.  Go ahead.

12  BY MS. KELLEY

13  **Q.**  Dr. Wallace, you have some materials there in front of

14  you?

15  **A.**  Yes.

16  **Q.**  And do you recognize those?

17  **A.**  Yes.

18  **Q.**  And what are those?

19  **A.**  The first document I am looking at is the treatment

20  agreement from our agency.

21  **Q.**  Is that entire packet something that you sent to me from

22  your agency?

23  **A.**  Yes.

24  **Q.**  And do those documents kind of explain the treatment

25  philosophy and go through the various stages of treatment

```
 1    with your agency?

 2    A.  Yes, those are some of the documents, yes.

 3          MS. KELLEY:  Okay.  I'd like to move that both of

 4    these documents be admitted into evidence.

 5          MS. STACEY:  Objection, Your Honor.  He hasn't

 6    testified to any of them.  It's full of hearsay --

 7          THE COURT:  Well, he has identified them as

 8    documents belonging to his agency so I will let them in.

 9          THE CLERK:  Do they have a number, please?

10          MS. KELLEY:  This is in our book as Exhibit 11.

11          THE CLERK:  And the resume, please?  What number

12    was that?

13          MS. KELLEY:  That would be 11A.

14          (Defendant's Exhibit No. 11 received in evidence.)

15    BY MS. KELLEY

16    Q.  So could you just briefly explain to His Honor what does

17    your program -- well, first of all, how big is your program?

18    How many participants are there in the Sex Offender

19    Treatment Program?

20    A.  We have eleven --

21          THE COURT:  You are talking about what if he gets

22    released?

23          MS. KELLEY:  Yes, sir, this is where --

24          THE COURT:  That is where he is focusing, all

25    right.
```

```
1          MR. EURBGS:  He will receive treatment --

2          THE COURT:  As opposed to the Butner program that

3    was referenced by counsel here?

4          MS. KELLEY:  Yes, where Mr. Carta would be the sole

5    participant if you sent him there.

6          THE COURT:  Unless Judge Wolf does the same thing.

7          MS. BOAL:  And Judge Saris has already made a

8    preliminary finding that Charles Peavy is a sexually

9    dangerous person and he's actually now at Butner being

10   evaluated for a 4246 but he has been moved to Butner.

11         THE COURT:  Okay.  Go ahead.

12   BY MS. KELLEY

13   Q.  So could you just explain to Judge Tauro what -- well,

14   first of all, how many people are in your program?

15   A.  We have approximately 1100 clients listed on our

16   database.  Of that it fluctuates at times because people

17   will be in violation, things like that, so we usually are

18   actively treating and evaluating between 900 and 950.

19   Q.  And this is statewide?

20   A.  This is statewide.  Some of them are incarcerated in the

21   evaluation process.  The vast majority of them are

22   outpatient treatment.

23   Q.  And what -- can you just tell Judge Tauro what is the

24   overall type of treatment?  What do you call this type of

25   treatment?
```

1   **A.**   The theoretical model is what is the standard which is

2   cognitive behavioral treatment with specific interventions

3   to address what they call dynamic and static risk factors.

4          A static risk factor would be something that

5   doesn't change like number of victims, age, those types of

6   things.

7          A dynamic risk factor would be things that are more

8   changeable, things like alcohol problems, pornography use,

9   things like that.

10         And most of our clinical interventions will relate

11   to the dynamic risk factors.

12   **Q.**   And what does -- when a person comes in to your program,

13   what do they actually do when they first get there?

14   **A.**   The first step is they do an intake evaluation.   That is

15   typically two to four sessions where we get background

16   information, get collateral information, and we will do an

17   initial risk assessment using the most standard risk

18   protocols out there.

19         Then if they were accepted into treatment, then

20   they are moved into what we call phase one.   Phase one

21   basically has two functions.   One is to provide the client

22   with psycho educational information, basically information

23   they need to know about the fundamentals of sexual offending

24   like risk factors and how to deal with those.

25         The other thing that we were doing is we're

1      appraising their amenability to treatment.  Like, for

2      example, if somebody in a group setting is resistive or

3      denying their crime, then we are going to keep them in phase

4      one until we resolve that issue one way or the other.

5              Once, if they -- for some clients they'll stop at

6      phase one.  For example, if we have a statutory case like a

7      17-year old with a 15- or 14-year old, then -- and there is

8      not a lot of other dynamic risk factors, they may be done in

9      treatment at that point.  But for the vast majority of the

10     clients, they then go on to what's called phase two which is

11     where they deal with, we have a treatment curriculum, an

12     empirically-based treatment curriculum, actually the only

13     empirically-based treatment curriculum based out of Canada,

14     that they will go through that.

15     **Q.**  Can I just ask you, because we've heard his name at the

16     trial, is this a treatment curriculum that has been studied

17     and validated by Carl Hanson?

18     **A.**  Not validated by Carl Hanson specifically.  It uses his

19     material.  It uses his studies to develop the curriculum, as

20     part it.

21             The other part of it is that there, like there are

22     some, there are some interventions in there and what the

23     Canadians basically did is they only used interventions that

24     had some empirical basis for them.

25     **Q.**  And this second phase of treatment how long would you

1   say typically that lasts?

2   **A.**   Well, at some level it will always depend on the client.

3   They have to meet the competency.   They have to meet all of

4   the goals but they also have to demonstrate that they are

5   behaving safely and healthily in the community.

6            I would say typically you're talking two to three

7   years in that phase.   Some can go somewhat shorter, some can

8   take longer.   And if they are at a higher risk, they would

9   almost certainly take longer.

10   **Q.**   And does the person who is in treatment with you agree

11   to any type of restrictions as part of the treatment

12   program?

13   **A.**   Yes.   They have two levels of restrictions really.   One

14   is whatever the probation restrictions are.   And then also

15   in terms of our treatment agreement, whatever those

16   conditions are.   And essentially the client is going to have

17   to adhere to whatever the most restrictive manners are from

18   both the probation and the treatment provider.

19   **Q.**   So, in other words, if someone had probation conditions,

20   if someone has supervised release conditions that are not as

21   restrictive as your conditions, they have to abide by your

22   conditions?

23   **A.**   If they want us to provide the treatment, yes.

24   **Q.**   Now, I'm going to ask you to turn in that packet to page

25   17 of your fax.

1    **A.**   Okay.

2    **Q.**   And just ask you, obviously this says "Treatment

3    Agreement" at the top.

4    **A.**   Yes.

5           **MS. KELLEY:**  Do you have a picture, Your Honor?

6           **THE COURT:**  I don't seem to have one here.

7           (Pause in proceedings.)

8           **MS. KELLEY:**  You are the only one that matters so.

9           (Laughter.)

10          (Pause in proceedings.)

11          **THE CLERK:**  These are working over here

12   (indicating).

13          (Pause in proceedings.)

14          **MS. KELLEY:**  We do have the binder up there with

15   these pages in it.

16          **THE COURT:**  I guess, you know, we spent about 400

17   million dollars for this courtroom so.

18          (Laughter.)

19          **THE COURT:**  I will just go sit in the jury box.  I

20   will go over here.

21          **THE CLERK:**  We're the only two that don't have it

22   working.

23          **THE COURT:**  All right.  Go ahead.  Here, I will sit

24   here.

25          **MS. KELLEY:**  Is that monitor properly focused?  Can

1    you see the writing?

2            **THE COURT:**  It is a little blurry.

3            That is fine now.

4            **MS. KELLEY:**  There is a way you can focus it.

5    BY MS. KELLEY

6    **Q.**  So I am showing you this document entitled "Treatment

7    Agreement."  Do you see that?

8    **A.**  Yes.

9    **Q.**  And is this something that people need to go over and

10   sign?

11   **A.**  Every client that enters into our -- they're not

12   accepted into our treatment program until they've signed the

13   Treatment Agreement.

14   **Q.**  And I'm just going to go to the second page of that

15   Treatment Agreement, No. 11.

16   **A.**  Yes.

17   **Q.**  And this says that you --

18            (Whereupon, the Court and the Clerk conferred.)

19            **THE COURT:**  Go ahead.

20   BY MS. KELLEY

21   **Q.**  This No. 11 says the person agrees to submit to a

22   polygraph?

23   **A.**  Yes -- well, yes.  There are multiple polygraphs that

24   each client will take but they have to agree to the process

25   of taking polygraphs, yes.

1    **Q.**  And can you just explain to the judge during the

2    treatment program what are the multiple polygraphs that

3    someone has to take?

4    **A.**  The standard process -- and this can be modified by the

5    probation officer or the clinicians.  The standard process

6    is that in the first -- if a person is not denying their

7    crime of conviction, in the first six months they will take

8    most likely a sexual history polygraph and they have to pass

9    that.  They have to disclose all of their past sexual

10   behaviors including any potential sexual crimes.  We don't

11   ask them about specific names of victims because we don't

12   want to get at a point of further litigation.  What we do is

13   we ask for the dynamics of victims.

14        If assuming they pass the sexual history in six

15   months, then they are moved into every six months taking

16   what's called a maintenance exam.  And that is an exam which

17   checks the compliance of their conditions on treatment and

18   probation.

19   **Q.**  So you have this initial polygraph exam where they

20   disclose their, basically their offending history; right?

21   **A.**  Yes, known and unknown.

22   **Q.**  And then you have these exams every six months where you

23   check to see are they really compliant; right?

24   **A.**  Correct.

25   **Q.**  And then if someone needed a poly, another polygraph,

1    would you be able to give them those?

2    **A.**   The probation, because this is contracted, the probation

3    officer or the clinician can request a polygraph of the

4    client at any time they want.  So if they feel like there's

5    an issue at hand and they're concerned, we can do it within

6    24 hours.

7            That's not common but it's their right to have

8    that.  So if they seek it for whatever reason, they can do

9    that.

10   **Q.**  Now, also part of this agreement with you is that,

11   No. 14, well, No. 13 is they can't leave the state without

12   your permission; correct?

13   **A.**   Permission from both the treatment provider and the

14   supervising agent.

15   **Q.**  And then there are also restrictions such as you have to

16   approve their residence?

17   **A.**   Correct.

18   **Q.**  And that you can restrict the type of work they do and

19   the hours they work?

20   **A.**   We can and we often do.

21   **Q.**  And you -- also they have to contract with you not to go

22   to any porn stores or video stores that sell pornography, et

23   cetera; correct?

24   **A.**   That's a standard, yes.  They're not allowed to view any

25   type of unapproved nudity.

1    **Q.**  Now, looking at page 19 of those materials -- and I

2    won't go through every single one of these -- but what are

3    these, what is this form used for?

4    **A.**  Well, this is basically, I wouldn't say an addendum but

5    basically the first 18 of these are standard.  Everybody

6    that enters into treatment has these conditions.

7          After that what they are is, after we have done an

8    intake evaluation and gotten the collateral information,

9    talked to the supervising officer, met with the client, then

10   we form additional restrictions that may be out there.

11         So if, for example, somebody has a problem with

12   Internet things, we will restrict computer access.  Because

13   you're going to have as many clients as we do, there will be

14   different conditions for different clients.

15   **Q.**  And you tailor the conditions to their specific triggers

16   and things that are going to be specific to their offending;

17   correct?

18   **A.**  To their specific risk factors, yes.

19   **Q.**  And so, for example, if you had someone who was

20   interested in teenagers, you would restrict things like,

21   that are listed here such as using certain parks or

22   buildings where perhaps there was a high concentration of

23   teens?

24   **A.**  Yes, malls, movie theaters, all of those types of

25   things, yes.

1    **Q.**  And they could perhaps even be restricted from going to

2    public restaurants?

3    **A.**  Yes, particularly they're not allowed to go to fast food

4    restaurants because of play areas.  And so, yes, that's, for

5    most guys that's a restriction.

6    **Q.**  And you even have restrictions concerning whether they

7    can own certain types of clothing or toys or any type of

8    items --

9    **A.**  Right.

10   **Q.**  -- that might be somehow connected with their specific

11   offending pattern?

12   **A.**  Correct.

13   **Q.**  And also there are restrictions concerning going to sex

14   offender, I mean, going to substance abuse treatment; right?

15   **A.**  Sometimes it's mandated, if that's what you're asking.

16   **Q.**  And so a condition of your program is that they attend

17   their substance abuse treatment; correct?

18   **A.**  If they have other treatment needs that we don't provide

19   and there are active needs, yes, they're required to be part

20   of that, including mental health and psychiatric.

21   **Q.**  Now, I just want to go over, if you look at pages 21 and

22   22, your treatment goals.  And if you look -- this is a page

23   called, "Treatment Goals and Discharge Criteria."  If you

24   look at the bottom of that page No. one, treatment goal one.

25   Can you just explain what that is?

1    **A.** Basically the client has six months, the first six

2    months of treatment to accept responsibility at a level that

3    would be approved by the clinicians for their specific

4    convicted crime.

5    **Q.** And --

6    **A.** Or crimes.

7    **Q.** And this is where you test them to see if they're

8    minimizing or denying anything?

9    **A.** What happens is we put them in for the first three

10   months and let them be in a group setting where a lot of

11   times we can work down the denial at that point.

12           At around three to four months they will then, if

13   they choose, they can have a polygraph on that specific

14   offense.  If they were to pass that polygraph, then we would

15   reevaluate what we do at that point.

16           If they don't pass that polygraph, then they have

17   another two to three months to again admit to the crime at a

18   level acceptable to the clinicians or they are then

19   terminated from treatment.

20   **Q.** I'm looking at the next page, page 22, treatment goal

21   two.  This is something you work with people on, No. two,

22   identifying, be aware of risk factors that could lead to

23   your offense.  Could you just explain that?

24   **A.** Yes.  Every client is going to have specific dynamic

25   risk factors.  This is probably one of the primary things

1    that we do, things like pornography use, alcohol use,

2    intimacy deficits.   So whatever those specific areas that

3    are identified specifically, the ones that have the best

4    empirical evidence that these are risk factors, then we have

5    the clients identify those and start working on addressing

6    them.

7    Q.   And then treatment goal three, understand your offense

8    behavior?

9    A.   This is trying to look at the pattern behavior.   This

10   works particularly well with adults.   You want to see what

11   kind of pattern, kind of how the puzzle fits together.   It's

12   based mostly on what they call a pathways model which is

13   what is the direction, how do people get from having some

14   problems in their life to the point where they would

15   sexually offend.

16   Q.   And then No. 4, prosocial skills and activities?

17   A.   That's basically once you know what your risk factors

18   are and your patterns are, what pattern, how are you going

19   to address those in ways, how you have -- you want to do it

20   in two ways.

21        One, you want to know how to minimize the risk; but

22   the other part of it is that you want to have a client

23   developing a healthy lifestyle so that they are doing

24   positive things.

25        So it's not just, you know, if I had an alcohol

1   problem, I don't drink, but it's also developing a support

2   system of people who don't drink.  It's doing activities

3   that make them feel good about themselves.  It's having

4   jobs.  It's about being in relationships.

5        So it's both trying to minimize the risk factors as

6   well as developing prosocial behaviors.

7   **Q.**  And in this regard are you helping the treatment

8   participants develop a social network of acceptable, healthy

9   lifestyle living peers?

10  **A.**  Yes, we do a couple of things.  One of the primary

11  things we do is we have, we're in the middle of modifying

12  it.  It used to be a ten-week seminar.  Now it's I think a

13  seven- or eight-week seminar.

14       Essentially what we do is we are trying to

15  encourage the clients, we expect them to have a support

16  system.

17       One of the key issues for people who have sexually

18  perpetrated is to have people who are aware of their crimes,

19  who are aware of their risk factors, who are still

20  supportive of them so they come -- their support system is

21  required to come to these sessions, these seven sessions,

22  seven weekly sessions so that they can learn about the

23  client's specific issues as well as general sexual offending

24  dynamics.  And those people are then used as part of their

25  support network.

1  **Q.** And No. 5 I think is related to that, that you've

2  developed a positive support system.  And by that you mean a

3  social network of people who can support the person;

4  correct?

5  **A.** Right.  The client can't leave -- our program isn't in a

6  way that the client can just say, okay, I've learned A, B

7  and C, they can walk out of it.  The client has to, if

8  they're going to successfully complete the program, they

9  have to demonstrate that they have done certain things.

10  One of the key things they have to demonstrate is

11  that they have a support system that we're actively -- and

12  when I say "we," we, the probation and the therapists are

13  actively aware of who this system is.  We know that they're

14  aware of the crimes and we believe that these are reasonably

15  healthy, supportive people.

16  **Q.** So not only do you encourage people to develop these

17  relationships and foster this but because they have to bring

18  the people to you, you actually can see who their social

19  network is and kind of, you have control over who are they

20  associating with?

21  **MS. STACEY:**  Objection, leading.

22  **THE COURT:**  It is but I will take it.  Go ahead.

23  BY MS. KELLEY:

24  **Q.** Is that a fair rendition (ph.) of what you said?

25  **A.** We do monitor the people that we know, who they're

1  interacting with, yes, and we approve or disapprove of

2  certain people that they will interact with, yes.

3  **Q.**  And then, last of all, present a risk reduction plan

4  that shows that you can function basically with these five

5  criteria there; right?

6  **A.**  Yes, essentially.  The other part of this that is

7  important about that last goal is that where somebody starts

8  treatment when we start treatment with somebody, let's say

9  we're talking two to three years, they're going to start

10  very restrictive in their life.  And the reality is once

11  they get out of treatment and once they're off probation,

12  their life will not be as restrictive.

13       What we're wanting them to do in that goal is to

14  take a realistic appraisal of how they will live their life

15  when somebody is not supervising them.  It may not be as

16  restrictive as when we started with them but we don't want

17  them to be at the point where they were when they were

18  offending.  So it's trying to adjust their goals for a more

19  long-term pattern.

20  **Q.**  Now, Doctor, normally when someone is in therapies like

21  such as your program, everything you do there is

22  confidential; correct?

23  **A.**  It's not confidential -- it's confidential in that it's

24  not going to go into the newspaper.  But it is not

25  confidential in the sense that everything that the client

1    says can be conveyed to whoever the supervising agency is.

2          We also have, in almost all of our groups, we have

3    what's called a victim advocate.  And so the victim advocate

4    will also be allowed to have access to all of the

5    information to that.  And we have weekly meetings with the

6    supervising officers.

7    **Q.**  And when you're talking about the supervising officers,

8    for someone who is on federal supervised release, you're

9    saying you would meet every week with their probation

10   officer?

11   **A.**  Yes.  The only reason I hesitate is I don't know the

12   federal probation system as well.  Mr. Collette would have

13   to tell you.

14         I know on the state probation it's every week.  I

15   don't know exactly -- I'm sure there is a regular pattern.

16   I'm not actively involved in the meeting with the federal

17   probation officer so I don't know their schedule of meeting.

18   But I would presume it's something close to that.

19   **Q.**  Do you find that your agency is in frequent contact,

20   even unscheduled contact with probation officers?

21   **A.**  Yes, particularly with the state side because what

22   happens is we are doing the groups in the probation offices.

23   So we see them, every time we do a group, we are seeing

24   probation officers.

25   **Q.**  If someone in your agency had some misgivings about

1    someone or was having problems with someone in treatment,

2    would they be able to contact the probation officer?

3            **MS. STACEY:**  Objection.

4    **A.**  Yes.

5            **THE COURT:**  What is the objection?

6            **MS. STACEY:**  Speculation.

7            **THE COURT:**  No.  It is overruled.

8    BY MS. KELLEY

9    **Q.**  And your answer was?

10   **A.**  Yes, we have direct -- we have both email and phone

11   availability to all the supervising officers.

12   **Q.**  Now, another requirement of people in your program is

13   that they register with the sex offender registry in

14   Connecticut, the state registry?

15   **A.**  I don't know if it's a requirement of our program.  It's

16   a requirement of the State.

17   **Q.**  And so the sex offenders in your program typically will

18   also be registered in Connecticut; correct?

19   **A.**  I think they all are.

20   **Q.**  And that is a registry that is maintained on the

21   computer?

22   **A.**  Yes, it's an Internet registry, yes.

23   **Q.**  And that is open to the public, people can go in and

24   look at who is a sex offender?

25           **MS. STACEY:**  Your Honor, may I ask that she stop

 1    leading the witness.  It is her witness.

 2              **THE COURT:**  In this kind of a jury-waived setting,

 3    what you are trying to do is to give me as much information

 4    as possible.

 5              If she leads, she saves some time.  And I think

 6    that is more important than being very technical.

 7              Your objection is correct but I am just going to

 8    overrule it.

 9              **MS. STACEY:**  Thank you, Your Honor.

10    **A.**  I'm getting old, I forgot.

11    **Q.**  You can go online and see who the sex offenders are in

12    Connecticut?

13    **A.**  Yes.  Now, I believe that there is legislation right now

14    to modify our registry thing.  But as it is at this moment,

15    I believe all people identified as a sex offender in

16    Connecticut are required to be on the Internet.

17              I know that there is legislation to modify to have

18    a tier system but I'm almost sure it hasn't gone into effect

19    yet.

20    **Q.**  Now, if you have a client in your -- who was referred to

21    your center who is brand-new and just released from

22    confinement and is homeless, what do you do?

23    **A.**  Well, it's essentially the same process with the

24    exception of if they are in certain areas, we have a

25    clinician who her job, her specialty is working with

1    homeless sexual perpetrators.  And we do that because we

2    want to make sure -- when a guy comes out of prison, he's

3    going to have more needs.  And when I say "needs," dynamic

4    risk factors.  He's not going to have a job life.  He's not

5    going to have much of a support system.  So we pay extra

6    attention to those guys because we want to get them stable

7    as fast as possible.

8           So we have a clinician specifically assigned to

9    work with them.  And because she has a smaller caseload, she

10   is able to work more directly with the supervising officer

11   and with the clients because they're going to have more

12   needs.  They're, you know, getting jobs, getting a place to

13   live other than a shelter, dealing with the emotional,

14   whatever it is, having to be in a shelter.  They have more

15   needs so we have somebody specifically assigned to that.

16   **Q.**  And in New Haven, Connecticut, is there -- what's the

17   proximity between the shelter and your office?

18   **A.**  Right there, next-door.

19   **Q.**  Right next-door?

20   **A.**  Yeah, they're pretty close.

21          Let me modify, there is more than one shelter

22   though.  I believe where most of the guys go -- and I'm not

23   the person who does that -- that's a homeless shelter, but I

24   believe the vast majority of them are real close to the

25   probation office.

1          Now, there could be somebody in another shelter in

2     the city that isn't there.  Sometimes they have to bump guys

3     around and I don't know the specifics of that.  But the vast

4     majority of times it would be very close.

5     **Q.**  Now, finally, I just want to ask you, does your

6     organization keep statistics on the recidivism rates of

7     people who are in your program?

8     **A.**  Yes, only while they're in treatment.  Guys who are in,

9     active in our program, we have a 1.7 percent recidivism

10    rate.

11         Once they leave, the state doesn't let us have

12    access to the data so we don't know what our recidivism

13    rates are post being out of our -- when they're no longer an

14    active client, we don't know what it is.

15         But for all of our 1100 guys we have about a 1.7

16    percent.

17    **Q.**  Can you also just address one last point which is is

18    there some --

19    **A.**  What I could say, one thing I think that is so

20    important, to know kind of the, you know, in between the

21    line, you have to know about recidivism rates.  We deal with

22    all kinds and we have, what really actually bumps our

23    numbers up and kind of throws us off is the exposers.  We

24    count the exposers as part of our recidivism rates.

25         Exposers have about a 50 percent recidivism.  It's

1    a very compulsive act so we don't have a lot of exposure but

2    you have to, I don't know what it is parsing that out.  But

3    when you factor the 1.7, you have to also factor in that

4    you've got exhibitionists who are throwing our numbers off

5    basically.

