1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MASSACHUSETTS
2
    * * * * * * * * * * * * * *
3   UNITED STATES OF AMERICA      *
                                  *
4              vs.                *       CIVIL ACTION
                                  *       No. 07-12064-JLT
5   TODD CARTA                    *
                                  *
6   * * * * * * * * * * * * * *

7              BEFORE THE HONORABLE JOSEPH L. TAURO
                   UNITED STATES DISTRICT JUDGE
8                          **DAY ONE**
                         **NONJURY TRIAL**
9
    A P P E A R A N C E S
10
                OFFICE OF THE UNITED STATES ATTORNEY
11              1 Courthouse Way, Suite 9200
                Boston, Massachusetts 02210
12              for the United States
                By:  Eve A. Piemonte Stacey, AUSA
13                   Jennifer C. Boal, AUSA

14

15              FEDERAL DEFENDER OFFICE
                408 Atlantic Avenue, Suite 328
16              Boston, Massachusetts 02210
                for the defendant
17              By:  Page Kelley, Esq.
                     Ian Gold, Esq.
18

19
                                  Courtroom No. 22
20                                John J. Moakley Courthouse
                                  1 Courthouse Way
21                                Boston, Massachusetts 02210
                                  February 9, 2009
22                                10:30 a.m.

23
                      CAROL LYNN SCOTT, CSR, RMR
24                       Official Court Reporter
                     One Courthouse Way, Suite 7204
25                    Boston, Massachusetts 02210
                          (617) 330-1377

## I N D E X

WITNESS:              DIRECT    CROSS    REDIRECT    RECROSS

OPENING STATEMENT BY MS. BOAL...................PAGE  8

OPENING STATEMENT BY MR. GOLD...................PAGE 15


* * * * * * * * * *

JAMES MICHAEL WOOD

  By Ms. Stacey     40
  By Mr. Gold                106

AMY PHENIX

  By Ms. Boal      168


* * * * * * * * * *

## E X H I B I T S

GOVERNMENT'S:                              IN EVD.


    No. 25   Consent Form Bates              47
         Stamped 963-965

    No. 24   PDS Records dated 9/29/05        55

    No. 27   PHQ Update Form                  61

    No. 22   PDS Records dated                63
         January 20, 2006

1      No. 25  Psychosexual Evaluation          65
                dated 1/23/06
2

3      No. 22  Treatment Plan dated 1/20/06     86

4      No. 21  PDS Records dated 1/31/06        95

5      No. 27A Document                         99

6      No. 19  Memo dated 3/2/06               101

7      No. 27  Discharge Report               102

8      No. 2   CV of Dr. Amy Phenix           169

9      No. 3   List of Publications and       171
                Presentations of Dr. Phenix
10

11     No. 1   Report of Dr. Phenix           172

12     No. 11  DSM-IV Section on Paraphilia   179

13     No. 12  DSM-IV-TR Section Re:          187
                Paraphilias and Paraphilias NOS
14

15     No. 13  DSM-IV-TR Section Re:          187
                Hallucinogen Dependence
16

17     No. 14  DSM-IV-TR Section Re:          187
                Alcohol Abuse
18

19     No. 15  DSM-IV-TR Section Re:          190
                Personality Disorder with
20              Antisocial and Borderline Traits

21  **DEFENDANT'S**:

22     No. A   PDS note Bates No. 407         148

23     No. 27A Page with Bates No. 01023      159

24

25

1              **P R O C E E D I N G S**

2              **THE CLERK:**  Civil Action No. 07-12064, United

3    States of America versus Todd Carta.

4              Counsel please identify themselves for the record.

5              **MS. BOAL:**  Good morning, Your Honor.  Assistant

6    United States Attorneys Jennifer Boal and Eve Piemonte

7    Stacey.

8              **MR. GOLD:**  Good morning, Your Honor.  Ian Gold and

9    Page Kelley of the Federal Defender Office for Mr. Carta.

10             **THE COURT:**  Okay.  Good morning.  The defendant is

11   here.  The respondent is ready to go?

12             **MS. BOAL:**  Yes, we are.

13             **THE COURT:**  Okay.  I have one motion in limine left

14   that I haven't handled and this is the government's motion

15   in limine to exclude the age of consent chart.

16             I think what I am going to do is just deny it

17   without prejudice to your raising an objection when we reach

18   the point that the chart is offered.  It is a little

19   confusing to have the different dates but I am sure that the

20   evidence is going to somehow rationalize those discrepancies

21   in dates.

22             I mean, the statute we are dealing with here talks

23   about 18, right, 18 as being the triggering date for the

24   offense?

25             **MS. BOAL:**  The 18 age is contained in BOP

1    regulations.

2         **THE COURT:**  Yes, but in Massachusetts, as I

3    understand it, the age of consent is sixteen; is that right?

4         **MR. GOLD:**  Your Honor, a lot of the subject matter

5    of this case takes place in Connecticut where it is sixteen,

6    the age of consent.

7         But we may not need to do it or when the time

8    comes, the purpose of the age of consent is actually part of

9    the attack on the diagnosis in the case.  That the diagnosis

10   depends or appears to or may depend on these arbitrary

11   differences in age of consent --

12        **THE COURT:**  Okay.

13        **MR. GOLD:**  -- on this.

14        **THE COURT:**  All right.  I am going to deny it

15   without prejudice, all right.

16        **MS. BOAL:**  Yes.  And, Your Honor, just one

17   clarification.

18        The Court had permitted Dr. Bard to sit through the

19   testimony.  We would ask -- and my understanding is

20   respondent's counsel agrees -- that Dr. Phenix be permitted

21   to sit through the testimony.  I think there is an open

22   question of whether -- I don't know what you guys believe

23   about the opening arguments or not, whether anyone should be

24   in the courtroom other than the attorneys.

25        **THE COURT:**  Well, what is the story?  How do you

```
1    feel about it?

2         MS. KELLEY:  We don't object to the witnesses being

3    here for the openings.

4         THE COURT:  I will let everybody stay.

5         MS. BOAL:  Okay.

6         THE COURT:  It is just more information.

7         MS. BOAL:  Okay.  And that would include -- the

8    government does have a fact witness, Dr. Wood, as well.  I

9    don't -- do you have --

10        THE COURT:  Any objection to that?

11        MS. KELLEY:  We have no objection to his being

12   here.  We do want to be clear that Mr. Wood is not an expert

13   and we want to be careful to limit his testimony.  He hasn't

14   been -- we haven't received discovery as we would have for

15   an expert.  We didn't have a chance to depose him --

16        THE COURT:  Well, that is a different issue than

17   whether or not he sits in the courtroom.

18        MS. KELLEY:  Right.  But just as an aside we do

19   have that issue as to his testimony.

20        THE COURT:  Well, then you raise the objections at

21   the appropriate time.

22        MS. BOAL:  And, Your Honor, just one clarification

23   with respect to Dr. Bard.  We understand that you allowed

24   the motion to have him sit through the testimony.

25             I wasn't clear if you had also allowed him to
```

1    assist respondent's counsel in the preparation of their

2    cross-examination.

3         **THE COURT:**  Yes, that is what he is here for.

4         **MS. BOAL:**  Okay.  Then we would ask that he not be

5    referred to as a court or independent examiner if he is

6    actually providing that type of assistance to the

7    respondent.

8         **THE COURT:**  Well, you are only trying the case

9    before me.

10         **MS. BOAL:**  Yes.

11         **THE COURT:**  You are not going to be prejudiced as

12    far as any jury is concerned.  I know who he is and where he

13    came from so I don't think we have to worry too much about

14    that.

15         **MS. BOAL:**  And, Your Honor, also just, is it the

16    Court's practice to formally qualify someone as an expert

17    during the voir dire or just to -- I know some courts do not

18    require that in this jurisdiction.

19         **THE COURT:**  What I do is when you reach a point

20    where you ask a question that calls for an opinion, if there

21    is an objection to the question, I will rule as to whether

22    or not I think he is qualified to answer.

23         **MS. BOAL:**  Thank you.

24         **THE COURT:**  You don't have to reach a point and

25    then submit him as being qualified.

1          **MS. BOAL:**  Thank you, Your Honor.

2          **THE COURT:**  Okay.  Are we ready to start?  Do you

3     want to make an opening?

4          **MS. BOAL:**  Yes, Your Honor.  And with your

5     permission, I'll just do it back from the table here

6     (indicating).

7          **THE COURT:**  Any place you want.

8              <u>**OPENING STATEMENT BY MS. BOAL**</u>

9          **MS. BOAL:**  Okay.  Your Honor, Todd Carta is a

10    dangerous man.  The evidence will show that he has preyed on

11    young children since he himself was a child.  He has engaged

12    in a pervasive pattern of seeking out persons who are

13    increasingly younger than himself, preying on them, grooming

14    them and molesting them continuously over many decades until

15    his federal conviction on child pornography offenses when he

16    was in his forties.

17         The evidence will show that he began this pattern

18    when he was eleven to thirteen when he molested and

19    performed fellatio on a child in diapers.

20         He continued throughout his life into his forties

21    when he had a lengthy relationship with a 17-year old.  When

22    he and the 17-year old had a dispute, he placed flyers

23    regarding the 17-year old's sexual habits in mailboxes.

24    Then he lured and preyed on the 17-year old's 13- and

25    15-year old brothers.  He supplied them with marijuana and

1    alcohol and molested the 15-year old.

2          Since he has been an adult he has admitted to a

3    dozen victims under the age of 18.  He has never been

4    convicted of any hands-on sex offenses, which is important

5    in that there was no deterrence for this man for over thirty

6    years.  For thirty years he molested children and never

7    completed treatment or took any other steps to stop this

8    behavior.  It is ingrained.

9          So when he finally attended sex offender treatment

10   at the Bureau of Prisons facility at Butner, North Carolina,

11   he couldn't handle it.  It was too difficult for him.

12         He spent time with the younger inmates in the

13   program, some as young as nineteen, and engaged in some of

14   the behavior as he had previously with children that he

15   molested.

16         Dr. Wood, his treatment provider at Butner, will

17   testify today and he will testify that he was told to stay

18   away, Mr. Carta was told to stay away from the younger

19   inmates during sex offender treatment and he could not.  So

20   he quit.

21         His failure to complete treatment caused his risk

22   of reoffense to go up.  The evidence will show that someone

23   who drops out of treatment is at greater risk to reoffend in

24   another act of child molestation or sexually violent

25   conduct.

1            So what does the government have to prove by clear

2     and convincing evidence?  Three elements.  Whether Carta has

3     engaged in or attempted to engage in sexually violent

4     conduct or child molestation.  You will hear through Carta's

5     own admissions and expert testimony that Carta has engaged

6     in both sexually violent conduct and child molestation.

7            The evidence will show that Carta has admitted to

8     at least seven victims.  Indeed, Carta's trial counsel has

9     conceded in their brief to, quote, a dozen illegal sexual

10    encounters, end quote, with children.

11           For example, when Carta was 30 to 31 he began a

12    long-term sexual relationship with a boy who was 13.  When

13    he was 39 he began chatting online with a 13-year old boy

14    whom he later met and then molested on a number of

15    occasions.

16           When he was in his forties, as I mentioned

17    previously, he had a sexual contact with the 15-year old

18    brother of his 17-year old lover.  After providing the kids

19    with drugs and marijuana.

20           When he was 15 he attempted to talk a similarly

21    aged boy into performing fellatio.  When the boy refused,

22    Carta shot him with a BB gun and Carta reports that the boy

23    then voluntarily complied with Carta's sexual advances after

24    that.

25           All of this evidence and more will show that

1    Mr. Carta attempted to engage in and did engage in sexually

2    violent conduct and child molestation.

3          For the second element the government must show

4    that Mr. Carta suffers from serious mental abnormality,

5    illness or disorder.

6          Dr. Phenix, a leader in the field of sex offender

7    evaluation with twenty years experience, will testify that

8    Mr. Carta meets this criteria.

9          First she has diagnosed him with paraphilia NOS --

10   and the NOS stands for "not otherwise specified" -- a

11   diagnosis found in the DSM-IV.

12         A paraphilia is a recurrent, intense sexually

13   arousing fantasy, sexual urge or behavior involving children

14   or other non-consenting persons over a period of at least

15   six months.

16         As to the recurrent, intense sexual fantasies, the

17   evidence will show that as an adult Mr. Carta's preferred

18   age range for sex includes children as young as 13.  The

19   evidence will show that this recurrent, intense sexual

20   arousal has led him to act illegally by having sexual

21   contact, in some cases repeatedly, and over a year long

22   period of time with children.

23         The evidence will show that this recurrent, intense

24   sexual arousal led him to engage in deviant contact with

25   children.

1          The evidence will show that this recurrent intense

2     sexual arousal led Mr. Carta to collect at his peek 50,000

3     child pornography images and to carefully organize them and

4     categorize them.  His actions involved children and they

5     certainly last longer than a period of six months, in fact,

6     decades.

7          The Court will undoubtedly hear a discussion about

8     the term "hebephilia" which refers to an erotic preference

9     for pubescent children as a mental disorder.

10         The testimony will show that while not everyone in

11    the field agrees with the diagnosis, it is widely accepted

12    in the field and has been used by many courts as a basis for

13    civil commitment of a sexually dangerous person.

14         It is also important to remember that Dr. Phenix

15    did not diagnose him with hebephilia but with paraphilia NOS

16    which is a listed diagnosis in the DSM-IV.

17         Dr. Phenix also diagnosed Mr. Carta with a variety

18    of substance abuse disorders.  And she will testify that the

19    use of such substances acts as a disinhibitor for Carta's

20    sexual tendencies and increases the risk that he will

21    reoffend against children.

22         Finally, Dr. Phenix diagnosed Carta with another

23    serious mental illness, abnormality or disorder --

24         **THE COURT:**  Excuse me one second.

25         (Whereupon, the Court and the Clerk conferred.)

1          **THE COURT:**  Go ahead.  Thank you.

2          **MS. BOAL:**  Dr. Phenix diagnosed Carta with another

3     serious mental illness, abnormality or disorder, namely,

4     personality disorder with antisocial and borderline

5     personality traits.  She will testify that this condition

6     contributes to his likelihood to reoffend against children.

7          Finally the government must prove that as a result

8     of his serious mental illness, abnormality or disorder

9     Mr. Carta will have serious difficulty refraining from

10    sexually violent conduct and/or child molestation if

11    released.

12         Dr. Phenix will testify that Mr. Carta is at a high

13    risk to reoffend.  The evidence will show Mr. Carta's

14    condition has in the past caused him serious difficulty

15    refraining and will do so in the future.

16         As I mentioned, at its peek Mr. Carta collected

17    50,000 images of children.  And at his peek he spent 70

18    hours a week looking at the images and in the process missed

19    work and didn't shower because his obsession was so

20    overwhelming.

21         While he was collecting pornography he was also

22    molesting children.  He would groom them or offer them drugs

23    or alcohol and engage in fellatio with them.  There will

24    also be evidence about actuarial instruments.  These are

25    instruments that attempt to objectify risk assessment by

1    concentrating on static or unchanging factors.

2         In this case one of the few things that the experts

3    agree on is the methodology.  Both of them used two of the

4    same actuarial instruments.  They're called the Static-99

5    and the MnSOST-R.  And that's M-N-S-O-S-T dash R.

6         And with respect to the Static-99, it came out with

7    remarkably similar scores.  Dr. Bard came out with a score

8    of five.  That means Mr. Carta's score matched his scores

9    for a group of other sex offenders who have scored in the

10   moderate to high range for reconviction or arrest, rearrest.

11        And Dr. Phenix came out with a six.  That means

12   that Mr. Carta's score matches other sex offenders who have

13   scored in the high range for reconviction or rearrest.

14        And you will hear that these scores are linked to

15   percentages of reconviction or rearrest rates for five and

16   ten years.

17        It's important to remember about the actuarials

18   that they underestimate the risk because they focus on

19   rearrest or reconviction.  And as we know from Mr. Carta's

20   case alone, sex crimes are underreported.

21        Each expert also considered dynamic factors.  And

22   those factors are things that can change.  One of those

23   factors that you will hear about is treatment.  Mr. Carta

24   participated in a treatment program for approximately seven

25   months at FMC Butner in North Carolina.  He was in a

1    controlled environment.  He was living there.  There were no

2    young teenagers to distract him.  But he dropped out and he

3    couldn't handle it.  He was hanging around with the younger

4    inmates.  He was told to stop and he could not.  His

5    condition prevented him from receiving the treatment that he

6    needed.

7         The research shows that a failure to complete

8    treatment increases an individual's risk to reoffend.

9         For all these reasons the evidence will show that

10   Mr. Carta will have serious difficulty in refraining from

11   either sexually violent conduct or child molestation.  And

12   the government respectfully requests that the Court after

13   hearing all the evidence enters judgment consistent with the

14   evidence that Mr. Carta is a sexually dangerous person.

15        **THE COURT:**  Okay.  Do you want to make an opening

16   now?

17        **MR. GOLD:**  Yes, Your Honor.

18        **THE COURT:**  Go ahead.

19            **OPENING STATEMENT BY MR. GOLD**

20        **MR. GOLD:**  Your Honor, I wanted to start by --

21        **THE COURT:**  You can use the lecturn if you want.

22   Whatever makes you comfortable.

23        **MR. GOLD:**  Thanks.  I'm happy here.

24        **THE COURT:**  Okay.

25        **MR. GOLD:**  I wanted to start just by giving a bit

1    of background.

2          I am recently with the Federal Defender Office.

3    Before this I worked for two years at the Committee For

4    Public Counsel Services Unit dedicated to doing these

5    sexually dangerous persons cases in Massachusetts.  And it

6    was a very intense two years I can tell you but it gave me a

7    little bit of expertise in the area, at least familiarity

8    with it.

9          And the reason I bring that up is the idea of a

10   prototype.  My sense of this case when I look at it is that

11   Mr. Carta, Todd Carta, doesn't meet the prototype for a

12   sexually dangerous person.  The type of person who is

13   typically -- this doesn't necessarily mean that he shouldn't

14   be committed in a particular case but that not the type of

15   person that we tend to see, which are pedophiles, people who

16   interfere with prepubescent kids and violent rapists.

17         He is someone, and I think the evidence will show

18   this, his pattern of behavior is to engage in sexual

19   contacts with minors as young as 13 who are interested in

20   sexual contact with an adult.  It's not healthy behavior and

21   no one is arguing that it is.  But it's not the same type of

22   pathological behavior that we see in people who do other

23   types of sex crimes.

24         Now, what I learned in the time that I worked in

25   this area is that it's a very divided and divisive area in

1        both the science and the law.  And we outline some of these

2        issues in the brief that we submitted to the Court before

3        today.  But what I found is that the experts in the area

4        tend to break into different sides because there are a lot

5        of value judgments implicit in the very activity of going

6        about determining whether someone is sexually dangerous.

7               Dr. Bard is the person we proposed as an examiner

8        in this case.  And very briefly about Dr. Bard, he is

9        someone who has worked in this career from the or has made

10       his career in this area from the very beginning at the

11       Massachusetts Treatment Center which is sort of a center of

12       research in this area.  A lot of the research that's been

13       done about sex offender recidivism and things along those

14       lines has been done there because this Massachusetts

15       Treatment Center has been around for so long.  And he's got

16       experience doing first-hand research with these people and

17       then are, or these men who are committed there and also

18       treating them.

19              He worked as a qualified examiner.  He was one of

20       the people who worked for the Department of Mental Health,

21       later the Department of Correction, doing these type of

22       evaluations, testifying for either side, and now makes a

23       living participating in these cases, because it's been a

24       great growth industry for psychologists in this area.

25              Now, Mr. Carta carried on with these minors several

1    times.  In our brief we said approximately a dozen times.

2    Some of the interactions were over the course of months.

3    Some of them were one shot incidents.  But the important

4    thing to I think recognize first about Mr. Carta is that the

5    government said he was not deterred all these years.  But,

6    in fact, the typical person that we see in these types of

7    proceedings is someone who has been sanctioned for a crime

8    of some kind, has been in prison or something and then gone

9    on to reoffend.

10         And Mr. Carta is not a recidivist.  He has carried

11   on these relationships for a number of years and then got

12   into the child porn and, you know, got -- this was his first

13   serious sentence or sanction of any kind.

14         His life I think turned out in a way that he

15   wouldn't have wished starting out.  His childhood was

16   unhappy.  He certainly engaged in sex as a form of

17   connecting with people when he wasn't able to connect with

18   people on different levels.  All that the evidence will show

19   is a kind of complex picture of someone who is not quite

20   right.

21         But what it doesn't show is the pattern of a serial

22   child molester or someone who does violence in order to gain

23   compliance with his sexual aims.

24         There are going be two issues legally in dispute

25   here for the most part but the first issue is it's

1    questionable whether his conduct, the type of conduct that

2    is emerging that we've described is sexually violent conduct

3    or child molestation for the purposes of the statute.  It's

4    a question of statutory interpretation.  And we've submitted

5    some materials about it.

6         But child molestation, the word "child" evokes the

7    image of a prepubescent.  And this sexual activity with

8    people who are sexually mature, although they are pubescent,

9    is, or maturing and capable of having sexual contact and

10   even desirous of sexual conduct or contact, it doesn't

11   clearly fit the definition of child molestation that comes

12   to mind and what we argue in the papers what Congress had in

13   mind when they demarcated the statute child molestation and

14   sexually violent conduct.

15        What you will see the experts in this case do is

16   they take in those terms and define them for themselves so

17   they're able to go about their work.  For example,

18   Dr. Phenix I expect will testify that these interactions are

19   sexually violent because of what she imputes as a

20   unhealthiness to the relationship or a harm that naturally

21   results from them even though there is no overt violence in

22   the acts.

23        Now, the second issue or I think one main issue

24   that we're going to be contesting is the validity of the

25   diagnosis in this case.  Mr. Carta has had, and there is no

1    question that he has sexual interest in adolescents.  The

2    question is whether that is a mental disorder for purposes

3    of psychology, for purposes of the statute.

4         Now, it's absolutely correct that the government

5    says that this diagnosis appears in state cases, state

6    commitment cases.  And, again, these cases -- there is a

7    recent *New York*, or now not so recent, a 2007 overview in

8    the *New York Times* about these states, there is

9    approximately twenty that have these statutes now.  And so

10   it's attracting a lot of psychologists and people to the

11   field, but that the diagnosis is found in state cases.

12        But the two federal courts, and we cite this in our

13   papers, to have considered the diagnosis have both chucked

14   it.  They have both thrown it out.

15        The first was in the <u>Shields</u> case.  Judge Saris

16   took evidence on the issue and said it's not a valid

17   diagnosis.

18        The other case is a variation on the theme, the

19   <u>United States versus Abregana</u> case in Hawaii which is also a

20   not SDP finding at the end.  But part of the finding there

21   was that while accepting for the purposes of the opinion

22   that this hebephilia was a mental disorder, it was not a

23   serious mental disorder which the statute also requires.

24        Now, the state's expert here will say, Dr. Phenix

25   will say that this is commonly done, and it no doubt is.

1          **THE COURT:**  What is commonly done?

2          **MR. GOLD:**  Commonly diagnosed.  People who have

3     illegal sexual interactions with adolescents are commonly

4     diagnosed as pedophiles.

5          And when we deposed Dr. Phenix she cited some

6     literature and some recent research articles about the

7     diagnosis or the kind of discriminable sexual interest in

8     adolescents as being the primary sexual interest.

9          What the government says and what her argument is

10    is that it fits in because it's -- there is a not otherwise

11    specified category in this paraphilia section of the

12    *Diagnostic and Statistical Manual*.  And then you can put any

13    descriptor that you want.

14         The basic response to that is and will be that the

15    way that this section of the DSM is set up, they set out the

16    major paraphilias and then they say, and these are just

17    deviant sexual or pressing deviant sexual mental disorders.

18    But if you have one that is less commonly encountered, you

19    can use the NOS.  And then they have all these bizarre and

20    very rare disorders that they tick off as examples.

21         What the state's expert -- a lot of this goes back

22    to a name which will recur in these proceedings -- Dennis

23    Doren is an evaluator.  He's someone who works at one of

24    these places or worked until he retired at the Sand Ridge

25    Treatment Facility, one of these places in the midwest where

1    he does these types of evaluations.  He came out with a very

2    influential book in 2002 called *Evaluating Sex Offenders*.

3    And what that book did is it established this hebephilia

4    diagnosis saying if you find someone who has this illegal

5    activity with teenagers, you can diagnose them in this way.

6         And it also did promote a very controversial

7    diagnosis in the field, paraphilia NOS, not consent, which

8    the critique of the diagnosis is, whatever its validity,

9    that it was short of jury-rigged or engineered for the

10   purpose of facilitating the civil commitment of rapists in

11   these types of proceedings.  So this is the type of conflict

12   that there is here.

13        Now, before just leaving the hebephilia issue for

14   the trial, again, there is no question that Mr. Carta has a

15   sexual interest in adolescents.  The question is whether

16   that is a disorder.

17        Now, there is some political element in diagnosing,

18   and I think we will see that evident during the course of

19   this.  But I think the best way to demonstrate it is that

20   there is no currently paraphilia NOS homosexuality.  And I

21   am going to ask Dr. Phenix about what the difference is

22   between those two diagnoses but that these are basically

23   political choices that they have made.

24        And when you look at the literature --

25        **THE COURT:**  Say that again. I want to make sure I

1    follow it.  And I remember reading it in your brief but I

2    want to make sure I followed that.  There is no designation

3    of homosexuality as a discrete illness; is that what you are

4    saying?

5            **MR. GOLD:**  Well, there was, Your Honor.

6            **THE COURT:**  There is not now.

7            **MR. GOLD:**  There is not now, right.

8            **THE COURT:**  And it was removed?

9            **MR. GOLD:**  It was removed essentially for political

10   reasons.  Good ones I would argue but reasons that are not

11   necessarily tied to empirical findings or anything of that

12   nature.

13           We have some research about this hebephilia

14   diagnostic concept.  And just before moving beyond this,

15   we've looked at the research and what it is is very

16   promising research we can characterize it showing that they

17   are able to discriminate people who are primarily interested

18   in pubescents.

19           But the way those researchers are defining it, even

20   if we accepted that, and the article that we are discussing

21   in those papers is essentially a proposal to add this to,

22   you know, the DSM-V is coming out in a little while, in a

23   few years.  And they have got these committees convening now

24   who are discussing what the diagnoses should be, what

25   changes they should make.

1          So in that political context they published this

2     article saying these are our findings.  We think you should

3     modify the hebephilia diagnosis by bumping it past

4     prepubescence a couple years or come up with your own

5     diagnosis.  That's basically what they're saying about this.

6          But even that, you know, the authors of that

7     article -- and we're going to be coming back to this line a

8     few times -- say no one would want to characterize sexual

9     interest in mid or late or even mid adolescence as a

10    psychopathology.  That's what they say.  And this is part of

11    the corpus of literature that Dr. Phenix is purporting to

12    apply, but what she's saying is hebephilia or NOS hebephilia

13    is simply sexual interest in post-pubescents.  That's

14    actually what she states in the literature.

15         So based on that we are making a Daubert challenge.

16    The typical things that you find with a diagnosis, I mean,

17    things aren't included presumably for a reason, that they do

18    epidemiological studies or they do their type of things to

19    find out if there is inter-rater reliability to determine if

20    they're looking at a valid construct simply hasn't been

21    done.  And the variant of this diagnosis which comes from we

22    would argue this Dennis Doren book primarily, which is not a

23    peer reviewed document, although it's cited occasionally in

24    the literature, is a very different diagnosis than even what

25    the most promising research is showing should be.

