**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-12064-JLT |
| | ) | |
| TODD CARTA, | ) | |
| | ) | |
| Respondent. | ) | |

## GOVERNMENT'S PROPOSED FINDINGS OF FACT IN SUPPORT OF A FINDING THAT CARTA IS A SEXUALLY DANGEROUS PERSON

The United States respectfully requests that the Court enter the following findings

of fact and conclusions of law in this matter, pursuant to Rule 52(a) of the Federal Rules

of Civil Procedure.  The United States, pursuant to the Court's direction, submits

separately a memorandum of law in support of this Court's award of judgment in favor of

the United States.[1]

## INTRODUCTION

This civil action was commenced under the Adam Walsh Child Protection and

Safety Act of 2006, Pub. L. No. 109-248, 120 Stat. 587 (2006) (the "Adam Walsh Act"),

by the March 7, 2007 certification of the Bureau of Prisons ("BOP") that Respondent

Todd Carta  ("Carta" or "Respondent") is a sexually dangerous person.  See 18 U.S.C. §

---

[1] While the government's memorandum of law submitted today is similar to its pre-trial memorandum, the government respectfully submits that the Court should refer to the memorandum submitted today in reaching a decision, as it contains updated information based upon the evidence adduced at trial.

4248(a).   To order such commitment, the Court must conclude, after an evidentiary

hearing at which the government bears the burden of proof, by clear and convincing

evidence, that an individual is a sexually dangerous person as defined by the Adam Walsh

Act.  If the Court finds that the government has satisfied its burden, the individual must

be committed to a suitable facility for mental health treatment until he is determined to be

no longer sexually dangerous to others. 18 U.S.C. § 4248(d).

Pursuant to 18 U.S.C. § 4247(d), the Court conducted a trial in this matter on

February 9, 10, and 11, 2009.  The Court heard the testimony of Dr. J. Michael Wood

Ph.D. Carta's treating psychologist at the Bureau of Prisons ("BOP") correctional facility

at FCI Butner, North Carolina; Dr. Amy Phenix, a government retained expert

psychologist; Dr. Leonard Bard, an expert psychologist; Dr. Randall Kent Wallace, a

psychologist who works for Connection, Incorporated, an entity that provides

psychological services for those under supervision of the U.S. Probation Department; and

Paul Collette, a senior U.S. Probation Officer from the District of Connecticut.  The Court

also received various exhibits into evidence, including the experts' curriculum vitae and

reports, various records concerning Carta's past criminal conduct, and Bureau of Prisons

records.

## FINDINGS OF FACT

I.   **Personal History**

 A.   **Pertinent Occupational History**

  1.   Carta, who was approximately 49 at the time of the hearing, reported that he

has never had a problem finding work, but has never held any job for very long.

Government Exhibit 25 at C00941.[2]   He has held approximately 100 jobs, with the

longest lasting for eight months.  Id.   In the 10 years prior to his most recent

incarceration, he did contract work as a painter.  Id.

**B.      Pertinent Educational and Social History**

2.      Carta skipped much of seventh and eighth grade, but reportedly received

credits through ninth grade.  Government Exhibit 25 at C00939.   During that time, Carta

associated with other kids whom he describes as fellow delinquents, who began breaking

into houses to steal alcohol, marijuana and money.  Id.  He reports many juvenile arrests

and "lots of trouble" with police, which he claims mainly stemmed from breaking into

homes and stealing property.  Id.   He reported a fascination with fire that began when he

was seven.  Id.  He set numerous fires and felt an "adrenaline rush" while watching the

fires.   He was arrested for arson for setting fire to an abandoned shack, but that charge

was pled down to Reckless Burning.  Mr. Carta reports that he stopped setting fires at age

17 after his prosecution.  Id.

**C.      Pertinent Marital and Relationship History**

3.      Carta has no relationship with his immediate family.  He reported he had a

good relationship with his 87-year-old father, a superficially friendly relationship with his

mother, and a very poor relationship with his daughter, brother and sister.  Government

---

[2] "C00___" refers to the bates stamp number on the bottom right hand corner of an
exhibit's page.

Exhibit 27 at C01073, C01075.

4.      Carta's family has described him as angry, hostile and prone to volatile outbursts.  He has threatened his mother, sister and his sister's boyfriend with death. Government Exhibit 1 at 27; Tr. 2/11/09 at 97, 98.

5.      At age 24, Carta met a 17-year old female, Lucille.  Government Exhibit 25 at C00939.  They dated for a year and married – Lucille was eight months pregnant at the time.  The marriage lasted nine months and ended when Carta had sex with a man he described as his wife's best friend.  Although Carta was awarded custody, his daughter was raised by his parents from the time she was one year old.  Id.

6.      Carta met Brenda whom he dated for four to five years.  Id. at C00940. When he learned that Brenda was having an affair, he reports becoming angry and smashing the windshield of a friend's car.  To retaliate against her, he placed nude photographs of her in her brother's mailbox in an attempt to "destroy her."  Id.

7.      Immediately prior to his federal incarceration, he met Fred, a 17 year old male, whom Carta "fell in love with."  Id.   Carta was aware that Fred came from a "bad family" and manipulated Fred by providing him with a job and money until Fred became comfortable and accustomed to the situation.  Id.   According to Carta, friction developed with Fred as a result of Carta's trying to control and isolate Fred from his friends and family.   The friction eventually developed into an argument which involved the police. Id.  Carta stated that he was hurt and tried to "hurt [Fred] back" by making flyers and humiliating things about Fred's family and sexual behavior.  Id.   He placed the flyers in

Fred's neighbors' mailboxes and Fred's yard.    Carta noted that he was on probation at the time but that this did not deter him from acting in a vengeful and impulsive way.  Id. Carta stated that his intention was to make Fred feel ashamed so that he would lose support from his friends and family and feel compelled to return to Carta.  Id.

8.     His last relationship prior to federal incarceration was with his daughter's 17-year old boyfriend.   The relationship lasted for a year.  Id.   Carta reported that he did not have a significant relationship with his daughter up to that point but decided to let her and her boyfriend move in with him.   Carta hid the sexual relationship with the daughter's boyfriend from the daughter.  While he was incarcerated, out of spite, he told his daughter about the relationship hoping that he would leave the boyfriend, causing the boyfriend to return to Carta.   Carta has no contact with his daughter.  Id

### D.    Carta's Criminal History

9.     Carta has an extensive criminal history dating back to his adolescence. Government Exhibit 1 at 15-19; Government Exhibit 25 at C00942.   He was arrested for the following crimes: Larceny (6 counts); Burglary (3 counts); Possession of Marijuana or other Controlled Substances (4 counts); Criminal Mischief (2 Counts); Failure to Appear (2 Counts); Breach of Peace, Criminal Trespass, Interfering, Harassment, Disorderly Conduct, and Risk of Injury.  Id.

10.    On October 8, 2002, Carta was convicted of transportation of child pornography in violation of 18 U.S.C. § 2252A(a)(1) and sentenced to 60 months with a three year term of supervised release.   Government Exhibit 26 at C00883.   Carta reports

that he first discovered child pornography in 1995.  He acquired a computer for the sole purpose of accessing child pornography.  Government Exhibit 25 at C00946.  He was careful to take steps to mask his use of child pornography including the use of an encryption program, a "wiping" program and not keeping the images on the hard drive of his computer.  Id.   He also stated that he was not deterred by law enforcement because he thought "they would never get me."  Government Exhibit 27 at C01113.   He estimates that his collection contained 10,000 - 20,000 images involving child pornography at any one time and, at its height, his collection contained 50,000 images.  Id.; Government Exhibit 27 at C01110.   The average number of hours he spent per week viewing child pornography was 70.  Government Exhibit 27 at C01106.   During peak involvement, the number of hours Carta spent per week watching child pornography was 100.  Id.

**E.    Sex Offender Treatment**

11.    Carta participated in a sex offender treatment program ("SOTP") at FCI Butner in North Carolina from July 26, 2005 to March 2, 2006.  The SOTP is an intensive residential therapeutic program that employs a wide range of cognitive behavioral and relapse prevention techniques to treat and manage sex offenders.   The SOTP is divided into four phases: 1) orientation; 2) evaluation during which a comprehensive psychosexual evaluation is performed and treatment needs and goals are formulated; 3) treatment which includes a 56-week instructional program; and 4) release planning.  Government Exhibit 27 at C00951.   Carta withdrew after he completed the second phase.  Government Exhibit 27 at C00953.

