IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,          )
                                   )
               Petitioner          )
                                   )
       -VS-                        )   CA No. 07-12064-PBS
                                   )   Pages 1 - 124
TODD CARTA,                        )
                                   )
               Respondent          )


BENCH TRIAL - DAY ONE

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE



United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
December 13, 2010, 9:25 a.m.



LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 7200
Boston, MA  02210
(617)345-6787

aad00d87-693c-4031-858e-4f9d2d8a97b1

1   A P P E A R A N C E S:

2

3        EVE A. PIEMONTE-STACEY, ESQ. and JENNIFER A. SERAFYN, ESQ.,
    Assistant United States Attorneys, United States Attorney's
    Office, 1 Courthouse Way, Boston, Massachusetts, 02210,
4   for the Petitioner.

5        IAN GOLD, ESQ. and TAMARA FISHER, ESQ., Federal Public
    Defender Office, District of Massachusetts, 51 Sleeper Street,
6   5th Floor, Boston, Massachusetts, 02210, for the Respondent.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

United States v. Todd Carta - Bench Trial Day 1

1                          I N D E X

2

3    Opening Statement by Ms. Serafyn:  P. 13
     Opening Statement by Mr. Gold:  P. 33

4

5    WITNESS                    DIRECT   CROSS   REDIRECT   RECROSS

     AMY PHENIX
6
         By Ms. Serafyn:          55
7

8    EXHIBITS                RECEIVED IN EVIDENCE

9    Government

10   1-A                          57

11   29                           74

12   30                           85

13   31                           103

14   32                           107

15   33                           112

16

17

18

19

20

21

22

23

24

25

United States v. Todd Carta – Bench Trial Day 1

aad00d87-693c-4031-858e-4f9d2d8a97b1

1                    P R O C E E D I N G S

2          THE CLERK:  The case of the United States v. Todd

3     Carta, Civil Action 07-12064, will now be heard before this

4     Court.  Will counsel please identify themselves for the record.

5          MS. PIEMONTE-STACEY:  Good morning, your Honor.  Eve

6     Piemonte-Stacey and Jennifer Serafyn for the United States.

7          MR. GOLD:  Good morning, your Honor.  Ian Gold on

8     behalf of Todd Carta.  With me at counsel table is a research

9     and writing associate from our office.  With the Court's

10    permission, I'd ask that she sit with me.

11         THE COURT:  Of course.  Welcome.

12         MS. FISHER:  Thank you.

13         MR. GOLD:  Your Honor, I would also ask that during

14    preliminary statements and arguments about motions, that the

15    witness be sequestered or outside the courtroom.

16         THE COURT:  Well, let me talk first before I sequester

17    her.  I started getting barraged with motions and objections at

18    the end of last week, and we realized we never had any of the

19    reports.  No one ever gave us the updated report that I know

20    of, and we think we didn't have some of the other reports

21    either.  So you're all looking puzzled, but I don't know

22    whether you filed them in a sealed way or whether -- I'm pretty

23    sure we never got the updated Amy Phenix report.  You both were

24    arguing over a report that I never had, or at least we can't

25    find.  No one attached it, right?

aad00d87-693c-4031-858e-4f9d2d8a97b1

1          MS. PIEMONTE-STACEY:  No.

2          THE COURT:  So I don't know why you think I have it.

3     I can't possibly rule; I never had the report.  So this is my

4     proposal as to how we're going to go forward.  I'm hoping I

5     even have it.  So right now I'm supposed to have, which I saw

6     for the first time ever, the Leonard A. Bard, Ph.D. report; the

7     Prentky report, which may have been separately filed in a

8     sealed way because that's my report, it's possible that I got

9     that; and then the Amy Phenix updated report.  Is there any

10    other report I should have?

11         MS. PIEMONTE-STACEY:  No, your Honor.

12         THE COURT:  Okay.  So it is quite possible that I have

13    four of these cases and that they are flowing around in a

14    different order, but the one that I know I didn't have is the

15    updated Phoenix report.  So when you were all arguing about it,

16    I actually didn't have it.  I didn't know what was in it, and I

17    cannot possibly rule.

18         So what I am going to do is, you can both do opening

19    statements.  I am unlikely to allow a brand-new methodology

20    right now in a case that's been pending since 2007, but I'm not

21    unlikely to strike the whole thing to the extent it's

22    responsive to what's in Dr. Prentky's report, or to the extent

23    they're just minor changes in methodology.  And I can't

24    possibly assess that now because I haven't read the report and

25    I just saw for the first time a detailed analysis that you gave

United States v. Todd Carta - Bench Trial Day 1

aad00d87-693c-4031-858e-4f9d2d8a97b1

1    me, I think over the weekend or this morning.  So what we are

2    going to do is, we are going to put -- who are your witnesses

3    today?

4             MS. PIEMONTE-STACEY:  Just Dr. Phenix, your Honor.

5             THE COURT:  Is she your only witness in this case?

6             MS. PIEMONTE-STACEY:  Well, yes, in that the remand,

7    the mandate says that the testimony is only on the third prong;

8    and so I think both parties anticipated that the only witnesses

9    for the third prong, the first and second having been

10   established, at least according to the First Circuit, is the

11   three experts, Bard, Phenix, and Prentky.

12            THE COURT:  Fine.  But what you all have to do is --

13   we have this rule, as you know, that when you remand, it goes

14   to a new judge.  I am not very familiar yet.  You haven't, to

15   my knowledge -- have you all given me transcripts of what you

16   want me to read and that sort of thing?

17            MS. PIEMONTE-STACEY:  No, your Honor.  I think the

18   thought was that you would take the testimony of the experts,

19   as we had at least previewed at the last conference, and then

20   after that, almost in the form of rulings and findings, mark

21   the transcripts, mark the pages, mark --

22            THE COURT:  Fine, but -- I have no problem with that,

23   really.  I'm willing to be flexible.  I don't know this case.

24   Let me start from the beginning.  I don't know prong one, I

25   don't know prong two, I don't know prong three.  I am like a

United States v. Todd Carta - Bench Trial Day 1

1   new jury walking into this case.  I'm willing to take all of

2   that stuff.  I will learn all of that stuff.  I didn't get

3   pretrial memos, although we have had a couple of pretrial

4   conferences.  This kept getting bumped, which is why I refused

5   to do it again, but you're going to have to bring me along.

6   That's why I want to get going.  And so you'll do opening

7   statements, basically cover the whole waterfront because I

8   don't know prong one and two.  I don't know Mr. Carta who's

9   sitting here.  This was before Judge Tauro, I think, right?

10          MS. PIEMONTE-STACEY:  Yes.

11          THE COURT:  And it got remanded on appeal, so I've

12   read the appeal.  But we just need to get up to speed in a --

13   the new word is in a "granular" way, right in the weeds,

14   understand it.  So I don't know why we need to exclude the

15   expert.  Are you going to be dealing with some of these

16   methodological issues in your opening statement?  I don't know

17   that we need to get so -- I may well knock it out.  If I think

18   it's a brand-new methodology and there's prejudice, I may knock

19   it out.

20          MS. PIEMONTE-STACEY:  Your Honor, his expert uses one

21   of the same methodologies.  He's had eleven months to use it.

22   I mean, that's the part that's a little annoying.  One of the

23   methodologies --

24          THE COURT:  Maybe one of the methodologies.  That's

25   why I'm not ruling right now.  If it's not a new methodology or

United States v. Todd Carta - Bench Trial Day 1

1  if it's one that's well known and there's no prejudice, fine.

2  If it's a brand-new methodology that's never been -- wait a

3  minute, there are two different -- you're shaking your head --

4  where he says there's no peer-reviewed literature, she's never

5  used it before, then I'm knocking it out.  I'm not doing it

6  suddenly in year four a Daubert hearing on a brand-new

7  methodology.  I've been mired in all these methodologies, and

8  so if there's yet a new one, I'm not starting again.

9          What's the new one you said where no one has looked at

10  it, no peer-reviewed literature, no data?

11          MR. GOLD:  Well, there's two things.  The Static-99,

12  since I know the Court heard some testimony in the Wetmore case

13  in October, it's my impression that what we're talking about

14  was sort of glanced over, it wasn't -- but the way of giving

15  meaning to Static-99 scores has changed.  The evaluator

16  compares a subject to a different sample depending on --

17          THE COURT:  But is it true your expert relies on it?

18          MR. GOLD:  The old Static-99 that the Court is

19  familiar with --

20          THE COURT:  Yes, very familiar with the old one.

21          MR. GOLD:  Very familiar with that -- I think one of

22  our experts makes use of that.  But that's not what we're

23  talking about here.  There are two things.  One is that the

24  developers of the Static-99, and the background is that when

25  they did this re-norming of the Static-99, they found that the

United States v. Todd Carta - Bench Trial Day 1

aad00d87-693c-4031-858e-4f9d2d8a97b1

1    percentages overall were much lower than they had been under

2    the table that the Court is accustomed to seeing, much lower.

3         THE COURT:  That's good for you.

4         MR. GOLD:  Well, and so what the developers did --

5    and, your Honor, just very candidly, this is the conspiracy

6    theory story of how it develops, but immediately after that

7    they came up with a new method of reporting and thinking about

8    and interpreting the scores by saying, "Well, we've got some

9    samples that we're going to call high risk, and we've got some

10   samples that we're going to call normal."  And so if your guy

11   is compared to the normal, he has a low recidivism risk --

12        THE COURT:  Can I just stop you.  You're right in the

13   merits right now.  I don't want to know about Static-99 as much

14   as you mentioned another methodology which you said you never

15   heard of before.

16        MR. GOLD:  Okay, but they're connected.  That's the

17   only reason why I'm wading in a little bit, and I'll just walk

18   back out, which is to say that that's now almost an

19   outcome-determinative choice of who you compare your guy to

20   before you report the scores; and Dr. Phenix has in this

21   methodology, which she recently in a deposition the other day

22   called "brand-new," has this instrument which we just got the

23   coding rules for, I think unpublished, just this morning --

24        THE COURT:  Right that was the one I'm referring to.

25   What's the name of that?

United States v. Todd Carta – Bench Trial Day 1

1          MR. GOLD:  It's called the SRA: FV.

2          THE COURT:  All right, stop right there.  Is that a

3     brand-new methodology?

4          MS. PIEMONTE-STACEY:  It's not a brand-new

5     methodology, your Honor.  It is a factor that she used that did

6     just come out, but it's one of many pieces.

7          THE COURT:  Excuse me, can I just say something.

8     After four years, I'm not starting, I'm not going to put

9     Mr. Gold in that position of something brand-new.  The

10    Static-99R may be a different situation.  Everyone knows about

11    the Static-99.  Now, I don't know if the R -- I'm assuming it

12    means revised -- is significantly different.  I'll take

13    testimony on that.  If it's significantly different in a way

14    that prejudices him, I will strike it.  If it's not, I won't.

15    But for the other one, wouldn't you be screaming off the

16    rafters?

17         MS. PIEMONTE-STACEY:  No, your Honor, because you're

18    being misled, and I'm sorry to use those words, but you're

19    being misled.  There are a number of factors.  There are

20    actuarial instruments that are used.  Okay, that's the 99, the

21    99R, the 2002, and the 2002R.  Now, the 2002R came out in 2009.

22    There have been trainings on them over the past couple of

23    years, and his expert uses one of those.  Okay, put those

24    actuarial instruments to the side.  In Dr. Phenix's report,

25    there are also other of those factors that we talk about,

United States v. Todd Carta - Bench Trial Day 1

1    dynamic factors, risk factors, all these.

2         THE COURT:  Sure.

3         MS. PIEMONTE-STACEY:  And she used a methodology

4    called the Stable.  And that's fine, and she'll testify about

5    that methodology.  However, recently there's an updated Stable

6    that has come out.  It came out, I think it was in September of

7    this year.  And all she did is just update the report, but the

8    report doesn't rise or fall on it.  It's a simple update.

9         THE COURT:  Well, fine, then you don't need it.

10        MS. PIEMONTE-STACEY:  But I'd ask that you take the

11   evidence at least de bene and then make a decision afterwards

12   if you find --

13        THE COURT:  You know what?  There's a basic rule in

14   the First Circuit:  You don't spring new expert methodologies

15   on someone.  You can rebut, and if it's brand-new and if it

16   hadn't been disclosed till December 2, or whatever the timing

17   is, I'm not going to do it to him.  You'll just have to rely on

18   the old stuff.

19        MS. PIEMONTE-STACEY:  And he had the opportunity to

20   discover that before the trial.

21        THE COURT:  You know what?  You know what the rules

22   are on the expert testimony.  You don't supplement with

23   something brand-new.  If it's not brand-new, fair game.  So

24   we're just going to get going.  We're going to put her

25   testimony on.  I think what I should do is have her leave

United States v. Todd Carta – Bench Trial Day 1

1  during the opening statements because I really do not know this

2  case very well.  I would like also Mr. Carta to hear basically

3  the case on both sides.  So, Dr. Phenix, why don't you leave.

4  Dr. Phenix is for today.  We think she'll go into tomorrow, do

5  we?

6            MR. GOLD:  She may.  We've blocked out the day.

7            THE COURT:  And we have Dr. Prentky coming when?

8            MR. GOLD:  Dr. Prentky is not available on Friday,

9  your Honor.  We're going to have to have, I think, just a mini

10  discussion about scheduling the other two folks.

11            THE COURT:  I thought you said he was.

12            MR. GOLD:  I said that I thought he was, and I was --

13            THE COURT:  Well, do you have dates for him?

14            MR. GOLD:  I do, I do.  I have a collection of dates,

15  your Honor.

16            THE COURT:  Do they push us into March?

17            MR. GOLD:  No, no.

18            THE COURT:  I am deeply concerned about how long this

19  case has taken, so, I mean, I am deeply concerned.  So I know

20  Mr. Carta is as well.  It's been four years, and I understand

21  some of it involved Supreme Court challenges and appeals, but I

22  want the case to finish.  So was Dr. Prentky able to come in

23  any other day this week?

24            MR. GOLD:  The thing is, your Honor, with Prentky in

25  particular -- the other expert, Dr. Bard, has trial will.

United States v. Todd Carta - Bench Trial Day 1

aad00d87-693c-4031-858e-4f9d2d8a97b1

1  Dr. Prentky is in just the crush of ending an academic

2  semester.  Both of them free up just in a little while.  The

3  first week of January is open.  The middle week between the

4  holidays is open.  I have a collection of dates.

5       THE COURT:  The middle week between the holidays is

6  not happening.  I haven't had a vacation since the end of July,

7  early August.  You know, the week before the holidays is not

8  feasible, and I'm on trial the beginning of January.  We had

9  scheduled this so long ago.  So let's get going on the opening

10 statements.

11      Why don't you sit outside.

12 OPENING STATEMENT BY MS. SERAFYN:

13      MS. SERAFYN:  Your Honor, I just wanted to mention

14 something that my colleague alluded to, which is that we

15 believe, based on the First Circuit's opinion, that the only

16 element here is the third element.  So I'm happy to give the

17 Court an opening statement that encompasses first and second

18 element as well --

19      THE COURT:  Yes, do everything.

20      MS. SERAFYN:  -- just to sort of preview it.

21      THE COURT:  Yes.

22      MS. SERAFYN:  But I just wanted to note for the record

23 that our position is, the only testimony you should be hearing

24 is as to the third element.

25      THE COURT:  You can put in the testimony from the

United States v. Todd Carta - Bench Trial Day 1

1  first trial, and we can deal with that later.  The live

2  testimony, as I understand it, is as to the third element.  Go

3  ahead.  I'm not going to revisit anything that Judge Tauro

4  found that was not reversed, but it may be relevant to the

5  third element, I mean, as a practical matter, right?  His past

6  is his future, so what he did in the past is relevant to

7  whether he can control himself.

8          MS. SERAFYN:  Your Honor is familiar with the three

9  elements that the government is required to prove by clear and

10  convincing evidence under the Adam Walsh Act, and, your Honor,

11  there is no dispute that Mr. Carta meets the first element.

12  I'll just start with sort of the index offense, which is a

13  conviction for child pornography that dates back to October,

14  2002, and Mr. Carta pled guilty to that charge and was

15  sentenced to five years in federal prison and three years of

16  supervised release.

17          THE COURT:  Out of what court?

18          MS. SERAFYN:  Your Honor, I believe that was in the

19  District of Connecticut, and, again, that was October of 2002.

20  And, your Honor, he had thousands and thousands of images of

21  child pornography ranging from children in diapers all the way

22  up through young adolescence and teenagers up to, you know,

23  sixteen, seventeen, and eighteen years old.

24          Then, just going back, I know that this is a long time

25  ago, but I think it's important just to show Mr. Carta's

United States v. Todd Carta – Bench Trial Day 1

1  history.  It started when he was a child himself.  When he was

2  between eleven and thirteen years old, he orally copulated a

3  child in diapers who was approximately three or four years old

4  at the time.  Around the same age when Mr. Carta was between

5  eleven and thirteen years old, he also orally copulated his

6  seven-year-old cousin approximately ten times during a one-year

7  period.  Then when Mr. Carta is about fifteen or sixteen years

8  old, he attempts to orally copulate a similar-age male, and

9  when that peer refused, Mr. Carta shot him with a BB gun.

10 Mr. Carta says that he later talked that boy into it, and they

11 engaged in oral copulation twice a year over approximately five

12 years.

13         When Mr. Carta was --

14         THE COURT:  So they were about the same age?

15         MS. SERAFYN:  Yes.  When Mr. Carta was twenty-one

16 years old, he orally copulated a sixteen-year-old nephew of his

17 several times.  Then when Mr. Carta was twenty-eight, he orally

18 copulated an intoxicated thirteen-year-old male.  Again at

19 age twenty-eight he orally copulated a seventeen- or

20 eighteen-year-old male --

21         THE COURT:  Excuse me.  What age?

22         MS. SERAFYN:  I'm sorry.  When Mr. Carta was

23 twenty-eight and the male was about seventeen or eighteen.  He

24 orally copulated --

25         THE COURT:  So that one wasn't illegal?

United States v. Todd Carta - Bench Trial Day 1

1        MS. SERAFYN:  Well, it's questionable.  The individual

2   was either seventeen or eighteen.

3        THE COURT:  Okay, so that's a question mark.  So the

4   one where there's a significant gap in years, there are how

5   many of them, two of them when he was twenty-one with the oral

6   copulation of the sixteen-year-old --

7        MS. SERAFYN:  Yes.

8        THE COURT:  -- and the twenty-eight year-old --

9        MS. SERAFYN:  When Mr. Carta was twenty-eight, there

10  was a thirteen-year-old.

11       THE COURT:  All right.

12       MS. SERAFYN:  And then, additionally, when Mr. Carta

13  was about thirty years old, he engaged in sexual activity with

14  a thirteen-year-old male about 30 to 40 times over a four-year

15  period.

16       THE COURT:  Is that intercourse?

17       MS. SERAFYN:  Yes.  I believe it was just various

18  types of sexual activity over 30 or 40 times.  Then when

19  Mr. Carta was in his thirties, he met a thirteen-year-old male

20  on a chat line who he orally copulated, and Mr. Carta later

21  engaged in sexual activity with both a thirteen-year-old male

22  and a seventeen-year-old male at the same time.

23       When Mr. Carta --

24       THE COURT:  Is there any evidence as to whether the

25  thirteen-year-old was prepubescent or postpubescent?

United States v. Todd Carta - Bench Trial Day 1

aad00d87-693c-4031-858e-4f9d2d8a97b1

1          MS. SERAFYN:  No, your Honor.  The problem is that

2     these records come typically from, you know, obviously police

3     reports and convictions and charges and things like that, and

4     there's typically no indication of what the --

5          THE COURT:  Did all of these result in convictions?

6          MS. SERAFYN:  Not all of them.  I believe some of

7     these are by Mr. Carta's admission.

