```
              IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,          )
                                   )
              Petitioner           )
                                   )
       -VS-                        )  CA No. 07-12064-PBS
                                   )  Pages 2-1 - 2-140
TODD CARTA,                        )
                                   )
              Respondent           )
```

BENCH TRIAL - DAY TWO

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE

United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
December 14, 2010, 9:15 a.m.

LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 7200
Boston, MA  02210
(617)345-6787

1    A P P E A R A N C E S:

2

3         EVE A. PIEMONTE-STACEY, ESQ. and JENNIFER A. SERAFYN, ESQ.,
     Assistant United States Attorneys, United States Attorney's
     Office, 1 Courthouse Way, Boston, Massachusetts, 02210,
4    for the Petitioner.

5         IAN GOLD, ESQ. and TAMARA FISHER, EXQ., Federal Public
     Defender Office, District of Massachusetts, 51 Sleeper Street,
6    5th Floor, Boston, Massachusetts, 02210, for the Respondent.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

United States v. Todd Carta - Bench Trial Day 2

Page 3

1                           I N D E X

2

WITNESS                  DIRECT    CROSS    REDIRECT    RECROSS

3

AMY PHENIX

4

        By Mr. Gold:                2-4

5       By Ms. Serafyn:                       2-118
        By Mr. Gold:                                    2-132

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1                    P R O C E E D I N G S

2          THE COURT:  Do you want to call the case?  Well, it's

3   a continuation of the case.  She's still under oath.  Mr. Gold,

4   it's your opportunity here.  You're up at bat.

5          MR. GOLD:  Thank you.  Your Honor, I'm going to use

6   the document camera and then come over here sometimes.

7          THE COURT:  Do whatever you want.

8          MR. GOLD:  Thank you very much.

9          THE COURT:  Short of leaving.

10          MS. PIEMONTE-STACY:  He can leave.

11          MR. GOLD:  I'm resisting the urge.

12                         AMY PHENIX

13   having been previously duly sworn, was examined and testified

14   further as follows:

15   CROSS-EXAMINATION BY MR. GOLD:

16   Q.   Good morning, Dr. Phenix.

17   A.   Good morning.

18          THE COURT:  Let me just ask, is there anybody else

19   who's going to be a witness today, to our knowledge?

20          MR. GOLD:  Not today.  I have reached out and made

21   contact with our experts about setting something up for next

22   week, and we expect to be able to confirm something with

23   Mr. Alba early next week.

24          THE COURT:  Okay.  Just I saw someone else out there.

25   I didn't know that we had any scheduling issues.  That's fine.

United States v. Todd Carta - Bench Trial Day 2

ea80c287-9e6a-4921-aea0-a5f475e78ff1

Page 5

1   Q.   Dr. Phenix, we spoke yesterday about the diagnosis of

2   hebephilia.  Do you recall that?

3   A.   Yes.

4   Q.   And "hebephilia" is a term that exists in the psychological

5   literature?

6   A.   Yes.

7   Q.   And we talked about the upcoming DSM-V.  Do you recall

8   that?

9   A.   Yes.

10  Q.   When is the DSM-V going to come out?  Do you have any

11  knowledge of that?

12  A.   No.

13  Q.   Right now, the DSM-V has committees that are considering

14  proposed diagnoses for the new book.  Is that a fair statement?

15  A.   Yes.

16  Q.   And one of those committees is considering sexual disorder

17  diagnoses?

18  A.   Yes.

19  Q.   And the diagnosis that we spoke about yesterday and the

20  criteria that we looked at is a proposal from one of these

21  committees, right?

22  A.   Yes.

23  Q.   Now, yesterday you testified that your understanding of

24  hebephilia is the same as the diagnosis that we were speaking

25  of yesterday?

ea80c287-9e6a-4921-aea0-a5f475e78ff1

1   A.   Yes, similar to that, yes.

2   Q.   And you stated that people who are afflicted with

3   hebephilia, or pedohebephilia as it's going to be called, have

4   a sexual attraction to immature humans, I believe, between the

5   ages of eleven and fourteen?

6   A.   Yes.

7   Q.   And you said that you could describe those people as

8   becoming pubescent?

9   A.   Yes, during pubescence.

10  Q.   Or going through pubescent.  Do you recall saying that?

11  A.   Yes.

12  Q.   And do you recall Ms. Serafyn asked you whether people in

13  the age range of sixteen to seventeen would qualify as being

14  part of the focus of people afflicted with this diagnosis?

15  A.   Yes.

16  Q.   And you said "not in my opinion," right?

17  A.   Yes, although I allowed that there are different -- that

18  some children don't become pubescent until later.  So the

19  average would be eleven to fourteen.  It's possible that a

20  child could still be going through pubescence at fifteen or

21  sixteen, so I would make that consideration.

22  Q.   At fifteen or sixteen?

23  A.   Right.

24  Q.   And you testified that what the Blanchard -- Ray Blanchard

25  is the name of one of the researchers who is describing this

United States v. Todd Carta - Bench Trial Day 2

ea80c287-9e6a-4921-aea0-a5f475e78ff1

Page 7

1    diagnosis in the literature right now, right?

2    A.    Right.  He's the first author.

3    Q.    He's the first author of a research article describing

4    some research in which this diagnosis is proposed for inclusion

5    in the DSM, right?

6    A.    Right.

7    Q.    And in fact the research article that we discussed and was

8    entered into evidence describes a body of research by this

9    research group headed by Dr. Blanchard and a proposal that it

10   be included in the forthcoming DSM-V, right?

11   A.    Yes.

12   Q.    Now, you said that you had consulted this article prior to

13   or in the process of developing your original opinion in this

14   case.  Do you recall that?

15   A.    Yes, I believe that I read it, uh-huh.

16   Q.    And you said that your diagnosis was consistent with what

17   they had proposed.  Do you recall that?

18   A.    I think it is, yes.

19   Q.    But, now, you testified in a trial in this case in

20   February of 2009 over a year ago, right?

21   A.    Correct.

22   Q.    And during that trial you talked about the purpose of

23   diagnosis and stated that the purpose of a diagnosis or one of

24   the purposes is so that clinicians can communicate with each

25   other.  Is that a fair statement?

Page 8

1    A.    Yes, the diagnoses in the DSM-IV-TR.

2    Q.    Well, that's one of the reasons you have diagnoses, so

3    that you can communicate information to someone by diagnosing

4    them about that person, right?

5    A.    Yes, to have agreement.

6    Q.    And for the record, I'm putting up on the document viewer

7    your testimony from this trial, day one.

8          THE COURT:  Excuse me.  Is that my trial or

9    Judge Tauro's trial?

10         MR. GOLD:  Judge Tauro's trial.  I'm looking for the

11   date.  I don't see it on the first page of this, but

12   February 9, 2009, Page 184.

13   Q.    And you testified that "Hebephilia is well recognized by

14   those of us that work in this field diagnostically.  If someone

15   comes to me and says, you know, 'I've provided this diagnosis,'

16   I know exactly what it means.  You testified it means that the

17   person does not just have sexual arousal or perhaps any sexual

18   arousal to prepubescent children, but that is this preference

19   for young teens to -- throughout the teenage years actually

20   till about age seventeen."

21         That was your testimony?

22   A.    Yes.

23   Q.    Now, the way the diagnoses are included in the manual is,

24   research is performed prior to the diagnosis being adopted in

25   the manual; is that right?

1    A.    Yes.

2    Q.    And part of the purpose of that research is to develop

3    information about the condition, right?

4    A.    Yes.

5    Q.    And part of the information that you might develop about

6    the condition is information about its chronicity or how long

7    it lasts, right?

8    A.    Yes.

9    Q.    And in fact pedophilia is a diagnosis which is included in

10   the manual, correct?

11   A.    Yes.

12   Q.    And there have been research studies about, for example,

13   the chronicity of pedophilia, right?

14   A.    Yes.

15   Q.    And there have been research studies about different

16   people who were afflicted with different types of pedophilia;

17   for example, fixated pedophiles versus nonexclusive pedophiles?

18   A.    That's very old research, it's not used anymore, but there

19   was research that described pedophilia that way as fixated.

20   Q.    Well, this is part of the process or the research which

21   makes a diagnosis includable in the DSM, right?

22   A.    That really wasn't research-based, determining a fixated

23   pedophile.  That was just a typology, a description based on

24   observation.  But certainly there are scientific studies that

25   are examining various aspects of pedophilia.

United States v. Todd Carta – Bench Trial Day 2

ea80c287-9e6a-4921-aea0-a5f475e78ff1

1  Q.   Well, but you have testified that, for example, pedophiles

2  with male victims are more likely to reoffend than pedophiles

3  with female victims based on a statement in the DSM, right?

4  A.   A statement in the DSM, the Hanson-Bussiere meta-analysis.

5  There's lots of --

6  Q.   But the statement in the DSM in particular is based on

7  research, right?

8  A.   It is, yes.

9  Q.   And the DSM informs you or directs clinicians to add a

10  qualifier such as exclusive or nonexclusive when diagnosing

11  someone with pedophilia, correct?

12  A.   Yes.

13  Q.   And presumably that practice is also based on the research

14  regarding that particular affliction, right?

15  A.   Presumably.

16  Q.   Has there been research done of which you're aware

17  regarding the chronicity of hebephilia?

18  A.   Not that I'm aware of, no.

19  Q.   Now, Dr. Phenix, I want to ask you a few questions about

20  your background and qualifications.  You are essentially, well,

21  a professional witness.  Is that a fair statement?

22  A.   Yes.

23  Q.   A good part of your work life is taken up with testifying

24  in cases such as this one, right?

25  A.   That's right.

1  Q.   And another good part of your work life is taken up doing

2  trainings and things for people involved in the management of

3  sex offenders?

4  A.   Yes.

5  Q.   For the record, I'm putting up on the document viewer an

6  image of a website.  Do you recognize your website on the

7  document viewer?

8  A.   Actually, it's not on, my viewer.

9       THE CLERK:  Turn the monitor on, the right-hand side

10 button, the lower right-hand.

11 A.   I recognize this, yes.

12      THE COURT:  You know, just as yesterday when I

13 couldn't read it, for some reason this is blurry on my -- is

14 there a way of, like, focusing in on it?

15      THE WITNESS:  Mine is also blurry.

16      THE COURT:  Yesterday's was a problem too, but

17 anyway -- oh, oh.

18      MR. GOLD:  No, I think this will be good.  Oh, no,

19 that's too big, too big.  Sorry.

20      (Discussion off the record.)

21      THE COURT:  Can you all see that?

22      MR. GOLD:  I'm not actually getting into much detail

23 on this, Judge.

24      THE COURT:  All right.

25 Q.   And it says there "Amy Phenix, Ph.D., Incorporated"?

1    A.    Right.

2    Q.    And so you are an incorporated business?

3    A.    I am.

4    Q.    And do you have employees that work for you?

5    A.    I do.

6    Q.    And do they do any of this work that we've just talked

7    about, report writing or testifying?

8    A.    I have one individual who helps me with the legal

9    documents and writing up the case, but no one testifies.

10   Q.    So with respect to the report that you've done in this

11   case, did anyone help or participate with you in drafting the

12   report?

13   A.    No.

14   Q.    And when you refer in your reports to "we," are you

15   referring to other people in your corporation?

16   A.    I don't know.  I don't -- I don't recall saying "we."

17   Q.    Your career has started in about 1990, is that right, as a

18   clinical psychologist?

19   A.    Yes.

20   Q.    Now, you obtained your professional degree from the

21   California School of Professional Psychology; is that right?

22   A.    Correct.

23   Q.    And you did not focus as a student on sex offenders in

24   particular, right?

25   A.    Correct.

ea80c287-9e6a-4921-aea0-a5f475e78ff1

1  Q.   And in fact, as a student, you did not involve yourself in

2  forensic psychology specifically, right?

3  A.   Uhm, I did during my clinical internship but not in my

4  class work.

5  Q.   So after your class work was done, you got a job

6  essentially at a prison; is that right?

7  A.   Right.  That's where I did my clinical internship.

8  Q.   And was that the California Men's Colony?

9  A.   Yes.

10  Q.   And how long was that clinical internship?

11  A.   One year.

12  Q.   Now, you've had experience treating sex offenders, right?

13  A.   Yes.

14  Q.   And you cite that experience as part of the experience on

15  which you rely when you do these evaluations, right?

16  A.   Yes.

17  Q.   And when you were doing your clinical internship at the

18  California Men's Colony, did you do any treatment there?

19  A.   Yes.

20  Q.   And what did that treatment consist of?

21  A.   I provided individual therapy for about four years to a

22  case load of inmates, many of who had committed sex offenses.

23  It's a protective custody prison, so there were a lot of

24  individuals who committed sex offenses.  I also provided other

25  types of group therapy to -- call them lifers, individuals who

1  had committed homicides and had life sentences, on life skills,

2  anger management, interpersonal skills, that type of thing.

3  Q.   Well, that therapy that you were providing was not

4  sex-offender-specific treatment, correct?

5  A.   Not those groups for lifers, but the individual therapy,

6  much of it was, yes.

7  Q.   Was it sex-offender-specific therapy or psychotherapy

8  provided to people who happened to be sex offenders?

9  A.   Well, it was a long time ago, and we didn't have the same

10  type of structured cognitive behavioral treatment programs, so

11  it was primarily a psychotherapy but focused on not reoffending

12  sexually or criminally, and gaining the pro-social skills to be

13  able to do that.

14  Q.   Now, at some point you did facilitate -- well, let me

15  withdraw that.  Now, does California have a sex offender

16  commitment law?

17  A.   Yes.

18  Q.   And when was that passed?

19  A.   January 1, 1996.

20  Q.   January 1, 1996.  Now, when you were working at the

21  California Men's Colony, did you have an opportunity to change

22  jobs?

23  A.   Yes.  I changed jobs.

24  Q.   And where did you go after the California Men's Colony?

25  A.   I went to the Parole Department, California Parole

1   Department, Fresno, California.

2   Q.   And after that, did you go to the Department of Mental

3   Health?

4   A.   Yes.

5   Q.   And why did you go to the Department of Mental Health?

6   A.   To become a clinical consultant for the Sex Offender

7   Commitment Program.

8   Q.   Now, is the name of the person who invited you there Craig

9   Nelson?  Is that something that I recall correctly?

10  A.   Yes.

11  Q.   So Craig Nelson invited you to come over to help start a

12  sex offender evaluation program for this new commitment law.

13  Is that a fair statement?

14  A.   Yes.

15  Q.   And when he asked you to do that, you didn't have any

16  special expertise in the evaluation of sex offenders.  Is that

17  a fair statement?

18  A.   Well, I -- I had evaluated several hundred sex offenders,

19  so I did have experience.

20  Q.   Well, but when you say you evaluated them, what exactly

21  does that mean?

22  A.   Well, any -- California Men's Colony was a large

23  psychiatric hospital and protective custody prison, so as

24  inmates were referred to the prison, they needed to be

25  evaluated when they got there.  And then a treatment plan was

1   developed, and then they were placed into some type of

2   treatment program or not, or sent back out.  And so I evaluated

3   many sex offenders at the California Men's Colony, diagnosed

4   them, provided a treatment plan for them, and provided

5   treatment to them.

6           THE COURT:  Did any of them get better, so to speak,

7   and were able to control their impulses?

8           THE WITNESS:  I wouldn't know because I didn't follow

9   them once they were released.  Seemingly they gained skills in

10  treatment, but that really wouldn't tell you anything.  You

11  would need to see a follow-up of how they did once released to

12  the community.

13          THE COURT:  Well, did you ever actually follow someone

14  through and provide them therapy and then feel as if they could

15  control their impulses?

16          THE WITNESS:  Oh, yes.

17          THE COURT:  And you recommended release?

18          THE WITNESS:  Uhm, those individuals I had in

19  treatment groups in the Parole Department, and I thought that

20  they improved, and I could see that they did not reoffend when

21  I was working there.  In terms of the prison, they had

22  determinant sentences, so I had nothing to do with when they

23  would be released.

24          THE COURT:  I see.  So it wasn't a civil commitment

25  situation like this?

1      THE WITNESS:  Exactly.

2      THE COURT:  So you've never been involved in sort of,

3  the guy's got a problem, maybe a chronic problem, and then you

4  work with him, and then you say, "Well, I think he can control

5  himself now," and recommend release?  You've never been in that

6  situation?

7      THE WITNESS:  Well, I have actually.  I've had

8  several -- I've had maybe three or four cases where I've worked

9  for the respondent once they have completed treatment in the

10  Sex Offender Commitment Program in California as a sexually

11  violent predator where they've completed treatment, and I made

12  recommendations for their release; or they have been released

13  to conditional release, so they're on supervision, and I've

14  made recommendations that supervision could end.

15  Q.   Now, going back to the early 1990s for a minute, so you

16  provided this treatment to all the offenders that were referred

17  to you at the California Men's Colony, right?

18  A.   Well, I provided treatment to some of the offenders.  I

19  evaluated many, and some of those I provided treatment to.

20  Q.   Well, what was your task there when you were referred an

21  inmate?  Were all inmates who came in referred to you?

22  A.   No.  There was an intake team, and that team was a

23  multitude of psychologists who did incoming evaluations.  We

24  provided -- we conducted a mental status examination, we took a

25  psychosocial history, we provided a diagnosis, and then we

1    provided a treatment plan, and then they were referred to

2    treatment groups.  And I did some of those groups; I did some

3    individual therapy.

4    Q.   But wasn't that therapy primarily for psychological issues

5    of the typical variety; for example, depression and things of

6    that nature?

7    A.   Sometimes.  Sometimes it was sex offenders, and we worked

8    on sex offender issues.

9    Q.   But they were referred because of these other primary

10   ailments such as depression, things that would require referral

11   to the mental health unit?

12   A.   No, not always.

13   Q.   Not always?

14   A.   Treatment was available.  You could have a case load of

15   individual therapy that you selected individuals, and they

16   didn't have to have a secondary -- a dual diagnosis, for

17   example.  They could have just had pedophilia and been there

18   for protective custody or for other reasons rather than

19   psychiatric purposes.

20   Q.   And is that the extent of your experience as a therapist,

21   providing treatment to sex offenders?

22   A.   No.  I had a private therapy practice in California from

23   the time that I was licensed for about five years.  I have

24   postdoctoral training in sex therapy.  I was a sex therapist

25   for a number of years.  In the community I also treated --

1  provided psychotherapy for adults in my private practice, so

2  I --

3  Q.   Well, so psychotherapy for adults, and you just mentioned

4  this human sexuality part of your practice?

5  A.   Right.

6  Q.   Is that related to the study of abnormal psychology?

7  A.   Well, there was a minimal amount of training, I would say,

8  in deviant sexual behavior.

9  Q.   A minimal amount?

10 A.   Yes, a minimal amount.  I mean, there was some but not

11 much.

12 Q.   And then the work that you were doing was counseling

13 couples essentially?

14 A.   That's right, that's right.

15 Q.   And that was before your work in correctional psychology

16 that we're talking about right now?

17 A.   I did it at the same time.  I worked evenings and weekends

18 in my private practice, and I worked at the prison kind of 8:00

19 to 5:00 during the week.

20 Q.   Now, Craig Nelson, when he asks you to come over to the

21 sex offender treatment program that he was starting up, he gave

22 you a packet of research, right?

23 A.   He did, yes.

24 Q.   So that you could start to educate yourself about the

25 research in this area of forensic psychology, right?

1    A.    Right, so new research had just come out.

2    Q.    After you got this research, I believe he asked you to do

3    it, and then I believe you've testified that you went to the

4    Association for the Treatment of Sexual Abusers' annual

5    conference, right?

6    A.    Right.

7    Q.    And that was the first time you had ever gone to that

8    particular conference, right?

9    A.    That's right.

10   Q.    And one of the things that Dr. Nelson had given you was

11   this meta-analysis which this Court has heard about, then in

12   unpublished form, by Dr. Karl Hanson, right?

13   A.    Yes.

14   Q.    And a meta-analysis is a study, a quantitative study of

15   other studies, and this was one about characteristics

16   associated with sexual reoffending, right?

17   A.    Right.

18   Q.    And you then, as one of the first steps that you took in

19   this post at the California Department of Mental Health, you

20   hired Dr. Hanson as a consultant, right?

