IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,       )
                                )
            Petitioner          )
                                )
      -VS-                       )   CA No. 07-12064-PBS
                                )   Pages 1 - 37
TODD CARTA,                      )
                                )
            Respondent           )


STATUS CONFERENCE

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE


United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
October 18, 2010, 3:15 p.m.


LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 7200
Boston, MA  02210
(617)345-6787

1    A P P E A R A N C E S:

2

         EVE A. PIEMONTE-STACEY, ESQ. and JENNIFER A. SERAFYN,
3    ESQ., Assistant United States Attorneys, United States
     Attorney's Office, 1 Courthouse Way, Boston, Massachusetts,
4    02210, for the Petitioner.

5        IAN GOLD, ESQ., Federal Public Defender Office,
     District of Massachusetts, 51 Sleeper Street, 5th Floor,
6    Boston, Massachusetts, 02210, for the Respondent.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2           THE CLERK:  The case of the United States v. Todd

3    Carta, Civil Action 07-12064, will now be heard before this

4    Court.  Will counsel please identify themselves for the record.

5           MR. PIEMONTE-STACEY:  Good afternoon, your Honor.  Eve

6    Piemonte-Stacey and Jennifer Serafyn for the United States.

7           MR. GOLD:  Good afternoon, your Honor.  Ian Gold on

8    behalf of Mr. Carta.

9           THE COURT:  Thank you.  Mr. Gold, have you had a

10   chance to read this letter he sent me?

11          MR. GOLD:  I did read the letter, your Honor.

12          THE COURT:  Have you had a chance to talk to him in

13   the interim?

14          MR. GOLD:  I did.  I visited Mr. Carta at Devens last

15   week.

16          THE COURT:  So, Mr. Carta, what's your current

17   position?

18          MR. CARTA:  I want to keep Ian as my attorney.

19          THE COURT:  All right, so at this point you're

20   satisfied?

21          MR. CARTA:  Yeah.  The only problem -- the biggest

22   problem I have, your Honor, is not being, you know, in the loop

23   kind of.  It was about three months since I was told what was

24   going on, and I understand that Mr. Gold was very busy.

25          THE COURT:  Yes, but also I wanted to see you because

1   he has no obligation to represent you on any disciplinary

2   infractions in the prison, and I'm not going to require him to

3   do that.  He's got a hard enough task here just worrying about

4   the very important case that you've got on the civil

5   commitment; and so while I'm sympathetic, I wanted to make sure

6   I saw you first, but whatever plight you have in the prison,

7   that's not his job.

8        MR. CARTA:  Yeah, but, see, the only thing about that

9   was, I didn't want it to hurt my case.  That's why I was trying

10  to find out --

11       THE COURT:  I don't know.  Sometimes it does, and

12  sometimes it doesn't, but if it doesn't have anything to do

13  with a sex offense, I don't know that it does.  It didn't sound

14  as if it did.  We've had situations where disciplinary

15  infractions have actually had a sexual overtone, but I don't

16  know if this does or not.

17       MR. GOLD:  Well, part of the claim against Mr. Carta

18  is his overall anti-sociality, so maybe we can commit the

19  government to say it doesn't matter now, but I think that's

20  where Mr. --

21       THE COURT:  Well, maybe it does or it doesn't, but you

22  don't have an obligation to represent him in a prison

23  disciplinary --

24       MR. GOLD:  No, but I do want to say I appreciate, and

25  Mr. Carta's letter the way I read it -- and I read it a couple

1  weeks ago, I haven't revisited it -- when it came out, I should

2  have -- I thought I printed it out here, but the basic thing

3  that Mr. Carta said that was true is that we promised him

4  expert reports by the end of last month.

5       THE COURT:  Oh, I see.

6       MR. GOLD:  And in fact we had delays from both the

7  experts that we have in the case.  We're now looking forward to

8  getting them at the end of this month.  One of them had a

9  computer disaster and things of that nature.

10      THE COURT:  Who, yours?

11      MR. GOLD:  One of mine, yes.  Which one?

12      THE COURT:  Yes.

13      MR. GOLD:  Dr. Prentky, Dr. Prentky.

14      THE COURT:  Well, he's been here, I mean, so we know

15  where he is.  He just testified last week here.

16      MR. GOLD:  Right.

17      THE COURT:  So when is he going to be able to get his

18  in?  Does he say?

19      MR. GOLD:  No.  I gave them till the end of this

20  month.  I mean, I'm in touch with him; I'm not not in touch

21  with him.  And so, I mean, he's testifying in this case.  He's

22  testifying in Brooklyn.  He's a --

23      THE COURT:  Busy guy.

24      MR. GOLD:  A busy guy, yeah.

25      MR. PIEMONTE-STACEY:  And, your Honor, that was

1    Dr. Plaud last week.  Dr. Prentky testified in July in this

2    case, just so the record is clear.

3              THE COURT:  Didn't I see Prentky in one of these

4    cases?

5              MR. PIEMONTE-STACEY:  You did.  It was the Wetmore

6    case in the July --

7              THE COURT:  Oh, it was in the July.

8              MR. PIEMONTE-STACEY:  Yes.

9              THE COURT:  So who's your doctor?  Has he got his

10   report in?

11             MR. PIEMONTE-STACEY:  Your Honor, we do not have a

12   report yet because what happened was, all of this -- the

13   initial reports were all in.  This is a case that's on remand

14   just on the third prong.  There was a motion by the respondent

15   to have a reexamination by their two doctors; and so after

16   those reports, Mr. Carta has never agreed to examination by our

17   expert, who's Dr. Phenix, who you did see last week.  So, no,

18   there's no supplemental report, but we've not received the

19   report from the respondents, and that's all that she's been

20   traditionally --

21             THE COURT:  I understand why he's upset.  This case

22   has been pending forever, and the truth, he's probably -- are

23   you in a local prison?

