UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| | ) Civil Action |
| Petitioner, | ) No. 1:07-cv-12064-PBS |
| | ) March 18, 2011 |
| vs. | ) Non-Jury Trial |
| | ) Day III |
| TODD CARTA, | ) 9:20 a.m. |
| | ) |
| Respondent. | |


BEFORE:  THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE




John Joseph Moakley United States Courthouse
1 Courthouse Way, Courtroom No. 19
Boston, MA  02210




Helana E. Kline, RMR, CRR
Official Court Reporter
John Joseph Moakley United States Courthouse
1 Courthouse Way, Room 5209
Boston, MA  02210

APPEARANCES:


For the Petitioner:


United States Attorney's Office
(By:  Jennifer A. Serafyn, Assistant U.S. Attorney &
      Eve A. Piemonte-Stacey, Assistant U.S. Attorney)
John Joseph Moakley United States Courthouse
1 Courthouse Way, Suite 9200
Boston, Massachusetts  02210
617-748-3100


For the Respondent:


Federal Public Defender Office
(By:  Ian Gold, Attorney at Law)
51 Sleeper Street, 5th Floor
Boston, Massachusetts  02210
617-223-8061

I N D E X

Witnesses called on behalf of the Respondent:

Testimony of:

ROBERT ALAN PRENTKY, Ph.D.

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| By Mr. Gold | 7 | | | |
| By Ms. Serafyn | | 103 | | |

E X H I B I T S

Respondent's

In Evidence:

| No. | Description | Page |
|---|---|---|
| 34 | Report of Robert A. Prentky, Ph.D. | 15 |
| 35 | Robert A. Prentky, Ph.D., Curriculum Vitae. | 15 |
| 36 | PDS Note dated January 11, 2006, from Mr. Wood Bates No. C00407. | 51 |

Respondent's

For Identification:

| No. | Description | Page |
|---|---|---|
| B | Franklin Paper. | 63 |

```
 1                    P R O C E E D I N G S
 2            THE CLERK:  All rise.  The United States District
 3    Court is now in session.
 4            THE COURT:  All right.  Good morning.  Mr. Gold?
 5    Oh, there he is.  Mr. Carta, there he is.  I just wanted to
 6    mention just off the record for one minute.
 7            (Whereupon, a brief discussion
 8             commenced off the record.)
 9            THE CLERK:  Be seated.  The court calls Civil
10    Action 07-12064, United States versus Todd Carta, Bench
11    Trial, Day Three.
12        Can counsel please identify themselves for the record?
13            MS. PIEMONTE-STACEY:  Eve A. Piemonte-Stacey for the
14    United States.
15            MS. SERAFYN:  Jennifer Serafyn for the United
16    States.
17            MR. GOLD:  Good morning, your Honor.  Ian Gold on
18    behalf of Todd Carta.  Your Honor, the government rested, I
19    think, at the conclusion of the evidence in December.  The
20    respondent would seek now to call Dr. Robert Prentky.
21            THE COURT:  Fine.  Thank you.  Welcome back,
22    Dr. Prentky.
23            THE CLERK:  You can take a seat over here, and I'll
24    swear you in.
25            THE COURT:  No, you have all your stuff there.
```

```
 1              THE WITNESS:  Should I move it?

 2              THE COURT:  Yes, the mic and everything's over

 3     there; we also have a screen over there so just move

 4     everything there.

 5         As he's going over there, it's been a very long time

 6     because, as you remember, Mr. Carta canceled the hearings

 7     in December and so I forget what the issue was but we had a

 8     list of hearings and he didn't feel well, and you all had

 9     scheduling problems so it's been three months.

10         So what have we done so far in this case.  Who's

11     testified?

12              MS. SERAFYN:  Dr. Phenix, Dr. Amy Phenix, testified

13     on behalf of the United States, your Honor.

14              THE COURT:  That's all that's happened in this case?

15              MS. SERAFYN:  Yes.

16              THE COURT:  All right.  Thank you, and what are our

17     plans for the next few days?

18              MR. GOLD:  Well, your Honor, just for clarity sake,

19     we have agreed that the record we were briefing is part of

20     the evidence in the case; the record from the February 2009

21     trial.

22         Now, the respondent is presenting evidence from two

23     examiners:  Dr. Prentky, who's the defense-selected

24     court-appointed examiner; there is also the original

25     court-appointed examiner who was also nominated by the
```

```
1    defense but selected by Judge Tauro, and he will be
2    testifying; that's Dr. Leonard Bard.  He'll be testifying on
3    Monday --
4              THE COURT:  Okay.
5              MR. GOLD:  -- and Tuesday.
6              THE COURT:  Okay.  And, Dr. Prentky, just I'm losing
7    track because I have so many of these cases, you testified
8    before me on which case?
9              THE WITNESS:  Previously with Mr. Wetmore.
10             THE COURT:  Mr. Wetmore?
11             THE WITNESS:  Correct.
12             THE COURT:  And you were not on the Shields case?
13             THE WITNESS:  No, I was not.
14             THE COURT:  Okay.
15             MR. GOLD:  I don't know if your Honor had the Peavy
16   case.
17             THE COURT:  Peavy, that's what I was --
18             THE WITNESS:  Mr. Peavy was the first case in which I
19   was appointed by the court.
20             THE COURT:  All right.  So you were my expert on
21   Peavy?
22             THE WITNESS:  Yes.
23             THE COURT:  And then Wetmore?
24             MS. PIEMONTE-STACEY:  Also a court-appointed expert.
25             THE COURT:  Court appointed, and now you're here as
```

```
1    the defense expert?
2           THE WITNESS:  That's correct.  Peavy was the first
3    case I was appointed by the court; Wetmore was the second
4    one.
5           THE COURT:  Thank you.  All right.
6           THE CLERK:  Dr. Prentky, could you raise your right
7    hand?
8           (Robert Alan Prentky, Ph.D., duly sworn.)
9           THE CLERK:  Could you please take a seat and state
10   your name and spell it for the record?
11          THE WITNESS:  Robert Alan Prentky, P-r-e-n-t-k-y.
12          MR. GOLD:  May I inquire, your Honor?
13          THE COURT:  You may.
14          DIRECT EXAMINATION BY MR. GOLD:
15   Q.   Good morning, Dr. Prentky.
16   A.   Good morning.
17          THE COURT:  Thank you for coming back.
18   Q.   Dr. Prentky, could you please describe your current
19   occupation or job?
20   A.   Full-time professor at Fairleigh Dickinson University,
21   metropolitan campus, in Teaneck, New Jersey, and I'm the
22   Director of Graduate Training in Forensic Psychology at the
23   university.
24   Q.   And so is that academic post with a particular
25   department in the university?
```

1    A.   Yes, the School of Psychology.

2    Q.   And you stated you were the Director of which program in

3    particular?

4    A.   Graduate Training in Forensic Psychology.

5    Q.   In Forensic Psychology, how long have you held that

6    position?

7    A.   This is my fourth year at Fairleigh Dickinson.

8    Q.   And what credentials do you have that qualify you for

9    that position?

10   A.   I'm not sure I understand your question.  Are you asking

11   me what I did prior to coming here?

12   Q.   Just, well, yes, I was trying to just ask a shorthand

13   question for your educational background.

14   A.   All right.  Very briefly I got my Ph.D. in 1975 in

15   Northwestern University, Evanston campus, Illinois, and that

16   was followed by three National Institute of Mental Health

17   post-doctoral fellowships.

18       The first being University of Massachusetts Amherst for

19   two years, followed by a stint in England at the University

20   of York, Heslington, York, followed by two years at the

21   University of Rochester Medical School, Department of

22   Psychiatry.

23   Q.   And could you briefly describe your professional

24   experience after obtaining your Ph.D.?

25   A.   All of my post-doctoral training was in the area of

1    psychophysiological assessment of high-risk families in the

2    area of schizophrenia.

3        When I completed my last year at the University of

4    Rochester, I was on-the-job market, and I moved to, briefly,

5    to Boston for several academic job interviews; and while I

6    was there, I applied for a job at a place called The

7    Massachusetts Treatment Center which was advertised in the

8    Mass. Psychological newsletter, Association newsletter, not

9    knowing exactly what they treated, but my principle

10   interest had been in research.

11       I had several job interviews there.  I began a job

12   interview, but I was also called immediately to go down to

13   Bridgewater and experience the prison there for the first

14   time.  It is a medium-security prison for sex offenders.

15       I accepted an invitation to come here as Director of

16   Research in 1980; and although I certainly didn't expect it

17   at the time, I was there for 13 years.

18       We developed a very large federally-funded research

19   program principally based on support from The National

20   Institute of Mental Health and The National Institute of

21   Justice oriented around the development of taxonomic systems

22   for the classification of sexual offenders.

23   Q.   Dr. Prentky, if I could just stop you to clarify here.

24   The center where you were working where the institution was,

25   the Bridgewater Treatment Center for the Sexually Dangerous;

1    is that the name of it?

2    A.   Correct.

3    Q.   And is that an important place in the annals of sex

4    offender research?

5    A.   I'm not sure how to respond to that.  A lot of research

6    came out of it, if that's what you're asking me.

7    Q.   And is there research continuing to be done based on

8    the populations of men at that institution?

9    A.   Research continues to be published based on the data

10   that were collected at that time.  Since we left, since my

11   colleagues and I left, to the best my knowledge there has

12   been no new programmatic research there.  However, clearly,

13   research continues to be published based on the original

14   work that we did.

15   Q.   And this is the data that you and your colleagues

16   collected pursuant to this federally-funded research

17   program?

18   A.   That's correct.

19   Q.   And what was the purpose of the federally-funded

20   research program?

21   A.   Well, as I was saying, in the 1980s there was

22   particular interest on the part of The National Institute

23   of Justice to develop taxonomic systems for classifying a

24   range of different types of offenders; and we received

25   considerable funding during that decade to develop two

1    different models for classifying, one for classifying child

2    molesters and one for classifying rapists.  We continued

3    working on that until the end of 1980s and into the early

4    1990s.

5    Q.   And this taxonomic system for classifying sex

6    offenders, what place does it have in the literature area

7    of sex offender research today?

8         THE COURT:  Is it agreed that he's an expert?

9         MR. GOLD:  Yes, your Honor, and I understand the

10   time constraints that we're under, I do -- once I hit

11   several points, I'm going to move right on, but I think it

12   is agreed that he is an expert.

13        THE COURT:  So we got going late so how long do you

14   think you're going to be with him?

15        MR. GOLD:  On this part, probably another ten

16   minutes, and then we'll get right into the merits.

17        THE COURT:  What are the time restraints on this?

18        MR. GOLD:  We're going into the afternoon today, and

19   I think we should complete --

20        THE COURT:  You do know I have two things on this

21   afternoon?

22        MR. GOLD:  The clerk told me, yes.

23        THE COURT:  All right.  So I think Dr. Prentky

24   twice has been qualified as a court-appointed expert; I

25   believe the government doesn't challenge his qualifications,

1     is that right?

2          MS. SERAFYN:  We don't, your Honor.

3     Q.   Continue, Dr. Prentky.

4     A.   As is often the case, the research is driven by the

5     priorities of the funding agencies; and as we moved into the

6     '90s, particularly with the advent of the first SDP law in

7     the State of Washington, we see ushered in a whole new wave

8     of research focused on risk assessments.

9         We began to gradually move in that direction, and

10    certainly I did.  In 1994 I began working on a risk

11    assessment instrument for juvenile sex offenders.

12    Q.   And did you develop an actuarial instrument?

13    A.   I developed an instrument which is not actuarial; it's

14    structured as empirically guided research, very similar to

15    something like the SVR-20.

16    Q.   And is that a type of instrument similar to an

17    actuarial an accepted protocol in your field?

18    A.   It is absolutely similar to the actuarial with the

19    obvious exception that they do not have life tables

20    associated, probabilistic estimates of reoffense connected

21    to each of the scores.

22    Q.   But it's a protocol which is developed to assist in

23    assessing risk of sex offenders?

24    A.   Correct.

25    Q.   And is the protocol that you developed in use in the

```
 1    field today?

 2    A.   Yes.

 3    Q.   Now, Dr. Prentky, have you published in the field of

 4    sex offender --

 5              THE COURT:  Excuse me.  What's the name of it?

 6              THE WITNESS:  It's referred to as the J-SOAP, the

 7    Juvenile-Sex Offender Assessment Protocol, J-S-O-A-P.

 8    Q.   Dr. Prentky, have you published in the area of sex

 9    offending or sex offender recidivism research?

10    A.   Yes.

11    Q.   And approximately how many published articles do you

12    have to your credit?

13    A.   My CV lists I think approximately 80 articles and book

14    chapters.

15    Q.   Are there any -- is there research that you yourself

16    have performed which is germane to your opinion in this

17    case?

18    A.   I suppose it would be hard not to say that most of

19    what I've done over the past 30 years is not germane.  This

20    is a particularly difficult case.  You have to talk about

21    what aspect of it if you want me to narrow my answer.

22        If we're really talking about risk assessment, then I

23    would say:  yes, of course, the work I've done in the past

24    many decades is germane.

25    Q.   Are there any articles in particular which -- well,
```

1   have your articles been cited by other authors in the field

2   of sex offender recidivism research?

3   A.   Yes.

4   Q.   Are they frequently cited?

5   A.   I don't keep track.  I would imagine; but as I said, I

6   don't keep track.

7        MR. GOLD:  Your Honor, I have some exhibits.  I'd

8   like to approach the witness with, put them on the stand, if

9   I may?

10        THE COURT:  Yes, you don't even have to ask.

11        MR. GOLD:  Thank you.

12   Q.   Dr. Prentky, I've put some exhibits before you, and

13   just to keep the numbering straight, I'm going to ask you

14   something that's a little out of order ... exhibit --

15   proposed Exhibit No. 34, did you draft the report in this

16   case?

17   A.   Yes.

18   Q.   Do you recognize Exhibit No. 34 as the report that you

19   drafted --

20   A.   Yes.

21   Q.   -- in this case?

22   A.   Yes.

23   Q.   And Exhibit No. 35, do you recognize that to be your

24   resume?

25   A.   Yes.

1          MR. GOLD:  I'd move to admit those two.

2          THE COURT:  All right.

3          MS. SERAFYN:  No objection.

4          (Respondent's Exhibit Nos. 34 & 35

5           admitted in evidence.)

6     Q.   Dr. Prentky, are you currently involved in research in

7     this area?

8     A.   Yes.

9     Q.   And what are your current research projects?

10    A.   I continue to work on the development and validation of

11    the J-SOAP.  As recently as perhaps a month ago we submitted

12    yet another proposal to the government for support for doing

13    an integrative development testing and validity study that

14    would bring together the J-SOAP and the other principle

15    juvenile risk assessment scale that exists in the field

16    referred to as the RRASOR developed by Dr. Moreland ... so

17    that would be a wonderful project if we could do that.  So

18    I continue to work in the area, trying to better our

19    assessments of risk of juveniles; that's one project.

20         In quite a different area, and it's something we've been

21    involved in for about five years, and that's internet child

22    safety.  We have been funded by the Department of Juvenile

23    Justice and Delinquency Prevention to examine a wide range

24    of different facets of internet safety as it pertains to

25    both children and adolescents.

1      It has many prongs to it.  We have surveyed a large,

2    large amount of high school students, college students, and

3    offenders, and what would perhaps be again germane to this

4    case, the work that we've been doing with the cohort of

5    offenders in which we were able to look at known child

6    molesters and compare them with internet pornography

7    offenders, child pornography offenders, and then separate

8    the child molesters into those that also had internet

9    offenses ... so we effectively have three discrete groups,

10   and we've been attempting to answer the rather difficult

11   question of what risk is posed by an internet offender to

12   essentially assault a child.

13   Q.   Now, when you say "we" in this context, Dr. Prentky,

14   who are you talking about; is it you and other colleagues?

15   A.   It's a large number of co-investigators, and that

16   includes colleagues of longstanding including Beth Dowdell

17   at Villa Nova University and Dr. Anne Burgess at Boston

18   College, and Neil Malamuth at UCLA, and Dr. Federoff from

19   Canada.  It's a fairly large group.

20   Q.   And, Dr. Prentky, two more brief questions --

21        THE COURT:  Can I ask you what do you mean by

22   internet offenders?

23        THE WITNESS:  These are all individuals that have

24   been charged and been convicted for child pornography

25   offenses on the internet.

1          THE COURT:  So not the people who are stalking

2    children?

3          THE WITNESS:  No.

4          THE COURT:  -- in chat rooms or --

5          THE WITNESS:  No.  Although, many of them may have

6    also done that, all of them had to have been arrested or

7    charged for either being in possession, downloading,

8    dissemination of child pornography over the internet.

9       These are all individuals, who when we assess them,

10   were either in prison or had been in prison and were now in

11   the community.

12   Q.   And, Dr. Prentky, is this research as you stated to

13   determine the risk of hands-on offending by child

14   pornography offenders, is that the --

15   A.   That wasn't the sole purpose of the project by any

16   means.

17   Q.   But that is a purpose?

18   A.   That was one of the many questions that was asked.  As

19   I said, it was a multi-pronged effort that looked at many,

20   many different facets of this including the risk factors

21   that placed high school boys and girls at risk for child

22   pornography.

23   Q.   And will this research culminate in a published report

24   of some kind, a government report or something of that

25   nature?

1   A.   A final technical report has already been completed and

2   various papers are being worked on.

3          THE COURT:   When you say "technical report," you

4   mean on the methodology or the results?

5          THE WITNESS:   The results.

6          THE COURT:   So what were the results?

7          THE WITNESS:   It's a very, very long, as you can

8   imagine, rather dreary document.

9          THE COURT:   It is the criminal justice question that

10  a lot of people ask?

11         THE WITNESS:   Indeed.

12         MR. GOLD:   Maybe I can bring him in for one of our

13  sentencing hearings?

14         THE WITNESS:   I would be happy to share with the

15  Court the actual document, the final technical report.

16         THE COURT:   Well, let me ask:   are you hesitating

17  because it's supposed to be confidential?

18         THE WITNESS:   No, no, no, it's not confidential at

19  all, no.   I'm hesitating because of the length of it and the

20  time that we have here.

21         THE COURT:   All right.   So is it relevant to what

22  I'm doing here?

23         THE WITNESS:   I think, your Honor, it's all

24  potentially relevant.   I'm not sure how to labor in and

25  focus on particular aspects of the report on Mr. Carta as

1    one individual, but I think it's all of potential relevance.

2         I can tell you in brief that the models that we were

3    attempting to develop to predict an outcome of hands-on

4    sexual offending were quite successful.

5         They are undermined by a relatively small sample.  We

6    had a total of 466 individuals; and of that 466, not all of

7    them were child molesters or internet offenders.

8         We did not signal our intentions when we went into the

9    prison, which means that there were people who may have

10   volunteered to take our survey who were rapists, individuals

11   who were not sex offenders, so those people had to be

12   excluded.

13        We ended up with 276 offenders that we could actually

14   compare.  That's a relatively small sample for our purposes.

15   We found that the internet-only offenders clearly

16   distinguished themselves in a variety of different ways.

17   They were significantly higher in social competence than

18   the aggregate sample of child molesters, which is not

19   surprising.  We found that they were significantly lower in

20   general antisocial behavior.  We found that they were

21   significantly higher in, as one would predict, in internet

22   preoccupation.

23        Various scales have been developed.  Internet

24   preoccupation was not key to predicting who would be a

25   child molester.  In a nutshell, that's what those studies

1    found; but as I said, I would be happy to share that with

2    the Court.

3            THE COURT:   Thank you.

4    Q.   Dr. Prentky, have you specifically performed or have

5    you performed research by yourself and with colleagues

6    specifically on the question of the impact of age on the

7    risk of recidivism?

8    A.   We published one study in the year 2007; it has not

9    been a focal point of my own research, but we do have one

10   study that we did publish, as I said, in 2007.

11   Q.   And have you performed research specifically on rates

12   of reoffense among offenders of among the populations of sex

13   offenders?

14   A.   Again, we published a study in 1997 on human behavior,

15   a 25-year year follow-up.  It was never intended, at least

16   from my vantage, as a recidivism study per se.

17       I was curious about the methodological issues that would

18   result in variability among recidivism studies.  That was

19   my concern at the time as we were saying a wide range of

20   estimates of base rates of sexual reoffending, and the

21   question that I set out to explore is whether I could

22   actually change the outcome of these base rates simply by

23   changing the methods to which we -- or the lens through

24   which we looked at sexual reoffending ... so if you change

25   the reference point, you know, what do you include as a

1    sexual reoffense, how do you define it legally, how does

2    the -- how could the base rates change?  That would be --

3    from my vantage, that was the purpose of the study when we

4    did it.

5    Q.   And is this a landmark study in the -- let me withdraw

6    that.

7       Is that an important study in the field; is it frequently

8    cited?

9    A.   I believe so, yes.

10   Q.   And do I understand your testimony correctly that it is

11   an empirical examination of recidivism studies themselves

12   or --

13   A.   No.

14   Q.   An empirical examination of the methodological issues

15   that recidivism studies raise?

16   A.   Correct.

17   Q.   But it's also a study based on an actual population of

18   individuals?

19   A.   It's based on the population of sex offenders at The

20   Massachusetts Treatment Center.

21   Q.   Dr. Prentky, have you -- the Journal of Law and Human

22   Behavior, is that a well-respected journal in your field?

23   A.   Yes.

24   Q.   Now, Dr. Prentky, have you received any recognition

25   in the field of -- in your area of psychology?

1    A.    I guess having been designated a fellow would be

2    regarded as such, if that's what you're asking.

3    Q.    Yes.  What does that mean, to be designated a fellow?

4    A.    One must be nominated, and by the respective

5    organization, and it requires a committee to vote on

6    whether one's contributions to the field are sufficiently

7    meritorious to designate the individual as a fellow of the

8    organization; and I was first appointed a fellow of the

9    American Psychological Association seven or eight years ago

10   and subsequently appointed fellow of APS, American

11   Psychological Society, about four years later.

12   Q.    Have you performed research specifically on the impact

13   of sex offender treatment on sex offender recidivism?

14   A.    I have written fairly extensively about it.  It again

15   has not been a focus of my research.

16   Q.    But when you say you've written extensively about it,

17   where have you written about it?

18   A.    Many book chapters.

19   Q.    Dr. Prentky, I'd like to turn to the merits of this

20   case.  You've entered your report into evidence in this

21   case.

22       Is that report a summary of the conclusions that you've

23   reached with respect to the respondent in this case?

24   A.    Yes.

25   Q.    And can I ask you how you came to be involved in this

1    case?

2    A.   Through communication from your office, directly through

3    you.

4    Q.   And once you began to participate in this case, what

5    did you do?

6    A.   Well, as always, I request discovery, and I began a

7    process of wading through the discovery in this case; there

8    was a lot to wade through.  I customarily take notes.  I

9    usually put those notes on the computer.  In anticipation of

10   an interview, I generate questions for myself, a guideline

11   for the instructor interview that I conduct on an individual.

12   Q.   And on Page 1 there is a summary of the documents that

13   you reviewed in the context of this case?

14   A.   Yes.

15   Q.   Is that a fair summary of the documents that you

16   reviewed?

