UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


|   |   |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| | ) Civil Action |
| Petitioner, | ) No. 1:07-cv-12064-PBS |
| | ) March 21, 2011 |
| vs. | ) Non-Jury Trial |
| | ) Day IV |
| TODD CARTA, | ) 9:00 a.m. |
| | ) |
| Respondent. | |


BEFORE:  THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE


John Joseph Moakley United States Courthouse
1 Courthouse Way, Courtroom No. 19
Boston, MA  02210


Helana E. Kline, RMR, CRR
Official Court Reporter
John Joseph Moakley United States Courthouse
1 Courthouse Way, Room 5209
Boston, MA  02210

```
APPEARANCES:


For the Petitioner:


United States Attorney's Office
(By:  Jennifer A. Serafyn, Assistant U.S. Attorney &
      Eve A. Piemonte-Stacey, Assistant U.S. Attorney)
John Joseph Moakley United States Courthouse
1 Courthouse Way, Suite 9200
Boston, Massachusetts  02210
617-748-3100


For the Respondent:


Federal Public Defender Office
(By:  Ian Gold, Attorney at Law)
51 Sleeper Street, 5th Floor
Boston, Massachusetts  02210
617-223-8061
```

I N D E X

Witnesses called on behalf of the Respondent:

Testimony of:

 TODD M. CARTA

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| By Mr. Gold | 5 | | | |

```
1                      P R O C E E D I N G S

2          THE CLERK:  All rise.  United States District

3   Court for the District of Massachusetts is now in session.

4   United States v. Todd Carta, Case No. 07-12064, will now be

5   heard before this Court.

6      Will counsel please identify themselves for the record?

7          MS. SERAFYN:  Good morning, your Honor.  Jennifer

8   Serafyn for the United States.

9          MS. PIEMONTE-STACEY:  Good morning, your Honor.

10  Eve A. Piemonte-Stacey for the United States.

11         MR. GOLD:  Good morning, your Honor.  Ian Gold for

12  Todd Carta.  With me at counsel table is Tamara Fisher who

13  is a research associate, with the Court's permission?

14         THE COURT:  Yes.  Mr. Gold?

15         MR. GOLD:  Your Honor, we broke on Friday in the

16  middle of Robert Prentky's examination, and I expect we'll

17  resume that, but now we'd call the Respondent Todd Carta.

18         THE COURT:  Thank you.

19         THE CLERK:  Mr. Carta, please approach the witness

20  stand.  Please raise your right hand.

21         (Todd M. Carta duly sworn.)

22         THE CLERK:  Please be seated.  Please state your

23  full name and spell it for the record.

24         THE WITNESS:  Todd Michael Carta, T-o-d-d

25  M-i-c-h-a-e-l C-a-r-t-a.
```

```
1          DIRECT EXAMINATION BY MR. GOLD:

2     Q.   Good morning, Mr. Carta.

3     A.   Good morning, counsel.

4     Q.   Mr. Carta, what's your birth date?

5     A.   October 24th, 1960.

6     Q.   And where were you born?

7     A.   Middletown, Connecticut.

8     Q.   Did you grow up with both parents?

9     A.   Yes, I did.

10    Q.   And what were your parents' names?

11    A.   My mother's name was Lucien Carrier, and my father's

12  name was Sebastian Carta.

13    Q.   Did you have siblings?

14    A.   Yes.

15    Q.   How many?

16    A.   Three.  I had a brother named Gerry, Gerald, and then a

17  sister Anna, and a sister Jean.

18    Q.   And were they older or younger?

19    A.   They were all older.

20    Q.   How much older?

21    A.   My brother was oldest.  I believe he was about maybe 15

22  years older than me, and my sister Anna was next.  I think

23  she was about 13 years older than me, and my sister Jeanie

24  was about 7 years older than me.

25    Q.   What was your life like growing up?
```

1    A.   In our household there wasn't much love.  My mother was,

2    you know, very strict.  She never told us that she loved us.

3    I saw my sisters get beat a lot, you know, which really

4    affected me; I think it affected me more than myself as a

5    kid, but there was a lot of verbal abuse, a lot of emotional

6    abuse.

7    Q.   Is there any -- are there any instances of abuse that

8    you still reflect on or that come to your mind today?

9    A.   Absolutely.  My mother hitting my sisters and hitting

10   me, you know.

11   Q.   What did your parents do for a living?

12   A.   Well, my father worked at New England Aircraft.  He was

13   a polisher, and my mother mostly was a homemaker; she once in

14   awhile took a job in the factory, but she mostly stayed home.

15   Q.   And were your parents emotionally supportive of you and

16   your siblings?

17   A.   No.

18   Q.   What kinds of things did they tell you?

19   A.   My mother used to tell me that I was a mistake, and

20   she'd tell me stuff like she hated me, and, you know.

21   Q.   What did she mean when she said you were a mistake?

22   A.   Well, she said I was a mistake; I wish you were never

23   born.  That's what she would tell me.

24   Q.   Now, were you growing up with your siblings or were you

25   alone in that house?

A.   I was -- I grew up with my mother and my sisters until,
I would say, I was around age maybe 11.  I'm not sure, but I
was very young when they started leaving.

Q.   Mr. Carta, how far have you gone in school?

A.   Originally I completed 8th grade, but I got my GED when
I came to the prison in 2002/2003.

Q.   Why did you leave school?

A.   I was having a lot of problems in elementary school.  I
went through a lot of things where people would call me
names:  toad, for instance, crater face because of an acne
problem.

Q.   When did that start?

A.   When I was very young, probably around 11 I started
getting acne; and by the time I got to 6th grade, you know,
I no longer wanted to be there so I started acting out.  I
was, what they called me was they called me the class
clown; I started a lot of havoc in school, you know, and,
eventually, it came to the point where the teachers used to
tell me to go home so that's what I did; I started not going.

Q.   Now, there are incidents of abuse that you experienced
of a sexual nature that have been discussed in the reports.
I think the first one is when you were age 7?

A.   Yes.

Q.   Would you describe what happened; where were you first?

A.   That happened out at, I believe it was, a work site

1    where they were building a school, and there was an older

2    boy there, and I was with another kid that was around 7,

3    and he forced me to perform oral sex on the boy.

4    Q.   On the other boy?

5    A.   Yes, on the other boy.

6    Q.   If you can recall, what was your -- what was your

7    experience of that assault at the time?

8    A.   Well, I was scared.  I was afraid that he was gonna

9    beat me, beat me up, if I didn't do what he told me.  You

10   know, as far as the sexual part, I didn't really know what I

11   was doing.  I didn't have an understanding of that.

12   Q.   When you reflect on it today, do you have an emotional

13   response to that?

14   A.   Yeah, it hurt me a lot.  I think about this person that

15   did it, you know, the person who did it to me, and I don't

16   like him.

17   Q.   Does it elicit anger?

18   A.   Very much, yes.

19   Q.   Now, is there another incident of abuse that you

20   experienced as a young person?

21   A.   Yes.  My next-door neighbor who was approximately 15

22   years old at the time, he forced me to -- well, we were --

23   we played doctor in the house is what we did, and it

24   gradually got more sexual, and then he had me perform oral

25   sex on him in the swimming pool -- by the swimming pool.

```
1    Q.   And about how old were you when this took place?

2    A.   I think I was around 11.

3    Q.   Now, you said you think?

4    A.   Yeah, you know.

5    Q.   Can you estimate?

6    A.   It's a long time ago.  I don't really know the exact

7    age, but I believe I was around 11 -- 10, 11 years old.  I

8    know he was older than me.

9    Q.   Now, what was your emotional experience of that

10   incident, the swimming pool incident, at the time?

11   A.   Well, since I had already done it one time before, it

12   wasn't as bad.  You know, it wasn't -- I trusted him.  He

13   was a friend of the family's, so, I mean, it didn't affect

14   me the way the first one did.

15   Q.   And the first one continues to?

16   A.   Yes.

17   Q.   Now, we've heard testimony about your putting your

18   mouth on the genitals of a young child, and you said that

19   you were about 13 at the time that that happened?

20   A.   I estimated I was about 13, yes.

21   Q.   Well, can you describe the background to that incident;

22   what was happening at the time?

23   A.   Well, I was staying at my sister Anna's house.  I was

24   walking around her neighborhood, and I met a boy; I believe

25   he was around the same age as me.
```

1    Q.   Can I ask you, I'm sorry to interrupt, but what is --

2    why were you at your sister's house and not your home?

3    A.   Well, my sister was having a problem with -- boys in

4    the neighborhood were throwing apples at the house late at

5    night, and my brother-in-law worked so she was scared; I was

6    staying there trying to keep her company, and, eventually,

7    we caught the people, but one day in the afternoon, I

8    believe it was, I was walking around, and I saw a boy about

9    the same age as me playing with his younger brother in the

10   garage.  And I approached them, and I think we started

11   talking about penises, and I don't know exactly.  You know,

12   it's a long time ago, I don't remember exactly what

13   happened, but I believe I pulled the boy's diaper down, and

14   I performed oral sex on him.

15   Q.   For how long?

16   A.   I don't know ... maybe a couple minutes, if that long.

17   Q.   And what was going through your mind when you did that?

18   A.   It was kind of a normal thing to me.  It had been done

19   to me, so, you know, I didn't understand what I was really

20   doing.

21   Q.   What was the reaction of the boy's brother?

22   A.   I don't know if he was fascinated or interested, you

23   know.  He was watching what I was doing, you know.

24   Q.   And you were mentioning earlier today, are you sure you

25   were 13 at the time?

1    A.   No, I have no clue.  I could have been 10; I don't

2    know.  You know, I remember staying with my sister.  I try

3    to place events with things, you know, where I went, if I

4    was going to school, if I was driving cars, that sort of

5    thing, and I can't remember anything specific about that

6    point.

7        I believe my mother was in the hospital, but I don't

8    know what year it was.

9    Q.   And were you sexually mature at the time, if you recall?

10   A.   Yes.

11   Q.   How did you come to stop going to school?

12   A.   Well, I was having a lot of trouble in school.  I just

13   started skipping, and a truant officer came to my house one

14   day and told my mother that if I didn't want to go, he wasn't

15   gonna force me, and that was the end.  I stopped going.

16       My mother didn't care.  The school didn't care.  The

17   school actually didn't want me.  You know, the teachers

18   would tell me to go home when I would show up.

19   Q.   How old do you think you were about this time?

20   A.   I had to be around 13 -- 12 or 13 years old -- 13 I

21   think.

22   Q.   Well, if you stopped going to school, what did you

23   start doing?

24   A.   I started hanging out down in the woods behind my

25   house.  I would stay down there, light fires, build forts.

1    Q.   Now, when you say "your house," where were you living

2    at this time?

3    A.   I'm living in an apartment complex in Middletown.

4    Q.   And did you live in Middletown throughout your

5    childhood?

6    A.   There was a brief period where we moved, I think for a

7    little while, but not very long.  I think it was about a

8    year.

9    Q.   Did you move several times growing up in the Middletown

10   area?

11   A.   We moved many times.

12   Q.   Now, I think I asked you before but what did your days

13   start to consist of; did you start working?

14   A.   I started working when I was 15 at a used car

15   dealership.  I held that job until the summertime when they

16   needed to get full-time help.

17   Q.   And so from the age of 13 to 15 you were basically

18   going to the woods?

19   A.   I was doing a lot of hanging out in the woods.  I met a

20   man down there fishing, and he would take me fishing with

21   him.

22   Q.   And before we talk about the man, did you have friends

23   at this time?

24   A.   Yes.  Neighborhood kids, yes.

25   Q.   And did those kids go to school?

1    A.   Yes, they did.

2    Q.   And so when would you meet with those kids?

3    A.   After school they would come down there and hang out.

4    Q.   Now, how did you -- how did those kids regard you as

5    someone who was not going to school?

6    A.   They probably thought I was cool, you know.

7    Q.   Was that the sense that you had at the time?

8    A.   Yeah, they thought I was -- you know, I didn't have to

9    go to school; I was special.

10   Q.   Now, you mentioned the man that you met fishing, is

11   that the man that we've heard about before that you had a

12   sexual relationship with?

13   A.   Yes, sir.

14   Q.   So how did that -- how did you first meet him?

15   A.   He was fishing down the river, and I was down there,

16   and he saw me.  He asked me if I like to fish, I said yeah.

17   He handed me a pole.  I started fishing with him, and this

18   went on for a couple of days, and it started becoming -- he

19   started asking me questions, sexual questions, you know,

20   about telling me he -- by looking at me he thought that I

21   had a nice penis, which he had never seen, but that was his

22   approach, I guess.

23        He asked me if I was willing to have oral sex with him,

24   and at first I said no, and he continued this after a few

25   more days, and, finally, I gave in and allowed him to

1    perform oral sex on me.

2    Q.   What do you know about this man?

3    A.   He was, he was a janitor in an apartment complex where

4    I lived.  He -- it was called Stone Crest Housing.  I

5    believe it was a high rise for elderly people, and he was

6    married, and he had children of his own who didn't live

7    with him.  He seemed like a nice guy at the time.

8    Q.   How long did your relationship with him last?

9    A.   I think a couple of years, maybe two.

10   Q.   From the ages of when to when do you think?

11   A.   I would say from 13 to 15.  It might have been a

12   little -- I might have been a little older.  I don't believe

13   I was driving a car, so that's why I think I was about 15.

14   Q.   And about how many sexual encounters did you have with

15   him?

16   A.   It's hard to say.  I really don't know ... probably 20.

17   Q.   And what was your experience of these encounters at the

18   time?

19   A.   Well, it felt good, you know.  He was -- I was looking

20   for somebody who cared about me, and he showed me love, what

21   I thought was love, you know.

22   Q.   And how do you reflect back on those experiences today;

23   you said "what I thought was love," what do you mean by

24   that?

25   A.   Well, I wasn't getting any emotional support from my

1    family, my mother and father.  You know, my mother never

2    showed us any love, and here was a man that was interested,

3    and I perceived that to be love.

4        Now, when I reflect back on it, he just wanted, he just

5    wanted something else, and it wasn't friendship so ... he

6    wanted sex from me.

7    Q.   Well, did he provide you with any emotional support; did

8    he talk to you?

9    A.   We had discussions while, you know, we were fishing,

10   yes; but once the sex was done, you know, he was, he was

11   back to his wife.

12   Q.   Why did that relationship end?

13   A.   I think, you know, I don't really -- I'm not too sure.

14   I believe we moved out of Stone Crest.  We no longer lived

15   there.  And when I got older, I started being a little bit

16   maybe disgusted with what I was doing 'cause he was so old.

17   Q.   And how old do you estimate that he was?

18   A.   Well, in the paperwork I put 65, but on further

19   reflection I think he was more like 50 ... because the

20   reason I put 65 was because he lived in an elderly apartment

21   building, but when I really think about it, I think he was,

22   he was about around 50 because he was the manager there.

23   He was like -- he took care of the place.  You know, it was

24   a big apartment building and he took care of it.  He had

25   keys for the upstairs elevator shaft and all that stuff

1    so -- but I can't be absolutely sure, you know, but I

2    believe he was in his 50s.

3    Q.   And at the time as a 13- to 15-year-old, did you have a

4    sense of what you thought his age was?

5    A.   You know, I knew he was old.  I don't recall.

6    Q.   And did you feel attracted to him?

7    A.   No.

8    Q.   So you mentioned working in a used car sales position.

9    What was your work history prior to that?

10   A.   Well, I worked for the car dealership for awhile.  I

11   had a permit from school where I could work, and I worked

12   there for, I think it was, around six months until the

13   summertime when they started getting busy and they needed

14   a full-time person.  So they laid me off, and I went to a

15   program that the City of Middletown ran, and learned how to

16   paint.  And I was doing apartments at a place called Long

17   River Village; it was like apartment units, and learned how

18   to paint there.  And after that I think I started working, I

19   started working with my sister's boyfriend at another

20   painting company.

21   Q.   And where were you living during this period?

22   A.   I was living with my parents.

23   Q.   Did you get arrested for a burglary?

24   A.   Yes.

25   Q.   About how old were you when that happened?

```
1    A.   I think I was around 17.

2    Q.   Were you driving?

3    A.   Yes.

4    Q.   And what was the background to that, did you -- what

5    did you do, and did you do it alone?

6    A.   No.  Me and a few friends went to a movie theater to

7    see Led Zeppelin's The Song Remains The Same.  We were

8    drinking heavily that day, and it was snowing out really

9    bad; and coming back from the movie theater, I was

10   intoxicated and put my car into a snowbank, and we had to

11   call a tow truck to get us out, and he basically took all

12   the money we had.  And during this time while we're waiting

13   for the tow truck the car's running because everybody was

14   cold; and after we got out, we drive maybe five miles down

15   the road and run out of gas right in front of a store.

16       It was a combination drugstore and next to it was a

17   restaurant.  And after a little while sitting in the store,

18   I got out of the car with another friend of mine and

19   proceeded to smash the window in the store.

20       And once I got in, my mind turned to stealing, and I

21   just started stealing cigarettes.  I loaded up a shopping

22   cart full of cigarettes.  And after that, we broke into the

23   restaurant and stole meatballs, and the thing was I had

24   nowhere to go, my car was still outside, and we saw a state

25   police officer pull in, and that was the end of that.  I
```

1   got arrested and went to prison or went to jail for it.

