UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| | ) Civil Action |
| Petitioner, | ) No. 1:07-cv-12064-PBS |
| | ) March 22, 2011 |
| vs. | ) Non-Jury Trial |
| | ) Day V |
| TODD CARTA, | ) 9:20 a.m. |
| Respondent. | ) |


BEFORE:   THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE


John Joseph Moakley United States Courthouse
1 Courthouse Way, Courtroom No. 19
Boston, MA  02210


Helana E. Kline, RMR, CRR
Official Court Reporter
John Joseph Moakley United States Courthouse
1 Courthouse Way, Room 5209
Boston, MA  02210

APPEARANCES:


For the Petitioner:


United States Attorney's Office
(By:  Jennifer A. Serafyn, Assistant U.S. Attorney &
      Eve A. Piemonte-Stacey, Assistant U.S. Attorney)
John Joseph Moakley United States Courthouse
1 Courthouse Way, Suite 9200
Boston, Massachusetts  02210
617-748-3100


For the Respondent:


Federal Public Defender Office
(By:  Ian Gold, Attorney at Law)
51 Sleeper Street, 5th Floor
Boston, Massachusetts  02210
617-223-8061

I N D E X

Witnesses called on behalf of the Respondent:

Testimony of:

 TODD M. CARTA

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|

By Ms. Piemonte-Stacey                4

By Mr. Gold                                              46

LEONARD A. BARD, Ph.D.

By Mr. Gold                 51

By Ms. Piemonte-Stacey                116

E X H I B I T S

Respondent's

In Evidence:

| No. | Description | Page |
|---|---|---|
| 37 | Leonard A. Bard, Ph.D., Report dated November 3, 2010. | 52 |
| 38 | Franklin article:  Hebephilia - Quintessence of Diagnostic Pretextuality. | 69 |
| 39 | Frances article:  Hebephilia is not a mental disorder in the DSM-IV-TR and should not become one in the DSM-V. | 69 |
| 40 | PSR. | 96 |

```
1                        P R O C E E D I N G S

2            THE CLERK:  All rise.  The United States District

3    Court for the District of Massachusetts is now in session.

4    United States versus Carta, Case No. 07-12064, will now be

5    heard before this Court.

6            THE COURT:  All right.  Good morning.  Mr. Carta,

7    come on up.  Is that what we decided to do, Mr. Gold?

8            MR. GOLD:  Yes.

9            MS. PIEMONTE-STACEY:  May I begin, your Honor?

10           THE COURT:  Please do.

11       CROSS-EXAMINATION BY MS. PIEMONTE-STACEY:

12   Q.   Good morning, Mr. Carta.

13   A.   Good morning.

14   Q.   Your primary attraction to children is to 13- to

15   17-year-olds, is that right?

16   A.   Yes.

17   Q.   And you've had difficulty throughout treatment keeping

18   the ages of your victims straight, haven't you?

19   A.   Well, I didn't spend a lot of time thinking about it.

20   You know, there's a lot of things in there that are

21   different.

22   Q.   And at least Dr. Wood told you that that's something

23   you need to work on, to see as a barrier; in other words,

24   it's something you need to concern yourself with, the ages

25   of these children, right?
```

1    A.   He said, I believe he said, I wasn't to concern myself

2    between the difference between a 12-year-old and a

3    14-year-old.

4    Q.   Now, at one point during treatment you told Dr. Wood

5    that you thought one of your 13-year-old victims should be

6    prosecuted for having sex with you, didn't you?

7    A.   I never said that.  What I told him was:  if a

8    13-year-old boy is willing to have sex with a 40-year-old

9    man, maybe that 13-year-old boy might need some kind of

10   counseling, some kind of intervention; that's what I told

11   him.

12   Q.   I'm sorry, your Honor, I'm dropping everything.  I'm

13   going to show you a document that's been marked in evidence

14   Exhibit 25, the Bates Stamp on the bottom, No. 949?

15          THE COURT:  There's something wrong there.

16          THE CLERK:  I'm trying to see if I can mess with it.

17          THE COURT:  Turn it off and try again.  Either that

18   or just read it to me?

19          MS. PIEMONTE-STACEY:  Would you like me to turn this

20   off?

21          THE CLERK:  Let me try to turn it off here.

22          THE COURT:  Did you try before we came in, did it

23   work?

24          MS. PIEMONTE-STACEY:  Your Honor, I didn't try

25   before we came in.

```
 1              THE COURT:  Is this on, the document?
 2              THE CLERK:  No.
 3              THE COURT:  I've never seen it look like this.
 4              THE CLERK:  Yeah, hold on, let me see ... there it
 5      goes online.
 6              THE COURT:  You don't have it there?
 7              MS. PIEMONTE-STACEY:  No.
 8              MR. GOLD:  Do you have it?
 9              THE WITNESS:  No.
10              THE COURT:  So is there something that says "all"?
11              THE CLERK:  Yeah, let me --
12              MR. GOLD:  Your Honor, while we're doing this, can I
13      ask the marshals turn that TV so Dr. Bard can follow along?
14              THE COURT:  Yes.  So it's not going on "all"?
15              THE CLERK:  I just pushed it to "all monitors."
16              MS. PIEMONTE-STACEY:  There you go.
17              THE CLERK:  You got it?
18              THE COURT:  You got it, Mr. Carta?
19              THE WITNESS:  Yes.
20              THE COURT:  You all got it.  Now, we got to get the,
21      just get the -- just touch, are we all set ... perfect.
22              THE CLERK:  Great.
23              THE COURT:  So success under pressure ... poor
24      Ms. Molloy is trying to cover both my session and Judge
25      Gertner's session so we're trying to pinch hit here.
```

```
1     Q.   So I patted the screen to highlight a portion of the
2     document from an evaluation of Dr. Wood:  "This firmly held
3     belief was evidenced when he," that's you, "argued that
4     one of the 13-year-olds in his past should also have been
5     prosecuted for having sex with him," with Mr. Carta.
6          Do you deny that that's true?
7     A.   I'm sorry, but I can't control what Mr. Wood said.
8     What I said to him is that if a 13-year-old boy is willing
9     to have sex with a 40-year-old man, that may be that boy has
10    some problems, and he might need counseling.  I never said
11    anything about him being arrested.
12    Q.   And yesterday you said that you would never have sex
13    again with a 13-year-old, didn't you?
14    A.   Yes, I did.
15    Q.   Did you say 14?
16    A.   Pardon?
17    Q.   You didn't say a 14-year-old, did you?
18    A.   I wouldn't have sex with a 14-year-old.
19    Q.   You didn't say 15-year-old, did you?
20    A.   It's illegal; I wouldn't do it.
21    Q.   And you talked or testified yesterday about following
22    the Grateful Dead, and your time following that band; do
23    you recall that?
24    A.   Yes, ma'am.
25    Q.   And you testified how you took advantage of a
```

1    13-year-old that you met while following the Grateful Dead,

2    do you recall that?

3    A.   Yes, ma'am.

4    Q.   And you said you offered concert tickets in return for

5    oral sex, is that right?

6    A.   Yes, ma'am.  I performed oral sex on him.

7    Q.   And you thought that boy was street wise, didn't you?

8    A.   He was very street wise, yes.

9    Q.   And you didn't testify yesterday that that boy was

10   under the influence of something, did you?

11   A.   No, I didn't.  I don't know if I did, no.

12   Q.   He was under the influence of something, wasn't he?

13   A.   Oh, I believe he was.

14   Q.   And you blamed the boy and his parents for allowing the

15   sexual contact between you and the boy to happen, didn't you?

16   A.   I don't know if I blamed them, but I said that -- what

17   I believe I said was that I believed the parents brought the

18   children into the Grateful Dead show to try to get them to

19   get money so they could get on their way to where they were

20   going.

21   Q.   I'm just putting on the document camera another --

22   again, this is Exhibit 25 from your session with Dr. Wood,

23   and the highlighted paragraph:  "At 28 years of age he

24   encountered a 13-year-old man who he characterized as 'street

25   wise,'" did I read that correctly?

```
1    A.   Yes.
2    Q.   "And although he acknowledged the child was messed up
3    (under the influence of an intoxicant) and that he,"
4    Mr. Carta "took advantage of him by offering him concert
5    tickets to perform fellatio on him.  He suddenly blames the
6    child and the parents for allowing this to happen."
7         Did I read that correctly?
8    A.   Yeah, you did.
9    Q.   There's comments that he believes the child's parents
10   blamed him, the child; is that right?
11   A.   Yes, it is.
12   Q.   And you also testified yesterday about the
13   17-year-old -- well, you were asked yesterday whether there
14   were any other encounters that happened during this --
15   A.   Yes.
16   Q.   -- Grateful Dead, and you didn't mention the
17   17-year-old, did you?
18   A.   I forgot, no.  I forgot.
19   Q.   But you did have another encounter with a 17- or
20   18-year-old?
21   A.   Yes, I did.
22   Q.   And you were about 28 years old at the time, right?
23   A.   Yes.
24   Q.   And this young man had passed out from substance abuse
25   in your van, right?
```

1    A.   Yes, he did.

2    Q.   And while he was passed out you began fondling him

3    while you masturbated, right?

4    A.   Yes.

5    Q.   He woke up, he yelled at you, and he caused a scene,

6    and you left, right?

7    A.   Right.

8    Q.   And this young man doesn't appear on your victim list

9    that you went through yesterday, does it?

10   A.   I believe he does.

11   Q.   You went through the victim list yesterday, and you

12   didn't testify about this man, did you?

13   A.   I thought he was in there.  I think we didn't testify --

14   but I forgot like I said.

15   Q.   Well, you also testified yesterday about, I believe,

16   John was the name, a 13-year-old you met who lived on the

17   jetty; is that right?

18   A.   Yes.

19   Q.   This is the California kid, right?

20   A.   Yes, it is.

21   Q.   And this is the boy that knocked on your door and

22   asked if he could come hang out with you, right?

23   A.   Yes.

24   Q.   You testified that once he got inside, you gave him a

25   blanket; you began masturbating, right?

1    A.   Yes.

2    Q.   But you ended up in at least a two-year relationship

3    with him, didn't you?

4    A.   Well, I think it was a three-year relationship, yes.

5    Q.   Two or three?

6    A.   Yes.

7    Q.   And you had contact with him 20 to 30 times, didn't

8    you?

9    A.   Well, yes, approximately.

10   Q.   And what you didn't testify about yesterday is that you

11   engaged in stalking-type behavior with this boy, didn't you?

12   A.   Well, I don't know if trying to find out if he was okay

13   is stalking.

14   Q.   Well, you would make arrangements for the two of you to

15   meet; and if he didn't show up, you would go looking for

16   him, right?

17   A.   Well, yes, I would.  I would drive like 500 miles

18   'cause he would call me; and if he wasn't there, I didn't

19   just turn around and leave.  You know, I would go and see if

20   I could find him before I would even go back home.

21   Q.   So I'm showing you Exhibit 25, Bates Stamp 944, at

22   the top of the page:  "Mr. Carta describes stalking-type

23   behaviors such as making arrangements for the two to meet;

24   and if the young male wouldn't show, he would go looking

25   for him (track his hangouts, track his calling cards,

1   etc.)"

2       Did I read it correctly?

3   A.   Yes, you read it correctly.

4   Q.   And this is the boy that you groomed and eventually

5   convinced him to go on to a better life, to move from

6   California to Connecticut, right?

7   A.   Yes.

8   Q.   And you wanted him to move from California to

9   Connecticut so that he would be away from familiar

10  surroundings and less likely to leave you, right?

11  A.   I probably manipulated him that way, yes.

12  Q.   Again, Exhibit 25, Page 944, I'm reading:  "He

13  acknowledges that he wanted to take the boy from California

14  to Connecticut because the boy would be away from familiar

15  surroundings and less likely to roam away from him as he

16  would have done in California."

17      Did I read that correctly?

18  A.   Yes, you did.

19  Q.   And while yesterday you offered up a few ideas of why

20  John might have left you, you didn't offer any of those

21  ideas to Dr. Wood when he sat with you in 2006, did you?

22  A.   I don't remember.

23  Q.   And yesterday you didn't acknowledge that your

24  behavior toward John was predatory, did you?

25  A.   No, I didn't.

1    Q.   You testified that you didn't force him; you gave him

2    an address and he found you, right?

3    A.   Yes.

4    Q.   Now, you testified yesterday about a 13-year-old boy

5    that you met over the internet; do you recall that?

6    A.   Yes.

7    Q.   And you performed oral sex on him but you wouldn't let

8    him perform it on you, right?

9    A.   Yes.

10   Q.   Because you didn't want to hurt him, right?

11   A.   Well, I thought it was too intrusive is the way I think

12   I put it.

13   Q.   And you recognize today, though, that what you did

14   hurt the boy, right?

15   A.   Absolutely.

16   Q.   And you testified to that yesterday, right?

17   A.   Yes, I did.

18   Q.   But what you didn't testify to yesterday is that you

19   asked this boy to have three-way sex with you and Fred,

20   didn't you?

21   A.   Yes, I did.

22   Q.   And that's hurting the boy, isn't it?

23   A.   Yes, it is.

24   Q.   And you actually picked up the boy and the three of

25   you had three-way sex:  you, Fred, and this 13-year-old,

1    right?

2    A.   Actually, Fred and him had sex, and I watched; I didn't

3    engage.

4    Q.   Exhibit 25, Bates Page 944, you see a black line off

5    to the right there:  "Mr. Carta reports that he asked

6    this victim," this is the 13-year-old, "if he would be

7    interested in participating in three-way sex with he and one

8    of his previously mentioned 17-year-old partners, Fred.

9    Mr. Carta again picked up the victim and the three had

10   sexual contact."

11      Did I read that correctly?

12   A.   You read it correctly, but it's wrong.

13   Q.   Now, on these internet postings you advertised you were

14   looking for teenagers to have relationships with, right?

15   A.   Yes.

16   Q.   And the message boards or the chat rooms that you

17   visited were saying things like:  Dads for sons, right?

18   A.   Yes, they were.

19   Q.   Now, moving on to Fred's 15-year-old brother; you

20   testified about your sexual encounter with the brother

21   yesterday, do you recall that?

22   A.   Yes, I do.

23   Q.   And when his, Fred and his brother, the brothers, were

24   at your house, you gave them alcohol and marijuana, right?

25   A.   Yes.

1    Q.   Excuse me.  And you claimed in treatment that the

2    15-year-old and the 13-year-old approached you about

3    participating in an orgy with them, right?

4    A.   Actually, it was the 15-year-old that approached me.

5    Q.   And you refused?

6    A.   Yes.

7    Q.   And you testified yesterday that you stopped the

8    sexual encounter with Fred -- Fred's brother, the

9    15-year-old, because you loved Fred, right?

10   A.   Yes.

11   Q.   But you said in treatment that you stopped it because

12   the brother was fat, ugly, immature, and sickly; do you

13   recall that?

14   A.   I said that it was a mistake because he was fat and

15   homely, I think was the word I used.

16   Q.   Well, in addition to loving Fred, and I'll show you

17   Bates 945 from Exhibit 25:  "He also states that the

18   15-year-old boy was 'fat, immature, ugly, and sickly."

19       Did I read that correctly?

20   A.   Yes.

21   Q.   You maintain that you felt sorry for the boy because he

22   was on heavy duty psychiatric drugs; do you recall that?

23   A.   I think, I think Mr. Wood got Bradley mixed up with

24   Sean.  I don't believe Sean was on psychiatric drugs; I

25   think Bradley was on Prozac.

1    Q.   Either way, you gave marijuana and alcohol to these

2    boys, right?

3    A.   Yes, I did.

4    Q.   And you thought you were helping them, right?

5    A.   I thought marijuana was better than Prozac, yes, I did

6    say that.

7    Q.   Well, I'll read the next highlighted sentence:  "When

8    confronted with the fact that he provided marijuana and

9    alcohol to the same child, he claimed he believed that by

10   doing this he was quote helping him."

11       Did I read that correctly?

12   A.   Yes.

13   Q.   Now, although you've testified to sexual contact with

14   the brother; you denied that to probation while they were

15   preparing the presentence report on your 2001 conviction,

16   didn't you?

17   A.   Yes, I did.

18   Q.   Now, your MO is you found sexualized kids from troubled

19   homes, right?

20   A.   Was.

21   Q.   You seduced them with a place to hang out, right?

22   A.   Yeah, I'd correspond.

23   Q.   You gave them alcohol and drugs?

24   A.   Yes.

25   Q.   And then you blamed these kids for soliciting you,

1    didn't you?

2    A.   I don't know that I blamed them.

3    Q.   I'll show you Exhibit 25.  "It appears that Mr. Carta

4    established a relationship with a group of minors who were

5    already sexualized and from troubled homes seduced them by

6    providing 'a party house' to hang out at, money, drugs, and

7    attention, and then blamed them for soliciting him."

8         Did I read that correctly?

9    A.   Well, it says "it appears," that's what it appears to

10   him.

11   Q.   You didn't testify to that; you didn't say that to

12   Dr. Wood?

13   A.   That I blamed them?  No, I didn't.

14   Q.   Yesterday you testified about your relationship with

15   Fred; do you recall that?

16   A.   Yes.

17   Q.   And what you didn't testify about yesterday was how you

18   tested the waters with Fred by showing him pornography, is

19   that right?

20   A.   Yes.  I showed him pornography while we were having

21   sex, yes.

22   Q.   And you gave Fred a job and some money, right?

23   A.   Yes.

24   Q.   And it was after this argument with Fred that you were

25   arrested and convicted for breach of the peace and risk of

1    injury to a minor, right?

2    A.   Yes.

3    Q.   And you were under a no contact order with Fred as a

4    result, weren't you?

5    A.   Yes, I was.

6    Q.   And despite that no contact order with Fred, you tried

7    to meet Fred three times, right?

8    A.   After he called me, I did.

9    Q.   Despite the no contact order you tried to meet him,

10   right?

11   A.   Yes.

12   Q.   And because you were hurt by Fred, that's when you made

13   the flyers and distributed them in the mailboxes and on the

14   lawn, right?

15   A.   Well, actually, I was angry because I had gotten a big

16   fine in court, and the court did absolutely nothing about

17   all my stuff that was smashed in my house, and I was angry

18   about that.  That's why I did what I did.

