IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,          )
                                   )
                Petitioner         )
                                   )
        -VS-                       )  CA No. 07-12064-PBS
                                   )  Pages 6-1 - 6-45
TODD CARTA,                        )
                                   )
                Respondent         )


BENCH TRIAL - DAY SIX

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE




United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
March 23, 2011, 9:22 a.m.




LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 7200
Boston, MA  02210
(617)345-6787

dbb9085e-c6fd-469f-9976-ebc983e1019c

1    A P P E A R A N C E S:

2

3         EVE A. PIEMONTE-STACEY, ESQ. and JENNIFER A. SERAFYN,
     ESQ., Assistant United States Attorneys, United States
     Attorney's Office, 1 Courthouse Way, Boston, Massachusetts,
4    02210, for the Petitioner.

5         IAN GOLD, ESQ. and TAMARA FISHER, ESQ., Federal Public
     Defender Office, District of Massachusetts, 51 Sleeper Street,
6    5th Floor, Boston, Massachusetts, 02210, for the Respondent.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

United States v. Todd Carta - Bench Trial Day 6

dbb9085e-c6fd-469f-9976-ebc983e1019c

Page 3

1                            I N D E X

2

    WITNESS                      DIRECT   CROSS   REDIRECT   RECROSS
3
    LEONARD A. BARD
4
       By Ms. Piemonte-Stacey:   6-9
5      By Mr. Gold:                        6-20
       By Ms. Piemonte-Stacey:                      6-31
6

7   EXHIBITS              DESCRIPTION          RECEIVED IN EVIDENCE

8
    41              BOP letter re:  request for         6-9
9                   treatment

10  42              Seto article                        6-18

11  43              Carta prison work performance       6-21
                    records
12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                 P R O C E E D I N G S

2          THE CLERK:  Civil Action 07-12064 will now be heard

3    before this Court.  Will counsel please identify themselves for

4    the record.

5          MS. SERAFYN:  Good morning, your Honor.  Jennifer

6    Serafyn for the United States.

7          MS. PIEMONTE-STACEY:  Good morning, your Honor.  Eve

8    Piemonte-Stacey for the United States.

9          MR. GOLD:  Good morning, your Honor.  Ian Gold on

10   behalf of Todd Carta.  With me is Tamara Fisher.

11         THE COURT:  Okay, thank you.  Dr. Bard, come on up.

12         MS. PIEMONTE-STACEY:  Your Honor, before Dr. Bard

13   testifies, yesterday I had started a line of questioning

14   involving a request for treatment, and I just want to inform

15   the Court that Mr. Carta did indeed request treatment from

16   Devens, and I believe that was on in May of 2010.  And he did

17   not qualify for treatment, but I don't want to mislead this

18   Court.  He did request treatment from Devens.

19         THE COURT:  And why, why did he not qualify?

20         MS. PIEMONTE-STACEY:  Apparently the sex offender

21   treatment program at Butner is similar to the one that he was

22   involved with at Allenwood where you have to be convicted in

23   order to participate and you're nearing the term of your

24   release; and because he's a different status as an inmate, he's

25   not a convicted inmate --

dbb9085e-c6fd-469f-9976-ebc983e1019c

1          THE COURT:  That's crazy.

2          MS. PIEMONTE-STACEY:  -- he was denied.  Now, crazy or

3    not, the fact remains that he didn't get treatment.  He had

4    individual treatment available to him through an individual

5    psychologist.

6          THE COURT:  Did he receive that?

7          MS. PIEMONTE-STACEY:  He did not request it, I am

8    informed.

9          THE COURT:  Well, did someone offer that to him when

10   he was turned down?

11         MS. PIEMONTE-STACEY:  I'm informed it was, yes.

12         MR. GOLD:  Well, he's informed by the same authorities

13   who don't seem to be able to find this cop-out.

14         THE COURT:  No, no, no.  Your position is that he was

15   not offered individual treatment?

16         MR. GOLD:  Well, your Honor, I think that's a

17   complicated question, I need to talk about it with Mr. Carta,

18   but this I'm just learning this morning.  I mean, I think they

19   have psychologists and counselors there.  But I'd like to move

20   this document, this cop-out, the request, it's actually got a

21   detailed response.

22         THE COURT:  It's ironic, "cop-out" in common parlance

23   means something a little different.

24         MR. GOLD:  Yes, it's a BOP terms.  I have no idea as

25   to what the --

United States v. Todd Carta - Bench Trial Day 6

1        MS. PIEMONTE-STACEY:  It's called an "inmate request

2    to staff," and I think inside it's called a "cop-out" by

3    inmates and staff.

4        MR. GOLD:  The important issue here is, I think the

5    government suggested or stated that Mr. Carta had lied on the

6    stand.  He didn't.  He actually made this request, received

7    this response from the director of the program saying she would

8    look into it.  She said he could start in July if it all worked

9    out, and that's what it says in this document that he received

10   in reply from the BOP, and then he never heard anything

11   further.  When the government inquired after he testified, BOP

12   currently says they don't have a copy of this document.

13       MS. PIEMONTE-STACEY:  No, that's not true.

14       THE COURT:  Well, whatever it is, what I think we

15   probably need to find is, he did request it over a year ago,

16   that it was never given.

17       MS. PIEMONTE-STACEY:  I think that's fair, your Honor,

18   and I have no objection if the Court would like this exhibit

19   admitted.

20       THE COURT:  Yes, absolutely, but I do think it would

21   be useful for you to revisit that, especially when someone like

22   Mr. Carta, whatever I do in this case, it's dead time.

23       MS. PIEMONTE-STACEY:  Well, it's true, your Honor.

24   And, I mean, I really don't want to throw the grenade in the

25   room, but there was administrative procedures.  Had counsel

United States v. Todd Carta - Bench Trial Day 6

dbb9085e-c6fd-469f-9976-ebc983e1019c

1   called me, I've certainly intervened in other situations, and I

2   just wasn't aware of this until --

3          THE COURT:  Am I faulting you?  Not at all.  I am

4   simply saying --

5          MS. PIEMONTE-STACEY:  It is a shame.

6          THE COURT:  -- it is not rational that if somebody --

7   I understand the Defenders frequently advise against it for the

8   very reasons that happened with Mr. Carta, which is in fact the

9   things that he disclosed are what's worked against him.  I

10  mean, he admitted to all these activities with

11  thirteen-year-olds.  Otherwise the government would never have

12  known it.  So I certainly understand why Federal Defenders

13  recommends against it, but if someone wants it, it seems like

14  so wrong.

15         MS. PIEMONTE-STACEY:  I understand.

16         MR. GOLD:  Well, and, your Honor, just to be clear, I

17  mean, the gist of our advice to clients like Mr. Carta,

18  Mr. Carta, what he said on the stand is correct:  We advised

19  him, and it's been our office policy not to do it.  Mr. Carta's

20  case, it wasn't so much that he might make new disclosures but

21  that any inconsistency of any kind would be used against him in

22  a proceeding like this to his disadvantage.  If there were

23  some --

24         THE COURT:  It's hard to imagine what else could -- I

25  mean, I understand that you've dealt with some pretty tough

United States v. Todd Carta − Bench Trial Day 6

Page 8

1   cases, but, I mean --

2          MR. GOLD:  Well, but the point I wanted to make was,

3   if there were some modicum of confidentiality in the context of

4   providing this treatment, we wouldn't be in this bind.

