IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,          )
                                   )
                 Petitioner        )
                                   )
        -VS-                       )  CA No. 07-12064-PBS
                                   )  Pages 7-1 - 7-65
TODD CARTA,                        )
                                   )
                 Respondent        )


                  BENCH TRIAL - DAY SEVEN

            BEFORE THE HONORABLE PATTI B. SARIS
                UNITED STATES DISTRICT JUDGE




                        United States District Court
                        1 Courthouse Way, Courtroom 19
                        Boston, Massachusetts
                        March 29, 2011, 9:42 a.m.

                      LEE A. MARZILLI
                   OFFICIAL COURT REPORTER
                United States District Court
                1 Courthouse Way, Room 7200
                     Boston, MA  02210
                       (617)345-6787

1   A P P E A R A N C E S:

2

3        EVE A. PIEMONTE-STACEY, ESQ. and JENNIFER A. SERAFYN,
    ESQ., Assistant United States Attorneys, United States
    Attorney's Office, 1 Courthouse Way, Boston, Massachusetts,
4   02210, for the Petitioner.

5        IAN GOLD, ESQ. and TAMARA FISHER, ESQ., Federal Public
    Defender Office, District of Massachusetts, 51 Sleeper Street,
6   5th Floor, Boston, Massachusetts, 02210, for the Respondent.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

United States v. Todd Carta - Bench Trial Day 7

Page 3

1                          I N D E X

2

    WITNESS                 DIRECT   CROSS   REDIRECT   RECROSS
3
    ROBERT PRENTKY (By Video)
4
        By Ms. Serafyn:                7-4
5       By Mr. Gold:                           7-33
        By Ms. Serafyn:                                    7-55
6       By Mr. Gold:                           7-57

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1                    P R O C E E D I N G S

2          THE CLERK:  The Court calls Civil Action 07-12064,

3   United States v. Todd Carta.  Can counsel please identify

4   themselves for the record.

5          MS. SERAFYN:  Good morning, your Honor.  Jennifer

6   Serafyn for the United States.

7          MS. PIEMONTE-STACEY:  Good morning, your Honor.  Eve

8   Piemonte-Stacey for the United States.

9          THE COURT:  Thank you.  Dr. Prentky, you're there?

10  Can you hear us?

11         THE WITNESS:  Yes, I am, your Honor.

12         THE COURT:  I guess we got delayed due to parking?

13         THE WITNESS:  Traffic and parking, your Honor.  I

14  apologize.

15         THE COURT:  All right.  Well, at this point, just for

16  the record, I think Mr. Carta did waive his presence, but let's

17  just get going because I am eager to finish this morning.

18                    ROBERT A. PRENTKY

19  having been previously duly sworn, was examined and testified

20  by video further as follows:

21  CONTINUED CROSS-EXAMINATION BY MS. SERAFYN:

22  Q.   Dr. Prentky, you didn't actually diagnose Mr. Carta with

23  any mental illness, abnormality, or disorder, correct?

24         THE COURT:  Can you hear?

25         THE WITNESS:  I'm sorry, I'm not hearing you.

ad5871a2-e59a-4fa0-9904-a7d863b685cd

Page 5

1           THE COURT:  Is your mike on?  Whom can you see?  Can

2      you see Ms. Serafyn?

3           THE WITNESS:  Yes, I can, your Honor.

4           THE COURT:  But you couldn't hear her?

5           MS. SERAFYN:  Can you hear me, Dr. Prentky?

6           THE WITNESS:  I didn't hear the question.

7           MS. SERAFYN:  Can you hear me now?

8           THE COURT:  Can you hear me?

9           THE WITNESS:  Yes.

10          MS. SERAFYN:  Dr. Prentky, this is Jennifer Serafyn.

11     Can you hear me?

12          THE WITNESS:  Yes, I can.

13          THE COURT:  I'm thinking that there is a time delay.

14          MS. SERAFYN:  It seems like there might be a little, a

15     slight one.

16     Q.   Dr. Prentky, you didn't actually diagnose Mr. Carta with

17     any mental illness, abnormality, or disorder, correct?

18     A.   Correct.

19     Q.   And in your report you said that antisocial personality

20     disorder is a defensible diagnosis, but you didn't make that

21     diagnosis here because it's not germane; is that right?

22     A.   That's correct.

23     Q.   Okay.  And in fact you didn't make any diagnosis that you

24     felt was not germane to this case?

25     A.   That's correct.

ad5871a2-e59a-4fa0-9904-a7d863b685cd

Page 6

1   Q.   And you're familiar with Section 4247 and Section 4248,

2   right?

3   A.   Yes.

4   Q.   Okay.  And in fact you cite both of those statutory

5   sections in your report?

6   A.   Yes.

7   Q.   And neither of those sections provides that an evaluator

8   should make only those diagnoses that he or she feels are

9   germane, do they?

10  A.   Well, the language of the statute obviously doesn't use

11  the word "germane."  In fact, the most important key points

12  from the statute are not defined, so they're obviously left up

13  to us to interpret.  Since the DSM is routinely used in these

14  cases, we are compelled to use that particular classification

15  system for rendering diagnoses, so we are limited to the

16  diagnostic categories that are provided in the DSM.  So when I

17  say "germane," I'm talking about what is available in the DSM.

18  Q.   But there isn't anything in the statute that says that an

19  evaluator should only make those diagnoses that he or she feels

20  are germane or relevant to the case?  The statutes don't limit

21  it in that way, do they?

22  A.   Well, I mean, I wouldn't want to make a diagnosis for the

23  Court that was not germane or not relevant.  The key issue here

24  is that whatever this mental abnormality is, it results in

25  something else happening, it results in some behavior.  The

United States v. Todd Carta - Bench Trial Day 7

ad5871a2-e59a-4fa0-9904-a7d863b685cd

1   statute uses the words "results in, leads to."  That's the way

2   I interpret it.  So when I talk about germane, it seems to me

3   that whatever this mental abnormality is, it must lead to or

4   result in the behavior that is of concern to the Court.

5   Q.   Okay.  Well, Dr. Prentky, you noted Mr. Carta's extensive

6   substance abuse history in your report, but you didn't actually

7   diagnose him with any substance abuse, did you?

8   A.   I could have fully diagnosed Mr. Carta.  I undoubtedly

9   could have diagnosed him with ADD, antisocial personality

10  disorder in Axis II.  I might have been able to diagnose him

11  with a substance abuse disorder in Axis I.  But as I noted in

12  the report, it only would have been germane if I thought that

13  as a result of his substance abuse or as a result of his long

14  history of antisocial behavior, it would result in or lead to

15  the unwanted sexual behavior battery offenses against children.

16  That, to me, would have been germane.

17  Q.   Well, substance use or abuse can act as a disinhibitor;

18  isn't that right?

19  A.   Well, it certainly has acted as a disinhibitor for his

20  antisocial behavior, but there's no indication ever that it has

21  led to his committing a sex offense.

22  Q.   Well, in fact, many of Mr. Carta's teenage boy victims

23  were actually on some kind of drugs when Mr. Carta sexually

24  molested them; isn't that right?

25  A.   All by his self-report, Counsel.  All of this information

United States v. Todd Carta - Bench Trial Day 7

1   comes by his self-report.

2   Q.   And Mr. Carta actually gave drugs and alcohol to some of

3   his child victims; isn't that right?

4   A.   Once again, according to his self-report and according to,

5   as I recall, Fred's brother reported that he had used both

6   alcohol and marijuana, as I recall.

7   Q.   So you didn't diagnose Mr. Carta with any substance abuse,

8   but you do acknowledge that he has a lengthy history of

9   substance abuse, correct?

10   A.   Absolutely.

11   Q.   And in fact he started drinking alcohol at age sixteen?

12   A.   Correct.

13   Q.   And he started smoking marijuana and using LSD at age

14   eighteen?

15   A.   That's correct.

16   Q.   And he actually smoked marijuana continuously from the age

17   of seventeen to the age of forty-one, right before he went to

18   prison; isn't that right?

19   A.   I don't think there's any question about his track record

20   of substance use and a track record of antisocial behavior.

21   The issue really is whether it is a statutorily relevant

22   diagnosis, whether I could say that because of his long history

23   of substance abuse and his long history of antisocial behavior,

24   it will result in or lead to an outcome of a sexual assault on

25   a child; and clearly there's no evidence for that other than

1    perhaps by his self-report, but beyond what he's reported,

2    there's no behavioral evidence at all for it.

3    Q.   And, Dr. Prentky, do you have all of the Bates-stamped

4    discovery there with you?

5    A.   Yes, I believe so.

6    Q.   Okay.  And I just want to draw your attention to Page 941

7    of those Bates-stamped documents.  This has actually been

8    marked as Exhibit 25 in this case, and it comes from the

9    psychosexual evaluation from the sex offender treatment

10   program.  Do you have Page 941, Dr. Prentky?

11   A.   Substance Abuse History?

12   Q.   That's right.  And in the second paragraph under Substance

13   Abuse History, it says, "With the exception of a couple of

14   years, he acknowledges that he smoked continuously from

15   seventeen to forty-one," and this is referring to marijuana,

16   "with his heaviest use being daily from his thirties to the

17   time of his incarceration.  He estimates using 2 ounces of

18   marijuana per week during this time.  He noticed that when he

19   quit smoking marijuana, he was more irritable."

20        Did I read that correctly, Dr. Prentky?

21   A.   Yes.  I have it in front of me.

22   Q.   So Mr. Carta acknowledged actually having legal problems

23   as a result of his marijuana use, correct?

24   A.   Yes, absolutely.

25   Q.   And in fact Mr. Carta acknowledged -- well, in fact the

1    records show that Mr. Carta was arrested for possession of

2    marijuana at least three times?

3         (Witness examining documents.)

4    Q.   Dr. Prentky, did Mr. Carta --

5    A.   I'm sorry.  Are you asking me a question?

6    Q.   I am asking you a question, Dr. Prentky.  Was Mr. Carta

7    arrested for possession of marijuana at least three times?

8    A.   Yes.  Let's see.  He was arrested at age eighteen, he was

9    arrested at age nineteen, he was arrested at age twenty-nine,

10   and he was arrested at age forty, it looks like.

11   Q.   Now, in addition to his marijuana use, Mr. Carta also used

12   LSD; isn't that right?

13   A.   That's correct.

14   Q.   And in fact he had these binge episodes where he would

15   take three to four hits of LSD at a time; isn't that right?

