IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,              )
                                       )
              Petitioner               )
                                       )
         -VS-                          )   CA No. 07-12064-PBS
                                       )   Pages 1 - 56
TODD CARTA,                            )
                                       )
              Respondent               )



HEARING

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE






United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
June 14, 2011, 3:00 p.m.






LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 7200
Boston, MA  02210
(617)345-6787

1    A P P E A R A N C E S:

2

3        EVE A. PIEMONTE-STACEY, ESQ. and JENNIFER A. SERAFYN, ESQ.,
     Assistant United States Attorneys, United States Attorney's
     Office, 1 Courthouse Way, Boston, Massachusetts, 02210,
4    for the Petitioner.

5        IAN GOLD, ESQ. and TAMARA FISHER, ESQ., Federal Public
     Defender Office, District of Massachusetts, 51 Sleeper Street,
6    5th Floor, Boston, Massachusetts, 02110, for the Respondent.

7

8                            I N D E X

9    CLOSING ARGUMENTS                      PAGE

10   By Mr. Gold:                            3

11   By Ms. Serafyn:                         31

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2          THE CLERK:  Court calls Civil Action 07-12064, United

3     States v. Todd Carta.  Could everyone identify themselves for

4     the record.

5          MS. SERAFYN:  Good afternoon, your Honor.  Jennifer

6     Serafyn and Eve Piemonte-Stacey for the United States.

7          THE COURT:  Thank you.

8          MR. GOLD:  Good afternoon, your Honor.  Ian Gold for

9     Mr. Carta, the Federal Defender's Office.  With me is Tamara

10    Fisher, also of that office.

11         THE COURT:  Good, thank you.  So I'm trying to think,

12    since this is a civil case, I actually think, Mr. Gold, you go

13    first.

14         MR. GOLD:  We were talking about that, and we weren't

15    sure.  We've done it different ways in different ones --

16         THE COURT:  If you've agreed on something else, I'll

17    go with your agreed-upon order, but otherwise plaintiff goes

18    last.

19         MR. GOLD:  I'm happy to go first.  That's fine.

20         THE COURT:  But I don't care really.  I've read both

21    memos, so this isn't going to have the same closing-to-a-jury

22    feeling to it.

23         MR. GOLD:  I hadn't seen it that way.

24    CLOSING ARGUMENT BY MR. GOLD:

25         MR. GOLD:  I wanted to start out, your Honor, just

1   bringing the Court back to when we closed the evidence in the

2   case.  At that time it came to the Court's attention, we

3   brought it to the Court's attention that there was no treatment

4   available for people with sexual behavior problems at Devens

5   who were pre-commitment like Mr. Carta.  We then worked it out

6   that he's in one-on-one counseling with a Dr. Schoeller over

7   there.  Since the time of the close of the evidence, he's been

8   doing these weekly one-on-one sessions and has completed a

9   rational-thinking program, which was a six-week psychoeducational

10  class or psychoeducational group, and also an anger management

11  group.  And I suppose, as a formal matter, we'd like to have

12  that in, we'd like to have that before the Court.

13       THE COURT:  You want to move to reopen the evidence?

14  Is there a certificate or something?  Or you want to just make

15  a proffer?

16       MR. GOLD:  I'd like to make a proffer.  In lieu of a

17  certificate, we have a brief memorandum from Dr. Schoeller -- I

18  tried to reach out to her today -- simply stating that he

19  finished the rational-thinking group, but a proffer along the

20  lines of what I just said I think would be sufficient from our

21  perspective, that he's engaged and continuing to be amenable to

22  bettering himself in that way.

23       THE COURT:  Fine.

24       MR. GOLD:  Very good.

25       THE COURT:  By "fine" meaning I'm taking that proffer

1    that he finished those two programs, and if you find out that's

2    not true, let me know.

3         What's the problem?

4         MS. SERAFYN:  There is no problem, your Honor.  I can

5    certainly let you know if that isn't true, but I accept

6    Mr. Gold's representation that it is.  I would just note that

7    neither of those programs are related to sex-offender-specific

8    treatment.

9         THE COURT:  Thank you.  I will take that proffer as

10   well.

11        MR. GOLD:  All right.  And I would just respond that

12   Dr. Schoeller is a therapist with the sex offender program and

13   is doing one-on-one therapy with Mr. Carta.

14        THE COURT:  Sex offender?

15        MR. GOLD:  Well, Mr. Carta is a sex offender, and he's

16   in treatment with Dr. Schoeller dealing with the primary issues

17   that he presents, so, yes, sex offender therapy.

18        THE COURT:  Actually, I'm not sure I'm willing to take

19   that proffer, since it was represented to me that they weren't

20   willing to do it.

21        MS. SERAFYN:  Right, it's my understanding that it's

22   not sex offender therapy, that --

23        THE COURT:  If it's disputed, we're going to leave it

24   alone.  He's getting psychological treatment, and he is a sex

25   offender, but I am not going to take a proffer as to what's in

1   it at this point.

2        MR. GOLD:  Well, we'd have to have her in, but let me

3   just start by doing some argument, which I think is that I

4   wanted to start by simply saying that the commitment of

5   individuals like Mr. Carta is a very high-stakes endeavor.  If

6   Mr. Carta is committed, the Court has jurisdiction over him.

7   He will be under the power of the Court potentially for the

8   rest of his life.  I know that I have experience, I have a

9   client like Mr. Shields who recently went through the program

10   and benefitting from some access to it through the process of

11   representing the other --

12        THE COURT:  We just let Mr. Shields go actually.

13        MR. GOLD:  Right.  No, I'm aware of that.  I'm aware

14   of that, and I --

15        THE COURT:  That sounds too broad.  We just released

16   him subject to conditions of release, but it was by agreement

17   of everyone.  So I think he would say, Shields, that it was a

18   fabulous program.  I mean, I think he got a lot out of it.

19        MR. GOLD:  Right.  And, Judge, I want to be very

20   candid, and I have a client down there who is also benefitting

21   from the program.  And as an advocate for Mr. Carta, my concern

22   is that we lose sight of the high-stakes nature of what we're

23   doing, which is ordering outside of our typical criminal

24   procedures the civil commitment by dint of a mental condition

25   of an individual who has serious difficulty controlling

1  themselves; and that it's not just about whether Mr. Carta may

2  have in the past or may in the future benefit from the

3  treatment that's offered down there, but whether as a

4  constitutional matter he's so out of control of his behavior

5  that he must receive that treatment while confined.

6        And in this go-round we didn't receive the evidence,

7  but the evidence is in from Mr. Carta's probation officer and

8  from Mr. Carta's treatment provider, who are available to him

9  in Connecticut, that he has a regime of which he's going to be

10 a part, quite similar, I would submit, to the regime that

11 Mr. Shields is released under now.  And so it's our position --

12 I was looking at the Wetmore case, the public Wetmore case the

13 other day, and when we first litigated this case in front of

14 Judge Tauro, the argument was, and I think remains on some

15 level, that Mr. Carta does not fit into the prototype, the

16 basic prototype that we would have in mind of the sexually

17 dangerous person, and that is for one basic reason, and that is

18 because he has not been sanctioned, suffered a consequence, and

19 then gone on to reoffend.  This is the behavioral data, if you

20 will, which is in almost every case that I've reviewed the most

21 persuasive piece of evidence and I think the type of evidence

22 that this Court has referred to in ordering the commitment of

23 someone based on this serious difficulty controlling behavior.

24        The testimonial kind of terrain is, we have two

25 experts, Dr. Bard and Dr. Prentky, who have testified that in

1   their opinions Mr. Carta is not a sexually dangerous person

2   under the statute.  The government has proffered Dr. Amy Phenix

3   who testified that he is.

4        The standard of proof is clear and convincing

5   evidence, taking into account this high liberty interest that I

6   started out talking about.  And that is an evidentiary

7   threshold with some bite, and we would argue that it's not met

8   in this particular case.  When the First Circuit remanded, the

9   First Circuit essentially found that Judge Tauro's finding was

10  clearly erroneous when Judge Tauro found that the government

11  had not met its burden by clear and convincing evidence of

12  establishing that there was a mental disorder here, and so I

13  wanted to begin speaking about the second prong and then

14  revisit hebephilia afterwards.

15       THE COURT:  Well, and also let's just put some cap on

16  it.  How long do you think you'll need?

17       MR. GOLD:  Oh, to finish this statement?  Ten --

18       THE COURT:  Yes, to do your closing argument.

19       MR. GOLD:  Oh, this argument?  Ten, fifteen minutes.

20       THE COURT:  That's perfect.

21       MR. GOLD:  Yes.  The Court has seen a lot of

22  testimony, not just in this case but in others, about the risk

23  assessment instruments that are used, are brought forth to kind

24  of justify these experts' opinions when they make their

25  opinions way back in the Shields case, and it really is -- it

1    started with the basic Static-99.  Now we have a newfangled

2    instrument with kind of new trappings.  And it really is quite

3    interesting, I would submit, that since this statute was passed

4    we've had such changes in this field, and this is a field where

5    courts have to find by a certain level of proof that someone

6    meets a particular threshold.