6    **Q.**  Okay.  You talked about a phenomenon in treatment you

7    referred to as a black hole and having to do with people's

8    motivation for treatment.  Can you just explain that concept

9    to Judge Tauro?

10   **A.**  One of the principles that we think is important is that

11   the clients have specific -- the reason we have specific

12   goals and specific criteria and specific restrictions in the

13   treatment agreement is that we want to know, we want the

14   client to know exactly what we expect them to do and give

15   them a pathway to get to that.  We don't, we don't want them

16   to be in a treatment program where they don't know where the

17   end is so that they become homeless.

18          One of the things you don't want with a sex

19   offender is to give up.  Once they give up, the old

20   terminology was absence violation effect, that basically

21   once somebody gives up, it increases all their risk factors.

22   I don't care anymore so I'll just go out and drink, I'll go

23   out and use pornography, whatever it is.  We don't want

24   that.  We want them to have very specific plans.  We want

25   them to have very specific goals.  And we want them to know

1    that there is an end date that they have control over it.

2    We don't give them a specific date but we give them specific

3    goals so that they know when they have accomplished the

4    treatment goals and when they are living a certain lifestyle

5    and they can demonstrate that through polygraphs and other

6    ways, they will complete it.

7            **MS. KELLEY:**   Okay.   Thank you, Your Honor.   No

8    further questions.

9                        **CROSS-EXAMINATION**

10   BY MS. STACEY

11   **Q.**   Dr. Wallace, you have been working with sex offenders

12   for over twenty years?

13   **A.**   I believe so, yes.

14   **Q.**   And in your experience over twenty years in the

15   profession, you have treated people with hebephilia; haven't

16   you?

17   **A.**   Hebephilia is not an actual diagnosis.

18   **Q.**   But have you seen it as a descriptor?

19   **A.**   I wouldn't describe it that way but there is no

20   empirical data to that.   I have seen people, we see a lot of

21   clients who have sexually assaulted teens.   It's actually

22   probably the most common scenario that we see.

23   **Q.**   Right.   When you and I spoke on the phone on Monday

24   evening, didn't you tell me that there was no special

25   treatment for hebephilia?

1    **A.**   There is no special treatment because it's not a

2    disorder.

3    **Q.**   And when I asked you what was hebephilia, you said an

4    attraction to teenagers; do you recall that conversation?

5    **A.**   If you would have a clinical term to it, when it's used

6    from a clinical impression, the dynamics that you would be

7    looking at is somebody who is interested in teens.  There

8    would probably be two areas that you would be focused on.

9    One area might be that the teen doesn't have the same

10   emotional level as an adult so the client may have emotional

11   limitations and they're more comfortable with that.  We see

12   that a lot when we get the 18-, 19-year old boys having sex

13   with the 14-, 15-year old girls.  They feel, if they're not

14   as socialized, they feel more comfortable.

15            The other part could be sexualized attraction.  The

16   only problem is all of the research essentially says that

17   all males or males in general who are not sexual

18   perpetrators have an equal amount of sexual attraction to a

19   post-pubescent female as they do with an adult female

20   because there isn't any remarkable differences.  In fact,

21   most teen females are in better physical condition.

22   **Q.**   But you're not an expert in the field of sexual

23   offending; are you?

24   **A.**   Yes, I am.

25   **Q.**   You have testified as an expert and been qualified as an

1   expert?

2   **A.**   Several times.

3   **Q.**   You don't serve on any peer review boards or journals;

4   do you?

5   **A.**   No.

6   **Q.**   In fact, now, when we discussed someone who has an

7   attraction to teenagers, you said the treatment would take

8   about three to five years to complete; isn't that right?

9   **A.**   I don't know that I put it that way.   What I was trying

10   to convey to you is that the typical moderate risk client in

11   our program would take three to five years, two to three

12   years actually.

13   **Q.**   Okay.

14   **A.**   We have a range, for all of our clients, it ranges from

15   between one year and five years.   There is a few very high

16   risk guys that stay in more than five years.   But we don't

17   try to keep them longer because of the homeless (ph.)

18   issues.   So typical, two to three years would be the typical

19   person, the higher risk a little longer.

20   **Q.**   And you don't cure a sex offender; correct?

21   **A.**   There is nothing to cure.

22   **Q.**   And you, in fact, I think -- so a sex offender would

23   come to you because they have conditions of release that are

24   requiring you -- requiring the sex offender to be treated;

25   right?

1   **A.**  Correct.

2   **Q.**  And, in fact, it's rare --

3           **THE COURT:**  Let me go back to his remark.  She

4   asked you you don't cure sex offenders and your answer was

5   there is nothing to cure.

6           **THE WITNESS:**  It's a behavioral problem.  This

7   isn't a medical disorder.  This is a behavioral problem.  We

8   approach it from a behavioral management level.  Any

9   behavioral problem, anger management, any of these problems

10  can be a persistent problem.  What we're trying to do is

11  teach the clients and help the clients learn to manage the

12  behavior over a long term recognizing that it doesn't get a

13  cure that goes away, it's something they deal with for the

14  rest of their life.

15  **Q.**  And you're helping them learn how to cope with the

16  sexual illness that they have?

17  **A.**  Correct.

18  **Q.**  And I think you -- so a sex offender is coming to you

19  because there is conditions of release or something that is

20  compelling them to treat with you; right?

21  **A.**  Correct.

22  **Q.**  And it is rare for a sex offender to continue to treat

23  with you once those conditions or whatever is compelling

24  them ends; isn't that right?

25  **A.**  Yes, it has been my experience that regardless of risk

1    or age, adults, juveniles, if they not compelled to be in

2    treatment, they are very unlikely to be there.  Every once

3    in a while you will get somebody who a family member may

4    compel them to be there and they'll say that.  But if there

5    isn't something over their head, it's very, very rare that

6    they would stay.

7    Q.  And you went over a number of restrictions contained as

8    part of the treatment agreement.  These restrictions, they

9    don't guarantee a person won't reoffend in the community; do

10   they?

11   A.  There is never a guarantee that anybody wouldn't offend.

12   Q.  And the restrictions being there don't guarantee

13   compliance with the treatment agreement; do they?

14   A.  I didn't go over -- by the way, I guess I misunderstood.

15   I didn't see the restrictions for the shelter.  That's not

16   what I saw when we were going over the Treatment Agreement.

17   Q.  Right.  And there were a number of things entitled

18   "restrictions," No. 19, No. 20, No. 21 that --

19   A.  Yes.  Yes.

20   Q.  And those restrictions don't guarantee that a sex

21   offender will comply; do they?

22   A.  There are no guarantees.

23   Q.  In fact, it's your experience that violations of the

24   restrictions do occur?

25   A.  Certainly.  With enough people at some level there is

1   always going to be some violations.

2   **Q.**  And you testified that if someone is accepted into

3   treatment, are some people not accepted into treatment?

4   **A.**  Yes.

5   **Q.**  And you know nothing about Mr. Carta; do you?

6   **A.**  No, I don't.

7   **Q.**  You don't know if he will be accepted into treatment; do

8   you?

9   **A.**  I do not.

10  **Q.**  If a sex offender is unwilling to acknowledge his

11  behavior within six months, he can be terminated from the

12  program; isn't that correct?

13  **A.**  He would be terminated from the program.

14  **Q.**  And in order to stay in the program Mr. Carta would have

15  to effectively participate in treatment; isn't that true?

16  **A.**  That's correct.

17  **Q.**  He would have to attend sessions?

18  **A.**  Weekly, yes.  At least weekly, once a week.

19  **Q.**  He would have to attend the sessions on time; right?

20  **A.**  Correct.

21  **Q.**  He would have to pay an appropriate fee in each session,

22  nominal or otherwise; right?

23  **A.**  Correct.

24  **Q.**  And he would have to complete his homework on time?

25  **A.**  Yes.

1   **Q.**  He would have to be active in group discussions?

2   **A.**  Yes.

3   **Q.**  And in your experience actually some people are not

4   active in group discussions; isn't that true?

5   **A.**  There is always some people who are not active, at

6   varying levels.  Sometimes it becomes a clinical problem and

7   they're terminated.  Sometimes it's something you work with.

8   You might have somebody who is shy or somebody who is

9   initially resistant.  So there is varying degrees of

10  participation.  It's a group setting.  But at some level

11  everybody has to participate.

12  **Q.**  And he would have to participate this way at least one

13  time a week?

14  **A.**  Correct.

15  **Q.**  For three to five years, that's the medium period of

16  time?

17  **A.**  Two to three years, yes.

18  **Q.**  Two to three years.

19       You don't know Mr. Carta; correct?

20  **A.**  Correct.

21  **Q.**  You've never treated Mr. Carta?

22  **A.**  Correct.

23  **Q.**  None of your testimony here today is specific to

24  Mr. Carta's situation; is it?

25  **A.**  That's correct.

1   **Q.**  And you cannot say whether Mr. Carta will succeed in

2   treatment; can you?

3   **A.**  I couldn't say that about any client.

4   **Q.**  And you can't say whether or not Mr. Carta will or won't

5   reoffend in the future; can you?

6   **A.**  I couldn't say that about any client.

7         **MS. STACEY:**  Nothing further.

8         **THE COURT:**  Okay.

9         **REDIRECT EXAMINATION**

10  BY MS. KELLEY

11  **Q.**  So, Doctor, in your opinion hebephilia is not a valid

12  diagnosis?

13  **A.**  I don't mean it as opinion.  If you are going to go on a

14  diagnosis, you would reference, most likely you would

15  reference the *Diagnostic and Statistical Manual*.  It's not

16  in there.  It's, there is not good validation, partly

17  because it's not well defined yet or ever.  There is no good

18  studies to validate it.

19  **Q.**  So when you used the term "hebephilia," you said it's a

20  descriptive term?

21  **A.**  You know, I think what people will do, clinicians will

22  do an evaluation and they'll try to come up with terminology

23  that will help them get a grasp of what they're dealing

24  with.

25        And so hebephilia has been used in the field and

1    different people have used it more as a descriptor to give

2    them a sense that what they're dealing with is somebody who

3    is interested in teen females or teens.

4    **Q.**  But that doesn't mean it's a valid diagnosis for

5    psychological purposes?

6    **A.**  Right, right.

7    **Q.**  Okay.

8         **MS. KELLEY:**  No further questions, Your Honor.

9         **THE COURT:**  Anything else?

10                         **RECROSS-EXAMINATION**

11   BY MS. STACEY

12   **Q.**  You're aware that the diagnosis of paraphilia not

13   otherwise specified appears in the DSM?

14   **A.**  Yes.

15        **MS. STACEY:**  Nothing further, Your Honor.

16        **MS. KELLEY:**  Thank you very much, Doctor.

17        **THE COURT:**  You are excused.

18        **THE WITNESS:**  Thank you.

19        (The witness was excused.)

20        (Pause in proceedings.)

21        **THE COURT:**  Call your witness.

22        **MS. KELLEY:**  Yes.  Mr. Collette, would you like to

23   take the stand.

24        **THE WITNESS:**  Yes.

25                    **PAUL COLLETTE, Sworn**

1          **THE CLERK:**  Thank you.  You may be seated.

2          **THE WITNESS:**  Thank you.

3          **MS. KELLEY:**  I'm going to just close this book

4     (indicating).

5          (Pause in proceedings.)

6                    <u>**DIRECT EXAMINATION**</u>

7     BY MS. KELLEY

8     **Q.**  I'm going to open the government's exhibit book to the

9     place where the, tab 26, at the end where the conditions of

10    special conditions of probation are set out.

11    **A.**  Okay.

12         **THE COURT:**  I missed the witness's name.

13    BY MS. KELLEY

14    **Q.**  Could you state your name, sir.

15    **A.**  Yes, ma'am.  My name is Paul Collette.

16    **Q.**  And what is your job?

17    **A.**  I'm a senior United States Probation Officer for the

18    District of Connecticut.

19    **Q.**  And do you have a specialization in that office?

20    **A.**  Yes, I'm the sex offender specialist.

21    **Q.**  Let me just ask you a little bit about your background.

22         How long have you been a federal probation officer?

23    **A.**  Approximately ten years.

24    **Q.**  And where have you been during that time?

25    **A.**  I started my career in the Southern District of New

1    York, which is Manhattan.  After approximately three and a

2    half, four years I moved to transfer to the Southern

3    District of Texas, one year at Corpus Christi, four years in

4    Houston, Texas.  Then transferred to the District of

5    Connecticut where I have been for the past two, two and a

6    half years.

7    **Q.**  And prior to being a federal probation officer, what

8    kind of work did you do?

9    **A.**  I was a New York City probation officer for

10   approximately four years.  Prior to that I was a clinical

11   case manager at Bellevue Hospital in New York City which is

12   a psychiatric hospital.

13           Prior to that I was in college.

14   **Q.**  So as the sex offender specialist in the office, I

15   assume you are in New Haven?

16   **A.**  Yes, my office is in New Haven.  However, I am -- the

17   whole state of Connecticut is pretty much my office.

18   **Q.**  And what kind of specialized training have you received

19   in the supervision of sex offenders?

20   **A.**  Well, going back to my first job working out of college

21   was in New York City at Bellevue Hospital.  I was working

22   with the mentally ill population, homeless, psychiatric

23   mentally ill, drug addicted population.  We had a lot of sex

24   offenders in that population, working with them, on-the-job

25   training, conferences.

1         After that I went to work for the New York City

2    Department of Probation where I worked in the family court

3    unit for several years.  I then transferred to the warrant

4    division where we executed warrants and several of our

5    offenders there were high risk sex offenders.  We also had

6    them on EM.  We did do supervision.

7         After that when I started working for the federal

8    government, a lot of it was on-the-job training, attending

9    conferences, hundreds and hundreds of hours of training.

10   **Q.**  Does every state or district now of U.S. Probation have

11   a sex offender specialist?

12   **A.**  No, no.  We would like to but, no.  It depends on the

13   size of the district.

14   **Q.**  And so you're the first one in Connecticut?

15   **A.**  Yes.

16   **Q.**  So this is a relatively new development that they

17   designate one person to be the specialist in this area?

18   **A.**  Within the federal probation system a sex offender

19   specialist is relatively new.  I would say within the past

20   two years that title has sort of been coming aboard in most

21   districts, large districts.

22   **Q.**  And is there, within the federal probation system there

23   is a kind of new emphasis on managing these people in a

24   specialized way?

25   **A.**  Correct.

1    **Q.**  And what kind of difference is there in your supervision

2    of a sex offender as opposed to a regular supervised release

3    client?

4    **A.**  It's a good question.  With our sex offenders we always

5    assume that they're high risk regardless of the actual type

6    of offenses that they've committed.  For example,

7    downloading child pornography versus another offender who

8    has committed a hands-on offense such as with a child.  We

9    always treat them the same equally.  And we always assume

10   that at some point down the road they may or may not -- they

11   may reoffend.  Statistically they may.

12         So we always start off intensely supervising all

13   the offenders and put them in outpatient treatment,

14   non-traditional field hours, office visits, things that we

15   typically don't do with our general offenders because of the

16   amount of risk involved to the general public.

17   **Q.**  So the public safety factor makes you much more vigilant

18   toward the supervisees?

19   **A.**  Yes.

20   **Q.**  And if someone were to be released to New Haven, would

21   you personally be the one in charge of supervising them?

22   **A.**  Generally speaking any sex offenders released to our

23   district I'm going to supervise them.  We have several

24   offices:  New Haven, Hartford, Bridgeport and Waterbury.  We

25   have four offices in Connecticut.

1   Q.   And if you needed assistance in monitoring somebody who

2   you thought needed even more attention, would you be able to

3   pull out the resources to do that?

4   A.   We have a team based approach for a lot of our

5   offenders.  So if I need to, I'll always call upon my fellow

6   officers and they'll always be there for me in a pinch.

7   Q.   Now, can you just take a look at -- this is Government

8   Exhibit 26.  It's a multipage exhibit.  It's at the tend of

9   the exhibit.  And can you, do you recognize that?

10  A.   I'm looking at a judgment in a criminal case.

11  Q.   And this is Judge Dominic, I can't --

12  A.   Squatrito.

13  Q.   Squatrito.  And are you familiar with him?

14  A.   Actually I have spoken with him many times on the phone.

15  I have never had the honor of being in his courtroom.

16  Q.   So he is still there?

17  A.   He's still there.

18  Q.   Okay.  And he was the judge who sentenced Mr. Carta;

19  correct?

20  A.   He was.

21  Q.   And he gave Mr. Carta all the standard conditions

22  obviously?

23  A.   Yes.

24  Q.   And then he also set out some very specialized

25  conditions given the nature of the case; right?

1    **A.**   Correct.

2    **Q.**   And can you just look at those and explain them briefly?

3    You don't have to read them word for word, just explain what

4    they mean in terms of actual supervision of Mr. Carta.

5    **A.**   Well, for Mr. Carta, and looking at the conditions,

6    typically these are conditions that we use in our district

7    for the supervision of sex offenders:

8          Computer monitoring; search and seizure; the

9    offender is restricted from going to places where children

10   me be.  For example, public malls, Chuckie Cheeses, you

11   know, playgrounds, schools, places like that that our

12   offenders are directed not to go to.

13         He's also to register as a sex offender.

14   **Q.**   And when you say he's to register as a sex offender, the

15   state of Connecticut has a sex offender registry law?

16   **A.**   Yes.

17         **MS. KELLEY:**  Your Honor, at this time, anyone could

18   look it up, but we have attached in our exhibit book No. 12,

19   the Sex Offender Registry Statute.  I'd like to move that

20   that go into evidence.

21         **MS. BOAL:**  I think it is appropriate for the Court

22   to take judicial notice rather than have the law put into

23   evidence.

24         **THE COURT:**  Yes, I will take judicial notice of it.

25   You can argue it.

1          **MS. KELLEY:**   Okay.

2    BY MS. KELLEY

3    **Q.**   And the Connecticut Sex Offender Registry is a state

4    requirement; right?

5    **A.**   Correct.

6    **Q.**   And you also kind of make sure everyone knows what they

7    have to do; right?

8    **A.**   Yes.

9    **Q.**   And they have to go to Middletown, Connecticut?

10   **A.**   The State Police Headquarters is located in Middletown,

11   Connecticut.

12   **Q.**   And what do they do there?

13   **A.**   Upon release they have 72 hours to report to State

14   Police Headquarters and register as a sex offender.   Once --

15   I'm sorry.

16   **Q.**   You go on.

17   **A.**   Once they go there, they're required to provide a DNA

18   sample, photographs, addresses.   Usually they will also

19   provide a copy of their judgment.   If not, I'll send them a

20   copy of their judgment just so they have it on file.   And

21   then at that point they report to my office where we go over

22   the conditions.

23   **Q.**   And so the State Police will know exactly who Mr. Carta

24   is?

25   **A.**   Correct.

1   **Q.**  And they have his photograph?

2   **A.**  Correct.

3   **Q.**  And if he ever changes his appearance he is required to

4   go and get rephotographed?

5   **A.**  Oh, yes.

6   **Q.**  And periodically he has to go and confirm his

7   information with the people in Middletown; correct?

8   **A.**  Yes.

9   **Q.**  And obviously failure to register is a crime in

10   Connecticut; right?

11   **A.**  It is.

12   **Q.**  Now, with regard to the conditions before you, Mr. Carta

13   in particular is required to attend sex offender treatment;

14   right?

15   **A.**  Correct.

16   **Q.**  And where would he receive that treatment?

17   **A.**  We contract out with an agency called Connections

18   Special Services.  There are sex offender, actually they

19   work exclusively with sex offenders in the State of

20   Connecticut.  They have several locations throughout the

21   State of Connecticut.  So if an offender, for example, lives

22   in Danbury, Connecticut, they can go to the nearest office

23   there for their treatment.

24        If, for example, Mr. Carta were to be released to

25   Hartford, they have a treatment center located in state

1    parole, the state parole building where he would be required

2    to go for his treatment.  But basically they have satellite

3    offices all over Connecticut.

4    **Q.**  And in New Haven, if a person who is released comes to

5    New Haven under your watch and they are initially homeless,

6    where is the homeless shelter they would go vis-a-vis the

7    Sex Offender Treatment Program?

8    **A.**  Well, in New Haven we have a homeless men's shelter.

9    It's, I can't give you the exact address but it's within

10   walking distance of the federal probation building.

11           In Hartford there is two homeless men's shelters

12   and they're both in walking distance of each other.  They're

13   also in walking distance of the sex offender treatment

14   center that he would be going to if he were to reside in

15   Hartford, for example.

16   **Q.**  If someone were to be released from custody, they're a

17   sex offender and they come let's say to New Haven and report

18   to you, what kind of supervision do you provide them with

19   initially at the time that they're homeless and just getting

20   settled?

21   **A.**  Well, with our homeless offenders we really try to

22   discourage them being homeless.  But we understand that we

23   do have homeless sex offenders out there.  We work closely

24   with the State Police.  They have a state trooper whose job

25   is exclusively to work with homeless sex offenders.

1          And what they do in conjunction with us is we do

2    unannounced visits.  We're in touch with the case managers

3    in the homeless shelters.  We also do non-traditional hours

4    showing up in the evening when they check in and get their

5    bed.

6          He would be required, as all my offenders, to

7    report to my office a minimum of once a month.  And that's

8    just to the office.  That's not counting how many times I go

9    out in the field and check up on them unannounced.

10          But, for example, Mr. Carta, I would need to sit

11   down with him, look at his conditions, his overall -- judge

12   his risk level, especially in terms of what other paperwork

13   I can get from the Bureau of Prisons, for example.  And then

14   we'll come up with some team based approach between myself

15   and other officers in the State Police.

16   **Q.**  So if he went and registered at the State Police and

17   didn't have a place immediately to live, the State Police

18   would be on that as well; right?

19   **A.**  Yes, they would.

20   **Q.**  Now, are there new technologies or new conditions that

21   were not available in 2002 when Mr. Carta was sentenced that

22   might be utilized today to supervise a sex offender who is

23   released?

24   **A.**  Well, just glancing at Mr. Carta's conditions, I don't

25   see anything as far as GPS monitoring.

1   **Q.**  And can you just explain to Judge Tauro what kind of GPS

2   monitoring is available in Connecticut for sex offenders?

3   **A.**  Well, in Connecticut we have passive GPS.  Passive GPS

4   is where they're hooked up to a device on their ankle or on

5   their belt which monitors their whereabouts 24/7.

6        The passive GPS is different than active GPS versus

7   we can't view where he is going in real time.  So if he were

8   to enter say an exclusion zone, which would be a school or a

9   mall, we wouldn't know until after the fact.  When he

10  reports back to his residence, that information is then

11  downloaded from his device on his body on to the unit which

12  is then sent off to the server where, you know, our GPS

13  contractor is located.

14       Then in the evening I could bring up the screen on

15  my computer, wherever I am, and I could see where he's gone

16  on the map.

17       But that's different than active GPS where, for

18  example, if he were to enter an exclusion zone, I would get

19  an immediate alert.  I could bring it up on my computer and

20  I would see exactly where he is in real time and then we

21  could take action at that point.

22  **Q.**  So some jurisdictions have this active GPS?

23  **A.**  Some do, yes.

24  **Q.**  But in your jurisdiction what happens then is at the end

25  of the day, at the end of each day you can review precisely

1    where someone has been during that day?

2    **A.**   Yes.  Well, I'm going to go back a little bit.  Not

3    precisely.  GPS monitoring isn't one hundred percent

4    accurate.  Especially in large urban areas.  It depends upon

5    satellites, triangulation.  We can't really pinpoint where

6    he would be to the foot, the square foot, for example.