1          I mean, what we have here is someone who is

2     starting relationships with 13-year olds, continuing them

3     until they're 17.  And, you know, we have this problem.  No

4     one is arguing that, or will be arguing that Mr. Carta's

5     relationship with the 17-year old that he had at the time

6     that he was arrested was healthy.  It wasn't.

7          It's the sort of thing that Mr. Carta, even now

8     reflecting on it, sees as a relationship with a power

9     imbalance and not a great relationship and not something

10    that he should continue with and can use treatment or be

11    educated or what have you about getting into better or more

12    healthy relationships, but that's not the point.

13         The point is does the relationship with a 16-year

14    old make it a psychopathology as opposed to, you know,

15    behavioral issues that, you know, can be treated but aren't

16    a sufficient predicate for lifetime civil commitment.

17         There is also a personality disorder diagnosis.

18         **THE COURT:**  But here according to you we have both.

19    We have the activity with an adolescent which I take it,

20    what do we consider an adolescent to be?  Sixteen,

21    seventeen?

22         **MR. GOLD:**  Well, that's a definitional question

23    that is not a clear answer.  Sure, there is -- the word that

24    we're using is pubescent, post-pubescent, adolescent.  But

25    the diagnosis that Dr. Phenix, you know, she'll be able to

1    testify about this more, says it's interest in

2    post-pubescence.  But we're all post-pubescence so there is

3    a sort of --

4         **THE COURT:**  No.  My question was going to be here,

5    if I understand your opening statement, if I understand the

6    background, your client admits to conduct with a 13-year old

7    as well as the 17- and 18-year old.

8         **MR. GOLD:**  That's right.

9         **THE COURT:**  So he runs across the gambit.

10        **MR. GOLD:**  Well, that's right.

11        **THE COURT:**  And does that make a difference?  Are

12   you going to be arguing that that makes a difference?  Does

13   there have to be exclusivity to qualify for a particular

14   diagnosis or can it be that his activities are broad enough

15   to include several diagnoses?

16        **MR. GOLD:**  Well, what we would argue in focusing

17   on -- this goes back to the statute.

18        **THE COURT:**  Do you understand my question?

19        **MR. GOLD:**  I do I think and I'm going to try to

20   answer it.  And Dr. Bard who we are going to have on later

21   will probably do a better job than I am capable of doing.

22        We have -- one thing I forgot to mention before

23   which I want to say now is that the entire brief against

24   Mr. Carta is his own statements basically.  And that's just

25   important to recognize.  Typically we are looking at

1   criminal records and things like that.  There is a little

2   bit of that here.  And obviously he was doing the child porn

3   which is bad, although, his, you know, all the information

4   we have about him comes from him.

5          And I think Dr. Wood who is going to testify was

6   the intern who was his therapist when he was at this Butner,

7   this Sex Offender Treatment Program at Butner, said he was

8   very forthcoming.  He was encouraged to be and he was.  And

9   he was truthful.

10         Now, what we -- what you will hear is that these

11  diagnoses, you don't have to be exclusive to have the

12  diagnosis, that's clear.  But what is the real difference

13  between a 17- and a 16-year old?  The 13-year olds that we

14  have seen are much too young to be engaging in sexual

15  relationships with adult men obviously but we don't know

16  whether sexual interest in them is a psychopathology.

17         The best proposal that we have going back to the

18  article which is authored by a man named Ray Blanchard and

19  some other people seem to define it, and they're a little

20  cagey on this point, sexual interest in pubescence only

21  which they sort of seem to define as between 12 and 14 but

22  that is not the definition that is being put forward in this

23  case.  That's sexual interest in teenagers generally

24  whatever they are.  I think one of the problems here is that

25  it's really hard to get a real angle on what we're talking

1      about here.

2             The behavior is -- I can move beyond hebephilia.  I

3      think I can go on, unless Your Honor has another question

4      about it?

5             **THE COURT:**  No, go ahead.  You are supposed to be

6      telling me what you expect your evidence is going to be or

7      what the evidence is going to be in the case.  So I am

8      interested in your preview of coming events.

9             **MR. GOLD:**  The struggle that I'm having now is kind

10     of wrapped into the problems with the diagnosis that we're

11     going to be picking away at when they testify about it.  I

12     asked Dr. Wood, and I'll ask him again today, about the

13     issues that happened around treatment.

14            The basic issue with Mr. Carta I think we'll be

15     able to demonstrate is that he is someone who has engaged in

16     these relationships with willing people and sometimes, you

17     know, children or, well, adolescents who are interested in

18     sex.  I think that's pretty clear.  And he shouldn't be

19     doing it.  And he sometimes justifies it as useful for them

20     or something like that.  But that the interest itself is not

21     deviant because it's found in many normal people who have

22     been studied, sexual interest in adolescents, so that it's

23     incorrect to characterize it as anything more than illegal

24     behavior and not a psychopathology.

25            The next diagnosis in the case of Dr. Phenix or the

1    government proposes is --

2              THE COURT:  Illegal depending on where you live.

3              MR. GOLD:  Illegal depending on where you live,

4    correct.

5              THE COURT:  Where the act takes place.

6              MR. GOLD:  Where the --

7              THE COURT:  Or where the act takes place.

8              MR. GOLD:  Where the act takes place.

9              Now, personality disorder, Dr. Phenix diagnosed him

10   with a personality disorder, also this not otherwise

11   specified category.  And this is the primary vehicle where

12   our take on this whole area of law and science is, you know,

13   psychology being sort of conscripted to justify the state's

14   aims in locking these guys up after the end of their prison

15   sentences.  And one of the vehicles is this not otherwise

16   specified diagnosis.

17             That's the critique or the background where we

18   start from, not that these diagnoses aren't of utility or

19   what have you.  But, again, when we were talking about the

20   DSM and how they go about doing their stuff, the idea is

21   that they have bodies, they do field research, they come up

22   with criteria sets.  They come up with better criteria sets

23   when the diagnoses don't work out.

24             And the idea is is that that increases validity.

25   And in a courtroom in the forensic context it increases our

1    confidence that we're talking about here is an actual

2    empirical valid construct and not somebody's sort of

3    characterization of a state of affairs, not something that

4    is designed just for the purposes of one person.

5           Now, that's not to say that Mr. Carta is a, you

6    know, a fully healthy human being.  He does exhibit or he

7    has exhibited traits that are associated with these two

8    major personality disorders, antisocial and borderline.

9           The one thing about antisocial personality

10   disorder, because it's been studied, that everyone agrees

11   with is that the, if you've got it -- and almost everyone

12   has got it because now it's been defined in a very broad

13   way.  Everyone in prison that is -- it tends to decline with

14   age.  The outward manifestations just tend to decline with

15   age and be less present, you know, just part of the

16   maturational process.

17          Now, Dr. Phenix diagnoses him with a personality

18   disorder which really requires we will argue some sort of

19   face-to-face interaction with a person and she didn't have

20   it here.  She wasn't -- she didn't interview Mr. Carta while

21   Dr. Bard who interacted with him got a sense, and that's I

22   think the sense that will emerge here, of someone who is six

23   or seven years into his first major encounter with the law

24   and -- when I say "encounter with the law," first major

25   prison sentence.  And it is burnt out.  It's kind of moved

1    beyond some of the more antisocial behavior that he

2    displayed in the past.

3            Now, the whole second part of this, while there

4    is -- of these trials tends to go into this risk assessment

5    testimony.  The statute itself says that what we need to

6    have is a psychologist saying that somebody is going to have

7    serious difficulty controlling or refraining from sexually

8    violent conduct or child molestation in the future.

9            And, again, we argue with respect to whether the

10   conduct that we're talking about here even qualifies as one

11   of those two things that Congress saw fit or had in mind to

12   prevent when they passed this statute.

13           But there's two components to that.  One is does

14   this, does Mr. Carta have a volitional impairment.  And

15   that's what the Supreme Court in looking at these cases has

16   said, well, what separates the committals from the

17   non-committals is this idea that they have got a serious

18   difficulty controlling themselves.  They have got a

19   volitional impairment.

20           The thinking was after the Kansas versus Hendricks

21   decision that maybe that meant a complete lack of control.

22   In the Kansas versus Crane decision they said, well,

23   something is required.  It's not a complete lack of control

24   but a serious difficulty controlling behavior.

25           That itself is a standard in the law which we will

1    argue and the psychologists have to give us some opinion as

2    to Mr. Carta's ability or, you know, perceived ability to

3    control himself in the future.

4         There is also this kind of enterprise of risk

5    assessment that we are going to be hearing a lot about.  And

6    in our papers we're not, the way these trials -- I

7    participated in the trial in front of Judge Wolf.  And it

8    gets a little murky whether this stuff goes to the serious

9    difficulty or is a separate sort of inquiry as to whether

10   someone is actually going to be dangerous, which we say

11   is -- you can't confine someone simply by -- and this is a

12   longstanding principle in the law.  You know, if you show

13   someone's mentally ill but not dangerous, you can't hold

14   them.  If you show they're dangerous but they're not

15   mentally ill, you can't hold them.  So that this

16   dangerousness requirement does the, you know, the testimony

17   go to that or to the serious difficulty in controlling

18   behavior.

19        Regardless, what we will learn about the field of

20   psychology is that back in the '80s or actually for decades

21   there has been this issue about how well clinicians predict

22   behavior in a variety of contexts.  And what the studies

23   show is when they look at their ability, say someone is

24   going to be dangerous, someone is going to do well on an

25   exam, things of that, or do well in college after an exam,

1    that clinician's ability to predict the future is no better

2    than chance.  That's the finding.  That's what most

3    psychologists who you will hear testify about it will agree

4    to.

5           But what you -- and so the response of the field

6    has been this push toward empiricism, doing studies,

7    isolating risk factors, ultimately coming up with these

8    instruments, looking at the effect of age on the risk of

9    reoffense.

10          And what the take home point is, what those, that

11   instrumentation shows, what that empirical contribution to

12   this proceeding shows is that Mr. Carta is actually not

13   someone who can be said to be likely to reoffend, just based

14   on the instruments.

15          And then I think part of the presentation that is

16   very important is Mr. Carta, the child pornography stuff

17   came to light.  He had this thing which we will learn about

18   with his live-in boyfriend who was 17, that not illegal but

19   unhealthy relationship we talked about.

20          He has admitted to having a very brief and

21   inappropriate sexual interaction with that man's younger

22   brother.  Part of his getting back at the original love

23   interest.  You know, he started to participate in treatment

24   then.  He was actually out, cooperated with the government,

25   got a 5K letter at the end of that, and has done this

1    treatment, has done this sentence.

2         At the time he was sentenced he was given very

3    stringent conditions, kind of looking at the same type of

4    stuff by the sentencing judge in that case which will

5    require him to do treatment, which will require him to, you

6    know, comply with all the standard conditions and a lot of

7    additional ones.  That itself is sufficient for someone like

8    Mr. Carta.  That's the basic pitch.

9         You know, lifetime civil commitment is not

10   appropriate.  This sort of stuff is what is indicated or is

11   appropriate for Mr. Carta, especially based on his record.

12   He is not someone who has really been sanctioned, imprisoned

13   for some type of sex offense and gone on to reoffend which

14   is what you typically see in these cases.

15        We're going to hear about, the first part of the

16   show here is Mr. Carta's failure in treatment, his dropping

17   out of treatment.  And that's not great but it's not we'll

18   argue so significant as to indicate that he is presently

19   dangerous.

20        He did fall into behavior patterns which very well

21   may have been similar to the patterns he had around

22   unhealthy relationships, many of which were legal when he

23   was on the outside.

24        And Dr. Wood who we spoke with briefly last night

25   and who is going to testify today who was an intern at the

1    time, he kind of spent a lot of time with Mr. Carta and

2    tried to get him to stay in the program.  Talked about this

3    unhealthy behavior with these younger guys who are in the

4    program.

5         THE COURT:  I may have misheard.  Did you say I

6    spoke to him last night?

7         MR. GOLD:  I did, yeah.

8         THE COURT:  I spoke to him?

9         MR. GOLD:  No, no, I, I said we.

10        THE COURT:  Oh, all right.  I thought you said that

11   I did, I spoke to Dr. Wood.  And I was going to say I have

12   no memory of that.

13        (Laughter.)

14        THE COURT:  Go ahead.

15        MR. GOLD:  No, we did last night.  He flew in

16   yesterday from Arkansas.

17        THE COURT:  All right.

18        MR. GOLD:  But at the time that he dropped out, and

19   Dr. Wood kind of shed a lot of light on that episode for us;

20   but he has this thing, sort of dramatic at times.  He wants

21   to pull out.  He comes back in.  He did this with his other

22   treatment programs, you know, general anti-recidivist

23   program that he did at the Bureau of Prisons, the CODE

24   Program.  He would quit, come back.  He would, you know,

25   protest about quitting again and ultimately completed the

1    program.

2         He was doing that here and it seemed like he was

3    too embarrassed the last time he quit since he threatened or

4    cried wolf so many times, he just really followed through

5    with it.  But at that time there was no civil commitment.

6    This was nothing hanging over his head.  He wasn't mandated

7    to do the treatment.  He wasn't required to do any of the

8    programming that he was doing.  And he knew at that time

9    that he would be released that he would have the opportunity

10   to do treatment on the outside and be required to at that

11   time.

12        That's important in understanding the context of

13   that treatment of him dropping out.

14        That is it in a very beg nutshell, Your Honor.  I

15   would just say with respect to the Daubert issue, one thing

16   we are also going to learn about these actuarial instruments

17   that I touched on very briefly is that they --

18        **THE COURT:**  That is not a Daubert issue, the

19   actuarial instruments; right?  I mean, both sides have

20   adopted them.  It is the definition that is the issue; do I

21   understand that correctly?

22        **MR. GOLD:**  That is how -- I understand we have a

23   Daubert challenge in front of Your Honor that has been ruled

24   on with regard to just the science of risk protection.

25        But one thing that was not apparent at that time

1    which has become apparent over the course of this trial is

2    that when Dr. Phenix -- there has been a great change in the

3    field while this case has been pending.  Basically what they

4    found is the way these actuarial instruments work, they get

5    populations.  They test them out.  They get recidivism

6    rates, estimates based on their development samples for

7    different scores.

8         And so when they tell you high risk, you say, well,

9    Doctor, what does that mean.  Well, people with this score

10   in the development sample reoffended at such and such a

11   rate.

12        Well, those norms dated from the '80s and before

13   and what our society has been experiencing independent of

14   all of this is a decrease in many types of crimes, including

15   sexual and violent crimes.  And so they have just been

16   coming out and continue to come out to this day with new

17   norms which are significantly lower than what they were just

18   months ago.  And all these commitments that have been

19   underway are, you know, have taken place under norms which

20   were artificially inflated basically.

21        And so what Dr. Phenix has testified at the

22   deposition in this case is that she uses the new norms as

23   they come out.  That they themselves have not been

24   validated, subject to peer review or anything along those

25   lines.  They're just the authors of the instruments saying

1  we've got an issue here.  The norms are actually much lower

2  than they were understood to be.

3          It is my understanding the other actuarial

4  instrument here, the MnSOST-R, those norms are anticipated

5  to come out next month I believe.  And they're also lower

6  than what the instrument had previously indicated.

7          And so -- and that's what I think the testimony

8  will uniformly be.  So what we have here is a field so in

9  flux that I think it's appropriate to renew that challenge

10  in light of the evidence that will come in.

11          We've also got a hebephilia challenge as well based

12  on, you know, if they had come in with the research which I

13  believe is the state of the art right now, the hebephilia

14  research that we've already put before the Court, we would

15  be talking about the validity of that proposal.  And that's

16  the only proposal on the table that I am aware of.  The fact

17  that people in this field typically diagnose that as a

18  separate or diagnose hebephilia in the context of these sort

19  of criminal justice type proceedings is a separate issue.

20          To the extent that that proposal could be validated

21  or accepted by the Court, what Dr. Phenix is testifying is

22  to something else entirely.

23          So I guess what I'm saying is, yes, we would

24  challenge the hebephilia.  That is her primary Daubert

25  challenge.  But there is also grist for the Daubert with

1    respect to these changing norms that we're going to hear

2    about.

3          Another thing about Dr. Phenix that we will learn

4    is that she, when she drafted her report, she went about it

5    in a particular way, a method called the adjusted actuarial

6    method.  And she herself in light of I guess advancing

7    science based on findings that that method produced

8    predictive accuracy has now gone to a pure, what she calls a

9    pure actuarial method.

10         So that's the landscape, Your Honor.

11         **THE COURT:**  Okay.  Ready to go?

12         **MS. BOAL:**  Yes, Your Honor.

13         Just for clarity sake, the government was not under

14   any notice that they were challenging the actuarial

15   instruments.  We had understood the Daubert challenge was

16   solely to the hebephilia.

17         **THE COURT:**  That is my understanding too.

18         **MS. STACEY:**  Your Honor, the government would call

19   Dr. Michael Wood as its first witness.

20         **THE COURT:**  Okay.

21         **MS. STACEY:**  While the witness is going to the

22   witness stand, Your Honor, may I ask that -- we have an

23   extra binder of exhibits.  May I ask that we put that on the

24   witness stand for ease of reference?

25         **THE COURT:**  Sure.  Any objection?

1              **MR. GOLD:**  No objection.

2              **JAMES MICHAEL WOOD, Sworn**

3              **THE CLERK:**  Thank you.  You may be seated.

4              **DIRECT EXAMINATION**

5    BY MS. STACEY

6    **Q.**  Good morning.

7    **A.**  Good morning.

8    **Q.**  Would you please state your name for the record.

9    **A.**  James Michael Wood.

10   **Q.**  And would you please briefly describe your educational

11   background and the degrees that you hold.

12   **A.**  Yes, I have a bachelor's degree from the University of

13   Arkansas, a master of science degree from the University of

14   Central Arkansas and a doctor of philosophy in counseling

15   psychology from the University of Memphis.

16   **Q.**  And what is your current position?

17   **A.**  I am a licensed psychologist for the Sex Offender

18   Screening and Risk Assessment Program in the State of

19   Arkansas.

20   **Q.**  And how long have you held that position?

21   **A.**  Nine years.

22   **Q.**  What are the duties in your current position with the

23   Arkansas Department of Correction?

24   **A.**  Okay.  Our program is tasked with doing risk assessment,

25   community notification assessments on all registered sex

1    offenders in the state.  We put them into tiers so that law

2    enforcement knows the appropriate level of community

3    notification for their offenders and also to help them

4    understand the offenders in their community better.

5    Q.   And do you hold any other positions at this time?

6    A.   I do contract work in various capacities with, whether

7    it teaching a psychology course, testing for a national

8    testing company when they have research projects, and also

9    court-appointed expert testimony in forensic issues for the

10   circuit courts in Arkansas.

11   Q.   And you mentioned you're a forensic examiner.  What are

12   your duties as a forensic examiner?

13   A.   I contract with the state hospital in Arkansas.  When

14   people have competency or responsibility mental status at

15   the time of the offense questions, I do those evaluations

16   for the court.

17   Q.   I'd like to direct your attention to September of 2005.

18   At that time were you employed?

19   A.   Yes, I was.  I started my internship with the Bureau of

20   Prisons at the Federal Correctional Complex in Butner, North

21   Carolina.

22   Q.   And what were your duties at Butner, North Carolina?

23   A.   My rotation, my major rotation was at the Sex Offender

24   Treatment Program.  And so I spent the first six months of

25   my time -- the internship is a year-long program so the

1    first six months was full time at the Sex Offender Treatment

2    Program at Butner.

3         And then after six months we switched and I did a

4    minor rotation in forensic mental health and general

5    correctional practice.

6    **Q.**   Okay.  Did you say this was your doctoral internship?

7    **A.**   Yes.

8    **Q.**   Okay.  And that lasted for how long?

9    **A.**   It's one year.

10   **Q.**   And what was your official position at the Bureau of

11   Prisons at that time?

12   **A.**   Psychology predoctoral intern.

13   **Q.**   And as a psychology predoctoral intern, does somebody

14   supervise your work at the Bureau of Prisons?

15   **A.**   Yes.

16   **Q.**   And who was that?

17   **A.**   We had many supervisors.  The overall supervision for

18   the interns was Rick Landis.  And then on each rotation, for

19   instance, for the Sex Offender Treatment Program, the

20   evaluations that I did, the psychosexual evaluation

21   discharge report that are seen in this case were cosigned by

22   Dr. Rob Melin.

23        When I did therapy, whether the group therapy or

24   just individual sections, that was supervised by Dr. Carolyn

25   Fraser.

```
 1              And then we had weekly supervision with all the

 2    psychologists at the treatment program so there was feedback

 3    from multiple psychologists in the program.

 4    Q.  How long, Dr. Wood, have you worked with sex offenders?

 5    A.  Since 2000.

 6    Q.  During the time that you were at FCI Butner did you come

 7    to know Mr. Todd Carta?

 8    A.  I did.

 9    Q.  How did you come to know him?

10    A.  I was assigned by the treatment staff when I started at

11    the treatment program to be his primary individual

12    therapist.

13    Q.  And you said when you started at the treatment program,

14    what do you mean by that?

15    A.  When I started my internship, my first rotation in

16    September was at the -- six months at the Sex Offender

17    Treatment Program.

18    Q.  And was the Sex Offender Treatment Program, was that at

19    Butner?

20    A.  Correct, at the medium Federal Correctional Institute at

21    the complex.

22    Q.  And generally what was the Sex Offender Treatment

23    Program?

24    A.  It was a -- at that time it was the only Sex Offender

25    Treatment Program in the Bureau of Prisons.  And it was
```

1        housed in a specific unit that the, I think there was a

2        hundred, a hundred twenty inmates that were in the program.

3        And they went through ten to twenty hours of specific

4        treatment, group therapy, individual therapy.  It's in a

5        therapeutic community so that they're always getting

6        feedback from their peers.

7                And they lived on the complex so they'd go out and

8        have jobs in the general correctional environment but it was

9        a specific program designated to help them manage their

10       sexual deviance and prevent future recidivism.

11       **Q.**  And what were the living arrangements like, the

12       incarcerative living arrangements for someone who was in the

13       Sex Offender Treatment Program?

14       **A.**  Right.  It was a specific unit that they lived in.  And

15       so there were, the treatment offices for all the

16       psychologists that worked there were inside that unit.  And

17       the inmates' cells were kind of towards the back in

18       different pods.  And then we had a big treatment room where

19       everyone could come together and we had smaller like group

20       therapy rooms.  So everything was housed in this one complex

21       or in one unit.

22       **Q.**  And what was the name of the unit?

23       **A.**  I believe it was the Maryland Unit.

24       **Q.**  Was your office located in the Maryland Unit?

25       **A.**  Yes, it was.

1    **Q.**  Did Mr. Carta participate in sex offender treatment?

2    **A.**  He did.

3    **Q.**  Did Mr. Carta have to sign any forms in order to

4    participate in sex offender treatment?

5    **A.**  He did.  At the beginning of treatment he signed a

6    consent to participate type form.

7    **Q.**  And I'll ask you to just turn to tab 27 in the witness

8    binder that's there before you.

9            And if you go a few pages in to the Bates stamp

10   963.

11   **A.**  I don't think it's under 27.

12           **MS. STACEY:**  May I assist, Your Honor?

13           **THE COURT:**  Yes.

14   BY MS. STACEY

15   **Q.**  Do you have that, Doctor?

16   **A.**  I do.

17   **Q.**  All right.  So looking at Bates stamp No. 963, is that

18   the consent form that you were referring to earlier?

19   **A.**  Yes.

20   **Q.**  And how many pages is that consent form?

21   **A.**  Three.

22   **Q.**  And are those Mr. Carta's initials and signature on the

23   consent form?

24   **A.**  Yes.

25   **Q.**  Okay.  So is that the paperwork that Mr. Carta signed

1    before he started sex offender treatment?

2    **A.**   Correct.

3    **Q.**   Now, what is the goal of sex offender treatment for

4    Mr. Carta?

5    **A.**   In short, as I have said, it's to help the offender

6    manage their sexual deviance --

7           **THE COURT:**   Before you go on, am I to understand

8    that these exhibits have all been agreed to and they are

9    part of the case or are you going to offer them?

10          **MS. KELLEY:**   They have not been agreed to.

11          **MS. STACEY:**   The only objection, Your Honor, is the

12    psycho patient privilege which this Court has deemed --

13          **THE COURT:**   I have already ruled on that.

14          **MS. STACEY:**   Yes.   That's the only objection to

15    these exhibits.

16          **THE COURT:**   But you have to establish that this is

17    in evidence.   Are you going to offer this?

18          **MS. STACEY:**   I will offer it.   Your Honor, there is

19    multi parts to this.   I can offer this piece now or offer

20    the entire exhibit as a whole at the end, whatever the

21    Court's preference.

22          **THE COURT:**   All right.   You can put it in now.

23          **MS. KELLEY:**   Well, if I may, that's not the only

24    objection.   If they're seeking to put, for example, his

25    whole treatment record --

```
 1            THE COURT:  Well, I am just asking a question about
 2    this consent form.
 3            MS. KELLEY:  Okay.
 4            THE COURT:  Are you offering the consent form?
 5            MS. STACEY:  I am offering the consent --
 6    BY MS. STACEY
 7    Q.  Is that a true and accurate copy of the consent form
 8    that Mr. Carta signed?
 9    A.  Yes, it is.
10            MS. STACEY:  Then I would offer the consent form
11    Bates 963 to 965 at this time.
12            THE COURT:  Any objection?
13            MR. GOLD:  No objection.
14            THE COURT:  Okay.  It comes in.
15            (Government's Exhibit No. 25 received in evidence.)
16    BY MS. STACEY
17    Q.  What are the goals of sex offender treatment?
18    A.  In short it is, as I mentioned, it's to help the
19    offender learn to manage their sexual deviance, sexual
20    behavior problem and to help prevent future recidivism.
21    Q.  In this case what was Mr. Carta's sexual deviance?
22    A.  Through working with him, doing the history intake that
23    I did, it came to be that he verbalized that he had a
24    specific sexual interest in young boys in the midst of
25    pubescence.
```

1   **Q.**  And can sex offender treatment cure his attraction to

2   these boys in the midst of pubescence?

3   **A.**  The common thinking right now is that there is no cure.

4   We work with them to help them manage.

5          **THE COURT:**  We work with what?

6          **THE WITNESS:**  We work with the offender to help

7   them manage the sexual behavior problem or sexual deviance

8   that there is.

9          **THE COURT:**  And what is the category pre-pubescent,

10  what did you --

11         **THE WITNESS:**  I said in working with him he said

12  that his specific interest was in pubescent males.  It was

13  those in the midst of puberty, not prepubescent but who had

14  actually achieved ability to orgasm and ejaculate.  So right

15  at the switch from prepubescence into pubescence.

16         **THE COURT:**  And is there a typical age that you

17  associate with that diagnosis?

18         **THE WITNESS:**  Well, there is an average age.  Maybe

19  12, 13, 14 but as you know, it can individually vary from

20  probably 10 to 15, 16.

21         **THE COURT:**  Okay.  Go ahead.

22  BY MS. STACEY

23  **Q.**  What are the phases or components of sex offender

24  treatment?

25  **A.**  Basically there were four phases.  There was the initial

1    orientation component, assessment, treatment, and then the

2    fourth step is the relapse prevention release planning

3    stage.

4    **Q.**   Now, looking at each of these phases, what happens in

5    the pretreatment and orientation phase of treatment?

6    **A.**   That's the initial phase where the inmates are brought

7    into the program and they're given an overview of what can

8    be expected in the program, what the expectations are.

9    They're doing some initial psychological testing and they're

10   seeing if they have what it takes to get through the rigors

11   of treatment.

12        So, yes, that's the initial phase.

13   **Q.**   And did Mr. Carta participate in the orientation phase?

14   **A.**   He did.