12.     During the evaluation phase, Carta presented with an antisocial attitude in which he disregarded the rights and boundaries of others in pursuit of his own wants and needs. Id.; Government Exhibit 25 at C00948.  He also presented with deeply ingrained cognitive distortions about young males and sex and a lack of self-confidence. Government Exhibit 27 at C00953;  Government Exhibit 25 at C00949.   For example, Dr. Wood, his treating psychologist at the program[3], found that Carta's difficulty in recalling his partners' ages (confusing 12-13 with 16-17) suggests that he did not see age as a barrier or something to concern himself with because he believes minors are capable of consenting to sexual contact.  Government Exhibit 25 at C00949.  Carta believes that once a child is capable of ejaculation that the child is capable of making his own sexual decisions.   As Dr. Wood wrote "[t]his firmly held belief was evidenced when he argued that one of the 13 year-olds in his past should also have been prosecuted for sex with him (Mr. Carta)" because he was "equally culpable for violating an adult-child sexual contact law." Id.   In addition, Carta did not acknowledge the manipulative characteristics of his behavior during which he groomed children with drugs, money or a place to live.   Id.

13.     During the early stages of SOTP treatment, Carta acknowledged difficulty establishing relationships with similarly-aged peers.  Government Exhibit 27 at C00954. He immediately gravitated toward the youngest members of the SOTP (young males in

---

[3] Although Dr. Wood was a psychology predoctoral intern at the time, all of his work was supervised and approved by a psychologist. Tr. 2/9/09 at 42-43.  In addition. Dr. Wood had worked with sex offenders for five years prior to his interaction with Carta, and had written thousands of risk assessment reports for sex offenders for the state of Arkansas. Tr. 2/9/09 at 43, 124.

their early twenties).  Id.  He became involved with a group of young men who were also new to treatment and who were known to act in ways that violated SOTP rules.  Id.  He wanted to "help" the young troubled program members.  Id.  Dr. Wood found that this pattern of behavior mimicked his behavior with younger males prior to his incarceration. Id.  When confronted about the behavior, Carta acknowledged that he was sexually attracted to the men but continued to maintain that he was helping them.  Id. at C00955. When asked to, he stated that he was unable to come up with a plan to hold himself accountable for his preoccupation with younger peers.  Id.  He eventually asked for a restriction that would prohibit him from interacting with the younger men.  The restriction was in place for two weeks when Carta left the treatment program and during that time he continued to expose faults of the peer whom he blamed for causing Carta to be placed on restriction rather than acknowledging his own failures.  Id.

## II.   Carta Has Engaged In Sexually Violent Conduct In The Past

14.     Both Dr. Phenix and Dr. Bard agree that Carta's past conduct satisfies the first element of the statute, namely whether he engaged in or attempted to engage in acts of sexually violent conduct or child molestation in accordance with 18 U.S.C. § 4248.  Tr. 2/9/09 at 174; Tr. 2/10/09 at 153.

15.     Dr. Phenix testified that Carta had engaged in 8 acts of sexually violent conduct as follows:

a.     Carta admitted that, when he was 11 to 13, he orally copulated a child in diapers aged 3-5 (Tr. 2/9/09 at 174; Government Exhibit 1 at 5, 11;

Government Exhibit 25 at C00942; Government Exhibit 27 at C01126);

b.   Carta orally copulated his 7 year old cousin 10 times during a one year period when Carta was 11-13 (Tr. 2/9/09 at 174-5; Government Exhibit 1 at 5, 11);

c.   When he was 15-16, Carta orally copulated a similarly aged male. When the male initially refused, Carta shot him with a BB gun.  Carta then was able to "talk him into it" meaning that they thereafter engaged in oral copulation (Tr 2/9/09 at 175; Government Exhibit 1 at 10, 11; Government Exhibit 25 at C00943);

d.   When he was 28 years old, Carta assaulted an intoxicated 13 year old male whom he had coerced into engaging in sexual activity by offering him tickets to a concert (Tr. 2/9/09 at 175; Government Exhibit 1 at 5, 11; Government Exhibit 25 at C00943).  Carta blamed the child and his parents for allowing this to happen (Government Exhibit 1 at 11; Government Exhibit 25 at C00943);

e.   Carta sexually assaulted a 17-18 year old male when the individual was both intoxicated and passed out.   When the individual woke up, he yelled and caused a disturbance (Tr. 2/9/09 at 175; Government Exhibit 1 at 6, 12; Government Exhibit 25 at C00943);

f.   When Carta was 30-31 years old, he sexually assaulted a 13 year old male 30 to 40 times over a four year period, and during that time brought

the child from California to Connecticut with him (Tr. 2/9/09 at 176).  Carta claims the boy knocked on his door asked if he could "hang out," and once inside began masturbating.  Carta then he asked the boy if he wanted Carta's help.  (Government Exhibit 1 at 12; Government Exhibit 25 at C00943);

g.    Carta, at age 39, sexually assaulted a 13 year old boy whom he met over an internet chat line (Tr. 2/9/09 at 176; Government Exhibit 1 at 6, 13; Government Exhibit 25 at C00944; Government Exhibit 27 at C01117);

h.    Carta, at age 40, sexually assaulted the 15 year old brother of Carta's then 17 year old lover (Tr. 2/9/09 at 176; Government Exhibit 1 at 6, 14, 18; Government Exhibit 25 at C00944).

16.    Dr. Phenix characterized these acts as sexually violent because of the nature of the hands-on offenses involving non-consenting victims and because the contact perpetrates harm on the victims. Tr. 2/9/09 at 176; Tr. 2/10/09 at 38.

17.    Dr. Phenix testified that she would classify all of the above acts of sexually violent conduct as also being acts of child molestation with the exception of the assault on the passed out 17-18 year old (subsection "15e" above) because those acts involved victims under age 15 who could not consent to the contact.   Tr. 2/9/09 at 177; Tr. 2/10/09 at 38.

18.    Carta admitted to all of these acts in his personal history questionnaire that he completed at FCI Butner.  Government Exhibit 27.

19.     Accordingly, having considered the foregoing testimony, this Court finds that Carta has engaged in or attempted to engage in sexually violent conduct or child molestation.

**III.     Mental Illness, Abnormality, Or Disorder**

A.     **Experts' Qualifications**

20.     Pursuant to 18 U.S.C. § 4247(b), the Court designated, Dr. Leonard Bard, a licensed psychologist, as the court-designated examiner. [D. 42].   Subsequent to that designation and the issuance of Dr. Bard's report, the Court permitted, over the government's objection, Respondent's counsel to consult with Dr. Bard regarding preparation for trial. [D. 100 ].  The Court also heard testimony from a licensed psychologist retained by the government, Dr. Amy Phenix.

21.     Dr. Phenix holds psychology licenses from California (since 1992), Florida (since approximately 2005) and Washington (since approximately 2006).  Government Exhibit 2 at 1; Tr. 2/9/09 at 169   She has been involved in the treatment or evaluation of sex offenders since 1989.   Tr. 2/9/09 at 169.   She has published peer-reviewed articles on the topic of sex offenders and written a chapter in Innovations in Clinical Practice: A Source Book  pertaining to the risk assessment of sex offenders.  Government Exhibit 2 at 4; Government Exhibit 3; Tr. 2/9/09 at 170.    Of particular note, she is a co-author of the Coding Rules for the Static-99 – the manual for the most-widely used actuarial instrument used to assess the risk of sexual recidivism.   Id.   She has presented at 20 - 30 conferences.  Exhibit 2 at 4 - 7; Tr. 2/9/09 at 171.  She has provided numerous training

sessions on actuarial instruments, the Static-99, and sex offender risk assessment.  <u>Id</u>.  In the past couple of years, she has testified 70% of the time for the prosecution and 30% of the time for the defense. Tr. 2/9/09 at 172.

22.     Dr. Leonard Bard is a licensed psychologist in Massachusetts (since 1985) and New York (since 2008).  Respondent Exhibit 10.   His resume references five publications and/or presentations in which he has participated.  <u>Id</u>. at 3.   His last publication was issued in 1987.   From 1987-1999, he served as a qualified examiner for the purposes of conducting sexually dangerous persons evaluations for proceedings in the Commonwealth of Massachusetts, and in that capacity testified for the government and the defense.  Tr. 2/10/09 at 73.   For the past four years, his sole source of income has been evaluations of sexually dangerous persons for defense counsel. Tr. 2/10/09 at 75.  As a result, he has only testified for the defense in the past four years.   Tr. 2/11/09 at 107.