8          THE COURT:  So did any of them result in convictions?

9          MS. SERAFYN:  Yes, your Honor.  There were charges,

10    and that's sort of what I'm getting up to --

11         THE COURT:  Okay.

12         MS. SERAFYN:  -- when --

13         THE COURT:  But so far, none of them were convictions,

14    is that right?

15         MS. SERAFYN:  I don't believe.

16         THE COURT:  Okay.

17         MS. SERAFYN:  And when Mr. Carta -- and this is the

18    sort of conviction that I'm leading up to -- when Mr. Carta was

19    thirty-nine years old, he orally copulated a seventeen-year-old

20    who was his sort of live-in boyfriend at the time, and then he

21    also engaged in sexual activity with that boy's

22    fifteen-year-old brother.  And the seventeen-year-old boy, his

23    name was Frederick.  And Mr. Carta did --

24         THE COURT:  Was it consensual?

25         MS. SERAFYN:  Excuse me?

United States v. Todd Carta - Bench Trial Day 1

1          THE COURT:  Was it consensual?

2          MS. SERAFYN:  You know, I think that might be

3     Mr. Carta's argument.

4          THE COURT:  Well, let me ask it a different way.  When

5     you're over sixteen years old, was it illegal?

6          MS. SERAFYN:  Was it legal?

7          THE COURT:  Illegal.

8          MS. SERAFYN:  Your Honor, I'm not sure.  I believe

9     that that charge was out of Connecticut or that conviction for

10    Frederick was in Connecticut.

11         THE COURT:  Do you know whether it was illegal?

12         MR. GOLD:  Your Honor, the evidence at the trial was,

13    the age of consent in Connecticut is sixteen.  So the

14    relationship, I don't think it's alleged in the case by any

15    expert that that was an illegal relationship.  It may be

16    unhealthy, but they lived together for a period of months.

17         THE COURT:  The fifteen-year-old then was illegal?

18         MR. GOLD:  The fifteen-year-old, it was clearly an

19    illegal act, but I should say -- and we'll talk about this when

20    I start talking -- that did not lead to a sex charge.  I'll go

21    into the details.

22         THE COURT:  Okay, okay.  So was there a conviction as

23    far as the --

24         MS. SERAFYN:  Well, there was a conviction, your

25    Honor, for risk of injury to a minor and possession of

United States v. Todd Carta - Bench Trial Day 1

aad00d87-693c-4031-858e-4f9d2d8a97b1

1    marijuana.  So what had happened was, Mr. Carta and this boy

2    Frederick got into some sort of fight, and the police were

3    called, and he was charged with possession of marijuana that I

4    believe was found either in the house or in his possession, and

5    risk of injury to a minor for this fight with Frederick.  After

6    the fight, when Mr. Carta got out of jail -- I believe he

7    served a couple of months for that charge -- after he got out

8    of jail, there was an allegation that Mr. Carta wrote explicit

9    notes and messages about his relationship with Frederick and

10   sort of plastered these fliers in Frederick's mailbox, around

11   the neighborhood, because he was just so sort of jilted or

12   upset about what had happened.  Shortly after that is when he

13   is arrested for the child pornography.  And then, as I

14   mentioned, your Honor, he pled guilty to that charge, and then

15   was sentenced to five years in prison.

16        Now --

17        THE COURT:  So the bottom line is, was he ever

18   convicted of raping or unlawfully touching or involved in

19   illicit sex with a minor in any of these multiple incidents you

20   just talked to me about?

21        MS. SERAFYN:  No, your Honor.  I believe that the only

22   convictions were for risk of injury to a minor.

23        THE COURT:  That was the fight?

24        MS. SERAFYN:  That was the fight for which he got

25   seven years in jail, and that was a suspended sentence with

1   five years probation, and then shortly after that, the

2   conviction for transportation of child pornography and criminal

3   forfeiture, and that is the conviction that he received five

4   years in federal prison plus the three years of supervised

5   release.

6          THE COURT:  So most of this other stuff has been

7   self-reports?

8          MS. SERAFYN:  Yes.

9          THE COURT:  I see.

10         MS. SERAFYN:  So, your Honor, I think, you know, the

11  evidence shows that with respect to the first element -- and

12  this is something that all of the experts, I think, agree on

13  and sort of agreed were -- at least the two experts agreed on

14  at the first trial -- that, you know, Mr. Carta has reported by

15  his own admission having a sexual relationship with at least at

16  a minimum thirteen teenagers.  Three of those thirteen

17  teenagers were age thirteen.

18         THE COURT:  Three were thirteen?

19         MS. SERAFYN:  Three were age thirteen, and then there

20  were fifteen-, sixteen-, and seventeen-year-olds.  So again,

21  your Honor, we don't believe that there's any dispute that

22  Mr. Carta meets the first element, which is, you know, past

23  instances of sexually violent conduct or child molestation.

24         And then with respect to the second element, which is

25  the mental diagnosis, again, we don't believe that there's any

United States v. Todd Carta - Bench Trial Day 1

1    dispute here based on the First Circuit's decision.  And

2    Dr. Phenix has diagnosed Mr. Carta with five different mental

3    illnesses, but the primary one in this case is paraphilia NOS,

4    and the descriptor is hebephilia.  And I know that your Honor

5    has heard testimony about hebephilia in other cases or at least

6    in one other case, but hebephilia is characterized by a sexual

7    attraction to children who are in the midst of pubescence.

8    Typically that age ranges between eleven and fourteen, but of

9    course there is some give-and-take there because obviously, you

10   know, everyone is different; and an eleven-year-old can have,

11   you know, sort of be in the midst of puberty, whereas a

12   fourteen-year-old can also still not quite have gotten there

13   yet and maybe will get there at age fifteen.  So eleven to

14   fourteen are the general parameters, and that has been well

15   established.  It's been established in this article by

16   Blanchard, which is sort of the leading article that

17   establishes the hebephilia diagnosis.  And in addition, the DSM

18   is in the process of being revised, and the DSM-V has a

19   separate -- well, the proposal is a category called

20   "pedohebephilic disorder."  So that hebephilia at this age

21   range, eleven to fourteen, roughly, now has its own sort of set

22   of diagnostic criteria.

23           THE COURT:  That's a proposal so far.  It has not been

24   accepted.

25           MS. SERAFYN:  That's right, and that proposal I

United States v. Todd Carta – Bench Trial Day 1

1  believe is based on the Blanchard article, which is sort of the

2  seminal peer-reviewed article on hebephilia.  And again, your

3  Honor --

4      THE COURT:  Am I right -- it's come up in two cases

5  with me so far.  In the Shields case there was just no

6  evidence, and I just rejected it because there was no record.

7  It came up again, right, in the Wetmore case?  Is that right?

8      MS. PIEMONTE-STACEY:  That's right.

9      THE COURT:  But it's disputed, right, among the

10  profession as to exactly what it is?  It's sort of evolving,

11  isn't it?

12      MS. SERAFYN:  I actually don't think that there is a

13  dispute anymore, and I think that the First Circuit recognized

14  that.  I think what respondents typically try to do in this

15  case is, the respondents typically try to say that hebephilia

16  doesn't exist because it's not listed in the DSM; there's no

17  word "hebephilia" in the DSM; therefore it can't exist.  But

18  Blanchard acknowledges that this diagnosis exists.  The DSM-V

19  is proposing it.

20      THE COURT:  You'll have copies of those two things?

21      MS. SERAFYN:  I do, your Honor, yes, and I'll ask

22  Dr. Phenix about them.  I have copies as well.

23      THE COURT:  Good.

24      MS. SERAFYN:  But importantly, your Honor, the

25  respondent's own expert, or I suppose it's your designated

United States v. Todd Carta - Bench Trial Day 1

1    examiner, Dr. Prentky, acknowledges that hebephilia is a

2    legitimate diagnosis.  And then also importantly, the First

3    Circuit found in its opinion that the government had met its

4    burden of showing that Mr. Carta did suffer from a mental

5    illness, abnormality, or disorder, and that diagnosis was

6    paraphilia NOS (hebephilia).  So it's our position, as I

7    mentioned at the outset, that you don't even have to hear

8    testimony on that because it's already been decided.

9          Now, as I mentioned, Dr. Phenix does diagnose

10   Mr. Carta with other mental illnesses, abnormalities or

11   disorders, including hallucinogen dependence, cannabis

12   dependence, alcohol dependence, as well as a personality

13   disorder with antisocial and borderline traits; but, candidly,

14   your Honor, the real diagnosis at issue here is the paraphilia

15   NOS (hebephilia).

16         THE COURT:  Thank you.

17         MS. SERAFYN:  And I don't believe that any of those

18   other diagnoses are in dispute.

19         So, your Honor, that brings us to the real issue that

20   you should be hearing testimony on, which is the third element,

21   and the government will prove or expects to prove by clear and

22   convincing evidence that as a result of Mr. Carta's hebephilia,

23   he will have serious difficulty in refraining from sexually

24   violent conduct if released.

25         And I just want to talk a little bit about the

1   methodology that Dr. Phenix has been using here.  It's the same

2   that she used in the first trial.  The difference is that the

3   instruments are better.  The instruments have just been tweaked

4   to make them better.  And, obviously, this is sort of an

5   evolving science, so instead of the Static-99, we have the

6   Static-99R, which stands for Static-99 Revised.  And the only

7   thing that that does differently is, it just better accounts

8   for age.  And as your Honor is well aware, age is such a big

9   issue in these cases because respondents often argue that these

10  offenders essentially age out, and that the older they get, the

11  less sort of sexual interest they have generally.  And so these

12  instruments have taken age into account and better account for

13  it.  And in some instances the recidivism rates that we have

14  are actually a little bit lower, which obviously works to

15  respondent's advantage.

16         So Dr. Phenix scored three actuarial instruments in

17  this case.  She scored the Static-99 Revised, which your Honor

18  is very familiar with.  All of the questions are basically the

19  same.  She scored the Static-2002 Revised, again, simply an

20  instrument that better accounts for age; and she scored the

21  MnSOST-R, which is the Minnesota Sex Offender Screening Tool,

22  and that instrument she scored in the first trial as well.

23         So looking at those three actuarial instruments,

24  Mr. Carta falls within the moderate to high-risk range on those

25  three instruments.  And Dr. Phenix again will testify about

United States v. Todd Carta - Bench Trial Day 1

aad00d87-693c-4031-858e-4f9d2d8a97b1

1    scoring those instruments.  And when you look at what she

2    scored in the first trial, in the first trial she scored the

3    Static-99, she scored the MnSOST-R.  So that's virtually the

4    same here.  She hadn't scored the Static-2002 at that point

5    because I believe that it had really sort of come out after she

6    had issued her report; but Mr. Gold asked Dr. Phenix to score

7    the Static-2002 on the stand during trial, which she did, so

8    she just sort of scored it on the spot.

9             THE COURT:  Who asked?

10            MS. SERAFYN:  Mr. Gold on cross-examination asked

11   Dr. Phenix to score that instrument.  So the actuarial

12   instruments that she scores here are basically the same as the

13   ones she scored the first time around.

14            Now, after Dr. Phenix looks at the actuarial

15   instruments and the actuarial scores, as part of her risk

16   assessment, she considers other things such as dynamic factors

17   and protective factors.  So obviously the static instruments

18   ask questions that don't change, so she looks at dynamic

19   factors, things that do change, things like age --

20            THE COURT:  Well, she'll go through this on the stand,

21   but her bottom line is -- has he had sex offender treatment at

22   all?

23            MS. SERAFYN:  So that's what I was sort of leading up

24   to and I was going to end with --

25            THE COURT:  Okay.

United States v. Todd Carta - Bench Trial Day 1

aad00d87-693c-4031-858e-4f9d2d8a97b1

1        MS. SERAFYN:  -- is that Mr. Carta has had some sex

2    offender treatment while he was at Butner, but he stopped that

3    treatment.  He essentially dropped out.  The reasons are a

4    little cloudy, but essentially it appears that he dropped out

5    because at some point he voiced having an attraction to some of

6    the younger-looking inmates in the treatment program, and then

7    at some point there was an allegation that he was just sort of,

8    you know, not interested in participating anymore.  And so he

9    didn't even complete a significant portion of the sex offender

10   treatment.  He just simply didn't want to do it.

11       THE COURT:  So he's never, to your knowledge, had sex

12   offender treatment?

13       MS. SERAFYN:  No, your Honor, he hasn't.  Through that

14   treatment, though, we know that Mr. Carta has described that

15   his primary interest is in children ranging in age from twelve

16   to seventeen, and then he's described his secondary interest as

17   children seven to eleven.

18       Now, Dr. Phenix has not made a diagnosis of pedophilia

19   here.  She solely made that paraphilia NOS (hebephilia)

20   diagnosis, you know, I think because most of his sexual

21   activity with prepubescent children occurred when he was sort

22   of a teenager and adolescent himself, so that's why she hasn't

23   made that diagnosis; but I still think it's important that he

24   himself has admitted that his secondary attraction is to

25   essentially prepubescent children ages seven to eleven.

United States v. Todd Carta - Bench Trial Day 1

1          In addition, in the sex offender treatment that he did

2     participate in, he admitted that his child pornography

3     collection spanned up to about 20,000 images, and as I

4     mentioned, it was ranging, you know, children who were

5     essentially in diapers, toddlers, on up to --

6          THE COURT:  Were they just pictures of kids in

7     diapers, or were they sexual?

8          MS. SERAFYN:  No, they were sexual, but in terms of

9     the ages of the kids --

10          THE COURT:  "Sexual" means someone was having --

11     sticking, I mean --

12          MS. SERAFYN:  Yes.

13          MR. GOLD:  Your Honor, I don't think there's really

14     any evidence about this in the record.  This is just

15     Mr. Carta's own statements that he had a certain number of

16     images, but the content of them I don't think we can make

17     statements about.

18          THE COURT:  Do you know what the content was?

19          MS. SERAFYN:  I haven't seen them, your Honor, but in

20     terms of the description --

21          THE COURT:  Sexual intercourse?  In other words, they

22     weren't just pictures of a kid standing with diapers on?

23          MS. SERAFYN:  No, no, no.  I don't know that it was

24     sexual intercourse, but they were sexually explicit.  When I

25     used the phrase "child in diapers," I meant to describe, you

1    know, a two-year-old.  But it's not as if it was just a picture

2    of a two-year-old in diapers.  These were sexually explicit

3    photos.

4              THE COURT:  All right.

5              MS. SERAFYN:  So, your Honor, I just wanted to briefly

6    get back to the risk assessment piece because after the three

7    actuarial instruments, Dr. Phenix considers dynamic risk

8    factors.  And in the previous trial and in her previous risk

9    assessment, she would use this instrument called the

10   Stable-2007.  And it's not an actuarial instrument.  So she

11   would use this instrument to essentially determine where he fit

12   within these dynamic factors.  So, for example, you know, had

13   he had treatment, had he had, you know, a relationship with

14   someone for a certain period of time, all these sorts of

15   questions, this instrument, this Stable-2007 was just sort of

16   her guide.

17             That Stable-2007 has sort of fallen out of fashion, as

18   it were, and the instrument that's favored now is the SRA: FV,

19   which stands for "forensic version."  So this SRA: FV, your

20   Honor, although it may seem like a new instrument, is actually

21   just an instrument that replaces the Stable-2007 which she used

22   before.  And this isn't an actuarial instrument.  Again, it's

23   just a sort of list of factors, and what this instrument does

24   is, it enables Dr. Phenix to figure out which sample --

25             THE COURT:  But can I say, has it been published?

United States v. Todd Carta - Bench Trial Day 1

1       MS. SERAFYN:  Your Honor, it has been validated.

2       THE COURT:  Excuse me.  Has it been published in a

3   peer-reviewed journal?

4       MS. SERAFYN:  I don't know that it's been published in

5   a peer-reviewed journal, but I do know that the instrument has

6   been validated, that there was --

7       THE COURT:  By whom?

8       MS. SERAFYN:  Well, Dr. David Thornton is the author

9   of the instrument, and in his research, the instrument has been

10  validated.  There has been a training on it.  The training was

11  actually at the beginning of December.  Over one hundred --

12      THE COURT:  December of this year?

13      MS. SERAFYN:  December of this year.

14      THE COURT:  I can't do that to defense counsel.  It's

15  too recent.  You've got to -- I mean, these all have -- we're

16  not doing that.

17      MS. SERAFYN:  Your Honor --

18      THE COURT:  It's not fair.

19      MS. SERAFYN:  The only thing that I would say about

20  that, your Honor, is, I think the reason why the government is

21  bothered by that is because we -- after this was remanded from

22  the First Circuit, the respondents had requested that Dr. Bard

23  be allowed to do a reevaluation of Mr. Carta and that

24  Dr. Prentky be allowed to do an evaluation --

25      THE COURT:  Did they use this dynamic list of factors?

United States v. Todd Carta – Bench Trial Day 1

1        MS. SERAFYN:  They don't, but, you know, your Honor,

2    we have the leading expert in the field, and it seems

3    prejudicial --

4        THE COURT:  Excuse me, but the rules -- let's just get

5    beyond sex offenders -- the basic rule, the basic rule is, you

6    don't pop surprise expert testimony and methodology on the

7    other side.  Now, I'm not accusing you of doing that because it

8    sounds so new, you couldn't have done it before then.  That

9    having been said, this case has been pending for four years.

10   You've got plenty of ammunition in your quiver.  We don't need

11   a -- I'm not going to start with a Daubert hearing right now on

12   a brand-new method.

13       MS. SERAFYN:  I understand, your Honor, but just for

14   the record, I just wanted to get out that it seems that the

15   reason why respondents wanted these new evaluations is because

16   their argument is that we can't commit, potentially commit

17   Mr. Carta on "old information," we can't commit him on

18   information dating from last year or two years ago when these

19   experts issued their reports.

20       THE COURT:  Excuse me, excuse me.  I'm not going with

21   a brand-new study that no one's seen, that has not been peer

22   reviewed, that they haven't seen the underlying data on until

23   this morning, is that it?  I'm not doing it.  Now, if in fact

24   after we now -- unfortunately, Dr. Prentky and the other doctor

25   are not available this week.  I don't know what I'll do

United States v. Todd Carta - Bench Trial Day 1

1   eventually in a rebuttal.  But I will tell you, for right now

2   in your case in chief, it's not fair, and I'm not going to do

3   it.  I don't understand why it was just updated two weeks ago

4   or three weeks ago.  We've known this trial has been here for a

5   very, very long time.  If we knew this new -- what did you call

6   it? -- SRA: FV was coming down the pike, why not let them know

7   a couple of months ago?

8         MS. SERAFYN:  Well, we didn't know.  I mean, we asked

9   Dr. Phenix to do --

10        THE COURT:  I understand.  I'm not blaming you.  I'm

11  not saying it's not like some repressing, you know,

12  information.  I'm not doing it.  It is a rule, Federal Rules of

13  Civil Procedure, you don't surprise people with expert

14  testimony with new methodologies.  So now they're extending it

15  out because these doctors aren't available, so if at the end of

16  it, you know, there's time for them to evaluate it and it's

17  appropriate for rebuttal, maybe I'd consider it, but right now

18  we're not doing a brand-new methodology.  She can testify on

19  the factors she's considered.  I mean, that's fair.

20        MS. SERAFYN:  And just to clarify, your Honor, I don't

21  think it's a new methodology.  It's simply a different

22  instrument.  I mean, the methodology is --

23        THE COURT:  I don't know why those aren't synonyms.

24        MS. SERAFYN:  Because I think the methodology is sort

25  of -- I would think of methodology as, for example, the

United States v. Todd Carta - Bench Trial Day 1

1    consideration of dynamic risk factors.  This is still

2    consideration of dynamic risk factors.  It's the same

3    methodology.  It's just using the SRA instead of the Stable.

4         THE COURT:  It's gobbledygook to me.  I don't even

5    understand what you're talking about because, first of all, as

6    you know, I've never received the report, so I'll read about

7    them.  But let's get going.  Let's get her here after Mr. Gold

8    speaks.