21   A.    Yes.

22   Q.    And you worked with him to develop a protocol for

23   evaluating sex offenders for the new Sex Offender Commitment

24   Program in about 1995-1996, right?

25   A.    Yes.

United States v. Todd Carta - Bench Trial Day 2

Page 21

1  Q.   This Court has heard a lot of testimony, but the first

2  development after this, I think, of significance is that the

3  Hanson group or Dr. Hanson develops an actuarial instrument,

4  right?

5  A.   Yes.

6  Q.   And that was a way to combine these factors because prior

7  to this, people were just sort of summing them up, right?

8  A.   Yes.

9  Q.   And this was a mechanistic way to combine them to improve

10  the accuracy of predictions, right?

11  A.   Yes.

12  Q.   And that is always the purpose of these developments in

13  the field, is ostensibly to improve the accuracy of these

14  determinations, right?

15  A.   Yes.

16  Q.   And that's because the old saw is that clinical judgment

17  is notoriously unreliable, right?

18  A.   Yes.

19  Q.   And that these mechanical methods of combining these

20  factors is more accurate for a number of reasons, right?

21  A.   Yes.

22  Q.   One of those reasons is, it removes human bias, right?

23  A.   Yes.

24  Q.   Or thought to be one of the reasons, right?

25  A.   Right.

1  Q.   Now, after the RRASOR, Dr. Hanson met with someone named

2  Dr. David Thornton who had his own instrument, right?

3  A.   Yes.

4  Q.   And that was called the S-A-C-J or Minimum or something

5  like that, right?

6  A.   SACJ-Min.

7  Q.   SACJ-Min.  And they combined those, and from that

8  combination was born the Static-99, right?

9  A.   Yes.

10 Q.   One of the interesting features about the RRASOR is that

11 it started with seven items, but then Dr. Hanson found that

12 three of them didn't improve the thing, so at the end of the

13 day, it was just four items, right?

14 A.   Yes.  That was the development, yes.

15 Q.   But then he combined it with Dr. Thornton's instrument,

16 and so then there were ten, right?

17 A.   Right.

18 Q.   Ten items.  And the Static-99 has come to occupy, really

19 occupy the field of actuarial instruments since it was

20 introduced, right?

21 A.   Yes.

22 Q.   Now, after the actuarial was introduced, Dr. Hanson asked

23 you to do a coding manual, right?

24 A.   Yes.

25 Q.   And that was based on your experience in California

Page 23

1  working with Dr. Hanson and evaluating sex offenders, right?

2  A.   Yes.

3  Q.   And you'd seen many coding issues come up, and so you were

4  well qualified to do a coding manual for the instrument, right?

5  A.   Yes.

6  Q.   But that coding manual was dated in 2000, and that was

7  about a 15-page document, right?

8  A.   Originally, yes.

9  Q.   And then subsequently in 2003 with some other authors, a

10  new coding manual was developed which was much lengthier,

11  right?

12  A.   Yes.

13  Q.   Now, that Static-99 was based on a sample of about 1,054

14  individuals, right?

15  A.   Yes.

16  Q.   And it was based on individuals who had been released from

17  prisons and mental hospitals in the 1970s and the 1980s, right?

18  A.   Yes.

19  Q.   And the experience tables -- well, an experience table is

20  where we get the percentages associated with particular scores

21  on the instrument, right?

22  A.   You can call it an experience table, sure.

23  Q.   And those experience tables were based on this old sample,

24  right?  Or, I'm sorry, this four old samples of individuals

25  released in the 1970s and 1980s, right?

1         THE COURT:  Mr. Gold, I just want to make sure.  I
2  don't know where you're going with this.
3         MR. GOLD:  Yes.
4         THE COURT:  So I don't know, but is this essentially a
5  Daubert attack on the actuarial tables?
6         MR. GOLD:  I've just been developing some context to
7  get to where we are today for --
8         THE COURT:  Because we are going to finish with her
9  today.
10        MR. GOLD:  Of course, yes.
11        THE COURT:  Okay, I just wanted to --
12  A.   I'm sorry.
13  Q.   And so those numbers were based on that old sample, right?
14  A.   The numbers were based on the validation of the UK sample,
15  the 531 UK inmates.
16  Q.   And those were the numbers for about seven or eight years,
17  right, that individuals would report when reporting Static-99
18  scores, right?
19  A.   That's right.
20  Q.   And it was a common criticism of those numbers from
21  defense experts, for example, or in the field that they might
22  be too high, right?
23  A.   Yes, that was a common criticism by defense experts.
24  Q.   Well, but there were many cross-validations of the
25  Static-99 during this period, right?

United States v. Todd Carta - Bench Trial Day 2

Page 25

1   A.   Yeah.  Oh, yes.

2   Q.   And those cross-validations confirmed that the instrument

3   did pretty well sorting people into risk bins, right?

4   A.   Yes.

5   Q.   But the percentages of reoffense were all over the place.

6   Is that a fair statement?

7   A.   They were different, yes.

8   Q.   And in recognition of this, the Hanson group in, I think,

9   2008 did a broad re-validation, right?

10  A.   Yes, a partial re-validation.  It was completed in 2009.

11  Q.   Well, they looked at a large number of contemporary

12  samples, right?

13  A.   In 2008, 18 samples they looked at.

14  Q.   In 2008, 18 samples?

15  A.   Right.

16  Q.   And then in the ATSA conference in 2008, they introduced a

17  new way to talk about the Static-99, right?

18  A.   Yes.

19  Q.   And they said that the recidivism rates in the old table

20  were overestimates, right?

21  A.   Yes.

22  Q.   And they said that they'd found that with contemporary

23  samples, the percentages were lower, right?

24  A.   Yes.

25  Q.   And what they did was, they took those samples and they

Page 26

1  developed two groups of samples which they called high and low

2  risk, right?

3  A.   Yes.

4  Q.   And they told evaluators to, when they reported a

5  Static-99 score, to give low and high risk, right?

6  A.   A range?

7  Q.   A range of risk, right?

8  A.   Right.

9  Q.   And this was in 2008, right about the time that you wrote

10  your report in this case, right?

11  A.   Uhm, let's see.  Yes.

12  Q.   And so while this case was pending, the field was changing

13  somewhat, right?

14  A.   Well, the reporting of Static-99 was changing.

15  Q.   Well, the meaning of what a Static-99 score was had

16  changed, right?

17  A.   Well, not the relative risk.  The low, medium, and high

18  ranges never changed, but the absolute probability, the way to

19  report that had changed.

20  Q.   Well, now, you call what you do to develop an opinion for

21  this Court "clinically adjusted actuarial risk assessment,"

22  right?

23  A.   I would say so, yes.

24  Q.   But your method has changed over the years, right?

25  A.   Well, of course.  The instruments have changed, and how

1    you interpret them has changed.

2    Q.   Well, you started out doing empirically guided clinical

3    judgment, right?

4    A.   Yes.

5    Q.   And then you went to clinically adjusted actuarial risk

6    assessment?

7    A.   Yes.

8    Q.   And that was for about over a decade, right, that you did

9    one version or another of that method, right?

10   A.   Right.

11   Q.   And then in this case, when you testified in February of

12   2009, you had recently changed your methodology.  Do you recall

13   that?

14   A.   Yes.

15   Q.   And you had changed your methodology to one which you

16   called "pure actuarial," right?

17   A.   Uhm, I don't recall saying that it was pure actuarial.

18   I -- I had more focus on the actuarials and less on the dynamic

19   risk factors at that time, but I still considered the dynamic

20   risk factors.  So that wouldn't be pure actuarial technically.

21   Q.   Do you recall participating as an expert witness in the

22   case of United States v. Wayne Hunt in this courthouse?

23   A.   Yes, I do.

24   Q.   And do you recall testifying at trial in April of 2009 in

25   that case?

Page 28

1  A.   Well, I don't remember my testimony, but I know that I did

2  testify.

3  Q.   And if you look at this screen, does that refresh your

4  memory as to whether you were describing what you did at that

5  time as a pure actuarial method?

6  A.   Let me review it.

7       (Witness examining transcript.)

8  A.   Yes.  I still maintain -- perhaps I didn't say it as well

9  there -- that technically I did consider the dynamic risk

10 factors, but I didn't adjust the actuarial instruments based on

11 those risk factors at that time.  I do today, but I did not at

12 that time based on some recent research.  So you could describe

13 it as pure actuarial, but I would have still discussed the

14 dynamic risk factors, but I wouldn't have adjusted the

15 actuarial instruments based on those dynamic risk factors.

16 Q.   Well, what happened in the 2008 is, they switched from

17 just telling you to report one percentage, and then after ATSA,

18 they said, "We want you to report a range."  That occurred,

19 right?

20 A.   It did.

21 Q.   When you'd report the Static-99?

22 A.   That's right.

23 Q.   And then about that same time, you said in trial in the

24 Hunt case -- it was about April -- that you'd switched to a

25 pure actuarial method where you used the dynamic factors, but

Page 29

1   you did not -- you would not state that the risk was outside

2   the range of those instruments, right?

3   A.   Correct, that's right.

4   Q.   And that was because of research by Dr. Hanson which said

5   that adding dynamic factors to an actuarial equation, I guess,

6   did not improve the accuracy of clinicians' decision-making,

7   right?

8   A.   Actually, it lowered the predictive accuracy.

9   Q.   Lowered.  And that was Hanson looking at three particular

10  studies, right?

11  A.   Right.

12  Q.   And I asked you at this trial, I said, "So that research

13  finding was important enough for you to change your method?"

14  And you replied "Yes," is that right?

15  A.   Well, yes, because Dr. Hanson advised us to change the

16  method.

17  Q.   And you took his advice, right?

18  A.   Right, I did.

19  Q.   And you changed a method that you had been using for many

20  years because of that advice, right?

21  A.   Uhm, changed it somewhat.  Much of it remained the same,

22  of course.  I always placed a great deal of emphasis on the

23  results of the actuarial instruments, so it wasn't a major

24  departure from what I had been doing.

25  Q.   Well, but a major departure was, you were telling

Page 30

1    courts -- or a departure was, you were telling courts that

2    "Whatever that high number is, I can't opine that the risk is

3    any greater than that based on the research."  That's what you

4    were saying at this time?

5    A.   Well, I would never say that.  If someone -- if there were

6    other factors involved in a case that I determined increased

7    the person's risk over the actuarials, I would always consider

8    that.  I would never say that a certain probability applied to

9    this individual and it could never be greater than that just

10   because an actuarial instrument tells me that.  I mean, it's a

11   case.  I have to consider the case factors.

12   Q.   Well, but you were using the dynamic factors, and you just

13   testified, to adjust within that range, right?

14        THE COURT:  You know, the problem is, I'm getting

15   confused now.  Can we talk about this case as to what she did

16   here and whether she adjusted and that sort of thing?

17        MR. GOLD:  Okay.

18        THE COURT:  Because I'm getting lost in another case

19   that you know a lot about and I don't.

20        MR. GOLD:  Right, and I'm trying to develop helpful

21   context, but I can see how that's happening, so I'll try to

22   loop it back.

23        THE COURT:  All right.

24   Q.   They've exchanged the way you should report the scores

25   again, right, the Hanson group?

Page 31

1   A.    Of the Static-99R and Static-2002?

2   Q.    That's right.

3   A.    Yes.   In 2009 the final analysis was done, and the

4   recommendations were that there would be four sample types and

5   to choose one of the four sample types.

6   Q.    So now when an evaluator is scoring a Static-99 -- you

7   said that with the Static-99R in your testimony yesterday,

8   there was one difference from the Static-99, right?

9   A.    Right, the Item 1, age item.

10  Q.    Age item.  But another difference is this choice of

11  choosing a sample before you report the scores, right?

12  A.    That's a difference in using the instrument.  The only

13  difference in the instrument is Item 1.

14  Q.    But in using the instrument, now you report four different

15  scores, right, or you choose from among four different samples,

16  right?

17  A.    You choose the appropriate sample type from four samples

18  in terms of finding an absolute, if you're looking for an

19  absolute probability of reoffense.

20  Q.    And are you looking for an absolute probability of

21  reoffense in this case?

22  A.    Yes.   I did consider that in this case.

23  Q.    And in your old report, you reported the Static-99

24  percentages from ten years ago, right?

25  A.    Well, yes.

United States v. Todd Carta - Bench Trial Day 2

ea80c287-9e6a-4921-aea0-a5f475e78ff1

Page 32

1   Q.    Because those were the percentages at the time?

2   A.    The original instrument, yes.

3   Q.    When you testified in trial in February of 2009, you said

4   that the Static-99 was associated with a range of scores,

5   right?

6   A.    Yes.

7   Q.    And that was your testimony.  That's what the Static-99 --

8   the same score but different percentages associated with it,

9   right?

10  A.    Right.

11  Q.    And now in 2010, the score is one point less, but we have

12  different percentages, right?

13  A.    Yes.

14  Q.    And even if he had not turned fifty, you'd be talking

15  about different percentages, right?

16  A.    Right.  When the validation went from 18 samples to 23, of

17  course the probabilities of reoffense would change.  The sample

18  changed.

19  Q.    Well, the sample --

20          THE COURT:  Here's my problem.  You're both losing me

21  as if you're having this private conversation, so if we can

22  just backtrack a minute.  So what's the difference between what

23  you did in Judge Tauro's trial and my trial?

24          THE WITNESS:  At the time of Judge -- you know, I

25  don't exactly recall everything that I did in that case, but

Page 33

1    from what I can see here, the Static-99 had a new validation on

2    a much, much larger sample.  What was found was that the

3    probabilities of sexual reoffense associated --

4              THE COURT:  What was found in the Tauro trial?

5              THE WITNESS:  Yes.

6              THE COURT:  Or here?

7              THE WITNESS:  In the Tauro trial.

8              MS. SERAFYN:  Your Honor, just for clarification, when

9    we talk about the Tauro trial, are we talking about the

10   original Carta trial, or are we talking about the Hunt trial?

11             THE COURT:  I don't even know who Hunt is, so this is

12   why I'm getting lost here a little bit.  I'm just trying to

13   understand.  I'm assuming that there have been different

14   methodologies, may result in different statistical ranges.  So

15   Mr. Hunt was another trial in front of Judge Tauro?  Is that

16   it?

17             MS. PIEMONTE-STACY:  Yes, your Honor.

18             MR. GOLD:  Yes, that's right.

19             THE COURT:  And what year was that in?  So what was

20   the 2009 trial?

21             MR. GOLD:  There were two 2009 trials, one in

22   February.

23             THE COURT:  Which is whose?

24             MR. GOLD:  And that's ours.

25             THE COURT:  Yes, right, that's what I have down.

United States v. Todd Carta - Bench Trial Day 2

ea80c287-9e6a-4921-aea0-a5f475e78ff1

Page 34

1          MR. GOLD:  And that's February, 2009.

2          THE COURT:  Yes.

3          MR. GOLD:  She also testified in the May, 2009 trial

4  of United States v. Wayne Hunt.  That's the second man who was

5  committed, Jeffrey Shields and Wayne Hunt.

6          THE COURT:  And was Hunt also in front of Judge Tauro?

7          MR. GOLD:  That was also a Tauro trial.

8          THE COURT:  I see.  So when you're all referring to

9  the Tauro trial, there are two Tauro trials?

10          MR. GOLD:  There are two Tauro trials, yes.

11          THE COURT:  Okay, so --

12          THE WITNESS:  And I did different Static-99

13  calculations for the probabilities of reoffense in each of

14  those trials.  In this trial, previous trial of Mr. Carta, I

15  used the original Static-99.  I had the original probabilities

16  of sexual reoffense for five, ten, and fifteen years,

17  39 percent, 45 percent in ten years, and 52 percent in fifteen

18  years.  That does not --

19          THE COURT:  That's what you told Judge Tauro in

20  February of 2009?

21          THE WITNESS:  Right, for the case of Mr. Carta.

22  Those, of course, don't apply directly to Mr. Carta, but that

23  is the probabilities of reoffense for the original study

24  sample.

25          THE COURT:  Right.

United States v. Todd Carta - Bench Trial Day 2

Page 35

1          THE WITNESS:  Now, there was another validation in

2    2008 where 18 new samples were collected from international

3    samples, combined together, and the Static-99 was validated on

4    those 18 samples.  And what we found is -- those samples are

5    newer -- we found --

6          THE COURT:  That's what you used for Hunt, or you're

7    using here?

8          THE WITNESS:  That's what I used for Mr. Hunt because

9    those had been released for Mr. Hunt but had not been released

10   for Mr. Carta.

11         THE COURT:  All right, but they're irrelevant to me

12   right now?  Is that wrong?

13         THE WITNESS:  They are irrelevant to you right now,

14   that's correct.  They're no longer used.

15         THE COURT:  Because they're no longer used?

16         THE WITNESS:  Because in 2009 the validation was

17   completed with a total of 23 samples, and it's those absolute

18   probabilities of sexual reoffense that we use today.

19         THE COURT:  Do you agree?

20         MR. GOLD:  No.

21   Q.   In fact in 2008 at ATSA -- this is an annual fall

22   conference.  They always come out with a new development.  So

23   there were the two samples.  So actually just to correct the

24   record, Dr. Phenix --

25         THE COURT:  Well, you can't testify.  Ask her about

Page 36

1  it.

2  Q.   Dr. Phenix, I've put up on the screen your testimony from

3  February 10, 2009.

4       THE COURT:  This is the what trial?

5  Q.   And this is in United States v. Carta.  And there you

6  testified that Mr. Carta had a 6 on the Static-99?

7  A.   Uh-huh.

8  Q.   And you were asked on direct examination what that score

9  meant, and you said, "There are probabilities associated with a

10 risk of 6.  They have changed since my original evaluation to

11 the current range of risk for a score of 6, and there are

12 estimates for five years and estimates for ten years."  And

13 then you reported that range.  Do you see that?

14 A.   That's right.  That's the 2008 ATSA release of the

15 validation of 18 samples that I was referring to just now.

16 Q.   Oh, okay, I'm sorry.  I thought you told the Court that

17 you had reported the original samples to the Court, to

18 Judge Tauro.

19      MS. SERAFYN:  Your Honor, I just want to object

20 because the First Circuit remanded this so that we could do

21 this again, and it seems like we're just reliving the first

22 trial and rereading those transcripts.  I'm not sure how that's

23 relevant to --

24      THE COURT:  Well, it might be relevant to credibility,

25 but I just have to understand it because I got so lost in the

1    Hunt trial.

2            MR. GOLD:  Right, and I'm sorry.  That was just a

3    convenient citation that she had changed her method and changed

4    back from pure actuarial to clinical actuarial, but she

5    actually testifies to the same effect here.

6    Q.   In the original Carta trial, you reported a range for the

7    Static-99 score of 6, right?

8    A.   Excuse me.  I'm going to refresh my memory.

9            THE COURT:  Well, what was just up on the screen is

10   different from what you just told me.

11           THE WITNESS:  Okay, referring to Page 29 of my

12   original report for Mr. Carta, I report the original

13   probabilities for the Static-99.  I do not use -- did not use

14   the 2008 validation release at ATSA.

15           THE COURT:  So what did you say the range was in the

16   original Carta trial?

17           THE WITNESS:  The original Carta trial was a

18   probability of sexual reconviction in five years of 39 percent,

19   in ten years of 45 percent, and in fifteen years of 52 percent.

20           THE COURT:  So what did I just see up on the screen?

21   What is the 13 to 27?

22           THE WITNESS:  Okay, this is the Hunt.

23           THE COURT:  Oh, this is Hunt.

24           MR. GOLD:  No, this is not Hunt.  I'm going to -- I

25   think this is just -- we're also --

United States v. Todd Carta - Bench Trial Day 2

Page 38

1      THE WITNESS:  But my report reflects the original

2   probabilities.  Now, whether I --

3      THE COURT:  So that's Carta?

4      THE WITNESS:  For Mr. Carta.  So I don't remember --

5   Q.   Well, that's right, because the report came out in 2008

6   prior to ATSA, right?  It's July, 2008, that your report is

7   dated?

8   A.   My evaluation is dated September 14, 2008.

9   Q.   September of 2008?

10  A.   And so ATSA was in October.

11  Q.   Right.  And you testified in the Carta trial in February

12  of 2009?

13  A.   Uhm, I don't know.

14      THE COURT:  Is it possible you readjusted again for

15  the new data?