24             MR. GOLD:  He's at Devens.

25             THE COURT:  He's at Devens?  I mean, is there any

1   chance -- I've got this opening that came up the first week in

2   November.  Can we try it?  I mean, I --

3            MR. GOLD:  We were going to propose December or

4   January, your Honor, just logistically to get everything --

5            THE COURT:  Well, when is Prentky -- the end of the

6   month is two weeks, so his report is going to be in.

7            MR. GOLD:  Right.

8            THE COURT:  And then what?

9            MR. GOLD:  Well, and then we will try to squeeze in,

10  if we keep -- and we may not do this -- but we would try to

11  squeeze in depositions of these people by phone or in person.

12           THE COURT:  Why?  It's just a bench trial at this

13  point, right?

14           MR. GOLD:  Well, that's a good question.  That's what

15  we've done in the previous cases, and maybe we don't have to do

16  that if we have the reports.  I mean, that's typical on the

17  criminal side that we don't have this advantage of doing the

18  depositions.

19           THE COURT:  I want to move this along.

20           MR. PIEMONTE-STACEY:  But, your Honor, and I think you

21  can.  This is in a very procedurally different place.  We've

22  had the whole trial.  The First Circuit remanded this case for

23  a finding on the third prong, which is, would he have serious

24  difficulty refraining?  So when we're even talking about trial,

25  I'm not sure what the trial is.  I suspect that with new

1   reports, there would be a limited period of time for direct and

2   cross, but the government maintained that the issue is whether

3   he was a sexually dangerous person at the time of this trial,

4   and this case has been remanded for the third prong.  If this

5   Court wants to hear again from the government's experts to see

6   them in person, but the First Circuit opinion basically says,

7   you know, "Dr. Bard said this, Dr. Phenix said that, and which

8   of the two is more credible is why we're remanding this case

9   for further findings on the third prong."  So the First Circuit

10  opinion didn't even contemplate this reexamination which is

11  happening.  It is happening, but I don't see a very long --

12          THE COURT:  Has he been getting sex offender treatment

13  in the interim?

14          MR. GOLD:  No, your Honor.

15          THE COURT:  I mean, it's just dead time is what it is.

16  It's neither helping him nor moving it along.  And I don't see

17  the need for a deposition at this point.  Who's your expert

18  going to be on the third prong?

19          MR. PIEMONTE-STACEY:  Dr. Amy Phenix.

20          THE COURT:  Has she already given a report on it?

21          MR. PIEMONTE-STACEY:  She's given an initial report.

22  She hasn't seen the supplemental.

23          THE COURT:  We're just going to move ahead on this.

24  This is not a -- did you represent him the first time around?

25          MR. GOLD:  I did, we did that trial, and we're in a --

1   I think it's not quite as simple as the government says with

2   respect to --

3           THE COURT:  You know, I tell you, I've got this

4   letter.  I've got to move this case.  It can't just be on and

5   on with these experts.  There seem to be only like three in the

6   country, and we're all pulling at their time, but it's just one

7   tiny sliver of this that's left.  I'm not going to redo

8   everything.

9           MR. GOLD:  Well, your Honor, I don't know that that is

10  a -- we're going to want to submit something to the Court about

11  the scope of the testimony on remand.

12          THE COURT:  Well, we've got to because we've got to do

13  this.  I was told, and I didn't even realize it, that we don't

14  even have a trial date yet.

15          MR. GOLD:  No, and that's what we were talking about.

16          THE COURT:  We have to have a trial date.  We can't

17  keep this slipping.  I think to some extent, I mean, you can't

18  represent him on amphetamines in the prison, but we've got to

19  just make this a high priority and not keep it slipping.  So

20  can we just get going on it on -- I literally have some -- a

21  case just fell off the plate.  I have the week of November 1.

22  Can't we just do it?

23          MR. GOLD:  I would really like to push for something

24  almost as close, but I think that's just cutting it too close.

25          THE COURT:  How about the week of November -- how

1    about 23rd and 24th of November right before that Thursday,

2    Tuesday, Wednesday before Thanksgiving?

3         MR. GOLD:  That might be good for me.  Right now I

4    have a trial scheduled in Worcester, but I think within the

5    next week I'm going to be able to confidently say it's going to

6    be a plea.

7         THE COURT:  Well, let me take this time.  Why don't

8    you sit down for a minute.  Tell me what you think the case is

9    about.  I've spent no time on this case.  It came back on

10   remand.  I don't even know why it was given back to me, since I

11   have no history with the case.  I think Judge Tauro recused

12   himself, it's his practice, after remand, but I know nothing

13   about the case.  But, boy, this is my fourth sex offender case,

14   so I know something about the law at this point and something

15   about those actuarial instruments.  So tell me what you think

16   happened below and what you think is left for a trial.

17        MR. PIEMONTE-STACEY:  Your Honor, what happened below

18   is, there was a full bench trial before Judge Tauro.  What

19   Judge Tauro found was that the government failed to meet its

20   burden of proving a serious mental illness, abnormality, or

21   disorder, finding that hebephilia was not a serious mental

22   illness, abnormality, or disorder.  The First Circuit reversed

23   on that saying that, one, there was plenty of evidence

24   introduced by Dr. Amy Phenix that paraphilia NOS with a

25   descriptor of hebephilia was a mental illness, abnormality, or

1    disorder that was included in the DSM; but even if this case

2    fell outside of a DSM diagnosis, on the facts presented, the

3    hebephilia descriptor, this attraction to adolescents, that

4    there was evidence that the government had met its burden on

5    serious mental illness, abnormality, or disorder.  Because

6    Judge Tauro found no mental illness, abnormality, or disorder,

7    he didn't reach the third prong as to whether the respondent

8    would have serious difficulty refraining.