17   A.   Well, there were so many individual documents I couldn't

18   possibly list them individually so I indicated them simply

19   by Bates number.  There were probably 1,000 pages or more of

20   discovery.

21   Q.   And did you review the trial transcripts in this case?

22   A.   Yes.

23   Q.   And did you review reports by other experts?

24   A.   Yes.

25   Q.   Now, this particular report lists a report by

1    Dr. Phenix dated in September of 2008; did you have the

2    opportunity to the examine a subsequent update to that

3    report by Dr. Phenix?

4    A.   Yes, I did, subsequent to the submission of my own

5    report.

6    Q.   Did you interview Mr. Carta?

7    A.   Yes.

8    Q.   And how many times, and when did you do that?

9    A.   I met with Mr. Carta twice, once on the 17th of May and

10   once on the 12th of July, for a total of approximately six

11   hours.

12   Q.   And why do you interview the respondent in a case such

13   as this?

14   A.   It would be from my vantage unethical to author an

15   opinion that goes to mental disorder, mental abnormality, or

16   diagnosis without interviewing the client; or had I not met

17   with him, that would be an entire area of his analysis that

18   would be essentially off limits to me.  I would be very

19   reluctant in summary to log any opinion about mental

20   abnormality without actually meeting him and interviewing

21   him documenting it.

22   Q.   Why is that, Dr. Prentky; why in your view is a record

23   review not sufficient to assess the condition?

24   A.   The records rarely go to the kind of information that

25   I look for when I'm trying to determine relatively subtle

1    aspects of motivation, subtle aspects of behavior, traits of

2    personality.

3        In this particular case it's very, very difficult to

4    formulate an opinion with respect to mental abnormality.  As

5    I believe are reflected in my report, I struggled with that

6    issue a great deal, and that was after having met with him.

7        Had I not met with him, it would have been virtually

8    impossible to have reached any kind of informed opinion with

9    respect to mental abnormality.

10   Q.   When you say that in your view it would not be ethical

11   for you to have delivered an opinion on the mental disorder

12   prong, that's not the only position in your field, correct,

13   with regard to the ethics of making that assessment?

14   A.   It's certainty a caveat that's provided for all

15   licensed psychologists who do this work.  I'm not suggesting

16   to you that, you know, that all of my colleagues do it, but

17   it's clearly something that's commended to us and is part of

18   the code of ethics of psychologists.

19       I believe that in the code of ethics the words are

20   strongly recommended or strongly encouraged.  It's not

21   something that you must do.  However, if I didn't conduct an

22   interview, I would feel compelled to explain why it was not

23   possible.

24   Q.   And would there be any limitations on your opinion that

25   you might express?

A.   There would certainly be limitations, as I would

experience them, in coming up with an informed diagnosis,

and, again, my diagnosis depends on the case.

   There are some cases that one could imagine that are

very straight-forward, and I could probably be comfortable

with relying on documents only, and there are other cases

such as Mr. Carta that I would be at a loss to come up with

a clear, sound, and informed diagnosis.

Q.   Dr. Prentky, after speaking with me and starting to

participate in this case what did you understand the

question that you were being asked to be?

A.   This is a Section 18 case, a 4248 case.  Just as I have

experienced in cases before, it's a commitment case to

determine whether or not this man is committable under the

federal guidelines as a sexually dangerous person.

Q.   And, Dr. Prentky, I put on the document viewer Exhibit

34, Page 7.  There do you recite the statutory standard?

A.   Yes.

Q.   And is this the standard that you employed in

delivering or coming up with your assessment in this case?

A.   Yes.

Q.   And, Dr. Prentky -- well, let me leave this up here.

In your opinion is Todd Carta a sexually dangerous person

under Sections 4247 and 4248?

A.   No.

```
 1     Q.   In your opinion, Dr. Prentky, does Todd Carta suffer
 2     from a serious mental illness abnormality or disorder?
 3     A.   Well, as I mentioned a moment ago, this is something
 4     that I have struggled with; and if you wish me to go into
 5     that, I'll be happy to do that.
 6     Q.   I was just asking for a summary if you can?
 7     A.   In my report I eventually say no.
 8     Q.   And do you do a separate analysis as to whether
 9     Mr. Carta will have serious difficulty refraining from
10     sexually violent conduct or child molestation if released?
11     A.   I discuss it separately but it is, of course, linked to
12     the mental abnormality.
13     Q.   And did you arrive at an opinion as to whether
14     Mr. Carta would have serious difficulty refraining from
15     those two categories of conduct?
16     A.   That was the focus of my analysis with regard to risk,
17     and I did conclude and feel even more confident in my
18     conclusion that we cannot or I cannot reach the opinion
19     that he would have serious difficulty refraining from
20     sexual misconduct.
21     Q.   And sexual misconduct, you just emphasized that word in
22     contrast that what type of conduct?
23     A.   Mr. Carta obviously has a long track record stemming
24     back to approximately the age of 15 of general delinquent,
25     impulsive, antisocial behavior.  It would be relatively
```

1    easy for me to conclude at this point even today at his

2    age that he may experience difficulty refraining from

3    generic inappropriate behavior.  His past behaviors

4    demonstrated that to me.

5    Q.   Dr. Prentky, I'm going to ask you to tell the Court

6    based on the records that you reviewed and the information

7    that you obtained from Mr. Carta himself, did you develop a

8    sense of Mr. Carta's developmental, psychosocial, and

9    medical history?

10   A.   Yes.

11   Q.   And could you relate to the Court the psychosocial and

12   developmental history of Mr. Carta as it pertains to your

13   opinion in this case?

14   A.   Very briefly, I apologize for encapsulating your life

15   in ten minutes, but, very briefly, Mr. Carta was born in

16   1960 --

17        THE COURT:  Do you want to pull the mic down just

18   a little, just because we're losing you a little bit.

19   Thank you.

20   A.   He was raised in Connecticut; and with the exception

21   of roughly four years, from 1994 to 1998 he lived in

22   California, he's always lived in Connecticut.  He's the

23   youngest of four children.  He has an older brother and

24   two older sisters.  His father served in the Second World

25   War and came back and worked at a factory at New England

1    Aircraft for about 25 years.  When he retired, he worked as

2    a taxicab driver as I recall.

3        All four children were exposed to a significant level

4    of psychological, emotional, and physical abuse that was

5    primarily instigated and perpetrated by their mother.  One

6    of Mr. Carta's sisters, Anna, I believe, ten years his

7    senior, commented that their mother was a survivor of

8    war-torn Belgium and his father was raised in an orphanage;

9    that when you put the two together, it perhaps begins to

10   explain why Mr. Carta has described his home life as

11   loveless and cold.

12       The sisters seemed to have fared better than the

13   brothers.  Mr. Carta has told me that both of his sisters

14   were able to go on and develop stable, long-term marriages

15   with families.  The brothers not so well.  Mr. Carta's older

16   brother is a severe alcoholic and has spent much of his

17   life living in homeless shelters.

18       In addition to what I've mentioned, Mr. Carta had been

19   sexually abused on a variety of occasions, at the age of 9.

20   He was abused first by a 14-year-old when he was 9-years-old,

21   and, again, by a, I believe, a 16-year-old when he was again

22   9-years-old.

23       At age 15 Mr. Carta discovers a man that I recall was in

24   his 60s when the two of them had met while fishing.  This man

25   was kindly disposed toward him and effectively provided

caring, and Mr. Carta received some love and support and
warmth in exchange for sexual favors; and this went on for
awhile.  There were about 20 or so sexual encounters between
Mr. Carta and this 60-year-old man.

Mr. Carta's track record of sort of conduct disorder and
delinquency begins -- seem to begin around the 8th grade.
It's around that time period that he becomes significantly
involved in drugs.  It's around that same time period at the
8th grade when he's expelled from school for truancy and
suspensions.  He never returned to school, which is indeed
very unfortunate, Mr. Carta says in particular, since he is
an extraordinarily bright man.

I make that comment not as a passing observation but on
reflection of the report that was done when he was down in
Butner in 2006.  He was described as having an IQ of
approximately 132 which places him several standard
deviations above me.

As I noted earlier, he spent about four years out in
California.  He described himself as a Deadhead.  He went
there sometime after Garcia died.

Q.   Garcia?

A.   Jerry Garcia, and he became part of this Deadhead
family, which openly he described as being, again, very
caring.  His comments about the group of people that he met
there was they were a very close-knit group.  They cared

1     about you.  They helped you ... similar kind of remarks

2     that he made about the fisherman.

3         He said he came back after four years; it's not clear

4     what he did there other than supporting himself by working

5     for a cleaning company, no indication that I've seen of any

6     risk conduct.

7         He comes back to Connecticut.  He has no stable

8     employment really at any time in his life.  Most of his

9     jobs are unskilled.  As I mentioned, he worked for a

10    cleaning company, has worked various odd jobs.  He has done

11    a fair amount of painting most likely under the table but no

12    stable employment.

13        I think I mention in my report that I found it rather

14    curious that a probation officer comes to his house I think

15    it was in May of 2002, and he described it as, I used the

16    word "oddly," because he described it as a welcoming visit.

17        He was happy to see this woman who came to see how -- to

18    check-up on him simply because, once again, there was the

19    delivering of someone, if you wished to coach it that way,

20    to care about him.  It seems like this has been something

21    that he's searched for his entire life.

22        He has one marriage, again rather dysfunctional.  He

23    meets Lucille in 1984.  He was 24 years old; she was 17 at

24    the time.  They eloped.  They went down to Florida.  They

25    were only there for about six months, I think, before

1     coming back to Connecticut.

2         They were married, and they were only married, I

3     believe, 16 months before the marriage dissolved.  They

4     were married long enough to have one child, a daughter,

5     Vanessa, and that's essentially the thumbnail sketch of who

6     Mr. Carta is.

7         It brings us up, of course, to his governing offenses or

8     governing events, that was possession and dissemination of

9     child pornography that essentially began in 1999, at least

10    that's when the investigation began.

11    Q.   Well, Dr. Prentky, you mentioned that Mr. Carta

12    experienced sexual abuse when he was a younger person ...

13    against this backdrop that you've laid out, can you describe

14    his sexual developmental history in that context?

15    A.   I think there are two comments that I would make.

16    First of all, his sexual developmental history, of course,

17    is rather clear.  You know, had he come from a relatively

18    normal, stable, intact, loving home, it is not clear what his

19    sexual preference would be today.  It is conceivable that

20    his same-sex preference, issues from all of his early life

21    experiences, both sexual abuse when he was 9, and, in

22    particular, his primary sexual experience that he had with

23    this fisherman when he was 15, but it strikes me from some

24    of the comments he made to me ... what was more important

25    or at least equally important in terms of trying to

1    understand his outcome was the emotional and psychological

2    abuse that he reports from his mother.

3        He made one comment that I found particularly poignant.

4    He said that she would scream at me, tell me I was a bad

5    child, a mistake.  Telling me I was a mistake would rip me

6    apart, and those kind of remarks seemed to inflict for me a

7    far more deep-seated sort of trauma, emotional trauma, than

8    even the sexual abuse.

9        He might have been able to cope with the sexual abuse

10   and rise above it and go on to a fairly normal life,

11   law-abiding life, had he otherwise come from a home that

12   had some, some degree of support and love and caring.

13   Q.   You mentioned the governing offense in this case.

14   What is your understanding of the governing offense?

15   A.   The governing offense, to the best of my understanding,

16   as I indicated, are the charges for possession and

17   dissemination of child pornography, and the investigation

18   of that begins, as I said, around 1999.

19   Q.   And what is the -- can you relate to the Court your

20   understanding of the factual basis for that conviction?

21   A.   As many other aspects of this case are complex, so are

22   the details that lead up to this eventual arrest and these

23   charges.  It appears as though, again, in more or less

24   aggregate chronological order:  he was arrested on the

25   29th of October in the year 2000 for a completely

1   unrelated matter, having to do with a domestic dispute

2   involving Frederick.  This was a 17-year-old man that he

3   had been in a sexual relationship with for roughly six

4   months.

5       Unrelated to that, in February 2001 Mr. Carta had

6   mailed a CD or several CDs and a modum to an individual in

7   Connecticut that was known apparently to be a participant in

8   a child pornography video.

9       Shortly thereafter, or roughly only four days thereafter,

10  I believe, the same man that he had been in a domestic

11  complaint with filed a complaint.  The complaint involved

12  harassing letters and harassing flyers, and I believe also

13  harassing phone calls.

14      The police began investigating the matter on

15  February 8th; that is, the mailing of the CDs and the modum

16  which the postal inspector had picked up, and during their

17  investigation of that matter it was revealed that Mr. Carta

18  had provided alcohol -- alcohol and marijuana to Frederick's

19  15-year-old brother and two other teenage boys, and that he

20  had been sexual with the 15-year-old brother.

21      I believe that that was the incident that led to the

22  September 2001 charges involving risk of injury.

23          THE COURT:  So I understand, the two other boys,

24  were they also 15, do you know?

25          THE WITNESS:  I don't recall, your Honor, seeing

1    ages.  I believe the 15-year-old was the only one that he

2    was sexual with, but I don't recall seeing the ages of the

3    other two.

4    Q.   After Mr. Carta was arrested for this offense, was he

5    out in the community for a period of time?

6    A.   Yes.  He is eventually arrested on the 9th of April,

7    2002, and charged with transportation of child pornography

8    and criminal forfeiture, and it's at that point that he

9    receives a 60-month sentence in federal prison.

10       That appears to be the governing offense, and then he

11   actually is sentenced on the 8th of October, 2002 ... so he,

12   of course, is out at this point until he was sentenced, and

13   he goes to federal prison on the 8th of October, 2002.

14   Q.   And is the fact that he spent this period out in the

15   community a fact which is relevant to your risk assessment

16   which we will discuss later on?

17   A.   Well, obviously, it has to be taken into consideration.

18   There was a period of roughly, what, six months or something

19   like that that he was free in the community and didn't

20   commit any further offenses.

21   Q.   Now, Dr. Prentky, in your report you have a discussion

22   of the -- of Mr. Carta's institutional history.  Can you

23   describe for the Court --

24       THE COURT:  Excuse me.  Can I back up for a minute.

25   What kinds of pictures were they?

1          THE WITNESS:  There were many pictures depicting --

2     well, first of all, perhaps I'll say I didn't naturally see

3     them myself, but this is only what I've read.

4        There were a lot of pictures depicting children, a lot

5     of pictures depicting adolescents.  There was a wide and

6     diverse range of pictures from young children all the way to

7     adolescent teenage boys.

8          THE COURT:  By adolescents, do we have a time, an

9     age like?

10          THE WITNESS:  It's very, very difficult.  The

11     investigators will occasionally try to use Tanner staging

12     to attach ages to the children that they're looking at.  I'm

13     aware that there are -- I have seen a number of warnings

14     against using at least Tanner stages to refer ages, but

15     nonetheless, they are used.  So some of the youngest

16     children would be Tanner stages 1 and 2, and some of the

17     older children, that clearly would fall more in the

18     adolescent range would be Tanner Staging 3 -- or Tanner

19     Stage 3.

20          THE COURT:  Which means?

21          THE WITNESS:  Tanner Stage 1 is generally age 10 or

22     younger and defined by the absence of pubic hair.  Tanner

23     Stage 2 is somewhat more ambiguous because there's some

24     evidence of pubertal development, some evidence of pubic

25     hair, but it's clear that the individual is not fully

1    developed.   There's sort of a gray area between Tanner

2    Stage 1 and 3.

3        Tanner Stage 3 is generally older than age 13, age 13 or

4    older, and one observes generally the full psychophysical

5    development at that point that tends to, as I said, be

6    associated with teenagers that are aged 13 or older; and,

7    again, I hasten to add that the Tanner Stages for girls are

8    not the same as the Tanner Stages for boys.

9             THE COURT:  Oh, so at point were these boys or

10   girls?

11            THE WITNESS:  Boys generally; although, there were

12   girls too as I recall.  There were both, but, obviously,

13   his particular interest would be boys, but the Tanner

14   Stages for girls, of course, they reach these milestones at

15   younger ages than boys.  And as I said a moment ago, as I'm

16   providing ages I'm aware of the caveat against using

17   chronological ages attached to these Tanner Stages.

18            THE COURT:  And when he sent the CD to somebody

19   who was participating in a child porn video, what was that

20   about; do you have more details?

21            THE WITNESS:  Well, again, that's what I read,

22   your Honor, that one of the -- the individual that

23   Mr. Carta actually mailed the CDS and the modum to was an

24   individual that had been identified as a participant in a

25   child pornography video.

1          THE COURT:  Like with a child?

2          THE WITNESS:  Correct, except I would imagine at

3     this point that it was a now grown-up or at least perhaps a

4     teenager -- again, I've never --

5          THE COURT:  But you don't know?

6          THE WITNESS:  I don't know about the age; I have no

7     idea, but I would imagine it would be perhaps a teenager who

8     had been in a -- as a child in a child pornography video --

9          THE COURT:  But you don't know?

10         THE WITNESS:  -- that I'm referring to, but I don't

11    know.

12         THE COURT:  What about what was on the CD, do we

13    know?

14         THE WITNESS:  I do not.

15         THE COURT:  So you don't really know the details of

16    that offense?

17         THE WITNESS:  Not at all.

18         THE COURT:  And you didn't ask him?

19         THE WITNESS:  Nothing more than what I've shared.

20         THE COURT:  And you didn't ask him about that when

21    you talked to him?

22         THE WITNESS:  I don't recall if I did.  It's been

23    quite awhile now.  I would have to go back and look at my

24    notes.

25         THE COURT:  Okay.  Thank you.

```
1     Q.   Dr. Prentky --

2          THE COURT:  Can I get a sense -- I know I keep

3     interrupting so I'm part of the problem, but how long do

4     you think you're going to have with the remainder of direct?

5          MR. GOLD:  I think we're about to conclude what I

6     think is the facts of the case and then we move on to the

7     elements.

8          THE COURT:  No, I just want to --

9          MR. GOLD:  So we've got I think an hour-and-a-half

10    total for me.

11         THE COURT:  Left?

12         MR. GOLD:  Yeah, maybe an hour.

13         THE COURT:  How long do you think you'll be on

14    cross?

15         MS. SERAFYN:  An hour-and-a-half to two hours.

16         THE COURT:  Well, at some point, let me ask the

17    court reporter....

18         (Whereupon, a brief discussion

19          commenced off the record.)

20         THE COURT:  So we'll plan on breaking for 15 minutes

21    for noon, does that sound all right?

22         MR. GOLD:  All right.

23    Q.   Dr. Prentky, does information about the child

24    pornography collection come from Mr. Carta himself?

25    A.   It comes both from Mr. Carta as well as the
```

1    investigators that obviously issued their reports after

2    having looked at it.

3    Q.   And was Mr. Carta a passive recipient of child

4    pornography or was he someone who maintained a collection of

5    it for trading purposes?

6    A.   More the latter.  More the latter.  He seemed to have

7    a wide range of pornography that spilled out over the

8    boundaries of what one would probably regard as his sexual

9    preference, and I can only infer from that that he was

10   using many of those images for trading purposes.

11   Q.   Has Mr. Carta stated to you in the course of your

12   evaluation anything about his child pornography collection

13   that's germane?

14   A.   Mr. Carta described it in a way that is not

15   inconsistent with what I've heard from some other men that

16   I've evaluated; in that, there was a compulsive quality to

17   it, that he went beyond collecting pornography simply as

18   nonusers who might infer that one would be looking at

19   pornography simply to gratify sexual needs; however, so many

20   individuals that I've spoken to including Mr. Carta say that

21   the driving force underlying this goes well beyond that;

22   that there was something that became rather compulsive

23   about collecting pornography.

24       I've heard men say things like:  Oh, you know, it was

25   like collecting baseball cards when I was a kid.  One man

```
1    said to me:  Oh, you know, it's just like when I was a kid
2    I had Beanie Babies; I needed to collect every Beanie Baby,
3    and I threw them in the closet.  There is a sort of a
4    quality that is hard to understand but it's obviously
5    satisfying some --
6         THE COURT:  Excuse me.  These Beanie Baby, baseball
7    cards, is that what Mr. Carta said --
8         THE WITNESS:  No, it's not, your Honor.
9         THE COURT:  -- or this is something totally
10   different?
11        THE WITNESS:  I'm talking about other people that
12   I've evaluated that report to me a similar kind of
13   underlying drive, force, a motivation to collect that
14   simply became compulsive, and it went way beyond what we
15   would understand to be simply sexual gratification, simply,
16   the need to collect, to gather every type of image.  Now,
17   whether that's used simply for trading purposes, I don't
18   know.
19        THE COURT:  So what did he say again he wanted to
20   collect, Mr. Carta?
21        THE WITNESS:  He said to me that he was collecting
22   in part for trading purposes.
23        THE COURT:  Collecting what?
24        THE WITNESS:  Oh, a wide range of different types of
25   images.
```

1          THE COURT:  Of?

2          THE WITNESS:  Both children, prepubescent children

3     and pubescent adolescent aged children.

4          THE COURT:  Both categories?

5          THE WITNESS:  Correct, that's correct.

6     Q.   Dr. Prentky, if I could refer you to Page 9 of your

7     report, the paragraph that begins "Although," if you could

8     just briefly examine that paragraph.

9     A.   Yes.

10    Q.   Does that refresh your recollection as to the statements

11    that Mr. Carta made about his child pornography collection

12    and his relationship to it?

13    A.   It's not inconsistent.  I believe that I've already

14    shared with the Court; namely, that there were a wide

15    range of images.  The images, the images that he was most

16    interested in are images that involved adolescent males, but,

17    obviously, they were preadolescent images, preadolescence as

18    well, if that's what you're asking me, prepubescent children

19    as well.

20    Q.   Mr. Prentky -- Dr. Prentky, I'm sorry, what I'd like to

21    do is have you speak briefly about Mr. Carta's institutional

22    course with particular emphasis on his period in the sex

23    offender treatment program, and then I'd like to move into

24    the elements of the opinion in particular.

25         Could you describe his course in the Bureau of Prisons?

1    A.   There's one word that comes to mind, and it's

2    astuteness.  He has been in prison now for, what, eight

3    years, over eight years.  He has received quite a number of

4    disciplinary reports for a range of institutional misconduct

5    including things like:  misuse of a telephone at Allenwood;

6    he was written up for threatening bodily harm while he was

7    at Butner, insolence, having unauthorized property, to wit:

8    a radio, mouthing off to a woman in the SOTP program and so

9    forth.

10    His accomplishments, however, are by no means sort of

11   dwarfed by his misconduct.  He was in the CODE program,

12   which is a year-long residential program.  He was in a

13   program called Breaking Barriers.  That's a two-week

14   intensive program for breaking the chain of events that

15   leads you back repeatedly to prison.

16    He was in the basic and advanced computer skills

17   courses.  He was in the eight FEMA programs, the federal

18   emergency management agency programs, including emergency

19   planning, principles of emergency management, professionals

20   in emergency management, and so forth.  There were, I

21   believe, eight different programs that he's completed.

22    And then he spent something like seven or eight months

23   in the SOTP program at Butner from late July 2005 until

24   March 2006.  He attended all of the various process groups

25   that are part of the Butner program.  He attended the

 1    community meetings.  He characterized it as 24-hour

 2    programming; it never stopped.