2   Q.   How long did you go to prison for that or jail?

3   A.   I don't remember.  I think it was six months.  I

4   think there was one charge I got a sentence of like 18

5   months, but it was commuted down.  I think I actually did

6   six months on it.

7   Q.   Prior to this incarceration what was the longest that

8   you estimate you spent in jail?

9   A.   This one here?

10  Q.   This one here.

11  A.   Six months.

12  Q.   And was it that incarceration?

13  A.   Yes.

14  Q.   What was your relationships like, Mr. Carta, during

15  this period of your later teens?

16  A.   Well, I was a bisexual man, and in that period of time

17  it was very hard to come out because homosexuality was not

18  accepted the way it is today.  So I pretty much stayed in

19  the closet, and I would -- once in awhile I would meet a man

20  or, you know, a boy and engage in sexual contact with them.

21      I had a couple girls that I -- you know, small

22  relationships with a couple of girls; nothing that really

23  amounted to anything.

24  Q.   When was your first sexual experience with a woman or a

25  girl?

```
1    A.   That was my wife -- my ex-wife Lucille, when I met her.
2    Q.   Now, did you have difficulty approaching girls as a
3    younger person?
4    A.   A lot of difficulty.
5    Q.   More difficulty than approaching people of the same
6    sex?
7    A.   Yes, very much.
8    Q.   But did you want to approach girls?
9    A.   Very much so.
10   Q.   Now, how old were you when you met Lucille?
11   A.   I was 24.
12   Q.   How old was she?
13   A.   17.
14   Q.   How did you meet her?
15   A.   Two mutual friends of ours introduced us.
16   Q.   Well, there's a reference in the records to you as a
17   teenager having a relationship with an older woman, a brief
18   relationship?
19   A.   Yes, she was a woman that lived in a trailer park where
20   I lived.
21   Q.   And did you just -- was that actually your first
22   experience with a woman?
23   A.   My first sexual experience, yes, and I'd forgotten about
24   that.
25   Q.   And between that and Lucille was there anything?
```

```
1    A.   No, I had another girlfriend, but we never had sex so,
2    I don't -- I don't believe there was anything else other
3    than that, that woman and then Lucille.
4    Q.   So you met Lucille.  What kind of relationship was that;
5    was it good?
6    A.   Yeah, at first it was good, and we eloped and went to
7    Florida, and we came back; we got married, and then it
8    became very rocky, very stormy.  You know, I would be
9    working -- I worked in the apartment complex where I lived,
10   and I would turn around and I would see my wife watching me,
11   and at this time we had a child, a baby, and I was worried
12   about this because my baby's upstairs in the house by
13   herself.
14   Q.   Well, so was Lucille pregnant when you got married?
15   A.   Yes, she was.
16   Q.   And when was your daughter born?
17   A.   I believe it was October of '85, 1985.
18   Q.   And when you returned from Florida, you were working in
19   this apartment complex?
20   A.   Yes, sir.
21   Q.   Was she working?
22   A.   No.
23   Q.   Why was she not working during that period?
24   A.   She thought I was fooling around with another woman, an
25   older woman, actually, my boss, and I tried to convince her
```

1     that, you know, I didn't want to be with an older woman; I

2     wanted to be with her.  Why would I do that?  She was very

3     pretty, and she was 17, you know.

4     Q.   How did the relationship progress after that?

5     A.   Well, Lucille wanted to party a lot.  I was -- more or

6     less, I wanted to settle down with our daughter and try to

7     start having a better life.  She wasn't ready.  She wanted

8     to go out with her friends all the time.  She wanted to

9     have -- to drink, to smoke marijuana, and it created a lot

10    of problems.

11    Q.   How did the relationship conclude?

12    A.   She left me and my daughter one day, and I didn't know

13    what happened to her.  I actually went to the police and put

14    in a missing person's report, and I found out two weeks

15    later that she was okay, and I gave her back her daughter --

16    our daughter because I thought that that was the best thing,

17    for the daughter to be with her mother; but as it turned

18    out, Lucille didn't care for the girl, for my daughter, and

19    me and my father went to the court and got a court order

20    declaring her an unfit mother and we took custody -- I

21    took custody of my daughter.

22    Q.   And so would you have been about 25 years old at this

23    point?

24    A.   Yes.

25    Q.   Now, what happened next in your employment; were you

```
1    still working at the apartment complex?
2    A.   No, at this time I think I was working at Newman Trade
3    Bindery.
4    Q.   Say that again.
5    A.   It's Newman Trade Bindery, making books.
6    Q.   And what was your -- what were your duties there, what
7    did you do there?
8    A.   I operated a Newman Martini Inserter.  It was a machine
9    that stapled, maybe like, you know, stuff that you guys get
10   from Staples, like little magazines.
11   Q.   And was this a good job in your opinion?
12   A.   It was a very good job.
13   Q.   And what shift did you work?
14   A.   I worked second shift.
15   Q.   Were you working for a time and taking care of Vanessa?
16   A.   Yes.
17   Q.   How long did that last?
18   A.   It lasted about, it lasted about six months while I was
19   taking care of her by myself; and then the problem was, I
20   had to bring her to my mother's so my mother could take care
21   of her during those hours.
22        And after awhile my mother didn't want me to come get
23   her no more because she said it was a bad thing to wake up
24   the baby up at 1:00 in the morning to take her home, so it
25   got easier and easier for me to just leave her with her,
```

1   and, you know, do my own thing; I'd go out and party or do

2   what I wanted.

3   Q.   Do you think maybe you weren't ready to be a dad at

4   that time?

5   A.   I was not ready to be a dad.

6   Q.   And so did the child gradually become your mother's

7   responsibility?

8   A.   Yes, she became my mother's responsibility.

9   Q.   Now, did you have a significant relationship with

10  another person that came after this?

11  A.   Yes, Brenda.

12  Q.   And who was Brenda?

13  A.   Brenda was a girl I met through some mutual friends of

14  mine.  She was maybe a few years younger than me, and we

15  were together for a long time.

16  Q.   About how long?

17  A.   About five years.

18  Q.   Now, did you ever move in together?

19  A.   Well, she lived with me, but she went home on the

20  weekends to be with her mom, and so I don't really count

21  that as living together.

22  Q.   Now, how did you meet Brenda?

23  A.   A friend of mine introduced me to her.

24  Q.   And did you work with her?

25  A.   No.

```
 1    Q.   What did she do?

 2    A.   She worked in a convalescent home; she was in food

 3    service there.

 4    Q.   Did there come a time in your relationship that you

 5    left Newman Trade Bindery?

 6    A.   Yes.  I left Newman Trade Bindery because I worked

 7    first shift and she worked second shift, and I could never

 8    see her, and we wanted to be together so....

 9    Q.   So did you take another job after that?

10    A.   Yeah.  I went to work at Cromwell, Green.  I went to a

11    first-shift job at Cromwell, Green.

12    Q.   Was that a similar job?

13    A.   Yes, it was the running the same machine.

14    Q.   Now, how long did you keep that job?

15    A.   About a year.

16    Q.   The relationship you had with Brenda, was it emotional

17    as well as sexual?

18    A.   Yes.

19    Q.   Were you able to have conversations with her?

20    A.   Yes.

21    Q.   What was your sex life with Brenda?

22    A.   She was insatiable.  She wanted certain things that I

23    had never done before.  She wanted to be tied up.  She

24    liked to be bonded, you know, and I had never experienced

25    that before, and it really -- I don't know how to say it
```

1    without being graphic -- but it really turned me off, but,

2    you know, that's what she liked.

3    Q.   And did you also have sex with other people at the

4    same time during this period?

5    A.   Yes, sir.  We had three-ways with two men and another

6    girl that she knew, another woman.

7    Q.   So there were three separate occasions --

8    A.   Yes.

9    Q.   -- in which you did that?

10   A.   Yes.

11   Q.   Did you have sexual relationship with anyone else

12   during the approximately five years that you were with

13   Brenda?

14   A.   Just, you know, I believe it was just the three people

15   that we did it together with.

16   Q.   How did that relationship end?

17   A.   I caught her cheating on me with the landlord, and I

18   went a little overboard.  I caught them at my friend's

19   house, and I ended up smashing the windshield on his car.

20   Q.   What else did you do in retaliation for that?

21   A.   I took all the pictures I had of her and put them in

22   the mailbox where she was living, I think it was, with her

23   brother.

24   Q.   Why was that retaliation?

25   A.   Well, there was a chance they could have found them,

1     you know.

2     Q.   What were the pictures of?

3     A.   They were of her being tied up, naked.

4     Q.   After this relationship ended what did you do?

5     A.   Oh, I started traveling with the Grateful Dead.  I

6     think it was about that time.  I think I was working at

7     Sears, living at my brother's house at the time, and I went

8     to a Grateful Dead concert in Philadelphia, and I jumped

9     back in my car and came back to Middletown, packed up all

10    my stuff, quit my job, and went what they call on tour with

11    the Grateful Dead.

12    Q.   Can you describe a little bit what the experience of

13    that concert was that made you wanted to do that?

14    A.   It was like being with a big family, being with a lot

15    of people who cared about you.  It was something that I had

16    never really experienced in my life.  It felt very close.

17    Q.   And what was the Grateful Dead scene like, can you

18    describe it?

19    A.   It was like a carnival.  People selling stuff

20    everywhere.  We had a main thoroughfare, what they call

21    Shakedown Street.  They would sell clothes, beer, jewelry,

22    drugs, food.

23    Q.   And did you start to make a living by selling something

24    on Shakedown Alley?

25    A.   Yes, sir, I sold beer on Shakedown Alley.

1    Q.   And the markup you got you were able to --

2    A.   Double my profit, I would double my money.

3    Q.   You were able to get by doing that?

4    A.   Very well, yes.

5    Q.   Did you go to the concerts?

6    A.   I went to some, but the main scene was in the parking

7    lot, that's where the scene was.

8    Q.   And how long did this itinerant period of your life

9    last?

10   A.   Approximately five years.

11   Q.   Do you know where that puts us?

12   A.   It puts us in California.

13   Q.   Well, you had mentioned Jerry Garcia's death?

14   A.   Yes, 1995.

15   Q.   And were you touring with them at that time or had you

16   stopped?

17   A.   I had stopped.

18   Q.   About?

19   A.   Probably around 1994.

20   Q.   About a year before --

21   A.   Yes.

22   Q.   -- his death?

23   A.   Yes, somewhere around there.

24   Q.   So where did you go with the Grateful Dead?

25   A.   Well, I went all over the country, almost every state

1  in the country.

2  Q.   During this period had you talked about any sexual

3  experiences that you had in treatment?

4  A.   Can you repeat that?

5  Q.   Yes.  Sorry about that.  During this period of your

6  life did you have sexual encounters?

7  A.   Yes, I had a sexual encounter with a boy that I met at

8  a Grateful Dead show.  He was, I believe, 13.

9  Q.   Could you describe the circumstances of that encounter?

10  A.   I met him in the parking lot.  He was high on something.

11  I don't know what it was.  I think it was nitrous, and it

12  led to me following him and then performing oral sex on him

13  for the concert tickets.

14  Q.   Did you have concert tickets?

15  A.   Yes, I did.

16  Q.   And did you go to the concert with him?

17  A.   No, he took the concert tickets and gave them -- I

18  think he gave them to his parents, but I don't know.  They

19  were gone the next morning.

20  Q.   Why do you think he gave them to his parents?

21  A.   Well, I think he was there to try to hustle up money,

22  so he'd give it to his parents.  I think they were trying

23  to go somewhere maybe.  I don't know, but I know the next

24  morning when I woke up, they were all gone, the whole

25  family.

1   Q.   Where were you when you first encountered this

2   13-year-old?

3   A.   Where was I physically?

4   Q.   Were you on Shakedown Alley?

5   A.   Oh, no.  Well, no, I was in my van.  They were parked

6   right across the little aisle from me in the parking lot.

7   Q.   What made you think the boy was 13; did he tell you?

8   A.   He looked 13.  I don't --

9   Q.   Why do you say that?

10  A.   Well, he looked, he looked young.  You know, I mean,

11  he didn't look -- he didn't have any facial hair.  You know,

12  I'm not sure if he told me; he may have told me.  I may have

13  asked him.

14  Q.   And what was his stage of physical development -- well,

15  was he capable of achieving an erection?

16  A.   Yes.

17  Q.   Did he have pubic hair, if you recall?

18  A.   Yes, he did.

19  Q.   About how tall was he?

20  A.   He was probably about almost 6 feet tall, pretty tall.

21  Q.   Did you have any other sexual encounters of any kind

22  during the period you were touring with the Grateful Dead?

23  A.   No.

24  Q.   Legal or illegal?

25  A.   No.

1    Q.   How did you end up in California?

2    A.   I ended up going to Santa Cruz during a break where

3    there was no shows and fell in love with it and decided to

4    stay there.

5    Q.   How long were you in California?

6    A.   About five years.

7    Q.   What was your life like in California?

8    A.   Well, I was doing okay.  When I first got there, I was

9    homeless.  I lived on what they call a jetty in Eureka,

10   California, and --

11   Q.   About how long was that period of time?

12   A.   For about a month.

13   Q.   And when you say you were homeless, were you living

14   in the open air?

15   A.   No I was living in my van.  I had a conversion van.

16   Q.   What's a conversion van?

17   A.   Well, it had a bed in it, it had a couch in it, a stove,

18   and an oven.

19   Q.   Was this the vehicle that you toured with?

20   A.   Yes.

21   Q.   And so the period of homelessness, how long did that

22   last?

23   A.   About a month.

24   Q.   Did you get work?

25   A.   Yes.  Eventually, yes.  At first I went on welfare.

```
 1      Q.   How long did that last?
 2      A.   Well, it was about a month.  I was in a hotel, so
 3      that's what I did to get out of the jetty, and I went into
 4      the motel and I started looking for work and --
 5      Q.   Over the next several years what was the work that you
 6      did?
 7      A.   I worked for a company called Respite Cleaning Company.
 8      We cleaned banks, grocery stores.  I became a floor
 9      specialist, waxing floors, stripping floors, and then I
10      became a mechanic for the shop fixing all the vehicles.
11      Q.   Where did you live during this time?
12      A.   I lived in Arcadia, California, in a house with three
13      or four other people.
14      Q.   Now, we've heard testimony in this case that during
15      this period you met someone named or you met a 13-year-old
16      named John?
17      A.   Yes, that was at the jetty.
18      Q.   So is this the period when you were first at Eureka,
19      California?
20      A.   Yes, that's when I first got there.
21      Q.   Would you describe how you met John?
22      A.   I was parked.  I was parked on the side of the road.
23      Well, a jetty is a long road about five miles long, and on
24      the sides were pull-offs where people pull off when they
25      can.
```

1       I was pulled off in one of these pull-offs, and John

2   came and knocked on my door and asked me if he could come

3   and hang out, and I said:  Sure, and he was wet; it was

4   raining out.  He -- I gave him a blanket to wrap himself up

5   in.  He started masturbating.  And I sat there for a couple

6   of minutes, and then I asked him if he wanted some help,

7   and he said yes, and I proceeded to perform oral sex on him.

8   Q.   Had you had any prior interaction with this --

9   A.   No.

10  Q.   -- young man before that?

11  A.   No.

12  Q.   Did that strike you as unusual, that he would do

13  something like that?

14  A.   Yeah.

15  Q.   About how long did you know John?

16  A.   About three years.

17  Q.   What kind of interactions did you have with him after

18  this incident?

19  A.   Well, I kind of became friends with his family.  His

20  mother and father would leave him and his other brother; he

21  had an older brother, Mark.  They would leave him down the

22  jetty for weeks at a time, and I would make sure that they

23  were okay, make sure they had food and stuff like that.

24       And probably about a month later they left.  They lived

25  in a bus, a big school bus, and it was a while later that I

```
 1   saw him in Eureka, California, about five miles from where I
 2   lived at the time, and I saw him -- I think he was riding
 3   his bike down the road one day.
 4   Q.   You estimated in your sex offender homework from the
 5   Butner program that you had numerous sexual encounters with
 6   John?
 7   A.   Uh-huh.
 8   Q.   At one time you estimated it was 25; do you think
 9   that's right?
10   A.   That's an estimation, but it could be.  It's close,
11   I'm sure.
12   Q.   Where were these encounters, where did they take place?
13   A.   He would call me up, and I would go meet him at say a
14   parking lot of a grocery store, and he would get in the van,
15   and we would have sexual contact.  I would perform oral sex
16   on him, and he came and stayed with me for a little while
17   at my house.  I think it was about a two-week period and --
18   Q.   What kind of emotional connection in your mind did you
19   have with John?
20   A.   In my mind, you know, he was, he was young, he was
21   energetic, he liked to -- you know, that's what I was
22   looking for, somebody that didn't want to sit home and
23   watch football.  You know, I liked to go hiking and stuff
24   like that, and, you know, he was interesting, I thought, a
25   little bit.
```

1    Q.   Now, your day-to-day life in California; you said that

2    you were working at this time?

3         THE COURT:  So just to back up when you first met

4    him he was 13, is that --

5         THE WITNESS:  Yes, he was 13 when I first met him.

6         THE COURT:  What did he look like?

7         THE WITNESS:  He was mature.  He looked older.  He

8    was a street kid.  He knew all about drugs and everything.