19   Q.   I'm going to show you Exhibit 25, 940 is the Bates

20   Number, the first highlighted portion:  "Mr. Carta was

21   under a no contact order from the court and attempted to

22   meet with Fred to talk, but Fred stood him up three times."

23        Did I read that correctly?

24   A.   Yes.

25   Q.   Okay.  You didn't report that he tried to call you,

1    and then you tried to call him back; none of that is in this

2    report, right?

3    A.   We contacted each other, yes.

4    Q.   And then, I'm sorry, the next sentence, and it's not

5    highlighted:  "Mr. Carta acknowledging that he was 'hurt,'

6    decided to hurt Fred back by making flyers, and that said

7    humiliating things about Fred's family and his sexual

8    behavior."

9        Did I read that correctly?

10   A.   Yes.

11   Q.   Now, you listed Fred as a victim on your first sex

12   offender treatment program questionnaire/homework; do you

13   recall that?

14   A.   Well, I was told I had to, I had to because he was

15   under federal age.

16   Q.   So even as you sit here today, you don't think he's a

17   victim?

18   A.   Well, I was confused because in Connecticut the

19   statutory age is 16 ... so I never knew there was a federal

20   law that said you couldn't have sex with a person under 17

21   or under 18.

22   Q.   But you didn't list him as a victim on your second or

23   PHQ supplement, though, did you?

24   A.   If he was on the first, he should have been on the

25   second.

1    Q.   Now, you testified yesterday about a sexual encounter

2    with Seth, your daughter's boyfriend; do you recall that?

3    A.   Yep.

4    Q.   And, I'm sorry, I'm paraphrasing, but you testified

5    that you and Seth were hanging out at your house, your

6    daughter wasn't there; Seth started taking off his clothes.

7    You said:  What are you doing?  He said:  Well, you're gay;

8    want to have sex, is that close to what you testified to

9    yesterday?

10   A.   That's exactly what he said, yes.

11   Q.   But you had a one-year relationship with Seth, didn't

12   you?

13   A.   Yes, I did.

14   Q.   It wasn't just that one time, right?

15   A.   No, it was many times.

16   Q.   And you didn't testify yesterday that when this

17   happened with Seth he was either intoxicated or coming off a

18   drug binge when this happened?

19   A.   He was actually coming off of ecstasy from the night

20   before.

21   Q.   And you said to the treatment providers that you and

22   Seth had sex every chance you got, right?

23   A.   Yes.

24   Q.   And you hid the relationship from your daughter,

25   right?

```
 1    A.   Yes.
 2    Q.   And then you told your daughter about this relationship
 3    out of spite, didn't you?
 4    A.   Yes, I did.
 5    Q.   And that's because you didn't care much for your
 6    daughter at that point, right?
 7    A.   It's not that I didn't care about her; it was more that
 8    I was kind of angry because she had had sex with Fred, and
 9    I guess to be honest about it I was probably getting her
10    back for doing that a little bit, yes.
11    Q.   I'll show you Exhibit 25, Bates Stamp 940 at the
12    bottom:  "Mr. Carta explains that he did not care much for
13    his daughter at this point."
14         Did I read that correctly?
15    A.   That's Mr. Wood's take on it.
16    Q.   "Mr. Carta explains," did I read it correctly?
17    A.   Yeah, you read it.
18    Q.   And by telling your daughter about this relationship
19    with Seth you were hoping your daughter would leave Seth and
20    Seth would be free to be with you, right?
21    A.   Yeah, I did that.
22    Q.   You also traveled to meet minors to have sexual contact
23    with minors, right?
24    A.   Yes.
25    Q.   And the age of the minors that you traveled to meet
```

1    for sex were between 13 and 16 years old, is that right?

2    A.   Yeah.

3    Q.   You made five trips to meet a 13-year-old, right?

4    A.   Yeah.

5    Q.   And I'm showing you Exhibit 27, Bates Stamp 1117; this

6    is a chart that you completed in sex offender treatment,

7    right?

8    A.   Yes, it is.

9    Q.   And it lists five minors that you traveled, and I'll

10   put it down so you can see the top of the page, that you

11   traveled with the intent to have sexual contact with?

12   A.   Yes.

13   Q.   And of the five, three of these were 13-year-olds,

14   right?

15   A.   Yes.

16   Q.   You met them over the internet?

17   A.   One of them, one of them was John; I met him in the van.

18   I didn't meet all three over the internet.

19   Q.   Okay.  And so one of the 13-year-olds, you made five

20   trips to see him, right?

21   A.   Yes.

22   Q.   And the 13-year-olds listed at lines two and three,

23   you don't state the number of trips you made, but you made

24   at least one trip to meet them, right?

25   A.   Yeah.

```
1    Q.   And you filled out an update of this form in treatment,

2    do you recall filling that out, updates?

3    A.   Yes.

4    Q.   And, again, just the top's highlighted:  "Travel with

5    intent to have a sexual contact with a minor," do you see

6    that?

7    A.   Uh-huh -- yes, I do.

8    Q.   And on this update you listed only four victims, and

9    three of them were 16; do you see that?

10   A.   Yes, I see it.

11   Q.   So you have the 13-year-old, I assume the 13-year-old

12   on Line 4 that traveled five times, I assume that's the same

13   13-year-old, right?

14   A.   I imagine it is, yeah.

15   Q.   And then the other three victims -- then, there are

16   three 16-year-olds listed, right?

17   A.   Yes.

18   Q.   You met with Dr. Wood in 2006 to form a treatment plan;

19   do you recall that?

20   A.   I thought it was 2005, but, yeah, I remember meeting

21   him.

22   Q.   And at that time Dr. Wood had diagnosed you with

23   paraphilia NOS, did you know that?

24   A.   Yes.

25   Q.   And one aspect of meeting with him to form a treatment
```

1    plan was to talk about acceptance of responsibility, do

2    you remember that?

3    A.   Yes.

4    Q.   And at least in 2006 you weren't accepting

5    responsibility for your offenses, is that right?

6    A.   I don't believe that's right at all.

7    Q.   I'll show you Exhibit 22, Bates Stamp 966, under

8    Domain 1, Acceptance of Responsibility, the first sentence:

9    "The inmate admits to a long history of sexual deviant

10   behavior.  However he diffuses responsibility for much of

11   his behaviors."  Did I read that correctly?

12   A.   Yes, you did.

13   Q.   And the next sentence:  "He needs to accept

14   responsibility for his actions and the consequences for his

15   deviant behavior?"

16       Did I read that correctly?

17   A.   Yes.

18   Q.   And the goal was to admit your entire sexual offense

19   history, right?

20   A.   Which I did.

21   Q.   Okay, and in this 2006 -- I'm sorry, I keep saying

22   2006; do you see at the top of the page I've highlighted

23   1/20/2006?

24   A.   Yes.

25   Q.   Does that refresh your recollection whether it was '05

1   or '06?

2   A.   Yes, it does.

3   Q.   You also discussed with Dr. Wood the -- your sexual

4   deviance in your offense pattern, right?

5   A.   Yes.

6   Q.   And you testified yesterday about cognitive distortions,

7   do you recall that?

8   A.   Yes.

9   Q.   And you had them in 2006 when you met with Dr. Wood,

10  right?

11  A.   Yes, I did.

12  Q.   And some of these distortions were that boys needed a

13  mentor or a parent in exchange for sex, right?

14  A.   Yes.

15  Q.   And that boys could make informed choices about sex,

16  right?

17  A.   Yes.

18  Q.   And you also talked with Dr. Wood about managing your

19  sexual arousal in your deviance pattern, do you remember

20  that?

21  A.   Yes.

22  Q.   And you talked about your attraction to children,

23  right?

24  A.   Yes, I did.

25  Q.   And, specifically, postpubescent adolescent children,

1    right?

2    A.   Yes.

3    Q.   And the goal was to learn to control and manage these

4    arousals, right?

5    A.   Yes.

6    Q.   And you talked about victim impact and empathy

7    problems, right?

8    A.   Yes, I did.

9    Q.   And at least in 2006 you were very defensive, you

10   remained defensive about the harm you caused these children,

11   didn't you?

12   A.   Yes, I didn't want to accept that.  It was hard to

13   accept.

14   Q.   You didn't think you were hurting these kids, right?

15   A.   At that point, no, in the program, no, I didn't.

16   Q.   And you were using the term you used yesterday

17   "cognitive distortions" to minimize the responsibility for

18   your actions, right?

19   A.   Yes.

20   Q.   And that was in 2006, right?

21   A.   That was in January 2006, yes.

22   Q.   Now, just prior -- moving onto the child pornography,

23   just prior to your incarceration you were hooked on child

24   porn, right?

25   A.   Yes, I was hooked.

1    Q.   And you were masturbating two or three times a day,

2    right?

3    A.   Yeah.  I mean, I never kept track of how many times I

4    was masturbating, but that's what I put on the paper, yes.

5    Q.   Okay.  And you spent 12 to 14 hours a day on the

6    computer, right?

7    A.   No, that's not true.

8    Q.   Could I just have a moment ... I'm reading, I have the

9    wrong page in front of me; I apologize.  I'm reading at the

10   bottom of Exhibit 25, Page 945:  "Mr. Carta indicates that

11   he was hooked on masturbating to child pornography two to

12   three times a day and spending 12 to 14 hours a day on the

13   computer."

14       You told that to Dr. Wood; do you recall that?

15   A.   I'm not sure if I told him that or if he got that out

16   of my PHQ; and if you look at my PHQ, you will see it says,

17   one says 100 hours a week, one says 10 hours a week; it's a

18   huge discrepancy, and I don't know why I'd put 100 hours a

19   week ... that is ridiculous.

20   Q.   You missed work because of your addiction to child

21   pornography, right?

22   A.   Yeah.  I missed some work, yes.

23   Q.   You didn't shower at times, right?

24   A.   I might skip a shower here and there, yes.

25   Q.   And you testified yesterday that you organized your

1    child pornography collection, do you recall that?

2    A.   Very organized.

3    Q.   You spent about 10 hours a week organizing it, didn't

4    you?

5    A.   I'm not sure that I recall exactly how many hours I

6    spent, but I would say in the ballpark, yes.

7    Q.   You posted over 100 images on a website including --

8    let me rephrase that.  You posted over 100 images of child

9    pornography including images of prepubescent children, right?

10   A.   Yes.

11   Q.   And at one time you also masturbated to images of

12   prepubescent boys, right?

13   A.   No, I don't believe that.

14   Q.   And then didn't you masturbate to images of prepubescent

15   boys but then as time got -- time went on, you realized your

16   attraction to more of the older kids?

17   A.   I don't remember saying that.

18   Q.   Let me just show you, it's Bates Stamp 86, produced in

19   discovery.  It's the presentence report.  I'll ask if that

20   refreshes your -- I'll ask you to read the highlighted

21   portion and see if it refreshes your recollection?

22        THE COURT:  I can't see the screen.

23   A.   I still can't read it.

24   Q.   Yep.  Well, your Honor where this is not in evidence --

25   here we go.  He stated -- actually, I'm going to ask you to

1    read the highlighted portion of this document and ask if

2    this refreshes your recollection.

3    A.   You want me to read it?

4    Q.   Does that -- have you read it to yourself?

5    A.   I don't see anything about prepubescent.

6    Q.   At one time did you have an interest in prepubescent

7    boys and then realized "I was more interested in the

8    teenagers"?

9    A.   I don't recall.  I don't really recall that, no.

10   Q.   Okay.  Now, you collected about 50,000 images of child

11   pornography, right?

12   A.   Again, I wouldn't know.  I never counted, but that was

13   an estimation, yes.

14   Q.   And the age range in your collection, you testified

15   yesterday you had 3- to 6-year-olds, 7- to 11-year-olds, and

16   12- to 17-year-olds; do you recall that?

17   A.   Yes.

18   Q.   And there was a question yesterday about the age

19   preference for child porn and the question said, your age

20   preference for child pornography, and you listed 12 to 17

21   first, and then 7 to 11; do you recall that?

22   A.   Yes.

23   Q.   You spent an average of 70 hours a week watching

24   child pornography at one point, right?

25   A.   70?

1    Q.   Yes.

2    A.   I think that's a little high.

3    Q.   I'm just going to show you Exhibit 27, Bates 1106, the

4    highlighted first sentence:  "What was the average number of

5    hours per week you spent viewing child pornography?"  You

6    wrote:  "70."

7        Did I read that correctly?

8    A.   Yes.  And if you go back to the other PHQ, it says 7

9    hours, not 70.

10   Q.   So the first time you disclosed the number of hours you

11   watched child pornography you said 70?

12   A.   It shows how accurate these papers are, yes.  They're

13   not very accurate.

14   Q.   You wrote these, correct?

15   A.   Yeah, I did; I wrote them.

16   Q.   And the second time, as you're learning more in

17   treatment and you're learning more about deviance and you're

18   learning more about child pornography, you make it 7?

19   A.   Because I thought about it more, and I tried to be more

20   accurate.

21   Q.   You also were asked to estimate the number of hours a

22   week you spent viewing child pornography during your peak

23   involvement or the number of hours at your peak, and that

24   was 100 hours per week you viewed child pornography; do you

25   recall writing that?

1    A.   I wrote that, and, again, on the other PHQ, it says 10.

2    Q.   So as you learned more, you decreased the number of

3    hours, right?

4    A.   Because I thought about it more, yes.  I tried to be

5    more accurate.

6    Q.   And it made you look less deviant, didn't it?

7    A.   No, I don't think anything like that would make me look

8    less deviant.

9    Q.   Now, you were in the sex offender treatment program --

10   well, actually, twice, right; once on the state side, and

11   once on the federal side?

12   A.   Yes.

13   Q.   And in the sex offender treatment program papers you

14   wrote that you didn't like following rules, do you recall

15   that?

16   A.   I hated following rules.  I recall that, yes.

17   Q.   And you quit sex offender treatment in March of 2006,

18   right?

19           THE COURT:  That's the federal one?

20           MS. PIEMONTE-STACEY:  Yes.

21   A.   Yes.

22   Q.   You quit because you couldn't tolerate the demands of

23   treatment, right?

24   A.   I couldn't tolerate a lot of things, yeah.

25   Q.   You didn't want to be there anymore?

```
 1     A.   Pardon?

 2     Q.   You didn't want to be there anymore?

 3     A.   No, I didn't.

 4     Q.   Now, you had tried to quit treatment before, right?

 5     A.   I think three times, yes.

 6     Q.   And in trying to quit before you told Dr. Wood you

 7     couldn't take the feedback of others, right?

 8     A.   Well, it was hard hearing all that stuff.

 9     Q.   Sure.  And that you're not sure you understood the

10     process, right?

11     A.   No, I -- at that point I didn't understand the process.

12     Q.   And you didn't think you had what it took to complete

13     treatment, right?

14     A.   No, I didn't.

15     Q.   But you admitted to Dr. Wood that in treatment you

16     purposely put yourself in positions to be close to the other

17     members of the program; do you remember that?

18     A.   Well, part of that is because that's what they wanted

19     to hear.  It became easier to start telling him stuff that

20     he wanted to hear than to argue about it, but I did say that,

21     yes.

22     Q.   And as you sit here today, you still don't admit or

23     acknowledge how putting yourself close to people in the

24     treatment program was in your offense cycle?

25     A.   I don't see how being around 26-year-old men is putting
```

1    myself in my offense level.  I don't understand it still.

2    I mean, I know it's not good idea, but I don't see it as

3    putting me back in my offense level.

4    Q.   Well, to oversimplify, you thought you were "helping

5    these kids by giving them marijuana and drugs and being a

6    parent and a mentor to them in exchange for sex," right?

7    A.   Yes.

8    Q.   And you turned around and then in your sex offender

9    treatment program you thought you were helping these younger

10   offenders of the program by putting yourself in a position

11   with them, right?

12   A.   Well, my understanding of that was we were supposed to

13   help everybody in the community, and, yes, I did focus too

14   much of my time on younger men.  I admit to that.

15   Q.   And you testified yesterday about the reasons that you

16   wanted to transfer to Butner for the sex offender treatment

17   program?

18   A.   Yes.

19   Q.   And one of the reasons that you didn't testify to is

20   you thought enrolling in sex offender treatment program

21   would get you to a halfway house faster, right?

22   A.   Well, absolutely.  That was part of it, yes.

23   Q.   And you, when you were focusing on these younger

24   members of the treatment program, you were kind of fooling

25   with the satisfaction, right, with treatment; you were

1    reinforcing their antisocial attitudes and their deviant

2    beliefs, right?

3    A.   That's something that happens in prison quite a bit,

4    yes, I was doing that.

5    Q.   And you were confronted by this with someone, and it

6    was someone you were attracted to, and that's when you then

7    became enraged and wanted to quit, right?

8    A.   Yes.

9    Q.   And then you spent the next few weeks trying to get

10   revenge on the person that confronted you, right?

11   A.   I don't -- yeah.  Well, it was, yeah.

12   Q.   And you confronted him in community meeting in

13   treatment with information that he previously had told you

14   in confidence, right?

15   A.   There's nothing in confidence in community -- in sex

16   offender treatment.

17   Q.   Well, you're not supposed to talk outside of sex

18   offender treatment about what goes on inside of it, are you?

19   A.   He was a program member.  I wasn't outside of it.

20   Q.   I'm going to show you Exhibit 27 at Bates Stamp 955.

21   I've drawn a line that says:  "This included confronting a

22   participant in community meetings for his own misdoings,

23   using information this individual had previously told him in

24   confidence against him, and repeatedly telling staff about

25   the other person's wrongdoings."

```
 1        Did I read that correctly?
 2   A.   Yes, and, again, there is no such thing as
 3   confidentiality.  When a person tells you something that
 4   should be reported to staff, you are to report it to staff.
 5   Q.   And you testified yesterday about the restrictions that
 6   were put on you in the treatment program, do you remember
 7   that?
 8   A.   That I put on myself, yes.
 9   Q.   Well, and that was my next question:  you put that
10   restriction on yourself, didn't you?
11   A.   I put them on myself, yes.
12   Q.   So they, and you used the word "they," but BOP, they
13   didn't give you a restriction that was impossible to follow;
14   you put that restriction on yourself, didn't you?
15   A.   I don't remember if it was modified or not, but,
16   basically, yes, I put it on myself.
17   Q.   And that was you coming up with an action plan to hold
18   yourself accountable for this preoccupation that was seen
19   about hanging out with the younger people in the group,
20   right?
21   A.   Yes.
22   Q.   And the restriction that was imposed, though, it was
23   for people under Phase IV of treatment, right?
24   A.   Right.
25   Q.   And it was outside of these daytime supervised program
```

1    activities, right?