5          THE COURT:  Fair enough, but here we have a situation

6   where someone went against your advice, asked for treatment,

7   the treatment is available at Devens.  He's sitting and it's

8   dead time.  Regardless of whether I commit him or I don't

9   commit him, he's going to have to do sex offender treatment.

10  And so I think maybe something strongly worded everyone might

11  agree with to Devens saying this does not make sense for future

12  people.  Maybe you can both even help me on it.  I could do it

13  in the opinion and you can mail it to them, or I can just sort

14  of send a letter to them.  Maybe you could think about how I

15  should do it.

16         MS. PIEMONTE-STACEY:  Well, I understand, your Honor,

17  and I'm not going to even pretend that I have an in-depth

18  knowledge of how, you know, central office says this or that to

19  Devens.  I will represent to the Court that I'll explore it

20  further with them and understand it more and --

21         THE COURT:  Sure, and I'm sure everyone's on the same

22  page.  It just makes sense.  So, anyway, enough.  Let's go.

23  Dr. Bard.

24         MR. GOLD:  Your Honor, can we take the opportunity to

25  put in this document?

1          THE COURT:  Sure.

2          MR. GOLD:  Is it number --

3          THE CLERK:  41.

4          MR. GOLD:  41?

5          (Exhibit 41 received in evidence.)

6                    LEONARD A. BARD

7  having been previously duly sworn, was examined and testified

8  further as follows:

9  CONTINUED CROSS-EXAMINATION BY MS. PIEMONTE-STACEY:

10  Q.   Dr. Bard, you testified yesterday about the Frances

11  article -- I believe it's Exhibit 38 -- questioning hebephilia

12  as a diagnosis.  Do you recall that?

13  A.   I do, yes.

14  Q.   And the article itself is entitled "Analysis and

15  Commentary," isn't it?

16  A.   Well, that's the section of the journal that it was in.

17  The article itself is entitled "Hebephilia is Not a,"

18  blah-blah-blah.

19  Q.   And, to your knowledge, neither Drs. Frances or First have

20  treated sex offenders, have they?

21  A.   I have no idea if they have or have not.

22  Q.   They have not evaluated sex offenders, to your knowledge?

23  A.   Dr. Frances has been in this field for fifty years.  I can

24  only imagine that he has some experience in this field, but I

25  have no firsthand knowledge either way.

dbb9085e-c6fd-469f-9976-ebc983e1019c

1  Q.   No firsthand knowledge whether Drs. Frances or First have

2  any experience giving meds to sex offenders?

3  A.   As I said, I have no idea what their backgrounds are in

4  terms of their clinical work.  I know where they have

5  practiced, but that's all I know.

6  Q.   And you testified yesterday that Dr. Blanchard is

7  respected in the field?

8  A.   Yes.

9  Q.   And he is part of the working group for the DSM-V who is

10  proposing this pedohebephilia diagnosis?

11  A.   Correct.

12  Q.   Now, you testified yesterday that Mr. Carta has changed

13  due to his incarceration, his age, and his maturation; is that

14  fair?

15  A.   And treatment, yes.

16  Q.   And you're aware of the body of research that says time in

17  prison alone doesn't change behavior or reduce risk of

18  reoffense?

19  A.   I'm aware of that.

20  Q.   And in terms of cognitive distortions, your report

21  indicates that Mr. Carta didn't use cognitive distortions to

22  rationalize or minimalize.  Do you recall that?

23  A.   That's not what I wrote in my report.  I said he doesn't

24  do that now.

25  Q.   Okay, so now he doesn't; is that right?

dbb9085e-c6fd-469f-9976-ebc983e1019c

Page 11

1    A.    Right.

2    Q.    And let me just show you Page 13 of your report:

3    "Mr. Carta did not employ any cognitive distortions to

4    rationalize or minimize his sexual behavior with minors.  He

5    accepted responsibility for his actions and has divulged

6    numerous episodes of uncharged conduct that could only hurt him

7    in his desire to return to the community."  Is that correct?

8    A.    You missed the first five words of that sentence which

9    puts it into context, "in contrast to previous reports."  We're

10   talking about his behavior and his thinking now, but, yes.

11   Q.    And you testified about Mr. Carta's abuse as a child.  Do

12   you remember that?

13   A.    Yes.

14   Q.    And you testified how his abuse or victimization shaped

15   the way he treated others; is that right?

16   A.    I'm not sure I used those terms.  I think I talked about

17   how his victimization as a child led to the beginning of the

18   inappropriate and illegal sexual behaviors, and that

19   unfortunately was reinforced, but I don't think I talked about

20   it in terms of how he treated others in a general sense, at

21   least I don't think I did, but --

22   Q.    And you're aware of the body of research that indicates

23   that abuse as a child doesn't necessarily mean you'll abuse

24   someone later on, right?

25   A.    Well, as someone who has actually done research with that

Page 12

1  area at the treatment center, there is no direct relationship

2  between being abused as a child and committing sexual offenses,

3  although the population of sex offenders that we examined at

4  the treatment center had very high rates of being sexually

5  abused, particularly those who targeted children.

6  Q.   And so, I'm sorry, is your testimony that there's no

7  direct correlation between being abused as a child and

8  reoffending sexually?

9  A.   There may be a correlation, but there's no causation.

10 Q.   Dr. Bard, I'd like to show you your deposition.  The

11 bottom of Page 39 begins my question:  "Does the sexual abuse,

12 again, factor into your," and then on the top of Page 40,

13 "consideration, a risk of reoffense, or his opinion as a

14 sexually dangerous person?"  And your answer, "Well, here

15 again, there is no direct correlation between being abused as a

16 child and reoffending sexually."  Is that correct?

17 A.   One sign does not cause the other one.

18 Q.   Okay.  And you're aware of Rice and Harris' 1997 research

19 article that finds child molesters, especially those whose

20 victims were male, are at higher risk for committing new sexual

21 offenses?

22 A.   I think that's part of the common knowledge in the field.

23 It's part of the Static-99 also, yes.

24 Q.   And you're aware of Seto's 2005 research that suggests

25 prior sex offending is predictive of recidivism?

United States v. Todd Carta - Bench Trial Day 6

dbb9085e-c6fd-469f-9976-ebc983e1019c

1   A.   I would have to see the article that you're talking about

2   because that doesn't seem correct to me.

3   Q.   Here's a copy of the article in the journal Sexual Abuse:

4   A Journal of Research and Treatment, "The criminal histories

5   and later offending of child pornography offenders."  Have I

6   read that correctly?

7   A.   Yes.

8   Q.   By Michael Seto and Angela Eke?  And I'm referring --

9   A.   Just turn back again, please, because I'd like to

10  actually --

11  Q.   Sure.

12       MS. PIEMONTE-STACEY:  May I approach and just hand him

13  a copy of this article.

14       THE COURT:  Sure.

15  Q.   But before I do that, the question I'm referring to is "In

16  the present study," and then the highlighted portion, "Prior

17  sexual offending is specifically predictive of sexual

18  recidivism."  Did I read that correctly?

19  A.   You read that correctly, but you didn't explain that prior

20  sexual offending means exactly what I testified to yesterday:

21  It is being sanctioned for an offense and then reoffending,

22  which Mr. Carta has not done.