16   A.   That's correct.

17   Q.   And in some instances he took up to fifty hits of acid in

18   a single episode; isn't that right?

19   A.   According to what is disclosed on Page 5 that you're

20   referring to, that's what it says here.

21   Q.   And in addition to the marijuana and the LSD, Mr. Carta

22   also used cocaine, ecstasy, opium, and crystal meth; isn't that

23   right?

24   A.   Uhm. . .

25        (Witness examining document.)

ad5871a2-e59a-4fa0-9904-a7d863b685cd

1   A.   I mean, I don't see that here on Page 5, Counsel, but I

2   assume, if you're reading it, it's correct that he disclosed

3   that.

4   Q.   Okay.  Well, on the bottom of Page 5, Bates stamped 941

5   continuing to 942, it says, "Mr. Carta reports that he has also

6   experimented with a variety of other drugs a few times.  These

7   include cocaine, ecstasy, opium, and crystal meth amphetamine."

8        So, Dr. Prentky, again, you acknowledge that drug use can

9   be a disinhibitor for Mr. Carta; isn't that right?

10  A.   Drug use serves a lot of different purposes for different

11  people.  Drug use numbs emotions.  Drug use disinhibits

12  antisocial behavior.  Drug use is often used to help cope with

13  adverse emotions.  It does a wide range of different things.

14  But the key is whether because of drug use he has serious

15  difficulty refraining from sexually violent conduct, and in all

16  those many, many years since the age of eighteen through the

17  age of forty when he's been charged with drug use, he was not

18  also charged, ever charged with a sexual offense.  So for

19  twenty-four years he reports using drugs.  For twenty-four

20  years he's charged with a whole range of different non-sexual

21  crimes, but he's never charged with a sexual offense.

22  Q.   Well, Dr. Prentky, Mr. Carta --

23  A.   So how can I say that it's leading to a sexual offense?

24  Q.   Well, Dr. Prentky, Mr. Carta was never charged with a

25  sexual offense during those twenty-four years, but we know from

United States v. Todd Carta - Bench Trial Day 7

1  his self-report that he was molesting children during those

2  twenty-four years; isn't that right?

3  A.   We know only by his self-report, Counsel.  It seems to be

4  rather remarkable that he's charged repeatedly, repeatedly for

5  a wide range of criminal conduct.  It's not as though this man

6  is unknown to the criminal justice system.  He's in and out of

7  the courts facing a wide range of different charges over

8  twenty-four years, and yet he was never charged or arrested for

9  a sexual offense involving a child.  So all we know is what

10 he's reporting.

11 Q.   So, Dr. Prentky, are you saying that you don't credit

12 Mr. Carta's self-report about the children that he sexually

13 molested?

14 A.   What I'm saying, Counsel, is that this whole issue of

15 self-report takes center stage for me in this particular case

16 because were it not for his self-report, I am not of the

17 opinion that he ever would have been petitioned for civil

18 commitment based solely on transportation of child pornography

19 and criminal forfeiture.

20 Q.   Now, Dr. Prentky, you did a risk assessment --

21 A.   So the entire case for me -- I'm sorry, if I can make one

22 last statement.  The entire case for me rests on our belief in

23 a wide range of different disclosures he has made about victims

24 of varying ages.  These disclosures have been made in widely

25 different contexts, in different situations, to different

United States v. Todd Carta - Bench Trial Day 7

ad5871a2-e59a-4fa0-9904-a7d863b685cd

Page 13

1   people.  And the determination of the second prong, mental

2   abnormality, as well as risk hinges on self-report; and the

3   self-report, in my reading of the discovery, is highly

4   variable.  So that the government can choose whatever

5   self-report shores up or supports its case; Mr. Carta can use

6   whatever self-report he chooses to support his case, and we end

7   up with this conundrum of, what self-report do we believe?

8   That, to me, is really critical in this case.  We're dealing

9   with highly unreliable, in my opinion, unreliable evidence.

10          THE COURT:  Well, is it likely that it's unreliable

11  what he self-reported?  In other words, do you doubt --

12          THE WITNESS:  The unreliability --

13          THE COURT:  Why would he report --

14          THE WITNESS:  The unreliability, your Honor --

15          THE COURT:  Go ahead.

16          THE WITNESS:  Your Honor, the unreliability goes to

17  the question, in my opinion, of consistency.  The question is

18  not, do I believe what he said to me any more or less than I

19  believe what he said when he was at Butner?  The issue is that

20  he's reported a wide range of things, and what is actually

21  true, nobody knows.  We don't know exactly how many teenage

22  boys he was sexual with.  We don't know actually what their

23  ages were.  We don't know actually what he did with them or how

24  long he spent with them.  It's all by his disclosure, and his

25  disclosures are different.  I thought it rather remarkable that

United States v. Todd Carta - Bench Trial Day 7

ad5871a2-e59a-4fa0-9904-a7d863b685cd

1    if you look at the psychosexual evaluation that was done when

2    he went down to Butner, you get a completely different flavor

3    of who this man is than when you read the PS -- the history

4    questionnaire that he filled out for Dr. Hernandez at Butner.

5    What do we believe?  When you look at the psychosexual, he

6    clearly looks like a man who is primarily interested in

7    adolescents in the age range of fifteen to twenty or

8    twenty-five, in the fifteen- to twenty-year-old age range; but

9    when he enters into the program at Butner and he fills out this

10   questionnaire for Dr. Hernandez, he reports all manner of other

11   things.  What is it that we rely on?  What is it that we

12   believe?  That's what I mean that his self-report as evidence

13   in this case is unreliable.  And if I might say so, your Honor,

14   this is the issue why self-report is never used for determining

15   criminal history when assessing risk.  You know, the coding --

16           THE COURT:  Excuse me, sir.

17           THE WITNESS:  -- rules of the Static-99 are very

18   clear.  I'm sorry, your Honor?

19           THE COURT:  No, I'm just wanting to make sure we

20   finish this morning, and it's a little harder to read each

21   other's body language over this distance, so I'm just hoping

22   you'll finish up this sentence and we'll get another question

23   asked.

24           THE WITNESS:  All right, I'm done, your Honor.  If

25   I've answered your question, I'm done.

United States v. Todd Carta - Bench Trial Day 7

1          THE COURT:  Yes.

2   Q.   Now, Dr. Prentky, you performed a risk assessment in this

3   case, correct?

4   A.   Yes.

5   Q.   And as part of that risk assessment, you scored the

6   Static-99?  Is that right?

7   A.   Yes.

8   Q.   But you scored the Static-99, even though you actually had

9   an issue regarding whether you could score the instrument?

10  A.   That's correct.

11  Q.   And your issue was that the Static-99 is not recommended

12  for offenders with only a Category B offense, right?

13  A.   That's correct.

14  Q.   And a Category B offense includes sexual behavior that is

15  illegal, but the parties are consenting or there's no specific

16  victim, correct?

17  A.   I'm not sure how we define Category B, but Category B

18  happens to include child pornography.

19  Q.   Well, Exhibit 5 in this case is the Static-99 coding

20  rules, and on Page 14 of those coding rules, it says,

21  "Category B offenses include sexual behavior that is illegal

22  but the parties are consenting or no specific victim is

23  involved."

24          Are you familiar with that definition of a Category B

25  offense?

United States v. Todd Carta – Bench Trial Day 7

Page 16

1   A.   Counsel, whatever it says, the most important thing is

2   that child pornography is listed as a Category B offense.   I

3   don't have to make any further interpretations because it lists

4   child pornography.

5   Q.   Well, you were unclear as to whether Mr. Carta's risk of

6   injury conviction could be counted as a sexual offense,

7   correct?

8   A.   That's, again, a technical issue with coding rules for the

9   Static-99 because only Mr. Carta, once again, self-reports that

10  he pled out to risk of injury.

11  Q.   Right.  And, Dr. Prentky, you're aware that the risk of

12  injury charge to which Mr. Carta pled guilty actually started

13  as a sex offense; isn't that right?

14  A.   By Mr. Carta's report, we understand that.

15  Q.   And the risk of injury conviction came about because

16  Mr. Carta performed fellatio on Fred's fifteen-year-old

17  brother; isn't that right?

18  A.   You mean the offense that was pled out to risk of injury?

19  Q.   Correct.

20  A.   Is that what you're asking me?

21  Q.   Yes.

22  A.   Yes.  And, of course, Mr. Carta later denied -- I believe

23  he denied that he was sexual with Fred's brother.

24  Q.   Well, Dr. Prentky --

25  A.   I believe that --

United States v. Todd Carta - Bench Trial Day 7

ad5871a2-e59a-4fa0-9904-a7d863b685cd

Page 17

1  Q.   Dr. Prentky, Mr. Carta was sanctioned for this risk of

2  injury conviction; isn't that right?

3  A.   Yes.

4  Q.   Okay.  And part of the sanction included probation,

5  correct?

6  A.   He received seven years in jail suspended with five years

7  probation.

8  Q.   And one of the conditions of that probation was that

9  Mr. Carta must participate in sex offender treatment; isn't

10  that right?

11  A.   That is correct.

12  Q.   And that was as a result of the risk of injury conviction,

13  correct?

14  A.   That's correct.

15  Q.   Now, you're aware, Dr. Prentky, that other psychologists

16  scored Mr. Carta on the Static-99, right?

17  A.   Yes, that's correct.

18  Q.   And in fact as part of Mr. Carta's discharge report from

19  the sex offender treatment program at Butner -- that's the

20  program that he voluntarily dropped out of -- Mr. Carta was

21  scored on the Static-99; isn't that right?

22  A.   That's correct.

23  Q.   And in fact the discharge report offers a justification

24  for scoring the risk of injury conviction as a sex offense on

25  the Static-99.  Do you remember reading that?

ad5871a2-e59a-4fa0-9904-a7d863b685cd

Page 18

1        (Witness examining document.)

2    A.    I'm sorry, Counsel.  I didn't hear.  You said --

3    Q.    I said that --

4    A.    -- justified scoring risk of injury --

5    Q.    Right, the discharge report from the sex offender

6    treatment program at Butner explains why the Static-99 could be

7    scored on Mr. Carta.  Do you remember that?