7           Now, in preparing this, we've been paying close

8    attention to what this Court has written and other courts, and

9    I again go back to the question of whether there is serious

10   difficulty controlling behavior.  And we don't start with

11   the --

12          THE COURT:  Can I interrupt you?

13          MR. GOLD:  Yes.

14          THE COURT:  Have other courts struggled with this

15   hebephilia issue?  Or more accurately, have they written on the

16   hebephilia issue?

17          MR. GOLD:  I am not aware of -- I think that there are

18   state court decisions accepting the diagnosis.  When we first

19   made the argument to Judge Tauro, the psychiatric literature

20   was at a particular state that it isn't anymore.  We made

21   reference to the Abregana case, where it was our position that

22   the court in that case, which was a District Court in Hawaii,

23   took evidence from someone who posited that hebephilia may or

24   may not be a disorder; and then our read of that opinion is,

25   the court found that it was a disorder but not a serious

1  disorder.  That was a sort of finding where most of the finding

2  in that case was that the person was not dangerous.  That was

3  the Abregana case, a federal case.

4       Your Honor had heard briefly testimony that wasn't

5  developed by Dr. Kriegman about the issue, and then there was

6  one other case --

7       THE COURT:  Nothing subsequent, is there?

8       MR. GOLD:  No.  And since we have the further

9  developments of the literature, there has been nothing that I

10 have seen of any court wading in and really taking a bite out

11 of the issue.

12      But to return back, both Dr. Prentky and Dr. Bard find

13 that Mr. Carta is not dangerous.  I want to talk about how they

14 justify those opinions, but first I think it's important to

15 start with:  These cases, the instruments, the offenses, I

16 submit, just my own interactions with these cases, have a

17 dehumanizing sort of impact.  You know, you start focusing

18 perhaps on the wrong things.

19      And what we have with Mr. Carta is at the bottom

20 someone who has been changed fundamentally by his experiences.

21 He's someone who it's true, his first sanction, his first

22 serious sanction or interaction with the criminal justice

23 system for a heavy sentence is this sentence that he's serving

24 right now.  In contrast to a lot of the other people who have

25 been targeted for this type of treatment, there is no sexual

1  misconduct of any kind over the past nearly a decade that we

2  can see in his record.

3        He is someone who opened up and told great volumes to

4  therapists in the sex offender treatment program there and did

5  in fact voluntarily -- and this is a distinction which is

6  important in the literature -- voluntarily withdrew from that

7  program, but still was exposed, both in that program and a

8  significant program before that, the Code Program which is

9  offered by the Bureau of Prisons, and it was a yearlong also

10  residential program where Mr. Carta was exposed, I think for

11  the first time, to this programming that the Bureau of Prisons

12  offers.  A lot of the substrate of this programming is the

13  same.  It's cognitive behavioral ideas which targets criminal

14  thinking and so forth, and Mr. Carta in fact testified, and

15  testified, I think, very feelingly and well, about his

16  experiences and how he views them today.

17        And that is where we start with a risk assessment, and

18  I think that going to the instruments simply demonstrates that

19  this is not someone who is of that level or that order of

20  someone who is at high risk to reoffend such that they need to

21  be confined, as opposed to allowed to be at liberty pursuant to

22  their original criminal sentence.

23        These statutes were passed.  I've read in one area

24  Eric Janus, a law professor who writes about these statutes,

25  that when they first emerged in the early 1990s there was a

1    prevention gap.  There had been an increase in determinant

2    sentencing, a decrease in the availability of parole, and so

3    you had people that couldn't be committed under typical civil

4    statutes, because they weren't mentally disordered in the

5    traditional way, being released without any supervision

6    whatsoever.  And you had some crimes that followed, and then

7    this Washington state predator statute emerged, and that's the

8    model that's been copied from then on out; in fact, in the

9    twenty states that have them.  That's not the case here.

10   Mr. Carta would be released, if released, to a panoply of

11   supervision, treatment, and other types of protections.

12            When an expert like Dr. Prentky or Dr. Bard or

13   Dr. Phenix goes about the task of determining whether someone

14   is at high risk to reoffend, they all make reference to this

15   instrumentation.  I think the best way for the Court to look at

16   it is:  Here is a professional who is needing to come to a

17   determination that needs to be communicated to the court and is

18   taking defensible steps to do it in a transparent and useful

19   way.  And both Dr. Bard and Dr. Prentky come about it, have

20   different ways up the mountain.  Dr. Bard uses the

21   instrumentation that he did, the Static-99-R.  Dr. Prentky

22   stated that the Static-99 didn't apply in the case, although he

23   made reference to its scoring, and used another instrument

24   which is used in the field, this SVR-20.

25            The point is, is that all of these instruments started

1  to coalesce around this notion of moderate risk.  The

2  difference of opinion was whether that moderate risk should be

3  elevated in some way.  And there was a lot of testimony that

4  the Court heard -- and we kind of chew through a lot of that in

5  these papers -- about the dynamic factors.

6      The comment that I have about Dr. Phenix's treatment

7  of the dynamic factors is that she treats them in a sense like

8  static factors.  The information that she goes to when she

9  talks about them are anecdotes or information about Mr. Carta

10  very early on in his BOP career or from his life, and it's a

11  different operation than what Dr. Bard does, which is simply

12  assess Mr. Carta as a person as he is right now, and is he

13  exhibiting any pattern of disordered thinking or behavior right

14  now which would tend to indicate that what the instruments are

15  showing is not particularly accurate?

16      I want to go after Dr. Phenix in a couple of ways.  I

17  think that the government on these facts doesn't meet the

18  burden.  Mr. Carta does not fit the threshold despite his

19  disclosures.  He's not someone who demonstrates this lack of

20  capacity to control, which is the sine qua non of the statute.

21  But, also, when the Court is evaluating and going through

22  Dr. Phenix's testimony, I would make reference to two broad

23  changes.  One is the way that she dealt with the

24  instrumentation over the course of this very case, and the

25  other is the change in the way that she conceived of the

70b875a7-d43f-4e50-8920-fa081e5f87c9

1   diagnosis.  And both of these things are important.  I think

2   they affect the weight that the Court should give to her

3   testimony in evaluating it against the testimony of the other

4   two.

5           The first is, when we start at the report that

6   Dr. Phenix produced in this case in 2008, she was using a

7   method which the Court had heard a great deal about by that

8   time in the Shields case, a clinically adjusted actuarial

9   method.  You use the actuarial instrument; you make clinical

10  adjustments as appropriate.  However, based on developments in

11  the field, by the time that we tried the case in February of

12  2009, she'd changed her method.  She called it a "pure

13  actuarial method."  That is, she was saying --

14          THE COURT:  When did we try the case?

15          MR. GOLD:  Well, we tried the case in February of

16  2009.

17          THE COURT:  I see.  So you're referring to the one

18  before me?

19          MR. GOLD:  That's right, and I'm coming up to the one

20  that we did.  But the testimony is in.  We have it in front of

21  us.  We refer to it in the papers.  She was using a pure

22  actuarial method.  That is, she was stating that her opinion

23  was -- she's a responsible professional choosing the best

24  methodology to come up with assessing risk in this high-stakes

25  enterprise.  She said, "I'm most accurate, most accurate when I

1   use the actuarial instruments and do not adjust with the

2   dynamic factors."  That's what she said.  That was her

3   testimony.  She used the dynamic factors to put someone within

4   a range that the actuarials gave her, but she said the

5   actuarials were the end-all and be-all, if you will.

6          By the time that we got to the trial in this case, she

7   had abandoned that method and was back to using a clinically

8   adjusted actuarial method, but the actuarial method had been

9   very affected by this new dispositive or kind of

10  outcome-determinative choice that comes before you use the

11  actuarials, which is, what sample do you compare a respondent

12  to?  So it's not enough to get a 6 on the Static-99.  Is it a 6

13  compared to the high-risk sample?  Is it a 6 compared to the

14  routine sample?  And that is now the operation that she does,

15  and she talks about using these dynamic factors in that

16  context, of using them to determine whether he should be

17  compared to the high-risk sample or the low-risk sample.

18          And it's very easy to get lost in the weeds when

19  talking about this detailed information.  Some of the

20  information that we brought that I think is important, for

21  example, is that the high-risk sample, although the virtue of

22  all these new samples is that they're new and more contemporary

23  and therefore presumably giving us more accurate information,

24  this high-risk sample is dominated by this group from the

25  Massachusetts Treatment Center at Bridgewater which was

1    released starting in 1959 to the 1980s, and there we are

2    starting to suggest that there were certain choices in this

3    enterprise which prejudiced respondents like Mr. Carta,

4    perhaps, and were not necessarily as accurate as we might

5    think.