7            So if he were to walk within close proximity of a

8    school, I might get, you know, an alert that he's actually

9    on school grounds when, in fact, he may not be.  He may be

10   passing by the school.  It's not one hundred percent

11   accurate.  I just want to just say that for the record.

12   **Q.**   But within certain bounds at the end of each day you can

13   see at least approximately where someone has been vis-a-vis

14   restricted areas?

15   **A.**   Yes.

16   **Q.**   And if someone were repeatedly say going near a school,

17   it's repeatedly showing up, you would have a talk with them;

18   right?

19   **A.**   I would do more than that with him.

20   **Q.**   Yes.  Okay.  That's what I was getting to.  You have a

21   zero tolerance policy; correct?

22   **A.**   Yes.

23   **Q.**   What does that mean?

24   **A.**   It means I would immediately go to our court, ask for a

25   warrant for his arrest.  Then I would request that his

1    supervised release be revoked.

2    **Q.**  And in these instances do you find with modifying sex

3    offenders' supervised release to include -- let me just take

4    one step back.

5           Other than the GPS monitoring, are there any other

6    new technologies that are not listed in Mr. Carta's list?

7    **A.**  Well, I'm looking here, I do see that there is, we do

8    have computer monitoring as a condition also and we can do

9    that.

10          The software back in 2002 was, is a lot different

11   than the software we have now in 2009.

12   **Q.**  And what is the software you have now like?

13   **A.**  The software is a contractor, it's called IPPC and

14   they're located in Philadelphia -- I'm sorry -- Pittsburgh.

15   The software we can view in real time from any computer

16   around the world, what he's looking at on his computer at

17   that moment.

18          So if he is surfing the Internet, I can view

19   whatever websites he's looking at.  If he's engaged in any

20   Internet chat rooms, if he's looking at his mail, I can view

21   that.  I can also control his computer remotely.  I can lock

22   it down.  I can prevent him from going to certain websites.

23   I can lock down his browser.  I can prevent him from

24   accessing the Internet from my computer.

25          We didn't have that technology back in 2002.

1   **Q.**  I know you don't know a lot about Mr. Carta but assuming

2   what you know about him is he's a sex offender, he's just

3   finishing a child -- an offense for child pornography, would

4   you even allow him to have a computer or use a computer?

5   **A.**  No.

6   **Q.**  And would you seek to modify his conditions so that that

7   was a condition of his supervised release?

8   **A.**  No.

9   **Q.**  What would you do?

10  **A.**  In terms of what?

11  **Q.**  How would you go about refusing to allow him to use a

12  computer?

13  **A.**  Tell him no.

14  **Q.**  And are there some conditions under which you might let

15  someone like him use a computer for short periods of time?

16  **A.**  There are.

17  **Q.**  And how do you make arrangements for that?

18  **A.**  Well, for example, they need to secure employment and if

19  they're having difficulty securing employment, particularly

20  in this economic environment, the State of Connecticut has

21  several job placement agencies which is called

22  ConnecticutWorks.  I do have some, some of my offenders are

23  allowed to go there, use their work stations.

24          Now, the work stations are set up where they're in

25  plain view of the secretary and the office staff there.  The

1   offender goes in, signs in for the computer for an hour, an

2   hour and a half.  They're allowed to go on to some of the

3   job hunting websites such as Monster.com, Career Builder.

4   They can look for jobs there.  And then they can print out

5   on their printer some job leads.  But those computers are

6   monitored visually.

7        And also I have good relationships with most of the

8   locations so I can go in, I can do an audit myself and I can

9   see where, what time he was there and, if necessary, you

10  know, on rare occasions I can actually view his browsing

11  history.

12       But for somebody like Mr. Carta, we're not even

13  there.  I'm not going to consider that.

14  **Q.**  And when you say you're not going to consider that, you,

15  as his supervising probation officer, you would not allow

16  him anywhere near a computer?

17  **A.**  No.

18  **Q.**  Now, with regard to the treatment, the sex treatment

19  that is mandated, do you have regular contact with the

20  workers in that treatment program?

21  **A.**  Yes.

22  **Q.**  And what is that like?  Can you just explain to the

23  judge how do you communicate with them?

24  **A.**  We have a great relationship with our contract

25  providers.  They're clinical psychologists, psychiatrists,

1     master level therapists.  And all they do is work

2     exclusively with that sex offender population, not only on

3     the federal side but also on the state side.

4          So all offenders once when go into their group

5     sessions and, for example, somebody like Mr. Carta, we would

6     mandate that he go to group three times a week.  We

7     communicate with them via email, phone calls.  I always give

8     all my treatment providers, even my sex offenders, my cell

9     phone number.  They can access me 24/7 if they need to.

10          I also participate in the groups.  I'll sit in and

11     watch what's going on in the groups and see what's being

12     disclosed and get a sort of better feel on a level of

13     insight that most of our offenders have.

14          And, of course, if there are any red flags, such an

15     offender disclosing something in one of the groups and I'm

16     not there, then our treatment providers will call me up or

17     send me an email immediately.

18   Q.  Are you able to request that they perform polygraphs for

19     you?

20   A.  We do have that as a condition.

21   Q.  And do you ever do that?

22   A.  Yes.

23   Q.  And what are the kinds of things that would trigger that

24     request?

25   A.  Well, typically, actually if it's here as a condition

1    and they're in sex offender treatment, our treatment

2    providers will already take care of that for us.  For

3    example, they have full disclosure polygraph, full sexual

4    history polygraph followed by a maintenance polygraph which

5    is anywhere every six months to a year while they're in

6    treatment.

7    **Q.**  And finally one of Mr. Carta's requirements, conditions

8    of supervised release is that he receive substance abuse

9    treatment.  And what would you do for him or with him with

10   regard to this condition?

11   **A.**  Well, typically what will happen is in our district

12   substance abuse, our courts defer to the Probation Office in

13   terms of referring them.  We'll keep an eye on them.  We'll

14   do unannounced random urinalysis in the home and in the

15   office.  Based upon their history we'll, first off, somebody

16   like Mr. Carta I would put in sex offender treatment first

17   along with random urinalysis.  Down the road I might put him

18   in outpatient drug treatment.

19        One of the things I always want to caution the

20   courts with is over supervising an offender where he won't

21   have the opportunity to work.  So putting him in sex

22   offender, intensive sex offender treatment with drug

23   treatment, which is a whole separate agency, separate times

24   that he would have to go, we will take a look at that.

25   **Q.**  And for someone who is a sex offender and also has a

1    history of drug abuse, what is your tolerance policy for

2    those people who test positive?

3    **A.**   Honestly, Counselor, it depends on the actual offender

4    and their background, personal history characteristics.  If,

5    for example, I have a sex offender that when he uses PCP he

6    sexually assaults women, okay, you know, we're going to deal

7    with that immediately.  You know, he is going to go into

8    drug treatment.

9            I will have a zero tolerance policy for drug use.

10   But typically we treat drug use a little differently than

11   our sex offender conditions.  We'll put them in outpatient

12   treatment, then inpatient treatment which can be anywhere

13   from thirty days to six months.  And then if that doesn't

14   work, we'll ask for revocation.  Sex offenders, we'll have

15   to take a look at his history.

16   **Q.**   Okay.

17           **MS. KELLEY:**  Thank you very much.  No further

18   questions.

19           **MS. BOAL:**  May I proceed, Your Honor?

20           **THE COURT:**  Yes, please.

21                      <u>**CROSS-EXAMINATION**</u>

22   BY MS. BOAL

23   **Q.**   Good morning, Officer Collette.

24   **A.**   Good morning, Counselor.

25   **Q.**   How many people do you currently supervise?

1   **A.**   Fifty-seven.

2   **Q.**   And approximately how many of those are non-sex

3   offenders?

4   **A.**   Oh, are non-sex offenders?

5   **Q.**   Yes.

6   **A.**   Give or take I'd say about fifteen are non-sex

7   offenders.

8   **Q.**   And so how many are sex offenders?

9   **A.**   Fifteen minus fifty-seven, I'd say --

10   **Q.**   I'm not testing your math.

11   **A.**   I'd say about 41, 42.

12   **Q.**   So you currently supervise approximately 41 sex

13   offenders?

14   **A.**   Yes, ma'am.

15   **Q.**   And you would actually think the optimum case load would

16   be about twenty; isn't that right?

17   **A.**   That would be optimum.

18   **Q.**   And that is because you would like to spend more time

19   with each of them?

20   **A.**   Yes.

21   **Q.**   And you would like to have a reduced case load because

22   in your experience sex offenders are hard wired?

23   **A.**   Yes.

24   **Q.**   And, in other words, based on your experience, you know

25   that sex offenders that you have supervised never lose their

1   sexual desire?

2   **A.**   I have yet to meet one that has lost his sexual desire.

3   **Q.**   And you know that through your interaction with them?

4   **A.**   Interaction, through conferences I've attended, through

5   my professional experience with treatment providers.

6   **Q.**   And, in fact, the reports that you get from the

7   treatment center that we've discussed here today?

8   **A.**   Correct.

9   **Q.**   In fact, you've supervised men who have reoffended

10  sexually while under your supervision?

11  **A.**   I have.

12  **Q.**   Now, Mr. Carta has a term of three years of supervised

13  release; is that correct?

14  **A.**   Yes, it is.

15  **Q.**   So you can only supervise him for three years?

16  **A.**   Correct.

17  **Q.**   And it's possible, isn't it, that his supervised release

18  time is running since the expiration of his federal

19  sentence?

20  **A.**   It's possible.

21  **Q.**   And his federal sentence --

22          **MS. KELLEY:**   Objection.   That is a legal question

23  and it's wrong --

24          **THE COURT:**   I don't know -- it is a legal question.

25  I don't know the answer to it but I don't think we have to

1    deal with it right now.

2         **MS. KELLEY:**  Okay.

3    BY MS. BOAL

4    **Q.**  In this case Mr. Carta's federal sentence expired in

5    February of 2007; isn't that right?

6    **A.**  I can't answer to that.  I haven't seen his file.

7    **Q.**  And today if Mr. Carta was convicted of the same federal

8    offense, he would get a minimum of five years supervised

9    release; isn't that right?

10   **A.**  It is correct.

11   **Q.**  And, indeed, the Sentencing Guidelines today recommend

12   lifetime supervision for persons such as Mr. Carta?

13   **A.**  Correct.

14   **Q.**  Now, you spoke a little bit earlier about revocation.

15   And if you found that someone had violated their terms of

16   supervised release, you might petition for revocation to the

17   court?

18   **A.**  Yes.

19   **Q.**  And that is often a contested proceeding; isn't it?

20   **A.**  Oh, yes.

21   **Q.**  And could you describe the procedure?

22   **A.**  Well, it's similar to other districts I've worked in.

23   But in our district this is how it would work.  The

24   defendant would be with his defense counsel at one table.  I

25   would be with the government at the other.  And it would be

1    a mini trial.  And we would present our evidence.  I would

2    testify.  And the defendant would have an opportunity also

3    to testify.

4    **Q.**  And then ultimately the judge decides?

5    **A.**  Correct.

6    **Q.**  So just because you seek revocation doesn't necessarily

7    mean that it will happen?

8    **A.**  That's correct.

9    **Q.**  And even if he is returned to custody, let's say his

10   supervised release was revoked, the term of incarceration

11   could not exceed the time left on his supervised release;

12   isn't that right?

13   **A.**  That's correct.

14   **Q.**  Now, you talked about sex offender registration.  That

15   is not a lifetime registration; is it?

16   **A.**  No, it's not.

17   **Q.**  Indeed, in the State of Connecticut it's only for ten

18   years?

19   **A.**  Yes, it is.

20   **Q.**  Now, we talked about Mr. Carta's restriction that he

21   couldn't be in the company of children.  But that's

22   difficult to enforce; isn't it?

23   **A.**  It's very difficult to enforce.

24   **Q.**  And why is that?

25   **A.**  Because I can't be with my offender 24 hours a day seven

1    days a week 365 days a year for three years.

2    **Q.**  And is it especially difficult in a large metropolitan

3    area?

4    **A.**  It's very difficult.

5    **Q.**  And why does it become more difficult in a metropolitan

6    area?

7    **A.**  Well, typically there is more opportunities for an

8    offender to run into children on a random basis, walking

9    down the street, walking by a store, walking by a

10   playground, walking by a school, walking into a mall.  And

11   he may not be walking into a toy store or a kid's store but

12   rather maybe in an adult store but he is going to have to

13   walk by other areas where children are.

14   **Q.**  And we talked about passive GPS which is what

15   Connecticut currently uses --

16   **A.**  Correct.

17   **Q.**  -- at your probation office.

18          And that is not, does not equip you to deal with an

19   imminent violation?

20   **A.**  It does not.

21   **Q.**  You're only able to see where they have gone after the

22   fact?

23   **A.**  Correct.

24   **Q.**  Now, we talked about computer restrictions.  And those

25   restrictions are on his own computer; isn't that right?

1    **A.**   Well, can I answer that and then add something?

2    **Q.**   Yes.

3    **A.**   Okay.  Yes, they would be on his own computer but also,

4    we also look at his work computer.  So if he is working for

5    a company, for example, we can install the software on the

6    company provided he's disclosed that he's a sex offender,

7    that he's got that, those conditions.  Provided also, the

8    company, it's a small company, if it's Fortune 500 or a

9    Fortune 100 company, the server could be located in Japan

10   and it would be impossible for us to install that software.

11   **Q.**   And if Mr. Carta went to a library to use the computer,

12   you couldn't do anything about that?

13   **A.**   No, I couldn't.

14   **Q.**   Now, Mr. Carta was scheduled to be released to Open

15   Hearth; is that correct?

16   **A.**   From what I understand.

17   **Q.**   And that's located in Hartford; isn't that right?

18   **A.**   Correct.

19   **Q.**   What is Open Hearth?

20   **A.**   It's a men's shelter.

21   **Q.**   And how long could he stay at Open Hearth during the

22   day?

23   **A.**   During the day he wouldn't be allowed to be in Open

24   Hearth.  He would be, for want of a better world, all of the

25   males are kicked out about 7:30 in the morning.

1    **Q.**  And then what happens?

2    **A.**  They return about four o'clock, 4:30 in the afternoon

3    for their bed.

4    **Q.**  So if Mr. Carta doesn't have a job to go to, he doesn't

5    have anyplace to go to between 7:30 and 4?

6    **A.**  From what I understand he has nothing lined up.

7    **Q.**  And the Open Hearth shelter is next to a school; isn't

8    that right?

9    **A.**  Yes.

10   **Q.**  And it's across the street from an apartment building;

11   isn't that right?

12   **A.**  Yes, it is.

13   **Q.**  And there are children that live in that apartment

14   building based on your experience?

15   **A.**  Yes, there are.

16   **Q.**  The conditions of supervised release that Mr. Carta has

17   do not guarantee that he will not reoffend; do they?

18   **A.**  They do not guarantee that.

19          **MS. BOAL:**  No further questions.

20          **MS. KELLEY:**  Just briefly, Your Honor.

21                      **REDIRECT EXAMINATION**

22   BY MS. KELLEY

23   **Q.**  I am going to show you a document.  Do you recognize

24   that?

25          **MS. BOAL:**  Can we have a copy of this?

1          (Whereupon, counsel conferred.)

2    **A.**  Actually, to be honest, I haven't seen their brochure

3    but I do recognize Open Hearth.

4    **Q.**  Okay.  This seems to be a brochure for the Open Hearth

5    organization or shelter?

6    **A.**  Yes.

7    **Q.**  And Open Hearth no longer takes sex offenders now; do

8    they?

9    **A.**  To be honest, from what -- well, no, they do take sex

10   offenders.

11   **Q.**  They do at this time?

12   **A.**  Well, they do take my federal offenders.

13   **Q.**  Okay.  And Open Hearth is not only a homeless shelter,

14   it also has a transitional living component; doesn't it?

15   **A.**  It does.

16   **Q.**  Yes.  And people who are there can work in their wood

17   industry, they're required to do that to help pay the

18   expenses of living there; right?

19   **A.**  From what I understand, yes.

20   **Q.**  And so if Mr. Carta were to have said to someone when he

21   was first getting ready to be released that he hoped to go

22   to Open Hearth, that would not have been a lie; would it?  A

23   person at that time who was seeking to be released could

24   have planned to go there; correct?

25   **A.**  Correct.

1    **Q.**  And it's not just a homeless shelter, it also, according

2    to the literature, has another facility there which is a

3    transitional living facility; correct?

4    **A.**  It does.

5    **Q.**  Because there are some people in this world who don't

6    have a place to go; right?

7    **A.**  Yes, ma'am.

8    **Q.**  But they're trying to get on their feet; right?

9    **A.**  Correct.

10    **Q.**  And they're looking for a job; right?

11    **A.**  Yes.

12    **Q.**  And they need a place to live?

13    **A.**  Yes.

14    **Q.**  And work; right?

15    **A.**  Yes, ma'am.

16    **Q.**  So they work there also?  And that's not a lie; is it?

17    **A.**  It's not a lie coming from you, ma'am.

18    **Q.**  Thanks.

19         Do you have sex offenders that you've supervised

20    who come out and are homeless?

21    **A.**  Yes, I do.

22    **Q.**  And they go to their treatment?

23    **A.**  Yes.

24    **Q.**  And they stay sober?

25    **A.**  Yes.

 1   **Q.**   And they get a job?

 2   **A.**   Yes.

 3   **Q.**   And they've really tried to reintegrate?

 4   **A.**   Yes.

 5              **MS. KELLEY:**  Thank you.

 6              **THE WITNESS:**  You're welcome.

 7              **THE COURT:**  Anything else?

 8              **MS. KELLEY:**  I have nothing else.

 9              **MS. BOAL:**  Nothing, Your Honor.

10              **THE COURT:**  All right.  You are excused, sir.

11   Thank you.

12              **THE WITNESS:**  Thank you, Your Honor.

13              (The witness was excused.)

14              **THE COURT:**  We are back to the cross now?

15              **MS. KELLEY:**  Can we take just a five-minute

16   bathroom break?

17              **THE COURT:**  Sure.

18              **MS. KELLEY:**  Thank you.

19              **THE COURT:**  You know, I never think of those

20   things.  Any time you want to take a break, just raise your

21   hand and we will all join in.

22              **MS. KELLEY:**  Thank you, Your Honor.

23              **MS. BOAL:**  Thank you.

24

25              (Recess.)

1

2          **THE COURT:**  Sit down, everybody, please.

3          (Pause in proceedings.)

4          **MS. STACEY:**  May I proceed, Your Honor?

5          **THE COURT:**  Yes.  This is the cross of Dr. Bard;

6     right?

7          **MS. STACEY:**  Yes.

8                    **LEONARD BARD, Resumed**

9                 **CROSS-EXAMINATION, (Cont'd.)**

10    BY MS. STACEY

11    **Q.**  Now, Dr. Bard, yesterday we discussed hebephilia and

12    whether it was a proper diagnosis.  Do you recall that?

13    **A.**  I do.

14    **Q.**  And we referred to a number of articles during your

15    testimony about hebephilia.  Do you recall that?

16    **A.**  Not very many articles actually, no.

17    **Q.**  Studies?

18    **A.**  No.

19    **Q.**  Texts?

20    **A.**  There were a couple of texts.  There weren't any

21    articles.

22    **Q.**  You said that you kept current with the research on

23    sexual offending; correct?

24    **A.**  Correct.

25    **Q.**  And one of the articles that I believe you were asked

1    about yesterday was a 2008 article by Ray Blanchard.  Do you

2    recall that?

3    **A.**   Yes.

4    **Q.**   And that article is entitled, "*Pedophilia, Hebephilia*

5    *and the DSM-V.*"  And it was published in 2008.

6    **A.**   Yes.

7    **Q.**   Are you familiar with that?

8    **A.**   Yes, I am.

9    **Q.**   And that's a peer reviewed article?

10   **A.**   It is.

11   **Q.**   And that particular study, the Blanchard 2008 study

12   showed that hebephilia exists and is relatively common

13   compared with other forms of erotic interest in children;

14   didn't it?

15   **A.**   No, it did not.  That was the author's conclusion.  It

16   did not show that in the least.

17   **Q.**   So --

18          **THE COURT:**  You mean the article didn't show it?

19          **THE WITNESS:**  The article, the actual data, the

20   actual research that he conducted did not show that in the

21   least.  He leapt to that conclusion but it's not supported.

22   BY MS. STACEY

23   **Q.**   So it was -- and if I might show it to you on the

24   screen, it's highlighted.

25          The Blanchard article, The present study showed

1    that hebephilia exists and, incidentally, that it is

2    relatively common compared with other forms of erotic

3    interest in children.

4           Isn't that what he said in his article?

5    **A.**  That is the conclusion, the discussion section.  It is

6    not, it does not follow from the actual research that he

7    conducted.  The research is faulty on a number of different

8    levels which I'll be happy to explain again.

9    **Q.**  You agree that that's what the discussion of his

10   conclusion reads in the article; correct?

11   **A.**  That is what he wrote in his discussion.  Again, it is

12   not supported by anything.

13   **Q.**  And in the same article he referenced a number of other

14   studies and articles that were peer reviewed on hebephilia;

15   didn't he?

16   **A.**  He referenced his own research.  That is the only

17   research that he discussed, the research that is done by his

18   laboratory in Canada from 2002 until the present time.

19          **MS. STACEY:**  Your Honor, I am doing my best to ask

20   yes or no questions.  So I would just ask that the witness

21   be responsive to my questions.  He will have an opportunity

22   on direct to expound.

23          **THE COURT:**  Yes, he will, but have in mind the type

24   of hearing that we have.  I am looking for information.

25          **MS. STACEY:**  Thank you, Your Honor.

1          **THE COURT:**  This isn't a question of who got to the

2     intersection first.  I want to know as much as I possibly

3     can.

4          **MS. STACEY:**  I understand.  Thank you.

5          **THE COURT:**  So I am going to give him a little

6     leeway.  I am going to give you leeway.  Everybody is doing

7     their best to make me fully informed.  Okay.

8          **MS. STACEY:**  Yes, Your Honor.  Thank you.

9     BY MS. STACEY

10    **Q.**  One of the studies, you're familiar with Mr. Blanchard's

11    2007 study on IQ, handedness and pedophilia in adult male

12    patients stratified by referral source.  Are you familiar

13    with that?

14    **A.**  I have read it, yes.

15    **Q.**  And that was peer reviewed and published in the <u>Journal</u>

16    <u>of Research and Treatment</u>?

17    **A.**  <u>Journal of Research</u> --

18    **Q.**  <u>Sexual Abuse, A Journal of Research and Treatment</u>?

19    **A.**  Oh, yes.

20    **Q.**  And that study references hebephilia; doesn't it?

21    **A.**  It does.

22    **Q.**  And you're also familiar with Blanchard's 2003 study,

23    "*Self-reported Head Injuries Before and After Age 13 in*

24    *Pedophilic and Non-pedophilic Men Referred for Clinical*

25    *Assessments*"?

1    **A.**  I don't think I have actually read that article.

2    **Q.**  He references it in --

3    **A.**  I am aware of it though, yes.

4    **Q.**  Okay.  You're aware of it?

5    **A.**  Yes.

6    **Q.**  And it was published in the peer reviewed Archives of

7    Sexual Behavior; correct?

8    **A.**  That's the same journal as this one, yes.

9    **Q.**  And that references hebephilia; doesn't it?

10   **A.**  I don't know.  I haven't read the article.