15   **Q.**   Okay.  Going to the second phase of sex offender

16   treatment, what happens in that phase?

17   **A.**   Okay.  There is some overlap.  And as I said, they start

18   the psychological testing in that orientation phase and it

19   carries through to the assessment phase.  And so that's when

20   they're completing the psychological testing that I talked

21   about.  We have a very thick, it's like 50, 60, 70 pages of

22   a personal history questionnaire.  It's called a PHQ.  And

23   that's where the inmate is really documenting their entire

24   life.

25        And so once they complete that, that is when

1    they're assigned the individual therapist and we begin going

2    over the history so that we can put together a psychosexual

3    evaluation which is the first document that puts together

4    all the parts of their history and comes up with a diagnosis

5    and a treatment plan.

6    **Q.**   And did Mr. Carta complete that phase?

7    **A.**   He did.

8    **Q.**   What happens in the next phase of sex offender

9    treatment?

10   **A.**   That's the active component of treatment where we're

11   doing psycho educational groups, doing group therapy,

12   individual therapy, community meetings, really the heart of

13   the treatment program.

14   **Q.**   And during the treatment phase what are the primary

15   goals of treatment for each inmate?

16   **A.**   There is overall general goals that we're hoping that

17   they come forward with their sexual history because the goal

18   is is that they talk about all the things that they have

19   done, even the stuff that they haven't been caught for so

20   that they can eventually pass a polygraph exam at the end of

21   treatment.

22        That we want them to accept responsibility for

23   their sexual behavior, to learn how to manage any kind of

24   sexual arousal or sexual deviant problems, to have empathy

25   for their victims and learn to manage their sexual deviance.

1    **Q.**  And did Mr. Carta meet those goals?

2    **A.**  No.

3    **Q.**  Why not?

4    **A.**  He quit treatment.

5    **Q.**  And at the time that he quit treatment, were there any

6    other phases left in the Sex Offender Treatment Program?

7    **A.**  Right.  He would have continued in the treatment phase

8    in that we didn't get to the relapse prevention or release

9    planning stage.

10   **Q.**  And what is release planning?

11   **A.**  That's where they take everything that they -- the

12   program participants take everything that they have learned

13   and they make an individual relapse prevention plan.  It's

14   very elaborate.  It talks about the individuals of their

15   case and then they can go and give it to people that, when

16   they release out, to their probation officer, to people that

17   are going to help hold them accountable.  If they're going

18   to live with specific people, they can give that information

19   to them and it documents their history and their interests.

20          And examples I've seen are if the person might say

21   this is what I do, if I'm going to start manipulating you,

22   these are the signs to watch for that I might be sliding

23   back towards a new offense.  Here's how you can hold me

24   accountable.  Here's the steps you can take.  So it's a very

25   detailed plan that -- it's a culmination of treatment.  It

1    can be like a 40- or 50-page document, type document.

2    **Q.**   And does that document exist for Mr. Carta?

3    **A.**   No.

4    **Q.**   And why is that?

5    **A.**   He quit the treatment.

6    **Q.**   Okay.

7    **A.**   Voluntarily.

8    **Q.**   How long was Mr. Carta in sex offender treatment?

9    **A.**   This consent form is -- the orientation phase was dated

10   July 26, '05.  I think the discharge report says early March

11   of 2006.

12   **Q.**   Okay.

13   **A.**   So seven months roughly.

14   **Q.**   Okay.  Now, after Mr. Carta was initially assigned to

15   you, did you meet with Mr. Carta?

16   **A.**   I did.

17   **Q.**   And why did you meet with him?

18   **A.**   I initially meet to introduce myself, to go over what

19   could be expected from treatment, to talk about the informed

20   consent to participate in treatment, to go back over this

21   form, the limits of confidentiality, to get a feel for where

22   he stood on his motivation for treatment and to begin

23   gathering information to do that initial in-depth report,

24   the psychosexual evaluation.

25   **Q.**   And I'll ask you to turn to, it's tab 24 of the binder

1    that's before you.

2    **A.**   Okay.

3    **Q.**   Did you make notes of your treatment sessions with

4    Mr. Carta?

5    **A.**   I did.   Every session was documented in the Bureau of

6    Prisons PDS computer system.

7    **Q.**   And looking at what's been marked at tab 24 in the book,

8    are those notes that you made?

9    **A.**   Correct.

10   **Q.**   And why did you make the notes?

11   **A.**   It's standard practice to document all of your

12   interactions with a patient or client.

13   **Q.**   And were those notes kept in the regular course of

14   business at the Bureau of Prisons?

15   **A.**   Yes.

16   **Q.**   Are those notes listed at tab 24, are they a true and

17   accurate copy of the notes that you kept on September 29,

18   2005?

19   **A.**   I think I'm looking at the wrong --

20   **Q.**   Do you have Exhibits 24 and 25 --

21   **A.**   What's the page number?   Is it 409?

22           **MS. STACEY:**   Might I assist, Your Honor?

23           **THE COURT:**   Yes.

24   BY MS. STACEY

25   **Q.**   It's Exhibit 24.

1    **A.**  Oh, yeah, I was looking at December.  There was one

2    before.

3              Yes, September 29, 2005.

4    **Q.**  And those are notes from your treatment session with

5    Mr. Carta?

6    **A.**  Correct.

7    **Q.**  And you made the notes on that date?

8    **A.**  Yes.

9              **MS. STACEY:**  Your Honor, I would now move at this

10   time for Exhibit 24 into evidence.

11             **MR. GOLD:**  Your Honor, we are going to object.  Why

12   is he testifying now, shouldn't he testify first to see if

13   his memory is exhausted before entering the notes?

14             **THE COURT:**  Well, I take it this is just in the

15   form of a verbal act.  These are notes that he took.  They

16   are not coming in for the truth of the assertions in the

17   notes, just that this is part of his operation.

18             **MS. STACEY:**  Furthermore they are a business

19   record, Your Honor.  And I have business certificates if

20   necessary (indicating).

21             **THE COURT:**  I am going to let them in.

22             **MR. GOLD:**  If we can just note one more objection

23   on a different ground, same objection, that given the nature

24   of these proceedings we argue that the notes, these

25   underlying notes are cumulative.  The experts whose opinions

1    are crucial to the Court's determinations have reviewed them

2    and made determinations about them.  Having these underlying

3    documents in is unnecessary and cumulative.

4              **THE COURT:**  Overruled.

5              **(Government's Exhibit No. 24 received in evidence.)**

6    BY MS. STACEY

7    **Q.**  Now, looking at what's now been marked as Exhibit 24,

8    you testified that you went over the limits of

9    confidentially with Mr. Carta.  What does that mean?

10   **A.**  Well, a basic tenet of therapy is that a patient has or

11   a client has confidentiality, that, you know, you won't

12   reveal information that is obtained during the course of

13   treatment.

14         It's a little different in the Sex Offender

15   Treatment Program at the Bureau of Prisons in that there are

16   limits to that confidentiality and that we went over some of

17   those.  That information would be shared upon release with

18   the Probation or Parole Office that might be supervising

19   him.  There was information about other agencies in the

20   Department of Justice.

21         If information came out in the course of therapy

22   that there was a specified minor victim that they had

23   sexually assaulted, that we would, are mandated reporters

24   and that we would report that.

25   **Q.**  And did you go over the consent form that you previously

1    testified to?

2    **A.**   Yes.

3    **Q.**   Now, during this initial treatment center -- treatment

4    sessions with Mr. Carta, did you discuss his victims at that

5    time?

6    **A.**   We did.

7    **Q.**   And what is it that he told you?

8    **A.**   I was beginning the process of gathering information to

9    do that initial psychosexual evaluation and begin the

10   diagnosis process and so I was seeing where he was with his

11   motivation for treatment, setting out what are his goals for

12   treatment, and trying to get an overview of what his

13   problems were.

14          And he summarized for me that he had been working

15   on that Personal History Questionnaire, that thick document

16   to document all the types of victims he had had.  And he

17   summarized to me that he characterized having eleven victims

18   of sexual assault or abuse.

19          And then he kind of outlined, he started when he

20   was young, at 13 his first sexual offense and then gave an

21   overview of some of those offenses.

22   **Q.**   Did Mr. Carta express any definitiveness about who his

23   victims were?

24   **A.**   Sometimes.  There were victims that he would list as a

25   victim and then he would question whether they were truly

1    victims such as if they gave consent because they were old

2    enough, they were in the stage of puberty where they could

3    have orgasm and ejaculation.  He felt that that was a signal

4    that they were old enough to consent to sexual interaction.

5    So he would say I guess because he's learned from the

6    treatment program that this technically is a victim, he

7    questioned whether this was truly accurate.

8    **Q.**  And as a treatment provider, was that significant to

9    you?

10   **A.**  Yes.

11   **Q.**  Why?

12   **A.**  Those are the kind of what we call cognitive distortions

13   or thinking errors that we try to confront or work within

14   treatment.  The type of thinking that this problematically

15   (ph.) gets them in trouble or it gives them permission to

16   commit their offense.

17   **Q.**  And at the time he made these statements to you about

18   doubting who his victims were, how long had he been in the

19   Sex Offender Treatment Program?

20   **A.**  That initial orientation phase started in late July and

21   then I was meeting with him for our initial session on

22   September 29, 2005.

23   **Q.**  So approximately two months?

24   **A.**  Yes.

25   **Q.**  Was Mr. Carta committed to treatment to you at the time

1    he met with you?

2    **A.**   You mean invested when you say committed?

3    **Q.**   Let me ask, did he ever express any feelings about

4    treatment to you?

5    **A.**   Yeah, he did.  And the best way I'll characterize it is

6    ambivalence.  He came across as wanting help for his sexual

7    behavior problem but not really sure whether he could make

8    it in the treatment program for a variety of reasons.  So he

9    was on the fence it seemed.

10   **Q.**   At the end of this initial session with him in September

11   of 2005 did you discuss a course of treatment with him?

12   **A.**   I did.

13   **Q.**   And what was the course of treatment?

14   **A.**   I briefly went over what, now that he was in this new

15   phase, I was his individual therapist, what the treatment

16   for him was going to look like, that we were going to meet I

17   think at that time weekly for approximately a month so I

18   could build rapport with him, get to know him better, gather

19   information for that detailed psychosexual evaluation that I

20   was going to do.  And also went over that he was going to

21   get assigned to a group therapy group and to psycho

22   educational groups and what the course of treatment was

23   going to look like.

24   **Q.**   And how often did you meet with Mr. Carta?

25   **A.**   We were scheduled, like I said, to meet weekly.  And I

1    think the notes support that we met weekly in that first

2    month.  And then it was supposed to taper off to maybe once

3    or twice a month over the rest of therapy or as needed.  So

4    if there were problems or a crisis or just if they needed

5    something, they would put in a request for treatment so it

6    was more often than was anticipated.

7    **Q.**  And why was it more often than anticipated?

8    **A.**  He was having problems in treatment and he was needing

9    to talk about those.

10   **Q.**  Now, a bit earlier you testified about these personal

11   questionnaires that Mr. Carta was required to complete.  Why

12   was he required to complete that?

13   **A.**  It's standard operating procedure in the program to

14   gather information, for them to have time, the inmates in

15   the program to think about all their history so that it can

16   be documented first.  When someone like myself as the

17   primary therapist sits down to go over their history,

18   they've got that information.

19           Ultimately over the course of therapy it's not

20   uncommon for new information about new victims and new

21   behaviors to come out for a variety of reasons.  And so they

22   will do -- we'll give them an updated Personal History

23   Questionnaire.

24           The ultimate goal is I think the polygraph examiner

25   at the end of treatment, Dr. Burke, tests them, gives them a

1    polygraph exam whether they were truthful on that Personal

2    History Questionnaire.  And the goal, of course, is to pass

3    the polygraph about that they were truthful on that

4    document.

5    **Q.**  And did Mr. Carta ever get to the polygraph stage?

6    **A.**  Not that I'm aware of, no.

7    **Q.**  Okay.  I'd ask you to turn to tab 27 of that notebook.

8    **A.**  Okay.

9    **Q.**  And after the discharge report, starting at Bates page

10   1023, do you see that document?

11   **A.**  You said tab 27?

12   **Q.**  Yes.

13   **A.**  I am having trouble here.

14           **MS. STACEY:**  May I assist?

15           **THE COURT:**  Go ahead.

16           **MS. STACEY:**  Thank you.

17           (Pause in proceedings.)

18   **A.**  Okay.  Thanks.

19   **Q.**  Okay.  What is the name of that document?

20   **A.**  That is the Sex Offender Treatment Program Personal

21   History Questionnaire Update Form.

22   **Q.**  And is that the update that you just referenced in your

23   testimony?

24   **A.**  Correct.  There is a note on there saying that that was

25   the second PHQ that he was given.

1    **Q.**   Okay.   And is that Mr. Carta's handwriting on the

2    update?

3    **A.**   I believe so, yes.

4    **Q.**   And is that something that you reviewed during your

5    therapy and treatment with him?

6    **A.**   Yes.

7    **Q.**   And that was kept at the Bureau of Prisons in

8    Mr. Carta's file?

9    **A.**   Correct.

10          **MS. STACEY:**   Your Honor, at this time I move for

11    admission of the PHQ Update Form into evidence.

12          **MR. GOLD:**   No objection.

13          **THE COURT:**   It comes in.

14          **(Government's Exhibit No. 27 received in evidence.)**

15    BY MS. STACEY

16    **Q.**   I want to ask you to stay there and turn to Bates page

17    1072.

18    **A.**   Okay.

19    **Q.**   And what is the name of that document?

20    **A.**   That's the Sex Offender Treatment Program Psychosexual

21    History Questionnaire.

22    **Q.**   And is that the first questionnaire that Mr. Carta was

23    required to complete?

24    **A.**   I believe so.   I don't see a date on it but I believe

25    so, yes.   The last page is not dated but I do believe it is.

1    **Q.**   Okay.  And is that Mr. Carta's signature on the --

2    **A.**   Yeah, it appears to be.

3    **Q.**   On the last page?

4    **A.**   Mm-hmm.

5    **Q.**   And is that a document that you reviewed during your

6    treatment of Mr. Carta?

7    **A.**   Yes.

8    **Q.**   And was that kept in the Sex Offender Treatment file at

9    the Bureau of Prisons?

10   **A.**   Yes.

11          **MS. STACEY:**  At this time I would move for

12   admission of the history questionnaire into evidence.

13          **MS. KELLEY:**  Your Honor, if I could just be heard

14   on this.  We don't intend to switch off all the time, but

15   these are such highly personal treatment records --

16          **THE COURT:**  I ruled on it.

17          **MS. KELLEY:**  Well, I know you ruled that they can

18   be given to the experts in this case.  For them --

19          **THE COURT:**  I am going to let them in.

20          **MS. KELLEY:**  Well, can we at least ask if you are

21   admitting them, that they be somehow held under seal and not

22   made part of the public record of the case?

23          **THE COURT:**  Do you have any objection to that?

24          **MS. STACEY:**  No objection.

25          **THE COURT:**  Okay.  We will do that.

1          **MS. KELLEY:**  All of these treatment records,

2     please, because it's just --

3          **THE COURT:**  You have made your point.  You work

4     with Ms. Lovett to create a very satisfactory sealing

5     program for you, okay.

6          **MS. KELLEY:**  Thank you.

7          **(Government's Exhibit No. 22 received in evidence.)**

8     BY MS. STACEY

9     **Q.**  Now, you also mentioned during your course of treatment

10    with Mr. Carta that you were aiming toward completion of a

11    psychosexual evaluation; is that right?

12    **A.**  Correct.

13    **Q.**  And what is that?

14    **A.**  It's an in-depth document.  A psychological evaluation

15    in the normal course of treatment is a history and

16    psychological testing and then we add, we have an added

17    component in sex offender treatment where we do detailed

18    exploration of their sexual history.  So they're in the

19    psychosexual component of the report.

20          And it's a way for us to gather information to be

21    able to accurately diagnose, make a treatment plan and that

22    all the psychologists in the program can then understand at

23    a glance, because we're all working in the different groups

24    and activities with the same inmates and so everyone doesn't

25    have to go do their own in-depth history.  They can then

1    share that report with each other.

2            That information is also used upon discharge to

3    make a discharge report that goes to the probation/parole

4    officer so they can supervise the offender in the community.

5    **Q.**  And in doing a psychosexual evaluation, I'm going to ask

6    you to look at Exhibit 25 in the binder.

7    **A.**  Okay.

8    **Q.**  And is that document, is that the psychosexual

9    evaluation?

10   **A.**  Yes.

11   **Q.**  Did you author that evaluation?

12   **A.**  I did.

13   **Q.**  And did the person supervising you sign off on that as

14   well?

15   **A.**  He did.

16   **Q.**  And is that a true and accurate copy of your

17   psychosexual evaluation?

18   **A.**  It appears to be, yes.

19   **Q.**  And you kept that as part of your duties as the

20   psychological intern?

21   **A.**  Correct.

22           **MS. STACEY:**  At this time I'd move for admission of

23   Exhibit 25 into evidence.

24           **MS. KELLEY:**  If I may just make one other

25   objection, Your Honor, which is in some of these materials

1   this witness opines concerning dangerousness and other kind

2   of conclusory information from him.  This isn't just

3   factual.  You know, we were informed that this was a fact

4   witness to talk about facts about treatment but we're now

5   moving into evidence, all kinds of expert conclusions, et

6   cetera, from someone who at the time he authored this

7   doesn't even have a doctorate.

8           **THE COURT:**  I understand.  I am going to let it in.

9           **MS. KELLEY:**  Well, note our objection.

10          **THE COURT:**  Yes.

11          **(Government's Exhibit No. 25 received in evidence.)**

12   BY MS. STACEY

13   **Q.**  Now, what did Mr. Carta -- did you document, in

14   Exhibit 25 did you document Mr. Carta's federal offense

15   history?

16   **A.**  I did.

17   **Q.**  Now, what did Mr. Carta tell you --

18          **THE COURT:**  Federal?

19          **MS. STACEY:**  Federal offense history.

20   BY MS. STACEY

21   **Q.**  What did Mr. Carta tell you about his federal offense

22   history?

23   **A.**  There is a section in the report in which I get his

24   version and in essence he says that he reflected how -- I am

25   trying to find it.

1           That he was caught with ten to twenty thousand

2     images of child pornography.  And he estimated that at the

3     height of his collecting he had approximately 50,000 images

4     of child pornography.

5           He also talked about the depth or scope of the

6     problem, that he bought a computer for collecting child

7     pornography and the depth of the problem, that it got to be

8     where he wasn't taking care of daily needs, of going to work

9     or bathing at times because he was so entrenched in viewing

10    the child pornography.

11    **Q.**  And did he tell you how many images that he had at the

12    height of his collecting?

13    **A.**  Yes, he estimated 50,000.

14    **Q.**  Did he say anything else to you about the way he kept

15    the child pornography images that he collected?

16    **A.**  I think he had documented in the Personal History

17    Questionnaire how he had them categorized in specific

18    folders.  And he also told me about having specific

19    encryption programs that could help evade detection by law

20    enforcement.

21    **Q.**  Now, as a treatment provider is this information

22    important to you?

23    **A.**  Absolutely.

24    **Q.**  And why is that?

25    **A.**  It goes to the strength of the deviant sexual interest.

1   **Q.** Did you make any observations as you were preparing your

2   psychosexual evaluation, did you make any observations about

3   Mr. Carta's insight?

4   **A.** I did.  I was -- I thought it was a good sign that he

5   appeared to be so forthcoming about his history at the early

6   stages of treatment but in the same vein it was problematic

7   that he was very evident with his distortions about children

8   and sex.  Whether pubescent children who are in the 13-,

9   14-year old range could consent to sex.

10        And at one point it was really striking because he

11   said that he thought when he was, you know, in his thirties

12   or forties and had sex with a 13-year old that that child

13   should also be equally culpable of breaking the law.  So

14   those kind of distortions caught my attention.

15   **Q.** And was that important to you as a treatment provider?

16   **A.** Yes.

17   **Q.** Why is that?

18   **A.** Because as I explained earlier, those are the type of

19   thinking patterns that we want to expose to therapy and try

20   to correct.

21   **Q.** Did you also review Mr. Carta's history of sexual

22   relationships for this?

23   **A.** Yes, I did.

24   **Q.** And what is it that you learned from Mr. Carta?

25   **A.** About his sexual history?

1    **Q.**   Yes.

2    **A.**   There was a lengthy history of abusive sexual behavior

3    starting in his early adolescence and multiple sexual

4    contacts mainly with young males in the 13- to 17-year old

5    range.

6              And he did have some adult relationships that

7    seemed pretty chaotic in that -- I forgot the word he

8    used -- suffocated people, a real intense relationship.  And

9    that he would almost drive them off.  And then if they would

10   go away, then he would kind of be vengeful about it and make

11   flyers or posters about people.  There was a couple

12   incidents like that, or get back at people in some way so

13   that they would lose their relationships, outside

14   relationships and have no one but him to come back to.

15   **Q.**   When Mr. Carta told you about his vengeful behavior and

16   the example making flyers, was that important to you as a

17   treatment provider?

18   **A.**   Yes.

19   **Q.**   Why?

20   **A.**   I thought it spoke, it spoke to two things.  The chaotic

21   relationships that he had engaged in and also towards the

22   diagnosis of the personality disorder that I was formulating

23   at that time.

24   **Q.**   And as part of the psychosexual evaluation did you also

25   review Mr. Carta's job history?

1    **A.**   I think there was a job history as part of the

2    presentence investigation and then his self-report of a job

3    history.

4    **Q.**   And what did he self-report to you?

5    **A.**   A very unstable work relationship.  He's never had a job

6    for long.  I think he said the longest was eight months.

7    And he estimated he's held approximately one hundred jobs.

8    **Q.**   And is that important to you as a treatment provider?

9    **A.**   Yes.

10   **Q.**   Why is that?

11   **A.**   That goes again to the instability in his life and also

12   towards my formulation of the personality disorder I was

13   working with.

14   **Q.**   Now, as part of this evaluation, did you also look at

15   Mr. Carta's psychiatric history?

16   **A.**   Yes, what was documented in his self-report.

17   **Q.**   Okay.  What did he self-report to you in terms of the

18   psychiatric history?

19   **A.**   That is when I learned that he had previously been, I

20   guess before he came to prison had been in a sex offender,

21   outpatient in the community sex offender treatment program.

22   I wasn't aware of that until we were talking.

23   **Q.**   And did he finish that program in the community?

24   **A.**   I don't believe so.

25   **Q.**   And was that important to you?

1    **A.**  Yes, because it flagged for me that there had been prior

2    sexual, some type of sexual involvement that the court felt

3    that he needed treatment for.

4    **Q.**  And was there anything else that was important to you as

5    a treatment provider that you got through the psychiatric

6    history from Mr. Carta?

7    **A.**  I don't think so.

8    **Q.**  Now, did Mr. Carta talk to you at all about his

9    substance abuse history?

10   **A.**  He did.

11   **Q.**  And what is it that you learned from Mr. Carta about his

12   substance abuse history?

13   **A.**  He had a history of abusing several substances.  Alcohol

14   was one.  Daily marijuana use for a lengthy period of time.

15   And there was a period when he was following the Grateful

16   Dead for like five years and he said he was doing a lot of

17   LSD.

18   **Q.**  And is that important to you as a treatment provider?

19   **A.**  Yes.

20   **Q.**  Why is that?

21   **A.**  It's just another area that we want to address because

22   that can factor -- you can't follow a relapse prevention

23   plan when you get out if you're disinhibited on drugs or not

24   caring if, you know.

25   **Q.**  Okay.  And going back for one minute to the psychiatric

1  history, if you look at the second line under the paragraph

2  entitled, "Psychiatric History," do you see your notation

3  about a relationship that Mr. Carta had with someone named

4  Fred?

5          **THE COURT:**  Fred?

6          **MS. STACEY:**  Fred.

7  **A.**  Yes.

8  **Q.**  And why was that -- why did you note that there?  Why is

9  it significant to you?

10  **A.**  It represented an official conviction.  It was a

11  conviction for a breach of peace and risk of injury to a

12  minor in which it came to light that that's where the sexual

13  assault charge for Fred's younger brother, I think it was a

14  15-year old brother.

15          And the way I understood it from Mr. Carta is

16  through the negotiated plea process the sexual assault

17  charge was dismissed I guess in exchange for the breach of

18  peace, breach of peace and risk of injury.  And so then he

19  went to sex offender treatment.  So it's informative to look

20  at his criminal history and history of violence and sexual,

21  prior sexual offending offenses.

22  **Q.**  And did you ask or speak to Mr. Carta about his criminal

23  history?

24  **A.**  I did.

25  **Q.**  And what is it that you learned about his criminal

1   history?

2   **A.**   In combination with talking with him and looking at the

3   documents, prior criminal history and the presentence

4   investigation, I had an extensive criminal history of a

5   variety of different things:  Larceny, burglary, possession

6   of marijuana, controlled substances, criminal mischief,

7   failure to appear, breach of peace, criminal trespass,

8   harassment, disorderly conduct, risk of injury.

9   **Q.**   And is that important to you as a treatment provider?

10  **A.**   Yes.

11  **Q.**   Why is that?

12  **A.**   That reflects just a diversity of criminal behavior.

13  Those are important risk factors.  If you have violence in

14  your prior history, that's also a significant risk factor

15  for when you're looking at sex offenders and their

16  propensity to commit now offenses in the future.

17  **Q.**   Now, I ask you as part of the sexual history that

18  Mr. Carta reported to you, did you go over that with

19  Mr. Carta?

20  **A.**   In depth, yes.

21  **Q.**   And what is it that he told you about his victims in the

22  sexual history?

23  **A.**   He reported that beginning when he was between the ages

24  of eleven and thirteen he engaged in sexual contact with

25  younger children.  One of them specifically he said was in

1    diapers.  He estimated the child to have been three or four.

2    And I questioned, you know, that is kind of old to be in

3    diapers but, so that's where we were, somewhere between

4    diapers and three to four years old.  He performed fellatio

5    on that child.  That was a neighborhood child.

6         And also he engaged in mutual fellatio on

7    approximately ten occasions over a one-year period with a

8    younger cousin who was three to four years younger than him.

9         So that was the beginning of what I was documenting

10   as sexually abusive behavior.  It went on from there to

11   other sexual offending acts.  There was mention of a 15- to

12   16-year old male in his neighborhood.  Mr. Carta said he

13   wanted to -- he asked this guy to, if they could have oral

14   sex and the guy declined.  And so when he refused, Mr. Carta

15   said he shot this man or boy with a BB gun.

16        And a month later the young male then approached

17   him and asked him to engage in oral sex.  And Mr. Carta

18   denied that there was or saw that there was any force or

19   coercion in this act and that he characterized them as

20   having an ongoing relationship off and on over a five-year

21   period.

22        He outlined at 21 he performed fellatio on a

23   16-year old nephew on several occasions.  And he said that

24   this victim had his preferred body type which he

25   characterized as young and thin.  He denied there was any

 1    force or coercion in that.

 2            He went on to talk about when he was following the

 3    Grateful Dead around, he estimated about 28 years old he

 4    encountered a 13-year old male who he characterized as

 5    street wise and knowing what's going on.  He said this child

 6    might have been messed up, like on some kind of drugs or

 7    alcohol.  And he said he took advantage of the kid by

 8    offering him concert tickets in exchange for performing

 9    fellatio on that child.

10            He then questioned whether that kid's parents were

11    in on it and whether they were maybe pimping the kid out to

12    do this kind of act in exchange for some type of material

13    item.