23.     The Court having reviewed the curricula vitae of Drs. Phenix and Bard and having heard their testimony, finds that both are qualified by education and experience to offer expert testimony in this matter both as to the diagnosis of Carta and as to the issue of whether Carta would have serious difficulty in refraining from further acts of sexually violent conduct or child molestation if released.[4]

**B.     Materials reviewed**

24.     Both experts in this matter were provided with extensive records of Carta's

_____

[4] Neither party objected to either psychologists' qualifications to give expert testimony.

background, including records of conviction and police reports, and records of Carta's

incarceration at the BOP, including records of treatment while incarcerated.  Government

Exhibit 1 at 1; Respondent Exhibit 9 at 1-2; Tr. 2/9/10 at 173.

25.     Dr. Bard interviewed Carta on June 26, 2008.  Respondent Exhibit 9 at 1.

26.     Carta refused to be interviewed by Dr. Phenix and this Court issued an

order that Dr. Phenix could not interview Carta.  Government Exhibit 1 at Tr. 2/9/10 at

173; D. 45.

**C.     Carta Suffers From A Serious Mental Illness, Abnormality or Disorder**

27.     Dr. Phenix diagnosed Carta with five separate diagnoses found in the

Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision

("DSM-IV-TR").  Government Exhibit 1 at 24-28.  Tr. 2/9/09 at 177.  Dr. Bard did not

diagnose Carta with anything.  See Respondent Exhibit 10; Tr. 2/11/09 at 106.

28.     Dr. Bard and Dr. Phenix agree that the DSM-IV-TR is a classification

manual relied upon in the field of psychology and psychiatry to diagnose and classify

mental illnesses and disorders.  Tr.  2/9/09 at 178-9; Tr. 2/10/09 at 172.

**1.     Carta Suffers from Paraphilia NOS**

29.     Under the DSM-IV-TR, paraphilia NOS (not otherwise specified) is a listed

diagnosis and is described as follows:

> This category is included for coding Paraphilias that do not meet the criteria
> for any of the specific categories.  Examples include, but are not limited to,
> telephone scatologia (obscene phone calls), necrophilia (corpses), partialism
> (exclusive focus on part of body), zoophilia (animals), coprophilia (feces),

klismaphilia (enemas), and urophilia (urine).

Government Exhibit 11 at 576; Tr. 2/9/09 at 179.

30.     The diagnostic features for a paraphilia in general are as follows:

recurrent, intense sexually arousing fantasies, sexual urges, or behaviors
generally involving 1) nonhuman objects, 2) the suffering or humiliation of
oneself or one's partner, or 3) children or other nonconsenting persons that
occur over a period of at least 6 months (Criterion A) . . . [or] if a behavior,
sexual urges or fantasies caus significant distress, impairment in social,
occupational, or other important areas of functioning (Criterion B).

Government Exhibit 11 at 566.

31.     Dr. Phenix testified that Carta met the criteria for a diagnosis of paraphilia

NOS based upon his long established pervasive sexual arousal to children becoming

pubescent and also to post-pubescent children.  Tr. 2/9/09 at 180.

32.     Carta has a self-stated specific arousal interest.  He reported in his SOTP

questionnaire that his primary arousal is to children age 12 to 17 and that his secondary

arousal or sexual interest was to children age 7 to 11.  Tr. 2/9/09 at 180-1.  Government

Exhibit 27 at C01034.

33.     Not only did Carta admit to this arousal pattern, but he acted on it in a more

than detrimental way.  This arousal pattern led to marked distress and dysfunction in his

life.  His arousal to pubescent children led him "to highly compulsive behavior" and

criminal acts.  Tr. 2/9/09 at 182.[5]  For example, it led him to have unlawful sexual

_____

    [5]  Thus, Dr. Bard's dismissal of Carta's condition as simply a normal widespread
attraction to teens is misplaced in this case where Carta, over a period of decades, either
(1) acted on this attraction in illegal ways, or (2) behaved in ways to satisfy his arousal

contact with children - 3 times as an adult with three different thirteen year olds.  Tr. 2/9/09 at 181.  It led to his federal conviction on transportation and possession of child pornography.  Tr. 2/9/09 at 181; Government Exhibit 26.  This arousal pattern led him to collect 50,000 images of child pornography.  Tr. 2/9/09 at 181; Government Exhibit 27 at C01109.  His compulsivity led him to masturbate two to three times a day, well over the average for a man of his age.  Tr. 2/9/09 at 182.  His compulsivity led him to view child pornography 12 to 14 hours a day to the exclusion of work, showering, and taking care of his hygiene.  Tr. 2/9/09 at 182.

34.    Accordingly, Dr. Phenix found that Carta met the criteria for paraphilia NOS as a result of his longstanding intense sexual arousal to post-pubescent teenagers, and his actions based on that arousal.  Government Exhibit 1 at 25.

35.    Paraphilia NOS can be a serious mental abnormality, illness or disorder. Tr. 2/9/09 at 186.  Indeed, Dr. Phenix testified that Carta's paraphilia NOS is a serious mental abnormality or disorder for him because, for example, it has cost him a significant loss of freedom in his life.   Id.  He has not been able to function as a normal human being as a result of his obsession with illegal child pornography.   Id.; see also paragraph 33, supra.

36.    Dr**.** Phenix added a descriptor to her diagnosis of Paraphilia NOS - namely

---

needs that had a significant impairment with respect to Carta's ability to function in society, such as the ability to maintain normal bathing and work routines.  Indeed, Dr. Bard agreed that normal men do not act on their arousal to 13-year old children, nor do they selectively pursue 13-year old children for sex.  Tr. 2/10/09 at 176.

"sexual arousal to post-pubescent teenagers, sometimes in the literature described as Hebephilia."   Government Exhibit 1 at 25.   Dr. Phenix does not identify hebephilia as a diagnosis but as a description.  Tr. 2/9/09 at 186.  It is a specific description of a sexual arousal to persons between ages 13 and 17.   Tr. 2/9/09 at 184.

37.     The term "hebephelia" is well recognized in the field of psychology.   Tr. 2/9/09 at 184.   As Dr. Phenix explained, "If someone comes to me and says . . . I've provided this diagnosis [hebephelia], I know exactly what it means."  Id.  It is an accepted term in the field of psychology to describe a particular sexual arousal pattern.   Id.

38.     Indeed, Dr. Wood, Carta's treatment provider at the Bureau of Prison's sex offender treatment program, diagnosed Carta with paraphilia NOS hebephelia on January 23, 2006.[6]   Government Exhibit 25 at C00947.  Dr. Wood gave Carta this diagnosis based on "his admitted long-standing sexual attraction to, and preference for, post-pubescent teenaged males." Id.   He gave the same age range as Dr. Phenix of children that were the object of Carta's arousal - 13 - 17 year olds.   Tr. 2/9/09 at 84.[7]

39.     Hebephilia is the subject of study in peer-reviewed journals.   Tr. 2/9/09 at 184.  It is an accepted descriptor used in courtrooms around the country.  Id. Physiological tests can quantify and make an objective determination of a hebephilic arousal.   Tr. 2/9/09 at 185.

_____

[6] This diagnosis preceded the enactment of the Adam Walsh statute.

[7] On March 5, 2007, Carta received a third diagnosis of paraphilia not otherwise specified (hebephilia) in his precertification evaluation report from Dr. Ferraro. Respondent's Exhibit 9 at p. 7.

40.    Dr. Bard did not significantly disagree with Dr. Phenix's general assessment of Carta.  He agreed that Carta was a hypersexual person.  Tr. 2/10/09 at 167. Carta had used sex as a means of coping.  Id.  Carta found pubescent children attractive. Tr. 2/10/09 at 170.   Indeed, Dr. Bard testified that Carta's arousal does not have to do with age. Tr. 2/10/09 at 160.  Rather, "he is aroused by post-pubescent adolescent males." Tr. 2/10/09 at 160.   Dr. Bard testified that Carta would always have an attraction to adolescents.  Tr. 2/10/09 at 146.