9         MS. SERAFYN:  Okay.  So, your Honor, then just to sum

10   up, you know, I think even if your Honor wanted to ignore the

11   SRA, I think the dynamic risk factors are still there and --

12        THE COURT:  She can testify about what she considered.

13   A lot of this is common sense, as far as I'm concerned.

14        MS. SERAFYN:  I don't disagree.

15        THE COURT:  This is my fourth trial.

16        MS. SERAFYN:  I don't disagree, your Honor.

17        THE COURT:  Age is common sense, you think about it,

18   right?  Did he go through sex offender treatment?  Did it work?

19   Was he involved in stable relationships?  Those are common

20   sense, right?

21        MS. SERAFYN:  I don't disagree, your Honor, and I

22   think that a key piece here is, you know, apart from what the

23   actuarial instruments show, which is that he's moderate to high

24   risk, a key piece here is, as I mentioned earlier, he hasn't

25   had sex offender treatment.  In fact he dropped out, and the

1    expert testimony or, you know, experts have testified that

2    treatment failure is an indication or can be related to

3    increased recidivism.

4           THE COURT:  Sure.  Okay, all right.

5           MS. SERAFYN:  So, your Honor, just to sum up, you

6    know, I think through testimony of Dr. Amy Phenix, she'll show

7    that Mr. Carta will have serious difficulty in refraining from

8    sexually violent conduct or child molestation if he's released.

9           THE COURT:  All right, thank you.

10   OPENING STATEMENT BY MR. GOLD:

11          MR. GOLD:  Thank you, Judge.  As you started to point

12   out, the central fact, from our perspective, is the fact that

13   Mr. Carta has never been sanctioned for a sex offense and then

14   reoffended.  He's on his first significant sentence of any

15   kind, the most he did in prison.  He's got a pretty significant

16   but very low-grade criminal history when he was a younger man,

17   larcenies and burglaries and things like that, never did more

18   than, I think, six months in prison, and then he's got this

19   major catastrophe.  He got arrested for the child porn and was

20   sentenced in October of 2002.  This is it.  He's in prison for

21   coming on a decade.  In some way, he's not the prototypical

22   person who would be pulled out and isolated for this type of

23   special commitment.  He's not someone that we have the evidence

24   for that probation or, you know, outside treatment is not

25   adequate to protect the public and so forth with Mr. Carta.

United States v. Todd Carta - Bench Trial Day 1

Page 34

1   The evidence simply isn't there.

2          THE COURT:  Where did all of these reports of this sex

3   with thirteen-year-olds come from?

4          MR. GOLD:  Well, your Honor, Mr. Carta spent a

5   significant period of his life in the Butner sex offender

6   treatment program, approximately seven months.  And in contrast

7   to the government's representations, that was treatment,

8   although he withdrew.  I think at the time when the Court is

9   considering this and has a granular view of what really went on

10  there, that Mr. Carta made substantial gains which are still

11  with him.

12         Everything that we know about him comes from his own

13  disclosure.  He made significant disclosures in treatment in

14  the process of -- there was the development of a psychosocial

15  history questionnaire.  They do the full-court press down there

16  in Butner.  They did all sorts of testing on him and things

17  like that, and ultimately he washed out, and we'll be getting

18  into the details about that.

19         The government made reference to Dr. Phenix has been

20  the leading expert in the field, and so as defense counsel in

21  the case, one of the tasks I see is trying, at least, making an

22  effort to make a dent in her credibility if I can.  But this

23  report, which I hadn't quite begun to digest when we received

24  it and when we were in here and I was begging the Court for a

25  continuance before actually sort of looking through that, I

1   think at this point the sex offender gain, your Honor, I'll

2   call it the sex offender industry, has reached this kind of

3   level of self-parity.  The report that we got is 22 pages long.

4   It alludes to the other report but doesn't actually repeat much

5   of the information in there.  It goes on and on about samples

6   and things like that, and I do contest very much that this

7   isn't a new methodology, and I'll just get into that very

8   briefly, but the trial in front of Judge Tauro went like this:

9   We contested primarily the validity of the diagnosis.

10  Dr. Phenix diagnosed Mr. Carta with paraphilia NOS (hebephilia),

11  as the government said.  We said that -- we put on evidence,

12  Dr. Bard, Dr. Leonard Bard, who's worked in the field himself

13  for a considerable amount of time, said that's not a diagnosis

14  that's in the book; and to interpret paraphilia NOS to allow a

15  diagnosis of hebephilia is sort of an end run.  And I think the

16  gist there of what the testimony was was that this is pressure

17  from the court system basically to pathologize new areas of

18  conduct.

19      At the time the Blanchard group, the government made

20  reference to a particular article by -- there is a research

21  group up in Canada.  Ray Blanchard is the principal researcher.

22  They've been doing research, and they're proposing a hebephilia

23  diagnosis.  And they have proposed it, and the DSM-V isn't

24  coming out for quite a while, but just there, I think that adds

25  credence to the argument that it's not something that's

United States v. Todd Carta - Bench Trial Day 1

1    generally accepted.

2         THE COURT:  Well, maybe, maybe not.  It just hasn't --

3    the jury's out, right?  They haven't decided yet.

4         MR. GOLD:  Well, you know, frankly, your Honor, to be

5    perfectly candid, I think it's likely that their proposal will

6    be adopted.  There is a lot of controversy about it.  In fact,

7    there are research articles going both ways talking about it as

8    a pretextual diagnosis, criticizing the research.  But they

9    have a research-based empirical proposal, right, that this is a

10   discriminatable class of people and that we should call it a

11   "disorder," and they have a proposal, and as the government

12   said, they propose extending the pedophilia concept a few more

13   years, essentially.

14        But in the article in which they advance this, they

15   say essentially -- and I don't know exactly how mechanically

16   we're going to do it, but we're going to want to put this

17   social science research in front of the Court so the Court can

18   consider it -- but no one would want to pathologize sexual

19   interest in late adolescents.  That's what they say, and what

20   they are proposing is that this diagnostic class --

21        THE COURT:  You keep using the word "they."  Are you

22   referring to the Blanchard group?

23        MR. GOLD:  This research group, this research group

24   that has done --

25        THE COURT:  Not the American Psychiatric Association?

United States v. Todd Carta - Bench Trial Day 1

1          MR. GOLD:  No, no.

2          THE COURT:  But The Blanchard group.

3          MR. GOLD:  But the reason why I said it's likely to be

4     adopted is that this research group is on the paraphilia

5     subcommittee that's considering it, so the writing very well

6     may be --

7          THE COURT:  Do you know when that decision will be

8     made?

9          MR. GOLD:  I think 2013 so not for some time.

10         THE COURT:  Oh.

11         MR. GOLD:  Yes, yes, I think that's right.  I think it

12    was supposed to be 2012, and I recently heard that it's slower

13    even than that.

14         And as the Court is saying, this diagnosis is relevant

15    to when we move on to the third prongs.  I don't think that

16    there's this even division.  In fact, when people talk about

17    pedophilia, they talk about whether there's a fixated type,

18    whether someone has other outlets, whether this sexual

19    orientation or attraction wanes over time.  And, I mean, part

20    of the issue, not having a validated or a fully accepted

21    diagnosis is, we can't make confident statements about that.

22         THE COURT:  Well, would you agree that that issue has

23    been resolved?  Although it may well be relevant to what I do

24    on prong three --

25         MR. GOLD:  Well, the First Circuit has given us this

1  remand.  I think it is relevant, so we should hear testimony

2  about it.  We have two experts.  One, Dr. Prentky relies on

3  this research and says carefully, "I think it is defensible to

4  diagnose pursuant to this."  But he finds that the way that

5  Dr. Blanchard and Dr. Cantor and this research group in Canada

6  have defined it, he doesn't fit.  Despite the three

7  thirteen-year-olds that you heard about, what is clear is that

8  the overwhelming evidence is that Mr. Carta has sexual interest

9  in carrying on with these late adolescents.  He had the

10  relationship with the seventeen-year-old and the other conduct,

11  and that what he's interested in is people who are sexually

12  developed and youthful-looking.  That's his diagnosis.

13       And in fact at the first trial, we had a difference of

14  view on all this research.  The government cited the same

15  research we did to say, look, hebephilia exists.  We cited this

16  research to say, look, it doesn't exist because they're

17  proposing it right now for inclusion in the DSM-V; and even if

18  you were to accept that, it doesn't include our guy because our

19  guy is mostly interested in this other stuff.  And this is an

20  important distinction.  Dr. Bard I think made it very well, and

21  it goes to the heart of the project of what we're doing here,

22  which is the distinction between criminal and civil

23  proceedings.

24       Mr. Carta was not living a life that we would consider

25  to be commendable.  He was involved with young people who are

United States v. Todd Carta – Bench Trial Day 1

1    probably too young for him.

2           THE COURT:  How old is he now?

3           MR. GOLD:  He's fifty, recently turned fifty, and

4    that's a significant number in this world.

5           I just wanted to again talk very briefly about a

6    couple of the incidents that the government alluded to because

7    they were not -- what we have on all these incidents is his own

8    report, right?  He gave his own accounting of everything

9    sexually that ever happened to him.  In the government's

10   recounting of him, he himself was sexually abused, as is not

11   uncommon.  That's always kind of omitted in these recountings

12   of Mr. Carta's life.  It seems like the family life was

13   difficult for him; very overbearing mother, siblings that were

14   much removed from him in age, and then these instances of

15   sexual abuse that we'll hear a little bit more about.  But then

16   the --

17          THE COURT:  Did he ever get psychiatric care?

18          MR. GOLD:  Psychiatric care as a young person?  No,

19   no.

20          THE COURT:  So he's never really had treatment of any

21   kind?

22          MR. GOLD:  Well, we're going to dispute that.  The

23   correctional treatment that he had in Bureau of Prisons is

24   significant to us.  First of all, he completed essentially a

25   yearlong program, you know, just on general criminality called

United States v. Todd Carta - Bench Trial Day 1

aad00d87-693c-4031-858e-4f9d2d8a97b1

1   the Code Program at the Bureau of Prisons, and he passed that

2   with flying colors.  And I think that you'll see -- and it's

3   well documented, his interactions with his therapist there --

4   that he's someone who really discloses, engages with treatment.

5   He did this with his therapist in the Butner program as well,

6   but things got complicated, and you'll see that it was a

7   process.

8           One of the things that happened with him is, he sort

9   of can be dramatic.  You'll get a feel for his personality.  He

10  wants to leave.  He says, "I'm quitting this.  I can't do it.

11  I can't stand it anymore."  The therapist in the Code Program,

12  who was a licensed social worker, constantly cajoled him back

13  into the program, and he completed the program.  He was doing

14  exactly the same pattern in the Butner program, and it was a

15  voluntary program, and unfortunately he did it again.  And then

16  at some point, and he said to his therapist, "I feel too

17  embarrassed to come back again after representing that I'm

18  going to quit."  And unfortunately he didn't continue, and if

19  he had, he might not be in this position today.

20          And just to skip to the end, your Honor, we're

21  essentially arguing that Mr. Carta is not a high-risk offender,

22  and that when he's released, like many other people in his

23  situation, he's going to be on intensive supervision in the

24  state of Connecticut.  We had testimony, which I think we'll

25  just be putting before the Court in writing, from the probation

1  officer and his sex offender treatment provider about what's

2  going to be provided, and we're going to be arguing that that's

3  adequate for him.  It's a risk-mitigating thing.

4       There is a couple of things that are just -- I do want

5  to seize on them and then move on a little bit.  There is a

6  thirteen-year-old that he's said to have a relationship with,

7  but it's a relationship that extends a significant amount of

8  time, right?  And so he is in a relationship and it's

9  inappropriate, but it continues into what the current research

10  group says is the nonpathological zone, fourteen, fifteen.

11  This would take him out of the realm of the mental disorder if

12  we were considering that for the first time.

13       THE COURT:  So the Blanchard people would agree that

14  after a certain point it's not a disease, after fourteen?

15       MR. GOLD:  That's what they say.  I go back to that

16  comment.  No one would want to pathologize sexual interest in

17  late adolescents.  And, again, they're proposing this.  It's

18  being talked about and presumably further defined.  One of the

19  criticisms that we had and Dr. Phenix has said in testimony,

20  "The purpose of a diagnosis is so when I say something, other

21  clinicians know what I'm talking about."  The interesting thing

22  about her new report is, in her prior testimony, she said very

23  clearly that her diagnosis of paraphilia NOS (hebephilia)

24  includes people who have sexual interest in teenagers, period,

25  anyone up to seventeen or eighteen years old.  Her testimony on

aad000d87-693c-4031-858e-4f9d2d8a97b1

1   that is quite clear.  It was a different diagnosis than the one

2   that's being proposed.  It's a very interesting situation.  I'm

3   going to ask her about that.  But now in her new report she's

4   referring to this elegant research study by Blanchard and how

5   that supports her --

6          THE COURT:  "Elegant" is her word or yours?

7          MR. GOLD:  She says "seminal," but she's, you know,

8   lauding this research study.

9          THE COURT:  But you're not running away from

10  Blanchard, are you?

11         MR. GOLD:  No.  We like Blanchard.

12         THE COURT:  Okay, sort of everybody, that's the

13  cornerstone right now.

14         MR. GOLD:  Well, let me withdraw that.  I spoke a

15  little loosely.  We're presenting the Court with, again, we

16  respectfully disagree with the First Circuit.  I'm not sure

17  whether that matters for this proceeding, but we don't concede

18  that element.  But Dr. Bard still testifies that it's not

19  generally accepted, and he's got good reasons.  Dr. Prentky has

20  a more nuanced position in the middle saying, "Well, I think

21  it's defensible to diagnose based on what this group is doing.

22  I think that's defensible, even though it's not in the DSM,"

23  but he doesn't do it.  And then we have Dr. Phenix who's --

24         Now, a lot of these things take on enormous importance

25  in this case in contrast to the case that this Court has seen

United States v. Todd Carta – Bench Trial Day 1

1   where we have people who are reoffending after being convicted

2   of a sex offense, serving time in prison, being on probation.

3   We don't have any of that evidence here.  Also, in contrast to

4   cases that this Court has seen, we don't have evidence of

5   sexual acting out in prison:  creation of pornography, ordering

6   of certain things.  That evidence is simply not present in this

7   case.  What we have is a pretty uneventful disciplinary record

8   for the past close to a decade for Mr. Carta.

9           Because all of the incidents come from his own

10  account, there aren't official records about them.  We just

11  have his story about them, and they take on this life of their

12  own which is not supported by other records.  So, for example,

13  the BB gun incident is another thing where he is -- it's -- and

14  I don't know.  I think this is, you know, ultimately a question

15  of temperament, and maybe we'll have the experts tell different

16  stories about these offenses and put it together, but, you

17  know, he has this sexually charged conversation with another

18  fifteen-year-old.  The fifteen-year-old doesn't want to engage

19  in sexual contact with him, and he shoots him in the coat with

20  a BB gun, and then they have sexual contact going on for

21  months.

22          So how to understand that incident, the government

23  takes the view that this is coercion, as if the young man

24  returned to him and they had this ongoing relationship because

25  he was afraid of being shot with a BB gun again or something

United States v. Todd Carta - Bench Trial Day 1

1    like that, when I think, you know, a lot of these things put in

2    context in their proper place, you know, should shrink in

3    importance.

4         I think we're almost ready to go.  I want to talk

5    about Dr. Phenix.  I disagree that she's a leading expert in

6    this field.

7         THE COURT:  Excuse me.  In any event, the BB gun

8    situation, from looking at my notes, was a fifteen- to

9    sixteen-year-old, wasn't it?

10        MR. GOLD:  That's right.  I mean, they were peers,

11   they were peers.

12        THE COURT:  I mean, it's pretty terrible if it was a

13   thirteen-year-old, but he was the same age as this guy.

14        MR. GOLD:  Right.  They were two boys, correct, right,

15   right.

16        Right, I think what gets him into prison now is a

17   couple of things, and this, you know, gives you -- you know,

18   Mr. Carta can be a jerk, right?  I mean, you know, they

19   diagnose him with borderline personality disorder, whatever,

20   but he's in this relationship with a seventeen-year-old.  They

21   have a big fight because he's desperately in love with the

22   young man, he feels.  They were having some conflict, the

23   seventeen-year-old, probably an exploitive relationship but not

24   something I think that you can be committed for.  He gets a

25   disorderly conduct conviction and is in prison for a short

United States v. Todd Carta - Bench Trial Day 1

aad00d87-693c-4031-858e-4f9d2d8a97b1

1    period of time.

2         He then gets so angry that he writes letters trying to

3    humiliate this man, right, about revealing details about his

4    sex life to his own family.  That was Mr. Carta's undoing

5    essentially.  Then that young man, Fred, told the police about

6    the letters, mentioned of the child pornography.  There had

7    been some other incidental investigation of the child

8    pornography, and there he gets arrested.  After he gets

9    arrested for that, then this incident from the past with Fred's

10   younger brother comes up, and he -- I feel like I'm wading too

11   deep into the details.

12        THE COURT:  You may be.  Maybe we should get going

13   with the --

14        MR. GOLD:  Let me just briefly state our position on

15   the science, and then we'll get going.  What the Court heard in

16   the Shields case was basically what the Static-99 had been for

17   the previous ten years.  You heard extensive evidence from

18   Dr. Daniel Kriegman.  I think Dr. Tomich was the government

19   expert in that case, right?

20        THE COURT:  Dr. Tomich, yes.  He was no statistician

21   and he didn't pretend to be.  I mean, I think he was just

22   putting in what he used.

23        MR. GOLD:  But the point here is that that had been

24   the state of affairs in this field for about ten years, since

25   the Static-99 came out.  They said certain things about it.

United States v. Todd Carta - Bench Trial Day 1

1   It's got moderate predictive accuracy.  That means that it

2   sorts people from high to low pretty well, right?  Not

3   perfectly well.  It's got associated risks of recidivism from

4   this original what they call a development sample, and that

5   also had been the same for many years.  There was contention in

6   the field about whether that development sample had risk

7   estimates that were too high.

8        Now, Dr. Phenix's career spans sort of the growth of

9   the sex offender commitment industry, actually, I think pretty

10  neatly, right?  It starts in 1990, so does her career, and I'll

11  talk to her a little bit about that; but since that time, this

12  group, the Association For the Treatment of Sexual Abusers, has

13  become a big production, right?  They have a big conference

14  every year.  I did this work as a state public defender before

15  coming to the Federal Defender for two years, these commitments

16  in state courts, and they sent me there to one of these things,

17  and, you know, it's a conference where people have the name

18  cards and so forth.

19       And so since the Court heard testimony about this,

20  there has been this major hubbub about the Static-99, what it

21  means, how to interpret it, and I believe -- and it's funny,

22  the Dr. Hanson that you've heard about just wrote an article

23  talking about developments in the field over the past two

24  years:  It's like we're building a ship while the ship is

25  sailing and it's got completely new wood.  It's like a

United States v. Todd Carta – Bench Trial Day 1

1    different ship.  But that's a good thing, they say.  You know,

2    but that is the developer of the instrument saying that about

3    what's been happening over the last two years.

4         What they did was, they did a major rerunning of the

5    Static over contemporary samples, and they found that the

6    recidivism rates overall had dropped substantially.  And then

7    they said:  Well, what we're going to do is, we're going to cut

8    the samples into a high-risk sample and a low-risk sample.  So

9    if an evaluator says, well, you got a 6 but you're in the

10   high-risk sample, so this is your percentage recidivism rate,

11   this is how risky you are, but if you're in the low, then you

12   have a very different recidivism potential that's being

13   reported to the court.  And so that was the first thing they've

14   done.  And that was a couple of years ago now, so that's not

15   new, but what's been happening now is that they're adding layer

16   upon layer upon layer of complexity to this project.  And I

17   mentioned conspiracy theory before, but it seems to me that one

18   of the major purposes of this is to tailor this type of stuff

19   for reporting in courts to justify high-risk opinions.  That

20   seems to be one of the purposes of it.