16      THE WITNESS:  It's very possible, but it's very hard

17  to remember, so --

18      THE COURT:  I agree with you.  I'm right there.  It's

19  hard for me to remember things too, but I'm just trying to get

20  it right.  So could you flip up that, if you still have that,

21  Mr. Gold.

22  Q.   So right now we are looking, I have up for the record on

23  the document viewer transcript from day two of the jury-waived

24  trial in front of Judge Tauro.

25      THE COURT:  It's hard for her.  Do you have the

1    transcript so she can actually see the transcript.

2         THE WITNESS:  I can see now that this is his name and

3    this is his transcript rather than the Hunt transcript.  I

4    confused myself with that.  So it appears that counsel is

5    correct that I used the new validation from 2008, 2008 release

6    at ATSA.

7         THE COURT:  So if you updated it, it meant within --

8    you gave a range of 13 to 27 percent.

9         THE WITNESS:  That's right.

10        THE COURT:  And then you gave a --

11        MR. GOLD:  Those are five- and ten-year ranges.

12        THE COURT:  16 to 37 would be in ten, right?

13        THE WITNESS:  In the ten-year, yes.

14        THE COURT:  So that's dramatically less.

15        THE WITNESS:  Yes.  What they found in the original

16   revalidation of the 18 samples was that when you use

17   contemporary samples, those that were released from

18   institutions and prisons in the '80s and '90s rather than the

19   '60s and '70s, that recidivism rates dropped significantly.

20   And that's why the new validation was released because --

21        THE COURT:  Now, when you say "new," is that the new

22   before the last trial or the new before this trial?

23        THE WITNESS:  This new one right before this --

24   Mr. Carta's trial was --

25        THE COURT:  The first trial?

Page 40

1        THE WITNESS:  Yes.  About three months before his

2    trial, the validation was released.  And in 2008 at the

3    Association for Treatment of Sexual Abusers, these new

4    probabilities were -- we were advised to use these new

5    probabilities of sexual reoffense that were lower than the

6    original probabilities that I actually have in my report for

7    Mr. Carta from my first evaluation.

8        THE COURT:  Okay, so the correct ones would be these

9    ranges?

10        THE WITNESS:  At the time.

11        MR. GOLD:  Well, we're getting there, Judge.

12    Q.   But in February of 2009 --

13        THE COURT:  I just needed to understand historically.

14        MR. GOLD:  Right.

15    Q.   In February, 2009, you testified under oath that those

16    were the best ranges; that was the risk that the actuarial

17    instrument was telling you, right?

18    A.   I did, and that was true.

19        THE COURT:  Trial transcript, what page were you on in

20    case I want to go find that again?

21        MS. SERAFYN:  I think it was Page 16.

22        THE COURT:  16?

23        MS. SERAFYN:  Of day two.

24        THE COURT:  Thank you.

25        MR. GOLD:  Page 16 of day two, yes.

Page 41

1          THE COURT:  Perfect.  Thank you.

2     Q.   And turning your attention to Page 42 of the same

3     transcript, this is February of 2009.  So you were

4     characterizing the method that you were using to assess risk, a

5     pure actuarial method, during the Tauro Carta trial as well?

6     A.   That's right, because I did not adjust the overall risk

7     for the dynamic factors, even though I considered them.

8     Q.   And that's right, and so what you were testifying to in

9     that case was that the Static-99 gave you a range of risk,

10    right?

11    A.   Yes.

12    Q.   And the dynamic factors allowed you to adjust within that

13    range?

14    A.   Right.

15    Q.   But the pure actuarial method, which based on those

16    research studies at the time you thought was most accurate,

17    didn't allow you to use those to adjust above that range that

18    you gave?

19    A.   Right, generally, yes.

20         THE COURT:  So today, now the recommendation is just

21    to have an absolute number rather than a range?

22         THE WITNESS:  Correct.

23         THE COURT:  So when you gave the absolute numbers

24    yesterday, they fell within the second range but not the first

25    one?  Is that right?  I just want to understand.  You said

ea80c287-9e6a-4921-aea0-a5f475e78ff1

Page 42

1    under Hanson and Thornton under the 99-R, it was 35.5 percent

2    in ten years, which falls within that range, and 25.2 percent

3    within five years, right?

4           THE WITNESS:  That's correct.

5           THE COURT:  Sort of roughly similar for the 2002-R?

6           THE WITNESS:  That's right, almost identical.

7           THE COURT:  But you don't give ranges anymore?

8           THE WITNESS:  No.

9           THE COURT:  And what's the reason for that?

10          THE WITNESS:  Because they found -- identified four

11   different sample types, and you now choose the correct sample

12   type, the one that is most similar to the person you're

13   evaluating.

14          THE COURT:  So help me.  What does that mean?

15          THE WITNESS:  What it means is that they found that

16   factors outside of the actuarial instrument affected base rates

17   or rates of sexual reoffense.

18          THE COURT:  Like what?

19          THE WITNESS:  Like, has someone been preselected for

20   treatment?  Most jurisdictions and prisons will choose the top

21   twenty to thirty, the most risky twenty to thirty, most high-

22   risk offenders to participate in treatment because they can't

23   afford to provide treatment to all of the offenders in the

24   prison, nor do all of them need sex offender treatment.

25          So when an individual is preselected for treatment,

Page 43

1    what they found is that that person had higher base rates than

2    someone who had not been preselected for treatment.  And that

3    makes sense because if someone's being -- if the riskiest

4    offenders are being placed into sex offender treatment, their

5    base rates or reoffense rates are higher than just an average

6    inmate who committed a sex offense who was not referred to

7    treatment.

8            THE COURT:  So it involves discretion on your part as

9    to which of the four bins you put someone in?

10           THE WITNESS:  That's right.

11           THE COURT:  And which bin did you put Mr. Carta in?

12           THE WITNESS:  I put him in the high-risk bin.  What

13   we've also found out through new research is that these base

14   rates vary, and what is accounting for the differences in

15   reoffense rates in groups of sex offenders is the presence of

16   what we call "needs," high needs, or the presence of a lot of

17   dynamic risk factors.  So what we now know is that it's really

18   primarily the presence of dynamic risk factors that are

19   affecting different reoffense rates.  So if you use the

20   high-risk sample type, which I did, you would use that for an

21   individual who scored in the high range on the instrument that

22   I did not testify about yesterday, or has essentially all of

23   the dynamic risk factors present on the Stable-2000 that I did

24   testify about yesterday.

25           So if a person has a strong presence of those dynamic

ea80c287-9e6a-4921-aea0-a5f475e78ff1

Page 44

1  risk factors, then you choose the high-risk sample.  If the

2  person has been preselected for treatment, you could choose the

3  preselected-for-treatment sample --

4          THE COURT:  What are the other samples?

5          THE WITNESS:  The other sample is a --

6          THE COURT:  There are four of them?

7          THE WITNESS:  There's four.  One is simply a

8  combination of preselected for treatment and high-risk needs,

9  so if you're unclear, you can use that.  But the three primary

10 samples are routine, preselected for treatment, and high-risk

11 needs sample.  Those are the three.  And the probabilities --

12         THE COURT:  So why aren't they the same thing?  If

13 you're preselected for treatment under the thing you just told

14 me about, then it's because they're high risk.

15         THE WITNESS:  If you're preselected for treatment,

16 you're higher risk than the routine sample.  And if you have

17 the presence of many dynamic risk factors or all of the dynamic

18 risk factors, then you're higher risk than preselected for

19 treatment.

20         THE COURT:  So what are the dynamic risk factors you

21 used to put him in the high risk?

22         THE WITNESS:  And I testified to those.  Intimacy

23 deficit --

24         THE COURT:  Yes, but I didn't understand it.  When I

25 did this with -- was it Mr. Shields?  Probably, and maybe

Page 45

1   Mr. Wetmore.  Like you, they're all starting to blend.  But

2   basically the dynamic risk factors were things you considered

3   after you did -- you know, you did the -- like you did the

4   first time around here.

5             THE WITNESS:  Correct.

6             THE COURT:  You adjust -- I did or people did the

7   clinically adjusted actuarial risk.  So you did the basic --

8   there was no discretion.  It was like sentencing -- no.  It was

9   like, you know, it was a checkoff like your IRS forms.  This is

10  what you did.  It was literally mathematical.  You know, did he

11  have so many convictions?  Did he -- maybe not age back then, I

12  don't remember, but there were various factors, was it with a

13  male?  And you added it all up, and there was no discretion,

14  and then you started thinking about these dynamic risk factors.

15            Here, that's not the case because the very range or

16  percentage involved discretion to put him there, right?

17            THE WITNESS:  Well, I actually considered -- I scored

18  the actuarial instruments.  That's all empirical, it's all

19  mathematical.  But then I'd review all the dynamic risk

20  factors, which I had said in this case for Mr. Carta remain

21  present, all of them for him.  That means that he has high

22  needs.  We call that high needs, needs to be treated.

23            MR. GOLD:  Your Honor, could I just ask?

24            THE COURT:  Yes.

25  Q.   When you say "we" in that context, who are you referring

Page 46

1   to in particular or specifically?

2   A.   I'm referring to Dr. Hanson and my colleagues who I work

3   with in this capacity.  I'm part of the Static-99 development

4   team.

5          THE COURT:  Well, just out of curiosity, if we put him

6   in another bin, does the statistics change?

7          THE WITNESS:  Yes.

8          MR. GOLD:  Your Honor, could I ask some questions?

9          THE COURT:  Yes, go ahead.  You'll get there.  Yes,

10  you probably understand it a lot better than I do.

11         MR. GOLD:  Well, no, I think the Court is --

12  Q.   Let me just start just to kind of wrap up some of what we

13  were just talking about, before Carta one, in 2008 we have the

14  two samples?

15  A.   Yes.

16  Q.   And you testified in 2009, pure actuarial.  You reported a

17  range.  You said the dynamic factors allowed you to adjust

18  within the range, right?

19  A.   Right.

20  Q.   And then you -- and I guess you mean you and the Static-99

21  development team -- made a new presentation at a new ATSA in

22  2009, right?

23  A.   Yes.

24  Q.   And that was when this notion of dividing up samples into

25  four different groups was first introduced, right?

United States v. Todd Carta - Bench Trial Day 2

Page 47

1  A.    Yes.  I introduced it at ATSA.

2  Q.    You introduced it with your colleagues that you just

3  mentioned, right?

4  A.    Right.

5  Q.    And that has remained -- there was an ATSA also in 2010, I

6  suppose, but that's still the recommendation, to break up these

7  samples, right?

8  A.    Yes, to have four samples.  There are still four samples,

9  and it is recommended to choose one of them.

10  Q.    And, now, in your report you go through all in really very

11  fine detail these different samples and this process that we're

12  talking about right now, right, in the report that you just

13  submitted --

14  A.    Yes.

15  Q.    -- dated November 18?

16  A.    Yes.

17  Q.    And there you chose the high-risk sample, right --

18  A.    Right.

19  Q.    -- to compare Mr. Carta to?

20  A.    Yes.

21  Q.    Right.  Now, this comparison -- and the Court asked

22  whether there was discretion involved.  Has that comparison

23  been tested in any peer-reviewed type literature, the process

24  of placing individuals into these or comparing them to

25  particular groups of samples?

United States v. Todd Carta - Bench Trial Day 2

1   A.   No.

2   Q.   Has even the very notion of not comparing someone to the

3   overall sample been subjected or proposed in a peer-reviewed

4   journal?

5   A.   Well, there's peer-reviewed, you know, articles on

6   Static-99 demonstrating the variability and base rates and the

7   need to consider that variability.

8   Q.   But isn't it a common concept in statistics that the

9   larger the number that you have, the more reliable your

10  results, right?

11  A.   Generally, yes.

12  Q.   Generally that's true.  And in fact when the first split

13  of samples was announced, one of the advantages that was touted

14  for the new Static-99 was the size of the sample?  The number

15  of bodies had become a lot larger, right, about 6,000

16  individuals, right?

17  A.   Right, 8,000, yes.

18  Q.   Eight thousand individuals?

19  A.   Right.

20  Q.   And that was at least thought at the time to increase our

21  confidence in those numbers because we had larger numbers of

22  individuals, right?

23  A.   Well, we think that today, yes.

24  Q.   Well, but today what we're proposing in breaking up these

25  samples, you have now broken them up again into much smaller

ea80c287-9e6a-4921-aea0-a5f475e78ff1

Page 49

1    groups of individuals, right?

2    A.   Because the sample is so large, you have the capacity to

3    break them up into groups and still have meaningful

4    probabilities.  If you lump them all together, you will never

5    identify a high-risk sex offender from a low-risk sex offender

6    because it waters down those high base rate samples.  So it's

7    important that you identify individuals who are higher risk and

8    individuals who are lower risk so we can appropriately manage

9    them.

10   Q.   But isn't that what the Static-99 scores do?

11   A.   The Static-99 cutoff score is -- can -- relative risk does

12   that, relative risk, but the probabilities of sexual reoffense

13   vary.  So you can have a person with a score of 6 on Static-99,

14   and one person will have a reoffense rate of 15 percent while

15   another will have a reoffense rate similar to 50 percent.  So

16   the cutoff score --

17   Q.   Well, but individuals don't have their own reoffense

18   rate --

19              MS. SERAFYN:  Can the witness finish her answer?

20              MR. GOLD:  Oh, I'm sorry.

21   A.   So the cutoff score is one issue.  There will be higher

22   risk associated with a higher cutoff score.  But there are

23   individuals with higher cutoff scores that have very different

24   base rates of reoffense, and we must identify, if we can, those

25   individuals with high cutoff scores and high base rates of

Page 50

1    reoffense to appropriately manage them; and if you average all

2    of the samples together into one big routine sample, you will

3    not identify those individuals.  And so this method will help

4    us to know who are truly the high base rate sample offenders.

5             THE COURT:  You calculated risk based on which

6    instrument?

7             THE WITNESS:  Static-99R.

8             THE COURT:  And that came out in 2009?

9             THE WITNESS:  The new probabilities of reoffense on

10   the entire sample of 23 came out in 2009, were released.

11            THE COURT:  Has anyone done a Daubert hearing on it?

12            THE WITNESS:  Uhm --

13            THE COURT:  To your knowledge?

14            THE WITNESS:  Yes.  There's a Daubert hearing actually

15   on the Static-99R that will be next month?

16            THE COURT:  Before whom?

17            THE WITNESS:  Next month will be the first one.

18            THE COURT:  Before?

19            THE WITNESS:  In New Hampshire.  Counsel is here in

20   our audience.  The judge?

21            THE COURT:  So was it peer reviewed anywhere, these

22   new bins?

23            THE WITNESS:  Oh, the article on Static-99R has been

24   peer reviewed.  It's not yet out, but it's been peer reviewed.

25   The probabilities --

United States v. Todd Carta - Bench Trial Day 2

Page 51

1   Q.   Can we have some more information about that?  Something

2   has been peer reviewed but has not been published?

3   A.   Right.  It takes two years to get an article published.

4   But they have submitted articles.  I don't have them off the

5   top of my head.  I could certainly get the information for you,

6   but I don't have the articles that have been submitted.  But

7   the development of the Static-99R article has been submitted

8   and it has been peer reviewed, according to the authors.

9          THE COURT:  What is the last test that has been peer

10  reviewed and is published and is commonly used?  Would that

11  just be the basic Static-99 or the range one?

12         THE WITNESS:  The authors have recommended not to use

13  the Static-99 anymore because the probabilities of sexual

14  reoffense are too high.

15         THE COURT:  So it's the next one?

16         THE WITNESS:  So it's the Static-99R.

17         THE COURT:  But with the old criteria that creates the

18  range, was that peer reviewed?

19         THE WITNESS:  The peer review is simply the

20  development of the instrument.  That's what they peer review.

21  They don't peer review the probabilities.  Those are simply a

22  mathematical calculation that results from the sample type that

23  you use.

24         THE COURT:  Here's my problem, all right?  It keeps

25  changing.

1          THE WITNESS:  It does.  It has.

2          THE COURT:  And so from a judge's point of view, I

3     don't know enough about it.  The original one had a certain

4     appeal because there was no discretion.  It just was math.

5          THE WITNESS:  I agree.

6          THE COURT:  And then I could adjust up and down based

7     on characteristics, whether it was alcohol or age, whatever.  I

8     could adjust.  And now you've got this brand-new thing that

9     hasn't yet come out, and I don't know its validity, and we

10    haven't had a Daubert hearing.  So you may be right or you may

11    be wrong.  It's just brand-new.  Right?

12         THE WITNESS:  Yes, the validity has been established.

13    The article --

14         THE COURT:  By who?

15         THE WITNESS:  By the authors of the instrument.  So

16    Hanson and Helmus and Thornton have written the article on the

17    development of the instrument.  It predicts with moderate

18    predictive accuracy and almost identically to the Static-99.

19    The advantage is that it accounts for age.  That article has

20    been written, but the way we interpret the instrument is new

21    indeed.  The instrument has only one minor change with the age

22    item, but the way we interpret it is different.  But that

23    generally isn't subject to peer review.  It's the development

24    of the instrument and the validity of the instrument that is

25    subject to --

Page 53

1        THE COURT:  But it can't be like, you know, pulling a

2   rabbit out of a hat.  I need to be able to evaluate myself

3   whether or not I think it's reliable and whether or not the

4   factors you used are reliable, so I need to be -- I guess I'm

5   just not going to rubber-stamp it.

6        THE WITNESS:  Right.  I think one consideration for

7   the Court is that the relative risk is unchanged for the

8   instrument.

9        THE COURT:  That is comforting, I'll grant you that.

10  It hasn't changed very much.  I mean, it's less than 50 percent

11  in five years no matter which you use, right?  Or actually less

12  than 50 percent in ten years.

13       THE WITNESS:  Actually the scores, the probabilities

14  of reoffense go up with each cutoff score up to, like, a score

15  of 10.  So the probabilities can go well over 50 percent for

16  certain offenders.

17       MR. GOLD:  Oh, your Honor, can we actually isolate

18  this point?  I just want to ask a couple of questions.

19  Q.   So now with the larger number of bodies, you actually get

20  reliable recidivism rates for scores of 6, 7, 8, 9, and 10?

21  A.   Right.

22  Q.   Is that right?  Is that what you just testified to?

23  A.   Right.

24  Q.   So previously, as the Court is familiar, the Static-99,

25  6 and above is all the same, but now you're getting reliable

1    results for an 8 or a 9, and those are higher, right?

2    A.    Right.

3    Q.    And I put up on the screen a table that I made, and it has

4    some of the information that we were just talking about and

5    that you talk about in your report.  Now, do you see a table

6    there where I have it entitled "Score of 5 on Static-99R"?

7    That's called "Moderate high," right?

8    A.    Yes.

9    Q.    And the probability associated with the routine sample

10   you'll agree with me is 11.4 percent recidivism in five years?

11   A.    I'm sure it is.  I would have to see the table but --

12   Q.    Do you have the table?

13   A.    I actually don't have it with me, but, you know, I would

14   need to check it.

15   Q.    Well, would you accept that from me?

16   A.    Yes, it looks accurate to me.

17   Q.    And the treatment need group is 15.9 percent over five

18   years?

19   A.    Right.

20   Q.    High risk, which is what you compared Mr. Carta to, and

21   the only number that you reported in your testimony yesterday

22   and in your report is 25.2 percent?

23   A.    Right.  I think that's the correct one.

24   Q.    And then the non-routine I believe is a combination of

25   treatment need and high risk?

ea80c287-9e6a-4921-aea0-a5f475e78ff1

1   A.   Correct.

2   Q.   And that affords a 19.6 recidivism rate?

3   A.   Yes.

4   Q.   So the decision as to whether to compare someone to a

5   particular group has assumed a certain importance in

6   interpreting the Static-99 score, right?

7   A.   That's right.

8   Q.   And I believe your testimony is, that decision has not or

9   is not even capable of being subject to peer review?

10  A.   Uhm, certainly making decisions like that, you could test

11  it.  You could, for example, do an inter-rater reliability

12  study:  How well do I do it compared to other people?  Do we do

13  it in the same way?  Do we do it in a different way?  You can

14  always design a study to look at those kinds of things.

15       I was talking about the paper that was submitted for peer

16  review, and that paper simply examines the methodology in

17  developing the instrument and validating the instrument.