9           THE COURT:  The first prong is the one I usually think

10   of, whether there was past sexual --

11          MR. PIEMONTE-STACEY:  Past acts, stipulated basically.

12   There was really no dispute.  He admitted to past acts.

13          THE COURT:  Like what?

14          MR. PIEMONTE-STACEY:  When he was between the ages of

15   eleven and thirteen, he performed oral sex on a child in

16   diapers, approximately three or four years old.  When he was

17   fifteen or sixteen, he shot a similar-aged peer with a BB gun

18   because he failed to perform oral sex on him.  He later

19   persuaded the teen to perform oral sex on him, and they engaged

20   in that approximately ten times over a five-year period.

21          THE COURT:  So there wasn't that five-year

22   discrepancy, right?

23          MS. PIEMONTE-STACEY:  Right.  These are just past --

24          THE COURT:  Just get to the ones that just clearly

25   fall within --

1          MR. PIEMONTE-STACEY:  At age twenty-one he engaged in

2     oral sex with a sixteen-year-old nephew.  Between the ages of

3     twenty-eight and thirty-four, he had sex with a

4     thirteen-year-old.  When he was thirty or thirty-one, he began

5     sexually abusing a thirteen-year-old boy who he referred to as

6     his "boyfriend."

7          THE COURT:  So when he became an adult, he raped a

8     thirteen-year-old, is that it?

9          MS. PIEMONTE-STACEY:  Yes, and I believe it will be,

10    like, unlawful sexual conduct or something like that.  It was

11    oral sex, fondling, similar to some of the other evidence that

12    you've heard in other cases.  And so that's generally it in a

13    nutshell.  Both expert reports are fully in evidence.

14         THE COURT:  Right, so prong one is met.

15         MS. PIEMONTE-STACEY:  Prong one is met.

16         THE COURT:  Prong two is met, and the only issue is

17    whether he can control his conduct.

18         MR. PIEMONTE-STACEY:  That's right.  Now, all that

19    evidence was put in at trial before Judge Tauro.

20         THE COURT:  Yes, maybe, but I don't want to sit and

21    read 1,000 pages, okay?  How long is the transcript?

22         MR. PIEMONTE-STACEY:  It's several volumes.  It was a

23    three-day, I think, trial.

24         THE COURT:  So, I mean, maybe I'll have to, but the

25    issue really is, I've got a lot going on, and he's been sitting

1    in jail for a very long time without either treatment or a

2    finding.  So I don't plan on retrying that case.

3         Now, that having been said, you've got to teach me.

4    I'm not going to just -- you know, so I have to have it in

5    context.  Like some of these other people who just kept

6    molesting hundreds and hundreds of boys, I need to know that.

7    It's related to know whether or not somebody can control their

8    conduct.

9         MR. GOLD:  Your Honor, if I might just address a

10   couple of these points.  One is that just the gist from the

11   defendant's perspective:  Mr. Carta is here on a child

12   pornography conviction.  He was in the Butner program for a

13   substantial period of time, the sex offender treatment program

14   that they had in the early part of this decade.  He washed out

15   after making certain gains in the program, but the --

16        THE COURT:  You know, I don't know the expression.

17   "Washed out" just means he graduated?

18        MR. GOLD:  No, not that he graduated.  He discontinued

19   participation at some point, right, without graduating.

20        THE COURT:  On his own?

21        MR. GOLD:  On his own, that's right.  But he did --

22   and this was part of the testimony at the trial -- but that

23   everything that he did -- and again the government just recited

24   things that he did as a juvenile, which aren't particularly

25   relevant, as the experts say, to his makeup as an adult or

300d73f2-8ff0-416c-bbc6-f960478a442c

1    relevant in a particular way, but also that he was one of these

2    individuals who carried on with teenage boys, some as young as

3    thirteen, but he had relationships with the same individuals

4    until they were seventeen.  And so the classification that the

5    government gave him -- and also I should say, he was never ever

6    sanctioned for a sex offense.  That is, he wasn't reported to

7    the authorities.  He wasn't arrested, did time and then came

8    out.  This is, as you know from the testimony about the

9    actuarials, one of the central sort of factors that they look

10   at, this recidivating after being sanctioned.  He wasn't one of

11   those.  This is his first criminal intervention.

12          THE COURT:  Well, how do people know about all

13   these --

14          MR. GOLD:  Because he disclosed it all in treatment in

15   this big forum that they want you to disclose every single

16   victim, and the more you disclose -- you know, we argue, and I

17   think with good effect, that you're incentivized to really beef

18   up your profile of yourself in these treatment programs, but

19   everything we know about his sexual conduct comes from his own

20   mouth, everything, and so that's a unique kind of aspect.

21          THE COURT:  So he was never convicted, unlike some of

22   the other ones?

23          MR. GOLD:  No, he was never convicted and then went on

24   to commit another crime.  That never happened with him.

25          THE COURT:  So he never had the sex offender treatment

1    until he actually got there on the child pornography charge?

2          MR. GOLD:  That's right, that's right.  And the

3    government experts rely on that fact generally first before all

4    other, that this man was released from prison --

5          THE COURT:  How did he do in treatment?  What do the

6    providers say?

7          MR. GOLD:  Well, we had two different views of that.

8    First of all, his main therapist there was at the time not a

9    licensed psychologist.  He was an intern.  They have a good

10   internship program there at Butner, so I'm not -- but I'm just

11   putting some kind of meat on the bones there.  He came up.  He

12   was called by the government to testify.  He testified about

13   this give-and-take.  Mr. Carta was, first of all, criticized

14   for hanging around too much with younger members in that

15   program.  That was seen as unhealthy behavior.  I suppose that

16   was part of it.  He was also someone who sort of went into the

17   community meetings, was a little dramatic, stepped out.  He was

18   actually cajoled back into the program a couple of times.  That

19   was part of his process.