 3         The circumstances surrounding his decision to drop out

 4    of the SOTP had been called into question, but I don't

 5    believe anyone has ever called into question the benefits

 6    that he derived from the time that he was in that program

 7    prior to dropping out.

 8              THE COURT:  So could you give me some sense of the

 9    dispute as to why he dropped out?

10              THE WITNESS:  I'll be happy to share with you,

11    your Honor, what Mr. Carta said to me.  He was increasingly

12    in disputes with individuals who were responsible for

13    the program itself around matters having to do with

14    confidentiality of disclosures that he made that required

15    an iron-clad requirement on the part of the offenders that

16    everything that's stated on the part of the offender in

17    the context of this SOTP, obviously, must stay there, is

18    entirely confidential.

19         However, there's no such guarantee of confidentiality on

20    the part of the institution itself ... so that everything

21    that an inmate discloses is understood to be available for

22    use by the institution itself, and there was an increasing,

23    ever increasing amount of tension around those issues

24    having to do with confidentiality.  I believe that that

25    ultimately was --

1          THE COURT:  So that's the reason that he gave you?

2          THE WITNESS:  That's correct.

3          THE COURT:  And when you said it was a dispute about

4     that, did Butner have a different point of view as to why he

5     dropped out?

6          THE WITNESS:  Well, naturally, Butner strongly

7     encouraged him and they sent him in, and they strongly

8     encouraged him to return to therapy ... so, obviously, they

9     tried to encourage him to return, and he didn't.

10         THE COURT:  So what did you say was the dispute?

11         THE WITNESS:  The dispute involves certain

12    altercations that Mr. Carta was written up for vis-à-vis

13    a man that he had been sexual with, and he had received a

14    disciplinary report for this, and whether or not this was a

15    legitimate basis for a disciplinary report seemed to be in

16    dispute.

17         THE COURT:  So I'm just trying to understand, was he

18    thrown out of the program:  no?

19         THE WITNESS:  No, he dropped out.

20         THE COURT:  So when you say dispute, you mean it was

21    one of the reasons why Mr. Carta was feeling hostile to the

22    administrators?

23         THE WITNESS:  Yes, in effect, perhaps that's a, you

24    know, fair way of characterizing it.  Yeah, no, he was not

25    thrown out, and, in fact, the last --

1          THE COURT:  Because don't forget, in other cases

2     I've had, for example, Mr. Wetmore was actually thrown out

3     of the program.

4          THE WITNESS:  Yeah, right.

5          THE COURT:  So this was not a situation where he was

6     accused of misconduct and the program booted him; this was

7     where he felt he was -- his statements were being -- weren't

8     being kept confidential or he was unfairly disciplined so he

9     basically rebuffed them?

10         THE WITNESS:  He was the one that dropped out.  He

11    elected to drop out.  I saw at least one memo strongly

12    encouraging him to return.  He did not.  That's correct.

13         THE COURT:  All right, I have just wanted to --

14         THE WITNESS:  However, it's also correct that he was

15    written up for being sexual with another inmate.

16         THE COURT:  How old was that man?

17         THE WITNESS:  I believe it became at issue because

18    this was a younger individual, and, obviously, it had to be

19    an adult to be at Butner.

20         THE COURT:  But was there a big age difference?

21         THE WITNESS:  Yeah, there was an age difference, and

22    he was understood somehow to be predatory, that he was --

23    well, I --

24         THE COURT:  So is there a question on the table?

25    Did you want to add something?

1          THE WITNESS:  I'm not sure if Attorney Gold would

2      want me to continue?

3          THE COURT:  I think we were talking about why he

4      left the program, is that it?

5          THE WITNESS:  I mean, Mr. Carta shared with me his

6      experiences during the time that he was in treatment, and he

7      clearly was actively and deeply moved as he was relating his

8      experiences to me in treatment.

9          There was a time, as he was talking to me, that he was

10     actively crying.  He was talking about how ashamed he was of

11     his misdeeds.  He was talking about how he had effectively

12     wasted his entire life.  He was talking about the terrible

13     ways that he treated his parents.  He was a terrible kid,

14     that he treated his parents, to use his word, like shit.

15         He talked about how he would swear at his mother, how he

16     pushed his father, and he characterized himself as a very

17     deeply hurt, angry child.  This is what he shared with me

18     during the time that he was with me.

19         He further characterized himself as hypersexual.  He

20     understood that because of how young he was when his

21     sexuality was awakened.  He said that it was roughly the

22     age of seven.

23         Then, he talked about the sexual experiences years later

24     with this 60-year-old man, and he said he thought that the

25     old man loved me, the old man cared about me, and it felt

1    good.  It meant to me that he must care about me, and it was

2    evident to me at the time that my parents didn't.

3        These are all the things that he shared with me during

4    the time that we were together.  He further said in no

5    uncertain terms that I am the owner of all of my behavior; I

6    am responsible for all of my behavior, and he ended by --

7    with the comment that if I ever, ever, go out and commit

8    another sexual offense, I deserve to be locked up for the

9    rest of my life.  I'd be a stupid idiot.

10   Q.   Dr. Prentky, if I could, I want to put before you a

11   couple of documents.  One is been marked as Exhibit 21.

12   Can you read that?  Can you see that on the document viewer?

13   A.   Yes.

14   Q.   And this is a document which is marked as Bates stamped

15   document No. 400, is that among the documents that you

16   reviewed?

17   A.   Yes.

18   Q.   Now, could you, you just testified that there was --

19   that Mr. Carta was written up for being sexual with someone

20   else at Butner?

21   A.   Yes.

22   Q.   Could you read the contents of this document to

23   yourself?  Could you discuss what is happening in

24   Exhibit 21?

25   A.   This is, it looks like a memo, that was submitted by

1    an intern by the name of Mr. Wood on the 31st of January of

2    '06 regarding Mr. Carta's request to submit what is called

3    a copout to quit the SOTP program, and in this memo Mr. Wood

4    says that Mr. Carta was unable to take feedback from other

5    members of the group.  Mr. Carta was visibly distressed and

6    crying.  Parallels were drawn between his offending cycle

7    and his behavior in the program.

8       He admitted that he was placing himself in positions to

9    be close to the younger members of the group that he was

10   sexually attracted to.  He went to a community meeting,

11   admitted his behavior, talked about his behavior to the

12   other participants, asked for their help in changing his

13   behavior.

14      He received support and encouragement, and then the last

15   sentence is, "will meet with inmate later this week to

16   process today's events as well as enact a plan for him to

17   increase his social circle beyond these young members with

18   whom he is attracted."

19   Q.   And, Dr. Prentky, I'm showing you a document which is

20   a document that I believe has been admitted into evidence in

21   the prior proceeding but I can't prove it so I'm going to

22   admit it, I'm going to seek to admit it now.

23      This is a subsequent note by the same author.  It is

24   Bates stamped number 407.  Is this among the documents that

25   you recognize as having reviewed for the purposes of this

1    case?

2    A.   Again, it appears to be a follow-up memo from the same

3    intern, Mr. Wood, on the 11th of January '06.

4    Q.   And is Bates Stamp 407 among the rung of numbers that

5    you reviewed in preparation for this case?

6    A.   Yes.

7    Q.   And do you recognize this document as being among the

8    documents that you reviewed:  yes?

9    A.   Yes, I believe so.

10   Q.   And, Dr. Prentky, this subsequent interaction that

11   Mr. Carta had with Mr. Wood, what is the subject of your

12   discussion here?  Could I ask you to read, well --

13           THE COURT:  Which exhibit is this?

14           MR. GOLD:  This is admitted or, I'm sorry, I'm

15   seeking to enter this now.

16           THE COURT:  Exhibit No.?

17           MR. GOLD:  30.

18           THE CLERK:  36 will be the next number.

19           THE COURT:  All right, so this is not in my book?

20           MR. GOLD:  I found it in the books, but I think it

21   might have been my mistake so it's either in a run of

22   documents that were already in the book.

23           THE COURT:  But if not, you'll just give it to me

24   anyway?

25           MR. GOLD:  I'll admit it now as Exhibit 36.

```
1              THE COURT:  All right.
2              (Respondent's Exhibit No. 36 admitted in evidence.)
3    Q.   Dr. Prentky, could you read the paragraph starting
4    "inmate indicated" into the record?
5    A.   Yes.  "Inmate indicated that he is doing well in the
6    program and not experiencing any significant problems.  He
7    brought up that a community member asked him who his clique
8    was.  This opened the door for discussion of inmate's focus
9    of mentoring younger, newer inmates in the SOTP."
10   Q.   All right.  Just to stop you there, the word "mentoring"
11   is in quotes by the author, Mr. Wood?
12   A.   Right.
13   Q.   What does that communicate to you?
14   A.   Taking these individuals under his wing.
15   Q.   Please continue?
16   A.   "Inmate admitted that there are several young inmates
17   with whom he associates but was quick to defend that the
18   program is based on helping others, etc.  Inmate was able to
19   acknowledge that he was attracted to one of the inmates he
20   formally counseled, again in quotes, but denied attraction
21   with others.  In fact, he identified one of the other young
22   inmates as his best friend -- as the best friend he has ever
23   had and stated that he had to quit associating with him as
24   a program issue" -- I'm sorry, "that if he had to quit
25   associating with him as a program issue, he would quit
```

1    SOTP.

2        Inmate had a number of rationalizations and

3    justifications as why it was acceptable for him to behave

4    as he had.  He was reminded that this was important

5    treatment issue for him and something that he needs to

6    address if change is important to him.

7        Inmate verbalized a number of reasons why he does not

8    associate as much with older members (while also highlighting

9    the few he does associate with), which essentially comes down

10   to the fact that he is more comfortable, that is, has more in

11   common, with the younger members.

12       Additionally, inmate stated that when he is released he

13   will look for a partner who's in their young to mid 20s.

14   Problematic aspects of his behavior patterns were addressed,

15   as well as, what a healthy relationship for him would look

16   like."

17   Q.   And then the writer goes on to say that "inmate

18   verbalized some anger about another issue in an appropriate

19   way"?

20           THE COURT:  I don't want him to read it.

21           MR. GOLD:  No, we're done reading it.

22   Q.   Dr. Prentky, you testified earlier, and I just want to

23   be very clear about this point, that it was your impression

24   that you inferred from the records that Mr. Carta had, in

25   fact, been sexual with another inmate while in the Butner

1    treatment program.

2        The records that I've just put in front of you indicate,

3    I think, some of what was going on in the program.  Are you

4    aware of any other documents beyond this issue of mentoring

5    which would substantiate that Mr. Carta was alleged to be

6    sexual with an inmate in the Butner program?

7    A.   Counsel, that was my impression.  Obviously, I could

8    easily be mistaken, and we're talking about voluminous

9    records here.

10            THE COURT:  Do you remember as you sit here whether

11   you got that impression from a document or something

12   Mr. Carta said?

13            THE WITNESS:  No.  No, that was my impression from

14   what Mr. Carta shared with me; but as I said, your Honor,

15   I could easily be mistaken with the enormous amount of

16   information here.

17            THE COURT:  Do you have your notes with you here?

18            THE WITNESS:  My original handwritten notes, I don't

19   have them here, your Honor.

20            THE COURT:  It would be useful, I mean, whether

21   it's today or some other time, whether you could go back to

22   them and see if you refresh your recollection to see

23   whether this is something Mr. Carta said or whether this

24   is the incident, and maybe you just got a misimpression.

25            THE WITNESS:  Perhaps.  That was my impression,

```
 1    though.
 2    Q.   Dr. Prentky, moving -- should we take a break?
 3         THE COURT:  Yes.  Yes, why don't we go off the
 4    record and take a quick break, and I'll need you to wrap up
 5    by 1 today.
 6         MR. GOLD:  Okay, 1.  Okay, 1, and that gives them
 7    two hours on the other side?
 8         THE COURT:  Maybe, but I also have these afternoon
 9    things and I would like Dr. Prentky to not have to come
10    back; that's essential, so it took an unbelievably long
11    time.
12       I was, as you know, very eager to finish this by the end
13    of last year; we couldn't because of the difficulties in
14    getting the experts' schedules coordinated with counsel's
15    and my own, and it didn't work ... so if we have to have
16    you come back, it just moves it out some more, okay.
17         THE CLERK:  All rise.
18         (Whereupon, a brief recess convened.)
19         THE CLERK:  All rise.  You can be seated.
20       BY MR. GOLD:
21    Q.   Dr. Prentky, when we stopped for the break, we were
22    talking about the circumstances behind Mr. Carta's
23    withdrawing from the treatment program.
24       Do you recall that?
25    A.   Yes.
```

1   Q.   Now, Dr. Prentky, Mr. Carta participated in the

2   treatment program for how long was your testimony?

3   A.   Five, six months.

4   Q.   And in that period he made disclosures about his sexual

5   history?

6   A.   Correct.

7   Q.   And much of the information that we have about his

8   history, both his history being the victim of sexual abuse

9   and also his reactive behavior after, that comes from him,

10  correct?

11  A.   Correct.

12  Q.   And that is part of the information that you used to

13  arrive at your diagnoses and opinion in this case?

14  A.   Yes.

15  Q.   Now, Dr. Prentky, in your opinion does Mr. Carta --

16  has Mr. Carta committed sexually violent conduct or child

17  molestation within the meaning of the statute, that's the

18  first prong of the statute?

19  A.   You mean did his deviant behaviors qualify for

20  consideration, is that what you're asking me?

21  Q.   Yes.

22  A.   If the governing offense is solely possession and

23  transportation of child pornography, then that question

24  would be rather dubious.

25  Q.   But based on his disclosures, do you arrive at an

1    opinion or a position with regard to the first element of

2    the statute?

3    A.   Based on his disclosures, it is arguably appropriate

4    for at least considering commitment.  However, as I said,

5    if we're simply talking only about what is known, the child

6    pornography, then my way of thinking would be rather dubious.

7          THE COURT:  Well, I think there are three prongs

8    here.  So the first is, did he commit child molestation in

9    the past.  So the question is:  based on what he said, has

10   he?

11         THE WITNESS:  Based on his self-report, the answer

12   would be yes.

13   Q.   Dr. Prentky, moving to the second prong --

14         THE COURT:  I think that was stipulated to, right?

15         MR. GOLD:  I don't know if we formally stipulated to

16   it but --

17         MS. SERAFYN:  I thought we did, your Honor, because

18   as you remember this case was remanded and --

19         MR. GOLD:  Oh, that's right.

20         MS. SERAFYN:  And there was no dispute about the

21   first element.

22         THE COURT:  And the what?

23         MS. SERAFYN:  There was no dispute about the first

24   element, but I think as your Honor hadn't heard this case

25   before, you wanted some testimony as to the second and

```
 1   third prongs, your Honor.
 2        MR. GOLD:  Judge, I didn't mean to open up a
 3   philosophical discussion about the first element.  I just
 4   wanted to move through it.  I don't know that we formally
 5   stipulated; maybe we did.  I concede it now.
 6        MS. PIEMONTE-STACEY:  It's not a stipulation; it's a
 7   First Circuit decision, your Honor, saying that we proved
 8   that and affirming that piece of it anyway.
 9        THE COURT:  Anyway, it's not in dispute here.
10        MR. GOLD:  Fine.
11        THE COURT:  I just think it was confusing because,
12   perhaps with the expert here, he thought he meant the
13   indexed offense as opposed to what was admitted in the
14   past so --
15        MR. GOLD:  Just I'll move to the second prong.
16        THE COURT:  All right.
17   Q.   In your opinion does Mr. Carta have a serious mental
18   illness, abnormality, or disorder within the meaning of the
19   statute?
20   A.   No.
21   Q.   And please describe the basis of that opinion.
22   A.   I have tried to set out a formulation for the way I
23   conceive of the diagnosis of hebephilia, and I go into
24   some detail in my report with regard to my understanding
25   of that diagnosis.  I should say --
```

1    Q.   Now, Dr. Prentky, on your -- on the witness stand is

2    Exhibit 29.  Do you see a document which is labeled

3    Exhibit 29?

4    A.   Yes, correct.

5    Q.   And what is that document?

6    A.   An article by Ray Blanchard and his colleagues that

7    appeared in the Archives of Sexual Behavior.

8    Q.   And what is the subject of that article?

9    A.   Pedophilia, Hebephilia, and the DSM-V.

10   Q.   Now, do you make reference to this article in the body

11   of your report?

12   A.   Yes.

13   Q.   And do you discuss this article and other articles in

14   the body of your report?

15   A.   Yes.

16   Q.   And is there controversy in the field about the concept

17   of hebephilia?

18        THE COURT:  Well, again, I think this is off the

19   plate, and the First Circuit did decide that it's a viable

20   mental illness.

21        MR. GOLD:  Your Honor, the devil's in the details.

22   With all due respect to the First Circuit, they're not

23   doctors; they're judges.

24        THE COURT:  I know, but it's the law of the case

25   that it's -- in other words, I don't want a Daubert kind of

1    challenge to whether or not you can come up with paraphilia

2    NOS hebephilia.

3        Whether he qualifies may be a different thing; I don't

4    know whether you can continue to challenge that.  I don't

5    remember exactly how the First Circuit worded it, but I

6    don't want a Daubert challenge as to whether or not the

7    diagnosis is even valid.

8        MR. GOLD:  Well, it's all of a piece, your Honor;

9    that's what I would say.  Dr. Prentky, I think takes the

10   position that --

11       THE COURT:  I know but I don't want to waste time.

12   If you want to challenge the First Circuit's opinion, move

13   for reconsideration, but at least paraphilia NOS

14   (hebephilia), that's why they remanded it because

15   Judge Tauro said it wasn't an illness.

16       MR. GOLD:  That's right.

17       THE COURT:  So that's the law of the case; it's an

18   illness.  So now maybe he -- now, the parameters of the

19   illness, maybe he doesn't qualify somehow; that's fair

20   enough, but I don't want to go through whether Blanchard

21   is right or not.

22       MR. GOLD:  Your Honor, I think we can -- we're

23   going to move this through.  As your Honor noted when we

24   started the case is that the serious difficulty questions,

25   some of these cases haven't been assessed out the legal

```
1    issues.  It's intimately related not to just to, you know,

2    the fact of a Diagnosis A or B, but the quality and nature

3    of it, so I think we need the testimony --

4          THE COURT:  Fine, but I'm just saying right now I

5    am not going to be reversing the First Circuit.

6          MR. GOLD:  No, and I don't see that --

7          THE COURT:  Okay.

8          MR. GOLD:  -- down the line, but in order to simply

9    understand and have the context of what -- the opinions in

10   context for an understanding.

11         THE COURT:  All right, but let's move it.  I'm not

12   spending a lot of time on something which undercuts what the

13   First Circuit decided.

14         MS. SERAFYN:  Your Honor, just for the record, we

15   also believe that the First Circuit actually decided that

16   the government did prove that Mr. Carta has hebephilia.

17         THE COURT:  Why don't you read the sentence that

18   makes you think that.  I just don't remember.  I can go back

19   and read it but --

20         MS. SERAFYN:  Well, I will; I have the judgment

21   right here.  It says:  "The matter is remanded for the

22   district court to consider whether the requisite of

23   dangerousness exists," so we believe coupled with the

24   First Circuit's opinion which I have also that --

25         THE COURT:  I don't remember, and I'm not going to
```

1    take the time right now to remember.

2         MR. GOLD:  We'll hash it out in the papers, your

3    Honor, so I just want to get in the evidence, and then

4    we'll move beyond it.

5      I just want to say one thing with respect to that which

6    is that, you know, normally, and I've been thinking about

7    this a little bit, but, normally, we get a remand from

8    the First Circuit about some issue in a case determining

9    something that's a historical fact; but what we're

10   determining in these types of cases is present mental

11   state.  If Judge Boudin diagnoses my client in June of

12   2010, and then there's a sea change in what the American

13   Psychiatric Association is doing, then I think it's --

14         THE COURT:  Sure.

15         MR. GOLD:  -- relevant to this.

16         THE COURT:  If there's new evidence.

17         MR. GOLD:  Right.

18         THE COURT:  But, if anything, it seems to be moving

19   the other way.

20         MR. GOLD:  Right.

21         THE COURT:  But go ahead.

22   Q.  And you made note of this controversy in your report,

23   Dr. Prentky?

24   A.  Yes.

25   Q.  And you cite several articles that are referenced or

```
1    you reference several articles in your report?

2    A.   Yes.

3    Q.   And can I refer you to what's been premarked as

4    Exhibits 36 and 37, if I'm not mistaken, the two articles

5    there; maybe you can assist me, Dr. Prentky?

6    A.   37 is the Frances/First paper.

7    Q.   And the other one?

8         THE COURT:  Are these post the First Circuit opinion?

9         MR. GOLD:  These are post the First Circuit opinion.

10   A.   38 is that what you said?

11   Q.   38.

12   A.   That's the Franklin paper.

13   Q.   So is the Franklin paper --

14        THE COURT:  I haven't got those, right?

15   Q.   Is the Franklin paper among the literature that you

16   cite as germane to the issue of hebephilia in your report?

17   A.   That I cite with regards to the controversial nature of

18   the diagnosis of hebephilia, the answer is yes.

19   Q.   Yes.

20        MR. GOLD:  Your Honor, I'd seek to move the

21   Franklin article into evidence.

22        THE COURT:  Have you been shown it before?

23        MS. SERAFYN:  No, we hadn't.

24        THE COURT:  All right.  So what's your position?

25   Are you sick?
```

1        MS. SERAFYN:  I am, your Honor.  I'm sorry, I seemed

2    to have lost my voice.  Dr. Prentky does cite this article

3    in his report, but we hadn't been provided with it

4    beforehand.

5        THE COURT:  Why don't you read it over lunch and

6    see if you object?

7        MS. SERAFYN:  Okay.

8        THE COURT:  I'll mark it for ID at this point; it

9    would be useful because, you know, they don't know this

10   stuff.

11       MR. GOLD:  Well --

12       THE COURT:  Why wasn't it given to them?

13       MR. GOLD:  That's an oversight, your Honor.  It was

14   cited in the report; I kind of considered it.

15       THE COURT:  I know, but they're not reading

16   everything, so I'll mark it -- what are we marking it for

17   identification?

18       THE CLERK:  Do you want me to give it letter A or

19   did you use that -- B?

20       MR. GOLD:  I don't know whether it's --

21       MS. SERAFYN:  B.

22       THE CLERK:  B.

23       (Respondent's Exhibit B marked for identification.)

24   Q.  And what's been premarked as Exhibit 36, what is this?

25   A.  Franklin's already marked as Exhibit 38.

1    Q.   I'm sorry, 37?

2    A.   37 is marked as -- that's Frances/First.

3    Q.   And --

4         THE COURT:  You haven't seen this either?

5         MS. SERAFYN:  No, Mr. Gold delivered it to us last

6    night at 5:00.  I believe that this is cited in Dr. Prentky's

7    report, but we do object to this one.

8         THE COURT:  If it's not cited, sustained.

9    Q.   Well, your Honor, let me ask it this way:  Dr. Prentky,

10   are you aware in this month of the ongoing controversy; do

11   you keep abreast of developments in the field?

12   A.   Yes.

13   Q.   And has there recently been a new commentary which has

14   been issued about the hebephilia controversy?