9    You know, he lived with it; his parents were drug addicts.

10   He -- I don't remember if he had a mustache at that time.

11   He started growing facial hair probably a year later, I

12   think, but he looked very mature.

13   Q.   You were working and living at this house for how long?

14   A.   I think it was about two years.

15   Q.   What made you decide to come back to Connecticut?

16   A.   I wanted to be closer to my friends, you know, my

17   family.

18   Q.   So when did you move back?

19   A.   I think it was around 97, 1997.

20   Q.   And were we just yesterday looking at some documents

21   that seemed to suggest that you were back in Connecticut in

22   1997?

23   A.   Yeah, we did.

24   Q.   And were those police reports that we were looking at?

25   A.   Yes, they were.

1    Q.   And is there a reference in those police reports to

2    John's age?

3    A.   Yes.

4    Q.   How old did those reports say John was in 1997?

5    A.   15 years old.

6    Q.   What were the circumstances of John coming out to

7    California; did you bring him with you?

8    A.   No, I didn't.  He took a bus.  I had given him a

9    contact address to get in touch with me, and he took a bus

10   out.

11   Q.   Now --

12           THE COURT:  Did you pay for it?

13           THE WITNESS:  No.

14   Q.   When he came, did he live with you?

15   A.   Yes.

16   Q.   For how long?

17   A.   I think it was around a month.  I lived in an apartment.

18   Q.   Where were you living?

19   A.   I was living in New Britain, Connecticut.

20   Q.   Now, how did it come that he left?

21   A.   He was -- something happened where I lived.  He was

22   being -- he was afraid of drug dealers that were living

23   around the area, and he also mentioned something about a

24   prostitute propositioning him, and I went to work and came

25   home one day, and he was gone.

```
1    Q.   What were you doing for work at this time?

2    A.   I was working at NQ Environmental.

3    Q.   NQ Environmental?

4    A.   Yeah.

5    Q.   And so what was John doing during the day?

6    A.   Just hanging around, not doing anything.

7    Q.   Do you think you had any role in him leaving?

8    A.   I think he probably got tired of me, you know, tired

9    of being with an older person, but to me I think he was

10   homesick, wanted to be back with his family.

11   Q.   Now, during this period back in Connecticut did you

12   learn about child pornography for the first time in

13   Connecticut?

14   A.   No, I learned about child pornography in California.

15   Q.   And how did that come about?

16   A.   I was -- I had just gotten a computer.  I think I

17   bought it used, and I started searching for it.  I started

18   searching, I think it was just for regular pornography, and

19   then started trying to find younger and younger, and,

20   eventually, I found them.  And when I found them, I

21   couldn't believe how much that there was.

22   Q.   And this was -- what you're describing now was in

23   California?

24   A.   Yes.

25   Q.   And so did you distribute child pornography when you
```

1   were in California?

2   A.   No.

3   Q.   Did you purchase child pornography when you were in

4   California?

5   A.   No.

6   Q.   Did you download it?

7   A.   Yes, I got it on America Online.

8   Q.   When you moved to Connecticut with respect to child

9   pornography, what did you do; did you resort to looking at

10   child pornography right away?

11   A.   No, not right away.  I would say probably within six

12   months because I had to get my life settled once I got

13   there.  You know, I had nothing.  I was working at NQ

14   Environmental and living with a friend that worked there,

15   and then after that I got my own apartment, and that's when

16   I got the computer.

17   Q.   Did you have your own apartment when John came?

18   A.   Yes.

19   Q.   And now so was there a lag of time between when you

20   left California and when John came?

21   A.   Yeah, there was.  I don't remember how much ... three

22   months.

23   Q.   So what did you start to do when you got back from

24   California?

25   A.   I started searching for child pornography.

1    Q.   And how did you do that?

2    A.   Well, for instance, on AOL I would go to keyword news

3    groups, and then look up "alt," or "alt" is alternative,

4    and I would just put in "boy," and that would bring up all

5    the news stories that had anything to do with boys.

6    Q.   Would you characterize yourself as someone who was

7    heavily involved in child pornography?

8    A.   Very heavily involved.

9    Q.   And what did that -- what do you mean when you say

10   "heavily involved"?

11   A.   I learned how to operate servers.

12   Q.   What's a server?

13   A.   A server is a place -- it's a program on the computer

14   that allows other people to come into my computer and

15   download child pornography.

16   Q.   And why did you do that?

17   A.   Because I was heavily into trading.  It was easier to

18   have the files going both ways.  You know, I could put a

19   bunch of files on my computer and people could come in and

20   get what they wanted, and I could upload for me what I

21   wanted.

22   Q.   Did you communicate with other people during this time

23   with respect to child pornography?

24   A.   Yes.

25   Q.   And what was that communication about?

A.   It was about trading child pornography.

Q.   Now, on the homework that you did at Butner you estimated that you had 50,000 images at one time; does that -- do you think that's an accurate estimate?

A.   I think it's a little high.

Q.   But is that the ballpark?

A.   Yeah, I would say so.

Q.   Now, when you had these images, were you sexually interested in all of them?

A.   No, I was interested in images that were 13, 14, all the way up until 20 as long as the person in the -- if the 20-year-old looked younger, it was fine.

Q.   Now, when you were -- during this period did you have sex with anyone?

A.   I had sex with John.

Q.   Well, going from '97 until 1999, did you have any sexual encounters?

A.   I don't remember.  Let me think about it.

Q.   Well, let me ask you a different question, Mr. Carta. When you were arrested, did they find an advertisement looking for companions that you had posted on YouTube?

A.   Yes, they did.

Q.   And what did that -- what was that advertisement which was in the presentence report in your case, what was it for?

A.   I was looking for cute 14- to 18-year-old boys to

1    cuddle with.

2    Q.   And did you ever receive responses to those

3    advertisements?

4    A.   A lot of responses.

5    Q.   And did you ever have sex as a consequence of those

6    responses?

7    A.   Yes.

8    Q.   How many times?

9    A.   Well, there was a boy that I believed to be 13 that

10   e-mailed -- that answered my ad.

11   Q.   And where was that, was that in Connecticut?

12   A.   That was in Connecticut, yes.

13   Q.   Why do you believe that boy to be 13?

14   A.   I believe that's what he told me.

15   Q.   What did that encounter entail; what was that about?

16   A.   Well, I performed oral sex on him.  I believe he might

17   have wanted to perform oral sex on me, but I didn't want to;

18   I felt it was too intrusive for some reason.  I don't know.

19      I didn't want to hurt him like that; even though, I was

20   still hurting him, I didn't want -- I don't know, it just

21   feels more intrusive to have somebody perform oral sex on

22   you, you know.

23   Q.   Well, let's -- so at the time, and you've mentioned

24   this before, you thought he wanted to try on you and you

25   didn't want to allow that because you thought that might

```
1    be damaging to him?
2    A.   Yeah.
3    Q.   But at the time you didn't think that what you were
4    doing was damaging to him?
5    A.   No.
6    Q.   Now, through your experiences, I know you've reflected
7    a lot about, a lot of this, but how do you view that
8    encounter in particular; was it damaging to him?
9    A.   Very damaging.
10   Q.   Well, in what way, in what way did you force him?
11   A.   Well, no.  But even though he was willing to have sex
12   with me, you know, physically, he was ready, but, mentally,
13   you know, mentally, he wasn't.  I believe, you know, I
14   could have caused him a lot of damage.
15   Q.   Did you have any other encounters as a result of the
16   ads?
17   A.   I think there was, I think there was -- I think there
18   was another kid in California or something.  I think I had
19   an ad out to that.  He was 16, I think, and a girl.
20   Q.   I just put up on the document viewer a section of
21   Exhibit 27, which is your personal history questionnaires
22   from the Butner treatment program.
23        Do you recognize the document, Page Bates No. 1053
24   that I've put up there?
25   A.   Yes.
```

```
1     Q.   And what is this document?

2     A.   It's a table of victims of sexual abuse assault.

3     Q.   Now, do you know just by looking at this whether this

4     is the first one or the second one?

5     A.   No, I don't know.

6     Q.   But suffice it to say, you did two?

7     A.   I did three actually altogether, but we only have two.

8     Q.   There are only two in the records that we have, and so

9     the first No. 1 here is that child in the diapers?

10    A.   The boy in diapers.

11    Q.   And on this chart it says you were about 13?

12    A.   Yes.

13    Q.   Do you think that might be a bit of an overestimate as

14    you reflect back on what you were thinking at the time?

15    A.   I think it might be.

16    Q.   Now, next is Robert?

17    A.   Uh-huh.

18    Q.   And did we speak about Robert today?

19    A.   No, not yet.

20    Q.   So let's -- I know we've been beyond this, but let's go

21    through the list.

22         Who is Robert?

23    A.   I believe that Robert is my cousin.

24    Q.   And this is a -- you had sex, it says in the far right

25    column, you think about five times?
```

1    A.   Right, yes.  That could be a little off.  It might be

2    a little bit more.

3    Q.   Well, what was that -- how did it come to be that you

4    were involved sexually with Robert?

5    A.   Oh, I don't know.  We were fooling around.  He, his --

6    where his parents lived, where he lived, he had an old

7    broken down barn in the backyard and we were fooling around

8    back there, and we ended up -- I believe we performed oral

9    sex on each other.

10   Q.   And you were about the same age?

11   A.   About the same age.

12   Q.   Next, on this list is David who was 17, and you were

13   21?

14   A.   Yes.

15   Q.   Have we talked about him?

16   A.   I think we did.  Today?

17   Q.   No, today?

18   A.   No, we didn't talk about him.

19   Q.   We skipped over him?

20   A.   We didn't talk about him.

21   Q.   So what was the story with David?

22   A.   David was my nephew, my sister's son.

23   Q.   Now, did you later think he might have been 16 during

24   this period?

25            MS. PIEMONTE-STACEY:  Objection, your Honor.

```
1              THE COURT:  The grounds?

2              MS. PIEMONTE-STACEY:  Well, the paper says 17.

3              THE COURT:  He's leading all around; I think he just

4     wants to know what hit you about this.

5              MS. PIEMONTE-STACEY:  Well, I believe some of the

6     others were foundationary; he had previously testified to

7     already.

8              THE COURT:  I'll sustain this as leading.

9     Q.   For the record I've placed Page 1126 of the same

10    document on the document viewer.  Do you recognize this?

11    A.   Please move it over.  Thank you.  Yes.

12    Q.   And what is this document?

13    A.   It's the same as the last document.  I don't know if

14    you want to use this one, but it's the same thing.

15    Q.   And what is that?

16    A.   What is this?  Oh, it's just the reporting of all the

17    persons that I had sex with.

18    Q.   Well, is it a reporting of all the persons you had

19    sex with or all the persons that you had sexual offenses

20    against?  If you don't know, that's fine.

21    A.   Yeah.

22    Q.   Does David appear on this list?

23    A.   Yes, he does.

24    Q.   And did you estimate his age in this list as 16?

25    A.   Yeah, I listed him as 16.
```

```
 1    Q.   Do you know as you sit here how old he was when you
 2   were interacting with him?
 3    A.   No.
 4    Q.   But is that in the right ballpark?
 5    A.   It's in the ballpark.
 6    Q.   So how could it be that you gave two estimates for his
 7   age at two different moments?
 8    A.   Because a lot of the ages on here, I don't know.  I'm
 9   guessing.  You know, there was two different PHQs at two
10   different periods of time, you know, once at Butner, you
11   know.
12    Q.   Now, one offense that we didn't talk about, did there
13   come a time when you shot somebody with BB gun?
14    A.   Yes.
15    Q.   And does that incident appear on this list?
16    A.   It's not on this -- you mean does the person appear on
17   here?
18    Q.   Well, this list has two pages?
19    A.   Yes.
20    Q.   I'm referring to the second page.
21    A.   Yes, there's the one on the top, Robbie.
22    Q.   What were the circumstances of that offense, of that
23   incident?
24    A.   Well, me and him were hanging down the river in back
25   of my house, and I knew that he was gay, and I asked him if
```

```
1    I could have oral sex with him and he said no.  So I said:
2    Well, if you don't let me have oral sex with you, I'll
3    shoot you, and I shot him.  And he had a winter jacket on,
4    and I shot him in the jacket.
5    Q.   Well, what did you shoot him with?
6    A.   A BB gun.
7    Q.   What kind of BB gun was it?
8    A.   It was a Crosman 760 one pump.
9    Q.   How did you know this person?
10   A.   He lived in my neighborhood.
11   Q.   And is this the period when you were hanging out by
12   the -- in the woods a fair amount?
13   A.   Yeah.  Yeah.  I mean, I lived in a different -- I lived
14   -- it was a different apartment complex, but on the same
15   grounds.
16   Q.   Uh-huh.
17   A.   He lived next-door to me.
18   Q.   And what happened next in your relationship with him?
19   A.   Well, that was the end of that right there and then I
20   didn't see him for about a month, and then he called me on
21   the phone and wanted me to come over, and we engaged in
22   sexual contact, oral sex.
23   Q.   And about how many times after that did you -- what
24   did he say when he called you?
25   A.   He wanted me to come over.  You know, he told me:
```

1    Come on over, my parents are gone.

2    Q.   Did you threaten him in any way?

3    A.   No.

4    Q.   When you shot him with the BB gun, did it enter, did it

5    enter into the jacket?

6    A.   No, it bounced off.

7    Q.   What does it mean when you say you pumped the BB gun

8    one time?

9    A.   You pump it.  On a 760, I think it was ten times.  The

10   harder you pump it the harder -- the faster the BB's come

11   out.

12   Q.   Next on this page, 1153, or, I'm sorry, 1053 is John;

13   did we speak about John?

14   A.   Yes.

15   Q.   And next appears something -- can you read what that

16   says?

17   A.   It says:  "Boy with tickets."

18   Q.   And did we speak about that?

19   A.   Yes, we did.

20   Q.   And next can you read what that says?

21   A.   I believe that says "men involved" or "men at school."

22   Q.   And what are the circumstances of this incident?

23   A.   He was a boy that answered my ad.

24   Q.   Was that in Connecticut or was this in California?

25   A.   No, this was in California.

1    Q.   So you had posted these ads in California as well?

2    A.   Yes.

3    Q.   And was the ad that you posted like the ad that is in

4    the records that we have?

5    A.   Yeah, the same thing.

6    Q.   You estimate you had one sexual encounter with him?

7    A.   Yes, I only saw him once.

8    Q.   And that's because a "1" appears in the right-hand

9    column there, and up above here, the "20" response is your

10   estimation at this time of how many encounters you had with

11   John?

12   A.   Yes.

13   Q.   And that's over the period that you --

14   A.   Three years.

15        THE COURT:  I think I missed something.  What is

16   this chart; was this at Butner?

17        MR. GOLD:  This is a chart from Butner, part of

18   what's called the PHQ; it's his homework.

19        THE COURT:  So he filled this in?

20        MR. GOLD:  This is his document, yes, and it's in

21   evidence as Exhibit 27.

22   Q.   Who is Alex?

23   A.   Alex was another person that I met through the internet.

24   Q.   In California or Connecticut --

25   A.   California.

1    Q.   -- or somewhere else?

2    A.   California.

3    Q.   And you estimate you had five encounters with Alex?

4    A.   Approximately.

5    Q.   And what were the circumstances of your relationship

6    with Alex?

7    A.   We performed oral sex on each other.

8    Q.   And Alex you estimate was about 16?

9    A.   Yeah.

10   Q.   Why do you give him that age?

11   A.   I believe he told me that's how old he was.

12   Q.   And what did Alex look like, if you recall?

13   A.   He was, he was mature.  It's a long time ago; I don't

14   remember exactly but....

15   Q.   Next on the list is "girl."  What's the story there?

16   A.   She was a girl I met in California, and I believe I

17   made a mistake before when I said that the boy at school

18   answered the ad; I believe it was instant massaging he was

19   using in California.  I don't think it was an ad.  Alex was

20   the same thing.  We chatted online, and the girl was the same

21   thing; I chatted online with her, too, and she was interested

22   in having sex with an older man.

23   Q.   And did you have a sexual encounter with her?

24   A.   No.

25   Q.   Did you meet with her?

1    A.   No.

2    Q.   What happened?

3    A.   Well, I brought her home to my house.  She got

4    undressed, and she was obese -- not real fat; she was chubby,

5    and I wasn't interested in her, and I didn't know how to

6    tell her without, you know, without hurting her.  I didn't

7    want to hurt her.

8    Q.   And if she had been attractive to you, do you think you

9    would have had sex with her?

10   A.   Probably, yes.

11   Q.   What's No. 2 mean on this list?

12   A.   It's just the number I assigned to the person that, you

13   know, I don't know -- either I didn't know the name or I'm

14   trying to remember who that is.  Oh, I know who that is.

15   Q.   Who is that?

16   A.   At that time I didn't remember his name, but he was

17   Fred's brother, younger brother.

18   Q.   Who?

19   A.   Sean.

20   Q.   And we'll get to that when we talked about Fred.  Who's

21   No. 3 when we talk about --

22   A.   Yeah, that's the boy that answered my ad, and me, Fred,

23   and him had sex together.