2    A.   I don't know why it says that in there, but that is

3    not true.  Mr. Wood told me that I was not to associate

4    with these people unless we were in meeting.

5    Q.   Well, a meeting is a daytime supervised activity,

6    right?

7    A.   But I was not supposed to do homework or anything with

8    them.  Just meetings, that was it.  I had no choice but to

9    talk to them in the meetings.

10   Q.   I'm going to show you a document, Bates Stamp 394,

11   that was produced in discovery.  It's a February of 2006

12   Psychology Data Systems.  I'm reading the highlighted

13   portion:  "He believes that staff is correct to impose

14   restrictions for him, in which he is not to communicate or

15   interact with program participants who are under Phase IV

16   outside of daytime supervised program groups and

17   activities."

18       Did I read that right?

19   A.   Yes.

20   Q.   And you testified a little bit yesterday about

21   Dr. Hernandez, do you recall that?

22   A.   Yes.

23   Q.   And at least one of the times that you were going to

24   quit the program Dr. Hernandez spoke to you and you stayed

25   in, right?

1    A.   It was a combination of people that spoke to me, yes,

2    he was involved.

3    Q.   And Dr. Wood also talked to you so you met with

4    Dr. Wood, and you met with him to review your treatment

5    restriction; and during that previous weekend, that's when

6    you had left one of the withdrawal forms in Dr. Wood's

7    office, right?

8    A.   Yes.

9    Q.   And then Dr. Wood told Dr. Hernandez that you wanted to

10   withdraw, right?

11   A.   Yes.

12   Q.   And then after speaking with Dr. Hernandez, you said

13   you made a mistake; you didn't want to end treatment, right?

14   A.   Dr. Hernandez told me that since I had an attraction to

15   adults he said I was one of the easier ones to treat so I

16   decided to stay in treatment, yes.

17   Q.   And at that time Dr. Wood also instructed you to be

18   active in your treatment plan and don't challenge every

19   rule, right?

20   A.   Yeah, he did.

21   Q.   And you had this restriction in place for two weeks

22   before you quit treatment, right?

23   A.   I didn't even think it was that long.

24   Q.   But you blamed the peer that you were attracted to for

25   causing your restriction, didn't you?

1    A.   Yes, I did.

2    Q.   And on the same day that you were terminated from

3    treatment the peer that you were attracted to was also

4    expelled from treatment, right?

5    A.   I was not terminated; I quit.

6    Q.   On the day that you quit treatment the peer that you

7    were attracted to was expelled on that same day?

8    A.   I told Dr. Hernandez:  if you throw this man out, I was

9    gonna quit, yes.

10   Q.   And you did, right?

11   A.   I did.

12   Q.   And this was the man you were attracted to?

13   A.   Yeah.  I was attracted to him, yeah.

14   Q.   You were given time to reconsider your decision to

15   quit?

16   A.   Yes.

17   Q.   But you kept, you kept fast with your decision?

18   A.   I was embarrassed to change it, yes.

19        THE COURT:  Why was the peer thrown out?

20        THE WITNESS:  Because he was having sex in the paint

21   shop with another inmate.

22        THE COURT:  So this is --

23        THE WITNESS:  I confronted him.  Pardon?

24        THE COURT:  This had nothing to do with you, the

25   reason he was thrown out?

1          THE WITNESS:  I felt it had everything to do with

2     me.  I'm the one that confronted him.

3          THE COURT:  I see.  So he had sex with someone else,

4     you confronted him, and then he got thrown out?

5          THE WITNESS:  Yes.

6          THE COURT:  Were you jealous?

7          THE WITNESS:  Was I jealous?  I was angry because he

8     was confronting me about small things that I was doing in

9     the unit, and he was doing stuff like that, you know.  I

10    mean, I imagine it was a little bit of a get back at him.  I

11    wasn't jealous of him, though, no.

12    Q.  You were in Phase III of treatment at the time that you

13    quit?

14    A.  Yes, the beginning of Phase III.

15    Q.  You had more to learn in treatment, right?

16    A.  I had a lot more to learn.

17    Q.  And as you testified yesterday, you need sex offender

18    treatment, right?

19    A.  Absolutely.

20    Q.  And you testified yesterday that if you had to go,

21    you'd go again in a minute to treatment, right?

22    A.  In a minute.

23    Q.  And you haven't volunteered to participate in treatment

24    at Butner, have you?

25    A.  That's a civil commitment program.  I volunteered at

1    Devens to participate, and I was refused.

2            THE COURT:  Why?

3            THE WITNESS:  She said that she didn't know what to

4    do because I was the first one that had asked, and she said

5    she was gonna send it up to the higher authority to get an

6    okay for me to come into the program.  And I put in two

7    more copouts, which is a request to staff asking her what

8    the status of that was, and I never got a response, okay?

9    Q.   Sorry.

10   A.   And I want to make this clear now, during the status

11   hearing Madam prosecutor said that that was because you had

12   to go home from the program ... that is not true.  They

13   have lifetime -- they have men with life in that program,

14   okay?

15       And I -- my lawyers advised me not to go to that

16   program; I went against their advice, okay, because I

17   figured if I'm going to be sitting there, I might as well

18   do something constructive, okay?  And I'm very angry that

19   they didn't let me go; I would have been almost done right

20   now.  Go ahead, I'm sorry.

21   Q.   No apology necessary, and that was the second part of

22   my question, though --

23   A.   I'm sorry.

24   Q.   -- your counsel advised you also not to participate in

25   treatment; isn't that true?

1    A.   Yes, that's true.

2         THE COURT:  Well, that's -- I guess it isn't

3    privileged; he just said it?

4         MS. PIEMONTE-STACEY:  No, and it's been in public

5    pleadings, your Honor.

6    Q.   Phase I of treatment was orientation, right?

7    A.   Yes.

8    Q.   And Phase II was your psychosexual exam?

9    A.   Yeah.  I don't really remember the names of them, but,

10   yes, I'll take your word for it.

11   Q.   And so Phase III, the treatment phase, that's the part

12   that you were in when you quit, right?

13   A.   Yes.

14   Q.   And what's left to do is to finish treatment and to

15   also do release planning, a relapse prevention plan, a plan

16   for reintegration into the community, right?

17   A.   Yes.

18        THE COURT:  Where is BOP on that last phase?

19        MS. PIEMONTE-STACEY:  On V it's not enacted yet.

20   Q.   Now, when you terminated treatment, you expressed to

21   Dr. Wood regret that you had disclosed so much of your

22   sexual history, didn't you?

23   A.   I was afraid they were going to use it against me, yes.

24   Q.   And that's another reason you don't want to participate

25   in treatment, right?

1  A.   You know everything about me now, so there's no point

2  in not going to treatment.

3  Q.   And you testified yesterday that another reason why to

4  quit was because you found out your therapist, Dr. Wood, was

5  leaving; do you remember that?

6  A.   He was getting ready to leave, yeah.

7  Q.   But do you recall meeting with Dr. Wood and discussing

8  his leaving with you, and you told him you had no concern

9  who your new therapist was?

10  A.   Yeah, that's what I told him.

11  Q.   That you trusted the treatment staff to make a good

12  decision for you?

13  A.   Yeah, but you have to understand:  it's a very hard to

14  talk to somebody that you don't know about this kind of

15  stuff, and you kind of create, you know, a working

16  relationship; and all of a sudden to have that person leave

17  and then have to start all over again is very disruptive.

18  Q.   Now, you also testified yesterday about the CODE

19  program at Allenwood; do you recall that?

20  A.   Yes.

21  Q.   And you tried to quit CODE a couple of times, too,

22  didn't you?

23  A.   I think three.

24  Q.   At least I know of at least two, one was like two

25  months after you started, one was three months after you

started; do you recall that?

A.   Yes.

Q.   And you testified yesterday that you couldn't talk about your offenses so it wasn't worth your while?

A.   I didn't say it wasn't worth my while.  I said that it was very hard to do, not being able to talk about my offenses.

Q.   But at least at one point in the CODE program they gave you a worksheet about changing criminal lifestyles, and you refused to complete it; do you recall that?

A.   I believe it had some things on there that wanted information about my current crimes, and I was not going to put it down.  Yes, I refused to do it.

Q.   And it was your CODE social worker that checked on sex offender treatment for you and offered to refer you to it in 2003; do you recall that?

A.   No, that's not true.

Q.   I'm going to show you a document -- sorry, a document that was Bates Stamp 427 in discovery which are program notes from your time at Allenwood; and on October 17, 2003, Dr. --

A.   Trgovac.

Q.   -- T-r-g-o-u-a-c (sic).

A.   That's Trgovac.  She was not my co-counselor; she was a psychologist.

Q.   Okay.  So a psychologist there checked on sex offender

1   treatment for you and spoke with Dr. Hernandez for you and

2   then talked to you about it, and you reported you didn't

3   want to be referred in 2003, right?

4   A.   I'm the one that initiated that, though.  I'm the one

5   that asked them to call him up.

6   Q.   So you asked them and they did it, and then you told

7   the doctor that you didn't want to be referred at that time,

8   right?

9   A.   I couldn't be referred at that time.  I was -- I had to

10  be in the program within 24 months of completing it; this

11  was in 2003.  I was nowhere close to that, but I believe

12  what I had asked was I wanted information about the program.

13  Q.   But when confronted with the document that says:  "He

14  reported that he did not want to be referred at this time,"

15  are you denying that?

16  A.   Ma'am, I couldn't have been referred.  I didn't have, I

17  didn't have the qual -- I wasn't at the time in my sentence

18  where I could be referred at that time.

19  Q.   Now, for purposes of CODE you explored family issues,

20  your criminal thinking, drug and alcohol abuse, and things

21  like that, right?

22  A.   Victim empathy, victim impact, a lot of things, yes.

23  Q.   And you testified that, yesterday about after leaving

24  Allenwood and wanting to go to Butner, you were afraid at

25  Allenwood, right?  You didn't want to go back?

```
1     A.   I was terrified of Allenwood.

2     Q.   But you remember being transferred back to Allenwood

3     and Butner and being asked to transfer back to the CODE

4     unit?

5     A.   Yeah, I felt more safe in the CODE unit; plus, I had my

6     counselors who were in there that I could talk to.

7     Q.   Now, you testified a little bit about your family

8     yesterday and your parents.  Your family, they haven't

9     visited you at least in the last eight years, right?

10    A.   My dad died and my mother's in her 80s.  No, they

11    haven't visited me.

12    Q.   And you talked yesterday about some threatening remarks

13    that you made to your mom?

14    A.   Yes.

15    Q.   But in 2001 you wrote her a note saying that when you

16    were released you'd find her and kill her, do you recall

17    that?

18    A.   Yes, I do.

19    Q.   And you also made those threats against Seth and your

20    daughter, right?

21    A.   Yes, I was angry at that time.

22    Q.   You sent a letter to your daughter at your parent's

23    house saying you were going to kill her and Seth when you

24    were released, right?

25    A.   That's what I said, yes.
```

```
 1              MS. PIEMONTE-STACEY:  Could I just have a moment,
 2      your Honor ... no further questions at this time.
 3              REDIRECT EXAMINATION BY MR. GOLD:
 4      Q.    Do you recognize this document?
 5      A.    Yes, I do.
 6      Q.    Is this a document we talked about yesterday?
 7      A.    Yes.
 8      Q.    And for the record, this is Exhibit 27, the sex
 9      offender homework, Page 1053.  What is this document?
10      A.    This is a list of victims of sexual assault.
11      Q.    And does it go on for more than one page?
12      A.    Yep, there's two pages.
13      Q.    Who is the man in the van?
14      A.    The man in the van is the man that I met at the
15      Grateful Dead concert that I talked about.
16      Q.    When we were going through the list of victims
17      yesterday, did we omit this man?
18      A.    Yes, we did.
19      Q.    What was the story here?
20      A.    This was a man I had met at a Grateful Dead show, who
21      me and him partied one night and got -- I don't remember
22      if it was drugs or alcohol, but we got intoxicated, and I
23      believe he gave me signals about wanting to have sex.  I
24      could be mistaken, but that's what I thought, and the next
25      morning I proceeded to masturbate him while he was sleeping.
```

Q.   Todd, did you testify that your daughter had sex with

Fred?

A.   I don't remember if I testified about that.

Q.   Just now on cross-examination?

A.   Yes, I did.  Yes.

Q.   And you had sex with Seth?

A.   Yes.

Q.   How do you feel about that behavior today?

A.   I think it's disgusting, what I did to my daughter.

Q.   How do you view sex offender therapy, do you think

you'll come to an end of it?

A.   Yes, I do.

Q.   When will that be?

A.   Well, as far as a program goes, you know, if I go out

on the street, I'll be doing that for three years; but as

far as ever getting over, within myself, having to

continuously, you know, to try to make myself a better

person, I don't think I'll ever get over that.  I think

I'll be working on that for the rest of my life; but sex

offender treatment, if I do it on the street, they told me

I'd have three years to do it.

Q.   And just to clear up what was happening in the CODE

program, and I think we're trying to locate that document,

why would you have asked about Butner while you were taking

the CODE?

1    A.  Well, there was a number of reasons.  One was that I

2    wanted to get out of the penitentiary.  I was trying to get

3    information about it because Judge Squatrito had recommended

4    me and --

5          THE COURT:  Did you think the Butner program was

6    better than what you had on the state side?

7          THE WITNESS:  Do I think it was now?

8          THE COURT:  Yes.

9          THE WITNESS:  There was beneficial things about

10   both.  I think the Butner treatment program was more

11   intense, and I think the one that was on the state side has

12   gotten to be a lot like the Butner one now, but I think the

13   Butner one was better, yes.

14         THE COURT:  I think you described the state one was,

15   what, twice a week?

16         THE WITNESS:  Yeah.  I think it was twice, yeah.

17         THE COURT:  And you said Butner was 24-7?

18         THE WITNESS:  It was 24-7.  Well, you're living in a

19   program unit, yeah.  It was much more -- you could never get

20   away from it; that was part of the problem.  You know, you

21   could never get away from people always coming to you and

22   wanting to talk about stuff.

23      It would have been nice to have a break once in awhile,

24   you know, just to get your head together and think about it.

25   Q.  So this Dr. Trgovac?

```
 1     A.   Trgovac.

 2     Q.   Trgovac.

 3     A.   It's Russian.

 4     Q.   So did you ask her to look into SOTP on your behalf?

 5     A.   Yes, I did.

 6     Q.   And what did she tell you that she learned?

 7     A.   She said she didn't learn very much because they didn't

 8     have very much posted, but she said I had to be within 24

 9     months of release to get into the program.

10     Q.   Do you remember what else she told you about reapplying

11     if you wanted to?

12     A.   Yes, she said:  Come back when you're closer to going

13     home, is what she told me.

14          THE COURT:  Excuse me.  Is she the one in Devens

15     recently or the one way back when?

16          THE WITNESS:  No, this is Allenwood.

17          THE COURT:  This is Allenwood, okay.

18     Q.   And during the CODE program you inquired about it?

19     A.   I believe -- if I may, I believe it says I had 39

20     months left here, the part that isn't highlighted.

21     Q.   I don't know if this document is in evidence or --

22     A.   And at that point I was not eligible for the program;

23     I couldn't go into it, but I did want information on it at

24     this time.

25          MR. GOLD:  Your Honor what I think we'll do is
```

```
 1    maybe ask Dr. Bard about some of these documents and move

 2    them in.

 3             THE COURT:  All right.  Anything further?

 4             MR. GOLD:  Nothing further, your Honor.

 5             MS. PIEMONTE-STACEY:  Nothing further, your Honor.

 6             THE COURT:  Thank you.  Woe, we're right on track

 7    for today.  Thank you, Mr. Carta.

 8             THE WITNESS:  Thank you.

 9             MR. GOLD:  Your Honor, Leonard Bard is here.  We'd

10    call Leonard Bard to testify.

11             THE CLERK:  Dr. Bard, please raise your right hand.

12             (Leonard A. Bard, Ph.D., duly sworn.)

13             THE CLERK:  Please state your name, your full name,

14    and spell your last name for the record.

15             THE WITNESS:  My name is Leonard Alan Bard, B-a-r-d.

16             THE COURT:  I have read your credentials, sir, but

17    have you testified -- what other trials have you testified

18    for in the Federal Adam Walsh Act Commitment other than this

19    one?

20             THE WITNESS:  None, your Honor.

21             THE COURT:  What?

22             THE WITNESS:  None.

23             THE COURT:  So this is your one federal involvement?

24             THE WITNESS:  Yes, your Honor.

25             THE COURT:  In this or another court?
```

```
 1              THE WITNESS:  Right.
 2              MR. GOLD:  Should I touch on that, your Honor,
 3      briefly, the credentials?
 4              THE COURT:  No.
 5              MR. GOLD:  It's in the record.
 6              THE COURT:  No.  I did read the transcripts of the
 7      last proceeding so he is qualified.
 8              THE WITNESS:  Yes, your Honor.
 9              DIRECT EXAMINATION BY MR. GOLD:
10      Q.   Dr. Bard, good morning.
11      A.   Good morning.
12      Q.   Have you drafted a report in this case?
13      A.   I believe two of them, but, yes.
14              THE COURT:  By the way, Mr. Gold, I didn't mean to
15      preclude you, if there's anything you need to update from
16      his last set of credentials, but, I mean, he is qualified.
17              MR. GOLD:  I don't think that --
18              THE COURT:  The last trial was, what, two years ago,
19      three years ago?
20              MR. GOLD:  It was in February of 2009.  I think
21      it's been -- for Dr. Bard, maybe I'll just ask him that.
22      I don't know; we have some things we'd like to touch on,
23      but they're in the transcripts that furnish his credentials,
24      the length of his experience back in the 80s, work at the
25      Massachusetts Treatment Center, work as a qualified
```

1    examiner for the Commonwealth of Massachusetts.