23  Q.   He didn't get caught, correct?

24  A.   That's right, and the way --

25  Q.   But he did offend sexually, right?

United States v. Todd Carta - Bench Trial Day 6

dbb9085e-c6fd-469f-9976-ebc983e1019c

1   A.   No.   The way that we interpret it, and the article that

2   you cited is the Hanson meta-analysis, where clearly it's prior

3   sex offenses, which means you look at the governing offense,

4   and you see if he has any prior offenses for which he was

5   sanctioned.   That is one of the most robust predictors.

6   Mr. Carta does not fall in that category.

7           THE COURT:   So you're saying, just so I get it right,

8   that the literature says that prior sex offenses for which a

9   defendant is sanctioned, followed by reoffense, is one of the

10  best predictors of future activity?

11          THE WITNESS:   It is, your Honor.

12          THE COURT:   And what does the role of child

13  pornography play?

14          THE WITNESS:   That's a totally separate issue.   The

15  article over here talks about child pornography offenders and

16  how likely they are to reoffend with child pornography

17  offenses, which is really not relevant here.

18          THE COURT:   Well, of course it's relevant here.

19          THE WITNESS:   No, it's not.

20          THE COURT:   Why?   He's got child pornography offenses.

21          THE WITNESS:   I understand that, but the concern, at

22  least the way I understand the way the law is written, is that

23  the concern is whether or not someone is likely to engage in --

24  excuse me -- sexually violent conduct or child molestation if

25  released.

dbb9085e-c6fd-469f-9976-ebc983e1019c

1        THE COURT:  Sure.

2        THE WITNESS:  And child pornography offenses would not

3   fall in --

4        THE COURT:  I understand that, doctor.  I'm just

5   simply asking, given a pattern of sex offenses, coupled with

6   child pornography, is there an increased likelihood of

7   reoffending?

8        THE WITNESS:  In terms of child pornography offenses,

9   yes.  In terms of non-sexual -- I'm sorry.  In terms of serious

10  sexual offending, hands-on offending?

11        THE COURT:  Yes.

12        THE WITNESS:  I am not aware of any research that

13  specifically says that, having what we call -- no.  No, I'm not

14  actually.

15        THE COURT:  All right, so sexual offending coupled

16  with child pornography does not statistically give you a

17  greater chance of reoffending?

18        THE WITNESS:  In terms of sexual offending hands on,

19  I'm not aware of any research on that.

20        THE COURT:  Thank you.  So do you have the Seto

21  article?  Are you admitting that?

22        MS. PIEMONTE-STACEY:  I will admit it, your Honor.

23        THE COURT:  In your view, because I obviously can't

24  sit and read it, does he address that issue if somebody's --

25        MS. PIEMONTE-STACEY:  That was my next question.

United States v. Todd Carta - Bench Trial Day 6

dbb9085e-c6fd-469f-9976-ebc983e1019c

Page 16

1          THE COURT:  All right.

2    Q.   Dr. Bard, the study by Seto is the first study to report

3    on later offending of a sample of child pornography offenders,

4    right?

5    A.   That's what he says, yes.

6    Q.   And the study found that child pornography offenders who

7    had ever committed a contact sexual offense were the most

8    likely to reoffend, didn't he?

9    A.   That's what it says.  The question is, at least my recall

10   of that article, is that when they say most likely to reoffend,

11   it's in terms of child pornography offenses.  I may be wrong,

12   but I don't have it here, so --

13          THE COURT:  Why don't you show it to him.

14          MS. PIEMONTE-STACEY:  I'm sorry?

15          THE COURT:  Show him the article.  He's been very

16   careful to say there's an increased likelihood of reoffense

17   with respect to pornography but not touching, so let's just see

18   what the article says.

19          MS. PIEMONTE-STACEY:  I admit that as Exhibit 42.

20          MR. GOLD:  Your Honor, I haven't seen it yet.  I'd

21   like to --

22          MS. PIEMONTE-STACEY:  It was used in the last trial,

23   your Honor.

24          MR. GOLD:  Well, I haven't seen it today.

25          THE COURT:  You don't have it memorized?

United States v. Todd Carta - Bench Trial Day 6

dbb9085e-c6fd-469f-9976-ebc983e1019c

1          MR. GOLD:  No, I don't.

2          MS. PIEMONTE-STACEY:  I don't have an extra copy, but

3     I will get you one at the break.

4          THE COURT:  No, no.  No break.  We're finishing.  I

5     have an 11:00 clocking sentencing.

6          MR. GOLD:  Well, your Honor, I'd like to take a look

7     at it and preserve an opportunity to object.  Can you take it

8     de bene or something like that?

9          THE COURT:  No.  If it was at the last trial, it's in.

10         MR. GOLD:  Well, let's parse that statement.  I don't

11    know what it means.  No articles were admitted at the last

12    trial, so I'm not sure --

13         THE COURT:  I let you put in two articles.  I'm going

14    to let her put in an article as long as --

15         MR. GOLD:  Okay, I'm not afraid of the article.  Just

16    my first reaction is, I mean, I'm not sure -- I mean, we could

17    put in a whole flood of articles.  We don't want to do that.

18    So I'm not sure how germane it is to the points that the Court

19    were interested in.

20         THE COURT:  It sounds like it goes to the heartland of

21    it, but, in any event, he's just looking at it.  See what he

22    says.  Can you figure it out this quickly?

23         THE WITNESS:  I'm trying to.  Basically, among the

24    sample that they used, 17 percent of the sample offended in

25    some ways sexually, and 4 percent committed a new contact

1   offense, so a recidivism rate of 4 percent for contact

2   offenses, which is no higher than you would see in any other

3   sample.  In fact, it's most likely lower.

4           THE COURT:  Mr. Gold, do you want to go grab the

5   article?

6           MR. GOLD:  Oh, yeah.

7           MS. PIEMONTE-STACEY:  I'll hand it to counsel.

8           (Exhibit 42 received in evidence.)

9   Q.  Now, you also testified about Mr. Carta's withdrawal or

10  failure to complete sex offender treatment.  Do you recall

11  that?

12  A.  I do.

13  Q.  And you're aware that failure to complete sex offender

14  treatment increases risk of recidivism, right?

15  A.  There is some research on that, yes.

16  Q.  And just as is the case here, you're aware that many sex

17  offenses go undetected, right?

18  A.  Of course.

19  Q.  Now, you testified yesterday that Mr. Carta's actions

20  weren't deviant; they were criminal.  Right?

21  A.  In terms of his sexual offenses, yes.

22  Q.  And you would agree that Mr. Carta is at risk to act

23  criminally if released, right?

24  A.  I believe that all sex offenders are going to be at some

25  risk to repeat their sexual offenses, yes.

United States v. Todd Carta - Bench Trial Day 6

dbb9085e-c6fd-469f-9976-ebc983e1019c

Page 19

1    Q.   And it is unclear to you whether Mr. Carta, as you sit

2    here today, whether Mr. Carta will be able to translate the

3    knowledge that he learned into absorbable behavior if he's

4    released into the community, right?