8    A.    Yes.

9    Q.    And, Dr. Prentky, I want to draw your attention to that

10   discharge report.  It was marked as Exhibit 27, specifically

11   Bates stamp 957.  Do you have that page in front of you,

12   Dr. Prentky?

13   A.    Yes, I do.

14   Q.    And the last paragraph there says "Assessment of Risk,"

15   and I'm just going to start reading the third sentence.  It

16   says, "The fifteen-year-old male reported to police that

17   Mr. Carta performed fellatio on him.  During the SOTP

18   evaluation, Mr. Carta acknowledged that he was originally

19   charged for sexually abusing the minor, which was dropped in

20   exchange for his guilty plea to the risk of injury charge.

21   Additionally, Mr. Carta admitted that he engaged in sexual

22   contact with this victim.  Therefore, there is credible

23   documentation to suggest that Mr. Carta has committed and been

24   officially sanctioned for a hands-on sexual offense warranting

25   the use of the Static-99."  Did I read that correctly,

ad5871a2-e59a-4fa0-9904-a7d863b685cd

1    Dr. Prentky?

2    A.    Yes, you read it correctly.

3    Q.    Now, you read Dr. Bard's report in this case, right?

4          (Witness examining document.)

5    Q.    Dr. Prentky, did you read Dr. Bard's report in this case?

6    A.    Yes.  Yes, I said "yes."

7    Q.    Sorry, I didn't hear you.  And he scored the Static-99;

8    isn't that right?

9    A.    I have Dr. Bard's report in front of me here, and it

10   appears that he completed the Static-99 along with the RRASOR

11   and MnSOST-R.

12   Q.    And you read Dr. Phenix's report in this case, correct?

13   A.    Correct.

14   Q.    And Dr. Phenix is actually one of the authors of the

15   coding manual on the Static-99; isn't that right?

16   A.    That's correct.

17   Q.    And Dr. Phenix scored Mr. Carta on the Static-99, correct?

18   A.    That's correct.

19   Q.    Now, Dr. Prentky, did you consult with anyone about

20   whether you could score the Static-99 in this case based on

21   that risk of injury charge?

22   A.    I occasionally consult with Karl Hanson about specific

23   questions that I have with regard to his coding rules.

24   Q.    And did you consult with Dr. Hanson in this case about the

25   risk of injury charge and whether it was a Category B or

ad5871a2-e59a-4fa0-9904-a7d863b685cd

Page 20

1   Category A offense?

2   A.   I generally ask him about broader issues than a specific

3   coding rule.  I don't recall.  I corresponded with him, I

4   believe, in the last six months.  I don't recall what the last

5   e-mail interchange concerned.

6   Q.   Now, even though you weren't sure whether you could score

7   Mr. Carta on the Static-99, you scored it anyway; isn't that

8   right?

9   A.   I scored it -- I attempted to score it in part because, as

10  you pointed out, the other examiners had used it, despite the

11  fact that I'm somewhat leery as to its appropriateness in this

12  case.

13  Q.   And when you scored Mr. Carta on the Static-99, he got a

14  score of 6; isn't that right?

15  A.   Yes.  I gave him a score of 6.  Apparently Dr. Bard gave

16  him a score of 5.

17  Q.   And the average score on the Static-99 is 2; isn't that

18  right?

19          THE COURT:  The average of what?

20          MS. SERAFYN:  The average score that offenders get on

21  the instrument is a 2.

22          MR. GOLD:  That's not the whole story, but. . .

23  Q.   Dr. Prentky, isn't the average score on the Static-99 a 2?

24  A.   The average score when the Static-99 is completed on

25  general population of offenders, general population of sex

United States v. Todd Carta - Bench Trial Day 7

ad5871a2-e59a-4fa0-9904-a7d863b685cd

1   offenders, that's the average score.

2   Q.   And a score of 6 on the --

3   A.   These are obviously --

4   Q.   I'm sorry?

5   A.   These are obviously not people who have been petitioned

6   for civil commitment.

7   Q.   A score of 6 on the Static-99 places Mr. Carta in the

8   high-risk category; isn't that right?

9   A.   According to that arbitrary label that's given to that

10  cutoff score on the Static-99.

11          THE COURT:  What's the highest it goes again?

12          MR. GOLD:  It goes to 12.

13          THE WITNESS:  12.

14          THE COURT:  12?  So what the 6 is, how many people

15  within that cohort will reoffend?  Do you remember the

16  percentage?  Is that the twelve to twenty?

17          THE WITNESS:  I can tell you, your Honor, we'd have to

18  look at the new norms, which I have here.

19          (Witness examining document.)

20          THE WITNESS:  There are two obviously -- there are a

21  number of different normative samples that are now used.  The

22  (Inaudible) third of the Canada sample, which is the low-risk

23  sample, the recidivism rate is 10.4 percent over five years and

24  13.2 percent over ten years, but as I said, that's their

25  low-risk sample.  And then. . .

Page 22

1          (Witness examining document.)

2          THE WITNESS:  The complete sample, the recidivism rate

3    is 21.3 percent over five years and 29.6 percent over ten

4    years.

5    Q.   So, Dr. Prentky, even though Mr. Carta scored in the

6    high-risk category on the Static-99, you don't think he'll have

7    serious difficulty in refraining from sexually violent conduct

8    if released; is that right?

9    A.   I think I made fairly clear, Counsel, that if you look at

10   his long history, criminal behavior, there is reason to

11   conclude that he will have serious difficulty refraining from

12   nonsexual criminal conduct.  Based on his long history, that's

13   a reasonable conclusion.  But if you ask me whether he will

14   have difficulty refraining from engaging in sexually abusive

15   conduct involving a child, I would have to categorically

16   conclude that the answer is "no," given that there's no

17   behavioral evidence for it.  The only evidence we have is what

18   he has reported.  He has never been charged or sanctioned for

19   any battery offense involving a child.  So to conclude that he

20   is at high risk to refrain from engaging in a behavior that

21   he's never been charged or sanctioned for would be very

22   difficult for me.  It would be based solely on his self-report.

23   Q.   Dr. Prentky, you would agree, though, that the Static-99

24   assesses an individual's risk of sexual recidivism, right?

25   A.   Yes.  What you see with the Static-99, I think it's very,

United States v. Todd Carta - Bench Trial Day 7

1  very clear, if you look at the way that Mr. Carta acquires his

2  sixth point, it's primarily from those items that reflect his

3  long history of antisocial behavior.  He would be coded much

4  more like a rapist than a child molester for all of the

5  criminal behavior involving non-sexual violence.

6  Q.   Well, Dr. Prentky, you didn't include a copy of your

7  Static-99 coding sheet in your report, did you?

8  A.   I believe that I only included the SVR-20 in my report.

9  Q.   Now, Dr. Prentky, are you familiar with the Static-99R or

10  the Static-99 Revised?

11  A.   Yes.

12  Q.   Okay.  And the Static-99R is different from the Static-99;

13  isn't that right?

14  A.   The Static-99R differs from the Static-99 only in one

15  material respect, and that is the age variable.  Other than

16  that, the other nine variables are identical, with the

17  exception of some tweaking of language to make some of the

18  items clearer; but, as I said, the only substantive change is

19  the age variable.  And then of course the introduction of all

20  of these new norms --

21  Q.   So the --

22  A.   -- Static-99R.

23  Q.   Okay.  So the Static-99R is different from the Static-99,

24  correct?

25  A.   Only in the respect that I mentioned.

United States v. Todd Carta – Bench Trial Day 7

1   Q.    Okay.  And there's actually --

2   A.    There's one item that has been changed.

3   Q.    And there's actually a different score sheet for the

4   Static-99R; isn't that right?

5   A.    Honestly, there doesn't have to be another score sheet

6   because as long as you know how to score the age variable, the

7   other items are the same.

8   Q.    Well, on the Static-99 Revised score sheet, it breaks out

9   age into many more different categories than the original

10  Static-99 score sheet did; isn't that correct?

11  A.    That's what I just said, Counsel.  If you know how to

12  score the eighth variable, the other items are the same.

13  Q.    And you didn't score the Static-99R in this case, did you?

14  A.    Given his age, the Static-99R -- that is, the adjusted for

15  being younger -- would not have been given risk benefit.  In

16  other words, it wouldn't have increased risk because of his

17  age.  He's fifty years old.

18  Q.    But you didn't score the Static-99R in this case, right?

19  You scored the original Static-99?

20  A.    Counsel, what I said is that he would receive the lowest

21  score on that age variable by virtue of his age.  He's fifty

22  years old.  So materially it makes no difference.  It makes a

23  big difference if you're using the Static-99 on a young

24  offender.  On a young offender, say someone who's twenty years

25  old, they get three points as opposed to one point in the

Page 25

1    original Static-99.

2    Q.   Dr. Prentky, I'm just --

3    A.   If Mr. Carta was twenty years old, then I would have been

4    remiss in not using it.  At the age of fifty, it really doesn't

5    matter.

6    Q.   I'm just asking you, Dr. Prentky, which instrument did you

7    score in this case?  Your report says that you scored the

8    Static-99.

9         MR. GOLD:  That's been asked and answered, your Honor.

10   He said --

11   A.   That's correct.

12        THE COURT:  Yes, I think this format is so difficult.

13   I think we need to just sort of -- how much longer do you think

14   you have?

15        MS. SERAFYN:  Sorry, your Honor.  I didn't think I had

16   an answer to that question.  He's telling me about the age

17   score, and I'm just asking him whether or not he scored the

18   Static-99R.

19        THE COURT:  Oh, the R.

20        MR. GOLD:  It's clear from his report that --

21        THE COURT:  I don't know if it's clear.  I'm trying to

22   finish this.  How much longer do you think you have?

23        MS. SERAFYN:  Twenty to thirty minutes?

24        THE COURT:  Fine, all right.

25   A.   Counsel, I scored the Static-99 as it says in my report;

ad5871a2-e59a-4fa0-9904-a7d863b685cd

1   and, as I just said, given his age, it wouldn't have made any

2   difference.  The bottom line is the same.

3   Q.   Okay.  Dr. Prentky, you're familiar with the Association

4   for the Treatment of Sexual Abusers, correct?

5   A.   Yes.

6   Q.   Okay.  And this is also known as ATSA, right, A-T-S-A?

7   A.   Correct.

8   Q.   And ATSA has an annual conference, correct?

9   A.   Yes.

10   Q.   And are you now a member of ATSA?

11   A.   I believe I'm still a member.  I'm not sure.

12   Q.   Now, at this annual ATSA conference, new research is

13   typically presented; isn't that right?