6         Now, on one level, this can all just be the progress

7    of science.  Dr. Phenix is trying to come up with the methods

8    which best are adapted to the task of communicating good risk

9    information to the Court.  What we noticed when we parsed

10   through all this information is how her opinions and the

11   emphases of her opinions changed over the course of the two

12   trials, and this is in fact something like a natural

13   experiment.  And when she was doing a pure actuarial method,

14   she said that the actuarials happened to be in this particular

15   case high, they were high.  She had a high score on the

16   Static-99.  She had not scored this Static-2002 yet, and she

17   scored this instrument called the MnSOST-R, this Minnesota Sex

18   Offender Screening Tool, and that was high.

19        During the testimony in that case, we uncovered

20   through cross-examination that she'd made errors in scoring

21   this instrument.  And as a footnote, your Honor, it's important

22   to make reference, just in terms of the nature of the community

23   and the information that's coming to the courts, that the

24   MnSOST-R is not commonly used, was not used by the other

25   experts in this case, and is in fact developed by Dr. Phenix's

70b875a7-d43f-4e50-8920-fa081e5f87c9

1    husband.

2             Now, she made errors scoring on it --

3             THE COURT:  Now, this is the Tauro trial, right?

4             MR. GOLD:  No.  This is the Tauro trial and this

5    trial.  She made --

6             THE COURT:  She took some brand-new -- can I say,

7    you're really in the weeds now, and at the end of the day,

8    don't they all sort of agree that these actuarial tables put

9    him basically at moderate risk to reoffend?

10            MR. GOLD:  Yes, they do, they do, but Dr. Phenix, I

11   think -- you know, it's --

12            THE COURT:  She says that, right?

13            MR. GOLD:  No.  What I'm trying to do is hoist the

14   lady on her own petard, and the only way to do it is to sort of

15   develop some detail.  I definitely don't want to burden the

16   Court with detail that is not necessary to the purpose.  I

17   mean, I think it's important to lay out.  But to take a step

18   back to this level of generality, the instruments say moderate

19   risk.  Dr. Phenix says the moderate risk is overridden in this

20   case by the presence of these dynamic factors.  The dynamic

21   factors we argue go to Dr. Bard because her treatment of the

22   dynamic factors is a little wooden; she finds the information

23   for them way back in the past, treats them like static factors.

24   That's one point.

25            We also would like to point out that when she had high

1  actuarials, which she doesn't anymore, she was an actuarial

2  person.  Now that she's got moderate actuarials, she's a

3  dynamic factors person; and that when you're assessing a person

4  like Mr. Carta, we had the benefit of having him testify on the

5  stand -- I think he testified truthfully and well -- and those

6  are the dynamic factors:  How is someone considering or

7  reflecting on their own experience in the here and now?

8        So, I mean, that's the nutshell on risk.  We do a lot

9  to try to point out these features of her testimony in the

10  papers.

11        THE COURT:  So you're basically encouraging me to use

12  the actuarial tables at moderate risk and saying that's not

13  enough to meet the clear and convincing because his dynamic

14  factors on the stand show that he's moving in the right

15  direction?

16        MR. GOLD:  That's a way to put it.  Before we get to

17  the actuarials, I focus on this important fact of, what

18  evidence do we have that he can't control himself?  And, again,

19  I want to say it again, although I've said it before, this

20  evidence of reoffending after a sanction has been really the --

21        THE COURT:  Right, that's the really strong evidence

22  in your corner.

23        MR. GOLD:  -- defining piece of evidence, and that

24  evidence is not here.  Then with respect to going to the risk

25  assessment instruments, and it's not entirely clear how this

1  assessment of risk goes back to determining whether someone's

2  able to control themselves, but to the extent that it is

3  evidence, the moderate evidence is helpful.  We would argue

4  that for this type of determination at this standard of proof,

5  you would need these high levels, you would look for it, and it

6  isn't present here.

7          With respect to the dynamic factors, that point is

8  well-taken.  That point is well-taken that certain things can

9  override these actuarials; but that looking at Dr. Phenix's

10  treatment of these dynamic factors, I'm encouraging the Court

11  to be somewhat skeptical of that, to look at Dr. Bard or look

12  at the holistic determinations that you get from Dr. Prentky

13  and Dr. Bard about where Mr. Carta's functioning is right now,

14  and the importance, the relative importance, of these pieces of

15  information that we all agree on:  There is no offending,

16  there's no evidence of particular types of acting out in prison

17  and so forth, and what is the relative importance of that data

18  or the absence of it to the determination?

19          I think our dispute with the government is going to be

20  about the importance of these dynamic factors and how the Court

21  should look at this sequence where Mr. Carta left treatment, he

22  withdrew from treatment.

23          THE COURT:  Right.

24          MR. GOLD:  And we've had testimony twice about that,

25  and the Court doesn't have the benefit -- we could have brought

1   the folks back in, but we elected to use the paper record, and

2   that's what we have.  Dr. Wood was an intern who was

3   supervising Mr. Carta during this period.  I think the Court

4   has looked at his testimony.  It's there in the record.  And

5   Dr. Bard, in my view, gives a very, in the prior trial and also

6   here, a clinically informed interpretation of what that is.

7           THE COURT:  So Bard, has he ever been a

8   court-appointed expert?

9           MR. GOLD:  He was a qualified examiner.  Has he been a

10  court-appointed expert in --

11          THE COURT:  In any of these sex offender cases?

12          MR. GOLD:  Well, he's a court-appointed expert now

13  actually.  He's not ours.  He's the court-appointed.

14          THE COURT:  Right, in this one, but other than this

15  one?

16          MR. GOLD:  Do you know?

17          MS. PIEMONTE-STACEY:  Not to our knowledge.

18          MR. GOLD:  No.  I mean, he was a qualified examiner

19  for about a decade until --

20          THE COURT:  Until Judge Tauro appointed him, but it's

21  the only time he's been a court-appointed expert?

22          MR. GOLD:  I think that's right.  I think that's

23  right.  I think this is the only case that he participated in.

24          THE COURT:  And Prentky was mine when?

25          MR. GOLD:  In the Wetmore case.

1          THE COURT:  Wetmore.

2          MR. GOLD:  Yes.  And I would encourage the Court to

3   look at Wetmore.  We think Wetmore helps us.  And this is not

4   to disparage Wetmore but to look at the important distinctions

5   between, and it's important, I think.

6          THE COURT:  It's certainly a harder case than

7   Mr. Wetmore.

8          MR. GOLD:  Yes.  Now, I want to -- the other issue is

9   going --

10          THE COURT:  Let me --

11          MR. GOLD:  Go ahead.

12          THE COURT:  I have somebody who has been attracted to

13   thirteen-year-olds, has had three relationships with

14   thirteen-year-olds and continues to be attracted to

15   thirteen-year-olds, and likely has or by clear and convincing

16   has hebephilia.  So I do agree with you that this all boils

17   down to whether he has the capacity to control himself and

18   whether the government has proven by clear and convincing that

19   he doesn't.  And so I'm always struggling with these actuarial

20   instruments, which I haven't had the need to put much weight on

21   because the other three cases I had were so clear.  So you're

22   saying, in this case, they cut in your favor basically.

23          MR. GOLD:  Yes.  Well, they cut in our favor.  They're

24   information that I think is on our side of the scale, that's

25   right.  I think that --

1      THE COURT:  But they hit moderate, not high, as in

2  some of these other cases.

3      MR. GOLD:  That's right.  And, also, the Court

4  actually observed during the course of the trial that

5  Dr. Phenix had scored a new instrument to the Court, the

6  Static-2002.  They're always trying the elaborate on these

7  instruments.  The Static-2002 is supposedly an improvement over

8  the Static-99, in that it measures deviance over here and

9  anti-sociality over here.  Mr. Carta's risk comes from this

10 anti-sociality.  This is an observation which is also reflected

11 in Dr. Prentky's scoring of the SVR-20, another instrument

12 which is sort of not an actuarial.

13     THE COURT:  Right, because he's in the past, and the

14 past predicts the future.  He's got this antisocial personality

15 disorder, which does not make him sexually dangerous but could

16 affect whether the treatment helps or not.

17     MR. GOLD:  It could, although, you know, a frequently

18 observed fact about antisocial personality or these personality

19 traits which are maladaptive, which I've learned, is that they

20 decline with time.  And I think that's evident in people like

21 Mr. Carta, who the way he presents, the way he is on the stand

22 or with counsel, over time.  He's now an older person and is

23 not the person he was when he was doing these things that are

24 the basis of these diagnoses in the first place.

25     I do want to speak separately about the diagnosis.  I

1   object to the Court and the government's rhetoric also,

2   Dr. Phenix too, about the thirteen-year-olds.  I think --

3          THE COURT:  It's not rhetoric.  It's what the evidence

4   was.

5          MR. GOLD:  Well, but let me --

6          THE COURT:  "Rhetoric" is a little harsh.  He said it.

7          MR. GOLD:  Well, no, let me parse out the rhetoric

8   from the -- because I think it's important.  There are three

9   thirteen-year-olds, and the government used language during the

10  course of the trial that he was continually offending against

11  thirteen-year-olds over the period of a decade, right?  But

12  there is one incident with one thirteen-year-old.  And, again,

13  we know that that is a thirteen-year-old because Mr. Carta

14  believes that the person was thirteen.  And we can't forget

15  when talking about these diagnostic ideas that thirteen is a

16  proxy for something, a level of sexual development.  So at the

17  end of the day, it's an arbitrary cutoff which is used to

18  usefully approximate what the issue is, which is level of human

19  development.