11   **Q.**  And someone by the name of J. M. Cantor, Blanchard,

12   Christensen, Dickey, Beckstead, in 2004 they published on

13   *"Intelligence, Memory and Handedness in Pedophilia;"* do you

14   recall that?

15   **A.**  To be clear, that is not someone named Cantor.  That's

16   the coinvestigator on all of his research, Blanchard and

17   Cantor.  The answer is yes.

18   **Q.**  And that group of people, that study also referenced

19   hebephilia --

20   **A.**  Yes.

21   **Q.**  -- didn't it?

22   **A.**  Yes, it did.

23   **Q.**  And Cantor, Klassen, Dickey, Christensen, Kuben, Blak

24   and all in 2005 in an article entitled, *"Handedness in*

25   *Pedophilia and Hebephilia"* was published in the Archives of

1    <u>Sexual Behavior</u>.   You're familiar with that?

2    **A.**   Same journal, same authors, yes.

3    **Q.**   And it references again hebephilia?

4    **A.**   They're the only ones, yes.

5    **Q.**   And in 2006 in a study entitled, "*Grade failure in*

6    *Special Education Placement in Sexual Offender's Educational*

7    *Histories*," published in the <u>Archives of Sexual Behavior</u> by

8    Cantor, et al, in 2006, that also referenced hebephilia;

9    didn't it?

10   **A.**   I don't know that article at all.   I'm sorry.

11              **THE COURT:**   Let me ask you this:

12              Do you have any articles that are not, what is

13   the --

14              **MS. STACEY:**   Not Cantor or Blanchard?

15              **THE COURT:**   Blanchard or Cantor that talk about

16   hebephilia?

17              **MS. STACEY:**   Yes, Your Honor.   And this would be --

18              **THE COURT:**   I get the impression from the witness

19   that he is dismissive because he says this is just a one-man

20   band --

21              **MS. STACEY:**   Yes.

22              **THE COURT:**   -- "touting" this disease.

23              **MS. STACEY:**   And in addition, so that the record is

24   completely clear about the references yesterday that I put

25   on the record.

1    BY MS. STACEY

2    **Q.**  You're familiar, there is a text called Sex Offenders

3    written by Alfred C. Kinsey, published in 1965, the

4    Institute for Sexual Research, that referenced hebephilia.

5    Do you recall my asking you about that?

6    **A.**  I do recall that you asked me about it but it's not

7    research.  And that's the problem.

8    **Q.**  Well, it's a book that references hebephilia; correct?

9    **A.**  It's a book that talks about it as it was postulated in

10   the 1950s.  But there is no research anywhere to support its

11   existence except for Blanchard.  That's my only point here.

12   **Q.**  And Cantor?

13   **A.**  Well, yes, Blanchard, et al.  I apologize.  But it's the

14   same group that is published over and over again trying to

15   justify this and they have failed.

16   **Q.**  And Bernard C. Glueck in 1955 on, "*Final Report,*

17   *Research Project for the Study and Treatment of Persons*

18   *Convicted of Crimes Involving Sexual Aberrations*" in June

19   1952 to 1955 referenced hebephilia at page 13 of that?

20   **A.**  And homosexuality and other things, yes.  It's not

21   research.

22   **Q.**  And Dr. Dennis Doren in his book entitled, Evaluating

23   Sex Offenders in 2002 listed hebephilia as a type of

24   relevant type of paraphilia NOS; correct?

25   **A.**  It's not research.  You asked me about research.  He is

1    just giving an opinion.

2    **Q.**   The question I just asked you is does Dr. Doren's book

3    Evaluating Sex Offenders list under other relevant types of

4    paraphilia NOS, hebephilia?

5    **A.**   It does.

6    **Q.**   And in another article by John Money entitled,

7    "*Paraphilia Phenomenology and Classification*," and I believe

8    that was in 1984, are you familiar with that study?

9    **A.**   I am familiar with John Money, yes.

10   **Q.**   And in that study ephebophilia, the former name for

11   hebephilia, is listed as a paraphilia; isn't it?

12   **A.**   It's not necessarily the former name.   It's people have

13   used that to designate various things, including what is now

14   incorrectly described as hebephilia but also sexual arousal

15   to older adolescents.

16   **Q.**   And that is listed as a paraphilia in this article?

17   **A.**   It's not research.

18   **Q.**   Okay.

19   **A.**   Dr. Money has written books about a thousand different

20   paraphilias.   And he has served as a consultant for

21   *Penthouse Magazine*.   He is not taken seriously by anybody.

22   **Q.**   In your opinion?

23   **A.**   In anyone's opinion.

24   **Q.**   You can't speak to what other people think.

25   **A.**   And it's not generally accepted.   I can say that.   John

1   Money is nowhere --

2   **Q.**  Dr. Bard --

3   **A.**  -- if he was so important, he would be referenced by

4   Blanchard.  But he is not because even Blanchard is

5   embarrassed by him.

6   **Q.**  Dr. Bard --

7            **MS. STACEY:**  I move to strike Blanchard --

8            **THE COURT:**  You know, I was reading.  I wasn't

9   listening, so with all due respect to the doctor.

10           Now, I am just trying to focus.  I have trouble

11  with that word too.  I keep thinking "hemophilia" but that

12  is not it.  It is "hebephilia."

13           **MS. STACEY:**  Hebephilia.

14           **THE COURT:**  Hebephilia.  This becomes significant

15  because one of the things that you have to show is that

16  Mr. Carta currently suffers from serious mental illness,

17  abnormality or disorder.

18           **MS. STACEY:**  Yes.

19           **THE COURT:**  So you are trying to say that this

20  hebephilia is that disorder.

21           **MS. STACEY:**  It's a descriptor of a disorder called

22  paraphilia NOS.  Paraphilia NOS --

23           **THE COURT:**  And you say that it is not an illness.

24           **THE WITNESS:**  It is not an illness.  It is not a

25  disorder.  It is not an abnormality.  It has never been

```
 1    accepted as such.

 2           THE COURT:  And I take it it is part of your case

 3    to convince me by --

 4           MS. STACEY:  Clear and convincing.

 5           MR. GOLD:  Clear and convincing.

 6           THE COURT:  -- clear and convincing evidence that

 7    this is a serious mental illness.

 8           MS. STACEY:  Yes, Your Honor.

 9           THE COURT:  Okay.

10           MS. STACEY:  And the mental illness --

11           THE COURT:  I mean, everybody is doing a great job

12    trying the case.  I just want to make sure that I didn't

13    miss any of the innings, that is all.  I think that I have

14    my arms around it.  Go ahead.

15           MS. STACEY:  Thank you, Your Honor.

16           THE COURT:  Okay.  Go ahead.

17    BY MS. STACEY

18    Q.  You also --

19           THE COURT:  And I really did hear what you had to

20    say.  I don't want you to --

21           THE WITNESS:  Thank you.

22           THE COURT:  I don't want to be dismissive towards

23    you either.

24           Go ahead.

25    BY MS. STACEY
```

1    **Q.**  And are you familiar with the book entitled <u>Sex Crimes</u>

2    <u>and Paraphilia</u> by Eric W. Hickey?

3    **A.**  No, I am not.

4    **Q.**  Have you -- that was published in 2005.  You are not

5    familiar with it?

6    **A.**  I am not.

7    **Q.**  You're not aware that it contains an entire chapter on

8    hebephilia?

9    **A.**  I have never seen that book.

10        **MS. KELLEY:**  If I can just object here.  We

11   provided the government with a very long list of all the

12   articles we would be referencing in this courtroom so that

13   this would not happen, and copies of the articles so that

14   this would not happen where they can leave an impression

15   with Your Honor that something is about scientific studies,

16   et cetera, when our expert doesn't know what they're talking

17   about and has never seen something.

18        **THE COURT:**  He is doing a good job convincing me

19   that he feels that whatever she is bringing up is not

20   intellectual property.  It is not a study that raises this

21   hebephilia to the level of being a serious mental illness;

22   is that a fair statement?

23        **THE WITNESS:**  It is absolutely right, sir.

24        **THE COURT:**  And he is not changing.  I mean, she

25   can go over the laundry list of articles; but if he has the

1    same reaction to it, that is not research.

2    BY MS. STACEY

3    **Q.**  You testified earlier that -- and, I'm sorry, you said

4    you did not, you were not familiar with the book?

5    **A.**  I am not familiar with that book.

6    **Q.**  Okay.  And you testified earlier that you respected

7    Dr. Barbaree?

8    **A.**  Yes.

9    **Q.**  And that he was a well known researcher in the fields?

10   **A.**  Yes.

11   **Q.**  And you are aware, aren't you, that Dr. Barbaree

12   testified in Hawaii in the <u>Abregana</u> case?

13   **A.**  No.

14   **Q.**  Are you aware that Dr. Barbaree testified that

15   hebephilia is quite properly diagnosed?

16   **A.**  I haven't seen that.  I don't know anything about it.

17   **Q.**  Are you aware that in --

18           **THE COURT:**  Now what are you referencing?

19           **MS. STACEY:**  I'm referencing the transcript from

20   the <u>Abregana</u> hearing, Your Honor.

21           **THE COURT:**  Show it to him.

22           Is that in evidence?  Is it going to be offered?

23           **MS. STACEY:**  It is not in evidence, Your Honor.

24           **THE COURT:**  Well, are you going to offer it?

25           **MS. STACEY:**  As a public record?  My copy is marked

1    up --

2              **THE COURT:**  Well, it is a transcript.  I mean --

3              **MS. STACEY:**  Yes, yes.  It's just my copy is marked

4    up.  I have to just offer a cleaner copy when we're done, if

5    that's all right?

6              **THE COURT:**  Okay.

7              **MR. GOLD:**  Your Honor, we just request that the

8    entire transcript from that day -- I think that's a good

9    idea and Dr. Barbaree does discuss this at a little length.

10   We actually included an excerpt of his testimony in one of

11   the things that we filed.

12             **THE COURT:**  Well, let me have it as an exhibit.  We

13   will refer to it during this doctor's testimony.

14   BY MS. STACEY

15   **Q.**  So I am showing you one portion of the transcript.  And

16   the question is you have been -- the answer for Dr. Barbaree

17   when asked about hebephilia is that he testified it's quite

18   properly diagnosed or that the person was quite properly

19   diagnosed as a hebephile.  Do you see that?

20   **A.**  I see that.

21   **Q.**  And you were not aware of that testimony?

22   **A.**  You have shown me one line in an entire transcript.  I

23   make nothing of that.  I don't know what he was talking

24   about.  I don't know if the individual was the same as

25   Mr. Carta or different than Mr. Carta.  It is a meaningless

1     thing for me.

2     **Q.**   The question was were you aware of the testimony?

3     **A.**   I am not aware of anything about that.   I told you that.

4     **Q.**   Okay.   Thank you.

5          **MS. STACEY:**   Your Honor, if this is going to be

6     admitted as an exhibit, I'd ask that we make references in

7     rulings and findings at a later date, proposed rulings and

8     findings rather, because he is not familiar with it.

9          **THE COURT:**   Well, you are going to give me proposed

10     findings reference to the transcript at the conclusion of

11     the evidence.

12          But is that the only reference to hebephilia?

13          **MS. STACEY:**   Your Honor, it goes throughout the

14     entire transcript.

15          **MS. KELLEY:**   Well, I do happen to know that in the

16     judge's findings she ruled that he also testified it was not

17     a serious disorder --

18          **MS. STACEY:**   For that particular individual.

19          **MS. KELLEY:**   And that was -- well, I don't know

20     because I haven't seen this.   We weren't given notice of

21     this.   We don't have a copy of this transcript.

22          **MS. BOAL:**   Your Honor, they quoted from the

23     transcript in their brief so there is no surprise here.

24          **MS. KELLEY:**   If you read the actual court case, the

25     Abregana case, the judge ruled that in that case that

 1     hebephilia did not constitute a serious mental illness or

 2     abnormality under 4248.

 3            **MS. STACEY:**  For Mr. Abregana.

 4            **MS. KELLEY:**  And she discharged that guy.  So I

 5     don't know what the upshot of all of the testimony there

 6     was.

 7            But I object to a tiny portion of an entire

 8     transcript being read to an expert and asking him to comment

 9     on it.

10            **MS. STACEY:**  I asked if he was aware of simply the

11     testimony.

12            **THE COURT:**  Well, it is of no significance he says

13     so that is his reaction to it.

14            **MS. STACEY:**  I mean, the issue...

15     BY MS. STACEY

16     **Q.**  Now, Dr. Bard, in -- pardon me -- in discussing risk of

17     reoffense with sex offenders, there is no such thing as no

18     risk for reoffense; correct?

19     **A.**  In my opinion all offenders will be at some risk always.

20     **Q.**  And research suggests that a person who commits sex

21     offenses both as a juvenile and as an adult, they're at

22     increased risk to reoffend later; aren't they?

23     **A.**  No, it says the individuals who commit offenses and are

24     sanctioned as juveniles and they're committed as adults are.

25     **Q.**  Okay.  And that increases the risk to reoffend; correct?

1    A.   If they are sanctioned and they reoffend, yes.

2    Q.   And research suggests that a person who has poorly

3    controlled sexual impulses are at an increased risk of

4    sexual reoffense; correct?

5    A.   That is a very broad statement.  I'm not sure I would

6    agree with that overall.  I do know that, as I indicated

7    yesterday, sexual self-regulation is a dynamic risk factor

8    but I'm not sure what you're asking me.

9         **MS. STACEY:**  If I might just have a moment, Your

10   Honor?

11        **THE COURT:**  Yes.

12        (Pause in proceedings.)

13   BY MS. STACEY

14   Q.   I am going to show you page 138 of your transcript.

15        "QUESTION:  Are you aware of research that

16   indicates people who have poorly controlled sexual impulses

17   are at a higher risk of reoffense?

18        "ANSWER:  Yes, that goes to the whole dynamic

19   factors."

20        Didn't you testify --

21   A.   That's exactly what I just said here.  Exactly.

22   Q.   What you testified to here, Dr. Bard, was that it was

23   more complicated than that.  You didn't testify to that at

24   your deposition; did you?

25   A.   No, you asked me a very vague question about sexual

1    impulses.  And I refined it and talked about in terms of

2    dynamic risk factors just right now.  It's exactly the same

3    thing as I said.

4    **Q.**  Dr. Bard, you are aware of research that says many sex

5    offenses go undetected; aren't you?

6    **A.**  I am certainly aware of that.

7    **Q.**  In fact, that's what happened in this case; right?

8    **A.**  Yes, obviously.

9    **Q.**  And you are aware of research that indicates that child

10   pornography offenders who had committed a contact sexual

11   offense, that they were most likely to reoffend again;

12   aren't you?

13   **A.**  I think that's the research of Seto and I recall it but

14   I don't recall it that well.

15        (Whereupon, counsel conferred.)

16   **Q.**  I'm showing you page 208 of Michael Seto and Angela Eke,

17   *"Criminal Histories and Later Offending of Child Pornography*

18   *Offenders"* in the Sexual Abuse:  The Journal of Research and

19   Treatment, Volume 17, No. 2, April 2005.  "Child pornography

20   offenders who had ever committed a contact sexual offense

21   were the most likely to reoffend."

22        Did I read that correctly?

23   **A.**  Yes, you did.

24   **Q.**  Does that refresh your recollection about whether that

25   study showed that?

1    **A.**  Well, I do recall vaguely.  You know, seeing one

2    sentence does not tell me the entire thrust of the research;

3    but it certainly does say that.

4    **Q.**  You testified yesterday that Mr. Carta was forthcoming

5    with you.  Do you recall that?

6    **A.**  Yes.

7    **Q.**  And whether Mr. Carta was forthcoming was never tested

8    in the Sex Offender Treatment Program; was it?

9    **A.**  I don't know how you could test that other than with a

10   polygraph.

11   **Q.**  Right.  And the polygraph happens in the fourth phase of

12   sex offender treatment; doesn't it?

13   **A.**  In that program, yes.

14   **Q.**  And Mr. Carta quit the Sex Offender Treatment Program

15   before he had to take that polygraph; didn't he?

16   **A.**  Yes, I believe was in phase two at the time.  Or phase

17   three, I'm sorry.

18   **Q.**  In assessing Mr. Carta's risk of reoffense, you used an

19   adjusted actuarial approach; didn't you?

20   **A.**  I did.

21   **Q.**  And are you aware of the Hanson 2007 study that says

22   using the adjusted actuarial approach actually reduces the

23   predictive risk of accuracy?

24   **A.**  I am aware of many different pieces of research on this

25   issue.  Hanson was the one who originally recommended the

1   adjusted actuarial.

2          I think that you're taking that out of context

3   because nobody, not even Dr. Phenix does a totally actuarial

4   approach.  She discussed the dynamic factors here also.  So

5   I think there is nothing wrong with relying on the

6   actuarials.  I do all the time.

7   **Q.**  Dr. Bard, are you aware that Dr. Hanson found in 2007

8   that you using the actuarial, adjusted actuarial approach

9   reduced predictive accuracy?

10  **A.**  I would have to look at that study much more closely in

11  order to comment on it, I'm sorry.

12  **Q.**  And there is a difference between what you and

13  Dr. Phenix did in terms of risk assessment?

14         **THE COURT:**  If I understand correctly, one of the

15  problems with using the actuarial approach exclusively is

16  that the situation never changes.

17         **THE WITNESS:**  Exactly, Your Honor.

18         **THE COURT:**  Five years from now he is going to have

19  the same --

20         **THE WITNESS:**  Right, if someone is deemed at high

21  risk under the actuarials and someone relies only on that,

22  he will never be anything other than that, high risk.  No

23  matter what.

24         **THE COURT:**  Yes.

25  BY MS. STACEY

1    **Q.**  You used the RRASOR to assess Mr. Carta's risk of

2    recidivism?

3    **A.**  I used that among other actuarials.

4    **Q.**  And Hanson says that the RRASOR shouldn't be used

5    anymore; correct?

6    **A.**  Yes, that's what he says.

7    **Q.**  And, in fact, you don't use that anymore?

8    **A.**  I rely right now on the Static-99 only.

9    **Q.**  And both you and Dr. Phenix used the Static-99 to score

10   Mr. Carta; isn't that true?

11   **A.**  Yes, it is.

12   **Q.**  And actually you scored every element the same except

13   for a fourth element, prior non-sexual violence; correct?

14   **A.**  That's right.

15   **Q.**  You gave Carta a zero on that element?

16   **A.**  Yes, I did.

17   **Q.**  And Dr. Phenix, she was one of the authors of the Coding

18   Manual; isn't she?

19   **A.**  Yes.

20   **Q.**  And that's the Coding Manual for the Static-99?

21   **A.**  That's right.

22   **Q.**  And you would agree that Dr. Phenix has a certain

23   expertise in coding; wouldn't you?

24        **THE COURT:**  Does this revolve around the fire,

25   setting fires?

1          **MS. STACEY:**  Yes, Your Honor.

2          **THE COURT:**  Okay.  Go ahead.

3    **A.**  Are you asking me to comment about her?

4    **Q.**  Would you agree that Dr. Phenix has a certain expertise

5    in coding as an author of the Coding Manual?

6    **A.**  I have never seen her do a coding except in this case so

7    I would reserve judgment on that.

8    **Q.**  You are aware that Dr. Phenix gave Mr. Carta a one for

9    non-violence?

10   **A.**  I am aware of that.

11   **Q.**  And she included the reckless burning conviction there

12   and you did not?

13   **A.**  That's exactly right.

14   **Q.**  And she also actually included the risk of injury to a

15   minor in 2001 and you did not; correct?

16   **A.**  I saw that on her coding sheet but I don't think that

17   she testified to that.

18   **Q.**  So because of that Dr. Phenix scored Mr. Carta at a six;

19   Correct?

20   **A.**  Correct.

21   **Q.**  And you scored Mr. Carta at a five?

22   **A.**  Correct.

23   **Q.**  Your score of five put Mr. Carta in the moderate to high

24   risk category; correct?

25   **A.**  Correct.

1    **Q.**  And Dr. Phenix's score of six put Mr. Carta in the high

2    risk category; correct?

3    **A.**  Correct.

4    **Q.**  You used dynamic factors to adjust the level of risk in

5    your scoring; didn't you?

6    **A.**  I did.

7    **Q.**  And you adjusted Mr. Carta's risk downward for age;

8    didn't you?

9    **A.**  Yes.

10   **Q.**  And you testified that you did that because of a 2006

11   article entitled, "*The Static-99 Predict Recidivism Among*

12   *Older Sexual Offenders*;" is that correct?

13   **A.**  That was one of the reasons why, yes.

14   **Q.**  And the article said that research suggests that the

15   Static-99's methods of accounting for an offender's age

16   might be insufficient to capture the decline for recidivism

17   associated with advanced age; didn't it?

18   **A.**  Yes.

19   **Q.**  And the average Static-99 score for the people in that

20   sample was in the moderate to low range; wasn't it?

21   **A.**  I believe that's been the average in all of the

22   research.

23   **Q.**  And Mr. Carta is in the moderate to high range; isn't

24   he?

25   **A.**  Yes.

1   **Q.**  And research suggests that evaluators who use the

2   Static-99 should consider advanced age as just one factor in

3   an overall estimate of risk; correct?

4   **A.**  Which is exactly what I did here, yes.

5   **Q.**  But at least according to that article that you relied

6   upon in the 40- to 60-age range, it is not mandatory to

7   consider age as a mitigating factor; is it?

8   **A.**  It's not mandatory to do anything with any of this but

9   it's good practice if you know the research.

10  **Q.**  And you're aware of research that says child molesters

11  offend well into their fifties?

12  **A.**  I am aware of research that suggests that there is less

13  of a decline with age for child molesters than it is for

14  rapists, yes.

15  **Q.**  And you're aware of research that says reductions in

16  risk as a result of age were actually significantly slower

17  for child molesters than they were for rapists?

18  **A.**  I believe that's what I just said.

19  **Q.**  And you're aware of research that says that child

20  molesters and especially those whose victims were male are

21  at a higher risk for committing new sexual offenses?

22  **A.**  That's already accounted for in the actuarial.

23  **Q.**  Now, Mr. Carta committed his offense, some offenses when

24  he was in his forties; correct?

25  **A.**  I believe he was either 40 or 41.

1    Q.   Okay.  And he is still in his forties; correct?

2    A.   He is.

3    Q.   And men in their forties are still sexually active;

4    aren't they?

5    A.   Ment of them are, yes.

6    Q.   You didn't diagnose Mr. Carta with a personality

7    disorder; did you?

8    A.   I did not.

9    Q.   You testified that Mr. Carta clearly met the criteria

10   for antisocial personality disorder but in the past?

11   A.   Yes.

12   Q.   And you testified that his history, he clearly met

13   borderline personality disorder but again in the past?

14   A.   No, I did not say that.

15   Q.   And you don't diagnose him with the personality disorder

16   today based on his behavior since his arrest in 2001?

17   A.   No, I don't diagnose him with antisocial personality

18   disorder because the definition of a personality disorder

19   means that it is an ongoing lifelong kind of thing.  And I

20   don't see the same pattern on behavior in the past five to

21   ten years that we saw earlier in his life.

22   Q.   You would expect someone with this personality disorder

23   to challenge authority?

24   A.   More than just challenge authority.  You would expect

25   him to act in ways that would seek to disregard them and put

1    his own interests first.

2    **Q.**  You would expect someone with these personality

3    disorders to make threats?

4    **A.**  It's possible.

5    **Q.**  And, in fact, the records show that Mr. Carta threatened

6    to kill his mother in 2001; didn't he?

7    **A.**  I actually have heard that before when I was watching

8    but I don't recall seeing that anywhere.