14            He also said there was another guy, another victim

15    while following the Grateful Dead, he said that he

16    encountered a 17- or 18-year old male who had passed out

17    from substance use.  And that Mr. Carta thought he had

18    gotten signals from this guy that the guy wanted to engage

19    in sexual contact.  So while the guy was passed out,

20    Mr. Carta said he began fondling him and masturbating

21    himself and that the man woke up during this assault and

22    yelled at Carta and Carta ran off.

23            There are sexual offending behaviors.  He said that

24    at 30 or 31 he encountered a 13-year old male and he said

25    that this young guy came to his home or apartment and asked

1    if he could hang out.  And once inside the house, he said

2    the boy spontaneously began masturbating.  And Mr. Carta

3    said that he didn't do anything or believed that he had done

4    anything to encourage this boy to do this.  And that that

5    started an ongoing sexual relationship with this young man

6    over, he initially said two years and then he changed it and

7    thought about it and said maybe it was over four years.

8         He described this boy as kind of a runaway who hung

9    out where homeless people did.  He said the boy was lonely.

10   His parents were drug addicts.  The young boy would come and

11   go in and out of his life.  He said they had sexual contact

12   he estimated over 20 or 30 times.

13   **Q.**  Was that with this 13-year old male?

14   **A.**  Yes.

15   **Q.**  Did he describe any Internet activity that he had with

16   you?

17   **A.**  He did.  He said that he also would chat with young

18   people to see if they wanted to meet for sex.  And I think

19   most of the time he said that this didn't happen because

20   they were in far away areas, maybe they're in other states

21   or something, but there were occasions where he met with

22   minors.

23   **Q.**  And did he give you the age of those minors?

24   **A.**  Yes, he estimated that at 39 he chatted on the Internet

25   with a 13-year male who propositioned him.  This young male

1    propositioned Mr. Carta for sex so he reported.  And that

2    boy lived two towns over.

3         And that, this was another evidence of the

4    distortion for me because he had this young boy who wanted

5    to fellate him but he told the boy, you know, no, let's do

6    that, let me do this to you.  He described it, it's him

7    providing pleasure for this young boy.  That doing it the

8    other way, if the young boy did it on the male, that could

9    mess children up.  And so he wanted him to be sure and think

10   about that.

11        So that was another flag for me of those type of

12   distortions that I'm thinking of that he doesn't see may be

13   providing, what he considered providing pleasure or oral sex

14   on this young boy, that that's problematic as well.

15        I think this is the child that he -- yeah, somehow

16   he asked that 13-year old boy if he would be interested in

17   participating with three-way sex with Mr. Carta's 17-year

18   old sexual partner.  And he said that that did occur.

19        **THE COURT:**  Let's take a five-minute recess, okay.

20

21        (Recess.)

22

23        **THE COURT:**  I am sorry to keep you waiting.  I made

24   the mistake of taking one phone call.

25        (Laughter.)

1          **THE COURT:**  Go ahead.  Sit down.

2          Go ahead.

3          **MS. STACEY:**  Thank you, Your Honor.

4              **JAMES MICHAEL WOOD, Resumed**

5              **DIRECT EXAMINATION, (Cont'd.)**

6   BY MS. STACEY

7   **Q.**  Dr. Wood, have you completed your answer about the

8   sexual history that you discussed with Mr. Carta?

9   **A.**  I don't believe we covered all the areas that came out

10  during that psychosexual evaluation.

11  **Q.**  Okay.  So what would you like to add at this time?

12  **A.**  Let me try to see where we picked up.

13  **Q.**  You had last testified to the, I believe the Internet

14  activity with a 13-year old male.

15  **A.**  Right.  He said there was Internet activity.  And there

16  was also, I was talking about the 13-year old boy in

17  California.

18          And Mr. Carta said he convinced this boy to go

19  over, back to Connecticut to the East Coast, possibly to

20  live with him.  And so that was important to me.

21          He also said that he posted ads on the Internet in

22  which he was looking for teenagers to have relationships

23  with and cruised message boards, chat rooms such as "Dads 4

24  Sons."

25          **MR. GOLD:**  Your Honor, the witness appears to be

1    reading his own report.  I'd ask that he be asked to exhaust

2    his memory before --

3              **THE COURT:**  Okay.  Try to tell us what you remember

4    before you refresh your recollection.

5              **THE WITNESS:**  Okay.

6    **A.**  There were several teenagers, I remember a teenage,

7    maybe a 16-year old girl and I'm thinking a teenage boy that

8    he met over the Internet and met up to have sex with.  I

9    don't believe he had sex with the teenage girl or the boy in

10   that instance.

11   **Q.**  Okay.  Now, are all these instances of sexual history,

12   is that important to you as a treatment provider?

13   **A.**  Yes.

14   **Q.**  And why is that?

15   **A.**  Well, it helped formulate my diagnosis that we were

16   working towards.

17   **Q.**  And did you also review Mr. Carta's history of

18   masturbation and fantasies?

19   **A.**  I did.

20   **Q.**  Why did you do that?

21   **A.**  That gets to the heart of the sexual interests that he

22   had that would help with my diagnosis.

23   **Q.**  And what did he tell you about his masturbatory practice

24   and his fantasies?

25   **A.**  That his primary sexual interest was 13- to 17-year old

1    males.  And that the characteristics that he liked of those

2    children were that they were fresh and innocent and virginal

3    were his words.

4    **Q.**  Did he discuss with you anything about child pornography

5    being involved with his masturbation practices or his

6    fantasies?

7    **A.**  Yes.  Prior to his incarceration it got to the point

8    where he said it was very compulsive type behavior, that he

9    was spending large amounts of time viewing child pornography

10   and fantasizing, masturbating.

11   **Q.**  How much time was he spending?

12   **A.**  It was -- I don't remember the exact hours but it was a

13   significant part of his day that he said he wasn't showering

14   or going to work.

15   **Q.**  Would looking at the report help you refresh your

16   recollection?

17   **A.**  Yes, it would.

18         He estimated two to three times a day looking at

19   child pornography spending 12 to 14 hours on the computer.

20   **Q.**  And did this 12- to 14-hour a day habit have any affect

21   or result on him and his social history?

22   **A.**  Yes, it kept him, if you are asking, it kept him from

23   getting out and interacting with people in everyday life,

24   working and personal hygiene.

25   **Q.**  When you say personal hygiene, what do you mean?

1    **A.**   Taking showers.

2    **Q.**   Did this prevent him from taking a shower?

3    **A.**   I guess he chose to view child pornography rather than

4    doing other activities in life.

5    **Q.**   Was Mr. Carta deterred from this child pornography

6    activity on the Internet by the presence of law enforcement?

7    **A.**   No, he said he wasn't.

8    **Q.**   And did he tell you why he wasn't?

9    **A.**   It came across to me that either he didn't think he

10   would get caught because he had several different avenues

11   that he thought he could evade detection and also he wrote I

12   think in his personal history questionnaire that he didn't

13   care.

14   **Q.**   And was any other testing performed on Mr. Carta?

15   **A.**   Yes, we gave him a battery of tests in that initial

16   orientation assessment phase that was part of the

17   psychosexual evaluation.

18   **Q.**   And generally speaking what were the tests?

19   **A.**   There is an intelligence test, an achievement test to

20   look at reading and spelling levels, to be able to navigate

21   the course of treatment, some personality assessment

22   inventories, a sex specific test, multiphasic sex inventory.

23   **Q.**   And were you given the results of the tests?

24   **A.**   I was.

25   **Q.**   And why were you given the results of the test?

1    **A.**  Well, when you combined the information that I gathered

2    in the history along with the test interpretation, that

3    helps with your diagnostic formulation for the diagnosis.

4    **Q.**  Did you interpret the tests that were actually performed

5    on Mr. Carta?

6    **A.**  I did.

7    **Q.**  And what is it that you determined?

8    **A.**  That when you combined that with his history they showed

9    what, you could see the pattern in his life of a disregard

10   for society's rules and expectations --

11        **MR. GOLD:**  Objection, Your Honor.  I think the

12   question calls for expert opinion interpretation of these

13   test results.  I realize there is a line --

14        **THE COURT:**  I am going to make this the line.  I

15   will sustain your objection.

16        **MS. STACEY:**  Your Honor, may I ask he be allowed to

17   testify as to what he interpreted the results of these tests

18   and what his interpretations were is what I'm asking him to

19   testify to.

20        **THE COURT:**  He is only going to tell me that for my

21   benefit supposedly and he is not an expert.

22        **MS. STACEY:**  He does at the end of this make a

23   diagnosis, Your Honor, and so this would --

24        **THE COURT:**  I know, but you haven't qualified him

25   as an expert.  You haven't submitted him as an expert.  He

1    is only doing this for me.  It is -- I mean no disrespect

2    but we don't care what he thinks in the abstract.  We care

3    what he thinks insofar as it might influence my decision.

4         **MS. STACEY:**  Okay, Your Honor.  I just ask, so he

5    may testify to what he did as his treating physician though?

6         **THE COURT:**  Yes.

7         **MR. GOLD:**  Your Honor --

8         **THE COURT:**  Well, he --

9         **MS. STACEY:**  As his treating provider, treatment

10   provider.

11        **THE COURT:**  Yes.

12   BY MS. STACEY

13   **Q.**  Now, as a treatment provider are the testing results

14   important to you?

15   **A.**  Yes.

16   **Q.**  And why are they important to you?

17   **A.**  Because you put them together with the history that I

18   had gathered to help with the diagnosis that you're going to

19   make, the treatment planning, the course of treatment and

20   the program.

21   **Q.**  And at the end of your psychosexual evaluation of

22   Mr. Carta, did you make a diagnosis based on your

23   observations of him at that time?

24        **MR. GOLD:**  Objection, Your Honor.

25   **Q.**  At that time?

1    **MR. GOLD:**  At the time the witness was an intern.

2    He wasn't even qualified to make a diagnosis.

3        **THE COURT:**  Well, that goes to the weight of it.

4    But we will let him testify.  Go ahead.

5        **MR. GOLD:**  We also say that, by the same token, a

6    diagnosis is an expert opinion.

7        **THE COURT:**  She is asking how he felt about it back

8    then.  I am going to let it in.

9    **A.**   Yes, I did make a diagnosis.

10   **Q.**   And what was your diagnosis at the time?

11   **A.**   The primary sexual diagnosis was paraphilia not

12   otherwise specified, hebephilia.

13   **Q.**   And what is that?

14   **A.**   It's the sexual attraction or interest in behaviors with

15   teenagers right at the age of pubescence.

16   **Q.**   And did you make any other diagnosis of Mr. Carta at the

17   time?

18        **THE COURT:**  When you say "the age of pubescence,"

19   be specific.  What are you talking about?

20        **THE WITNESS:**  For him it was that he said he was

21   sexually attracted to children who were in the midst of

22   puberty so, are you looking for a specific age?

23        **THE COURT:**  You are the one that used the

24   expression I think.  You said something.

25        **THE WITNESS:**  Right.  Well, what I based it on was

1    his attraction to the midst of puberty and he characterized

2    13, 14, up to 17 years old.

3              **THE COURT:**  All right.

4    BY MS. STACEY

5    **Q.**  Did you make any other diagnosis of Mr. Carta at that

6    time?

7    **A.**  I did.

8    **Q.**  And what else did you diagnose?

9    **A.**  There was several on the substance abuse list, the

10   cannabis dependence, hallucinogen dependence in remission,

11   because he hadn't done that in several years before he came

12   to prison.  And then the personality, antisocial personality

13   disorder and borderline personality traits.

14   **Q.**  And did you memorialize those diagnoses in that sexual

15   evaluation, psychosexual evaluation that's marked as

16   Exhibit 5 -- 25?

17   **A.**  I did.

18   **Q.**  And as part of your duties with Mr. Carta, did you also

19   develop a treatment plan for him?

20   **A.**  I did.

21   **Q.**  And what is a treatment plan?

22   **A.**  It's kind of a road map or a goal for what treatment is

23   going to look like where we identify problems and then what

24   are the aims of treatment going to be, how we're going to go

25   about satisfying relieving those problems that we have

1   identified.

2   **Q.**   And, I'm sorry, before I leave the, before I leave the

3   psychosexual evaluation again, did you diagnose him with any

4   type of personality diagnosis?

5   **A.**   Yes, the antisocial personality disorder and the

6   borderline personality traits that I observed.

7   **Q.**   Okay.   And what did you base that on?

8   **A.**   His history of violating -- there is multiple criteria

9   in the DSM, the *Diagnostic and Statistical Manual*, but it's

10   multiple rule violations, early onset of criminal activity,

11   juvenile delinquency, irresponsibility, disregard for rules,

12   irritability.

13   **Q.**   And moving back, and I apologize, to the treatment plan,

14   when did you develop a treatment plan with Mr. Carta?

15   **A.**   I don't remember the date.   It would be during those

16   first few months of treatment in working with him, the fall

17   to the winter of 2005.

18   **Q.**   I'll ask you to turn to tab 22 on the binder that's

19   there before you.

20   **A.**   Okay.

21   **Q.**   I ask you to review the document.   Is that the treatment

22   plan?

23   **A.**   Yes, it is.

24   **Q.**   Does that refresh your recollection about the date that

25   you developed the treatment plan?

```
1   A.   Yes, it does.  It's dated January 20, 2006.

2   Q.   And why is the treatment plan typed up on this document?

3   A.   That's the format we used for all of the program

4   participants and that we outline their diagnosis and their

5   problems and the goals and interventions we're going to do.

6   And then we actually sit down with the program participant

7   and go over that with them so they have a road map for

8   treatment.

9   Q.   Did you type this up as part of your duties at FCI

10  Butner?

11  A.   Correct.

12  Q.   And was it in the FCI Butner system?

13  A.   Yes.

14  Q.   And is it a true and accurate copy of the treatment plan

15  you developed?

16  A.   Yes.

17       MS. STACEY:  And at this time I'd move for

18  admission of the treatment plan as Exhibit 22.

19       THE COURT:  Any objection?

20       MR. GOLD:  No objection.

21       THE COURT:  It comes in.

22       Is that January 20, '06?

23       MS. STACEY:  Yes, Your Honor.

24       (Government's Exhibit No. 22 received in evidence.)

25  BY MS. STACEY
```

1   **Q.**  Now, when you say you go through the different goals and

2   stages, there is something listed as an acceptance of

3   responsibility.  Did Mr. Carta have any issues with

4   acceptance of responsibility?

5   **A.**  He was in the early phases I believe of accepting

6   responsibility but he hadn't, I believe he hadn't

7   participated long enough in treatment to fully accept the

8   harmfulness of his behavior.

9   **Q.**  And what about the second domain of the treatment plan,

10  understanding his sexual deviance, did Mr. Carta have any

11  issues with that?

12  **A.**  Again, it was in and out, that I believe we would have a

13  breakthrough and then it was like one step forward and two

14  steps back.

15  **Q.**  Did you note the problems in the report that Mr. Carta

16  had?

17  **A.**  On this report?

18  **Q.**  Yes.

19  **A.**  Yes.

20  **Q.**  And are you able to remember some of the problems that

21  Mr. Carta had in this area, of understanding his sexual

22  deviance?

23  **A.**  Yes.

24  **Q.**  And what were they?

25  **A.**  He would begin to recognize some of the harmful

1    behaviors he had but he didn't fully recognize the role he

2    played in that, that, you know, he viewed the children as

3    being able to make choices to engage in the sexual behavior

4    with consent or willingly.

5    Q.   And moving onto management of Mr. Carta's sexual arousal

6    and his deviance, the third prong of the treatment plan, did

7    he have any issues with that?

8    A.   We really didn't get to address that because of where he

9    was in treatment when he left.

10   Q.   What is that, the management of sexual arousal and

11   deviance generally, what is that there for?

12           THE COURT:   Arousal?

13           MS. STACEY:   I'm sorry, sexual arousal and

14   deviance.

15   A.   For some of the men in the treatment program, they

16   report problems managing their sexual arousal.  They're

17   fantasizing and masturbating like to an excessive extent.

18   They feel like they can't control their fantasies.  And we

19   will either have behavioral interventions that we can do to

20   help them with that or they can see the psychiatrist.

21   They're starting to use medication to help control that.

22   Q.   The fourth part of the treatment plan you have listed,

23   victim impact and empathy problems, did Mr. Carta have any

24   issues there?

25   A.   Yes, he did.

1    **Q.**  And what were they?

2    **A.**  It speaks to that, the previous problem I was

3    discussing, his understanding the full impact that his

4    behavior had on the children.  And so I think he was

5    beginning to understand that this was problematic but then

6    in the next breath he would start to defend why what he did

7    was okay in his perspective.

8    **Q.**  Did Mr. Carta meet any of the goals set out in this

9    treatment plan?

10   **A.**  No.

11   **Q.**  And why is that?

12   **A.**  Because he discontinued treatment voluntarily.

13   **Q.**  And I ask you to look at the last page of Exhibit 22.

14   Did both you and Mr. Carta sign that treatment plan?

15   **A.**  We did.

16   **Q.**  And what did the signatures signify?

17   **A.**  That we went over the problems and the interventions

18   together.

19   **Q.**  Now, moving to your treatment of Mr. Carta, during your

20   treatment of him, did he encounter any issues during

21   treatment?

22   **A.**  He did.  It seemed to be a continuous problem from the

23   beginning.

24   **Q.**  And what issues did he encounter?

25   **A.**  There were minor things like he complained that not

1    being able to smoke was a problem in the treatment.  I think

2    at that time the Bureau had just instituted a no smoking

3    policy and that was difficult on the inmates.

4           He verbalized concern that he might not have the

5    intelligence or the memory to successfully complete the

6    program.

7           And the more problematic aspect was this ongoing

8    thing that I documented of getting confronted for his

9    interactions with the younger program participants or some

10   of the newer younger program participants.

11   **Q.**  And when you say staying away from the newer younger

12   program participants, why is that a problem?

13   **A.**  It was, it began -- he was getting feedback from some of

14   the community members that -- and, again, this is a

15   therapeutic community where you're kind of in treatment

16   throughout the day, even when you're not sitting in the room

17   with the psychologists, some of the more experienced program

18   participants are with you all the time.  And they're giving

19   you feedback about their observations.

20          And so it began that these more experienced program

21   participants started confronting Mr. Carta that he was

22   spending an unusual amount of time in interview and focus

23   with these new, there was a group of new young program, I

24   think they were like 19 to 22, and they were young

25   appearing.

1          And then, and they saw that he was spending a lot

2     of attention on them.  And so they started giving him

3     feedback about that.  And then that started a spiral of

4     problems throughout the rest of the treatment program.

5     **Q.**  And did you counsel Mr. Carta about this problem,

6     hanging out with the younger members?

7     **A.**  We did.  And, you know, it began as just a treatment

8     issue, hey, we're getting reports on this, what do you think

9     about this, getting this feedback about it.  And he was back

10    and forth about where he was with that.  First denying that

11    there was any problem, that that was part of the treatment

12    philosophy, that each person was going to give feedback to

13    others.

14         And so we started saying, well, why is it just this

15    group, are you giving feedback to older program

16    participants.  And he had some issues saying that he didn't

17    relate to them or they went to bed early and these other

18    people are more accessible.

19         Over time it got to the point where I would observe

20    when I was walking through that he would be at tables or in

21    the courtyard with some of these same guys that he was

22    getting confronted for.  And he eventually admitted that he

23    was sexually attracted to these guys.  So that he was

24    spending time with them, mentoring them but it was also

25    serving a dual or underlying purpose of sexual attraction.

1    **Q.**  And as a result of that, what, if anything, did you do?

2    **A.**  Well, we talked about it for an ongoing period, you

3    know, is this a problem.  We tried to address the least

4    restrictive issues like in the community, him coming forth

5    in the community and admitting that this has been going on.

6    Getting feedback from the community or help or advice.

7           Eventually it got to the point where he was wanting

8    to quit the program.  He just couldn't tolerate the

9    confrontation about this issue.  He saw these people as

10   friends.  He didn't want to participate if it was going to

11   get to this level that he couldn't interact with them.

12          So Dr. Hernandez is the program director and at

13   this point Mr. Carta was wanting to quit.  So the three of

14   us met to talk about that.  And Mr. Carta changed his mind.

15   He said he needed help with changing his behavior and not

16   hanging out with this younger group of guys.  And

17   Dr. Hernandez put it back on Mr. Carta to come up with some

18   type of alternative or restriction that would help him

19   progress in treatment and not hang around these guys.

20          And so over the next couple days or week I think it

21   was Mr. Carta's idea to say he wasn't supposed to interact

22   with anybody below what they call a phase four.  Phase four

23   is the most experienced group of guys.  But it also had a

24   dual purpose of none of the young guys who were a problem

25   for him were in that phase so it kept him away from that

1    group.

2    **Q.**   And why did Dr. Hernandez put it back on Mr. Carta to

3    make the restriction?

4    **A.**   It was a way to keep, hopefully keep him invested in

5    treatment, that we weren't going to outline rules that

6    dictate for someone with Mr. Carta's personality style to

7    want to buck the system.  If he was invested in helping to

8    come up with the solution, he might be more invested in

9    helping to continue on.

10   **Q.**   Did you ever discuss with Mr. Carta whether he was

11   grooming members of the Sex Offender Treatment Program?

12   **A.**   That did come up.

13   **Q.**   And what was Mr. Carta's response?

14   **A.**   Like I said, it was back and forth about whether it was

15   a problem or not.  At one point he did admit that he was

16   interacting with these guys because he was sexually aroused

17   to them.  And he was operating in this mentoring type role.

18   **Q.**   And what is grooming, Dr. Wood?

19   **A.**   It is a type of behavior that is common with sex

20   offenders that they build trust or rapport with, in the

21   definition of a sexual offense, to build up a relationship

22   or trust to let a victim's guard down so that they don't

23   know maybe what's happening.

24   **Q.**   Did Mr. Carta ever try to quit the Sex Offender

25   Treatment Program?

1    **A.**   Multiple times.

2    **Q.**   And eventually, you testified eventually Mr. Carta quit;

3    is that correct?

4    **A.**   Correct.

5    **Q.**   How did you know that?

6    **A.**   I don't remember, either he put a note -- I guess it

7    might have started when he put a note on my door.  He came

8    to see me and said that he was done.  And we had gone

9    through this multiple times, multiple other times but he was

10   able to talk about it and we were able to process, you know,

11   what the problems were and maybe some strategies to keep him

12   in.  But I think the last time he said that he didn't want

13   to talk about the reasons why he was leaving.  It was pretty

14   final to me.

15   **Q.**   I'll ask you to turn to Exhibit 21 in the book in front

16   of you, tab 21.

17   **A.**   Okay.

18   **Q.**   And do recognize that document?

19   **A.**   Can you tell me which one you're referring to?  I'm

20   having problems here.

21   **Q.**   I'm sorry.  It's PDS note dated January 31, 2006.

22   **A.**   Yes.  Okay.

23   **Q.**   Do you recognize the document?

24   **A.**   Yes.

25   **Q.**   What is the document?

1  **A.**  It's an entry note that when I document an interaction

2  with any of the inmates in the program.  And that's one

3  where I discuss he was waiting on me upon my arrival to the

4  unit that morning and saying that he couldn't take treatment

5  and was wanting to quit.

6  **Q.**  Okay.  And there are other -- are there other things

7  other than that note in this report?  Strike that.

8      Did you make this report as part of your duties as

9  the psycho doctoral intern?

10  **A.**  I did.

11  **Q.**  And is it a true and accurate copy of the notes you made

12  about his wanting to quit the Sex Offender Treatment

13  Program?

14  **A.**  Yes.

15      **MS. STACEY:**  I move to admit this as Exhibit 21.

16      **MR. GOLD:**  Same objection, Your Honor.

17      **THE COURT:**  Overruled.

18      **(Government's Exhibit No. 21 received in evidence.)**

19  BY MS. STACEY

20  **Q.**  After he told you that he wanted to quit, what, if

21  anything, did you do?

22      And that's on January 31st, 2006.

23  **A.**  Okay.  If this was the final time that he said he was

24  going to quit, I would have talked to my supervisors and

25  they had me write a memo that he was going to leave the

1    program or move out of the Maryland Unit to another unit.

2    **Q.**  Well, at least on January 31, 2006, what were the

3    reasons that Mr. Carta was giving you for wanting to quit

4    the Sex Offender Treatment Program?

5    **A.**  I think it would have been the ongoing problem with the

6    restrictions placed on him for hanging out with the younger

7    program participants that he was getting confronted for and

8    the challenge about that.

9    **Q.**  I ask you to look at tab twenty in the book that you

10   have in front of you.

11           Is that a treatment note dated February 14, 2006?

12   **A.**  Yes, it is.

13   **Q.**  And at that time were you also discussing Mr. Carta

14   wanting to quit the Sex Offender Treatment Program?

15   **A.**  This is the note where it looked like he was coming

16   around getting on board with treatment.  And he was going to

17   tell the community that he was going to be placed on

18   restriction, that he had trust in the staff and it was

19   looking promising on this day it appears.

20   **Q.**  And when you say announce the restriction, what do you

21   mean?

22   **A.**  What is the restriction?

23   **Q.**  Yes.

24   **A.**  It was that I described, that he wasn't going to

25   interact with any lower phased people in the treatment

```
 1    program, that he was just going to interact with phase four.

 2    Q.  And if you could just back up a little.

 3    A.  Okay, sorry.

 4    Q.  I don't know if that's you or the system.

 5    A.  Yes, I think I got closer.

 6    Q.  Okay.

 7         THE COURT:  Oh, you are the one that is making that

 8    noise.

 9         THE WITNESS:  Sorry.

10         (Laughter.)

11         THE COURT:  We are blaming you anyway.

12         THE WITNESS:  I'm moving in.

13         (Laughter.)

14    BY MS. STACEY

15    Q.  So looking at Exhibit 21 where Mr. Carta is explaining

16    to you why he wants to quit the Sex Offender Treatment

17    Program, did he offer anything other than the restriction as

18    reasons?

19    A.  Are we still looking at the February 14th document?

20    Q.  I'm sorry, January 31, 2006.

21    A.  Okay.  Yes, he did.  He said that he didn't think he had

22    what it took to complete treatment.

23    Q.  And did that mean anything to you as his treatment

24    provider?

25    A.  That he felt defeated and frustrated and overwhelmed.
```

1   **Q.**   And I'm going to ask you to go to Exhibit 27, an exhibit

2   that is in evidence.   And it's midway through, Bates No.

3   1071.

4   **A.**   Okay.

5        Right, yes.

6   **Q.**   Do you recognize that document?

7   **A.**   Yes.

8   **Q.**   And what is it?

9   **A.**   That's what they call a copout.   It's a written

10  communication that he left for me saying that he wanted to

11  quit -- yes, this would be the last time he communicated

12  that he wanted to quit treatment.   This was the final

13  decision.

14  **Q.**   And how do you know it was the final decision?

15  **A.**   When he told me I do not wish to talk about the

16  decision, my mind is made up, I felt like we had gone

17  through so many times and navigated being able to stay in

18  but this time he didn't even want to talk about it.

19  **Q.**   And is that --

20  **A.**   It had been building.

21  **Q.**   I'm sorry.

22  **A.**   That's all right.

23  **Q.**   Is that a true and accurate copy of the document that

24  you received?

25  **A.**   Yes.

1          **MS. STACEY:**  I would move for admission of that at

2     this time as the final portion of Exhibit 27.

3          **THE COURT:**  It comes in.

4          **(Government's Exhibit No. 27A received in**

5          **evidence.)**

6     BY MS. STACEY

7     **Q.**  If someone wants to quit the Sex Offender Treatment

8     Program, may they?

9     **A.**  Sure, yes, it's a voluntary program.

10    **Q.**  Is there anything that you do to help the decision, to

11    help a person make that decision?