41.    Dr. Bard did not significantly disagree with Dr. Phenix's assessment that Carta met some of the underlying criteria for a diagnosis of a paraphilia.   For example, he agreed that Carta had recurrent, intense sexually arousing fantasies, sexual urges or behaviors.  Tr. 2/10/09 173.   Although he acknowledged that Carta "is aroused by post-pubescent adolescent males," he accepted Carta's statement that he is also interested now in older individuals who have the capacity to have a relationship even though Dr. Bard had no way to verify this.   Tr. 2/10/09 160.

42.    Dr. Bard disagrees with the use of the descriptor of hebephilia but acknowledges that there are peer-reviewed articles, with which he disagrees, that acknowledge the existence of hebephilia.   He also respects the researcher Dr. Howard Barbaree and agrees with his conclusion that hebephilia is not a paraphilia but a description.  Tr. 2/11/09 at 123.

43.    Dr. Bard agrees that the term "hebephilia" is used as a descriptive term. However, he believes it is not a diagnosis.   Tr. 2/10/09 at 171.

## 2.   Substance Abuse Disorder

44.     Dr. Phenix diagnosed Carta with three separate substance abuse disorders found in the DSM-IV-TR: hallucinogen dependence; cannabis dependence; and alcohol abuse.  Exhibit 1 at p. 24-26.  Tr. 2/9/09 at 187.   Although he did not diagnosis Carta with any substance abuse disorders, Dr. Bard reported that Carta "acknowledged that substance abuse has been a significant problem for him and indicated that he often acted out sexually when using substances."   Respondent's Exhibit 9 at 4.

45.     Substance dependence and polysubstance use are defined in the DSM-IV-TR as:

> a maladaptive pattern of substance use leading to clinically significant impairment or distress as manifested by three or more of the following occurring at any time in the same 12-month period: 1) tolerance as defined by a need for markedly increased amounts of substance to achieve intoxication or desired effect or increased amounts of the substance to achieve intoxication or desired effect or markedly diminished effect with continued use of the same amount of the substance; 2) withdrawal; 3) the substance is often taken in larger amounts or over a longer period than intended; 4) there is a persistent desire or unsuccessful efforts to cut down or control substance use; 5) a great deal of time is spent in activities necessary to obtain the substance; 6) important social occupation or recreational activities are given up or reduced because of substance use; 7) the substance use is continued despite knowledge of having a persistent or recurrent physical or psychological problem that is likely to have been caused or exacerbated by the substance.

Government Exhibit 1 at 26; Government Exhibit 12.

46.     Carta met the DSM-IV-TR diagnostic criteria for hallucinogen dependence as a result of his lengthy history of LSD use.  He began using LSD when he was 18 and continued to use the drug for over 20 years.  Government Exhibit 1 at 26.   Dr. Bard

reported that LSD was Carta's drug of choice.  Respondent's Exhibit 9 at 4.   He used the

substance up to three times a week during his peak usage in his 20s and 30s.   He reported

his tolerance increased over time.  Id.   He began by taking three to four doses and as his

tolerance grew he would use up to 50 doses of LSD.   Tr. 2/9/09 at 188.   He denies that he

used acid prior to his latest incarceration.  Government Exhibit 25 at C000941.   Given

the frequency of his use, Dr. Phenix opined that it was reasonable to conclude that he

gave up other activities to engage in the use of LSD.   Id.

47.   Carta met the DSM-IV-TR criteria for cannabis dependence as a result of

his lengthy history of marijuana use.   He reported first using marijuana at age 17-18 and

continued up until the time of his federal incarceration.  Government Exhibit 1 at 26; Tr.

2/9/09 at 188; Respondent's Exhibit 9 at 4; Government Exhibit 25 at C000941.   He

described himself as a heavy smoker and engaging in habitual use, smoking up to 10

marijuana cigarettes a day.  Government Exhibit 1 at 26.  He admitted to signs of

withdrawal, of irritability, and being involved in legal problems as a result of his

marijuana use.  Government Exhibit 25 at C000941.  He had four substance abuse arrests

in his criminal record.   Tr. 2/9/09 at 189.

48.   Carta met the DSM-IV-TR criteria for alcohol abuse.  He reported first

consuming alcohol at age 15-16 and drinking heavily in his 30s.  Government Exhibit 1 at

26; Government Exhibit at C00737; Respondent's Exhibit 9 at 4.  He reported that he

consumed 3-4 six packs a week at the height of his use.   Government Exhibit 25 at

C00941.   He acknowledged that he had seen his tolerance increase and that he had

committed criminal acts while under the influence of alcohol.  Id.  It contributed to his

legal troubles as he was intoxicated when he set a fire resulting in a conviction at age 16.

Id.; Tr. 2/9/09 at 189.

49.    The various substance abuse diagnoses both constitute a serious mental

illness abnormality or disorder as a general matter, and more particularly, they are serious

for Carta.  Tr. 2/9/09 at 189.   The use of substances does not cause Carta to molest

children, but they disinhibit him.   If he is experiencing deviant sexual arousal, he is far

more likely to act out.  Tr. 2/9/09 at 190.  Dr. Bard agreed that substance abuse did not

cause Carta to act out sexually, but the substances may have made it easier for him to act

out.  Tr. 2/10/09 at 157.  Dr. Bard further stated that alcohol is a disinhibitor and "it

would certainly be a risky situation for him" to have access to alcohol.  Id.

### 3.  Personality Disorder with Antisocial and Borderline Traits

50.    Dr. Phenix diagnosed Carta as suffering from personality disorder with

antisocial and borderline traits.   Government Exhibit 1 at 27.

51.    The DSM-IV-TR defines a personality disorder as an enduring pattern of

inner experience and behavior that deviates markedly from the expectations of the

individual's culture, is pervasive and inflexible, has an onset in adolescence or early

adulthood, is stable over time and leads to distress or impairment.  Government Exhibit

15 at 685.

52.    Dr. Phenix testified that Carta has exhibited a number of anti-social

personality disorder traits.  Tr. 2/9/09 at 191.  For example, since the age of 16 and

throughout his adult life, he has accumulated 20 arrests, most resulting in convictions, for various types of criminal activity.   Government Exhibit 1 at 27.   He engaged in numerous types of criminal activity including drug offenses, property offenses, sex offenses, and non-sexual violence such as arson.   Tr. 2/9/09 at 193.   After dropping out of high school, he lived a life dependent on illicit drugs, and criminal activity, with little community stability or gainful employment.   Id.   Indeed, there have been significant periods of unemployment.   Tr. 2/9/09 at 193.   Carta can become enraged and fly off the handle.   Id. He has threatened various family members, including his mother, father, sister, and sister's boyfriend.   Id.   He has retaliated against and attempted to humiliate his sexual partners by publishing details of their sexual behavior.   Id.   For example, he retaliated against a girlfriend by putting nude photos of her in her brother's mailbox.   Tr. 2/9/09 at 194.   After Carta broke up with his 17 year old boyfriend, he put flyers with explicit embarrassing information about the boyfriend's sexual history on people's front lawns and in neighbors' mailboxes.   Id.   He has a need to hurt people that he has cared about in the past.   Id.   Dr. Phenix testified that such behavior contributed to her diagnosis that Carta suffers from a personality disorder with antisocial traits.

53.      Dr. Phenix testified that Carta has exhibited a number of traits of borderline personality disorder including: his attempted suicide after his wife ended their brief marriage; after being spurned by his girlfriend Brenda and boyfriend Frederick, his efforts to devalue both persons by disclosing, over the internet and/or with flyers, intimate details of their sex lives; his behavioral impulsivity through the use of illegal drugs and

alcohol; and his demonstrated affective instability marked by irritability, aggression and hostility towards others including family members.  Government Exhibit 1 at 28.  He had a sexual relationship with his daughter's boyfriend, told the daughter about the relationship so that she would break up with the boyfriend so that the boyfriend would return to Carta.  Tr. 2/09/09 at 197.  Carta wants to maintain a relationship desperately and when he loses that relationship, he acts out in a variety of ways.  Tr. 2/9/09 at 196.

54.     Personality disorder with antisocial and borderline traits is a serious mental illness, abnormality, or disorder as a general matter, and more particularly, it is a serious diagnosis for Carta.  Tr. 2/9/09 at 194.  It furthers his offending.  His antisocial attitudes give him permission to violate the rights of others, such as a 13 year old child with whom he wants to have sex.  Tr. 2/9/09 at 194-5.  The borderline traits contribute to his creating suffocating desperate relationships.  For example, he developed a relationship with a 13 year old boy that he brought with him from California to Connecticut, even though several police reports indicated that the parents were upset that he had taken the child.  Tr. 2/9/09 at 198.