21        Now we have four samples.  You have these criteria,

22   which apparently are not peer reviewed, that an evaluator has

23   to put someone in one of the --

24        THE COURT:  What's that called, the one that's not

25   peer reviewed?

United States v. Todd Carta - Bench Trial Day 1

1          MR. GOLD:  Well, the Static-99R and the Static-2002R,

2     right, there's the Static-2002 which came out, but now they're

3     both R, that's from the big ATSA conference in November of '09,

4     right?

5          THE COURT:  Those have both been around for a while.

6          MR. GOLD:  Well, yes, they have.  They have been

7     around since November of '09.  And the age part is one of them.

8     That was what the government said is the only change.  But the

9     putting people into different risk bins and then running the

10    score for them, that is new and has not been peer reviewed at

11    all.  As far as I'm aware, there is only --

12         THE COURT:  Well, you can ask her about that, but

13    those -- I mean, I've heard of certainly the Static-99R.  I

14    don't remember about the 2002.  But you'll be able to ask about

15    those.  I don't want to do that now.  The only thing that's

16    brand-new to you that you've never heard of before was what you

17    told me about before, the SRA: FV.

18         MR. GOLD:  Right, the SRA: FV, and, I mean, the

19    purpose of that instrument is twofold.  She says it allows her

20    to justify putting the guy into the high-risk group.  That's

21    why I went into all this business about the high-risk group.

22    They've been criticized for saying, "Look, you just put people

23    in the high-risk group for whatever reason," and she said,

24    "Well, now I have this instrument" -- I think that's what she's

25    saying -- "and it's a technical instrument, and that allows me

United States v. Todd Carta - Bench Trial Day 1

1    to justify putting someone in the high-risk group," which is a

2    very controversial and contested operation to begin with.  I

3    think in the Wetmore case, for whatever reason, the novelty of

4    this process wasn't developed.  And then that's what this

5    instrument is being used for, to put him in the high-risk

6    group, and then also to justify a statement that even that

7    recidivism percentage is an underestimate for this man.

8            THE COURT:  But that's the one you'd never seen

9    before?

10           MR. GOLD:  That's right.  That's the one that I think

11   had a training about in, I guess, early December.

12           THE COURT:  And is that the one you just got the data

13   on this morning, you said?

14           MR. GOLD:  Well, we didn't get the data, but we did

15   get a scoring sheet or a scoring manual which is dated

16   September 6 of 2010.

17           THE COURT:  Okay, thank you.  Who are you planning on

18   calling as witnesses?

19           MR. GOLD:  Our two guys and potentially Mr. Carta, our

20   two experts, the examiners.

21           THE COURT:  Well, Prentky is joint.  He's not really

22   your expert.

23           MR. GOLD:  Well, he's the defense-selected examiner

24   the statute allows, and then Dr. Bard was, I think, the initial

25   examiner.

United States v. Todd Carta – Bench Trial Day 1

1           THE COURT:  He's the one that I appointed?

2           MR. GOLD:  No.

3           MS. PIEMONTE-STACEY:  Dr. Bard was appointed by

4    Judge Tauro.

5           THE COURT:  By Judge Tauro.

6           MS. PIEMONTE-STACEY:  Yes, your Honor, he's the court-

7    appointed.  And then when they asked for the supplemental

8    reports, they also asked if Dr. Prentky could be appointed, and

9    this Court allowed those motions.  That was in April.

10          THE COURT:  Good, all right.  All right, thanks.

11   Let's get going.

12          MS. PIEMONTE-STACEY:  Before we get going, your Honor,

13   may I ask to clarify.  What the First Circuit has said is that

14   on this whole hebephilia piece, that it was clear error to say

15   that the DSM excluded this intense sexual fixation on young

16   teenagers accompanied by a pattern of conduct such as

17   Mr. Carta's.  They said that Dr. Phenix provided ample reason

18   to conclude that Mr. Carta fell within the paraphilia NOS

19   diagnosis in the DSM, and that even if they improbably

20   found -- and that's their words, not mine -- even if they

21   improbably found that Mr. Carta fell outside of that

22   DSM-recognized affliction, that the reach of 4248 doesn't

23   extend to conditions only in the DSM, that line of Hendricks

24   Supreme Court cases.  So we were not planning -- I mean,

25   obviously you need to hear, "I diagnosed him with hebephilia,"

United States v. Todd Carta – Bench Trial Day 1

1  but we were planning on focusing on the third prong.  Would

2  this Court, knowing that that piece, at least in our opinion,

3  is settled, do you want us to take you through the whole

4  paraphilia NOS (hebephilia)?

5       THE COURT:  Well, yes.  I'm not sure I need to revisit

6  it, but it is definitely relevant to the third piece; for

7  example, if he fell within the area, the heartland area where

8  everyone agrees there might be a problem, which is the younger

9  end, the thirteen-year-olds, as opposed to if it's at the

10 higher end like the fifteen-year-olds or sixteen-year-olds.  It

11 seems as if Mr. Gold is making a distinction between the two.

12 I'm learning the case as I'm going.  It's relevant to me if she

13 initially gave the diagnosis because it spanned both groups,

14 right?

15      MS. PIEMONTE-STACEY:  It's whatever the Court wants.

16      THE COURT:  Yes, I'd love that, or at least I'd need

17 that to understand whether or not he could -- well, if there

18 was new information that in fact he was mostly attracted to

19 sixteen- and seventeen-year-olds as opposed to thirteen- and

20 fourteen-year-olds, and that's where the science is going that

21 it's the younger age group -- do you agree that's where

22 Blanchard is going?

23      MS. PIEMONTE-STACEY:  No.  Well, Blanchard, the

24 Blanchard article I think does do eleven to fourteen or eleven

25 to fifteen, that's set, pedohebephilia that's proposed for

1  inclusion within the DSM-V.

2       THE COURT:  I can't remember what you told me, but

3  eleven to fourteen is what you told me, is that right?  Is that

4  what Blanchard does?

5       MS. PIEMONTE-STACEY:  That's the 2008 article, yes.

6  But we don't take the position that that's the only time you

7  can have a paraphilia NOS (hebephilia).

8       THE COURT:  Well, sure, if you're so obsessed with

9  someone's ankle, you can be a paraphilia.  But in terms of what

10 I'm worried about, I'm worried about whether or not he's got a

11 mental disease or disorder that he can't control, so it matters

12 to me if the science and the literature is changing since the

13 First Circuit opinion.  It sounds like it has, right?

14      MS. PIEMONTE-STACEY:  No, your Honor.  Actually I

15 think the First Circuit -- even if it has, the First Circuit

16 opinion is consistent with the, it doesn't have to be in the --

17      THE COURT:  Fair enough, it doesn't have to be.  I

18 agree with that, it doesn't have to be.  I mean, just the

19 question is, it can be in peer-reviewed literature.  Totally

20 agree, totally agree with the First Circuit.  But if the

21 peer-reviewed literature now is saying something a little

22 different than what Dr. Phenix had originally testified to,

23 don't I need to know about it?

24      MS. PIEMONTE-STACEY:  Yes, absolutely, and I guess I'm

25 saying, I don't think that that's the case.

United States v. Todd Carta - Bench Trial Day 1

1          THE COURT:  Okay, fair enough.  It may not be.  It's

2     now ten -- what's it now?  Do you want to get going the first

3     twenty minutes?  I think that makes sense to get it going.  And

4     how long do you anticipate her testimony will be?

5          MS. SERAFYN:  Not more than two hours on direct.

6          THE COURT:  Oh, we will definitely go into tomorrow

7     morning, right?  I mean, how long do you think you'll have?  At

8     least two hours, right?

9          MR. GOLD:  About two hours.

10         THE COURT:  She's going to be here tomorrow, right?

11    She's going to stay overnight?

12         MS. SERAFYN:  Yes.

13         THE COURT:  Okay.  And during the break what I'm

14    hoping is that you can give phone numbers so we can make some

15    calls to Bard and Prentky and get definite dates here because I

16    forget.  That's the other issue.  I don't remember.  As you can

17    tell, I've got four of these, and to boot, one is coming back

18    for reexamination.  So I'm starting to mingle them, and I've

19    got to keep it clear.  So why don't we call --

20         MR. GOLD:  We'll just maybe do a first pass with

21    Mr. Alba, seeing if we --

22         THE COURT:  Yes, yes.

23         MS. SERAFYN:  Your Honor, the government calls Dr. Amy

24    Phenix.

25         MS. PIEMONTE-STACY:  Your Honor, may I have a moment

Page 54

1   just inform Dr. Phenix about the instrument that's being

2   excluded?

3         THE COURT:  Well, I think the first twenty minutes we

4   won't get to that, will we?  Do we?  I mean, I have no problem

5   with you talking with her over the break.  If we get to it

6   earlier, just let me know.  Okay.

7                        AMY PHENIX

8   having been first duly sworn, was examined and testified as

9   follows:

10         THE CLERK:  Would you please state your name and spell

11   it for the record.

12         THE WITNESS:  Amy Phenix, A-m-y P-h-e-n-i-x.

13         MS. SERAFYN:  Your Honor, with the Court's permission,

14   I was actually going to bypass Dr. Phenix's professional

15   background and experience in her CV.  That information is

16   already in the record, and I don't believe that there's any

17   objection to her qualifications as an expert.

18         THE COURT:  Fine, but what I do want to mark is her

19   first -- I want to mark her CV, her first report, and then her

20   supplemental report, and it's subject to the motion to strike

21   on the part that Mr. Gold was just provided information for

22   today.

23         MS. SERAFYN:  And would your Honor like to reenter

24   those as exhibits, or would you like me to point you to those

25   exhibits from the first trial?

United States v. Todd Carta - Bench Trial Day 1

1    THE COURT:  Let me ask you.  I don't have this whole

2  record that you think I have.  Robert, have we gotten it from

3  Judge Tauro?  We don't actually have it.  Did you all take back

4  the exhibits?

5    MR. GOLD:  Your Honor, I just found to my concern -- I

6  think we'll spend some time recreating the record.  I just

7  found that we have some defense exhibits with us that I thought

8  were in the court file, so --

9    THE COURT:  Where is the record, do you know?  Did you

10  take back your exhibits when you finished with Judge Tauro?

11    MS. PIEMONTE-STACEY:  I thought we had left them with

12  Judge Tauro, your Honor.

13    THE COURT:  We haven't even looked.  But, I mean,

14  typically what happens is the parties take back the exhibits.

15  Did you take them back?  Do you remember?

16    MS. PIEMONTE-STACEY:  I have no memory of taking them

17  back, your Honor.  It may have been that --

18    THE COURT:  We will try and find it at our end, but I

19  need you to all coordinate.  I don't have it, okay.  So at the

20  very least what we should do is -- we can wait on that -- is

21  mark the expert reports.  But why don't we get going with the

22  questioning while we're --

23  DIRECT EXAMINATION BY MS. SERAFYN:

24  Q.  Dr. Phenix, did you render an opinion in this case as to

25  whether Mr. Carta is a sexually dangerous person?

United States v. Todd Carta - Bench Trial Day 1

aad00d87-693c-4031-858e-4f9d2d8a97b1

1  A.   Yes.

2  Q.   And is that opinion to a reasonable degree of professional

3  certainty?

4  A.   Yes.

5  Q.   And what is your opinion?

6  A.   My opinion is that he qualifies as a sexually dangerous

7  person.

8  Q.   And did you write a report that contains your opinion?

9  A.   I actually wrote a report and an updated report.

10        MS. SERAFYN:  And, your Honor, I'd like to move

11  Dr. Phenix's updated report into evidence.

12        MR. GOLD:  No objection, subject to our motion.

13        THE COURT:  Yes.  So wait a minute.  What are we going

14  to mark it, Government Exhibit 1?  Do you have one to give

15  Mr. Alba?  I have one, but I'd sort of like to mark it up.  You

16  gave it to me this morning.

17        MS. PIEMONTE-STACEY:  I think that was the

18  supplemental, your Honor.

19        THE COURT:  Yes.

20        MS. SERAFYN:  Oh, I'm sorry.  That was the one that I

21  wanted to just admit into evidence now.

22        THE COURT:  The updated report.

23        MS. SERAFYN:  The updated, but, your Honor, in the

24  original trial, Dr. Phenix's report was Exhibit 1 and her CV

25  was Exhibit 2.

United States v. Todd Carta - Bench Trial Day 1

aad00d87-693c-4031-858e-4f9d2d8a97b1

1          THE COURT:  All right, so we'll do that, and so we'll

2      have the updated Exhibit 3, all right?  Does that make sense?

3          MS. PIEMONTE-STACEY:  Could we do 1-A, your Honor, and

4      then that way it's together?

5          THE COURT:  Yes, yes, yes, that makes more sense,

6      Exhibit 1-A.  I thought that as I said it.

7          (Government Exhibit 1-A received in evidence.)

8      Q.  Dr. Phenix, now, did you testify at the original trial in

9      this case before Judge Tauro?

10     A.  Yes.

11     Q.  And did you write a report in advance of that trial?

12     A.  Yes, I did.

13     Q.  And what was your opinion in that report?

14     A.  My opinion was that Mr. Carta qualified as a sexually

15     dangerous person.

16     Q.  And how does your second report differ, if at all, from

17     your first report?

18     A.  The second report actually utilized updated actuarial

19     instruments, revisions of the Static-99 to the Static-99R in

20     terms of the risk assessment.  It also included the Static-2002

21     Revised, which was not available at the time of the original

22     evaluation.  And I used a different but very similar dynamic

23     risk assessment instrument.  Instead of the Stable-2007, I used

24     the Structured Risk Assessment: Forensic Version.

25         MR. GOLD:  Objection, your Honor.

United States v. Todd Carta - Bench Trial Day 1

1          THE COURT:  Is that the one that just came into play?

2          THE WITNESS:  Yes.

3          THE COURT:  And when do you remember it first came

4     into play, was first validated and started being used?

5          THE WITNESS:  Well, it was validated last year, but it

6     was released for use at the Association for Treatment of Sexual

7     Abusers' meeting in October in Phoenix in a presentation by

8     Dr. David Thornton and myself.  I was unable to go because of a

9     death in the family, but he presented the data, the research on

10    the instrument there, as well as clinical examples on how to

11    use the instrument.  And then there was a two-day formal

12    training, certification training on the instrument December 2

13    and 3 by Dr. Thornton.  So it was released --

14         THE COURT:  As in last week or two weeks ago.

15         THE WITNESS:  Correct.  It was released in October at

16    ATSA, our professional meeting, and it's released for use at

17    the current time, if an individual is trained to use it.

18         THE COURT:  So let me just say this:  I have deep

19    concerns about your using something that he's really had no

20    advance notice of till today, so at this point I am not

21    allowing you to testify about it.  Can you use the dynamic

22    factors, the older list?

23         THE WITNESS:  Of course.  I can use the Stable-2007

24    from my original report.  The items actually are very similar.

25         THE COURT:  All right.  That's some of what we were

United States v. Todd Carta - Bench Trial Day 1

1    talking about while you were gone.  He just received the

2    training manual this morning.

3             THE WITNESS:  Right.  It's only released actually to

4    clinicians, so he didn't ask for it.

5             THE COURT:  I'm not here to fault you, but sort of the

6    basic rule of fair play in the courts is not to do that to

7    someone, so use the older --

8             THE WITNESS:  Sure, sure.  I wasn't requested.

9             THE COURT:  All right, thank you.

10            MS. SERAFYN:  Your Honor, also with the Court's

11   permission, I was actually background going to bypass questions

12   about the first element.  I don't believe that that's in

13   dispute at all.

14            THE COURT:  Fine.  But, remember, I'm a new kid on the

15   block on this.  To the extent that his prior acts are relevant

16   to any of the other prongs, it's important to get me there.

17   You don't need to walk me through it.

18            MS. SERAFYN:  Okay.

19   Q.   Dr. Phenix, I'd like to focus on the second element.  Does

20   Mr. Carta suffer from a serious mental illness, abnormality, or

21   disorder, in your opinion?

22   A.   Yes, he does.

23   Q.   What does he suffer from?

24   A.   Several.  I've diagnosed him with paraphilia otherwise

25   specified; hallucinogen dependence, I would add, in a

United States v. Todd Carta – Bench Trial Day 1

1    controlled environment; Cannibis dependence in a controlled

2    environment; alcohol abuse in a controlled environment; and

3    also I diagnosed him with personality disorder not otherwise

4    specified with antisocial and borderline traits.

5    Q.   And how did you go about making these five diagnoses?

6    A.   Well, I examined the records, you know, his history, his

7    psychiatric history, his history of criminality, drug use, and

8    believe that through an examination of his case records,

9    including fairly extensive treatment records from the SOTP

10   program, that he meets the Diagnostic and Statistical Manual of

11   Mental Disorders' Fourth Edition Text Revision definition of

12   these various disorders.

13   Q.   Did you make any diagnoses in your supplemental report

14   that you did not make in your first report?

15   A.   No.

16   Q.   And I want to just focus on the first diagnosis,

17   paraphilia NOS.  Can you describe what that is?

18   A.   Right, a paraphilia is a sexual abnormality.  It's defined

19   in the Diagnostic and Statistical Manual, which I'll now call

20   the DSM for short, as an individual who experiences recurrent,

21   intense, sexually arousing fantasies, sexual urges, or

22   behaviors involving three general groups.  The first of those

23   would be nonhuman objects such as women's panties or shoes,

24   sexual arousal to that.  The second would be having to do with

25   sexual sadism, sexual masochism, and that is the suffering or

1    humiliation of oneself or one's partner, that that would be

2    sexually arousing to you.  And the third category of paraphilia

3    would be children or other nonconsenting persons.  So that

4    would be prepubescent children such as in pedophilia, or in

5    sexual violence, rape-type of behavior for nonconsenting

6    persons.  This disorder is a longstanding and pervasive

7    disorder that lasts throughout a person's lifetime.  The DSM

8    would indicate at least a six-month period of time that one

9    would experience these various symptoms, and also that the

10   symptoms or the disorder would cause the person distress or

11   impairment in their life, such as a significant loss of

12   freedom; going to prison, getting in trouble with the law.

13        MS. SERAFYN:  Your Honor, the diagnostic criteria for

14   paraphilia was entered as Exhibit 11 in the previous trial, and

15   I'd like to move those into evidence here.

16        THE COURT:  I'm happy to do that.  Should we just say

17   that all the exhibits from the prior trial are admitted?

18        MR. GOLD:  Just say that, and then we'll make sure

19   that it's reconstructed by the time we need to.

20        THE COURT:  Yes, I think so.

21        MS. SERAFYN:  I think that makes sense.  Thank you.

22   Q.   Dr. Phenix, in your opinion, does Mr. Carta meet all of

23   the diagnostic criteria for paraphilia NOS?

24   A.   Yes, I believe he does.

25   Q.   And why do you believe that he meets those diagnostic

aad000d87-693c-4031-858e-4f9d2d8a97b1

1  criteria?

2  A.   Well, first of all, from his behaviors; second of all,

3  from his admissions; from his criminal record.  So those three

4  things would indicate him meeting a diagnosis of a paraphilia.

5  He has admitted for many years and in treatment, both to law

6  enforcement and treatment providers, that he has sexual arousal

7  to boys who are prepubescent, to boys going through pubescence,

8  and for boys in their later teenage years.  There are no

9  behaviors of his that I am aware of that involve sexual

10  behavior with prepubescent boys.  I did not diagnose pedophilia

11  in this case, which would have been appropriate had there been

12  those behaviors, although it's well established that he had at

13  one time up to 50,000 images of child pornography ranging in

14  age from age three to age seventeen.

15          THE COURT:  Did you look at them?

16          THE WITNESS:  I did not.

17          THE COURT:  Did you see any cataloging of them?

18          THE WITNESS:  I did not see cataloging of them.  I

19  would have to go back and refresh my memory to how they were

20  organized.  There were a number of sites that he went to, and

21  he had downloaded --

22          THE COURT:  Would it be significant to you whether the

23  pictures ranged from sex with children up to age seventeen or

24  whether the preponderance of them were in a particular age

25  group?