18  Q.   But it doesn't talk about this process or validating this

19  process of comparing individuals to particular risk groups?

20  A.   It does not address choosing a sample type, and I guess

21  that's the clearest way to say it.

22  Q.   And just for the Court's reference, this was the range

23  that you reported in your testimony of 13.4 to 27.7 in February

24  of 2009, and then the five-year risk rate from the original

25  samples is actually 39 percent?

1   A.   Right.

2   Q.   Now, you have a website, and you're one of the developers

3   of the Static-99.  Is that a fair statement?

4   A.   No.  I didn't develop it.  I just wrote the coding rules.

5   Q.   Oh, and that was that 15-page document that we talked

6   about, and that was later expanded in 2003 to the coding rules

7   that are in common use?

8   A.   That's right, and that's authored by Andrew Harris.

9   Q.   But now you are on the website for something called the

10  Static-99 Clearinghouse, right?

11  A.   Clearinghouse?  I think it's just Static99.org.

12  Q.   This isn't the clearest, but this is just an image of the

13  Static99.org website that you just referred to?

14  A.   Right.

15  Q.   And there is a picture of you and Dr. Hanson on the

16  website?

17  A.   Right.

18  Q.   And it's called the Static-99 Clearinghouse there but

19  probably not in the address line.  You have information for

20  people scoring the Static-99 nationwide on this website, right?

21  A.   That's right.

22  Q.   And in fact you post things like legal decisions on the

23  website, right?

24  A.   Yes.

25  Q.   And there have been hearings about this process that we

Page 57

1   have been talking about ongoing in the state of New Hampshire

2   in which you participated, right?

3   A.   Yes.

4   Q.   And one of those cases is the State v. Hurley?

5   A.   Right.

6   Q.   Thomas Hurley?

7   A.   Yes.

8   Q.   And there was actually a Daubert ruling about what we're

9   talking about right now in that case, right?

10  A.   Yes.

11  Q.   And you're familiar with it because you post it on your

12  website, right?

13  A.   Well, and I testified in it, yes.

14  Q.   And you testified in it.  And the court ruling in that

15  case, in the Hurley case, is that the only sample that is

16  admissible for interpretation of Static-99 scores is in fact

17  the routine sample, right?

18  A.   Right.

19  Q.   And that was based in part on a finding that the choice of

20  high- and low-risk samples was based on post hoc logical

21  inference, right?  That's the phrase that the court used?

22  A.   Yes.

23          THE COURT:  Which means what?

24          MR. GOLD:  That it was -- you're asking --

25          THE COURT:  This is in his opinion?

United States v. Todd Carta - Bench Trial Day 2

1       MR. GOLD:  This is in the opinion, yes.  So I think

2   it's an opinion that we've already submitted in some briefing

3   to the Court, but --

4       THE COURT:  Yes, I think you did on Friday.  Has any

5   Federal Court looked at this?

6       THE WITNESS:  No.

7       THE COURT:  So could you go through exactly again why

8   you put him in the high-risk/high-needs bin?  I was actually

9   reading your report as you were being examined, and it doesn't

10  state why.

11      THE WITNESS:  I do have it in my report, your Honor,

12  if you want me to point it out.

13      MS. SERAFYN:  I was just going to mention, your Honor,

14  that, I mean, I believe what she uses to decide which bin is

15  the SRA: FV, which is the instrument that --

16      THE COURT:  Yes, but she said she could explain it

17  based on the earlier Stable.  Is that true or not?

18      THE WITNESS:  Yes, I can explain it based on that.

19      MR. GOLD:  But, your Honor, you know, I don't want to

20  upset the apple cart here, but I think that it might -- I kind

21  of want to have my cake and eat it too, but if she wants to

22  talk about what she did without admitting --

23      THE COURT:  Well, unfortunately, you all raised all of

24  these issues on Thursday and Friday, but I'm starting to

25  understand it a whole lot better.  We're going to finish with

1  her today, and then I'll figure out what to do.

2       Right now, I need to know why you put him in this

3  incredibly -- this high bin with someone who's -- what did you

4  consider in putting him in this bin?  What are the factors?

5       THE WITNESS:  I considered the presence of the dynamic

6  risk factors outside the instrument.  You pick a bin based on

7  factors outside.

8       THE COURT:  Right.  Where are they?

9       THE WITNESS:  It would be the factors on this -- in

10  this case today -- when I wrote my report, it was the SRA.  It

11  was the new instrument.

12       THE COURT:  Yes, but what are the factors, like

13  alcohol?

14       THE WITNESS:  The factors are intimacy deficits,

15  including -- let's see, if you turn to --

16       THE COURT:  I remember, you described those yesterday.

17  I'm just trying to get through.  So it was the intimacy

18  deficits.

19       THE WITNESS:  Yes.  They're on Page 32 of my original

20  report:  significant social influences, and all the factors

21  under intimacy deficits, like relationship with partners,

22  emotional identification with children, hostility toward women,

23  feelings of loneliness and social rejection, and lack of

24  concern for others; also factors having to do with sexual

25  self-regulation, sex drive, high sex drive and sexual

Page 60

1   preoccupation; turning to deviant sex when you feel

2   overwhelmed, having a history of deviant sexual arousal; also

3   cooperation with supervision; and then factors having to do

4   with general self-regulation, behavioral impulsivity;

5   problem-solving, being able to make good decisions and follow

6   through with those and think of the consequences.

7            THE COURT:  Okay, so you went through those yesterday.

8   I just didn't understand that's what went into the bin you

9   chose, if I'm now understanding this.  But that involves

10  judgment on your part?

11           THE WITNESS:  It involves a clinical evaluation of

12  whether those factors are present or not for an individual

13  case.

14           THE COURT:  Right, but it's not like math like the

15  pure actuarial, right?

16           THE WITNESS:  Not at all.

17           THE COURT:  You're making a judgment call, right?

18           THE WITNESS:  Absolutely.  I'm deciding whether that

19  is a risk factor for him or not.

20           THE COURT:  Not just whether it's a risk factor.  It's

21  which bin you go into.

22           THE WITNESS:  Right, and the bin, if he had low needs,

23  few of these factors, you would choose the routine sample.

24           THE COURT:  Right, but it's not math the way --

25           THE WITNESS:  Right.

Page 61

1          THE COURT:  I mean, it's just, you know, like, you

2    could be a second-grader and fill in the actuarial tables that

3    are pure, right?

4          THE WITNESS:  Right.

5          THE COURT:  So this involves your judgment as a

6    psychologist, right?

7          THE WITNESS:  It definitely does.

8          THE COURT:  It's not like adding up, tallying zeros

9    and ones, right?

10          THE WITNESS:  No.  It involves my judgment on the

11    strength of the presence of these factors.

12          THE COURT:  Okay, and so by definition almost, it's

13    person-specific rather than something that can be validated.

14    Is that what you were trying to tell me before?

15          THE WITNESS:  Absolutely person-specific.

16          THE COURT:  So you can't be validated in terms of

17    which bin he falls into.

18          THE WITNESS:  The method of choosing the bin is not

19    validated.  The instrument is validated.  I guess I was

20    confusing you in that way.  The instrument has moderate

21    predictive accuracy, ROC of .72, but it's not -- the method of

22    choosing the bin is based on the presence of needs.  That is

23    not validated.  There is a mathematical way to do that now --

24          THE COURT:  I got it, I got it.

25          THE WITNESS:  -- but I couldn't use that.

United States v. Todd Carta - Bench Trial Day 2

1    MR. GOLD:  I think there's more to it.  I mean, I have

2    to ask a couple of questions about it.

3    THE COURT:  Fine.

4    Q.   The idea of breaking up samples in the first place, has

5    that been validated?

6    A.   No.  It was a judgment by the researchers to divide the

7    samples up because of the varying base rates.

8    Q.   And that was the same judgment that the Court disagreed

9    with in the Hurley case that we were just talking about, right?

10   A.   I would say so, yes.

11   Q.   And one of the things you do that we spoke about is, you

12   do testimony in cases like this, and you also give

13   presentations about these instruments, right?

14   A.   Yes.

15   Q.   And you were informed before testimony yesterday that an

16   instrument that you had recently started using you couldn't

17   talk about because of a court ruling, right?

18   A.   Because of -- yes, this Court ruling, yes.

19   Q.   Right.  So what you were just talking about was using

20   these factors as a justification for putting people in

21   different bins, right?

22   A.   Right.

23   Q.   And the instrument that you weren't allowed to testify

24   about was a method of mechanizing that process, right, or

25   making that process mechanical, right?

Page 63

1      MS. SERAFYN:  Your Honor, I have to object.  We
2  weren't allowed to bring this out on direct, and now it seems
3  like he's trying to --
4      THE COURT:  Do you want to open --
5      MR. GOLD:  Well, I'm opening it up, your Honor,
6  because I just think it goes to, you know, credibility.  I
7  mean, I --
8      THE COURT:  Fine.
9      MS. SERAFYN:  Just having said that, she has a flight
10  this afternoon.  We weren't allowed to ask her about this on
11  direct, so I want an opportunity to be able to ask her about
12  this instrument that he's now opened the door to before she
13  leaves today.
14      THE COURT:  He'll finish by 12:30, and then you'll
15  have time.
16  Q.  But that instrument, the purpose of that instrument was to
17  mechanize this process, right?
18  A.  Yes.
19  Q.  And in fact there was a training about that instrument for
20  use in this process December 1, right, December 1 and 2?
21  A.  2 and 3, I think.
22  Q.  Right.  And is it a fair statement to say that the
23  development of that instrument for that purpose was in response
24  to criticism about the clinical judgment involved in this
25  process that we're just talking about?

Page 64

1   A.   I don't know that it was in response to criticism.  It's

2   been in the development stage for quite a while and --

3   Q.   Well, it can't have been in the development stage for

4   before this whole process of breaking up the samples began,

5   right?

6   A.   You know, Dr. Thornton would have to answer that.  I,

7   frankly, don't know.

8   Q.   You don't know?

9   A.   I don't know his motivation other than the fact that it

10  makes this procedure more precise.  If it was in response to

11  criticism or when he actually started the development, I just

12  don't know.

13  Q.   Now, there are people in the routine sample, and we just

14  look at those low numbers, that have a 6 on the Static-99,

15  right?

16  A.   Yes.

17  Q.   And there are people in the low routine sample that have a

18  7, 8, and a 9, right?

19  A.   Yes.

20  Q.   Right.  Now, by the way, when you reported the average of

21  all Static-99 scores -- do you recall that?

22  A.   Yes.

23  Q.   -- what was that average taken from, the routine sample?

24  That average score, you said the average score in the Static-99

25  was a 2, and he's a lot higher than a 2.  Was that from the

Page 65

1   routine sample?

2   A.   I believe it was the routine sample, but I'm just not

3   positive.  I just can't remember.

4   Q.   And so the average for this high-risk sample, do you know

5   that?

6   A.   No, I don't know.

7   Q.   And the average for the old Static-99, that was 3.2,

8   right?

9   A.   Yes.

10          THE COURT:  Are courts still using the earlier

11  percentages you gave at the trial?

12          THE WITNESS:  I don't know.  Not in my cases, but I

13  just don't know.

14          THE COURT:  Would that still be reliable in the field?

15          THE WITNESS:  Oh, no.  It would be an overestimate of

16  even the high-risk sample.

17          THE COURT:  The 13 to 27 percent range?

18          THE WITNESS:  Oh.  Oh, those.  No, those are

19  not valid.  Those are based on the 18-sample validation.  There

20  was a larger 23-sample validation, which is the current

21  probabilities.  They should be used, the current probabilities

22  in the four sample types.

23          THE COURT:  Were those other ranges peer reviewed and

24  validated?

25          THE WITNESS:  The instrument was, and the validation

United States v. Todd Carta - Bench Trial Day 2

Page 66

1  occurred, and those were the true probabilities of two separate

2  samples.  How you chose the low risk from the high risk was not

3  validated.

4          THE COURT:  And that's why you have a range?

5          THE WITNESS:  We have a range because there was a

6  range in the sample, the two samples, between lower-risk

7  offenders and high-risk offenders.  That's one of the

8  problems --

9          THE COURT:  Yes, it's a big problem for the Court.

10  I'm trying to find something that's not evolving and dynamic.

11  I just want a methodology like I used the last time.  So

12  suddenly you're telling me it's "throw it in the wastebasket

13  and start with a brand-new one" without any kind of oversight

14  on my part.  So is it reliable to use the old 13 to 27, 16 to

15  37 percent range?

16          THE WITNESS:  No.

17          THE COURT:  Well, then we need to have a Daubert

18  hearing on this methodology.

19          MR. GOLD:  We'd ask for that, your Honor.

20          THE COURT:  I don't know how I can just --

21          MS. SERAFYN:  I mean, your Honor, again, it just

22  seems -- and this is something I alluded to yesterday -- it

23  just seems that we're sort of being penalized for the fact that

24  we have the leading expert who relies on the most up-to-date

25  research.

1      THE COURT:  You know what?  Let me just say this:

2  It's likely that you're going to win on prongs one and two, but

3  I'm now on prong three.  You know, you've won before the First

4  Circuit.  It seems to be reaffirmed here.  There's still debate

5  in these reports, but that's likely to be my conclusion.  But I

6  need to be sure.  This is a brand-new instrument that was just

7  training -- it's evolving as of about two weeks ago.  I need to

8  understand it.

9      MS. SERAFYN:  Your Honor, an alternative is something

10 that we suggested previously, which is, you could rely on the

11 record that was established during the first trial.  We had

12 testimony about the third element.

13     THE COURT:  She just told me it isn't reliable.

14     That's your opinion, right, the old numbers aren't

15 reliable?

16     THE WITNESS:  The absolute probabilities are different

17 now, but the instrument is reliable and valid.

18     THE COURT:  The old instrument?

19     THE WITNESS:  Yes, yes.

20     THE COURT:  So what did you just answer "no" to?

21     THE WITNESS:  The probabilities.  The instrument and

22 the scoring and the risk range, low, medium, to high, it's all

23 been validated.  It's the process, that the clinician chooses

24 to use different absolute probabilities based on sample type.

25     THE COURT:  Is it still valid to use the statistics

United States v. Todd Carta - Bench Trial Day 2

Page 68

1  from the 18 sample?

2          THE WITNESS:  No.  It's been advised by the authors,

3  Hanson and Thornton, to use the newest validation that has a

4  total of 23.

5          THE COURT:  Sure, I understand they want the newest

6  one used, but they're not sort of Zeus on Mount Olympus.  Is it

7  still reliable to use the 18 samples that doesn't break these

8  into these four bins?

9          THE WITNESS:  Uhm, it's not advised to use the range

10  from low risk to high risk.

11          THE COURT:  Because these two guys don't advise?

12          THE WITNESS:  Right.  And it's their instrument, and

13  they advise that the most accurate procedure would be to choose

14  a sample type from the full validation of 23 samples.  And so

15  that's what I do, do what the authors advise.

16          THE COURT:  I understand that.  You want to be

17  cutting-edge.  I understand that, but I have to make sure it's

18  valid.  So you'll finish up, and then I'll decide what to do

19  about this.

20  Q.   In the Hurley case, you were across the aisle from a

21  statistician or a psychologist named Brian Abbott.  Are you

22  aware of that?

23  A.   Yes.

24  Q.   And he's referenced in the decision that the court has in

25  the Hurley case, right?

1   A.   He is.

2   Q.   And if I'm mistaken, please let me know, but he

3   recommends, if you're going to use the instrument, to just

4   group all the bodies together, right?

5   A.   Well, sure.   Then there would be a lower probability of

6   sexual reoffense, which would have been advantageous to his

7   case.

8   Q.   Well, he was testifying as a Daubert expert the same way

9   you were, right?

10  A.   Yes, and he's only testified for the defense in any case

11  ever for sexually violent predator purposes.

12  Q.   And so presumably he justified the recommendation to look

13  at the whole group by reference to some statistical principle,

14  right?

15  A.   I don't recall what statistical principle he referenced.

16  Q.   Well, I just as a layperson brought up this notion that if

17  you have a large number of bodies, you get reliable results,

18  right?

19  A.   Uhm, yes.

20  Q.   And you've agreed with me that that's generally true?

21  A.   Generally true, but not in this case.

22  Q.   So this --

23  A.   You'll get erroneous results.

24  Q.   -- that we're talking about is not that.   It's something

25  else, right?

United States v. Todd Carta – Bench Trial Day 2

Page 70

1    A.    It looks beyond a mere average to find a method to

2    identify high-risk sex offenders.  That's the whole purpose of

3    giving an actuarial instrument, to know who's high risk and

4    who's low risk.  If you average all the samples, then you lose

5    the capacity to do that.

6    Q.    Well, but what you're doing is in effect deciding he's

7    high risk and then scoring him on the instrument, right?

8    That's exactly what you're doing, right?

9    A.    I did decide he was high risk after looking at his dynamic

10   risk factors and needs, of which he has all of them, which

11   means that his probability of reoffense will be greater than

12   the routine sample.

13            THE COURT:  Well, would you have numbers if we just

14   wanted to average across the large number of samples, the 23

15   samples?

16            THE WITNESS:  There would be probabilities similar to

17   what you see in the original Static-99 for five years, ten

18   years, and perhaps fifteen years.  I don't know the followup

19   for all the studies, but --

20            THE COURT:  So if you did it across the 23, he'd be at

21   39 percent and 45 percent and 52 percent?

22            THE WITNESS:  Except that the new contemporary samples

23   have lower reoffense rates, so those probabilities -- if you

24   use the methodology that Dr. Abbott has proposed, then you

25   would have just one set of probabilities for five years and ten

Page 71

1  years, and they would be significantly lower than the old

2  probabilities.

3          THE COURT:  So would you be able to get those for me?

4          THE WITNESS:  The averages?

5          THE COURT:  Yes.

6          THE WITNESS:  Sure.

7          THE COURT:  Would you know them?

8          MR. GOLD:  I think I can get them.  I mean, I'd have

9  to talk about an expert about that.  It's been done.  I think

10  it's been done.

11          THE COURT:  So that would be at least a way to think

12  about this, which is, if you averaged across all 23 samples,

13  here's your percentage; if you averaged with your prejudgment

14  that he's high risk, here's the average.  And as a court, none

15  of this is a science.  I mean, I'm only using this as one of

16  many factors in making my decision.  This isn't like a litmus

17  test for me.  I never have used it that way, so it would be

18  just one of the many things I thought about are these different

19  ways of thinking about it.  I mean, you know that Mark Twain

20  quote, right?

21          THE WITNESS:  Right.

22          THE COURT:  "There's lies, damn lies, and statistics."

23  So, I mean, it would just be different goalposts, if you will.

24          THE WITNESS:  Right.  And another way as a clinician

25  to conceptualize that would be, let's say I did look at the

United States v. Todd Carta - Bench Trial Day 2

1   overall probabilities, I would know that it's lower than the

2   true probability of a true high-risk sex offender; and I would

3   consider Mr. Carta's risk to be significantly higher than those

4   23-sample average probabilities for a score of 5.

5           THE COURT:  That's what we did before basically --

6           THE WITNESS:  We did.

7           THE COURT:  -- which is, you adjusted for dynamic risk

8   factors.  You gave me a percentage in the past that was across

9   all populations, and as a Judge I exercise some judgment, just

10  like you as a psychologist exercise some judgment, but then

11  it's not prebuilt into the model.

12          THE WITNESS:  Right, and that is how we did it before,

13  yes.

14          THE COURT:  Okay.

15  Q.  How do you know that these dynamic factors differentiate

16  between these four sample groups?

17  A.  Because the incremental validity of the dynamic factors

18  has been established, well established, that it increases

19  predictive accuracy when you consider the dynamic factors as

20  well as with the static factors.

21  Q.  Well, you're referring to research that -- first of all,

22  when you had abandoned the clinically adjusted actuarial

23  approach, it was based on Hanson's reporting of three research

24  studies that said that adding dynamic factors actually lowered

25  predictive accuracy, right?

United States v. Todd Carta - Bench Trial Day 2

ea80c287-9e6a-4921-aea0-a5f475e78ff1

1    A.   Well, it said when the clinician considered dynamic risk

2    factors or the probation officer considered dynamic.  Two of

3    the studies had probation officers, and one study had

4    psychologists in a prison; and when they considered other risk

5    factors, not just the dynamic risk factors, they considered a

6    lot of other factors, some of them extraneous to predicting

7    reoffense, that it lowered their predictive accuracy.