20         We had an expert I don't think your Honor has seen

21   named Leonard Bard who testified, and he testified -- he's

22   someone who's treated dozens or hundreds of these

23   individuals -- and testified, I think, very feelingly, sort of

24   putting a sort of more human face on this sequence of, you

25   know, kind of wanting to get out, getting back in, wanting to

1    get out, get the attention, getting back in.  But at some point

2    he didn't complete the program.  The government's take on that

3    was that this is evidence that he's --

4              THE COURT:  Noncompliant.

5              MR. GOLD:  -- noncompliant or not rehabilitated.  We

6    pointed to the gains that he had made in the program that he

7    continues to have, and that he wasn't, you know, perfect but

8    that it was certainly something that mitigates his risk of

9    reoffense now.  I mean, that was part of the flavor --

10             THE COURT:  So this is very interesting and important.

11   So isn't that going to be the debate at trial as the government

12   states?  It's going to be, how did he do in treatment?  What's

13   his riskiness for reoffending?  Can he control his actions?  I

14   don't have to go through prong one and two except to the extent

15   it bears on the control issue.

16             MR. GOLD:  Well, I do need to -- has the Court read

17   within recent memory this appellate opinion?  The issue there

18   is -- we had two experts.  One is Dr. Phenix, and our expert

19   was Dr. Bard.  And the issue there was this hebephilia

20   diagnosis, and Dr. Bard testified that basically it was a

21   "bad/not mad" type argument.  He said, in his view, hebephilia

22   was proposed by certain people in the field but was not a

23   recognized sort of diagnosis.  In fact at the time, and still

24   currently, a version of hebephilia, this idea is being proposed

25   for inclusion into the Diagnostic and Statistical Manual of

300d73f2-8ff0-416c-bbc6-f960478a442c

1    Mental Disorders.  It's coming out in 2013 or so.  They're

2    doing trials, they're proposing studies about it; and he

3    testified that, in his view, it wasn't accepted and it wasn't a

4    diagnosis that he saw as valid.

5             He also testified that he saw a lot of --

6             THE COURT:  Well, maybe it is, but the First Circuit

7    reversed, right?

8             MR. GOLD:  Well, they reversed, but, you know, I guess

9    what I'm saying is, I don't want to stand here and -- they did,

10   and maybe there's no fight on this at all and it's the law of

11   the case, but, in our view, the First Circuit did something

12   very peculiar in reversing.  They basically said -- Judge Tauro

13   accepted Dr. Bard's testimony about this.  He evaluated the

14   credibility of both witnesses.  He understood the testimony.

15   In fact, I was surprised the government appealed because, in

16   our view, it was a heavily fact-dependent determination.  But

17   what they did was, they did reverse, and they determined, I

18   guess, that Judge Tauro's opinion was clearly erroneous in

19   siding with the categorical opinion of our expert, which said

20   that it wasn't a diagnosis to begin with, and that the

21   categorical opinion that it's okay to diagnose this from the

22   government's expert's opinion was correct, and that also her

23   factual determination in a sense was also correct.  That's what

24   they held.

25             Now we're over here, and I think one of our positions

1    is, our expert hasn't been asked, "Well, if you assume that

2    it's categorically okay, does he have it in fact?"  And now

3    we've pushed another expert into the case, and we'd like to ask

4    that expert the same question.  And that's something I think in

5    a trial brief -- I mean, I don't think I'm slowing up the trial

6    by saying --

7              THE COURT:  Well, let me put it this way:  I have not

8    read the case in recent memory other than the -- actually, I'm

9    not sure I read it in depth ever other than sort of to see what

10   had happened when it was redrawn to me, so I need to read it in

11   depth.  But if the First Circuit has ruled on this, I'm not

12   going to revisit it, okay.  If it's left it open, it's left it

13   open.  But let me just say this:  It may be, though, even if

14   they've closed the door on prong two, as we've been calling it,

15   that some of that evidence, as I've done these past trials, is

16   very relevant to whether or not you can conform your conduct to

17   the requirements of the law or control yourself.  So to some

18   extent I'm not viewing it as a backdoor; it's the front door

19   because it depends how seriously he's got it, see how dangerous

20   he is.

21              MR. GOLD:  Well, that was the second point I think

22   that the Court -- that we can't avoid taking testimony on the

23   point by -- even if we weren't litigating it, I think to give

24   context to the serious difficulty controlling behavior, they're

25   so intimately related.

1          THE COURT:  I think they are, but I want to get there.

2    So you have Dr. Prentky.  Is he my expert again?  Is he the

3    neutral witness?

4          MR. GOLD:  Well, we have a neutral one that's

5    Dr. Bard, who the Court granted a motion to have him go in and

6    do a refresher.

7          THE COURT:  And where's he --

8          MR. GOLD:  And then the defense-appointed or

9    defense-selected examiner is Dr. Prentky.

10         THE COURT:  So when is Bard's refresher?

11         MR. GOLD:  Bard is done.

12         THE COURT:  What did he say the second time around?

13         MR. GOLD:  Well, he continues to --

14         THE COURT:  Right, it's the same opinion.

15         MR. GOLD:  The same opinion.

16         THE COURT:  So, now, are you bringing on another

17   government witness?

18         MR. PIEMONTE-STACEY:  This is the first time I've

19   heard that Bard is done, so I think we would stay with Dr. Amy

20   Phenix, but she'd like the benefit of seeing Dr. Prentky's and

21   Dr. Bard's opinions.

22         THE COURT:  Well, Bard, I'm wondering why you have it

23   and she doesn't.

24         MR. GOLD:  Oh, well, I don't -- when I say he's done,

25   I mean his report is in the hopper.  I actually don't have it

1    in hand yet.

2            THE COURT:  Oh, I see.

3            MR. GOLD:  When both of them had some difficulties

4    with the deadline at the end of this month, I gave them another

5    month.  I've communicated with Dr. Bard.  He can essentially

6    get me the report right away.