15   A.   In the AAPL bulletin.

16   Q.   What is the AAPL bulletin?

17   A.   The Journal of the American Association of Psychiatry

18   and the Law current issue 2011.

19   Q.   And who is the author of that commentary?

20   A.   Two psychiatrists, one by the name of Frances and the

21   other by the name of First, Michael First.

22   Q.   And who are those psychiatrists?

23   A.   Michael First is a practicing academic psychiatrist in

24   Columbia, I believe; and as far as I can recollect, Frances

25   is retired.  I believe that he was an academic psychiatrist

1    at Duke University way down south.

2    Q.   Dr. Prentky, what is their relationship to the DSM-IV?

3    A.   They are both a part of the panel that considered

4    paraphilia.  Certainly, Michael First is; I'm not sure if

5    Frances is still affiliated with it.

6    Q.   Well, when you say still is a part --

7         THE COURT:  All right.  Has the DSM -- I know they

8    were considering this issue, have they come out yet with

9    their revised --

10        THE WITNESS:  No.

11        THE COURT:  -- standards?

12        THE WITNESS:  No.

13        THE COURT:  And there was controversy there, right?

14        THE WITNESS:  Correct.  The DSM-V is not due out

15    until 2013 at the earliest, as far as I understand.

16   Q.   Did Dr. Frances and Dr. First at the American

17   Psychiatric Association issue a published critique of the

18   criteria, the proposed criteria for DSM-V within the last

19   month?

20   A.   Well, are you talking about the article that just

21   appeared in the AAPL?

22   Q.   Yes, Dr. Prentky.

23   A.   Yes, of course.

24   Q.   And is that evidence of the ongoing controversy

25   regarding this diagnosis in the field?

1    A.   This is clear.

2         THE COURT:  Well, what's "this diagnosis"?

3         THE WITNESS:  Your Honor, hebephilia as a diagnosis

4    is highly controversial.  I believe it's fair to say that,

5    clearly, hebephilia cannot be understood to be broadly

6    accepted by practitioners in the field.

7         THE COURT:  Excuse me, but that's not the diagnosis

8    that I'm talking about.  That's not in the DSM, as I

9    understand it people have taught me.

10     The diagnosis we're talking about is Paraphilia Not

11   Otherwise Specialized and then there are various criteria,

12   so it's not the hebephilia, if I can use the word

13   free-standing; that you all have taught me that it's typical,

14   not atypical to be attracted to post-pubescent adolescents;

15   the issue is whether you act on it and whether it affects

16   major life -- I forget; you probably know this by heart,

17   but whether it affects your life in a significant way,

18   when you act out on it.

19     I just recently did an opinion on this ... so the

20   question is:  is it not accepted in the literature that you

21   can have a paraphilia NOS that's characterized by hebephilia

22   if those other criteria are met?

23         THE WITNESS:  NOS, as you know, is a wastebasket

24   category.  It's intended to include the myriad paraphilias

25   that are not listed.

1          THE COURT:  Right.

2          THE WITNESS:  You could use that NOS category for

3    any paraphilia that perhaps the community widely recognized

4    as being a legitimate paraphilia; for instance, bestiality

5    or zoophilia.

6          THE COURT:  Well, what about raping a 13-year-old

7    consistently and you can't stop; I'm not saying he did that.

8    You're attracted to 13- and 14-year-olds; they're

9    post-pubescent, and you keep attacking them, you know, with

10   oral sex, anal sex, all the disgusting things you hear about

11   it; you keep doing it and it's affected your life because

12   you can't stop and you keep going to jail, would that be a

13   paraphilia NOS hebephilia?

14         THE WITNESS:  I attempted to diagnose him with

15   paraphilia NOS hebephilia initially; this is what I had in

16   mind, and I found as I continued to scrutinize the case in

17   the way that I formulated this diagnosis, I take a somewhat

18   nuanced view of what hebephilia means.

19      I found that if there is to be this nexus, this linkage,

20   with serious difficulty, that that nexus simply wasn't

21   there.  It was not possible for me to conclude that

22   because of this hebephilia, he had serious difficulty

23   refraining from sexual misconduct; that's the bridge, the

24   linkage, that I could not make.

25         THE COURT:  So I guess we intellectually reach this

1    in two steps:  one is whether or not it's possible to have,

2    possible but would it be reliable, I guess is a better word,

3    to use, whether it's a reliable diagnosis that someone might

4    have paraphilia NOS hebephilia if they met the various

5    criteria; would that be a reliable diagnosis in your field?

6         THE WITNESS:  It would be a reasonable, legitimate

7    diagnosis for me.  However, I hasten to add that I

8    recognize that many of my colleagues would never reach such

9    a diagnosis; they would never consider such a diagnosis

10   because they consider it to be effectively an afterthought.

11   A psychiatrist by the name of Dr. Green wrote a rather

12   remarkable piece about this same subject.

13        THE COURT:  Somebody who continued to offend, not

14   just an attraction, and he said it wasn't a mental illness?

15        THE WITNESS:  What Green said in this rather

16   interesting piece entitled:  Sexual Preference for

17   14-year-olds as a Mental Disorder:  You Can't Be Serious,

18   with two exclamation points.

19        THE COURT:  That's fair enough, but what about --

20   I'm not talking about sexual preference or attraction; I'm

21   talking about acting on it.

22        THE WITNESS:  Because the question is -- this is

23   sort of a gray zone of whether you can act on a sexual

24   preference or a sexual desire, sexual interest, whatever

25   word you want to use, for individuals in this gray zone

1    and have that be considered a mental disorder independent

2    of the particular jurisdictional authority over the age

3    that dictates whether or not this is criminal ... because,

4    obviously, that will change from state to state.

5        So independent of the legality of it, these

6    psychiatrists seem to be commenting on whether at this

7    point in time sexual interest and sexual acting out on that

8    interest involving sexual objects in the age range of, say,

9    14 to 17 or 16 would be considered a mental disorder.

10           THE COURT:  No, I'm talking about ages 11 to 12 to

11   14?

12           THE WITNESS:  There's a long history here.  We can

13   go back to roughly 1924, I believe, when, when Krafft-Ebing

14   first proposed the diagnosis that we would call hebephilia,

15   he called it ephebophilia, but, essentially, it's what we

16   would call today hebephilia, and that goes back, as I said,

17   to 1924.

18           THE COURT:  What did he say?

19           THE WITNESS:  That he considered it a mental disorder

20   back then.  You can come forward to say many years later to

21   the writings of Glueck in the 40s, I believe, and Glueck

22   used exactly the same age range that Ray Blanchard does in

23   his paper, roughly 11 to 14, and he referred to hebephilia

24   at this point.

25           THE COURT:  Did he say it was a mental disorder?

1          THE WITNESS:  That's how he characterized it but --

2          THE COURT:  Excuse me.  Somebody coughed.

3          THE WITNESS:  Yes, that's how he characterized it,

4   but, again, let me hasten to add there was no DSM then.

5          THE COURT:  Sure, but I'm just saying at this point

6   you're the expert up here; you've been in front of me many

7   times:  would it be generally accepted in your profession,

8   while there may be some people who disagree, that if you

9   continue to act out and have oral or anal sex with

10  postpubescent adolescent boys ages 11 to 14, and you were

11  substantially older ... you know, what was it like

12  15-year-olds, that that could be reliably diagnosed as

13  paraphilia NOS if it interfered with your significant life

14  functions?

15         THE WITNESS:  As I said before, I am comfortable

16  going there; I've gone there before.  I have attempted

17  contemplate diagnoses along those lines myself, but I,

18  however, have to reflect back to you that there is clearly,

19  as I implied, a level of controversy around this issue.

20         THE COURT:  Fair enough.  I mean, experts in the

21  field do disagree on that; I mean, I understand that this

22  has been a controversial area, but I'm just saying from

23  your point of view, you're the expert; it's at least, you

24  know, generally accepted by some serious portion of your

25  profession that that would be a reliable diagnosis, not by

1  every single person?

2         THE WITNESS:  Yes, I believe so, but I think that's

3  what's critical, your Honor, is the issue of whether this

4  problem, I don't think anyone, including Dr. First or even

5  Dr. Green, would say that the kind of individual that

6  you're describing doesn't have a problem, doesn't have some

7  psychological problem ... I think what they might say is

8  it's not clear that that best be characterized as a

9  paraphilia.

10     What they might say, and, again, I have never asked, but

11  what they might say is that it's a failure in some adult

12  social adaptation.

13         THE COURT:  Could you call it a mental disease or

14  disorder?  Well, what's the statutory word?

15         MS. PIEMONTE-STACEY:  A mental illness, abnormality,

16  or disorder, your Honor.

17         MR. GOLD:  A serious mental illness.

18         THE COURT:  All right, fair enough.  That's the

19  statutory term.

20         THE WITNESS:  I guess for me the word "serious" would

21  come into play if you acknowledge that in what

22  you're actually engaging in, the behavior was criminal,

23  and it kept getting you into trouble, and you couldn't

24  stop; if it rose to that level of gravity, then I guess I

25  would call it serious.

```
 1              THE COURT:  But serious mental illness?

 2              MS. SERAFYN:  Abnormality or disorder.

 3              THE COURT:  Would it be?

 4              THE WITNESS:  If it rose to that level of gravity,

 5     then I guess I would consider it a serious problem.

 6              THE COURT:  All right.  So that's in the abstract;

 7     I'm not tying you down to Mr. Carta, so now we can jump into

 8     Mr. Carta.

 9     Q.   Dr. Prentky, what diagnosis did you consider when

10     assessing Mr. Carta?

11     A.   Paraphilia NOS hebephilia.

12     Q.   Did you consider any other diagnoses as potentially

13     applicable to the case?

14     A.   Not that are potentially applicable, and clearly one

15     could try to diagnose him of having antisocial personality

16     disorder, but I don't regard that as totally relevant.

17     Q.   Now, with respect to the paraphilia NOS hebephilia, how

18     do you -- how did you go about diagnosing or analyzing that

19     question in this case?

20     A.   I posed the question in my report as to the evidence

21     that could be brought to bear that this was a, well,

22     defensible diagnosis, and I have a list of those points

23     that seemed germane, that seemed to speak to that ultimate

24     conclusion, and I list them in my report.  Do you want me to

25     go through it?
```

1    Q.   If you could describe the evidentiary basis, and the

2    analysis.

3    A.   He has disclosed, and this evidence comes primarily

4    from his reports, that he had oral sex with a 15-year-old

5    nephew when he was 21.  He disclosed that he had oral sex

6    with an intoxicated 13-year-old when he was 28.  He had oral

7    sex with an intoxicated 17- or 18-year-old when he was 28.

8    He engaged in sexual activity with a 13-year-old on many

9    occasions; he estimated 30 or 40 occasions when he was 30 or

10   31 years old.

11   Q.   Over what time period, if you know?

12   A.   Well, as I vaguely recall, a period of roughly six

13   months it was extended.  I don't remember exactly --

14   Q.   Okay.

15   A.   -- but that's to the best of my recollection.  On

16   another occasion he engaged in sexual activity with a 13-

17   and a 17-year-old when he was in his 30s.

18       On another occasion he engaged in sexual activity with

19   three 16-year-olds that he met in chat rooms when he was

20   33; and then, of course, finally, we know that he lived

21   with Frederick who was 17 and they had a relationship for

22   roughly six months; and, lastly, he had oral sex with

23   Frederick's 15-year-old brother when he was -- when

24   Mr. Carta was 39 years old.  He further reported being

25   sexual with Seth, his daughter's 17-year-old boyfriend;

1    that is, Vanessa's boyfriend.

2        Lastly, one might conclude if one was being entirely

3    inclusive of everything that we know from what he has shared

4    with us that his wife was 17 when he met her; he was 24.

5    Again, there was roughly a seven-year age difference.

6    She was obviously of legal age, but there was roughly a

7    seven-year age gap ... so in my report I state that in total

8    he has reported being sexual with 13 teenagers:  three that

9    are 13 years old, one 15-year-old, four 16-year-olds, and

10   five either 17- or 18-year-olds.

11       Of the three -- I'm sorry, of the 13 teenagers, three --

12   the three 13-year-olds would fall within this general age

13   range, whatever it is, whether you're using the original

14   Glueck or the more recent Blanchard age range of 11 to 14

15   ... so that is the evidentiary basis for consideration of

16   whether a diagnosis of hebephilia is defensible.

17       When I asked him to simply report to me, to describe

18   for me what it is that attracts him the most ... not

19   surprisingly, he spoke about young adolescents, good-looking

20   guys, as he called them or referred to them, that are thin,

21   that are youthful-looking; they have a lot of energy, the

22   body type that he described would be essentially a pubescent

23   male in the age range of 15 to 20.  That's probably a fair

24   and complete characterization of what his actual sexual

25   preference is.

1    Q.   Why doesn't that statement lock him into a paraphilia

2    diagnosis?

3    A.   It's clearly outside the range of what has in the past

4    been reported to be a general range for hebephilia.  If I

5    use that range, and I'm not going to create my own

6    literature here, my own scholarship ... so if I rely upon

7    those scholars of the past who have written about

8    hebephilia, who have described it as a diagnostic entity, a

9    mental disorder, trust and use their guidelines of an age

10   range that is in early adolescence somewhere in the

11   neighborhood of 11 to 14.

12        THE COURT:  That's when you referred to me going

13   back 100 years or so?

14        THE WITNESS:  That's correct.

15        THE COURT:  Everybody's pretty consistent in that

16   definition?

17        THE WITNESS:  That's correct.

18   Q.   Dr. Prentky, why then did you not diagnose Mr. Carta as

19   suffering from this condition that you've described if he's

20   got three victims who are 13 years old?

21   A.   Again, the issue here is the most defensible diagnosis

22   that I can offer the Court, if I suggest that Mr. Carta is,

23   in fact, a hebephile, by that diagnosis I am locking him

24   into a sexual preference age that I find questionable.

25   We're talking about 13 teenagers, three of whom would fall

1    in this questionable range.

2         The overwhelming weight of the evidence seems to be

3    that his preference is for young adolescents who are older

4    than that; as I said, in the age range roughly of 15 to 20;

5    and if you look at all of the individuals that we're talking

6    about, indeed, 9 of the 13 were either 15, 16, or 17 years

7    old, and one apparently was 15 ... I feel uncertain

8    ascribing that diagnosis to him based on relatively weak

9    evidence, but it's clear in this case that the diagnosis

10   is complex and has resulted in obviously some degree of, you

11   know, disagreement among the experts who have evaluated him.

12        I've tried to walk a middle line.  I've tried to

13   consider a diagnosis that I thought was potentially

14   appropriate and found that I simply wasn't comfortable

15   concluding that diagnosis based on the simple weight of the

16   evidence.

17   Q.   Dr. Prentky, is age a proxy for how someone looks, if

18   you understand that question?

19   A.   I don't.

20        THE COURT:  I don't.

21   Q.   Well, when we're talking about age, is it possible

22   that someone is -- who is young is fully physically

23   developed?

24   A.   Obviously, the age of psychosexual development varies

25   enormously.

1   Q.   Well, could you find a 13-year-old who looked like an

2   18-year-old?

3   A.   Yes, of course.

4   Q.   Could you find 18-year-old whose maturity was not so

5   fast and looked like a pubescent person?

6   A.   I'm sure.

7   Q.   So in that context is age simply a proxy for

8   understanding some level of sexual development when you

9   think about the diagnosis?

10  A.   Age is a relatively crude measure when we're talking

11  about this gray area of adolescence.  Age is much easier

12  when we're talking about children or we're talking about

13  adults; it only becomes highly problematic when we're

14  talking about adolescence.

15  Q.   Well, Doctor, you've heard testimony in this case that

16  we don't have any doctor evidence of how the 15-year-old

17  victim looked; is the same true of all the victims in this

18  case?

19  A.   I certainly have not seen any images of any of these,

20  and many of these are, of course, simply the result of

21  Mr. Carta's own self-report so, obviously, we have nothing

22  to look at.  We don't know how they appeared or what their

23  physical development was.

24  Q.   Now, one of the 13-year-olds that you identified

25  Mr. Carta continued to relate to that person or, you know,

1    in an offending situation for a period of time; obviously,

2    that person would have continued to develop, is that fair

3    to say?

4    A.   Absolutely, but, of course, it depends what the time

5    frame was, and, again, I believe on a number of occasions

6    it was estimated to be 30 to 40 ... if the time frame was

7    perhaps as long as a year, then there might have been

8    obviously some change in development.  It's less likely if

9    the time frame was as short as say six months.

10   Q.   Now, where does the 11 to 14 that you rely on come

11   from, that age range, this literature that you describe?

12   A.   As I said, it depends on the historical teaching.  If

13   you want to go back to the writings of Glueck or back in the

14   40s, he uses -- I believe he's the first one to use that

15   same age bracket, 11 to 14, that Dr. Blanchard mentions in

16   his paper.

17   Q.   All right, but, Dr. Prentky, you have, well --

18        THE COURT:  So how much longer?

19        MR. GOLD:  I'm going to move now into the risk

20   element.

21        THE COURT:  I just need to get some sense of this

22   because we've got today, and how much longer do you have?

23        MR. GOLD:  Well, I think 45 minutes to one hour;

24   that's what I think.  We've got this prong.  I just think

25   the testimony is --

```
1         THE COURT:  We need to break now.  I have a 2:00.

2    We can come back here at 2.  We should come back here at

3    maybe at 2:15, all right, and then you're going to finish

4    at 3.

5       I'm just going to cut it off because this keeps going

6    longer and longer.  You'll probably want some redirect?  I

7    need to finish this today.  I assume that you're all

8    available to come back Monday?

9       This took forever, forever, and I have to give a fair

10   opportunity to everyone.  If I have extra time on redirect,

11   I'll let you use it, but we're going to finish it today.

12      You remember at the last minute we had this all booked

13   up and Mr. Carta canceled because his back hurt him and so

14   then we've been grappling for the last two months.  Now,

15   this is on the record trying to get days, and now it's

16   significantly longer than you expected at this point.

17      You know, I've seen Dr. Prentky before; he speaks

18   deliberatively, and we just need to finish it today.

19         MR. GOLD:  But what is the Court proposing?

20         THE COURT:  We can come back at 2:15, you're going

21   to finish at 3, and then I have a pretrial that will go

22   roughly to 3:15, and then you'll have the remainder of

23   the day, leaving us maybe 15 to 20 minutes for redirect.

24   That's what I'm proposing.

25         MR. GOLD:  Your Honor, I counter propose that.  I
```

1    understand what you're saying, and we want to move it too,

2    but we also don't want to be in the position where we're

3    drafting and regretting that we didn't get certain things

4    into the record.

5         THE COURT:  Well, you spent an hour on credentials

6    when everybody agrees he's qualified; he's one of the most

7    qualified guys out there, so I don't known why we used that

8    time that way.  I actually used him myself as an independent

9    expert; he's qualified.

10         MR. GOLD:  But, your Honor --

11         THE COURT:  You know what, I've got to meet someone

12   downstairs.  We'll see you at 2:15.

13         THE CLERK:  All rise.

14         (Whereupon, a brief lunch recess convened.)

15         THE CLERK:  Counsel can come forward in the next

16   case.

17         MR. GOLD:  Did you say come forward?

18         THE CLERK:  No, I meant set up.

19      BY MR. GOLD:

20   Q.   Good afternoon, Dr. Prentky.

21   A.   Good afternoon.

22   Q.   How did you answer the question of whether Mr. Carta

23   would have serious difficulty refraining from sexually

24   violent conduct or child molestation in the future?

25   A.   I completed or at least attempted to complete the

1    structured actuarial scale referred to as the Static-99,

2    and I followed that up by completing a non-actuarial

3    empirically-guided risk assessment referred to as the

4    SVR-20.

5    Q.   When you say you tried to complete the Static-99,

6    could you explain that?

7    A.   The history here, as we've discussed it this morning,

8    is complex, and, particularly so as it pertains to the

9    guidelines for completing the 10 items on the Static-99.

10   I worked under the assumption that the governing offense

11   was the possession of child pornography.

12       However, that is impermissible as a governing offense;

13   with the Static-99 there needs to be, it's referred to as

14   Category A offense, a battery sexual offense.  So if the

15   other evidence that we had brought to bear by a self-report

16   is used to justify the scoring of the Static-99, then we

17   would encounter the problem that a self-report is understood

18   to be impermissible in the completion of the five criminal

19   history variables on the Static-99.

20   Q.   Now, Dr. Prentky, are you right now talking about a

21   discussion of the coding rules of the Static-99 which is

22   contained in your report?

23   A.   Yes.

24   Q.   And what does that discussion lead you to in terms of

25   the Static-99 in this case, did you employ it?

1    A.   I attempted to, in part, because it has been used by

2    other experts in this case, and I wanted there to be some

3    common ground ... so I tried to find different ways in

4    which one could interpret Mr. Carta's criminal history such

5    that it would be appropriate to use the Static-99 given the

6    2003 guidelines.

7    Q.   But do you believe those guidelines actually preclude

8    the scoring of the Static-99 in this case?

9    A.   I believe that the guidelines make it highly

10   problematic; that, as I said, it depends on how we construe

11   his criminal history, and the pivotal issue here I believe

12   is not that the governing offense is a Category B offense,

13   child pornography, but that the Static-99 does not allow us

14   to rely on self-report for coding the criminal history

15   variables.

16   Q.   Now, how did you do your risk assessment then; did you

17   use another instrument?

18   A.   That's one of the reasons that I also completed the

19   SVR-20, Sexual Violence Risk 20.  It's not an actuarial

20   scale; in that, there are no life tables associated with it.

21       It is referred to as an empirically-guided risk

22   assessment.  It is similar to the Static-99 in that all

23   of the items are based on or written on by sufficient

24   scientific literature such as to justify their use as

25   risk predictors.

1  Q.   And for the record I'm putting up on the document

2  viewer Exhibit 34, Page 16, which is Page 16 of your

3  report, and in the appendix you set up the coding that you

4  did for the SVR-20; is that what's on the screen?

5  A.   Yes.

6         THE COURT:  Is that the one you developed or --

7         THE WITNESS:  No.  No, your Honor.  I developed an

8  instrument for juveniles.

9         THE COURT:  Just for the juveniles?

10        THE WITNESS:  Correct.

11  Q.   But the SVR-20, could you briefly describe for the

12  Court where that came from and how long it's been around and

13  whether it's empirically validated in the literature?

14  A.   The SVR-20 has been used for, let me see, approximately

15  13, 15 years now.  It was developed in Canada roughly, I

16  would guess, two years prior to the Static-99.

17     It was developed by a number of well-respected, highly

18  esteemed forensic researchers:  Webster, Hart, Bore and

19  others.  It has been certainly the subject of ample

20  empirical research.

21     It is not nearly as commonly used in the United States

22  for these SVP or SDP hearings so we don't hear about it as

23  much, but there certainly is an empirical basis for it; and

24  in several studies that have compared the SVR-20 to the

25  Static-99, the SVR-20 is at least as good in terms of its

1    predictive performance as the Static-99, and in at least one

2    or two studies it actually is better.

3             THE COURT:  Were these studies in peer-reviewed

4    journals?