24   Q.   Okay, so let's just go back to the chronology.  You

25   were working at NQ Environmental when you were back in

```
 1    Connecticut?
 2    A.   Yes.
 3    Q.   And were your parents alive?
 4    A.   Yes.
 5    Q.   Did you see your parents?
 6    A.   Yes.
 7    Q.   Were your siblings alive?
 8    A.   Yes.
 9    Q.   Did you see them?
10    A.   Yes.
11    Q.   And what were you doing with respect to the child
12    pornography?
13    A.   I was heavily involved in trading online.
14    Q.   Did you come to move in with a particular landlady?
15    A.   Yes, I moved in with Ann.
16    Q.   And did she charge you rent?
17    A.   No, I performed all the, all the jobs around the house
18    that needed fixing; for instance, I painted the whole house,
19    did all the plumbing, electrical, pretty much redid two
20    whole apartments.
21    Q.   And did Ann actually appear at your sentencing hearing?
22    A.   Yes, she did.
23    Q.   And did she talk about what you did for her?
24    A.   Yes.
25    Q.   Now, during this period were you ever charged for
```

```
1    harassment?

2    A.   Yes, I was.

3    Q.   And why were you charged for harassment?

4    A.   That was a threat -- oh, no, that was NQ Environmental.

5    Q.   Do you remember the circumstances?

6    A.   Yes.

7    Q.   What were they?

8    A.   I ended my employment with them, and they refused to

9    give me my last check.  So I had called them like 50 times;

10   it was close to Christmas, and I wanted my money, and they

11   wouldn't give it to me, so they called, they called the

12   police on me.

13   Q.   So do you think your calls were civil in tone?

14   A.   I was angry.  No, I was angry.

15   Q.   Why did you stop working there?

16   A.   Well, I don't remember.  I might have -- I don't

17   remember.  I got fired; I don't know.

18   Q.   Now, why were you spending so much time involved in

19   child pornography?

20   A.   I was addicted.

21   Q.   What do you mean when you say that?

22   A.   When I was collecting, I had to have every picture out

23   there.  If I had a series of pictures, if I was missing one,

24   I would scour the internet for it until I found it, and I

25   would spend hours on end.
```

1    Q.   And was your collection organized?

2    A.   Very organized.

3    Q.   How did you organize it?

4    A.   I had folders with a series of names on it.

5    Q.   Did you have any relationships of a romantic or

6    emotional nature during that time?

7    A.   I was with Fred.

8    Q.   Who's Fred?

9    A.   Fred is a 17-year-old that I met through mutual

10   friends.

11   Q.   And how did that relationship begin?

12   A.   I called him up one day, asked him if he wanted to

13   come over and hang out.  And he said yes, and he came over

14   and hung out with me.  We played video games, and I think we

15   didn't have sex the first time.

16   Q.   And what happened after that?

17   A.   Well, I believe after the second or third time that we

18   got together, I asked him if he wanted to have sex, and he

19   said yes.

20   Q.   Did there come a time when he moved in with you?

21   A.   Yeah, it was shortly after that.

22   Q.   And about how long did you live with him?

23   A.   Six, eight months.

24   Q.   Could you describe the course of the relationship?

25   A.   Well, he worked with me.  I took him to work with me to

```
1    give him something to do.

2    Q.   And what were you doing for work at this time?

3    A.   I was painting, house painting.  I was working for a

4    man in New Britain; I don't remember the name of the

5    company.  I was a subcontractor under the table, and I was

6    getting a lot of side jobs from people that we did work for;

7    I would go out and do that, and I would take him with me to

8    do those jobs and pay him and so he would have money.

9       He smoked cigarettes and he drank; I provided him

10   alcohol, but, you know, he bought his own cigarettes.

11   Q.   At the time did you feel that you -- how did you feel

12   about him?

13   A.   I was in love with him --

14   Q.   And --

15   A.   -- or I thought I was.

16   Q.   -- did you see a future for yourself and Fred?

17   A.   Yes.

18   Q.   What was it about Fred that made you love him?

19   A.   He was interested in some of the same things, same

20   things as I was.  He was energetic.  He was good looking.

21   Q.   At the time did the age differential seem like a

22   problem to you?

23   A.   No.  At the beginning, no.

24   Q.   At some point did Fred begin to pull away from you?

25   A.   Yes.  He wanted to spend more time with his family,
```

1    with his brothers.

2    Q.   And what did that do to you?

3    A.   What did it do to me?  Well, it got me a little jealous

4    or maybe a lot jealous.  I wanted to be with him.  I have a

5    habit of, when I'm in love with somebody, I want to grab on

6    to them and not let go.  You know, I want to be with them

7    all the time, which can be overbearing.

8    Q.   Is this the same type of reaction that you had at the

9    end of your relationship with Brenda?

10   A.   Yeah.

11   Q.   Now, on your victim list there is a reference to a

12   brother of Fred; is that right?

13   A.   Yes, Sean.

14   Q.   Could you describe what happened there?

15   A.   Well, me and Fred got in a fight one night, and Fred

16   left, and I was in my room crying, and the door was shut.

17   Sean opened the door, came in, and climbed into bed with me.

18   Q.   What happened next?

19   A.   Well, he started telling me about how lucky his brother

20   was to have me and that he would do anything to be with me,

21   and I performed oral sex on him.

22   Q.   For how long?

23   A.   About five minutes.

24   Q.   Did you ejaculate?

25   A.   No.

1   Q.   Why did you stop?

2   A.   Because it just didn't feel right.

3   Q.   What do you mean?

4   A.   Well, I was, I was in love with Fred.  You know, it was

5   unsafe, if you know what I'm talking about.

6   Q.   And at the time did you feel that he was too young?

7   A.   No, I didn't feel he was too young.  After I stopped

8   I -- he was not the type of person that I would want to be

9   with because of his body style.  He was, he was chubby,

10   which is not what I usually look for.

11   Q.   Did Fred have any other brothers?

12   A.   Yes, he had a 15-year-old brother.

13   Q.   And did you ever have any sexual contact with that

14   person?

15   A.   No.

16   Q.   Why not?

17   A.   He was immature.

18   Q.   What do you mean when you say that?

19   A.   He looked young.  He acted young.

20   Q.   Did there come a time when you had a fight with Fred?

21   A.   Yes, we had a blowout.

22   Q.   And do you happen to recall about when that was?

23   A.   I think it was around 2000.  I think it was in the

24   year 2000, 2001; I don't recall.

25   Q.   What happened as a result of that blowout?

```
1    A.   We were both arrested.  I called 911; he was smashing

2    stuff at my house.  He was smashing stuff at my house.  I

3    called 911.  Because it was a domestic dispute in

4    Connecticut, we both got arrested.  I was released, and he

5    was held on bond.

6    Q.   What happened after you were released?

7    A.   I don't understand your question.

8    Q.   Well, did you go home?

9    A.   Oh, yes, I went home.  I called his aunt, told her he

10   was in jail.  I tried to bail him out, but they wouldn't let

11   me so I called his family and told them, and they went and

12   bailed him out.

13   Q.   Did he come back to live with you after that?

14   A.   No.  He came back one time, and then I gave him all his

15   possessions.

16   Q.   About how long after that was that?

17   A.   A couple of days.

18   Q.   And did you seek to retaliate against Fred after that?

19   A.   Yes.

20   Q.   What exactly did you do?

21   A.   Well, what happened was he kept calling me.  He would

22   call me and tell me to come over; he wanted to see me, and

23   I would drive all the way to where he lived, which was about

24   30 miles away.  And when I got there, he wouldn't be there.

25   And he did this three times; and after the third time, I
```

```
1    became really angry, and I printed up some flyers and put a
2    lot of derogatory things about him and his family on there,
3    and I went to where he lived, put them in neighbors'
4    mailboxes, and I threw the majority of them on the back of
5    the lawn.
6    Q.   What kind of derogatory things?
7    A.   Things about his sexual habits, stuff about what his
8    father was doing with the boys.  Well, his father would use
9    the boys to carry drugs for him.  That way if he got
10   stopped, he knew that the boys wouldn't be searched, and I
11   put all that stuff on there.
12   Q.   What happened to you after that?
13   A.   Well, I was arrested.
14   Q.   About what time of year were you arrested?
15   A.   I don't remember.  I don't remember.  I think it was
16   in, maybe, maybe the fall, I think; I don't recall.
17   Q.   Well, we can put a document or two in front of you, but
18   just to the best of your recollection, were you arrested
19   based on this behavior or for something else?
20   A.   No, I was arrested for something else.
21   Q.   And what was that?
22   A.   It was risk of injury on a minor, for providing alcohol
23   and drugs.
24   Q.   And how did that charge come about?
25   A.   I believe Fred called the police on me after I did the
```

1    flyers and told them what was happening in the house.

2    Q.   And what was the basis of the charge for the risk of

3    injury to a minor, if you know?

4    A.   What do you mean?  I don't understand the question.

5    Q.   Why were you charged?  What was the -- what did they

6    accuse you of?

7    A.   Well, originally, it was sexual assault, and then it

8    was -- that was dropped, and then they charged me with

9    providing alcohol and drugs to minors.

10   Q.   And which minors?

11   A.   I think it was all three:  Bradley, Sean, and Fred.

12        THE COURT:  Is Bradley the 13-year-old?

13        THE WITNESS:  Bradley's the 13-year-old.

14   Q.   After this did you get arrested for child pornography

15   possession?

16   A.   No, I got arrested for operating a drug factory,

17   possession of illegal fireworks, possession of marijuana.

18   That was all before I was arrested by the federal

19   government, by the feds.

20   Q.   And so did you spend time in jail after that arrest by

21   the State of Connecticut?

22   A.   Yes, I did.  I think it was three months.

23   Q.   And during that three-month period, did you write

24   letters?

25   A.   I wrote some letters to my mother.

Q.   And what was the contents -- what were the contents of
those letters; what were those letters about?

A.   That was about the stuff when my daughter was living
there.

THE COURT:  Now, I'm confused.  So you're in jail;
is your daughter living with you at the time you're having a
relationship with Fred?

THE WITNESS:  No.  No, the whole timeline's kind of
a little messed up.  Fred left, okay, and then approximately
a month later my daughter moved in with her boyfriend.

I don't remember exactly how long after that, but the
charges were pending during that time when my daughter moved
in, and then what happened was --

THE COURT:  You mean the pornography charges?

THE WITNESS:  No, operating the drug factory, the
possession of drugs.

THE COURT:  The state charges.

THE WITNESS:  The state charges, yes.  And what
happened was there was an agreement, I was to turn myself
in, that my lawyer had arranged.  And I left some money
with Fred -- not with Fred, with Seth, and he was supposed
to come bail me out, and that never happened.

And I became angry and I eventually wrote a letter to
my mother, and I threatened her.  I told her I was gonna get
her, and I think I might have said I was gonna -- I said

```
 1    something like:  I'll get you, bitch, for what you're doing;

 2    she wouldn't let me talk to them when I called the house.

 3            THE COURT:  So who's Seth?

 4            THE WITNESS:  My daughter's boyfriend.

 5            THE COURT:  So there are two Seth's or no?

 6            THE WITNESS:  No, there's one.

 7            THE COURT:  There was Brad and Sean, so Seth's the

 8    daughter's boyfriend?

 9            THE WITNESS:  Seth is my daughter's boyfriend.

10    Q.   Let me ask you a few questions about that.  So Fred had

11    two brothers?

12    A.   Yeah.

13    Q.   You had a domestic dispute with Fred which led to both

14    of you being arrested?

15    A.   Yep.

16    Q.   After this Fred moved out?

17    A.   Yes.

18    Q.   Then you were charged, after leaving the flyers on

19    Fred's lawn he called the police?

20    A.   Yes.

21    Q.   And you were charged with risk of injury to a minor?

22    A.   At that time I think I was charged with -- what do you

23    call it -- I was charged with something else at the time.

24    Q.   Based on the conduct with Sean?

25    A.   No, based on putting the flyers in Fred's yard.
```

```
 1      Q.   Disorderly conduct?

 2      A.   Yes, that's what it was.

 3      Q.   Then Vanessa, your daughter, moved into your house?

 4      A.   Vanessa and her boyfriend, yes.

 5      Q.   And, I'm sorry, Vanessa, your daughter, and her

 6      boyfriend moved in, and what was the boyfriend's name?

 7      A.   His name was Seth.

 8      Q.   And did you have sex with Seth as well?

 9      A.   Yes, I did.

10      Q.   And how did that come about?

11      A.   Well, one day when my daughter went to work, me and

12      Seth were sitting in the living room and he got up and

13      started taking off his clothes.  And I asked him:  What are

14      you doing, and he said:  Well, you're gay, ain't you?  And I

15      said:  Yeah and?  And he said:  Well, why not have sex?  I

16      said:  Well, I don't want to do that to my daughter, and he

17      said:  Well, I won't tell her if you won't, and I gave in,

18      and I had sex with him.

19      Q.   So --

20                THE COURT:  How old was he?

21                THE WITNESS:  17.

22      Q.   So how badly did you not want to do that to your

23      daughter?

24      A.   I guess not badly enough, huh?  It was a very poor

25      decision.
```

1    Q.   Now, in your chronology here we talked about a

2    three-month period in which you were in jail in

3    Connecticut?

4    A.   Yes.

5    Q.   And during that period were Vanessa and Seth staying at

6    your house?

7    A.   Yes, they were.

8    Q.   And what was going on in your house in your mind?

9    A.   What was going on?  They were partying like it was out

10   of style; they were running up bills, phone bills, electric

11   bills, gas bills.  They had all -- they had a bunch of

12   money that I left him; they were supposed to come bail me

13   out.  They didn't do that.

14      I was very worried.  I was worried for my property; I

15   was worried for them.

16   Q.   Now, and this is when you wrote the threatening letter

17   to your mother?

18   A.   Well, what happened was I called my mom and I told my

19   mom I wanted to talk to Seth, and my mom said she wasn't

20   gonna let me talk to him.

21      I got really angry, and I told her on the phone that:

22   Listen, if you don't let me talk to him, I'll get you,

23   bitch, and that's what I said to her.  And then she hung up

24   on me and I tried calling back and she wouldn't answer the

25   phone again, so I wrote her a letter and threatened her.  I

```
 1    told her when I got out I was gonna kill her; that's what I
 2    said.
 3    Q.   How did you end up getting out of jail?
 4    A.   My time ran out.  I believe it was five years, five
 5    years probation, seven years suspended sentence.
 6    Q.   So your case was resolved, and you were released?
 7    A.   Yes.
 8    Q.   Where did you go after that?
 9    A.   I went back to my apartment.
10    Q.   And how long after you got back was it before you were
11    arrested on the child porn charge?
12    A.   Well, it was awhile.  You know, they were doing an
13    investigation so maybe eight months.
14    Q.   And how did you come to be or, well, what were you
15    doing for those eight months?
16    A.   What was I doing?  I did -- I was going to sex offender
17    treatment.  I was working.
18            THE COURT:  In the state side?
19            THE WITNESS:  Yes.
20            THE COURT:  For eight months?
21            THE WITNESS:  Yes.  Well, I don't think it was the
22    full eight months; I think it was about six months, and I
23    tried to get my life back together.
24       You know, when I got out my house was destroyed and all
25    my bills were so far overdue I didn't know what I was gonna
```

1    do.

2          THE COURT:  So when did you have sex with Seth,

3    while you were having sex offender treatment?

4          THE WITNESS:  No.

5          THE COURT:  This was before?

6          THE WITNESS:  Before I went to prison, before I went

7    to jail for those charges.

8          THE COURT:  Now, it's a few minutes past 11.  What's

9    going on?

10         MR. GOLD:  Well, we're into the last quarter so....

11         THE COURT:  How much longer do you think you have?

12         MR. GOLD:  I think about 45 minutes more.  Are you

13    going to hold me to it?

14         THE COURT:  No, you had thought the whole thing

15    would take an hour.

16         MR. GOLD:  An hour-and-a-half, so I think that's

17    exactly on par for our estimates.

18         THE COURT:  So I think we should probably take a

19    break now.  So let me just script out the day.  Let's say

20    we come back in the vicinity of 11:30.  The best we can do

21    is, at best we'll finish with you between 12 and 12:15,

22    right; and then how long do you think you'll have?

23         MS. PIEMONTE-STACEY:  I'll do my best to finish

24    by 1, your Honor.

25         THE COURT:  Well, when is Dr. Bard supposed to be

1    here?

2          MR. GOLD:  Dr. Bard is here on our dime, your Honor.

3          THE COURT:  That might encourage you to go faster,

4    but in any event, I think as a practical matter, when are we

5    going until?  Just until 1 today, right?

6          MR. GOLD:  That's what we were told.

7          THE COURT:  So Dr. Bard would have to come back

8    tomorrow?

9          MR. GOLD:  Right.

10         THE COURT:  Yeah, I read his entire transcript over

11   the weekend; it was actually huge.  Now how long was he on

12   the stand, for a couple of days almost?

13         MS. PIEMONTE-STACEY:  It was, your Honor; it was over

14   a span of two days.

15         THE COURT:  So what are we doing with him since he

16   testified so expansively?