2              THE COURT:  Right, I remember reading that.

3    Q.   Dr. Bard, is there anything in your professional

4    experience since your curriculum vitae was entered into

5    evidence in 2009 that you feel is important to the Court's

6    understanding of your credentials?

7    A.   No, I don't, your Honor.

8    Q.   Now, I've placed a document in front of you.  Is that

9    the report that you've authored in this case?

10   A.   It is.

11             MR. GOLD:  Your Honor, without objection I'd seek to

12   enter Dr. Bard's updated report into evidence.

13             MS. PIEMONTE-STACEY:  No objection.

14             THE COURT:  Yes.  Although, I have to confess, I'm

15   not sure I read the updated report.

16             MR. GOLD:  November 3rd, 2010, and that is No. 37.

17             THE COURT:  I actually do have that.  I didn't

18   realize it was the updated report.

19             (Respondent's Exhibit No. 37 admitted in evidence.)

20   Q.   Dr. Bard, in your opinion is hebephilia a mental

21   disorder?

22   A.   No.

23   Q.   Have you had the opportunity to review the legal

24   opinions that have been drafted in this case?

25   A.   I have.

1    Q.   Have you reviewed the opinion by Judge Tauro?

2    A.   Yes.

3    Q.   And did you review the opinion by the First Circuit?

4    A.   Yes.

5    Q.   And have there been any relevant developments in the

6    field of psychology or psychiatry with respect to the

7    diagnosis of paraphilia NOS hebephilia since you testified

8    in February of 2009?

9    A.   Yes.

10   Q.   And what are those developments?

11   A.    To just, to just back up for a second, in 2008 a paper

12   was published by Blanchard and his colleagues that suggested

13   the inclusion of a new diagnostic category which they called

14   pedohebephilia, including the bold diagnosis of pedophilia

15   and adding to it a new diagnosis for individuals who were

16   sexually aroused by sexual activity with individuals aged

17   11 to 14.   That paper was --

18   Q.   And for the record, I've placed in front of you,

19   Dr. Bard, Exhibit 29, which is in evidence in this case.

20   Is that the article that you were just referring to?

21   A.   It is.   That paper was followed by seven responses.

22        THE COURT:   Can I just ask, was it accepted into a

23   peer-reviewed journal?

24        THE WITNESS:   Yes, it was, but that was one of the

25   concerns of the responders was that the peer-reviewed

```
 1    journal had as its associate editor, one of the authors
 2    which raises some questions about a conflict.
 3              THE COURT:  You know what, I read your last
 4    testimony; I know you feel passionately about this subject.
 5              THE WITNESS:  No, no, no.
 6              THE COURT:  It's just I need, you're the
 7    court-appointed expert, a neutral presentation of the state
 8    of where hebephilia is.
 9              THE WITNESS:  And I will do my best to report on
10    everything that has been published since then.
11              THE COURT:  So is Dr. Blanchard well respected in
12    the field?
13              THE WITNESS:  He is.
14              THE COURT:  All right.  So he publishes a paper that
15    said it should be a mental disorder if you're attracted to
16    11- to 14-year-olds, and what you're saying is some people
17    disagree with that?
18              THE WITNESS:  There were seven responses to this
19    article.
20              THE COURT:  What is a response mean?
21              THE WITNESS:  A response was in the same journal;
22    consequently, seven psychiatrists and psychologists
23    independently wrote criticisms of this article.  I was none
24    of them.
25              THE COURT:  Excuse me, was that a letter to the
```

1    editor or --

2         THE WITNESS:  It was a letter to the editor citing

3    numerous problems in this article.  That's all I'm saying

4    about that.

5         THE COURT:  So these seven people, are they

6    respected in the field; do you know that?

7         THE WITNESS:  Every one of them.

8         THE COURT:  All right.  So did they write other

9    articles in peer-reviewed journals saying why it is not a

10   mental disease in the 11- to 14-year-old range, to be

11   attracted to someone --

12        THE WITNESS:  One of them, one of them is Dr. Karen

13   Franklin who wrote a lengthy article in a journal called

14   Behavioral Sciences and The Law, a peer-reviewed journal; it

15   came out in 2010, explaining her reasoning for her opinion.

16        MR. GOLD:  Judge Saris and let me --

17        THE COURT:  Okay.

18        MR. GOLD:  What I'm intending to do is simply draw a

19   roadmap from the summaries of the field since it's developed

20   through his testimony.

21        THE COURT:  All right, so you're planning --

22        MR. GOLD:  I'm planning on doing, I think, the

23   background that you, but I think we need to enter -- let

24   me ask you this, Dr. Bard:  are these responses that you've

25   described part of the peer-review process as you understand

1    it in the art and science of psychology and psychiatry?

2    A.   As far as I know any paper that is submitted to a

3    peer-reviewed journal goes through a process of being

4    reviewed anonymously by members of the editorial board.

5    Q.   Does that include responses to an article such as this

6    that are also published in the same journal?

7    A.   I would imagine so, but I cannot say with 100%

8    certainty about that.

9    Q.   And are those responses part of the process or the

10   development of science?

11   A.   Yes.

12   Q.   In your opinion, Dr. Bard, is it possible for a court

13   reviewing Exhibit 29 to situate it in context or understand

14   it without looking at it alongside these responses?

15   A.   No.

16        MS. PIEMONTE-STACEY:  Objection.

17        THE COURT:  Overruled.

18   A.   No, because the criticisms of the article are

19   methodological and have to do more with psychological

20   science, which is often something that the courts don't

21   have firsthand knowledge of, and I think it illuminates

22   the issues that were raised in that article which were

23   subsequently raised in subsequent articles about that.

24   Q.   And after receiving the responses did the Blanchard

25   group themselves do a response to those responses?

```
1    A.   Yes.
2    Q.   I've placed a document in front of you.  Could you
3    briefly examine it and tell me if you recognize it as the
4    responses?
5         MS. PIEMONTE-STACEY:  I'm going to ask what the
6    article is?
7         THE COURT:  Have you shown it to her?
8         MR. GOLD:  I gave it to Ms. Serafyn this morning.
9         THE COURT:  All right.
10   Q.   And did you refer to these responses in the course of
11   your testimony in February of 2009, were they available?
12   A.   Yes.
13   Q.   Are the documents that I handed you those responses?
14   A.   Yes.
15        MR. GOLD:  Your Honor, the respondent would seek to
16   move those into evidence as the next exhibits.
17        MS. PIEMONTE-STACEY:  We object to it.  We have
18   issues.
19        THE COURT:  On what grounds?
20        MS. PIEMONTE-STACEY:  Two:  No. 1, the First Circuit
21   has already decided the issue; secondly, there are not
22   further decisions.  In other words, at the time the First
23   Circuit decided this issue, the Blanchard, et al, article,
24   these are simply letters to the editor that Dr. Bard has
25   just testified to.  He can't say it didn't go through the
```

```
1    same peer-reviewed process, and it doesn't change the

2    current status of hebephilia -- paraphilia NOS hebephilia.

3         THE COURT:  If they're just letters to the editor

4    that are not peer-reviewed, I'll sustain the objection.

5         MR. GOLD:  Well, we don't know that.

6         THE COURT:  Well, then, it's your burden.  I'm just

7    not going to accept it.

8         MS. PIEMONTE-STACEY:  It says at the top:  Letter to

9    the editor.

10        THE COURT:  I'll let in Ms. Franklin's article, but

11   what that is peer-reviewed?

12        MR. GOLD:  We'll get there, your Honor.  I will note

13   that the authors replied to it, and that the doctor has

14   testified that these letters to the editor are not of a

15   newspaper-type variety, but part of the advancement of the

16   science, and that understanding or reading Exhibit 29

17   without the benefit of these letters will be not ideal in

18   terms of the Court's understanding of Exhibit 29, so that's

19   our pitch right now.

20        THE COURT:  It's not admissible, though.  It's not

21   peer-reviewed and it isn't authenticated, you know, it's

22   just a letter to the editor.

23        MR. GOLD:  Understood.

24   Q.  After these responses that you discussed at the time of

25   your testimony, what happened next in terms of publications
```

1    in the field addressing the issue?

2    A.   Subsequently, the DSM-V working group came out with

3    their proposals for diagnosis for the main version of the

4    diagnostic manual which is now due out in 2013, and among

5    those were an article by Blanchard, the author of that

6    first article who was a member of the DSM-V working group,

7    with his recommendations for inclusion of pedohebephilia as

8    an accepted diagnosis.

9        Then, an article was published by Dr. Karen Franklin

10   indicating numerous problems with the whole concept of

11   pedohebephilia, doing a fairly exhaustive review of the

12   history of that term; and this was published, as I said, in

13   Behavioral Sciences and the Law, a peer-reviewed journal in

14   2010.

15   Q.   I've placed a document in front of you.  Is that a copy

16   of that journal article?

17   A.   It is.

18   Q.   And --

19            THE COURT:  This is number, this is?

20            MR. GOLD:  Oh, this is Exhibit B for ID from

21   Dr. Prentky's testimony, I believe.

22   Q.   Is this document important in understanding Exhibit 29,

23   which is the Blanchard group's article?

24   A.   I believe it puts the concept of hebephilia into a

25   more historical perspective.  It also delineates numerous

resources on phallometric testing that were not included in
the previous articles that argue against the notion of
inclusion.

Q.   And you mentioned --

        THE COURT:  What do you mean by hebephilia?

        THE WITNESS:  What I mean by hebephilia is a
descriptive term that has been explained in various ways
over the years from an attraction to all adolescents to an
attraction to early stage puberty adolescence to anyone
under the age of legal consent, and that's one of the big
problems with using that term is that it's never been
precisely defined, and it's never been accepted in any way.

   Blanchard, to his credit, is at least saying:  let's
pinpoint this, 11 to 14 is what he thinks it ought to be
arguing against any arousal to postpubescent adolescents as
being deviant ... so anyone who is attracted to a sexually
mature adolescent would in their view not fall under that.

        THE COURT:  I just want the record to be clear,
though, that the issue is paraphilia NOS hebephilia; it's
not straight up hebephilia, so I know you feel frustrated by
that, but that's the way the law is right now.

        THE WITNESS:  Right.

        THE COURT:  So the issue is if a person is attracted
to let's say a pubescent adolescent in the range of 11 to 14
and then it meets the other criteria for paraphilia NOS,

```
 1    Criterion A and Criterion B; I'm sure you're familiar with

 2    them?

 3           THE WITNESS:  No.  Your Honor, unfortunately, there

 4    are no criteria for paraphilia NOS.  That is a mistake.

 5    Even if it was said so by the First Circuit, it is a mistake

 6    ... because the DSM simply does not show any diagnostic

 7    criteria, and if someone has it, I can show it to you, for

 8    the notion of paraphilia NOS.

 9       Moreover, in a more recent article, which I'm sure I'll

10    be asked about, specifically talks about that, and I'm happy

11    to talk about that.  The article was written by the chairman

12    of the DSM.

13           THE COURT:  Can I just say this:  I am a district

14    court judge.  I do not overturn the First Circuit, okay?

15    So right now you can have an opinion as a neutral expert;

16    I'm hoping you will have one, but right now I've got to work

17    through paraphilia NOS, descriptor hebephilia ... so,

18    ideally speaking, at some point we'll get to that.

19       It's not just whether attraction to pubescent boys is

20    normal or abnormal; it's whether or not acting on it in

21    ways that disrupt your life functions, I guess, by being

22    attracted, what is it, over six months if that what the

23    criterion is?  It sets out Criterion A and Criterion B,

24    and I'm hoping you're going to get me there?

25           MR. GOLD:  We're going to get there, Judge.
```

```
1            THE COURT:  I don't want this distracting debate;
2       the First Circuit has ruled.
3            MR. GOLD:  From my perspective just so it's clear
4       and to give the Court a roadmap of where I'm taking the
5       examination, there's a development in the field that's
6       very recent where the authors of DSM-IV themselves address
7       the use of paraphilia NOS in the way the Court is describing
8       and the way the First Circuit has laid out.
9          They say the manual doesn't permit it, and they give
10      reasons.  It's a peer-reviewed article.  It's new scientific
11      evidence.
12           THE COURT:  All right.  I'm willing to take new
13      scientific evidence, but I can't rehash; I read those,
14      actually, at times contentious examinations last time
15      around.  It was sort of high intensity.  I can't go back
16      through this again.  If there's new evidence, I'm willing to
17      talk about the new evidence.
18           MR. GOLD:  This is all background to the new
19      evidence.
20           THE COURT:  All right.
21           MR. GOLD:  That's what this is.
22           MS. PIEMONTE-STACEY:  Just so the record's clear,
23      your Honor, this is the article that he tried to submit
24      with Dr. Prentky that you had sustained an objection on
25      and it's not a scientific --
```

```
1              THE COURT:  Why did I sustain it, I don't remember?

2              MS. PIEMONTE-STACEY:  Well, I think it was

3    timeliness, and it was outside the scope of his report; he

4    hadn't mentioned it nor has Dr. Bard mentioned it in his

5    report so we have the same exact issues here.

6              THE COURT:  It's not mentioned in your report?

7              THE WITNESS:  No, it is not, your Honor.

8              MS. PIEMONTE-STACEY:  And it's in the form, I'm not

9    going to say it's in the form a letter to the editor, but

10   it's commentary.

11             THE COURT:  Is it peer-reviewed?

12             THE WITNESS:  It is absolutely peer-reviewed.

13             THE COURT:  It's been entered into a journal?

14             THE WITNESS:  Yes, the Journal of the American

15   Academy of Psychiatry and the Law.

16             MR. GOLD:  And it's germane to the central issues.

17             THE COURT:  Then why didn't he supplement his report

18   about it?

19             MR. GOLD:  Well, because --

20             THE COURT:  How long ago did it come about?

21             THE WITNESS:  Approximately three weeks ago.

22             THE COURT:  Well, this is like when you objected

23   with Dr. Phenix, it's the exact same issue, and I sustained

24   the objection.

25             MR. GOLD:  It's similar.
```

```
 1              THE COURT:  It's identical, I knocked her out of the

 2    ballpark on the -- what was it -- the Static-99.

 3              MS. Serafyn:  The SRA.

 4              THE COURT:  The SRA.

 5              MR. GOLD:  This is --

 6              THE COURT:  Excuse me.  What's sauce for the goose

 7    is sauce for the gander, so if I let him do it on brand new,

 8    I let her do it.

 9              MR. GOLD:  Oh, she can do it.

10              THE COURT:  No, you fought me tooth and nail on it.

11              MR. GOLD:  I know, but then we opened the door to it

12    at the end because --

13              THE COURT:  No, we didn't.

14              MR. GOLD:  -- because we needed to cross-examine her

15    on it.

16              THE COURT:  No, we didn't.  So I am going to -- I

17    mean, I want to do what's in the interest of justice.  If

18    there's a brand new article out there, you should have

19    supplemented, but it is an important issue, and I can't

20    believe that you've now known about it for awhile.

21              MS. PIEMONTE-STACEY:  It was yesterday, your Honor,

22    when he presented it to me.

23              THE COURT:  No, no.  You knew when Prentky mentioned

24    it last week.

25              MS. PIEMONTE-STACEY:  That was yesterday in my book.
```

1    I'm sorry, that was Friday.

2              MR. GOLD:  It was Thursday that we provided that.

3              THE COURT:  And I have to let her then come up with

4    an opportunity to rebut it, and just he's been in jail now

5    for four years?

6              THE WITNESS:  Four years, two weeks.

7              THE COURT:  Over four years.  You keep coming up

8    with new stuff so think about how much you want it.

9              MS. PIEMONTE-STACEY:  And, your Honor, I think I can

10   say at the end of the day the status is the same.  It remains

11   a proposal in the DSM-V, and the First Circuit has already

12   decided it.

13             THE COURT:  I'm going to allow this in.  I'm going

14   to read her report on the static, whatever it is, called,

15   because you've got to understand:  if it's good for you,

16   it's good for her.

17             MR. GOLD:  I'm not afraid of that, Judge.  That's

18   fine.

19             THE COURT:  Okay.

20             MS. PIEMONTE-STACEY:  Okay, and the objection's --

21             THE COURT:  If it's in her report, I will consider

22   that evidence.  Isn't it in that updated status thing?

23             MS. Serafyn:  It is in the report, your Honor, yes.

24             THE COURT:  All right.

25             MR. GOLD:  Thank you.

```
 1              THE COURT:  Everyone agrees, all right?  I'm letting

 2      it all in, fine, but it just could take us longer is all I'm

 3      saying.

 4              MR. GOLD:  Well, I think it will help us get it

 5      right, Judge.

 6              THE COURT:  Well, I'm hoping that it will.

 7      Q.   Dr. Bard, so have we formally entered or we'd seek to

 8      enter as the next exhibit Dr. Franklin's article.

 9              THE COURT:  This is the only new article?

10              MR. GOLD:  There are two new articles.

11              THE COURT:  If you haven't shown it to her yet, then

12      it's not happening.

13              MR. GOLD:  Well, no, the Franklin article is not --

14              MS. PIEMONTE-STACEY:  We saw the Franklin one the

15      morning of Dr. Prentky's testimony; there's no objection to

16      it.

17              THE COURT:  What's the second one?

18              MR. GOLD:  The second one is the one we're talking

19      about, the editors to which Dr. Bard will talk about.

20              MS. PIEMONTE-STACEY:  That's the one where you

21      sustained the objection.

22              THE COURT:  I'm not allowing in a letter to the

23      editor.

24              MR. GOLD:  No, no, this isn't a letter to the editor;

25      this is commentary by the DSM-IV Task Force authors on the
```

```
1      hebephilia issue.

2             THE COURT:  Is that the one that he said was

3      peer-reviewed and had been in a peer-reviewed journal?  Have

4      you shown it to them?

5             MR. GOLD:  Yes, they've had that since Thursday.

6             THE COURT:  Have you?

7             MS. Serafyn:  We did, your Honor, but then your

8      Honor sustained the objection.

9             THE COURT:  Because you had seen it for 30 seconds

10     the last time; this is different.  You've seen it now for

11     five days, not a long period of time, but at least it wasn't

12     something shoved over the threshold.

13            MS. PIEMONTE-STACEY:  You're right, your Honor, but

14     it does open the door because Dr. Phenix would have an

15     opinion about this article and if so --

16            THE COURT:  At this point the law of the case is

17     different, and I'm unlikely to change the law of the case.

18     Let me at least hear about it to decide whether I am going

19     to do anything about it.  If it's in a peer-reviewed journal,

20     I will allow them in; if they're not in a peer-reviewed

21     journal, I will not ... so what has been allowed into a

22     peer-reviewed journal?

23            MR. GOLD:  So we've got two.  We've got the --

24     Dr. Bard mentioned an article by Karen Franklin.  We'll

25     talk about her a little bit more, but it's "Hebephilia,
```

1    Quintessence of Diagnostic Pretextuality, Behavioral

2    Sciences and the Law, 2010, which is a peer-reviewed journal

3    in the field of forensic psychology.  We would seek to

4    admit that as the next exhibit which is 38.