5    A.   Well, we have some data on that.  We have data from his

6    period of time in prison, and we have some data from his eight

7    or nine months in the community.  Other than that, I simply

8    cannot say with -- I cannot guarantee, obviously, that

9    Mr. Carta will never do anything bad again.  It's impossible.

10   Q.   And I'll direct your attention to Page 14 of your report

11   which is in evidence as -- this is your 2010 report:  "While he

12   did choose to terminate treatment in 2006, the circumstances of

13   that termination are not clear to this examiner.  When asked

14   about treatment, Mr. Carta was able to apply much of what he

15   learned to himself, but it remains unclear if he will be able

16   to translate that knowledge into absorbable behavior if

17   released into the community."

18        Did I read that correctly?

19   A.   Yes, yes.

20   Q.   Thank you.

21        MS. PIEMONTE-STACEY:  Can I have a moment, your Honor?

22        THE COURT:  What did you just flip up there?

23        MS. PIEMONTE-STACEY:  That's Dr. Bard's report.  It's

24   in evidence.  May I have just one moment, your Honor?

25        (Discussion off the record between plaintiff counsel.)

1            MS. PIEMONTE-STACEY:  I have nothing further, your

2     Honor.

3            MR. GOLD:  I have some redirect, your Honor.

4     REDIRECT EXAMINATION BY MR. GOLD:

5     Q.   Dr. Bard, you were asked about Frances and First.  In your

6     opinion, are they qualified to interpret the DSM?

7     A.   They are probably two of the most qualified people in

8     America to interpret it because they were the ones who edited

9     it.

10    Q.   Now, you said that you were aware that research regarding

11    prison time not being associated with reoffense.  How does that

12    impact your opinion?

13    A.   It only shows that just being in prison for a lengthy

14    amount of time does not correlate with any reduced risk, but

15    that's certainly not my opinion as to why Mr. Carta is at lower

16    risk now.  The length of time that he was in prison is really

17    irrelevant.  It's what he has accomplished while he's been in

18    prison:  the fact that he's undergone a variety of treatment,

19    not just the sex offender treatment at Butner but the Code

20    Program, substance abuse treatment, which has always been an

21    issue for him; his behavior while incarcerated, again, it's

22    very easy to act out in prison, and he has done none of the

23    behaviors that would be considered of concern.  So certainly

24    the length of time in prison is not what I'm talking about

25    here.  It is the distinct and observable changes that he has

dbb9085e-c6fd-469f-9976-ebc983e1019c

1   shown during that time.

2   Q.   Now, when you were reviewing the documents for this case,

3   did you have occasion to review Mr. Carta's programming and

4   work records from the Bureau of Prisons?

5   A.   Yes.

6   Q.   And I just put a packet of documents in front of you.  Do

7   you recognize those documents as among the documents that you

8   reviewed?

9   A.   I do.

10       MR. GOLD:  Your Honor, we'd move these work

11  certificates from the Bates stamped series of Mr. Carta's

12  prison records into evidence.

13       MS. PIEMONTE-STACEY:  Your Honor, these were just

14  handed to me this minute, so if I just might have a minute to

15  look at them.

16       (Pause.)

17       MS. PIEMONTE-STACEY:  No objection, your Honor.

18       THE COURT:  What number is that?

19       MS. PIEMONTE-STACEY:  I believe it's 43.  The Seto

20  article is 42.

21       (Exhibit 43 received in evidence.)

22  Q.   How does that behavioral data, if you will, affect your

23  assessment of Mr. Carta today?

24  A.   Again, I think it shows the commitment that Mr. Carta made

25  to improving himself.  These are work performance records which

dbb9085e-c6fd-469f-9976-ebc983e1019c

Page 22

1  are all positive, if I recall.  Many of them talk about him as

2  outstanding.  There are treatment certificates for completing

3  things like the Code Program, and the intensive piece of the

4  Code Program, and the sex offender treatment program.  I think

5  that's these.  Yes.  Completing at Butner, which I actually

6  forgot about, a release preparation program in February of 2006

7  and before that in December of '05.  So it really shows that

8  Mr. Carta's involvement in numerous positive activities

9  certainly argues against any presence of antisocial personality

10  disorder at the present time, and it shows the extent of his

11  documented efforts in changing himself.

12         MR. GOLD:  May I have a copy of Exhibit 41.  Thank

13  you.

14  Q.   Dr. Bard, I've handed you Exhibit 41, what's been marked

15  as Exhibit 41.  When was the first time you saw that document?

16  A.   The first time I saw this document was this morning.

17  Q.   And prior to that, what information did you have that

18  Mr. Carta had requested to participate in the Devens program?

19  A.   Mr. Carta told me and he also testified here that he had

20  requested on several occasions to participate in the sex

21  offender treatment program at Devens, and that he has never

22  heard a response back either way.

23  Q.   And how did you assess the credibility of those

24  statements?

25  A.   I had no reason to doubt him.  While I am very much aware

Page 23

1  that offenders often tend to lie and make things up along the

2  way, usually they don't lie when you can prove something like

3  this.  And I think Mr. Carta has been reported in numerous

4  reports from Dr. Wood forward, he's been unusually open and

5  honest.  As your Honor has noted, if he hadn't have spoken

6  about his sexual offenses, he would not be here now.  So I had

7  no reason to doubt him.  I found him to be one of the more

8  credible individuals I've evaluated, based on his decision to

9  talk about some very difficult matters and some matters that

10  have clearly harmed him in the long-term.

11       THE COURT:  Doctor, one of the things I've been

12  struggling with is, he's very credible, as you say, in

13  discussing his prior acts, and yet -- I don't want to be

14  insulting -- he does these excessively mean and impulsive

15  things.

16       MR. GOLD:  Did, your Honor.

17       THE COURT:  So can I ask you, so how do you weigh that

18  in deciding whether or not -- you weigh the credibility that

19  he's had reporting his own misconduct, and yet time and time

20  again, whether it's with his daughter or with his mother or

21  with the program at Butner, he just acts out because he gets

22  angry.

23       THE WITNESS:  Well, I don't think that he has been

24  this credible all of his life.  I think back then, if you had

25  spoken to him, you would have, at least I would have, gotten,

Page 24

1    I'm sure, a very different opinion of him.  I think where he is

2    now reflects the changes.  It's very hard for me to picture the

3    man sitting here, after talking to him for so many hours and

4    listening to him for so many hours, that he could do the things

5    that he has done to his family members, really painful, as you

6    said, awful things.  But I think we have to differentiate what

7    he did in the 1990s and the early 2000s and now.  It's a period

8    of at least ten years, and people do change, and I think that's

9    where I am with him.  He acknowledges all that.

10          You know, he's not acknowledging it because he's proud

11   of it, and he's not acknowledging it because he thinks it can

12   help him in any way.  No one knew about this.  He didn't have

13   to talk about his relationship with Seth.  That was private.

14   He was never charged or anything else.  He didn't have to talk

15   about all that.  It's clear that at some point along the way

16   Mr. Carta decided, "I have to change.  This is a crazy way to

17   live, and I hate the way I'm living."

18          He described himself to me as a terrible person back

19   then.  I agree with him a hundred percent, but he's not a

20   terrible person now.  And I think that's the most important

21   thing in this case is that he's not the same person; and as a

22   result, in my opinion, he's certainly not likely to do any of

23   the things that he did in the past, whether it's sexual or non.