14   A.   Counsel, I have not been to an ATSA conference in well

15   over a decade, but I would imagine that that's the case.

16   Q.   Okay.  Well, there are typically sort of prominent

17   researchers in the field that present at the ATSA conference;

18   isn't that right?

19   A.   As I said, Counsel, I have not been in a long time, so I

20   don't know who it is that presents at ATSA or the quality of

21   the presentations.

22   Q.   Well, have you ever presented at an ATSA conference?

23   A.   A long time ago, yes.

24   Q.   And people like Karl Hanson, David Thornton and Amy

25   Phenix, they've presented at ATSA conferences; isn't that

United States v. Todd Carta - Bench Trial Day 7

1    right?

2    A.    That's correct.

3    Q.    So you didn't attend the ATSA conference in the fall of

4    2009, did you?

5    A.    I did not.

6    Q.    Okay.  And were you aware that at that conference in 2009,

7    there was a presentation about the Static-99R?

8    A.    It certainly would not surprise me.

9    Q.    Okay.  And were you aware that at that conference in the

10   fall of 2009, Karl Hanson, Leslie Helmus, and Amy Phenix

11   presented the Static-99R and said that it should replace the

12   Static-99?

13   A.    I have had subsequent communications with Karl Hanson, and

14   he has recommended to me the use of the Static-99R in

15   combination with the Static-2002R.

16   Q.    Okay.  And now the Static-99 has these new norms, and

17   there's also these sort of samples that are associated with the

18   Static-99R; isn't that right?

19   A.    That's correct.

20   Q.    And have you ever scored the Static-99R as part of a risk

21   assessment?

22   A.    Counsel, I think that I have tried to answer this question

23   several times.  Of course I've scored the age variable.  I've

24   always scored the new age variable on the Static-99R when it

25   weighs in the direction of risk regarding a client that I'm

United States v. Todd Carta - Bench Trial Day 7

ad5871a2-e59a-4fa0-9904-a7d863b685cd

1  scoring.  If it doesn't, it makes no difference because the

2  other items are the same.  The only key item is age.  When you

3  have someone of Mr. Carta's age, it doesn't matter.  The weight

4  that is risk-relevant is inversely related to age, so that the

5  younger the offender, the higher the risk and the higher the

6  weight attributed to that coding for that particular item.

7  Q.   So it sounds to me like you're saying you view the

8  Static-99 and the Static-99R as interchangeable.

9  A.   With the exception of the age variable, they are

10 interchangeable.

11 Q.   So even though the developers of the Static-99R have said

12 that the Static-99 should not be used anymore, you continue to

13 use it where the age variable isn't affected; is that fair?

14 A.   Counsel, you're trying to sort of trap me into a silly box

15 here.  I'm saying that I have a very clear and full

16 understanding of the differences of all of these different

17 scales.  I understand what is risk-relevant.  I understand that

18 the intent at this point is to take into consideration a more

19 differentiated weighting with respect to age as it becomes

20 risk-relevant.  What I've said to you -- and it is really not

21 material for Mr. Carta at all -- is that I do score the new age

22 item routinely --

23 Q.   Did you say that in your report here, Dr. Prentky --

24 A.   -- Static-99, most of the people that I scored the

25 Static-99 on tend to be older.  I can recall only one instance

1    in which I scored at age variable and coded someone a 3 because

2    of their youth.  With Mr. Carta's age, as I said three or four

3    times already, it makes no difference.  With respect to the

4    other nine items, the only difference with all of those nine

5    items is some slight tweaking of language, but the way those

6    items are coded remains the same.

7    Q.    But the norms are different; isn't that right?

8    A.    And I always use the new norms.  I usually use the high

9    risk, when I'm doing a civil commitment evaluation, I use the

10   norms for what Karl Hanson referred to as this high-risk group

11   or high-risk sample.

12   Q.    And, Dr. Prentky, both Dr. Bard and Dr. Phenix score the

13   Static-99R; isn't that right?

14         (Witness examining document.)

15   A.    I have Dr. Bard's report here.  He says that according to

16   the Static-99, a score of 5 suggests -- he doesn't say

17   Static-99R, so I don't know whether he used the Static-99R that

18   is the age variable or not, but he says that he used the

19   Static-99.

20   Q.    Okay.  Well, on Page 12 at the bottom, his report says,

21   "Alternatively, if one was to use the Static-99R, which

22   accounts for more recent age-related research, Mr. Carta would

23   receive a score of 4."  Do you see that?

24         MR. GOLD:  We should make the record clear as to which

25   report, the date of the report that Dr. Prentky is referring

ad5871a2-e59a-4fa0-9904-a7d863b685cd

Page 30

1    to, or counsel.

2          THE WITNESS:  I'm looking at a report dated July 8,

3    2008.  I have three reports here from Dr. Bard, and all three

4    of them are dated July 8, 2008.

5    Q.   Dr. Prentky, do you know if you read Dr. Bard's

6    November 3, 2010 report?

7    A.   I'm not certain if I did because, as I said, I'm holding

8    three copies of his report, and they all have the same date,

9    July 8, 2008.

10   Q.   Are you familiar with the Static --

11   A.   I --

12   Q.   That's fine, Dr. Prentky.

13   A.   I'm sorry, am I familiar with what?

14   Q.   Are you familiar with the Static-2002?

15   A.   Yes.

16   Q.   And you didn't score the Static-2002 on Mr. Carta, did

17   you?

18   A.   No, I did not.

19   Q.   Now, in addition to the original Static-99, you also

20   scored an instrument called the SVR-20; is that right?

21   A.   That's correct.

22   Q.   And the SVR-20 is not an actuarial instrument, correct?

23   A.   That's correct.

24   Q.   And the SVR-20 forces you to use structured professional

25   judgment, correct?

ad5871a2-e59a-4fa0-9904-a7d863b685cd

1   A.   Correct.

2   Q.   Okay.  And the SVR-20 isn't a particularly widely used

3   instrument for the evaluation of sex offenders, right?

4   A.   You said it's not widely used?

5   Q.   Correct.

6   A.   Is that what your question is?

7   Q.   Yes, for the evaluation of sex offenders.

8   A.   I'm not sure how to answer that question.  I don't know

9   what is widely used.  Obviously the Static and its progeny are

10  the most widely used.  Following that, there are a whole slew

11  of other scales that are occasionally used like the MnSOST-R,

12  the SORAG, the SVR-20.

13  Q.   And Dr. Phenix didn't score the SVR-20 in this case,

14  right?

15  A.   You said she did not?

16  Q.   She did not.

17  A.   No.

18  Q.   And Dr. Bard didn't score the SVR-20 either, correct?

19  A.   Both of them more particularly score the MnSOST-R.

20  Q.   And, to your knowledge, has the SVR-20 ever been scored in

21  an Adam Walsh sex offender case?

22  A.   I am not really sure, Counsel.  I don't know how to

23  respond to that question.  I don't know the answer to that.

24  Q.   Now, you included a copy of your SVR-20 score sheet in

25  your report, correct?

ad5871a2-e59a-4fa0-9904-a7d863b685cd

Page 32

1    A.    Yes.

2    Q.    And you didn't include a score sheet from the Static-99,

3    even though you scored that instrument and got a score of 6,

4    right?

5    A.    Yeah, I didn't include the score sheet for the Static-99

6    because my score was the same as the score of Dr. Phenix.

7    Q.    And it's fair to say that you relied on Mr. Carta's SVR-20

8    score in forming your ultimate opinion in this case, and you

9    disregarded the Static-99 score?

10   A.    No, I wouldn't say that I disregarded it.  I indicated at

11   the outset that I am somewhat cautious in the use of the

12   Static-99.  I think I made that clear.  I think both of these

13   structured estimates of risk reflect more or less the same

14   thing, and that is Mr. Carta's lengthy history of antisocial

15   behaviors.  If you look at the SVR-20, you find something

16   similar to what you find on the Static-99, that he has a

17   criminogenic life-style.  And that's reflected on the Scale 1,

18   Psychosocial Adjustment, where I've given him a score of 9 out

19   of 22.  And I believe -- let me see.

20            (Witness examining document.)

21   A.    I'm sorry.  No, it is much higher than that.  I said, "Not

22   surprisingly, Mr. Carta received a high overall score on

23   (Inaudible) risk factors."  17 out of 22 is much higher than

24   that, and that reflects his nonsexual criminal life-style.  The

25   second group of items, the sex offenses, has seven risk

United States v. Todd Carta - Bench Trial Day 7

1    factors, and he received essentially a score of 1 or 2 out of

2    14.

3         I think that it puts in fairly clear relief where his risk

4    lies, and it does so far more dramatically than the Static-99.

5    I mentioned earlier that I think most of the risk conveyed on

6    the Static-99 is similarly conveyed by his criminogenic

7    life-style.  The difference here is that on the SVR-20, it

8    breaks it out, and it's fairly dramatic, the 17 out of 22 for

9    nonsexual criminal life-style and 1 or 2 out of 14 for sex

10   offenses.

11   Q.   Dr. Prentky, are you aware of research that shows that

12   prior sexual offending is specifically predictive of sexual

13   recidivism?

14   A.   Prior sexually offending, absolutely critical, yes.

15   Q.   And are you aware of research that shows that child

16   pornography offenders who have ever committed a contact sexual

17   offense were the most likely to reoffend?

18   A.   Yes.

19        MS. SERAFYN:  Your Honor, if I could just have a

20   moment.

21        (Discussion off the record between government

22   attorneys.)

23        MS. SERAFYN:  Nothing further, your Honor.

24   REDIRECT EXAMINATION BY MR. GOLD:

25   Q.   Good morning, Dr. Prentky.

ad5871a2-e59a-4fa0-9904-a7d863b685cd

Page 34

1   A.   Good morning.

2   Q.   Dr. Prentky, is there only one way for a forensic

3   psychologist such as yourself to do a risk assessment in a case

4   such as this?

5   A.   Obviously not.  There are a range of approaches.  I'm not

6   sure exactly what you're asking, but the answer is "obviously

7   not."

8   Q.   Well, are Dr. Hanson and his group, Zeus on Mount Olympus,

9   does a forensic psychologist have to do what they say in terms

10  of risk assessment?

11  A.   No, of course not.

12  Q.   How does a forensic psychologist such as yourself go about

13  choosing the tool or the method in which he or she will do a

14  risk assessment?