20          There is another thirteen-year-old who we can't

21  forget.  The government often in its papers says he offended

22  against a thirteen-year-old 30 to 40 times by his own

23  admission, 20 to 30 times over a two- to four-year period, but

24  the person isn't thirteen for that period of time.

25          Now, if what we're trying to do with these diagnoses

1   is zero in on someone who has this pathological sexual

2   interest, it starts to seem less like someone who is looking

3   for the younger persons and someone who is looking for the

4   older persons.  And then the other is a thirteen-year-old that

5   Mr. Carta did not in fact have any physical interaction with

6   but who was involved with, when he was dating the

7   seventeen-year-old, was involved with an interaction where he

8   watched the seventeen-year-old and the thirteen-year-old have

9   sexual contact.  Those are the three.

10       THE COURT:  I actually don't remember that.

11       MR. GOLD:  Yes, the third victim, that is the account

12   of what happened.  Those are the three things.  John is the --

13       THE COURT:  But just assume -- I mean, you started off

14   with where I think you correctly started off, which is, the

15   issue is here lack of capacity to control.

16       MR. GOLD:  Yes.

17       THE COURT:  So assuming for a minute I find he's still

18   attracted to thirteen-year-olds because he said that, and in

19   fact he has molested thirteen-year-olds, the issue is still,

20   could he control himself?  And it's a little harder in this

21   case because those actuarials, which you say, the actuarial

22   tables only put him at a moderate risk, and all the other

23   people I've seen put him at the high risk.  Is that, I mean --

24       MR. GOLD:  Yes, but, you know, I want to put the

25   actuarials in their place.  I mean, Dr. Phenix is the actuarial

1    person.  I talked about hoisting her on her own petard --

2         THE COURT:  You just spent so much time on actuarials,

3    so that's why I'm asking.  You're asking me to actually look at

4    them and rely on them.

5         MR. GOLD:  Well, let me take a step back, Judge, and

6    let you know what I'm doing.  I want to impeach Dr. Phenix.

7    That's what I want to do.  I want to demonstrate to the Court

8    or put some parts of her opinion into context.

9         She is the actuarial lady.  She justifies herself by

10   virtue of these instruments, and therefore it's important how

11   she treats them and how she treats them differently over time.

12   She is the one who says that these actuarials are moderate.

13   Dr. Bard says that too.  Dr. Prentky goes about the risk

14   assessment in a different way.

15        We would encourage the Court to look at the testimony

16   of the experts, as the Court has said, considered as a whole,

17   considering their interaction with Mr. Carta and their

18   consideration of all the factors, including these risk

19   assessment tools, and value our guys over theirs.  I mean,

20   that's what we want at the end of the day.

21        I do want to talk about the diagnosis because I

22   think --

23        THE COURT:  You know what, here's my issue:  You've

24   now gone about almost a half an hour.

25        MR. GOLD:  Oh, really?  Oh, I'm --

1        THE COURT:  And it's a very important case, and I'm

2    not trying to dispute it.  What I'm going to have you do is go

3    for five more minutes, you're going to finish up, and then I

4    have to take a call at quarter of.  Then we will come back

5    here, and I don't know what else to do, and then I'll give you

6    your time.

7        MR. GOLD:  And that's what I need, your Honor, so I

8    think that's fine.

9        THE COURT:  All right, so five more minutes.

10       MR. GOLD:  But the diagnosis is important even if the

11   Court were to find -- we invite the Court to say that the First

12   Circuit decided its case in a particular point in time, that

13   the psychiatric literature which we marched into the record is

14   important and changes the nature of the evidence regarding

15   that.  We have three opinions on hebephilia.  One is,

16   Dr. Phenix says she can diagnose it through paraphilia not

17   otherwise specified, and she can also diagnose it with

18   reference to this criteria for the new DSM which is coming out.

19   And she says, under either criteria, he qualifies as mentally

20   disordered.

21       Dr. Bard maintains the position that he had before,

22   and Dr. Prentky has what we're characterizing as a

23   middle-of-the-road sort of opinion.  He finds that it's

24   defensible to make the diagnosis at this point in time, but

25   that based on his formulation of the case -- and this I

1   would -- I was reading Wetmore again.  I keep going back to

2   that because it's one of the most recent things I've read,

3   that's basically -- and of course your Honor wrote it, but --

4           THE COURT:  And, of course, your office had it for a

5   while.

6           MR. GOLD:  But that talking about, you know, what the

7   DSM says, what it requires, you know, the thirteen-year-old

8   threshold was an issue in that case.  Here the diagnostic

9   criteria, which are not even in place -- they're proposed,

10  they're currently proposed for the psychiatric community to

11  consider for this new diagnosis, you know -- and what

12  Dr. Phenix is saying is, "Well, I can use this new one, or I

13  can use this old backdoor way to do it."  The new one has these

14  three thirteen-year-olds as a psychiatric sort of -- as a

15  criterion in the diagnosis.

16          Dr. Prentky says:  The man's interest is in older

17  teens.  It's always been until older teens to youths.  That's

18  his interest.  And so even if the Court decides, "The First

19  Circuit had it buttoned up, and I'm not going to look at that

20  anymore," it's still important because the nature of the

21  diagnosis and who the person is is important when you consider

22  what's likely to happen.  Here is someone who the majority of

23  his interactions have been with older people, who the docs are

24  telling you are not pathological.  He's carried on relationships

25  with adult women, with older men, in addition to these teens.

1   And he's someone who has the outlets.  He's not someone who's

2   fixated or locked in some area which is necessarily criminal.

3   That's a feature of who he is.

4        And it's also important when we consider his testimony

5   about how he's not interested in carrying on with young

6   individuals anymore.  He doesn't want to.  He felt that he

7   identified with them.  It gave him self-esteem to be someone

8   who is more powerful than younger people, or whatever the

9   dynamic was.  He's not there anymore.  And with someone like

10  Mr. Carta who we have the record that we have, it's important.

11  That's one reason why the diagnosis is important.

12       The other thing is, you know, the three

13  thirteen-year-olds I don't think knock it out of the park for

14  the government anymore.  I want to go back to -- yes?

15       THE COURT:  Let me just say, you gave me a 70-page

16  brief.

17       MR. GOLD:  I did, yes, 76.

18       THE COURT:  And you're lucky that I didn't just strike

19  it, other than I didn't want to have to reread something else,

20  but you really need to finish this up, and I can just see

21  you --

22       MR. GOLD:  I'll close the door on the hebephilia.

23       THE COURT:  I am not going to say that hebephilia is

24  not a valid diagnosis, so you can reserve it for the record.

25  I'm not going to overturn the First Circuit.  I'm not going to

1    say that it's now an invalid diagnosis.  I understand you want

2    me to say that, in any event, he shouldn't be diagnosed with

3    it.

4              MR. GOLD:  Well, that's Prentky's position, that's

5    right.  That's right.  I mean, and that's --

6              THE COURT:  That's the Prentky position.

7              MR. GOLD:  Right, that's the Prentky position.

8              I would just make two quick observations before moving

9    on.  One is that Dr. Bard pointed out conceptual problems with

10   the diagnosis.  What happened in this case was that those

11   conceptual problems were borne out.  First of all, it's our

12   position that the framers of the DSM -- that is, Dr. Frances

13   and Dr. First, who are the authors of one of the articles that

14   we put into evidence -- essentially backed up his opinion in

15   every jot and tittle.  That's one point, and that bears

16   mention.

17             The other is that the diagnosis, the criteria in this

18   very case that the government has proposed have changed.  In

19   their briefing in the initial round of this case, they said

20   it's thirteen to seventeen years old, that's the diagnostic

21   window.  Now the same expert has come back and has said, "Well,

22   no, it's eleven to fourteen, and I've got the three

23   thirteen-year-olds, so I'm still good," right?  But I think

24   Dr. Prentky's opinion is what we'd expect from a psychologist,

25   someone who's giving the Court an informed formulation of the

1  case, which is that this man's area of interest is higher; the

2  three thirteen-year-olds are contrary information, but they

3  don't go against it.

4          THE COURT:  Right, that's the Prentky --

5          MR. GOLD:  That's the Prentky position.  But what we

6  argue in the papers, in the long papers that Dr. Phenix does is

7  suddenly adjusts her opinion, and sort of without acknowledging

8  it has changed the criteria by which she went about

9  diagnosing -- you know, one clinician, two sets of diagnostic

10  criteria.