9    **Q.**  I am going to show you and ask you to look at paragraph

10   68.  Do you recognize this document as one of the documents

11   you reviewed?  It's Bates stamp 0095.

12   **A.**  It looks like the presentencing evaluation.

13   **Q.**  And so in that document did you review, looking at

14   paragraph 68, "Now all he sees is him yelling and screaming,

15   especially his parents, to who he says he wrote a letter

16   while in state custody in 2001 indicating that when he was

17   released he would find his mother and kill her."

18   **A.**  I see that, yes.

19   **Q.**  And you're aware that while he was in custody in 2001 he

20   also threatened to kill his daughter?

21   **A.**  Again, I have a vague memory of that.  If you tell me

22   it's there, I certainly accept that.

23   **Q.**  He threatened to kill his daughter and her boyfriend

24   when he was released; didn't he?

25   **A.**  Again, I don't have a specific memory of that.  But if

```
 1    you are telling me it is in the file, I certainly accept

 2    that.

 3    Q.  And after 2001 Mr. Carta actually sought revenge against

 4    another inmate in the Sex Offender Treatment Program; didn't

 5    he?

 6    A.  I know that there was a note about that.  Mr. Carta's

 7    version of events is a little bit different.

 8    Q.  And there was -- and there was notes that he became

 9    enraged in the Sex Offender Treatment Program; weren't

10    there?

11    A.  Again, I don't recall every piece of paper I have seen.

12    I know that he was cited for being angry at times, yes.

13    Q.  And you know that incident after 2001 when Mr. Carta

14    threatened to throw hot oil on another inmate; do you recall

15    that?

16    A.  I remember that, yes.

17    Q.  And he was disciplined by the Bureau of Prisons for

18    that?

19    A.  I believe he was.

20    Q.  And he lost 27 days good conduct time?

21    A.  Again, I don't remember every detail; but if you are

22    saying that, I certainly accept that.

23    Q.  And, in fact, this behavior continued at Devens; didn't

24    it?

25    A.  I don't know what you mean, I'm sorry.
```

1  **Q.**  Well, at Devens didn't Mr. Carta steal property and was

2  disciplined for that?

3  **A.**  I do not recall that, I'm sorry.

4  **Q.**  Do you recall the incident report where Mr. Carta was

5  found with two radios in his pocket and he said that they

6  were his?  And it was determined that he had stolen the

7  radios from another inmate?

8  **A.**  I don't recall that, I'm sorry.

9  **Q.**  Do you recall the citation where Mr. Carta was cited for

10  being insolent --

11       **THE COURT:**  Do you have a record of this that you

12  could show to him?

13       **MS. STACEY:**  I do, Your Honor.

14       **THE COURT:**  And the issue for me is, assuming this

15  all happened back in 2001, whether it is stale right now; is

16  that --

17       **MS. STACEY:**  Well, it goes to his testimony that he

18  hasn't had any incidents of acting out in the last ten or so

19  years.

20       **THE COURT:**  Yes.  I mean, that is why I want to see

21  it.  I think that that part is very relevant.

22       **MS. STACEY:**  Just give me a moment to find it.

23       **THE COURT:**  Take your time, take your time.  You

24  are doing a fine job.

25       (Whereupon, counsel conferred.)

BY MS. STACEY

**Q.**  I'm showing you a document that is entitled, "Inmate

Discipline Data, Chronological Disciplinary Record."

        Do you see that?

**A.**  Yes, I do.

**Q.**  And the bottom of the document is Bates stamp No. 01239?

**A.**  It is.

**Q.**  And do you see that on 10/11/2008 he was sanctioned for

possessing an unauthorized item and he was also sanctioned

for being insolent to a staff member?

**A.**  Yes, I do.

**Q.**  And on the same record, on March 11 of 2006 you see that

he threatened bodily harm?

**A.**  I am not seeing this, I'm sorry.  March 11, 2006?

**Q.**  It's -- for whatever reason this isn't working here,

sorry.

        But it's the mid piece of the document.  It says

report number and status.

        **MS. KELLEY:**  That's the date of the incident?

        (Whereupon, counsel conferred.)

        **MS. STACEY:**  May I approach?

**A.**  Okay.  All right.  That's separate.

**Q.**  Right.  So you see the first incident that we just

discussed, the possessing an unauthorized item and being

insolent to a staff member.  Do you see that in the first

1    block?

2    **A.**   I do.

3    **Q.**   Okay.  And there is a second block.  And that second

4    book says that on March 11, 2006 there's threatening bodily

5    harm.  Do you see that?  Next to the number 203?

6    **A.**   Yes, I see that.

7    **Q.**   And that's --

8    **A.**   That's not a sanction though.

9    **Q.**   I'm sorry?

10         **THE COURT:**  I can't hear you.

11         **THE WITNESS:**  I'm sorry.  All I see there is that

12   that was an allegation but there is no sanction.

13   BY MS. STACEY

14   **Q.**   Well, do you see underneath "threatened bodily harm DIS

15   GCT"?

16   **A.**   Yes.

17   **Q.**   Discipline, good conduct time?

18   **A.**   I didn't know what that meant.

19   **Q.**   Okay.  And 27 days is next to that?

20   **A.**   Yes.

21         **MS. STACEY:**  At this point, Your Honor, I'd like to

22   move this exhibit into evidence where we've been referring

23   to it.  It's Exhibit 28.

24         **THE COURT:**  It may come in.

25         **(Government's Exhibit No. 28 received in evidence.)**

1    BY MS. STACEY

2    **Q.**  Carta, Mr. Carta himself in the Sex Offender Treatment

3    Program admitted that he got mad in prison; didn't he?

4    **A.**  Again, I don't recall specifics; but I'm sure he has,

5    yes.

6    **Q.**  And he admitted that he went overboard in prison; didn't

7    he?

8    **A.**  Again, I have read thousands of pages in this case.  I

9    don't recall a specific comment.

10   **Q.**  Showing you -- this is already in evidence as

11   Exhibit 27 -- Bates stamp No. 00938.

12           (Pause in proceedings.)

13   **Q.**  I'm sorry.  I just want to make sure of something.

14           So the kind of second highlighted paragraph on

15   here, and the sentence reads, "Mr. Carta initially denied

16   history of homicidal ideation but when confronted with

17   contradictory information from his Presentence Investigation

18   Report recalled several episodes of threatening behavior

19   directed at others in his life:  Ex-boyfriend, mother,

20   daughter and daughter's boyfriend.  Mr. Carta explained that

21   he made these threats out of anger and stated that when he

22   gets mad, he goes overboard."

23           Do you recall that?

24   **A.**  I see it here but this does not reflect what he's doing

25   now.  This reflects his entire past.

1   **Q.** But these incidents of insolence, threatening another,

2   the incidents on his disciplinary report, they all occurred

3   while he was in a controlled environment with minimal

4   opportunity to act out; correct?

5   **A.** I would disagree with you there.  There is always an

6   opportunity to act out.

7   **Q.** He was in a controlled environment, Dr. Bard?

8   **A.** Yes, but that's not what you asked me.  You can be in a

9   controlled environment and you can act out.  I have

10  evaluated numerous men who have.

11  **Q.** As has Mr. Carta; correct?

12  **A.** Mr. Carta has not acted out violently --

13          (Whereupon, counsel and the witness talking

14  simultaneously.)

15  **Q.** Has Mr. Carta acted --

16  **A.** -- he has not acted out sexually.

17  **Q.** Has Mr. Carta acted out?

18  **A.** If you consider --

19  **Q.** Yes or no?

20  **A.** I'd like to be able to answer the question.

21          If you consider a verbal threat to be acting out,

22  yes.

23  **Q.** You have not published an article on sex offenders since

24  the 1980s; have you?

25  **A.** I have not.

1   **Q.**  Dr. Bard, you didn't diagnose Mr. Carta with anything at

2   all; did you?

3   **A.**  As I indicated, I did not include the substance abuse

4   disorders for which he probably does meet the diagnostic

5   criteria because I was focused on the language in the law

6   that talked about a disorder that has that results -- I

7   apologize -- that results in difficulty refraining from

8   child molestation or sexual conduct.  And I did not find a

9   disorder that matched that.

10  **Q.**  And that same law asks you to provide a prognosis;

11  doesn't it?

12  **A.**  I'm not aware of that, I'm sorry.

13  **Q.**  Your report indicates that he is at a low to moderate

14  risk of reoffense; correct?

15  **A.**  That's not a prognosis.  A prognosis is something else.

16  If you ask me was I asked to do a risk assessment, yes.

17  **Q.**  Right.  It's a new question, Dr. Bard.

18  **A.**  Yes.

19  **Q.**  In your report you have in your risk assessment

20  indicated that Mr. Carta is at a low to moderate risk of

21  reoffense; correct?

22  **A.**  Correct.

23  **Q.**  And you don't think he needs treatment?

24  **A.**  Who says that?  I have been saying that all along.  I

25  said it yesterday as clearly as I could.

1    **Q.**  Now, you told Mr. Carta -- I'm going to show you a

2    portion of 18 U.S.C., Section 4247(c).  C is just the title,

3    "Psychiatric or Psychological Reports."  And next piece of

4    that, it talks about how the report should be prepared.

5            It says, "It shall be prepared by the examiner

6    designated to conduct the psychiatric or psychological

7    examination."

8            That's you; correct?

9    **A.**  I believe it is.

10   **Q.**  And, "It shall be filed with the court with copies

11   provided to counsel."

12           And you did that; correct?

13   **A.**  I did.

14   **Q.**  And it says, "The report shall include the person's

15   history and present symptoms."

16           And you did that; correct?

17   **A.**  Correct.

18   **Q.**  "A description of the psychiatric, psychological and

19   medical tests that were employed and their results"?

20   **A.**  Yes.

21   **Q.**  Your findings; correct?

22   **A.**  Yes.

23   **Q.**  And your opinion as to diagnosis, prognosis and whether

24   the person is a sexually dangerous person under part D?

25   **A.**  Yes.

1    **Q.**   And did you not include diagnosis or prognosis in your

2    report; did you?

3    **A.**   Well, it depends how you define what "prognosis" is.

4    "Prognosis" medically would be what is this person's future

5    course.   And I believe that a risk assessment in this case

6    is what was considered a prognosis.

7    **Q.**   Your report contains no diagnosis for Mr. Carta; does

8    it?

9    **A.**   My opinion is that there is no diagnosis for Mr. Carta

10   that meets this law.

11   **Q.**   Now, you told Mr. Carta about the purpose of your

12   evaluation of him; didn't you?

13   **A.**   I did.

14   **Q.**   And you told him what you would do, what he told you

15   would be put into the form of a report; didn't you?

16   **A.**   I told him that I would be preparing a report based on

17   what we talked about and my review of the files.

18   **Q.**   Mr. Carta then had no benefit in admitting to you that

19   he was still attracted to 13-year olds; did he?

20   **A.**   He had no benefit in admitting to me that he was still

21   attracted to 13-year olds, probably not.

22   **Q.**   And you helped the respondent's counsel prepare the

23   defense in this case; haven't you?

24   **A.**   I have only spoken to them in the past few days before

25   court.   I don't think I helped them prepare all that much.

1    **Q.**  Well, you have been meeting with respondent's counsel;

2    right?

3    **A.**  I was forbidden to have any contact with them until

4    approximately two or three days before trial.  I had very

5    little contact.

6    **Q.**  And in those two to three days before trial you helped

7    respondent's counsel prepare for Mr. Carta's defense;

8    correct?

9    **A.**  I helped them, we discussed my testimony and we

10   discussed some of the weaknesses of Dr. Phenix's, if that's

11   what you mean, yes.

12   **Q.**  And you have testified that Mr. Carta is not a sexually

13   dangerous person; correct?

14   **A.**  In my opinion he is not at this time.

15   **Q.**  And over the past four years you testified in more than

16   200 cases in the Commonwealth; is that right?

17   **A.**  I believe so.

18   **Q.**  And in none of these cases did you testify that anyone

19   was a sexually dangerous person in the last four years?

20   **A.**  Well, that's because when I do opine that, as I

21   indicated earlier, the prosecution isn't allowed to call me.

22   **Q.**  And you have only testified for the defense in these

23   last four years?

24   **A.**  I have.

25   **Q.**  And your hourly fee is $200 an hour?

1    **A.**   It is.

2    **Q.**   And in the last two years alone in the Commonwealth of

3    Massachusetts you've earned $330,615 testifying for the

4    defense; haven't you?

5    **A.**   I have no idea how much I've earned testifying for the

6    defense.

7                **MS. STACEY:**   May I approach?

8                **THE COURT:**   Yes.

9    BY MS. STACEY

10   **Q.**   I'm handing you a document entitled, "Payment History

11   From the Commonwealth of Massachusetts."   Do you see that

12   document?

13   **A.**   I do.

14   **Q.**   And it appears to document all the times that you have

15   been paid and the cases you have been paid when you worked

16   for the Committee for Public Counsel Services?

17   **A.**   No, that's not what this is.

18           May I explain this?   This is a listing of

19   everything that I have gotten paid for with the individuals'

20   names on them, which is a violation of privacy.   It is an

21   ethical violation for you to even have this.

22           It is under vendor web, the Office of the

23   Comptroller of the Commonwealth.   I am the only person who

24   is allowed to access this.

25   **Q.**   Dr. Bard, does it say --

1   **A.**  No, this is an ethical issue.  This has happened once

2   before in the Commonwealth and the judge sanctioned the DA.

3         This is every evaluation that I have done, whether

4   or not I found them sexually dangerous or not.

5   **Q.**  In the past two years --

6   **A.**  Excuse me.  This is every evaluation I have done for

7   competency, criminal responsibility, every other forensic

8   evaluation.

9   **Q.**  Okay.

10   **A.**  I find this appalling that you would dare even violate

11   my patients' privacy with this.

12   **Q.**  I did not create that document, Doctor.

13   **A.**  You accessed it.

14   **Q.**  And, Dr. Bard, at the end of that document does it say

15   you have earned $330,615 from the State of Massachusetts?

16   **A.**  I am not looking at that.

17         Your Honor, I apologize, and I don't want to be

18   held in contempt; but this is not her property.  I'm sorry.

19         **THE COURT:**  Ssh, ssh, take a deep breath.  Calm

20   down.  You will live longer.  That is a doctor's advice from

21   up here.

22         **THE WITNESS:**  Thank you, Your Honor.

23         **MS. STACEY:**  May I take the document back?

24         **THE WITNESS:**  This is not hers.

25         **THE COURT:**  What?

1          **THE WITNESS:**  This is not hers.  This is a vendor

2    web link that I am the only person who is allowed access.

3          **THE COURT:**  I am not going to get involved in that

4    dispute right now.  She produced it.  I am telling her to

5    take it back.

6          **MS. STACEY:**  I have nothing further, Your Honor.

7          **THE COURT:**  Okay.  Anything else?

8          **MS. KELLEY:**  I have a motion to strike from the

9    record that exchange about anything about that --

10         **THE COURT:**  I presume that he makes $200 an hour.

11   I think that everybody in the world makes $200 an hour

12   except for federal judges.

13         (Laughter.)

14         **THE COURT:**  So we don't, you know, nothing

15   startling about that fee.  And I will just let it stand that

16   he makes $200 an hour.

17         **MR. GOLD:**  We have some redirect, Your Honor.

18         **THE COURT:**  Yes.  Go ahead.

19         (Pause in proceedings.)

20         **THE COURT:**  Now, we are not going to go into that

21   last document again; right?

22         **MS. KELLEY:**  No, we're not.

23         **MR. GOLD:**  No, Your Honor.

24         **THE COURT:**  All right.

25         (Pause in proceedings.)

1  **REDIRECT EXAMINATION**

2  BY MR. GOLD

3  **Q.**  Dr. Bard, can you explain for us, going back to the

4  article from 2008, this Blanchard and Cantor research.

5        Now, I'm putting it up there and I just want to

6  make a couple of points about it clear for the Court.  But

7  could I draw your attention, I am pointing now to a

8  paragraph there.  I have some highlighting there.  Could you

9  read that paragraph that I have highlighted to yourself and

10  then --

11        **THE COURT:**  Do I see that on my machine here?  It

12  doesn't work.

13        **THE CLERK:**  It should be.

14        (Pause in proceedings.)

15        **THE COURT:**  Okay.  Great.  Thank you.

16  **A.**  "The existence of men whose erotic interest centers on

17  pubescents has not, of course, been totally ignored."

18        **THE COURT:**  Where are you now?

19        **MR. GOLD:**  I have an arrow there, Your Honor.  Do

20  you see the --

21        **THE COURT:**  Yes.

22        Okay.

23  **A.**  "Coin the term 'hebephiles' to refer to them.  This term

24  has not come into widespread use even among professionals

25  who work with sex offenders."

1    **Q.**  Could you continue.

2    **A.**  "One can only speculate why not.  It may have been

3    confused with the term 'ephebophiles' which denotes men who

4    prefer adolescents around 15 to 19 years of age.  Few would

5    want to label erotic interest in late or even mid

6    adolescents as a psychopathology so the term 'hebephilia'

7    may have been ignored along with ephebophilia."

8    **Q.**  So what are the authors saying in that paragraph?

9    **A.**  I think they're acknowledging that even though the term

10   was coined in the 1950s it has not been accepted by the

11   majority of people in the field.  And as they say,

12   particularly those who work with sex offenders.

13   **Q.**  Now, what does peer review --

14          **THE COURT:**  Where did that come from?

15          **MR. GOLD:**  That comes from the, this article, Your

16   Honor, *"Pedophilia, Hebephilia and the DSM-V."*

17   BY MR. GOLD

18   **Q.**  And, Dr. Bard, essentially we've said this before, the

19   authors here are proposing the hebephilia that they have

20   researched as a diagnosis?

21   **A.**  They are proposing that it be included in the next

22   version of the DSM.

23   **Q.**  And you've read this article?

24   **A.**  More than once.

25   **Q.**  And what is wrong with their proposal?  First of all,

1   what exactly in your reading of what is here are they

2   proposing?

3   **A.**  Well, what they appear to be proposing is a diagnostic

4   category for individuals who show a preference for pubescent

5   people.

6   **Q.**  And how do they define that?

7   **A.**  They don't and that's the problem.

8   **Q.**  What do you mean?

9   **A.**  The problem is, as I indicated, is that there is no

10  definition that has been accepted and has been -- there is

11  no consensus on what this might mean, whether we're looking

12  at people who are just beginning puberty, in the middle of

13  puberty, at the end of puberty.  The age of 12, the age of

14  14, the age of 16, it's not in there.

15       So there are numerous definitional problems here.

16  But the definitional problems are the least of this study's

17  problems.

18       There are three basic problems, and I don't want to

19  bore Your Honor with these statistics.  Briefly they began

20  with 2800 potential subjects and they purposefully excluded

21  more than half of them because they simply could not believe

22  that individuals who professed no arousal to children yet

23  had committed offenses against the children or adolescents

24  were not deviant.

25       So they just threw them out and they only looked at

1    a very small sample of this group.  It makes the findings

2    certainly not generalized or anywhere else.

3           No. two, they showed these subjects various slides

4    and various audiotapes.  And they monitored their sexual

5    arousal.  They showed them prepubescents.  They showed them

6    11-year olds.  There is no reason why they selected just 11,

7    12 to 14 and 17 and older.  They left out 14 to 17.  No one

8    knows why.  It's not clear in the report.

9           But you're basically taking away what most people

10   consider normal.  And we don't know if these guys who they

11   label "hebephiles" would have shown even more arousal to

12   them.  So they only showed them adults and what they were

13   hoping to find.

14          It raises serious questions about the methodology.

15          And the third is there was no controlled group of

16   non-offenders to see what do normal non-offending adults

17   show.  Three significant problems.

18          As a result of this there were one, two, three,

19   four, five, six responses to this article published

20   immediately afterwards, each of them criticizing them on the

21   same grounds I did and more.

22          So certainly -- and these are from people who are

23   doing this work in Massachusetts, in Wisconsin, in

24   California.  These are people who are pro-prosecution,

25   pro-defense.  Everything is in there.  They all agree that

1    this study is garbage.   Bottom line.

2    **Q.**   Dr. Bard, could you describe for the Court what the peer

3    reviewed process is, is supposed to do and how what we're

4    talking about now plays into it?

5    **A.**   Well, what it's supposed to do -- and I don't know

6    clearly what occurred here -- is that papers are supposed to

7    be reviewed anonymously by the editorial board of a certain

8    journal and either accepted or rejected or asked for

9    revisions.

10          It's too much of a coincidence that both Blanchard

11   and Cantor are on the editorial board of the same journal

12   that keeps publishing their work and hardly anyone else

13   does.

14   **Q.**   And are the critiques you talked about considered part

15   of the peer reviewed process or is that something --

16   **A.**   No, this was done by independent people after the online

17   publication of this article because people were enraged.

18   **Q.**   I'm putting one of those responses on the ELMO.

19   Dr. Bard, have you read this one?

20   **A.**   I certainly have.

21   **Q.**   And is there anything you'd like to tell the Court about

22   Dr. Moser who drafted it or about his comments here?

23   **A.**   Dr. Moser is a psychiatrist, works out of California,

24   very well known in the area.

25          His comments basically say that you can have

 1    arousal to adolescents and it does not mean that this

 2    constitutes a mental disorder.

 3    **Q.**   Dr. Bard, I'm asking you the same questions here about

 4    the rest of these.  Do you know who Dr. DeClue is?

 5    **A.**   I do.

 6    **Q.**   And who is he?

 7    **A.**   He is a psychologist.  I believe he works out of

 8    Florida.  He is known as someone who is generally pro

 9    prosecution in these kinds of cases.

10    **Q.**   Is there anything you'd like to say just based on your

11    recollection about the type of thing he is saying here?

12    **A.**   You know, all of them basically meet, basically say the

13    same thing.  That you can be aroused to adolescents and it's

14    not a mental disorder.  It's not an illness.  It's not

15    necessarily deviant.

16    **Q.**   The same question about this one, Dr. Franklin?

17    **A.**   Karen Franklin is a psychologist in California who was

18    particularly critical of this article.  Again, I think her

19    point is that, at least one of her points is that a large

20    number of adult heterosexual attracted to adult kind of

21    people show similar kinds of arousal so you can't

22    pathologize what the majority of people think.

23    **Q.**   This response?

24    **A.**   Dr. Ploud is a psychologist and a colleague of mine here

25    in Massachusetts.  He was concerned more with the technical

1    aspects of this study and criticized it mostly on the basis

2    of the lack of stimuli with 15- to 18-year olds which

3    certainly masks the results.

4    **Q.**   Dr. Zander?

5    **A.**   Dr. Zander is a psychologist and an attorney, works out

6    of Wisconsin.   Has been very prolific in writing about civil

7    commitment and the lack of numerous -- the lack of validity

8    concerning a diagnosis like hebephilia or the other one that

9    the many jurisdictions use, paraphilia NOS, again

10   non-consent, to find ways to incarcerate rapists.

11          So this is more of his opinion that you cannot just

12   diagnose on the basis of what someone is aroused to and that

13   arousal is not necessarily pathological.

14   **Q.**   Dr. Tomovich (ph.)?

15   **A.**   I don't actually know him, but the same idea that, you

16   know, his title I think says it all:   *"Manufacturing Mental*

17   *Disorder by Pathologizing Erotic Age Orientation."*

18   **Q.**   Now, Ray Blanchard published a reply to these?

19   **A.**   Yes.

20   **Q.**   Did you read that as well?

21   **A.**   Yes, I did.

22   **Q.**   And did you consider his arguments in response to these

23   critiques?

24   **A.**   I have certainly reviewed it.   I found his responses to

25   be nonresponsive appropriately to the questions that were

1    raised.