12    **A.**  Well, what I experienced with Mr. Carta was that he

13    received much support.  He was told to talk to other people

14    in the community, more experienced people in the community,

15    bring his problems to the community, talk about it in his

16    process group.  He talked about it with me so I think there

17    was much -- we went and talked to Dr. Hernandez.  There was

18    much support.

19          And we definitely wanted, especially someone like

20    Mr. Carta that had a history of acting impulsively and

21    getting mad and then regretting his decision, that, you

22    know, we wanted him to take time to think about it.

23    **Q.**  How long had he been in treatment when he quit?

24    **A.**  Approximately seven months.

25    **Q.**  And what phase of treatment was he in when he quit?

1   **A.**   The treatment phase, that third stage.

2   **Q.**   And the restriction you talked about, about him not

3   being with the younger members, how long had that

4   restriction been in place when he quit?  For the last time?

5   **A.**   I don't remember specifically.  I mean, one, two weeks.

6   It was a couple weeks I think.

7   **Q.**   Okay.  And did you write any memos as a result of his

8   quiting the program?

9   **A.**   I did.  It was standard procedure to write a memo to

10  notify the different directors, the security people, unit

11  team, that he was going to need to transition or move out of

12  the Sex Offender Treatment Housing Unit into a different

13  unit.

14  **Q.**   I'll ask you to look at Exhibit 19 in the book before

15  you.  It's a memorandum dated March 2, 2006.

16  **A.**   Yes.

17  **Q.**   Is that the memo that you wrote?

18  **A.**   It is.

19  **Q.**   And is it a true and accurate copy of the memo that you

20  wrote?

21  **A.**   It is.

22          **MS. STACEY:**  At this time, Your Honor, I would move

23  to admit this into evidence as Exhibit 19.

24          **MR. GOLD:**  No objection.

25          **THE COURT:**  It comes in.

1           **(Government's Exhibit No. 19 received in evidence.)**

2    BY MS. STACEY

3    **Q.**  Other than the memo, were you required to write anything

4    else about Mr. Carta's leaving the Sex Offender Treatment

5    Program?

6    **A.**  Yes, it was the common procedure for people who quit or

7    who successfully completed the program, for the individual

8    treatment provider to write a discharge report.

9    **Q.**  Okay.  If you would turn to Exhibit 27.

10   **A.**  Okay.

11   **Q.**  Is that top page, is that your discharge report?

12   **A.**  I'm again having problems.

13   **Q.**  That's all right.  Exhibit 27, the very first page.

14          **MS. STACEY:**  May I assist, Your Honor?

15          **THE COURT:**  Yes.

16          (Pause in proceedings.)

17   BY MS. STACEY

18   **Q.**  Is that your discharge report?

19   **A.**  It is.

20   **Q.**  And did you author that report?

21   **A.**  I'm sorry, did I author?

22   **Q.**  Did you author that report?

23   **A.**  Yes.

24   **Q.**  Is your signature on that report?

25   **A.**  It should be.

1           Yes.

2     **Q.**  And did your supervisor also sign off on the discharge

3     report?

4     **A.**  He did.

5     **Q.**  And was that Dr. Melin?

6     **A.**  Melin, yes.

7     **Q.**  M-E-L-I-N?

8     **A.**  Correct.

9     **Q.**  And did you prepare this report as part of your duties

10    as a psych doctoral intern?

11    **A.**  I did.

12    **Q.**  And at this time -- is it a true and accurate copy of

13    the report you completed?

14    **A.**  Yes.

15          **MS. STACEY:**  I'd move for admission of the report

16    in Exhibit 27 as well, Your Honor?

17          **MR. GOLD:**  The same objection, Your Honor.

18          **THE COURT:**  Okay.

19          **MR. GOLD:**  It contains expert conclusions.

20          **THE COURT:**  Your objection is noted.  Overruled.

21          **(Government's Exhibit No. 27 received in evidence.)**

22    BY MS. STACEY

23    **Q.**  What is a discharge report?

24    **A.**  The two main purposes for it are to document the

25    progress or lack of progress in treatment for future

1    treatment providers.  And also it's sent to the

2    probation/parole supervising officer for them to better

3    understand the offender they're going to monitor.

4    **Q.**  During the course of his treatment with you, did

5    Mr. Carta ever express any regrets to you?

6    **A.**  During the course of treatment?  Yes, at the end he did

7    say that he regretted having told me so much about his

8    history.

9    **Q.**  And at the time that you treated Mr. Carta, what was his

10   sex offending pattern?

11   **A.**  What I had come to the conclusion of, that I was going

12   to focus treatment on was the -- someone mentioned here

13   earlier the power imbalance of his relationships.  And he

14   had described multiple instances of befriending kind of hard

15   luck kids who were at risk and came from poor homes or had

16   poor supervision or drug and alcohol runaway type of

17   problems, and had been taking them in, mentoring them,

18   providing them with food or shelter or a living situation

19   and engaging in sexual contact with them.

20   **Q.**  And you testified that the discharge report also goes to

21   Probation, the Bureau of Prisons and all these people.  Did

22   you actually send his report to Probation?

23   **A.**  I did.

24   **Q.**  And did you conduct a risk assessment as part of

25   Mr. Carta's discharge report?

1    **A.**   I did.

2    **Q.**   And what was your risk assessment of Mr. Carta at the

3    time of the report?

4          **MR. GOLD:**   Objection, Your Honor.

5          **THE COURT:**   I am going to let it in.

6    **A.**   We looked at the identified risk factors using the

7    Static-99 and other measures and had a high risk of future

8    recidivism.

9    **Q.**   And this report, this discharge report also lists a

10   number of recommendations for community supervision within

11   it?

12   **A.**   Correct.

13   **Q.**   Why is that there?

14   **A.**   I believe that's again helpful to the, from what the

15   staff had told me in their experiences, that's helpful to

16   the supervising probation/parole officer.

17   **Q.**   Do these recommendations guarantee that Mr. Carta will

18   not reoffend if released?

19   **A.**   No.  No.

20         **MS. STACEY:**   I have nothing further at this time.

21         **THE COURT:**   Okay.  It is good timing.  We will take

22   the one o'clock recess.  And why don't we come back at two.

23   Usually we come back at 2:15.  We will get an extra few

24   minutes in.  I have a physical therapy appointment later

25   this afternoon so I will probably leave a little early.

1          So we will see you at two o'clock.  Okay.

2

3          (Luncheon recess.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **AFTERNOON PROCEEDINGS**

2            **THE CLERK:**  All rise for the Honorable Court.

3            **THE COURT:**  Good afternoon, everybody.

4            **THE CLERK:**  You may be seated.

5            (Pause in proceedings.)

6            **THE COURT:**  Mr. Gold, are you ready?

7            **MR. GOLD:**  May I proceed?

8            **THE COURT:**  Please.

9                      **CROSS-EXAMINATION**

10   BY MR. GOLD

11   **Q.**  Good afternoon, Dr. Wood.

12   **A.**  Good afternoon.

13   **Q.**  Dr. Wood, you currently work for the Arkansas Department

14   of Correction?

15   **A.**  Correct.

16   **Q.**  And we talked a little bit about this last night but you

17   have been continuously employed with them since 2000?

18   **A.**  Correct.

19   **Q.**  But that was while you were getting a degree in

20   psychology?

21   **A.**  Correct.

22   **Q.**  How does that work?

23   **A.**  When I got the job in 2000 in Arkansas I was licensed,

24   in Arkansas you can get licensed at the master's level of a

25   psychological examiner, so I was employed until the time I

1    got my degree at that level under supervision of a

2    psychologist.

3    Q.   So at the time that you did this internship you were a

4    master's level, what did you call it?

5    A.   A psychological -- I was licensed in Arkansas as a

6    psychological examiner but working in North Carolina I was a

7    predoctoral psychology intern.

8    Q.   Predoctoral psychology intern?

9    A.   Correct.

10   Q.   Now, where did you take, where were you taking your Ph.D

11   courses?

12   A.   Memphis, University of Memphis.

13   Q.   And at the University of Memphis where in your career as

14   a Ph.D candidate student did this internship take place?

15   A.   You complete your internship in the last year of your

16   graduate studies so after you completed the course work on

17   campus, you -- most people leave to another site to do their

18   one-year internship.

19   Q.   And your one-year internship was at Butner, North

20   Carolina?

21   A.   Correct.

22   Q.   Now, only half of that internship was with the Sex

23   Offender Treatment Program?

24   A.   Correct.

25   Q.   There was another forensic psychological program there

1    that you also participated in?

2    **A.**   Right, the FMC, the hospital.

3    **Q.**   Now, are you a licensed psychologist now?

4    **A.**   In Arkansas, yes.

5    **Q.**   And since when have you been a licensed psychologist in

6    Arkansas?

7    **A.**   Licensed in October, I think it was October 2007.

8    **Q.**   Now, in order to be licensed you need to pass a

9    licensing exam of some kind; right?

10   **A.**   Correct.

11   **Q.**   Now, you did not make the cutoff score for that

12   licensing exam; is that right?

13        **MS. STACEY:**   Objection.

14        **THE COURT:**   I don't understand the question.

15   BY MR. GOLD

16   **Q.**   Well, did you pass that licensing exam?

17   **A.**   I did.

18   **Q.**   Well, did the -- did you have to be specially moved into

19   Arkansas, to be licensed in Arkansas by another

20   psychologist?

21   **A.**   I don't understand your question.

22   **Q.**   Well, did a licensing board need to have you, your score

23   rounded up --

24   **A.**   Yes, that's correct.

25   **Q.**   So it was below the passing grade until they rounded it

1   up?

2   **A.**   Correct.  I took the test at the master's level before

3   my doctoral program and made the score where they round it

4   up for the psychologist when I got that degree.

5   **Q.**  I see.  So you didn't have to take it again?

6   **A.**  Correct.

7   **Q.**  Now --

8          **THE COURT:**  I take it they didn't just do that for

9   you, that was the process?

10         **THE WITNESS:**  Yes, sir, from what I understand.

11  BY MR. GOLD

12  **Q.**  Well, do you know that for a fact, whether some people

13  have to take the exam again?

14  **A.**   I don't know their process.

15  **Q.**  Now, you have been interested in forensics for awhile;

16  right?

17  **A.**  Correct.

18  **Q.**  Now, as a student at the University of Memphis, did you

19  take courses relating to sex offending generally?

20  **A.**   There was one specific course that had a heavy emphasis

21  in sex offending, yes.

22  **Q.**  All right.  It was an emphasis in sex offending.  What

23  was the title of the course?

24  **A.**   I think it was "Counseling sexually victimized children

25  and their families."

1    Q.   I see.  So it wasn't looking at the behavior of sex

2    offenders only, it was focused on victims of sexual abuse?

3    A.   Throughout the continuum of the course we did -- I think

4    the emphasis was more heavily on offenders but, yes, we did

5    talk about sexually victimized children and their families

6    and the whole gambit.

7    Q.   And that was a one-semester course?

8    A.   Correct.

9    Q.   Was there a paper at the end of that course?

10   A.   Yes.

11   Q.   Now, did you have any experience treating people as a

12   student?

13   A.   Yes.

14   Q.   And where did that treatment experience take place?

15   A.   The University of Tennessee Health Science Center.

16   There is a Special Problems Unit.  Dr. Bill Murphy was my

17   supervisor.

18   Q.   And when did -- how long did you do it?

19   A.   That was a semester-long practicum placement, that I was

20   doing the treatment and then there was several periods that

21   I worked on research, grant-funded research as a data

22   collector.

23   Q.   But actual experience treating individuals?

24   A.   That one semester.

25   Q.   And is there a -- do people in the psychology field talk

1    in terms of contact hours?

2    **A.**  Yes, we did keep contact hours as -- you keep that

3    record so when you apply to internships, you can give them

4    some sense of how much experience you have in the field.

5    **Q.**  And how many contact hours did you amass with sex

6    offenders generally?

7    **A.**  I don't remember.  I had that listed out on my vitae.  I

8    think you have a copy of that.  I don't remember off the top

9    of my head.

10   **Q.**  Well, how many sex offenders do you remember that you

11   treated?

12   **A.**  That semester they tried to give me a diversity of

13   experience.  I worked with, specifically I recall a child

14   with sexual behavior problems, an adolescent, and then I did

15   weekly group therapy with Dr. Murphy for that semester.

16   With adult men, I'm sorry.

17   **Q.**  And when you say you did weekly therapy, what did that

18   entail?

19   **A.**  Sitting in a group of men who had -- outpatient who had

20   been convicted for sex offenses and they were participating

21   in group treatment, like we did at the SOTP, to help them

22   manage their sexual deviance and prevent future recidivism.

23   **Q.**  Did you meet with the men in these groups individually

24   one on one?

25   **A.**  They did, I did have -- I don't remember if there were

1  any men from that group where I did the psychosexual

2  evaluation but they did give me experience with doing that

3  initial psychosexual evaluation with an adult man or two.

4  **Q.**  I just meant, so part of this semester-long experience

5  was sitting in a group with -- the name of the doctor is?

6  **A.**  Murphy.

7  **Q.**  Dr. Murphy?

8  **A.**  Yes.

9  **Q.**  And that was once a week that that group met?

10  **A.**  Correct.

11  **Q.**  Now, did you meet with any of those men individually?

12  **A.**  I don't believe so, no.

13  **Q.**  Did Dr. Murphy?

14  **A.**  I don't know.

15  **Q.**  Now, did you have course work with Dr. Murphy in

16  addition to doing the treatment during this semester?

17  **A.**  He supervised me.  I would go in for supervision

18  feedback sessions.  And I also, I'm not sure if you're

19  asking but I used data from his clinic for my dissertation.

20  He was on my dissertation committee.

21  **Q.**  Now, your dissertation was about some research question.

22  Was it about treating these men?

23  **A.**  No.

24  **Q.**  Now, so coming into this internship, you had to apply

25  for it; right?

1    **A.**  Correct.

2    **Q.**  And you expressed interest in this particular program?

3    **A.**  Yes.

4    **Q.**  And you interviewed with some people and said you had

5    interest in it?

6    **A.**  Correct.

7    **Q.**  And so the interest that you had was expressed in part

8    by this one-semester treatment experience?

9    **A.**  Yes.

10   **Q.**  And also the one-semester class that you took?

11   **A.**  Correct.

12   **Q.**  Now, were you given any reading material when you

13   started?  You told me last night that you were given a

14   binder.

15   **A.**  Mm-hmm.  Yes, two binders of articles from the field.

16   **Q.**  And I don't mean to out you here but --

17   **A.**  I know where you're going.

18   **Q.**  -- you don't remember how much you read?

19   **A.**  I thought that was coming.

20        I don't think I read every article in there.  I

21   cannot say that.  But I tried to read most of them.

22   **Q.**  So coming into this experience, how much one-on-one

23   treatment experience had you actually had as a doctoral

24   student?

25   **A.**  The treatment experience, the main treatment experience

1    with sex offenders would be that semester with Dr. Murphy in

2    my doctoral program.

3    **Q.**   And how many patients was that?  How many people?

4    **A.**   I can give you an estimate.  I think that's like 2003 so

5    my memory has become a little fuzzy.  But, you know, I had

6    the men in the group which was maybe five to seven.

7    **Q.**   I guess what we're trying to get at is this:  How much

8    experience doing one-on-one counseling?

9    **A.**   Right, the one-on-one counseling in Dr. Murphy's clinic

10   was with the child and adolescent.  The group was the

11   primary modality for treatment.

12   **Q.**   And so it's one child and one adolescent?

13   **A.**   Correct.

14   **Q.**   And no adults?

15   **A.**   For individual therapy, no.

16   **Q.**   So did they just throw you in the deep end, you were

17   given a case load when you got there?

18           **MS. STACEY:**  Objection.

19           **THE COURT:**  Help us out.  Be a little more

20   specific.

21   BY MR. GOLD

22   **Q.**   When you got there, how did it work?  Did they give you

23   a case load or --

24   **A.**   Yeah, we did I think a two-week orientation, the general

25   correctional principles in how to navigate the unit.  And

1    then they gave us binders of reading material and oriented

2    us to the process.

3         They gave us a case load of five individual

4    clients, like Mr. Carta was one, that we were going to be

5    doing the psychosexual evaluation for and seeing for

6    one-on-one therapy.  They assigned us our psycho-educational

7    groups.  And I was assigned to process group with different

8    supervisors.

9    **Q.**  Now, that two-week orientation, you just mentioned this

10   but just to be clear, that was about being an employee of

11   the Bureau of Prisons; right?

12   **A.**  Correct.  It was open to all the new employees.

13   **Q.**  And it wasn't anything specific to treating people at

14   the Butner Treatment Program?

15   **A.**  Correct.

16   **Q.**  And then you were given a case load of five new, five

17   new inmates; right?

18   **A.**  Yes.

19   **Q.**  Now, when you talk about the people in the program, do

20   you call them inmates or do you call them patients?

21   **A.**  We kind of refer to them in all ways.  Not patients but

22   inmates, program participants, I think those were the two

23   main terms used.

24   **Q.**  So coming into this you had the experience treating the

25   adolescent and the child and no experience treating adult

1    sex offenders in similar situations; right?

2    **A.**   I felt I did have experience in treatment with adult,

3    adults.

4    **Q.**   Adult but not adult sex offenders; right?

5    **A.**   Well, I also felt like I had experience with adult --

6    **Q.**   Because you were also participating in Dr. Murphy's

7    group?

8    **A.**   Right.  Right, yes.

9    **Q.**   Now, did you have a supervisor at Butner?

10   **A.**   Yes.

11   **Q.**   And who was that person?

12   **A.**   Like I explained, I had multiple supervisors.  For the

13   overall internship and in each rotation for each kind of

14   project you would work on from writing the evaluations to

15   therapy, they differed.

16   **Q.**   But you had two main supervisors; right?

17   **A.**   Correct.

18   **Q.**   One for the SOTP, which is the Sex Offender Treatment

19   Program, and one for general psychological stuff; is that a

20   good way to characterize it?

21   **A.**   Really I had two in the Sex Offender Treatment Program,

22   one in Dr. Melin was for the report writing and then

23   Dr. Fraser was also in that.  So for issues as a SOTP

24   psychologist, she was there for all of my quote/unquote

25   therapy hours and interactions I was having.

```
 1              And then one day a week we did get out on the
 2    compound for other things and so she handled it if there
 3    were other questions in other areas too.
 4    Q.  Now, did -- so everything that you wrote was signed off
 5    on; right?
 6    A.  Yes, I believe so.
 7    Q.  So the reports that you wrote, they were reviewed by a
 8    supervisor and then signed off on?
 9    A.  Yes.
10    Q.  And the notes that you were writing, the detailed notes
11    that you were keeping were presumably reviewed by a
12    supervisor?
13    A.  That was my hesitancy.  I think the computer -- I would
14    enter them in the computer program and I believe they had to
15    accept them before they were in there.  I don't know exactly
16    how that process worked for the computer program.
17    Q.  So about how many men are in Butner, if you recall, or
18    were at the time?
19    A.  I was thinking --
20              THE COURT:  How many men what?
21              MR. GOLD:  Were at, the name of the program,
22    Butner, were at Butner.
23              THE COURT:  Okay.
24    A.  In the Sex Offender Treatment Program I think it was
25    between a hundred and a hundred twenty.
```

1    **Q.**  And you had a case load of five?

2    **A.**  I believe so.

3    **Q.**  And so how long is the program?

4    **A.**  I think the average is about 18 months but they say it's

5    more task based than time based so I don't think there is an

6    actual time criteria.

7    **Q.**  But it's generally understood to be about 18 months?

8    **A.**  I believe so.

9    **Q.**  And so, now, when you are assigned -- well, let me ask

10   you this:  Are all new men in the program assigned interns?

11   **A.**  I don't think that's their practice.  I was there for,

12   you know, a six-month period so I wasn't privy to all the

13   workings of the program.  But there was, you know five, six,

14   seven psychologists in there.  And they also had new guys

15   that came in on their case loads so it wasn't always the new

16   guy went to an intern.

17   **Q.**  So some guys had psychologists --

18   **A.**  Correct.

19   **Q.**  -- treating them?

20   **A.**  Correct.

21   **Q.**  Doing the same work that you did?

22   **A.**  Yes.

23   **Q.**  And some people had an intern if there was an intern

24   around?

25   **A.**  Right.

1    **Q.**  Now, have you ever testified in a proceeding like this

2    before?

3    **A.**  Civil commitment?

4    **Q.**  Yes.

5    **A.**  No.

6    **Q.**  Either as an expert or as a treater?

7    **A.**  No.

8    **Q.**  So you got Mr. Carta as part of your case load?

9    **A.**  Right.

10   **Q.**  And you had an initial meeting with him?

11   **A.**  Yes.

12   **Q.**  Now, did they give you a standard thing to say to the

13   new men on your case load?

14   **A.**  I don't think so.

15   **Q.**  So you just sort of played it by ear when you had that

16   initial meeting or how did you know what to say to

17   Mr. Carta?

18   **A.**  Well, I had much training in different types of therapy.

19   And so you generalize that from working in other settings

20   with people with other kinds of problems so how to get

21   rapport built and how to talk about informed consent and how

22   to get into people's motivation for change and, you know, so

23   it's based on my experience and training.

24   **Q.**  Now, you mentioned the word "rapport."  Is it important

25   to build a rapport with a program participant?

1    **A.**   Absolutely.

2    **Q.**   And do you feel that you were successful in building a

3    rapport with your case load generally?

4    **A.**   Yes.

5    **Q.**   And with Mr. Carta?

6    **A.**   Yes.

7    **Q.**   Now, when you say "informed consent," what do you mean?

8    **A.**   What I testified earlier this morning about the limits

9    of confidentiality that the mandated reporting, if there is

10   an identified victim that they choose they want to report,

11   that -- we talked about the Bureau's computer system, how

12   other people in the system weren't supposed to have access.

13   But you can't ultimately, you know, say for sure that

14   they -- that an officer in some other unit can access

15   records.

16       I had asked my supervisors, you know, how to

17   explain that to people because I didn't know either.   So

18   they had guided me how to inform about that aspect.

19   **Q.**   And so, but can you tell us in some sense what you told

20   Mr. Carta or the men about disclosing their past?

21   **A.**   Yes.

22       **THE COURT:**   Disclosing their what?

23       **MR. GOLD:**   About disclosing their pasts.

24   **A.**   Essentially I would, I was telling them that it was

25   important for them to come clean about everything that they

1       had done because I knew that the end result of the

2       treatment, they were needing to pass a polygraph exam about

3       being truthful and honest.  And I also tried to impart on

4       them that, you know, they're kind of at that rock bottom

5       stage, sitting in federal prison, that this was a really

6       well-known and respected treatment program, take advantage

7       of it while you're here.

8             That if you had to get out in the community, you're

9       not going to get that level of intensity and expertise for

10      the most part.  You have to pay money.  So I was trying to,

11      you know, really engage them and get them invested in

12      treatment.

13      **Q.**  And encourage them to be as full and forthcoming as they

14      could?

15      **A.**  Yes.

16      **Q.**  Now, Doctor, Mr. Carta complained often about memory

17      trouble; didn't he?

18      **A.**  Yes.   True.

19      **Q.**  And he had this history which he disclosed to you of

20      drug abuse; right?

21      **A.**  Right.

22      **Q.**  And he brought it up so much that you went to your

23      supervisors and asked whether memory testing might be

24      appropriate?

25      **A.**  Yes.

1    **Q.**  And then you did it?

2    **A.**  Right.

3    **Q.**  I think what I get from the records is there were kind

4    of two reasons there, one to put the issue to rest?

5    **A.**  Right.

6    **Q.**  And, two, to see if there were some memory problems?

7    **A.**  Correct.

8    **Q.**  Because sometimes his memory seemed fine?

9    **A.**  Yes.

10   **Q.**  Right.  And that testing did reveal below average,

11   average on different, different types of memory that you can

12   have; right?

13   **A.**  Yes.

14   **Q.**  Had you, by the way, done any of those memory tests

15   before?

16   **A.**  Yes.

17   **Q.**  You had in your prior clinical experience?

18   **A.**  Yes, when I worked licensed in Arkansas with my master's

19   degree, I worked at a neuro rehab with people with brain

20   injuries and routinely gave them a test like that for the

21   neuropsychologist.

22   **Q.**  So a similar test is what you gave Mr. Carta?

23   **A.**  Correct.

24   **Q.**  And Mr. Carta was complaining very early on about these

25   memory problems; right?

1    **A.**  He did.

2    **Q.**  And what did you say to Mr. Carta in the context of his

3    disclosing things when he said he didn't remember

4    everything?  Do you remember?

5    **A.**  No, I don't.

6    **Q.**  Do you recall telling Mr. Carta that if he was in doubt

7    about, for example, the number of images that he had, he

8    should round up?

9    **A.**  No.

10            **MS. STACEY:**  Objection.

11            **THE COURT:**  What is the objection?

12            **MS. STACEY:**  It's hearsay.  If he wants to show him

13   a document to refresh his recollection.

14            **THE COURT:**  No, it is cross-examination.  Go ahead.

15            **THE WITNESS:**  Answer the question?

16            **THE COURT:**  Yes.

17            **THE WITNESS:**  No, I don't remember telling him to

18   round up.  If anything, I would have said give me an

19   estimate, but I would not have said round up.

20   BY MR. GOLD

21   **Q.**  And what did you tell Mr. Carta specifically about the

22   polygraph?

23   **A.**  I don't remember exact details but it would be something

24   that I testified to, that a goal of treatment is going to be

25   that I want the program participants to be able to pass a

1    polygraph about their disclosures.

2    **Q.**   So it behooved them to be as forthcoming as possible?

3    **A.**   Yes.

4    **Q.**   Now, you had limited experience dealing with men in this

5    situation prior to this; right?  Almost none dealing with

6    men in Mr. Carta's situation; right?  This was your first

7    experience doing this kind of work?

8         **MS. STACEY:**   Objection to the form.  It's compound.

9         **THE COURT:**   Just ask him one question at a time.

10   BY MR. GOLD

11    **Q.**   When --

12         **THE COURT:**   Do you want to ask him are these the

13   first adults that you dealt with?

14   BY MR. GOLD

15    **Q.**   These are the first adults that you dealt with; correct?

16    **A.**   No.

17    **Q.**   With sex offending or sexual behavior problems?

18    **A.**   No, it wasn't.

19    **Q.**   Apart from the eight in which you sat in with

20   Dr. Murphy?

21    **A.**   Well, I also had done many interview, risk assessment

22   interviews in Arkansas and written thousands of risk

23   assessment reports that I drew upon my experience and my

24   knowledge of sex offenders even though it wasn't therapy.

25    **Q.**   Okay.  But we are talking right now about providing

1    therapy to these people?

2    **A.**   Right.

3    **Q.**   So this was the first time you had been in this

4    situation; right?

5    **A.**   In an inpatient treatment setting, yes.

6    **Q.**   And so the reason I ask that was was it common in your

7    experience for men to be as forthcoming in the initial

8    disclosures as Mr. Carta was?

9    **A.**   I thought he was more forthcoming than I generally

10   experienced.  Several guys that I was doing the initial

11   intakes on were forthcoming and I don't know if that's a

12   characteristic of, you know, them coming to prison but it

13   was more than I expected, yes.

14   **Q.**   And did you have the sense that he was being honest with

15   you?

16   **A.**   Yes.

17   **Q.**   And did you have the sense in dealing with him that he

18   was holding back offending that he hadn't talked about?

19   **A.**   No.

20   **Q.**   Because he disclosed all sorts of things?

21   **A.**   Right.

22   **Q.**   Including things that would be potentially very

23   embarrassing to him?

24   **A.**   Right.

25   **Q.**   Now, when this relationship was happening, there was no

1    such thing as civil commitment in the federal system?