55.     Dr. Bard acknowledged that a personality disorder is "longstanding in nature" and "does not change easily."  Tr. 2/10/09 at 95.  He further stated a personality disorder standing alone could be sufficient for civil commitment in and of itself under certain circumstances such as where an individual is clearly antisocial, has continued his antisocial behavior into the present, and, as part of the antisocial behavior, engaged in sexually violent behavior.  Tr. 2/10/09 at 101.

-22-

56.     Dr. Bard found that Carta "clearly met the criteria for antisocial personality disorder."   Tr. 2/10/09 at 96.   Dr. Bard agreed that Carta had a history of symptoms before the age of 15.   He had a long history of disregard for the rights of others, a long criminal history, substance abuse, poor employment, and poor relationship quality.   In other words, "he's got it all."   Id.     Dr. Bard believed, however, that Carta did not have the personality disorder now, even though he acknowledged that Carta would not be expected to engage in the same kind of behavior while incarcerated.   Id.   In doing so, Dr. Bard minimized the following events: (1) Carta's expulsion from the SOTP program because he refused to relinquish his relationship with the younger participants; (2) his threat to throw hot oil on another inmate; and (3) his stealing two radios and being insolent to staff while at FMC Devens.   Government Exhibit 28; Tr. 2/11/09 at 97, 98, 99, 100, 101.

57.     Dr. Bard did not diagnose Carta with anything, see Respondent's Exhibit 9, yet he believes he needs treatment.   Tr. 2/11/09 at 104.

58.     The Court having considered the foregoing testimony, as well as the supporting documentation, finds that Carta suffers from a combination of serious mental disorders within the meaning of the DSM-IV-TR.   This combination of serious mental disorders are serious for Carta in so far as they have caused significant distress and impairment in his life, including his illegal sexual activity with minors, his resistance to sex offender treatment, and his general inability to function productively in society.

-23-

IV.     **As A Result Of Carta's Serious Mental Illnesses, Abnormalities, or Disorders He Would Have Serious Difficulty In Refraining From Sexually Violent Conduct If Released**

A.      **Experts' Methodology**

59.     Both experts conducted an assessment of whether Carta's mental illnesses, abnormalities or disorders would cause him to have "serious difficulty in refraining from sexually violent conduct or child molestation" if released.[8]  18 U.S.C. § 4248.

60.     Both experts testified that they used the "adjusted actuarial risk assessment method," to assess Carta's risk of re-offending, in which one or more empirically validated actuarial tools is used to set a baseline of risk for the specific individual, then that baseline is adjusted upward or downward based on a consideration of empirically-validated mitigating and aggravating dynamic factors.  Government's Exhibit 1 at 28 -30; Tr. 2/10/09 at 5-6; Respondent's Exhibit 9 at 11; Tr. 2/10/09 at 104-5.

B.      **Actuarial Risk Assessment Instruments**

61.     Drs. Phenix and Bard both used an actuarial instrument called the Static-99 and one called the MnSOST-R.   Government Exhibit 1 at 1; Respondent's Exhibit 9 at 11.  Dr. Bard also utilized an actuarial instrument called the Rapid Risk Assessment for Sexual Offense Recidivism or "RRASOR."  Respondent's Exhibit 9 at 11.  Actuarial instruments have been shown to be superior to clinical judgment at assessing the

---

[8]  Dr. Bard did not find that Carta met the statutory criteria for a "serious mental illness, mental abnormality or disorder" and therefore, potentially, his analysis could have ended at that point.  Respondent's Exhibit 9 at 14; Tr. 2/10/10 at p. 90.  Nevertheless, Dr. Bard did perform a risk assessment of Carta to determine whether he would have serious difficulty refraining from sexually violent conduct if released.   Tr. 2/10/90 at p. 102.

likelihood of sexual recidivism.  Tr. 2/10/09 at 5.

62.     The Static-99 is an actuarial instrument developed by R. Karl Hanson,

Ph.D., and David Thornton, Ph.D., to estimate the probability of sexual and violent

reconviction for adult males who have been charged with or convicted of at least one

sexual offense against a child or non-consenting adult.  Government Exhibit 5 at 3, 5; Tr.

2/10/09 at 6.  The Static-99 consists of ten items that, based on the scoring of those ten

items, produces estimates of future risk based on the number of risk factors present in any

one individual.  Government Exhibit 5 at Appendix 5; Tr.  2/10/09 at 10.  A Coding

Manual for the Static-99, for which Dr. Phenix is one of the authors, provides instructions

for scoring each item.  <u>See</u> Government Exhibit 5.

63.     Scores on the Static-99 range from zero to twelve; a score of zero places an

individual in the Low Risk category for reoffense, while a score of six or above places an

individual in the High Risk category.  Government Exhibit 5 at Appendix 5.  The

average score of all sex offenders in the developmental and first validation sample was a

3.2 or in the moderate range of risk.  Tr. 2/10/09 at 12.  There is no increased risk of

recidivism based upon a score higher than a 6, however, the fact that an individual scores

higher than a 6 allows greater assurance that the individual is, in fact, at high risk to

reoffend.  Government Exhibit 5 at 3.

64.     The recidivism estimates provided by the Static-99 are group estimates

based on reconvictions, as opposed to rearrests or reoffenses, that were derived from

groups of sex offenders.  Government Exhibit 5 at 3.  Because the recidivism rates are

based on reconvictions only, the recidivism percentages associated with a specific Static-99 score are conservative estimates because they do not include offenses that are undetected or uncharged.  Government Exhibit 1 at 35; Tr. 2/10/09 at 16.

65.      In addition, the Static-99, and other actuarial instruments, underestimate risk, because the projected probabilities, which increase over time, only go up to fifteen years in the community.  Tr. 2/10/09 at 18.  Whereas, typically, the subject of a risk assessment is likely to live longer than fifteen years.  Id.

66.      The Static-99 has known error rates and has been cross-validated in over sixty studies.  Government Exhibit 6; Tr, 2/10/09 at 7, 8.  Cross-validation is used to test the instrument on many different types and groups of sex offenders in different jurisdictions and countries to ensure that it performs accurately in a multitude of settings.  Tr. 2/10/09 at 7-8.  Cross-validation means that an instrument is valid in its ability to discriminate between high, medium and low risk.  Tr. 2/10/09 at 44.   More cross-validation leads to more confidence that the instrument works.  Id. at 8.

67.      The RRASOR was developed in 1997 by Dr. Hanson and consists of four items, each of which was later incorporated into the Static-99. Government Exhibit 5 at 3; Tr. 2/10/09 at 114.   Scores on the RRASOR range from zero to six, with zero representing a lower risk of recidivism than a six.   Dr. Bard scored the RRASOR, although he testified that he currently does not use the RRASOR.  Tr. 2/10/09 at 113. Dr. Phenix testified that this instrument should not be used anymore and indeed the creators of the RRASOR believe that it should not be used anymore.   Tr. 2/10/09 at 48-9; 63-4.

68.     The MnSOST-R is another actuarial instrument that measures static factors found to be related to sex offender recidivism, but it also includes four dynamic factors related to treatment, behavior while incarcerated and age.   Respondent's Exhibit 9 at 11. The instrument was developed by the Minnesota Department of Corrections.  Tr. 2/9/09 at 18.

69.     These actuarial instruments serve to, within the general population of sex offenders, distinguish those offenders who present a higher risk to re-offend than others.

70.     These actuarial instruments are what is described in the field as "moderate" predictors of sexual reoffense. Government Exhibit 1 at 29.

71.     The Static-99 is generally accepted for assessing sex offender recidivism risk within the community of professionals who conduct sex offender risk assessment and, indeed, was used by both psychologists in this case.  Tr. 2/10/09 at 9; Tr. 2/11/09 at 92.

72.     The actuarial models contain factors which have been shown through empirical study to correlate to a higher risk of sexual reoffending in groups of sex offenders.  Carta's scores on the following factors increased his risk of sexual reoffense:

> A.     Individuals who sexually offend against male victims are at higher risk to recidivate sexually.   Carta had numerous male victims so he received a point on the Static-99 which places Carta at higher risk to reoffend.  Government Exhibit 1 at 29 (question 10); Respondent Exhibit 9 at 12.