1        THE WITNESS:  As far as I know, there was nothing in

2    the records that I saw that there was a preponderance of a

3    certain age group.

4        THE COURT:  So if 90 percent of them were in the

5    sixteen to seventeen age group, that might signify that's his

6    primary interest, right?

7        THE WITNESS:  I certainly would say that if I knew

8    that.

9        THE COURT:  But if there were a huge number that were

10    in the eleven to fourteen, then we would say that that's an

11    area of interest because that's what he's keeping and looking

12    at presumably.

13        THE WITNESS:  Right.  Well, I believe that from the

14    records, what I can conclude is that he has arousal to

15    prepubescent children.  He has admitted in SOTP, so if we look

16    at what he's talked about in terms of --

17        THE COURT:  That's the sex offender treatment program?

18        THE WITNESS:  Yes.

19        THE COURT:  Is that the one at Butner?

20        THE WITNESS:  Yes.

21        THE COURT:  That's what we're calling it?

22        THE WITNESS:  Yes.

23        THE COURT:  All right.

24        THE WITNESS:  So in SOTP he said that his first range

25    of preference with children was twelve to seventeen, and this

aad00d87-693c-4031-858e-4f9d2d8a97b1

1    would comport with his known behaviors and admitted behaviors

2    of sexual activity with children, which we have admissions of

3    sexual behavior with boys from age thirteen essentially to

4    young adults, seventeen, eighteen, nineteen.  He said that his

5    second most arousal was to children seven to eleven years of

6    age.

7         So he's admitted to arousal to prepubescent children.

8    Certainly the pornography contained many images of prepubescent

9    children and also movie images of prepubescent children, and

10   that he spent, you know, 12 to 14 hours a day at his maximum

11   masturbating up to three times a day to these images would

12   indicate that he has this arousal.  I don't know how much of

13   the pornography was a specific age.  I only know an age range

14   of age three to seventeen.  But there is an absence of

15   behaviors, and I don't diagnose a mental disorder or a

16   paraphilia when there is an absence of established behaviors

17   with that particular age group.

18        What is abundantly clear is that he has very strong

19   sexual arousal to boys going through pubescence up to teenage

20   boys, sixteen, seventeen, and eighteen years of age.  And if

21   you look at the age range of his victims, his admitted victims,

22   there were three boys that were age thirteen that he orally

23   copulated and actually had a lengthy relationship with,

24   beginning within one boy age thirteen over a four-year period.

25   So there's a clear arousal and interest in seeking boys

1    thirteen, fourteen, fifteen, and sixteen.  So we know what his

2    admissions are in terms of the age range of his sexual

3    interest.  We know the age range of those involved in the

4    50,000 images of child pornography.  And then he made a number

5    of admissions in sex offender treatment at Butner that

6    demonstrated that his arousal goes from boys just becoming or

7    in the middle of pubescence to postpubescence, and we saw this

8    develop early in his life.  At age eleven to thirteen, he

9    admitted that he had orally copulated a neighbor child who was

10   in diapers, and he also admitted orally copulating a

11   seven-year-old cousin about ten times.  So we see the

12   development of sexual arousal to much younger children very

13   early on in his life, which is not atypical at all for

14   individuals with pedophilia, for individuals with paraphilia

15   not otherwise specified, or hebephilia sometimes it's called.

16        At age fifteen or sixteen, we see the beginning of him

17   being willing to force another individual into sexual activity.

18   He wanted to orally copulate a peer and shot him with a BB gun

19   when he would not do that.  This peer subsequently consented to

20   this oral copulation a number of times after that, but

21   obviously there was a coercive aspect involved, having been

22   shot with a BB gun when he declined to do it in the first

23   place.

24        At age twenty-one he orally copulated his

25   sixteen-year-old nephew several times, so we're still seeing

United States v. Todd Carta - Bench Trial Day 1

1    some age range.  And then at age twenty-eight -- now he's

2    older, seven years older -- he then orally copulated a

3    thirteen-year-old intoxicated boy who was kind of a street kid,

4    didn't have good parental supervision.  He also that same year

5    orally copulated a sleeping seventeen- or eighteen-year-old

6    male who woke up and resisted him, and there was a scene, they

7    said, he had said, because this man, it was not a consenting

8    act.  And at the same time he met at a mall another eighteen-

9    or nineteen-year-old male who he said he talked him into

10   letting him orally copulate him.

11          At age thirty, he then engaged in a sexual activity

12   and relationship with a thirteen-year-old that went on for four

13   years.  This is a boy that he took from California to

14   Connecticut for a summer.  I believe there is a police report

15   written about that.  The parents had not agreed for him to take

16   this boy with him.

17          THE COURT:  How old was he now?

18          THE WITNESS:  He was thirteen at the time.

19          THE COURT:  So this is when he was --

20          THE WITNESS:  He was twenty- -- he was thirty at this

21   time and the boy was thirteen.

22          At age thirty-three, he had been involved in chat

23   lines on the Internet, and he had met three sixteen-year-old

24   kids.  One was a female and the other two were males.  He

25   engaged in sexual activity with all three of those

United States v. Todd Carta - Bench Trial Day 1

aad00d87-693c-4031-858e-4f9d2d8a97b1

1   sixteen-year-olds.  And then at age thirty-nine, now almost

2   forty years of age, he was on chat lines again and met a

3   thirteen year-old male and orally copulated him.  And he also

4   engaged in sexual activity with his seventeen-year-old

5   boyfriend -- he had a live-in boyfriend at the time -- and he

6   had the thirteen-year-old engage in sexual activity with his

7   seventeen-year-old boyfriend and himself at the same time, and

8   now he's at this time thirty-nine years of age.  So --

9           THE COURT:  Now, if he was just having sex or sexual

10  arousal to sixteen-, seventeen-, and eighteen-year-olds, would

11  that in your view qualify as hebephilia?

12          THE WITNESS:  I would not diagnose hebephilia.  When

13  it's a distinct sexual preference -- in other words, there are

14  no other age-appropriate partners and it's just focused on

15  sexual activity and arousal and fantasy -- it's just focused on

16  teenagers, it's not uncommon to have a diagnosis of hebephilia

17  even if --

18          THE COURT:  Please don't use the word "teenagers,"

19  though, just because I understand there's some divide as to

20  what ages would qualify as hebephilia.  So if it was, I'm just

21  trying to say, the later years, if you will, sixteen,

22  seventeen, eighteen, in your view, is there scientific evidence

23  or reliable evidence in your field that that's hebephilia in

24  those later years?

25          THE WITNESS:  No, not in my opinion.  It's --

United States v. Todd Carta - Bench Trial Day 1

1    THE COURT:  Okay, I just wanted to understand.  So

2  what makes this a mental disease, disorder, or defect is the

3  earlier years.  And what would you call the earlier years?

4    THE WITNESS:  Just the earlier years.  You know, I

5  would call it becoming pubescent.  That's, you know,

6  developmentally how I would define that.  And that would be

7  essentially -- it's defined in the literature as eleven to

8  fourteen, okay?  And if you look at the guidelines for the new

9  proposed diagnosis for the DSM-V, pedohebephilia, it would be

10  defined as age eleven to fourteen.  That's because of

11  phallometric research that has demonstrated there's a distinct

12  group of individuals who are sexually aroused to immature

13  humans, okay.  And we already have the diagnosis of pedophilia

14  for prepubescent children, but males begin pubescence on

15  average at age eleven.  They get the first secondary sexual

16  characteristics.  And that's generally completed on average at

17  about age fourteen.

18    THE COURT:  So the reliable, generally accepted

19  evidence in your field as it stands today is that the mental

20  disease or disorder involves an attraction to boys eleven to

21  fourteen?

22    THE WITNESS:  Yes, and that's the proposed guidelines

23  for the new DSM-V.

24    THE COURT:  And is that different from what you

25  diagnosed last time before Judge Tauro?

United States v. Todd Carta - Bench Trial Day 1

aad00d87-693c-4031-858e-4f9d2d8a97b1

1      THE WITNESS:  No, it's not different.  And I also

2  discussed at that time that if you look at PPG data or

3  phallometric data, which I can explain how to administer that,

4  if you would like, but if you look at PPG data on normal men --

5  and we've known this for years -- who have no history of

6  deviant sexual arousal, and you give them a PPG, and they will

7  show arousal to individuals in their teens down to about age

8  fifteen, and then their arousal drops off because of the

9  immature, in this case females.

10      THE COURT:  So it's relatively normal after age

11  fifteen and older?

12      THE WITNESS:  It's not deviant sexual arousal any

13  longer.  It may be socially illegal or inappropriate.

14      THE COURT:  Absolutely.

15      THE WITNESS:  But it's not deviant sexual arousal.

16      THE COURT:  Or at least that's not where the

17  psychiatric field is going.

18      THE WITNESS:  Exactly.

19      THE COURT:  So we'll be careful here.  When you say

20  he's got paraphilia NOS, it's not all these relationships with

21  seventeen-year-olds you're referring to?

22      THE WITNESS:  No.  It's the relationships with

23  thirteen- and fourteen-year-olds.  And fifteen-year-olds can be

24  very immature.  I mean, you just look at the child.  But, no,

25  it's the less-developed boys who are just going through

United States v. Todd Carta - Bench Trial Day 1

1    puberty.

2    Q.   Dr. Phenix, are there any peer-reviewed articles

3    supporting hebephilia as you described it as a diagnosis?

4    A.   Yes.   There is the article "Pedohebephilia" in the DSM-V.

5    It was published by Dr. Blanchard, who did the landmark work in

6    this area, and it was published in the Archives of Sexual

7    Behavior last year, I believe.   Yes.

8    Q.   I'm putting a document on the screen here.

9         THE COURT:   You know what, this might be a good time

10   to break since we've been going -- so why don't we take a break

11   right now, and I'll see you -- I know you just got going, but

12   we were having all these other discussions.   So we'll get going

13   in the vicinity of 11:30 and be back here at that time.   All

14   right, thank you.   And we're going to finish you in terms of

15   the direct today, but my guess is, there's at least a

16   significant chance we won't finish you as far as the

17   cross-examination till tomorrow, so you have a hotel here, I

18   hope.

19        THE WITNESS:   I do, and I had planned to be testifying

20   tomorrow.

21        THE COURT:   Okay, fine.   Thank you.   So just off the

22   record for a minute on scheduling.

23        (Discussion off the record.)

24        (A recess was taken, 11:04 a.m.)

25        (Resumed, 11:39 a.m.)

1       THE COURT:  All right, go ahead.

2   BY MS. SERAFYN:

3   Q.   Dr. Phenix, are you aware of any peer-reviewed articles

4   that support hebephilia as a diagnosis?

5       MR. GOLD:  Your Honor --

6   A.   Yes.  That would be --

7       THE COURT:  What's the issue?

8       MR. GOLD:  Mr. Carta is not --

9       THE COURT:  Oh, gee, Robert, Mr. Carta isn't here.

10  Excellent point.  While we're here, you all are from Brookline

11  high, is that it?  Is there a teacher here?  Can I talk to you

12  for one second.

13      (Discussion off the record.)

14      THE COURT:  For the record, so that you all know what

15  happened, that was a class of seniors at Brookline High School.

16  I suggested she take them outside and -- many of them are over

17  eighteen but some aren't maybe, and she hadn't fully understood

18  the nature of the testimony, and she's talking with them right

19  now.  They may come back in.  Maybe some will come back in, or

20  they may leave.  But it's not that I shooed them out.  This is

21  a public proceeding.  I just want to make it clear, they're

22  talking.  I think it's a legal studies class or some such

23  thing.

24      So, anyway, go ahead.

25

1   BY MS. SERAFYN:

2   Q.   Dr. Phenix, are you familiar with any peer-reviewed

3   articles regarding hebephilia as a diagnosis?

4   A.   Yes.  In 2008 in Archives of Sexual Behavior,

5   Dr. Blanchard, et al published the known research supporting

6   hebephilia in an article called "Pedophilia, Hebephilia, and

7   the DSM-V."

8   Q.   And I'm putting an article on the screen here.  Is this

9   the article you're referring to?

10  A.   Yes.

11  Q.   And have you read this article?

12  A.   Yes.

13  Q.   And did you rely on this article in forming your opinion?

14  A.   Yes.

15  Q.   Could you just give us the general gist of this article.

16          THE COURT:  Excuse me.  Did you rely on it in forming

17  your first opinion?

18          THE WITNESS:  Uhm, yes.

19          THE COURT:  So this was out before the Tauro trial?

20          THE WITNESS:  To the best of my memory.

21          THE COURT:  Does anyone know when the Judge Tauro

22  trial was?

23          MS. PIEMONTE-STACEY:  It was in February of 2009, your

24  Honor.

25          THE COURT:  Oh, so it was out.

United States v. Todd Carta - Bench Trial Day 1

aad00d87-693c-4031-858e-4f9d2d8a97b1

1          MR. GOLD:  The article was out, yes.

2          THE COURT:  Okay, all right.

3          MR. GOLD:  But it may have come out after she drafted

4     her opinion.

5          THE WITNESS:  No, because it came out in April, so I

6     had access.  I've had this article for quite a while.

7          THE COURT:  Okay.

8     Q.   Dr. Phenix, could you generally summarize this article for

9     us.

10    A.   Yes.  This examined over 800 subjects in

11    Dr. Blanchard's -- he has a sex offender evaluation and

12    treatment program in Canada, and they administered routinely as

13    part of the evaluation process phallometric assessment, or PPG

14    assessment, to their offenders.  And they wanted to determine

15    if individuals with sexual arousal to boys becoming pubescent

16    was a specific arousal pattern that was distinguishable from a

17    group of offenders who were roused just to prepubescent

18    children and a group of offenders aroused to adults.  And so

19    they conducted these evaluations and did find, did support the

20    fact that there is a discrete group of individuals who are

21    aroused to boys and girls becoming pubescent.  And that's where

22    what he defined as from about age eleven, when pubescence

23    begins, to age fourteen; and that that group of individuals,

24    many of them were not aroused to prepubescent children or to

25    adults.  So he was able to establish in a research setting

1    individuals with what we have called, you know, hebephilia

2    since the 1950s.

3    Q.   And, Dr. Phenix, does your diagnosis of paraphilia NOS

4    (hebephilia) comport with the diagnosis that Blanchard, et al

5    are putting forward in this article?

6    A.   Yes, it does.

7         MS. SERAFYN:  Your Honor, I'd like to move the

8    Blanchard article into evidence.

9         THE COURT:  Yes.  What exhibit is it?

10        MS. SERAFYN:  Your Honor, if we're using the exhibits

11   from the first trial, that ended with Exhibit 28, so this would

12   be Exhibit 29.

13        THE COURT:  Fine.

14        (Government Exhibit 29 received in evidence.)

15        MR. GOLD:  No objection.

16   Q.   Dr. Phenix, before the break you testified about a

17   proposal from the DSM-V working group regarding hebephilia.

18   Are you familiar with the working group's written proposal?

19   A.   Yes.

20   Q.   And I'm putting a document up on the screen here.  Have

21   you seen this before?

22   A.   Yes.

23   Q.   Okay.  And what is this?

24   A.   This is actually a descriptor of how the proposed

25   diagnosis would appear in the DSM-V, should it be adopted by

United States v. Todd Carta - Bench Trial Day 1

1    the American Psychiatric Association, and also some narrative

2    which discusses the reasons that support the inclusion of this

3    in the DSM-V.

4    Q.   So you've read this proposal?

5    A.   I have.

6    Q.   And can you explain for us what the proposal is regarding

7    hebephilia.

8    A.   Well, the proposal is to adopt a diagnosis which --

9         THE COURT:  Excuse me.  Is that screen on?  Is that

10   what's up there?

11        MS. SERAFYN:  It is on, your Honor.

12   A.   -- which combines the diagnosis of pedophilia, and it then

13   includes hebephilia.  So it would be pedohebephilic disorder is

14   what is proposed by Dr. Blanchard for the DSM-V.

15   Q.   And I'd like to focus on the first paragraph here where it

16   says, "We propose that the diagnosis of pedophilia (the erotic

17   preference for children in Tanner Stage 1) be revised to

18   include hebephilia (the erotic preference for children in

19   Tanner Stages 2-3) and that the revised entity be named

20   pedohebephilic disorder."  Do you see that?

21   A.   Yes.

22   Q.   Can you explain what Tanner Stages 1, 2, and 3 are?

23   A.   Tanner stage 1 would be prepubescent, children that have

24   no secondary sexual characteristics.  And then the Tanner

25   stages increase up to 5 depending upon the development of

1    secondary sexual characteristics such as pubic hair, breast

2    buds and breasts, changes in the penis and the scrotum that are

3    consistent with puberty.  So as the Tanner stage advances,

4    there would be more secondary sexual characteristics.  So this

5    diagnosis would essentially capture, sensibly capture not only

6    those children in Tanner Stage 1 that do not have any secondary

7    sexual characteristics, but it would capture the arousal to

8    children becoming pubescent but are still immature bodies.  So

9    instead of just being a definitive line, which has been

10   criticized for years as not capturing deviant arousal

11   adequately, it would allow for someone whose arousal pattern

12   was perhaps not prepubescent children or was prepubescent

13   children and then children going through pubescence.

14         THE COURT:  Mr. Gold, I'm just trying to figure this

15   out.  Are you objecting?

16         MR. GOLD:  Oh, no, your Honor.  I'm just reading the

17   screen.  Sorry.

18         THE COURT:  Do you need it magnified?

19         MR. GOLD:  No, no, no.  I can move it closer.  If I'm

20   confusing the Court, I'll just do that.

21         THE COURT:  All right.

22   Q.   Now, Dr. Phenix, are you aware that the DSM-V working

23   group addressed the issue of whether this new diagnosis would

24   actually increase the rate of a hebephilia diagnosis?

25   A.   Yes.  It was proposed that it would not increase the rate

1   of hebephilia diagnosis.  We're already currently diagnosing

2   this on a consistent basis because we need to do that for

3   treatment planning purposes.  Hebephilia is addressed in every

4   sex offender treatment program.

5          THE COURT:  Is your mike on?  I'm just worried that

6   it's very soft.

7          THE WITNESS:  I'm not usually very soft, so --

8          THE COURT:  Much better.

9          THE WITNESS:  Is that better?  I'll just get it

10  closer.

11  A.   So it's thought that since we are already identifying it

12  for treatment planning purposes, diagnosing it certainly in

13  these types of proceedings on a regular basis, that the rate of

14  diagnosis would not change significantly.

15  Q.   And, Dr. Phenix, did the DSM-V working group propose any

16  diagnostic criteria for this new pedohebephilic disorder?

17  A.   Yes.

18  Q.   And are you familiar with those diagnostic criteria?

19  A.   Yes.

20  Q.   And the document I'm putting on the screen now, have you

21  seen that before?

22  A.   Yes.  That is the diagnostic criteria that's proposed for

23  the DSM-V.

24  Q.   And can you summarize that proposed diagnostic criteria

25  for us?

United States v. Todd Carta - Bench Trial Day 1

1  A.   Yes.  Part of it's very similar to pedophilia.  So over

2  the period of six months, the individual would experience

3  sexual fantasies, urges, or behaviors that are recurrent; but

4  it adds to not only prepubescent children but also to pubescent

5  children, those going through pubescence, and that they would

6  have equal or greater arousal from those children rather than

7  physically mature individuals.  So you can still be attracted

8  to physically mature individuals, but they would have equal or

9  greater arousal to that age group, either prepubescent or

10  becoming pubescent.

11     Also, there are symptoms of this disorder that are listed.

12  As with every mental disorder, the individual has clinically

13  significant impairment or distress as a result of their sexual

14  arousal, in this case to children, and that they have sought

15  sexual stimulation on separate occasions from certain

16  behaviors.  The first one would be two or more different

17  children if both are prepubescent; three or more different

18  children if one or more are pubescent.  So there is a little

19  bit higher standard in terms of diagnosing this diagnosis when

20  the children are going through pubescence, seeing at least

21  three incidents of that.  And repeated use of or greater

22  arousal from pornography depicting prepubescent or pubescent

23  children than from pornography that depicts adults, and so

24  these are very new criteria.