8    Q.   Those three research studies influenced you, as we just

9    talked about, to say, "You know what, I'm not going to go above

10   these percentages.  I'm a clinician.  I need to give good

11   information to the Court.  I want to be accurate, and this is

12   the top.  The dynamic factors might put me toward the top, but

13   I don't want to degrade my predictive accuracy."  That was your

14   position; is that fair?

15   A.   That's right, based on those three studies.

16   Q.   And now you've just referenced a study or just by

17   description that adding dynamic factors to an actuarial, I

18   suppose in some research sample, added incremental validity,

19   you called it?

20   A.   Right, new information that increased predictive accuracy.

21   Q.   Okay.  But was that -- how many studies?  How many?

22   A.   Oh, there's been maybe six studies now.

23   Q.   Six studies.  When?

24   A.   When?  In the last -- well, the first one was a dynamic

25   supervision project by Hanson, which was the validation of the

1  Stable-2000.

2  Q.  Okay, but, I mean, I don't want to get too bogged down in

3  the details, but for the purpose of separating out people into

4  these groups, has there been any validation study?

5  A.  Uhm, a validation study, you mean a peer-reviewed

6  published study to look at the effect of dynamic risk factors?

7  Is that what I'm --

8  Q.  Using these dynamic risk factors to -- for example, the

9  four groups weren't selected based on the presence or absence

10  of dynamic risk factors, were they?  They were just selected

11  because they had higher or lower base rates, right?

12  A.  Uhm, right.  I'm sorry, they weren't selected on base

13  rates.  They were selected on factors outside of the actuarial

14  instrument.  So they found a sample that had been detained

15  because they were too dangerous, the high-risk sample, for

16  example.  They had been detained in Canada and not released on

17  their release date because they were found to be too dangerous.

18  A large part of that sample is the old sexual psychopath

19  commitments that are just very similar to SVPs from the

20  Bridgewater sample in Massachusetts.  So it was those factors:

21  that they had been detained, committed as sexual psychopaths,

22  detained for dangerousness.  That is how that sample was

23  chosen, not by base rates.  Base rates vary in every one of the

24  samples.

25  Q.  Okay.  Well, but the developers said there were some

Page 75

1   groups that had naturally-occurring overall base rates that

2   were higher, right?

3   A.   Well, there were, but they didn't choose them by base

4   rate.  They choose them by characteristics.  If they had been

5   preselected for treatment, they went into that sample type.  If

6   they had been committed as a sexual psychopath or detained for

7   dangerousness, they went into the high-risk sample type.  So

8   they were chosen by factors, not by base rates.

9   Q.   And so you compared individuals to the factors that went

10  into those choices, right?

11  A.   Yes.

12  Q.   And did they use these dynamic factors to, for example,

13  the Stable-2007, to split up these groups?

14  A.   Uhm, no.  They used the other characteristics I just

15  described.  But what they found after they divided them up,

16  because they had been preselected for treatment or because they

17  had been committed as a sexual psychopath, what they found is

18  that the reoffense rates could be explained, the higher

19  reoffense rates could be explained by the presence of higher

20  dynamic risk factors.

21       THE COURT:  Well, were any of these -- I understand

22  how you picked, that makes sense to me, the Bridgewater group

23  and the Canadian group that were detained.  Was there a group

24  that looked like Mr. Carta?  In other words, he didn't fall

25  into any of those groups.  Was there a group that was

United States v. Todd Carta - Bench Trial Day 2

1  preselected based on the various factors that you just told me

2  about and then decided what their base rates were?

3       THE WITNESS:  Actually, Mr. Carta did resemble one of

4  the groups.  He was preselected for treatment in SOTP, so he

5  could be compared to the preselected-for-treatment sample.

6  That would remove him from the routine sample just on the face

7  at the time that I originally --

8       THE COURT:  Okay, fair enough.  So what would his

9  reoffense rates be if he was just put in that sample?

10       THE WITNESS:  I need the evaluator handbook.  Do you

11  have it, Ian?

12  Q.   I'm assuming that number would be 15.9, or, I'm sorry --

13  yes, preselected for treatment need, 15.9?

14  A.   Right, and the ten-year is 22.6.

15  Q.   Dr. Phenix, you give presentations.  I'm showing you a

16  slide from one of the presentations that you provided us with.

17  Is this the composition of the preselected-for-treatment need

18  group?

19  A.   No.  It's the high risk.

20  Q.   I'm sorry, I'm sorry.  That's what I meant.  The high

21  risk?

22  A.   Yes, it is, yes.

23  Q.   Okay.  So you've got Denmark, Canada, Canada, Canada,

24  Canada, U.S.A., right, not in that order?

25  A.   Right.

1  Q.   Okay.  Now, one of the things that you've been mentioning

2  about these new samples is that they're contemporary and

3  they're better, right, because they're contemporary, so they're

4  more applicable to decisions that we have to make in the

5  present time?

6  A.   Yeah, they're all contemporary except Knight and Thornton

7  is the older sample.  The other one, two, three, four, five are

8  more contemporary samples.  They have lower base rates

9  generally.

10  Q.   Right, the Denmark Canada, Canada, Canada, Canada are all

11  more recent, but I think the largest number of bodies here and

12  the highest reoffense rate is from the Bridgewater treatment

13  sample, right?

14  A.   Right.

15  Q.   People who were released from 1959 to 1984, right?

16  A.   Yes.

17       THE COURT:  Knight and Thornton is Bridgewater?

18       MR. GOLD:  Knight and Thornton is Bridgewater, and

19  that is the Bridgewater sample.

20  Q.   And so these are people who have actually been committed

21  as sexually dangerous persons and released, right?

22  A.   Yes.

23  Q.   So what is the justification for including this in a group

24  of samples when you're making contemporary decisions?

25  A.   You'd have to ask the authors about that.  I mean, I think

1  that they believe that the sample was representative with the

2  others and chose to use it, but you'd really need to consult

3  them about the final decision to do that.

4  Q.   But you'll agree with me that the more contemporary a

5  sample is, that's a virtue, right?

6  A.   Oh, I will agree, yes.

7  Q.   And that that's a virtue that this sample doesn't have,

8  right?

9  A.   Right, the Knight and Thornton sample is older.

10  Q.   Now, after you went and discussed this, you discussed

11  characteristics of the various samples, and for context for the

12  Court, this is your instructions to evaluators in New Hampshire

13  about how to go about scoring your instrument, right?

14  A.   Right.  This is the New Hampshire presentation?

15  Q.   Correct.

16  A.   Yes, that's right.

17  Q.   Yes.  And so, for example, you tell them that the Haag

18  sample -- and that must be the Denmark sample -- the sample had

19  these factors?

20       THE COURT:  This is the high risk?

21  Q.   This is one of the samples in the high-risk overall

22  sample:  "Patterns of persistent violence or sex behavior with

23  children, seriousness of current offense, info that offender

24  difficulty controlling violent sex offending, use of weapon,

25  and threats of violence."  Those were all characteristics that

ea80c287-9e6a-4921-aea0-a5f475e78ff1

Page 79

1    distinguished the group of men in the Haag sample, right?

2    A.   Yes.

3    Q.   You have all these factors, and these are factors that --

4    "availability of supervision, number of sex offenses involving

5    child, being likely to commit a sex offense against a child,"

6    I'm not sure how these cut, but you're telling the evaluators

7    that you're instructing that these are factors of the Haag

8    sample, right, so that they can know whether to compare their

9    individual to the high-risk sample, right?

10   A.   Just to show them some of the characteristics of the

11   samples in the high-risk group.

12   Q.   So the Bengston sample is also in there.  In that sample

13   you had "report addressing insanity, psychiatric

14   recommendation," you had "severe sexual offenses," you had

15   "violent offenders," you had "mental illness, mental

16   retardation, formal psychiatric evaluation" in that sample,

17   right?

18   A.   Yes.

19   Q.   Now, distinguishing these samples -- and there your

20   overall here is "Offenders referred to intensive treatment

21   programs for the highest-risk offenders, such as sexually

22   violent predators, sexually dangerous persons."  That's

23   something that describes the Bridgewater sample, right?

24   A.   Yes.

25   Q.   "Incompetent to stand trial, not guilty by reason of

Page 80

1    insanity," and then "Offenders identified as high risk through
2    a quasi-judicial or administrative process resulting in
3    extended detention for dangerousness, preventive or indefinite
4    detention treatment orders, denial of statutory release."
5    These are factors that would make one put one in the high-risk
6    group, right?
7    A.   Well, they may be similar to those individuals, yes, your
8    offender you're evaluating.
9    Q.   And these are factors that don't help you identify
10   high-risk/high-need offender.  This is in March of 2010.  So
11   dropping out of treatment, that's not a factor that you should
12   use to distinguish someone?
13   A.   Right.  We don't know if that helps you choose a sample
14   type, so those are factors that people have used that should
15   not use to choose a sample type.
16   Q.   And for the record, the record that the Court has
17   regarding Mr. Carta's participation in treatment, he in fact
18   withdrew, right?
19   A.   He did drop out of treatment.
20   Q.   He voluntarily dropped out, right?
21   A.   Yes.
22   Q.   Right.  He wasn't terminated for misbehavior, right?
23   A.   No, but it's the same increased risk whether you drop out
24   or get kicked out.
25   Q.   Well, but just for clarification.  And then he stated in

United States v. Todd Carta - Bench Trial Day 2

Page 81

1   the record to his therapist he wanted to get back into

2   treatment but was too embarrassed because he had withdrawn in

3   such a noisy way, right?  Do you recall that?

4   A.   Yes, he did say that.

5   Q.   So not treated is not a factor that justifies putting

6   someone in the high-risk group, right?

7   A.   Right.  These factors don't help you choose a sample type.

8   That does not mean they're not risk factors for future sexual

9   reoffense because they are.

10  Q.   Right, but right now we're talking about your initial

11  decision to put Mr. Carta in the high-risk group, right?

12  A.   Right.

13  Q.   Antisocial behavior and preselection for evaluation as

14  SVP, the situation that Mr. Carta is in right now, look at the

15  procedure of reselection -- I'm not sure what that means -- but

16  these are all factors that don't help you decide to make that

17  initial determination?

18  A.   That's right.

19       THE COURT:  But let me just ask you, a lot of the

20  factors that you just gave me just now and yesterday fall in

21  the factors that don't help you?

22       THE WITNESS:  Okay, to be clear, this slide pertains

23  to how you decide to choose a sample type, not decide if

24  they're a risk to reoffend, how you choose a sample type.

25       THE COURT:  Right, right, but --

United States v. Todd Carta - Bench Trial Day 2

Page 82

1        THE WITNESS:  These characteristics are unknown about

2    the samples, so we can't use these to choose a sample, but we

3    can certainly use these factors to determine, if present, a

4    person's risk to reoffend, period, is higher because they are

5    clearly risk factors for sexual reoffense, but they don't help

6    you pick a sample type.

7        THE COURT:  Yes, one of the bins.

8        THE WITNESS:  Right.

9        THE COURT:  So when you told me about the intimacy

10   deficits and the impulsiveness and all these various other

11   things, that did not help you pick the bin?

12       THE WITNESS:  Those do.  Those dynamic risk factors

13   that I identified do help you --

14       THE COURT:  Isn't antisocial -- maybe I'm losing --

15       THE WITNESS:  Antisocial behavior, so if a person

16   commits crimes, all right, which would be general antisocial

17   behavior, that does not help you decide if they're high risk,

18   preselected for treatment, or routine.  However, if they have

19   high needs, the factors I gave you, if all of those are

20   present, that helps you select the high-risk/high-needs sample.

21       THE COURT:  Is that in any of these lists?

22       THE WITNESS:  No.  Those dynamic risk factors are not

23   here on this list.

24       THE COURT:  Are they in any of the lists we've looked

25   at?

Page 83

1       THE WITNESS:  They're on the Stable-2000.

2       THE COURT:  But in this new method that you said we

3  just trained on and you're all learning about, that wasn't on

4  any of those lists you trained on the other day?

5       THE WITNESS:  The SRA is the new instrument, and it

6  has similar, very similar factors to the Stable-2000.

7  Sexualized violence is probably the only real new and

8  grievances thinking, but the rest of them are very similar to

9  the factors on the Stable-2000 because they're both dynamic

10 risk instruments.

11      THE COURT:  Just revisit my question, though.  I

12 understand that it may have shown up a long time ago, but on

13 this most recent SRA that you trained on, did any of them

14 include the factors that you relied on in putting Mr. Carta in

15 the highest bin?

16      THE WITNESS:  It included almost all of them, and none

17 of them were these.

18      THE COURT:  Okay, so he's not giving you a complete

19 set of the factors you told the people to rely on?

20      THE WITNESS:  I didn't -- we didn't have the SRA then,

21 so I couldn't tell them to rely on that.  This training was a

22 year or two ago, something like that.

23      MR. GOLD:  In March of 2010.

24      THE WITNESS:  Yes.  This was before the SRA was

25 available, or I would have told them that.

United States v. Todd Carta – Bench Trial Day 2

Page 84

1    THE COURT:  I see.  So you're saying, in the most

2  recent December training, it does include those lists?

3    THE WITNESS:  Right.  Today I would tell them to use

4  that.

5    THE COURT:  This is what I'm talking about, the

6  evolving.  So did you give him what you showed people on

7  December 1?

8    THE WITNESS:  Yes.  I administered the dynamic risk

9  assessment instrument in this evaluation, and I trained them to

10  do the same thing.

11    THE COURT:  I'm just trying to say, for him to be able

12  to represent his client, there are discovery requirements, and

13  I know he was just handed something yesterday.  Did that

14  include the factors that you now use in putting someone in

15  bins?

16    THE WITNESS:  The SRA?

17    MR. GOLD:  The SRA coding rules.

18    THE WITNESS:  Yes, it does.

19    MR. GOLD:  Your Honor, we got the coding rules for the

20  instrument.  I don't -- this is actually getting me a little

21  twisted up because what I want to ask the doctor is, this

22  splitting up into bins, which we object to in the first place,

23  that happens a year ago.  Now, to justify putting people into

24  different bins, I think we've heard about two or three methods,

25  and this is the --

Page 85

1        THE COURT:  Right, the evolving answer, right, good

2    point.  So when you put people into bins, how long ago was it?

3    A year ago?  When is your report date?  The updated report is

4    when?

5        THE WITNESS:  That would be November 18, 2010.

6        THE COURT:  At that point -- let's just freeze it at

7    that spot moment in time -- when you wrote this report, are

8    there published factors that helped you put it into bins?

9        THE WITNESS:  Uhm, yes, there are dynamic risk factors

10   that help me put it into bins.

11       THE COURT:  And did you give those to counsel or to

12   the government?

13       THE WITNESS:  It's in my report.

14       MS. SERAFYN:  Your Honor, so just for the time line,

15   her report is dated November 18.  We got it shortly after that

16   and provided it to Mr. Gold.  We heard nothing until last week.

17       THE COURT:  Excuse me.  This has all been two or three

18   weeks, including Thanksgiving, so, I mean, I'm not going to

19   hold him to that, so --

20       MS. SERAFYN:  And I understand, but he didn't request

21   a deposition, he didn't request -- so when we say, your Honor,

22   that we gave it to him yesterday morning, Mr. Gold called me on

23   my cell phone Sunday night and asked for anything we had on the

24   SRA.  I gave it to him first thing yesterday morning.

25       THE COURT:  It's no longer what Mr. Gold needs.  I

United States v. Todd Carta - Bench Trial Day 2

Page 86

1    need it.

2           Were there published criteria for the factors you used

3    in putting him into bins at the time you did your updated

4    report?

5           THE WITNESS:  Published, no.  They're provided in the

6    training that you get on how to do this.  The author of the

7    instrument, Dr. Thornton, has --

8           THE COURT:  Okay, so did he have handouts?

9           THE WITNESS:  Yes.

10          MS. SERAFYN:  Your Honor, I have it right here, and

11   I --

12          THE COURT:  And you never gave it to him?

13          MR. GOLD:  No, no, no.  I got that yesterday morning.

14          MS. SERAFYN:  And I would have entered it as an

15   exhibit yesterday, but she wasn't allowed to testify, so --

16          THE COURT:  I'm not faulting you.  I want to

17   understand it.

18          MS. SERAFYN:  Right, but I'm saying I can put it in on

19   redirect.

20          THE COURT:  Are those factors that you relied on in

21   your report the same factors that you handed Mr. Gold

22   yesterday?

23          MS. SERAFYN:  I handed it to Mr. Gold.

24          THE COURT:  Or whoever to Mr. Gold?

25          THE WITNESS:  Yes.

United States v. Todd Carta - Bench Trial Day 2

1    THE COURT:  All right, okay.  So what you just put up

2  on the screen, Mr. Gold, are those the factors?

3    MR. GOLD:  Those are the factors, I believe, that we

4  were talking about in March of 2010.

5    THE COURT:  Okay.  So, in your view, these are

6  outdated factors, or at least not complete?

7    THE WITNESS:  No, that's not true.  These are

8  characteristics of the samples in the high-risk sample type,

9  and they will always be characteristics of the high-risk

10  sample.  I was just trying to inform my audience what those

11  individuals were like because they were different.  They came

12  from six different hospitals and prisons.  So I was just

13  saying, here's a description of this high-risk sample, here's a

14  description of that high-risk sample.

15    THE COURT:  Sure, okay.  So are any of the published

16  criteria picking up the kinds of things that you used in

17  categorizing Mr. Carta?

18    THE WITNESS:  The SRA, okay, is the instrument that I

19  was trained on.  Papers will be submitted and coming out with

20  that instrument.

21    THE COURT:  Well, does the SRA have these factors that

22  you relied on?

23    THE WITNESS:  Yes.

24    THE COURT:  Impulsivity, intimacy deficits and the

25  like?

United States v. Todd Carta - Bench Trial Day 2

1    THE WITNESS:  Basically all of them.

2    THE COURT:  They use those words?

3    THE WITNESS:  They say it a little differently.

4  Instead of "emotional identification with children," it's

5  called "emotional congruence with children."  So, yes, but it's

6  the same factor.  All but two factors are the same.

7    THE COURT:  And what are those two?

8    THE WITNESS:  Sexual violence is on the SRA and it's

9  not on the Stable-2000, and -- I'm just going to refresh my

10  memory.

11    (Witness examining document.)

12    THE WITNESS:  Oh, here it is.  Grievance thinking is

13  not on the Stable-2000.  Actually, a very similar item about

14  distorted attitudes was, but I did not use it.  And those are

15  the two that are primarily different.  The rest are defined in

16  the same, way but their name is a touch different.

17    THE COURT:  So you'd say they're substantially the

18  same?

19    THE WITNESS:  Yes.

20    MR. GOLD:  Your Honor, can I ask a couple of questions

21  about --

22    THE COURT:  Yes, and then we'll break, have a morning

23  break here.

24  Q.   The SRA: FV, you reproduced the scoring in your report,

25  right?

1  A.   Yes.

2  Q.   And it's got a very complicated -- well, I'm calling it

3  complicated, but it's a whole chart, right?

4  A.   Yes.

5  Q.   And the score that you get is, you actually report it in

6  decimal form.  If I recall it's 4.8 something, 4.84 or

7  something?

8  A.   Right, 4.64.

9  Q.   4.64.  And that is a very precise number.  It's less than

10  4.65 and more than 4.63, right?

11  A.   Right.

12  Q.   Or in that range.  And the report requires you to do

13  division, I think, there is a division symbol in there to get

14  to that result, right?

15  A.   Right.

16  Q.   Now, these four samples, who has done that?  Who has used

17  the SRA: FV to justify this initial decision?

18  A.   Well, evaluators in California are using it.

19  Q.   Starting when?

20  A.   Right after the training on the --

21  Q.   Starting in December, right?

22  A.   Right.

23  Q.   So this is the brand-new bag on how to justify putting

24  individuals into these bins, right?

25  A.   It's more precise to be able to allow you to choose a bin.

United States v. Todd Carta - Bench Trial Day 2

Page 90

1   Q.   Well, it gives you this number which is very specific,

2   right?