7            THE COURT:  Yes, but another month means the end of

8    this month, right?

9            MR. GOLD:  Oh, right, and I think that's probably ten,

10   eleven --

11           THE COURT:  I won't give them any more time --

12           MR. GOLD:  I won't but --

13           THE COURT:  -- because we'll just keep getting bumped

14   behind all their other cases.  I mean, this man has been

15   waiting since 2007, 2008, right, something?

16           MR. GOLD:  Yes.

17           THE COURT:  That's a long time.  I mean, truthfully,

18   the reason I'm upset about it is, he may be a sex offender or

19   he may not, but given what amazing things they've done with

20   someone else I've been supervising, he could be done with

21   treatment by now.  I mean, even if I had ordered it, he

22   could -- it's not a terrible program.  It seems to be quite a

23   good program.  And I don't know, I've never done it, but, I

24   mean, we could be done by now, and so it actually has a price

25   waiting like this.  And I don't know if he's never had sex

1   offender treatment, and if I sent him down for it and if he

2   takes it seriously this time, he could be out in a year, you

3   know, whatever.

4          MR. GOLD:  But, your Honor, I did want to -- I have a

5   man down -- the other man who's committed down there is

6   actually my client as well.

7          THE COURT:  Oh, is he?

8          MR. GOLD:  And I was just in North Carolina speaking

9   with him.

10          THE COURT:  What did you think?

11          MR. GOLD:  Well, I was also positively impressed, or

12   my client is, I will report, with what's going on down there.

13   I will say, though, that -- and again this is talking as a

14   member of the Federal Defender's Office -- we've seen it as a

15   matter of policy -- this is a policy which we can always

16   revisit -- to not advise individuals in this type of jeopardy

17   to continue in treatment.  And in fact Mr. Carta's particular

18   experience, his disclosures --

19          THE COURT:  Oh, your case, then fine.

20          MR. GOLD:  Well, but his disclosures are what's --

21          THE COURT:  I agree with that totally as a policy.  It

22   doesn't matter if I agree or not.  I'm just simply saying, I'm

23   not telling him to go down before I've made the commitment

24   order or said no commitment.  I'm simply saying it's dead time.

25   He's probably sitting getting no treatment, no nothing, right?

1          MR. CARTA:  Can I say something?

2          THE COURT:  Yes.

3          MR. CARTA:  I tried to get into the SOTP in Devens.

4    They refused.

5          THE COURT:  Is that right?

6          MR. CARTA:  Yes, they refused me.  He has the cop-out

7    that I put in.

8          THE COURT:  Why?

9          MS. PIEMONTE-STACEY:  He would be allowed to get into

10   the program at Butner.  The program at Devens, my understanding

11   of the program at Devens is it's for people who have been

12   criminally convicted and are at the end of their sentences and

13   are getting ready for community release.  It's a different type

14   of program than the one at Butner.  If he had asked for

15   treatment and he wants to be in treatment, my understanding,

16   and this is from speaking with Dr. Hernandez and the legal

17   folks down at Butner, is that they could transfer to Butner and

18   participate in treatment.

19         THE COURT:  But then they'll use it against him,

20   right?

21         MR. PIEMONTE-STACEY:  Well, your Honor, we use the

22   records either way.  I mean, in this particular case, as you

23   saw in Shields, we just submit everything.

24         THE COURT:  Well, anyway, it just proves up my point.

25   I don't want to wait for depositions.  I don't want to do all

1    that.  I just want a trial.  And since it's a bench trial, we

2    can just do it off of the report.  It happens a lot anyway.  I

3    mean, you obviously need the report first, but we just need a

4    date.  So if both reports are coming in at the end of October,

5    what is your need in terms of Dr. Phenix?  Where is she from

6    again?

7              MR. PIEMONTE-STACEY:  She's from Washington.

8              THE COURT:  She's from Washington.

9              MR. PIEMONTE-STACEY:  State.

10             THE COURT:  So she can read the reports, and I take it

11   you're not -- well, I shouldn't prejudge.  Are you allowing her

12   to interview your client?

13             MR. GOLD:  Well, we have not up till now.  That's the

14   way these cases played out.

15             THE COURT:  I was assuming you would not.

16             MR. GOLD:  Oh, oh, okay, okay.

17             THE COURT:  Okay.  So I don't know why she can't just

18   respond.  She probably doesn't have to respond to Bard's if

19   he's right.

20             MR. PIEMONTE-STACEY:  Well, the Bard's is going to

21   have a new -- if he's -- I'm sorry.

22             THE COURT:  Yes, but he seems to think he's going to

23   come out the same way.  Isn't that what you said?

24             MR. PIEMONTE-STACEY:  He is the court examiner, so I

25   hope that there -- you know, I don't know.

1          THE COURT:  If he's right, and that's what he's

2     predicting, if he's right and that's where he ends up, she only

3     needs to respond to one report, and I don't know why --

4          MR. PIEMONTE-STACEY:  Or Dr. Prentky's she's never

5     seen, your Honor.

6          THE COURT:  Right.  So it's coming in at the end of

7     the month.

8          MR. PIEMONTE-STACEY:  And could she have thirty days?

9          THE COURT:  Well, why don't we at least get started on

10    Prentky and Bard and all those people; and then if she feels

11    like she can't respond or needs time, we'll just give it

12    another couple of weeks, and I just have to squeeze in one day.

13         MR. PIEMONTE-STACEY:  I know, speaking for my

14    colleague and I, I know we're available on the dates that you

15    mentioned in November.  I know Dr. Phenix is not during that

16    Thanksgiving week period.  But, as you say, if you break it up,

17    but then -- as long as we have some time to look at the

18    reports.  I don't want the reports coming in October 30 and

19    we're starting November 1.  That's prejudice to the government.