5             THE WITNESS:  Yes.

6             THE COURT:  Is this a test that's generally accepted

7    in the forensics -- what would you call your area of

8    expertise:  forensic psychology?

9             THE WITNESS:  Forensic psychology.

10            THE COURT:  Is this generally accepted by forensic

11   psychologists?

12            THE WITNESS:  The SVR-20?

13            THE COURT:  Yes.

14            THE WITNESS:  Absolutely.  One of the authors of

15   the SVR-20, Dr. Hart was past president of the forensic

16   division of the American Psychological Association.

17            THE COURT:  All right.  Thank you.

18   Q.   Now, there are a list of factors here, and these are

19   the factors you were talking about as individual factors

20   being supported in the research as associated with risk of

21   recidivism or reoffense?

22   A.   Yes.

23   Q.   Now, without going through them individually, but

24   could you tell us what your scoring of the SVR-20 told you

25   in Mr. Carta's case and how it contributed to your opinion?

A.  Well, it's fairly dramatic.  You can see under the

cluster of risk variables referred to as psychosocial

adjustments that he has rated as present, so a yes on

virtually every single one of those items, and those items

reflect overwhelmingly an antisocial lifestyle.  Items such

as:  supervision failure, nonviolent offenses, nonsexual

violent offenses, employment problems, relationship

problems, substance abuse problems; all of those items are

marked in the affirmative.

    There are two additional items that, on that same scale,

that are -- don't really reflect criminal history, but

they're also marked in the affirmative, and that's that he

was a victim of child abuse and sexual deviation ... so

all tolled, on the psychosocial adjustment scale, I came up

with a score of 17 out of 20, which is an extraordinarily

high score, and it reflects his -- what we know about

Mr. Carta; namely, his antisocial lifestyle.

Q.  And how does this result, how does it inform your

opinion in this case; what is the SVR-20 telling you and

telling us?

A.  If we take a look at this second set of items, risk

factors on the SVR-20 clustered under the large heading of

Sexual Offenses, the items that are listed here are high

density sexual offenses, and I coded that actually in a

question mark; I wasn't sure exactly how to code that so I

1    coded it as a 1.

2         THE COURT:  What does that mean?

3    Q.   Could you describe how the coding works, what a 2, a 1,

4    and a 0 and a question mark means?

5    A.   Well, the 0, 1, 2 works exactly the same way here as it

6    does for the Static-99; namely, if you're confident that the

7    risk factor is absent, you code it a zero.

8       If you're confident that the risk factor is present,

9    then you code it a 2; and if you're somewhat unsure, it's

10   like a gray area, the data are somewhat ambiguous, you might

11   code it a 1.

12        THE COURT:  Well, what does density mean?

13        THE WITNESS:  A concentration, a very high

14   concentration of sexual offenses or sexual offending.  Many,

15   many sexual offenses perhaps concentrated in a relatively

16   short time period.

17        THE COURT:  So if somebody rapes a 13-year-old 30 or

18   40 times in six months, what's that considered?

19        THE WITNESS:  That would be probably considered high

20   density, but for the fact that we have the same problem

21   here that we have with the Static-99; that for most of these

22   risk assessment scales a determination of criminal history

23   rely on official documentation, so I don't escape that

24   problem by using this scale.  However --

25        THE COURT:  So do they have to be convictions, is

1    that what you're saying?

2         THE WITNESS:  They have to be adjudicated.  They

3    have to be adjudicated.  They could be a charge or an arrest.

4         THE COURT:  But they can't just be a self-report, is

5    that how this works?

6         THE WITNESS:  Yes.  Now, I tried to evaluate these

7    even independent of that using self-report, and that's why

8    I think that I initially coded that a 1 because I really

9    wasn't sure.

10      It was clear to me as I coded the other items that even

11   using self report, it wasn't possible to code them in the

12   affirmative.  Things like physical harm to victims, again

13   the way -- I don't have the manual here -- but the way that

14   the criteria are indicated for the coding of those items

15   uses webbings and threats, escalation and frequency or

16   severity, extreme minimization or denial ... all of those

17   items that I coded 0 or no, and that was even taking into

18   account the fact that the data I was working with were all

19   self-reported.

20        THE COURT:  Well, if you counted non-convictions

21   with self-reports in the first line, would that give it a 2?

22        THE WITNESS:  Yes, that would be a 2.

23        THE COURT:  If it kind of acts or supports or

24   condones as 2 points, at some point somewhere I read he

25   wasn't sure it was a problem 'cause somebody -- I believe a

1    13-year-old consented, does that qualify?

2         THE WITNESS:  For?

3         THE COURT:  Support of?

4         THE WITNESS:  The very last line, attitudes that

5    support or condone?

6         THE COURT:  Yes.

7         THE WITNESS:  Well, this is the attitudes that he

8    was reflecting to me when I interviewed him.

9         THE COURT:  Yes, that's what I think I'm

10   remembering.

11        THE WITNESS:  Yes, so, and that's why, again, he

12   clearly did not share with me attitudes that we would

13   characterize as distorted.  He wasn't giving me blatant

14   cognitive distortions that justified or minimized the

15   behavior.  In fact, as I think I shared this morning, he

16   actually was rather embarrassed.

17        THE COURT:  All right.  So that would stay 0 to 1?

18        THE WITNESS:  Yeah, I think that's legitimate.

19        THE COURT:  I'm trying to just get it.

20        THE WITNESS:  I think that that's a reasonable

21   coding.  I tried to be conservative, but I think that this

22   is a reasonable coding; and no matter how we tweak it,

23   you can see that the overall score is remarkably low.

24        You have an overall score of 1 or 2, 2 if you like out

25   of 14, compared to 17 out of 20 for the psychosocial

1    adjustment scale.

2            THE COURT:  Well, suppose you were to say it was 2

3    to 3 out of 14, is that still considered low?

4            THE WITNESS:  The SVR-20 requires the user to make

5    that judgment.  Unlike the Static-99, there are no a priori

6    risk categories.

7        The Static-99 has these little boxes:  low, low moderate,

8    moderate, you know, high, and so forth; the SRV-20 doesn't

9    use that.  The SVR forces you to incorporate the results

10   of the risk assessment scale with everything else that you

11   know and to make it a part of a comprehensive risk

12   assessment ... so how would I characterize that?

13       You know, I would certainly say that 17 out of 20,

14   obviously, is high, and I think I would certainly say that 2

15   or even 3 out of 14 is low, but it's not because the manual

16   says I have to say that.

17           THE COURT:  So you've done thousands of these, so in

18   your experience?

19           THE WITNESS:  In my experience that's extremely low

20   for a sex offender, yes.  It's not what you typically see for

21   a sex offender.

22   Q.  And, Dr. Prentky, can you interpret these results for

23   the Court in the context of your overall risk assessment of

24   Mr. Carta?

25   A.  The conclusions that I draw at the end of my analysis

1    that bear on my opinion about the ultimate conclusions

2    having to do with risk appear on the last page, and I list

3    them as -- the fact that I keep in mind that there's no

4    documented evidence, documented evidence, of a sexual

5    offense until the age of 40, I appreciate that we have much

6    self-reported evidence, but there's no documented evidence.

7        The second point is that the prison sentence resulting

8    from his convictions on charges related to risk of injury

9    to a minor and transportation of child pornography is his

10   first significant sanction and the first sanction for a

11   sexual offense.

12       It's the first lengthy incarceration in his entire

13   criminal career.  He has been incarcerated before, but

14   typically for very small lengths of time.  This is the

15   first lengthy incarceration of this man; and as I said, the

16   first one for a sexual offense.

17       The third point is that after he was convicted of

18   transportation of child pornography and criminal forfeiture,

19   he was released pending sentencing and was in the community

20   for half a year without any known infraction.

21       The fourth point is insofar as his disclosures of

22   sexual involvement where teenage boys are concerned, there

23   has never been an illegal response; he's never been

24   charged, arrested, or sanctioned for any of these

25   self-disclosed offenses; and that's despite the fact that

1    as we know looking at his lengthy record, he has been

2    arrested and sanctioned numerous times for his many

3    nonsexual crimes, typically, as I said very brief periods.

4         And, finally, the last point that I arrive at is that,

5    of course, the SVR-20 clearly suggests that Mr. Carta is, in

6    fact, a true, although it's based on his behavior, a generic

7    criminal and a criminal lifestyle, and he is, in fact, at

8    high risk for general criminal activity; that's inescapable,

9    but by contrast, there is contrary evidence of risk gleaned

10   from the sex offender specific risk factors that I looked at

11   here.

12   Q.   Dr. Prentky, why is it important to your opinion that

13   this is the first serious sanction that he's received and

14   the first sanction for a sex offense?

15   A.   It is fundamental to our understanding of the

16   importance, the profound importance, of a risk variable for

17   prior sexual offenses.  It used to be clearly articulated

18   in the original manual for the Static-99 that if an

19   individual has transgressed, been arrested, and been

20   seriously sanctioned by the court, and then proceeds to

21   ignore those sanctions and elects to continue the kind of

22   behavior that resulted in those sanctions, that that

23   clearly speaks to some kind of serious difficulty ...

24   whatever words we want to use, whatever you want to attach

25   to it.  There's something there that suggests that the

1    sanction is relatively meaningless in terms of containing

2    and controlling the individual's behavior, and, hence, the

3    notion of prior sexual offenses becomes quite important.

4    Q.   And is reoffending after a serious sanction behavioral

5    evidence that you have seen in other cases of this nature?

6    A.   It's not unusual, I guess, in my experience to see

7    people with a long history of repeated involvement with the

8    criminal justice system, repeated tours of duty through a

9    prison system, and they come out and they reoffend, and they

10   come out again and they reoffend again.  It's not unusual

11   for people to have a long track record of sexual offending.

12   Q.   Now, Dr. Prentky, you've had the opportunity to, at

13   least from a distance, assess the documentary record of

14   Mr. Carta's participation in the Butner treatment program,

15   and earlier today we spoke about the incident toward the

16   time when he withdrew from the program, and there was a

17   comment in those records that he was in cycle at the time

18   of his withdrawal.

19       In your opinion is the withdrawal from treatment at the

20   Butner BOP facility risk relevant; is it relevant to your

21   risk assessment in this case?

22   A.   Well, first of all, I have no idea whether or not he

23   was in cycle or not.

24           THE COURT:  What does "in cycle" mean?

25           THE WITNESS:  Relapse, a form of cognitive

behavioral therapy originally developed for use with

alcoholics.  It requires you to develop what's called an

offense cycle, and there are certain -- every offense cycle

is tailored to an individual, and there are certain factors

in your life, both behaviors and often emotions, events,

that lead you down a path that becomes perilously close to

another sexual offense.

The notion is that you can actually create this kind of

cycle events that leads to another offense.  Prior to what

is called the relapse, in clinical jargon, a relapse would

be another sexual offense, we get to things that are called

lapses, and lapses are basically the precursors of another

sexual offense ... so all of these events leading to lapses,

and, ultimately, leading to a relapse form a cycle.

I'm rather skeptical; although I don't know; I wasn't

his clinician; I wasn't in Butner; I'm somewhat skeptical

as to whether it's appropriate to refer to his interest in

these young inmates there as being a cycle for the simple

reason that if they're adults and he was, in fact,

befriending them, sexual with them on the outside, it

would not be of a nature that would subject him to arrest

and prosecution.

In other words, these people are old enough to have

made a determination as to whether they wanted to have a

consented sexual encounter ... so, I mean, given that

1    obvious consideration that there is an enormous age

2    difference, but the age difference notwithstanding, they

3    are still adults, I'm not sure if it's legitimate to refer

4    to them as a cycle.

5    Q.   Now, independent of your interpretation of what went on

6    at that time, is withdrawal from treatment in the way that

7    Mr. Carta did it a risk factor in the literature?

8    A.   No.  Well, there's no risk factor called withdrawal.

9    There are risk factors that one of which is called treatment

10   dropout, and that has certainly been looked at.

11        There are many other variables that bear on one's

12   commitment and investment in treatment that have certainly

13   been looked at, and, frankly, the literature is very, very

14   clear that however clinically important it may seem to us,

15   and it is clinically important, it has no bearing on their

16   risk to recidivate.

17        If you look at the two major META analyses that Hanson

18   did, you find that things like length of treatment, the

19   correlation with sexual recidivism, the length of treatment

20   is .03; there's no correlation at all; low motivation for

21   treatment .01, negative clinical presentation, which is

22   an overall combination of these clinical variables, the

23   correlation is 0; denial, if you deny your offense, your

24   sexual offense, the correlation is .02, and I've left for

25   last the one item that continues to be commented on.  It's

1    called failure to complete treatment.

2        Failure to complete treatment in at least that META

3    correlates to .17. .17 looks like it's larger than .0 or

4    .02, but, remember, we're talking about correlation

5    coefficients.

6        Now, without getting into an any more detailed analysis

7    of what this means, if you were to use that correlation in a

8    regression analysis to predict whether or not this man would

9    reoffend, it would account for less than 4% of a variance.

10       If the correlation was as high as 20.2, you square the

11   correlation coefficient .2 squared is .04, that's 4% of the

12   variance ... .17 is a small effect.

13       So, although it's been commented upon, it often comes up

14   simply because it's a larger coefficient than .03, but I

15   certainly wouldn't write home about it and I certainly

16   would not want to rest upon it or lean upon it as support

17   as a risk predictor.

18   Q.   So in your opinion in this case you do not rely on the

19   withdrawal in treatment as a risk enhancing factor?

20   A.   It's hard, counsel ... as recently as, what, 2003,

21   when Hanson presented at the New York Academy of Sciences

22   meeting in New York, he reported that the factor

23   unmotivated for treatment correlated to .01 with sexual

24   recidivism, again, unrelated.

25   Q.   Now, Dr. Prentky, are you familiar with the -- you've

1    reviewed the other opinions in this case, correct?

2    A.   Yes.

3    Q.   Are you familiar with the developments that have been

4    happening with the Static-99 and the Association for the

5    Treatment of Sexual Abusers over the past three years?

6    A.   More or less.  I don't attend those meetings any

7    longer, haven't in about a decade, but I try to keep up

8    with the developments in the field.

9    Q.   Well, is it fair to ask whether it's required of an

10   evaluator like yourself to use the Static-99R, for example,

11   in a case like this?

12   A.   Well, I mean, clearly, there's no question that

13   Dr. Hanson would say -- in effect he said to me very

14   clearly through e-mail -- that it's inappropriate for

15   anyone to be using the old norms, so I guess the answer is:

16   if you're going to use his scales, you would have to use

17   the Static-99R and use those norms and/or the Static-2002R

18   that use those norms.

19   Q.   Now, why didn't you use these instruments in your

20   assessment in this case?

21   A.   Well, we spoke about that earlier.  The Static-99R or

22   the Static-99 --

23   Q.   So is the reason that you did not use the Static-99 --

24   well, you didn't code the Static-99R in this case, did you?

25   A.   The only difference, the only difference between the --

1   if you look at the Static-99 and the Static-99R, the obvious

2   difference is, of course, the norms; but if you compare the

3   two scales, there's minor tweaking of a few items, and the

4   only fundamental change at all is the age variable.  That's

5   the only difference.  The only substantive difference

6   between the Static-99 and the Static-99R.

7          THE COURT:  Now, you've all lost me.  It's getting

8   late on a Friday.  Did you use the -- did you use one of the

9   static instruments?

10          THE WITNESS:  I used the Static-99, yes.

11          THE COURT:  Revised, and what was the predictive

12   capability of that?  What did it say and what was the risk to

13   reoffend?

14          THE WITNESS:  I never completed it, your Honor, but

15   we talked about this briefly earlier.  The Static-99

16   requires what's called a Category A offense.

17          THE COURT:  All right, so it's going back to that

18   reason?

19          THE WITNESS:  Correct.

20   Q.   Okay.  Now --

21          THE COURT:  He did mention that.

22   Q.   Dr. Prentky, have you reviewed the other opinions in

23   this case?

24   A.   Dr. Phenix and Dr. Bard.

25   Q.   And are you familiar with the use of dynamic factors in

1    assessments such as this?

2    A.   Yes.

3    Q.   And what is your opinion on the use of dynamic factors

4    in assessments of this kind?

5    A.   The --

6    Q.   Well, if we could take a step back, Dr. Prentky, what

7    are the dynamic factors; what am I talking about?

8         THE COURT:  Why are we even doing this if he thought

9    he couldn't do it?

10        MR. GOLD:  Well, the dynamic factors, I'm talking

11   about other thing that Phenix does and I'm presenting the

12   situation for the Court by having him talk about what they

13   are.

14        THE COURT:  Well, maybe just, did you agree with her

15   analysis, Dr. Phenix's?

16        THE WITNESS:  Vis-a-vis this thing called FVA or

17   something like that, is that what you're referring to?

18        THE COURT:  Didn't I tell her she couldn't testify

19   because it was produced at the last minute and it wasn't

20   even validated so I think I excluded this opinion.

21        MR. GOLD:  But then we opened the door.

22        THE COURT:  Not much.  No, we didn't.  I said no,

23   because she hadn't -- it had just been validated in

24   December if I'm remembering correctly, that what she

25   testified or hadn't even quite yet been validated yet.  No,

1    no, come on; we need to finish this.  How much longer do

2    you have?

3           MR. GOLD:  This is the last piece, but I just want

4    to ask him these questions and then --

5           THE COURT:  No, I rejected it.  Didn't I reject her

6    opinion on Static -- am I remembering this wrong?

7           MR. GOLD:  No, I can explain.

8           THE COURT:  All right, go ahead.

9           MR. GOLD:  She at the last minute had introduced --

10   remember, we went through this, all this -- really what's

11   happening with the Static-99, you've got to choose these

12   groups now.

13          THE COURT:  Right.

14          MR. GOLD:  And she said she was using this new

15   instrument which had just been introduced like eight days

16   before the trial and we excluded that and then she said:

17   Well, I can make the same operation by relying on these

18   research-supported dynamic factors and --

19          THE COURT:  I see, so you're going back?

20          MR. GOLD:  So I'm going back.

21          THE COURT:  Fine, but we're not going through the

22   instrument that I said no.

23          MR. GOLD:  No, I'm asking him about what she

24   ultimately said she was using to make this operation and

25   then we're done.

1          THE COURT:  We're completely done?

2          MR. GOLD:  Well, I'd imagine the government has some

3     questions.

4          THE COURT:  Right, but you're done?  I see the

5     attorneys here for the next case.  I'll finish this one and

6     then come back to you.

7          (Whereupon, a brief discussion

8           commenced off the record.)

9     Q.   Dr. Prentky, you had occasion as you testified to

10    review both reports by Dr. Phenix where she discusses

11    dynamic factors.  What are those dynamic factors in general

12    terms?

13    A.   Dynamic risk factors are intended to take us beyond the

14    static risk assessment that is imposed on us by scales like

15    the Static-99.  Dynamic risk factors, however, can only be

16    rated reliably when the individual is, of course, in the

17    community and able to engage in all of those behaviors, the

18    very behaviors that the dynamic risk factors are intended to

19    measure or assess.

20        Things like anger management, things like management of

21    sexual urges, things like intimacy deficits ... these are

22    all dynamic risk factors that reflect flux or change.  In

23    my opinion sexual recidivism is, in fact, a non-linear

24    dynamic process, and I don't believe that we're going to

25    make significant strides beyond what we now do with the

1    Static-99 until we're able to embrace in a reliable way

2    these dynamic risk factors.

3        The problem is obvious; that the vast majority of the

4    people that we end up evaluating are in prison and have been

5    in prison for years, and to evaluate those risk factors

6    reliably as if they were in the community makes no sense.

7        I have suggested the use of proxy dynamic risk factors

8    that take advantage of their comportment in prison to try

9    to assess that aspect of risk.  It is, I believe, key to

10   breaking this sort of glass ceiling with respect to the

11   accuracy or efficacy with which we assess risk, which we

12   don't do very well.  If we move it beyond, I think we have

13   to do that; but we can't do it, in part, because dynamic

14   risk is not blended, there's no mechanistic procedure for

15   making it a part of static risk, and because there's no way

16   at the moment of reliably coding those variables.

17       We can't do it retrospectively because we can't say

18   that Mr. Carta was in the community eight years ago and then

19   code those variables about the way he was eight years ago.

20   That's silly.

21   Q.   Well, why is that silly, Dr. Prentky?  Is that -- would

22   that be supported by the research as you read it to do that?

23   A.   It would be supported by the very nature of what

24   dynamic risk factors reflect, which is flux/change.  They

25   are intended to capture change in behavior, both

1    risk-aggravating change and risk-mitigating change, both.

2       As a rule of thumb, we impose some kind of a threshold

3    of around six months.  Once we get beyond six months, the

4    information frankly is stale, and I would prefer not even

5    doing it every six months; I would prefer to get an

6    assessment of these variables within 30 days to get a more

7    accurate approximation of the dynamic risk that that

8    individual reflects at that moment in time.

9    Q.   You've had occasion to read the testimony or have you

10   had occasion to read the testimony in this case from the

11   probation officer and treatment provider that Mr. Carta

12   called at the initial trial?

13   A.   Honestly, I'm not sure whether I read it or not.

14   Q.   Well, are you aware that Mr. Carta has a journal of

15   supervised release in the event that he's released?

16        THE COURT:  Well, he just incorporated that and you

17   know you can't incorporate that in the record.

18        MR. GOLD:  Fine.  I will stop here, your Honor.

19        THE COURT:  Thank you.  We'll take a 15-minute

20   recess.  I don't know if Ms. Fried's ready....

21        (Whereupon, a brief recess convened.)

22        THE CLERK:  All rise.

23        THE COURT:  Are we all set here?

24   MS. SERAFYN:  Yes.

25        THE COURT:  Okay.  Are you all set, Doctor?

1              THE WITNESS:  Yes.

2              THE COURT:  Good, all right.

3         CROSS-EXAMINATION BY MS. SERAFYN:

4    Q.   Dr. Prentky, hebephilia is defined as an attraction to

5    pubescent children, correct?

6    A.   Correct.

7    Q.   And pubescence typically occurs between the ages of 11

8    and 14?

9    A.   Again, obviously, it varies considerably.

10             THE COURT:  Pull in that mic or I'm going to lose

11   you altogether here.

12             THE WITNESS:  Whoops, sorry.

13             THE COURT:  All right.

14   A.   It varies depending on gender.  You know, obviously,

15   girls are earlier than boys, but it's generally in the

16   neighborhood of 10, 11, 12, onset.

17   Q.   Well, Dr. Prentky, you're familiar with the 2009

18   Blanchard article on hebephilia, correct?

19   A.   Yes.

20   Q.   And in that article Blanchard uses the age range 11 to

21   14 to essentially describe or define hebephilia?

22   A.   That's correct.

23   Q.   And, in fact, the DSM-V proposal that we've talked

24   about today includes the age range of 11 to 14?

25   A.   That's correct.

1    Q.   Now, in your report on Page 8 you define hebephilia as

2    the sexual preference for postpubescent males, typically

3    young adolescents; is that just an error, Dr. Prentky, the

4    term "postpubescent"?

5    A.   I suppose, counsel, it may be a little ambiguous.  I

6    guess what I meant is that if there is a magic line in the

7    sand, which we talk about the onset of pubescence, that it's

8    after that point, I guess that's what I had in mind, but I

9    could see it that it could be ambiguous.