17         MR. GOLD:  Well, he's got a new report, updated, and

18   he saw Mr. Carta again.  There's been developments in the

19   field, both with respect to risk assessment and important

20   recent developments just on the nature of the controversy to

21   talk about, the diagnosis.

22         THE COURT:  But you're not going to repeat anything?

23   I mean, it took me a long time to actually just sit and read

24   it; I mean, it was extensive.

25         MR. GOLD:  Yes.  Well, I think anything that we

1     would -- I'm glad to hear that the Court has read it, so I
2     think that's going to speed things up a considerable amount.
3          THE COURT:  We're not going to go through his
4     credentials, we're not going to go through the old report --
5          MR. GOLD:  No.
6          THE COURT:  -- or anything, so it's just what's
7     happened since the last trial?
8          MR. GOLD:  That's right.  And to do that, we might
9     have to just summarize.
10         THE COURT:  Sure, I'm not saying it will be five or
11    ten minutes, but we're not going to backtrack through
12    everything.
13         MR. GOLD:  That's right, but, again, there have been
14    developments in risk assessments since the trial, and there
15    is new --
16         THE COURT:  But just I stopped her from doing the
17    new one, so is he doing the new one?
18         MR. GOLD:  No, no.  I mean, we'll hear from him.  I
19    mean, he's got --
20         THE COURT:  No, no, the one that had just been
21    developed eight days before her testimony.
22         MR. GOLD:  I don't know of anyone who's doing that
23    particular thing, the SRA-FV --
24         THE COURT:  Because I don't want to have to then
25    bring her back for the same old damages.  Because if he

```
 1    starts testifying about that, I'll let her.
 2              MR. GOLD:  No, he won't testify about that.
 3              THE COURT:  Why don't we just take a few minutes
 4    break here.  We'll come back at 11:30, okay?
 5              THE CLERK:  Court is in recess.
 6              (Whereupon, a brief recess convened at 11:05 a.m.)
 7              THE CLERK:  All rise.  The United States District
 8    Court for the District of Massachusetts in now in session.
 9              THE COURT:  Thank you.  You may all be seated.
10    This group of young people there, are you from a class?
11              A SPECTATOR:  Yes.
12              THE COURT:  Where are you from?
13              A SPECTATOR:  New York.
14              THE COURT:  Is there a teacher or a leader?
15              A SPECTATOR:  They left for the day.  We probably
16    should have gotten permission for this.
17              THE COURT:  Is there somebody who's coordinating?
18    How old are you all?
19              A SPECTATOR:  Well over 21, most of us.
20              THE COURT:  Okay.  Do you know the nature of this
21    proceeding?
22              A SPECTATOR:  Yes.
23              THE COURT:  Okay.  It's a compliment that I wasn't
24    sure exactly where you were on the age scale.  So, all
25    right, that's fine.  Go ahead, Mr. Gold.
```

```
1              MR. GOLD:  Thank you, your Honor.

2         BY MR. GOLD:

3    Q.   Todd, or, Mr. Carta, when we broke we were talking

4    about the chronology of events leading to your arrest on the

5    risk of injury charge?

6    A.   Yes.

7    Q.   Now, over the break I showed you a document which was

8    the PSR in this case.

9         Does that refresh your memory at all as to the

10   chronology of events for you being charged with the child

11   pornography case?

12   A.   A little bit.  It's a long time ago.

13   Q.   But try to fill it in to the best of your memory ...

14   did you come to be sentenced on the risk of injury case?

15   A.   Yes.

16   Q.   And was that in about February of 2002?

17   A.   Yes, it was.

18   Q.   And had you been in prison for a period of time?

19   A.   Yes, I was.

20   Q.   And was that a pretrial detention?

21   A.   Yes.

22   Q.   And what was the sentence that you received on that

23   case?

24   A.   Can I back up a second?

25   Q.   Sure.
```

A.   It wasn't pretrial.  It was I believe 60 days I got for

possession of marijuana.

Q.   Okay.

A.   That was actual time that I did.  When I got sentenced,

my sentence was:  five years probation, seven years

suspended.

Q.   And were there conditions of that probation?

A.   Yes, the conditions was -- there was many conditions:

no alcohol, drugs, and sex offender treatment.

Q.   Now, did your lawyer tell you anything about the sex

offender treatment condition?

A.   He told me that if I wanted to get it annulled I

probably could because I wasn't charged with a sex offense.

Q.   And what was your response to that?

A.   I told him no, because I needed it.

        THE COURT:  Wait, wait, wait.  So where was the

child pornography charge, out of what state?

        THE WITNESS:  It was out of Connecticut.

        THE COURT:  Out of Connecticut?

        THE WITNESS:  Yeah.

        THE COURT:  This was in federal court, right?

        THE WITNESS:  No, this was before.  I hadn't been

arrested for child pornography yet; this was for the risk of

injury.

        THE COURT:  I see.  So that's what you were given the

1    sex offender in state court for?

2           THE WITNESS:  Right.  But because it wasn't a sex

3    offense, my lawyer told me I didn't have to do sex offender

4    treatment.  He said --

5           THE COURT:  What's risk of injury, was that the

6    alcohol?

7           THE WITNESS:  It was for providing alcohol and drugs

8    to a minor.

9           THE COURT:  All right.  Was that broken down as part

10   of a plea; did it start off being a sex offense?

11          THE WITNESS:  It was sexual assault in the beginning,

12   yes, and --

13          THE COURT:  Was it part of a plea that you had to do

14   the sex offender treatment?

15          THE WITNESS:  No.  No.

16          THE COURT:  No, it wasn't?

17          MR. GOLD:  We have the sentencing transcript in

18   the criminal case which I think we'll put before the Court,

19   because a lot of this is discussed.  I'm not sure how to do

20   that, as an exhibit or have the Court take notice of it?

21          THE COURT:  Either way.

22          MR. GOLD:  Yeah.

23          THE COURT:  Can I ask him, what was the sex offender

24   treatment, was it group therapy?

25          THE WITNESS:  It was out of Connections in -- I was

1    doing it in New Britain, Connecticut, and it was group

2    therapy.

3            THE COURT:  Once a week?

4            THE WITNESS:  I think it was twice.  I don't recall,

5    but I think it was twice.

6    Q.  And --

7            THE WITNESS:  But I'm not positive on that.  It was

8    either once or twice.

9    Q.  -- once you were sentenced on the case you were released

10   on probation, did you come to be charged in federal court --

11   A.  Yes.

12   Q.  -- for the child pornography?

13   A.  Yes, I did.

14   Q.  And do you remember when that was approximately?

15   A.  It was some months after that.  I don't recall.

16   Q.  Well, did you -- do you recall whether you were charged

17   and plead guilty at the same time?

18   A.  I was brought in front of a judge.  I believe I plead

19   out, and then he ordered a PSR done on me, and he released

20   me without a mandatory fine.

21   Q.  And during this time did you have occasion to cooperate

22   with the federal government in any way in any investigation?

23   A.  Yes, I did.

24   Q.  And what were the circumstances behind that?

25   A.  They were running a sting on a man who was running

1    child pornography, and he was also about to adopt a couple

2    little boys from Russia.

3    Q.   Now, and what did that participation in the

4    investigation entail, sir?

5    A.   Well, they would call me up on the phone, and I would

6    have to drop everything I was doing and go to the FBI

7    headquarters in Meriden, Connecticut, and we would sit in

8    front of the computer and wait and see if he got on.

9    Q.   Now, during the time that you were out in the community

10   did you consume child pornography?

11   A.   No.

12   Q.   Did you lay your hands on any -- did you have sex with

13   anybody?

14   A.   No.

15   Q.   Did you lay hands on anyone under the age of 18?

16   A.   I laid hands on nobody.

17   Q.   Now, did you come back into federal court to be

18   sentenced?

19   A.   Yes, I did.

20   Q.   And who sentenced you?

21          THE COURT:   I was going to say, had your computer

22   been taken from you?

23          THE WITNESS:   Yes, it was, Judge Squatrito.

24   Q.   And do you remember the sentencing hearing that you had?

25   A.   Vaguely.

```
1    Q.   What was your experience being sentenced by Judge

2    Squatrito?

3    A.   I thought he was very nice to me.

4    Q.   What did he communicate to you?

5    A.   I didn't hear you.

6         MR. STACEY:  Objection, just to the relevance.

7         THE COURT:  No, this is relevant, what he heard and

8    so this is the federal judge, right?

9         THE WITNESS:  Yes.

10        MS. PIEMONTE-STACEY:  I'm sorry.

11        THE COURT:  What did he say?

12        THE WITNESS:  He came down, shook my hand, and said:

13   I wish you the best of luck, and I felt that he cared about

14   me.

15   Q.   And what did he sentence you to?

16   A.   60 months.

17   Q.   And did that represent in part a recognition of the

18   cooperation that you'd done?

19   A.   Yes, sir, exactly.

20   Q.   Did you talk with Judge Squatrito about the sex

21   offender treatment you'd been doing?

22   A.   I believe I did.

23   Q.   Did you have a letter from your sex offender therapist

24   that was submitted to court?

25   A.   Yes, I did.
```

1  Q.   And we talked before that your landlady came?

2  A.   Yes, she did.  She also wrote a letter, too.

3  Q.   And at that time how did you feel about the sex

4  offender treatment that you did?

5  A.   I thought it was great help because I was finally able

6  to talk about my problems that I had.

7          THE COURT:  Which were, what were your problems?

8          THE WITNESS:  Offending, I mean, child pornography,

9  touching kids, all that.

10  Q.   And had you ever been in an environment like that

11  before?

12  A.   No, never.

13  Q.   Where did you first get programmed where you were in

14  prison?

15  A.   I first got programmed in Allenwood, USP Allenwood in

16  Pennsylvania.

17  Q.   And what was USP Allenwood like?

18  A.   It was scary.  It was a penitentiary.  There was

19  murderers, a mix of everybody in there.

20  Q.   About how long were you there?

21  A.   In total fours years.  Three years, and then I went

22  back for another year again.

23  Q.   Now, while you were at Allenwood did you feel fear for

24  your personal safety?

25  A.   Very much so.

1    Q.   Why?

2    A.   I had seen men get murdered over a mouse -- I saw a man

3    get murdered over a mouse.

4    Q.   What does that mean?

5    A.   Well, it scared me.  You know, I knew that anything

6    could happen in there, and something that happened to me

7    there that really terrified me was that one of the men that

8    worked in food services, he wasn't a CO but he was staff,

9    had given out my name to other inmates in the institution

10   that I was a sex offender.

11   Q.   Now, during this period did you do any programming?

12   A.   I did a lot of programming.

13   Q.   What was the programming that you did?

14   A.   Well, the first thing that I did when I came in was I

15   got my GED.  After that I believe I went to CODE, a

16   residential treatment program that they were running.

17   Q.   And what was CODE about?

18   A.   Well, CODE stands for Challenges, Opportunities,

19   Discipline, and Ethics, and you learn a lot of the same

20   things that you would in sex offender treatment:  cognitive

21   distortions, thinking errors, you know, all that stuff.

22   Q.   Did you talk about being a sex offender in the CODE

23   program?

24   A.   Absolutely not.

25   Q.   Why not?

1    A.   Because if I did, I would have been either dead or in

2    the SHU.

3             THE COURT:  Dead or what?

4             THE WITNESS:  In the SHU, segregated housing unit.

5    I would have been checked in.

6    Q.   I think it's Special Housing Unit?

7    A.   It's segregated housing unit.

8    Q.   Segregated housing unit?

9    A.   Yeah.

10   Q.   And are inmates sometimes put there for their own

11   protection?

12   A.   Yes, sir.  They are under PC, protective custody.

13   Q.   Now, did you benefit from the CODE program?

14   A.   I benefited a lot.

15   Q.   What did you learn about yourself?

16   A.   I learned that I had a lot of problems; that some of

17   my thinking wasn't -- the way I was thinking about certain

18   things wasn't right, you know.

19   Q.   Can you elaborate on that a little bit?  Do you have an

20   example?

21   A.   Like thinking that it's okay to rob and steal, you

22   know, because it's what I want.  You know, that's a thinking

23   error; it's not right.  You know, cognitive distortions.

24   You know, we did a lot of stuff like that, but the problem

25   with that program was that I couldn't talk about my offense,

1   you know.  I mean, it was very frustrating to be in a

2   program like that and not be able to talk about what I

3   really needed to talk about.

4   Q.   Now, did there come a time in the CODE program where

5   you wanted to withdraw or quit toward the end?

6   A.   Yeah, there was a few times.

7   Q.   Did you actually come close to dropping out?

8   A.   A couple times I did, yes.

9   Q.   What was going on when you wanted to drop out of that

10  program?

11  A.   Well, I was frustrated.  You know, like I said, I

12  couldn't talk about my offense, and talking about your

13  offense is part of the reason to go to CODE, you know, to --

14  you want to try to break the path that you're on and veer

15  off, and, you know, stay out of prison.  You know, that's

16  what it's all about.

17  Q.   Did you have a therapist in that program --

18  A.   Yes.

19  Q.   -- or a counselor?

20  A.   Yes, I did.

21  Q.   And did that person, how was that person reacting to

22  your wanting to withdraw from the program?

23  A.   Well, she gave me some really good advice.  She told me

24  to sit back, relax, and give it some time.

25          THE COURT:  Why couldn't you talk to her about

```
1    your problems?
2              THE WITNESS:  I did.
3              THE COURT:  Oh, you did talk privately about the --
4              THE WITNESS:  To my CODE counselor, yes.
5              THE COURT:  So what would you say to her?
6              THE WITNESS:  Well, I didn't get into a lot of
7    details with her about my sex offending, but she knew that
8    I was a sex offender.
9         You know, the program wasn't designed for sex offenders;
10   it was designed for general criminality, that's what it was
11   for, so it was really -- she was not trained in that field,
12   in sex offending, you know, but she helped me a lot.  I
13   mean, you know, I don't remember exactly what we talked
14   about, if we talked about anything that had to do with sex.
15   Q.   But did you talk with her about issues having to do
16   with general criminality?
17   A.   Yes.
18   Q.   And was there a part of the program where you spoke in
19   group with men?
20   A.   Yes.
21   Q.   And in that context did you talk about general
22   criminality with those men?
23   A.   Yes.
24   Q.   But you did not talk about your offense?
25   A.   Absolutely not.
```

1    Q.   Did there come a time when you applied to be

2    transferred to Butner for the program there?

3    A.   Yes.  It was after the program, after the CODE program,

4    was over.

5    Q.   And what were the reasons that you wanted to transfer

6    to that program?

7    A.   Well, one reason was because I was scared and it was a

8    way out of the pen.  I realized that I needed help; I needed

9    a lot of help, you know, and --

10   Q.   Had there been a recommendation that you go to the

11   program?

12   A.   There was a recommendation by Judge Squatrito; and I

13   felt that because of what he had done for me, I would go by

14   his recommendation.

15   Q.   And so did you -- were you transferred to Butner?

16   A.   Yes.

17   Q.   About when was that, if you recall?

18   A.   It was in 2005.

19   Q.   And so did you begin to participate in the Butner

20   program?

21   A.   Yes, I did.

22   Q.   And what did that participation entail?

23   A.   There was a number of groups.  We had -- at first it

24   was discussion groups, community meetings, one-on-one

25   therapy.

1    As it progressed, it became more intense.  We had --

2    there was another group I did that I can't recall the name

3    right now.

4    Q.   Did you have an evaluation or assessment at the

5    beginning?

6    A.   Yes.

7    Q.   And what did that entail?

8    A.   Labeling out my entire sexual history.

9    Q.   Did you have a therapist in the program?

10   A.   I had an intern, yes.

11   Q.   Who was that person?

12   A.   Mr. Wood.

13   Q.   And how many times did you meet with Mr. Wood over this

14   period?

15   A.   During the time that I was in the program?

16   Q.   Yes.

17   A.   Oh, I have no way of knowing that ... 10, 20, 30.

18   Q.   And did Mr. Wood do a report on you?

19   A.   Yes, he did.

20   Q.   Did he do testing with you?

21   A.   Yes.

22   Q.   What was your daily experience -- well, are there

23   phases in the treatment program?

24   A.   Yes, there are five phases.

25   Q.   And do you know what those phases are?

1    A.   Well, there's Phase I, Phase II, Phase III, Phase IV,

2    and Phase V, and then there's RPP where we -- Relapse

3    Prevention Planning, and each phase entails different, you

4    know, different workbooks you get.

5        Phase II -- Phase II, I believe, had a process group

6    where they ripped you down, and then rebuilt you all back

7    up and bared you open to everything; I mean, made you

8    actually look at yourself and see what kind of person you

9    were, and it wasn't fun.

10   Q.   And did you complete that phase?

11   A.   Yes, I did, Phase II.

12   Q.   And then what comes after that phase?

13   A.   Phase III.

14            THE COURT:  What did you realize about yourself?

15            THE WITNESS:  I realized I had a lot of problems.  I

16   realized I had a lot of thinking errors going on.  I had a

17   lot of cognitive distortions.

18            THE COURT:  Like?

19            THE WITNESS:  Triggers.

20            THE COURT:  Like?

21            THE WITNESS:  Well, thinking errors like this kid

22   wants to have sex with me so it's okay.  Cognitive

23   distortions like:  I'm only trying to help him, you know,

24   stuff like that.