5          MS. PIEMONTE-STACEY:  And there's the objection.

6          THE COURT:  Excuse me?

7          MS. PIEMONTE-STACEY:  And there's the objection

8    that's already on the record.

9          THE COURT:  That's overruled, but you'll be given an

10   opportunity to rebut it; and I'm not sure it matters, given

11   the law of the case, but I haven't read it yet, so I don't

12   know because no one's shown it to me; and if it's not in

13   here, then I don't know what it says.

14         MR. GOLD:  And then, Judge Saris, the next, before

15   we move on, is by Allen Frances, M.D., and Michael B. First,

16   M.D., "Hebephilia is not a mental disorder in DSM-IV-TR and

17   should not become one in DSM-V," I would seek to admit

18   that; that's in a peer-reviewed journal, the Journal of the

19   American Academy of Psychiatry and the Law.

20         THE COURT:  Do these articles address paraphilia

21   NOS?

22         THE WITNESS:  The Franklin one only vaguely talks

23   about hebephilia; the Frances and First one directly talks

24   about it.

25         MR. GOLD:  So that we would seek to admit as

1    Exhibit 39.

2              (Respondent's Exhibit Nos. 38 and 39

3               admitted in evidence.)

4              THE COURT:  So can I just cut past all of this for

5    one minute?  So is it your basic testimony that someone who

6    is attracted to, stalks, and consistently grooms to have sex

7    a 13-year-old does not suffer from a mental illness?

8              THE WITNESS:  I can't answer the question the way

9    you asked it because the age is basically irrelevant.

10   Sexual development is the only issue, not age.

11             THE COURT:  A 13-year-old boy?

12             THE WITNESS:  Your Honor, it still doesn't matter.

13   13-year-old boys can look like five feet tall and thin, and

14   they can look six feet tall and athletic; it's not the age.

15             THE COURT:  The 13-year-old boy, I think this goes

16   to the heart of it, what is -- typically speaking, what does

17   a 13-year-old boy look like?

18             THE WITNESS:  There's no such thing, your Honor,

19   that's the problem because --

20             THE COURT:  As a mother of four kids, I'm not sure

21   I'm buying this.

22             THE WITNESS:  And as the father of two others, I

23   can tell you that they didn't look the same at 13 and I

24   doubt that your children looked the same.

25             THE COURT:  Let's put it this way, so let's take a

1    13-year-old boy who even was starting to develop, starting

2    to develop?

3         THE WITNESS:  13-year-olds are not starting --

4         THE COURT:  Has pubic hair and facial hair starting,

5    so let's even say that they're sort of in the process of,

6    you know, that's why they get Bar Mitzvah'd, right they're

7    starting the process of manhood, just starting --

8         THE WITNESS:  Right.

9         THE COURT:  -- do you think it's a mental illness to

10   essentially have sex with them, groom them, stalk them, and

11   over a period of a decade be attracted to 13-year-olds who

12   are in the process of becoming a man?

13        THE WITNESS:  Again, the way you asked that

14   question, if your child, if you're talking only to

15   13-year-olds, to that very narrow thing, and it becomes a

16   very hard question, but, in general, no.  It's not mental

17   illness; it's not mental disorder.  It depends on the sexual

18   development.

19        THE COURT:  To act on it?

20        THE WITNESS:  Acting and having the thoughts don't

21   matter.  In psychology and psychiatry it's the thought, it's

22   the urge, it's the fantasy, that is equally as important,

23   which is why your Honor --

24        THE COURT:  Excuse me.

25        THE WITNESS:  -- for example, you can be diagnosed

1      with pedophilia, for example, if you never act on it.  If

2      you have the thoughts, it's enough.  You don't have to act

3      on it.

4              THE COURT:  Excuse me, I understand that, but it's

5      all drilled into me that being attracted to an adolescent

6      is normal, not abnormal, but when you act on it and you

7      persistently act on it over a decade to boys who are, let's

8      say, 13-year-old; that's what we have here, a consistent

9      strain of 13-year-olds.

10             MR. GOLD:  Your Honor, I object to that

11     characterization but --

12             THE COURT:  All right, fair enough.  A bunch of

13     13-year-olds --

14             MR. GOLD:  Three, your Honor.

15             THE COURT:  -- over a long period of time, is that a

16     mental illness?

17             THE WITNESS:  But it's not just, he's not just

18     looking at 13-year-olds and downward, he's looking at

19     individuals who are sexually mature and the age doesn't

20     matter.

21         He could have had sexual contact with a 13-year-old who

22     looked older than a 15-year-old he had sexual contact with.

23     The age is irrelevant; it's the sexual development.

24         I think Mr. Carta himself testified there were

25     13-years-olds who he had the opportunity but he wasn't

```
1     aroused because they were not developed, so we're looking

2     at development --

3            THE COURT:  Sure, but he wasn't attracted to fat

4     people either.  I mean, human beings are attracted to some

5     people and not to others; but given the way that a typical

6     13-year-old looks, a man child, suppose somebody -- what

7     you're telling me and I understand that, the literature

8     supports it that just attraction isn't enough.

9            THE WITNESS:  No, I'm not saying that.

10           THE COURT:  But suppose you act on it?

11           THE WITNESS:  It doesn't matter.

12           THE COURT:  That's just counterintuitive.

13           THE WITNESS:  No, it's not, your Honor, because it's

14    the attraction; it's the arousal.  If someone sits home and

15    masturbates to thoughts of 8-year-olds all day long and

16    never touches an 8-year-old, it isn't illegal, but it's

17    deviant as hell.

18           THE COURT:  Sure.

19           THE WITNESS:  And if somebody -- so you don't need

20    to act for it to be deviant.  The question is, is the object

21    that you are thinking about and fantasizing about, is that

22    deviant?

23        And being aroused to a sexually-developed adolescent,

24    whether he's 13 or 19, if it's the same level of sexual

25    development, then the age doesn't matter.
```

1     It's hard to know age.  Your Honor made that point very

2   well yesterday with those young ladies in the courtroom.

3   Just like you I thought that they were teenagers.  They were

4   over 21; I was blown away.  They don't look like they're

5   over 21.

6     You cannot tell anything about age.  You have to look at

7   the person and how they are developed.  We don't pathologize

8   sexual arousal to sexually-developed people, whether they

9   are 14 or whether they are 59; it doesn't matter.  If

10  they're developed, it's not deviant.  Plus, there's research

11  that shows that --

12          THE COURT:  Excuse me.

13          THE WITNESS:  -- normal men are aroused to sexually

14  mature adolescents as young as 15 so it doesn't fit to say

15  that just because someone's 13 it's deviant.  It's illegal.

16  It should be illegal; you should be punished.

17          THE COURT:  I understand you're talking as a

18  psychiatrist.

19          THE WITNESS:  Psychologist.

20          THE COURT:  A psychologist, that it's not abnormal

21  to be attracted to pubescent children, but is it abnormal to

22  then act on it?

23          THE WITNESS:  No, it's criminal to act on it.  The

24  same way that if you rape someone, if you rape an adult,

25  if you're attracted to a very attractive adult, that's not

```
 1   deviant.  If you sexually assault them, is that deviant?
 2   No, it's criminal.
 3        THE COURT:  Suppose you continuously rape a woman --
 4   women; I had some guy who had a thing about nurses.  He
 5   continuously raped nurses.  He can't control himself.  He
 6   rapes women.  Would you call that a mental abnormality:  he
 7   can't control himself?
 8        THE WITNESS:  First, I don't believe that any sex
 9   offender cannot control themselves.  I've evaluated
10   thousands of men in 25 years and I have yet to find someone
11   except for someone who's either manic or mentally ill at
12   the time who cannot control themselves.
13      They chose not to control themselves.  When you sexually
14   assault someone, you're making a decision.  There's nothing
15   inside you that pushes you and you're helpless; that is a
16   misconception.
17        THE COURT:  So you would say that nobody qualifies
18   under the statute?
19        THE WITNESS:  No, I would say if someone is
20   attracted to and has sexually assaulted prepubescent
21   children, they would qualify easy; I have no problem with
22   that.
23        THE COURT:  The third part of that is the
24   seriousness of sexually controlling --
25        THE WITNESS:  That's a whole other issue, and I'm
```

1    going to have to talk about that, but in terms of the

2    abnormality of the disorder, the first problem or the second

3    problem, you simply cannot pathologize what many people see

4    as normal.

5    Q.   I'm just going to ask a couple of questions anchoring us

6    back to the literature for the benefit of the Court, but

7    after Dr. Franklin's article are there any significant

8    publications in the field germane to this issue?

9    A.   Yes.

10   Q.   And what are they or what are those?

11   A.   The article that you mentioned a while ago by Allen

12   Frances and Michael First.

13   Q.   And that's been entered into evidence as Exhibit 38?

14   A.   Yes.

15   Q.   Who are Dr. Frances and Dr. First?

16   A.   Dr. Frances is a psychiatrist who is the chairman of

17   the DSM-IV Task Force, basically in charge of the entire

18   DSM-IV process that resulted in the Diagnostic Manual

19   Version IV in 1993, I believe.

20       Dr. First is a psychiatrist who was the text editor for

21   the DSM-IV and the cochair person of the DSM-IV Text

22   Revision which came out ten years ago ... so they were both

23   intimately involved in the development of the DSM-IV.

24            THE COURT:  What are we at now, DSM?

25            THE WITNESS:  We are on DSM-IV right now, that is

1    still, as it were, the law of the land.

2         THE COURT:  DSM-IV-TR?

3         THE WITNESS:  TR is the Text Revision that they made

4    some subtle changes to the DSM-IV about ten -- about ten

5    years ago and now they're in the process of developing the

6    DSM-V.

7    Q.  And what do Dr. First and Dr. Frances say in their

8    article?

9    A.  They say, with reference to what we're talking about

10   here, there are three important points they make.

11   Q.  What is the title of the article first of all?

12   A.  "Hebephilia is not a mental disorder in DSM-IV-TR and

13   should not become one in DSM-V."

14   Q.  And is this research or is it peer-reviewed literature

15   of another kind?

16   A.  This is a review of the research in the field, and it

17   is their -- their statements as to what the intent was in

18   terms of paraphilias in the DSM-IV.

19   Q.  Please, Dr. Bard, just continue to summarize your

20   points.

21        THE COURT:  You know what, we've been going since

22   about, we got going a little late because there was a little

23   delay, but we got going like 9:15, 9:20.  Does it make

24   sense to take our break now because I'd like to read these

25   articles over the break is what I'd like to do, rather

1  than have someone report it to me.

2      I don't know if they're too long to do that?

3          MR. GOLD:  The one we're talking about now is

4  actually pretty succinct.  It's about eight pages long.

5          THE COURT:  Okay.  So why don't we get those two

6  articles, see if I can at least skim them, and how long do

7  you anticipate you'll have with Dr. Bard, if I don't have

8  anything else?

9          MR. GOLD:  An hour-and-a-half.

10          THE COURT:  And then we'll finish him tomorrow, is

11  that it?

12          MR. GOLD:  Yes, your Honor.

13          THE COURT:  That sounds good to all of you?  What do

14  we have this afternoon?  I have a sentencing at 2.  Yeah,

15  that's not going to work; a 2:30 revocation, yeah, this

16  isn't going to work; it has to be tomorrow morning, so

17  we'll just have to finish it and I will not be available

18  Thursday and Friday, unfortunately, to finish Dr. Prentky

19  and --

20          MR. GOLD:  But we'll coordinate on Wednesday about

21  how to bring him back, Prentky?

22          MS. PIEMONTE-STACEY:  We have Monday and Tuesday as

23  well; we had five dates, your Honor.

24          THE COURT:  Yeah.

25          MR. GOLD:  Right.  Okay, we'll work that out.

1          THE COURT:  And then you need to decide if you need

2     to respond, and if you'd call Dr. Phenix to respond to these

3     two articles.  Have you even read them yet?

4          MS. PIEMONTE-STACEY:  Your Honor, I have read one of

5     them, so I'll get back to the Court.

6          THE COURT:  It just sounds like there is a dispute,

7     at this point a dispute in the literature, a disagreement

8     among experts so --

9          MS. PIEMONTE-STACEY:  Yes.

10         THE CLERK:  Court is in recess.  All rise.

11         THE COURT:  Do you need these back?

12         MR. GOLD:  No, those are yours, Judge.

13         (Whereupon, a brief recess convened at 11:05 a.m.)

14         MR. GOLD:  So, your Honor, I'm going to ask Dr. Bard

15     just a couple of summary questions about the article and

16     then move on past the article.

17     Q.   Dr. Bard, has there been any other research advanced in

18     favor of hebephilia since the Blanchard article came out?

19     A.   Since the article came out in 2008 there has not been a

20     single article I'm aware of that has purportedly a diagnosis

21     of hebephilia.

22     Q.   And what is Frances' and First's position with regard

23     to the diagnosis of the condition through the NOS category?

24     A.   Briefly their position is that it should not be

25     allowed in; that it was not the intent of the DSM-IV; in

```
1    that, as they say very clearly, hebephilia is not a mental

2    disorder in the DSM-IV.

3    Q.   Why is their opinion as to the -- is their opinion with

4    regard to the intent of the DSM-IV authoritative in your

5    opinion?

6    A.   Yes, because they are the ones who put the document

7    together, and they put it together based on the consensus of

8    the knowledge in the field at that time.

9    Q.   And how did it come about that clinicians in their view

10   are diagnosing this condition through the NOS category?

11          THE COURT:   I think you both need to keep your

12   voices up just a little bit.

13   A.   Well, they indicated that there was a change in

14   nomenclature from the DSM-III which talked about paraphilias

15   as basically being unusual and bizarre; and as a result of

16   that change in wording or the absence of those terms,

17   unusual and bizarre, that there was a misinterpretation of

18   what a paraphilia is.

19      They go on to say that the diagnostic features that

20   have been used by numerous evaluators basically involved

21   recurrent, intense sexually arousing fantasies, urges, or

22   behaviors involving either non-human objects, the suffering

23   or humiliation of one's self or one's partner, or children,

24   or other nonconsenting persons, is the entire cycle of a

25   paraphilia, and that those three general areas serve in
```

1    their words as a table of contents to what follows below.

2        For example, when they talk about non-human objects,

3    they're talking about, the paraphilias are fetishism and

4    frotteurism, both of which are listed in the DSM-IV as

5    specific paraphilias.

6        When they talk about suffering, we're talking about

7    sexual sadism, sexual masochism; and when we're talking

8    about children or other nonconsenting persons, we're talking

9    about pedophilia, frotteurism, exhibitionism, and voyeurism,

10   and that is all; that there's no other delineated or

11   considered paraphilias beyond that.

12       Then they go one step further and say that the

13   definition of children is prepubescent children, and it was

14   not meant to signify anything else but that.  These are the

15   editors of the DSM-IV, and they say that the use of children

16   is consistent and congruent with the notion of pedophilia,

17   and they also talk about the age ... because it generally

18   says, generally aged 13 and below, and they say that age is

19   irrelevant as long as the sexual development is known.

20           THE COURT:  Where do they say age is irrelevant?

21           THE WITNESS:  Irrelevant.

22           THE COURT:  Is that a quote, that word?

23           THE WITNESS:  I will quote it for you.  They talk

24   about puberty as being the most important thing and not

25   age.

1           THE COURT:  Where is this, page?

2           THE WITNESS:  Page 81 in the first full paragraph on

3      the left side.  The phrase was put in as they say as a

4      general upper limit, and with the advent of --

5           THE COURT:  But they didn't say it was irrelevant?

6           THE WITNESS:  -- puberty.  Well, they do.  They

7      don't necessarily use that term, but they basically say

8      that the diagnosis of pedophilia is based on the absence of

9      puberty, not on any arbitrary age cut-off that's their --

10          THE COURT:  Right, so it's relevant; it's just not

11     conclusive?

12          THE WITNESS:  Well, as I said, my interpretation

13     is that it's irrelevant as long as you know the sexual

14     development ... because that's the important piece, and

15     that's what they say.

16          Their third point has to do with paraphilia NOS, and,

17     specifically, they categorize that as, and I will quote

18     this:  "By virtue of their residual and idiosyncratic

19     nature, cases given the label of NOS are by definition

20     outside of what is generally accepted by the field as a

21     reliable and valid psychiatric disorder."

22          They also talk about it as inappropriate and misleading

23     when it's employed in forensic contexts.

24     Q.  Well, Dr. Bard, the Court asked you how could it be

25     that behavior like we see in Mr. Carta's case is not the

1    product of a mental disorder, is it not -- is it socially

2    beneficial behavior or what is your take on the behavior?

3    A.   No, it's certainly not a socially beneficial factor.

4    It is the opposite, it is extremely contrary, and there's no

5    doubt about that; but when we're looking at Mr. Carta, we

6    have to look at his whole pattern of sexual arousal.

7        It wasn't only that he had contact with 13-year-olds,

8    and he didn't have contact with anybody else other than

9    these 13-year-olds ... he was sexually active with older

10   adolescents; he was sexually active with people in their

11   20s; he was married for awhile and was sexually active with

12   females for awhile in their 20s; he was sexually active most

13   recently with his daughter's boyfriend ... a truly

14   despicable act that he has told me also embarrasses him to

15   no end, which was in his late adolescence.

16       He was in a longstanding relationship with Fred who was

17   17 at the beginning of the relationship, I would imagine 18

18   at the end ... so it's not any notion of preferential

19   arousal; this was part of his overall arousal pattern.