24          THE COURT:  Whether it's?

25          THE WITNESS:  Whether it's sexual or non-sexual.

United States v. Todd Carta - Bench Trial Day 6

dbb9085e-c6fd-469f-9976-ebc983e1019c

1  Q.   And this terrible, crazy behavior that we're talking about

2  with Seth or with Fred, the vindictiveness, all that stuff, in

3  your opinion, Dr. Bard, is that the product of a mental

4  disorder or a sexually-based mental disorder?

5  A.   I don't think that it is.  Not all terrible people can be

6  diagnosed.  They just do bad things because they can't control

7  their emotions, or they've had horrible early experiences, but

8  that doesn't mean that you assign a diagnosis.  There are lots

9  of people all around us that do bad things.  They're not all

10 ill in some way.  They just have poor judgment and don't like

11 other people and have anger problems and all of that.

12     So I think, also, what happened in the past is really in

13 this case in the past because he for the last ten years -- and

14 I will include his behavior at Butner -- hasn't resembled

15 anything that he's done before that.  While he used bad

16 judgment at Butner, he never acted out.  He never was that sort

17 of vindictive, angry jerk who did all these things in the past.

18 He had a hard time dealing with treatment, but that's normal.

19 I've evaluated enough guys and I've done enough treatment to

20 know that treatment is difficult.  We're talking about painful

21 emotional issues.  It's one step forward and two steps back a

22 lot of the times, so --

23 Q.   And, Dr. Bard, we've been talking a lot about treatment,

24 but does requiring or being in a position to benefit from

25 treatment as Mr. Carta, I believe you testified, is, does that

United States v. Todd Carta - Bench Trial Day 6

1   mean he has a diagnosable mental disorder?

2   A.   No.  Here again, just because you're in treatment, you

3   don't have to meet the requirements of a diagnosis.  There are

4   lots of people who use terrible judgment, people who quit their

5   jobs on impulse or people who have affairs without thinking

6   about the consequences.  These people aren't necessarily

7   psychologically disordered.  They just don't make good choices.

8   They use bad judgment.  And part of treatment for people like

9   that is to get them to, first, not act impulsively, to have

10  them learn to delay a little bit, and, second, to think about

11  the consequences.  If I quit my job, even though my boss is a

12  jerk and, you know, he's all over me every day at work, you

13  know, the economy is terrible; do I really want to be poor and

14  homeless?

15          THE COURT:  No, but let's get to this case.  In this

16  case, you've got a guy who's attracted to thirteen-year-olds.

17          THE WITNESS:  No, your Honor.  No, your Honor.

18          THE COURT:  Excuse me.  I know you don't agree, but

19  let me just assume for a minute a guy who's attracted to

20  thirteen-year-olds.  He knows now it's wrong.

21          THE WITNESS:  Right.

22          THE COURT:  And if he goes through treatment and if he

23  gets mad at the treatment, he gets mad at something that

24  happens, in your view, he's not going to likely revert back to

25  the impulsive, "Well, I'm mad at my treatment provider, so I'm

Page 27

1    going to go offend against a thirteen-year-old"?

2            THE WITNESS:  No, I don't, and I'll tell you why,

3    because he didn't -- assuming that he has an attraction towards

4    adolescents --

5            THE COURT:  I know you don't agree, but I'm going to

6    make certain fact findings.  Assume for a minute that I find

7    it.

8            THE WITNESS:  Assume that he has that, he didn't do

9    that when he was angry.  It wasn't like he felt rejected, then

10   he looked for a thirteen-year-old.  He looked for a

11   thirteen-year-old or a fifteen-year-old or seventeen-year-old

12   because that's what he was attracted to all along.  It had

13   nothing to do with anger, as with some sex offenders who get

14   rejected by a girlfriend and go out and duke a sexual assault.

15   He's never done that.  In fact, when he's gotten angry, he's

16   acted out nonsexually.  He's done harmful things.  He's written

17   things about people and handed out fliers, and told his

18   daughter that he had sex with her boyfriend; hurtful things,

19   but nothing to do with having sex with an underage person.

20   That was there, unfortunately, all along.

21   Q.   Dr. Bard, is your knowledge of Mr. Carta's release

22   conditions, both probation and treatment, from Carta's

23   self-report?

24   A.   No.  It's from Carta's self-report when I most recently

25   saw him, but I sat through the entire last trial where there

United States v. Todd Carta - Bench Trial Day 6

dbb9085e-c6fd-469f-9976-ebc983e1019c

Page 28

1    was evidence presented about the program where I assume he's

2    going to go to, Open Hearth.  There was testimony about the

3    treatment that he'll be receiving from Dr. Wallace.

4    Q.   Who is Dr. Wallace?

5    A.   Dr. Wallace is a colleague of mine who runs a sex offender

6    treatment program, I think in Hartford or near Hartford.  I'm

7    not exactly sure.  I think he actually has four separate

8    offices.  And we also heard testimony from the probation

9    officer, who basically said that he is going to have zero

10   tolerance with Mr. Carta, and that if he does anything wrong,

11   he'll yank him back in.  So I think there's a lot of positive

12   things out there for him in terms of housing, in terms of

13   treatment, in terms of supervision.

14        MR. GOLD:  Judge, I have one question which is a

15   follow-up to some questions that the Court was asking during my

16   direct about the -- and I went back and looked at the Phenix

17   transcripts.

18        THE COURT:  Well, so ask.

19        MR. GOLD:  Okay.

20   Q.   Dr. Bard, we had testimony in this case about choosing

21   bins to decide --

22        THE COURT:  The bin controversy, all right.

23   Q.   The bins for the Static-99R.  Are you familiar with that

24   testimony?

25   A.   Yes.

United States v. Todd Carta - Bench Trial Day 6

dbb9085e-c6fd-469f-9976-ebc983e1019c

Page 29

1    Q.   And do you have an opinion as to the selection of the

2    high-risk bin for a subject or for Mr. Carta?

3          MS. PIEMONTE-STACEY:   And I'd object.   It's way

4    outside the scope of his report.   This is that instrument that

5    you had excluded, and he's being asked to comment on the

6    validity of it.

7          THE COURT:   Well, excuse me.   I said yesterday, and it

8    remains true, unlike Mr. Gold, I did not go back and look at

9    the transcript.   I don't remember how much I let in and didn't.

10   I just remember that there were some gray areas as to what she

11   talked about and what she didn't and what I excluded, and I

12   just don't remember.   So I will assume -- did you go back and

13   look at the transcripts?

14         MS. PIEMONTE-STACEY:   I looked at some of it, I did,

15   and you clearly excluded the instrument that talked about the

16   methodology for sorting people into bins.   Her testimony was

17   that "This is how -- I use this instrument to decide what bin I

18   put somebody in," and you excluded it.   So while she talked

19   about dynamic risk factors and clinical judgment --

20         THE COURT:   I don't want to get into the bins if I

21   excluded it.

22         MR. GOLD:   But, your Honor, I have to say, her whole

23   opinion, Dr. Phenix's opinion, is the bins.   That's her whole

24   opinion, and that wasn't excluded.   She spent all day talking

25   about it.

Page 30

1          THE COURT:  All right, I will rely on your memory.  I

2     will allow the question.

3          MS. PIEMONTE-STACEY:  Okay, I just object to the

4     extent that it's nowhere in his report, so I have no basis on

5     which to cross him on it.