15  A.   I can share what I do.  I certainly can't impart what

16  should be done or what other people do.  I think what troubles

17  me the most is obfuscation or lack of clarity, and I try my

18  level best to try to proceed in a way that lends integrity to

19  what I share with the court, but also some sense of clarity and

20  some neutrality, some dispassion.  And a lot of what we have

21  been struggling with, it seems to me, misses the large picture

22  here.  The large picture is who Mr. Carta is in terms of his

23  long criminal history.  The large picture is what Mr. Carta can

24  be expected to do in the future based solely on his behavior as

25  opposed to his self-report.  And to get bogged down in what I

1  regard as the sort of minutia of struggling with what of his

2  self-report we invest credibility in and what of his

3  self-report we disregard simply because it doesn't support our

4  argument, I don't believe that that contributes anything to the

5  resolution of this case.  That's the main reason why I struggle

6  with the whole issue of self-report, and I believe it's the

7  main reason why on the Static-99 the coding rules eschew the

8  use of self-report for coding the criminal history variables.

9  As I mentioned before, it all goes to reliability.  Consistency

10  is the whole mark of reliability.  If we're all using different

11  pools of evidence to arrive at our conclusion, then obviously

12  that lends to a high degree of unreliability.

13          THE COURT:  Well, was he consistent --

14  A.  So --

15          THE COURT:  Let me just ask you.  That's a good point,

16  consistency here.  There were inconsistent points, but there

17  were some consistent ones.  So do you credit the fact that he

18  had multiple sexual encounters with more than one

19  thirteen-year-old?

20          THE WITNESS:  I credit it as much, your Honor, as all

21  the rest of his self-report that he --

22          THE COURT:  Well, but I'm just holding you to what you

23  said, which is the consistency.  There were some things he was

24  inconsistent on, like what age group he was attracted to and

25  the like; but on one thing he seemed to be pretty consistent

ad5871a2-e59a-4fa0-9904-a7d863b685cd

1  with, both to you and down in Butner and here at trial, that he

2  did have multiple sexual encounters with thirteen-year-olds.

3        THE WITNESS:  Yes.  Yes, your Honor, and I indicate

4  that in my report, that I think the most reasonable conclusion

5  at this point is that he was sexual with three

6  thirteen-year-olds.  I think that the weight of evidence seems

7  to be converging on that conclusion.

8        THE COURT:  And so what you're saying is, what may not

9  be so clear is whether he continues to have that attraction

10  because he's been inconsistent across time with where his

11  primary focus is?

12        THE WITNESS:  Yes, trying to draw a defensible

13  conclusion is -- see, this impacts in two respects:  One,

14  obviously, is the mental abnormality, whether he qualifies for

15  a hebephilia diagnosis; and the other is the risk that he

16  poses.  And this ambiguity impacts both of those dimensions or

17  elements.  With respect to hebephilia, I concluded that, again,

18  although I agree that there seem to be three thirteen-year-olds

19  that he has been sexual with, again, the weight of the

20  self-reported evidence seems to suggest that his preferred

21  preference is for individuals in an age range of roughly

22  fifteen to twenty or fourteen to fifteen and eighteen,

23  nineteen, and twenty, in that ballpark.

24  Q.   Dr. Prentky, can I interrupt you here.

25  A.   Yes.

Page 37

1   Q.   The statement that you just made, what is the diagnostic

2   significance of that statement?  If that is the case, does

3   Mr. Carta in the year 2000 or the year 2010, in your opinion,

4   qualify for a DSM diagnosis or sexual disorder diagnosis?

5   A.   I have stated in my report, and I tried to spell out my

6   rationale for it, that the answer is "no"; that at the very

7   beginning I feel like I took a somewhat more nuanced view of

8   hebephilia as a legitimate diagnosis, and the basis for that

9   position is expounded in my report.  Unfortunately, the

10  legitimacy of the diagnosis in Mr. Carta's case is mired in

11  conflicting self-reports, some of which appears to support the

12  diagnosis and much of which does not.  In truth, I believe, as

13  I mentioned just a moment ago, that his sexual preference, as I

14  stated in the report, seems most likely to fall in the ballpark

15  of fourteen, fifteen to eighteen, nineteen or twenty.  So in

16  translating that to a diagnosis, it becomes somewhat

17  problematic.

18       Historically, if we go all the way back to Krafft-Ebing,

19  and that was something like 85 years ago, Krafft-Ebing would

20  have said "absolutely yes" because the way he defines

21  hebephilia, it went all the way up to age nineteen.  If you

22  look more recently at writings of people like Glueck, and then

23  most recently with Blanchard, 2010, the conclusion would be

24  "no" because the age range is very clearly at the low end of

25  adolescence, from eleven to fourteen.  And in the most recent

ad5871a2-e59a-4fa0-9904-a7d863b685cd

1  Frances and First paper, they too would unequivocally say "no"

2  because being sexually aroused to teenagers, in their opinion,

3  is not deviant.  I believe that they comment that normal men --

4  and they use the word "normal" -- have fantasies and urges in

5  response to pubescent targets.  I believe those were their

6  words.

7       So I guess one could even raise the example of someone

8  like Miley Cyrus who was fourteen years old when she debuted as

9  Hannah Montana.  So being sexual -- and I think again this is

10 the distinction that Michael First makes -- being sexual with

11 Miley Cyrus is a crime but not a mental disorder in their

12 opinion.

13      So it seems as though we end up with these two conflicts,

14 one of which is, which of Mr. Carta's many disclosures do we

15 want to believe?  And the second conflict is, which of all of

16 the different professionals who have espoused opinions about

17 this diagnosis of hebephilia do we want to believe?  So that

18 goes back to my original comment that I tried to take a

19 somewhat more nuanced view of it and say that it was

20 potentially legitimate, but that in this particular case, it's

21 difficult because we do not have a set of codified operational

22 criteria for hebephilia.  The only criteria that we have are

23 from Blanchard, and Blanchard in his most recent article talks

24 about eleven to fourteen.  So if we're talking about a sexual

25 preference for that particular age, Mr. Carta clearly doesn't

Page 39

1    meet it.  I think, again, the weight of evidence, despite these

2    three thirteen-year-olds, the weight of evidence is that his

3    preference is for mid to late adolescent teenagers.

4    Q.   Dr. Prentky, you've testified on, I think, direct

5    examination and also on cross this morning about the antisocial

6    personality diagnosis.  Could Mr. Carta have been diagnosed

7    with antisocial personality disorder at the time of his initial

8    arrest?

9    A.   He clearly met the adult criteria for APD with his crimes

10   beginning -- his arrests beginning at age sixteen for burning

11   and larceny going all the way forward to age forty.  The key

12   obviously is whether he could be legitimately diagnosed with

13   conduct disorder prior to age fifteen; and without going back

14   and taking another look at the record, I believe that he

15   probably could have, in which case an APD diagnosis would

16   probably be diagnosable, but that would be the key issue,

17   whether he could be diagnosed with conduct disorder before

18   fifteen.

19   Q.   So is it your testimony, Dr. Prentky, that you are not

20   affirmatively diagnosing Mr. Carta with antisocial personality

21   disorder but that he would probably qualify for the diagnosis?

22   A.   I tried to address my rationale for not diagnosing him

23   with APD earlier this morning with counsel.  It's very clear

24   that an APD diagnosis is highly problematic for purposes of

25   civil commitment, and Amy Phenix has made that quite clear in

United States v. Todd Carta - Bench Trial Day 7

Page 40

1    her report with Vognsen that APD simply is not adequate, it's

2    not enough to alone justify civil commitment.

3        So there are really two issues here:  One, although he can

4    be diagnosed with APD, or more likely that he could be

5    diagnosed with APD, he is not being civilly committed because

6    of his long history of antisocial behavior.  He's being

7    committed or petitioned for commitment because of a presumptive

8    risk for committing a sex offense.  So that there is reason to

9    believe, certainly from that article by Amy Phenix that

10   justifies and supports my own opinion, that APD alone standing

11   alone is not adequate as a diagnosis.  And in my earlier

12   comments, I suggested that it simply doesn't go to the

13   second/third prong nexus, the language that suggests that

14   whatever this diagnosis is increases the likelihood of an

15   increased risk of an outcome of a sexual crime.

16   Q.    Assuming for the moment, Dr. Prentky, that the diagnosis

17   does apply or did apply, would it apply at the same level that

18   it did ten years ago, if you were to diagnose it today?

19   A.    I guess in my estimation -- and I have not been involved

20   with Mr. Carta as a therapist, but my sense of Mr. Carta,

21   having met with him twice, is that he certainly is a changed

22   individual, that he's not the same person that came to prison

23   eight years ago; that although he has been periodically

24   sanctioned for his various non-sexual criminal offenses, as I

25   mention in my report, this is the first time in his long career

ad5871a2-e59a-4fa0-9904-a7d863b685cd

Page 41

1    that he has endured a long period of incarceration, eight

2    years.  And this is a fairly serious sanction, and, moreover,

3    it's the first time that he's ever been sanctioned for a sexual

4    offense.  I think all of that is significant.  The fact that he

5    is fifty years old now is of significance.  We tend not to take

6    those factors into consideration, but it clearly is part and

7    parcel to everything that we know about the diminution of risk

8    as a function of age.

9    Q.   Is there a phenomenon in the literature which is described

10   as "burnout" when talking about antisocial personality

11   disorder?

12   A.   The burnout has been ascribed to generic criminals.  I

13   think it was initially ascribed to psychopaths, but it clearly

14   speaks to, in a more colloquial way, what I was just saying;

15   that there is a diminution of risk as a function of aging, that

16   risk does diminish as we get older, even among the most serious

17   offenders, including psychopaths.

18   Q.   Dr. Prentky, are you aware that Mr. Carta smoked

19   cigarettes in the past?

20   A.   I don't recall that.

21            THE COURT:  You're referring to burnout?

22            MR. GOLD:  No, your Honor.  I was --

23            THE COURT:  That's just a joke.

24            MR. GOLD:  Oh, I was planning a joke of my own, kind

25   of.

Page 42

1  Q.   If he had, could he have been diagnosed with nicotine

2  dependence?