11          And then I'll just end by reading a PowerPoint that we

12  read into evidence during the first trial when I was

13  cross-examining Dr. Phenix, where she did a presentation with

14  the New Hampshire professionals who were going to be involved

15  in the statute up there:  "Serious difficulty with volition is

16  defined by:  Overcame obvious barriers such as victim protests,

17  harm or pain; been detected in the past and reoffended; did not

18  learn from experience or punishment; reoffended quickly after

19  release; he said he had no or few controls; the offense was

20  risky and he would be easily identified or caught; excessive

21  numbers of offenses or victims."  And we would argue that none

22  of those factors apply to this case.

23          THE COURT:  What were you just reading?  It was --

24          MR. GOLD:  Oh, this was a PowerPoint presentation that

25  Dr. Phenix herself gave to operationalize "serious difficulty,"

1  that she herself said these are factors by which you might find

2  serious difficulty controlling behavior, and it's notable that

3  they're not present in Mr. Carta's case.

4       THE COURT:  Thank you.  I am going to have to take

5  this conference call.  Actually, you went longer than you

6  thought, but that's fine.  It's an important case.  Do you have

7  any problems if I take any commitments?  We'll take fifteen

8  minutes, twenty minutes, and then I will come back.  I think

9  that's probably the best way to handle this.

10      How long do you think your closing might be?

11      MS. SERAFYN:  Twenty to thirty minutes.

12      THE COURT:  Wow.  Okay, all right.

13      THE CLERK:  All rise.

14      (A recess was taken, 3:44 p.m.)

15      (Resumed, 4:10 p.m.)

16  CLOSING ARGUMENT BY MS. SERAFYN:

17      MS. SERAFYN:  Your Honor, the government has proved by

18  clear and convincing evidence that Todd Carta is a sexually

19  dangerous person under the Adam --

20      THE COURT:  Can I make a suggestion?

21      MS. SERAFYN:  Yes.

22      THE COURT:  Sit down.

23      MS. SERAFYN:  It's okay, your Honor.  It actually

24  feels good to stand up a little bit -- that Todd Carta is a

25  sexually dangerous person under the Adam Walsh Act.  He's an

1   untreated sex offender who has a history of molesting teenage

2   boys, including three thirteen-year-olds over a 30-year period.

3   The vast majority of these offenses, your Honor, went

4   undetected.   He preyed on these young teenage boys by giving

5   them drugs, alcohol, concert tickets, and often a place to

6   live.   This conduct went on for three decades until Mr. Carta

7   was sent to prison in his early forties for possessing child

8   pornography.

9         Now, Mr. Carta has admitted on several occasions,

10   including his testimony during this trial, that he is still

11   attracted to thirteen-year-old boys.   Mr. Carta hasn't been

12   treated for this criminal and deviant conduct.   He participated

13   in sex offender treatment for about seven months at Butner

14   before dropping out because he couldn't handle it -- he said it

15   was too intense -- and he continued his offense cycle in the

16   sex offender treatment program by preying on the youngest

17   members of his treatment group, who were young-looking men in

18   their very early twenties.

19         Now, the evidence in this case shows, your Honor, and

20   indeed I think common sense shows, that Mr. Carta is a sexually

21   dangerous person who needs to be committed for sex offender

22   treatment.   And your Honor is familiar with the three elements

23   of the Adam Walsh Act, and, as you know, this case was remanded

24   from the First Circuit, and so we believe there's only one

25   issue that the Court needs to decide, and that is the third

1    element.  So there's no dispute that Mr. Carta meets the first

2    element; he acknowledges that he has committed sexually violent

3    conduct or child molestation in the past.

4         And while Mr. Carta does dispute that he meets the

5    second element, the First Circuit has already decided that

6    issue.  The First Circuit has found that paraphilia not

7    otherwise specified characterized by hebephilia is a legitimate

8    mental diagnosis, and the First Circuit found that the

9    government met the mental element of the statute and remanded

10   the case for this Court to consider, quote, "whether the

11   requisite dangerousness exists."  And, your Honor, we all know

12   that requisite dangerousness is the third element of the

13   statute.

14        So it's the government's position that the only

15   question for this Court to decide is whether Mr. Carta would

16   have serious difficulty in refraining from sexually violent

17   conduct or child molestation if released, and on that issue,

18   your Honor, you heard from four witnesses.  You heard from

19   three experts and from Mr. Carta.

20        So the first expert that you heard from was Dr. Amy

21   Phenix, who is the government's expert in this case, and

22   Dr. Phenix opined to a reasonable degree of professional

23   certainty that Mr. Carta would have serious difficulty in

24   refraining from sexually violent conduct or child molestation

25   if released.  And she reached this conclusion by scoring three

1    actuarial instruments:  She scored the Static-99R, the

2    Static-2002R, and the MnSOST-R.

3         Now, the average score on the Static-99R is a 2.

4    Mr. Carta's score was a 5, which placed him in the moderate-

5    high risk range.  So I just wanted to be clear about that, your

6    Honor, because I know when Attorney Gold was giving his

7    closing, your Honor was referencing that Mr. Carta is only in

8    the moderate range, but on the Static-99R, he actually falls in

9    the moderate-high range.

10        The average score on the Static-2002R is a 4.

11   Mr. Carta's score on that instrument was a 6, which places him

12   in the moderate risk range.  And Mr. Carta's score on each of

13   these three instruments showed that he was at moderate to

14   moderate-high risk for sexual recidivism, and as your Honor

15   knows from this case and others --

16        THE COURT:  What was the MnSOST-R?  That was moderate?

17        MS. SERAFYN:  The MnSOST-R actually I believe was

18   high, your Honor.  In Dr. Phenix's report -- yes, and it's also

19   actually in our findings of fact -- he scored a 10 on the

20   MnSOST-R, which places him in the high risk range.

21        MR. GOLD:  If I might interject, your Honor, I'm

22   sorry, but that's the scoring that she corrected on the stand

23   as -- she made the same error at both trials, so she rescored

24   it from high to moderate at the first trial.  Then she said she

25   transposed her score from the one report to the other, and then

1   she corrected it again on cross-examination in the second

2   trial.

3          MS. SERAFYN:  Well, I believe, your Honor, that --

4          THE COURT:  Well, wait.  So she corrected, in your

5   view, to moderate?

6          MR. GOLD:  That's right.

7          MS. SERAFYN:  Your Honor, I believe that the scoring

8   error was that she had originally scored an 11, and then she

9   reduced it by one point to a 10.  But I thought that the risk

10  range didn't change; it was only the raw number that actually

11  changed.

12         So, your Honor, on these three instruments, Mr. Carta

13  scored in the moderate to moderate-high risk range to reoffend.

14  And as we know from this case and others, these actuarial

15  instruments actually underpredict sexual recidivism, and that's

16  because the numbers are based on reconviction rates.  And as we

17  know, most sex offenses or a majority of sex offenses go

18  undetected, and this case is the perfect example of that.

19  Virtually all of Mr. Carta's sex offenses went undetected for

20  thirty years, so these actuarial instruments don't capture the

21  kinds of sex offenses that allude law enforcement, or even the

22  kinds of sex offenses for which a conviction doesn't result.

23         So Dr. Phenix, though, didn't just look at the

24  actuarials.  She then considered dynamic risk factors, and she

25  considered dynamic risk factors that are empirically

1  established to determine whether Mr. Carta would have serious

2  difficulty in refraining.  So specifically she looked at

3  significant social influences, and she found that Mr. Carta has

4  no meaningful relationships with anyone in his family.  He

5  threatened to kill his own mother, he threatened to kill his

6  own daughter, and in fact he has no relationship with his now

7  adult daughter.

8       The last sexual relationship that Mr. Carta had before

9  he went to prison in 2002 was with his teenage daughter's

10  seventeen-year-old boyfriend, Seth, and Mr. Carta had a sexual

11  relationship with Seth for over a year behind his daughter's

12  back.  And then, out of spite, when Mr. Carta was in prison, he

13  told his daughter about his relationship with Seth because he

14  wanted Seth to leave his daughter and to return to Mr. Carta.

15      So Dr. Phenix also looked at intimacy deficits, and

16  she found that Mr. Carta has significant intimacy deficits.

17  He's never maintained a long-term relationship with a peer-age

18  individual.  When he was in his late thirties and forties, he

19  had sexual relationships with teenage boys.  He emotionally

20  identifies with children, especially pubescent boys in that

21  thirteen-year-old age range.  And Dr. Phenix testified during

22  the trial that as they sat there, Mr. Carta does not have the

23  skills to develop a meaningful relationship that would serve as

24  a protective factor against sexual recidivism if he were

25  released.

1           Other dynamic factors that Dr. Phenix looked at were

2    general self-regulation and sexual self-regulation, and she

3    found that during his time in the community Mr. Carta was

4    largely out of control sexually.  He was obsessed with child

5    pornography, amassing up to 50,000 images at its peak; and

6    those images were of children ranging in age from three years

7    old, basically a child in diapers, to age seventeen.  At its

8    peak, he viewed this child pornography for 12 to 14 hours a

9    day, at the expense of going to work and at the expense of

10   taking care of his hygiene and doing basic things like

11   showering.  He was completely obsessed with viewing child

12   pornography.