2          **MR. GOLD:**  Your Honor, we've included this series

3    of articles in our exhibit binder.  We think they benefit

4    the Court.  We'd seek to admit them into evidence.

5          **MS. STACEY:**  Your Honor, I'd object.  Under the

6    rules of evidence they can be read but they are not taken

7    and admitted into evidence.

8          **THE COURT:**  She is right.

9    BY MR. GOLD

10   **Q.**  Now, the government asked you about references in the

11   literature to this hebephilia concept.  And it's certainly

12   true that it has appeared.

13         What is the difference between these references and

14   a diagnosis?

15   **A.**  Well, it hasn't really even appeared much.  And it

16   certainly hasn't appeared until the advent of the civil

17   commitment laws.

18         From 1960 when that book was written until two

19   thousand something it's not anywhere because it's not

20   accepted.  And just because someone used it as a descriptive

21   term does not mean that it is psychopathology.

22         You have that same author Blanchard who has a new

23   term called "teleiophilia."  Teleiophilia is erotic

24   attraction to adults.  Why do we need a name for something

25   that most people do?  It makes it sound like there is some

1    pathology there.

2          There is a new term that I believe I have also seen

3    recently, "gerontophilia," attraction to older people.  It's

4    individual preference.  It's not pathology.

5          These folks are trying to pathologize everything.

6    **Q.**  Now, how do we square what you're saying with

7    Mr. Carta's problematic sexual behavior?  You're not saying

8    that there is no issue there?

9    **A.**  I'm certainly saying that.  He has committed sexual

10   offenses.  He clearly did not have control over his sexual

11   impulses at those times and they are criminal acts.

12         Psychologically Mr. Carta has numerous problems.

13   Just because somebody has problems doesn't mean that it

14   arises to a level of a diagnosed mental condition.  He has

15   problems with anger, problems with depression.  He's had

16   problems with loneliness and lack of support.  He's had poor

17   impulse control at times.  But that doesn't mean that there

18   is a diagnosis that accounts for all of this.

19         He is someone who was lived, again, in his words, a

20   terrible life.  And he is aware of that.

21   **Q.**  Now, your attention was directed to a piece of testimony

22   by Howard Barbaree from another court case.  And I want to

23   put some more of that testimony before you but can you tell

24   us who Dr. Barbaree is?

25   **A.**  Dr. Barbaree is a psychologist from Canada who has been

1    actively involved in the research of sexual offending.

2    **Q.**   Now, I have pointed on the screen there at a paragraph.

3    Can you read that paragraph.

4    **A.**   "So I think now, I think it's important to note here

5    that there is a controversy in the field about the diagnosis

6    of hebephilia, whether there really is such a diagnosis.

7    It's not included in the DSM.  Specifically there is no

8    mention of hebephilia in the DSM but there are some

9    authorities in the field who talk about this disorder and

10   it's been part of the literature for a number of decades."

11   **Q.**   Could you continue.

12   **A.**   "Part of the reason it's controversial I think is that

13   there is a widespread recognized similar sexual interest in

14   the general population in individuals who are quite young,

15   below the age of consent in most jurisdictions but who have

16   developed or are developing secondary sexual

17   characteristics.  Fashion magazines and other displays in

18   the media are I think an indication of that.  So I think

19   that in the professional literature there is a controversy

20   about whether this is an actual mental disorder or whether

21   it's a variation and sort of normal responses or variation

22   in normality."

23        **MS. STACEY:**   Your Honor, I would just ask that,

24   he's read everything on the page except the last question,

25   "Well, so your diagnosis is paraphilia and also hebephilia?"

1        So for the sake of completeness, I would ask that

2    that be read.

3        **THE COURT:**  Go ahead.  You are entitled to that.

4    Go ahead.

5        **MR. GOLD:**  Okay.  That was already, that was the

6    line that has already been read.

7        **MS. STACEY:**  That was not read.

8        **MR. GOLD:**  Oh, I'm sorry.  I thought it was.

9    BY MR. GOLD

10   **Q.**  Could you continue on then.

11   **A.**  "Your Honor, may I question or are you continuing on?

12   Let me know when I can again.

13        "Well, so you're diagnosis is paraphilia and also

14   hebephilia?

15        "THE WITNESS:  Hebephilia.  That's one diagnosis.

16   What I think Dr. Doren has done is taken the diagnosis

17   that's mentioned in the DSM, paraphilia not otherwise

18   specified.  This is a category of diagnosis in the DSM that

19   allows clinicians to make a diagnosis when an individual's

20   symptoms don't fit exactly the criteria for other disorders.

21   And so Dr. Doren has taken that diagnostic category from the

22   DSM and then added the descriptor for hebephilia."

23   **Q.**  Now, Doctor --

24        **MS. STACEY:**  I'm sorry, there is one final

25   paragraph.

1  **A.**  "But it is true that hebephilia is a -- is a paraphilia

2  that's discussed in the literature.  And there are some

3  authorities in this field who believe it's an actual

4  disorder."

5  **Q.**  And could you continue on until the end of this page,

6  Dr. Bard.

7  **A.**  "THE COURT:  Okay.  You may inquire.

8  "And your feeling is what?  Is it an actual

9  disorder or not?

10  "Subject to being hoisted by my own petard here

11  because I just -- I was just reading the other night a

12  chapter that I had written about some colleagues and in a

13  section that I didn't write but my colleagues did, there is

14  an argument for hebephilia being an actual disorder.  I

15  honestly think that it's questionable whether it's a real

16  disorder.  There is quite a prevalent interest in the

17  general population in this age group of individuals.  We

18  have done and I have published in the past studies where we

19  have tested volunteers in the general population and their

20  sexual responses to individuals of that age range and you

21  get a significant proportion of the general population show

22  significant responses.  So I guess I'd argue that it's, it

23  is a descriptive term that can be applied to a particular

24  sexual interest.  Whether it constitutes a mental disorder

25  or not, I'm not sure."

1    More?

2    "And I would say that in comparing the seriousness

3    of hebephilia with other paraphilias, for example, comparing

4    pedophilia with sexual sadism, its seriousness, the degree

5    of pathology is much less than with the other paraphilias."

6    **Q.**  Dr. Bard, could you comment on what Dr. Barbaree is

7    saying here?  First of all, is he saying hebephilia is a

8    disorder?

9       **MS. STACEY:**  Your Honor, the witness has testified

10   he is unfamiliar with this.  And the document that's just

11   been read speaks for itself and is entered into evidence for

12   consideration by the Court.

13      **MR. GOLD:**  Well, it's another clinical opinion,

14   Your Honor.  I'd ask that --

15      **MS. STACEY:**  Based on the foundation that Dr. Bard

16   said he had no personal knowledge of that.

17      **THE COURT:**  I don't think I need any explanation.

18   I think I understand the testimony.

19   BY MR. GOLD

20   **Q.**  Now, do you agree with Dr. Barbaree's position as

21   expressed in that testimony?

22   **A.**  I agree with his ultimate conclusion that it is a -- it

23   is not a paraphilia, it is a description.

24   **Q.**  Well, now sometimes he describes it as a paraphilia?

25   **A.**  Right.  He goes back and forth.  That's why it was hard,

1    even if I hadn't been asked your last question, he says a

2    lot of things there.  He concludes that, at least that's

3    what it seems to me, that it's not a disorder.  And that if

4    one does consider it a disorder, which some people do, it is

5    on the less severe side.

6    **Q.**   Now, you were asked on cross-examination about your

7    discussion of hypersexuality during the deposition?

8    **A.**   Yes.

9    **Q.**   Now, is Mr. Carta or was he hypersexual and is that a

10   clinical term?

11   **A.**   It's a clinical term.  It's, again, it's a descriptive

12   term.  It is not a diagnosis so it's not offered as one.

13   But it describes someone who is very sexually oriented,

14   whether he is looking for -- I believe Dr. Wallace talked

15   about this too.  There are individuals who look to have

16   their emotional needs met via sex.  And certainly Mr. Carta

17   would fall under that.

18        His frantic searching for sexual contact and his

19   compulsive masturbation at times certainly indicates that

20   one of the only ways that he felt good about himself was to

21   engage in some sort of sexual contact with others or

22   self-masturbation.

23   **Q.**   But now we've heard testimony about his own comments

24   saying that he devoted 12 hours in a particular day to

25   masturbation.  Now, how did you interpret that comment?  How

1    did you --

2    **A.**  Well, I think again that's taking it out of context.  At

3    least my impression from speaking to Mr. Carta and from

4    reading the files was that that was the worst it had ever

5    got.  And it wasn't that way for a period of weeks, months

6    or years.  That there were times when he would sit in front

7    of a computer screen and watch pornography and masturbate

8    for long periods of time.  But clearly he didn't do that

9    every day nor even every week necessarily.  And if he did,

10   it was for a relatively short amount of time.

11          He will be the first to tell you that.  This was a

12   big problem.  He acknowledges all of this.

13   **Q.**  Now, we have talked a great deal --

14          **THE COURT:**  How much longer are you going to be?

15          **MR. GOLD:**  Ten minutes, Your Honor.  Maybe fifteen

16   if you are thinking of --

17          **THE COURT:**  I am thinking of.

18          (Laughter.)

19          **THE COURT:**  We will see you -- what do we have?

20          **THE CLERK:**  We will see them at 2:30.

21          **THE COURT:**  We'll see you about 2:30.  We have

22   something at 2:15.

23

24          (Luncheon recess.)

25

1                    **AFTERNOON PROCEEDINGS**

2              **THE COURT:**  Okay.  Are we all set?

3              **MR. GOLD:**  May I proceed?

4              **THE COURT:**  Yes, please.

5                     **LEONARD BARD, Resumed**

6                **REDIRECT EXAMINATION, Continued**

7    BY MR. GOLD

8    **Q.**  Dr. Bard, good afternoon.

9    **A.**  Good afternoon.

10   **Q.**  You were asked on cross-examination about a Dr. John

11   Money; do you recall that?

12   **A.**  Yes, I do.

13   **Q.**  And you were asked about a particular article,

14   "*Paraphilias Phenomenology and Classification*: which

15   appeared in the American Journal of Psychotherapy in April

16   of 1984.  Do you remember that?

17   **A.**  Yes.

18   **Q.**  Can you tell us who Dr. Money is?

19   **A.**  Dr. Money is a psychologist who was a researcher in this

20   area in the 1980s and whose opinions tended to be sort of

21   extreme.  He was later employment as a consultant for

22   *Penthouse Magazine* and is not taken seriously in the

23   academic or the psychological community.

24   **Q.**  Now, we had the chance to look at this article over the

25   break.  Do you remember that?

1    **A.**   Yes.

2    **Q.**   And one of the things we looked at was this list of

3    paraphilias which John Money has listed here on page 167 of

4    the article.  Could you put that into context for the Court?

5    **A.**   Well, according to this article, Dr. Money believes that

6    the paraphilias that were put forth at that time was

7    DSM-III.  The paraphilias in DSM-III don't do justice to the

8    kind of paraphilias that actually exist.  So he went through

9    a, I believe 36 different paraphilias that he believes

10   exists.  There is no research associated with any of this.

11   This is just his opinion.

12   **Q.**   Well, some of these appear in the DSM-IV?

13   **A.**   A couple of them here and there, yes.

14   **Q.**   And what is the ephebophilia that appears there?

15   **A.**   Ephebophilia he describes as arousal to youth.

16   **Q.**   And does Dr. Money describe any research isolating this

17   paraphilia in this article?

18   **A.**   No.

19   **Q.**   There was testimony earlier in this case, Dr. Bard,

20   about Mr. Carta having failed on supervised release or

21   probation.  Do you recall that testimony?

22   **A.**   I believe Dr. Phenix noted that, yes.

23   **Q.**   And can you for the Court outline Mr. Carta's period

24   immediately preceding his arrest for the current child

25   pornography charges?

1    **A.**  Well, I believe that he was arrested in late 1981 on

2    state --

3    **Q.**  '81?

4    **A.**  I'm sorry.  In 2001 for state charges.  And then he was

5    charged in federal court in, I believe it was February of

6    2002.  And he was not incarcerated until October of 2002.

7    So I believe there was a period of about eight months in

8    which he was in the community under the supervision of

9    probation where he participated in sex offender treatment

10   and was compliant with all of the probation conditions.

11   **Q.**  So you are not aware from that period of any violation

12   of any conditions of supervised release?

13   **A.**  There was no violation that I saw in the files.  There

14   was no violation that Mr. Carta has told me about.

15   **Q.**  You were asked on cross-examination, Dr. Bard, about

16   your declining to diagnose Mr. Carta with a personality

17   disorder today.  Do you recall that?

18   **A.**  Yes, I do.

19   **Q.**  And the disciplinary reports that Mr. Carta has

20   generated in the past few years were brought to your

21   attention?

22   **A.**  Yes.

23   **Q.**  How do those figure into your diagnostic conclusion?

24   **A.**  Well, whenever we diagnose, we're not looking for one

25   instance of something or even two.  We are looking for a

1    pattern.  That's how we diagnose.  And while we certainly

2    don't expect Mr. Carta who clearly was functioning in a very

3    antisocial way in the past to overnight become a Pollyanna,

4    but what we do hope is that as a result of treatment and

5    maturity that he would lessen the frequency of those

6    antisocial behaviors.

7          And that's exactly what happened after he completed

8    the CODE Program which we talked about earlier, a year-long

9    intensive program dealing with criminal thinking and anger

10   management and substance abuse and all that.  And since that

11   time I believe there were two or three disciplinary reports

12   in about five years.  Now, that's not a pattern, especially

13   for someone who had I believe, we counted up 18 or 19

14   different sentencing dates in his past.

15         So he certainly made dramatic changes in the

16   disciplinary reports that he was sanctioned with.  One was

17   for making a verbal threat which he clearly did not carry

18   out.  And one was for having in his possession two radios

19   that belonged to somebody else.  And Mr. Carta told me that

20   he works on radios and headphones in order to earn a little

21   money.

22         So maybe it's a violation but it's certainly

23   nothing like we would expect to see if someone was truly an

24   antisocial personality disorder individual.

25   Q.  Well, have you worked on cases where you saw evidence of

1    acting out in prison?

2    **A.**  Many times.

3          **MS. STACEY:**  Objection.

4    BY MR. GOLD

5    **Q.**  And what would you expect to see to support a present

6    diagnosis of antisocial personality disorder?

7    **A.**  I would expect to see a similar, not necessarily the

8    exact same kind of behaviors or the same frequency but the

9    same overall kind of lifestyle because that's what a

10   personality disorder is.  For lack of a better term.  It's a

11   lifestyle.

12         You would expect to see numerous fights, arguments,

13   threats, assaults, sanctions for being -- what's the word

14   that they often use?  I can't recall.  I'm sorry.

15         But being verbally abusive to officers and doing

16   all sorts of antisocial things that would illustrate an

17   inability to manage his emotions, to manage his anger, to

18   deal with the sadness that he experience.  Instead of

19   actually experiencing those things you would expect him to

20   act them out.

21         And we simply don't see that.  I have seen it in

22   many other individuals who have gotten hundreds of

23   disciplinary reports while incarcerated.  Not with him

24   though.

25   **Q.**  Turning back to Mr. Carta's history growing up and the

1    incidents where he had sexual contact with children when he

2    himself was a child.  Is it appropriate to characterize that

3    as sexually violent conduct?

4    **A.**   In my opinion it is absolutely not.

5    **Q.**   Why not?

6    **A.**   Because 11-year olds are usually not held criminally

7    responsible for their behavior, especially 11-year olds who

8    have a history of being sexually molested themselves.  They

9    have learned unfortunately to associate sexual contact with

10   either attention, approval, comfort or something else.

11        So when they turn around and do it to somebody

12   else, it's not necessarily for their own sexual

13   gratification because most 13-year olds don't -- I mean most

14   11-year olds don't know anything about sexual

15   gratifications.  It's not in their vocabulary.

16        But they do this because it feels good or it's been

17   done to them.  And to pathologize that is in my opinion

18   going way beyond the bounds of what we know about

19   developmental psychology and sex offending.  11-year olds

20   just don't out of the blue decide to do this.

21        In Mr. Carta's case I think it's clear that his own

22   victimization led him to develop distorted thoughts and

23   attitudes about sexuality.  And given that he was a child at

24   the time, he acted out with other children, some of which

25   whom were younger than himself and some were more or less

1    the same age.  And to call that sexually violent behavior,

2    well, in my opinion it's, you know, it certainly is not.

3    **Q.**  And does this history that Mr. Carta had being abused,

4    does that make him more likely to recidivate in the future?

5    **A.**  No, I think the research is clear on that point, that

6    there is no relationship between someone being abused

7    themselves and reoffending sexually.

8         Now, we know that many individuals who have been

9    sexually abused do go on to abuse others but many don't.

10   But in terms of recidivism it simply is no, no link.

11            **MR. GOLD:**  I have nothing further.

12            **THE COURT:**  Okay.  Anything else?

13                      **RECROSS-EXAMINATION**

14   BY MS. STACEY

15   **Q.**  Dr. Bard --

16            **THE COURT:**  I think this young lady is trying to

17   reach you.

18            **MS. STACEY:**  Oh, I'm sorry.

19            As usual I forgot something.

20            (Pause in proceedings.)

21   BY MS. STACEY

22   **Q.**  Dr. Bard, is it your testimony today that Mr. Carta

23   never violated his probation?

24   **A.**  No, it is my opinion that during the period of time, I

25   believe from '01 to '02 he did not.

1   **Q.**   Because he did violate his probation in 2000; didn't he?

2   **A.**   I believe that he violated at some point before that.

3         **MS. STACEY:**   I have nothing further.

4         **THE COURT:**   Okay.   I guess you are excused.

5         **THE WITNESS:**   Thank you, Your Honor.

6         (The witness was excused.)

7         (Pause in proceedings.)

8         **MS. KELLEY:**   We rest, Your Honor.

9         **THE COURT:**   Okay.   The government?

10        **MS. STACEY:**   I'm sorry, Your Honor, I believe

11   because it's a civil case they would close first.

12        **THE COURT:**   No, but I am just talking about any

13   rebuttal or anything like that.

14        **MS. STACEY:**   No.

15        **THE COURT:**   Okay.   Both sides rest.

16        It is a civil case, yes.   Are you ready to argue?

17        **MS. KELLEY:**   Yes, I am.

18        **THE COURT:**   Okay.   Go ahead.

19        **MS. KELLEY:**   Is your screen working up there?

20        **THE COURT:**   Yes, I think.

21        It appears to be on but nothing is on it.

22        **THE CLERK:**   Did you put something up?

23        **MS. KELLEY:**   In a minute I will.

24        **THE COURT:**   Okay.

25

1            <u>**CLOSING ARGUMENT BY MS. KELLEY**</u>

2            **MS. KELLEY:**  Your Honor, I would first like to

3    address the question of whether the government has

4    demonstrated that this so-called diagnosis of hebephilia on

5    which their case rests is a valid diagnosis under the

6    standards of the <u>Daubert</u> case.

7            It is not.  This is junk science.  They have not

8    proven by any standard at all that Your Honor should

9    consider this as a valid scientific principle on which to

10   base your decision in this case.

11           Judge Saris threw out that diagnosis as not

12   comporting with the <u>Daubert</u> standard.  She heard from an

13   expert named Daniel Kriegman on that.  And it's very

14   explicit in her findings which we appended to our pretrial

15   motion or pretrial brief that she rejected that.

16           And also you have --

17           **THE COURT:**  Was that the end of her case?

18           **MS. KELLEY:**  No, that individual Jeff Shields had a

19   dual diagnosis of pedophilia and hebephilia.  She allowed

20   the case to be tried under the theory of pedophilia.  The

21   jury hung.  And so far it appears Judge Saris is also hung.

22   It's been five and a half months and she has not rendered a

23   decision in that case.  She had an advisory jury that was

24   unable to reach verdict.

25           So if you look at the Hawaii case, I think given

1    that testimony that we kind of poured over earlier this

2    afternoon, it is clear why the judge made the finding in

3    that case she did.  She said, well, it may be a valid mental

4    disorder for purposes of the statute but it's not serious

5    which the statute requires.  And so she also found that

6    under 4248 hebephilia is not a serious mental disorder

7    sufficient for it to be considered as a basis for civil

8    commitment.

9         Now, what the government is trying to do, and they

10   have set out some cases in their pretrial memorandum, is to

11   urge Your Honor to accept the diagnosis of hebephilia

12   because some state courts have done so.

13        And I am reminded in this case of growing up in a

14   household with my dad, a Baptist minister, and I used to

15   explain, you know, this is the way other kids behave and how

16   they get to act.  And my father would say to me, Not in my

17   house.  Not here you don't do that.

18        We don't know what evidence those other courts

19   took.  We don't know what experts they listened to.  We

20   don't know anything about their decisions.  In federal court

21   as this issue has been litigated no one has accepted this.

22   You would be the first.

23        If you look at the Massachusetts case that they

24   cite, in that case, I believe it's the Starkus case from

25   2007, it's an Appeals Court case, not an SJC case.  In that

1    case the court says, well, we don't know if the mental

2    disorder under the Massachusetts statute has to be in the

3    DSM.  And then they go on to find that that person had a

4    valid diagnosis of pedophilia.

5          Now, I would urge Your Honor not to consider that a

6    diagnosis that is not in the DSM is useable under the

7    statute.  Because as Dr. Bard testified, this is how it's

8    done in the field of science, of psychology and psychiatry

9    and mental health.  You have a consensus in the relevant

10   community, scientific community, they decide is a diagnosis

11   valid or not.  And then they put it in the DSM.

12         This is the fire storm of controversy that has been

13   created by this Blanchard article, which does not validate

14   this diagnosis.  Far from it.  This is really the best piece

15   of evidence that the government has that this should be a

16   diagnosis because these quacks up in Canada have proffered

17   it in this article.

18         And you're going to hear the government argue, oh,

19   this article has been peer reviewed.  Well, Dr. Bard as he

20   said is very suspicious of that.  All the articles they cite

21   in support of their research in that article were written by

22   them.  They are on the editorial board, the authors of this

23   article, of the journal that published the article.  So you

24   have to wonder in that case how meaningful the peer review

25   really was.

1          The scientific validity of the article also is

2     further undermined by these articles that came after the

3     proposal that this hebephilia be included in the DSM by very

4     highly respected people in the field saying this is garbage.

5     This diagnosis does not belong in the DSM.  Now, why doesn't

6     it?

7          If you are wanting to find out who is a pedophile,

8     you can hook up a bunch of normal people to a penile

9     plethysmograph and show them pictures of children and they

10    don't get aroused.  So you know that when you have an

11    individual who does get aroused by those kind of pictures of

12    prepubescent children, that is abnormal.  It's deviant.

13         You can point out this little group of people has a

14    problem.  They're not like everyone else.

15         If someone is, you know, turned on by shoes, which

16    is one of these paraphilia NOS's here, you can show them

17    pictures of shoes and they get aroused.  That's not normal.

18    Most people don't get aroused by looking at pictures of

19    shoes.

20         If you show a bunch of normal people pictures of

21    teenagers, they are aroused.  It's not deviant so it's not a

22    disorder.  That's why it's not in the DSM.

23         Dr. Bard listed a lot of other problems with this

24    diagnosis in his testimony.  Not only is it not deviant, you

25    can't really define it because of that, who is and who isn't

1    a hebephilia.  People who have sex with underage teenagers

2    are criminals.  They are breaking the law.  But they are not

3    disordered which this statute requires.