2    **A.**   Correct.

3    **Q.**   And so you did not tell him, for example, that he would,

4    might face civil commitment if he made disclosures; right?

5    **A.**   Not in the federal system.  I did have discussions with

6    some of the guys and I can't say for sure if it was with

7    Mr. Carta.  But one of the things that I was trying to

8    motivate them for treatment was that, something to the

9    effect that sex offending, society is getting fed up, and

10   that each time you got caught, the consequences get more

11   severe.  And if you're in a state that has civil commitment,

12   that a new offense could be very damaging.

13        So, and like I said, I can't say that Mr. Carta and

14   I had that discussion.  But I do remember saying, talking

15   about that.  And that's the only discussion about civil

16   commitment that I can recall.

17   **Q.**   And you can't recall if you did that with Mr. Carta but

18   did you do that in the context of telling him about informed

19   consent?

20   **A.**   No.

21   **Q.**   In some other context; right?

22   **A.**   Right, just trying to motivate them for treatment and

23   saying let's get on board, let's do this, you know.

24   **Q.**   Now, you said there were two purposes of treatment; do

25   you recall that?  You testified earlier today to manage

1    sexual deviance?

2    **A.**  Right, and prevent recidivism.

3    **Q.**  And prevent recidivism?

4    **A.**  Correct.

5    **Q.**  Now, and Mr. Carta has told you that he had a preferred

6    body type in people; right?

7    **A.**  Mm-hmm.

8    **Q.**  And that was males in the 14- to 18-year old range?

9    **A.**  Correct.

10   **Q.**  And in your opinion is that -- well, withdrawn.

11        At the time you saw that as deviant sexual

12   interest; right?

13   **A.**  Correct.

14   **Q.**  Now, you're collecting this information to synthesize it

15   into a psychosexual evaluation; right?

16   **A.**  Yes.

17   **Q.**  And you also provided one-on-one counseling with

18   Mr. Carta; right?

19   **A.**  Yes.

20   **Q.**  And you also, you sort of lived on the same unit with

21   the guys; right?

22   **A.**  I worked there, yes.

23   **Q.**  And so you were there on the unit with them for your

24   working day?

25   **A.**  Right, eight hours, yes.

1   **Q.**  And you would walk around and see them?

2   **A.**  Right, correct.

3   **Q.**  And so when they had some of these community meetings,

4   sometimes you would be there?

5   **A.**  Yes.

6   **Q.**  And that was all considered part of the treatment

7   community, therapeutic community I think you said?

8   **A.**  Correct.

9   **Q.**  Now, you talked, when you testified earlier that when

10  Mr. Carta talked about his prior offending --

11  **A.**  Mm-hmm.

12  **Q.**  -- he exhibited cognitive distortions about it; right?

13  **A.**  Right.

14  **Q.**  And those are, you described those as faking errors;

15  right?

16  **A.**  Correct.

17  **Q.**  Because a cognitive distortion is kind of a technical

18  term in your field; right?

19  **A.**  Right.

20  **Q.**  And an example of a cognitive distortion is often people

21  think children can consent to sexual contact; right?

22  **A.**  Correct.

23  **Q.**  Now, again, in your experience is it common for men in

24  Mr. Carta's position to exhibit these cognitive distortions?

25  **A.**  Absolutely.

1    **Q.**   And, in fact, one of the whole purposes of this

2    treatment is to isolate what those are?

3    **A.**   Yes.

4    **Q.**   And then to get at them; right?

5    **A.**   Absolutely.

6    **Q.**   And treatment is not conceived as a linear process

7    generally; is it?

8    **A.**   Right.

9    **Q.**   You're thinking of taking two steps forward and one step

10   back; right?

11   **A.**   Well, it was one step forward and two steps back.

12   **Q.**   Oh, yes, you're right.  Thank you.  You're the expert.

13          No, but two steps forward and one step back; right?

14   **A.**   It can be, yes.

15   **Q.**   That's the idea.  And so when Mr. Carta exhibited these

16   thoughts, it's not unusual that he would have done so;

17   right?

18   **A.**   Right.

19   **Q.**   It would have been unusual if he hadn't probably?

20   **A.**   Absolutely.

21   **Q.**   And when he vacillated about these thoughts or when you

22   say he was vacillating about endorsing them, meaning

23   agreeing with them and not?

24   **A.**   Right.

25   **Q.**   That was done in your presence; right?

1    **A.**   Yes.

2    **Q.**   In fact, he was very open and honest about that part of

3    his process with you; right?

4    **A.**   Yes.

5    **Q.**   And at times he became defensive?

6    **A.**   Mm-hmm.

7    **Q.**   And at times he would break down and agree with what you

8    were saying?

9    **A.**   Yes.

10   **Q.**   Now, Mr. Carta made several attempts to or there were a

11   couple of times when he wanted to quit treatment?

12   **A.**   Yes.

13   **Q.**   And you talked about the last time being the final

14   straw; right?

15   **A.**   Right.

16   **Q.**   And, in fact, you testified that you thought it was the

17   final one?

18   **A.**   Mm-hmm.

19   **Q.**   Now, if he were to withdraw, you would have had to write

20   a, you told us yesterday a discharge report?

21   **A.**   Correct.

22   **Q.**   And so you were sort of frank with us saying that part

23   of your motivation very well may have been to keep him in

24   not to have to write that thing?

25   **A.**   Well, that's correct.  I mean --

1    **Q.**   That was kind of tongue in cheek.

2    **A.**   Exactly.  And I did tell Mr. Carta in some of the times

3    we talked that unsuccessfully -- not successfully completing

4    treatment would be yet another risk factor in his list.  And

5    I was open with him to really think about what he was doing.

6    **Q.**   And, in fact, Mr. Carta told you the day afterwards, and

7    you memorialized this, that he had thought better of it yet

8    again but felt too embarrassed to come back in?

9    **A.**   He did.  He did.

10   **Q.**   Now, at the time that this, the last incident was

11   happening, you were getting ready to leave; right?

12   **A.**   Yes, I was.

13   **Q.**   Now, is there a concept in this field of psychology

14   called "transference"?

15   **A.**   Yes.

16   **Q.**   And what is that?

17   **A.**   It is when a client develops feelings and may project

18   them on to the therapist.

19   **Q.**   Now, at the time that Mr. Carta was doing or withdrawing

20   from the program, you were also leaving; right?

21   **A.**   Yes.

22   **Q.**   And he verbalized to you that it didn't -- I mean, and

23   you said you thought there was a good rapport between the

24   two of you; right?

25   **A.**   Right.

1    **Q.**  And you said he verbalized kind of easily oh, that's

2    fine when you first told him; right?

3    **A.**  Right.  That's what I had documented so.

4    **Q.**  Now, at the time, again, Mr. Carta wasn't required to be

5    in the program; right?

6    **A.**  You are correct.

7    **Q.**  And he had this, when you did this discharge report, the

8    two audiences are the sex offender treatment providers that

9    he may have in the future?

10   **A.**  Right.

11   **Q.**  And a probation officer; right?

12   **A.**  Correct.

13   **Q.**  And so not only do you lay out the experience that you

14   had with Mr. Carta but you have some conclusions in there

15   about risk and things of that nature?

16   **A.**  Right.

17   **Q.**  And then a long list of suggestions for supervision?

18   **A.**  Right.

19   **Q.**  Now, one of the diagnoses that you thought was

20   appropriate at the time was this paraphilia NOS, hebephilia;

21   right?

22   **A.**  Right.

23   **Q.**  And we discussed this yesterday that it's not in the

24   *Diagnostic and Statistical Manual* per se; right?

25   **A.**  Paraphilia NOS is.  Hebephilia --

1   **Q.**  But that descriptor that you were talking about is not;

2   right?

3   **A.**  Correct.

4   **Q.**  And we had talked about your familiarity with the book

5   *Evaluating Sex Offenders* by Dennis Doren; right?

6   **A.**  Yes.

7   **Q.**  And that was one of the sources on which you said you

8   relied for your diagnosis of hebephilia; right?

9   **A.**  Yes.

10  **Q.**  Now, you looked at his behavior, right, when you were

11  making this diagnosis?

12  **A.**  His self-report?

13  **Q.**  Yes.

14  **A.**  Yes, mm-hmm.

15  **Q.**  So all his behavior basically, there is some that comes

16  from official records but the majority of it really comes

17  from his self-report?

18  **A.**  Right, it's a combination.

19  **Q.**  Now, you talked about, testified that among the things,

20  the very private things that he admitted to you was the fact

21  that he put his mouth on the penis of a young child when he

22  himself was a child; right?

23  **A.**  Right.

24  **Q.**  But you didn't mention that he himself had been sexually

25  abused as a young person?  I think it's in the papers but

1    you didn't testify about that?

2    **A.**   Right.  I understood the earlier question to be about

3    his sexual offending behaviors, yes.

4    **Q.**   Right.  Perhaps the question wasn't asked.

5    **A.**   Correct.

6    **Q.**   Now, so in your opinion at the time did you see his

7    sexual abuse as an area to be considered in treatment

8    planning or things like that?

9    **A.**   Yes, the staff there, I asked them, you know, what was

10   their general philosophy about dealing with that.  And

11   basically they said that you want to deal with sexual

12   offending issues first and then towards the end of treatment

13   deal with the person's own sexual victimization.

14   **Q.**   And have you heard of reactivity in children for

15   example?

16   **A.**   Yes.

17   **Q.**   And that is a concept which describes how children who

18   are sexually abused react basically and sexually act out?

19   **A.**   Yes.

20   **Q.**   And did you consider that as something that was

21   happening with Mr. Carta when he was 11 and 13 and abused

22   that little child?

23   **A.**   It's possible, yes.

24   **Q.**   Now, one of the things you noted when you were taking

25   Mr. Carta in was the fact that he had done treatment in the

1      community and had stopped?

2      **A.**   Right.

3      **Q.**   But Mr. Carta told you that the reason that he had

4      stopped the treatment was he was starting this prison

5      sentence; right?

6      **A.**   That does sound familiar, yes.

7      **Q.**   So in that sense it seems, is it still clinically

8      significant that he stopped treatment?

9      **A.**   No.

10     **Q.**   And just to be clear about that period, he was, prior to

11     his starting this period of incarceration he was on pretrial

12     supervision for the child pornography crime?

13     **A.**   Okay.

14     **Q.**   And he was on probation for another offense; right?

15     **A.**   That sounds familiar.

16     **Q.**   And so he was, did this treatment while in the community

17     for about eight months; right?

18     **A.**   Correct.

19     **Q.**   And he also told you that during that period when all

20     this came to light for him he stopped drinking; do you

21     remember that?

22     **A.**   I do not remember that.

23              (Whereupon, counsel conferred.)

24     **Q.**   It is certainly possible that he said that to you;

25     right?

1   **A.**   Absolutely.

2   **Q.**   If we track down the document, we'll --

3   **A.**   Yes, that would be common for me to find out how much

4   they're using and when they quit.  And I just don't remember

5   the specifics of that issue.

6   **Q.**   So you recall, I mean, asking about substance abuse

7   history as something that you do --

8   **A.**   Yes.

9   **Q.**   -- in all these cases?

10   **A.**   Routinely, right.

11   **Q.**   Because it's part of the clinical picture?

12   **A.**   Absolutely.

13   **Q.**   Right.  And so you recall taking the substance abuse

14   history from Mr. Carta?

15   **A.**   Yes.

16   **Q.**   And so I'm just going to read from Bates numbered 941

17   from your report and ask you if this refreshes your

18   recollection as to what he told you.

19   **A.**   Okay.

20   **Q.**   "But he estimates that he drank three to four six-packs

21   a week at the height of his use.  He claims that he quit

22   drinking while he was on probation because he did not want

23   to violate the terms of his probation.  He acknowledges that

24   he has seen his tolerance increase and that he has committed

25   criminal acts while under the influence of alcohol."

1    **A.**  Okay, yes.

2    **Q.**  Now, again, this is Mr. Carta being apparently very

3    forthcoming about his past activities --

4    **A.**  Right.

5    **Q.**  -- in a wide variety of domains; right?

6    **A.**  Correct.

7    **Q.**  And so there he talks about having quit.  He also talks

8    about having abused alcohol?

9    **A.**  Mm-hmm, yes.

10   **Q.**  Now, the two goals are manage sexual deviance and

11   prevent sexual reoffending; right?

12   **A.**  Yes.

13   **Q.**  And one of the things that was of clinical concern to

14   you that you mentioned was some of the relationships that

15   Mr. Carta had with younger people partook of a power

16   imbalance; do you recall that?

17   **A.**  You are talking about the program participants and the

18   restrictions we were placing on him with the other community

19   members?

20   **Q.**  Well, I believe the context was you were talking about a

21   pattern of behavior for Mr. Carta both in the community --

22   **A.**  Yes.

23   **Q.**  -- and when he had these relationships with younger

24   people --

25   **A.**  Right.

1    **Q.**  -- they partook of a power imbalance?

2    **A.**  Right.

3    **Q.**  Right?

4    **A.**  Right.

5    **Q.**  And that the same dynamic was on display when he was

6    interacting with these young men --

7    **A.**  Yes.

8    **Q.**  -- on the program?

9    **A.**  Yes.

10   **Q.**  Now, you said these men were about 19 to 22?

11   **A.**  That is what I recall, yes.

12   **Q.**  And how did you know that?  Is that how they looked?

13   **A.**  I knew them from the treatment program, from

14   interacting.  I did groups with them.  And you just know the

15   background of the people that are in the program.

16   **Q.**  And so, but did you know it by estimating their age from

17   interacting with them and knowing them or do you remember

18   specifically checking to see how old they were?

19   **A.**  I did read their, when other people would do their

20   psychosexual evaluations, I would have read those.  But, you

21   know, I can't say that I can absolutely know with

22   assuredness their exact ages today, no, I don't know.

23   **Q.**  But you had the thought that they were between 19 and 22

24   years old?

25   **A.**  That's what I'm recalling, yes.

1    **Q.**   And so there is nothing deviant for a man like Mr. Carta

2    to have relationships with 19-to 20-year old men; right?

3    **A.**   Out in the community, no, right.

4    **Q.**   Well, is there -- now, deviance, deviant means not

5    mainstream; right?  Or does deviant have a clinical meaning?

6    **A.**   And I may have thrown you off course.  I didn't mean to

7    imply it would be deviant if he did.  It would just be

8    against the rules of a treatment program or a prison rule

9    violation to have sex between any of the men, inmates,

10   that's --

11   **Q.**   Well, we are not talking --

12            **THE COURT:**  You weren't talking about inmates.  You

13   were talking just generally?

14            **MR. GOLD:**  Well, no, first I asked generally.

15   BY MR. GOLD

16   **Q.**   And I believe you conceded that; right?  That it's not

17   deviant?

18   **A.**   I thought you said something like would it be deviant if

19   he would have sexual relations or a relationship with 19- to

20   22-year olds.

21   **Q.**   And your testimony is your sense of things were it would

22   not be?

23   **A.**   That's not deviant, no.

24   **Q.**   But it may not even be deviant within the Butner SOTP,

25   it may happen a lot?

1   **A.**   Right, I'm not saying that's deviant, correct.

2   **Q.**   Now, but, nevertheless, his having these relationships

3   was seen by you as negative?

4   **A.**   It was problematic, yes.

5   **Q.**   And, in fact, there were times when Mr. Carta agreed

6   with your assessment; right?

7   **A.**   He did.

8   **Q.**   And he said that it would be better if he didn't

9   interact with these men?

10   **A.**   Correct.

11   **Q.**   Now, the way you described these men -- how many men are

12   we talking about?  Three?

13   **A.**   I saw three listed in the documents, so, yes.

14   **Q.**   Do you have a recollection of men in particular?

15   **A.**   I could remember one in particular.  When I saw the

16   document, I remembered a second.  The third one I don't

17   remember.  But there was three he wrote about in treatment

18   notes.

19   **Q.**   And there were two that you remember?

20   **A.**   Right.

21   **Q.**   And, now, you described these men as sort of a negative,

22   independent of this stuff happening with Mr. Carta, as sort

23   of negative energy?

24   **A.**   Right.

25   **Q.**   Is that fair?

1    **A.**   Yes.

2    **Q.**   They had a lot of criminal attitudes I suppose?

3    **A.**   Mm-hmm.

4    **Q.**   Now, they were ultimately ejected from the program,

5    these two men, is that right, or just one of them?

6    **A.**   One of them I know, I got to think.  He left the

7    program.  I think he was thrown out.  I don't know if he

8    quit on his own but, yeah, I know one of them didn't make

9    it.  I'm not sure about the other one.

10   **Q.**   Now, and so do you know -- so you don't know whether he

11   was ejected or whether he left voluntarily as you sit here?

12   **A.**   Correct.

13   **Q.**   So the way it worked is Mr. Carta came to you and you

14   addressed -- you had these concerns and brought them up with

15   him?

16   **A.**   We had repeated sessions about that issue, yes.

17   **Q.**   Now, if Mr. Carta was to be out in the community and

18   interact with 19- or 20-year old men, do you see a problem

19   with that?  Sexually I mean.

20   **A.**   Right.  And if you are asking legally, no.  If there is,

21   as a therapist, if he's having problems maintaining

22   relationships because of the underlying aspects of the

23   relationship, that can be a treatment issue.

24   **Q.**   And so as a treatment provider you would see these --

25   and I'm just going to use layperson's terms -- but a

1    relationship between Mr. Carta and a man in his early 20s as

2    not necessarily healthy; right?

3              **MS. STACEY:**  Objection.

4              **THE COURT:**  What is the objection?

5              **MS. STACEY:**  I think he is asking him to speculate

6    about something in the future which -- and I was confined to

7    his testimony at the time.  So it's, he evaluated Mr. Carta

8    at the time of his relationship with the 20-year old in the

9    BOP prison at the time.

10             **THE COURT:**  I think that is a good objection.  Why

11   don't you lay a foundation and see if he made these

12   evaluations after he was treating him.

13   BY MR. GOLD

14   **Q.**  Well, Mr. Carta actually told you that he intended to go

15   out into the community and have relationships with men in

16   this age range; right?

17   **A.**  Correct.

18   **Q.**  And this was one of the reasons why -- he also told you

19   that he was good friends with these young men he felt?

20   **A.**  Mm-hmm.

21   **Q.**  Right?

22   **A.**  Mm-hmm.

23   **Q.**  And ultimately one of them he may have been sexually

24   attracted to, he admitted to you that he was?

25   **A.**  Correct.

1    **Q.**  Now, and, again, there was no allegation that he

2    sexually interacted with these men; right?

3    **A.**  Correct.

4    **Q.**  Now, did you at the time discuss with him whether that

5    would be healthy?  For Mr. Carta to have relationships with

6    men in their twenties?

7    **A.**  I don't recall specifically having that conversation.  I

8    think I had him do a paper or some type of list of, you

9    know, what a healthy relationship for him would look like

10   and what he was wanting, what he was working towards from

11   treatment.

12   **Q.**  And so what in your opinion would a healthy relationship

13   have looked like for Mr. Carta?

14   **A.**  I was letting him tell me what that would be.  And I

15   don't -- that paper wasn't part of the record so I have no

16   memory of that.

17   **Q.**  But you just testified that a relationship between

18   Mr. Carta and someone in their early twenties would be

19   problematic?

20   **A.**  It could be.  I'm not saying it would be.

21   **Q.**  And you said one of the goals of treatment would be to

22   address those underlying problems?

23   **A.**  Yes.

24   **Q.**  And what are the underlying problems in that

25   relationship?

1    **A.**   Well --

2    **Q.**   For Mr. Carta.

3    **A.**   Right.  What he was describing was getting into

4    relationships with much younger, anywhere from 13, 17, 18.

5    These guys were in much different stages of life.  They had

6    these backgrounds where they were running away and using

7    drugs.  And he was wanting to settle down and have a stable

8    type, you know, a long-term relationship.  And it was just

9    different stages of life.  These kids weren't ready for

10   that.

11         And so it was, he repeatedly had this pattern that

12   he talked about where, you know, he just wanted to stay home

13   and have quiet nights.  And that's not where these kids were

14   in life.  And so that created ongoing problems.

15   **Q.**   Now, I'd like to direct your attention to one of your

16   notes that you wrote for, I guess they're called PDS notes;

17   is that what they're called?

18   **A.**   Yes.

19   **Q.**   And it's page 407 in the Bates numbered series.

20         Now, I am just going to read from it and ask you if

21   it refreshes your recollection of a particular interaction.

22   This one is dated January 11, 2006.

23         **MS. STACEY:**   Your Honor, I object to reading

24   something that's not in evidence.

25         **MR. GOLD:**   I'm sorry, Your Honor, I thought it was.

```
 1    But I am just asking to refresh his recollection.  I think

 2    this is a document which is coming into evidence.

 3              THE COURT:  I don't recall any failure of

 4    recollection.

 5              MR. GOLD:  Well --

 6              THE COURT:  What question did you ask him?

 7              MR. GOLD:  This was a -- I'm asking Dr. Wood about

 8    an interaction when Mr. Carta said he had an interest in

 9    dating men in their twenties on the outside.

10              THE COURT:  I remember that.

11    BY MR. GOLD

12        Q.  And we talked about that.  And you had discussed,

13    Dr. Wood, that that seemed an unwise proposition?

14              THE COURT:  Are you asking him whether that is what

15    he said to --

16    BY MR. GOLD

17        Q.  Do you recall saying that?

18        A.  No.

19        Q.  Well, you did --

20              THE COURT:  You said no?

21              THE WITNESS:  I don't recall saying that.

22    BY MR. GOLD

23        Q.  But you did testify about what the components of a

24    healthy relationship would be; right?

25        A.  I am saying that we had a session where I asked him to
```

1    do a paper about what a healthy relationship would look like

2    for him.

3         MR. GOLD:  Your Honor, I'd just be interested -- I

4    know this might be a little unorthodox -- but for

5    convenience, just this is coming into evidence in a little

6    while as part of a nicely ordered exhibit but if I could

7    enter this document now with the idea that it might come in

8    again?

9         THE COURT:  I have no idea what it is.  I mean --

10        MR. GOLD:  It's one of these PDS notes from, Bates

11   No. 407, dated January 11, 2006.  It's the note that

12   documents I believe the interaction that we're talking

13   about.

14        MS. STACEY:  Right.  I generally don't have

15   objections to PDS notes.  But in this case he's refreshing

16   his recollection but there is nothing to refresh looking at

17   this document.

18        THE COURT:  I think he has abandoned the refreshing

19   recollection.  I think he is now just --

20        MR. GOLD:  Now I just want to talk to him about the

21   note, yes, Your Honor.

22        MS. STACEY:  Right.  So if he wants to question him

23   and show him the note, that's fine.  It's not listed as one

24   of the respondent's exhibits.  I'm not sure what he's doing

25   with this but --

1          **THE COURT:**  Well, neither am I so why don't you do

2     that.  Lay a foundation and then you can get it.

3          **MR. GOLD:**  May I approach the witness, Your Honor?

4          **THE COURT:**  Yes.

5     BY MR. GOLD

6     **Q.**  Dr. Wood, we have been talking about a PDS note dated

7     January 11, 2006.

8     **A.**  Okay.

9     **Q.**  Do you recognize that as a PDS note that you authored?

10    **A.**  I did.

11    **Q.**  And was this among the documents that was provided to

12    you by the government before your testimony today?

13    **A.**  I think so, yeah.

14         **THE COURT:**  Don't cover your mouth.

15         **THE WITNESS:**  I'm sorry.  Yes, I believe so.

16         **MR. GOLD:**  Your Honor, we'd move this document into

17    evidence.

18         **THE COURT:**  Is that your document?

19         **THE WITNESS:**  Yes.

20         **THE COURT:**  Did you write that?

21         **THE WITNESS:**  Yes.

22         **MR. GOLD:**  He is the author.  He recognizes it.

23    BY MR. GOLD

24    **Q.**  Is it a true copy of -- does it appear to be a true copy

25    of --

1    **A.**   Yes.

2    **Q.**   -- the entry that you made in the BOP computer system?

3              **THE COURT:**   Okay.  I will let it in.

4              **THE CLERK:**   Exhibit A.

5              **(Defendant's Exhibit No. A received in evidence.)**

6    BY MR. GOLD

7    **Q.**   So, "Additionally inmate stated that when he is

8    released, he will look for a partner who is in their young

9    to mid twenties.  Problematic aspects of his behavior were

10   addressed as was what a healthy relationship for him would

11   look like."

12   **A.**   Right.

13   **Q.**   And so, I mean, that's the terrain we have been

14   covering.  Does that -- what were the problematic aspects

15   that you were discussing with Mr. Carta at that time?

16   **A.**   Well, I believe it is, what I was trying to explain,

17   that that relationship in and of itself might not be a

18   problem.  If it's a problem, that the relationship with

19   people in their young twenties is at a different stage of

20   life issues.  If he is coming at it from a, not a straight

21   on position of dating, if it's this mentoring role and

22   people that are in a one down power differential problem,

23   that could be an issue.

24              But I wasn't going to tell him what a healthy

25   relationship looked like.  I was working for him to help

1    come to that conclusion.  That was what we were going to

2    work on in treatment.

3    **Q.**  But in your opinion with respect to that set of issues,

4    the problem is not deviant sexual arousal, it's these other

5    issues?

6    **A.**  Right.  I was helping him to have, hopefully have good

7    adult healthy relationships.  And, you know, I wasn't

8    looking at it from the legal component of what is and is not

9    okay.  I was helping him to have a better life hopefully.

10   **Q.**  And so with respect to how these men looked, that wasn't

11   so much part of the focus; right?

12   **A.**  Well, that did catch everyone's attention that was

13   bringing this issue to his --

14   **Q.**  Well, no.  I am talking again about this discussion

15   about healthy relationships that you had with Mr. Carta.

16   The reason why relationships with men in their twenties

17   would be problematic generally didn't have to do with

18   deviant sexual arousal?

19   **A.**  No.

20   **Q.**  Now, I am reading from a document which is in evidence

21   from the psychosexual evaluation that you wrote.

22         Now, were you very thorough when you did these?

23   **A.**  Yes.  I believe so.

24         I said I believe so.

25   **Q.**  I thought I heard something.

1    **A.**   Yes.

2    **Q.**   And, in fact, we sort of joked about that last night,

3    that you were exceptionally thorough because you were an

4    intern and wanted to document everything; right?

5    **A.**   I'm not sure, you know, how everyone else does this; but

6    I felt like I did put a lot of work into it, correct.

7    **Q.**   Now, Mr. Carta you wrote acknowledges liking therapy

8    because it was the first time in his life that he could talk

9    about his problems?

10             **MS. STACEY:**   Page?

11             **MR. GOLD:**   On Page 00941.

12   BY MR. GOLD

13   **Q.**   And so, I mean, that is consistent with what you got

14   from Mr. Carta, that he talked about basically everything

15   that was going on with him; right?

16   **A.**   Right.   I believed he wanted help.

17   **Q.**   And then you talked about his limited insight and these

18   cognitive distortions; right?

19   **A.**   Yes.

20   **Q.**   And a lot of that came from the process of him doing

21   this PHQ?

22   **A.**   The cognitive distortions would come to light when we

23   would go over the PHQ.

24   **Q.**   You would talk about it?

25   **A.**   Yes.   And his beliefs about what happened on or why it

1    happened or why it's a problem that it happened.

2    **Q.**  Because, again, the PHQ is a document and it's the --

3    what is it?

4    **A.**  Personal History Questionnaire.  It's an extensive, like

5    50-, 60-page questionnaire about their history.

6    **Q.**  And a big part of the data source that we have here is

7    this PHQ; right?

8    **A.**  Correct.

9    **Q.**  It's got a listing of his victims in six different ways;

10   right?