B.      Individuals who sexually offend outside of their families are at
        higher risk to recidivate sexually.  Carta's prior offenses are all
        against non-family members so he received a point on the Static-99
        which places him at higher risk to reoffend.  Government Exhibit 1
        at 29 (question 8); Respondent Exhibit 9 at 12.

C.      Individuals who commit non-contact sexual offenses, such as
        possession of child pornography, are at higher risk to reoffend
        sexually.  Carta's last conviction was for possession of child
        pornography so he received a point on the Static-99 which places
        him at a higher risk to reoffend.   Government Exhibit 1 at 29
        (question 7); Respondent Exhibit 9 at 12.

D.      Individuals with four or more prior sentencing dates for criminal
        offenses are at higher risk to reoffend sexually.  Carta has four or
        more prior sentencing dates which renders him to be at a higher risk
        to re-offend sexually.  Government Exhibit 1 at 20; Respondent
        Exhibit 9 at 12.

**C.      Carta's Scoring on the Actuarial Instruments**

73.     Dr. Phenix assigned Carta a score of six on the Static-99.[9]  Government

Exhibit 1 at 29; Tr. 2/10/09 at 15.

_____

[9] Dr. Ferraro, a BOP psychologist, also scored the Static-99 and gave Carta a score of 6.
Government Exhibit 1 at 21.

74.     A  score of six on the Static-99 places Carta in the high range for risk of reconviction for another sexual offense.  Id.

75.     The recidivism rates of the Static-99 are group estimates based on reconvictions.  Carta's score of six on the Static-99 signifies that he shares the same characteristics as a group of sex offenders: 39% of whom were reconvicted of a sexual offense within five years of being released; 45% of whom were reconvicted of a sexual offense within ten years of being released; and 52% of whom were reconvicted of a sexual offense within fifteen years of being released.  Tr. 2/9/09 at 9, 15; Government Exhibit 5 at Appendix 6.

76.     Dr. Bard assessed Carta a score of 5 on the Static-99.   A score of five places Carta in the moderate high risk of reconviction category.   Tr. 2/10/09 at 110.  That score is associated with a group of sex offenders, 33% of whom were reconvicted of a sexual offense within five years of being released, 38% of whom were reconvicted of a sexual offense within ten years of being released, and 40% of whom were reconvicted of a sexual offense within fifteen years of being released.  Government Exhibit 5 at Appendix 6.

77.     Dr. Bard differed in his scoring of the Static-99 from that of Dr. Phenix on only one item – whether Mr. Carta had any prior convictions for non sexual violence.  Tr. 2/10/09 at 109.   He testified that he did not find a separate conviction for non-sexual violence according to the coding rules.  Tr. 2/10/09 at 109.   Dr. Phenix, an author of the coding rules, testified that Carta's reckless burning conviction constituted a non-sexual

violence conviction.   Tr. 2/10/09 at 59.

78.     Because the recidivism rates are based on group estimates, Carta's score matches those of sex offenders in a similarly situated group.  The numbers are still important because that is how scientists make predictions in a number of areas including meteorology and life insurance.   Tr. 2/10/09 at 112.

79.     The recidivism rates are currently being re-evaluated and indeed the probabilities have changed since both experts issued their reports.  Tr. 2/10/09 at 16.   The original samples had higher recidivism rates than the current samples.  Tr. 2/10/09 at 44. In addition, a new instrument, the Static-2002, was issued after the experts completed their reports.  Tr. 2/10/09 at 21.  Dr. Phenix scored the Static-2002 during her testimony on cross-examination and Carta's score on that instrument placed him in the moderate-high risk category for reconviction of a sexual offense.  Tr. 2/10/09 at 60.  She testified that this was a similar risk category to the high risk category established by the Static-99. Tr. 2/10/09 at 60.

80.     Although the reoffense rates are currently being re-evaluated, the Static-99 continues to effectively triage between low, medium, and high risk sexual offenders. Government Exhibit 1 at 30.  As Dr. Phenix reported "In other words, relative to the other men in a given sample, those placed in the high risk group continue to reoffend at higher rates than those placed in the low or moderate risk groups.   Therefore, it remains significant that Mr. Carta was placed in the high risk category of this instrument." Government Exhibit 1 at 30.

**D.    Aggravating and Mitigating Dynamic Factors**

81.    After concluding that Carta scored in the high or moderate-high risk category of the Static-99, Drs. Phenix and Bard looked to aggravating and mitigating dynamic risk factors to determine whether to adjust Carta's baseline level of risk as revealed by the actuarial instruments.  Dynamic risk factors are factors that can change over time.  Government Exhibit 1 at 31.

82.    Dynamic factors such as age, treatment history, and current level of sexual deviance have been empirically validated as predictive of future risk.   Respondent Exhibit 9 at 11- 13.

**1.    Age as a Protective Factor**

83.    Both experts testified that Carta's age was a dynamic factor that should be considered because, generally speaking, as individuals age the likelihood of sexual reoffending is reduced.  Tr. 2/10/09 at 20-23; Tr. 2/10/09 at 117-119.

84.    However, Dr. Phenix described seven studies on age and sex recidivism that had conflicting findings.  Tr. 2/10/09 at 21.  She stated that there were a few studies that indicated after age thirty there was a gradual decrease in sexual reoffense, and there was a greater decrease after age fifty.  She also stated that studies have shown, however, that extra familial child molesters, such as Carta, show little reduction in recidivism until after age 50.  Tr. 2/10/09 at 20-21.  Indeed, at the time Carta reoffended in 2001 by possessing child pornography that included pre-pubescent and pubescent children, Carta was forty-one years old.  Government Exhibit 26 at C00883.

85.     Dr. Bard did not mention the study that showed little recidivism reduction as a result of age for extrafamilial child molesters and said that the studies were consistent in their finding that the peak of sexual recidivism occurred in a person's twenties, with a gradual decline in a person's thirties.   Tr. 2/10/09 at 117.

86.     Dr. Phenix viewed Carta's age, forty-nine, as having a modest reduction on his sexual recidivism risk but not significant enough to affect her overall conclusion that he was a sexually dangerous person. Tr. 2/10/10 at 22.  Dr. Bard stated that "age is not the most important factor in this case."  Tr. 2/10/09 at 123.

87.     Indeed, Carta committed sexual offenses in his thirties and forties - thereby indicating no reduction in sexual recidivism during that time period. Tr. 2/10/09 at 22.  In addition, Carta's sexual interests during SOTP indicated to Dr. Phenix that his libido had not been significantly reduced and that he remains very "sexually interested and actually preoccupied."  Tr. 2/10/09 at 22-23.

## 2.     Prior Sex Offender Treatment

88.     Successful completion of a cognitive behavioral sex offender treatment program, such as the one in which Carta participated at the BOP's FCI Butner facility, can lower the risk of reoffense.  Tr. 2/10/09 at 24.   Failure to complete treatment can increase a risk of reoffense.  Government Exhibit 1 at 31; Tr. 2/10/09 at 25, 34; Tr. 2/10/09 at 138.

89.     Carta participated in sex offender treatment for approximately seven months from July 26, 2005 to March 2, 2006,  at FCI Butner.  Government Exhibit 27 at

C00951.  He completed only the first two of four phases of treatment before he quit.  Id.

at C00953.

90.     He quit after multiple efforts by treatment staff to encourage him to

continue.  Government Exhibit 1 at 31.  He struggled during the program.  Tr. 2/10/09 at

24.  He was unable to curb his sexual interest in younger participants resulting in

restrictions from contact with them until he quit the program.  Id.  His focus on meeting

his sexual needs interfered with his ability to focus on his treatment needs, which were

extensive given that he has a lifelong paraphilic condition.  Tr. 2/10/09 at 24.  Dr. Bard

acknowledged that Carta could not handle the treatment.   Tr. 2/10/09 at 184.

91.     During the treatment, far from sharing any remorse for his victims, Carta

excused his conduct by stating once a child is capable of ejaculating, that the child is

capable of making his own sexual decisions.  Government Exhibit 25 at C00944.

92.     After reviewing his conduct and statements during Carta's participation in

treatment, in Dr. Phenix's opinion, he cannot manage his precursors to offending and he

is not clear about his reoffense cycle, which he actively engaged in while at FCI Butner.