25  Q.   And, Dr. Phenix, if these proposed diagnostic criteria

United States v. Todd Carta – Bench Trial Day 1

aad00d87-693c-4031-858e-4f9d2d8a97b1

1   were adopted and were in effect today, in your opinion, would

2   Mr. Carta meet the diagnostic criteria for pedohebephilic

3   disorder?

4   A.   Yes, he would.

5           MS. SERAFYN:  And, your Honor, I'd like to move the

6   DSM --

7           THE COURT:  Before you do that, is it A or B or A and

8   B?

9           THE WITNESS:  It would be A and B.

10          THE COURT:  So you have to have both A and B and C,

11  all three of them?

12          THE WITNESS:  Right, right.

13          THE COURT:  So can you walk me through why you think

14  that Mr. Carta falls within these criteria, what evidence you

15  have?

16          THE WITNESS:  Yes.  He has experienced recurrent

17  sexual fantasies of at least pubescent children, and I don't

18  know to what extent they were prepubescent, but he says he has

19  arousal to boys age seven to eleven as well.  So when he would

20  view his pornography, as you see in Criterion B(3), he

21  viewed -- he had up to 50,000 images, many of those children

22  age three to -- in this case let's say age fourteen, which that

23  would be the pubescent child up to age fourteen.  So he

24  repeatedly masturbated to those sexual fantasies and images

25  that he had of those children.  He has had few relationships

United States v. Todd Carta – Bench Trial Day 1

1   with --

2          THE COURT:  Can we go down them in order.  So he had

3   recurrent and intense sexual arousal from pubescent children,

4   right?

5          THE WITNESS:  Yes.

6          THE COURT:  All right, so then the second one is the

7   one:  "Equal or greater arousal from such children than from

8   physically mature individuals."  Do you have an opinion on that

9   one?

10         THE WITNESS:  It's a little bit more difficult for me

11  to say on that one.  We certainly know that he has sought out

12  pubescent children repeatedly.  The first time he engaged in

13  sexual activity was age twenty-eight with a thirteen-year-old,

14  and the last time shortly before he was arrested at

15  approximately age forty, and during that time he was on chat

16  lines seeking out young teenagers, advertising for them,

17  meeting them, engaging in sex with teenagers.

18         THE COURT:  So some of them were physically mature.

19  That's the piece that I'm trying to figure out here.  So some

20  of them were seventeen-year-olds, right, sixteen- and

21  seventeen-year-olds?

22         THE WITNESS:  That's correct.

23         THE COURT:  So how do you know, what are you relying

24  on that he had "equal or greater arousal from such children

25  than from physically mature individuals"?

United States v. Todd Carta - Bench Trial Day 1

1       THE WITNESS:  Only from the prevalence of him

2   continuing throughout his -- throughout from age twenty-eight

3   to forty, ultimately finding three thirteen-year-old boys to

4   have sex with, so he's seeking out teens.  And he also had

5   50,000 images of pornography; and while they ranged up to age

6   seventeen, he had of that a good share of child pornography.  I

7   can't measure 50 percent, you know, equal or greater, but I do

8   know that he continued to seek out boys as young as thirteen

9   throughout his adulthood.

10  Q.   And, Dr. Phenix, looking at Criterion A, it says "over a

11  period of at least six months, one or both of the following."

12  A.   That's correct, so we already have that criteria met, but

13  No. 2 is more difficult for me to quantify.

14  Q.   But, in other words, if Mr. Carta meets Criterion A(1),

15  then that satisfies that part of the diagnostic criteria, and

16  we can move on to B; is that right?

17  A.   That's right.

18       THE COURT:  So with respect to B, "one or more of the

19  following signs and symptoms," what are you relying on?

20       THE WITNESS:  Well, first, I'm relying on No. 1, that

21  the person has clinically significant distress or impairment in

22  important areas of functioning from a sexual attraction to

23  children.  He is a person who has been subject to a significant

24  loss of freedom, which has interfered with his ability to

25  maintain gainful employment.  It has caused him to be

United States v. Todd Carta - Bench Trial Day 1

Page 82

1   completely estranged -- that and other things have caused him

2   to be completely estranged from his family members, both his

3   parents and his siblings.  He at one point prior to his arrest

4   for the most recent incarceration, he was viewing pornography

5   twelve to fourteen hours a day.  He had poor hygiene.  He

6   wasn't caring for his daily living skills as a result of his

7   obsession with that pornography.  It interfered with him

8   working.  So clearly that first criteria is met.

9          He met Criteria 2 because he has engaged in sexual

10  activity with three different children who are pubescent, all

11  three of them pubescent.

12         THE COURT:  So that question mark means that's not a

13  resolved issue yet?  Is that a question mark?  I think it is.

14         MR. GOLD:  That's No. 7, your Honor.

15         THE COURT:  7, what does that mean, just the --

16         THE WITNESS:  It should be a footnote referencing a

17  research article.

18         THE COURT:  Okay, okay.

19         THE WITNESS:  And there is a research article that

20  demonstrates that individuals who have PPG responses to

21  pubescent children on average would have three victims, so it

22  substantiates the number three, which would indicate that those

23  individuals will usually have positive PPGs for children.  So

24  it comes from a research article.

25         And then Item B(3) is met, which I've already

United States v. Todd Carta - Bench Trial Day 1

1   discussed because if he has 50,000 images of children age three

2   to seventeen, it's likely that a reasonable amount of that

3   would be prepubescent and pubescent boys, particularly since

4   that's what he is aroused to.  And he was over eighteen when he

5   engaged in all of those behaviors.

6        THE COURT:  Is this a generally accepted standard in

7   your field?

8        THE WITNESS:  This is a new standard directly from the

9   research article that we discussed and other research.  It has

10  been generally accepted in my field much longer than this

11  article was available and this proposal was made.  There is a

12  lot of controversy about whether it should be included in the

13  DSM-V, and --

14       THE COURT:  Because?

15       THE WITNESS:  Well, I would say because certain

16  clinicians believe that it patholiges, makes a pathology out of

17  something that should not be.  And so they believe that because

18  normal sexual arousal will generally be found on PPG down to

19  age fifteen and sometimes age fourteen, and they believe that

20  because of evolution, that it's simply -- that there are many

21  cultures where pubescent females become mothers and heads of

22  household at age eleven, twelve, thirteen, that it turns this

23  arousal pattern into a pathology when it should not be.  It's

24  simply our social morays, in other words.

25       THE COURT:  So it's a cultural norm rather than a

United States v. Todd Carta - Bench Trial Day 1

1    psychological norm, in these people's view?

2            THE WITNESS:  In their view, yes.

3            THE COURT:  And what would you say in terms of the

4    field in general?  Is it 50 percent think one way and

5    50 percent think another, or is there a -- do you have a way of

6    knowing what the view of the larger number of psychiatrists is?

7            THE WITNESS:  Right, and psychologists, there are some

8    psychologists.

9            THE COURT:  Psychologists as well?

10           THE WITNESS:  Those folks that are creating the

11   controversy are doing so in a strong way, and so my opinion is

12   that almost everyone in my field accepts a diagnosis of

13   hebephilia, and certainly it's been a focus of treatment in all

14   standard sex offender treatment programs, but there is a

15   smaller group who feel strongly that it should not be included.

16           MS. SERAFYN:  Your Honor, I'd like to move into

17   evidence the proposed DSM-V working group narrative and

18   diagnostic criteria for hebephilia.

19           MR. GOLD:  Your Honor, I don't object to that in

20   principle, but I've got an authenticity sort of objection.  I'd

21   like to be sure that we have -- this is a printout from the

22   Internet site -- that we have the right --

23           THE COURT:  Fair enough.  I'll accept it in, and then

24   if there's a substitute that's a fuller version, we'll

25   substitute it in.  So what number is that?

United States v. Todd Carta - Bench Trial Day 1

aad00d87-693c-4031-858e-4f9d2d8a97b1

1        THE CLERK:  30?

2        MS. SERAFYN:  30.

3        (Government Exhibit 30 received in evidence.)

4    Q.   Dr. Phenix, can you compare the DSM-V proposed diagnostic

5    criteria with the diagnostic criteria for paraphilia NOS that

6    exists in the DSM-IV?

7    A.   Yes.

8    Q.   And how would you compare the two?

9    A.   It's just a different nomenclature.  So because the DSM

10   advises that if there is no specific diagnosis in a category,

11   mental disorder category such as paraphilias, that we're to

12   diagnose paraphilia not otherwise specified and then describe

13   what that is.  In the future, should this be adopted, there

14   would be a specific category, and I would diagnose

15   pedohebephilic disorder, but it's the same thing.

16   Q.   So what, if anything, do we know about Mr. Carta's

17   preferred sexual partner?

18   A.   We know that he prefers males and that they are between

19   the ages of at least thirteen.  There's an unknown about what

20   he prefers.  He may have a preference for prepubescent children

21   as well.  It would be unusual to have that much child

22   pornography and not have arousal to children, but at least in

23   terms of what he has been able to access and we know he has

24   accessed, it would be boys age thirteen generally to age

25   seventeen or eighteen.

United States v. Todd Carta - Bench Trial Day 1

1  Q.   So if we know that Mr. Carta has an attraction to boys

2  ranging up to age seventeen, how can we reliably diagnose him

3  with hebephilia?

4  A.   The same way we diagnose people with pedophilia who are

5  married, who have had adult partners all throughout their life.

6  There's a qualifier for pedophilia, "nonexclusive type."  That

7  means not aroused to just children but also aroused to adults,

8  and that would be the most common type of diagnosis for

9  pedophilia would be nonexclusive type.

10      Sexual preferences are sometimes very narrow; for example,

11  children age seven to nine and no one else.  But that's

12  unusual.  Generally there's a range of arousal for individuals,

13  and it would not at all be uncommon to have arousal to

14  children, for example, twelve through adults, okay.  And so it

15  doesn't say -- that doesn't mean that there is not an arousal

16  to a specific age group.  In this case, there's arousal to

17  non-deviant age males and females, as Mr. Carta describes

18  himself as bisexual, as well as pubescent children, and perhaps

19  prepubescent children.

20  Q.   Now, Dr. Phenix, you testified earlier about Mr. Carta's

21  sexual activity with three thirteen-year-olds.  How old was

22  Mr. Carta when he engaged in that sexual activity with the

23  three thirteen-year-olds?

24  A.   That began at age twenty-eight, and it concluded when he

25  was about forty.

United States v. Todd Carta - Bench Trial Day 1

1    Q.    And, Dr. Phenix, can paraphilia NOS amount to a serious

2    mental illness, abnormality, or disorder?

3    A.    Yes.

4    Q.    And is Mr. Carta's paraphilia NOS a serious mental

5    illness, abnormality, or disorder, in your opinion?

6    A.    Yes, it is.

7    Q.    Now, other than paraphilia NOS, have you diagnosed

8    Mr. Carta with anything else?  I believe you testified to four

9    other diagnoses before?

10   A.    Yes.

11   Q.    Okay.  And I just want to go through quickly with each

12   diagnosis.  Can we start with hallucinogen dependence.  Can you

13   just tell us generally what that is and why you believe

14   Mr. Carta has that?

15   A.    Yes.  Drug dependence is characterized, just in brief,

16   characterized by tolerance and withdrawal symptoms, tolerance

17   to the substance, either alcohol or drugs, where you use more

18   and more over a period of time, and you replace certain

19   activities with the use of drugs and alcohol.  In this case,

20   Mr. Carta has a history of spending many years using LSD.  He

21   spent about five years of his life touring with the Grateful

22   Dead, and in that touring was involved with certainly drug use

23   on his part.  He talked about using LSD every other day,

24   sometimes multiple times during the day, and he said that he

25   has spent a good deal of time doing that.  He also acknowledged

United States v. Todd Carta – Bench Trial Day 1

1   that he had tolerance to LSD, to the drug over time using more

2   and more.  So he did not, according to the records, use it for

3   about five years prior to his arrest, which I believe was at

4   age forty-one or so, forty-two.  However, he had so many years

5   of use of dependence on it, I diagnosed him with a drug

6   dependence, plus I don't have real good information about

7   whether he was or was not using it after that.

8           THE COURT:  Well, is there a long-term effect from

9   using LSD that long?

10          THE WITNESS:  There certainly can be a long-term

11  effect.  It can affect his memory.  It can affect various

12  aspects of his cognitive functioning.

13          THE COURT:  Do you have evidence one way or another as

14  to whether it affected him in that way?

15          THE WITNESS:  No, I don't.  He did complain of memory

16  problems while he was at Devens and -- well, while he was in

17  federal prison.  I can't remember which federal prison, but he

18  complained of memory problems, and he was given

19  neuropsychological testing, which showed some mild memory

20  impairment, but it's very hard to say what that resulted from.

21  It's certainly possible.

22          THE COURT:  Is it, in your view, enough to undermine

23  his credibility as a self-reporter?

24          THE WITNESS:  I'm not sure what you mean.

25          THE COURT:  Well, I mean, so much of this case -- it

1   may help him or hurt him, I don't know -- but so much of this

2   case is based on his own memory as to what happened and how

3   many times it happened and that sort of thing rather than court

4   records.  It makes it a little more unusual than the other

5   cases I've had.  It's not court convictions; it's his

6   self-report.  Would the chronic -- is that the right word? --

7   or the persistent use of LSD undermine his credibility in

8   self-reporting all those incidents from many years ago?

9           THE WITNESS:  It's not my opinion that his memory

10  problem was significant enough to really affect his

11  self-report.  Just the length of time that passed could affect

12  his self-report, but his memory problems were not that

13  significant despite, you know, his complaints about it.

14  Furthermore, he has an IQ in the very superior range.

15          THE COURT:  Excuse me?

16          THE WITNESS:  He has an IQ in the very superior range,

17  so he --

18          THE COURT:  He's a smart guy.

19          THE WITNESS:  He's a very smart guy, right.

20  Q.  So, Dr. Phenix, what was the next diagnosis that you made?

21  A.   The next diagnosis was marijuana dependence, and this

22  continued throughout the time that he was in the community,

23  throughout his adulthood, actually teenage years and adulthood.

24  He described himself as a heavy smoker.  He would smoke about

25  ten marijuana cigarettes a day, which is a heavy smoker of

1    marijuana.  He said that it certainly contributed to his legal

2    problems.  It's a disinhibitor; you act on things you wouldn't

3    ordinarily.  He described symptoms of irritability associated

4    with not smoking the marijuana, although he did pretty

5    consistently up until the time that he was arrested.  So he has

6    marijuana dependence, hallucinogen dependence.

7         And then I diagnosed alcohol abuse.  It's quite likely he

8    has also alcohol dependence.  He was drinking three to four

9    times weekly a case of beer at night or during the day, and

10   that would happen about three to four times a week, a case of

11   beer.  And he said his drinking was particularly heavy during

12   his thirties.  And the thing is, I wasn't able to interview

13   him.  I didn't see any symptoms of tolerance or withdrawal.

14   It's quite likely that there were symptoms of tolerance.  So in

15   the very least, he has alcohol abuse and could well have

16   alcohol dependence as well.

17        THE COURT:  And would dependence on LSD, marijuana, or

18   alcohol have any significance to you in terms of sex offending?

19        THE WITNESS:  Yes.  I do believe that it meets the

20   statutory definition of a mental illness for this law, and I

21   believe that because these substances disinhibit deviant sexual

22   behavior.  They don't cause it but they disinhibit his already

23   very strong sexual arousal to pubescent children, interfere

24   with his judgment --

25        THE COURT:  Is that one of the recognized factors in

United States v. Todd Carta – Bench Trial Day 1

aad00d87-693c-4031-858e-4f9d2d8a97b1

1    aggravating risk?

2              THE WITNESS:  Yes.

3              THE COURT:  Under which metric, which -- what would

4    you call it, actuarial table?

5              THE WITNESS:  The actuarial tables don't include

6    substance abuse.  The reason is because a history of substance

7    abuse is not a known risk factor for future sexual offense.

8              THE COURT:  Yes, I remembered that from one of my

9    prior trials.  So why do you say that it here would be a risk

10   factor?

11             THE WITNESS:  Well, you look at the person, how has it

12   interacted with that individual?  It's a acute dynamic risk

13   factor.  So it's been shown in the Dynamic Risk Project by

14   Hanson and Harris that within the period of time that the

15   person is intoxicated, they're at higher risk, not just a

16   history of substance abuse.  So if he's in the community and he

17   is using substances, it's during that period of time that he's

18   intoxicated that his risk goes up; and that's been established

19   and included as an acute dynamic risk factor in the

20   Stable-2007.

21   Q.   Dr. Phenix, those were all of the Axis I diagnoses that

22   you made; is that right?

23   A.   Yes.

24   Q.   And what are Axis I diagnoses?

25   A.   Those are major mental disorders.

1  Q.   And you diagnosed one Axis II disorder; is that right?

2  A.   Yes, I did, personality disorder not otherwise specified

3  with antisocial and borderline traits.

4  Q.   And so what is an Axis II diagnosis?

5  A.   That would be a personality disorder.

6  Q.   So can you just briefly run through the criteria for the

7  personality disorder that you diagnosed Mr. Carta with.

8  A.   Yes.  It's a combination of two, and the first, antisocial

9  personality disorder, is associated with long-term criminality,

10  incarceration, lack of remorse for your behavior, irritability

11  and aggression toward other people, lifetime irresponsibility.

12  And for antisocial personality disorder, one needs to have

13  evidence of a conduct disorder prior to age fifteen, which is

14  generally child misbehavior or criminality, childhood

15  misbehavior or criminality.  And looking at the case of

16  Mr. Carta, he had a fascination with setting fires from age

17  seven to seventeen when he was convicted for reckless burning.

18  He burned a bail of hay, a towel in his sister's bathroom.  He

19  burned a barn, set fire in a shack, for which he was finally

20  adjudicated.  Threw a rock through a neighbor's window.  He

21  assaulted in seventh grade a female classmate.  He admitted to

22  stealing hundreds of crayons and other things, causing him to

23  be suspended in fifth grade, and gave all those crayons to

24  other kids on the bus.  He admitted to stopping attending

25  school in the sixth grade, getting involved with a group of

aad00d87-693c-4031-858e-4f9d2d8a97b1

1    juvenile males; and they by eighth grade were truant, suspended

2    from school, and involved in multiple burglaries and larcenies

3    where they were stealing alcohol, money, drugs, and other

4    things.  And he was arrested many times for that.

5        As an adult, he continued to engage in criminal behavior.

6    He did not provide care for his daughter throughout her life.

7    He has verbally threatened to kill his daughter, his daughter's

8    boyfriend, his mother.  He retaliated against several of the

9    people that he had intimate relationships with by putting

10   private information about their sex life in public settings

11   where people could see it, smashing the window of a

12   girlfriend's friend's car, trying to hurt them and retaliate

13   them, obviously showing a lack of empathy in caring for other

14   people; assaulted his father, was described by his family as

15   angry and volatile, acting out.

16       So he has a fairly classic antisocial personality disorder

17   that I think contributes to his sex offending.  It gives him

18   permission.  It doesn't bother him.  He doesn't have a

19   conscience about engaging in sex with young boys and the harm

20   that it may cause them because of his antisocial attitudes.

21           THE COURT:  How do you know that?  Are you just

22   extrapolating from the disorder, or has he said anything that

23   would lead you to believe that he doesn't have any conscience

24   about it?

25           THE WITNESS:  Many times in SOTP he reported that he

United States v. Todd Carta – Bench Trial Day 1

1  did not hurt his victims, that boys age thirteen can have sex

2  with adults and there's no harm to them.  He had a number of

3  distorted attitudes about that that did not change in the time

4  that he was in treatment until he dropped out, and he dropped

5  out maintaining those distorted attitudes.