3   A.   That's right.

4   Q.   Right.  But that's not how the samples were originally

5   broken up, right?  No one did the SRA: FV on them, right?

6   A.   No.  They were originally chosen by characteristics

7   outside the actuarial instrument.

8   Q.   Right, and -- okay.

9        MR. GOLD:  Judge, is that -- okay.

10       THE COURT:  Let me just put it this way:  We should

11   take a break.  We've been going for two hours.  Everyone needs

12   a break.  How much longer do you think you have?  We can go off

13   the record for a minute for poor Lee, who has been going at

14   this for all morning.

15       (Discussion off the record.)

16       (A recess was taken, 11:16 a.m.)

17       (Resumed, 11:53 a.m.)

18       MR. GOLD:  May I inquire?

19       THE COURT:  Yes.

20   BY MR. GOLD:

21   Q.   Dr. Phenix, you scored three of these instruments, right?

22   A.   Yes.

23   Q.   And the other one or the second one is the Static-2002,

24   correct?

25   A.   R, yes.

Page 91

1  Q.   The Static-2002R.  And in interpreting that score, it has

2  the same process of choosing a sample before you report the

3  percentage associated with a score, right?

4  A.   Yes.

5  Q.   But the nominal category that is assigned to the

6  Static-2002R score that you got is moderate high, right?

7  A.   Right.

8  Q.   Right?

9  A.   Moderate, I believe.  Let me just check.

10  Q.   Or moderate, moderate.

11       (Witness examining document.)

12  A.   Moderate.

13  Q.   So the Static-99R is a moderate high, the Static-2002 is

14  moderate, and the MnSOST-R is high, correct?

15  A.   Yes.

16  Q.   Now, you reviewed all the records that you were provided

17  when you were asked to evaluate Mr. Carta, right?

18  A.   Yes.

19  Q.   And you did not have the benefit because of Court rulings

20  of a clinical interview with Mr. Carta, right?

21  A.   Yes.

22  Q.   And it's typical ethical practice to state that or qualify

23  your opinion when you don't have the benefit of a clinical

24  interview, correct?

25  A.   Yes, generally.  I mean, you would say that.

United States v. Todd Carta - Bench Trial Day 2

Page 92

1   Q.   And you have, however, reviewed reports of things

2   Mr. Carta has said in the course of his life and especially the

3   past eight years, right?

4   A.   Yes.

5   Q.   He was evaluated by a Dr. Leonard Bard, and you've read

6   Dr. Leonard Bard's reports, right?

7   A.   Yes.

8   Q.   And the same with Dr. Prentky, you've read his report?

9   A.   Yes.

10  Q.   And you've also read a Bates-stamped series of documents

11  over a thousand pages long which pertain to Mr. Carta, right?

12  A.   Yes.

13  Q.   So Mr. Carta has been in Bureau of Prisons custody for

14  approximately eight years, right?

15  A.   Yes.

16  Q.   And he did the sex offender treatment program at Butner

17  for about a six- or seven-month period?  Does that sound right?

18  A.   Yes.

19  Q.   He also completed something called the Code Program.  Do

20  you recall that?

21  A.   Yes.

22  Q.   And for the record, I am putting up on the screen a

23  document which carries Bates stamp No. 426, and is 426 among

24  the documents that you reviewed in preparing for this case?

25  A.   Yes.

United States v. Todd Carta - Bench Trial Day 2

ea80c287-9e6a-4921-aea0-a5f475e78ff1

Page 93

1   Q.   Now, this document is a document from the Bureau of

2   Prisons which indicates that "Mr. Carta successfully completed

3   the Code Program at USP Allenwood on November 24, 2003."

4        Did I read that line correctly?

5   A.   Yes.

6   Q.   And "The Code Program is a yearlong residential treatment

7   program focusing on both group and individual counseling

8   sessions"?

9   A.   Yes.

10  Q.   "Topics include family issues, criminal thinking, drug and

11  alcohol issues, and pro-social choices," right?

12  A.   Right.

13  Q.   Now, Mr. Carta wanted to withdraw several times from the

14  Code Program.  Do you recall reviewing that in the records?

15  A.   Yes.

16  Q.   And then was cajoled back in by his -- I use the word

17  "cajoled," but he was encouraged to stay back in by his

18  therapist in that program?

19  A.   Yes.

20  Q.   Now, another actuarial that you use is the MnSOST-R,

21  right?

22  A.   Yes.

23  Q.   And that stands for Minnesota Sex Offender Screening Tool

24  Revised, right?

25  A.   Right.

1  Q.   That was developed by a researcher named Douglas Epperson?

2  A.   Right.

3  Q.   And do you have a relationship with Douglas Epperson other

4  than professional?

5  A.   I'm married to him.

6       MS. SERAFYN:  Objection, your Honor.

7       THE COURT:  Overruled.

8  A.   I'm married to him.

9  Q.   Now, has a similar -- do you choose a sample with the

10  MnSOST-R when you score it?

11  A.   No.  Well, I'm sorry, let me qualify.  There are new

12  release probabilities of reoffense.  So it doesn't have a

13  sample type name, but it's a more contemporary sample, so I

14  would examine both the older sample and the newer sample.

15  Q.   And if I read your report correctly, so similar to what's

16  been happening with the Static-99, Dr. Epperson tested out the

17  MnSOST-R on a contemporary sample and got lower results; is

18  that right?

19  A.   Lower results for the higher-risk samples, yes.

20  Q.   Lower results for the people who scored higher on the

21  instrument?

22  A.   Right.  The probabilities for the low-risk samples were a

23  little -- pretty much the same.

24  Q.   Okay.  And you report those in your report as 30 percent

25  for the high-risk group?

Page 95

1   A.   Right.

2   Q.   And then I think -- well, first, let me ask you, have the

3   new norms been published?

4   A.   No.  They'll be -- they're in press.  They are chapters

5   submitted to a book I'm editing.

6   Q.   So you're editing a book, and the new results on the

7   MnSOST-R will be coming out in that particular book?

8   A.   Right, and the book will be submitted in a couple of

9   months.

10  Q.   And when is it scheduled to appear?

11  A.   You know, that I don't know.  I know that I need to submit

12  it in about two months.

13  Q.   And when we talk about a book chapter appearing as opposed

14  to an article in periodical literature, the peer-review process

15  is not the same, is it?

16  A.   Well, it's similar.  The editors of the book need to

17  review the chapter.  We sometimes ask for significant

18  revisions, and those need to be made for it to appear in the

19  book.  But for journals, there is a review panel that would do

20  a similar job of making recommendations to be published in

21  their journal.

22  Q.   But with a journal, typically the reviewers are anonymous,

23  correct?

24  A.   Not always, but oftentimes they are.

25  Q.   And that's part of our understanding of what peer review

Page 96

1   is about.  The anonymous reviewers, if you pass that hurdle,

2   then we have an indication that the research has passed some

3   threshold of good science, right?

4   A.   That's right.

5   Q.   But with the book-editing process, it's a little

6   different, in that there are no anonymous reviewers, more of an

7   editor-author type relationship?  Is that fair to say?

8   A.   Yes.

9   Q.   Now, in your report you report both the 30 percent rate

10  for this high-risk sample and the 57 percent rate, which I

11  understand to pertain to the old information, right?

12  A.   Correct.

13  Q.   And your justification for doing that is -- well, what is

14  your justification for reporting both of those numbers?  And

15  it's a six-year period, correct?

16  A.    It's a six-year period measuring rearrest.  The

17  justification was what I said yesterday, and that was that

18  Dr. Epperson believes that the higher recidivism rate is really

19  the person's true risk with those higher scores.  However, they

20  implemented a very intensive community supervision program in

21  Minnesota, and so what happened was that many of those

22  offenders that were higher risk that were released were revoked

23  and not in the community for that period of time.  So the

24  recidivism rates went down because those offenders were largely

25  locked up.  And so in communities where there are intensive

Page 97

1   community supervision programs, which is almost everywhere

2   these days, then Dr. Epperson has recommended that you use the

3   lower probabilities during that period of community supervision

4   because the threat, the person's threat to reoffend is reduced

5   significantly; but then when they're off community supervision,

6   he believes the true risk would equal what the old

7   probabilities were, 57 percent.

8       So I report both, and then I say, for the period of time

9   that the individual remains on community supervision, they pose

10  that lower probability of reoffense, in general.  Of course, it

11  doesn't apply to an individual but in general, and then that

12  that would increase once the person is off of community

13  supervision.

14      THE COURT:  What if they get off supervised release

15  when they're much older?

16      THE WITNESS:  That could affect their risk.  That

17  could lower the risk, depending upon how much older they are,

18  what type of offender they are.  It would be much more so for

19  someone who rapes rather than molests.

20      THE COURT:  Well, what about Mr. Carta?

21      THE WITNESS:  Mr. Carta has very pervasive deviant

22  sexual interests, and we generally don't look at a significant

23  reduction in probability of reoffense at his current age.  As

24  he turns sixty and certainly turning seventy, we would make

25  that consideration outside the actuarial instrument.  I'm also

United States v. Todd Carta - Bench Trial Day 2

ea80c287-9e6a-4921-aea0-a5f475e78ff1

1    looking at actuarial instruments that include his aging process
2    already, and those are moderate to moderate high risk.
3    Q.   Well, the Static-99 we just talked about had a major
4    revision in which they sort of incorporated the results of all
5    this research about the impact of age on sexual reoffending.
6    Has a similar process happened with the MnSOST-R?
7    A.   No.
8    Q.   And all this theory -- I'm going to call it a theory of
9    Dr. Epperson's that the reason for the results that he obtained
10   was because of supervision, that's an argument that he advances
11   based on the evidence in this forthcoming article?
12   A.   Yes.
13   Q.   So it's essentially an assertion in a yet-to-be-published
14   research article?
15   A.   Right.  It will be supported in the research article.  It
16   was supported in the training that I received when the new
17   norms were released.  He trained the California sexual predator
18   evaluators, so we learned the data there and how he came to
19   those conclusions.
20   Q.   It's a principle in this research that the longer you stay
21   out without offending, the rate of recidivism -- the threat
22   that an individual poses declines, is it not?
23   A.   Yes.
24   Q.   And so isn't that principle inconsistent with the idea --
25   for example, if Mr. Carta were to survive, in the language of

Page 99

1    statistical analysis, without reoffending for three years --

2    the prior court heard extensive testimony from the actual

3    probation officer who would be supervising Mr. Carta, talked

4    about the panoply of protections that they have as well as the

5    therapist who would be treating him in sex offender

6    treatment -- assuming that he in that regime survived three

7    years, wouldn't his risk of reoffense have declined, in theory?

8    A.   In theory, but we don't have a study to support that.

9    When you look at the time-free-in-the-community data from

10   Static-99 essentially and Static-2002 that was developed by

11   Dr. Hanson and is in the coding rules for Static-99, you do not

12   know how many of those samples were under community

13   supervision.  And they're old samples, so we know that it

14   certainly wouldn't be like contemporary community supervision.

15   So it's a question that we can't really answer in terms of time

16   free and how that relates to being on community supervision and

17   that being a protection.

18   Q.   Well, my question precisely, Dr. Phenix, was simply that

19   if he survives, based on this Static-99 research, not about

20   community supervision, but if he survived without reoffending

21   for three years, and his risk were to be evaluated at that

22   time, it would be lower, right?

23   A.   Uhm, it would be lower, but we don't know how much lower,

24   and there weren't individuals like him in those samples, so I'd

25   be very cautious about applying time free in the community

United States v. Todd Carta - Bench Trial Day 2

Page 100

1   while he's on community supervision to Mr. Carta.

2   Q.   Well, but I believe you agreed with me with the principle,

3   that the longer you stay out without reoffending, the risk of

4   reoffending decreases?

5   A.   I agree with the principle, yes.

6   Q.   And that principle, at least to me, seems inconsistent

7   with this notion that for people who have -- you've reported

8   that if he survives for three years, then his risk will

9   increase.  Am I misunderstanding how you're reporting the

10  MnSOST-R results?

11  A.   Uhm, I don't think we're talking about exactly the same

12  thing.  It was a different situation.  I would not apply time

13  free in the community to Mr. Carta.  What I would apply is that

14  he has general probabilities of reoffense while on community

15  supervision and a general probability of reoffense while not on

16  community supervision because he started out as a high-risk sex

17  offender.  So while his risk may be slightly lower at three

18  years if he stayed on community supervision, he's off of

19  community supervision, so you're confounding the results, and

20  it would go up.  Would it be 57 percent?  I don't know.  I

21  don't know if that applies to him, but --

22  Q.   Well, that's the number that you reported --

23  A.   Right.

24  Q.   -- as being applicable to this case, right?

25  A.   Study sample had a recidivism rate of 57 percent.

United States v. Todd Carta - Bench Trial Day 2

1       THE COURT:  At which year?

2       THE WITNESS:  At six years.  The original Minnesota

3  sample released to the community in the high-risk range,

4  57 percent of them reoffended in six years.

5       THE COURT:  That's not the number you're asking me to

6  rely on, right?  I mean, you have lower numbers.

7       THE WITNESS:  I have lower numbers on Static-99R and

8  Static-2002R and on the new data from the MnSOST-R during the

9  time he's under community supervision, but those probabilities

10 are higher when not on community supervision.  It's just the

11 nature of the sample.

12 Q.   Well, it's the old sample, correct?

13 A.   Exactly, yes.

14 Q.   So you report the old sample numbers and then also the new

15 sample numbers, right?

16 A.   Right.

17 Q.   And Dr. Epperson's theory, which has not yet appeared in a

18 published journal, is the reason is the supervision they were

19 under, right?

20 A.   Yes.  He looked at other factors.  Treatment did not

21 affect.  They both had the same treatment completion in both

22 samples.  So by nature of ruling out other factors it could be,

23 it appeared to be community supervision.

24 Q.   Now, you've testified that the reason you score three of

25 these things is because it's useful to have converging

1    evidence, that makes you more confident in your opinion, right?

2    A.    That's right.

3    Q.    And so here you have moderate high, moderate, and then

4    high, right?

5    A.    Yes.

6    Q.    Now, when you scored the MnSOST-R, you started out by

7    saying that you had -- and for the record, I'm putting on the

8    coding sheet which you scored which we were examining

9    yesterday, which has been entered into evidence, I know, but --

10   and you said you had noticed two errors, two mistakes?

11   A.    Yes.

12   Q.    And the first one was No. 3.

13   A.    Yes.

14   Q.    "Was the offender under any form of supervision when they

15   committed any sex offense for which they were eventually

16   charged and convicted?"  You originally scored that zero, but

17   you increased that to 2?

18   A.    Plus 2, correct.

19   Q.    Plus 2?

20   A.    Right.

21   Q.    Now.  And then you noticed a simple error on No. 7 where

22   it appears he has one victim class, but you had given him

23   plus 3?

24   A.    Right.

25   Q.    And that should be a zero?

Page 103

1  A.   I believe so, yes.

2  Q.   I direct your attention to No. 15.  There you gave him

3  plus 3 for treatment recommended but terminated?

4  A.   I did.

5  Q.   But we discussed earlier that Mr. Carta in fact withdrew

6  or quit voluntarily, he actually regretted the choice right

7  afterwards.  Wouldn't that qualify him for a zero under "quit"?

8  A.   Yes, that would qualify him for a zero under "quit."  He

9  was put on probation, but I do believe that he quit while on

10  probation and was not terminated.  I think that's correct.

11  Q.   Well, in fact, and I know it's a long time ago, but you

12  were deposed and in fact previously testified in this very

13  case.  Do you recall what score you gave him when you testified

14  about the MnSOST-R on the stand?

15  A.   I believe he had a score of 11, which is what I originally

16  scored him.

17       THE COURT:  I thought you testified that quitting sex

18  offender treatment was one of the dynamic risk factors you

19  considered.

20       THE WITNESS:  Oh, it is a dynamic risk factor.

21       THE COURT:  But Minnesota doesn't treat it that way?

22       THE WITNESS:  Oh, no, they do, because you're higher

23  risk -- a zero is higher risk than a minus 1, so you do get

24  risk -- it's just scored differently.  You do get a higher risk

25  than if you completed treatment.

United States v. Todd Carta - Bench Trial Day 2

Page 104

1   Q.   For the record, I'm putting on the screen your testimony,

2   Dr. Phenix, from the Carta trial, Page 19 where you were asked

3   the question by the government, "How did you score Mr. Carta on

4   the MnSOST-R?  I scored him, I gave him an overall score of 5."

5        Does that refresh your recollection as to whether you

6   rescored the MnSOST-R for Mr. Carta prior to your testimony in

7   the case?

8   A.   Right, I must have rescored it.  I didn't recall it, but I

9   must have, yes.

10  Q.   And based on the testimony that we just had, it seems

11  likely that the 11 that you reported in your report was revised

12  when you subtracted six points?

13  A.   That would be correct.

14  Q.   And now you've added an additional two points, correct?

15  A.   I have.

16  Q.   Which would give him either a 5 or a 7, right?

17  A.   Uhm, no.  I had an 8 because I subtracted three and added

18  two, so that would have been an 8.  I can reexamine it.

19  Q.   Well, you had an 11?

20  A.   Uh-huh.

21  Q.   We subtracted 6, and I believe that's what gave you a 5 in

22  February of 2009?

23  A.   I don't remember how I scored it in 2009 in terms of what

24  I subtracted.  I mean, I know the total points I subtracted,

25  obviously, because I had an 11 originally and it ended up to be

Page 105

1    a 5.  I'm not sure on what items.

2    Q.   But you just agreed with me that the coding form pretty

3    clearly indicates that if you quit treatment, you do not

4    qualify for three points, Item No. 15?

5    A.   Oh, I see what you're saying.  Yes, that would have been

6    the 5, and if I reduced this by three, I would also have a 5,

7    so that would be the correct scoring.

8    Q.   And so either a 5 or a 7 actually puts Mr. Carta in the 4

9    to 7 moderate range, right?

10   A.   Right.

11   Q.   Do you endorse that as the correct scoring of the MnSOST-R

12   on the stand right now?

13   A.   Yes, I do.

14   Q.   And so what we have here then is converging evidence of

15   moderate, moderate, and moderate high.  Would you agree with

16   that?

17   A.   I would.

18        THE COURT:  So what's the new predictor under

19   Minnesota?

20        THE WITNESS:  The new probabilities would be, for a

21   score of 5, that if he had community supervision during that

22   period of time, it would be a 20 percent probability of sexual

23   reoffense rather than 30; and if he did not have community

24   supervision, it would be a 25 percent probability of sexual

25   reoffense rather than 57 percent.

1          THE COURT:  So since we know he's going to have

2     supervision, right --

3          THE WITNESS:  For three years, I believe.

4          THE COURT:  Yes, so the range for him will be

5     20 percent rather than 30 percent?

6          THE WITNESS:  That's right, for those three years.

7          THE COURT:  For the three years?

8          THE WITNESS:  For the three years until he's off

9     community supervision, and then it would revert to the -- well,

10    just slightly higher, 25 percent, according to the instrument.

11         THE COURT:  For how long?

12         THE WITNESS:  For indefinitely until he has a new

13    evaluation.  Perhaps because he's older, perhaps because of his

14    age, I would say that certainly those probabilities could be

15    reduced below 25 percent after he's sixty, according to group

16    data.

17    Q.   All right, but, Dr. Phenix, just to clarify, the way that

18    you're reporting what the MnSOST-R means is different from the

19    way you report a Static-99 score.  For example, you just

20    testified that the old numbers for Static-99 are not valid; you

21    report the new numbers, the most current information.  But with

22    the MnSOST-R, you're reporting both, right?

23    A.   Yes.  I've been advised to report both.

24    Q.   By Dr. Epperson?

25    A.   Right.

1  Q.  Now, if I wanted to review this book chapter, I would have

2  to ask you personally for it because it's not available,

3  correct?

4  A.  Right.

5  Q.  Now, Mr. Carta had his first conviction for any sex

6  offense at the age of forty, right?

7  A.  Yes.

8  Q.  He was in a relationship with Fred who was seventeen years

9  old at the time of the relationship?

10  A.  That's right.

11  Q.  You testified briefly yesterday that he got into a fight

12  with Mr. (Redacted) in October of 2000 --

13       MS. PIEMONTE-STACY:  If we could just move to strike

14  the last name of the minor.