20         THE COURT:  I understand that.

21         MR. GOLD:  No, but the Court had proposed the

22    Thanksgiving week, right?  I also think just the first week in

23    November would -- I understand the week is open -- it would

24    just --

25         THE COURT:  Well, how about -- I'm in Washington

1    November 22, but how about the 23rd and the 24th?

2          MR. GOLD:  I'd like to book the dates, but, your

3    Honor, I do have this trial where I'm going to be working to

4    twist an arm in front of Judge Saylor and --

5          THE COURT:  Excuse me.  You're doing what?

6          MR. GOLD:  I'm working to -- speaking with my client

7    about whether it's in his interest to go forward with trial in

8    that case.

9          THE COURT:  I see.

10         MR. GOLD:  And I anticipate I'll probably have those

11   dates free.

12         THE COURT:  That week?  Well, I mean, if you do, you

13   do.  I mean, if Judge Saylor is scheduled before me, then he's

14   scheduled before me.  But there's another trial I have the

15   following week, I believe, the week of the 6th.

16         Is there a week in between there, Robert?

17         THE CLERK:  The week of the 29th is the last week in

18   November.

19         (Discussion off the record between the Court and

20   Clerk.)

21         THE COURT:  Well, we could potentially do the 29th and

22   30th also.  Why don't we plan on those two days right before

23   Thanksgiving, and if for some reason your trial bumps that,

24   we'll do it right after Thanksgiving.

25         MR. GOLD:  Well, that's for my guys.

 1          MR. PIEMONTE-STACEY:  Right, your Honor, so I won't

 2     have Phenix's report at that time.  Is that --

 3          MR. GOLD:  Well, your Honor is contemplating --

 4          THE COURT:  Well, by then, I think it shouldn't be

 5     such a big deal.

 6          MR. PIEMONTE-STACEY:  But it will affect our -- I

 7     mean, it will affect all the information we have.  In other

 8     words, I'm going to be looking at these reports cold as a lay

 9     person.  I don't know what the professional judgment of someone

10     else is going to be, and I would like that assistance at trial,

11     much as the respondents would like that assistance.  In other

12     words, I can get these and I can guess what it means, but

13     sometime after her report is due --

14          THE COURT:  You'll be receiving these October 29 or

15     so, right?

16          MR. PIEMONTE-STACEY:  I don't know.

17          THE COURT:  And just no more.  You don't have the

18     authority at this point to grant any continuances, so --

19          MR. GOLD:  Yes, okay.

20          THE COURT:  We need them in.  I mean, at this point

21     I'm hearing from Mr. Carta, and I don't blame him one iota.

22     Something needs to happen on this.  And believe me, I'm as --

23     I've got four of these cases, so -- and now one is on retry

24     because it's come back again.  I mean, I've just -- I'm ready

25     to finish these cases.  So he is, I am, you are.  It needs to

1   happen.  So if theirs comes in the end of October and you want

2   till the -- I don't know, how busy is she?  Could she get

3   one --

4          MR. PIEMONTE-STACEY:  That's why I had asked for

5   thirty days for her to review it and do a report.  I mean,

6   she's got other cases all over the country, and I know she's

7   out of pocket on trials at least two of those weeks.

8          THE COURT:  But it's only one, and it's -- my guess is

9   it's the only one that she needs to review, if your prediction

10  is correct, and that's Prentky.  So if she provided -- what?

11         MR. PIEMONTE-STACEY:  I don't think that that's

12  necessarily so.  I mean, I understand are why you think --

13         THE COURT:  Why?

14         MR. PIEMONTE-STACEY:  Because I suspect Dr. Bard is

15  going to come up with all sorts of fixes from his first report.

16  Now, I might be able to cross on that and make some type of

17  response, but she may need to respond clinically.  In other

18  words, the first time Dr. Bard wrote his report he diagnosed

19  Mr. Carta with nothing.  Now there's going to be this

20  diagnosis, maybe; but he said that hebephilia isn't accepted,

21  so I don't know what this thing is going to look like.

22         THE COURT:  Well, here's what I don't know:  Why is

23  this taking so long?  I'm sort of feeling very frustrated here

24  just like he is.  So if you gave her till the end of

25  November --

1        MR. PIEMONTE-STACEY:  Right, that's all we're asking

2   for.

3        THE COURT:  -- then can we start on his two experts,

4   at least to have you help, and then we can bump her a little?

5   You know, can't she read them and help you without having to do

6   her own report?

7        MR. PIEMONTE-STACEY:  If that's what the Court orders,

8   that's what we'll do.

9        THE COURT:  I mean, I'm not saying that she can't help

10  you.  Just I don't know -- otherwise, here's my problem:  I'm

11  busy December 6, okay?  I have a trial that's been rescheduled

12  a hundred times.  It's your office's trial.  I can't do it

13  again.  It's Charlie Rankin and Leah Foley, and it's been

14  rescheduled and rescheduled and rescheduled.  I've got to do

15  it.  So that should take at least a week.

16       So what do we have the second week out?  I mean, I

17  don't want to push this into January or February.  It takes me

18  three months to write them up.

19       MS. PIEMONTE-STACEY:  And the week of the 13th, your

20  Honor, we're on trial in the Swarm case with Chief Judge wolf.

21       MR. GOLD:  I do want to mention -- I know that's our

22  current date.  I just got information.  I'm on that case as

23  well, your Honor.  That may not be the case.  One of the

24  psychiatrists in that case -- we'll find out tomorrow is what

25  I'm saying.

1        MR. PIEMONTE-STACEY:  We have a pretrial tomorrow.

2        THE COURT:  Well, here's the thing:  I can't keep

3  bumping it.  The following week is Christmas week.  Do you all

4  want to be doing this Christmas week?