10    Q.   But you agree that hebephilia is an attraction to

11    children in the midst of puberty?

12    A.   Children that are already evidencing signs of physical

13    sexual development, that's correct.

14    Q.   Now, you acknowledged on direct that you're aware that

15    there are psychologists in the field who actually don't

16    believe that hebephilia is a legitimate diagnosis?

17    A.   Yes.

18    Q.   Okay, but you disagree with that, don't you?

19    A.   That's correct.  I tried to present my formulation in

20    my report for how I see hebephilia.  I certainly don't take

21    as striking a view as some of my colleagues.

22    Q.   And in your opinion, and you've listed this, you stated

23    this opinion in your report, in your opinion hebephilia is a

24    legitimate mental disorder?

25    A.   Yes, that's correct, and I've described why I feel that

1    it is a legitimate disorder.

2    Q.   And when we talk about --

3         THE COURT:  Excuse me, can I ask something else:

4    so now is that apart from the paraphilia or in conjunction

5    with those parameters?

6         THE WITNESS:  Good question, your Honor.  Hebephilia

7    is a philia; it is a paraphilia.  I think that that's what

8    makes it as controversial as it is; that it's hard at times

9    to think of it always as a paraphilia as opposed to some

10   kind of psychosexual or psycho -- even psychosocial kind of

11   disorder for which the individual has sufficiently impaired

12   social and intrapersonal skills, that they're unable to

13   develop and sustain relationships with pubescent individuals.

14        THE COURT:  I'm not sure I totally understand what

15   you just said, but the attraction, in your view is the

16   attraction to 11- to 14-year-old pubescent children a

17   mental disease?

18        THE WITNESS:  If it's a paraphilia, and I'm not

19   trying to duck your question, then, clearly, it would

20   qualify, if it's a paraphilia, it should qualify under

21   paraphilia NOS which is a diagnosis in the DSM.

22   Q.   I didn't mean to confuse things, but, Dr. Prentky, I

23   think in your report you use the term hebephilia.  I guess

24   for these purposes when I talk about hebephilia, what I'm

25   talking about is the diagnosis of paraphilia NOS with the

1    descriptor hebephilia ... so do you believe, Dr. Prentky,

2    that the diagnosis of paraphilia NOS hebephilia is a

3    legitimate mental disorder?

4    A.   I believe that I state fairly clearly, counsel, that I

5    believe it is potentially a defensible paraphilia ... so the

6    answer to your question is yes.  I think I made that point

7    fairly clear in my report, do I not?

8    Q.   I think you do too, Dr. Prentky; I'm just trying to

9    clarify because I think there was a little confusion

10   earlier.  So, although -- and, actually, in fact,

11   Dr. Prentky, you have made this diagnosis of paraphilia NOS

12   hebephilia in prior cases, correct?

13   A.   Yes, that's correct.

14   Q.   In fact, you testified in another Adam Walsh case

15   before Judge Saris:  United States versus Joel Wetmore with

16   paraphilia NOS hebephilia, correct?

17   A.   Yes.

18   Q.   Now, although you believe that the diagnosis of

19   paraphilia NOS hebephilia can be a legitimate mental

20   disorder, you don't think that Mr. Carta can be diagnosed

21   with that disorder, correct?

22   A.   Oh, yes, indeed.  I think that Mr. Carta is a vastly

23   different case than Mr. Wetmore, and I don't think the two

24   are comparable in this regard.

25   Q.   And you're familiar with the diagnostic criteria for

1   paraphilia NOS, correct?

2   A.   Yes.

3   Q.   And did you consult the DSM-IV in connection with

4   drafting your report in this case?

5   A.   You mean to consult the general paraphilia criteria?

6   Q.   Yes.

7   A.   I have those criteria available to me.  I didn't

8   actually have to open up the DSM.  I have them copied and

9   available to me.

10  Q.   Okay.  So you're familiar with the DSM-IV diagnostic

11  criteria for paraphilias?

12  A.   Yes.

13  Q.   And I'm going to show you on the camera here what has

14  been previously marked as Exhibit 11, and, Dr. Prentky,

15  you would agree that the first criteria for paraphilia is

16  recurrent intense, sexually arousing fantasies, sexual urges,

17  or behaviors, generally involving, and for our purposes

18  here, it would be generally involving children or other

19  nonconsenting persons that occur over a period of at least

20  six months?

21  A.   Yes.

22  Q.   And for our purposes here, the word "children" includes

23  children between the ages of 11 and 14, correct?

24  A.   That's correct as long as we're talking about the

25  general criteria for paraphilia as opposed to pedophilia;

1    that's different.

2    Q.   Okay, but for our purposes in trying to determine

3    whether Mr. Carta can be diagnosed with paraphilia NOS

4    hebephilia, when we look at the first criterion, we're

5    focusing on whether he has recurrent, intense sexually

6    arousing fantasies to children between the ages of 11 and

7    14?

8    A.   That's correct.

9    Q.   And now in your opinion, Mr. Carta doesn't meet this

10   first criterion?

11   A.   I think I'll try to answer your question, but let me

12   make a somewhat broader view of this, and, that is, I posed

13   the question in my mind of what the -- Mr. Carta's sexual

14   preference is.  In the broadest sense that to me would be my

15   definition, whatever his sexual preference would be, would

16   be my definition of what would result in recurrent, intense

17   sexually arousing fantasies and urges.

18       I think that that would be a reasonable definition for

19   any of us.  That's where I became stuck, as it were, trying

20   to comfortably diagnose him as a hebephile.

21   Q.   Well, Dr. Prentky, I'm just sort of not focusing on

22   your definition; I'm focusing on the definition that's

23   listed here in the DSM-IV for paraphilia, and my question

24   is:  in your opinion does Mr. Carta meet Criterion A; in

25   other words, does Mr. Carta have recurrent, intense sexually

1    arousing fantasies, sexual urges or behaviors, involving

2    children between the ages of 11 and 14?

3    A.   I guess I would have to say in response to that

4    specific question, counsel, no.

5    Q.   So, Dr. Prentky, you're aware, though, that when

6    Mr. Carta was 28 years old he had oral sex with an

7    intoxicated 13-year-old boy?

8    A.   I'm well aware of the long list of his encounters with

9    young teenagers, yes.

10   Q.   Okay.  That's good, but I'm specifically asking you

11   whether you're aware that Mr. Carta had sex, oral sex, with

12   an intoxicated 13-year-old boy when Mr. Carta was 28 years

13   old?

14   A.   Yes.

15   Q.   You're also aware that when Mr. Carta was 30 or 31

16   years old he engaged in sexual activity with a 13-year-old

17   boy on 30 or 40 separate occasions?

18   A.   That encounter, counsel, of course, goes on for awhile.

19   Obviously, the 13-year-old would not remain 13, but it

20   certainly did begin when the youngster was 13 years old.

21   Q.   And just focusing on your report here, on Page 8 at

22   the bottom here, No. 4, you say:  "Mr. Carta engaged in

23   sexual activity with a 13-year-old on 30 to 40 occasions

24   when he was 30 or 31," correct?

25   A.   Yes.

1    Q.    Okay.  And you're also aware that when Mr. Carta was

2    31 years old he had a sexual relationship with a 13-year-old

3    boy for approximately three to four years?

4    A.    Right.  And, counsel, obviously, again, he doesn't

5    remain the same age for a number of years; he does get older.

6    Q.    Right, but it started when the boy was 13 years old,

7    correct?

8    A.    That's correct, it started when he was 13.

9    Q.    And now Mr. Carta took this boy from California where

10   he was sort of following the Grateful Dead and brought this

11   13-year-old boy with him to Connecticut, correct?

12   A.    Yes.

13   Q.    And as a result of that conduct, the boy's parents

14   actually filed a complaint with the police based on

15   Mr. Carta taking their son across country without their

16   permission; do you remember reading that?

17   A.    I don't recall that in particular, no.

18   Q.    Okay, and do you remember that when the boy got to

19   Connecticut with Mr. Carta he ran away?

20   A.    I seem to recall that.

21        THE COURT:  Just you need to make sure the mic

22   catches this.  All right.

23   Q.    And you don't mention this in your report, right; you

24   don't mention that Mr. Carta took a 13-year-old boy from

25   California to Connecticut?

1    A.   No, I do not.  It's not in the report.

2    Q.   Now, when Mr. Carta was in his 30s he engaged in sexual

3    activity with a different 13-year-old boy, correct?

4    A.   Well, what I indicate in my report is that there were a

5    total of three.  I don't know whether you're counting more

6    than that.

7    Q.   Well, when Mr. Carta was 39 years old he solicited a

8    13-year-old boy on the internet who lived two towns over

9    from him, right?

10   A.   I believe this is No. 5, Item No. 5, in my report.  I'm

11   not certain; I don't specify the location.

12   Q.   Okay.  Well, I'm going to show you a document which

13   has been marked as Exhibit 25, and this comes from the Sex

14   Offender Treatment Program Psychosexual Evaluation, and the

15   Bates No. is 944, and here it says:  "Mr. Carta reports that

16   at 39 he began chatting on the internet with a 13-year-old

17   male who propositioned him," Mr. Carta, "for sex.  The boy

18   lived two towns over from Mr. Carta, who picked the child up

19   and performed fellatio on the child."

20        Do you recall considering that as part of your

21   assessment?

22   A.   Yes.

23   Q.   Do you recall considering that as part of your

24   assessment?

25   A.   Yes.

```
1    Q.   So based on the records that we have, from the time

2    Mr. Carta was in his late 20s to at least the age of 39,

3    right before he went to federal prison, he engaged in

4    sexual activity with at least three 13-year-old boys?

5    A.   Yes, that's correct.

6    Q.   And this sexual activity with the 13-year-old boys

7    occurred over a period of several years, correct?

8    A.   For one of those boys, yes.

9    Q.   But this sexual activity with 13-year-olds occurred for

10   at least a decade, from the time Mr. Carta was in late 20s

11   until the time he was in his late 30s?

12   A.   I'm sorry, what are you asking?

13   Q.   What I'm asking you, Dr. Prentky, is:  from the time

14   that Mr. Carta started engaging in sexual activity -- now we

15   know about the 13-year-old boys, that started when Mr. Carta

16   was in his late 20s, correct?

17   A.   Yes.

18   Q.   And from the time he was in his late 20s until he was

19   39 years old?

20   A.   Spanned a decade of his life --

21   Q.   Yes.

22   A.   -- yes.

23   Q.   So despite all of this, Dr. Prentky, you don't believe

24   that Mr. Carta meets the first criterion for paraphilia;

25   again, which is recurrent, intense sexually arousing
```

```
1    fantasies, urges, and behaviors involving children between
2    the ages of 11 and 14 over a period of at least six months?
3    A.   I don't doubt that these encounters occurred despite
4    the fact that they're only by Mr. Carta's self-report.  My
5    statement before, and, obviously, I might have acknowledged
6    in my report that he discloses these youngsters.
7        The question in my mind in diagnosing paraphilia is what
8    is his sexual preference, what is his desired or most
9    desired sexual object choice; and if you look at all of the
10   kids that he has been sexual with, it seems to me that the
11   weight of evidence clearly that his favored object choices
12   are older than that.  So I don't dispute that he reports
13   that there are these 13-year-olds in his life, but there
14   are far more kids that he also reports being sexual with
15   that were years older.
16   Q.   All right.  Dr. Prentky, the diagnostic criteria from
17   the DSM doesn't say that you should consider the person's
18   sexual preferences, does it?
19   A.   It says intense, recurrent sexual urges and fantasies.
20   Beyond that, it doesn't give us any guidelines.  It doesn't
21   tell us how to make that judgment.  It doesn't tell us,
22   for instance, if you take the word "recurrent," recurrent
23   certainly implies more than once, but it doesn't tell us
24   how many times more than once recurrent is.  It doesn't
25   tell us how to go about thinking about intense, what does
```

1    intense mean ... so, I mean, these judgments ultimately are
2    subjective.
3    Q.   So, Dr. Prentky, then you're interpreting sexually
4    arousing fantasies, urges, or behaviors to mean sexual
5    preference, correct?
6    A.   When it comes to something like hebephilia or
7    pedophilia, I would answer yes to that question.
8    Q.   And we're specifically talking hebephilia here?
9    A.   That's correct.
10   Q.   So since we're talking about hebephilia, you would
11   interpret sexual fantasies, urges, or behaviors to mean
12   sexual preferences?
13   A.   Yes, I would interpret the entire sentence which you
14   read, which, of course, is exclusive of recurrent, intense
15   sexually arousing fantasies, sexual urges, and behaviors.
16   Q.   Okay.  So that whole first sentence in your mind means
17   that we should consider the person's sexual preferences?
18   A.   Well, I'm not suggesting that you should or the Court
19   should.  I'm suggesting that that's the way I try to
20   operationalize it.
21       My understanding, and I'm only giving you my attempt to
22   formulate this in a way that is consistent for myself, this
23   is an area of enormous ambiguity.  I appreciate that there's
24   a lot of unreliability here.  The only thing that I can
25   control is my own reliability, so I try to create a standard

1  for myself that I can apply so that at least I try to be

2  consistent.

3  Q.  Dr. Prentky, in your view then having sex with a

4  13-year-old on 30 to 40 separate occasions is not recurrent?

5  A.  Obviously, that's preposterous, but as I pointed out

6  before:  if the 13-year-old was in his life for several

7  years, and I don't know what length of time, then,

8  obviously, he's no longer 13; it spans a period of at least

9  13, 14, or perhaps even 15.

10  Q.  Okay, but we don't know when those 30 or 40 occasions

11  occurred, right?  Those 30 or 40 occasions of sexual

12  activity could have occurred entirely when the boy was 13 or

13  14 years old; it's possible, right?

14  A.  Anything is possible including the fact that he wasn't

15  even 13, okay ... I mean, we're accepting at face value that

16  Mr. Carta says he was 13 that he actually was.  Mr. Carta

17  may not even have known his exact age.

18  Q.  He actually could have been younger than 13?

19  A.  He could have been younger; he could have been older.

20       THE COURT:  This wasn't the boy who came in from

21  California, was it; the one he was involved with for four

22  years?

23       MS. SERAFYN:  I don't think so, your Honor.

24       THE WITNESS:  No.

25       MR. GOLD:  I think we'll sort it out later; it's our

1    position that it is the same person.

2          THE COURT:  So despite the complaint, nobody came

3    and got this boy?

4          MS. SERAFYN:  No, I think, your Honor, the confusion

5    may be that the boy ran away after he came to Connecticut

6    and so I guess it's not clear when those 30 or 40 instances

7    occurred, whether they occurred in California, whether they

8    occurred partly in California and then in Connecticut.

9    That part is just unclear.

10         THE COURT:  How long was he in California, several

11   years, right?

12         MS. SERAFYN:  I think it was three years.

13         THE WITNESS:  Four years.

14         THE COURT:  So it could have been over that span of

15   time?

16         MS. SERAFYN:  That's right, but the record isn't

17   clear.

18       BY MS. SERAFYN:

19   Q.   So, Dr. Prentky, if you believe then that you wanted

20   to operationalize this criterion by determining Mr. Carta's

21   sexual preferences, let's just talk about that for a minute

22   ... so Mr. Carta admitted that his primary sexual

23   attraction is to 13- to 17-year-old males, correct?

24   A.   I'm sorry, what was the age range you said?

25   Q.   13 to 17.

1    A.    That's not what he indicated to me.

2    Q.    Do you remember looking at that in the records?

3    A.    I believe if that comes from Butner, I believe there is

4    a report to that effect, but there's some inconsistencies.

5    Q.    Okay.  So I'm just going to draw your attention to

6    Exhibit 25, Bates Stamp 945, and it says right here in the

7    middle:  "Mr. Carta indicates that his primary attraction is

8    for 13- to 17-year-old males."

9         Do you see that?

10   A.    Yes.

11   Q.    Okay, and did you consider that when determining

12   whether to diagnose Mr. Carta with paraphilia NOS

13   hebephilia?

14   A.    I'm not sure where you're reading from.

15   Q.    It's right here.

16   A.    No, no, no.  I mean what documents?

17   Q.    This comes, again, from the, from the psychosexual

18   evaluation.

19   A.    Yes, that's what I thought you were referring to, the

20   eval that was done at Butner.

21   Q.    Now, and he admitted his attraction to 13- to

22   17-year-olds in 2005, correct?

23   A.    What is the date that this report says, is that what

24   you're asking me?

25   Q.    Mr. Carta said he likes boys who are in the midst of

1    puberty, right, or again, so the same document here, at the

2    highlighted portion at the bottom it says:  "He says that he

3    likes youths who are in the midst of puberty and developing

4    secondary sexual characteristics that he can achieve orgasm

5    with."

6        Do you see that?

7    A.   Yes.

8    Q.   And you read this document in determining whether you

9    could diagnose Mr. Carta with hebephilia?

10   A.   Yes, I read this document, counsel.

11   Q.   But did you consider this information when attempting

12   to diagnose Mr. Carta?

13   A.   Counsel, I weighed it.

14   Q.   It's a yes or no question, Dr. Prentky.

15        MR. GOLD:  May the witness finish the answer, your

16   Honor?

17   A.   In all of the evidence that was available to me,

18   there's an overwhelming number of reports from Mr. Carta,

19   and they're not always consistent.  As I said to you, what

20   he shared with me was entirely consistent with what he was

21   learning when he was down in Butner.

22   Q.   Now, you read Mr. Carta's Sex Offender Treatment

23   Program homework, right?

24   A.   Yes.

25   Q.   Now as part of that sex offender treatment homework,

1    Mr. Carta stated, and this comes from Exhibit 27, Bates

2    Stamp 1030, Mr. Carta answered the question:  "What is your

3    preferred age range?"  For males he said the youngest that

4    he prefers is age 13, and the oldest is age 28, do you see

5    that?

6    A.   Yes.

7    Q.   Okay, and you read this, Doctor, and considered it as

8    part of your diagnosis, correct?

9    A.   That's correct.

10   Q.   Now, in addition to Mr. Carta disclosing this

11   information while at Butner about his preferred age range,

12   we can also glean information about his preferred sexual age

13   range from his child pornography collection, correct?

14   A.   That's extraordinarily difficult on two accounts:

15   one, determining the current age of the child accurately,

16   and, two, determining Mr. Carta's interest in that child.

17   Q.   Well, Dr. Prentky, in your report on Page 8, the last

18   paragraph, you say:  "Evidence of interest in younger

19   children must come from the child pornography that was

20   confiscated or from Mr. Carta's disclosure while in SOTP."

21       Do you see that?

22   A.   Yes, of course.

23   Q.   Okay.  So based on this report, we can glean

24   information from Mr. Carta's preferred sexual age range

25   from his child pornography collection?

1    A.   What was the question?

2    Q.   That was a question, yes.

3    A.   I didn't hear the end of it.

4    Q.   The question was, Dr. Prentky:  we can glean from

5    Mr. Carta's child pornography collection his preferred

6    sexual -- his preferred interest in the age range, and that

7    age range seemed to be 11 to 14 years old; is that right?

8         THE COURT:  That's a two-part question.

9         MS. SERAFYN:  Okay.  Let me back up.

10        THE COURT:  Well, does it matter which pictures

11   he's collecting, what the age range is; would that be

12   clinically significant to you?

13        THE WITNESS:  Your Honor, there are two major

14   issues:  one, understanding the age of the individuals that

15   we're looking at on the screen and determining whether --

16        THE COURT:  Hopefully, we're not.

17        THE WITNESS:  All right.  It is obvious that it is

18   problematic, and, the second issue, of course, is, as I

19   mentioned earlier this morning, Mr. Carta assembled a large

20   range of pornographic images that I believe well exceeded

21   the range of his sexual interest and nonsexual preferences

22   for purposes of trading ... so in looking at particular

23   images, it's not clear whether he gathered those images

24   because he, himself, preferred them and wanted them for

25   purposes of his own sexual gratification or for purposes

1    of trading; and as I said, it's also difficult to know

2    looking at these kids how old they are.

3    Q.   And you believe that by determining what the age

4    ranges were in his child pornography collection we can

5    gather some information about his preferred sexual interest?

6    A.   If you're asking about that sentence, counsel, I think

7    all I was trying to say is that I would be derelict if I

8    ignored as potential evidence the child pornography that

9    was confiscated from his computer.

10   Q.   Well, when you met with Mr. Carta, he told you that he

11   selectively looked at pictures of boys in the age range of

12   14 to 18 for purposes of sexual gratification, right?

13   A.   Correct.

14   Q.   And you met with Mr. Carta after the first trial in

15   this case, right?

16   A.   Yes, that's correct.

17   Q.   And you didn't testify and contrast, correct?

18   A.   That's correct.

19   Q.   But you have the transcripts, right?

20   A.   Yes.

21   Q.   And in that trial there was a discussion of hebephilia,

22   and there was an age range that was discussed during the

23   trial, correct?

24   A.   Yes.

25   Q.   And it was after that trial that Mr. Carta told you

1  that he prefers boys aged 14 to 18, right?

2  A.   Yes, that's correct.

3  Q.   Now, he also told you that the majority of the pictures

4  that he had in his child pornography collection, that he

5  actually never even looked at, right?

6  A.   That's correct.

7  Q.   And he said that collecting child pornography was like

8  collecting baseball cards?

9  A.   That's correct.

10  Q.   All right, and you credit his statement that he, that

11  he collected child pornography solely for trading purposes?

12  A.   Not solely.

13  Q.   Not solely, but partly he collected child pornography

14  just because he wanted to collect; he was almost obsessed

15  with collecting?

16  A.   That's, again, in my experience, counsel, typical; guys

17  will amass large collections in part to use for trading

18  purposes.

19  Q.   And, again, in Mr. Carta's SOTP homework which you

20  read, he describes the child pornography collection; this

21  is Exhibit 27, Bates Stamp 1034, and it says right here:

22  "Of your child pornography collection:  did any image depict

23  the following," and it says "(Check all that apply)," and

24  Mr. Carta checked off "any child ages 3 to 6, any child 7 to

25  11," and "any child 12 to 17," right?

1    A.   Correct.

2    Q.   Okay, and then the next question is:  "What was your

3    age of preference in the child pornography," and it says,

4    "(Rate 1 for most preferred, rate 2 for next preferred,

5    etc.)"  So from the first category of children, 0 to 2,

6    there's no checkmark, right?

7    A.   Correct.

8    Q.   And that would indicate that Mr. Carta has no interest

9    in children ages 0 to 2, right?

10   A.   Yes.

11   Q.   And then the next line has "children 3 to 6," and,

12   again, there's no checkmark, right?

13   A.   Correct.

14   Q.   Now, the next line says "children 7 to 11," and

15   Mr. Carta wrote in the number "2" there, right?

16   A.   That's correct.

17   Q.   And that indicates that children ages 7 to 11 are his

18   second preference, correct?

19   A.   Yes, correct.

20   Q.   And then below that it says "children 12 to 17,"

21   Mr. Carta rated that a "1," correct?

22   A.   Correct.

23   Q.   So according to Mr. Carta's SOTP homework, his

24   preference is children 12 to 17 first and 7 to 11 second,

25   right?