25       I mean, triggers, you know:  alcohol, marijuana's a

1    great big trigger because it enables me -- you know, it

2    lowers my inhibitions; pornography's, you know, a huge

3    trigger.  It puts me right back into where I don't need to

4    be.  You know, going around hanging out at malls or anything

5    like that can be a trigger.

6              THE COURT:  And at what point does the pornography

7    put you back where you don't want to be?

8              THE WITNESS:  Where I don't want to be, even if I'm

9    looking at adult pornography, I tend to try to get younger;

10   I tend to always find, you know, if they're 30 years old,

11   as long as they look young, but it's hard to find that stuff

12   on the internet sometimes so for me to go back and then

13   start going down on pornography is a bad thing because, you

14   know, it's just going to lead me to go lower and find

15   younger guys and I don't want to do that.  I'm trying to

16   get away from all of that stuff.

17             THE COURT:  Has that stopped you, staying away from

18   pornography and staying away from the malls?

19             THE WITNESS:  Well, staying away from anywhere where

20   kids hang out, you know, putting myself in a situation

21   somewhere where I could meet somebody young; it's not a

22   good idea.

23   Q.  All right.  You said that it was a cognitive distortion

24   that you were just helping?

25   A.  Yes.

```
1    Q.   Can you elaborate on that, what do you mean by that?

2    A.   Well, like --

3    Q.   In what situation would you think you were just helping

4    and how is that distorted?

5    A.   Well, like a kid that's like having a hard time out

6    there.  That's, you know, in a bad family life, you know,

7    taking him and giving him stuff, and you know, trying to

8    just befriend him, you know, with the ultimate goal of

9    having sex with him, you know, and thinking that's okay ...

10   you know that's not okay.

11       You know, I'm not sure if that's a distortion, but to me

12   that's a cognitive distortion.  You know, I'm looking at it

13   the wrong way.

14   Q.   The tearing-down phase of the program, how long did

15   that last?

16   A.   Well, that lasted for three phases.  I was in one full

17   phase and then started another full phase when they started

18   that; it was called process group.

19           THE COURT:  The process group was the tearing down?

20           THE WITNESS:  Yeah, they tore you apart.  They did a

21   different person every week; but when they ripped you apart,

22   they basically bared your soul, and they made you take a

23   look at yourself, you know, and what kind of person you

24   were, and what I saw I didn't like very much.

25       It was extremely hard because most people would leave
```

1    there crying, you know.

2    Q.   What kind of environment was that that you were in; were

3    you were asked to speak and then critiqued or were you --

4    A.   Yeah, that's exactly what it was.

5         THE COURT:  Was this with fellow inmates?

6         THE WITNESS:  Yes, there was about eight people in

7    the group.  You would have to sit in there and present your

8    personal history and go through all the things that you had

9    gone through, and people would -- I don't want to say

10   bash -- but they would, you know, try to look at you and

11   say, you know, why were you doing that, kind of, you know,

12   just ripping you apart.  I mean, it was hard.

13   Q.   Were these cognitive distortions revealed to you in

14   this process?

15   A.   Yeah.

16   Q.   What comes after this tearing down?

17   A.   Well, they try to build you back up, and to show you,

18   you know, good aspects of your life, you know, things that

19   you're doing good, and try to help you to understand all of

20   this stuff, and what, you know, that, you know, there's a

21   life out there; but if you go back and start doing this

22   stuff again, it's just going to -- you know, you're going

23   to end up back where you were.

24   Q.   Did you do something in the program every day or did

25   you have days off?

1  A.   Never a day off.  It was 24-7.

2  Q.   And what does that mean, did you have a schedule like

3  high school or --

4  A.   We had a schedule.  In the morning it was community

5  meetings which lasted for, I think it was, an

6  hour-and-a-half.  After community meeting you might have a

7  ten-minute break.  You went to discussion group, where it

8  was a one-on-one or an instructor would put a topic on the

9  board and a bunch of guys would discuss that topic.

10     There was process group.  There was multiple things

11  going on.  You had shift talks where you pulled a shift out

12  of a hat and you had to go talk to that person in a room for

13  an hour at least, and you couldn't discuss anything sexual.

14  You know, you couldn't discuss your sexual -- you know, the

15  stuff that you had done, but you could discuss your charges

16  and stuff like that.  It was intense.

17  Q.   Did you have therapy as well?

18  A.   Yes, I had one-on-one therapy, too.

19  Q.   And how did --

20          THE COURT:  With whom?

21          THE WITNESS:  Mr. Wood.

22          THE COURT:  So now he was just an intern?

23          THE WITNESS:  Yes.

24          THE COURT:  So what was -- did he have a degree

25  yet?

```
 1              THE WITNESS:  I don't even know.  I don't know.
 2              MR. GOLD:  He was a doctoral candidate?
 3              THE COURT:  He was a doctoral candidate, so do you
 4     know if he had his master's; do you think, do you know?
 5              MR. GOLD:  I think he must have had his Master's.
 6              THE WITNESS:  You know, I know he was there.  I
 7     guess they do six months there, and it's a part of something
 8     that they do; I'm not sure what it is.
 9     Q.  Well, how was that therapy; was it productive?
10     A.  Well, yeah.  Yeah, he told me a lot of things I didn't
11     want to hear, you know.
12              THE COURT:  Like what?
13              THE WITNESS:  Well, that I had a problem, you know,
14     I had an attraction to younger people, and that in the
15     community I was acting on that.  I was hanging out with
16     a lot of younger guys, you know.
17              THE COURT:  In what community, in the prison
18     community or in the regular community?
19              THE WITNESS:  In the program.
20              THE COURT:  In the program?
21              THE WITNESS:  In the program community, yeah.  I
22     was hanging out with 21-year-olds, 20-year-olds; I didn't
23     see that as a problem, but they did and I should have
24     listened to them better, you know.
25     Q.  Well, let's talk about that in particular.  Were you
```

```
1    accused of or were you under the impression that the

2    program was concerned about you spending time with these

3    younger group members?

4    A.   Yeah, I had been confronted about it in community

5    meeting.

6    Q.   And what were you doing at the community meeting, who

7    were you associating with?

8    A.   In community meeting, you mean in the community?   In

9    the community, well, I associated with most everybody that

10   was in my phase, Phase II.   These were all the guys that I

11   had gone through classes with.

12        THE COURT:   Phase II is the rip down?

13        THE WITNESS:   Yeah.   I think the process group goes

14   Phase II, Phase III, Phase IV, and Phase V, all the way

15   except for Phase I.   Phase I is like an orientation phase.

16   They focused on me hanging out with younger guys.

17      Now, in sex offender treatment a lot of the guys were

18   younger than me, but I should have spent more time with some

19   of the older members in the group, and I wasn't doing it,

20   and they saw that as a problem.

21   Q.   And as you sit here today, do you see any problems with

22   your behavior around the younger men?

23   A.   Yes.

24   Q.   What is the problem?

25   A.   The problem is that I don't need to -- you know, I
```

1  don't need to be there.  I don't need to do that.  I need to

2  be with people my own age.

3  Q.   Do you remember the names of any of the individuals?

4  A.   Well, Robert Stonewall was one.

5  Q.   And how old was Robert Stonewall?

6  A.   26.

7  Q.   And are you in communication with Robert Stonewall

8  today?

9  A.   No.

10  Q.   At the time did you think that there was anything

11  problematic about your interacting with him?

12  A.   No, I didn't think it was.

13  Q.   And were there legitimate reasons -- well, did you

14  admit being sexually attracted to them?

15  A.   I'm sexually attracted to a lot of people in the group.

16  I'm a gay man, but I haven't acted out on it.

17       THE COURT:  But did you consider your actions with

18  Mr. Stonewall and the others at that program to be acting

19  out on it?

20       THE WITNESS:  Well, when I said "acting out," I

21  meant sexually acting out.  I haven't been sexually active

22  in ten years.  That's what I mean.

23       THE COURT:  So you were attracted, but you didn't

24  actually have sex?

25       THE WITNESS:  Yeah.  I'm a gay man; I'm in a men's

1    prison.

2         THE COURT:  No, I just want to understand.  When

3    you say you were attracted to these younger people, you

4    didn't actually go forward and have any sexual contact?

5         THE WITNESS:  I haven't had sexual contact in

6    nine-and-a-half years.

7    Q.  Now, so what was the problem with your interaction with

8    these men; couldn't you have relationships with these men on

9    the street?

10   A.  I could.  These guys -- you know, I'm 50 years old,

11   all right, and I realize, you know, these guys are more

12   active; they have a different lifestyle than I do.  And if

13   I get into a relationship like that, that's not good for me

14   because it's not good for them.  I'm going to be holding

15   them back, you know, from what they want to do, and, you

16   know, I realize all of that; I know all that now.

17   Q.  Did they give you a lot of sex offender homework?

18   A.  Hundreds.

19   Q.  When did you find time to do that if you were in class

20   all day?

21   A.  After program hours were over.

22   Q.  Now, the PHQ, what is that?

23   A.  That's a Personal History Questionnaire.

24   Q.  And what's it about?

25   A.  It's about all the sexual contact that you have had in

1    your life.

2    Q.   Before I ask you about that, were you forthcoming with

3    Mr. Wood?

4    A.   I told him everything.

5    Q.   And what made it possible for you to tell him

6    everything?

7    A.   I think the sex offender treatment on the street had a

8    little to do with that.  It got me a little more used to

9    being open.

10   Q.   And were some of the concepts that you were introduced

11   to at Butner, had you been introduced to them at the CODE

12   program at Allenwood?

13   A.   Yeah, they have some of the same cognitive distortions

14   and thinking errors.  They use the same thing there.

15   Q.   So the PHQ, how much time did you devote to -- you said

16   you did three of them; how much time did it take you to do

17   them?

18   A.   Well --

19            THE COURT:  What did you say, the what?

20            MR. GOLD:  We're talking about the PHQ, which is the

21   Personal History Questionnaire.

22   A.   I believe -- I don't remember the time frame that they

23   gave us, you know, to complete them.  I believe it was two

24   weeks they gave us.

25       Typically, what we would do is we would take them back to

1    our cell and sift through them as best as we could, fill

2    them out.

3              MR. GOLD:  Could I have the document camera?

4              THE CLERK:  Sure.

5    Q.   For the record, I'm putting up on the document viewer

6    Exhibit 27, Bates Page 1030, and this is from one of these

7    PHQs?

8    A.   Yes.

9    Q.   Do you recognize this page?

10   A.   Yes, I do.

11   Q.   And do you recognize this page as a page that was

12   discussed in the testimony on Friday?

13   A.   Yes.

14   Q.   Now, on Page 1030 there's the question:  "What is your

15   preferred age range," and you say -- well, what do you

16   understand that question to be asking you?

17   A.   What age range do you prefer to have sexual contact

18   with.

19   Q.   And you put, what did you put there?

20   A.   I believe it says, "Males as young as 13, as old as 23

21   -- 23 or 28," I don't know what it says.

22   Q.   And for females, what did you write?

23   A.   "Females as young as 16, as old as 25," I think it was.

24   Q.   Is that accurate today?

25   A.   No.

1  Q.   What would you say today?

2  A.   Well --

3        THE COURT:  Well, let me back up, was it accurate

4  then?

5        THE WITNESS:  The male thing, with males, you know,

6  it depended on what the person looked like.  If they looked

7  mature, yes, it was accurate.  Okay.

8     If the 13-year-old looked mature, I would have sex with

9  him, yes.  If, for instance, Bradley, he looked immature; I

10  had opportunities to have sexual contact with him, but I

11  did not because he looked immature; but today, no, it's not

12  accurate because I would never have sex with a 13-year-old

13  today whether he looked mature, immature, or not, I

14  wouldn't.  After going through this, no.

15  Q.   But just to talk about your sense of your own level of

16  attraction, what would the age range be today, similar to

17  that?

18  A.   No.  You know, I have a friend in Devens who is 34

19  years old but looks young; I would love to have a

20  relationship with him.  You know, so I realize that I could

21  find an older person that might look younger and I'd be

22  happy with him.  You know, that's when I really love him.

23        THE COURT:  Can I just ask, are you saying you are

24  still attracted to 13-year-olds but after what you've gone

25  through you would never act on it?

1          THE WITNESS:  I won't act on it, no.  I don't know

2     if I --

3          THE COURT:  But hear both parts of the question,

4     though:  are you still attracted to 13-year-olds?

5          THE WITNESS:  You know, your Honor, I don't know.

6     I'm not gonna sit here and lie and say no, but I can't --

7     you know, I mean, I see them on TV all the time.  I look at

8     him and I say:  Oh, he's good looking; but as far as sex

9     goes, it's in my mind that that's, you know, off limits.

10          THE COURT:  Just I don't want to put words in your

11     mouth, so you're still attracted to them, but what you're

12     saying is you've been through so much you would never act on

13     it; is that what you're telling me?

14          THE WITNESS:  I guess, yeah.

15          THE COURT:  I don't want to put the words in your

16     mouth.  Is that reflecting what you're trying to tell me?

17          THE WITNESS:  Yeah.  I would say I still had an

18     attraction.  I mean, I don't know; I'm not around any

19     13-year-olds so ... I mean, I feel like I don't, but I can't

20     be honest and say that.

21        It's not an honest statement if I say I'm not attracted

22     to them, I don't know if that's honest or not.  We've got

23     guys in prison that, you know -- there ain't no 13-year-olds

24     in prison.

25        I know I would never have sex with a 13-year-old, you

1    know, no matter if they looked 20, you know, I don't care;

2    it's just illegal, and I know the damages I can cause that

3    person, you know, psychological damages.

4        A lot of these kids, you know, they're ready, sex wise,

5    they're ready, but, you know, up here, I know how I felt

6    about it, and how I feel about it now, so, you know.

7    Q.   Todd, when you think about who you're attracted to, do

8    you think about an age or a body type?

9    A.   I think about a body type.

10   Q.   And taking, I mean, going ahead four pages in this

11   same PHQ, it's Bates Stamp 1034 in Exhibit No. 27, and this

12   is a different section of the PHQ.  What is the general

13   subject of this page?

14   A.   Child pornography.

15   Q.   And do you recall testimony on Friday about this

16   particular section?

17   A.   Yes.

18   Q.   Can you tell me the question, "the beginning of your

19   child....," tell me what that was asking you in your

20   interpretation?

21   A.   It's asking you what the ages of the pictures that you

22   had in your collection were.

23   Q.   How did you respond?

24   A.   I put any child 3 to 6, any child 7 to 11, and any

25   child 12 to 17.

1    Q.   Now, was that true?

2    A.   Yes.  That's what I had in my collection, yes.

3    Q.   And then what's the next question there?

4         THE COURT:  Well, can I just ask, why did you

5    collect pictures of children from the ages of 3 to 6 and 7

6    to 11?

7         THE WITNESS:  For trading, to trade online.

8         THE COURT:  Did you look at them and feel sexual

9    attraction?

10        THE WITNESS:  No, they were strictly for trading.  I

11   call them trade bait.

12        THE COURT:  Did you get money for the trades?

13        THE WITNESS:  No.

14        THE COURT:  Why did you want to trade them?

15        THE WITNESS:  Because the way it works is you put up

16   an ad.  When your ad goes up -- it's hard to explain, but

17   you type in a trigger and it allows you into my computer,

18   but on my ad it says what I want.  What I want in exchange

19   was teens.  So a lot of times in order for me to get what I

20   want, I had to give people what they want, and there's a lot

21   of people looking for these age groups on the internet.

22        THE COURT:  That was your barter?

23        THE WITNESS:  That was my barter.  In order for me

24   to get what I want, I've got to give you what you want.

25        THE COURT:  So in order to get the 12 to 17 year

1    olds you had to have some of the other kind?

2         THE WITNESS:  Yes, I had a lot of people that wanted

3    kids in diapers, and I wouldn't allow any of that stuff on

4    my computer.

5         THE COURT:  What would be the difference in someone

6    in diapers and someone 3 to 6?

7         THE WITNESS:  I don't know.  It's just, I don't

8    know, that's a baby.  You know, I don't know.

9    Q.   Do you see much of a difference or much of a

10   distinction today between those two categories?

11   A.   Of the kid in diapers and the 3 to 6?

12   Q.   Yeah.

13   A.   No, they're still kids.

14   Q.   But at the time you had this rule that --

15   A.   Yeah, I had it up on my thing, on my ad, that said:

16   no diapers, no kids in diapers.

17   Q.   Now, when was the first time you told anyone in

18   authority about your trading; was it in treatment?

19   A.   No, as soon as the police arrested me.

20   Q.   And did you tell the probation officer about your

21   trading and --

22   A.   Yeah.

23   Q.   -- that type of activity?

24   A.   Yeah.

25   Q.   Now, what images did you look at, how did you -- did

1    you look at all 50,000 images or --

2    A.   Yes.  You know, that's impossible.  I had a folder that

3    was called favorites.  It had, I don't remember the amount,

4    it had about 30 to 50 pictures in it, and that's what I

5    would typically look at.

6    Q.   Now, the next question underneath the question we

7    talked about, what is that question asking you?