20   He likes younger males.  That is not unusual.

21       We are all attracted to attractive younger people.  It

22   is not deviant; and because it is not deviant to have the

23   attraction, it is not deviant to act on it.  Although, in

24   certain jurisdictions it may be illegal; but then, again, it

25   depends on the jurisdiction.

1        We cannot say that somebody is deviant in New York

2   where the age of consent is 18 and not deviant in

3   Massachusetts where the age of consent is 16.  We don't

4   diagnose geographic pathology; we diagnose what the field

5   thinks is deviant sexual misconduct, and, basically, that

6   means prepubescent children.

7   Q.   Dr. Bard, did you interview Mr. Carta after the trial

8   in this case?

9   A.   Yes.

10  Q.   And were you present in the courtroom during his

11  testimony in this case?

12  A.   I was.

13  Q.   Have the interviews that you've had with him or being

14  able to witness his testimony given you any insights into

15  what makes Mr. Carta tick or what the pertinent -- what's

16  behind some of his bad behavior?

17  A.   I think so, yes.

18  Q.   Could you give us a formulation or your sense of the

19  case?

20  A.   Well, my sense of the case is that Mr. Carta,

21  unfortunately, was sexually abused at a relatively early

22  age, and that it was subsequent sexual behaviors that he

23  showed where what we would consider in the field to be

24  reactive to that abuse; in that, he began to abuse others

25  and to use sex as a coping mechanism.

1    Unfortunately, he never got beyond that.  He continued

2    to use sex to make himself feel better because he couldn't

3    provide it from inside.  He never had the caring and the

4    compassion from adult caregivers that reinforce a positive

5    sense of self, and it's reflected, I think, also, by the

6    specific acts that he chose to perform.

7    There was rarely ever having someone do something to

8    him; it was always him trying to please others, again,

9    through sexualized behavior, which is not a good idea for

10   anybody, but for him it was:  I will perform oral sex; I

11   will make this person feel good.  Therefore, they will like

12   me; they will want to be with me and perhaps they will also

13   want to be sexual with me, and that's his pattern.

14   I think his focus on adolescents reflected where he was

15   emotionally.  For many years people would follow the

16   Grateful Dead and hang out and get high all the time are

17   very adolescent-like.  You expect to see that in some

18   adolescents; you don't expect to see it in grown adults.

19   Here, we do.

20   So I think developmentally he really never got beyond

21   that or he hasn't gotten beyond it for a long time.  It was

22   only once he got caught, and, again, he only got caught

23   one time in 2001, I believe.

24   Up until then there were no sanctions, there were no

25   penalties; he lived the life that he lived without any

1    negative consequences.  He just kept moving along,

2    establishing these relatively brief and meaningless

3    relationships.  When they were taken from him, when these

4    people disappointed him or abandoned him or rejected him,

5    he was left with anger and rage because he couldn't tolerate

6    that, and that's when you see the sending out of flyers

7    with his name and sexual acts on it.  That's when we see him

8    getting back at his daughter by having sex with the

9    daughter's boyfriend, by making threats to kill people, by

10   calling his mother names and threatening to harm her;

11   those features as I've talked about in court are very

12   borderline oriented features.  The --

13   Q.   Dr. Bard, could I just stop you.

14   A.   Sure.

15   Q.   When you say "borderline features," what do you mean?

16   A.   Well, I'm talking about features of a borderline

17   personality disorder, labile affect going up and down,

18   frantic attempts to avoid being abandoned or being alone,

19   inability to sort of self angulate into appropriate anger

20   and then withdraw back ... these are all characteristics of

21   what are called borderline personality disorder.

22       I don't think he fits the entire diagnostic picture,

23   but he certainly shows evidence of some development, and

24   as I indicated, some features of antisocial personality

25   disorder also, but that's pretty much my formulation of

1    Mr. Carta up until he was apprehended, and I think he has

2    changed as a result of his time incarcerated and his

3    participation in various kinds of treatment as well as his

4    age and maturation.

5    Q.   Just to be clear on the personality disorder issue,

6    did you consider those as diagnoses?

7    A.   I considered them, but I did not feel that he met the

8    entire diagnostic picture of them.

9    Q.   Dr. Bard, did you perform a -- what did the statute

10   require you to do in your view to answer the seriousness of

11   the question that we put to you?

12   A.   Well, in my interpretation with the assistance of the

13   other evaluations that I do, I conducted a risk assessment.

14   Q.   And the Court asked you based on the statement you made

15   about ability to control behavior but are you -- do you ever

16   find someone to be committable, I suppose?

17   A.   Yes.

18   Q.   And how do you square that comment about ability to

19   control behavior and the fact that you find individuals

20   above the threshold for treatment?

21   A.   Well, because the law in various jurisdictions doesn't

22   always talk about a serious difficulty in control, and, in

23   fact, in some ways it does talk about a serious difficulty

24   in control, and I see that in some people, but inability is

25   not in the law.

1     Plus, when you're doing a risk assessment, we're

2     looking at the likelihood.  The question is not, in most

3     jurisdictions whether or not the control is there or not or

4     how much control; the question is how likely is that person

5     to reoffend sexually if he's released.

6     Q.  And so you just made a distinction between inability

7     to control and serious difficulty from refraining from

8     certain behaviors?

9     A.  Yes.

10    Q.  So you certainly can find the latter, if not the former,

11    condition?

12    A.  Well, I think that I've certainly evaluated individuals

13    who have shown a serious difficulty in control.  People who

14    have been arrested or sanctioned and then are released, and

15    one case comes to mind:  four days later he offends with

16    serious difficulty in control, even if it's a week or two

17    weeks, a month, or six months.

18        Once someone has been sanctioned and they continue to

19    physically contemplate that behavior, it gives evidence

20    that that person has been unable to, sorry, has shown

21    difficulty controlling their control impulses.

22        We don't have that here.  Mr. Carta had never been

23    sanctioned up until his arrest in 2001.  He was in the

24    community for eight or nine months.  He did not do anything

25    inappropriate or illegal.  He's been incarcerated since

1    then, I believe, nine years or so now, and there's no

2    evidence of any sexual misconduct while he's been

3    incarcerated.

4        So he is not a recidivist in the way that people might

5    understand that term, but he's committed numerous offenses

6    he has reported all by himself and he's never offended after

7    being sanctioned.

8            THE COURT:  What significance do you give to the

9    fact that he dropped out of the program at Butner because he

10   was angry at some restrictions?

11           THE WITNESS:  He was angry.  He did not know how

12   to deal with his anger at the time.  He was also, I think,

13   from what he told me and what he testified to here, he felt

14   very badly about the fact that his behavior caused someone

15   else to be kicked out.

16       Clinically, it doesn't make a lot of sense to me, but

17   that's the program; and I think consistent with my

18   formulation, he tends to act first and think about it

19   afterwards, and oftentimes he would say:  I want to quit,

20   I'm leaving, and he would do so, and then he was unable to

21   be coerced back.

22       I think when his therapist was going to leave, I think

23   that was a major influence ... because the research has

24   shown that the most important factor in therapy of any kind,

25   no matter what the orientation, is the relationship between

1   the therapist and the patient, and I think that was really

2   all for him.

3       THE COURT:  So if he's on the street, let's say, I

4   found he had a mental abnormality and I have to decide

5   whether he has serious difficulty refraining; he's on the

6   street and he hits a bump in the road, his therapist leaves,

7   he doesn't like a rule, he has a problem with a peer, he

8   has a problem, will his impulsivity lead him back to

9   reoffending?

10      THE WITNESS:  I don't think so, and I don't think so

11  for several reasons:  No. 1, I think he's a very different

12  person now; No. 2, I think he's going to have a support

13  system there.

14     He's going to have therapists and group members; and

15  when I hear family members around, that could help him; he's

16  going to have a probation officer who's going to be keeping

17  tabs on him, those all come across as a positive support for

18  him.

19     He's not in the same kind of situation where he was in

20  this program 24-7; there was no way out of that.  I think

21  personally that's a terrible idea ... because people need

22  time to pull away and to process and attempt to do other

23  things, and you can't do anything all the time; it makes

24  you crazy.

25      THE COURT:  Is two times a week sufficient for

1    someone who's got one of these issues?

2         THE WITNESS:  Two times a week is twice as much as

3    what most programs do.  Most out-patient --

4         THE COURT:  That's different from other good

5    programs?

6         THE WITNESS:  No, I know some very good therapists

7    in the community.  The typical thing is once a week, an

8    hour-and-a-half to two hours.

9      I am in favor of individuals being in a group and in

10   individual therapy; I think they compliment each other well,

11   and I'm sure that that can be arranged here.  I think that

12   you can get something very good out of both of those, and

13   I think for people like Mr. Carta that would be really good

14   for him, because, again, it would be his therapists and he

15   could feel comfortable talking about some very painful things

16   and have somebody to call if he's having a thought that

17   upsets him.

18   Q.   Dr. Bard, backing up from the treatment question again,

19   I think it makes sense to return to it in a little bit, but

20   how did you do a risk assessment in this case?

21   A.   The way I do a risk assessment is something called an

22   adjusted actuarial approach.  Basically, it begins with the

23   actuarial tool.  I use that because it is an objective way

24   of assessing risk.

25     I know it's moderate in validity, but it's based only

1    on historical information, and it could give me information

2    up to a certain point; for example, the last offense that

3    the individual has.

4        It doesn't tell me anything about their current

5    situation.  It doesn't look at if he's in treatment or has

6    behaviors since his offending, but I use that to get a

7    beginning point, and then I use what the researchers call

8    dynamic factors to adjust the risk either upward or

9    downward, and the dynamic factors, as the researchers

10   indicated, are things like:  general self control in a

11   non-sexual way, sexual self-control, as is the pattern of

12   sexual offending, intimacy, differences, deficits,

13   participation and/or completion of a treatment program,

14   and age.

15           THE COURT:  Is this what we learned from the

16   testimony last time, right?

17           MR. GOLD:  That's right, and just this is a

18   shortened version.

19   Q.   I'm going to just ask, could you -- has the results of

20   your risk assessment changed in any way from the report

21   that we submitted into evidence today and at the time of

22   your original testimony in February of 2009?

23   A.   Yes.

24   Q.   And in what ways?

25   A.   It has changed only that the actuarial results have

1   changed.  The Static-99 has undergone a revision in 2008

2   and another revision in 2009, not a revision of the items

3   per se, but of what the scores mean.

4       Then, there was a revision of the actual test, as well,

5   for the Static-99-R which accounts better for age ... so

6   when I incorporated the new numbers, the new risk

7   assessments, as well as the new age-related adjustments on

8   the Static-99, I came up with different risk assessments

9   which are, again, the beginning point of my assessment.

10          THE COURT:  Is this since the last trial?

11          THE WITNESS:  Yes, your Honor.

12  Q.  And for the record, I'm putting Page 12 of Dr. Bard's

13  report on the document viewer.

14      Is this the portion of your report which addresses the

15  static risk assessment?

16  A.  Yes.

17  Q.  And could you briefly describe what you found when you

18  scored these instruments?

19  A.  Well, I scored Mr. Carta with a 5 which, according to

20  the most recent revision of the Static-99, yields recidivism

21  rates of between 18 and 27 percent over a period of 5 to 10

22  years.

23      Now, that is a group number for all individuals who

24  score a 5.  That does not tell me anything specific about

25  Mr. Carta ... because that's not his risk; this is based on

1    data, but, here, again, it's a beginning point.

2    Q.   Now, Dr. Bard, have you had the opportunity to review

3    the other expert reports that were produced in this case?

4    A.   Yes.

5    Q.   And is your scoring of the Static-99 different from the

6    scoring of other examiners?

7    A.   Yes.

8    Q.   And why is that?

9    A.   Because I believe both of the other examiners gave

10   Mr. Carta a point for having a conviction for nonsexual

11   violence in the past.  I know that we discussed this at the

12   last trial.

13        Mr. Carta was convicted of burning a building when he

14   was rather young.  The coding rules talk about arson, but

15   burning a building as far as I know legally is not the same

16   thing as arson --

17             THE COURT:  Why?

18             THE WITNESS:  -- and I did not give him a point.

19   As far as I know, the definition is not necessarily the

20   same legally.

21             THE COURT:  How are they different?

22             THE WITNESS:  I don't know.  I mean, I don't recall

23   that, but I do recall for the first question and the coding

24   rules specifically mention arson and I'm just --

25             THE COURT:  So as you're sitting here trying to

1    think it through, arson means burning down a building.

2            MR. GOLD:  Or intentional burning.

3            THE COURT:  Intentionally burning down a building.

4            THE WITNESS:  Right, I don't think this was

5    necessarily intentionally.

6            THE COURT:  So was there evidence that this was

7    unintentional, like he was smoking and fell asleep in bed or

8    something?

9            THE WITNESS:  I think Mr. Carta talked about, I

10   believe, it's somewhere in my report that he said I was in

11   the fields when it burned down so it's not a building that

12   housed anybody or anything else.

13           THE COURT:  There's no requirement of that in the

14   law, so, if, in fact, it's an intentional burning of a

15   building, do you have information that whatever he was

16   convicted of didn't qualify or you just don't remember?

17           THE WITNESS:  I don't recall specifically, but I

18   know he was not convicted of arson, and the coding rules, if

19   you're going to use the text, you have to use the coding

20   rules, specifically says arson, and in many other cases it

21   talks about different kinds of charges I should probably

22   also add that --

23           THE COURT:  I'm about to look it up.

24           THE WITNESS:  No, but I think that the important

25   piece is that all of these -- all of these items are proxies

1    for something else.

2        It's not just that there's a conviction; it's a way of

3    looking to see:  does this individual show a history of

4    nonsexual violence; and in Mr. Carta's case, we really don't

5    have that.

6            THE COURT:  Well, if you were to count it, what

7    would be the change in terms of the risk assessment how

8    who --

9            THE WITNESS:  It would become a 6 versus a 5, and

10   the recidivism number would go from what I mentioned to 21

11   to 30%.  It's not a huge difference.

12           THE COURT:  And then if you graduated it down to 8,

13   what would it be?

14           THE WITNESS:  Instead of a 4, it would be a 5 and --

15           THE COURT:  That would be the 18 to 27?

16           THE WITNESS:  No, no, no, because this is using the

17   new test which has all the new numbers which I don't have

18   here.

19           THE COURT:  Maybe you made this distinction because

20   this is reckless burning instead of intentional burning,

21   would that be the difference?

22           THE WITNESS:  It could be, but in all honesty,

23   your Honor, I don't recall it that well.

24       BY MR. GOLD:

25   Q.   Dr. Bard, I have on the document viewer Page 88 of the

1    Bates stamped discovery which you testified in the last

2    trial you reviewed, and this is the presentence report in

3    the case; you recognize that document?

4    A.   Yes, I do.

5         MR. GOLD:  And, your Honor, I'd move the presentence

6    report into evidence.

7         MS. PIEMONTE-STACEY:  No objection.

8         (Respondent's Exhibit No. 40 admitted in evidence.)

9    Q.   And as the Court just asked you, it appears that this

10   case was resolved not as an arson, but as a reckless burning

11   from this document?

12   A.   It looks that way, yes.

13   Q.   And do you know as you sit here whether the coding

14   rules for the Static-99 require for this item --

15   A.   I do recall.

16   Q.   -- official charges?

17   A.   Yes, you always go by the official charges and the

18   official conviction, and that was one that was not included

19   as far as I can recall, and arson is.

20   Q.   Dr. Bard, we heard testimony in this case that it's not

21   appropriate to score the Static-99 at all, or arguably not

22   appropriate, from Dr. Prentky; is that your opinion?

23   A.   No.

24   Q.   And is that a disagreement that you and Dr. Prentky

25   have about the coding rule interpretations?

1      THE COURT:  Back up since I just pulled up with the

2    statutory section for reckless burning.  The beauty of

3    having a computer at your desk.

4      It says:  A person is guilty of reckless burning when

5    he intentionally starts a fire or causes an explosion,

6    whether on his own property or on others, and, thereby,

7    recklessly places a building of another in danger of

8    destruction or damage.  It's a felony, a Class B felony ...

9    so if that's basically -- if it's an intentional act, so

10   since you have to exercise some judgment here,

11   intentionally starting a fire, it places a building in

12   danger of destruction or damage so does that come close

13   enough to arson or not?

14      THE WITNESS:  No, I think actually it supports my

15   understanding; for example, malicious destruction of

16   property, which would seem to be a similar kind of thing,

17   does not count.  We're looking for violence against a person.

18      THE COURT:  Well, arson is also, by the way, against

19   buildings and not a person.

20      THE WITNESS:  I don't know anything about it, your

21   Honor, and I can only go by what the coding rules of this

22   test say; I'm not supposed to use my own judgment unless I

23   have to.

24      THE COURT:  Well, your view is unless it actually

25   says arson, you can't do it?

1              THE WITNESS:  Well, that's in the coding rules.  It

2      says "arson."

3      Q.   I've put the Coding Rules, Item No. 4, up on the

4      screen, if you'd like to consult them, Dr. Bard?

5      A.   No, I mean, I know that it says "arson."  I don't

6      think that it says "reckless burning," and I don't think it

7      usually talks about things that have to do with property

8      damage, so we're trying to get at --

9              THE COURT:  Well, all right --

10              THE WITNESS:  -- nonsexual violence.

11              THE COURT:  -- I think I understand the nature of

12      where the discrepancy is.

13              THE WITNESS:  Okay.

14      Q.   But, Dr. Bard, what does a 5 on the Static-99 mean?

15      A.   Well, as I indicated, it means according to the most

16      recent data, that individuals with 5 were found to

17      recidivate between 18 and 27 percent in five or ten years.

18      Q.   And so in that case 73% of people with this score do

19      not reoffend, is that right?

20      A.   Right, I mean -- right, because someone is either going

21      to reoffend or not.  He's not going to have an 18%

22      reoffense; but when you look at 100 people who have scored

23      the same way, let's say, over ten years, 27 out of those

24      100 were found to have reoffended either by arrest or by a

25      conviction; 73 of those 100 did not.

1    So if you knew which of those two groups Mr. Carta would

2    be in, this would be easy, but we don't know.  So all we can

3    say is that that group had a recidivism rate of 27% over ten

4    years, and 18% over five years.