6          MR. GOLD:  It says it right here.  I mean, here it

7     says --

8          THE COURT:  I don't know.  Just ask the question, and

9     let's finish it and get him out of here.  No offense.  Let's

10    just finish this.  And it's subject to a motion to strike when

11    I go back and see her testimony.

12         MS. PIEMONTE-STACEY:  Thank you, your Honor.

13    Q.   Are you familiar with the process that the developers of

14    the Static-99 prescribe for selecting a bin for someone?

15    A.   As much as there is a process, yes.

16    Q.   And did you do that process in your case, in this case?

17    A.   No, no.

18    Q.   And why not?

19    A.   The developers suggest that you put the individual in a

20    bin using clinical judgment to find the bin, as it were, that

21    is closest to the individual to see where does he fit best; and

22    since there are no criteria associated with that, and he

23    certainly does not resemble anyone who is in the high-risk bin,

24    I used the routine sample, which is as I've said before and

25    your Honor has heard --

United States v. Todd Carta - Bench Trial Day 6

dbb9085e-c6fd-469f-9976-ebc983e1019c

1           THE COURT:  All right, thank you.  Wrap up.

2     A.    -- similar to the entire universe of sex offenders.

3           THE COURT:  Is that it, Mr. Gold?

4     Q.    So what problems do you have with selecting the high-risk

5     bin for Mr. Carta?  What's the high-risk bin composed of?

6     A.    The high-risk bin is composed of samples of individuals

7     who are found not guilty by reason of insanity, who have

8     problems with serious mental illnesses, and the samples from

9     the Massachusetts treatment center where individuals were

10    committed as sexually dangerous persons.  Mr. Carta doesn't

11    resemble any of those.

12          MR. GOLD:  No further questions, your Honor.

13          MS. PIEMONTE-STACEY:  Your Honor, briefly.

14    RECROSS-EXAMINATION BY MS. PIEMONTE-STACEY:

15    Q.    Dr. Bard, you said that Mr. Carta is not the same person

16    today, and he never acted out while in prison, right?

17    A.    I don't think I said he never acted out, but he certainly

18    has not acted out sexually, and he has not acted out violently.

19    Q.    But evidence that he is the same person is, he acted out

20    angrily in prison as he did before he was in prison, right?

21    A.    No.

22    Q.    He threatened to throw hot oil on an inmate, right?

23    A.    That was in the report.  Mr. Carta testified otherwise,

24    but, yes.

25    Q.    He spent weeks trying to get revenge on the person that

United States v. Todd Carta - Bench Trial Day 6

1   told on him in sex offender program, right?

2   A.   No.

3   Q.   You didn't see that in Dr. Wood's report?

4   A.   That he spent weeks trying to do this?  No.

5   Q.   And I showed Mr. Carta the document during his direct

6   examination.  You have no memory of that?

7   A.   I apologize, but I don't.

8   Q.   And you saw the treatment provider's notes that

9   Mr. Carta's actions in prison mirrored his offense cycle,

10  right?

11  A.   Well, that's their opinion, which I totally disagree with.

12  Q.   And you saw the disciplinary report for insolence in

13  prison, right?

14  A.   Yes.  He refused to tuck in his shirt, yes.

15  Q.   And you heard testimony about the fact that drugs were

16  found in his locker in his cell, right?

17  A.   I heard all of that, yes.

18  Q.   And so he has acted out and not sexually, to your

19  knowledge, right?

20  A.   He has certainly not acted out sexually in any way.

21  Q.   And you base that on the nonexistence of disciplinary

22  reports, right?

23  A.   On the nonexistence of disciplinary reports and

24  identifying sexual acting out and from Mr. Carta's

25  conversations with me.

United States v. Todd Carta - Bench Trial Day 6

1   Q.   And you said in talking about Mr. Carta's admissions of

2   his offense, you said he didn't have to talk about it, right?

3   A.   That's right.

4   Q.   But he did to get through treatment, right?

5   A.   He didn't even have to go to treatment.  He could have

6   served his time in Allenwood, gotten out, which would have not

7   helped him or the community at large.  So he did not have to

8   talk about it anywhere.

9   Q.   But a condition of release was sex offender treatment,

10  wasn't it?

11  A.   Condition of release is sex offender treatment afterwards,

12  but --

13  Q.   So at some point he had to talk about it, right?

14  A.   No.  There are many offenders who refuse to talk about it

15  who will say nothing ever happened.  I have had individuals who

16  I have evaluated tell me after the fact that they did not tell

17  their therapist.

18  Q.   And those offenders then aren't treated for their

19  deviance, right, because you can't treat the problem if they're

20  not talking about it, right?

21  A.   Well, it may not be as big a problem as everybody thinks

22  for every offender.

23  Q.   And those people, they don't pass the polygraph at the end

24  when they ask about whether you've disclosed all your victims,

25  right?

United States v. Todd Carta - Bench Trial Day 6

dbb9085e-c6fd-469f-9976-ebc983e1019c

Page 34

1   A.   Not every program uses polygraphs, and polygraphs are

2   notoriously unreliable.

3   Q.   But as someone who's treated sex offenders, you'd have to

4   admit that talking about the offense helps you learn what it is

5   that you need to treat in treatment, right?

6   A.   True.

7        MS. PIEMONTE-STACEY:  Nothing further, your Honor.

8        THE COURT:  Okay, thank you very much.

9        MR. GOLD:  No further questions, your Honor.

10       THE COURT:  Thank you for coming back.  I'm sorry you

11  had to.

12       (Witness excused.)

13       THE COURT:  So where are we?

14       MR. GOLD:  We're waiting to hear from Dr. Prentky.

15  The government has agreed to allow him to finish up by video,

16  so that might open up some more time for him, but we haven't --

17       THE COURT:  Oh, that's terrific.

18       MS. PIEMONTE-STACEY:  Your Honor, we had Monday and

19  Tuesday scheduled for trial, and apparently Dr. Prentky teaches

20  on those days, so that's how the agreement came.

21       THE COURT:  Yes, he mentioned it.  Where does he

22  teach?

23       MR. GOLD:  In New Jersey.

24       THE COURT:  So I can't even adjust around his

25  schedule.  So next Thursday I can't do it.  I'm in Washington.

dbb9085e-c6fd-469f-9976-ebc983e1019c

Page 35

1   Possibly I could do it on the Friday, but it would be easier if

2   we just videoed it.  So that's fine.  How long do you think it

3   would take you all to write -- do you all have transcripts

4   already of the earlier testimony?

5          MS. SERAFYN:  We do, your Honor, of Dr. Phenix's

6   testimony from December.

7          THE COURT:  And will you be ordering transcripts of

8   Mr. Carta and the various doctors?

9          MS. SERAFYN:  Yes, yes.

10          THE COURT:  And how long do you want to submit

11   proposed findings of fact and law?