3  A.   Well, he certainly could have been.

4       THE COURT:  Well, he doesn't know if he was dependent.

5  Q.   Dr. Prentky, you stated in your cross-examination that, in

6  your opinion, psychologists and psychiatrists presumably are

7  compelled to use the DSM in an evaluation such as this?

8  A.   If I used the word "compelled," I'm not sure that that's

9  an accurate word.  I think there's a reasonable expectation

10 that we will draw our diagnoses from the DSM.

11 Q.   A reasonable expectation by whom?

12 A.   By the court.  I think that the DSM conveys the authority

13 that is expected by the court in rendering a diagnosis; that if

14 we simply offer a diagnosis that's not part of well-established

15 taxonomy, then it will reasonably lead to unreliability.

16 Again, we could all propose diagnoses that are virtually at

17 random, we could make up diagnoses, or we could use systems

18 that are unvalidated.  So we're left with the one diagnostic

19 system that is recognized throughout the community of

20 professionals, and that is the DSM, despite the fact that it is

21 not designed to diagnose people like Mr. Carta.  That's why

22 we're struggling with this NOS variation of a new diagnosis

23 called "hebephilia," because for Mr. Carta, he falls between

24 multiple cracks, and there is no diagnostic category for him

25 other than using this wastebasket called "paraphilia NOS."

Page 43

1   Q.   Dr. Prentky, what is your defense for not formally

2   diagnosing Mr. Carta?  How do you defend the fact that you did

3   not formally diagnose Mr. Carta with substance abuse disorders

4   pursuant to the DSM?

5   A.   If I were doing a clinical evaluation of Mr. Carta, if I

6   were doing an intake evaluation of Mr. Carta, I obviously would

7   have diagnosed him with substance abuse.  I would have thought

8   to diagnose him with APD if it seemed appropriate.  I would

9   have diagnosed him with all of the relevant axes.  The reason I

10  did not diagnose him with those entities here is that they

11  simply don't go to the decision ultimately that I must make as

12  to whether there is some diagnosis that will result in or lead

13  to difficulties refraining from sexually violent conduct, and,

14  in my estimation, neither of those diagnoses were acceptable.

15  And I point out that no one that has evaluated Mr. Carta has

16  relied exclusively on diagnoses having to do with substance

17  abuse or antisociality to render a decision that he did or did

18  not comply with the requirements of the statute.  All of the

19  other examiners went to either the plausibility of a hebephilia

20  diagnosis in the case of Dr. Phenix, or the implausibility of

21  that diagnosis in the case of Dr. Bard, because such a

22  diagnosis could be statutorily relevant; it could be the kind

23  of diagnosis that would in fact lead to or result in an outcome

24  of sexually violent conduct.

25  Q.   Dr. Prentky, am I correct that you scored the Static-99 in

United States v. Todd Carta - Bench Trial Day 7

1   your report in a provisional manner?

2   A.   I guess it's reasonable to use the word "provisional."  I

3   was skeptical about the appropriateness of the Static-99, but,

4   as I said earlier, given that the other examiners had in fact

5   scored it, I went ahead and scored it in an "as if" capacity,

6   as if it was appropriate to use in this case using the risk of

7   injury offense as the key offense.

8   Q.   But it was your opinion that the risk of injury offense

9   did not qualify under the rules as a Category A offense?

10   A.   Well, again, Counsel, it's unclear.  When you go to the

11   guidelines, they speak to two issues:  one, the issue of

12   self-report, and, two, the issue of crimes that are pled down.

13   And it seems to me once again that there's some gray area here,

14   there's an area of ambiguity as to whether this particular

15   circumstances surrounding this offense was appropriate to use

16   as the index for governing offense for scoring the Static-99.

17   Whether there was intent, and it seems to me that that's the

18   language from the guidelines, whether it's clear that there was

19   intent to commit a sexual offense, the intent was apparent if

20   you rely on Mr. Carta's self-report.

21   Q.   And do you rely on self-report for coding this item?

22   A.   I personally do not rely on self-report for coding

23   criminal history.  I think that the Static-99 makes it clear

24   that self-report should not be relied upon, or at the very,

25   very least should be used very advisedly for coding the five

United States v. Todd Carta - Bench Trial Day 7

1    criminal history variables.  And I think there's good reason

2    for that that I tried to describe earlier; that I would much

3    prefer official documentation because the result of which is

4    that everyone is relying on the same official documentation.

5    It doesn't mean that the official documentation is highly

6    reliable, but it does mean that everyone is relying on the same

7    evidence.

8    Q.   Dr. Prentky, you testified on cross-examination --

9            THE COURT:  How much longer do you have here?

10           MR. GOLD:  Twenty minutes.

11           THE COURT:  A lot of this is repetitive, so --

12           MR. GOLD:  I need to get it in, your Honor.

13           THE COURT:  Well, if it's repetitive, I'm going to

14   stop because some of it is just going over the same thing we

15   keep going over.

16           MR. GOLD:  Well, I mean, I -- twenty minutes, Judge.

17   I mean, I'm going over points that were made in

18   cross-examination.

19           THE COURT:  I know, but we went through them amply on

20   direct too, so unless it's something new, let's try and move it

21   along.  In other words, we've gone through all of this.  At

22   this point it's repetitive on some points, not on all but on

23   some.

24           MR. GOLD:  Right.  Did you want to -- I'm going to

25   continue?

United States v. Todd Carta - Bench Trial Day 7

Page 46

1    Q.   Dr. Prentky, did you have something else to say on that

2    last answer?

3    A.   I was simply going to comment that there's a reason why

4    all examiners issue the caveat at the very beginning of their

5    evaluation warning the client to be careful what they disclose

6    and to talk about only what's known on the records because the

7    evaluation is not confidential.  Again, the whole intent is to

8    try to restrict the evaluation to that which is in the pool of

9    discoveries, what is known to the criminal justice system.

10   Q.   Dr. Prentky, you testified that the high label was

11   arbitrary.  That was the word you use.  What do you mean when

12   you say that the high label is arbitrary?

13   A.   Simply just that, that there's nothing inherently high

14   about drawing a cutoff line and marking a particular bracket or

15   range of scores as low, moderate, moderately high, high.  You

16   know, it's entirely up to the individual investigator to draw

17   those lines in certain places and to note that perhaps based on

18   a certain life experience, performance experience from your

19   table, that certain scores deserve to be thought of as low,

20   moderate, or high.  In other words, it's not empirically

21   driven; it is arbitrary.  It's up to the investigator to draw

22   those lines.

23   Q.   Dr. Prentky, are you familiar with the past iteration of

24   the Static-99 where scores of 6 or above were reported all the

25   same?

1   A.   Yes.

2   Q.   And are you familiar with the fact that now Static-99

3   scores greater than 6 have their own associated recidivism

4   rates according to the developers?

5   A.   In the new, using the new normative sample?

6   Q.   Yes.

7   A.   Is that what you're referring to?

8   Q.   Yes.

9   A.   Yes.

10  Q.   Does that affect your opinion as to whether the labels of

11  high, medium as you've just stated it are appropriate?

12  A.   I rarely ever use those labels, Counsel.  I don't find

13  that they're helpful because, as I said, because they're

14  arbitrary, which I mean by that they're not empirically

15  derived, I don't find that they're particularly useful.  The

16  bin that somebody falls into is defined by the relative

17  proportion of individuals in that bin who were noted to have

18  reoffended after a certain time period, five or ten, fifteen

19  years.  That to me is about as useful as the life table

20  becomes.  Noting that your client is among individuals who have

21  this particular history, calling that person high, moderate, or

22  low tends not to add much to the mix for me.

23  Q.   Now, Dr. Prentky, you didn't report recidivism percentages

24  for the Static-99 in the report that you drafted.  Why was

25  that?

United States v. Todd Carta - Bench Trial Day 7

Page 48

1          THE COURT:  He's gone through that.  That he has gone

2     through.

3          MR. GOLD:  Well, did he say why he didn't do it?  I

4     think he was impeached on that point, Judge, so I'm just --

5     A.   Sorry.  Are you asking me again that question?

6     Q.   Yes.  Is there a reason why in drafting your report you

7     did not report recidivism percentages at all?

8     A.   Sure.  I mean, it's because I was concerned about the

9     appropriateness of the use of this instrument, the

10    appropriateness of the use of a scale for Mr. Carta.  This is a

11    rather unusual case.  If I were absolutely confident in the

12    appropriateness of the Static-99 score for him, then I would

13    have reported the accompanying -- the bin that he fell into and

14    whatever the tables were, or, rather, whatever the

15    probabilistic estimates were for the different time periods.

16    But it can be very deceiving applying a scale inappropriately

17    to a client because the accuracy of those probabilistic

18    estimates that we derive from those life table is no more

19    accurate than the similarity of your client to the individuals

20    that are in the normative sample from which those probabilistic

21    estimates were derived.

22         So what we have here is an odd case of a man with a long

23    history of antisocial behavior, who at the end of this long

24    career at the age of forty is finally arrested and convicted on

25    a sexual offense; to wit, the risk of injury to a minor.  How

United States v. Todd Carta - Bench Trial Day 7

ad5871a2-e59a-4fa0-9904-a7d863b685cd

Page 49

1  that individual, Mr. Carta, falls into the mix of all of those

2  people that comprise the normative samples for the Static-99 is

3  unclear to me.

4  Q.   The recidivism percentages that you just reported to

5  Ms. Serafyn, what did you consult to get those percentages?

6  A.   Two different life tables reflecting two different

7  normative samples from the revised norms for the Static-99R.

8  Q.   You testified that you use the high-risk group when you do

9  refer to the percentage recidivism rates.  Why is that,

10 Dr. Prentky?

11        MS. SERAFYN:  Objection, your Honor.  It's not what he

12 did here, so I think it's just far, far beyond the scope of his

13 report.

14        MR. GOLD:  Your Honor, I don't understand the

15 objection.  I mean, she asked him extensive questions about it,

16 and he just said that.

17        THE COURT:  Yes, that's overruled, although what he

18 used before and why he didn't score before he's gone through

19 extensively before, and he gives extensive answers now.  So

20 let's just go shorter answers, just succinct to the questions

21 being asked.  We'll never finish.

22        So what's the question again?  And just short answers.

23 Q.   Dr. Prentky, you testified, in using the Static-99, when

24 you do report the results, that you use the high-risk reference

25 group.  Is that right, and what --

United States v. Todd Carta - Bench Trial Day 7

1        THE COURT:  Yes or no.

2   Q.   Yes or no, is that right?

3   A.   Yes, I testified I use the five preselected high-risk

4   samples.