13          So each of these dynamic risk factors that Dr. Phenix

14   looked at are empirically linked to increased sexual

15   recidivism.  And Dr. Phenix found, and she testified, that all

16   of the relevant dynamic risk factors are present for Mr. Carta,

17   and therefore his risk of sexual recidivism is increased beyond

18   the actuarial instruments.

19          So, your Honor, we believe that Dr. Phenix's testimony

20   is the testimony that should be credited in this case.  She's

21   one of the leading experts in the country in the field of sex

22   offender recidivism.  She's coauthored the coding manuals for

23   the most widely used and widely validated instruments, which

24   are the Static-99, now the Static-99R, and the Static-2002R.

25   She diagnosed Mr. Carta with five mental disorders that are

 1   listed in the DSM-IV.  She scored the most widely --

 2            THE COURT:  Which one are you pressing?

 3            MS. SERAFYN:  The paraphilia NOS characterized by

 4   hebephilia, but we do believe that all of the diagnoses are

 5   relevant.

 6            She also considered dynamic risk factors.  She

 7   considered protective risk factors, which would work in

 8   Mr. Carta's favor, and found that no protective risk factors

 9   were present here.  And based on all of these considerations,

10   based on all of these sort of pieces of the puzzle, Dr. Phenix

11   opined that Mr. Carta would have serious difficulty in

12   refraining from sexually violent conduct or child molestation

13   if released.

14            Now, the other two experts that you heard from in this

15   case, Dr. Prentky, who is Mr. Carta's chosen expert, and

16   Dr. Leonard Bard, who is the Court-appointed expert, simply

17   aren't credible, your Honor.  The risk assessment that

18   Dr. Prentky performed in this case was sloppy at best.  He

19   acknowledged that Mr. Carta had oral sex with an intoxicated

20   thirteen-year-old boy when Mr. Carta was twenty-eight years

21   old.  He acknowledged that Mr. Carta engaged in sexual activity

22   with a thirteen-year-old boy on at least thirty to forty

23   occasions when Mr. Carta was thirty years old, and he also

24   acknowledged that Mr. Carta engaged in sexual activity with a

25   thirteen-year-old boy when Mr. Carta was in his thirties.

1       Now, Dr. Prentky also admitted that Carta's sexual

2   activity with these three thirteen-year-old boys would qualify

3   as hebephilic activity, and he acknowledged that paraphilia NOS

4   characterized by hebephilia is a legitimate diagnosis.  But he

5   didn't diagnose Mr. Carta with hebephilia.  And why didn't he

6   diagnose Mr. Carta with hebephilia, even though he essentially

7   acknowledged that Mr. Carta met all of the criteria for this

8   diagnosis?  Well, Dr. Prentky didn't diagnose Mr. Carta with

9   hebephilia because he chose to ignore overwhelming evidence of

10  Mr. Carta's sexual interest and attraction to thirteen-year-old

11  boys in favor of crediting Mr. Carta's statements to

12  Dr. Prentky.  So Dr. Prentky interviewed Mr. Carta, and he

13  asked him to describe his ideal sexual partner, and Mr. Carta

14  said, and this is a quote from Dr. Prentky's report, "I like

15  younger-looking guys.  I am attracted to a certain body type.

16  I like guys that are thin, youthful-looking with a lot of

17  energy."

18       So based on this one statement, Dr. Prentky determined

19  that Carta's ideal partner is a pubescent male in the age range

20  of fifteen to twenty years old.  So Dr. Prentky didn't diagnose

21  Carter with hebephilia because he chose to take his word over

22  the overwhelming evidence.

23       THE COURT:  Well, wouldn't it be fair to say he's

24  interested in thirteen-year-olds, but he's also interested in

25  seventeen-year-olds and twenty-year-olds?

1          MS. SERAFYN:  I think you could say that, but I think

2     Dr. Prentky ignores that.  I don't think Dr. Prentky admitted

3     that Mr. Carta was sexually attracted to thirteen-year-olds,

4     and that's why we believe his risk assessment was sloppy.  I

5     think he ignored the evidence that he, frankly, didn't want to

6     see.  But I do think it's fair, based on Mr. Carta's history

7     with other teenage boys, that he does have an attraction to

8     boys in the thirteen, fourteen, fifteen --

9          THE COURT:  Thirteen, fifteen, seventeen, twenty.

10         MS. SERAFYN:  That's right.

11         THE COURT:  I mean, all of them.  So what I've been

12    trying to think about was, does that mean that, if given the

13    right therapy, he could substitute his interest in

14    thirteen-year-olds for interest in seventeen- -- well,

15    twenty-year-olds?

16         MS. SERAFYN:  I think it's certainly possible, your

17    Honor, and that, I think, is an important part of this case

18    because Mr. Carta has never had that therapy, he's never had

19    that sex offender treatment; and he admitted to you during this

20    trial that he still is attracted to thirteen-year-old boys.

21         THE COURT:  Right.  So the question for me that I have

22    to struggle with, as you said, is the controls:  Could he do

23    that in supervised release and then just date twenty-year-olds?

24         MS. SERAFYN:  Right, and --

25         THE COURT:  As opposed to some of the other people I

1    have who are just obsessed with children.

2         MS. SERAFYN:  Right, and we think, your Honor, that he

3    can't do that on supervised release because he couldn't do it

4    when he was in prison.  He couldn't do it when it was easiest

5    for him.  He couldn't do it when he was on a unit where the

6    treatment was right there for him on his unit, where his

7    therapist was available to him 24-7, where he had an extensive

8    support group, where there were no thirteen-year-olds in

9    prison.  He couldn't do it then in that kind of controlled

10   environment, and the odds are only going to be much more

11   stacked against him if he's released and he has to, you know,

12   walk or ride past a school or a playground to be able to get to

13   treatment, where treatment isn't as intense, where he may not

14   have the same kind of support that he had while he was in

15   prison, and, frankly, where he's going to have so many other

16   temptations.  Theoretically, he would have access to child

17   pornography, he would have access to drugs and alcohol, the

18   kinds of things that have been disinhibitors for him in the

19   past.  And those sorts of things weren't present in prison, and

20   he wasn't able to succeed in treatment because he voluntarily

21   withdrew after seven months.  So we would argue that he does

22   need treatment, but he needs inpatient treatment essentially at

23   Butner with Dr. Hernandez, as opposed to, you know, something

24   that's less frequent and less intense out in the community.

25         THE COURT:  So he couldn't make it last time, so what

1   makes you think that that would be a better option this time?

2   It's the same program, right?

3           MS. SERAFYN:  It is the same program, your Honor.  I

4   think -- I say it's the same program in the sense that it's the

5   sex offender treatment program at Butner.

6           THE COURT:  Butner with Hernandez.

7           MS. SERAFYN:  With Dr. Hernandez.  I'm not sure that

8   that same program in terms of the curriculum was in place the

9   first time around.  I think Mr. Carta went through that program

10  in 2006, which, you know, these trials didn't happen until

11  2009.

12          THE COURT:  So you're saying they're better programs

13  now?

14          MS. SERAFYN:  I think they're better, and I think, as

15  we've seen from the Shields case and as we've seen from the

16  Hunt case, which is the case that Mr. Gold referenced when he

17  talked about a client that he has down there, I tried that case

18  as well, and Mr. Hunt is getting out shortly, I think in July.

19  We just had a conference call with Dr. Hernandez about that.

20  So two of the three sex offenders -- I mean, there's only been

21  three sex offenders in the entire country committed under the

22  Adam Walsh Act:  Mr. Shields, who your Honor just released

23  under conditions, Mr. Hunt, who's about to be released, and

24  Mr. Wetmore, who just got down there.  So I think it's a bit

25  disingenuous for --

70b875a7-d43f-4e50-8920-fa081e5f87c9

1        THE COURT:  They're all moving down to North Carolina,

2   right, all these cases?

3        MS. SERAFYN:  They are, your Honor.  I think it's a

4   bit disingenuous for Mr. Gold to suggest that, as he did in the

5   beginning of his remarks, that these people potentially could

6   be committed for life.  I understand that that often is the

7   case on the state side, which is where Mr. Gold came from, but

8   in the two cases that we've seen so far, both of the sex

9   offenders are getting out within a span of, you know, two years

10   or less.  So I don't think it's a situation where, you know,

11   we're going to lock a sex offender up and throw away the key.

12   I do think that Dr. Hernandez's program is a good one, and

13   we've seen these offenders progress through treatment and

14   actually be released or on their way to being released.

15        So getting back to Dr. Prentky and his ignoring all of

16   the evidence in this case, I just want to give the Court some

17   examples of the kind of evidence that Dr. Prentky ignored.

18   While Mr. Carta was in Butner in 2006, he said that his primary

19   attraction was to thirteen- to seventeen-year-old males, and

20   that comes from Exhibit 25 which is in evidence.  Dr. Prentky

21   ignored this admission.  At the same time, Mr. Carta said that

22   he is most attracted to boys who are in the midst of puberty

23   who are developing secondary sexual characteristics and who can

24   achieve orgasm.  Dr. Prentky ignored that.  That also comes

25   from Exhibit 25.