4         The government even reaches to argue that this

5    so-called diagnosis which Mr. Wood, Dr. Wood now, but

6    Mr. Wood then as a student intern with no experience in

7    treating adults, because he wrote in a report that somebody

8    is a hebephile, that qualifies it as a mental disorder

9    generally accepted in the scientific community?

10        The government will also argue that because

11   Dr. Phenix came and testified here that it's generally

12   accepted, that makes it generally accepted.  That's like

13   proffering this book by Denis Doren who wrote a book.  The

14   fact that someone writes a book about something doesn't make

15   it so.  Or doesn't make it a valid diagnosis.

16        You could write a book about how the holocaust

17   didn't happen.  That doesn't make that true.

18        You can get on the witness stand and say, yes, it's

19   generally accepted.  No, it's not.  We have a case from the

20   Missouri Court of Appeals criticizing Dr. Phenix and her

21   methodology --

22        **MS. STACEY:**  Objection, Your Honor.  This is not in

23   evidence.

24        **MS. KELLEY:**  The case is cited in our pretrial

25   brief.

1          **THE COURT:**  That is a citation.  It is not

2    evidence.

3          Go ahead.

4          **MS. KELLEY:**  If you read that case, what the court

5    there says is Dr. Phenix came into our court and testified

6    that a female was sexually dangerous and likely to repeat

7    her crimes in the future.

8          **MS. STACEY:**  I object, Your Honor.  This is

9    extrinsic evidence.  They didn't even cross Dr. Phenix on

10   this.

11         **THE COURT:**  I take it it is a published citation

12   she is arguing from.

13         **MS. KELLEY:**  It is and it's cited in our --

14         **THE COURT:**  Overruled.

15         Start again, please.

16         **MS. KELLEY:**  She testified there that a female was

17   sexually dangerous.  I'm not sure this (indicating) is

18   focused.

19         And what the court here says is, "Dr. Phenix has

20   never diagnosed or counseled female sex offenders.  She

21   couldn't have had any formal training in the assessment of

22   them because no one has performed any research to support

23   such training.  Thus, the factors she considered in forming

24   her opinion of the likelihood that Angela would reoffend

25   sexually are based on clinical expertise that is simply

1    nonexistent.  They are simply unproven and untested

2    assumptions that enjoy no widespread acceptance in the

3    psychological community."

4         Now, this is not a case involving a female sex

5    offender.  It's involving a male sex offender.  And there is

6    research to support clinical, excuse me, statistical

7    assessment of male sex offenders' recidivism rates.

8         But what this says about Dr. Phenix is that she is

9    capable of coming to a court and sitting there and saying

10   something that is based on nothing.  That's what she did

11   there and that's what she did here.

12        She is one of a very small group of government

13   experts who will come in and testify that this diagnosis

14   that is utter garbage and has never been proven by any

15   research is valid and should be used to lock people away for

16   a day to life.

17        Now, why would you care if you have to be so

18   exacting with the science in a case like this?  Because

19   nobody likes a sex offender.  That much is very clear.

20        The statute gives Mr. Carta due process rights.

21   And there is good Supreme Court precedent from Kansas versus

22   Crane and Kansas versus Hendricks that a person facing civil

23   commitment in these types of situations is due

24   constitutional due process rights.

25        You cannot do this to someone, you cannot send them

1    away to a prison for an indeterminate period of time.  In

2    Massachusetts at the Treatment Center the average time to

3    stay there is twenty years.  In Minnesota no one ever gets

4    out.  We don't have any statistics yet on the federal

5    program because no one is there yet.

6            This is a momentous decision for the individual

7    facing civil commitment.  And you don't want to do it on

8    junk.

9            The government is going to argue that with regard

10   to the Daubert argument that this diagnosis of hebephilia is

11   not in the DSM but the diagnosis of paraphilia NOS is.

12           This is from the government's exhibit book

13   (indicating) and it shows that part of the DSM-IV-TR, 309.9,

14   Paraphilia Not Otherwise Specified.

15           Now, in the main part concerning paraphilias the

16   authors list sort of the main paraphilias that people know

17   about and that are common.  And what they say is you have to

18   have recurring, intense, sexually arousing fantasies, sexual

19   urges or behaviors involving nonhuman objects, which we know

20   this isn't, the suffering or humiliation of one's self or

21   one's partner.  That would be sadism, or masochism.  Or,

22   three, children or other non-consenting persons.

23           Now, the government is going to argue that this

24   fits into that category, children or other non-consenting

25   persons.  But you know from Dr. Bard's testimony that the

1    only children defined here are prepubescent, not

2    post-pubescent people.  They're not defining children

3    legally.  And there is a good reason for that.  Because the

4    age of consent varies from place to place.

5         Under that definition you would be molesting a

6    child in Virginia who is about to turn 18 when in Kentucky

7    you could have been having legal intercourse with them for

8    two years.  So you can't have that, that's not science.

9    Children are prepubescent in the DSM.

10        Furthermore non-consenting, if you recall Dr. Bard

11   read a note from the author of the DSM that said

12   non-consenting has to do with voyeurism, sadism or

13   exhibitionism.  That is, somebody reveals their body to

14   someone who doesn't want them to, that's what we mean by

15   non-consent.  Not a legal structure about an underage teen,

16   a 15-year old or 16-year old or a 17-year old in Virginia,

17   that's not what they're talking about.

18        And really the kind of silly thing is they list

19   some of the more better known paraphilia NOS's here.  And

20   they say, for example, Examples include but are not limited

21   to.  These are the more common ones:  Telephone scatologia,

22   necrophilia, that's a love of corpses, zoophilia, love of

23   animals, urophilia, you know, being obsessed with urine,

24   being aroused by urine.

25        And what are we going to put after that?

1    Attraction to teenagers?  It doesn't make sense.

2           They're trying to fit a round peg into a square

3    hole.  And the kind of controversy and outrage in the

4    psychological community is evidence of that.  It doesn't go

5    in there.  That is not where hebephilia belongs.

6           Hebephilia belongs as a descriptive term as

7    Dr. Wallace, I didn't call him as an expert but he ended up

8    telling you hebephilia is a fake diagnosis.  It's not a

9    valid diagnosis but it may be useful for clinicians to

10   describe someone who is attracted to teenagers and underaged

11   teenagers.  But it is not a mental disorder.

12          There are a lot of problems with this statute.  You

13   saw the experts both struggling with the definitions because

14   there aren't any.  The BOP has issued some regulations that

15   are not in the statute very broadly defining child

16   molestation and sexually violent conduct.  But Congress did

17   not put any definition in the statute.

18          And as Dr. Bard said, this is tough.  In

19   Massachusetts we have a definition.  Here it's nothing.

20   What is sexually violent conduct?  Is it having sex with a

21   16-year old?  What is child molestation?  Does it differ

22   depending on which state you're standing in?

23          In North Carolina this proceeding has been held to

24   be unconstitutional.  Judge Saris kept out the SOTP records

25   that you let -- against one man that you let in against this

man which basically constituted the whole case against him.

There is a footnote in the case from North Carolina holding the statute unconstitutional criticizing Judge Saris's ruling in a case here that you don't have to be lawfully in BOP custody at the time they move against you, because we have a fellow who was unlawfully in custody and he had overstayed his sentence but they moved on him anyway. They miscalculated his sentence.  And she ruled that is fine, you don't have to be in lawful custody.  There are all kinds of problems with this statute.

If you find that we have not mounted a successful Daubert challenge and you go on, let's say you find that he has a serious mental disease or disorder and you go on to evaluate the rest of the criteria in the statute, we still win.

Even assuming Mr. Carta has a serious mental disorder, which we know he doesn't, anyone who watches TV and sees pictures of young people on TV knows it is not deviant to be attracted to teens.  Nevertheless, does that mental disease or disorder mean because of that disorder he will have serious difficulty refraining from child molestation or sexually violent conduct, however you define that?  No, it does not.

Now, Amy Phenix testified that he's at a high risk to reoffend.  And how did she come to that conclusion?

1   Well, you heard about the actuarial instruments, the

2   Static-99, the Static-2002, the Mn-SOST-R.

3           I find it hard to believe myself not being a social

4   scientist that you can answer six questions about someone's

5   past and predict their future.  It seems crazy.  But we are

6   told that these risk factors have been studied and tested

7   out and validated.  And so we can have some confidence in

8   these numbers.

9           What are the numbers?  Well, that's another good

10  question.  Because you heard that the Static-99 has certain

11  percentages associated with five-year recidivism rates and

12  ten-year recidivism rates and that they're wrong.  They're

13  too high.  They have just been revised.

14          Of course, Dr. Phenix didn't bother to revise them.

15  She just testified to the old ones.  But what we know from

16  the old numbers is that after five years, if you take a

17  hundred people who score the same as this man, 19 percent of

18  them are going to recidivate.  And after ten years 27

19  percent.

20          Now, how you can ever get to a clear and convincing

21  standard on those numbers I don't know.  A clear and

22  convincing standard that he has a mental disease or defect

23  that is going to cause him to not be able to stop himself

24  from reoffending.  You can't.

25          20 percent, 27 percent, that is the high risk.  It

1    is funny how they turn -- call these things.  That's high

2    risk.

3         It's also very interesting, you have a hundred

4    people, you have nineteen of them who are going to reoffend,

5    how do you know which group he is in:  The reoffending group

6    or all the people who are not going to.  You don't know.

7         These numbers we do know have to be adjusted.  And

8    the one dynamic factor, because you heard Dr. Bard say the

9    problem with these actuarials is you always score the same

10   no matter who you are, where you are, what you did, so you

11   do adjust them according to some specified factors.

12        And age is the big one because everyone knows

13   intuitively and now also scientifically according to

14   Dr. Bard that sex offenders are going to reoffend less as

15   they age.

16        Now, on the Static-99 you actually get credit for

17   being above the age of 25 but that is very vague.  Because

18   as Dr. Bard was saying, really starting at age 50 things

19   really precipitously declined.

20        Dr. Phenix testified that the evidence on age was

21   mixed and so she wasn't going to consider it at all.  That's

22   like saying the evidence on evolution is mixed.  It's not

23   mixed.  Dr. Bard said yes, there is many studies on this.

24   They all show a substantial decline.  And he said you adjust

25   the Static-99 under the old regime because it should be

1    lower now. That for people like Mr. Carta who scored the

2    same and who are his age, his new number is 13.8 percent.

3         So out of the hundred people his age, 13.8 percent

4    of them are going to reoffend within five years. That's

5    very low.

6         And if you take into account other factors, it gets

7    even lower. I mean, did you hear Dr. Wallace say in their

8    group, you know, they have a lot of sex offenders they're

9    treating there, over a thousand at a time.

10        The recidivism rate is 1.7 percent and that's

11   inflated by a bunch of flashers who recidivate at a rate of

12   50 percent because they're so compulsive. These are very

13   low rates.

14        So Dr. Phenix doesn't account for age at all. Read

15   her report. She goes through the actuarials and then she

16   gets to these so-called dynamic and protective factors. She

17   never talks about age at all.

18        If you look at how she scores, for example, one of

19   these other instruments, the MnSOST-R, she scored it at an

20   11 in her report and she gives some very high percentage of

21   recidivism rates, it's like 47 percent or something. On the

22   stand here she said, oh, I scored that wrong, it's actually

23   a five. It's not that high.

24        Mr. Gold read to her from something she uses when

25   she teaches people which says don't use the 19 -- the

1    Static-99 from 1999, use the 2002 because we know that the

2    Static-99 is too high.  She didn't even do that.

3            When Mr. Gold scored it with her here, Todd Carta

4    came out lower.  He's not high risk, then he's moderate.

5    She doesn't even care.  Did she revise her opinion at all?

6    Did she say anything about that?  No.

7            Incidentally, on this MnSOST-R actuarial Dr. Bard

8    scored Mr. Carta zero.  If you read Dr. Phenix's report,

9    there are many things she doesn't consider at all such as

10   age.  There is absolutely no mention of the factors that we

11   brought up today about what controls he's going to have on

12   him when he gets out.  Nothing.  It is not even in her

13   report.  I don't know if she even acknowledges it.

14           I think in her testimony she might have been asked

15   and she said, oh, that doesn't matter to me.  Well, why not?

16           The government is going to argue that Mr. Carta

17   dropped out of treatment and that his behavior in treatment

18   demonstrates that he has this compulsion and he can't stop

19   himself and he has to be around younger people.

20           If he had a true compulsion to have sex with

21   younger people, he would have had sex with somebody in that

22   program, which he absolutely did not.  He was befriending

23   younger people.  It was one of several problems for him,

24   issues for him in that program.

25           If you read the records that the government

1       introduced into evidence, in his discharge memorandum that

2       Dr. Wallace wrote he writes interestingly the very day he

3       submitted his copout, one of his good friends whom he had

4       ratted out in this group meeting was expelled.  This was one

5       of the major reasons why he impulsively quit the program.

6       And he does have a problem with impulsivity.  We know it

7       from the CODE Program.  He kept trying to quit that program.

8       They would talk him back in.

9            And if you listen to Dr. Wallace, he said, yeah, I

10      think he would have come back in but he was too embarrassed.

11      He had said he was leaving so firmly.  Does this demonstrate

12      some kind of horrible compulsion he has, he can't control

13      himself?  No.

14           People who cannot control themselves sexually are

15      masturbating in prison.  They're having sex with other

16      inmates.  They're cutting out pictures of children.  We have

17      seen that even in the group of people we have here awaiting

18      these hearings.  People with very frequent disciplinary

19      reports for acting out sexually.  He has not one instance of

20      any type of that conduct.  And that's because he can control

21      himself.  The record demonstrates it.

22           Dr. Phenix says in her report, oh, he violated

23      probation three times.  I can't find three times in the

24      record.  I can't find it in there.  And does she ever point

25      out or even give you a hint of considering that in February

1    of 2002 he pled guilty and got probation in a Connecticut

2    state case and was released.  And the conditions of his

3    probation were sex offender counseling, to stay clean, drug

4    and urine analysis for drugs, and he did it.  He did it.  If

5    he had violated that probation, you would have heard about

6    that.

7            In April of 2002 he walks into federal court,

8    because he had been cooperating with the government in that

9    child pornography investigation, and he pleads guilty to an

10   information on his initial appearance.

11           And with the government's consent he walks right

12   back out the door.  Mr. Public Enemy No. One now, and he is

13   out from April of 2002 until he is sentenced in October.

14           So from February 2002 to October of 2002 he is a

15   free man.  And what does he do?  He goes to sex offender

16   treatment.  He stays sober.  And he has this sentencing and

17   the judge reduces his sentence on the government's motion.

18           This guy -- and we have the sentencing transcript

19   if you want to see it.  They knew good and well he was a

20   dangerous person.  They talked about his offending.  It's

21   not that all this stuff came out in treatment later that

22   they didn't know about.  They knew he was a risk.  But they

23   also knew, and correctly so, every sex offender is a risk.

24   We are not going to lock them all up forever.

25           This kind of statute and this kind of commitment is

for someone who is so compulsive and so dangerous that they cannot control their behavior.  And he has demonstrated that he can.

He has a couple of disciplinary reports.  As Dr. Bard said, people don't change overnight.  He was threatened by an inmate.  The records are very clear on that.  And he made a comment about throwing hot oil on someone.  Did he do it?  No.  Did he hit the person?  No. Is this a pattern he has?  Yes.  This is that old pattern rearing its head.

He'll make a verbal threat when he gets angry.  And he did it once in prison.  He has two radios on him because he's fixing radios for people and you're not supposed to be having other people's property on you.  That charge happens to be on appeal right now.

You don't see a pattern of his misbehaving.  Is he still an angry guy?  Does he need counseling?  Does he need help?  Yes.  Do you know what it's like to be so close to your release after serving a 60-month sentence and to get driven to Fort Devens, you don't know why?  And then to sit there for two years.

Has he acted out in Devens?  Has he been a behavior problem?  No, not at all.  The evidence the government has to bolster their contention that he is so sick that he cannot control his behavior is so pathetic.  He befriends

1    some twenty somethings in a treatment program.  He drops out

2    of the treatment program which was voluntary to begin with.

3    He makes one threat against another inmate in seven years of

4    incarceration.

5            Since February of 2002 this man has been straight

6    and sober.  And you can say all you want, oh, he's in

7    prison.  That means we keep him in prison?  He's in prison

8    so he hasn't really been tested so let's lock him on a unit

9    all by himself in Butner and see how he does there.

10           You heard Dr. Wallace talk about the hopelessness

11   of a person who wants help and needs help but sees no end to

12   what is happening to them.  You can't do it to someone.  You

13   can't say without very good evidence you are so hopeless and

14   sick we are putting you in there and we'll decide when you

15   get out.  No end in sight for you, buddy.

16           He has a wonderful and very safe and strict bunch

17   of conditions waiting for him.  He is going to have to go to

18   sex offender treatment.  A series of questions were asked of

19   Dr. Wallace, oh, he's going to have to stay in, he could

20   fail, he doesn't have to do this, he could get terminated.

21   You know what happens if he gets terminated?  He goes back

22   to prison and he is facing civil commitment again.  All that

23   is required is that he be in BOP custody.

24           How desperate do you think he is going to be to

25   keep his nose clean and not get violated?  How hard do you

1     think he is going to try in treatment?  They already know

2     everything about him.

3           You heard Dr. Wallace say he was amazed at how this

4     man in voluntary treatment completely opened up.  He didn't

5     need any type of update because he had already told

6     everything about himself.  Look at those questionnaires,

7     it's incredible what he told on himself that landed him

8     here.

9           And if you look at the consent form which says

10    nothing about this process, nothing about anything there

11    ever being used against him, it's heartbreaking to take

12    someone into a treatment modality like that and urge them to

13    get help and to be honest and to tell every deviant thing

14    they've ever done their whole life and everything that

15    happened to them as a child.

16          How do you think it feels to have Dr. Phenix up

17    there listing things he did as a child as sexually violent

18    conduct for which he should now be committed indefinitely?

19          So he tells all these things and this is the

20    result.  If he goes to treatment this time, he is going to

21    have a very strict set of rules.  You saw, they will tailor

22    the rules to his specific problems.

23          And I don't think there is any question after

24    hearing Mr. Collette talk he is going to be watched like a

25    hawk.  It's not just Mr. Collette with that case load.  He

1    said we have a team approach.  And he is going to be talking

2    to therapists.  And he's going to be polygraphed.  And he's

3    going to have the State Trooper after him.

4         And if violates his supervised release in any small

5    way, he will be back in custody.  That's all it takes.

6         If he were to ever get caught with child

7    pornography, it's a 15-year minimum mandatory.  He is not

8    doing these things anymore.

9         I would just like to close by urging Your Honor to

10   adopt the standard that is set out in the Abregana case,

11   which is cited in our pretrial memo, for the level of lack

12   of control you must find in order to find that Mr. Carta has

13   a mental disease or defect as a result of which he cannot

14   control his behavior.

15        And the court there said, "U.S. Supreme Court

16   precedent makes clear it must be difficult, if not

17   impossible, for the person to control his dangerous

18   behavior."

19        And the court there is citing Kansas versus Crane

20   and Kansas versus Hendricks.

21        Difficult if not impossible.  That's the standard.

22        It is not impossible for Todd Carta to control

23   himself.  He has proven that.  And I ask Your Honor to find

24   that he is not sexually dangerous.

25        Thank you.

1      **THE COURT:**  Why don't we take a five-minute break,

2  give everybody a chance to run in place and then we will

3  come back.  All right.

4      **THE CLERK:**  All rise for the Honorable Court.

5      Court is in recess.

6

7      (Recess.)

8

9      **THE CLERK:**  All rise for the Honorable Court.

10     **THE COURT:**  All set, everybody?

11     Sit down, please.  Ready to go?

12     **MS. STACEY:**  Your Honor, Todd Carta is a sexually

13  dangerous person.

14     **THE COURT:**  Wait a minute.

15     (Whereupon, the Court and the Clerk conferred.)

16     **THE CLERK:**  Sorry.

17     **THE COURT:**  I am sorry.  Start again.

18              **CLOSING ARGUMENT BY MS. STACEY**

19     **MS. STACEY:**  Your Honor, Todd Carta is a sexually

20  dangerous person.

21     The government has shown by clear and convincing

22  evidence that Mr. Carta has preyed on young children since

23  he himself was a child.  He has engaged in a pervasive

24  pattern of seeking out young boys who are increasingly

25  younger than he was.  He preyed on them.  He groomed them.

1  He molested them.  And he molested them continuously until

2  his federal conviction when he was in his forties on a child

3  pornography offense.

4  Now this Court has heard evidence of Mr. Carta's

5  pattern of predatory behavior, his obsession with children

6  as young as 13 years old.

7  When Mr. Carta was 11, between the ages of 11 and

8  13, he molested and orally copulated a three-to four-year

9  old child who was in diapers.  During this same time he

10  orally copulated his cousin who was seven.  And he did that

11  ten times for a one-year period of time.

12  When he was 15 years old Mr. Carta orally copulated

13  a similar aged male.  And when the male refused to orally

14  copulate him, Mr. Carta shot him with a BB gun.

15  As Mr. Carta aged, however, his sexual preference

16  did not.  Throughout his adult life Mr. Carta orally

17  copulated 13-year old boys.  He engaged in sexual acts with

18  13-year olds.  He met 13-year old boys on chat lines.  And

19  he later orally copulated these victims.

20  He engaged in sexual activity with children ages 13

21  to 17, his own stated preference.

22  Since he has been an adult you have heard evidence

23  that Mr. Carta has admitted to dozens of victims under the

24  age of eighteen.  Those admissions that were contained in

25  the sex offender treatment file have been entered into

1    evidence in this case.

2         Mr. Carta has never been convicted for any hands-on

3    contact offenses so there is no deterrence to Mr. Carta's

4    behavior for 30 years.  For 30 years he molested children.

5    And as Dr. Phenix has testified, nothing today has changed

6    for Mr. Carta.  He never completed any treatment for his

7    sexual offending.  He never took any other steps to stop

8    this behavior.  And when he was confronted with this

9    behavior, Mr. Carta became angry, he became defensive and he

10   engaged in cognitive distortions or blamed his victims.

11        Mr. Carta's behavior is ingrained.  And as

12   Mr. Carta admitted in the Sex Offender Treatment Program,

13   the questionnaire that's been admitted into evidence, "I

14   have been deviant my entire life."

15        When Mr. Carta finally began sex offender treatment

16   at the Bureau of Prisons facility in Butner, North Carolina,

17   he couldn't handle it.  It was too difficult for him.  And

18   you heard Dr. Wood describe how he continued his sexual

19   offense pattern.  He continually went after the newer

20   younger 19- to 20-year old men in the program, grooming them

21   under the guise of mentoring them and doing this while he

22   admitted that he was attracted to these men, sexually

23   attracted to these men.

24        When staff at the Bureau of Prisons and when

25   Mr. Carta's fellow inmates confronted Mr. Carta about this

1    behavior, again, he got angry, he got defensive but he

2    didn't stop.  Rather than stop socializing with the younger

3    members of the program, rather than recognize how this

4    behavior was mirroring his offense cycle, his offense

5    pattern, he quit the program.

6         Now, both Dr. Phenix and Dr. Bard agree that by

7    quiting that Sex Offender Treatment Program Mr. Carta's risk

8    of reoffense has increased.  And both Dr. Phenix and

9    Dr. Bard agree that someone who drops out of treatment is at

10   greater risk to engage in another act of child molestation.

11        And now when he can't even complete treatment in

12   the Bureau of Prisons that was free, that was convenient for

13   him, that was located in the very unit where he was

14   incarcerated, where his therapist was available during the

15   day, and where he was in a program that was free from any

16   distractions such as computers and younger boys, he asks you

17   now to consider the treatment he might receive if he's

18   released on an outpatient basis to the community.  Treatment

19   for which he has to be accepted, treatment where he has to

20   walk past an apartment building with young boys who live in

21   it, and where he has to walk past a school to get to this

22   treatment.