11   **A.**  Right.

12   **Q.**  And when you would talk about them, he would talk to you

13   about them in ways that made you think he had cognitive

14   distortions about them?

15   **A.**  About, yes, the offenses that happened.

16   **Q.**  Now, among those cognitive distortions was, that you

17   mentioned was this incident when he had actually a peer age

18   sexual interaction with a 16-year old boy when he himself

19   was 16.  Do you recall the BB gun incident?

20   **A.**  Yes.

21   **Q.**  And that incident, he told you that he was talking about

22   sex with a young man?

23   **A.**  Mm-hmm.

24   **Q.**  The young man denied, had refused to have sex with him

25   and then he was wearing a big coat or something and

1   Mr. Carta shot him with a BB gun?

2   **A.**   Mm-hmm.

3   **Q.**   And then about a month later he told you that the guy

4   came back and they had a, basically a sexual relationship

5   which lasted for several months to a year?

6   **A.**   Right.

7   **Q.**   Now, it was your testimony if I have it right that

8   Mr. Carta's denying the coercive aspect of that sequence was

9   a cognitive distortion; right?

10  **A.**   No.   That was something I tucked in the back of my mind

11  wondering is there a different way that it happened.   It

12  could have happened completely like he said but that was

13  something that you would tuck back there and over the course

14  of treatment maybe revisit and see if that was --

15  **Q.**   Oh, and that's the way it's supposed to go; right?   You

16  are supposed to tuck things back there and not make a

17  judgment until you have enough evidence; right?

18  **A.**   Right.   If that -- I'm ultimately not going to know if

19  that incident went down as he said.   But I'm going to see

20  over time if he changes that version or, you know, maybe it

21  did happen like that.

22  **Q.**   Right.   Because that's the only information that we

23  have; right?

24  **A.**   Right.

25  **Q.**   And, again, with respect to the story about the 13-year

1   old and this incident in which he has, performs oral sex on

2   a 13-year old around the time when he was a Dead Head

3   traveling with the Grateful Dead --

4   **A.**   Mm-hmm.

5   **Q.**   -- he described that kid almost as a street urchin, this

6   terrible description of the parents having something to do

7   with it?

8   **A.**   Right.

9   **Q.**   Now, that's another case where those descriptions may

10  very well have been accurate; right?

11  **A.**   Correct.

12  **Q.**   Things like that happen in the world?

13  **A.**   It does, yes.

14  **Q.**   And, again, the story that he tells about carrying on

15  with a 13-year old who he had a, basically a two- to

16  four-year relationship with?

17  **A.**   Mm-hmm.

18  **Q.**   Now, he describes this young man as already sexualized;

19  right?

20  **A.**   You mentioned that last night.  I don't recall that

21  but --

22  **Q.**   Well, when he told the story, he says one day the young

23  man appears in his van and starts masturbating?

24  **A.**   Okay.  Was that that kid -- that's true.  Yes, okay.

25  That's true.

1    **Q.**  And that certainly could be accurate as well?

2    **A.**  It's possible, yes.

3    **Q.**  And about all these children or adolescents that we're

4    learning about, we only have them through Mr. Carta's

5    report; right?

6    **A.**  Correct.

7    **Q.**  We don't have images of them or what they looked like?

8    **A.**  No.

9    **Q.**  Now, and, again, the incident, there is another incident

10   when he's a Dead Head and he is with a 17- to 18-year old

11   young man in his van; right?

12   **A.**  Yes.

13   **Q.**  And he says that, Mr. Carta said that he got signals

14   from this guy?

15   **A.**  Mm-hmm.

16   **Q.**  And then he, I guess the man is passed out and he starts

17   molesting him; right?

18   **A.**  Yes.

19   **Q.**  Or fondling him?

20   **A.**  Mm-hmm.

21   **Q.**  And then when the man wakes up, the way Mr. Carta tells

22   it, there is a scene and he leaves?

23   **A.**  Correct.

24   **Q.**  And so there is no coercion after the guy wakes up

25   according to Mr. Carta's own account?

1  **A.**  Correct.

2  **Q.**  And, in fact, we don't know whether this man was giving

3  signals or not?

4  **A.**  I do not, no.

5  **Q.**  Now, this treatment, the philosophy that they have in

6  these cognitive behavioral treatment programs is that it's a

7  lifelong process; right?

8  **A.**  Yes.

9  **Q.**  And it's a -- so, you know, a lot of these men may

10  complete the program and not be done; right?

11  **A.**  Yes.

12  **Q.**  And they may have after care, they may have probation

13  with mandated treatment?

14  **A.**  I believe that's recommended, that they transition in

15  the community to an aftercare kind of follow-up program.

16  **Q.**  And they'll be continuing to go through the process of

17  confronting their cognitive distortions and bringing them to

18  light with other men in process group and things like that?

19  **A.**  Right, because problems may ebb and flow and they may

20  resurface in the community.

21  **Q.**  And that's how life is?

22  **A.**  Yes.

23  **Q.**  And in these mandated treatment programs that these men

24  may do, if they've completed the program, they have this

25  document called a relapse prevention plan?

1    **A.**  Yes.

2    **Q.**  But if they have that in their pocket, that's no

3    insurance that they won't reoffend; right?

4    **A.**  Correct.

5    **Q.**  Now, the supervisors of these programs or the therapists

6    I guess are often in touch with probation officers; right?

7    **A.**  The SOTP therapists?

8    **Q.**  Treatment providers are often in touch with probation

9    officers where that's --

10   **A.**  I believe they do communicate with them.  I sent

11   that discharge report and I was told that's the common

12   practice.  I'm not sure how much contact they have on

13   average.

14   **Q.**  Now, the PHQ form that we talked about, there is an

15   update form to that; right?

16   **A.**  Yes.

17   **Q.**  And presumably men can do that many times as they come

18   up with new things about themselves?

19   **A.**  Right.

20   **Q.**  Right?

21   **A.**  Mm-hmm.

22           **MR. GOLD:**  May I approach, Your Honor?

23           **THE COURT:**  Yes.

24           **MS. STACEY:**  What are you approaching with?

25           **MR. GOLD:**  1023 (indicating).

```
 1              (Whereupon, counsel conferred.)

 2   BY MR. GOLD

 3   Q.   Dr. Wood, I have handed you a document.  Do you

 4   recognize it?

 5   A.   Right, it's a PHQ Update Form.

 6   Q.   And do you recognize the PHQ Update Form in general?

 7   A.   Yes.

 8   Q.   And this was a form that men were, did they submit it to

 9   you or how did it get done?

10   A.   In general a new updated form would be asked for by the

11   individual therapist if the person said, you know, they

12   weren't honest the first time or if they learned new things

13   they want to disclose.  And I don't remember why we did one

14   with Mr. Carta.

15   Q.   Do you recognize or does that -- do you recognize that

16   document that I just put in front of you?

17   A.   Yes, yes.

18   Q.   And that is the PHQ Update Form?

19   A.   Mm-hmm.

20   Q.   And you would have asked him to do it but you don't

21   specifically recall right now?

22   A.   I think it's common that I could have but probably me

23   and the psychologist could have asked him to do it.  But it

24   probably would have been me.

25   Q.   Now, is this among the documents that you received prior
```

1    to your testimony today?

2    **A.**   I believe that's in there.  Yes, I have seen that update

3    form.

4    **Q.**   You have seen it?

5    **A.**   Yes.

6    **Q.**   And do you recognize it as being among the treatment

7    documents in Mr. Carta's file that was maintained at the

8    Bureau of Prisons?

9    **A.**   Yes.

10   **Q.**   And you typically rely on documents like this in

11   drafting other documents?

12   **A.**   Yes.

13   **Q.**   As part of your work?

14   **A.**   Right.

15            **MR. GOLD:**  I move to admit this.

16            **MS. STACEY:**  It's already in evidence, Your Honor.

17            **MS. KELLEY:**  It's in.  It went in with the big

18   packet.

19            **MR. GOLD:**  Oh, and they told me that and I didn't

20   hear them, Your Honor.

21            **THE COURT:**  Okay.  That is all right.  Go ahead.

22            **MR. GOLD:**  In that case --

23            **THE COURT:**  What is the exhibit number?

24            **MS. STACEY:**  It is Exhibit No. 27.

25            **THE COURT:**  Is that the global?

1          **MS. STACEY:**  The global, Bates page 01023.

2          **THE COURT:**  So why don't we mark this page as 27A

3     since you are using it separately.  Okay.

4          **MR. GOLD:**  Great.

5          **(Defendant's Exhibit No. 27A received in evidence.)**

6     BY MR. GOLD

7     **Q.**  Now, so this is a standard form; right?

8     **A.**  Yes.

9     **Q.**  And so it has three questions here.  And it asks the

10    participants to assess and describe your own progress in the

11    Sex Offender Treatment Program.  And the first section is in

12    what areas do you feel you have improved or developed the

13    most.

14          And Mr. Carta said, "Understanding what it means to

15    be a victim, really coming to an understanding of how

16    deviant I've been throughout my entire life, seeing a real

17    need for change in order to live a more productive and

18    normal life."

19          And this document is dated January 13, 2006; right?

20    **A.**  Okay, yes.

21    **Q.**  And so this again is part of that ebb and flow that we

22    expect in treatment; right?

23    **A.**  Correct.

24    **Q.**  And after this, the confrontation regarding the young

25    man happened basically twice more; right?

1    **A.**   Yes.

2    **Q.**   Now we talked about Frank Damba; right?

3    **A.**   Yes.

4              **THE COURT:**   Frank?

5              **MR. GOLD:**   Frank Damba.

6              **THE COURT:**   Spell that.

7              **MR. GOLD:**   D-A-M-B-A.

8    BY MR. GOLD

9    **Q.**   And he is one of the men, these youthful men that

10   Mr. Carta was interested in; right?

11   **A.**   Yes.

12   **Q.**   Now, Mr. Carta -- you talked about these community

13   meetings in the morning; right?

14   **A.**   Right.

15   **Q.**   And part of what happens in this therapeutic community

16   is that people are supposed to challenge each other on

17   things that they're doing?

18   **A.**   Yes.

19   **Q.**   And make public certain things that might otherwise be

20   hidden; right?

21   **A.**   Yes.

22   **Q.**   Now, Mr. Carta participated in that process; right?

23   **A.**   Yes.

24   **Q.**   And, in fact, he confronted Mr. Damba on certain things

25   that he was doing; right?

1      **MS. STACEY:**  Objection.

2      **THE COURT:**  Damba?

3      **MR. GOLD:**  Damba, D-A-M-B-A.

4      **THE COURT:**  I have got it spelled wrong.

5      I am going to overrule the objection.  Go ahead.

6  You may have it.

7  **A.**  I'm sorry, the question -- my hesitancy here is I'm

8  starting to get uncomfortable about talking about another

9  inmate's treatment.

10      **THE COURT:**  He is not asking you for that.  He is

11  asking what you heard Mr. Carta say to Mr. Damba, as I

12  understand it.

13      **MS. STACEY:**  Well, and that was the basis of my

14  objection.

15      **THE COURT:**  Do I have that right?

16      **MR. GOLD:**  That's right, Your Honor.

17      **THE COURT:**  You are asking him what he said, what

18  he heard Mr. Carta say to Mr. Damba?

19      **MR. GOLD:**  To Mr. Damba, correct.

20      **THE WITNESS:**  Okay.  Correct.

21      **THE COURT:**  Just sort of putdowns, that is what you

22  are talking about; right?

23      **MR. GOLD:**  Well, no.  Now, these community

24  meetings -- well, putdowns is one way to --

25      **THE COURT:**  You are asking for -- criticizing

```
1    something that each one had done.
2            MR. GOLD:  Right.  I bet Dr. Wood would object to
3    the term "putdowns" but these --
4            THE COURT:  Well, let's wait.
5            MR. GOLD:  -- constructive --
6            THE COURT:  He doesn't have any objection right.
7            (Laughter.)
8    BY MR. GOLD
9    Q.  But, Dr. Wood, just to be clear, these community
10   meetings, where did they happen on the Maryland Unit?
11   A.  There was a large community room in the back that, you
12   know, could hold I think all hundred guys at the same time.
13   I think they split them up in an a.m. and a p.m. so maybe
14   half the treatment program would go into that community room
15   and have meetings.  They would go over announcements for the
16   day and what issues are going on in the unit.  It had a
17   structure to it.
18   Q.  And it wasn't just the, it wasn't just the men, right,
19   it was also treatment and therapy providers?
20   A.  Right, there was always a treatment staff member
21   assigned to that and other people, other staff could come in
22   as they wanted or needed.
23   Q.  And you told us that sometimes if you knew something was
24   going to happen with one of your guys, you would make an
25   effort to attend; right?
```

1    **A.**   Correct.

2    **Q.**   And there was oftentimes something happening with

3    Mr. Carta; right?

4    **A.**   It seemed to be toward the end, yes.

5    **Q.**   And so you would go and witness what was happening;

6    right?

7    **A.**   Right.  For example, when he was going to announce the

8    problem he was having or the restriction he was placing on

9    himself, I would try to be there to see how that happened or

10   occurred.

11   **Q.**   And so Mr. Carta in one of these community meetings

12   confronted Mr. Damba.  Do you recall that?

13        **MS. STACEY:**  Objection.  It's a relevance objection

14   in addition to the privacy objection, Your Honor.

15        **THE COURT:**  Overruled.

16        You may have the question.  Go ahead.

17   **A.**   Okay.  So Mr. Carta confronted Mr. Damba, yes.

18   **Q.**   And that's one of the reasons Mr. Damba left the SOTP?

19        **MS. STACEY:**  Objection.

20   BY MR. GOLD

21   **Q.**   Isn't that right?

22        **MS. STACEY:**  Objection.

23        **THE COURT:**  I am going to sustain the objection to

24   that question.

25   BY MR. GOLD

1   **Q.**  Well, after -- what was the subject matter of that

2   confrontation?

3              **MS. STACEY:**  Objection.

4              **THE COURT:**  You mean what did he hear Mr. Carta

5   say?

6              **MR. GOLD:**  Yes.

7              **THE COURT:**  If that is your question, then you may

8   have it.

9              **MS. STACEY:**  Your Honor, he is confronting another

10  sex offender about something the sex offender might have

11  done.  I think it's improper for him as a psychologist and a

12  treatment provider to testify.  Mr. Damba is not here.

13             **THE COURT:**  I understand he is not here.  He may

14  have the question.  Go ahead.

15  BY MR. GOLD

16  **Q.**  What did you hear Mr. Carta say to Mr. Damba in this

17  community meeting?

18  **A.**  I don't remember.

19  **Q.**  But after this, shortly after this Mr. Damba left the

20  program; right?

21  **A.**  My general memory is that there was an ongoing back and

22  forth between them.

23             (Whereupon, counsel conferred.)

24  **Q.**  Now, around this time, if you recall, did Mr. Carta talk

25  to you about being distressed about ratting other inmates

1    out?

2    **A.**   That does sound familiar, yes.

3    **Q.**   And he stated that that was an additional reason why he

4    wanted to leave the program; do you recall that?

5    **A.**   I don't remember him specifying it.  I thought he said

6    that he didn't want to talk about his reasons for ultimately

7    leaving the program.  That might have been discussed earlier

8    is maybe what you're asking.

9          That's a common complaint.  I have heard many

10   people say that so I have trouble saying that that was

11   Mr. Carta.

12         (Whereupon, counsel conferred.)

13   **Q.**   So it was a six-month period for you there?

14   **A.**   Yes.

15   **Q.**   At Butner?

16   **A.**   Yes.

17   **Q.**   And you testified earlier about how you would tell the

18   guys what a great opportunity it was to do the program?

19   **A.**   Yes.

20   **Q.**   And that's because they weren't going to have an

21   opportunity like that probably again, to have that kind of

22   treatment for free?

23   **A.**   Right, right.

24   **Q.**   Now, and it was an around-the-clock sort of affair;

25   right?

1   **A.**   Yes.

2   **Q.**   And what we've been talking about, these men lived

3   together 24/7?

4   **A.**   Correct.

5   **Q.**   Were those community meetings that we talked about every

6   day?

7   **A.**   I think they were every weekday.  I don't think they

8   happened on the weekend.

9   **Q.**   So every morning they had these public meetings?

10  **A.**   Right.  The group was split in half.  There was a.m. and

11  p.m. group meetings.

12  **Q.**   And they would do psycho educational classes?

13  **A.**   Yes.

14  **Q.**   And they would do process group?

15  **A.**   Yes.

16  **Q.**   They had the one-on-one with you?

17  **A.**   Right.

18  **Q.**   Are there other components that I am leaving out?

19  **A.**   Right, and then the daily community meetings.  All those

20  are I think the main gist of it.

21  **Q.**   And they are supposed to think of themselves as in a

22  therapeutic community?

23  **A.**   Yes.

24  **Q.**   And they're not in any of these things; right?

25  **A.**   Right, right.

1  **Q.**  So do you have any sense of what the dropout rate is?

2  **A.**  I told you last night, I asked Dr. Hernandez that.  I

3  was curious.  And I thought I remembered him to say 30 to 40

4  percent.

5  **Q.**  Of people dropping out?

6  **A.**  Of people that don't complete the program for various

7  reasons, whether they get kicked out or dropped out.

8  **Q.**  And it's also just a very intense experience for these

9  men, would you agree with that statement?

10  **A.**  Yes.

11  **Q.**  And they may form very intense bonds with the people who

12  are in the program with them?

13  **A.**  I saw that, yes.

14  **Q.**  Now, sometimes there is sexual acting out in these

15  programs.  Did you witness that?

16  **A.**  I'm sure it's possible but I have no knowledge of any

17  sexual acting out.

18          **MR. GOLD:**  I have nothing further.

19          **THE COURT:**  Okay.  Any redirect?

20          **MS. STACEY:**  Nothing further, Your Honor.

21          **THE COURT:**  Okay.  You are excused, sir.  Thank

22  you.

23          Next witness.

24          (The witness was excused.)

25          **MS. BOAL:**  The government calls Dr. Amy Phenix.

1              **AMY PHENIX, Sworn**

2            **DIRECT EXAMINATION**

3    BY MS. BOAL

4    **Q.**  Good afternoon, Dr. Phenix.

5    **A.**  Good afternoon.

6    **Q.**  Could you please state and spell your name for the

7    record.

8    **A.**  Amy Phenix, A-M-Y P-H-E-N-I-X.

9    **Q.**  What is your occupation?

10   **A.**  I'm a clinical psychologist in private practice.

11   **Q.**  Dr. Phenix, have you rendered an opinion in this case as

12   to whether Mr. Carta is a sexually dangerous person?

13   **A.**  I have.

14   **Q.**  Before we get to your opinion, I'm going to ask you some

15   questions about your background.  If you could turn to tab

16   two in the binder which has been marked as -- I'm sorry --

17   marked as Exhibit 2, do you recognize that document?

18   **A.**  I do.

19   **Q.**  And what is it?

20   **A.**  That's my CV.

21         **MS. BOAL:**  Your Honor, I understand there is no

22   objection to that and we would move into evidence Government

23   Exhibit 2.

24         **THE COURT:**  No objection?

25         **MR. GOLD:**  No objection.

```
 1            THE COURT:  It comes in.

 2            (Government's Exhibit No. 2 received in evidence.)

 3   BY MS. BOAL

 4   Q.  Are you a licensed psychologist?

 5   A.  Yes, I am.

 6   Q.  How many years have you been licensed and in what

 7   states?

 8   A.  I have been licensed in California since 1992.  And I am

 9   also licensed in the state of Washington for about the last

10   three years and the state of Florida for also about four

11   years.

12   Q.  Please briefly describe your educational background by

13   institution, field of study, degree received --

14            THE COURT:  We have got the CV; right?

15            MS. BOAL:  We do, Your Honor.

16            THE COURT:  So I have it.  I don't have to hear it

17   too.

18            MS. BOAL:  Okay.

19            THE COURT:  Go ahead.

20   BY MS. BOAL

21   Q.  For how long have you been involved in the treatment or

22   evaluation of sex offenders?

23   A.  Since 1989.

24   Q.  And do you stay current on the literature in the field

25   of sex offenders?
```

1    **A.**   Yes.

2    **Q.**   And have you published on the topic of sex offenders?

3    **A.**   I have.

4    **Q.**   And what have you published?

5    **A.**   I have published a book chapter and a few articles.  I

6    have a publication in the <u>Journal of The American Academy of</u>

7    <u>Psychiatry and Law.</u>  That publication is with a number of

8    other authors in 2001 called*, "Actuarial Risk Assessment*

9    *Models:  A review of critical issues related to violence and*

10   *sex-offender recidivism assessments."*

11         I also have a reply in the same journal to an

12   article called -- the reply is called, *"Antisocial*

13   *Personality Disorder Is Not Enough*:  *A reply to Sreenivasan,*

14   *Weinberger, and Garrick."*

15         I wrote a book chapter in <u>Innovations in Clinical</u>

16   <u>Practice:  A Source Book.</u>"  And that chapter was on the risk

17   assessment of sex offenders.

18         And furthermore I'm one of the authors on the

19   Coding Rules for the Static-99 and now the Static-2002.

20   **Q.**   And are any of those publications peer reviewed?

21   **A.**   Yes, two of them were.

22   **Q.**   And is Exhibit 3 the list of your publications in the

23   binder?

24   **A.**   Yes.

25         **MS. BOAL:**  And we would move into admission

1   Exhibit 3, Your Honor.

2                **MR. GOLD:**  No objection.

3                **THE COURT:**  Okay.  It comes in.

4                **(Government's Exhibit No. 3 received in evidence.)**

5   BY MS. BOAL

6   **Q.**  Have you given any presentations at conferences on the

7   topic of sex offenders?

8   **A.**  Yes, I have.

9   **Q.**  And how many and on what topic generally?

10  **A.**  Oh, about 25 or so, 30 presentations.

11  **Q.**  And have you also provided training and, if so, on what

12  topic generally?

13  **A.**  Yes, I provide training on coding the actuarial

14  instrument, the Static-99, as well as training on sex

15  offender risk assessment.

16  **Q.**  And have you ever testified in court about your

17  professional opinions in this area?

18  **A.**  Yes.

19  **Q.**  And has that testimony included the diagnosis of mental

20  illnesses or disorders suffered by sex offenders?

21  **A.**  Yes.

22  **Q.**  And has the testimony included the risk of recidivism

23  that would be posed by sex offenders?

24  **A.**  Yes.

25  **Q.**  And have you testified for both the prosecution and

1    defense in sexually dangerous person cases?

2    **A.**   Yes, I have.

3    **Q.**   And in the last couple of years approximately what

4    percentage have you testified for the prosecution and what

5    percentage have you testified for the defense?

6    **A.**   About 70 percent for the prosecution, about 30 percent

7    for the defense.

8    **Q.**   Have you ever failed to qualify as an expert?

9    **A.**   No.

10   **Q.**   Did you render an opinion as to whether or not Mr. Carta

11   is a sexually dangerous person?

12   **A.**   Yes, I did.

13   **Q.**   And did you write a report that contains those

14   conclusions?

15   **A.**   I did.

16   **Q.**   And turning to tab one in the exhibit binder, is that

17   your report?

18   **A.**   Yes, it is.

19        **MS. BOAL:**   Your Honor, I would move Government's

20   Exhibit 1 into evidence.   I understand there is no

21   objection.

22        **THE COURT:**   It comes in.

23        **(Government's Exhibit No. 1 received in evidence.)**

24   BY MS. BOAL

25   **Q.**   Before reaching an opinion, what, if any, materials did

1    you review?

2    **A.**   I reviewed a number of materials.  I reviewed all the

3    criminal legal records in this matter, charging documents,

4    conviction documents, police officers' report, presentence

5    report in this case.

6          Furthermore I reviewed the records from the

7    Department of Corrections which also contained his treatment

8    records in the Sex Offender Treatment Program and other

9    psychiatric records as well in this case.

10   **Q.**   Are those records the type that are reasonably relied on

11   by experts in your field in forming opinions or inferences

12   regarding whether a person is sexually dangerous?

13   **A.**   They are.

14   **Q.**   What, if any, actuarial instruments did you use in

15   connection with your review of this case?

16   **A.**   I used two actuarial instruments.  I scored the

17   Static-99 as well as the Minnesota Sex Offender Screening

18   Tool Revised or what I'll call the MnSOST-R.

19   **Q.**   Did you interview Mr. Carta?

20   **A.**   I did not.

21   **Q.**   And why did you not meet or interview Mr. Carta?

22   **A.**   He declined to be interviewed.

23   **Q.**   And, in fact, was there a court order that you could not

24   interview him?

25   **A.**   Yes.

1   **Q.**   In the past have you evaluated whether someone was a

2   sexually dangerous person without an interview?

3   **A.**   Yes, I have.

4   **Q.**   And is that an accepted practice in your field?

5   **A.**   It is as long as you have adequate records in order to

6   offer an opinion.

7   **Q.**   And did you have adequate records in this case?

8   **A.**   Yes, I did.

9   **Q.**   Turning to the first element under the statute, do you

10   have an opinion based on a reasonable degree of professional

11   certainty as to whether Mr. Carta engaged in or attempted to

12   engage in sexually violent conduct and/or child molestation?

13   **A.**   Yes.

14   **Q.**   And what is that opinion?

15   **A.**   I believe he has.

16   **Q.**   Did he engage in sexually violent conduct?

17   **A.**   Yes.

18   **Q.**   Please describe the sexually violent conduct that

19   Mr. Carta has engaged in.

20   **A.**   The first incident of sexually violent conduct was

21   actually discussed previously and that would be when he was

22   11 to 13 years of age and he orally copulated a 4-to 5-year

23   old child.

24   **Q.**   And what would be the next incident?

25   **A.**   The next incident would be when he engaged in mutual

1   oral copulation with his 7-year old cousin, again, when he

2   was between the ages of 11 and 13.  And this behavior

3   occurred on ten occasions over about a year period.

4   **Q.**  What is the next incident of sexually violent conduct

5   Mr. Carta engaged in?

6   **A.**  The next incident would be the incident when he was

7   about 15 years of age when he engaged in oral copulation

8   with another similar aged peer who he shot with a BB gun in

9   the process of first trying to talk him into engaging in

10   sexual activity with him.  And then when he did not, he shot

11   him with a BB gun.

12   **Q.**  And what would be the next incident of sexually violent

13   conduct?

14   **A.**  The next incident would involve when he was 28 years of

15   age, he orally copulated an intoxicated 13-year old boy who

16   he had coerced into engaging in sexual activity by offering

17   him tickets to a concert.

18   **Q.**  What would be the next incident of sexually violent

19   conduct?

20   **A.**  That would be when he engaged in non-consenting sexual

21   activity with a 17- or 18-year old male that was discussed

22   previously who had passed out, who was intoxicated.  When he

23   woke up, it was obvious that it was non-consenting sexual

24   activity and that the male yelled and caused a disturbance.

25   **Q.**  What is the next incident of sexually violent conduct?

1    **A.**   The next incident would be when Mr. Carta was 30 or 31

2    years of age.   And he engaged in sexual activity repeatedly

3    over a four-year period with a 13-year old male who he

4    engaged in sexual contact with on 30 to 40 separate times.

5    **Q.**   What is the next incident of sexually violent conduct?

6    **A.**   The next incident of sexually violent conduct would be

7    when he engaged in oral copulation again with a 13-year old

8    male that he met over the Internet.

9    **Q.**   And what is the last incident of sexually violent

10   conduct?

11   **A.**   The last incident would involve the sexual activity that

12   he engaged in with a 15-year old brother of his 17-year old

13   boyfriend Frederick.

14   **Q.**   And why do you characterize these acts as sexually

15   violent?