Tr. 2/10/09 at 25.

### 3.      Significant Social Influences

93.     Social associations are an established predictor of general recidivism.  Tr.

2/10/09 at 28; Government Exhibit 1 at 32.   Significant social influences also include an

examination of the role relatives, friends, and social supports play in an offender's life.

Id.

94.     Dr. Phenix found that Carta had alienated his immediate family and daughter through hostile, revengeful, and aggressive behavior and therefore would apparently have little familial support in the community.   Government Exhibit 1 at 32. He had lifelong problems with developing and maintaining interpersonal relationships as a result of his personality disorder.  Dr. Phenix found that although he needs people, he pushes them away with anger and retaliation.  Tr. 2/10/09 at 29.  For example, with respect to his mother and daughter, he threatened to kill them.  Government Exhibit 1 at 27.  He has had difficulties with two-way relationships that would allow him to have supportive individuals on a long-term basis in the community that would help him to not reoffend.  Id.  He has no family or social support in the community if released.

95.     Accordingly, Dr. Phenix opined that an examination of Carta's significant social influences, or lack thereof, places him at the higher end of the risk range for sexual recidivism.  Id.

### 4.     Intimacy Deficits

96.     Intimacy deficits are evaluated by examining a number of components that help to determine whether a person can establish meaningful relationships that meet their needs and whether they can maintain those relationships over time.  Tr. 2/10/09 at 27; Government Exhibit 1 at 32.  Sex offenders who live in an intimate relationship have a reduced risk for future sexual reoffense.  If a sex offender has a problem with establishing and maintaining relationships, then he is at higher risk to reoffend.  Tr. 2/10/09 at 27.

97.     Carta has significant intimacy deficits.  Tr. 2/10/09 at 27.  He has a

longstanding history of problematic relationships where people have left him, cheated on him or somehow let him down.  He has talked about "suffocating" partners by wanting them to be with him constantly and becoming unreasonably jealous with them. Government Exhibit 1 at 33.  He has stated that he has not had a real relationship in 20 years. Indeed, he has never maintained a long-term intimate relationship, sexual or otherwise, with a peer age individual.  Respondent's Exhibit 9 at 13.   His marriage lasted only 8 months and his relationship with Brenda was marked by Carta's attempt to damage her by posting intimate pictures of her on the internet.  He engaged in relationships with wholly inappropriate partners such as a 17 year old boy when Carta was 40.  He sought young teens in chat rooms on the internet for a relationship because he was  "lonely."  Tr. 2/10/09 at 27; Government Exhibit 1 at 33.

### 5.  Sexual Self-Regulation

98.     Sexual self-regulation refers to how well a person manages his/her sexual arousal and interest.  Tr. 2/10/09 at 30.   Offenders with an established deviant arousal pattern are higher risk and, therefore, in order to reduce their risk need to be able to self-regulate their sex drive.  Id.

99.     Carta has not been able to self-regulate his sexual arousal and interest. For example, he had a compulsive sexual preoccupation with pornography and seeking out boys for sexual activity.  Tr. 2/10/09 at 30.  With respect to the pornography, his compulsivity can be measured in terms of the hours he spent viewing the material - 12-14 hours per day at its peek.  He ignored his hygiene and his job in order to view

pornography. Government Exhibit 1 at 33.   His masturbatory habits – 2 to 3 times a day
– are above average for his age.  Tr. 2/10/09 at 31.   Rather than addressing these issues
when he finally had the opportunity to do so in SOTP, he became preoccupied with his
sexual attraction to the younger inmates which ultimately lead to his withdrawal from the
program.  Tr. 2/10/09 at 31.

100.    Carta's inability to self-regulate his sexual arousal and interest places him
in the higher range of risk of sexual recidivism.  Tr. 2/10/09 at 31.

### 6.    Lack of Cooperation with Supervision

101.    Sex offenders in the community who have violated conditions of release,
parole, or probation are at higher risk for future sexual reoffense. Government Exhibit 1
at 17, 34 (Carta, at age 40, was convicted of a probation violation); Tr. 2/10/09 at 31.

102.    At least three times, Carta violated supervision conditions.  Government
Exhibit 1 at 17, 34; Tr. 2/10/09 at 32.

### 7.    General Self-Regulation

103.    General self-regulation is measured by a number of factors including
impulsivity, poor problem solving, and negative emotionality and hostility.   Tr. 2/10/09
at 33.  Government Exhibit 1 at 34.   Individuals who feel hostile, victimized and
resentful and those vulnerable to emotional collapse when stressed are at higher risk for
sexual reoffense.   Government Exhibit 1 at 34.

104.    As a result of his personality disorder, Carta can fly off the handle and act
impulsively.   Tr. 2/10/09 at 33.   Indeed, Carta himself stated that he made threats "out of

anger" and "when he gets mad he goes overboard."  Government Exhibit 1 at 34.   He

has demonstrated significant problems with behavioral impulsivity in the community such

as the compulsive use of child pornography.  Government Exhibit 1 at 34.   As his

problem exacerbated, he was unable to think through the consequences of his behavior.

Id.  He had multiple arrests and multiple incidents of contact with the criminal justice

system.   Tr. 2/10/09 at 126.  He also has poor problem-solving skills as evidenced by his

behavior in SOTP.    Rather then following through with a program that he clearly needed

to be safe in the community, he chose not to finish the program for poor reasons such as

his inability to associate safely with the younger participants.   Tr. 2/10/09 at 33.   He has

shown poor community stability and long periods of unemployment.  Government

Exhibit 1 at 34.

105.    As a result, Carta has significant treatment needs that place him at the

higher end of risk for sexual recidivism.  Tr. 2/10/09 at 33.

### 8.  Conditions "If Released"

106.    This Court must determine if Carta is a sexually dangerous person "if

released."  18 U.S.C. § 4247(a)(6).   As to the sex offender treatment that Carta might

receive on supervised release, Dr. Randall Kent Wallace, a licensed psychologist who

works for Connection, Incorporated, an entity that provides sex offender treatment for

individuals supervised by the U.S. Probation Office in Connecticut, testified about the

program.  Dr. Wallace's organization treats anywhere from 900 to 950 people at one time.

Tr. 2/11/09 at 15.   It provides cognitive behavioral therapy only during the term of a

person's supervised release.   Tr. 2/11/09 at 16.   As part of the treatment process, the

patient must take polygraph examinations, demonstrate that he/she has a support system,

and develop a plan for life after supervision.   Tr. 2/11/09 at 21, 28.   The typical length of

treatment is anywhere from one to five years – two to three years is for the typical

offender and longer if the person is high risk.  Tr. 2/11/09 at 38.   The program does not

cure sex offenders but rather helps them manage their behaviors.  Tr. 2/11/09 at 39.   The

restrictions do not guarantee that a person will not reoffend.  Tr. 2/11/09 at 40.   Dr.

Wallace did not know anything about Carta and did not know if he would be accepted

into his program.   Tr. 2/11/09 at 41.

107.    As part of his federal sentence from his child pornography conviction, if

Carta is released, he is subject to a three-year term of supervised release.  Government

Exhibit 26 at C00083.  In addition to a series of standard conditions of supervision (e.g.

restrictions on one's movement, reporting requirements, etc.), Carta would be subject to

several special conditions imposed by the sentencing court.  Id.  Specifically, he would be

required to participate in mental heath, sexual offender, and substance abuse treatment,

polygraph examinations, as well as searches of his home and computer equipment by the

U.S. Probation Office.  Id.

108.    Officer Collette, a sex offender specialist for the U.S. Probation Office in

Connecticut, discussed the potential supervision of Carta if he was released.   Collette

currently supervises approximately 41 sex offenders, even though the optimum case load

would be about 20.  Tr. 2/11/09 at 63.   Collette would prefer a reduced caseload of sex

offenders because in his experience sex offenders are "hard wired" - in other words they never lose their sex drive. Tr. 2/11/09 at 64. In fact, he has supervised men who have reoffended sexually while under his supervision. Tr. 2/11/09 at 64. Indeed, it is hard to enforce any restriction that Carta not be in the company of children. Tr. 2/11/09 at 64. He testified that Carta would have to register as a sex offender with the State of Connecticut, Tr. 2/11/09 at 50, but registration is not for Carta's entire life, only for ten years. Tr. 2/11/09 at 66. He testified that Carta would have to participate in sex offender treatment. Tr. 2/11/09 at 52. He testified that Carta might be subject to passive GPS monitoring, which does not allow the officers to know where Carta is in real time, but gives them a record after the fact. Tr. 2/11/09 at 55. Further, even if GPS monitoring was used, it is not 100% accurate in urban areas. Tr. 2/11/09 at 56. Collette can only supervise Carta for three years. Tr. 2/11/09 at 64. If Carta had been convicted of the same federal offense today, he would have received a minimum of five years supervised release and the Sentencing Guidelines today recommend lifetime supervision for persons such as Carta. Tr. 2/11/09 at 65.