6       THE COURT:  So you could point that out to me in the

7  record, if I wanted to, exactly who he said it to and how many

8  times?

9       THE WITNESS:  Absolutely, yes.

10       And he also has pretty persistent borderline

11  personality traits.  And borderline personality is

12  characterized by generally having attachment problems, fears of

13  abandonment, so forming strong relationships, suffocating those

14  relationships, as he describes the way he was in relationships,

15  for fear that that individual would abandon them.  It's a

16  person who has wide mood swings, may idealize a person and then

17  demonize a person.  Someone with identity disturbance doesn't

18  feel like they have much sense of self or they have a damaged

19  sense of self.  They often act out with substance abuse,

20  substance dependence; and also, in times of really fear of

21  being abandoned, suicidal ideation, cutting on themselves,

22  self-mutilating, trying to kill themselves -- oftentimes it's a

23  cry for help and sometimes not -- because they're so distraught

24  about the separation.

25       So in terms of Mr. Carta and why I believe this is

United States v. Todd Carta - Bench Trial Day 1

1    applicable for him, he is a person that was married for I

2    believe six to eight months, for a very short period of time.

3    When he split up with his wife, he attempted suicide by taking

4    I believe aspirin, and as a cry for help with experiencing that

5    strong sense of abandonment.  When he then had a four-year

6    relationship with Brenda, who was a girlfriend, found that she

7    was having an affair with someone; and he then, again with

8    abandonment, acted out in a very angry and hostile way by

9    smashing her windshield and putting naked pictures of her in

10   her brother's mailbox.

11        His daughter, he reported that he was having a sexual

12   relationship with her boyfriend.  His daughter lived with him

13   for a brief period of time in the community, primarily was

14   raised by his mother but lived with him for a brief period of

15   time.

16        THE COURT:  Whose mother?  Mr. Carta's mother?

17        THE WITNESS:  Mr. Carta's mother, yes.  But as an

18   adult, she moved in with her boyfriend, in with him in the

19   community.  Mr. Carta began, according to Mr. Carta, a sexual

20   relationship with the boyfriend, and later on, angry at his

21   daughter, informed her that he was having a sexual relationship

22   with her boyfriend in terms of retaliating against her when she

23   became angry at him.  All of these angry, manipulative

24   behaviors are very borderline behaviors.

25        He described his relationships as intense and

United States v. Todd Carta - Bench Trial Day 1

1  suffocating because of fear of abandonment.  Psychological

2  testing shows that he has a very poor sense of self, consistent

3  with his diagnosis.

4        Furthermore, impulsivity is consistent with borderline

5  personality disorder, and he's been quite impulsive, certainly

6  sexually, and in part because of his alcohol and drug use.  And

7  he's experienced wide, wide mood swings and can get into a

8  rageful state very, very quickly; and much of that contributed

9  to his dropping out of the SOTP was his interpersonal conflict

10  and his borderline personality traits.

11  Q.   And these diagnoses that you just testified to, the drug

12  and alcohol abuse and the personality disorder, do those

13  actually cause Mr. Carta serious difficulty in refraining from

14  sexually violent conduct or child molestation?

15  A.    Yes, they do.  Certainly the hebephilia is a driving

16  force, in my opinion, or the paraphilia NOS, to his sexual

17  arousal for children.  There are people, however, who do not

18  act out on this deviant sexual arousal patterns, and he does

19  because he feeds it by looking at pornography, you know, up to

20  twelve to fourteen hours a day, which would inevitably put him

21  into a reoffense cycle.  Just it's inevitable that he would act

22  out when he is exposing himself so compulsively to that type of

23  material and reinforcing it by masturbating to deviant images.

24        THE COURT:  I've always wondered about that.  How do

25  you know that it would lead to further offending as opposed --

United States v. Todd Carta – Bench Trial Day 1

1  I understand the child pornography is just against the law, but

2  why wouldn't that be a surrogate for reoffending against actual

3  thirteen-year-olds?

4          THE WITNESS:  Well, it's possible to be a surrogate,

5  but those individuals generally have not acted out.  So there's

6  a difference in risk between offenders who view child

7  pornography and have never had a hands-on sex offense and those

8  who view child pornography and have had a hands-on sex offense,

9  and the risk is significantly increased for those who have

10 actually acted out on it.  So you've already defined a person

11 who has had volitional difficulty.

12         THE COURT:  And how do you know that?  Are there

13 studies?

14         THE WITNESS:  Well, no.  It would just I guess, in my

15 opinion, be common sense.  If a person has acted out on it,

16 they've had more difficulty with their volition than someone

17 who hasn't.  Okay, so we view individuals --

18         THE COURT:  I can't remember which of the other guys

19 I've had -- I mean, I'm learning this field -- but, you know,

20 who was an active sex offender, and then he turned to child

21 pornography and stopped touching, or at least there's no

22 evidence he continued touching.  So why wouldn't that -- I

23 mean, would it be -- you all have these actuarial tables that

24 help you take this out of an individual situation and magnify

25 it across a population.  So do you have any studies as to

United States v. Todd Carta - Bench Trial Day 1

1   whether or not turning to child pornography --

2           THE WITNESS:  Prevents?

3           THE COURT:  -- prevents?  It's against the law for

4   sure, but that would prevent you from actually going out and

5   touching?

6           THE WITNESS:  No studies on that topic, but if we look

7   at what happened with Mr. Carta, we know that while he was

8   looking at that pornography and was so compulsive with it, he

9   then offended against the fifteen-year-old male who was his

10  seventeen-year-old boyfriend's brother, okay.  So he was acting

11  out sexually inappropriately while he was looking at that

12  pornography, so we know that that's not the case for him.  It

13  didn't prevent him from offending against a minor.

14  Q.   And, Dr. Phenix, I just wanted to be clear.  Do you

15  believe that Mr. Carta's paraphilia NOS actually causes him

16  serious difficulty in refraining from sexually violent conduct

17  or child molestation if he were released?

18  A.   Absolutely, yes.

19  Q.   And what about the other four diagnoses that you made, do

20  those cause him serious difficulty in refraining?

21  A.   I believe that they do by disinhibiting his behavior, and,

22  in terms of his antisocial characteristics, by giving him

23  permission to act out on his own needs despite the hurt and

24  harm that it would cause someone else.

25  Q.   And I want to move on to the third element.  Do you reach

United States v. Todd Carta - Bench Trial Day 1

1   that opinion to a reasonable degree of professional certainty?

2   A.   Yes.

3   Q.   Okay.  And how did you reach that opinion?

4   A.   I in this case conducted three actuarial instruments,

5   scored them to see the risk range, and I also looked at a

6   number of dynamic risk factors that add more information to the

7   actuarials.  So, in other words, they improve predictive

8   accuracy over just looking at the actuarials.

9   Q.   And which three actuarial instruments did you score here?

10  A.   Well, I originally scored Static-99 and the Minnesota Sex

11  Offender Screening Tool Revised.  I went on to score the --

12  Q.   And I'm sorry to interrupt, but when you say "originally,"

13  you mean in advance of the first trial?

14  A.   That's right.

15  Q.   Okay.

16  A.   Okay.  I then scored, for the updated evaluation, I scored

17  the Static-99 Revised, which has replaced the Static-99, and

18  the Static-2002 Revised, which I did not originally score.

19  Q.   And why didn't you originally score those two instruments?

20  A.   Originally the revised instruments were unavailable.

21  Q.   So during the first trial --

22       THE COURT:  Can I ask, why were they unavailable?  The

23  trial was what, 2008?

24       MR. GOLD:  February of 2009.

25       THE COURT:  February of 2009.  Why were they

United States v. Todd Carta - Bench Trial Day 1

1   unavailable?

2          THE WITNESS:  Because the revised instruments were not

3   released until ATSA of 2009, which would have been October.

4          THE COURT:  I see.

5   Q.   Dr. Phenix, you said that you scored the Static-99 in the

6   first trial but the Static-99 Revised for this trial.  Can you

7   tell us the difference between the Static-99 and the Static-99

8   Revised?

9   A.   Yes.  The only difference is Item 1, the age item.  It

10  used to be in the original Static-99 either over twenty-five or

11  under twenty-five, under twenty-five being the risk point of 1

12  and over twenty-five being a risk point of zero.  What was

13  found out, however, in subsequent research is that this did not

14  fully account for aging, and we had to consider an aging

15  offender outside of the actuarial instrument.  So Dr. Hanson

16  and Thornton revised the instrument to fully account for the

17  aging sex offender; in other words, to reduce their risk

18  empirically as they age.  So there's now four age cutoffs in

19  Item 1.  Age 18 to 34.9 is one risk point; age 35 to 39.9 is

20  zero risk points; age 40 to 59.9 is minus 1 risk point, which

21  is what Mr. Carta gets on this item; and age 60 and over is a

22  minus 3, a major reduction in risk.

23  Q.   And is the Static-99 Revised generally accepted within the

24  psychological community?

25  A.   Yes.  Drs. Hanson and Thornton have advised to replace the

United States v. Todd Carta - Bench Trial Day 1

aad00d87-693c-4031-858e-4f9d2d8a97b1

1    Static-99 with the Static-99R, so they're no longer recommending

2    use of Static-99.

3    Q.   And you've described the age question for us.  Can you

4    just generally tell us what the rest of the Static-99 Revised

5    questionnaire looks like.

6    A.   Yes.  It looks identical to the original Static-99.  It

7    still has Item 2, ever lived with a lover for two years?  It

8    has two items measuring nonsexual violence, either right at the

9    time was he convicted of nonsexual violence of the index sex

10   offense or the most recent sex offense?  And then in his

11   criminal history, is there any prior nonsexual violence

12   convictions?  It still measures charges and convictions for

13   prior sex offenses, not including the most recent sex offense.

14   There is a measure of prior sentencing dates, any convictions

15   for any type, so it's a general criminality item; convictions

16   for noncontact sex offenses, such as the case for Mr. Carta;

17   and then the victim items.  Unrelated victims, stranger

18   victims, or male victims would all be a risk point.

19   Q.   And is this the scoring sheet that you used for the

20   Static-99 Revised?

21   A.   Yes.

22   Q.   And how is the Static-99 Revised scored?

23   A.   It is scored according to the presence or absence of the

24   risk factor, and each of those has an empirical statistical

25   weight.

United States v. Todd Carta – Bench Trial Day 1

1    Q.    Okay.  And is there an average score for sex offenders on

2    this instrument?

3    A.    An average score, the average score on the Static-99R

4    would be 2.

5    Q.    And what score did Mr. Carta receive on the Static-99R?

6    A.    5.

7    Q.    And what is the significance, if any, of a score of 5?

8    A.    A score of 5 would fall into the moderate high range on

9    this instrument, and it's associated with some general

10   probabilities of sexual reoffense.

11   Q.    Can you tell us a little bit more about those

12   probabilities of sexual reoffense.

13   A.    Yes.  I placed Mr. Carta, for reasons I'll explain when I

14   start talking about the Stable-2007, but placed him in the

15   high-risk sample.  We have four different normed groups, so I

16   need to place him into a norm group and then quote

17   probabilities of sexual reoffense that were actual

18   probabilities for that high-risk sample.  And the five-year

19   probability of sexual reoffense with a score of 5 in the

20   high-risk sample was 25.2, and the ten-year probability was

21   35.5, and that would be a probability of being arrested for a

22   new sex offense.

23        MS. SERAFYN:  Your Honor, I'd like to move the

24   Static-99 Revised coding form into evidence.

25        MR. GOLD:  No objection.

United States v. Todd Carta - Bench Trial Day 1

1       (Government Exhibit 31 received in evidence.)

2       THE CLERK:  That's 31.

3   Q.    And, Dr. Phenix, you also scored Mr. Carta on the

4   Static-2002R; is that right?

5   A.    Yes.

6   Q.    Okay.  And why didn't you score that instrument during the

7   first trial?

8   A.    Because this was not released until the ATSA 2009 as well.

9   Q.    And has the Static-2002R gained acceptance in the

10  psychological community?

11  A.    Yes.  It's used fairly widely at this point.

12  Q.    And can you describe for us generally the Static-2002R

13  questionnaire.

14  A.    Yes.  This is designed a bit differently.  The Static-99R

15  is simply a collection of ten items that are statistically

16  related to sexual reoffense.  The Static-2002R was designed to

17  look at where the risk was coming from, so it makes conceptual

18  sense when you look at it rather than just being a list of

19  factors.  So there are clusters of factors related to age,

20  persistence of sex offending, deviant sexual interests, the

21  relationship to the victim, and a number of items that measure

22  general criminality.  So you may see a person who scores high

23  because they have a strong deviant sexual arousal and past

24  history with children or raping, or they may score higher

25  because, for example, they maybe don't have much deviant

United States v. Todd Carta – Bench Trial Day 1

1   behavior or history, but they have a lot of general criminality.

2   so you can now sort that out better to see where risk comes

3   from.

4   Q.   And the document I'm putting on the screen here, is this

5   the coding sheet that you used to score Mr. Carta on the

6   Static-2002R?

7   A.   Yes.

8   Q.   Okay.  And is there a range of scores that a person can

9   get on the Static-2002R?

10  A.   There is a range of scores.  Off the top of my head, I

11  would have to calculate it.  Let's see.

12  Q.   I'm sorry.  Well, is there an average score?

13  A.   The average score is 4 on this instrument.

14  Q.   And what score did Mr. Carta receive on this instrument?

15  A.   Mr. Carta received a 6.  Now, a 6 -- I'm sorry.

16  Q.   There's actually two pages to this coding sheet, correct?

17  A.   Yes.

18  Q.   And what's the significance, if any, of a score of 6 on

19  the Static-2002R?

20  A.   A score of 6 is a little bit lower than his overall score

21  on the Static-99R.  That would be in the moderate risk range.

22       MS. SERAFYN:  Your Honor, I'd like to move into

23  evidence Dr. Phenix's coding form for the Static-2002R.

24       THE COURT:  You've gone through it too quickly, so I

25  just want to understand it a little better.

United States v. Todd Carta - Bench Trial Day 1

1          MS. SERAFYN:  I'm sorry.

2          THE COURT:  So he basically, on the general

3     criminality, that does not involve sex offending?

4          THE WITNESS:  General criminality does not.  We know

5     that there's different factors that contribute to sexual

6     reoffense.  The strongest contributors are deviant sexual

7     behavior, but also general criminality and nonsexual violence

8     contributes to future sexual reoffense, and those items are

9     contained in that construct of general criminality.

10         THE COURT:  Because it seems like all his points come

11    from non-sex offenses, or the vast majority, one, two, three,

12    four?

13         THE WITNESS:  That's right.  Whenever there's a lot of

14    undetected offending, and he's only detected for his

15    pornography offense and adjudicated for that, you're going to

16    see that he doesn't load up on the deviant sexual interest

17    items as much or the other items related to sexual offending.

18    Because his only arrest and conviction was for child

19    pornography and he was undetected for the other pubescent

20    victims or illegal victims, you can't count those on here.

21         THE COURT:  So you think this is more reliable?

22         THE WITNESS:  No.  I think the Static-99R is more

23    reliable, and that would be backed up by research as well.

24    This is a newer instrument that hasn't been validated anywhere

25    near as much as the Static-99R.  Furthermore, if you look at

United States v. Todd Carta - Bench Trial Day 1

1   the development of the Static-2002R, you'll see that it was

2   developed and validated on far fewer samples when it was made

3   into the revised instrument.  I think it's informative, but I

4   would rely more on the Static-99R.

5   Q.   Dr. Phenix, if you would rely more on the Static-99R, why

6   don't you just stop there?  Why do you score additional

7   actuarial instruments?

8   A.   What I'm looking for is a large discrepancy, okay.  So if

9   you have an instrument that says he's in the high range or the

10  moderate high range -- and different instruments say high

11  range, moderate high range -- you're going to have more

12  confidence in that overall measure of risk.  If you have one

13  saying he's in the high range and one saying he's in the low

14  range, then I would have less confidence in the overall measure

15  of risk, and I would want to look to see, first, you know, why

16  is that happening?  And then my conclusion may be that I just

17  can't really rely on what the instruments are telling me

18  because they're so discrepant.  So I still think it's important

19  to look at all three instruments that I used, but if I'm going

20  to make a final decision about what I'm relying on, then I have

21  to look at the methodology and how they were developed and how

22  often they've been validated.

23  Q.   And, Dr. Phenix, based on your score of the Static-99R and

24  the 2002R, do you believe that there's a discrepancy here?

25  A.   There's not a huge discrepancy here.  If we look at, for

1    example --

2         THE COURT:  Can I just see the bottom here?  Okay,

3    thank you.

4    A.   If we look at the probabilities of sexual reoffense

5    associated with each of these instruments, for the Static-99R,

6    the probability in five years for the study sample was 25.2.

7    The five-year probability for the study sample in Static-2002R

8    was 24 percent, one percent difference, all right.  If you look

9    at the ten-year probabilities, again, there is no significant

10   difference.  Static-99R, the probability in ten years is

11   35.5 percent for the study sample, and for the Static-2002R,

12   33.8.  There's absolutely no difference in the absolute

13   probabilities.  So while the risk range is, you know, one risk

14   range apart, the absolute probabilities of the study samples

15   are identical.  So it's really telling us the same thing.

16        MS. SERAFYN:  Your Honor, I don't remember if I did

17   this, but I'd like to move the Static-2002R score sheet into

18   evidence.

19        MR. GOLD:  No objection.

20        THE COURT:  All right.

21        (Government Exhibit 32 received in evidence.)

22   Q.   And, Dr. Phenix, I'd like to move on to the MnSOST-R.

23   Now, you scored that in both cases, correct?

24   A.   Yes.

25   Q.   And why did you score the MnSOST-R again here?

United States v. Todd Carta - Bench Trial Day 1

1  A.   Well, actually, I just transferred my scores from the

2  MnSOST-R from my original report to my updated report, but I

3  rescored it because I always rescore the actuarials before I

4  testify, so I rescored it again, a second time prior to trial.

5  Q.   Okay.  And what score did Mr. Carta get the first time as

6  opposed to the second on this instrument?

7  A.   Right, I gave him a score of 11 actually on both of the

8  evaluations.  Eleven is in the high range.  On rescoring it,

9  however, I found a scoring error, a couple of scoring errors,

10  and so I believe he has a score of 10 instead of 11.

11  Q.   And can you just explain those errors that you found to

12  us.

13  A.   Sure.  If we could focus first on Item 3, and Item 3 was,

14  was the offender under any form of supervision when they

15  committed any sex offense for which they were eventually

16  charged and convicted?  My new review of the records, because

17  this was just really tough to tell when he was released right

18  at the end before he was arrested, was that he actually

19  received probation for a year on December 12, 2000.  That would

20  have been for, I believe, disorderly conduct --

21          (Witness examining document.)

22  A.   -- disorderly conduct when he had the fight with his

23  boyfriend, okay, and he was convicted of that and given a year

24  probation.  And then he was arrested for risk of injury to a

25  minor on February, 2001.  So that actually should have been

United States v. Todd Carta - Bench Trial Day 1

1    scored a plus 2 rather than a zero, okay.

2        And now moving down to examining Item No. 7, I have a

3    scoring error there that's quite obvious, unfortunately.  If

4    you look at 7, the risk of injury to a minor had to do with

5    giving alcohol and drugs to Frederick's thirteen- and

6    fifteen-year-old brothers, and then he engaged in sexual

7    activity with the fifteen-year-old brother.  And so he had a

8    victim age thirteen to fifteen, and you see that checked.  But

9    if there's only one age group checked, that should be a zero

10   because no age group or one age group is a zero; and I put a

11   plus 3, so that should actually be a zero.  So if you look at

12   those two items, the difference is one point lower, which would

13   be a 10.  That's still in the high range, but it's a different

14   score.

15   Q.   So you've added two points to Question No. 3, and you

16   subtracted three points from Question No. 7; is that right?

17   A.   That's right.

18   Q.   And can you just tell us generally, how does the MnSOST-R

19   questionnaire differ from the Static-99 and 2002 questionnaires

20   in terms of the types of categories or questions on this list?