15       MR. GOLD:  Oh, did I say the name?  Oh, I was careful

16  the first time.

17       (Discussion off the record.)

18  Q.  -- that he had an incident with this young man, and the

19  police were called?  It resulted in a charge of disorderly

20  conduct?

21  A.  Correct.

22  Q.  And then that dispute between him and this young man

23  continued, and he wrote a letter and tried to embarrass or

24  humiliate this young man, right?

25  A.  Yes.

1  Q.   And, coincidentally, he was being investigated for child

2  pornography at the same time, right?

3  A.   Yes, some time during that period.  I don't know exactly

4  when.

5  Q.   And a search warrant was executed at his house in February

6  of 2001, right?

7  A.   Yes, it was.

8  Q.   And then Mr. Carta basically disclosed his activity

9  regarding child pornography to the police, right?

10  A.   Yes.

11  Q.   And then he was released for a substantial period of time,

12  right?

13  A.   I have to check my records here for a moment.

14       (Witness examining documents.)

15  A.   I don't know for what period of time he was released.  I'm

16  sorry, I don't seem to have that date.

17  Q.   Well, I will see if I can give you a document which

18  refreshes your recollection, but before I do that, he ended up

19  pleading guilty to child pornography in April of 2002?

20       (Witness examining document.)

21  A.   I have an arrest and charge in April of 2002 and then --

22  oh, I see, bailing out at that time in my notes.  I didn't know

23  that there was a plea in April of 2002.  I'd have to go back

24  and look, but if you have that, then that would be true.

25       MR. GOLD:  Your Honor, I feel like I just want to tell

United States v. Todd Carta - Bench Trial Day 2

Page 109

1    the Court what happened to him, but I guess that's not

2    orthodox.

3              THE COURT:  What are you talking about?

4              MR. GOLD:  Mr. Carta came in in a negotiated

5    disposition, pled to an information in April of 2002 in front

6    of, I think, Judge Squatrito in Connecticut.  Then he was

7    released.  He was sentenced in October of 2002 and required to

8    start serving his sentence at that time.

9              THE COURT:  Would that make a difference if that's

10   true, does that make a difference to your diagnosis?

11             THE WITNESS:  No, I believe that that is true.  I just

12   didn't know that -- I knew he was arrested and charged in April

13   of 2002.  I just didn't have the date of the plea, but I

14   certainly believe that counsel is correct.

15   Q.   Well, you read the presentence interview report, the

16   presentence report by Probation that was produced, right?

17   A.   Yes, I did.

18   Q.   And for the record, I am putting on the document viewer

19   the first page of that report which appears under our Bates

20   stamp series at 82, and there it says "Date of plea, 4/9/2002"?

21   A.   Right, that's true.

22             MS. PIEMONTE-STACY:  Your Honor, we'll stipulate to

23   the date of plea and that information contained on Bates

24   Stamp 82.

25   Q.   And so this presentence report reflects that Mr. Carta was

Page 110

1   home during the period of the presentence interview?

2   A.   I guess I'd have to be reminded of the date of the

3   presentence interview.

4        THE COURT:  Take his word for it.

5   A.   Yes, I take your word for it.

6        THE COURT:  You need to wrap this up.

7        MR. GOLD:  Right.  Right, right, right.

8   Q.   The point is, he was out from April until October while

9   these charges were pending, right?

10  A.   That's true.

11  Q.   And there's no evidence of misconduct of any kind during

12  that period that you have available to you, right?

13  A.   That's true.

14  Q.   And in fact the conviction for risk of injury to a minor

15  occurs from before -- the allegations stem from before the

16  disorderly conduct conviction, correct, if you know?

17       (Witness examining document.)

18  A.   I don't know when the allegations stem from.  It was all

19  rather confusing, that timeline to me, but it was in the

20  proximity of that time.

21  Q.   Well, in fact those allegations first come to light

22  because after the disorderly conduct, the young man who's the

23  older brother of the victim tells the police about it?

24  A.   Right.

25  Q.   Right.  And that happens in approximately February of

Page 111

1    2001, right?

2    A.   Yes.

3    Q.   So Mr. Carta is not someone who has been sanctioned for a

4    sex offense, then released, and then reoffended, right?

5    A.   Right.

6    Q.   And is it true in your experience that very often in these

7    cases, we're dealing with individuals who have reoffended after

8    being sanctioned for a sex offense?

9    A.   Yes.

10   Q.   And in fact that's one of the big scoring items in these

11   actuarials that we've been talking about is number of prior

12   offenses, right?

13   A.   Right.  It is a scoring item in all of them.

14        THE COURT:  Can I just ask, just to sum up for a

15   minute, so he's a moderate risk in most of these tables,

16   moderate, right?

17        THE WITNESS:  Moderate to moderate high on Static-99.

18        THE COURT:  All right, so moderate on two and moderate

19   to high on a third, okay.  So that puts him somewhere between

20   22 and 39 percent chance of offending in five years, right?

21        THE WITNESS:  Yes.

22        THE COURT:  Somewhere in that ballpark.  So what is

23   it -- I mean, putting these actuarial tables aside for a

24   minute, that's below 50 percent.

25        THE WITNESS:  Right.

United States v. Todd Carta - Bench Trial Day 2

Page 112

1        THE COURT:  Okay, so what is it that makes you think

2    he can't control himself if I released him subject to

3    conditions?

4        THE WITNESS:  Because his controls were so poor when

5    he was in the community previously, he was so sexually

6    preoccupied with his deviant arousal, because he did not stop

7    himself multiple times from acting out on that, and because

8    nothing's changed.

9        THE COURT:  So that's an analysis apart from these

10   actuarial tables?

11       THE WITNESS:  Yes.

12       THE COURT:  I mean, I'm not saying that they don't

13   supplement your thought process, but essentially you're relying

14   on his conduct at the prison and his conduct over a period of

15   years?

16       THE WITNESS:  Right.  I'm looking at his entire life

17   to see if he has ever developed volitional controls, the

18   ability to manage his deviant arousal, which he still has and

19   will have throughout his life; his hypersexuality which led him

20   to ignore all of life's responsibilities, only to look at child

21   pornography; and to see what would have changed him between

22   that time when he was arrested and today; and the difficulties

23   that he had in sex offender treatment indicate to me that there

24   has been no substantial change.

25       THE COURT:  So I understand that, and that makes

Page 113

1  common intuitive sense, but that's not something that these

2  tools help me a lot with.

3       THE WITNESS:  He's moderate to -- he looks lower risk

4  on the actuarial instruments because his crimes were not

5  detected, and then he was released and reoffended.  He was able

6  to offend throughout his life.

7       THE COURT:  So you're telling me to look beyond the

8  instruments.

9       THE WITNESS:  Yes, I always look beyond the

10  instruments, at each case individually.  He will not score high

11  on these instruments for a number of reasons but primarily

12  because he hasn't been adjudicated, as counsel pointed out,

13  prior to this time and reoffended.

14       THE COURT:  Anything else you want to ask?

15       MR. GOLD:  Judge, I've got a few more, just five

16  minutes?

17       THE COURT:  Five minutes you've got.

18       MR. GOLD:  Five minutes.

19  Q.  Well, part of the purpose of the instruments is because

20  they tell us information that our gut might not tell us, right?

21  A.  Uhm, they tell us information about reoffense, of course.

22  Q.  And they tell us sometimes things that might surprise us

23  based on our intuitive first response, right?

24  A.  Sometimes.

25  Q.  And so are you telling the Court that when the instruments

United States v. Todd Carta - Bench Trial Day 2

1  disagree with your kind of clinical judgment, you put the

2  instrument -- you disagree with the instruments?

3  A.   No.  I think I agree primarily with the instruments.  I

4  think he poses a moderate high risk to reoffend.  That agrees

5  with the Static-99.  I'm really not saying anything different.

6  I think that in this case, those in the moderate range are

7  underestimates because of these other factors I've discussed.

8         (Pause.)

9         THE COURT:  Why don't we do this:  Why don't we get

10  the redirect in, and then you can do it on recross.

11         MR. GOLD:  I'm just looking for one document.  That's

12  the only delay.

13         THE COURT:  I'll let you do it later, even if it's not

14  within the scope, if it's going to take a while.

15         MR. GOLD:  That would be helpful if I can have that

16  opportunity.

17         THE COURT:  Okay, we'll just put your stuff in, and

18  you can be looking for it, whatever it is you were --

19         MR. GOLD:  Oh, I found it now.

20         THE COURT:  All right, then go ahead.

21  Q.   Now, I'm putting up again the March presentation that you

22  gave to the folks in New Hampshire.  You know, this risk

23  assessment in a sense doesn't answer for us whether someone's

24  going to have serious difficulty controlling themselves.  Is

25  that true?

1  A.   Well, I think my risk assessment answers it.  I address it

2  in my risk assessment, at least.

3  Q.   These actuarial instruments give us a risk of reoffense

4  but are presumably completely agnostic as to whether the people

5  who reoffend are doing it because they can't control themselves

6  or for other what we would consider typical criminal reasons,

7  right?

8  A.   Right.

9  Q.   And so a risk assessment determining how likely it is may

10  not directly answer questions about Mr. Carta's volitional

11  control as he sits here right now, right?

12  A.   Right.

13  Q.   Right.  And typically what an evaluator will look at when

14  they're assessing volitional impairment is someone's behavior,

15  right?

16  A.   Yes.

17  Q.   And, for example, you often see in these types of cases

18  with people who have the persistent deviancy that you say

19  Mr. Carta has, that they will act out sexually in prison,

20  right?

21  A.   That could be.

22  Q.   That could be, and in fact it does happen, correct?

23  A.   Oh, it certainly happens.

24  Q.   In fact, it happens in cases in this very court in which

25  you have been a witness testifying, right?

United States v. Todd Carta - Bench Trial Day 2

Page 116

1   A.   That's right.

2   Q.   Right.  And you don't have any evidence of that kind of

3   behavior for Mr. Carta for an eight-year period, correct,

4   sexual acting out?

5   A.   Oh, no.  He was grooming the youngest-looking males in his

6   treatment groups, and I believe he was grooming them for the

7   purpose of ultimately engaging in sexual activity.

8   Q.   Well, you don't have any evidence of sexual activity for

9   Mr. Carta, right, sanctions or otherwise?

10  A.   Right, there were no sanctions.

11  Q.   Right.  And those individuals were individuals of legal

12  age, right?

13  A.   They were.

14  Q.   Now, you don't have any evidence in Mr. Carta's case of

15  reoffending after being released, right?

16  A.   Right.

17  Q.   Right.  Now, when you talked about this concept of serious

18  difficulty with volition, you said that these are factors that

19  evaluators that you were instructing should consider when

20  they're developing an opinion about it, right?

21  A.   Right.

22  Q.   And so you have "Overcame obvious barriers such as victim

23  protests, harm, or pain."  There's no evidence of that in

24  Mr. Carta's case, is there?

25  A.   No.

1  Q.   "Been detected in the past and reoffended, did not learn

2  from experience or punishment," again, with regard to sexual

3  offending in particular, that's not a factor that we can apply

4  to Mr. Carta because we simply don't know, right?

5  A.   Right.

6  Q.   We don't know what impact going through this process for

7  four years, being incarcerated for five years, is going to have

8  on him as a person, right?

9  A.   No, we don't know.

10 Q.   Now, "Reoffended quickly after release," again, that's

11 something that we have no evidence on, correct?

12 A.   Right.

13 Q.   "He made verbal statements that he had few or no

14 controls," right, no evidence of that?

15 A.   No statements, but it was obvious he had few controls.

16 Q.   It was obvious?

17 A.   Yes.

18 Q.   Now, "The offense was risky and he would be easily

19 identified or caught," that's not a factor that applies to

20 Mr. Carta, right?

21 A.   No.  He chose victims that didn't have parental

22 supervision so that he would not be caught.

23 Q.   And so that is a factor that you've identified to assess

24 volitional impairment which doesn't apply to Mr. Carta, right?

25 A.   Right, no.

United States v. Todd Carta - Bench Trial Day 2

Page 118

1   Q.   And "Excessive number of offenses or victims," would you

2   characterize the number of victims in this case as excessive?

3   Does excessive have an operationalized number?

4   A.   It doesn't.  You just look at the case.

5   Q.   Is it excessive here?

6   A.   Well, three thirteen-year-olds I think is, you know, three

7   separate crimes is certainly concerning, and it was concerning

8   to me in considering his volitional controls.

9        MR. GOLD:  Nothing further, your Honor.

10  REDIRECT EXAMINATION BY MS. SERAFYN:

11  Q.   Dr. Phenix, what do we know about Mr. Carta's sexual

12  preoccupation?

13  A.   He has very high levels of sexual preoccupation.  It

14  certainly was reflected in his designing his life around

15  seeking out and being with young boys, spending twelve to

16  fourteen hours a day viewing child pornography, being on chat

17  lines, trying to access boys for sexual relationships.  So it's

18  high, and it kind of spiraled, I would say, completely out of

19  control by the time that he was arrested.

20  Q.   And do we know anything about what Mr. Carta was doing in

21  terms of sexual activity while he was looking at this child

22  pornography?

23  A.   Well, he was masturbating up to two to three times a day

24  while looking at the pornography.

25  Q.   And was he actually, you know, during the months or years

United States v. Todd Carta - Bench Trial Day 2

ea80c287-9e6a-4921-aea0-a5f475e78ff1

Page 119

1   that he was looking at the child pornography, was he actually

2   also engaging in sexual activity with minors?

3   A.   Yes, throughout that time.

4   Q.   And on cross-examination you were asked about Mr. Carta's

5   participation in the Code Program, and Mr. Gold asked you about

6   the treatment that Mr. Carta participated in during that Code

7   Program.  Do you recall the treatment?

8   A.   Yes.

9   Q.   And was there any sex offender treatment as part of the

10  Code Program?

11  A.   No.

12  Q.   Now, Dr. Phenix, I want to show you the table that

13  Mr. Gold made and that he showed you on cross-examination

14  regarding the Static-99 scores.  Now, can you tell us, what

15  recidivism rates did you testify to during the first trial of

16  Mr. Carta before Judge Tauro?

17  A.   That would have been in a five years probability of sexual

18  rearrest is 27.7 and in ten years 37.3.

19  Q.   Okay, so that's in the middle table here?

20  A.   Yes.

21  Q.   Okay.  And then what are the recidivism rates that you're

22  testifying to now in this trial?

23  A.   That would be a five-year recidivism rate of 25.2 and a

24  ten-year recidivism rate of 35.5, so they would be very

25  similar.

Page 120

1    Q.    Now, I want to talk a little bit about this instrument,

2    the SRA: FV.  Can you tell us who developed that instrument and

3    when was it developed?

4    A.    Dr. David Thornton developed it in the last couple of

5    years and released it in December of this year.

6    Q.    And is there a coding form associated with that

7    instrument?

8    A.    Yes.

9    Q.    I'm going to put a document on the screen here --

10            THE COURT:  Do you want to introduce that, you said?

11            MS. SERAFYN:  What's that?  I'm sorry.

12            THE COURT:  Were you going to mark that?

13            MS. SERAFYN:  I will, your Honor, yes.

14            MR. GOLD:  Your Honor, I think it's already in the

15    report.

16    Q.    And is this the coding form that is associated with the

17    SRA: FV?

18    A.    Yes.

19    Q.    And how do you know how to score someone using this form?

20    A.    It's defined in the coding rules.  Each item is

21    operationally designed just like the Stable-2000 so that you

22    can tell if that factor is present for the individual or not,

23    and it has a lot of behavioral indices.  For example, you would

24    get a 2 on the first item, sexual preference for children, if

25    they had three or more child victims under the age of fourteen,

United States v. Todd Carta - Bench Trial Day 2

Page 121

1    and he had three age thirteen, so he would automatically get a

2    2 on that item.  So there's a lot of behavioral indicators that

3    help you.

4    Q.   Now, there are scoring manuals for other actuarial

5    instruments --

6             THE COURT:  Is this a new thing that just you were

7    training on two weeks ago?

8             THE WITNESS:  Yes.

9             THE COURT:  And is this just an effort to regularize

10   like the actuarial instruments, what your judgment calls were

11   as to the bin?

12            THE WITNESS:  Yes.  The actual score on this will be

13   associated with which bin you should use.

14            THE COURT:  Whereas before it was what we were talking

15   about before, you would make a judgment call; and this is an

16   effort to actually make it more scientific, if you will?

17            THE WITNESS:  This does make it more scientific, yes.

18   It's not up to me.

19            THE COURT:  So far, it's evolving, right?  No one's

20   tested it or --

21            THE WITNESS:  It's been validated, the instrument has

22   been validated.  It was developed on the Bridgewater sample.

23   Drs. Knight and Thornton -- Dr. Thornton developed this

24   instrument on the Bridgewater sample and validated it on a

25   separate Bridgewater sample, so that's been completed.  The

Page 122

1   papers, I'm not sure -- the process of the paper that's being

2   submitted on the development and validation of the instrument

3   is validated nicely in the moderate range, and it added

4   incremental validity to the Static-99, so it was developed to

5   be used with Static-99R.

6          THE COURT:  So it hasn't been published yet in a

7   peer-reviewed journal?

8          THE WITNESS:  Right.  It's too new, it's too new.  But

9   it has been validated.  I wouldn't use it if it wasn't.

10  Q.   Dr. Phenix, are there manuals or guides associated with

11  any of the other actuarial instruments?

12  A.   Yes, all of them.

13  Q.   Okay.  And you referenced the manual for the SRA.  I'm

14  just going to put the front page on the screen here.  Is this

15  the manual you were referring to?

16  A.   Yes.

17  Q.   And I just want to show you the -- well, actually, let me

18  step back.  Is the scoring sheet a part of this manual?

19  A.   Yes.

20  Q.   Okay.  And I want to show you the first page of this --

21          THE COURT:  What does SRA: FV mean?

22          THE WITNESS:  Structured Risk Assessment: Forensic

23  Version, so it's to be used for incarcerated offenders.

24  Q.   I'm just showing you the second page of the manual, and

25  there's a section there that says "Purpose of This Guide."  Can

1   you generally tell us what the purpose of the guide is?

2   A.   The purpose of the guide is to make sure that you know the

3   correct coding rules and how to score the instrument and how to

4   interpret it.

5   Q.   And can you just tell us again, what does this instrument

6   tell us?

7   A.   It measures what Dr. Thornton calls "long-term

8   vulnerabilities," which we've been talking about essentially as

9   similar to dynamic risk factors.  So it's measuring what we

10  call "dynamic needs," and it can actually give you a score

11  which is associated with essentially low, moderate, or high

12  dynamic needs.

13  Q.   And are the dynamic risk factors contained in the scoring

14  manual?

15  A.   Yes.

16  Q.   So, Dr. Phenix, what are the risk factors that the SRA: FV

17  measures?

18  A.   The first one is sexual preference for children.  There is

19  increased risk for individuals who commit child molest or are

20  attracted to prepubescent or pubescent children, and this first

21  factor would measure that.

22      The second factor, sexualized violence, is a measure of

23  sexual arousal to sexual sadism, causing pain, torture, or

24  hurting another person, being aroused to the forcefulness in

25  committing a sex offense.

ea80c287-9e6a-4921-aea0-a5f475e78ff1

1  Q.    And, Dr. Phenix, I'm actually just going to stop you

2  there.  I'm sorry to interrupt, but just in the interest of

3  time, as we're talking about these, why don't we talk about

4  these specifically for Mr. Carta.  So I'm going to put your

5  scoring sheet up on the screen here, and as you go through the

6  factors, can you explain to us just generally why you assigned

7  a certain score for Mr. Carta or generally why Mr. Carta meets

8  that particular factor?

9  A.    Yes.  In general, I can.  I don't have the scoring manual

10 up here, but I gave him a 2 for sexualized preference with

11 children.  That's operationally defined.  If you have three

12 victims or more of children under age -- males under age

13 fourteen, you automatically receive a score of 2.  Each item is

14 scored zero, 1, or 2, and 2 is the maximum risk points.

15     The second item is sexualized violence, and this is much

16 more pertinent to individuals who commit rape behaviors, and

17 Mr. Carta has not.  That is not how he seeks out individuals

18 for sexual activity, except in one instance we know where he

19 forced sexual activity on a seventeen- or eighteen-year-old

20 male who was nonconsenting, but he wasn't -- there's no

21 indication he was aroused to the nonconsenting aspects of that.