5        MR. PIEMONTE-STACEY:  No, and, your Honor, maybe we

6  could take the week of the 13th, if what Mr. Gold is saying is

7  true, because we're all open that week because we were supposed

8  to be on trial in Swarm, he and I both.

9        THE COURT:  I'm happy to do it the week of -- can we

10  do it the week of the 13th before I jump in and agree to this?

11        THE CLERK:  November 13?

12        MR. GOLD:  No, December.

13        THE COURT:  December 13.

14        THE CLERK:  We have a criminal trial scheduled.

15        (Discussion off the record between the Court and

16  Clerk.)

17        THE COURT:  We could potentially do it the week of the

18  13th, but if that doesn't go, then I'd like to at least get

19  started.

20        MR. PIEMONTE-STACEY:  But November 13, there's no

21  objection to at least getting started that week.

22        THE COURT:  No, but if you all are in doing Swarm, or

23  whatever the name is, I don't see why we can't -- why don't we

24  at least see if we can get Prentky, who's -- we need to book

25  his time.  That in and of itself is a minor --

1          MR. PIEMONTE-STACEY:  Prentky is actually very

2     available now that he's in academia.  It's Phenix and Bard I

3     think that is the problem.  Prentky is not available usually

4     around exam times, and that's --

5          THE COURT:  It doesn't have to be done all at once.

6     Why don't you find out when they're available, and we'll just

7     slot them into different dates that we have all available.

8          MR. PIEMONTE-STACEY:  And I know that Dr. Phenix has

9     some availability the week of the 13th, so --

10          THE COURT:  The 13th works for all of us.  It's

11     timely, it gives you the time that you need, and I'm happy to

12     do it, but if you've got Swarm -- the following week is not

13     good.  I'm traveling.  You may all not want to be here that

14     following week.  Maybe we could do a couple of days at the

15     beginning of the week.  Would you want to do that, the week of

16     December 20?

17          MR. GOLD:  Well, your Honor, what I would propose

18     is --

19          THE COURT:  I'm leaving on the 23rd, so, I mean,

20     potentially we could do the 20th and the 21st and the 22nd.

21          MR. GOLD:  In the event that we don't have the week of

22     the 13th?

23          THE COURT:  Yes, potentially.

24          MR. GOLD:  But doesn't it make sense to pencil in the

25     13th now?

1     THE COURT:  Yes, you've got us, you've got us.

2     MR. GOLD:  And then we could maybe coordinate with

3  Mr. Alba tomorrow in the event that we find tomorrow that falls

4  through.

5     THE COURT:  Yes, but you're in front of Chief

6  Judge Wolf on the 13th.  What happens then?

7     MR. PIEMONTE-STACEY:  The 13th is open for all of us

8  because he was starting the Swarm trial on December 14.

9     THE COURT:  Well, no, but you don't want to do one day

10  with me and then --

11     MR. GOLD:  But, your Honor, I guess what I was saying

12  is, the intelligence I --

13     MR. PIEMONTE-STACEY:  Well, I have, your Honor.  This

14  past week we had Shields on Wednesday, Wetmore Thursday,

15  Friday, and Mr. Carta today, so it's doable from our

16  perspective.

17     MR. GOLD:  And it seems like it may be less likely to

18  go on that date than it was just last week, so --

19     THE COURT:  Why don't you see which of your experts

20  are available the week of the 13th.  We will put in Carta the

21  week of the 13th.  I am willing to try this case the following

22  week.  I am leaving the country I think on December 23 or

23  something like that, so -- I just don't remember whether it's

24  at night.  I mean, we don't want to be up against it that

25  close.  I can do it the week of Thanksgiving.  I can do it the

1    week after Thanksgiving.  So keep those times in mind.  I could

2    slot in different experts at different times because it's a

3    bench trial.  I'm here to do this.  I view this as not needing

4    as much time as you all seem to think it does because it's only

5    on prong three, at least as I'm hearing it, and so it should

6    only be a day or two.

7              MR. GOLD:  Well, your Honor --

8              MR. PIEMONTE-STACEY:  And Dr. Prentky, your Honor.

9              THE COURT:  What?

10             MR. PIEMONTE-STACEY:  Dr. Prentky will be testifying,

11   so --

12             THE COURT:  Is he the one who talks so slowly?

13             MR. PIEMONTE-STACEY:  Yes, your Honor.

14             THE COURT:  A court reporter's delight?

15             MR. GOLD:  Your Honor, I do want to say, from the

16   defendant's perspective, we're going to be trying, I think,

17   parsing the First Circuit opinion, seeing what we can get in or

18   making arguments about --

19             THE COURT:  It might be relevant or background or

20   contextual.  I'm just simply saying I'm not going to,

21   obviously, entertain a motion for reconsideration of the First

22   Circuit's order, so if it's not -- I haven't read it in a long

23   time.  I don't remember what wiggle room you have.

24             MR. GOLD:  I don't think it gives us much, but

25   we're --

1      THE COURT:  You're going to fight for it, that's fair

2  enough.  In the meantime, I mean, I've got this letter.  It's

3  essentially two things.  One is a request for your help in a

4  disciplinary hearing.  Is it relevant at all, based on what you

5  know?

6      MR. PIEMONTE-STACEY:  I know that experts will look at

7  behavior when you're incarcerated, and there was an issue about

8  other disciplinary, so --

9      THE COURT:  It looks as if it's for amphetamines.

10      MR. PIEMONTE-STACEY:  Yes, I can't -- you know, I

11  can't say with certainty.

12      THE COURT:  It's not directly on point like a sex

13  offense.