1    A.   That's correct.

2    Q.   With no preference to children under the age of 6,

3    right?

4    A.   That's correct.

5    Q.   Okay.  But he told you that he only looked at pictures

6    of boys ages 13 to 18, correct?

7    A.   That's correct.

8    Q.   Now, Mr. Carta had a couple thousand images of child

9    pornography on his computer, right?

10   A.   Yes.

11   Q.   And he actually posted more than 100 images of child

12   pornography to a news group, right?

13   A.   Yes.

14   Q.   And these 100 pictures that he actually posted were

15   pictures that he actually sort of uploaded and posted to the

16   internet, right?

17   A.   Yes.

18   Q.   And those pictures contained images of prepubescent

19   boys, correct?

20   A.   Yes.

21   Q.   Now, Dr. Prentky, you don't believe that Mr. Carta's

22   primary sexual interest are boys in the age range of 12,

23   13, and 14, because he didn't tell you that, right?

24   A.   I'm not sure how to respond to that, counsel.  When

25   you said he didn't tell me, I mean, this is simply one

1    question that I asked; we talked about this, obviously,

2    for some time.

3    Q.   Well, I guess, Dr. Prentky, what I'm asking is:  you

4    don't credit the documents that I've just shown you

5    indicating Mr. Carta's preference, sexual preference, in

6    boys ages 12, 13, and 14 because he didn't tell you that;

7    what he told you was that he prefers boys in the age range

8    of 14 to 18?

9         THE COURT:  In other words, were you relying

10   primarily on his self-report?

11        THE WITNESS:  I was relying on good measure on his

12   self-report because that is all that we have; everything

13   that we're looking at is his self-report including Butner.

14   I mean, it was all his self-report including the documents

15   that you're showing me; that's his self-report as well.

16        THE COURT:  So, excuse me, now that you see these

17   documents, do you doubt what he told you?

18        THE WITNESS:  No, your Honor.  I think it's far, far

19   more complex.  I don't want to reduce this to something as

20   simplistic as a fixed and absolute age range.

21      I mean, in trying to understand what his real

22   preferences are is highly complex.  To the best of my

23   knowledge, I have not seen a PPG assessment that has been

24   done, a penile plethysmograph; that certainly would have

25   helped, or even an Abel Assessment.

1   Q.   Well, Dr. Prentky, let me stop you right there and ask

2   you about the Abel Assessment.  Now (coughing), excuse me.

3           THE COURT:  While you're coughing, what is your

4   expectation of the expected amount of time you need with

5   him?

6           MS. SERAFYN:  I would expect that I would need

7   another hour.  I'm not sure that I could finish right at 5.

8           THE COURT:  I'm not sure that your voice is going to

9   last that long.

10          MS. SERAFYN:  I think it will be close.

11          THE COURT:  Well, here's the issue, let me just go

12   off the record for just a minute.

13          THE CLERK:  All rise.

14          (Whereupon, a brief recess convened at 4:05 p.m.)

15          THE CLERK:  All rise.  Everyone can be seated.

16          THE COURT:  You're all resuscitated, energized.

17      BY MS. SERAFYN:

18   Q.   Dr. Prentky, before the break we were talking about the

19   Abel Assessment of Sexual Interest; are you familiar with

20   this instrument?

21   A.   Yes.

22   Q.   And, in fact, you've administered this instrument

23   hundreds of times in the past, correct?

24   A.   Probably not hundreds of times, but I have certainly

25   used it.

1    Q.   You've administered it more than 50 times?

2    A.   Maybe 50 times.  I'm sorry, I didn't count.

3    Q.   And you've been trained on it, administering the Abel

4    Assessment, correct?

5    A.   Yes.

6    Q.   And this instrument relies on visual reaction time in

7    response to pictures of children or adolescents or even

8    adults to assess someone's sexual interest, correct, and

9    you've actually used these tests in other Adam Walsh cases to

10   assess sexual interest, correct?

11   A.   I don't remember.

12   Q.   And in United States versus John Volungus, an Adam

13   Walsh case before Judge O'Toole, you administered the Abel

14   Assessment?

15   A.   Correct.

16   Q.   And based upon your administering of the Abel

17   Assessment in that case, you were able to determine what

18   the inmate's sexual preferences were, correct?

19   A.   I was able to provide feedback about what the results

20   of the Abel Assessment were, that's correct.

21   Q.   But you didn't use the Abel Assessment in this case,

22   right?

23   A.   That's correct.

24   Q.   And instead of administering the Abel Assessment on

25   Mr. Carta to determine his sexual interest, you instead

1  relied on his statement to you that he was most interested

2  in boys between the ages of 14 and 18, right?

3  A.   I wouldn't exactly couch it that way.

4         THE COURT:  Would you pull in the mic a little bit.

5         THE WITNESS:  Oh, sorry.  I said I wouldn't exactly

6  couch it that way.  I wouldn't say one as opposed to the

7  other.

8     I made a determination at the time that Mr. Carta's

9  history wasn't so overwhelmingly of an antisocial nature

10  that I was less concerned about using the Abel with him

11  than I was in the Volungas case.

12  Q.   So other than Mr. Carta's own statement to you, you

13  didn't do anything else to consider or to determine what

14  his actual sexual preference was in terms of age?

15  A.   Beyond trying to assimilate and make sense of the

16  overwhelming amount of information that can be gleaned from

17  the records.

18  Q.   So I want to now focus on the second criterion for a

19  diagnosis of paraphilia from the DSM-IV.  I'm showing you

20  Exhibit 11, and it's the second highlighted paragraph here

21  or highlighted sentence that says:  "For the remaining

22  paraphilias, the diagnosis is made if the behavior, sexual

23  urges, or fantasizing cause clinically significant distress

24  or impairment in social, occupational, or other important

25  areas of functioning."

1      Do you see that?

2      A.   Yes.

3      Q.   Okay.  And, again, having to operationalize this, is

4      it fair to say that impairment in social, occupational, or

5      other areas of functioning would include things like, things

6      like not being able to keep a job?

7      A.   Yes.  I'm sorry, I was actually reading the rest of the

8      paragraph.  It's actually somewhat ambiguous.  If you read

9      in the middle of the paragraph where it reads:  "For

10     Pedophilia, Voyeurism, Exhibitionism, and Frotteurism, the

11     diagnosis is --

12          THE COURT REPORTER:  Excuse me.  Could you try to

13     keep your voice up; I can't hear you.

14          THE WITNESS:  The mic is almost in my mouth.  In

15     the middle of the paragraph where it reads:  "For Pedophilia,

16     Voyeurism, Exhibitionism, and Frotteurism, the diagnosis is

17     made if the person has acted on these urges," et cetera,

18     et cetera.  And it says, "For Sexual Sadism, the diagnosis

19     is made if the person has acted on these urges with a

20     nonconsenting individual," and so forth.  And then the

21     sentence that you highlighted, it says:  "For the remaining

22     paraphilias," it seems to me that the occasion there is that

23     that is the exclusion of the affirmation paraphilias; that's

24     the way I would read it.

25     Q.   But hebephilia wasn't previously mentioned in this

1    paragraph, correct?

2    A.   Hebephilia, again, gets into sort of a diagnostic

3    conundrum, if you will, that I am using it as a paraphilia

4    NOS category because it's the only way at the present time

5    to diagnose it.

6         However, you have entered into evidence the criteria for

7    a DSM-V diagnosis called pedohebephilia, so I'm not sure if

8    the intent would be to be inclusive of that diagnosis called

9    pedophilia.

10   Q.   Dr. Prentky, I'm not asking you right now about the

11   proposal in the DSM-V.  What I'm focused on now is the

12   DSM-IV, the actual published book that we have, and this

13   comes from Page 566 in the DSM-IV, and it says:  "For the

14   remaining paraphilias," so would you agree that paraphilia

15   NOS hebephilia is kind of lumped into this category of the

16   remaining paraphilias?

17   A.   I would imagine that that would be the case.

18   Q.   And hebephilia, obviously, isn't pedophilia, voyeurism,

19   exhibitionism, or sexual sadism, right?  Those are the other

20   paraphilias that are mentioned here.

21   A.   The only reason for clustering this, counsel, is that

22   it says hebephilia has long been discussed as part of

23   this larger discussion about pedophilia.  What it is is a

24   continuous diagnosis that has to be seen as a similar kind

25   of paraphilia, differentiated only by virtue of preferred

1    choice that is made or whether it's something distinct.

2    That's the only reason that I'm mentioning it.

3            THE COURT:  Why don't we see if we can finish it

4    by 5.

5            MS. SERAFYN:  I'm trying to do my best, your Honor.

6    Q.   I just want to turn your attention back to your

7    report, Page 8, you say here in the report, this highlighted

8    section:  "It is my professional opinion that at the present

9    time hebephilia when correctly diagnosed is legitimate based

10   on one substantive consideration," and then you say:

11   "Criterion B of DSM-IV-TR specifies that the behavior, sexual

12   urges, or fantasies cause clinically significant distress or

13   impairment in social, occupational, or other important areas

14   of functioning."

15       Do you see that?

16   A.   Yes, that's correct.

17   Q.   Okay.  So you would agree that this is the second

18   criterion that you considered in determining whether

19   Mr. Carta had this diagnosis of paraphilia NOS hebephilia?

20   A.   That was my formulation, correct.

21   Q.   Okay.  And as part of your formulation, did you

22   consider that not amenable to keeping a job constituted

23   impairment in social, occupational, or other important

24   areas of functioning?

25   A.   Yes, absolutely.

1    Q.   And not showing up to a job would similarly be an

2    impairment of function, right?

3    A.   Correct.

4    Q.   And not showering would be another impairment of

5    functioning?

6    A.   That's correct.

7    Q.   Being arrested would be another example --

8    A.   Correct.

9    Q.   -- correct?  So now during these years when Carta was

10   molesting the three 13-year-old boys that we talked about

11   earlier, during that ten-year span, Mr. Carta never had any

12   meaningful employment during that time, right?

13   A.   His employment record was as I described it earlier.

14   Q.   Well, during that time that he was molesting the three

15   13-year-old boys he never held down a steady job, correct?

16   A.   No, that's correct.

17   Q.   And, in fact, there was no long-term employment history

18   at all in his entire life?

19   A.   That's correct.

20   Q.   And his entire employment history actually consists of

21   odd jobs?

22   A.   As I described this earlier, that's right.

23   Q.   And during the time that Mr. Carta was molesting these

24   three 13-year-old boys, he was pretty obsessively looking at

25   child pornography on his computer, right?

1    A.   That I don't know.

2    Q.   And while he was looking at child pornography,

3    Mr. Carta was masturbating to the images of child

4    pornography, correct?

5    A.   Occasionally.  I don't know -- I don't recall the

6    frequency of his masturbation.  I don't know that we

7    actually discussed it.

8    Q.   Well, if we look at Exhibit 27, Bates Stamp 1032,

9    Mr. Carta, as part of his SOTP homework, had to describe

10   the frequency and right here it says:  "Estimate the number

11   of masturbation episodes you engaged in while viewing or

12   fantasizing about child pornography/erotica during your

13   peak," and the range per week was from 9 to 20 hours.

14       Do you see that?

15          THE COURT:  It's actually episodes.

16   A.   It's not hours.

17   Q.   Well, episodes 9 to 20 per week, correct?

18   A.   Yes, that would be correct.

19          MR. GOLD:  What page number?

20          MS. SERAFYN:  It's Page 1032, sorry; I thought I

21   said that.

22   Q.   And Mr. Carta sometimes missed work because he was

23   looking at child pornography, correct?

24   A.   If it's so indicated.

25   Q.   Well, do you remember reading that as part of the

```
 1   records?
 2   A.   I don't recall that particular point, counsel, in these
 3   records now.
 4   Q.   Now, do you recall reading that sometimes Mr. Carta
 5   didn't shower because he was looking at child pornography?
 6   A.   I recall that in general his personal hygiene was
 7   impacted.
 8   Q.   And despite the fact that Mr. Carta reported not
 9   showering at times, missing work because he was masturbating
10   to child pornography, you found that he didn't meet this
11   second criterion; is that right?
12   A.   No, that's not right.
13   Q.   So did you find that he meets the second criterion?
14   A.   Yes, absolutely.  I think that it would be certainly
15   appropriate to conclude that his impairment was undermined
16   during that long stretch of time.  I don't think there's any
17   question about that.
18           THE COURT:  So now I'm trying to understand, so is
19   it --
20           THE WITNESS:  It's not a Criterion B issue.
21           THE COURT:  So is it, could he have had the
22   hebephilia during that decade, the paraphilia NOS; and when
23   you spoke to him, he no longer had it?
24           THE WITNESS:  Your Honor, so much of this comes from
25   the time that he's in treatment at Butner and so much of it
```

1    comes from his self-report that I honestly don't know what

2    to make of all of it.

3        When I met with Mr. Carta, my task was to try, to the

4    best of my ability, to diagnose him today, today, today, but

5    whenever I was meeting with him, not during the time that he

6    was at Butner; and self-reporting I find to be highly

7    problematic.

8        We're dealing with an overwhelming amount of evidence

9    that falls in the category of self-report, including what

10   he said to me, what he said to all of the other examiners

11   that had met with him, what he said to his therapists at

12   Butner, and it's very difficult to put all of that into

13   some coherent perspective and to make sense of it.

14           THE COURT:  I know, I got it.  So what I'm trying

15   to understand here is that assuming for the minute that the

16   self-reports were relatively accurate back at Butner, and

17   that much of it was corroborated in front of you, that he

18   had this relationship with three 13-year-olds for a decade

19   and it interfered with his significant life functions, and

20   so he would qualify as having this paraphilia NOS hebephilia

21   for at least that decade, have you -- I mean, you see this

22   all the time, you see these cases; by the time he talks to

23   you, he's not saying that.

24       So one of two things is possible:  he no longer has it

25   or he's changing his story because he's sat through a trial?

1          THE WITNESS:  I understand what you're asking me.

2     It's not my -- I guess it wasn't my impression when I met

3     with him that he was merely changing his story.  I honestly

4     believed that this individual sitting here today has

5     metamorphosed, has changed, over the years that he's been

6     in prison.

7          I think to think otherwise would be to conceive of him

8     as being an unmovable static organism.  I think that he's

9     been enormously impacted by the years and years and years

10    that he's been down, that he's been in prison, that he's

11    been left to his own devices to mull over his life, that he

12    has done soul-searching in the context of treatment, that

13    he's tried his best to come to terms with his life during

14    the half-a-year or so that he was at SOTP at Butner, and I

15    think it has changed him as a person; and what he reflects

16    to me today is not about -- it's a reflection of everything.

17    It's a reflection of his whole life in the past.  You know,

18    the discovery is also a reflection of his past that goes

19    back to the very beginning; and to try to understand who he

20    is today, I think we have to move beyond, way beyond, the

21    past and to try to, to the extent we can do it, to zero in

22    on who this individual is today sitting here in the

23    courtroom.

24         THE COURT:  But that seems to be my choice.  I mean,

25    it seems like he clearly qualifies back in that decade for

1    this definition?

2           THE WITNESS:  Correct.

3           THE COURT:  So the issue is today, it's your

4    assessment as a doctor that he's changed; the flip side is

5    the government's point of view probably is that he's

6    tailored his testimony to understanding what happened at

7    the trial, and that's going to be what's up to me to

8    decide, right?

9           THE WITNESS:  Yes, and I think that there's a larger

10   picture here, and I think that we don't -- I don't want to

11   get bogged down in trying to draw this white line across the

12   carpet, and say:  13, 14, 13, 14, and if he steps to one

13   side he's okay; if he steps to the other side, he's

14   diagnosable.

15      I don't think that that is going to help the Court, and

16   it certainly didn't help me.  I'm trying to balance it, to

17   come up with an appreciation of the likely sexual preference

18   of this individual today, and that's what I came down with --

19          THE COURT:  Sure.

20          THE WITNESS:  -- on the side of --

21          THE COURT:  That he's changed, he's moved on to

22   older teenagers?

23          THE WITNESS:  Basically, yes.

24          THE COURT:  All right.  So I don't know that we

25   need to hammer it so much on the pass, but I don't know,

1    Mr. Gold may not agree, but, I mean, it seems that if he

2    had in the past, so the issue is today, and your argument

3    basically is that he has an IQ of 132, and he listened to

4    that trial, and he changed what he said to this doctor, and

5    that's what the issue is, right?

6            MR. GOLD:  Can I lodge an objection?

7            THE COURT:  What?

8            MR. GOLD:  Or, well, you know, make a comment.  I

9    mean, I don't know that -- it's in the middle of cross I

10   understand -- but the testimony was that the majority of

11   the victims even during this period were older.  There was

12   only three in the age range.  I think that's the testimony,

13   and that's part of the basis for not giving the diagnosis

14   historically, and, I mean, that was --

15           THE COURT:  Okay, that's a fair point, and I'll let

16   you argue it later, but I'm just trying to move this ahead

17   to where the real debate point is, is has he changed.

18   Q.   You know, I see this as part of the debate.  My

19   question is to Dr. Prentky, but, Dr. Prentky, Mr. Carta was,

20   for ten years, up until the time he was 31 years old, he

21   had instances of molesting three 13-year-old boys, right?

22   A.   Correct.

23   Q.   And by the time he's 42 he's in prison, right?

24   A.   That's correct.

25   Q.   And he's been in prison since then?

1    A.   That's correct.

2    Q.   So I just wanted to show you, Dr. Prentky, just to

3    finish this point up.  This is the document that I was

4    looking for earlier, but it says right here, "Most

5    recently," and this again comes from Exhibit 25, Bates

6    Stamp 945.  It says:  "Most recently prior to his

7    incarceration Mr. Carta indicates that he was hooked on

8    masturbating to child pornography two to three times a day

9    and spending 12 to 14 hours on the computer and missed work

10   because of the time he spent on the computer and at times

11   would not even show to work."

12       Do you see that?

13   A.   Yes.

14   Q.   So, Dr. Prentky, I'm just trying to streamline things

15   so hopefully you can give a yes or no answer, but is it

16   fair to say that Mr. Carta does not meet in your opinion

17   Criterion A for a hebephilia diagnosis, but he does meet

18   Criterion B?

19   A.   That's fair.

20   Q.   Thank you.

21       THE COURT:  And that's as of today?

22   A.   Correct.  Well --

23       THE COURT:  Or is it at all times as Mr. Gold says?

24       THE WITNESS:  No.  I mean, as of today it's very

25   difficult, because as counsel pointed out, I mean, he's

1    been in prison now for years so it's rather difficult to get

2    any clear sense of his adult, you know, his adaptations

3    today, how functional or dysfunctional he would be today.

4    That actually goes to the difficulty of assessing dynamic

5    risk factors so it's hard to evaluate.

6           THE COURT:  Well, as of the period of time in which

7    he had these relationships with these 13-year-olds, do you

8    have an opinion as to what his diagnosis would have been?

9           THE WITNESS:  During that time period I would have

10   been much more comfortable assigning a diagnosis of

11   hebephilia, yes.

12   Q.   Now, Dr. Prentky, I believe on direct you testified

13   that Mr. Carta did not display any cognitive dysfunctions;

14   is that right?

15   A.   During the time that I was with him.

16   Q.   Right.  So I just want to focus your attention on

17   Exhibit 22, Bates Stamp 166, and it says here in the second

18   paragraph, that's highlighted:  "The inmate has little

19   understanding of the thoughts, feelings, and behaviors

20   involved in his sexually deviant acting out.  He harbors a

21   number of cognitive distortions related to his victimization

22   of young boys (e.g., boys need a mentor/parent in exchange

23   for sex, boys are able to make an informed choice with

24   regard to sex, etc.)"

25          Did you review this document as part of your assessment

1    here?

2    A.   Yes.

3    Q.   Okay.  So at least according to this PDS note,

4    Mr. Carta was exhibiting cognitive distortions, correct?

5    A.   This is, again, during the time when he was at Butner,

6    correct?

7    Q.   Yes.

8    A.   Yes, in 2006.

9    Q.   Now, showing you the second page of this exhibit, the

10   highlighted portion, again, says:  "The inmate continues to

11   be defensive about the harm he has caused children.  He does

12   not view his behaviors as contributing to the exploitation

13   of children.  He continues to use cognitive distortions to

14   minimize his responsibility and the perception of harm to

15   his victims.  He does not appear to understand the gravity

16   of the sexually deviant behaviors."

17        Do you see that?

18   A.   Yes.

19   Q.   Now, again, this is from 2006; nothing has changed for

20   Mr. Carta since 2006, right?

21   A.   I'm sorry, how do you mean nothing has changed?  Do

22   you mean he's in prison; is that what you're asking?

23   Q.   Well, if he continues to be in prison; he hasn't had

24   any meaningful sex offender treatment since 2006, has he?

25   A.   Other than that which he's been exposed to at FMC

1    Devens.

2    Q.   And, I'm sorry --

3         THE COURT:  Has he had some at Devens?

4         THE WITNESS:  I said other than whatever he's been

5    exposed to during the time that he's been at FMC Devens.

6    Q.   I don't understand, Dr. Prentky.  Are you saying that

7    Mr. Carta has had sex offender treatment at Devens?

8    A.   I said whatever he's been exposed to.

9    Q.   I don't understand what that means.  Has he had

10   treatment, sex offender treatment, at Devens or not?

11   A.   I'm saying I don't know --

12        THE COURT:  He doesn't know.

13   A.   -- what he's been exposed to.

14   Q.   So as far as you're aware, the only sex offender

15   treatment that Mr. Carta has had is the treatment that you

16   discussed on direct at Butner that he voluntarily withdrew

17   from, correct?

18   A.   That's the only structured program, the only sex

19   offender treatment program that he's been in.

20   Q.   And he was in that program in 2005, correct?

21   A.   That's correct.

22   Q.   And he only lasted about seven months, right?

23   A.   That's correct.

24   Q.   So his treatment started and ended before the 2006

25   note in Exhibit 22 I just showed you that talked about his

1    cognitive distortions, right?

2    A.   I'm not sure.  I don't recall the exact date that he

3    left treatment.  It seems to me that it was in the same

4    year, that is, in the year 2006; I don't remember what

5    month it was.

6    Q.   I'm sorry, 2006 was when he started treatment or ended

7    treatment?

8    A.   No, ended, I believe that it was during 2006 when he --

9    Q.   So you testified that Mr. Carta voluntary dropped out

10   of sex offender treatment, correct?

11   A.   Yes.

12   Q.   Because he no longer wanted to participate in it,

13   right?

14   A.   Correct.

15   Q.   And so I'm showing you Exhibit 19 here, and it says:

16   "On March 1st, 2006, inmate Carta submitted a copout to

17   withdrawal from the sex offender treatment program.  He

18   stated that he no longer wants to be in sex offender-

19   specific treatment and can no longer tolerate the demands

20   of treatment."

21       Do you see that?

22   A.   That's correct.

23   Q.   Okay.  And you considered that as part of your

24   assessment, right?

25   A.   Yes.

1    Q.   And Carta, Mr. Carta, admitted to one of his treatment

2    providers that he was attracted to some of the

3    younger-looking inmates in his treatment group?