8    A.   It's what was your age preference in the child

9    pornography, rate 1 for most referred, rate 2 for next

10   preferred, and I rated children 7 to 11 as a 2, and I rated

11   children 12 to 17 as a 1, meaning that I preferred to get

12   pictures of children of 12 to 17 more than I wanted children

13   7 to 11, and this all happened -- this all has to do with

14   trading, okay.

15       If I'm trading online, this is what I want you to give me

16   ... because children 7 to 11 is a trade bait, okay?  It's

17   barter.  It's like a barter, okay, but that's what it is.

18   Q.   Now, did you interpret this question to be asking you

19   about your sexual attraction or your sexual preferences?

20   A.   No.

21   Q.   Did you also consume or view adult pornography --

22   A.   Yeah.

23   Q.   -- when you were in the community?

24   A.   Yes.

25   Q.   And did you distribute adult pornography?

```
1     A.   I had a website with legal teen boys on it.
2          THE COURT:  Have you seen recently the 30 to 50
3     pictures you labeled "favorites"?
4          THE WITNESS:  Have I seen them recently?
5          THE COURT:  Yes.  Do you remember what was in there?
6          THE WITNESS:  They were basically 13 to 18.
7     Q.   Mr. Carta, did you attempt to withdraw from the Butner
8     program?
9     A.   Yeah, a few times, like three or four.
10    Q.   What was going on in your mind when you wanted to
11    withdraw?
12    A.   Well, it was extremely hard to deal with all the stuff
13    that was going on, you know, the emotions.
14    Q.   Is that part of the treatment process?
15    A.   Yes.
16    Q.   What would happen when you attempted to withdraw or
17    said you wanted to withdraw?
18    A.   They would call me in and talk to me, and three out of
19    four times I'd change my mind.
20    Q.   Well, and what was happening, what was the source of
21    conflict right before you ultimately did withdraw from that
22    program?
23    A.   Well, there was a restriction placed on me by
24    myself that said that I wasn't going to hang out with
25    anybody in Phase III or below.
```

1          THE COURT:  What do you mean Phase III or below?

2          THE WITNESS:  Phase II, Phase I, or Phase III, I

3     couldn't hang out with any of those people and --

4     Q.   So but when you say "restriction placed on you," what

5     are you talking about; how did that come about?

6     A.   Because they said I was hanging out with too many

7     younger guys.

8     Q.   Who said?

9     A.   Well, originally, it was inmates that were confronting

10    me in community meeting, and then it got to staff, and then

11    Mr. Wood told me that.

12    Q.   And so what do you mean when you say you put a

13    restriction on yourself?

14    A.   They had me write up a paper with restrictions, and I

15    had to introduce that paper to community meeting -- at

16    community meeting.

17    Q.   And what was the restriction in substance?

18    A.   Basically, that I wasn't going to hang out with anybody

19    under, I don't remember, Phase II I thought it was.

20    Q.   And what phase were you in?

21    A.   Phase III.

22    Q.   And was it difficult to abide by that restriction?

23    A.   Well, they wanted me to hang out with nobody under

24    Phase III, III or under, which meant I had nobody to do

25    homework with which made it extremely difficult.  You know,

```
 1    I was basically alone.
 2    Q.   And so did that contribute --
 3            THE COURT:  Even the older guys?
 4            THE WITNESS:  Everybody.
 5            THE COURT:  Why did they explain that they wanted
 6    that?
 7            THE WITNESS:  They wanted me to hang out with older
 8    -- they wanted me to hang out with senior program members.
 9    If they were 20 years old, it was okay because they were
10    senior, and they knew more --
11            THE COURT:  So people who had already been through
12    the phases --
13            THE WITNESS:  Had already been through the phases.
14            THE COURT:  -- and were more comfortable with their
15    cognitive development --
16            THE WITNESS:  Yes, exactly.
17            THE COURT:  -- is that the gist of it?
18            THE WITNESS:  Yes.
19            THE COURT:  Why didn't you think that was a good
20    thing?
21            THE WITNESS:  It wasn't that it wasn't a good thing;
22    it was these people didn't have any time for me.  First of
23    all, they were in phases that were above what I was in;
24    they weren't working on the stuff that I was working on,
25    and a lot of the stuff they didn't remember.
```

1          The higher up in phases you get, the more busy you are;

2     they were writing their RPPs and all kind of stuff.  There's

3     no time.

4               THE COURT:  RPPs?

5               THE WITNESS:  Relapse prevention plans.  There was

6     no time; they had no time for me.  Some guys looked at me

7     like a lower being, being in a lower phase, you know.

8     Q.   Did you say you found it complicated trying to abide by

9     this restriction?

10    A.   Yeah, again, it was almost impossible.

11              THE COURT:  Did you try?

12              THE WITNESS:  I did for a few days.  The original

13    plan, what they wanted was to try it for a week.  They

14    wanted me to go into community meeting and announce to the

15    community that I was going to be doing this restriction.

16         The thing was is they would not allow me to stay for a

17    week, and I didn't.  I wouldn't agree to it.  I said, I will

18    go in there and tell them for a week so I could try it, but

19    that was it; they wouldn't let me do that.  So I refused to

20    introduce it in the community meeting I think for a couple

21    of days, and then I did, and then I just withdrew.

22              THE COURT:  You got angry?

23              THE WITNESS:  Huh?

24              THE COURT:  You were angry?

25              THE WITNESS:  I was very angry, yes.

1    Q.   The day after you withdrew, how were you feeling about

2    the withdrawal?

3    A.   Terrible.

4    Q.   What did you say to Mr. Wood?

5    A.   I told him that I wanted to go back into the program,

6    but that I was embarrassed.

7    Q.   If you had to do it again, would you have gone back in

8    again?

9    A.   In a second.

10   Q.   Why, if it was so hard?

11   A.   Because I needed it.  Because I needed it.

12   Q.   Were some of the grievances that you had against the

13   program legitimate?

14   A.   Yeah, some were, a few.

15   Q.   But is that --

16   A.   No.  You know, let me put it this way:  they had a big

17   board that was almost as big as this (gesturing), okay?

18   With everybody's names on it, and the way they were running

19   it was:  if I confronted you in community meeting, I got

20   points.  And with those points, I could buy the TV for the

21   night, because they had no TV in the unit at all except for

22   they had CNN daily, that was it.

23       So I went to staff and I told them:  Listen, I don't

24   want to do this; I didn't come here to watch TV, and if I

25   have to confront people to get points to watch TV, this is

1   not the program I want to be in.

2       I didn't agree with it.  I didn't like that part of it.

3   People were confronting people in community meetings just to

4   get points.  They'd see somebody steal a pack of sugar out

5   of the chow hall and have them up standing in front of the

6   staff in community meeting and say:  I saw him steal sugar

7   so they could get points out of it.

8       I didn't like that.  I didn't think it was the right way

9   to go.  You know, and it created a lot of friction among

10  inmates, and the other thing is I came from a penitentiary.

11  You know, I learned for three years, you don't rat people

12  out.  You know, you're in prison.  So it was extremely hard

13  for me to start to do this.

14      Now, I confronted a couple of people, and the first one

15  I confronted was expelled at the meeting.

16  Q.   Why?

17  A.   Why did I confront him?

18          MS. PIEMONTE-STACEY:  Objection.  Objection as to

19  why the other inmate was expelled.

20          THE COURT:  Overruled.

21  Q.   What did you confront him about?

22  A.   I confronted him about, he was asking a mentor who was

23  a senior program member, for a picture of his teenage son,

24  and I stood him up in community meeting, and I confronted

25  him about it.

1    Q.   And what did you understand the consequence of that

2    confrontation to have been?

3    A.   He was thrown out of the program immediately.  They

4    told him to get out now.

5    Q.   And how did you feel about that?

6          THE COURT:  Well, what was he charged with?

7          THE WITNESS:  Well, he wasn't charged with anything;

8    he had asked the mentor for a picture of his son, his teen.

9          THE COURT:  Was he charged with molesting that son,

10   is that why he was there?

11         THE WITNESS:  No.

12         THE COURT:  Was this just a picture of a family

13   member?

14         THE WITNESS:  A picture that the man had in prison,

15   yeah.  They don't want you to have books with anything like

16   that it in.

17         THE COURT:  It was just because the boy was young?

18         THE WITNESS:  Because of the content, yeah.  It was

19   a teenage boy.  I don't remember but I think he was like 15

20   or something, and they expelled him immediately.  You know,

21   I left devastated.

22      I left crying because I didn't want the guy to get

23   expelled.  I wanted him to get punished for what he did,

24   and for them to talk to him, but not thrown out, but then

25   it happened again.  I confronted somebody about having

1   sexual contact where they worked in the paint shop, and

2   they threw him out.

3       And that was the last straw, that's when I went to

4   Dr. Hernandez and said:  Listen, if you throw the man out,

5   I'm leaving; and they threw him out, and I left.

6   Q.   But, nevertheless, the day after you regretted your

7   decision?

8   A.   Absolutely.

9           THE COURT:  Did you like Hernandez?

10          THE WITNESS:  No, I didn't like him.  I don't really

11  want to say this, but I think he was crazy, I thought.

12          THE COURT:  Because?

13          THE WITNESS:  Well, he told me a story about

14  something one time, and I'm not going to repeat it, but it

15  was very nasty, and he would come to the community meeting

16  and say:  there's not enough confronting going on in here;

17  I want to see more confrontation.  I want you guys to be

18  confronting people about all this stuff, to hold everybody

19  accountable, and I would stand up and say, you know, this

20  guy's off the wall; and it wasn't just me that thought that,

21  a lot of people did, but he seemed like a very nice man.

22  You know, when you look at him, I mean, he dressed

23  immaculately; he looked like a good man, he was very smart,

24  but some of the stuff he did in there was just crazy.  You

25  know, it was very hard.

Q.   Todd, is there anything else that you'd like to say
about your experience in the program?

A.   I've learned a lot.  You know, I learned a lot about
myself.  I'm glad I went through it.  I'm sorry that I left.
You know, there was one other reason why I left.  I mean,
Mr. Wood was getting ready to leave.

Q.   Oh, that's right.

A.   I was going to have to start all over again, not all
over in the program, but another one-on-one, and it's hard
to do that.  It's hard to open up to somebody that you don't
know.  So all that stuff combined, that's why I decided, you
know, I had enough, and, you know, I was very sorry that I
left.  I should have sucked it in and got embarrassed and
went back into community meeting, but I didn't; and if I
could, I'd change it.

Q.   Todd, what happened to you directly after that?

A.   I was in another unit where they put all the guys that
quit and got thrown out of SOTP, and the guys that got
thrown out of the drug offender unit.  I had an altercation
with an inmate who came in my cell and threatened me, to
beat me.

     And the next day I went to the officer and I told her
that I had been threatened, and I told her that I had come
from a penitentiary, and that I had seen a man get hot baby
oil thrown on him, and that I did not want to go there; and

1   they called him into the lieutenant's office, and when he

2   came back, he gave me a look like:  I'm going to get you, so

3   I went to work that morning and I told my boss the trouble

4   I was having and asked his advice, what I should do, and he

5   called the lieutenant's office.  They locked me up.  They

6   tried to have me assigned to PC.  I refused.  They signed me

7   into PC, and a month later I got a shot for threatening

8   bodily injury.

9           THE COURT:  You got a what?

10          THE WITNESS:  I got incident report for threatening

11  bodily injury.

12  Q.  And the statement that's attributed to you that you

13  were going to throw hot baby oil on someone, that was, in

14  fact, not what you communicated?

15  A.  That was absolutely not true.  I told that -- excuse me,

16  the CO Forte, I told her I had seen it in the penitentiary,

17  and I did not want to go there.  That's why I was coming to

18  her.  Because I was going to throw hot baby oil on somebody,

19  I would not go tell the police.

20          THE COURT:  So can you back up, what happened in

21  this incident again?

22          THE WITNESS:  This man came into our room and

23  started threatening me about the TV.  He said:  This is my

24  f'n TV.  He said:  You guys aren't going to watch it.  I

25  said:  Hey, man, you got a TV over there; we watch this TV;

1   we're not doing anything to you.

2       So he threatened me.  He said:  I'll "f" you up, he said

3   to me.  So the next morning I went to the officer, the CO

4   that was on duty, and I told her what happened, and I told

5   her that I had seen a man in the penitentiary get hot baby

6   oil thrown on him, okay, and I didn't want to go there, you

7   know.

8           THE COURT:  You didn't want to go there meaning you

9   didn't want to do it to this other guy?

10          THE WITNESS:  I didn't want to do that to somebody,

11  you know, so, I mean, I could have very easily gone to the

12  microwave, heat up a cup of baby oil and thrown it on him,

13  but I don't want to go there, okay?  I'm coming to you

14  instead, that's what I said to her, and she called the

15  lieutenant, the lieutenant called him down, and then an hour

16  later he came back in the unit.  You know, now he knows I

17  told on him.

18      So I go to work.  I tell my boss the problem that I was

19  having, you know, what happened and asked his advice.  He

20  called the lieutenant, and the lieutenant in front of all

21  this other staff he said:  we're going to lock you up.

22  Well, before they locked me up they tried to get me to sign

23  for the PC and I refused and they signed me in --

24          THE COURT:  That's Protective Custody?

25          THE WITNESS:  Protective Custody.  They did it

1   themselves and signed me in, and they also locked up the

2   other man.

3       About a month later I received a shot for threatening --

4   a bodily injury report for threatening bodily injury, an

5   incident report for threatening bodily injury.  I never

6   threatened.

7           THE COURT:  Did you have a hearing?

8           THE WITNESS:  Yeah.

9           THE COURT:  Were you found guilty?

10          THE WITNESS:  Yeah, of course.  I mean, it's the

11   BOP.  You know, I mean, they have a higher conviction rate

12   than the government probably.  I mean, their conviction rate

13   is like 99.9%.

14       What kind of evidence can you put forth to prove it?  I

15   can't prove that.  I can't prove what I said.  If she's not

16   willing to tell the truth, I can't do it.

17          THE COURT:  What did she say you said?

18          THE WITNESS:  She said that I told her that I was

19   going to pour hot baby oil on her.

20          THE COURT:  Unless you did something?

21          THE WITNESS:  Well, yeah, I never said that.  If I

22   was going to do that, I wouldn't have told her.  You know,

23   I'm not stupid.  That's a threat.  I would never do that,

24   so they gave me shot for that, and two months later they

25   sent me back to the pen, and I spent almost all the rest of

1    my time there.

2    Q.   Do you think that that could have been something that

3    you heard and not what you meant?

4    A.   Could she thought she had heard that?  She could have.

5    She might not have understood what I was saying.

6    Q.   How long were you in Allenwood?

7    A.   I was there for three years the first time; and then

8    when I came back, a year.

9    Q.   Well, did anything eventful happen during that year

10   that you'd care to mention?

11   A.   Not that I can recall.

12   Q.   What happened next in your career in the BOP?

13   A.   I was sent to Devens with two weeks left of my

14   sentence.  They were telling me that I was going for an

15   evaluation.  I was going to Butner is what they told me for

16   an evaluation for SDP, and they said:  Don't worry about it,

17   you don't fit the criteria; that's what they told me, okay?

18       I'm sure at the time no one knew anything about it

19   anyway.  I ended up in Devens, I had no reason -- I didn't

20   know why I was there, okay?  And they started asking me

21   questions and everything; and then once I got out onto the

22   unit, I met Mr. Shield s, and he advised me to call you, and

23   that's what I did.

24   Q.   By "you," do you mean my office?

25   A.   Yes, not you, I ended up calling Page Kelley.

1    Q.   This is before you were certified?

2    A.   Yes, this is two weeks --

3         THE COURT:  It was right when you got there?

4         THE WITNESS:  February 28th I got there, and my

5    release date was March 9th.

6    Q.   You did interview with them before you called?

7    A.   Yes, they got me in R&D.

8         THE COURT:  On what?

9         THE WITNESS:  Receiving and Discharge where they

10   bring you into an institution.

11   Q.   During your time at Devens have you had sex with

12   anybody?

13   A.   No.

14   Q.   Have you had any sexual disciplinary issues?

15   A.   No.

16   Q.   Have you had some disciplinary issues?

17   A.   Yes, a few.

18   Q.   What are the -- what are those?

19   A.   Well, what are they?

20   Q.   Just what's the nature of them?

21   A.   Okay.  I got caught fixing radios, which I love to do,

22   and was doing it almost the whole time I've been at the

23   BOP.

24   Q.   Well, Mr. Carta, I'm sorry to cut you off, but I

25   wanted to ask you something before, and I forgot:  did you

1    work while you were at Butner; did you have a job?

2    A.   Yes.

3    Q.   And was that part of -- how many hours did you spend

4    doing that?

5    A.   Some months it would be 200 hours working or I think

6    even more than that.

7    Q.   And did you like doing that; what did you do?

8    A.   I loved it.  I was in the chow hall.

9    Q.   And did you get positive reports?

10   A.   I got excellent reports.

11   Q.   Fast-forwarding now to Devens, were you working at

12   Devens?

13   A.   I had a job when I first -- I got a job when I first

14   went in there.  It was an inmate in hand.  They trained me

15   and then they put me in a unit that had chronically ill

16   people in it, and they told me part of my duties was to

17   give men showers, and, also, to wipe their bottoms after

18   they defecated, and I quit.