5    Q.   Now, Dr. Bard, you said "before adjusting for age,"

6    what do you mean?

7    A.   Well, one of the problems with the, with the original

8    Static-99 was that it did not account for the recent

9    research on age.  It basically looked at 25 as the puddle.

10    If you were under 25, you got a point; if you're over 25,

11    you got no points; and the research on age, since this was

12    developed, have indicated that as individuals age, the

13    recidivism rate goes down.

14    And what the Static-99 did that accounted for it, I

15    mean, before the "R," but before that came out this past

16    year, we had no other way of calculating that other than

17    what Hanson had indicated.  Hanson wrote an article in 2005

18    basically talking about how to adjust the Static-99 for

19    older offenders, and he gave a chart showing how to modify

20    the results, and that is what I talked about in that

21    sentence -- I mean, in that paragraph; individuals who

22    scored either a 4 or a 5 who were in their 50s were found

23    to recidivate at a rate of 12 -- I'm sorry, had recidivated

24    at a rate of about one-third less than the entire sample.

25    I applied that one-third reduction to the 18% noted above;

1    it yielded 12% over five years.

2       I have to say that is my way of doing it.  That has not

3    been validated, and I've been questioned about it numerous

4    times in court, but that's the only way that we had up until

5    the Static-99 came out.

6       Once the static -- R, I apologize.  Once the Static-99-R

7    came out, which accounts for the age-related research that I

8    had used beforehand, he would receive a score of 4.  He

9    would lose a point because he's between the ages of 40 and

10   60.  Therefore, he would score 4, which, according to that

11   particular test, yields a five-year recidivism rate between

12   7 and 15% using the entire sample, so it comes out pretty

13   much the same either way.

14   Q.  Well, Dr. Bard, I think you've said a lot of things

15   that we're familiar with in this proceeding, but I want to

16   ask:  this Court is familiar, very familiar, with the

17   Static-99 as it was employed for many years, but these

18   percentages, are they the percentages that have been

19   associated with the Static-99 for most of its existence?

20   A.  No.

21   Q.  And where do they come from?

22   A.  Well, the authors of the Static-99 at some point

23   became aware that the actual recidivism rates that were

24   being recorded in various jurisdictions; for example, Ohio

25   did its own recidivism study, and Florida did their own,

1     and Minnesota did their own.  The numbers that they were

2     seeing were much lower than the predictions that the test

3     was making.

4         The test, the original Static-99, was based on four

5     samples of about 1,500 men, all of whom were released from

6     incarceration between the 1960s and the 1980s, so it's

7     relatively old data.

8         To their credit, the authors updated that, and they

9     added numerous, numerous samples, because recidivism rates

10    over time have gone down; we don't know why, but they have,

11    so they reanalyzed all of their data in 2008 and came up

12    with new numbers that were approximately one-third lower

13    than the original ones.  I don't know if you want me to go

14    on about that at length?

15            THE COURT:  No, just the bottom line, the bottom

16    line is?

17            THE WITNESS:  Well, that was the first bottom line.

18    The second bottom line is they reanalyzed it again a year

19    later with even more samples, and they got the numbers that

20    we are now talking about.

21    Q.   And are you familiar with how the Static-99 is or the

22    Static-99-R is reported by evaluators -- well, did you have

23    the opportunity to review Dr. Phenix's report?

24    A.   Yes.

25    Q.   How does she report the results of the Static-99?

1    A.   Dr. Phenix reports that the results of the Static-99

2    are in terms of, I think, which group the individual falls

3    into, the authors.

4         THE COURT:  Excuse me.  Is this what I cut her off

5    from talking about?

6         MR. GOLD:  No, no, Judge.

7         THE COURT:  Yeah, I think it is.  This is the new

8    bin approach, right?

9    A.   No.  Well --

10        MR. GOLD:  Right, can I just clarify?

11        THE COURT:  Yes.

12        MR. GOLD:  Because this is part of the brand new

13   bag she brought in, but she testified about the bins; she

14   had a new instrument to justify how to put people in the

15   bins, that's excluded.

16        THE COURT:  No, I wish I hadn't yielded to you at

17   the time because now I don't remember what I did and didn't

18   allow; and it was so long ago, I'm a little reluctant to

19   have her rebut something if I didn't let her testify about

20   it.  That's the bizarre position I'm in.  Do you happen to

21   remember?

22        MS. Serafyn:  Your Honor, I think the

23   characterization is right, is that what you restricted was

24   how Dr. Phenix picked which bin Carta should be in, but the

25   fact that the Static-99-R kind of forces the clinician to

1    choose a bin is something that she testified to, but she

2    used that instrument, the SRA-FV, to determine which bin to

3    put Mr. Carta in, and that's the testimony that you

4    restricted.

5          MR. GOLD:  And Dr. Bard doesn't do bins, and

6    everybody does bins; I want him to talk about bins for the

7    benefit of the Court.

8          THE COURT:  This is what I restricted her from

9    talking about.  You're all comfortable that she talked

10   enough about this that I don't have to go back and look at

11   the transcripts?

12         MS. SERAFYN:  I don't think the existence of the

13   bins was controversial; what you restricted was how

14   Dr. Phenix chose the bins.

15         THE COURT:  This is this brand new methodology that

16   no one had looked at.  So you're not talking about that?

17   Are you talking about the bin methodology?

18         THE WITNESS:  No, your Honor.

19         THE COURT:  All right.

20   Q.   Dr. Bard, let me ask it this way:  how are the

21   developers of the -- you were telling us a narrative about

22   how they ran their instrument on new samples?

23   A.   Right.

24   Q.   And you were reporting data that they reported?

25   A.   Yes.

1    Q.   How are the developers of the instrument right now

2    advocating that evaluators report the instrument?

3    A.   They are advocating that examiners like myself should

4    try to pick the sample that most resembles the individual

5    that we're evaluating and --

6    Q.   And when you say "sample," I'm sorry to interrupt,

7    Dr. Bard, but what do you mean; what are these samples?

8    A.   The developers characterize the entire group of 9,000

9    into two groups at first:  a routine group and a non-routine

10   group.  They then take the non-routine group and divide

11   that into a preselected or a treatment group and a

12   high-risk group.  So you have one large routine group and

13   two smaller groups, one --

14            THE COURT:  Well, what does "routine" mean?

15            THE WITNESS:  "Routine" means according to what

16   Dr. Phenix wrote in her report is the group that most

17   resembles the typical sexual offender and is representative

18   of all sex offenders; that's what it means.

19            THE COURT:  And is there such a thing as a

20   non-routine sexual offender?

21            THE WITNESS:  According to them, yes.

22   Q.   Well, what did the developers do; why didn't the

23   developers simply have you report the statistics from the

24   entire sample?

25   A.   I can tell you what they have said, which is, that

1    they feel that it doesn't accurately capture an

2    individual's particular level of risk when you compare

3    them to the total group.

4          THE COURT:  Like?  I'm just not understanding, and

5    it was a very long time ago that I heard from Dr. Phenix.

6    Like what?  Like how would you make distinction between a

7    routine and non-routine sex offender?

8          THE WITNESS:  That is precisely the problem; that

9    the authors don't give us information as to how to do this.

10   They say it should be someone's clinical judgment.  That

11   introduces an element of error which is why many

12   individuals, myself included, do not classify anybody into

13   those bins.  We use the entire sample, if the entire sample

14   is available.

15         THE COURT:  Dr. Hanson's a smart guy; even you said,

16   you gave him credit?

17         THE WITNESS:  Yes.

18         THE COURT:  Every one has said it:  Hanson's the

19   guy, so he must have had some explanation as to what you do

20   so could you -- so what's your explanation as to what's a

21   routine versus non-routine sex offender?

22         THE WITNESS:  Your Honor, if I could tell you that,

23   I would.  It simply is not written down as to how you go

24   about choosing.

25       Dr. Phenix has her way of doing it.  I'm not commenting

1    on that, but there are no criteria, which is my problem

2    with it.  If there were criteria that were valid in the

3    research, I would use it as would everybody, but there

4    simply are none ... so the only, in my opinion, reasonable

5    way to look at where this individual falls in the universe of

6    sexual offenders that have been tested, and that yields

7    those 7 to 15% using the 7 from the routine group and the

8    15 from the non-routine group, so I'm looking at where

9    Mr. Carta fits among everybody.

10   Q.   Dr. Bard, has this process that the Hanson group is

11   now doing been published in a peer-reviewed journal to your

12   knowledge?

13   A.   No.

14   Q.   Where does this information about how to do it in the

15   first place actually come from?

16   A.   Well, the original work came from an unpublished

17   Master's thesis that Karl Hanson was supervising.  It was

18   then written up in the Newsletter of The Treatment for

19   Sexual Abusers.

20       Since that time there's various other psychologists

21   and researchers that have published their own critiques in

22   peer-reviewed journals, but the big problem is there's

23   still no reliable and valid way to know where to put

24   somebody, even two years later.  Nothing has been

25   published.

```
1    Q.   All right.  Is the static risk estimate that you're

2    giving us in your report in your opinion a good static risk

3    estimate for Mr. Carta?

4    A.   I think it's the best that we have.  I wouldn't call it

5    terrific.  I would call it, as they do, a moderate predictor

6    of ability.  I don't think you should use only that, whether

7    it's low or high.  I think it's a good beginning, though,

8    and that's it.

9    Q.   And this 7 to 15% or 12%, that's the figure or the

10   rough figures that you've arrived at?

11   A.   That's the rough figure of the beginning point before

12   I look at the dynamic factors, because, again, nothing in

13   the actuarials tells us anything about where Mr. Carta is

14   in 2011.

15       There's nothing recent in them.  It's based on

16   historical and unchanging factors other than age.

17   Q.   Before we move onto these dynamic factors, Dr. Bard,

18   did you score the MnSOST-R?

19       THE COURT:  This is my problem:  this is all

20   repetitive, so unless it's something new, I don't want to go

21   back through it, that was the instruction so --

22       MR. GOLD:  I was just thinking, your Honor, while

23   you were talking, so I want to ask Dr. Bard why he no longer

24   uses the MnSOST-R which is new.  I don't want to repeat the

25   information about the dynamic factors.
```

```
 1              THE COURT:  Right, that's what I was thinking I

 2    remembered.  We did do that last time.

 3              MR. GOLD:  Let me ask him about the other actuarial.

 4              THE COURT:  All right.

 5         BY MR. GOLD:

 6    Q.   Did you use the MnSOST-R in this case?

 7    A.   No.

 8    Q.   Why not, Dr. Bard?

 9    A.   I have not used it probably the past five years because

10    the research has shown that it's simply not valid, and it is

11    no longer being used by numerous other clinicians that used

12    to use it.

13    Q.   And did you use the RRASOR in this -- or why did you not

14    use the RRASOR in this evaluation?

15    A.   Because as my thinking about this area has changed, I

16    don't view that it is a subset of the Static-99.  I don't

17    think it provides any additional information; and even

18    though Mr. Carta scored lower on that than any other test,

19    I really don't feel it's adequate.

20    Q.   Now, Dr. Bard, we heard conflicting testimony a couple

21    of times now about the dynamic factors in this case, but do

22    you find the dynamic factors that were described present for

23    Mr. Carta today, are they -- has your opinion changed or

24    are they less or more present?

25    A.   I think, if anything, the two years since the last
```

1    trial, two years without any sexual misconduct, two years

2    of general appropriate behavior, no violence, no sexual

3    behaviors, support the fact that he's not the same kind of

4    person.

5        Again, the whole notion of a dynamic factor is a

6    changeable thing ... so that Mr. Carta's attraction, if you

7    can assess that, is clearly not the same now as it was then.

8    His impulsivity is not the same now as it was in the past.

9    His anger is not the same now as it was in the past.  He is

10   able to control his behavior as evidenced by his nine plus

11   years in prison without any serious violence.

12       The fact that he has requested to get back into sex

13   offender treatment, which I believe was after the last

14   trial, says something positive about him.  The fact that he

15   has requested it is at best puzzling, but it shows that he

16   is serious about this, and that he doesn't want to go back

17   and do the same things that he has done in the past.

18       I think that he has made significant changes, and that

19   is primarily the reason why I see him at the present time as

20   low risk.

21   Q.  And do you see it as concerning that he hasn't

22   completed the treatment program at Butner?

23   A.   Ideally, we want to see patients complete treatment

24   programs.  In reality it rarely ever happens.  In my work

25   in Massachusetts and other places, I can count on one hand

1    the number of individuals who have actually completed

2    treatment.  Many programs have rules that are not related to

3    treatment; and if you violate a rule, you're kicked out.

4         Mr. Carta had a hard time adapting to that environment,

5    and it was good that his therapist pulled him back a couple

6    of times, but, ultimately, made a decision, which she admits

7    was the wrong one, and so, yes, I would have loved to see

8    him complete treatment or more of it, and the fact that's

9    not being allowed to, while he's incarcerated for four years,

10   also causes me some concern.

11   Q.   Well, now, Dr. Bard, do you find this behavior that was

12   described about Mr. Carta's relationship with the younger

13   men in the program as concerning vis-a-vis your risk of him?

14   A.   No.

15   Q.   Why not?

16   A.   Because if Mr. Carta left the program today and

17   proceeded to engage in sexual relationships with

18   25-year-olds, why is that a bad thing?  It's not illegal.

19   It's not deviant.  It's his -- if he was able to

20   successfully move his level of attraction from teenagers to

21   20 somethings, why is that a problem?

22        It's against the rules there.  He shouldn't have been

23   doing that; the same way that having sex in these programs

24   is against the rules, but it happens, you know, not with

25   him necessarily, but there's the difference between

1    breaking a rule in a program and acting in deviant ways.

2        I've evaluated individuals who have been found with

3    child pornography; that's a big problem, but evaluated them

4    for reading it and who sent out child pornography, that's a

5    problem; but because he was associating with the younger

6    folks in the program, who by definition are of legal age, I

7    doubt there's anyone in the Butner program who was only 18.

8    That doesn't seem right; it doesn't seem possible, so we're

9    talking about individuals in their 20s, and I don't see that

10   as showing any deviance.

11       Again, if he successfully raises his interest level

12   to the 20s, and as he said now, he has someone who's

13   interested in him whose attracted to him at Devens who's in

14   his 30s, why is that considered problematic?

15   Q.   Well, Dr. Bard, I thought I heard you say that he has

16   this dynamic where he wants to help individuals and things

17   like that; would it be problematic to you if this dynamic

18   had been kept in play while he was in the treatment program?

19   A.   It may have been put into play, and he may have been

20   trying to encourage these individuals to be sexual.  It's

21   certainly possible; it certainly would fit.

22       Mr. Carta says he did not engage in any sexual

23   activity, and there's no reports anywhere that says that

24   he did, but let's say that was his goal ... again, it's

25   inappropriate there in the sense of the program, but

1     no one's going to tell me that having a sexual relationship

2     with a 20-year-old or 25-year-old is deviant; and if we're

3     concerned about him committing sexual offenses, which is what

4     this is all about, against under-age individuals, someone

5     in their 20s is not that.

6     Q.   Dr. Bard, you heard --

7          THE COURT:  How much longer do you think you have?

8          MR. GOLD:  Not until the end probably; we're just in

9     the home stretch.

10          THE COURT:  So we'll finish at 1?

11          MR. GOLD:  Yeah.

12          THE COURT:  Okay.

13     Q.   Dr. Bard, you heard testimony yesterday about the

14     homework that Mr. Carta had done while he was in the

15     program?

16     A.   Yes.

17     Q.   And, in particular, we heard testimony about -- well,

18     let me just put it up on the document viewer -- the page up

19     on the document viewer; and for the record, I have

20     Exhibit 27 here from the PHQ or Personal History

21     Questionnaire, Page 1034.

22       We heard testimony about these check boxes.  Can you

23     give us your opinion on the significance or diagnostic

24     significance of these check boxes?

25     A.   Actually, I think that Mr. Carta did very well.  This

1   is his preference in child pornography, not anything else;

2   in that, he would collect many images.  His preferred age

3   was 12 to 17.  He acknowledges that; that is, perhaps he

4   would have put 13 to 18, but that's not a choice there;

5   this is a forced choice kind of thing.

6      Out of these categories which ones have you preferred:

7   No. 1, No. 2, or whatever.  So you're right, so No. 1 is 12

8   to 17, No. 2 is children aged 11 to 14, and he indicated

9   that he used those to barter, and that's consistent with

10  what he's told everybody all along; that he's not attracted

11  to prepubescent children, he's attracted to postpubescent

12  adolescents.

13  Q.   Now, Dr. Bard, you've testified that you don't see

14  evidence of sexual acting out while he's in prison?

15  A.   Right.

16  Q.   Why is that of clinical significance, if there aren't

17  outlets for sexually acting out as there are in the

18  community?

19  A.   Well, I think it goes to someone's degree of control

20  over their sexual impulses.  We all know that sexual

21  activity occurs in business.  That's a fact.

22      The fact that Mr. Carta has refrained from that, even

23  though it is available, clearly indicates that he is making

24  an effort to control his sexual impulses.

25      As I said, he could easily have engaged in sexual

1   activity with a consenting adult.  Prisons are full of

2   consenting adults.  The fact that he is not doing that

3   tells me something about his desire to change and his

4   ability to control himself.

5   Q.   Dr. Bard, in your report you talk about serious

6   difficulty controlling behavior in separate sections on the

7   risk assessment; can you elaborate why that is?

8   A.   As I noted in terms of sexual control, there are three

9   points that I have been asked to make:  one is that he is

10  not a recidivist, as we understand it; once he was caught and

11  sanctioned, he has not repeated his actions.

12  Q.   Does that have support in the research?

13  A.   Yes.  In fact, the whole notion of prior sexual

14  offenses, meaning an individual who was apprehended and

15  proceeded to reoffend is one of the most reliable and valid

16  measures of the recidivism risk; and in Hanson's original

17  work in the '90s, that had the highest correlations, and

18  Hanson has done other research that has separated out

19  individuals who have committed one offense or only charged

20  with one offense and individuals who have committed many

21  offenses, and the recidivism rates for single charged guys

22  was much, much lower.