12          MS. SERAFYN:  Thirty days from receipt of the

13   transcript.  So we've actually already gotten started on

14   Dr. Phenix's, but, you know, we just resumed, obviously, on

15   Friday.

16          THE COURT:  So thirty days from receipt of the

17   transcripts?  And I understand some of them were not with

18   Ms. Marzilli.

19          MS. PIEMONTE-STACEY:  That's right.

20          THE COURT:  So I don't know how long it will take for

21   her to get them, but why don't you order them right away,

22   thirty days.  If there's any issue -- I mean, we're getting to

23   that time.  I want to make sure my opinion is out before the

24   end of the clerkship year, which is the critical criterion for

25   me.  So I can't wait too long at this point.  So let's assume

United States v. Todd Carta - Bench Trial Day 6

Page 36

1   it will take thirty days to get a transcript and thirty days to

2   get in your proposed findings.  I'm not going to be granting

3   continuances because then that just gives me a month or two, a

4   couple of months.

5           MR. GOLD:  When is that critical date, your Honor?

6           THE COURT:  The end of August, maybe even middle

7   August.

8           MR. GOLD:  And how quickly can we get the transcripts,

9   I wonder?

10          THE COURT:  I don't know.

11          MS. PIEMONTE-STACEY:  Well, it depends if he ordered

12  them expedited.  I think that we've just ordered them regular,

13  your Honor, so --

14          THE COURT:  You have to talk to the court reporter.

15          MS. SERAFYN:  And obviously we haven't even finished

16  with Prentky yet, so that would --

17          THE COURT:  Yes, but that's not going to --

18          MS. SERAFYN:  No, it's not going to be a whole lot,

19  but I think that would be the last.

20          THE COURT:  Yes, but it's not going to be thirty days

21  from then.  It's thirty days from all these transcripts, and

22  then that's just cleanup.  You know, you've already had an hour

23  and a half of cross, and you want another hour or hour and a

24  half.  That's fine with me.  I'm just simply saying that

25  shouldn't slow it down.  You can do most of it at this point.

United States v. Todd Carta - Bench Trial Day 6

dbb9085e-c6fd-469f-9976-ebc983e1019c

Page 37

1    We've got all the facts.  We have his testimony with the prior

2    trial.  We've got a lot.  So thirty days from the receipt of

3    all the transcripts from this trial, and then you'll have to

4    take good notes on Dr. Prentky.  So I think that should about

5    do it.

6              Do you want oral argument?

7              MS. PIEMONTE-STACEY:  On the rulings and findings,

8    your Honor?

9              MS. SERAFYN:  Yes.

10             MS. PIEMONTE-STACEY:  Your Honor, do you want the oral

11   argument in lieu of closings?  In other words, we'll finish up

12   and then just come back after we submit the transcripts?

13             THE COURT:  Yes, after I've got the proposed findings

14   of fact, I've got the --

15             MR. GOLD:  We'd like that, Judge, yes, yes.

16             THE COURT:  All right, now, in the interim --

17             MR. GOLD:  Can Mr. Carta be present for the argument?

18             THE COURT:  Absolutely.  It's part of the trial.

19   Absolutely.  But here's the question:  In the interim, why

20   doesn't he get some sort of treatment?  Whether it's on the

21   street or here, it's absolutely essential.  So why don't you go

22   ask -- does he still want it?

23             MR. GOLD:  Yes.

24             THE COURT:  Why don't you go back and say to Devens,

25   let's at least get him a psychiatrist.  Let's at least put him

United States v. Todd Carta - Bench Trial Day 6

dbb9085e-c6fd-469f-9976-ebc983e1019c

1   in whatever sex offender treatment exists there, because

2   whether it's as part of supervised release or whether it's at

3   Butner, he needs it.  It's been an unfortunate hiatus here.

4   It's been since 2006-ish.  Some of it's his doing, fair enough,

5   but --

6           MS. PIEMONTE-STACEY:  I understand your Honor's

7   concerns.  All I can do is try --

8           THE COURT:  So what should I do to get that going?

9           MS. PIEMONTE-STACEY:  Well, I mean, I'm getting a copy

10  of the transcript.  I think I can report back to them that this

11  is what happened today and this is what you said; and if there

12  are any issues, I'll file some type of status or anything with

13  the Court.

14          THE COURT:  Why don't I do this.  It could be another

15  three or four months.  It's going to be two months just to get

16  in all your stuff.  It could be till the end of August before I

17  rule.  All right, that's my timetable.

18          MR. GOLD:  Your Honor, I think there's two -- you

19  know, most of the experts will testify there's the group stuff

20  that we've heard about.  That's a modality.

21          THE COURT:  Yes.

22          MR. GOLD:  Then there's also individual one-on-one

23  therapy which can also be helpful, and they complement each

24  other.  So we'll ask them what they have.  We'll say

25  Judge Saris is interested, and we'll try to get him in

dbb9085e-c6fd-469f-9976-ebc983e1019c

1    individual counseling, at least.

2          THE COURT:  Yes.

3          MS. PIEMONTE-STACEY:  Well, he's had the opportunity,

4    and that remains.  Nothing has to be done for individual

5    counseling.  That individual therapist is there and available.

6          THE COURT:  Well, why don't you call and say, "Get him

7    at least the individual counseling."  Are you hearing me,

8    Mr. Carta?  I'm giving an order that she relay that you want

9    individual counseling, and that should be provided.

10         MR. CARTA:  Thank you.

11         THE COURT:  Now, what I don't know enough about is

12   whether you jump into group counseling and whether four months

13   or five months --

14         MR. CARTA:  Anything will help.

15         THE COURT:  -- is good.  If it is good, it would be

16   useful to get him started if it exists.  I don't know whether

17   you can jump in midstream, whether it's just iterative; you

18   know what I mean, whether it just keeps going and you can jump

19   in at any point.  I don't know.

20         MR. GOLD:  The indication that Mr. Carta received from

21   the director of the program last year when he applied, she

22   said, "Well, if you can start --" and remember he never

23   received a subsequent communication -- "If you can start, it

24   won't be until July," which gives me the impression that they

25   have semesters or something like that.

dbb9085e-c6fd-469f-9976-ebc983e1019c

Page 40

1          MS. PIEMONTE-STACEY:  That's right.

2          THE COURT:  Well --

3          MR. GOLD:  But we need to investigate.

4          THE COURT:  -- if it starts in July, he should start

5     in July if I haven't made a ruling by then.

6          MR. GOLD:  Well, this was last July.

7          THE COURT:  Right, but maybe it's every six months.

8          MS. PIEMONTE-STACEY:  I don't know, your Honor.

9          THE COURT:  We don't know.  We'll find out.  I'll have

10    maybe a report back.  Just give me a reasonable time.  Within a

11    week?  Within two weeks?

12         MS. PIEMONTE-STACEY:  For us to report back?

13         THE COURT:  Yes.

14         MS. PIEMONTE-STACEY:  Two weeks.

15         THE COURT:  Two weeks would be terrific, and you just

16    find out what's going on.  In the meantime, though, does he

17    still want individual counseling?

18         MR. CARTA:  Yes.

19         MR. GOLD:  Yes, your Honor, and, Mr. Carta, did you do

20    some counseling?

21         (Discussion off the record between Mr. Gold and

22    Mr. Carta.)

23         MR. GOLD:  He's already in individual counseling.

24         THE COURT:  All right, all right, so that part he's

25    getting.

United States v. Todd Carta - Bench Trial Day 6

Page 41

1        MR. GOLD:  That part he's getting.

2        THE COURT:  Is that sex offender counseling or just

3   mental health?

4        MR. CARTA:  She's a sex offender treatment specialist,

5   yes.