5   Q.   And what is your justification for using those high-risk

6   samples?

7   A.   I want the most conservative estimate possible; and it

8   seems to me that if the person is being petitioned for civil

9   commitment, then that individual properly fits into a sample of

10  individuals that were deemed high-risk.

11  Q.   Does it concern you for this purpose that a large portion

12  of those samples is your Bridgewater sample, the men released

13  from the Bridgewater Treatment Center from the 1960s to the

14  1980s?

15  A.   I'm aware that that's one of the five samples.  I'm not

16  sure what question you're asking me.  Does it concern me that

17  that's one of the samples?

18  Q.   Does that sample, in your opinion, offer accurate risk

19  estimates of risks posed by people currently being released

20  from prison?

21  A.   I'm not sure, Counsel, whether it does or it doesn't; but

22  it behooves me, if I'm going to use the Static-99R or the

23  Static-2002R, to use the life tables that are made available to

24  me by the developer of those scales.  So whether it makes sense

25  to me or not, those are the tables that I have to use.  I have

ad5871a2-e59a-4fa0-9904-a7d863b685cd

1   no other choice.  I'm not sure what -- I mean, obviously, as I

2   mentioned a moment ago, it's absolutely critical that your

3   client match the individuals in the normative groups that are

4   being used to derive these estimates.  That absolutely is

5   essential.  And the more the client departs from the

6   individuals in that normative sample, the more unreliable those

7   estimates are going to be.

8   Q.   You did not use the Static-99R or Static-2002R in this

9   case, right?

10  A.   As I said to Attorney Serafyn, I used the Static-99, which

11  is the Static-99R with the exception of the age variable.  And

12  at his age, that one variable would not confer any further

13  risk, which is why I --

14  Q.   Dr. Prentky, actually, let me --

15  A.   That's why I have the same score as Dr. Phenix.

16  Q.   Dr. Prentky, I just want to ask a couple of questions, and

17  then we're out.  But if you were to learn that in fact a

18  fifty-year-old gets one point less on the Static-99R, would

19  that affect your opinion?

20  A.   A 5 instead of 6?

21  Q.   Correct.

22  A.   My opinion remains, Attorney Gold, that there simply is an

23  absence of evidence of risk related to committing a sexual

24  offense.  It simply isn't there.

25  Q.   Now, Dr. --

United States v. Todd Carta - Bench Trial Day 7

Page 52

1    A.    Ask me a completely different question, I'll answer it,

2    you know --

3    Q.    Dr. Prentky, are you compelled to use the samples that the

4    developers of the instruments direct you to?

5    A.    I believe so.  There are two options:  Either use none, or

6    you use what the developers instruct you to.

7    Q.    Well, Dr. Prentky, did I understand your testimony to be

8    that although Dr. Hanson would like you to use the Static-99R

9    and Static-2002R, you are not compelled to do that because as a

10   forensic psychologist, you choose the method in which you

11   deliver a risk assessment to the court?  Isn't that right?

12   A.    Essentially that's right, Counsel.  I mean, obviously Karl

13   Hanson can't tell me to use the Static-99R.  He was simply

14   recommending that the Static-99R replace the Static-99 and that

15   the 2002R replace the 2002; and he's also suggesting that if

16   you're going to use two instruments, it would make most sense

17   to couple the Static-99R with the 2002R.  That is the extent of

18   his recommendation to me.  That doesn't mean I have to use one

19   or both or either one.  In this particular case, I chose to use

20   the SVR-20 in combination with the Static-99.

21   Q.    And nothing, by the same token, would compel you to use a

22   particular risk sample just because Dr. Hanson told you to?

23   A.    If I use the Static-99R or the Static-2002R and I report

24   probabilistic estimates, then I must use the normative samples

25   that are provided to me by the test developer.  I am not

ad5871a2-e59a-4fa0-9904-a7d863b685cd

Page 53

1    required to report probabilistic estimates.  I can simply
2    report a score.  But then the score alone is not going to
3    convey very much information to the court.  So I suppose I
4    could simply say, this is the score and this is the risk
5    category that the individual has been assigned to by the test
6    developer, or I could report the score and the probabilistic
7    estimates from the life table, or I could do both.
8         That, incidentally, is what we're talking about with
9    respect to an actuarial instrument.  When you're talking about
10   the SVR-20, there are no investigator-prescribed cutoffs, none.
11   There are no life tables, none.  There's simply a score.  It's
12   up to the user to impute significance to the score on an
13   SVR-20.
14   Q.   Dr. Prentky, you were asked to consult your notes on the
15   issue of whether Mr. Carta had told you during the interview he
16   had been sexual with another inmate in the prison.  Did you
17   have the opportunity to do that?
18   A.   Yes, I did take a look, Counsel.
19   Q.   What did you find?
20   A.   And I erred in my report to the Court, and I apologize.  I
21   was undoubtedly confusing Mr. Carta at that moment with one of
22   the other individuals I have reviewed and indeed testified for
23   for the court.
24   Q.   Now, Ms. Serafyn asked you whether you were familiar with
25   research regarding child pornography offenders and hands-on

Page 54

1   offenders.  Do you recall that?

2           THE COURT:  Well, you know, let me just back up.  So,

3   in other words, you did not think he was -- he never told you

4   he was sexual with someone in the prison?

5           MR. GOLD:  That's what he said.

6           THE COURT:  No, he didn't quite actually say that.  He

7   just said he was in error but didn't say how.  What do you now

8   believe based on your notes?

9           THE WITNESS:  It simply wasn't there, your Honor.  I

10  said I apologize that when I was in court on Friday, it was the

11  third trial that I was in that week.  I was tired, and I simply

12  made a mistake.

13          THE COURT:  No, no, that's fine.  Similarly, I've been

14  doing a lot.  I just wanted to make sure I understood what you

15  said was in error, so you've clarified the record.

16  Q.   Dr. Prentky, no particular research was mentioned, but

17  what research are you familiar with that is responsive to

18  Ms. Serafyn's question, which I believe was, are you familiar

19  with research which shows that child pornography offenders who

20  have hands-on offenses are at elevated risk to reoffend

21  sexually?

22  A.   Well, primarily the work of Michael Seto and his

23  colleagues.

24  Q.   And did you consider that research in developing your

25  opinion in this case?

1  A.   I am well aware of Michael's research in this area, and

2  the answer is "yes."

3  Q.   Dr. Prentky, one last question on the Static-99 just for

4  the purpose of clarity, and I know you didn't actually score it

5  in this particular case, but is it your testimony in going

6  about these evaluations that you always use the high-risk group

7  as a reference group for scoring the Static-99 because it's the

8  most conservative when you do these SVP or SDP cases?

9  A.   Yes.   I always like to err on the side of caution, so I'm

10 always going to look at the highest possible base rate

11 associated with a particular score.   That would be my

12 preference.

13 Q.   And that is your rationale for reporting the high-risk

14 group results?

15 A.   Well, indeed, I think it's a reasonable rationale that

16 these high-risk samples are composed of individuals that have

17 been determined by the court to be high risk.   So it seems to

18 me that that's a reasonable reference group for those

19 individuals that are being considered by the court to be deemed

20 high risk and hence committable.

21          MR. GOLD:   Nothing further from us, your Honor.

22          MS. SERAFYN:   At the risk of annoying the Court, I'd

23 like to ask just two questions.

24          THE COURT:   Two questions you have.   Stay right there.

25 RECROSS-EXAMINATION BY MS. SERAFYN:

United States v. Todd Carta - Bench Trial Day 7

1   Q.   Dr. Prentky, when you met with Mr. Carta, did you

2   specifically ask him whether he was attracted to

3   thirteen-year-old boys?

4   A.   I specifically asked Mr. Carta to explain to me or share

5   with me descriptively the kind of boy, the kind of bodies, if

6   you will, that he was most attracted to.  I didn't say

7   "thirteen-year-olds."  I said, "Describe to me your preferred

8   sexual object."  What I was trying to get at was the relative

9   Tanner stage of development that was associated with his

10  preference, and he clearly was not -- not describing a Tanner 1

11  individual.  He was describing a youthful post-pubescent

12  adolescent, somewhere in the age range, the crude age range of

13  roughly fifteen to twenty.

14  Q.   Dr. Prentky, if you learned that Mr. Carta testified

15  during this trial that he was still attracted to

16  thirteen-year-old boys, could that potentially change your

17  opinion as to whether he would have serious difficulty in

18  refraining from sexually violent conduct if released?

19  A.   It would not surprise me, Counsel, if Mr. Carta testified

20  to that effect because there certainly are plenty of

21  thirteen-year-olds today that would qualify for the kind of

22  sexually preferred body shape and body development that

23  Mr. Carta described to me.  It wouldn't surprise me in the

24  least to hear that, and I wouldn't jump to the conclusion from

25  that that he was a pedophile or even a hebephile.  I'm not even

Page 57

1  sure, again, what that means, but I would not jump to the

2  conclusion that because he said that, it qualified as a mental

3  disorder.  It's part and parcel of the wide range of normal

4  male development that he's responding to rather than the age.

5  So there are certainly thirteen-year-olds that are sufficiently

6  physically developed that he would find them sexually

7  appealing.

8        MS. SERAFYN:  Thank you, your Honor.

9        MR. GOLD:  Your Honor, I just --

10       THE COURT:  No, no.  Thank you very -- no, it's done.

11       MR. GOLD:  But I just remembered something, and it

12  would just take one second.  Just let me ask the question, and

13  then if you overrule it, it's fine.

14       THE COURT:  All right, but if it's one of these

15  repetitive ones like so many of them were --

16       MR. GOLD:  No, no.

17  FURTHER REDIRECT EXAMINATION BY MR. GOLD:

18  Q.   You were asked, Dr. Prentky, whether you scored something

19  called the Abel Assessment of Sexual Interest on cross the

20  other day.  Why did you not score the Abel Assessment of Sexual

21  Interest or perform that test on Mr. Carta?  That's the

22  question.

23  A.   The Abel has its maximum discrimination with respect to

24  sexual preference for children, and the Abel does a good job of

25  discriminating between those people who have a sexual

United States v. Todd Carta - Bench Trial Day 7

Page 58

1   preference for prepubescent children and those who don't.  The

2   Abel regards sexual preference for adolescents as normal.

3   There's nothing in the record to suggest that anyone considers

4   Mr. Carta to be a pedophile.  I don't think anyone has

5   intimated that.