1           In his SOTP homework, which is Exhibit 27, Mr. Carta

2     noted that his preferred age range were males ranging in age

3     from thirteen to twenty-eight years old.  Again, Dr. Prentky

4     ignored this evidence.  And also in his SOTP homework, which is

5     the sex offender treatment program homework, one of the

6     questions was, "What was your age preference in child

7     pornography?" and Mr. Carta wrote children ages twelve to

8     seventeen were his first preference.  His second preference

9     were children ages seven to eleven.  Again, Dr. Prentky ignored

10    this evidence.

11          So since Mr. Carta made these admissions about his

12    preferred age range being boys in the twelve- to

13    seventeen-year-old range, Mr. Carta sat through a trial before

14    Judge Tauro, and during that trial he heard testimony about

15    hebephilia, and that the definition of hebephilia is

16    adolescents going through puberty, and that the sort of age

17    range for puberty is eleven to fourteen years old.  Well, we've

18    heard testimony that Mr. Carta is a smart guy, he's got a

19    fairly high IQ; and now, conveniently, after he sat through the

20    first trial that Dr. Prentky was not involved in, he told

21    Dr. Prentky during an interview that his preferred age range is

22    fifteen, just beyond the definitional cusp of hebephilia.

23    Hebephilia is eleven to fourteen.  He now says that he's most

24    attracted to boys age fifteen and up, despite all of the

25    admissions that we saw from 2006 suggesting otherwise,

1  suggesting that twelve- and thirteen-year-olds were actually

2  his primary sexual attraction.

3      So, your Honor, Dr. Prentky didn't just ignore

4  hebephilia as a diagnosis; he also ignored Mr. Carta's long

5  history of substance abuse and antisocial personality disorder.

6  He acknowledged, though, that most of Mr. Carta's teenage boy

7  victims were actually on drugs or alcohol when Mr. Carta

8  molested them.  And Dr. Prentky also acknowledged that it was

9  Mr. Carta who gave the boys drugs and alcohol in order to

10 sexually molest them; yet he didn't diagnose Mr. Carta with any

11 substance abuse disorders.  Dr. Prentky also admitted that

12 Mr. Carta could be diagnosed with antisocial personality

13 disorder, but he didn't think that diagnosis was relevant to

14 the case, so he didn't make it.

15     So Dr. Prentky's sloppy risk assessment continued

16 beyond the diagnosis or the failure to make any diagnoses in

17 this case when he scored the actuarial instruments.  Dr. Prentky

18 scored the Static-99 and gave Mr. Carta a score of 6, which

19 places Carta in the high-risk category; yet Dr. Prentky didn't

20 score the Static-99R, even though the developers of the

21 instrument have said that the Static-99R should replace the

22 original Static-99.

23     Dr. Prentky determined that Mr. Carta scored a 6,

24 scored in the high-risk category; yet for some inexplicable

25 reason he completely ignored that score and didn't factor it

1    into his risk assessment.  And in addition to the Static-99,

2    Dr. Prentky also scored an instrument called the SVR-20.  Now,

3    he acknowledged that the SVR-20 is not an actuarial instrument.

4    He acknowledged that he didn't know whether this instrument had

5    ever been used in an Adam Walsh Act case before.  He admitted

6    that the SVR-20 is only occasionally used in risk assessments,

7    and he also acknowledged that the Static-99 is the most widely

8    used instrument and also the most widely validated instrument.

9         So, your Honor, you should not credit Dr. Prentky's

10   testimony in this case because he ignored overwhelming evidence

11   that Mr. Carta is sexually attracted to thirteen-year-old boys,

12   he ignored the high score that Mr. Carta received on the

13   Static-99, and he didn't consider any dynamic risk factors as

14   part of his risk assessment.

15        Now, Dr. Prentky's entire opinion that Mr. Carta is

16   not sexually dangerous is based simply on Mr. Carta telling

17   him, "I am most attracted to boys in the age range of fifteen

18   to twenty," and Dr. Prentky bases his opinion on nothing more

19   than that.  He chooses to credit Mr. Carta's self-report over

20   all of the evidence in this case.

21        And just as the Court should discredit Dr. Prentky's

22   opinion, we believe that the Court should also discredit

23   Dr. Bard's, which is even further afield than Dr. Prentky's.

24   Like Dr. Prentky, Dr. Bard didn't diagnose Mr. Carta with any

25   mental illness, abnormality, or disorder, but at least

70b875a7-d43f-4e50-8920-fa081e5f87c9

1    Dr. Prentky acknowledged that paraphilia NOS characterized by

2    hebephilia is a legitimate diagnosis in the field.  Dr. Bard

3    wouldn't even admit to that.  Dr. Bard recognizes that there

4    are practitioners/clinicians in the field who have adopted this

5    definition of hebephilia, but he doesn't agree with it, which

6    shows that Dr. Bard is a complete outlier in the field, by far

7    in the minority in terms of acknowledging that hebephilia is a

8    legitimate diagnosis.

9           Dr. Bard also testified that it's not a mental

10   illness, abnormality, or disorder for someone to be attracted

11   to, to groom, to stalk, and to have sex with thirteen-year-old

12   boys.  And, your Honor, you don't need to be a qualified

13   expert, you don't need to have a Ph.D. to know that that just

14   doesn't make sense; yet that's what Dr. Bard would have you

15   believe.

16          Now, as part of his risk assessment, Dr. Bard scored

17   both the original Static-99 and the Static-99R, and he found

18   that Carta's scores on these instruments placed him in the

19   moderate-high risk range for sexual recidivism; yet he too

20   chose to ignore these scores.  So now you have two experts who

21   for some reason are scoring the most widely used and validated

22   instruments; yet when they get high scores, they choose to just

23   completely disregard them.

24          THE COURT:  So suppose you have a range of these

25   actuarial instruments between moderate and moderate to high,

1    what significance does that have in the "clear and convincing"

2    analysis?

3         MS. SERAFYN:  Your Honor, I think it's but one piece

4    of the puzzle.  Unfortunately, Congress didn't give the courts

5    or any of us any guidance as to what the numbers mean.  So, for

6    example --

7         THE COURT:  When it's high, that sort of clearly

8    points in your direction.  When it's moderate or moderate to

9    high, it's less clear what it means.

10        MS. SERAFYN:  It may seem less clear, but we believe

11   that if you look at Dr. Phenix's opinion, because she didn't

12   just rely on the actuarials and she looked at other things like

13   the dynamic risk factors --

14        THE COURT:  Those are the subjective things.  I mean,

15   at the end of the day, then I'm not relying on an instrument;

16   I'm relying on the kinds of things I rely on every day in

17   court, common-sense factors.

18        MS. SERAFYN:  That's true, but I would say that you're

19   just not exclusively relying on the instruments.  You're taking

20   them into consideration, and then you're looking at all of the

21   other factors, and then, when you're looking at the totality,

22   you're saying this evidence shows that he will have serious

23   difficulty.

24        THE COURT:  It stops being so wooden.  It's not like a

25   science, if you will, because the actuarial instrument isn't so

70b875a7-d43f-4e50-8920-fa081e5f87c9

1   definitive here.  You have to look at dynamic risk factors.

2           MS. SERAFYN:  We believe that the dynamic risk factors

3   do shed important light on Mr. Carta.

4           THE COURT:  Sure, and they cut -- I understand that,

5   but that means it's judgments that I make.  It's not like a

6   scientific silver bullet.

7           MS. SERAFYN:  That's true, except that of course these

8   dynamic factors are empirically validated and show that if you

9   have all of these dynamic risk factors, you are at increased

10  risk to reoffend.  So the scores on the --

11          THE COURT:  Well, they missed some of them.  Some of

12  them he doesn't have.  Like, he didn't reoffend after a

13  sanction and he didn't reoffend after treatment, which made the

14  other cases so easy.  You know, you give treatment, and then

15  someone reoffends anyway.  Here it's harder, it's harder.  And

16  he now says he wants treatment.  Is that a dynamic risk factor?

17  I mean, you know, it starts becoming my judgments.  As you say,

18  it's a holistic look at this.

19          MS. SERAFYN:  Well, I mean, a couple of responses

20  there, your Honor.  First, Dr. Phenix testified that Mr. Carta

21  did have all of the dynamic risk factors.  I don't know exactly

22  what this PowerPoint is that Mr. Gold ended with except that I

23  know that Dr. Phenix has given presentations about state

24  statutes.  I don't think this presentation to New Hampshire was

25  about the Adam Walsh Act.  They've never had as far as I know

1    an Adam Walsh --

2            THE COURT:  It's common sense, right?

3            MS. SERAFYN:  Sort of common sense, but many of the

4    state statutes differ.  There are some state statutes that are

5    phrased as "more likely than not," which suggests that if the

6    actuarials are sort of 51 percent, that that tips the balance.