23        And as Dr. Wallace testified, there is no guarantee

24   that Mr. Carta will be accepted into the treatment he's put

25   forth.  There is no guarantee that he will participate in

1    treatment.  And there is no guarantee that he won't violate

2    the restrictions of the treatment program.

3         One of the three elements that the government must

4    prove in this case is that Mr. Carta has engaged or

5    attempted to engage in sexually violent conduct or child

6    molestation.  And on this element, the first element, both

7    experts agree.  Both Dr. Phenix as well as Dr. Bard

8    testified that Mr. Carta engaged in acts of child

9    molestation.  Dr. Phenix testified to eight discrete acts of

10   child molestation, seven of which she testified were also

11   sexually violent conduct:

12        The oral copulation of the three- to four-year old;

13   oral copulation of a 13-year old not old enough to consent;

14   oral copulation of a 15-year old; shooting a 15-year old

15   with a BB gun after he refused to engage; molesting an

16   intoxicated 13-year old; taking a 13-year old from

17   California to Connecticut where he had sexual contact with

18   him 30 or 40 times; orally copulating his seven-year old

19   cousin; molesting a 17-year old boy that had passed out; and

20   orally copulating the younger 15-year old brother of his

21   then 17-year old partner.

22        In the Sex Offender Treatment records that were

23   admitted into evidence Mr. Carta himself admitted to dozens

24   of illegal sexual encounters with children.  There is enough

25   core conduct, Your Honor, that you need not decide whether

1     the acts were either sexually violent or child molestation

2     as all of the experts agree that there is more than enough

3     child molestation to satisfy the first criteria.

4          Mr. Carta has admitted to child molestation.

5     Dr. Bard testified that he has, Mr. Carta has committed

6     child molestation.  Dr. Phenix testified that Mr. Carta

7     committed both child molestation and sexually violent

8     conduct.  And Dr. Wood testified and documented evidence of

9     a number of acts of child molestation as well as sexually

10    violent conduct.

11         The government must also prove that Mr. Carta

12    suffers from a serious mental illness, abnormality or

13    disorder, the second element of the statute.

14         This Court has heard a great deal of discussion

15    about paraphilia NOS with a description of hebephilia.  But

16    before this Court are three diagnoses of paraphilia NOS with

17    the hebephilia description.

18         Dr. Monica Ferraro's diagnosis is contained within

19    Dr. Bard's report, Dr. Wood, the psychological intern who

20    diagnosed Mr. Carta for the purpose of treatment and before

21    the Adam Walsh Act was passed, and Dr. Phenix who has over

22    twenty years of experience in the field of sex offenders.

23         The evidence has shown that while everyone in the

24    field does not agree on the diagnosis, it is widely accepted

25    in the field and used by many courts as a basis of civil

1    commitment of sexually dangerous persons.

2         Hebephilia has been referenced as far back as a

3    1955 study by Glueck to the present and in peer review

4    scientific articles and texts by respected researchers in

5    the scientific field.

6         This Court also heard the testimony of Dr. Michael

7    Wood.  Dr. Wood was Mr. Carta's treatment provider at FCI

8    Butner.  And at the time Dr. Wood treated Mr. Carta he was

9    in his doctoral internship.  All of his work though was

10   signed off by a psychologist.  And at the time he came to

11   Butner Dr. Wood had worked with sex offenders before.  He

12   had done thousands of psychological assessments of sex

13   offenders for the Arkansas Department of Correction.

14        And you heard Dr. Wood testify that during his

15   treatment of Mr. Carta that Mr. Carta needed a lot of

16   attention.  That he was struggling in the Sex Offender

17   Treatment Program and so he was meeting with him more than

18   he had expected to or more than was expected as laid out in

19   the treatment plan.

20        Dr. Wood performed a psychosexual evaluation on

21   Mr. Carta and eventually he prepared a discharge report when

22   Mr. Carta quit the program, both of which are admitted into

23   evidence in this case.

24        And at the end of Dr. Wood's psychosexual

25   evaluation of Mr. Carta, his diagnostic impression was that

Mr. Carta suffered from an Axis I diagnosis, disorder of paraphilia NOS, hebephilia.

Dr. Wood also diagnosed Mr. Carta at the time he treated him --

**THE COURT:**  What definition do you give to it?

**MS. STACEY:**  Paraphilia NOS (hebephilia).

**THE COURT:**  What about the hebephilia?

**MS. STACEY:**  The hebephilia is a descriptor --

**THE COURT:**  How do you define it?

**MS. STACEY:**  Define "hebephilia" as an attraction to post-pubescent children or to children in the midst of puberty.  And that testimony you heard from Dr. Wood, Dr. Phenix, as well as Dr. Phenix and as referenced by the various scientific articles that we referred to.

Now, Dr. Wood also diagnosed Mr. Carta at the time he treated him with a variety of substance abuse disorders. And you heard Dr. Wood testify that he based his diagnosis of paraphilia NOS with hebephilia on Mr. Carta's longstanding sexual attraction to and preference for post-pubescent teenage males.

You also heard the testimony of Dr. Amy Phenix who is a leader in the field of sex offender evaluation with over twenty years experience.  And also an author of Static-99 Coding Manual for assessing risk of reoffense in sex offenders.

1              And because the respondent can't attack Dr. Phenix

2     on the merits of her opinion, they direct this Court to an

3     opinion about a female sex offender on an issue that is not

4     even before this Court.  It's a red herring, Your Honor.

5              Dr. Phenix diagnosed Mr. Carta with paraphilia NOS,

6     a diagnosis found in the DSM-IV.  She testified how

7     Mr. Carta's preferred age range for sex included teenagers

8     as young at 13 years old.  And she testified that paraphilia

9     NOS is for diagnosing paraphilias that don't meet the

10    criteria of any specific category listed in the DSM.

11             She testified that this diagnosis was generally

12    accepted in the medical community, in the scientific

13    community.  And while Dr. Bard would have you believe that

14    there is no criteria for paraphilia NOS with the description

15    of hebephilia, Dr. Phenix testified to the exact diagnostic

16    criteria that she used and the criteria that is listed in

17    the DSM under paraphilia NOS.

18             The diagnostic criteria has been admitted into

19    evidence in this case.  And that diagnostic criteria is

20    Mr. Carta's recurrent, intense, sexually arousing fantasies,

21    sexual urges or behaviors generally involving children or

22    non-consenting partners.

23             Even Dr. Bard had to agree that Mr. Carta had

24    recurrent, intense, sexually arousing fantasies and sexual

25    urges or behaviors.

1     Dr. Phenix testified about Mr. Carta's impairment

2     due to his obsession for young boys.  Not just an attraction

3     but an obsession for young boys.  An obsession that caused

4     him to miss work, to neglect his hygiene, not to shower and

5     to sit at a computer viewing child pornography for 12 to 14

6     hours a day, an obsession that resulted in his accumulating

7     over 50 thousand images of child pornography and an

8     obsession that had him soliciting minors for sex over the

9     Internet.

10     As a result Dr. Phenix opined to a reasonable

11     degree of professional certainty that Mr. Carta suffered

12     from paraphilia NOS, a medically accepted illness,

13     abnormality or disorder.  She testified that many respected

14     clinicians diagnosed this condition and the recent article

15     by Blanchard in 2008 codified the thinking and supported the

16     scientific basis of this condition.

17     And if Your Honor looks at some of the articles and

18     the replies to that article that the respondent states,

19     you'll see that many of those people that responded to the

20     article are beyond the mainstream.  One even arguing that

21     pedophilia shouldn't be in the DSM:  An attraction to

22     children under the age of 12.

23     Finally Dr. Phenix testified that Mr. Carta's

24     paraphilia not otherwise specified was a serious mental

25     illness, abnormality or disorder and that it was so because

1    Mr. Carta sexually assaulted a series of non-consenting

2    children for more than a six-month period of time.

3          Dr. Phenix also diagnosed Mr. Carta with a

4    personality disorder not otherwise specified with antisocial

5    and borderline traits, another serious mental illness,

6    abnormality or disorder.  And as a result Dr. Phenix

7    testified that Mr. Carta's personality disorder contributed

8    to Mr. Carta's likelihood of reoffending against children in

9    the future.

10         You also heard from the respondent's expert

11   Dr. Leonard Bard.  Dr. Bard diagnosed Mr. Carta with

12   nothing.  This is Dr. Bard who assisted with the defense of

13   the case, served as a consultant for the respondent to their

14   case, and who has testified over a hundred times in the past

15   four years and only for the defense in civil commitment

16   proceedings.  He has never said in that period of time that

17   anybody was a sexually dangerous person.

18         He omitted the ages of Mr. Carta's victims in his

19   report.  He took Mr. Carta's self-report as true even when

20   records from the Bureau of Prisons and Mr. Carta's own

21   therapist contradicted what Mr. Carta told him.

22         When testifying about Mr. Carta's victims, Dr. Bard

23   omitted the 13- and 14-year olds, always going to the latter

24   end of the teenage years.  Victims when even by Mr. Carta's

25   own admission the majority of which were 13 years old.

1            But even Dr. Bard had to admit that Mr. Carta's

2     preference for children was 13 to 18 years old.  And even

3     Dr. Bard admitted that Mr. Carta had engaged in acts of

4     child molestation, acts that he termed were sexually violent

5     to others -- sexually dangerous acts to others.  Dr. Bard

6     characterized Carta's behavior as, and I quote, "illegal,

7     harmful and exploitive sexual acts."

8            Now, Dr. Bard doesn't like the diagnosis of

9     paraphilia NOS but he had to admit that individuals in the

10    profession believe that paraphilia NOS with a descriptor of

11    hebephilia existed.  He admitted that there was scientific

12    literature on paraphilia NOS.  He admitted that well known

13    and well respected members of the scientific community have

14    referred to hebephilia or had testified to it in other cases

15    as a diagnosis.

16           Dr. Bard finally admitted that the DSM diagnosis of

17    paraphilia NOS does exist in the DSM but then said the

18    descriptor of hebephilia did not.

19           Dr. Bard claimed that there was no diagnostic

20    criteria for paraphilia NOS despite its existence in the DSM

21    and, again, which were admitted into evidence.

22           And finally Dr. Bard said that hebephilia didn't

23    exist as a descriptor of the paraphilia NOS diagnosis

24    because it wasn't listed.  And he testified to this despite

25    the fact that within the DSM itself the language says

1    paraphilia NOS is included for coding paraphilias that do

2    not meet the criteria for any of the specific categories

3    listed in the DSM but say these examples are included but

4    not limited to.

5          The testimony by Dr. Bard is illustrative of

6    Dr. Bard's defense proclivity and his opinion should be

7    weighted accordingly.

8          The respondent inaccurately portrays Judge Saris's

9    decision, a decision that was not final as to the issue of

10   hebephilia.  In that case the issue of hebephilia was not

11   litigated fully before Judge Saris.  Judge Saris left the

12   issue open for the government to pursue later due to this

13   other diagnosis of pedophilia.

14         Now, disagreement in the profession about

15   hebephilia does not even sustain respondent's Daubert

16   challenge.  As the Supreme Court in Kansas v. Hendricks

17   opined, disagreements between psychiatric professionals on

18   the definitions do not tie the government's hands in setting

19   the bounds of its civil commitment laws.  In fact, it's

20   precisely where such disagreement exists that legislatures

21   have been afforded the widest latitude in drafting such

22   statutes and went on to explain when a legislature

23   undertakes to act in areas fraught with medical and

24   scientific uncertainties, legislative opinions must be

25   especially broad and courts should be cautious not to

1   rewrite the legislation.

2           This case is not just about a sexual attraction.

3   It's about Mr. Carta's compulsion.  And despite his efforts

4   to help the defense, Dr. Bard admitted normal men don't

5   target 13-year old boys exclusively for sex as Mr. Carta

6   did.

7           Dr. Bard admitted normal men don't act on their

8   arousal to young boys over decades of time with multiple

9   13-year old partners as Mr. Carta did.  Even Dr. Bard

10  admitted that Mr. Carta did not act as normal men who are

11  aroused to teenagers do.  And if Mr. Carta did not act

12  normally, he acted deviantly for that is the very definition

13  of deviant, deviating from what is considered normal.

14          Dr. Bard diagnoses Mr. Carta with nothing, not even

15  a personality disorder citing Mr. Carta's good behavior in

16  the past ten years.  And that's despite the numerous

17  instances of threatening behavior exhibited by Mr. Carta.

18          Mr. Carta threatened to kill his mother.  He

19  threatened to kill his daughter and her boyfriend.  He was

20  insolent to staff in prison.  He became enraged and sought

21  revenge against another member of the Sex Offender Treatment

22  Program.  And he stole property from another inmate.

23          But Dr. Bard ignores those behaviors, fails to

24  document those behaviors, and diagnoses Mr. Carta with

25  nothing despite his statutory obligation to do so in an

1    expert report.  And despite having no diagnosis Dr. Bard

2    assesses Mr. Carta with a risk of reoffense.  And he

3    assesses that of low to moderate if released to the

4    community.

5         The Supreme Court requires a volitional impairment

6    and Dr. Bard testified quite clearly that Mr. Carta's

7    volition was impaired.  It makes common sense and it's

8    evidenced by his compulsive viewing of his child pornography

9    and the behaviors he has exhibited.

10        Antisocial personality disorder and/or substance

11   abuse has the requisite impairment to satisfy the

12   constitutional standards set forth in Kansas versus Crane,

13   holding that in order to be committed a person need not have

14   a total inability to control the behavior.  And, in fact,

15   Hendricks sets forth no requirement of total or complete

16   lack of control.

17        Insistence upon absolute lack of control as the

18   respondent has asked you to do would risk barring the civil

19   commitment of highly dangerous persons suffering severe

20   mental abnormalities.  It's enough to say for these civil

21   commitment proceedings that there must be proof of serious

22   difficulty in controlling behavior.  And both experts agree

23   that Mr. Carta has had that difficulty.

24        On the final element, Your Honor, the government

25   has proven that as a result of Mr. Carta's serious mental

1    illness, abnormality or disorder, Mr. Carta will have

2    serious difficulty refraining from sexually violent conduct

3    or child molestation if he is released.

4         Dr. Phenix testified that Mr. Carta is at high risk

5    to reoffend.  And despite diagnosing him with nothing,

6    Dr. Bard has testified that Mr. Carta is at a low to

7    moderate risk to reoffend against children.  Both Dr. Phenix

8    and Dr. Bard scored Mr. Carta on the two actuarial

9    instruments that you heard about:  The Static-99 and the

10   MnSOST-R.

11        Dr. Bard scored Mr. Carta with a score of five

12   putting Mr. Carta in a group of other sex offenders who

13   scored in the moderate to high range for reconviction.

14        Dr. Phenix scored Mr. Carta a six, meaning that

15   Mr. Carta's score matched other sex offenders who have

16   scored in the high range for reconviction.

17        Now, Dr. Phenix testified that these actuarial

18   instruments actually underestimate the risk of reoffense

19   because they focus on arrest and reconviction rather than

20   the actual detection of sexual offending.  And as we know

21   from this case, many sex crimes go unreported and they go

22   undetected.

23        As a result, both experts considered dynamic

24   factors, including treatment.  And as Dr. Phenix testified,

25   Mr. Carta has alienated his immediate family through

1    hostile, revengeful and aggressive behavior.  While in

2    custody he threatened to kill his mother when released.

3    Separately he threatened to kill his daughter and her

4    boyfriend upon release.

5         He slept with his daughter's boyfriend, then he

6    told his daughter about it.  He has had a long history of

7    problematic relationships.  He tries to destroy partners

8    when the relationships end.  He preys on others for gain.

9    He has alienated his family.  And there is no evidence that

10   Mr. Carta has a support network if he is released, a support

11   network that Dr. Wallace testified was an essential

12   component of treatment.

13        Mr. Carta participated in treatment for seven

14   months in North Carolina.  And he was in a controlled

15   environment.  He was living with other sex offenders.  The

16   treatment room was in the same location.  The therapist's

17   office was in the same location.  There were no teenagers,

18   no computers and Mr. Carta still couldn't handle it.

19        And just like his offense pattern in the community,

20   he sought out younger members of the treatment program.  He

21   admitted he was attracted to them but he did that under the

22   guise of mentoring them in the program.

23        When other members confronted him in therapy, he

24   sought revenge.  He preyed on the newer younger members of

25   the Sex Offender Treatment Program to whom he was attracted

1    for his own gain.  His sexual attraction to these men and

2    his own sexual needs prevented him from getting the

3    treatment he so desperately needs.

4           Dr. Bard and Dr. Phenix agree that failure to

5    complete treatment increases the risk of reoffense.  And

6    there is no dispute that Mr. Carta has failed treatment.

7    And as a result Dr. Phenix said he was at a higher risk to

8    reoffend.  Yet, despite failing treatment, despite being

9    aware of the research that says it increases the risk of

10   reoffense, Dr. Bard decreased Mr. Carta's risk from the

11   actuarial scores.  And he used the adjusted actuarial

12   approach when he did so.

13          Now, Your Honor, the government believes that the

14   evidence shows by clear and convincing evidence that

15   Mr. Carta is a sexually dangerous person and should be

16   committed.  And this Court has undoubtedly spent more time

17   with Mr. Carta than any other court.  This Court has heard

18   evidence for three days and knows Mr. Carta better than any

19   other Court that he has been before.

20          If the Court agrees that the government has met its

21   burden of proof, it would retain jurisdiction over

22   Mr. Carta.  He can undergo the treatment that even Dr. Bard

23   says he needs.  It's difficult, if not impossible, to expect

24   that he can complete his treatment on an outpatient basis.

25          This Court has asked what happens to Mr. Carta if

1     he is committed.  And under Section 4248(d) if this Court

2     finds that Mr. Carta is a sexually dangerous person, the

3     Court will commit Mr. Carta to the custody of the Attorney

4     General.  The Attorney General will release Mr. Carta to the

5     appropriate official of the state in which he was domiciled

6     or was tried and the state will assume responsibility for

7     his custody, care and treatment.

8          The Attorney General has to make reasonable efforts

9     to cause such a state to assume the responsibility.  And if

10    the state won't take Mr. Carta, then the Attorney General

11    will place Mr. Carta in treatment in a suitable facility.

12         The Bureau of Prisons plans to treat committed

13    persons at its facility in Butner, North Carolina.  They

14    have hired a director, Karen Steinhauer (ph.), and appointed

15    a clinical director in Dr. Hernandez.

16         That Mr. Carta might be the first person committed

17    is not a rational argument not to commit him now.  There

18    must always be a first, Your Honor.  Butner obviously has

19    the expertise to treat him as evidenced by Dr. Wood's

20    testimony and the program has existed there for years.

21         And if he is committed, this Court retains the

22    jurisdiction to see that that is done, that he gets his

23    treatment and that he avails himself fully of that

24    treatment.

25         Mr. Carta can petition this Court for release

1    within six months of his commitment.  And once committed,

2    the Court retains the right to release someone on the

3    lifelong term of conditions pursuant to 4248.

4         Counsel for Mr. Carta or his legal guardian may

5    file with this Court a motion for a hearing to determine

6    whether he might be discharged from the facility that he is

7    at but no motion can be filed within 180 days of a court

8    determination that he should be committed.

9         For all of these -- if Mr. Carta is released to the

10   community, Your Honor, he is being released to Open Hearth.

11   Whether you call it a homeless shelter or transitional

12   housing --

13        **MS. KELLEY:**  Objection.  This is not correct.

14   That's not where he is being released to.

15        **THE COURT:**  Well, I can't know which -- I have

16   heard this Open Hearth talked about.

17        **MS. KELLEY:**  He had planned to be released there on

18   the last date but he --

19        **MS. STACEY:**  There was no evidence --

20        **MS. KELLEY:**  -- U.S. Probation to help him find a

21   place to live.

22        **THE COURT:**  I thought that he was supposed to go to

23   Butner.

24        **MS. KELLEY:**  If you don't release him, he is not

25   getting out and I don't know where he is going to go.  But

1    if you release him, he will go to Connecticut and be under

2    the supervision of Probation.  But there is no evidence that

3    he is going to Open Hearth.

4        **MS. STACEY:**  The evidence is contained in

5    Dr. Bard's report.  If he is released, he is going to Open

6    Hearth.  And that's contained in Dr. Bard's report.

7        But wherever he is being released to, if he is

8    released --

9        **THE COURT:**  If he is released, the probation

10   officer, what is the gentleman's name that --

11       **MS. STACEY:**  Officer Collette.

12       **THE COURT:**  Officer Collette, he is going to

13   supervise him.  In other words, he is not going anyplace

14   unless --

15       **MS. STACEY:**  That is absolutely right.  But he

16   becomes released as an untreated sex offender, Your Honor.

17   He will be released as an untreated sex offender who will

18   have serious difficulty in refraining from engaging in

19   sexually violent conduct or child molestation.

20       And he is an untreated sex offender who admits that

21   even today he has an attraction to 13-year old boys.  He has

22   a deviant interest in young male boys that he's had all his

23   life.  And he is an untreated sex offender who wherever he's

24   released, if you release him, has no relapse plan and has

25   never completed treatment and learned, never learned how to

1    manage the skills to manage his sexual deviance.

2            The respondent says he's over it, it's no big deal,

3    look at who his victims were.  Your Honor, this is not about

4    blaming his victims.  This is about Mr. Carta taking

5    responsibility and getting treatment for the sexually

6    dangerous person that he is.  And he is a sexually dangerous

7    person.  A sexually dangerous person who will have serious

8    difficulty refraining from sexually violent conduct and

9    child molestation.

10           And, therefore, Your Honor, the government requests

11   that you enter judgment finding him to be sexually dangerous

12   and simply commit him as a sexually dangerous person.

13       **THE COURT:**  Okay.  Very fine presentation by both

14   sides, very professionally done.  It was a pleasure to

15   preside over the trial.  I will do my best with the record

16   and then come up with a decision.

17           What I would like to have you both do is to give me

18   within 30 days after you get the transcript, you have to

19   order a transcript, within 30 days give me proposed findings

20   of fact reference with specificity to the transcript.  No

21   editorials in the proposed findings of fact.  Just, No. one,

22   John Jones is 25 years old, and you will cite transcript

23   page 3, line 6.  That is what I am looking for there.

24           You may also accompany it with a memorandum if you

25   want.  I have your memoranda.  If you feel comfortable

1    supplementing the proposed findings of fact with a

2    memorandum, you may do that as well.

3            But I would like those 30 days after you receive

4    the transcript.

5            Carol, when are you going to give them the

6    transcript?  In about a half hour?

7            (Laughter.)

8            **THE COURT REPORTER:**  Two to three weeks I hope.

9            **THE COURT:**  You will get it in about three weeks.

10   And we will hear from you a month after that.

11           Okay.  Thank you, everybody.

12           **THE CLERK:**  All rise for the Honorable Court.

13           Court is in recess.

14

15           (WHEREUPON, the proceedings were recessed at 4:35

16           p.m.)

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


        I, Carol Lynn Scott, Official Court Reporter for

the United States District Court for the District of

Massachusetts, do hereby certify that the foregoing pages

are a true and accurate transcription of my shorthand notes

taken in the aforementioned matter to the best of my skill

and ability.



        /S/CAROL LYNN SCOTT


_____

            CAROL LYNN SCOTT
          Official Court Reporter
        John J. Moakley Courthouse
        1 Courthouse Way, Suite 7204
        Boston, Massachusetts 02210
             (617) 330-1377