16   **A.**   These are acts that involve non-consenting victims or

17   they involve boys in contact sexual offenses.   And we know

18   that this kind of sexual activity, repeated sexual activity

19   with these young boys, 13-year old boys is sexually violent

20   because of the hurt and harm that it perpetrates upon those

21   boys and the victims involved.

22   **Q.**   Did Mr. Carta engage in acts of child molestation?

23   **A.**   Yes, he did.

24   **Q.**   And please describe the acts of child molestation in

25   which Mr. Carta has engaged.

1    **A.**   Some of the acts that were sexually violent I also

2    characterized as acts of child molestation.

3            And that first incident of child molestation would

4    be when he was 11 to 13 and orally copulated a 3-to 4-year

5    old child.

6    **Q.**   Is it fair to say that all the acts of child molestation

7    are the same as the sexually violent conduct except for the

8    one involving the 17- or 18-year old who passed out that was

9    molested?

10   **A.**   That would be correct.

11   **Q.**   And why do you characterize those acts as child

12   molestation?

13   **A.**   Because those were children.  And in terms of examining

14   who would be considered a child, someone in their later

15   teens would not be considered a child but I considered

16   these, certainly these 13-year olds and 15-year olds as

17   children.

18   **Q.**   Do you have an opinion based on a reasonable degree of

19   professional certainty as to whether Mr. Carta suffers from

20   a serious mental illness, abnormality or disorder?

21   **A.**   Yes, I do.

22   **Q.**   And what is your opinion?

23   **A.**   I believe he suffers from five mental abnormalities,

24   mental illnesses or disorders.

25   **Q.**   And what is the first one?

1    **A.**   The first of those is paraphilia not otherwise

2    specified.

3    **Q.**   What does the term "paraphilia" refer to?

4    **A.**   Paraphilia refers to an individual who experiences

5    intense recurrent sexually arousing fantasies, urges or

6    behavior that involve one of three acts.  And in terms of a

7    paraphilia, the first would be this type of fantasies or

8    behaviors with non-human objects.  That would be something

9    like a fetish with women's panties or perhaps shoes.

10          The second would be the suffering or humiliation of

11   one's self or one's partner, typically known and diagnosed

12   in the DSM as sexual sadism or sexual masochism.

13          And the final category of paraphilias would be

14   sexual fantasies, urges and behaviors with children,

15   prepubescent children and other non-consenting persons.

16   **Q.**   What does the NOS refer to in the paraphilia NOS

17   diagnosis?

18   **A.**   That means not otherwise specified.

19   **Q.**   Are you familiar with the *Diagnostic and Statistical*

20   *Manual of Mental Disorders*?

21   **A.**   Yes.

22   **Q.**   And what is the -- is it also known as the DSM?

23   **A.**   Yes.

24   **Q.**   And what is the DSM?

25   **A.**   The DSM is a classification manual that contains all of

1    the known research on mental disorders, symptoms of various

2    mental disorders.  It's a classification manual that allows

3    mental health workers to have an agreement on various mental

4    disorders.

5    **Q.**  And so is the DSM generally relied on in your field?

6    **A.**  Oh, yes.

7    **Q.**  And are you familiar with the diagnostic criteria for

8    paraphilia NOS as listed in the DSM?

9    **A.**  Yes.

10    **Q.**  And turning to tab 11 of the binder, are those the

11    DSM-IV diagnostic criteria for paraphilia NOS?

12    **A.**  Yes.

13             **MS. BOAL:**  Your Honor, I would move those

14    diagnostic criteria into evidence.  And I understand there

15    is no objection.

16             **MR. GOLD:**  That's right, no objection.

17             **THE COURT:**  Okay.  It may come in.

18             **(Government's Exhibit No. 11 received in evidence.)**

19    BY MS. BOAL

20    **Q.**  Could you explain in your own words generally what the

21    diagnostic criteria are for paraphilia NOS?

22    **A.**  Paraphilia not otherwise specified is a category that is

23    used when you have a paraphilia that does not fit into any

24    other specific subcategory in the paraphilias.

25             For example, there is a specific category for

1    pedophilia, sexual arousal to prepubescent children, a

2    specific category for sexual sadism.

3             But when a sexual abnormality does not fit into one

4    of the specific categories, just like all the other mental

5    disorder categories in the DSM, there is a specific category

6    one would use to diagnose that paraphilia and that would be

7    paraphilia not otherwise specified with an explanation or a

8    descriptor, if you will, of what that particular sexual

9    disorder is.

10   **Q.**   And does Mr. Carta meet the diagnostic criteria of

11   paraphilia NOS?

12   **A.**   Yes, he does.

13   **Q.**   And does it also have to have lasted more than six

14   months?

15   **A.**   Yes, there is a time requirement.

16   **Q.**   And why does Mr. Carta meet the criteria for paraphilia

17   NOS?

18   **A.**   In my opinion he meets that criteria because of his long

19   established pervasive sexual arousal to children becoming

20   pubescent and also to post-pubescent teens.

21            For individuals who are aroused to younger people,

22   they have different arousal patterns.  It could be to

23   prepubescent children or any time through the teen years.

24   And what we see here is his self-stated very specific

25   arousal.  He reported in the SOTP program that his primary

1   arousal is to children age 12 to 17 and that his secondary

2   arousal or sexual interest was to children 7 to 11.

3        So we have data that tells us a good deal of

4   information about Mr. Carta's arousal patterns.  And

5   certainly that had to do with his criminal offense and the

6   reason that he went to prison.

7        So not only do we have some admissions and

8   behaviors but we also have some understanding of his arousal

9   patterns by the pornography that he viewed and for which he

10  was arrested and convicted.

11       He has reported that he is aroused to, primarily to

12  boys age 12 to 17.  In fact, if you look at the age of the

13  pornography for which he had 50,000 images of children, the

14  age group there was much wider.  That was from age three all

15  the way up to age 17.

16       He has denied sexual arousal to the younger

17  children.  And, in fact, I don't have any evidence of

18  behaviors which indicate he has acted out on sexual arousal

19  to younger children but I do have at least in this case a

20  number of admissions that we have talked about a few times

21  now today.

22       His admissions that he has acted out three times as

23  an adult with a 13-year old children, so certainly we can

24  establish that at the very least his arousal begins at 12 or

25  13 when a child is becoming pubescent, has some of those

1    secondary sexual characteristics but not all of them, so an

2    immature child becoming an adult.

3         And then we also have evidence in his admissions

4    that he has sought out on the Internet and met young

5    teenagers.  He advertised for teenagers between the age of

6    14 and 18 to engage in sex with them, to have them as sexual

7    partners.

8         We know that he is very aroused to this age group

9    between the ages of, at the very least 12 to 17, because of

10   the compulsivity with which he engaged in viewing this

11   pornography.  He reported masturbating two to three times a

12   day which is well over the average for a man his age.

13        Viewing this pornography 12 to 14 hours a day at

14   the exclusion of working, showering, taking care of his

15   hygiene, so it was extremely highly compulsive behavior.

16   And furthermore he has acted out on his sexual arousal to

17   children becoming pubescent and teenagers ever since he was

18   very young.

19        So while we don't diagnose individuals who are

20   under the age of 16 with a paraphilia or a sexual

21   abnormality, we certainly often see the development of these

22   disorders early on.  And that's exactly what we are able to

23   see in Mr. Carta's case, that age 11 to 13 he was developing

24   sexual arousal not to his peers as we should have seen with

25   normal sexual development but to younger children.

1          And then we see him at age 15 sexually active with

2     peers.  And then what happened sexually with his development

3     as he gets older, we see that as he gets older he maintains

4     this sexual arousal to this younger age group, this 13-,

5     14-, 15-, 16-year age group, when he is in his twenties,

6     when he is in his thirties and when he is in his forties.

7          And this is an abnormal sexual development that I

8     have described as paraphilia not otherwise specified.

9     **Q.**  If a sexual behavior is legal, can the person still have

10    a diagnosis of paraphilia NOS?

11    **A.**  Oh, sure.

12    **Q.**  And could you give some examples.

13    **A.**  For example, there are diagnoses that you would diagnose

14    as paraphilia not otherwise specified when there is sexual

15    arousal to sexual activity that involves urine or feces.

16    This is not illegal activity but it's abnormal.  It's

17    statistically abnormal and unusual.

18          And if it causes distress in the person, then it

19    can become a mental disorder that you've diagnosed as

20    paraphilia.  It may be.  It may not be.

21    **Q.**  You mentioned the term "hebephilia" in your report.  And

22    what is that?

23    **A.**  I mentioned that because over the years that has been,

24    well, since I think about the 1950s in some of the

25    literature this arousal pattern to children becoming

1    pubescent and a preference, excuse me, and a preference for

2    teenagers has been described as hebephilia in various

3    journal articles and various researchers have discussed it

4    in that term.

5           So "hebephilia" is a very accepted term in my field

6    to describe this particular sexual arousal pattern.

7    **Q.**  And what when you say it's an accepted term, why do you

8    say that?

9    **A.**  Well, it's well recognized by those of us that work in

10   this field diagnostically.  If someone comes to me and says,

11   you know, I've provided this diagnosis, I know exactly what

12   it means.  It means that the person does not have just

13   sexual arousal or perhaps any sexual arousal to prepubescent

14   children but that is this preference for young teens to --

15   throughout the teenage years actually till about age 17.

16          And some articles actually refer to hebephilia, you

17   see, I see in, because I have an opportunity to review many

18   evaluations for the purpose of the sexually violent predator

19   laws or sexually dangerous person laws throughout the

20   country, I'll see those diagnoses offered as we have seen in

21   this case:  Paraphilia not otherwise specified, hebephilia,

22   which is simply another term for sexual arousal to children

23   becoming pubescent and postpubescent children.

24   **Q.**  And when you mentioned articles describing hebephilia,

25   are those peer reviewed articles?

1    **A.**   Yes, we do have peer reviewed articles, yes.

2    **Q.**   And are there physiological tests to determine an

3    arousal pattern?

4    **A.**   Yes.   That's how we know about arousal patterns.   We've

5    studied them via physiological tests.   For example,

6    phallometric assessment is a physiological test designed

7    just to determine what a person's arousal pattern is.   The

8    person is subject to slides or video, tapes of individuals

9    of both sexes, male and female, and all varying ages.   And

10   additionally their erectile response while looking at those

11   slides is monitored to see where their sexual interest lies.

12          And in administering these tests, phallometric

13   assessment, or called penile plethysmograph, we can tell if

14   individuals are sexually aroused to children or adults or

15   males or females in many cases.

16          There is also another type of test, the Abel

17   Assessment for Sexual Interest, where the same similar types

18   of slides of males and females at various ages are shown and

19   then the individuals, the length of time that they focus or

20   look at, their visual reaction time to that slide shows more

21   interest in that particular age group or sex.

22          So we have ways to measure sexual arousal patterns.

23   Often times it's less necessary when a person has discussed

24   them at length and furthermore when we have a lot of

25   behaviors that indicate what that arousal pattern is.

1    **Q.**   Did you diagnose Mr. Carta with hebephilia?

2    **A.**   I did not, no.

3    **Q.**   So what is your diagnosis of Mr. Carta -- what

4    paraphilia did you diagnose Mr. Carta as having?

5    **A.**   Paraphilia not otherwise specified.  The DSM notes that

6    if you provide a diagnosis that doesn't have a specific

7    category, that it be diagnosed in the category of paraphilia

8    not otherwise specified.

9    **Q.**   Can paraphilia NOS amount to a serious mental illness,

10   abnormality or disorder?

11   **A.**   Oh, of course.

12   **Q.**   And do you believe that Mr. Carta's paraphilia NOS is a

13   serious mental abnormality, illness or disorder?

14   **A.**   Yes, absolutely.

15   **Q.**   And why do you say that?

16   **A.**   Well, I say that because it has cost him a significant

17   loss of freedom in his life.  He has, he has not been able

18   to function as a normal human being because he became so

19   obsessed with looking at pornography that was illegal, that

20   he became incredibly risky with his behavior.

21          Hence, he was caught, incarcerated, separated from

22   his family and unable to maintain normal relationships in

23   the community and subject to, you know, criminal sanctions.

24   I mean, that's been a huge sacrifice in his life as a result

25   of this problem.

1  **Q.**  Now, you said you diagnosed Mr. Carta with five

2  diagnoses.  And we talked about paraphilia NOS.  Did you

3  also diagnose him with various substance abuse disorders?

4  **A.**  Yes, I did.

5  **Q.**  And with which ones?

6  **A.**  I diagnosed him with hallucinogen dependence, cannabis

7  dependence and alcohol abuse.

8  **Q.**  And are there DSM-IV criteria for all of these

9  diagnoses?

10  **A.**  There are.

11  **Q.**  And did he meet the criteria for these diagnoses?

12  **A.**  He met sufficient criteria, yes.

13  **Q.**  And are those criteria located at tabs 12, 13, 14 in the

14  exhibit binder?

15  **A.**  Yes.

16        **MS. BOAL:**  Your Honor, I believe there is no

17  objection to the admission of those diagnostic criteria.

18        **THE COURT:**  Okay.  They come in.

19        **(Government's Exhibit No. 12 received in evidence.)**

20        **(Government's Exhibit No. 13 received in evidence.)**

21        **(Government's Exhibit No. 14 received in evidence.)**

22  BY MS. BOAL

23  **Q.**  Why does he meet the criteria for hallucinogen

24  dependence?

25  **A.**  Mr. Carta has a lengthy history in the past.  He began

1    using LSD, which is a hallucinogen, when he was about 12 to

2    18 years of age.  He used it for approximately twenty years.

3    He was involved in the music culture and primarily during

4    that time I believe it was his heaviest use, he described it

5    in his twenties and thirties as actually extremely heavy.

6         He used hallucinogens approximately three times a

7    week.  He said he developed a tolerance which was one of the

8    criteria for substance dependence.  He developed a tolerance

9    over time.

10        He said initially he would take three to four doses

11   of LSD.  And it got to the point because of his excessive

12   use that he, and his tolerance, that he would use up to 50

13   doses of LSD, which is quite excessive.

14   **Q.**  And why does he meet the criteria for cannabis

15   dependence?

16   **A.**  For cannabis dependence, he began to use marijuana at

17   age 17 or 18.  He described being a heavy smoker and having

18   habitual use of marijuana, really throughout the time until

19   he was incarcerated for the instant offense.

20        He described smoking, you know, ten marijuana

21   cigarettes a day.  And he also described withdrawal symptoms

22   which is another characteristic symptom of substance

23   dependence.  So his withdrawal, when he would withdraw from

24   it or stop using it, he would become irritable.

25        And, furthermore, he said that he, records indicate

1    that he -- and when I say "he said," I know that this is a

2    review of the records so the records would indicate that he

3    smoked marijuana from 17 to age 41 continuously.  And both

4    with the LSD and with the marijuana, he incurred legal

5    problems.  He has about four substance abuse arrests in his

6    criminal record.

7    **Q.**   Why does he meet the criteria for alcohol abuse?

8    **A.**   I had less information about his alcohol intake.  He

9    certainly -- he -- there is information in the records that

10   indicate that he drank heavily.  And there was some

11   descriptors of what that meant.  And the heaviest drinking

12   that I saw reported was a case of beer per night for three

13   to four nights per week, which is heavy, heavy drinking.

14        I don't have any information, however, regarding

15   his alcohol intake, if it was associated with symptoms of

16   tolerance or withdrawal, which are the primary symptoms for

17   alcohol dependence, so it's possible that he has alcohol

18   dependence.  I diagnosed alcohol abuse to be conservative.

19   **Q.**   Do these various substance abuse diagnoses constitute a

20   serious mental illness, abnormality or disorder?

21   **A.**   Yes, they do.

22   **Q.**   And are they serious for Mr. Carta?

23   **A.**   Yes.

24   **Q.**   And why is that?

25   **A.**   That's because the use of substances, while it does not

1    cause a person to molest children or to engage in sexually

2    violent behavior, it is not the primary cause, the

3    paraphilia is the primary cause; but substances will

4    disinhibit him.  So if he's experiencing deviant sexual

5    arousal, he is far more likely to act out on that if he is

6    intoxicated and doesn't have a good judgment at the time.

7    Q.   Now, the fifth diagnosis that you made of Mr. Carta was

8    personality disorder with antisocial and borderline traits;

9    is that correct?

10   A.   Yes.

11   Q.   And are there criteria for this diagnosis in the DSM?

12   A.   Yes, there are.

13   Q.   And if you'd turn to tab fifteen, are these the

14   diagnostic criteria for both the personality disorders and

15   also antisocial personality disorder and borderline

16   personality disorder?

17   A.   Yes.

18        **MS. BOAL:**  Your Honor, I move into evidence

19   Exhibit No. 15 which I understand there is no objection to.

20        **THE COURT:**  No objection, it comes in.

21        **(Government's Exhibit No. 15 received in evidence.)**

22   BY MS. BOAL

23   Q.   What are the criteria generally for antisocial

24   personality disorder traits?

25   A.   Right.  Antisocial personality disorder is associated

1    with an individual who violates the rights of others.   A

2    person who engages in typical criminal behavior.   A person

3    who is, as a result of that behavior has been incarcerated

4    or institutionalized.   A person who lies to get their needs

5    met.   A person who is impulsive and acts out without

6    thinking through the consequences of their behavior.   A

7    person who may engage in aggressiveness towards others,

8    irritability, repeated physical fights, for example.

9    Someone who is irresponsible about their life

10   responsibilities such as not sustaining gainful employment

11   or work.   And also a person who doesn't experience normal

12   remorse, is not sorry for the hurt and harm that they have

13   perpetrated on others.

14   **Q.**   And for a diagnosis of antisocial personality disorder,

15   does there also have to be a pattern of disregard for rights

16   before the age of 15?

17   **A.**   Yes, there has to be evidence of what we call conduct

18   disorder which is like antisocial personality disorder for a

19   child.

20   **Q.**   And does Mr. Carta meet the diagnostic criteria for

21   personality disorder with antisocial personality traits?

22   **A.**   Indeed he does.

23   **Q.**   And why is that?

24   **A.**   Well, he has certainly evidence of conduct disorder.

25   Looking at the records there was a description of him

1    engaging -- well, there is interviews with his mother, his

2    sister and family members which have provided information

3    about his development as well as other psychological reports

4    that indicate that he had -- was a fire setter from about

5    age seven.  He set a number of things on fire including a

6    bale of hay, a shack, a barn-type shack.  He set a towel on

7    fire in his sister's home.

8          So he was -- and he talked about himself getting an

9    adrenaline rush when he started fires.

10          He was also at age 17 convicted of reckless

11    burning.  So this was a problem throughout his early

12    childhood up until the time that he was about 17 or so.

13          And furthermore he had difficulties at school.  He

14    was -- at school he was truant from very early on.  From

15    six, he was suspended.  He got into trouble at school.  He

16    was suspended in fifth grade.

17          In eighth grade he was suspended for truancy and

18    probably five to ten times I saw in the records.  So he was

19    truant.  He had suspensions for various reasons.

20          And in the seventh and eighth grade he was involved

21    with a number of other boys who were delinquent and

22    burglarizing homes and stealing things from other people.

23    They would steal alcohol.  They would steal marijuana.  They

24    would steal money.  He talked about a number of juvenile

25    arrests when he was younger.

1              So we see certainly evidence of conduct disorder

2      and then many indications as an adult of antisocial

3      behavior.

4      **Q.**  And what are some of those indications?

5      **A.**  Those would be twenty arrests and convictions, a

6      relatively long rap sheet for him.  Also very versatile

7      criminal offending.  So he has arrests and convictions for

8      drug offenses, property offenses, sex offenses, non-sexual

9      violence, arson.  So he has a versatile criminal history.

10             He is a person who has not really maintained

11     gainful employment.  He's had a hundred jobs.  They've been

12     short term jobs.  And there has been periods of time when he

13     has been, significant periods of time when he has been

14     unemployed.

15             He was irresponsible in terms of raising his

16     daughter.  He was given custody of his daughter when she was

17     just a baby.  His mother ended up raising the child.  He

18     talked about his irresponsibility in the records, of not

19     providing adequate care for her.

20             This is a person who can really fly off the handle,

21     become enraged, has threatened to kill his mother, his

22     daughter and his daughter's boyfriend in retaliation for

23     them not in some way to him meeting his needs.  And they

24     have been fearful for their lives as a result of that.

25             He has had a number of relationships that have

1    ended in retaliation that is very hurtful to the person with

2    whom he was involved and humiliating to those people, which

3    is antisocial in nature.  For example, after he broke up

4    with his girlfriend Brenda he put nude pictures of her in

5    her brother's mailbox.

6          After he broke up with Frederick, the 17-year old

7    boyfriend when he was in his forties, he put flyers with

8    explicit embarrassing information about their sexual

9    history, flyers on his front lawn, flyers in neighbors'

10   mailboxes.

11         So he has a need to hurt people who he has cared

12   about in the past.

13         And, furthermore, he, the years that he was

14   traveling with the band the Grateful Dead he was selling

15   drugs, LSD and marijuana.  So these are all indices of his

16   antisocial behavior.

17   **Q.**  Is the antisocial personality disorder trait, is that a

18   serious disorder?

19   **A.**  Yes.

20   **Q.**  And is it serious for Mr. Carta?

21   **A.**  It is.

22   **Q.**  And is that for all the reasons that you have just

23   stated?

24   **A.**  Yes, and it furthers his offending.  His antisocial

25   attitudes give him permission to violate the rights of

1  someone else such as a 13-year old with whom he wants to

2  have sex.

3  **Q.**  Now, there had been some mention that you had given a

4  diagnosis of personality disorder NOS; is that correct?

5  **A.**  Yes.

6  **Q.**  Did you give a diagnosis of personality disorder NOS?

7  **A.**  Yes, I provided a diagnosis of personality disorder not

8  otherwise specified with antisocial and borderline traits.

9  So I just described the two personality disorders I think he

10  fits.

11  **Q.**  And moving on to the borderline personality disorder

12  traits, are there DSM-IV criteria for that?

13  **A.**  Yes, there are.

14  **Q.**  And are those in an exhibit that has been admitted into

15  evidence, Exhibit No. 15?

16  **A.**  Yes, they are.

17  **Q.**  And what are the diagnostic criteria generally for

18  borderline personality disorder traits?

19  **A.**  Borderline personality disorder is characterized by

20  severe problems within personal relationships and intimate

21  relationships.  It's an individual who experiences or

22  exhibits frantic efforts to avoid being abandoned in

23  relationships.  So as long as the person stays with them,

24  the relationship can stay in tact.

25        When the person tries to leave, the person becomes,

1    the individual becomes frantic and will do almost anything

2    to try to get that person back, causing all kinds of

3    problems and chaos and in this case revenge.

4         A person that has unstable interpersonal

5    relationships, also an unstable view of themselves, a very

6    poor self image, generally, a person who is prone to

7    impulsivity, that would be things like reckless driving but

8    certainly substance abuse, using drugs and alcohol, and as a

9    result having very impulsive behavior.

10        Also a person whose moods fluctuate a great deal,

11   go up, go down and are not well controlled.  A person who

12   feels kind of chronically like they have no sense of self,

13   and also a person very prone to act out in anger, in

14   particular if they feel abandoned.

15   **Q.**  Does Mr. Carta meet the criteria for borderline

16   personality disorder traits?

17   **A.**  Yes, I believe he does.

18   **Q.**  And why does he meet the criteria?

19   **A.**  I think we see exactly what I described, an individual

20   who wants to maintain a relationship desperately.  And when

21   they lose that relationship, he acts out in a variety of

22   ways.

23        For example, he was married for eight months.  His

24   wife left him and his baby.  And he, to get her back

25   frantically and desperately to get her back, he attempted to

1    kill himself, took an overdose I believe of aspirin.  Not to

2    kill himself as he reported later but just to scare her, to

3    try to get her back.

4         And furthermore he retaliated or acted out against

5    his girlfriend, against his boyfriend Frederick in attempts

6    to try to get these individual to come back to him.

7         He had a relationship with his daughter's boyfriend

8    when they were living in his home.  And he went to the

9    extent to tell his daughter that he was having a sexual

10   relationship with her boyfriend so that they would break up

11   and Sean would come back and be with him.

12        So this is the type of behavior and relationships

13   that's very typical of borderline personality disorder.

14   He's acted quite impulsively of using drugs and alcohol

15   repeatedly over his life.

16        And furthermore he is very prone to act out with

17   anger.  I talked about the retaliation to partners but also

18   anger when someone doesn't meet his needs.  When his -- he

19   believes his parents destroyed property when he was

20   incarcerated and that's when he threatened to kill his

21   mother.  He threatened to kill his daughter and others.

22        So he can become very, very enraged.  This anger is

23   quite typical of borderline personality disorder.

24   Q.   Are borderline personality disorder traits serious?

25   A.   Yes, they are.

**Q.**   And is it a serious condition for Mr. Carta?

**A.**   It is.

**Q.**   And how, if at all, does Mr. Carta's personality

diagnosis with antisocial and borderline personality traits

affect his overall prognosis?

**A.**   Well, I discussed how antisocial personality disorder

affects his prognosis in that he feels he can violate the

rights of others.

In terms of borderline personality disorder, this

is a person who is desperate to develop relationships and

try to keep them.  And unfortunately there was one incident

when he developed a relationship with a 13-year old when he

was an adult.  And he went so far as to keep this

relationship in tact because this 13-year old was kind of

wandering off from a relationship he -- an inappropriate

obviously and illegal relationship that he wanted, that he

took this child from California to Connecticut.

There were two police reports that documented this

behavior.  The parents were very upset that he had taken

this child.  So he'll go to any extent to maintain a

relationship.

And we know that he has a history of highly

inappropriate and illegal relationships.

**Q.**   Did you consider any other diagnosis with respect to

Mr. Carta?

1   **A.**   I did.

2   **Q.**   And what did you consider?

3   **A.**   I considered a diagnosis of pedophilia.

4   **Q.**   And why did you not diagnose him with pedophilia?

5   **A.**   Well, pedophilia would be sexual arousal, fantasies,

6   urges or behaviors toward prepubescent children.  And I

7   seriously considered whether he had pedophilia because, of

8   course, the amount of pornography that he had from children

9   aged 3 up to age 12 or 13.

10        And so any time you see an individual who has the

11   possession of that much pornography or spending so much time

12   with deviant arousal, in other words, fantasizing and

13   masturbating to child pornography, I wonder, I have serious

14   concerns that he also has sexual arousal to pre-pubescent

15   children.  And it's not unusual to have both sexually

16   arousal to prepubescent children and children becoming

17   pubescent and post-pubescent children.

18        However, to diagnose pedophilia, I would have to

19   have, I would require behaviors that indicated he had acted

20   out on that.  So while he may have masturbated to that, had

21   sexual fantasies of prepubescent children, I don't have any

22   in this case admissions or any charges or convictions which

23   would indicate he has acted out on prepubescent children.

24        **MS. BOAL:**  Your Honor, I was going to move on to

25   the third element.  Is this a good time to break or --

1        **THE COURT:**  Well, I think it would because I do

2   have to get to the doctor's office.  And it will take me

3   about this much time to get there so why don't we recess

4   now.

5        What time?

6        **THE CLERK:**  Ten o'clock.

7        **THE COURT:**  Ten o'clock tomorrow morning, all

8   right.

9        Thank you.

10       **THE CLERK:**  Court is in recess.

11       (WHEREUPON, the proceedings were recessed at 4:00

12       p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

       I, Carol Lynn Scott, Official Court Reporter for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

/S/CAROL LYNN SCOTT

_____

CAROL LYNN SCOTT
Official Court Reporter
John J. Moakley Courthouse
1 Courthouse Way, Suite 7204
Boston, Massachusetts 02210
(617) 330-1377