### E.     Experts' Conclusions on Sexual Dangerousness

109.    Dr. Phenix's professional opinion is that Carta is a "sexually dangerous person" who, as a result of the combination of his serious mental illnesses, abnormalities or disorders would have serious difficulty refraining from child molestation or sexually violent conduct if released. Government Exhibit 1 at 35; Tr. 2/10/09 at 4, 35. Dr. Phenix further opined that nothing has changed for Carta since his last offense. Tr. 2/10/09 at 35.

This Court credits the testimony of Dr. Phenix.

110.    Dr. Bard opined that Carta did not have a serious mental illness, abnormality or disorder and that he would not have serious difficulty controlling his sexual behavior.  Respondent Exhibit 9 at 14.  This Court does not credit Dr. Bard's testimony as to the future dangerousness of Carta.

111.    In assessing Carta's risk, Dr. Bard failed to exercise reasonable professional skepticism.  For instance, Dr. Bard accepted Carta's self serving claim that he was interested in older individuals with whom he could have a meaningful relationship.  In accepting that claim, Dr. Bard ignored Carta's decades long sexual involvement with teenagers and Dr. Bard's own knowledge that time in prison alone does not change behavior or reduce risk of reoffense.  Tr. 2/10/09 at 146.  Dr. Bard also failed to acknowledge that there was no benefit to Carta in admitting that he was still sexually attracted to 13-year old boys.  Tr. 2/11/09 at 106.  Such a finding fails to exhibit reasonable professional skepticism of the claims of an individual, with numerous victims, who failed to complete sex offender treatment because he began to engage in the same destructive behavior that he had in his previous relationships.

112.    While Dr. Bard testified that Carta was "forthcoming" in treatment, he ignored documentary evidence to the contrary.  When Carta first entered sex offender treatment, he disclosed that the average number of hours he spent viewing child pornography was 70 hours per week.  Tr. 2/10/09 at 151.  Later in treatment, however, Carta stated that he viewed child pornography only 5 hours per week.  Tr. 2/10/09 at 152.

Furthermore, whether Carta was "forthcoming" in treatment was never tested, as Carta quit the sex offender treatment program before he had to take the polygraph examination. Tr. 2/11/09 at 90.

113.    Dr. Bard admitted that Carta was not forthcoming in treatment when he first disclosed the peak number of hours he spent watching child pornography as 100 hours, then later in treatment modified the response to list his viewing of child pornography as 10 hours.  Tr. 2/10/09 at 152

114.    Additionally, when Dr. Bard interviewed Carta in performing his risk assessment, he testified that he took what Carta said over official police reports.  Tr. 2/10/09 at 157.  For example, Carta told Dr. Bard that a 13 year old boy traveled voluntarily with Carta from California to Connecticut. Tr. 2/10/09 at 157, 158.   The police reports indicated otherwise.  Id.   Yet, Dr. Bard chose to believe Carta over the police reports and did not note the discrepancy in his report.   Id.

115.    Dr. Bard admitted that he failed to note a material difference between the facts contained in the records before him, and what Carta reported to Dr. Bard in his report.  The treatment records, therapy notes, psychosexual evaluation, and discharge reports all indicate that Carta was attracted to 19-20 year old men in the sex offender treatment program, causing his expulsion.  Tr. 2/10/09 at 160-161. Yet, Dr. Bard instead stated that the participants Carta was attracted to were in their 20s to 30s, based only on Carta's self report and despite the documentary evidence to the contrary.  Tr. 2/10/09 at 161.

116.    Dr. Bard admits that a sexual relationship with someone in the 13-19 year old range would be child molestation if the individual could not give consent. Tr. 2/10/09 at 167. Dr. Bard also admits that saving thousands of images of child pornography is evidence of a pattern of hypersexuality, and a compulsion for Carta. Tr. 2/10/09 at 168. He acknowledges that Carta had not completed any treatment to manage his hypersexuality. Tr. 2/10/09 at 169. Yet, Dr. Bard opines that Carta is not a sexually dangerous person, if released.

117.    Dr. Bard testified, based on Carta's self report, that one reason Carta withdrew from treatment was that his therapist, Dr. Wood, was leaving. Yet, records indicate that Carta said Dr. Wood's leaving was fine, and that he trusted the BOP to do what was best for him. Tr. 2/10/09 at 183.

118.    Dr. Bard testified that Carta did not have many people to talk to in the sex offender treatment program, again based on Carta's self-report. Tr. 2/10/09 at 183. Yet, Dr. Bard was aware that there were 100 people in the treatment program, and failed to acknowledge that in his report, taking only Carta's self report in arriving at his opinion. Id. at 183-184. Dr. Bard also failed to note in his report that other participants reported that Carta was focusing his attention on the younger members of the treatment program, and was covertly fueling other treatment program participant's dissatisfaction by reinforcing antisocial attitudes and deviant sexual beliefs. Tr. 2/10/09 at 185. When confronted in the community meeting about this behavior, Carta became enraged and verbalized wanting to quit the program, and spent the next several weeks attempting to

get revenge on the person that confronted him.  Tr. 2/10/09 at 186.  Carta refused to

acknowledge that his association with the younger members of the treatment program

patterned his offense cycle.  Tr. 2/10/09 at 189.  Yet, Dr. Bard did not note these reasons

for withdrawing from treatment or the repeating offense cycle in his report.  Tr. 2/10/09 at

186.

119.    Although Dr. Bard testified that there was "no literature" on hebephilia, Tr.

2/10/09 at 177, numerous articles and publications referencing hebephilia do exist.  Tr.

2/10/09 at 177-179; Tr. 2/11/09 at 74, 75, 76, 77, 78, 79, 80, 83.  In fact, a 2008 study by

Blanchard concluded that hebephilia exists and is relatively common compared with other

forms of erotic interest in children.  Tr. 2/11/09 at 74-75.  Dr. Bard later admitted that he

was familiar with and had read some of the research articles and publications citing

hebephilia.  Tr. 2/11/09 at 74, 76, 77, 80.  Further, Dr. Barbaree, whom Dr. Bard respects

and who is a well-known researcher in the sex offender field, testified in United States v.

Abregana that hebephilia was a proper and recognized diagnosis.  Tr. 2/11/09 at 84, 85;

Respondent Exhibit 12.

120.    Despite all of the discrepancies between Carta's self-report to Dr. Bard, and

the documentary evidence, Dr. Bard testified that he had no reason to doubt what Carta

had told him.  Tr. 2/10/09 at 155.  Dr. Bard has testified in more than 200 cases in the

Commonwealth during the last four years.  During that time, he has only testified for the

defense, and has never testified that anyone was a sexually dangerous person.  Tr. 2/11/09

at 107.  As a result, for all of the foregoing reasons, the court does not rely on Dr. Bard's

testimony, as it is not consistent with evidence presented in this case.

## CONCLUSION

After having considered Carta's decades long sexual involvement with teenagers,

his inability to complete sex offender treatment, and his compulsive behavior as a result

of his sexual arousal to teenagers, this Court finds that Carta would have serious difficulty

in refraining from acts of child molestation or sexually violent conduct if released.

Respectfully submitted,

MICHAEL K. LOUCKS
Acting United States Attorney

By:  /s/ Jennifer C. Boal
    Jennifer C. Boal
    Eve A. Piemonte Stacey
    Assistant U.S. Attorneys
    John Joseph Moakley U.S. Courthouse
    1 Courthouse Way, Suite 9200
    Boston, MA 02210
Dated: May 11, 2009    (617) 748-3100

## Certificate of Service

I hereby certify that this document filed through the ECF system will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing
(NEF), and paper copies will be sent to those indicated as non-registered participants on
May 11, 2009.

    /s/ Jennifer C. Boal
    Jennifer C. Boal
    Assistant United States Attorney