21   A.   Well, some of the items are exactly the same, some of them

22   very well-established predictors, but others are quite

23   different.  And so this is a broader look at some of the risk

24   factors that, at least when contained in the MnSOST-R, predict

25   future sexual offense, things like, was any sex offense

United States v. Todd Carta – Bench Trial Day 1

1    committed in a public place?  So that just shows a riskier

2    offended, right, that would offend in a public place.  Were

3    there multiple acts on a victim?  These are not contained in

4    other known actuarial instruments, so you get a little broader

5    predictor of the risk factors that predict future

6    sexual-offense.

7         Furthermore, this instrument contains four dynamic risk

8    factors or changeable risk factors, which neither of the other

9    instruments do, and it can account for treatment; completing

10   chemical dependency treatment, completing sex offender

11   treatment, or dropping out of that; also things like a

12   disciplinary history while incarcerated.  So there's a number

13   of very different items on this instrument.

14   Q.   And has the MnSOST-R gained acceptance in the

15   psychological community?

16   A.   Yes.  It's used widely.

17   Q.   And is there a range of scores that one can get on this

18   instrument?

19   A.   Yes.  You can get a negative score, and, you know, it goes

20   up to a much higher score than the static instruments simply

21   because of the way the items are arranged here.

22   Q.   And is there an average score on this instrument?

23   A.   I don't know the average score.  There is, but I don't

24   know what it is.

25   Q.   And what is the significance, if any, of Mr. Carta's score

United States v. Todd Carta - Bench Trial Day 1

1  of a 10?

2  A.   Well, it's in the high range, so he has many of these risk

3  factors on the MnSOST-R.   There are norms associated with

4  sexual reoffense on the MnSOST-R, some that are what we call

5  the older probabilities of sexual reoffense, the original

6  probabilities that have been used for many years.   A score of 8

7  or above would be associated in that sample with a 57 percent

8  probability of sexual rearrest in six years.   And they're also

9  a more contemporary sample, also of inmates released from the

10  Minnesota Department of Corrections, and in the contemporary

11  sample, the recidivism rates for a score in the high range are

12  lower.   They're approximately 30 percent -- or they are

13  30 percent for individuals who score in the high range.

14      Dr. Epperson has proposed that the higher probabilities

15  represent the person's true risk to the community.   So when not

16  under intensive community supervision, they would have the

17  higher probability of reoffense, 57 percent; and while under

18  community supervision, today, that they would have the lower

19  probability -- that would represent their threat rather than

20  their true risk -- that they would have the probability of

21  about 30 percent reoffense rate in a six-year period.

22      So if you look at those probabilities compared to those on

23  the Static-99R and Static-2002R, we've got the MnSOST-R at

24  about 30 percent because I believe Mr. Carta has two years of

25  community supervision.   I'm not completely sure, but I believe

United States v. Todd Carta - Bench Trial Day 1

1  so.  So for the next two years, his risk would be about similar

2  to an individual that would have a 30 percent risk on the

3  MnSOST-R; and if you stretch that six years out to ten years,

4  on the Static-99R and Static-2002R, it would be about

5  35 percent over ten years.  So they're actually pretty

6  comparable probabilities of sexual reoffense on all three

7  instruments.

8         MS. SERAFYN:  Your Honor, I'd like to move the

9  MnSOST-R scoring sheet into evidence.

10        MR. GOLD:  No objection.

11        THE COURT:  What number?

12        MS. PIEMONTE-STACEY:  33, your Honor.

13        THE COURT:  You need to finish in ten minutes because

14  this has been going on for a while, and we just need to finish

15  it so we can finish cross tomorrow.

16        (Government Exhibit 33 received in evidence.)

17        THE COURT:  How much more do we have?

18        MR. GOLD:  If I could just clarify, I believe the

19  evidence is that it's the three-year supervised release term,

20  but I just wanted to --

21        THE COURT:  How much longer because this has been

22  going --

23        MS. SERAFYN:  Your Honor, I don't have much more, but,

24  candidly, I spent more time than I wanted to on hebephilia.  I

25  don't believe that that's an issue here.

United States v. Todd Carta - Bench Trial Day 1

1      THE COURT:  But can we just move it along?  How much

2   longer do you think you have?

3      MS. SERAFYN:  You know, not more than a half an hour,

4   but I can try my best to compress it into ten minutes.

5      THE COURT:  Let's see what we can do, or even ten past

6   1:00.

7      MS. SERAFYN:  I'm almost done.

8   Q.  Dr. Phenix, after you score the actuarial instruments,

9   what, if anything, do you do next?

10  A.  Then I look at dynamic risk factors for future reoffense,

11  and in this case I looked at the Stable-2007.

12  Q.  And what is the Stable-2007?

13  A.  It's not an actuarial instrument, but it's an empirically

14  guided risk assessment instrument that examines the presence or

15  absence of dynamic risk factors.

16      MR. GOLD:  Your Honor, I just have an objection here

17  related to the objection to the other instrument.  The witness

18  is referring to the Stable-2007, but the instrument in the

19  report I believe is called --

20      THE COURT:  Yes, she can't have it both ways.  She has

21  to be able to look at factors.

22      MR. GOLD:  Right.

23      THE COURT:  So the 2007 one is in response to what I

24  just told her, which she couldn't rely on the one that you just

25  objected to.  So would you rather have her refer to the other

1   one?

2           MR. GOLD:  Well, no.  She's referring to something

3   which I think the idea was, it was what she had done before;

4   but what she had done before was not the 2007, I don't think.

5   I think it's something else.

6           THE COURT:  Well, do you withdraw your objection to

7   her looking at the other factors?

8           MR. GOLD:  Well, your Honor, she's referring to an

9   instrument like the SRA: FV, I think Stable-2007.  In her

10  report she uses something called the Stable-2000.

11          THE WITNESS:  There's a revision to it.  I just

12  haven't used the Stable-2007 in a long time.  But it is the

13  Stable-2000, I'm sorry, not the Stable-2007.  That's my fault.

14          THE COURT:  I see.  This isn't an objection that goes

15  back to the original?

16          MR. GOLD:  No, your Honor.

17          THE COURT:  Fine, okay.

18          THE WITNESS:  I originally used the Stable-2000.

19          THE COURT:  All right.

20  Q.   I'm sorry, did you finish explaining what the Stable-2000

21  is?

22  A.   Yes.

23  Q.   And can you tell us generally what sort of factors the

24  Stable-2007 considers?

25  A.   It considers significant social influences, factors having

United States v. Todd Carta – Bench Trial Day 1

aad00d87-693c-4031-858e-4f9d2d8a97b1

1   to do with intimacy deficits, factors having to do with the

2   ability to control your sexual preoccupation and sex drive,

3   cooperating with supervision, both institutionally and in the

4   community; and then also general self-regulation:  controlling

5   impulsive behavior that can end up with sexual acting out,

6   using good problem-solving, release planning, planning your

7   life, factors having to do with negative emotionality, which we

8   know predict future sexual reoffense.

9   Q.   And can you just generally go through those factors and

10  tell us about Mr. Carta's conduct or characteristics and how

11  they apply to each factor.

12  A.   Yes.   The first is significant social influences:  Who

13  will he be around that's not paid to be with him once he gets

14  out in the community?  And Mr. Carta is estranged from his

15  family, from his daughter, and will not be having the support

16  of his family once released to the community.  It's my

17  understanding that he has no structured release plan that

18  involves social support in the community.  This is a person who

19  was most recently in SOTP.  There, who was he associating with?

20  He was associating with the younger males, eighteen, nineteen,

21  and young-looking males.  The reason that he left SOTP was

22  because he wasn't allowed to associate with those individuals.

23      So it is clear to me that he does not have sufficient pro-

24  social support in the community and that he has a propensity

25  still to seek out inappropriate partners that will help him to

United States v. Todd Carta - Bench Trial Day 1

1   develop an appropriate relationship once released.

2   Q.   And are there any other dynamic factors that are relevant

3   to your risk assessment here from the Stable-2000?

4   A.   Yes.  They're all relevant.  He has significant intimacy

5   deficits.  He was in a marriage that lasted only eight months.

6   He had a four-year relationship with a female that involved

7   sexual behavior with multiple other people at the same time.

8           THE COURT:  Was he living with her?

9           THE WITNESS:  I --

10          (Witness examining document.)

11          THE WITNESS:  He was not living with her for over two

12  years.  But it ended up that the relationship was involved with

13  infidelity, which is what broke up that relationship.  He then

14  had a relationship with a seventeen-year-old male when he was

15  forty or forty-one, a turbulent relationship that ended up in a

16  conviction for disturbing the peace after they had a fight.

17          Mr. Carta has described himself as lonely.  He has

18  said that all of the relationships he's had, people have

19  cheated on him, people have let him down.  He's untrustworthy

20  of other people.  Psychological testing would indicate that his

21  ability to maintain relationships is very superficial.  It's

22  not likely that he has skills certainly to develop a meaningful

23  relationship that would be protective for future sexual

24  reoffense, and this is a person who turned to pornography all

25  day long as a substitute for an appropriate relationship.

United States v. Todd Carta - Bench Trial Day 1

1    He also has as part of intimacy deficits emotional

2    identification with children, with pubescent boys certainly.

3    He admits that he describes these youngsters as fresh and

4    innocent and virginal, and that's what's attractive to him.  He

5    says that they're not used up, okay, which indicates more

6    arousal to a younger person than an older person, because you

7    would think of an age-appropriate person in the way of thinking

8    of them as sexually used up would be a negative connotation.

9    He sees teens as more energetic, and also he says it makes him

10   appear more knowledgeable; you know, he's more respected by

11   youngsters than by his peers, for whom he has talked about

12   having a good deal of disdain.  So I believe that he has

13   present a strong emotional identification with children.

14       He also has present feelings of loneliness.  This is a

15   person who hasn't been able to maintain relationships that meet

16   his needs.  He has said that his feelings of loneliness caused

17   him to seek young males for sexual activity.  He had a home

18   visit from a probation officer, and when he came by, he just

19   said he was lonely and liked to have someone to talk to.  So if

20   you feel lonely and you have sexual arousal to children, you're

21   going to seek that person you feel most comfortable with so

22   that you're not feeling lonely, so that is another risk factor

23   for Mr. Carta.

24       The final component of intimacy deficits is a lack of

25   concern for others.  This means you have no in group, you have

1    no loyalties to, for example, your family or your lover or your

2    husband or wife.  And this is the case for Mr. Carta.  He has

3    alienated everyone in his life, either through retaliating

4    behavior when he has had fights or problems with them.  He's

5    alienated from his entire family.  He had his parents put up

6    bail for him a number of times.  He's skipped bail so that his

7    parents have lost that money.  These are the people that he

8    should be closest to.  He retaliates against his daughter, whom

9    he never really parented, and he told her to hurt her that he

10   had had sex with her boyfriend to get the boyfriend back so he

11   could have the boyfriend and she would not.  So he really lives

12   his life by preying on other people and just really meeting his

13   own needs, and this is also part of what we call "intimacy

14   deficits."

15           There are also factors having to do with sexual

16   self-regulation, and he's been very sexually out of control for

17   much of the time that he's been in the community.  He's a

18   highly sexually preoccupied individual, which is not

19   particularly unusual for individuals with paraphilias, but

20   that's certainly evidenced by the pornography that I've talked

21   about, the compulsivity, masturbating two or three times a day,

22   which for a man who's forty, an average would be twice a week,

23   an average for most males that age.  Missing work, not paying

24   attention to his hygiene because he's looking at pornography.

25           THE COURT:  What did he do for a job?

United States v. Todd Carta - Bench Trial Day 1

1       THE WITNESS:  Most recently I believe he lived for

2  free at a woman's residence, an elderly woman's residence where

3  he would, when things needed to be fixed around the house, he

4  would fix them.  He has very little organized job history.  He

5  is a person who has been involved for years with chat rooms

6  trying to seek out various age teenagers.  He advertised for a

7  fourteen- to seventeen-year-old male that he wanted to have a

8  relationship with.  So he's quite involved in Internet-seeking

9  pornography and sexual activity, both.  And he also was

10  sexually preoccupied in SOTP, as recently as SOTP, being

11  counseled repeatedly for engaging in inappropriate

12  relationships with the young participants, and undermining

13  their treatment and undermining his treatment at the same time.

14       He also has had a lack of cooperation with

15  supervision.  He's had three conditional release violations,

16  probation or parole, by my count.  And, furthermore, in SOTP

17  there was a lack of cooperation with what they were hoping

18  would be his goals for treatment, continuing to engage in

19  behaviors that he was counseled on repeatedly and even put on

20  probation for in SOTP.

21       Finally, he has exhibited general self-regulation

22  problems.  He is a person who is quite impulsive in his

23  behaviors.  We know that because, generally, when you use

24  significant drugs and alcohol in the community, that increases

25  a person's impulsivity, not thinking through the consequences

1  of his behavior.  It's pretty clear that he wasn't thinking

2  through the consequences of his behavior when he was engaging

3  in sex with these boys, when he was seeking and trading child

4  pornography and engaging in chat rooms to find children.

5      This is a person with poor problem-solving skills.  He

6  has no organized plan for release to the community.  He makes

7  poor decision when he's left to his own devices.  And he's also

8  a person who, the records indicate at least, has experienced

9  negative mood states and feels victimized and vulnerable to

10  emotional collapse when he feels victimized, and part of this

11  is his borderline personality traits which are relatively

12  strong.  He feels victimized by his parents, even though they

13  have every reason in the world to be estranged from him or

14  angry with him; victimized by his daughter; victimized by a

15  member in SOTP, who was a young member being pursued by

16  Mr. Carta.  When the young member brought it up in group,

17  Mr. Carta felt victimized and retaliated against that

18  individual.

19      Emotionally he spiraled out of control in several

20  instances, particularly those instances where he's threatened

21  his daughter, his mother, his daughter's boyfriend with death,

22  and retaliated through emotional rage in relationships.  So

23  that factor is present.

24      Every factor of the dynamic risk factors that are in

25  the Stable-2000 I believe are present for Mr. Carta, and I

United States v. Todd Carta - Bench Trial Day 1

1   think that they increase his risk.

2   Q.   Now, Dr. Phenix, have you considered protective factors at

3   all?

4   A.   Yes, I did consider protective factors.  Those would be:

5   Having been in the community for ten years without sexually

6   reoffending, his risk would be half.  That's never happened.

7   He offended and then went into custody.  Having less than

8   fifteen years in his life; his health is good.  And also being

9   what we consider a significantly older offender, and that would

10  pertain to someone over seventy, when the probabilities of

11  sexual reoffense that we see are likely to be lower than those

12  on the actual instrument.  So none of these apply to Mr. Carta.

13  Q.   And what role, if any, does Mr. Carta's age play in your

14  risk assessment?

15  A.   Well, his age reduces his risk.  It reduced it from a 6 to

16  a 5 on the Static-99R.  So it's already fully accounted for in

17  the actuarial instrument.  We no longer look at age outside the

18  actuarials.

19  Q.   And does the fact that Mr. Carta committed sexual offenses

20  in his thirties or forties affect your opinion at all, or is

21  that accounted for in the instruments?

22  A.   That's accounted for in the instruments.

23  Q.   And what about treatment, what role does treatment play,

24  if any, in your risk assessment?

25  A.   Well, his risk is increased as a result of dropping out of

United States v. Todd Carta – Bench Trial Day 1

1    sex offender treatment.  First of all, that's a risk factor

2    that he received three points for on the MnSOST-R because we

3    have overwhelming evidence that dropping out of sex offender

4    treatment increases an individual's risk.  But it's what he did

5    in treatment that is so troubling.  He essentially recreated

6    his reoffense cycle, was living that out while he was in

7    treatment.  He admitted that he was sexually aroused and

8    attracted to the younger teenager, you know, or early twenties.

9    I know there was a nineteen-year-old or eighteen-year-old that

10   he was attracted to.  He would admit that he was aroused to

11   them, and then, however, he wouldn't stop that.  He would

12   continue to seek out those young males to be their best friend,

13   to have them look up to him as --

14            THE COURT:  Any evidence he ever touched any of them?

15            THE WITNESS:  No, no evidence that he touched.

16            THE COURT:  Well, then how do we know this?  Is this

17   his self-report, or is it an observing made by the staff?

18            THE WITNESS:  Oh, it was an observation made over and

19   over again in SOTP records.

20            THE COURT:  By staff?

21            THE WITNESS:  By staff.  But he admitted to it.  He

22   admitted to being aroused to them.

23            THE COURT:  To the staff down in Butner?

24            THE WITNESS:  No, aroused to the other inmates, the

25   young inmates.

United States v. Todd Carta - Bench Trial Day 1

1          THE COURT:  Right, right.  Whom did he admit it to?

2          THE WITNESS:  The staff at Butner in the treatment

3     program.

4          THE COURT:  I see.

5          THE WITNESS:  And it became a subject of group and

6     individual therapy, so it was discussed in both in the progress

7     notes.

8          He tried to avoid those individuals -- well, he said

9     he was going to try to avoid them.  I don't know whether he did

10    try to.  And he was repeatedly counseled.  He was finally put

11    on probation.  And staff attempted in every way to help him,

12    they reported, help him to avoid this.  And he said he

13    preferred to be around -- associate with the younger inmates,

14    so he quit treatment so he could associate with them.

15         Furthermore, he did not change the cognitive

16    distortions or thinking errors that contributed to his

17    offending, such as it was okay to have sex with a

18    thirteen-year-old boy and it didn't hurt or harm that boy.  It

19    was noted in the treatment summary that he still had

20    maladaptive attitudes that would contribute to his offending.

21    So it just appears that today Mr. Carta is the same person who

22    was arrested for the child pornography, does not have, was not

23    in treatment long enough to develop a relapse prevention plan,

24    a structured way to avoid relapsing again.  And so he's

25    essentially an untreated sex offender, no different than when,

United States v. Todd Carta - Bench Trial Day 1

1   in my opinion, than when he was arrested with the pornography.

2   Q.   What, if anything, does the research tell us about

3   treatment failure?

4   A.   Treatment failure is a robust predictor of future sexual

5   reoffense.

6   Q.   And, in your opinion, what is the effect of Mr. Carta's

7   dropping out of treatment on his overall risk?

8   A.   It increases his risk.

9        MS. SERAFYN:   Your Honor, if I could just have a

10  moment.

11       (Discussion off the record between government

12  counsel.)

13  Q.   Dr. Phenix, based on everything that we've discussed here,

14  including the actuarial instruments and the dynamic risk

15  factors that you considered, what is your opinion regarding

16  whether Mr. Carta will have serious difficulty in refraining

17  from sexually violent conduct or child molestation if he's

18  released?

19  A.   I believe that he will.

20       MS. SERAFYN:   I have nothing further, your Honor.

21       THE COURT:   So we'll come back tomorrow morning at

22  9:00.  Let's go off the record and talk about scheduling for a

23  second here.

24       (Discussion off the record.)

25       (Adjourned, 1:15 p.m.)

United States v. Todd Carta — Bench Trial Day 1

1                    C E R T I F I C A T E

2


3

UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS    ) ss.
CITY OF BOSTON                )
5


6


7           I, Lee A. Marzilli, Official Federal Court Reporter,

8  do hereby certify that the foregoing transcript, Pages 1

9  through 124 inclusive, was recorded by me stenographically at

10  the time and place aforesaid in Civil Action No. 07-12064-PBS,

11  United States of America v. Todd Carta, and thereafter by me

12  reduced to typewriting and is a true and accurate record of the

13  proceedings.

14       In witness whereof I have hereunto set my hand this 16th

15  day of December, 2010.

16


17


18


19


20
              /s/ Lee A. Marzilli
21           _____

              LEE A. MARZILLI, CRR
22           OFFICIAL COURT REPORTER

23


24


25

United States v. Todd Carta - Bench Trial Day 1

aad00d87-693c-4031-858e-4f9d2d8a97b1