22 The young man was asleep, so it was just an easy victim for

23 Mr. Carta.  So I gave him a zero on that.  I didn't see signs

24 of arousal to sexual violence.

25     He does, however, have, as we know, a significant sexual

Page 125

1   preoccupation.  That's measured in two ways.  On the narrow

2   measures of preoccupation, it's essentially just being

3   preoccupied with sexual matters.  And in this case, because of

4   his extensive use of pornography, he received a score of 2, as

5   defined by the manual.

6       The broad sexual preoccupation refers to essentially signs

7   of just hypersexuality, and for him, I gave him a score of 1 on

8   that.  He did not meet the full criteria.

9       You, however, add those two items, narrow and broad

10  hypersexuality, and got a total score of 3 divided by 2 which

11  becomes a decimal, 1.5.  So that is the sexual interest domain.

12  That is equivalent on the Stable-2000 to the sexual

13  self-regulation factors.  They're similar.

14      There's a second domain, and that's how a person relates

15  to others.  It's similar to the intimacy deficits factors on

16  the Stable-2002, and the first one, LEIRA, is actually defined

17  as "lack of emotionally intimate relationships with adults."

18  So that is the same as intimacy deficits.  I gave Mr. Carta a 2

19  on that due to his associating primarily with inappropriate

20  sexual partners who are younger and not maintaining or

21  sustaining -- defined in this item, not maintaining or

22  sustaining a relationship over a two-year period with an

23  appropriate partner without problems.

24      He scored a 2 on emotional congruence with children, which

25  is the same as emotional identification with children on the

United States v. Todd Carta - Bench Trial Day 2

Page 126

1   Stable-2000.  This is a person who really feels very

2   emotionally close to children.  They comfort him.  He feels

3   lonely, and he gets a great deal of comfort from being with

4   them.  So he identifies with children emotionally rather than

5   just engaging in sex with them.  That's only part of the

6   picture for Mr. Carta.

7        Callousness as well as two of the items in

8   self-management, which is the category below, is measured by

9   scores on the Hare Psychopathy Checklist-Revised.  So I scored

10  those items on that instrument.

11  Q.   And is that the PCL-R?

12  A.   That's the PCL-R.

13  Q.   And how long has the PCL-R been around for?

14  A.   Oh, since the '80s, I guess the early '80s perhaps?

15  Q.   And is it --

16       MR. GOLD:  Your Honor, I'm going to object at this

17  point.  The testimony is now going to this instrument.  The

18  scoring of it incorporates by reference another instrument

19  which I don't have.

20       MS. SERAFYN:  I think that's disingenuous because I'm

21  sure that Mr. Gold is very familiar with the PCL-R.

22       THE COURT:  Maybe yes, maybe no, but I'm not, and this

23  is running through a huge amount of information that I don't

24  know.  I mean, this is like a whole -- I have no way of

25  evaluating this.  It may be right, may be wrong.  It's just I

Page 127

1   think we're better off just going back with the old -- I have

2   no idea.  I don't know what a PCL-R is.  I don't know where she

3   gets it from.

4           MR. GOLD:  Your Honor, just to clarify, it is a very

5   well-known instrument, so I wasn't claiming to be surprised by

6   it, but she's just said she's scored this other instrument

7   which is important to this.  The PCL-R they use in the death

8   penalty context all the time.  Psychopathy, you get a high

9   score, you're doomed.  So that's what that is.

10          THE COURT:  I'm not sure all these instruments are

11  that relevant anyway because they're all coming up at about the

12  same percentage, but this is adding a whole new dimension.  Why

13  don't you finish it up, and then I'll figure out what I'll do

14  with it.  How much longer do you have on this?

15          MS. SERAFYN:  Well, I just wanted to run through the

16  rest of the factors.

17  Q.   So, Dr. Phenix, you scored this PCL-R, and then what score

18  did you come up with for the relational style section of the

19  SRA?

20  A.   That was a 1.68 domain score.

21  Q.   Okay.  And then moving on to the self-management piece.

22  A.   Right, this looks at lifestyle impulsivity, which is also

23  measured on the Stable-2000, and those are scores from the

24  PCL-R.  It examines resistance to rules and supervision.  These

25  are what's called "factor scores" on the PCL-R.  And

1   cooperation with supervision is examined on the Stable-2000 as

2   well, so we have already -- I've already examined that in my

3   testimony.

4       And then the final factor in self-management is

5   dysfunctional coping, and that equates to just simply poor

6   problem-solving, judgment and insight that is just impaired in

7   terms of making important life decisions.

8       And so the total self-management score was 5.4.  I think

9   the important issue is that the overall score in scoring this

10  instrument would be consistent with placing him in the

11  high-risk sample type.

12  Q.   So I just want you to explain a little bit about why this

13  score of 4.64 is consistent with placing him in the high-risk

14  bin.  So once you score this instrument and you get a total

15  score, what do you do?

16  A.   Well, you look at the grid of what sample type he falls

17  into, but that grid is developed statistically by looking at

18  the midrange group, which is preselected for treatment.  And

19  you would see that the high-risk group is one standard

20  deviation higher in terms of reoffense rates than the

21  preselected for treatment, and the routine sample would be one

22  standard deviation lower than the preselected for treatment.

23  So it really essentially allows you to know if he's riskier as

24  a result of his needs or lower risk as a result of his needs,

25  or just --

United States v. Todd Carta - Bench Trial Day 2

Page 129

1          THE COURT:  Would you give me those numbers -- after

2     the trial is fine -- what his different reoffense rate is

3     depending on what bin he's in?

4          THE WITNESS:  Yes.

5          THE COURT:  Maybe there are four bins.  We'll look at

6     all four of them.

7          THE WITNESS:  Three bins.

8          THE COURT:  Three bins.

9          THE WITNESS:  Right.

10    Q.   So, Dr. Phenix, is it fair to say that once you come up

11    with a score on the SRA, that you look at a grid, and that grid

12    determines which bin the offender is placed in?

13    A.   Right.  It tells you, from this score to this score, he's

14    routine; from this score to this score, he's preselected for

15    treatment; and scores above that, high and very high scores,

16    designated scores would be put in the high-risk needs sample.

17    Q.   So if you score the SRA: FV, you're not using your

18    clinical judgment to determine which bin the offender belongs

19    in?

20    A.   No.  It's assigned.

21    Q.   Now, you've testified previously that the dynamic risk

22    factors contained in the Stable-2000 are virtually identical to

23    the factors that you've just gone through here in the SRA; is

24    that correct?

25    A.   Almost all of them are very similar.

United States v. Todd Carta - Bench Trial Day 2

1   Q.   So what do you do once you come up with a score on the

2   Stable-2000?  In other words, do you use your clinical judgment

3   at that point, or do you not use your clinical judgment to

4   place the offender in a bin?

5   A.   I use my clinical judgment because there is no

6   interpretation -- first of all, I don't score that instrument

7   because it was normed on a community sample, so there are

8   certain things I can't score on this Stable-2000.  So I don't

9   score it, and there is no mechanical calculation of how to

10  assign a sample type from a score on Stable-2000.

11  Q.   And when you considered the factors in the Stable-2000,

12  you determined that Mr. Carta belongs in the high-risk bin; is

13  that right?

14  A.   I did, yes.

15  Q.   And when you used the grid that removes clinical judgment

16  from the SRA, that also placed Mr. Carta in the high bin; is

17  that right?

18  A.   Right, yes.

19        MS. SERAFYN:  If I could just have a moment, your

20  Honor?

21        (Discussion between government counsel.)

22        THE COURT:  Anything?

23        MR. GOLD:  A couple.

24  BY MS. SERAFYN:

25  Q.   Dr. Phenix, what is the age range for a diagnosis of

1   hebephilia?

2   A.   The age range would be deviant sexual arousal, and, you

3   know, for example, the new guidelines, age eleven to fourteen.

4   Q.   And on cross-examination Mr. Gold asked you about your

5   testimony regarding the hebephilia diagnosis from the first

6   trial.  Do you recall those questions?

7   A.   Yes.

8   Q.   And is your testimony now different from or consistent

9   with your testimony from the first trial regarding a hebephilia

10  diagnosis?

11       MR. GOLD:  I'm going to object to that.

12       THE COURT:  Sustained.  We've gone through this.

13  Q.   So, Dr. Phenix, does Mr. Carta have any victims within the

14  age range of eleven to fourteen?

15  A.   Yes.

16  Q.   How many?

17  A.   Three.

18  Q.   And how do the actuarial instruments that you've scored

19  inform your overall risk assessment of Mr. Carta?

20  A.   They give me general guidelines of overall risk.

21  Q.   But do you consider information outside of the actuarials?

22  A.   Of course.  There is no actuarial instrument that includes

23  all the risk factors for future sexual reoffense, and every

24  case is different.

25       MS. SERAFYN:  Your Honor, I'd like to move into

United States v. Todd Carta - Bench Trial Day 2

Page 132

1   evidence the SRA: FV Coding Manual that Dr. Phenix testified

2   about.

3           MR. GOLD:  I object to that, your Honor.  I don't know

4   if we need it.  I mean, she's got it in her report.

5           THE COURT:  Sustained.

6           MS. SERAFYN:  Well, your Honor, she only has the

7   scoring sheet in her report.  The manual --

8           THE COURT:  This is late produced yesterday.  Whether

9   it eventually comes in, I don't know, but it was just generated

10  two weeks ago.  I just don't have a basis.  I'll take her

11  scoring.  It sort of validates -- you know, there are two

12  different ones, the 2000 one and this thing.  It's just

13  brand-new.  As she says, it's brand-new.  It's not even in a

14  peer-reviewed journal yet.  It hasn't even been accepted into a

15  peer-reviewed journal yet.  It's just being developed.

16          MS. SERAFYN:  I was just thinking in the interest of

17  completeness, since we've had a lot of testimony about it,

18  that --

19          THE COURT:  I sustain the objection.  Any questions?

20          MR. GOLD:  Just a couple, your Honor.

21  RECROSS-EXAMINATION BY MR. GOLD:

22  Q.   First of all, you brought up the incident with the

23  seventeen- to eighteen-year-old who was nonconsenting, right?

24  A.   Yes.

25  Q.   Now, that in particular, again to emphasize in this case,

United States v. Todd Carta - Bench Trial Day 2

Page 133

1    an aspect of this case is that all the information we have

2    about his offending comes from him, right?

3    A.    That's right.

4    Q.    His disclosures, his voluntary disclosures in treatment,

5    right?

6    A.    Correct.

7    Q.    And so we don't have any official record or other record

8    about these offenses but his own accounting, right?

9    A.    That's right.

10        THE COURT:  Yes, I know that.

11   Q.    Right.  And so in this case, the seventeen- to

12   eighteen-year-old, Mr. Carta said he was getting signals from

13   that person, right?

14   A.    He thought he was flirting with him.

15   Q.    He thought he was being flirted with.  He started to

16   interfere with that person while that person was asleep, right?

17   A.    Yes.

18   Q.    And then the person woke up, right?

19   A.    Yes.

20   Q.    And that was the end of it, right?

21   A.    Well, I think there was a big --

22   Q.    Well, he said he yelled, said, "what are you doing?"

23   A.    Right.

24   Q.    And left.  And that was the end of that incident right?

25        THE COURT:  Was that the seventeen-year-old or the --

United States v. Todd Carta - Bench Trial Day 2

Page 134

1          MR. GOLD:  The seventeen-year-old.

2     A.   Yes, as far as I know.

3     Q.   Now, again, does this material that you were talking about

4     explicitly apply to choosing the risk bin, the SRA: FV?

5     A.   Yes.

6     Q.   Does this scoring manual explicitly refer to choosing a

7     risk bin?

8     A.   Not the manual, but additional information does.

9     Q.   Additional unpublished information?

10         MR. GOLD:  Nothing further, your Honor.

11         THE COURT:  Thank you.  You'll make your plane.

12         THE WITNESS:  Thank you.

13         (Witness excused.)

14         THE COURT:  All right, so what do we have in terms of

15    the availability?  Do we have future dates here?

16         MR. GOLD:  We promised that -- I have phone calls

17    scheduled with both of them.  We're going to try to get them

18    in, but we need to do it, I think, when we're back at the

19    office early this afternoon.

20         THE COURT:  Sure.  All right, thank you.  If we can't,

21    we can't, but I do have those mornings free next week, so it

22    would be nice to finish this, although I'm not sure we will be

23    able to, right, because let's assume we take a psychiatrist

24    today, you still might want to put Mr. Carta on, right?

25         MR. GOLD:  Right, and we would like to make that

Page 135

1   determination after we hear from the two others.

2          THE COURT:  Sure.  But that could be another morning,

3   so we may not finish it, depending on what you decide to do

4   with him, right?

5          MR. GOLD:  Right.

6          THE COURT:  And will you want to brief this

7   afterwards?

8          MR. GOLD:  Yes.

9          MS. PIEMONTE-STACY:  Yes, your Honor.

10          THE COURT:  I mean, I've reread Judge Tauro's and the

11   First Circuit's opinion.  It's clear that the first prong has

12   been met.  No one's even disputing that.  It's likely by clear

13   and convincing that the second prong has been met based on the

14   First Circuit opinion and what I've heard here today, but

15   that's not a done -- that may be something that would be

16   subject to -- because, I mean, I think Prentky is agreeing, as

17   I'm reading the reports, that hebephilia applies to a certain

18   age group, and I can't make up my mind finally until I've heard

19   from him, potentially, as well as the other two doctors, but at

20   least it looks as if the First Circuit sort of decided it.

21          MR. GOLD:  Dr. Boudin, I think.

22          THE COURT:  He did decide it, and he so far is coming

23   in consistently with that, but I haven't heard the whole record

24   yet, so I don't know whether we'll need briefing on that.  It's

25   really the third issue that's very hotly debated here.  So that

United States v. Todd Carta - Bench Trial Day 2

Page 136

1    would be very useful.

2          Let me ask the government one question:  Do you know,

3    has anyone looked at or cataloged the pictures that he was

4    looking at?

5          MS. PIEMONTE-STACY:  We never had them, your Honor.

6          THE COURT:  You've never had them?

7          MS. PIEMONTE-STACY:  Any information we have is coming

8    from the PSR.

9          MR. GOLD:  And, your Honor, I think what your Honor

10   has heard about frequency and numbers all come -- and this is

11   something we'll develop from the experts -- but from him again.

12   The high number amount is actually his estimate of what his

13   collection was at the height.  He also characterizes what was

14   in his collection and makes other statements about it, but it's

15   all his report.

16         MS. PIEMONTE-STACY:  Well, we agree with that.  The

17   sex offender treatment program are also self-reports, but the

18   sexually explicit language, that came from the PSR, and the

19   prepubescent also came from that.

20         MS. SERAFYN:  Yes, I was just going to add, your

21   Honor, that Exhibit 26 from the first trial is the plea, and

22   then on the third-to-last page there's a stipulation of offense

23   conduct that Mr. Carta signed, and that's what explains that it

24   was "child pornographic movies depicting minor children,

25   including prepubescent minor boys engaged in sexually explicit

Page 137

1    conduct."

2          THE COURT:  All right, but that doesn't help me as

3    much on this very, very narrow issue.  He's not being charged

4    with being a pedophile, really, and everyone agrees that for

5    the most part, fifteen- to seventeen-year-olds are not what

6    hebephilia is about, and so it's really some of the boys he was

7    looking at in this eleven to fourteen-ish age group.  It's

8    clear they were.  He self-reported they were, but I don't have

9    any sense of proportion, right?

10         MR. GOLD:  Well, the sex offender treatment, I mean,

11   it depends on how much you're going to rely on that, Judge, and

12   the credibility that you put on it.  He's required to break

13   down the composition of his own collection.  He does it in some

14   detail.

15         THE COURT:  And it includes eleven- to

16   fourteen-year-olds, right?

17         MR. GOLD:  I think so, but he's pretty explicit that

18   what he's interested in what he keeps for -- he said he was

19   addicted to the collecting.  I don't know that this is hotly

20   disputed.

21         THE COURT:  Well, I just don't have that, so if

22   someone has what he self-reported that was about, that's

23   relevant.

24         MS. PIEMONTE-STACY:  It went in as Exhibit 26 and 27,

25   your Honor.

1      THE COURT:  I just don't know that record because I

2  wasn't the first judge.

3      MS. PIEMONTE-STACY:  And that's part of why I want a

4  brief, so that we can point out the pieces, so that I think it

5  would be helpful for the Court to point out the --

6      THE COURT:  Let me just tell you what I'm struggling

7  with, and I haven't heard the other two psychiatrists nor

8  Mr. Carta.  So I'm struggling with, he's, let's say, a moderate

9  risk to reoffend under any of these studies.  Even if I have

10  questions about this most recent one and has it been validated,

11  it's coming out pretty consistently less than 50 percent,

12  unlike some of the other people I have who are over 50 percent.

13  So there may be reasons for that, but it is.  So, I mean, at

14  the end of the day, though, I've got to make a decision based

15  upon my own personal judgment based on the evidence; and a

16  piece of it are these actuarial tables, but a piece of it is

17  the evidence, and a piece of it is the expert points of view.

18  I mean, the actual tables which we spent 90 percent on today is

19  only one piece of my puzzle, and they're coming out pretty

20  consistently.  So while we've spent a huge amount of time on

21  them, they're not dispositive; they're just one piece of

22  evidence, right?

23      MS. PIEMONTE-STACY:  Yes, your Honor.

24      THE COURT:  I barely even looked at it in Shields, I

25  mean, because the evidence was so compelling otherwise in terms

Page 139

1   of his past, Mr. Shields now I'm referring to.  So, I mean, I

2   will look at the totality of the record, and I just don't know

3   that the Daubert hearing is necessary or that these actuarial

4   tables, which are all pretty consistent, tell you that much.  I

5   don't know what moderate risk to reoffend, that tells you

6   something but not --

7          MR. GOLD:  I'd like to -- can we revisit this after

8   the other two guys?

9          THE COURT:  Yes, but I'm just telling you how I'm

10  thinking, sort of a running -- it was interesting today.

11  They're all sort of roughly coming out the same way, so we

12  could deconstruct each one of the ones that's basically coming

13  out in the moderate range.

14         MR. GOLD:  Right, the scores are moderate.  You know,

15  I think that the numbers -- I mean, our argument would be that

16  the numbers for our guys are overstated by the way that they're

17  deciding to construct this and that the numbers are actually

18  even lower.  And, again, they can score --

19         THE COURT:  Well, maybe your experts would say that.

20  I'm keeping an open mind, but I'm just saying I want to hear

21  everything, but I don't know that the differences between all

22  these tests and these scoring devices, which give me some

23  concern that they keep changing, except in this particular

24  case, they're relatively consistent, unless, as you say,

25  they're just dead wrong, and I guess I'll hear from your expert

United States v. Todd Carta - Bench Trial Day 2

Page 140

1    on that.  I mean, so, in any event, I will wait.  You'll come

2    up with other dates for me.  If we can finish it before, fine.

3    Otherwise, it may just spread out, which is unfortunate because

4    then we all forget.  So if we can do it next week, I would love

5    it, Thursday and Friday, if possible.  Good.  See you later.

6    Bye-bye.

7            THE CLERK:  It will be Wednesday and Thursday.

8            THE COURT:  I meant Wednesday and Thursday.

9            MR. GOLD:  Wednesday and Thursday.

10           THE CLERK:  Court is in recess.

11           (Adjourned, 1:05 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 141

1                    C E R T I F I C A T E

2

3

   UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS     ) ss.
   CITY OF BOSTON                )
5

6

7           I, Lee A. Marzilli, Official Federal Court Reporter,

8  do hereby certify that the foregoing transcript, Pages 2-1

9  through 2-140 inclusive, was recorded by me stenographically at

10 the time and place aforesaid in Civil Action No. 08-12064-PBS,

11 United States of America v. Todd Carta, and thereafter by me

12 reduced to typewriting and is a true and accurate record of the

13 proceedings.

14      In witness whereof I have hereunto set my hand this 16th

15 day of December, 2010.

16

17

18

19

20           /s/ Lee A. Marzilli

21           _____
             LEE A. MARZILLI, CRR
             OFFICIAL COURT REPORTER
22

23

24

25