14      MR. PIEMONTE-STACEY:  That's right, it's not like he

15  got expelled for doing something in the --

16      THE COURT:  Right, or there aren't pictures of obscene

17  things under his bunk or something, you know, so --

18      MS. PIEMONTE-STACEY:  Right.

19      MR. GOLD:  Well, but I expect that Dr. Phenix, since I

20  know her pretty well by now, will say that this is an element

21  of anti-sociality which makes him therefore more dangerous in

22  the event that he's released, it's more recent so it proves her

23  case, and --

24      THE COURT:  Well, if you want to fight about it, you

25  can.  My only point is that at this point I'm focused on

1    finishing this trial, and it's got to move up to the top of the

2    list, unless you all wanted to agree to some vast continuance.

3    But he doesn't want it.  That's what this letter says.  He

4    wants it and I want it, so that will make it happen.  Let's

5    just move forward.  He's been there too long.

6          How many of these are left in our system?  There's

7    Swarm, there's --

8          MR. GOLD:  Swarm, Carta, Volungus.  That's scheduled

9    for trial in January in front of Judge O'Toole.  That case was

10   probably held up the longest, in part because Judge O'Toole

11   found the statute unconstitutional and stayed the case.

12         THE COURT:  So all these people have just been sitting

13   there?

14         MR. GOLD:  Yes.  And Mr. Volungus is also another

15   person who tried or made steps toward getting into the

16   treatment program that they have there.  I don't know that our

17   perception of BOP's, you know, that program or their attitude

18   toward us is the same.  We --

19         THE COURT:  Just it's the first I've heard of that

20   issue.  You would think if they wanted to do sex offender

21   treatment, that they should be able to without my shipping them

22   down to Butner.

23         MR. PIEMONTE-STACEY:  Well, I think the programs are

24   different, your Honor.  It's a residential program, and that's

25   been started at Butner, and that's where all of them are.

1    That's why North Carolina has something like ninety something

2    cases pending.

3            THE COURT:  What's happening in the Fourth Circuit

4    right now?

5            MR. PIEMONTE-STACEY:  I know the Timms opinion came

6    up, and that went up to the Fourth Circuit, finding --

7            MR. GOLD:  Your Honor, all those men are frozen in

8    dead time.  There's about ninety-six to a hundred individuals.

9    The Fourth Circuit, when Comstock came down, apparently they've

10   raised the other constitutional challenges that they have.

11   Those are in front of the Fourth Circuit.

12           THE COURT:  I see.  So we're actually ahead.

13           MR. GOLD:  We're way ahead.

14           THE COURT:  If we're going to do treatment, I want to

15   get my people in before the onslaught because apparently, with

16   only two or three people there, the treatment has been

17   phenomenal, so --

18           MR. PIEMONTE-STACEY:  And they're looking at local

19   rules changes to handle these kinds of cases, discovery

20   period --

21           THE COURT:  You know, I got a phone call from some law

22   clerk down there.  They didn't even think about depositions.  I

23   mean, they were just so much at the beginning of this process.

24           MS. PIEMONTE-STACEY:  They are.

25           THE COURT:  It was quite extraordinary.  So, anyway,

1    we've at least got a plan, and so if you wouldn't mind calling

2    Dr. Prentky, Dr. Bard, and just say I'm really -- "The mean old

3    judge really wants to just get this thing going, so no more

4    continuances," and we'll see what we can -- we won't take

5    depositions.  This is just a bench trial.  You both have been

6    around for a while.  You can sort of cross-examine them based

7    on the reports, and I think you'll be able to get your expert's

8    assistance if we have it in mid-December, and even if she can't

9    quite finish the report by then.  But I'll make sure you have

10   the report before you have to cross-examine her.  I mean, even

11   if it spreads into January, we'll get the thing started.  So

12   ideally she'll get the report to us thirty days from getting

13   their reports, all right?

14        MR. PIEMONTE-STACEY:  Yes.

15        MR. GOLD:  Your Honor, if we can do it without slowing

16   it down, can we depose these folks over the phone by agreement

17   among ourselves?

18        THE COURT:  If you agree, I agree.  The key is not

19   slowing it down.

20        MR. GOLD:  The key is not slowing it down, but we have

21   that latitude, okay.

22        THE COURT:  I think that's right.  And there's no

23   possibility here -- has anyone ever thought about a magistrate

24   judge's findings of facts on some of these?  No?

25        MR. GOLD:  I've never discussed that.

1        MR. PIEMONTE-STACEY:  It's not been discussed.  Asking

2   the magistrate judges to do the findings of fact?

3        THE COURT:  I've never done it in this kind of case.

4   I'm just sort of worrying if for some reason this all goes

5   flabooey and I get too wrapped up, I have all these cases

6   behind me, these huge pharmaceutical things, and I just don't

7   want him to get behind that.  I want him to be heard sooner

8   rather than later, so we'll see what we can do.  We have a big

9   tax case.  When is that, Robert?  That's January 16.  So it's

10  like I'm trying to squeeze him in and get it done, okay, so see

11  what you can do.

12        All right, thank you.  We'll stand in recess.

13        MR. PIEMONTE-STACEY:  Thank you, your Honor.

14        THE CLERK:  Court is in recess.

15        (Adjourned, 3:57 p.m.)

16

17

18

19

20

21

22

23

24

25

300d73f2-8ff0-416c-bbc6-f960478a442c

1                        C E R T I F I C A T E

2


3

   UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS     ) ss.
   CITY OF BOSTON                )
5

6

7           I, Lee A. Marzilli, Official Federal Court Reporter,

8   do hereby certify that the foregoing transcript, Pages 1

9   through 37 inclusive, was recorded by me stenographically at

10  the time and place aforesaid in Civil Action No. 07-12064-PBS,

11  United States of America v. Todd Carta, and thereafter by me

12  reduced to typewriting and is a true and accurate record of the

13  proceedings.

14       In witness whereof I have hereunto set my hand this 28th

15  day of March, 2011.

16

17

18

19

20           /s/ Lee A. Marzilli

21           _____
             LEE A. MARZILLI, CRR
             OFFICIAL COURT REPORTER
22

23

24

25