4    A.   Correct.

5    Q.   And we know that from this document here, Exhibit 21,

6    which says that, "Mr. Carta does not think he has what it

7    takes to complete treatment.  He admitted that he has

8    purposefully placed himself in positions to be close to the

9    young members who he is sexually attracted to."

10        Do you see that?

11   A.   Yes.

12   Q.   Now, when we were talking a bit earlier about the

13   specific reasons why Mr. Carta withdrew from treatment, and

14   I wanted to direct your attention to Exhibit 27, Bates

15   Stamp 955; do you recall ever reviewing this document?

16   Let's see if I can find it ... it comes from this Sex

17   Offender Treatment Program Discharge Report dated March 5th,

18   2006.

19        Do you see that?

20   A.   Yes.

21   Q.   So do you recall reviewing Bates Stamp 955?

22   A.   Yes.

23   Q.   And in this document here, I don't want to read the

24   entire highlighted section, but it says that:  "Prior to

25   his actual termination, Mr. Carta spoke of quitting

```
1   treatment on numerous occasions, and he impulsively

2   submitted at least two written requests that he quickly

3   regretted and withdrew."

4       Do you remember that?

5   A.   Yes.

6   Q.   Okay.  And then this report goes on to say that, "Other

7   program participants began reporting that, not only was

8   Mr. Carta focusing the majority of his attention on young

9   members, that he was covertly fueling their dissatisfaction

10  with treatment by reinforcing their antisocial attitudes and

11  deviant sexual behaviors."

12      Did you consider that as part of your risk assessment;

13  in other words, the reason for Mr. Carta withdrawing from

14  treatment?

15  A.   Counsel, those are two different questions.

16  Q.   Dr. Prentky, did you consider the fact that Mr. Carta

17  withdrew from treatment because he was focused on his sexual

18  attraction to younger members of the group as part of his

19  sexual treatment?

20  A.   Yes.

21  Q.   And did you also consider, just showing you the bottom

22  of this page, this statement here where it says -- let's see

23  -- I'm sorry, I'm actually going to show you the next page,

24  Page 956, just to kind of streamline things.

25      It says right here at the bottom of this page:  "His
```

```
1    behavior in treatment mimicked his offense cycle in the

2    community in which he sought out contact with the younger

3    program participants who he groomed in sexually provocative

4    ways all under the guise of helping them?"

5         Did you consider that as part of the risk assessment?

6    A.   I read it, counsel.  Did I consider it as part of my

7    risk assessment, no.

8              THE COURT:  Well, let me ask you this on the part of

9    whether or not he's in serious danger in not reoffending,

10   serious difficulty in not reoffending, does this give you

11   concern?

12             THE WITNESS:  No.

13             THE COURT:  Why?

14             THE WITNESS:  This issue, in particular, came up

15   earlier.  The whole notion that he was in cycle, because

16   he's attracted to other men at Butner, seems not to

17   personally be germane when it comes to estimating the risk

18   that he may pose out in the community today for reoffending

19   against an underaged youngster; that we may consider that

20   any involvement, henceforth, that Mr. Carta has with 19 and

21   20-year-olds to be maladaptive given his age, but they're

22   not illegal.

23        I don't expect for the rest of his life that there's a

24   high likelihood that he's going to establish his strongest

25   bonds and his longest relationships with people his own
```

age.  I would guess that whatever his preferences are today

they're going to be, as we see them, for young men in the

vicinity of 20 years old.

I think that he clearly, clearly understands at this

point that young teenage boys are off-limits.  There's no

question in my mind that he has been -- that that message

has been permanently burned, burned inexorably, into his

unconscious mind, and either he'll go in haste or he'll find

himself a legal young man, and those legal young men may be

in their early 20s, but I don't consider that evidence that

he was in cycle, that he was sexually attracted to other

inmates there.

As I said before, if he wouldn't be arrested, then I

don't assume that we're talking about 13-year-olds being in

the treatment program at Butner, then I believe what we

see is what we've got; that that is what he's going to

experience when he returns to the community:  primary

sexual attraction to young men around the age of 20.

Q.   But, Dr. Prentky, as you just said, there obviously

are no children in the sex offender treatment program,

correct?

A.   That's correct.

Q.   So this reference to Mr. Carta continuing in his

offense cycle in prison focuses on the fact that Mr. Carta

was attracted to the youngest-looking members in his

1    treatment group, right?

2    A.   That's correct.

3    Q.   And you think, though, that Mr. Carta has changed

4    since the time that he was 39 years old and sexually

5    molesting a 13-year-old boy, right?

6    A.   That's correct.

7    Q.   And you think he's changed just by virtue of the fact

8    that he's been in prison, correct?

9    A.   I would never want to underestimate the import of eight

10   years in prison for modifying behavior.  I think that's

11   what prison's all about.  It's a clearly significant

12   sanction to deprive someone of their liberty for eight

13   years.

14       Somebody certainly as intelligent as Mr. Carta

15   understands that, and that's one thing that he did say to

16   me that I think is accurate.  He said that if I ever did

17   anything like that again I would deserve to spend the rest

18   of my life in prison because I would be a stupid idiot.

19   Q.   And so Mr. Carta hasn't changed because of anything

20   that he learned in treatment because he only lasted seven

21   months in treatment, right?

22   A.   I would certainly not say, counsel, that he hasn't

23   learned anything, he hasn't benefited in any way by the

24   seven months he was in treatment.  I don't think that's a

25   fair representation.

1   Q.   So you saw evidence in the record of Mr. Carta

2   benefiting from the seven months of treatment that he had

3   before he withdrew?

4   A.   What I saw, counsel, is an enormous amount of struggle,

5   and I believe that that's part and parcel of the engagement

6   in treatment.  It's not unusual for people to have to

7   overcome that resistance in his case to what he had been

8   doing for the better part of his entire life.

9        He comes in, you know, at the age of 40, right, and he's

10  being asked to rethink his entire life.  He's been asked to

11  repath everything that he's ever done in a criminal life.

12  He's being reasked to define all of his prior sexual

13  contacts as not only criminal in nature but harmful in

14  nature, and that's a lot to swallow, and the fact that he

15  responded rebelliously is probably not unexpected.

16       I would have preferred that he move through the

17  rebelliousness and continue his involvement, but it doesn't

18  mean that the time was meaningless.

19  Q.   So, Dr. Prentky, Mr. Carta identified several goals

20  that he had before he entered the sex offender treatment

21  program.  Do you remember that?

22  A.   Yes.

23  Q.   So one of his goals, this comes from Exhibit 24, was

24  to -- Item No. 3 here, one of his goals was being able to

25  work a regular job.  Do you remember that?

```
1    A.   Yes.

2    Q.   Now, Mr. Carta admitted that he actually quit most of

3    the jobs that he had because he doesn't like being told what

4    to do, right?

5    A.   Yes.

6    Q.   And that's also one of the reasons why he withdraw

7    from the treatment program, because he didn't like the

8    sort of rules that had been established for the treatment

9    program, right?

10   A.   Perhaps you could capture it that way.  I'm not sure if

11   it was the rules, the regimentation, the structure of the

12   treatment program as much as the expectation that he was to

13   probe and essentially evacuate all thoughts and fantasies

14   and disclose in a way that at that time he simply couldn't

15   do.

16   Q.   So, Dr. Prentky, you didn't see any evidence in the

17   record that in the seven months that Mr. Carta was in

18   treatment before he withdraw, you didn't see any evidence

19   that he learned any skills that would enable him to begin to

20   work a regular job, did you?

21   A.   I'm not sure honestly, counsel, what skills would be

22   evident in the course of SOTP that would speak to his

23   ability to sustain employment.

24   Q.   Well, Dr. Prentky, I'm not talking about the skills as

25   in trades; I'm talking about characteristics or qualities,
```

1    and, obviously, Mr. Carta identified that he's not able to

2    follow rules or the reason why he quit the jobs, what I'm

3    asking you is, is there any evidence that you saw that he

4    learned anything through treatment that would enable him to

5    hold down a job?

6    A.    Just, counsel, I'm very much of the mindset that the

7    most important time for Mr. Carta, as for all these men who

8    are released, will be their aftercare plans and will be the

9    time they spend in treatment, not in prison, but in the

10   community where the issues that you're talking about, the

11   very legitimate issues, become absolutely real, and they

12   become harder in treatment, and that will be the most

13   important treatment experience that he has.

14   Q.    So let's look at No. 1 then, one of his other goals was

15   not being alone anymore and locked in his home looking at a

16   computer, and you testified earlier that Mr. Carta spent a

17   great deal of time looking at child pornography, right?

18   A.    Yes.

19   Q.    Now, did you see any evidence in the record that

20   Mr. Carta learned anything during his seven months in

21   treatment that would enable him to achieve this goal of not

22   being alone anymore, locked up anymore, looking at his

23   computer?

24   A.    Counsel, I think that there's a certain naivete there;

25   that this is part of how you construct the very best

1    aftercare plan for him; that this should not be left

2    entirely up to Mr. Carta to decide how he's going to

3    socialize.  It's part of his whole treatment plan, part of

4    his supervision, and built into that are orchestrated,

5    structured activities that provide him that kind of social

6    life, should all be built in, so it shouldn't be left up to

7    him to do that.

8    Q.   Dr. Prentky, I'm not focusing on Mr. Carta's release

9    plan; I'm focused exclusively on what he may or may not

10   have learned during the seven months of treatment that he

11   had throughout his eight years in prison.

12       So my question is, do you see any evidence in the record

13   that he learned anything, gained any skills, learned any

14   techniques, to achieve, in treatment to achieve this goal of

15   not being on his computer, looking at child pornography for

16   hours on end?

17   A.   I tried to answer your question.  I guess what I meant

18   was that I don't know that there's anything that you can

19   learn in treatment other than in principle that it's sad to

20   be lonely; it's sad to be isolated, it's sad to be alone;

21   it's better to be out and be socialized.  You can learn

22   that in principle, and, apparently, he gave that as a goal,

23   but until he's outside, until this becomes actualized,

24   until it's real, I'm not sure that there's anything that

25   he could learn in treatment that would facilitate that

1   happening.

2   Q.   So, Dr. Prentky, have you treated sex offenders before?

3   A.   Yes.

4   Q.   And, generally, seven to eight months, which is the

5   amount of time Mr. Carta was in treatment, that's not

6   sufficient for someone to complete treatment, is it?

7         THE COURT:  I think we need to -- when you finish

8   answering this question, we need to talk.

9   A.   I'm not sure what complete treatment means.  I don't

10  want to avoid your question.  Generally, sex offenders are

11  in treatment for much longer than six or seven or eight

12  months, but he could be in treatment for the rest of his

13  life in the community.

14      The question really isn't so much the length of time; I

15  think it's really the context of treatment that would be

16  important.

17        THE COURT:  So how much longer do you have?

18        MS. SERAFYN:  Under an hour.

19        THE COURT:  Well, we're not going to stay here until

20  6; that's for sure so I don't know what to do.  When are we

21  meeting again?

22        MR. GOLD:  The schedule right now, your Honor, is

23  Mr. Carta intends to testify on Monday, and we have a second

24  expert who's scheduled to testify on Monday and Tuesday,

25  and it should be completed.  Dr. Prentky's schedule is he's

1  regularly available on Thursday and Fridays; he teaches

2  those first three days of every week.

3      THE COURT:  Next Thursday and Friday are not doable

4  for me so we'll have to -- there's a chance that I could --

5  I cannot do it on Friday -- Thursday at all but I could

6  possibly do it -- I don't know if I can do it Thursday and

7  Friday, or in the morning.  I definitely can't do it Friday

8  afternoon; I'll just have to get back to you because we're

9  right now blocked off.  Whether I can have an hour first

10 thing in the morning, I don't know, possibly, and I'll let

11 you know on Monday.  Do you want to potentially put it in

12 for either Thursday or Friday morning?  Well, how much

13 redirect will you have?

14      MR. GOLD:  Pretty limited, but I've got a humdinger

15 that I just want to make sure I get in, but probably half an

16 hour or so or 20 minutes.

17      THE COURT:  Well, here's the issue:  Thursday my

18 mother's going in for surgery, so I don't know exactly what

19 time it is and I'm supposed -- I got to be there.  So if

20 it's an hour and if it's sort of going in later in the

21 morning, I could come in quick and then go take her but I

22 don't want to come back a second time; that's my issue, and

23 so for whatever reason this is taking a lot longer than

24 either of you predicted.  We started at 10; I'm not sure why

25 we did that.  I think it had something to do with someone's

1   schedule; I don't know what to say, so at this point I will

2   let you know on Monday what my situation is.

3       MR. GOLD:  Very good.  I'm sorry, where are we with

4   the Friday morning?  It's in-depth, but we'll learn on

5   Monday?

6       THE COURT:  You'll learn on Monday, all right?  So

7   just keep those times open, I will figure it out, but I need

8   to know timing.  You think it would be, I would just ask,

9   an hour, and I cut you off in an hour, and a half an hour,

10  and I would cut you off at half an hour because I have all

11  this stuff going on.  I had pretty much been told it was

12  definitely going to finish today; that's why I could let it

13  start at 10:00 in the morning.  It didn't happen, so on

14  Monday what's the situation?

15      MR. GOLD:  Monday we have the rest of the case.

16  We're going to suspend with Dr. Prentky.  We'll put on Todd

17  Carta who's going to testify, and then Dr. Bard.

18      THE COURT:  Well, how much time do we have for

19  putting them on?

20      MR. GOLD:  I think we have eight hours over the two

21  days.

22      THE COURT:  No, it's not all day, I have an

23  evidentiary hearing on at 3.

24      MR. GOLD:  No, I meant over the two days.

25      MS. SERAFYN:  That's my understanding, 9 to 1 on

1    Monday.

2         THE COURT:  Oh, okay, that's fine.  Monday and

3    Tuesday 9 to 1, I mean, and then when's your witness coming?

4    The court-appointed expert, when he is coming?

5         MR. GOLD:  He's coming on Monday and then

6    Mr. Carta --

7         THE COURT:  Mr. Carta is not going to be done in the

8    morning.  Do you think so?

9         MR. GOLD:  In four hours I had anticipated.

10        THE COURT:  You guys aren't having much credibility

11   on time limits.

12        MR. GOLD:  I guess we don't, but I had anticipated

13   trying to make Mr. Carta's testimony focused to the points

14   that the Court has to decide but --

15        THE COURT:  Wait a second.  You can step down.  I'm

16   sorry.  When is Dr. Bard coming?

17        MR. GOLD:  Dr. Bard is going to watch Mr. Carta's

18   testimony or that's my intention.

19        THE COURT:  I don't want to pay for that.  That's

20   crazy at those kinds of rates.  Aren't you ordering

21   transcripts anyway?

22        MR. GOLD:  Well, the notion was that Dr. Bard could

23   as part of the diagnostic evaluation --

24        THE COURT:  Hasn't he already met with him?

25        MR. GOLD:  Yes, he has.

1          THE COURT:  No, no, no.  I'm not going to pay for

2     that.  If you want a transcript, fine.

3          MR. GOLD:  No, but the idea is he was available to

4     testify on Monday, starting Monday we will complete

5     Mr. Carta.

6          THE COURT:  Well, why don't we do Bard first since

7     it's impossible to get the experts in.  It's taken us four

8     months to get him in here.  I tried so hard in October,

9     November, December; it didn't happen.  To lose all of you

10    again, it's easy to get Mr. Carta in; let's do Dr. Bard

11    first, he's already talked to him.

12         MS. PIEMONTE-STACEY:  And then this Court has two

13    dates scheduled the following week, Monday and Tuesday, and

14    Mr. Carta could come back then, your Honor.

15         MR. GOLD:  I didn't want Mr. Carta to go last,

16    Judge, to be candid.  I wanted him to go before the expert.

17         THE COURT:  Well, I'm not going to pay for Bard to

18    sit here for two days.  That's not happening ... so if you

19    want -- so as far as I'm concerned, if Dr. Bard is scheduled?

20         MR. GOLD:  Well, your Honor, I think this might be

21    something we've done in another case, I mean, we could pay

22    him for those two hours.

23         THE COURT:  It's not going to be two hours.  How

24    long do you think you're going to be on direct?

25         MR. GOLD:  I think I'm going to be an hour with

1    Mr. Carta.

2            THE COURT:  How long do you think you're going to be

3    on cross?

4            MS. PIEMONTE-STACEY:  Your Honor, it wouldn't be a

5    couple hours; Dr. Bard has --

6            THE COURT:  I'm talking about Carta.

7            MS. PIEMONTE-STACEY:  Oh, sorry.

8            THE COURT:  Now, to the extent this is credible,

9    which I can't make credibility assessments anymore, then

10   Bard would start around 11:30?

11           MR. GOLD:  Right.

12           THE COURT:  And then how long would he take

13   because --

14           MR. GOLD:  Well, he goes into the next day.

15           THE COURT:  Because Dr. Prentky was on the stand for

16   how long today, about six hours, and we're not done.

17           MR. GOLD:  I believe it was five.

18           THE COURT:  I'll give you five.  Are you going to

19   have as much?  I mean, he's the court-appointed expert.  I

20   mean, he's the guy at this point who's sort of neutral.

21           MR. GOLD:  But Dr. Bard testified before, and so we

22   have part of the record here established and --

23           THE COURT:  Have you given me that transcript?

24           MR. GOLD:  Yeah.

25           THE COURT:  Well, I mean, do I have it?

```
 1              MR. GOLD:  It's on the docket.

 2              MS. PIEMONTE-STACEY:  Your Honor, I have an extra

 3       copy; I'd be happy to give you both days of testimony, and

 4       it's just Dr. Bard.

 5              THE COURT:  Good, so we just won't redo the whole

 6       thing; I can live with that.

 7              MR. GOLD:  Right, it will be very focused.

 8              THE COURT:  So give me the testimony, we'll put it

 9       in the record, and we'll take that as at least shortening

10       this thing.  No qualifications.

11              MR. GOLD:  No qualifications, I promise.  When we

12       talk about the -- I think the parties anticipate that we've

13       got free reign with respect to the record in the prior

14       trial.

15              THE COURT:  Maybe, but no, I don't know it; I just

16       simply know -- how many days, this has been?

17              MR. GOLD:  There's only three days.

18              THE COURT:  I know, but how many days -- I mean, we

19       already had this trial.  How long did we have?

20              MR. GOLD:  This is Day VI.

21              THE COURT:  Day VI, that's huge, given the fact

22       there was a full other trial.

23              MR. GOLD:  No, there was three days in the prior

24       trial and this would be Day VI.

25              THE COURT:  This would be Day IV, no?
```

1          MS. PIEMONTE-STACEY:  Tomorrow would be Day IV.  So

2     since the remand we've had two days of testimony, both of

3     those days with Dr. Phenix; today was Day III and then

4     Monday would be Day IV.

5          THE COURT:  Well, let me put it this way:  you've

6     got the days that she committed.  If this keeps gets pushed

7     off, my time is extremely constrained right now, the experts'

8     time; this could kick over into the summer, I mean, if we

9     don't finish next week, just everybody's got to have that

10    in terms of getting everyone in the front door.  That's

11    what the situation is, and I know Mr. Carta's been in jail

12    a long time, and I know I threw this little -- gave this

13    little speech in October, November, December; it didn't

14    help me at all.

15       Mr. Carta canceled the hearings the last time.  Why, I

16    still don't necessarily buy it, but he said he was in such

17    back pain that he couldn't concentrate so I deferred, but

18    it's very frustrating.  So whatever happens, it just got

19    kicked over and kicked over and kicked over, and I want to

20    finish this.  So I can't limit the amount of time with

21    Mr. Carta, I mean, that's like a due process thing; he's

22    the defendant here.

23         MR. GOLD:  That's right, Judge.  What I'd like to do

24    is discuss this with Mr. Carta over the weekend --

25         THE COURT:  Yes.

1          MR. GOLD:  -- because he's going to be locally

2     housed I hope; I think is he at Wyatt, yeah, and I'd like to

3     confer with Dr. Bard.

4        What I would propose is still I think it would be

5     helpful to the Court frankly if the court-appointed examiner

6     was there for at least a portion of the direct testimony.

7          THE COURT:  I'm not going to pay for it.  It's too

8     expensive.

9          MR. GOLD:  I want to propose --

10          THE COURT:  If you want to pay for it, that's your

11     call.

12          MR. GOLD:  That's our call but I just wanted to

13     alert the Court.

14          THE COURT:  Of course, you could let him read the

15     transcripts, and he's met with this guy forever, but the

16     one thing I'm not going to allow, given the track record

17     here, is to lose Dr. Bard from the schedule.  It will take

18     us months again, and I don't care what sequence happens ...

19     so if he can't make it that following Monday and Tuesday, I

20     want Bard first; I can always find time for Mr. Carta.

21          MR. GOLD:  Okay.

22          THE COURT:  The sequence may matter hugely for a

23     jury; it matters less hugely for me, so that's the one

24     constraint I'm going to put.  I don't want to lose Bard

25     over the next period of time, and right now I don't really

```
1    trust the time evaluations.  I'm not going to cut you off on
2    Mr. Carta; I mean, it's his liberty at stake.
3         MR. GOLD:  Right, so we're going to, with this
4    information, Judge, we'll tailor the presentation; we'll
5    figure it out.  I think, I mean, I still don't want to
6    comment, but I'm going to speak with Mr. Bard -- Dr. Bard
7    about his availability.
8         THE COURT:  That's perfect.  If he's available, I'm
9    willing to be flexible on sequence; but if not, I can't lose
10   him.  It's taken us too long.  With Dr. Prentky, we only have
11   another hour-and-a-half, so we can find some time to squeeze
12   that in.  Okay, perfect, so have a good weekend.
13        MS. SERAFYN:  Your Honor, we just don't think it's a
14   pure money issue with Dr. Bard; we actually believe that the
15   witnesses should be sequestered.
16        THE COURT:  No way.  He's a psychiatrist; he's used
17   to looking at credibility, no, no, no, no.
18        MS. SERAFYN:  Your Honor, I think the practice in
19   these cases has been to sequester the witnesses.
20        THE COURT:  He's my court-appointed expert.  It's not
21   a sequestration issue; it's a money issue.  It's not worth
22   the money in terms of two full days or a full day of
23   testimony at the rates that they're being charged; but if
24   his office wants to pay, that's fine.
25        MS. PIEMONTE-STACEY:  Your Honor, in terms of the
```

1    transcripts, do you want this formally submitted as another

2    exhibit or just note the record --

3            THE COURT:  Just show her where it is so I can read

4    it.

5            MS. PIEMONTE:  Okay, that's fine.

6            THE CLERK:  All rise.

7            THE COURT:  All right.  Thank you.

8            (Whereupon, the proceedings concluded at 5:15 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          C E R T I F I C A T E

2

3        I, Helana E. Kline, a Registered Merit Reporter,

4    Certified Realtime Reporter, and Federal Official Court

5    Reporter of the United States District Court, do hereby

6    certify that the foregoing transcript, from Page 1 to

7    Page 164, constitutes, to the best of my skill and ability,

8    a true and accurate transcription of my stenotype notes

9    taken in the matter of the United States of America v.

10   Todd Carta.

11

12

13

14

15

16

17

18

19

20

21

22

23       /s/ Helana E. Kline                  April 4, 2011

24       Helana E. Kline, RMR, CRR

25       Federal Official Court Reporter