19       I told them it was inappropriate for me to be doing

20   that, especially in the situation that I was in.  And then I

21   had a job in safety which lasted for three days because all

22   we did was sit down there every day and I decided I didn't

23   wanted to get up at 7:00 in the morning to go sit.

24   Q.   So this fixing radios, what is that about?  Do a lot of

25   radios need fixing?

1    A.   A ton of radios need fixing.  People in Devens don't

2    have a lot of money, and the BOP sells radios for $46, so I

3    make a little money doing it.  You know, they come to me

4    when they drop the radio and it breaks and it don't work.

5       If people didn't fix radios in there, a lot of people

6    wouldn't have them; you need radio to watch TV.

7    Q.   How does that work?  You need a radio to watch TV?

8    A.   Yeah, they have a transmitter on the TV that transmits

9    it to FM so without the radio you cannot watch -- well, you

10   can watch it, but you can't listen to it.

11   Q.   But that's against the rules?

12   A.   It is against the rules, yes.

13   Q.   Do you have other disciplinary reports?

14   A.   Yes, I have an insolence report where a woman told me

15   to tuck in my T-shirt.  I tucked in my shirt, and it was

16   actually in a spot in the institution where you don't have

17   to tuck your shirt in; but when I looked over and saw SOTP,

18   I flipped out; I freaked out on her, and I told her not to

19   talk to me.

20      I said:  If you want to talk to me, call my lawyer; and

21   she gave me an incident report for insolence.

22   Q.   Anything else?

23   A.   Yeah, there's another one.  You know, I got a few for

24   fixing radios.  I think there's two or three for that, and

25   I got a big one for possession of amphetamines.

1    Q.   Could you briefly describe what that was about?

2    A.   Well, they were doing a mass shakedown in my unit and I

3    left my locker and went out, and about six hours later they

4    called me to the lieutenant's office, and they told me that

5    they had found a lollipop in my locker with drugs in it,

6    okay?  And I haven't done drugs in ten years; I haven't.

7    I've tried to clean my act up since I've been in prison.

8        I tried to explain to them if there was a lollipop with

9    amphetamines in my locker I would have thrown it away

10   because I had plenty of time from the time when they

11   announced shakedown to where they actually come in and start

12   checking, I could have thrown it down the hall.

13   Q.   But, Todd, can you explain how or what it means that

14   there was a lollipop with amphetamines out, what is that?

15   A.   People make lollipops from -- by putting certain hard

16   candies together and I guess they put -- I don't know what

17   kind of amphetamines they have in prison.  You know, they

18   have a medical hospital so I'd imagine they have certain

19   things in there.  I guess they put the pills in there and

20   sell them.

21   Q.   Weren't you drug tested?

22   A.   Yes, immediately, when they called me down to the

23   lieutenant's office.  I was negative.

24   Q.   And have you been drug tested since then?

25   A.   15 times, I've been negative every time.

```
1    Q.   Todd, did you ever request to start -- after the trial

2    in this case did you request to participate in the sex

3    offender program?

4    A.   Yes, I did.  I put a copout in with Ms. Renard; she's

5    the Director of the SOTP.

6    Q.   And were you accepted?

7    A.   I was told that because I was the first one she didn't

8    know what to do.  She said she would have to go to the

9    central office and get permission, and that was in April,

10   and I never heard back, and I inquired two more times after

11   that with no results.

12        THE COURT:  So what happened with the charge; were

13   you ever charged with it?

14        THE WITNESS:  Yeah, I did 45 days for it in the hole.

15        THE COURT:  So you went through a hearing?

16        THE WITNESS:  Yeah.  Remember, I talked about that

17   when we had the status hearing because what happened was

18   they kept me in the hole; it was hard to get pencils and

19   everything in there, so by the time I filed my appeal, it

20   was too late, and I asked that Ian go down there and --

21        THE COURT:  Was the locker locked?

22        THE WITNESS:  My locker's open all night.  You know,

23   I believe that --

24        THE COURT:  Excuse me, could you have locked it?

25        THE WITNESS:  Yeah, I have a combination lock.
```

```
1              THE COURT:  So how did it get open?

2              THE WITNESS:  It's open all night.  We live right

3     there.  Your locker's right at the foot of your bed.  It

4     stays open all night.

5              THE COURT:  The locker's underneath your bed?

6              THE WITNESS:  Well, right in front of your bed.

7              THE COURT:  Well, how would it have gotten in there?

8              THE WITNESS:  It's a cubicle, right.  You have a

9     cubicle.  You have your bed here and your locker's right

10    here (gesturing) and --

11             THE COURT:  So you left it open for the night?

12             THE WITNESS:  Yeah, we all do.

13             THE COURT:  And how many people in your cubicle?

14             THE WITNESS:  Well, I had a roommate.

15             THE COURT:  One roommate?

16             THE WITNESS:  Yes.

17             THE COURT:  So how did the drugs get in there?

18             THE WITNESS:  I don't know.  From my understanding,

19    the only thing I know is people have told me he put it in

20    there, but I don't know that for a fact.  I don't know.

21             THE COURT:  Have you ever seen him do drugs before?

22             THE WITNESS:  No.

23             THE COURT:  Did you have a fight or --

24             THE WITNESS:  Well, we had a argument a couple days

25    before that, but I don't know if he would do that.  He was
```

1   going home in 30 days; I couldn't see him doing that.

2       The only thing I can figure, and I told Ian this, they

3   called another man down to the lieutenant's office and

4   accused him of having drugs first, okay?

5       When he went down and talked to them, they said:  well,

6   we've got the wrong guy, go back to your unit, and don't

7   tell anyone.  Then after they got him, they got me, and

8   they called me down there, and I told them:  I don't do

9   drugs.

10      Your Honor, I haven't done drugs since September 7,

11  2001.  Before I turned myself in I smoked a joint on the

12  way into court like an idiot, but that's what I did, okay?

13  I have not done drugs since then, okay?

14      I haven't even smoked tobacco since I've been in the BOP.

15  I've been offered many times.  I just, you know, don't want

16  to go into that relapse because if I start doing that, it's

17  not going to help me, you know, and in the situation I'm in,

18  I'd be an idiot ... so I haven't done drugs in

19  nine-and-a-half years; I haven't had sex.

20          THE COURT:  Were you storing it for someone else?

21          THE WITNESS:  No, I didn't even know it was in

22  there.  I did not know it was in there.  You know, to this

23  day I don't know actually what they said is true, if

24  they actually found it in my locker.

25      I don't know the circumstances or if the CO that found

1    it actually got my locker mixed up with somebody's else; I

2    don't know if my cellmate put it in there to try to get out

3    of the cell, which I was told by inmates in other units, but

4    I don't know if that's true.  You know, I don't know if it

5    was actually in my locker.  I don't know; I'd never seen it

6    in there.  That's why I asked Mr. Gold to come down and --

7    what is it called?

8    Q.   Defend you at the hearing?

9    A.   Well it wasn't --

10           THE COURT:  I remember that.

11   A.   It was, I was deposed.  I asked Mr. Gold to come and

12   depose them and to talk to them and talk to this man that

13   they had called down there before me.

14           THE COURT:  Did the other inmate in the cell testify

15   at the hearing?

16           THE WITNESS:  No, nobody testified at the hearing; I

17   asked for an inmate --

18           THE COURT:  Did you ask to call him in as an witness

19   for you?

20           THE WITNESS:  Who?

21           THE COURT:  The roommate?

22           THE WITNESS:  No, he was already -- I don't even

23   know if he was there; he had very little time left, but,

24   no.  I had a -- what they call is a staff member that's

25   supposed to go around; this is what I thought, and question

1   people and ask.  She does all the work, okay?

2       And when I went to the hearing, the man told me:  Oh,

3   all she does is make sure your rights haven't been violated;

4   but if you want her to do that for you, fine, you'll be in

5   here another extra 30 days, so I said:  you know what, I'll

6   just sign off; I just wanted to get out.

7           THE COURT:  You signed off on what, that you said

8   you did it?

9           THE WITNESS:  No, I never said I did it; I denied it

10  the whole time.

11          THE COURT:  So what did you sign off on?

12          THE WITNESS:  On having a representative, a staff

13  rep, because, you know, we all --

14          THE COURT:  No, that's fine.  I'm trying to finish

15  this by 1, okay.

16  Q.   Now, you're not in the SHU?

17  A.   No, I haven't been in the SHU for eight months, I think.

18  I'm in general population.

19  Q.   And were you being drug tested before this happened?

20  A.   No.

21  Q.   And now you're being drug tested probably because that

22  happened?

23  A.   Every two weeks.

24  Q.   You sat through a trial, your own trial, where there

25  was testimony regarding your probation conditions?

1    A.   Yes.

2    Q.   And your treatment provider testified?

3    A.   Yes, I did.

4    Q.   What's your understanding of your conditions of

5    release?

6    A.   I have to participate in sex offender treatment.  I

7    cannot be around anybody under 18 years old without

8    approved supervision.  I can't go to McDonald's or really

9    any fast-food restaurants, the mall, grocery stores, unless

10   I have an authorized chaperone with me; and anger management

11   and drug treatment.

12   Q.   What's the sex offender treatment?

13   A.   The sex offender treatment is at the Connections, and

14   it's a very extensive program.  I believe it's modeled off

15   the old Butner program.

16   Q.   How many times a week?

17   A.   My probation officer said it will probably be three

18   times a week.

19        THE COURT:  How do I know you wouldn't get

20   frustrated at some dumb rule and just quit again?

21        THE WITNESS:  Because if I do, I'll be right back

22   here again; that's the only thing I can tell you ...

23   because being on the street's a little bit different, you

24   know, it's not -- you're not in prison so you're not

25   getting all this stuff rammed down your throat 24 hours a

```
1    day, but I did a little bit of it before at Connections,

2    and I liked the people that put it together, and like the

3    psychologists and stuff, I like them; but I can only give

4    my word, your Honor, that's all I can do, and tell you that

5    if I go out there and do something again and I come back

6    here, you won't have to have a trial; I'll commit myself,

7    okay?  That's all I can tell you.

8        Anyway, it's a very extensive program from my

9    understanding.  It's modeled after the old Butner one; it

10   has the phases and everything.  It has polygraph tests.

11   They have a child advocate sit in there in the meetings in

12   case you reveal something so they can charge you.

13   Q.  Mr. Carta, after going through this experience what

14   kind of ideal do you have for your future life?

15   A.  I want to get out.  I want to work.  I want to take

16   care of my mom.

17   Q.  Did your father pass away?

18   A.  Yes.

19   Q.  When did that happen?

20   A.  I believe it was in April of 2010.

21       THE COURT:  Have you reconciled with your mother?

22       THE WITNESS:  Yes.  My mom and dad wrote me a

23   letter when I was in Butner.  I wrote them three extensive

24   letters about how sorry I was for all the stuff I did, and

25   I never had the courage to tell my father (witness crying).
```

1    Q.   Do you have some tissues?

2         THE COURT:  Yeah, there's some right over there.

3    A.   It's all right, I'm sorry.  I was not very good at

4    telling my father how sorry I was for all the bad things

5    that I did.

6         My mother wants me home.  She told me she needs me.

7    My brother is out there and he said he'll do whatever he

8    can to help me.

9         My sister, my sister Anna, wants nothing to do with me,

10   so I can work on changing that, but I don't know if I'll

11   have a relationship with her again.

12        MR. GOLD:  Does the Court have any other questions

13   for Mr. Carta?

14        THE COURT:  I think I've asked as I've gone along.

15   Q.   Todd, is there anything else that you'd like to say to

16   the Court?

17   A.   I'm sorry for all the things that I did.  If I could

18   take it back, I would, but I can't.

19        MR. GOLD:  No further questions, your Honor.

20        THE COURT:  It's close to 1 so it's probably not

21   worth getting going, so tomorrow we've got Mr. Carta, and

22   I'm just a little worried because I've got -- Dr. Bard's

23   sitting out here not on my dime, but still it's on the

24   public tax payers' dime, so I'm just trying to figure

25   this out.

1          MS. PIEMONTE-STACEY:  Would the Court prefer I

2     deferred cross-examination of Mr. Carta?

3          THE COURT:  Well, I was going to ask you that.  Did

4     you feel you need to sit through both the direct and the

5     cross?  Because it sounds as if given what poor estimators

6     we've been of time that my guess is that this examination

7     would go at least until the break tomorrow, right?

8        And between your cross and redirect and recross, I think

9     I'd be very surprised if we finish before the break, and I

10    think that's probably an optimistic estimate so I'm trying

11    to think.  What do you want to do?

12         MR. GOLD:  Well, I want to go back to my boss, and,

13    I mean, I would like Dr. Bard to see the whole examination.

14       He was telling me during the break that this is an

15    opportunity for him to really gather clinical information

16    that's quite different than he could gather at a clinical

17    interview, and that it's useful.  So that's why I'd prefer

18    to just keep going and --

19         THE COURT:  Let me ask you this -- I cannot do it

20    Thursday and Friday -- is there a guarantee he will be done

21    on Wednesday?

22         MR. GOLD:  Dr. Bard?

23         THE COURT:  Right.  Assuming we get going sometime

24    tomorrow?

25         MR. GOLD:  You know, I didn't know that the Court

```
1    had Wednesday; I don't know if Dr. Bard does.
2         MS. PIEMONTE-STACEY:  Your Honor, we were only
3    scheduled for Monday and Tuesday this week; certainly, I can
4    see if we can do Wednesday, but I believe the schedule has us
5    only on Monday and Tuesday.
6         THE COURT:  I think I can do it.  Why don't we get
7    back to you on that.
8        Would you be available, Dr. Bard, if I could clear that
9    up?
10        THE WITNESS:  On Wednesday, your Honor?
11        THE COURT:  Yes.
12        THE WITNESS:  Yes, I would.
13        THE COURT:  I can't remember why we --
14        MS. PIEMONTE-STACEY:  I believe, your Honor, it may
15   be because the initial schedule, as proposed by my brother,
16   said that none of the experts were available on Wednesday,
17   and I believe that may be why.
18        THE COURT:  Well, that's quite possible, but I think
19   at this point, and I may be wrong, I actually think I am
20   available Wednesday morning.
21       Why don't I confirm that?  It sounds like Dr. Bard is
22   available.  It sounds like the two of you or three of you
23   would be.
24       I'd like to get some momentum going here because then I
25   could potentially finish most, if not all, of it this week,
```

1    and we could either squeeze in the remaining portion or

2    both; we could squeeze in Dr. Prentky at some point in the

3    next few weeks, but in the meantime you could start doing --

4    I mean, we will have known 90% of it, right?

5            MR. GOLD:  We can start the drafting.

6            THE COURT:  Start the drafting and stuff.  I don't

7    know enough about why we need the other hour or so with

8    Dr. Prentky; but in fairness to you, he had quite a bit on

9    direct; I don't know what you need on cross, but we can get

10   through it, but that's fair enough.

11     I mean, there's not that much left that I need to

12   squeeze in; I could do that in an afternoon easily.  We'd

13   work around everyone's schedules, so why don't we just

14   assume for the minute, I'll check with Mary Ellen to make

15   sure she didn't schedule something in, but I'm not seeing it

16   on my electronic calendar.

17     Please hold the date.  We will finish with Mr. Carta

18   tomorrow unless your boss pulls the plug; in which case, we

19   will do Dr. Bard tomorrow, okay?  Does that make sense?

20           MR. GOLD:  Yes.

21           THE COURT:  And given what you've heard so far, what

22   would be a good-faith estimate on how long you will need for

23   cross on Mr. Carta?

24           MS. PIEMONTE-STACEY:  I don't think longer than two

25   hours, your Honor.  The cross went about four -- I mean, the

1   direct went about four, so I'd be surprised -- I mean, I

2   still think an hour is still my estimate.

3          THE COURT:  Okay.  Let me just ask you -- I didn't

4   go through the transcript -- did Mr. Carta testify last time?

5          MR. GOLD:  No, he didn't.

6          THE COURT:  So this is all new?

7          MS. PIEMONTE-STACEY:  This is all new.

8          THE COURT:  I see.  Because last time it was

9   primarily focused on the nature of the disease or disorder,

10  whether it existed or not?

11         MR. GOLD:  That's right.

12         THE COURT:  From what I can gather from the

13  examinations?

14         MS. PIEMONTE-STACEY:  It went the traditional route

15  where there were experts as well as the probation officer

16  and treatment provider and such.

17         THE COURT:  Well, actually, in all three or four

18  of my cases so far the person has testified.  All right,

19  thank you.  See you tomorrow morning.

20         THE CLERK:  Court is in recess.

21         (Whereupon, the proceedings concluded at 1:00 p.m.)

22

23

24

25

1                    C E R T I F I C A T E

2

3        I, Helana E. Kline, a Registered Merit Reporter,

4   Certified Realtime Reporter, and Federal Official Court

5   Reporter of the United States District Court, do hereby

6   certify that the foregoing transcript, from Page 1 to

7   Page 128, constitutes, to the best of my skill and ability,

8   a true and accurate transcription of my stenotype notes

9   taken in the matter of the United States of America v.

10  Todd Carta.

11

12

13

14

15

16

17

18

19

20

21

22

23      /s/ Helana E. Kline                April 4, 2011

24      Helana E. Kline, RMR, CRR

25      Federal Official Court Reporter