23      Secondly, he resided in the community for nine months,

24  did not engage in any inappropriate behavior ... clearly,

25  there were opportunities while at Butner while he may have

1   been hanging around younger inmates; these are sexually

2   mature adults, and he did not engage in sexual behavior

3   there, and, again, for someone's who was addicted to child

4   pornography in the past, there was no reports of any use of

5   child pornography, which as we all know, is available as

6   well.  It is nine years, so I think that he's shown

7   excellent control of his sexual impulses since his arrest.

8   Q.   And you mentioned briefly your understanding of the

9   circumstances in which he is going to be released; how do

10  those play into your opinion for the Court?

11  A.   Well, one, I certainly think that it is a positive

12  prognostic factor; two, he will be monitored by probation

13  for the next three years, he will be involved in sex

14  offender treatment, which is something he's been asking

15  for, for years, substance abuse treatment and any other

16  conditions that the probation office decides to add ... so

17  that will guarantee that Mr. Carta will be able to continue

18  work in treatment; and if he choses not to, then he knows

19  that there are serious consequences for him.  And as

20  indicated, he does not wish to do that; he's eager to

21  participate, and he doesn't want to do those things

22  anymore.  He's 50 years old.  He's finally grown up.

23  Q.   And is a residential treatment program for Mr. Carta

24  necessary or advisable in your opinion?

25  A.   In my opinion, no.

1    Q.  Why not?

2    A.  Well, it's certainly not necessary.  There's no

3    evidence that he cannot control himself in the community

4    under supervision, but he had only been out for eight, nine

5    months last time.  He was fine then.

6        And is it advisable?  I don't think so.  I think that

7    the vast majority of offenders can be treated successfully

8    with good treatment in the community and a desire to change.

9            MR. GOLD:  Nothing further, your Honor.

10           THE COURT:  Now, let me ask you this question:  how

11   long do you think you have on cross?

12           MS. PIEMONTE-STACEY:  An hour.

13           THE COURT:  I'm sort of thinking maybe we can finish

14   it today if we could just go the extra 15 minutes rather

15   than have him come back just for an hour, or, you know, for

16   under an hour, so if it's doable; and if not, you know, I

17   don't want to rush you.

18           MS. PIEMONTE-STACEY:  I'll try my best.

19           THE COURT:  And if not, I don't want to rush you.  I

20   mean, if it doesn't work, it doesn't work, but let me know

21   at around 1 whether it's in the realm of feasible?

22           MS. PIEMONTE-STACEY:  Everything is feasible, your

23   Honor.  I'm sorry, your Honor, I'm losing my notes.

24       CROSS-EXAMINATION BY MS. PIEMONTE-STACEY:

25   Q.  Dr. Bard, would you agree that at least as of today

1    Mr. Carta does not have all of the skills necessary to

2    manage his sexual arousal, right?

3    A.   I'm not sure that I would agree with that.

4    Q.   Well, you've interviewed him twice?

5    A.   Yes.

6    Q.   And on both occasions your reports indicate that he,

7    Mr. Carta, told you he would be stupid if he did this again,

8    right?

9    A.   Yes.

10   Q.   He's never said:  I don't have those desires anymore,

11   right?

12   A.   I believe up here he said that he did not have those

13   desires, but that he will always have an interest in younger

14   individuals.

15   Q.   But his testimony was he remains attracted to children

16   13- to 19-years-old, didn't it?

17   A.   I think he said he's attracted to adolescents.  I don't

18   know if he used the numbers, but I know that he talked about

19   that as being more in the past, but he did acknowledge that,

20   you know, sexually-developed adolescents will always have an

21   interest for him.  That's not the same as managing behavior.

22   Q.   So the answer to my question is that he has interest

23   in 13- to 19-year-old boys or adolescents is yes, is that

24   right?

25   A.   I don't know what you just said.  Say that again?

1    Q.   You heard Mr. Carta testify that he continues to have

2    an interest in, whether it's boys or adolescents, aged 13 to

3    19, correct?

4    A.   Again, I don't know if he used those terms or you used

5    those terms, but, yes, he was attracted to adolescents males.

6    Q.   He has not completed sex offender treatment, correct?

7    A.   He has not.

8    Q.   He has not done relapse prevention, right?

9    A.   He has not done a formal plan.

10   Q.   He quit after eight months in treatment, right?

11   A.   I believe so.

12   Q.   And I know at the last trial you had never -- at least

13   for the previous four years prior, in the last trial that

14   you had testified in over 200 cases in the Commonwealth of

15   Massachusetts and never testified that someone was

16   sexually dangerous, is that right?

17   A.   Yes and no.  I found people sexually dangerous many

18   times, but I was not called because the attorneys that hired

19   me don't want me to say that in court.

20   Q.   So, yes, you've never testified that someone was

21   sexually dangerous, right?

22   A.   I'm trying to explain that I have not testified that

23   someone's dangerous when I find them dangerous because the

24   attorneys don't call me, yes.

25        MS. PIEMONTE-STACEY:  Your Honor, I'm not going to

 1   be done within an hour.

 2         THE COURT:  Maybe, but I'm also going to look to you

 3   the way I looked to Mr. Gold and said:  you went through all

 4   this and, I mean, I remember this whole line of --

 5         MS. PIEMONTE-STACEY:  That one line, your Honor,

 6   and the next follow-up, if he just said yes or no was does

 7   that remain the same today; I was just trying to --

 8         THE COURT:  Okay.

 9         MS. PIEMONTE-STACEY:  -- get the update, but I'm

10   getting paragraphs to a yes or no question.

11         THE COURT:  But it isn't a fair one.  Of the ones

12   he's testified in, he's always for the defense, but then he

13   doesn't get called, but you both said all that the last

14   time so --

15         MS. PIEMONTE-STACEY:  Right.

16   Q.   And it remains the same today?

17   A.   It does.

18   Q.   And does your testimony remain the same today that

19   you would consider a relationship with 13- to 19-year-olds

20   as child molestation if the crime was committed with

21   individuals who did not give consent; does that testimony

22   remain the same?

23   A.   13 to 19, no.  Because as far as I understand,

24   19-year-olds are legal anywhere.  If the individual is

25   under the age of consent and does not give -- I'm sorry,

1    if the individual is under the age of consent, then it's

2    clearly an illegal act.

3    Q.   And you testified on the stand here today about the

4    images that were on Mr. Carta's child pornography

5    collection, do you recall that?

6    A.   No.

7    Q.   You were shown a document by Mr. Gold that had

8    different age ranges?

9    A.   Yes, that I remember, I'm sorry.

10   Q.   And you said that was -- that Mr. Carta testified about

11   those age ranges, right?

12   A.   Yes.

13   Q.   And you said that Mr. Carta was clear that -- well, he

14   had preferred age ranges to use for trading, right?

15   A.   Yes.

16   Q.   But nothing in answer to that question has anything to

17   do with trading, does it?  It said:  What is your preferred

18   age range, didn't it?

19   A.   The issue of trading was not asked.

20   Q.   And you would continue to agree today, Dr. Bard, that

21   generally eight months is not enough time for sex offender

22   treatment, right, to complete it?

23   A.   I would agree with that, yes.

24   Q.   And you testified today about how a 24-hour 7-day a

25   week program is not a good program, right?

1    A.   In my opinion.

2    Q.   And there are benefits to a residential program such as

3    the one in Butner, aren't there?

4    A.   There are numerous advantages to residential or

5    inpatient programs, but this is the only one that I've ever

6    heard of that is 24-7 treatment.

7    Q.   And where are you getting the notion that it's 24-7

8    treatment?

9    A.   From what Mr. Carta testified to, they were -- they

10   could only associate with other people in the program, that

11   there was -- there were group sessions morning and evening;

12   homework that was done among the various participants.

13      It seems to me pretty much if not 24-7, then let's call

14   it 18-7, or 15-7, but it's much more intense.  I don't want

15   to use "intensive," but much more of a consistent program

16   than any other program that I've ever heard of.

17   Q.   And you take that from Mr. Carta's self-report, right?

18   A.   That's the only information I have about the Butner

19   program right now.

20   Q.   Okay.  You were in court when Dr. Wood testified the

21   last time about the program?

22   A.   Yes.

23   Q.   And so today on the stand you continue to take

24   Mr. Carta's version of the program over Dr. Wood's version

25   of the program?

1   A.   I can honestly tell you that I don't recall anything

2   of what Mr. Wood said about the program at Butner at all.

3   Q.   And you also talked about the reason that Mr. Carta

4   left the program saying that, you know, the therapist is

5   very important, and that that was one reason you thought

6   that Mr. Carta left the program, right?

7   A.   I think that was the difference between the other

8   times when he came back and this time when he didn't; the

9   therapist had left also.

10  Q.   And in reviewing the records you had at your disposal

11  the record that's Bates Stamp No. 393 in discovery where --

12  and you heard Mr. Carta's testimony that after he discussed

13  Dr. Wood's departure from the treatment program and the

14  transfer to a new therapist that Mr. Carta said he didn't

15  have any concerns about who his new therapist was and he

16  trusted the treatment staff to make the best decision for

17  him, and he remained tearful about previous topics he had

18  discussed.

19      Do you remember that?

20  A.   Yes, I do.

21  Q.   And as you sit here today, you take, again, Mr. Carta's

22  version over documented treatment notes?

23  A.   In this case I sort of think that Mr. Carta knows what

24  he's talking about in terms of his reaction to this.

25  Having the therapist leave is a very difficult thing.

1          When I left employment at the Mass. Treatment Center,

2      it was difficult for me, and some of my patients had a very

3      hard time.  I think you can say that:  Oh, sure, they'll be

4      fine, and then the next sentence is "he remains tearful," I

5      think there's some discrepancies there.

6      Q.   And you also heard Mr. Carta's testimony where he said:

7      "I just said what I had to say," remember that?  "I told them

8      what they wanted to hear"?

9      A.   At one point, yes.

10     Q.   And that would be impediment in treatment, wouldn't it?

11     A.   If that was all that he was doing, sure, but everything

12     about his offending comes from him.

13     Q.   Well, the fact that a therapist is leaving is not a

14     reason to quit sex offender treatment, is it?

15     A.   Of course not.  There should never be a reason.

16     Q.   And lying in treatment can impede treatment, right?

17     A.   Lying in treatment can impede treatment.

18     Q.   And minimization in treatment can impede treatment,

19     right?

20     A.   That's right, these are all issues that need to be

21     dealt with, right.

22     Q.   And Mr. Carta has engaged in both?

23     A.   In lying, I'm not aware of that.

24     Q.   I'm going to refer you to your deposition in this

25     case, the question at Line 10:  "In Mr. Carta's case do you

1    know whether he engaged in any instances of lying and

2    minimization?  A:  I'm sure he has.  I don't think there's a

3    sex offender on the face of the earth who has not minimized

4    things at certain times," and then you go on?

5    A.    That's pretty much what I'm saying right now, but I

6    cannot give you any instance, and you cannot give me any

7    instance where he knowingly lied.

8    Q.    Today he testified, "I just told them what they wanted

9    to hear," that's not a lie to you, Dr. Bard?

10   A.    No.

11   Q.    Now, you took Mr. Carta's word that he had refused

12   treatment since the last trial, right?

13   A.    Yes.

14   Q.    You didn't see any documents that said he refused

15   treatment, did you?

16   A.    Not according to the files that I reviewed.

17   Q.    But he said he submitted a copout, didn't he?

18   A.    Yes, I did.

19   Q.    And you've seen plenty of other copouts in his records,

20   haven't you?

21   A.    I did.

22   Q.    And you didn't see one for asking for treatment in the

23   program and refusing it, did you?

24   A.    I don't recall seeing one, no.

25               THE COURT:  So just to understand that line of

```
1    inquiry, what would have been the process to request
2    treatment at Devens?
3            THE WITNESS:  I do not know, your Honor.
4            THE COURT:  So how do you know he asked for
5    treatment?
6            THE WITNESS:  He testified here under oath.
7            THE COURT:  I see, what he said?
8            THE WITNESS:  Yes, yes.
9            THE COURT:  I see.
10           THE WITNESS:  And that is what he has also told me
11   the last time when I saw him.
12           THE COURT:  And do you know whether he was required
13   to submit paperwork and he didn't?
14           THE WITNESS:  I do not know, your Honor.
15           THE COURT:  You don't know one way or another?
16           THE WITNESS:  No.
17   Q.  And you testified that a residential treatment --
18           THE COURT:  Can I ask you, just let me ask, it's a
19   little difficult:  What's your point on this?  He says --
20   he has been consistent.  He said he asked for it and he
21   didn't get it, so your point is that you think he's lying,
22   he didn't ask for it or that he didn't ask for the right
23   group; what's your position?
24           MS. PIEMONTE-STACEY:  I think that's the position
25   he's taking today in court.
```

```
1           THE COURT:  So you have no evidence that he asked

2      for it at Devens?

3           MS. PIEMONTE-STACEY:  No, but I am going to look

4      and see.  And if I'm wrong, I will show the Court the

5      information; I'll withdraw the inquiry, but I have seen no

6      documents, no copouts.

7           THE COURT:  What's a copout?

8           MS. PIEMONTE-STACEY:  They're forms that you do, an

9      inmate request to staff, and so when Mr. Carta wanted to

10     quit the sex offender treatment program --

11          THE COURT:  I just want to say, so your view is that

12     to your knowledge there's no written request or oral request?

13          MS. PIEMONTE-STACEY:  That's my knowledge; and as

14     has been discussed openly, there was advice of counsel not

15     to so --

16          THE COURT:  That's a different issue because he said

17     he went against the advice of his attorney.

18          MS. PIEMONTE-STACEY:  That's right.

19          MR. GOLD:  Your Honor, maybe we can -- we have

20     documentation of the copout that he submitted; and if I'm not

21     mistaken, and I think we talked about this issue and the

22     BOP's response in open court.  If not in this case, in

23     another case.

24       I mean, right now we have his testimony that says what

25     he did, and, I mean, the government's now representing
```

```
 1    that --
 2              MS. PIEMONTE-STACEY:  I haven't seen it.
 3              MR. GOLD:  You haven't seen it but we have his
 4    testimony so....
 5              THE COURT:  Wait.  Do you have the written
 6    materials now?
 7              MR. GOLD:  I don't have them in court here with me
 8    because we haven't received them through the -- from the BOP
 9    but we can get them.  I mean, I think we should just move on.
10              THE COURT:  You've seen them?
11              MR. GOLD:  Yes, I've seen them; they sent them to us.
12         BY MS. PIEMONTE-STACEY:
13    Q.   Your report indicates that Mr. Carta plans to live at
14    Open Heart if released, right?
15    A.   Yes.
16    Q.   And that's a transitional housing program?
17    A.   Yes, I believe it is.
18    Q.   But you've already testified that now his release plan
19    is to live with his mother, right?
20    A.    I don't know if that's what he said.  I think he wants
21    to be there to help her, but unless I heard it wrong, I
22    didn't hear him say that he's planning to live there; I
23    might be wrong so....
24    Q.   And as of today you still don't know if any concrete
25    arrangements have been made at Open Heart, right?
```

```
 1    A.   Only what he told me the last time I saw him, which

 2    was back in July, so, no.

 3    Q.   You don't know if he'll be taken if he's released?

 4    A.   I really don't know.

 5         THE COURT:  So you need to make a judgment right

 6    now.  I don't want to spend the extra 15 minutes if he has

 7    to come back anyway.  I think it's fine.  We've blocked the

 8    time.

 9         MS. PIEMONTE-STACEY:  I think it's too close, your

10    Honor.

11         THE COURT:  I'll see you tomorrow.  It's not worth

12    waiting if you're not going to finish.  You know, I have a

13    full afternoon so I would only do it if it meant the doctor

14    didn't have to come back tomorrow, and thank you, and it

15    would be really useful if in the interim you could show her

16    those documents.

17         MR. GOLD:  We'll get those documents.

18         THE COURT:  Your understanding is that he asked for

19    it and they said no?

20         MR. GOLD:  That's right.  I mean, I think that

21    Mr. Carta submitted to us copies of the official requests,

22    what they're calling a copout that he made to the system

23    saying:  I want treatment, give it to me so....

24         THE COURT:  Sex offender treatment to be specific?

25         MR. GOLD:  That's right.
```

```
 1              THE COURT:  While he was at Devens?

 2              MR. GOLD:  That's right.

 3              THE COURT:  And your understanding is?

 4              MS. PIEMONTE-STACEY:  I know I've asked for it.

 5              THE COURT:  You know he asked for it from Devens?

 6              MS. PIEMONTE-STACEY:  I have.

 7              THE COURT:  And does he have a specific counselor

 8       that he works with there?

 9              MS. PIEMONTE-STACEY:  No, because it's been -- my

10       understanding is there's been no core treatment because of

11       his medical refusal to participate.

12              THE COURT:  And who did you get that understanding

13       from?

14              MS. PIEMONTE-STACEY:  From Devens.

15              THE COURT:  From the staff?  All right.

16              MR. GOLD:  Well, if we have to, we'll get some

17       witnesses.

18              MS. PIEMONTE-STACEY:  Right, and I in no way mean

19       any disrespect to the Court; I just have nothing, so to the

20       extent that documents exist, you know, we'll do it.  I won't

21       object to them coming in or whatever but --

22              THE COURT:  You've got them; you'll produce them;

23       we'll mark them.

24              MR. GOLD:  Sure, right.  Let's just work it out by

25       tomorrow morning.
```

1        THE COURT:  Yes, that sounds good.  So we'll finish

2   up tomorrow so you don't have to come back another day; and,

3   although, I know often that people bill by the half day but

4   there's nothing we can do about it.

5        THE WITNESS:  By the hour, your Honor.

6        THE COURT:  By the hour, all right.

7        THE CLERK:  Court is in recess.

8        (Whereupon, the proceedings concluded at 1:05 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>C E R T I F I C A T E</u>

    I, Helana E. Kline, a Registered Merit Reporter,

Certified Realtime Reporter, and Federal Official Court

Reporter of the United States District Court, do hereby

certify that the foregoing transcript, from Page 1 to

Page 131, constitutes, to the best of my skill and ability,

a true and accurate transcription of my stenotype notes

taken in the matter of the United States of America v.

Todd Carta.

<u>/s/ Helana E. Kline</u>               <u>April 4, 2011</u>

Helana E. Kline, RMR, CRR

Federal Official Court Reporter