6        THE COURT:  All right, all right, so you've been

7   getting something.  Now somebody is looking in a state of shock

8   there.

9        MR. GOLD:  It's kind of news to me, your Honor, in all

10  frankness.

11       MS. PIEMONTE-STACEY:  It makes me feel a little better

12  that that piece of information --

13       THE COURT:  It makes me feel better.  It makes me feel

14  a lot better that this just hasn't been him sitting in a cell.

15  It makes me feel a lot better.  So at least he is getting sex

16  offender treatment by whoever this woman is.  Ms. Schole, is

17  that right?

18       MR. CARTA:  It's Mrs. Scholer.

19       THE COURT:  Mrs. Scholer.

20       MR. CARTA:  Yeah.  I just want to be clear, though, we

21  don't really talk about any of the sex offender stuff because

22  I'm not in the program, okay, but I do go to her when I have a

23  problem that I need to talk to somebody about.  I don't want to

24  mis --

25       THE COURT:  Well, let's be clear.  What is it you want

1   right now?

2          MR. CARTA:  I want individual treatment by one on one,

3   and I'd like group therapy.

4          THE COURT:  About sex offending?

5          MR. CARTA:  Yes, yes.

6          THE COURT:  All right.

7          MR. GOLD:  So he was seeing Ms. Scholer as part of --

8   you know, you can see a psychologist when you're having some

9   sort of issue.  She's got the sex offense background, but he's

10  not receiving sex-offender-specific treatment.  That's what

11  we're going to investigate now, whether Ms. Scholer can provide

12  it or start to provide it on an individual basis, maybe come up

13  with a treatment plan for him for the limited time that he has

14  remaining at Devens, four to five months, and then also see if

15  we can push him into the groups that they have going on there.

16  The sex offender program for incarcerated inmates is now at

17  Devens that used to be at Butner, so we'll see if he can get in

18  there, even though apparently he was rejected because he's not

19  classified as a sentenced --

20         THE COURT:  Yes, we need to change that actually in

21  general.  These things take so long.  Hopefully this is the end

22  of mine.

23         MS. SERAFYN:  Your Honor, I actually think,

24  practically speaking, it's the end of all of them in

25  Massachusetts.  I think they're just going to be handled out of

dbb9085e-c6fd-469f-9976-ebc983e1019c

Page 43

1    North Carolina from now on.  So Judge O'Toole has one other

2    case, Volungis, that's pending now that we started actually in

3    January.  So I think, practically speaking, Mr. Carta and

4    Mr. Volungis are the last two Adam Walsh committees at Devens.

5              MR. GOLD:  And there's 120 down at Butner that haven't

6    started yet.

7              THE COURT:  Do they know what they're about to engage

8    in?

9              MR. GOLD:  I've been down there a couple of times to

10   talk to the public defender.  I believe it's fair to say they

11   have no idea.

12             THE COURT:  All right.

13             MS. SERAFYN:  Your Honor, just to clarify, because we

14   have blocked off Monday and Tuesday, can we see if Dr. Prentky

15   is available by video?  I know he teaches, but he might have a

16   large gap where he can give us two hours, and we could get this

17   done Monday or Tuesday?

18             THE COURT:  I'd be very happy.

19             MR. GOLD:  Your Honor, I was going to request

20   something that is kind of -- I have a message in to

21   Dr. Prentky.  However, what I'd like to do is to ask the Court

22   to release Mr. Carta for Monday and Tuesday from trial so that

23   he's able to get sent back to Devens instead of staying at

24   Wyatt.

25             THE COURT:  Right, but if we do this video --

United States v. Todd Carta – Bench Trial Day 6

dbb9085e-c6fd-469f-9976-ebc983e1019c

1          MR. GOLD:  And then put him back on when we find out

2     from Dr. Prentky --

3          THE COURT:  Well --

4          MR. GOLD:  It's my understanding the marshals have him

5     booked until Tuesday, so --

6          THE COURT:  In Wyatt or some such place?  Fine, but

7     here's the issue:  If I can squeeze in Prentky, I'm going to do

8     it, and if Mr. Carta can't see it, he can't.  You will give him

9     a transcript.  That's the trade-off.

10         MR. GOLD:  Okay, but I would just ask the Clerk, I

11    think we'd have time to issue a habe and get him back.

12         THE COURT:  Not if it's Monday.  I don't know.  It

13    depends how quickly you can turn it around.  Let me put it this

14    way:  If I can get him in on Monday and Tuesday, my schedule is

15    so chaotic and so uncertain, you know, that --

16         MR. GOLD:  Mr. Carta doesn't care.  That's fine.

17         THE COURT:  Okay, because it's just like another hour,

18    and he can get a transcript of it.  He knows what Prentky looks

19    like.  You know, he's very slow-speaking, and so, you know --

20         MR. GOLD:  It might be better in the transcript.

21         THE COURT:  It might, yes.

22         MR. GOLD:  Okay.

23         THE COURT:  Okay, so perfect.  Just, you know, last

24    time we lost that opportunity when your back was hurting.

25         MR. CARTA:  I'm sorry.

dbb9085e-c6fd-469f-9976-ebc983e1019c

Page 45

1          THE COURT:  It just slipped another two or three

2     months.  My point is only that I don't want it to slip again

3     another two or three months, so if we can get him Monday or

4     Tuesday, I want that to happen.  And if we can habe you in in

5     time, we will, and if we can't, then we'll just do it.

6          MS. SERAFYN:  Your Honor, to the extent we can have

7     oral argument on the rulings and findings before mid-June, that

8     would be terrific.

9          THE COURT:  It depends when you get in your proposed

10    findings, right?  You don't think so?  Are you leaving or

11    something?

12         MS. SERAFYN:  I'll be on maternity leave starting in

13    mid-June, so I would like to be here for the oral arguments.

14         THE COURT:  Well, we could do the -- at the risk of

15    being indiscreet, but I've been there myself, when are you due?

16         MS. SERAFYN:  June 23.

17         THE COURT:  June 23?  So like, say, do it by the end

18    of May?

19         MS. SERAFYN:  I think that's fine.

20         THE COURT:  If worst comes to worst -- if best comes

21    to best, you can do it if there's an issue, but we'll try

22    and -- just remind me, okay?

23         MS. PIEMONTE-STACEY:  Thank you, your Honor.

24         THE COURT:  All right, great.  Thank you.

25         (Adjourned, 10:19 a.m.)

1                    C E R T I F I C A T E

2

3

  UNITED STATES DISTRICT COURT )
4 DISTRICT OF MASSACHUSETTS     ) ss.
  CITY OF BOSTON                )
5

6

7          I, Lee A. Marzilli, Official Federal Court Reporter,

8 do hereby certify that the foregoing transcript, Pages 6-1

9 through 6-45 inclusive, was recorded by me stenographically at

10 the time and place aforesaid in Civil Action No. 07-12064-PBS,

11 United States of America v. Todd Carta, and thereafter by me

12 reduced to typewriting and is a true and accurate record of the

13 proceedings.

14      In witness whereof I have hereunto set my hand this 9th

15 day of April, 2011.

16

17

18

19

20          /s/ Lee A. Marzilli

21          _____
            LEE A. MARZILLI, CRR
            OFFICIAL COURT REPORTER
22

23

24

25