6           THE COURT:  Thank you.

7   A.   If that was an issue, I would have administered the Abel,

8   but it's not; and if he had responded by a preference to the

9   adolescents, the Abel would regard that as normal.

10          THE COURT:  Thank you very much.

11          MR. GOLD:  Thank you.

12          THE COURT:  Anything based on the Abel?

13          MS. SERAFYN:  No, your Honor.

14          THE COURT:  Thank you very much, Dr. Prentky.  I'll

15   see you -- well, I think we may not have any more cases up here

16   in Boston, so good luck in North Carolina.

17          THE WITNESS:  Well, thank you.

18          THE COURT:  Thank you very much for your services.  So

19   I think we can sign off now.

20          THE WITNESS:  Thank you very much.

21          (Witness excused.)

22          THE COURT:  Now, I just had one question about whether

23   or not we learned any more about when he can start getting

24   services.

25          MS. PIEMONTE-STACEY:  Your Honor, we're in continuing

United States v. Todd Carta - Bench Trial Day 7

Page 59

1    discussions with Bureau of Prisons.  You know, one question

2    that I have not asked Mr. Gold yet was whether he, Mr. Carta,

3    would agree to go to Butner to get services until the decision

4    is released, so that's one possibility.

5          THE COURT:  Are there services available at Devens?

6          MS. PIEMONTE-STACEY:  The services available at Devens

7    is more limited than that, which at least at this point he's

8    asking for and needs.  It's a more limited program designed for

9    people who have been convicted of a sex offense who are nearing

10   the end of their term, so I think it's a more limited treatment

11   program.  And, again, this is just based on the limited amount

12   of information I have since our last court appearance, but we

13   have another conference call set up for today.

14         THE COURT:  You were going to be reporting back when?

15         MS. PIEMONTE-STACEY:  April 5.

16         THE COURT:  Do you know whether if the better

17   treatment program is down in Butner, whether he would want to

18   do that?

19         MR. GOLD:  Your Honor, I can't speak for him.  That

20   requires a discussion.  I mean, I --

21         THE COURT:  I understand.

22         MR. GOLD:  No, no, but I would just say, I think where

23   we were, which is we have this period of writing.  I don't want

24   to precommit my guy, you know, and that he's in individual

25   therapy with someone who works for the program anyway, but he

Page 60

1    doesn't see her systemically.  He's been at Devens for a period

2    of time.  We're talking about a period of months where he could

3    be starting to get a momentum and a groove.  I mean, that's

4    essentially the only thing we're asking for the BOP, so the

5    more information that we can find the better.

6            THE COURT:  Well, make a decision based on what

7    program is available at Devens, what's available at Butner,

8    whether or not this woman, whom apparently he does somewhat

9    like, but apparently she doesn't really do sex offender

10   treatment --

11           MR. GOLD:  No, no, she does, but she's not doing it

12   with him, but she's --

13           THE COURT:  No, I meant with him, with him.  Maybe she

14   could just move into that mode.  Maybe that would be some way

15   of handling it.  I can understand why he doesn't want to be

16   transported to Butner.  Last time I lost Mr. Shields.  I lost

17   him in Brooklyn.  Do you remember that plaintiff that no one

18   knew who he was, and he's sitting in the Brooklyn Detention

19   Center, and I had to get Mr. Swomley to get him out?  So I can

20   see why he wants to stay at Devens, so if there's a way of

21   maybe having this therapist move into sex offender treatment

22   one on one, you know, just something so we can just -- you

23   know, it's going to take us four to six months just to sort out

24   all the writing.

25           MS. PIEMONTE-STACEY:  Well, and a review -- and again

Page 61

1   this is hearsay, I did not look at the note myself -- but I'm

2   informed that a review of the notes indicate that he was never

3   prohibited from discussing his sex offenses with her.

4        THE COURT:  I know, but I hate that reverse thing, he

5   was never prohibited.  Why don't they actively offer him sex

6   offender therapy.  He's now said to me affirmatively he wants

7   it, so apart from whether or not -- I'm not trying to pin

8   anyone, they did something bad in the past.  I'm saying he's

9   now told us he wants it, so someone should be proactive in

10  giving it to him.

11       MS. PIEMONTE-STACEY:  Right, and I guess those are

12  cyclical, and they start on certain dates, and that's what I'm

13  looking to; but he also said, "She said I couldn't," and I'm

14  saying I don't think that's true.

15       THE COURT:  Well, why don't you proactively have

16  someone say to this woman, "Start sex offender treatment."

17       MS. PIEMONTE-STACEY:  Your Honor, this is what we're

18  working on.  I've tried.

19       THE COURT:  No, I understand.  Listen, I understand

20  totally.  You all can do what you can do with the Bureau of

21  Prisons.  At most, I can only recommend.  I'm not faulting you.

22  Tell them, "The mean judge said start sex offender treatment."

23  He wants it.  This has been dead time.  Whether he's on the

24  streets or here, there's no possible good that comes from

25  having him just sit there and not do sex offender treatment.

ad5871a2-e59a-4fa0-9904-a7d863b685cd

1        MS. PIEMONTE-STACEY:  They got that message, your

2   Honor.

3        THE COURT:  Okay, all right, and so I'm happy to, if

4   nothing comes of this --

5        MR. GOLD:  We'll shake the tree.

6        THE COURT:  Shake the tree.  I understand if he

7   doesn't want to go to Butner.  It may be he doesn't get the

8   best treatment, though, so he just has to weigh that.

9        MR. GOLD:  Right.

10        THE COURT:  All right, so did we come up with

11   deadlines for all the briefing, et cetera?

12        MR. GOLD:  We have, I think, two sets of transcripts

13   coming, and I think what we said was thirty days from when we

14   receive the transcripts up to but not including today.

15        THE COURT:  Right.

16        MR. GOLD:  Today will come last, so -- and I'm not

17   sure if we've been in touch with -- how many reporters do we

18   have on this, just two?

19        THE COURT:  The combination of him speaking so slowly

20   and the delay in the transcript (Sic), I actually think,

21   although this -- I actually think it will be very -- it took a

22   long time, but I'm actually thinking --

23        MR. GOLD:  People are going to say, what was the Judge

24   so pushing them for?  It was --

25        THE COURT:  I think I wouldn't do this again.

United States v. Todd Carta - Bench Trial Day 7

1              MR. GOLD:  Oh, this?

2              THE COURT:  Yes.

3              MR. GOLD:  But we had it in mind because you had been

4    suggesting it, and I think in this case as --

5              THE COURT:  No, it was my fault.  I'm just saying, I

6    don't know that I would -- I found it extraordinarily

7    frustrating, the combination of the delay time between the

8    question and when he'd respond, and his slowness of speech, and

9    the fact that much of it was repetitive, the combination made

10   it -- we could have done it better, we just could have done it

11   better if he was live here, I think.  He would have sensed our

12   body language; we could have jumped in more easily.  It just

13   doesn't work that way.  And I don't know why the transmission

14   was so poor.  I've had better ones.  Have you all used it

15   before?

16             MR. GOLD:  I have too.  I've had better transmission.

17   This was not great.

18             THE COURT:  It was very, very slow.  Have you seen

19   better ones?

20             MS. PIEMONTE-STACEY:  Your Honor, in this courtroom

21   with Mr. Shields, I thought that went better.

22             THE COURT:  That went much better.

23             MS. PIEMONTE-STACEY:  I think it's in part Dr. Prentky

24   and then maybe -- I'm not technologically savvy, but I just

25   wonder if it was just a worse connection than before and if

United States v. Todd Carta - Bench Trial Day 7

Page 64

1    that's the chance you take with some of these.

2            THE COURT:  Have you seen better ones, Mary Ellen?

3            (Discussion off the record between the Court and

4    Clerk.)

5            THE COURT:  It's never been so slow.  Well, in any

6    event, we're done, and next time I'll know, or at least we

7    should maybe test it out and see if there's a problem.  Where

8    was he, the U.S. Attorney's office there?

9            MS. PIEMONTE-STACEY:  He was.

10           THE COURT:  You might want to just report back to them

11   and let them know that we thought the transmission was poor.

12           MS. SERAFYN:  And, your Honor, we've done a number of

13   depositions in these cases where Dr. Prentky has gone to the

14   U.S. Attorney's office in Newark, and it's been fine.

15           THE COURT:  It's not been like this?

16           MS. SERAFYN:  No.

17           MR. GOLD:  And also the video quality was poorer than

18   it has to be.

19           THE COURT:  I happen to agree with you on all those

20   counts, and so -- well, it's too late now, but we would check

21   it out in the future.  All right, thank you to everyone.  I'll

22   wait till I see your briefs.  And then we decided we wanted

23   oral argument?  Is that what we decided?

24           MR. GOLD:  Yes.

25           MS. SERAFYN:  At the same time I think the rulings and

Page 65

1    findings are due shortly after that.

2              THE COURT:  Excuse me?

3              MS. SERAFYN:  Sorry.  The closing arguments would be

4    shortly after we submit our rulings and findings.

5              THE COURT:  Yes, yes, yes, okay.  All right, thank

6    you.

7              MS. SERAFYN:  Thank you.

8              THE COURT:  Thank you.

9              THE CLERK:  All rise.

10             (Adjourned, 11:44 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 66

C E R T I F I C A T E

1

2

3

UNITED STATES DISTRICT COURT )
4   DISTRICT OF MASSACHUSETTS     ) ss.
CITY OF BOSTON                )
5

6

7          I, Lee A. Marzilli, Official Federal Court Reporter,

8   do hereby certify that the foregoing transcript, Pages 7-1

9   through 7-65 inclusive, was recorded by me stenographically at

10  the time and place aforesaid in Civil Action No. 07-12064-PBS,

11  United States of America v. Todd Carta, and thereafter by me

12  reduced to typewriting and is a true and accurate record of the

13  proceedings.

14      In witness whereof I have hereunto set my hand this 12th

15  day of April, 2011.

16

17

18

19

20          /s/ Lee A. Marzilli

21          _____
            LEE A. MARZILLI, CRR
            OFFICIAL COURT REPORTER
22

23

24

25

United States v. Todd Carta – Bench Trial Day 7

ad5871a2-e59a-4fa0-9904-a7d863b685cd