7    So I don't think those risk factors or those bullet points are

8    relevant to this case here.  Dr. Phenix found that he had all

9    of the dynamic risk factors.

10           And this idea that Mr. Carta hasn't been sanctioned,

11   then gone on to reoffend, I think is a bit illogical in this

12   case.  Mr. Carta hasn't been sanctioned and gone on to reoffend

13   because all of his sex offenses went undetected, so --

14           THE COURT:  Sure.  I'm just saying, when you have

15   someone like with Shields or Wetmore or -- the other guy was,

16   for me anyway, was very different -- but, you know, then you

17   almost have a slam dunk:  The treatment didn't work, he went

18   back and did it anyway, so he's serious.  I mean, here we don't

19   have that, that's all, not that we have the opposite.  We just

20   don't have it.  It's not as easy.

21           MS. SERAFYN:  I don't think we have it necessarily

22   just from one source, but I do think that it's a slam dunk when

23   you look at all of the sources and when you look at all the

24   factors.

25           THE COURT:  All right, I get your point.  You need to

1  wrap up in five minutes or so.

2       MS. SERAFYN:  So, your Honor, like Dr. Prentky,

3  Dr. Bard chose to rely on Mr. Carta's statements to him rather

4  than on all of the evidence of his decades-long sexual

5  molestation of thirteen-year-old boys and his own admission

6  that he preferred thirteen- to seventeen-year-old boys.

7       Now, in addition to the three experts in this case,

8  you also heard from Mr. Carta, and I think the most important

9  thing about Mr. Carta's testimony was his response to a

10 question that your Honor actually asked him.  And this comes

11 from the Trial Day 4, the transcript from March 21, 2011, and

12 your Honor asked him:  "Are you still attracted to

13 thirteen-year-olds?"  And Mr. Carta answered, "You know, your

14 Honor, I don't know.  I'm not going to sit here and lie and say

15 no, but I can't -- I mean, I see them on TV all the time.  I

16 look at him and I say, 'Oh, he's good-looking,' but as far as

17 sex goes it's in my mind that -- that -- you know, it's

18 off-limits."

19      And then, "THE COURT:  I don't want to put words in

20 your mouth.  So you're still attracted to them.  But what

21 you're saying is, you've been through so much, you would never

22 act on it.  Is that what you're telling me?

23      "THE WITNESS:  Yeah.  I would say I still had an

24 attraction.  I mean, I don't know.  I'm not around any

25 thirteen-year-olds so, I mean, I feel like I don't, but I can't

1  be honest and say that.  It's not an honest statement if I say

2  I'm not attracted to them.  I don't know if that's honest or

3  not.  We've got guys in prison that, you know, there ain't no

4  thirteen-year-olds in prison.  A lot of these kids, you know,

5  they're ready, sex-wise they're ready."

6         So Mr. Carta acknowledged to you during this trial

7  that he remains interested in thirteen-year-old boys, he

8  remains attracted to them, and that he believes that they're

9  still ready for sex.

10        Mr. Carta went beyond that, though.  When he was on

11  the stand, he continued to demonstrate cognitive distortions,

12  and he continued to minimize his sexual activity with

13  thirteen-year-old boys.  He would have you believe that these

14  thirteen-year-old boys are basically coming up to him, taking

15  off their clothes and initiating sexual contact with him.  For

16  example, he testified that after he got into a fight with his

17  seventeen-year-old boyfriend Fred, that Fred's fifteen-year-old

18  brother walked into Carta's room, climbed into bed with him and

19  told him that he'd do anything to be with Carta, and it was

20  only at that time that Mr. Carta started performing oral sex on

21  a fifteen-year-old boy.

22        Mr. Carta also testified about the time that his

23  teenage daughter and her seventeen-year-old boyfriend Seth were

24  living with him.  He said that one day his daughter went to

25  work, and Seth suddenly started taking off his clothes and

1  asked Carta, "You're gay, aren't you?  Why don't we have sex."

2  And it was only then that Carta, quote, "gave in" and had sex

3  with Seth, and then went on to have sex with Seth for over a

4  year without telling his daughter.

5       And Mr. Carta would also have you believe that when he

6  was living in California following the Grateful Dead, that he

7  was in his van one day when thirteen-year-old John came

8  knocking on his van door.  It was raining out.  John was wet.

9  Mr. Carta gave him a blanket, and John immediately started

10 masturbating, and it was only then that Mr. Carta performed

11 oral sex on him.  So even on the stand during trial he's

12 minimizing his role in preying on these boys, in stalking them,

13 in offering them drugs and alcohol, and essentially grooming

14 them to have sex with him.  He wants you to believe that

15 they're just completely disrobing and throwing themselves at

16 Mr. Carta and that's when the sexual contact begins.

17      Now, your Honor, I just want to talk a little bit

18 about treatment.  The evidence shows, I mentioned earlier, that

19 Mr. Carta dropped out of treatment after about seven months

20 after he completed two of the four phases.  Well, the first

21 phase of treatment is orientation; the second phase of

22 treatment is an evaluation.  Mr. Carta dropped out of treatment

23 before the real kind of serious hard look at himself even took

24 place.  And the reason why he dropped out of treatment is

25 because he gravitated towards the youngest members who were in

70b875a7-d43f-4e50-8920-fa081e5f87c9

1    the treatment group.

2           Now, of course these were men because there are no

3    children in prison.  As Mr. Carta acknowledged, "There ain't

4    any thirteen-year-olds in prison," so he picked the

5    youngest-looking members, nineteen-, twenty-,

6    twenty-one-year-old guys, and under the guise of mentoring

7    them, he was repeating his offense cycle.  He was grooming

8    them.  He admitted that he was sexually attracted to them.  So

9    in prison we have him mirroring the offense cycle that he was

10   actually participating in while he was out in the community.

11   When Dr. Wood confronted Mr. Carta about this behavior, he

12   couldn't take it, he felt that treatment was too intense, and

13   he ended up dropping out of treatment.

14          So in Dr. Phenix's opinion, the fact that Mr. Carta

15   dropped out of treatment actually increases his risk of sexual

16   reoffense.  And even Dr. Bard acknowledged that failure to

17   complete sex offender treatment increases risk of recidivism.

18   And Dr. Bard also acknowledged that seven months is not enough

19   time to complete sex offender treatment.  Yet now Mr. Carta

20   wants you to believe that he'll get sex offender treatment, the

21   kind that he needs, if he is released to the community, and,

22   your Honor, this just doesn't make sense.  For many of the

23   reasons that I mentioned earlier, he's going to have access to

24   the disinhibitors -- the alcohol, the drugs, the child

25   pornography -- that he simply didn't have access to in prison.

1        If Mr. Carta is released to the community, your Honor,

2   he's being released as an untreated sex offender, an untreated

3   sex offender who will have serious difficulty in refraining

4   from sexually violent conduct or child molestation, an

5   untreated sex offender who even today remains attracted to

6   thirteen-year-old boys.  He's got a deviant interest in young

7   boys that he admits he's had his entire life.  He's an

8   untreated sex offender with no relapse prevention plan, no

9   place to live, no family support, and essentially no skills to

10  manage his sexual deviance; and we believe that it's much more

11  realistic for him to get those skills, to get that treatment at

12  Butner with Dr. Hernandez than it is if he were released to the

13  community.

14       So, your Honor, there's ample support in the record,

15  particularly from Dr. Phenix's report and her testimony, that

16  Mr. Carta would have serious difficulty in refraining from

17  sexually violent conduct or child molestation if released, and

18  we believe that the government has proved this by clear and

19  convincing evidence, and we ask the Court to commit Mr. Carta

20  as a sexually dangerous person under the Adam Walsh Act.

21       THE COURT:  Thank you.  I'll take this matter under

22  advisement.  I want to thank you both, both sides actually, for

23  excellent advocacy.  I thought the briefing was amazing and the

24  level of effort put into this was as well.  As I've said

25  throughout, it is a harder case than the other three, and I'm

70b875a7-d43f-4e50-8920-fa081e5f87c9

1    not sure what I'm going to do, so I take this under advisement.

2              MS. PIEMONTE-STACEY:  Thank you, your Honor.

3              THE CLERK:  All rise.

4              (Adjourned, 4:45 p.m.)

5                    C E R T I F I C A T E

6

7

UNITED STATES DISTRICT COURT )
8   DISTRICT OF MASSACHUSETTS    ) ss.
CITY OF BOSTON                )
9

10

11          I, Lee A. Marzilli, Official Federal Court Reporter,

12   do hereby certify that the foregoing transcript, Pages 1

13   through 56 inclusive, was recorded by me stenographically at

14   the time and place aforesaid in Civil Action No. 07-12046-PBS,

15   United States of America v. Todd Carta, and thereafter by me

16   reduced to typewriting and is a true and accurate record of the

17   proceedings.

18       In witness whereof I have hereunto set my hand this 30th

19   day of June, 2011.

20

21

22

23

24              /s/ Lee A. Marzilli
                _____
25              LEE A. MARZILLI, CRR
                OFFICIAL COURT REPORTER