UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                              )
UNITED STATES OF AMERICA      )
                              )
          v.                  ) CIVIL NO. 07-12064-PBS
                              )
TODD CARTA,                   )
          Respondent.         )
                              )
```

## FINDINGS OF FACT AND CONCLUSIONS OF LAW AND ORDER

July 7, 2011

Saris, U.S.D.J.

### INTRODUCTION

The United States seeks to civilly commit Respondent Todd Carta as a "sexually dangerous person" under Section 302(4) of the Adam Walsh Child Protection and Safety Act of 2006 ("Adam Walsh Act"), Pub. L. No. 109-248, Title 111, § 302(4), 120 Stat. 587, 620-22 (2006), codified at 18 U.S.C. §§ 4247-4248.

In order to commit Mr. Carta, the government must prove by clear and convincing evidence that he is "sexually dangerous." Under the Adam Walsh Act, a person is sexually dangerous if he "has engaged or attempted to engage in sexually violent conduct or child molestation and. . . is sexually dangerous to others." 18 U.S.C. § 4247(a)(5). In order to determine that someone is sexually dangerous to others, a court must find that he "suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining

1

from sexually violent conduct or child molestation if released."
Id. § 4247(a)(6).  Mr. Carta concedes that he has engaged in
sexually violent conduct or child molestation, meaning that in
order to commit Mr. Carta the government must prove by clear and
convincing evidence (1) that Mr. Carta has a mental illness,
abnormality, or disorder; and (2) that he would have "serious
difficulty refraining from sexually violent conduct or child
molestation" as a result of this serious mental illness
abnormality or disorder.

This case has already been to trial once.  On June 4, 2009,
after a three-day bench trial, Judge Tauro determined that the
government had not met its burden of establishing that Mr. Carta
was a sexually dangerous person.  See United States v. Carta, 620
F.Supp.2d 210, 229 (D. Mass. 2009)("Carta I").  The court based
this conclusion on its findings (1) that paraphilia not otherwise
specified ("NOS") characterized by Hebephilia, a diagnosis Mr.
Carta had received from the government's expert Dr. Amy Phenix,
was not a "serious mental illness, abnormality, or disorder"
under the Adam Walsh Act, id. at 222-27; and (2) that Mr. Carta's
alternative potential diagnoses, including personality disorders
and substance abuse disorders, either did not "[rise] to the
level of a serious mental illness" under the Act, id. at 227
(with regard to personality disorders), or did not "significantly
contribute to his history of sexual offending" and, thus, did not

2

serve as a basis for civil commitment under the Act. Id. at 228-
29 (with regard to substance abuse disorders).

The First Circuit reversed and remanded. See United States
v. Carta, 592 F.3d 34, 44 (1st Cir. 2010)("Carta II"). The court
focused on the determination in Carta I that paraphilia NOS
(Hebephilia) did not constitute a serious mental illness,
abnormality, or disorder under the Adam Walsh Act. The court
observed that the district court had determined that Hebephilia,
or attraction to pubescent-age children, was not an accepted
diagnosis within the medical community; however, the First
Circuit noted that "the statutory concept [of a mental illness]
is [not] delimited by the consensus of the medical community. . .
." Carta II at 39. Moreover, even if the DSM-IV and medical
consensus did set the bounds of the mental illness analysis,
"paraphilia is expressly a DSM-listed disorder and Carta appears
to fall in this category." Id. at 40 (emphasis in original).
Under the Diagnostic and Statistical Manual ("DSM"), IV, which is
the most recently published DSM, "Paraphilia" is characterized by
the following features:

> [R]ecurrent, intense sexually arousing fantasies,
> sexual urges, or behaviors generally involving 1)
> nonhuman objects, 2) the suffering or humiliation of
> oneself or one's partner, or 3) children or other
> nonconsenting persons, that occur over a period of at
> least 6 months. . . [and that] cause clinically
> significant distress or impairment in social,
> occupational, or other important areas of functioning.

Carta II at 38 (quoting Am. Psychiatric Ass'n, DSM 522-23 (4th

ed. 2000)(internal quotation marks omitted). At trial there had

been disagreement over whether the term "children" referred only

to pre-pubescent aged children or whether it also included

pubescent or even post-pubescent minor children. In response,

the court noted that "it would be clear error to say that the DSM

definition of paraphilia excluded an intense sexual fixation on

young teenagers accompanied by a pattern of conduct such as

Carta's." Id. at 41 (emphasis added). The court clarified that

"[t]his does not mean that everyone sexually attracted to

adolescents is mentally disordered; rather, it means that one

whose urges are so strong as to produce the symptoms and

consequences identified in the DSM and exhibited by Carta could

be so classified in an appropriate case." Id. The court held

that "[b]ased on Dr. Phenix's report, Carta's past history of

sexually abusing minors, his in-prison behavior and his expressed

attitudes seemingly justify classifying him as suffering from a

paraphilia: he has a decades-long sexual fixation on minors that

plainly has 'caused significant distress or impairment' in his

life." Id. at 40. Moreover, according to the court, "[the report

of an expert who disagreed with the diagnosis] would be unlikely

to take Carta outside the statute even if we concluded improbably

that he fell outside any DSM-recognized affliction." Id. at 41.

The court concluded its opinion by finding that "the district

court erred in holding that the government failed to establish

that Carta met the mental condition element." Id. at 44. The court then "remand[ed] for the [district court] to consider whether the requisite dangerousness exists." Id. at 44.

The case was then remanded to this Court. The Court held a seven-day trial in late 2010 and early 2011. The parties agreed to admit the transcripts and exhibits from Carta I, and the Court heard the testimony of Dr. Amy Phenix, the government's expert; Dr. Leonard Bard, the court-appointed expert; and Dr. Robert Prentky, Mr. Carta's expert. The Court also heard testimony from Mr. Carta.

Although the First Circuit appears to have explicitly answered the "mental condition" question and remanded solely for a determination of whether Carta will have serious difficulty refraining from sexually violent conduct or child molestation, the parties submitted evidence on both the mental condition question and the "serious difficulty" question. According to Carta, to the extent that the First Circuit answered the former inquiry, this analysis should be rethought in light of new developments in the thriving academic debate over the status of paraphilia NOS (Hebephilia). The Court need not decide, however, whether the First Circuit has foreclosed reexamination of whether Carta has a "serious mental illness" under the Act, for the Court finds that the government has established this prong of the test by clear and convincing evidence. The Court also finds that the

government has established by clear and convincing evidence that Mr. Carta will have serious difficulty refraining from sexually violent conduct or child molestation, and, therefore, that he meets the requirements of Adam Walsh Act commitment.

These holdings are based upon the following findings of fact and conclusions of law.

<strong>FINDINGS OF FACT</strong>

**A. Carta's Personal History**

**1. Early Life and Non-Sexual Criminal History**

Born on October 21, 1960, Mr. Carta lived with his mother, father, and three older siblings in Connecticut during childhood. Mr. Carta has reported that his family-life was loveless and cold; his mother never expressed love for him and subjected him and his sisters to verbal, emotional, and physical abuse. (Trial Tr. Day 4, 6:1-10). At school, Mr. Carta reports that his classmates bullied and teased him, ultimately causing him to stop attending school around seventh or eighth grade. (<u>Id.</u> at 7:4-11.)

Between the ages of thirteen and fifteen, Mr. Carta spent the majority of his time in the woods behind the apartment complex where he lived. (<u>Id.</u> at 11:22-12:3.) Around this time he began hanging out with a group of neighborhood kids whom he described as fellow delinquents, (Ex. 25 at 3,) and he started having problems with the law. At the age of fifteen, he pleaded guilty to Reckless Burning for setting fire to an abandoned

shack. This was apparently not the first time that he had experimented with lighting fires, and he reported feeling an "adrenaline rush" when he ignited the shack. (<u>Id.</u>) When he was seventeen, the police arrested Mr. Carta for burglary when he broke into a drug store and restaurant to steal cigarettes and food. He ultimately spent six-months in state incarceration as a result of this incident. (Trial Tr. Day 4, 16:23-17:1).

### 2. Sexual and Relationship History

Mr. Carta's childhood was also plagued by his frequent victimization by sexual abuse. At the age of seven, a neighborhood boy forced Carta to perform oral sex with a similarly-aged child. (<u>Id.</u> at 8:1-3). When he was ten or eleven, a fifteen-year-old boy forced Carta to perform oral sex on him during a game of "doctor." (<u>Id.</u> at 8:21-9:8). When Carta was about thirteen, he met an older man fishing by the river. The man asked Carta if the man could perform oral sex on Carta. Carta initially refused, but ultimately relented. (<u>Id.</u> at 13-14.) Carta's relationship with the man lasted approximately two years, and during this period they engaged in approximately twenty sexual encounters. (<u>Id.</u> at 14:7-16.) At the time, Carta felt that he had a positive experience with the man. At trial, Carta testified that the man had "showed me love, what I thought was love, you know." (<u>Id.</u> at 14:20-21).

During this same period, Carta also began perpetrating acts

7

of abuse on others. At approximately thirteen, Mr. Carta performed oral sex on a boy in diapers. (_Id._ at 9:17-10:14.) In describing the incident, Mr. Carta testified that, at the time, he thought his behavior appropriate because similar acts had been performed on him. (_Id._ at 10:18-20.) At the age of sixteen, Mr. Carta shot a similarly-aged boy with a BB gun after the boy refused to engage in oral sex; the pair eventually performed oral sex on each other on multiple occasions. (_Id._ at 45:24-46:22.) At the age of twenty-one, Mr. Carta engaged in oral sex with his sixteen-year-old nephew on multiple occasions. (_Id._ at 43.)

Beginning in his twenties, Mr. Carta entered into two separate long-term relationships with women: Lucille and Brenda. At the age of twenty-four, Mr. Carta married Lucille, who was seventeen at the time. (_Id._ at 20:4-21:3.) The relationship appears to have been relatively rocky. At one point, Mr. Carta took approximately 20 aspirin and then called his wife to tell her what he had done. (Ex. 25 at 2.) The marriage dissolved after less than one year, but the relationship produced one daughter. Initially, Mr. Carta's daughter lived with her mother, Lucille, but Carta ultimately pursued a court order declaring Lucille unfit. At that point, when he was twenty-five, Carta took custody of his daughter. (_Id._ at 21.) After a few months, Carta's mother ended up caring for his daughter. (_Id._ at 23.)

Subsequently, Mr. Carta entered into a five year monogamous

8

relationship with Brenda.  The relationship was fairly stable. Carta reported, however, that Brenda's sexual appetite was "insatiable." (Id. at 24:22.) The couple routinely engaged in bondage and participated in three-way sexual intercourse on multiple occasions. (Id. at 25.)  Ultimately, Carta learned that Brenda was having an affair.  In response he reported becoming "pissed" and smashing the windshield of a friend's car.  He also placed nude photographs of Brenda in her brother's mailbox in an attempt to "destroy her." (Ex. 25 at 4.)

For approximately five years, in his late twenties and early thirties, Mr. Carta went "on tour" with the band Grateful Dead. (Id. at 26:5-11).  He described the experience as "like being with a big family." (Id. at 26:14.)  While touring with the Grateful Dead, Carta had at least one sexual encounter when he exchanged his own concert tickets for the opportunity to perform oral sex on a thirteen-year-old boy. (Id. at 28:7-13.)  Mr. Carta reports that the boy did not have facial hair, but had pubic hair, and looked approximately six feet tall. (Id. at 29:10-20). While in federal sex offender treatment, Carta also admitted that during this period he once fondled a seventeen to eighteen year-old male who was unconscious as a result of drug use. (Ex. 25. at 7.)

After touring with the Dead, Carta moved to California and entered into a three-year relationship with a thirteen year-old

boy named John. (Trial Tr. Day 4, 31:14-20.) Mr. Carta claims

that the relationship began when Mr. Carta was living in Eureka,

California. When he was sitting in his van one day while it was

raining, John knocked on the door and asked to come in. Carta

says he gave John a blanket, and John began to masturbate. Carta

then says he asked John if he needed "any help;" when John said

yes, Carta began performing oral sex on him. (Trial Tr. Day 4,

32:5-7.) Mr. Carta estimates that they engaged in sexual

activity on at least twenty occasions, the majority of which

involved Mr. Carta performing oral sex on John. (Id. at 33:4-11).

Mr. Carta testified that he was attracted to John because he was

young, energetic, and physically active. (Id. at 33:18-25).

Carta's relationship with John seems to have been particularly

predatory. Carta has acknowledged that John's parents were drug

addicts and that John tended to be very lonely. (Ex. 25 at 8.)

Carta would often invite John to meet him, but John would often

fail to show up. When this happened, Carta would track John,

going to all of his favorite hang-outs to find him. (Id.)

In his late thirties, Mr. Carta moved back to Connecticut

and John soon followed. (Id. at 34:15-35:10.) Apparently, Carta

convinced John that Carta could offer him a better life in

Connecticut. (Ex. 25 at 8.) Carta at one point acknowledged,

however, that the true intent behind moving John to Connecticut

was that John would be less likely to roam from Carta as he had

been prone to do in California. (Id.) After living together for an unknown period of time, John eventually moved back to California. According to Mr. Carta, John had become homesick and likely tired of living with an older man. (Trial Tr. Day 4, 7-10).

After John moved away, Mr. Carta testified that he became addicted to child pornography, amassing approximately 50,000 images of children, some as young as three-years-old. (Id. at 39:2-7.) His addiction became so severe that if he was missing a specific picture from a series, he would scour the internet for hours until he found it. (Id. at 52.) According to Mr. Carta, he primarily viewed images of males between the ages of thirteen and twenty, but collected images of children of a variety of ages for the purposes of trading with other collectors. (Id. at 38:22-39:12.) Carta's preoccupation with child pornography became very disruptive to the rest of his life. He reported spending between 12-14 hours on the internet and masturbating to child pornography between 2-3 times a day. (Ex. 25 at 9.)

In addition to viewing child pornography, Mr. Carta posted online advertisements in search of sex with fourteen to eighteen year old males. (Id. at 39:19-40:7.) On one occasion, Mr. Carta performed oral sex on a thirteen-year-old boy who responded to an advertisement. Mr. Carta testified he did not allow the boy to give him oral sex because it was "too intrusive," and he did not

11

want to damage the boy. (<u>Id.</u> at 40:9-22.)

During this time, Mr. Carta also developed a long-term relationship with Fred, a seventeen-year-old boy. (<u>Id.</u> at 53:8-23.) He knew that Fred was from a "bad family," and Carta provided Fred with a job and money to manipulate Fred into feeling comfortable with Carta. Ultimately, Carta asked Fred to move in with him. (Ex. 25 at 4.) The relationship included a number of deviant aspects. Fred and Carta once had three-way sexual contact with the same thirteen year-old boy whom Carta had met over the internet. (<u>Id.</u> at 8.) Overtime, Carta fell in love with Fred and envisioned a future for the two of them together. (Trial Tr. Day 4, 54.) However, Carta testified that he had a habit of becoming overbearing in a relationship. (<u>Id.</u> at 55.) After a time, he felt like he needed to be with Fred all the time. (<u>Id.</u> at 55:3-7.) As a result, Carta's relationship with Fred became explosive, and they fought often. According to Carta, after one fight, Fred's fifteen year-old brother came to Carta's room and told Carta how lucky Fred was for being in a relationship with Carta. (<u>Id.</u> at 55:19-20.) At this time, Carta performed oral sex on Fred's brother for a couple of minutes. (<u>Id.</u> at 55:19-21.) This version of events differs from the narrative provided by Fred's brother, however, who claimed that Carta invited him into bed and initiated sexual contact. (Ex. 40 at 9.)

12

At some point later, Carta and Fred had another fight after
which Carta called 911 because Fred was "smashing stuff" at
Carta's house. (Trial Tr. Day 4, 57.) Both Carta and Fred were
arrested for the domestic disturbance. (Id.) After this
incident, Carta and Fred moved apart, but on a number of
occasions Fred called Carta in order to invite him over. On
these occasions, when Carta arrived at Fred's residence, Fred was
often not present. To retaliate for this frequent rejection,
Carta posted flyers with derogatory remarks about Fred and his
family in mailboxes around the neighborhood. (Id. at 57:21-
58:11). The police arrested Mr. Carta for Disorderly Conduct.
(Id. at 61:22-62:2).

Subsequently, state authorities charged Mr. Carta with Risk
of Injury to a Minor for providing alcohol and drugs to Fred and
his younger brothers. (Id. at 59:2-9.) For this charge, Mr.
Carta was sentenced to five years probation and conditions of
release which included a recommended sex offender treatment
program at the state level. According to Mr. Carta, even though
Carta's lawyer told him that he could avoid the sex offender
treatment because he was not charged for a sex crime, he agreed
to attend the meetings "because [he] needed them." (Id. at 70:4-
15).

About a month after Fred left, Carta's daughter and her
boyfriend, Seth, moved in with Carta. (Id. at 62:3-4.) At some

point soon after they moved in, Carta had sex with Seth when Seth was "coming down" from a drug binge. (Ex. 25 at 4.) Seth was seventeen at the time. (Id.) According to Carta, the first sexual contact occurred at some point when Carta's daughter was out of the house and Seth and Carta were sitting in the living room. Seth apparently began taking off his clothes, and when Carta asked him what he was doing Seth, according to Carta, responded: "Well, you're gay, ain't you?" (Trial Tr. Day 4, 62:13-18.) Over the course of a year, they had sex many times but hid the relationship from Carta's daughter. (Trial Tr. Day 5, 20-21.)

While Carta's daughter was living with him, Carta was taken into state custody on marijuana charges. Carta had left money for his daughter and Seth to bail him out of jail. When they never came to bail him out, he tried to contact them through his mother, who refused to allow him to communicate with either his daughter or her boyfriend. At this point Carta sent a threatening letter to his mother in which he stated that he would "get her." (Trial Tr. Day 4, 60:19-25.) Carta also lashed out at his daughter by telling her about his relationship with Seth. While in the federal sex offender treatment program, Carta stated that he told his daughter about the relationship hoping that his daughter would leave Seth so that he could have a relationship with him. (Ex. 25 at 5.)

### 3. Substance Abuse History

Carta has also struggled with substance abuse. In federal sex offender treatment he reported beginning to use alcohol when he was fifteen or sixteen. His alcohol use continued to increase until he was drinking three or four "six-packs" a week, though he claimed to quit drinking once released on his state charges. (Id.)

He also has struggled with marijuana and other drugs. He smoked marijuana regularly between the ages of seventeen and forty-one, including daily use while in his thirties. Between the ages of seventeen through nineteen he began using LSD. This use grew substantially while he toured with the Grateful Dead, when he would sometimes have week-long LSD "binges." (Id.)

Carta has acknowledged that his alcohol and drug use have contributed to his legal problems, (id.) and that they are triggers for his sexual offending. (Trial Tr. Day 4, 82-83.)

### 4. Pornography Charges and Federal Incarceration

In 1999, the FBI conducted an investigation of newsgroups involved in the trading of child pornography. (Ex. 40 at 2.) During the course of this investigation, the FBI found approximately 110 postings by Carta containing child pornography. (Id.) In 2001, the postal service learned that Carta had mailed a package containing computer disks and a modem to an individual

15

in Maryland who had been identified as a participant in a child pornography video. (Id.)  Around this same time, the New Britain Police Department received a complaint from Carta's live-in boyfriend Fred that Carta had been viewing child pornography, that Carta had performed oral sex on Fred's fifteen year-old brother, and that Carta had provided drugs and alcohol to Fred and his fifteen and thirteen year-old brothers. (Id. at 2-3.) When police investigated Carta's house, they discovered that he operated several websites featuring naked pictures of teenage boys.  They also found incriminating online ads in which Carta stated that he was "looking for a cute, hot 14-18 year-old to take care of and spoil. . . ." (Ex. 40 at 3-4.)

On April 9, 2002 Carta pled guilty in Federal Court to Transportation of Child Pornography.  He was released pending sentencing and continued to attend sex offender treatment in the community until his federal sentencing. (Trial Tr. Day 4, 72.) During this period Carta also assisted the government in prosecuting other child porn offenders. (Id. at 72-73.)  While he was in state sex offender treatment and cooperating with the government, Carta said he did not view child pornography or engage in sexual contact with a minor (Id. at 73-74.)  The sentencing court sentenced Carta to 60 months incarceration, a substantial downward departure, in recognition of the cooperation he had provided to the government. (Id.)  At sentencing, Carta

16

told the court that he had had a positive experience in state sex offender treatment, and that the treatment had provided him with his first opportunity to "talk about [his] problems. . . like touching kids, all that." (<u>Id.</u> at 75.)

Carta was initially sentenced to the United States Prison at Allenwood, PA. (<u>Id.</u>) Carta described his experience at Allenwood as being frightening, and he often feared for his own personal safety. (<u>Id.</u>) During his time there he saw one fellow inmate murdered. (<u>Id.</u> at 76) And, apparently, at some point one of the staff members in the institution informed inmates that Carta was a sex offender thereby subjecting Carta to considerable danger. (<u>Id.</u>) Simultaneously, however, Carta took part in educational programming at the institution. (<u>Id.</u>) He earned his GED and participated in a program called Challenges, Opportunities, Discipline, and Ethics (CODE). (<u>Id.</u>) The program helped Carta work on many of the same issues, including his thinking errors and cognitive distortions, that he worked on during his stint in sex offender treatment. (<u>Id.</u>) Nonetheless, the program did not give Carta an opportunity to actually speak about his sexual offenses and urges, as doing so would have revealed his status as a sex offender and exposed him to danger in the institution. (<u>Id.</u> at 76-77.) Carta described this drawback of the CODE program as "very frustrating." (<u>Id.</u> at 78:1-2.)

In 2005, after Carta had completed CODE, he applied to the federal sex offender treatment program ("SOTP") at FCI-Butner ("Butner") in North Carolina. (<u>See</u> Ex. 25 at 1; Trial Tr. Day 4, 80.) This voluntary decision was based in part on Carta's desire to leave Allenwood, along with his understanding that he needed to focus more specifically on the problems that led to his sexual offenses. (<u>Id.</u> at 80:7-9.)

The SOTP at Butner was comprised of four phases: (1) initial orientation; (2) assessment; (3) treatment; and (4) relapse prevention release planning. As part of the assessment phase, Mr. Carta voluntarily filled out a Personal History Questionnaire, a detailed self-report which revealed his previously undetected sexual offenses. At the first trial, Carta's physiologist at Butner, Michael Wood, testified that Carta was "more forthcoming than [Wood] generally experienced" with newly admitted patients. (<u>See</u> <u>Carta I</u>, Trial Tr. Day 1, 125.)

Based on Carta's answers to the PHQ, and the results of other tests, Dr. Wood published a comprehensive psychosexual evaluation. (<u>See</u> Ex. 25.) The evaluation provided a comprehensive review of Carta's personal history, with a focus on his sexually deviant and criminal behaviors. Wood summarized his findings by noting that Carta "exhibits a number of problematic personality traits in that he reports being 'intense' in his

relationships, in that he does not trust others and 'suffocates' them because he wants to spend all of his available time with them." (Ex. 25 at 12.) The report also noted that Carta "reports a primary attraction to postpubescent teenaged males." (Id. at 13.) In Carta's first interview with SOTP staff, he reported this age range to be between the ages of 13-17. (Id. at 9.) This group was particularly attractive to Carta because with teens Carta feels "cooler, more knowledgeable, and wealthier." (Id. at 13.) The evaluation also deemed Carta's sexual behavior particularly problematic due to a number of cognitive distortions. For example, Carta never acknowledged the "manipulative characteristics of his behavior in which he grooms [teenage boys] with drugs, money or a place to live." (Id.) Carta's comments on this issue suggested to Wood that Carta believed his relationships with his victims helped them as opposed to hurt them. (Id.) Wood noted that Carta's explanation that he "perform[ed] fellatio on minors because it is enjoyable for them, while [he] refrain[ed] from having them to reciprocate because it is more intrusive and 'can mess them up' highlighted [this problem]." (Id.) Finally, also of note, the evaluation observed that Carta scored in the "Very Superior" range of intelligence on an IQ test. (Id. at 10.)

Dr. Wood testified that Carta's progress at SOTP was a somewhat mixed bag. Though Carta was in the early phases of

beginning to accept responsibility for his actions, he did not participate in the program long enough to "fully accept the harmfulness of his behavior." (Carta I, Trial Tr. Day 1, 87:6-8.) When it came to Carta understanding his own sexual deviance, "he would have a breakthrough and then it was like one step forward and two steps back." (Id. at 87:12-14.)  At times Carta became defensive about his cognitive distortions regarding his behaviors and victims, but at other times he would break down and agree with Dr. Wood about his problems. (Id. at 129-30.)  In Carta's discharge report, Dr. Wood wrote that Carta presented at Butner with significant cognitive distortions common to men who sexually offended.  Carta was, at times, able to acknowledge these distortions, however, "he exhibited difficulty enacting these insights into behavior change." (Ex. 27 at 3.)

At trial Carta testified about the difficulty of the SOTP at Butner.  In particular, he noted that he participated in a "process group," which "ripped you down, and then rebuilt you all back up and bared you open to everything." (Trial Tr. Day 4, 82:5-8.)  During this process he apparently realized that he "had a lot of thinking errors" and "cognitive distortions." (Id. at 82:16.)  These included thought patterns like "this kid wants to have sex with me so it's okay" or "I'm only trying to help him." (Id. at 82:21-24.)  He also identified drugs, alcohol, and pornography as possible triggers. (Id. at 82-83.)

Despite this moderate progress, Carta failed to complete
SOTP at Butner.  While there, Carta began to associate with some
of the younger men who took part in the treatment program.  He
apparently stated that his desire was to "help" these younger
participants. (Ex. 27 at 4.)  This, according to Dr. Wood,
"mimicked Mr. Carta's pattern of behavior with young males prior
to his incarceration." (Id.)  According to Dr. Wood, though there
was nothing technically deviant about this behavior, it was
"problematic." (Carta I, Trial Tr. Day 1, 140:4.)  When staff and
other participants challenged his behavior, Carta became angry
and argued that he was acting appropriately.  This pattern
continued for a number of weeks until Carta finally broke down
crying and admitted that he was attracted to one of the men. (Ex.
27 at 4-5.)  At one point a young male participant, whom Carta
admitted being attracted to, challenged Carta on his behavior at
a community meeting.  Mr. Carta became enraged and spent the next
few weeks seeking revenge against the other participant,
repeatedly telling staff about the other participant's
wrongdoing. (Id. at 5.)  Eventually Carta was encouraged to come
up with an action plan to hold himself accountable for his
preoccupation with younger peers. (Id.)  He ultimately decided to
restrict himself from interacting with anyone not in the final
stages of treatment. (Carta I, Trial Tr. Day 1, at 92-93.)
Eventually, after struggling with this restriction, Carta quit

the program.  This was not the first time that Carta had attempted to quit the program.  Each of the prior times he had changed his mind, but, according to Dr. Wood, this decision seemed final. (Id. at 94.)  The day after he quit treatment he acknowledged that he had made the wrong decision but stated that he was "too embarrassed" to resume treatment. (Id. at 131.)

Carta's version of why he left treatment differs from Dr. Wood's as memorialized in the discharge report. (See Ex. 27.) According to Carta, his decision to leave the SOTP at Butner was the result of a dispute with treatment providers over the expulsion of a fellow participant.  Apparently, the program was designed to encourage participants to disclose other participants' behaviors that were inconsistent with the aims of the treatment program. (Trial Tr. Day 4, 104-05.)  On a few occasions, Carta confronted other inmates in open meetings about their behaviors, including on one occasion confronting another inmate on the fact that he was having sexual contact with someone else in the facility. (Trial Tr. Day 4, 106-07; Day 5, 38-39.) Carta said he was remorseful about confronting the other inmate, however, and told treatment providers that he would quit the program if this other participant were expelled. (Trial Tr. Day 4, 102.)  The other participant was ultimately expelled, and Carta quit treatment. (Trial Tr. Day 4, 106.)

After leaving the SOTP, Carta was transferred back to

Allenwood for about a year. During that time he had one disciplinary issue when he allegedly threatened a member of prison staff by stating that he was "going to pour hot baby oil on her." (<u>Id.</u> at 110.) Carta disputes this allegation. (<u>Id.</u>)

With two weeks left on his sentence Carta was transferred to FMC-Devens for evaluation as a sexually dangerous person under the Adam Walsh Act. (Trial Tr. Day 4, 111.) Since he was transferred to Devens, he has had a few disciplinary problems. For example, he has received citations for "fixing radios" for other inmates and an insolence report for talking back to a staff member who requested that he tuck in his shirt. (Id. at 114.) Most seriously, he has also been cited for possession of amphetamines. (<u>Id.</u> at 114:25.) Carta says he does not know how the amphetamines appeared in his locker. (<u>Id.</u> at 117.) Since the incident he has been drug tested on a number of occasions and has tested negatively each time. (<u>Id.</u> at 116.) He testified that since his incarceration he has never consumed drugs of any kind or had any sexual contact. (<u>Id.</u> at 118.)

## B. Carta's Testimony

At trial Carta testified extensively about his past offending and his experience in the BOP. He also specifically addressed the question of whether he continues to be attracted to children. He stated:

> Yeah. I would say I still had an attraction. I
> mean, I don't know; I'm not around any 13-year-olds so

23

> . . . I mean, I feel like I don't, but I can't be
> honest and say that.
>     It's not an honest statement if I say I'm not
> attracted to them, I don't know if that's honest or
> not.  We've got guys in prison that, you know – there
> ain't no 12-year-olds in prison.
>     I know I would never have sex with a 13-year-old
> you know, no matter if they looked 20, you know, I
> don't care; it's just illegal, and I know the damages I
> can cause that person, you know, psychological damages.

(Id. at 94-95.)  The Court pushed Carta on his ability to

restrain himself from acting on an attraction to young men.  In

the past, during the course of his relationships with family and

his time at Butner, Carta has acted impulsively when he has felt

discouraged, challenged, or spurned.  At trial I asked, "How do I

know you wouldn't get frustrated at some dumb rule and just quit

[treatment] again?" He responded:

> Because if I do, I'll be right back here again;
> that's the only thing I can tell you. . . because being
> on the street's a little bit different, you know, it's
> no – you're not in prison so you're not getting all
> this stuff rammed down your throat 24 hours a day, but
> I did a little bit of it before at Connections, and I
> liked the people that put it together, and like the
> psychologists and stuff, I like them; but I can only
> give my word, your Honor, that's all I can do, and tell
> you that if I go out there and do something again and I
> come back here, you won't have to have a trial; I'll
> commit myself, okay?  That's all I can tell you.

(Id. at 121-22.)

At trial Carta also expressed an eagerness to resume

intensive sex offender treatment despite his attorney's

objection.  According to BOP, Carta is not eligible for sex

offender treatment because he has not been formally committed. (See Ex. 41.) Ultimately Carta began receiving a form of one-on-one treatment at FMC-Devens pending the resolution of this matter, though it is unclear how much of this treatment has been focused specifically on sex offending as opposed to criminality more generally.

Carta also testified about his eagerness to be released. Despite his past problems with his family, he claims to have reconciled with at least some family members. While at Butner, he wrote his mom and dad a letter about how sorry he was for "all the stuff [he had done]" which he "had never had the courage to tell [his father]" who died in 2010. (Trial Tr. Day 4, 122-23.) He then continued, "My mother wants me home. She told me she needs me. My brother is out there and he said he'll do whatever he can to help me." (Id. at 123.)

**C. Experts**

**1. Dr. Amy Phenix**

Dr. Phenix, the government's expert witness, formed her opinion after examining Mr. Carta's records, including his psychiatric history, his history of criminality and drug use, and his treatment records from SOTP at Butner. She has never held a face-to-face evaluation of Mr. Carta because he refused to be interviewed. On the basis of this review Dr. Phenix has opined that Carta can be diagnosed with a serious mental illness,

abnormality, or disorder as a result of which he will have serious difficulty refraining from sexually abusing minor-aged children if released.

### a) Mental Condition

Dr. Phenix diagnosed Carta with paraphilia-NOS, characterized by Hebephilia. She testified that this diagnosis was supported by the text of the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision ("DSM-IV-TR"), which includes a paraphilia NOS diagnosis as a "residual category" meant to code paraphilias that do not fall within the codified and more common paraphilias, like Pedophilia, Exhibitionism, and Fetishism. (See Trial Tr. Day 1, 61.) As discussed above, paraphilia NOS is characterized by two criteria:

> "(1) recurrent, intense sexually arousing fantasies,
> sexual urges, or behaviors generally involving. . .
> children or other nonconsenting persons that occur over
> a period of at least 6 months. . . [and] (2) behavior,
> sexual urges, or fantasies [that] cause significant
> distress, impairment in social occupational or other
> important areas of functioning."

(Ex. 11.)

Although Dr. Phenix did not testify expressly about whether she believed the term "children" included pubescent-aged children, she opined that Mr. Carta fit the DSM-IV diagnosis of paraphilia NOS because of an intense arousal to pubescent children coupled with its disruptive effects on Carta's life. (Trial Tr. Day 1, 64:7-22.) According to Dr. Phenix, this

attraction is evident in Carta's admissions in the SOTP that his primary child pornography interest was in images depicting children between the ages of 12 and 17, with an admitted secondary interest in images depicting 7 to 11 year olds. (<u>Id.</u> at 79.)  The arousal is also evident in Carta's extensive sexual contact with thirteen year-old boys, including a multi-year relationship with one boy that began when the boy was thirteen. (<u>Id.</u> at 64.)  Furthermore, this arousal has, in the past, caused considerable distress and dysfunction in Carta's life.  In particular, Dr. Phenix noted that Carta admitted to viewing child pornography up to twelve to fourteen hours a day to the exclusion of work, showering and taking care of his hygiene. (<u>Id.</u>)

Dr. Phenix also testified that "Hebephilia" is a discreet mental illness studied in peer-reviewed journals, and, thus, that it is an appropriate specification to a paraphilia NOS diagnosis. The most prominent academic exploration of Hebephilia is Dr. Ray Blanchard's article "Pedohebephilia, Hebephilia, and the DSM-V." (Trial Tr. Day 1, 70:4-7.)  Dr. Blanchard determined that certain individuals are particularly attracted to children going through the process of puberty, defined as children aged 11-14. (<u>Id.</u> at 73:20-23.)  In addition, the DSM-V working group, a group of scholars working on a proposed text for the new version of the DSM, has recommended that the manual include a diagnosis of Pedohebephilic Disorder. (<u>Id.</u> at 74-75.)  The recommendation

specifies that the definition of pedophilia "be revised to include Hebepedophilia" as defined as "the erotic preference for children in Tanner stages 2-3." (Id. at 75:16-20.)  The "Tanner stages" refer to the stages of physical development in children and adolescents.  Stages two and three describe children who are developing some secondary sexual characteristics but still have mostly immature bodies. (Id. at 76.)  By including these children, Dr. Phenix testified, the diagnosis of Pedohebephilia usefully expands on the Pedophilia diagnosis to capture deviant arousal not only to prepubescent children but to pubescent children as well.  Although the diagnosis has yet to be added to the DSM, Dr. Phenix testified that it is already fairly well accepted in the treatment community because treatment providers often diagnose patients with Hebephilia for the purposes of treatment planning. (Id. at 77:1-4.)

The diagnostic criteria for the proposed Pedohebephilic disorder are the following: 1) over a period of six months, the individual experiences recurrent sexual fantasies, urges, or behaviors directed toward prepubescent and pubescent children, or has greater arousal to these ages than to physically mature individuals; and 2) the person has clinically significant distress or impairment in important areas of functioning from sexual attraction to children; or the person has sought sexual stimulation, on separate occasions, from either two or more

different children, if both are prepubescent or three or more different children, if one or more are pubescent; or repeated use of and greater arousal from, pornography depicting prepubescent or pubescent children than from pornography depicting physically mature persons, for a period of six months or longer. (<u>Id.</u> at 78.)

Dr. Phenix also testified about Carta's fit with these criteria.  Carta met criterion one as a result of his numerous sexual relationships with thirteen year-olds, at least some of whom Dr. Phenix believed to fall into the pubescent, as opposed to post-pubescent category, his admissions of arousal to children in this age group, and his extensive collection and obsession with child pornography. (<u>Id.</u> at 81:1-10.)  Dr. Phenix was less certain about whether Carta was primarily attracted to children in this age group, as his relationships with post-pubescent minors and adults would seem to suggest at least some attraction to those outside of the stages identified in the Pedehebephilia diagnosis. (<u>Id.</u> at 81:12-13.)  However, this did not necessarily preclude a Hebephilia finding.  As Dr. Phenix testified, deviant sexual arousal is sometimes very narrow – focused on a small range of ages. (<u>Id.</u> at 86.)  More often, however, individuals with diagnosable paraphilias exhibit some non-deviant sexual attraction along with their deviant sexual arousal. (<u>Id.</u>)  The Pedehebephilia diagnosis allows for this possibility by including

a criterion of primary arousal to prepubescent or pubescent children as a sufficient but not a necessary condition to meeting prong one of the diagnosis.  An individual can also meet the diagnosis of Pedehebephilia when he has "recurrent sexual fantasies, urges, or behaviors" in relation to this age group. Dr. Phenix did not have any doubt that Carta met at least this criterion.

Dr. Phenix also opined that Mr. Carta met the second part of the diagnosis for Pedehebephilia.  First, he is, according to Dr. Phenix, a "person who has been subject to a significant loss of freedom" as a result of his attraction to pubescent children. Once again, he has admitted to spending between twelve and fourteen hours a day looking at child pornography, to the exclusion of keeping good hygiene or gaining employment. (<u>Id.</u> at 82.)  He also meets criterion two because he has engaged in sexual conduct with at least three different pubescent-aged children. (<u>Id.</u>)

Dr. Phenix acknowledged that a diagnosis of paraphilia NOS (Hebephilia) was not universally accepted in the medical community because some experts believe that attraction to post-pubescent minors, though in contravention of clear social mores, is not psychologically deviant and is present in the normal population.  She agreed with this notion, but, she testified that there was a clear distinction between post-pubescent aged minors

and pubescent children who may have some secondary sexual characteristics but are mainly physically immature. A failure to recognize this distinction, she argues, has led some to eschew the paraphilia NOS (Hebephilia) diagnosis. Nonetheless, she testified that this opinion was held by a small, though vocal, minority in the medical community. "Almost everyone in [the] field accepts a Hebephilia diagnosis and it has been a focus of treatment in standard sex offender treatment programs." (Id. at 84:12-15.) Dr. Phenix clarified, however, that the diagnosis only applies to attraction to pubescent children, not to post-pubescents. Carta fit the diagnosis, therefore, because of his arousal to children in the eleven to fourteen year old age group, not his frequent sexual contact with older teens. (Id. at 81:8-9.)

Dr. Phenix also diagnosed Mr. Carta with Hallucinogen Dependence, Cannabis Dependence, Alcohol Abuse, and Personality Disorder NOS with antisocial and borderline traits. The diagnosis of dependence disorders was based upon Carta's significant consumption of alcohol and drugs in the years prior to his incarceration. (Trial Tr. 88-92.)

In regard to the personality disorder diagnosis, the DSM-IV-TR defines a personality disorder as an enduring pattern of inner experience and behavior that deviates markedly from the expectations of the individual's culture, is pervasive and

inflexible, has an onset in adolescence or early adulthood, is stable over time, and leads to distress or impairment. According to Dr. Phenix, Carta's volatile, manipulative, and often vindictive behaviors all suggest that he falls within this diagnosis.  Of particular relevance, Dr. Phenix focused on: 1) his attempted suicide after his wife ended their brief marriage; 2) his very similar efforts to retaliate against Brenda and Fred by posting damaging flyers about them around the neighborhood after they broke up with him; 4) his excessive use of drugs and alcohol; and 5) his general criminality. (Id. at 92-93.) According to the Government and Dr. Phenix, this diagnosis qualifies as a mental illness under the Act because it allows Carta to rationalize hurting others.  As Dr. Phenix testified, Carta "does not have a conscience about engaging in sex with young boys and the harm that it may cause them because of his antisocial attitudes." (Id. at 93.)  For example, his borderline traits cause him to form the kind of suffocating relationship tendencies that led him to manipulate a thirteen year-old, John, to come across the country and live with him in Connecticut, and during SOPT he exhibited a number of distorted views on his sexual behavior, including that he was helping the boys he assaulted. (Id. at 94:1-5.)

**b)  Serious Difficulty Refraining**

Dr. Phenix then testified that, as a result of Carta's

paraphilia NOS (Hebephilia), he would have serious difficulty refraining from sexually violent conduct or child molestation. She reached this conclusion after scoring three separate risk-assessment instruments to determine Carta's risk range, as well as considering a number of dynamic risk factors.

First she scored the Static-99R. The Static-99R is peer-reviewed actuarial instrument that estimates the probability of sexual and violent re-conviction for adult males sex offenders. (See Trial Tr. Day 2, 50:23-25 (Static-99R is peer reviewed.).) It is a revision of the Static-99, which Dr. Phenix scored at Carta's first trial before Judge Tauro. The revised instrument includes new data on age and reoffending. Whereas the Static-99 included only two age groups – below twenty-five and above twenty-five – the Static-99R scores subjects differently depending on whether they are 18 to 34.9, 35 to 39.9, 40 to 59.9, or 60 and over. (Id. at 100:18-22.) The new instrument, therefore, takes a more nuanced account of Mr. Carta's age by scoring him within the 40 to 59.9 age group, which, according to the instrument, makes him less likely to reoffend than a similar younger subject.

Along with age, the instrument scores a number of other characteristics including whether the subject has lived with a lover for two years (which will make a subject less likely to reoffend), whether he has exhibited nonsexual violence (which

will make him more likely to reoffend), and whether he has had stranger victims, male victims, or unrelated victims (all of which will also make him more likely to reoffend). (<u>Id.</u> at 100.) According to Dr. Phenix's scoring of these multiple factors, Carta scored in the moderate-high range as compared to other offenders. (<u>Id.</u> at 102.)

Determining the likelihood that Carta will reoffend based upon this scoring is a more complicated question. At the last trial in this case, Dr. Phenix scored according to what she termed a "pure actuarial" method. (Trial Tr. Day 2, 41:5.) This method produced a range of percentages within which Carta's reoffense rate at five and ten years was likely to fall. According to the pure actuarial method, the scorer would use this range, along with consultation of a number of general risk factors, known as dynamic risk factors, to provide an opinion on whether an individual would have serious difficulty refraining if released. For Mr. Carta in 2009 the percentage range for five years was 13 to 27 percent, and for ten years 16 to 37 percent. (<u>Id.</u> at 39.)

According to Dr. Phenix, however, since that time, scorers have been instructed[1] that they can arrive at a more precise

---

[1]     It does not appear that placing offenders in bins in order to calculate  more precise reoffense rates has been empirically validated.  Dr. Phenix testified that this approach does not require empirical validation because the scoring instruments, the Static 99 and the Static-99R, have been peer reviewed and are generally accepted in the scientific community.  Placing

prediction of likelihood that any specific subject will reoffend
by categorizing that subject and using the data from past
offenders who fall within the same category.  In other words,
actuarial instruments like the Static-99R work by comparing the
subject to data samples for past offenders.  In part because not
all offenders are exactly alike, the instruments will generally
only be able to arrive at a rough estimate of the likelihood of
reoffending.  If a scorer bores down into the data underlying the
instrument and compares the subject with data samples that appear
more similar to him, then, according to Dr. Phenix, the
instrument can yield more precise predictions.  This change has
been spurred by the recognition that "factors outside of the
actuarial instrument affect[] base rates or rates of sexual
reoffense," and that, by relying on these other factors, the
scorer can compare the subject of the instrument to samples that
exhibit similar extra-instrument risk factors. (Id. at 42:16-17.)
For example, one sample set includes only offenders who have been
pre-selected for treatment.  Because these types of offenders are
inherently more likely to reoffend, it makes sense, according to

---

offenders in bins in order to refine the prediction percentage
is, according to Dr. Phenix, merely a way of "interpret[ing] the
instrument" and is "not subject to peer review." (Trial Tr. Day
2, 51-52.) I have doubts about whether this method would survive
Daubert analysis, but it is not necessary to perform such an
analysis here, for though I have considered Dr. Phenix's scoring
of the Static-99R, an instrument which is widely accepted, I have
not placed dispositive weight in the resulting percentage
likelihood of reoffense.

Dr. Phenix, to compare an offender who has been pre-selected for treatment to this sample. (Id. at 42-43.) In this case, Dr. Phenix relied upon a number of dynamic risk factors, discussed further below, to place Mr. Carta into the "high-risk bin." (Id. at 43.) She testified that she could have also placed him into the pre-selected for treatment bin, but that he exhibited a number of factors that made his reoffense rate even higher than it would be for the average person pre-selected for treatment. (Id.) When using data from offenders who fall within a similar high risk category, Dr. Phenix claims she was able to provide more precise predictions of the likelihood that Carta will reoffend. (Id.) She predicted that he had a 25.2 percent likelihood of reoffending at five years and a 35.5 percent likelihood of reoffending at ten years. (Id. at 42:1-3.) As Dr. Phenix's testimony also disclosed, however, the decision to place an offender within a certain "bin" is remarkably high stakes. If Dr. Phenix had placed Mr. Carta in the routine sample, then she would have predicted an 11.4 percent likelihood of reoffense within five years; if she had placed him in the pre-selected for treatment sample, she would have predicted a 15.9 percent likelihood of reoffense over five years. (Id. at 54.)

Dr. Phenix also scored Mr. Carta on two other actuarial instruments, the Static 2002-R and the MnSTOT-R. She testified that the most reliable instrument was likely the Static-99R,

which had been validated on more samples than either of the two other instruments. (Trial Tr. Day 1, 105:22-23.) Nonetheless, she scored multiple instruments in order to ensure that there was not a large discrepancy between any of the instruments, which might have given cause to doubt the validity of her conclusions. (Id. at 106:8-14.)

The Static-2002R is a risk assessment device that is similar to the Static-99R, but as opposed to providing just a list of ten factors, it includes clusters of factors each related to various characteristics of the subject. When Dr. Phenix scored the Static-2002R she found that Carta was in the moderate-high risk range. Offenders with the same score as Carta on this instrument reoffended at a rate of 25 percent in five years and 33.8 percent in ten years. (Id. at 107.)

The MnSTOT-R is based on data from inmates released from the Minnesota Department of Corrections. (Id. at 111:2-13.) The instrument includes many of the same factors taken into account on the Static-99R and Static-2002R, but it also includes some more untraditional risk factors that researchers have found to be statistically significant, like whether any offending has occurred in a public place. (Id. at 109-10.) Furthermore, it includes four dynamic, or changing, risk factors like whether the subject has completed chemical dependency treatment, has completed sex offender treatment, or has a disciplinary history

while incarcerated. (Id. at 110.)  When Dr. Phenix explained her scoring of this instrument on direct examination, she placed Carta in the high risk range and predicted about a thirty percent likelihood of reoffending while under supervision. (Id. at 111:23-25.)  On cross examination, however, she admitted that she had made an error on the scoring of this instrument when she added three points for Carta's termination of sex offender treatment.  In fact, according to the instrument's instructions, a scorer should not add these points when the offender voluntarily quits treatment, as was the case with Carta, as opposed to being forced out. (Id. at 103-105.)  After adjusting Carta's score accordingly, Dr. Phenix found that he scored in the "moderate" risk range with a 20 percent rate of reoffense under supervision. (Id. at 105:20-25.)

Dr. Phenix also relied upon a number of dynamic risk factors in forming her opinion that Carta will have serious difficulty refraining from reoffending.  These factors, laid out in an instrument called the Stable-2000, address various dynamic influences on an offender's life and ability to control behavior. They include: significant social influences, intimacy deficits, ability to control sexual preoccupation, cooperation with supervision, and general self-regulation.  Dr. Phenix testified that all of the factors set forth in the Stable-2000 are present in Carta. (Id. at 115.)

First, Carta will, according to Dr. Phenix, have minimal social support in the community.  Carta's vindictive behavior, especially toward his family, has driven his support-system away and estranged him from his daughter. (<u>Id.</u> at 115-16.)

Second, according to Dr. Phenix, Carta has significant intimacy deficits.  He has described difficulty in relationships, stating that he often suffocates his partners.  He has also turned toward pornography as a substitute for real relationships.  Dr. Phenix also testified that Carta has turned to inappropriate sexual partners and that he does not have the skills to develop a meaningful relationship that would protect against future reoffending. (<u>Id.</u>)

Third, Carta, according to Dr. Phenix, has poor "sexual self-regulation."  To support this claim, she pointed to Carta's compulsive preoccupation with child pornography and his seeking out pubescent boys for sexual activity.  According to Dr. Phenix, this obsessiveness has also been apparent during Carta's time in custody where he has developed inappropriate relationships with younger treatment program participants. (<u>Id.</u> at 116-17.)

Fourth, Carta has a diminished "general self-regulation."  This characteristic manifests in Carta's behavioral impulsivity as evident in his non-sexual criminal history, compulsive use of child pornography, and tendency to act emotionally and vindictively to hurt the people close to him. Furthermore,

Dr.Phenix testified that Carta has exhibited bad problem-solving, which is indicative of poor general self-regulation. In particular, he impulsively quit the SOTP at Butner despite the fact that he later believed quitting to be a mistake. (_Id._ at 120-21.)

Fifth, Carta exhibited a lack of cooperation with supervision. Of particular note to Dr. Phenix was Carta's failure to follow through with SOTP at Butner, which, according to Dr. Phenix, entailed repeatedly engaging in behaviors that treatment providers had counseled against. (_Id._ at 119.)

Dr. Phenix concluded by testifying that Carta's failure to complete the SOTP at Butner was particularly concerning. She believed that his focus on meeting his sexual needs with younger participants interfered with his ability to focus on treatment needs. (_Id._ at 123.) Furthermore, upon reviewing Carta's response to treatment, Dr. Phenix testified that she does not believe that he understands his offense cycle, which he engaged in by spending time with younger program participants at Butner. In sum, she felt that Carta is now the same person he was when he entered Butner as an untreated sex offender. When he left the program at Butner he retained a number of cognitive distortions, including that it was permissible to have sex with thirteen year-old boys because it was good for them. (_Id._) Without further treatment, and a structured plan to avoid relapse, Dr. Phenix

believes that Carta will have serious difficulty refraining from sexually violent crimes or child molestation. (<u>Id.</u>)

## 2. Dr. Bard (Court-Appointed Expert)

### a) Mental Condition

Dr. Bard did not agree with Dr. Phenix that Carta had a diagnosable mental illness.  He agreed that Carta was attracted to, at the very least, "post-pubescent" age children, and he agreed that this attraction would always be present.  Dr. Bard disagreed, however, with the use of the descriptor "Hebephilia" attached to the paraphilia NOS diagnosis, and further testified that paraphilia NOS does not describe a diagnosable mental illness in the forensic context.

Dr. Bard first explained that attraction to pubescent and post-pubescent minors cannot be considered deviant because research indicates that normal adults with no history of sexually offending experience some arousal to these age groups. (<u>See</u> Ex. 37.)  According to Dr. Bard, the Blanchard article, on which Dr. Phenix based much of her testimony, is not valid and has been criticized by a number of researchers.  The methodological problems cited have been 1) exclusion of images of the 15-18 year old age group; 2) no control group of non-offenders to compare the phallometric response of normal non-offending adults to the stimuli; and 3) the exclusion of more than half of the study's potential subjects. (<u>Id.</u>)

Dr. Bard believes that attraction to pubescent children and post-pubescent children is non-deviant.  When pressed on whether he believed that attraction to thirteen year-olds fell within the contours of non-deviant sexual arousal, Dr. Bard wavered: "I can't answer the question the way you asked it because the age is basically irrelevant. Sexual development is the only issue, not age." (Trial Tr. Day 5, 69:8-9.)

Dr. Bard also specifically testified about the paraphilia NOS diagnosis.  Though this diagnosis was accepted by the First Circuit in Carta I, Carta contends that new research since that case was published complicates the assumptions on which the First Circuit's reasoning was based.  Most importantly, Allen Frances, the chair of the DSM-IV task force, and Michael First, editor of the text and criteria for DSM-IV and editor and co-chair of the DSM-IV-TR, recently wrote an article in The Journal of the American Academy of Psychiatry and the Law explaining their understanding of the text of the DSM-IV paraphilia definition. (Ex. 39.)  The article explains that the forensic diagnosis of paraphilia NOS with a Hebephilia descriptor is a misreading of the DSM-IV. (Id. at 79.)  In the DSM-IV, reference to an arousal to "children or nonconsenting persons" as a criterion for paraphilia replaced the DSM-III's reference to "unusual or bizarre imagery or acts" as being an essential feature of any disorder in the paraphilia category.  The authors explain that

this language was removed from the DSM-III because of a concern that "unusual or bizarre" called for too subjective an inquiry into the arousal pattern. (Id.)  Nonetheless, the authors did not envision the change as effectuating a fundamental reworking of the paraphilia definition.  In their view, someone can only have a paraphilia if his arousal patterns are somehow "unusual or bizarre."  Because, in their view, attraction to pubescents is normal, it does not support a paraphilia diagnosis, and, therefore, the term "children" in the DSM-IV definition cannot reference adolescent or post-adolescent youths.  In sum, they conclude:

> "Paraphilia is meant to apply only to sexual urges, fantasies, and behaviors that are unusual or bizarre. . . . [S]exual attraction to pubescent individuals is far too widespread to be considered unusual or bizarre and has not been considered to be evidence of a paraphilia in any of the DSMs from DSM-I all the way through DSM-IV-Tr.  Given the rightful illegality of predatory sexual relationships with minors, being intensely sexually aroused by adolescents may predispose the individual with such inclinations to committing a crime, but the attraction in and of itself is not an indicator of a mental disorder."

(Id. at 90.)

### b) Serious Difficulty Refraining

Dr. Bard concluded to a reasonable degree of professional and medical certainty that Carta would not have serious difficulty refraining from molesting children.  In reaching this conclusion, Dr. Bard performed an "adjusted risk assessment." (Trial Tr. Day 5, 90:21-24).  The process included use of an

43

actuarial tool and evaluation of dynamic risk factors, including "general self control in a non-sexual way, sexual self-control, as is the pattern of sexual offending, intimacy, differences, deficits, participation and/or completion of a treatment program, and age." (<u>Id.</u> at 90:21-91:14).

Dr. Bard described the actuarial tool – the Static-99 – as only "moderate in validity" because "[i]t doesn't tell me anything about their current situation. It doesn't look at if he's in treatment or has behaviors since his offending . . . . I think it's a good beginning, though, and that's it." (Bard Dep. 107:4-8). Dr. Bard's application of the Static-99R revealed that Mr. Carta had a 7-15 percent chance of re-offense. (<u>Id.</u> at 100:6-13.)

In finding that Mr. Carta would not have serious difficulty refraining from child molestation if released from prison, Dr. Bard found it significant that Mr. Carta has not engaged in sexual misconduct in prison. (<u>Id.</u> at 88:1-3.) In addition, Dr. Bard stressed that Mr. Carta is not a classic recidivist in the sense that he has not committed additional sexual offenses since his imprisonment for child pornography. (<u>Id.</u> at 88:4-7.) According to Dr. Bard, "Once someone has been sanctioned and they continue to physically contemplate that behavior, it gives evidence that that person. . . has shown difficulty controlling their. . . impulses." (<u>Id.</u> at 87:18-21.)

With respect to Mr. Carta associating with younger members of the SOTP at Butner before his voluntary withdrawal, Dr. Bard does not view that activity as problematic. Dr. Bard testified that "if Mr. Carta left the program today and proceeded to engage in sexual relationships with 25-year-olds, why is that a bad thing? It's not illegal. It's not deviant. It's his -- if he was able to successfully move his level of attraction from teenagers to twenty-somethings, why is that a problem?" (<u>Id.</u> at 110:16-21). Overall, he credits Mr. Carta's assertion that the reason he dropped out of SOTP was frustration with the program and Mr. Carta's own stubbornness about admitting that he had made a mistake, not because of any sexual or otherwise inappropriate contact with anyone in the program. (<u>Id.</u> at 110-13.)

In response the Court's inquiry of whether Mr. Carta would impulsively reoffend if "he hits a bump in the road" after his release from prison in the same way that he appears to have responded impulsively to other negative experiences, Dr. Bard responded that Mr. Carta is "a very different person now" and "he's going to have a support system" in the form of therapists, family members, and a probation officer. (<u>Id.</u> at 89:3-18.) According to Dr. Bard, "the vast majority of offenders can be treated successfully with good treatment in the community and a desire to change." (<u>Id.</u> at 116:6-8.)

In sum, Dr. Bard testified that "Mr. Carta's attraction, if

you can assess that, is clearly not the same now as it was then. His impulsivity is not the same now as it was in the past. His anger is not the same now as it was in the past. He is able to control his behavior as evidenced by his nine plus years in prison without any serious violence." (<u>Id.</u> at 109:6-11.) Ultimately, according to Dr. Bard, these changes make it unlikely that Carta will reoffend. (<u>Id.</u> at 109:18-20).

### 3. Dr. Prentky

Dr. Prentky's opinion was based on his review of Mr. Carta's record and two, three-hour interviews with Mr. Carta. (Trial Tr. Day 3, 22-25.)

#### a) Mental Condition

Dr. Prentky testified that Mr. Carta does not suffer from a mental illness, abnormality, or disorder, and, in particular, that he does not suffer from the mental disorder of paraphilia NOS, characterized by Hebephilia. (<u>Id.</u> at 57:17-20.)

This opinion, however, was not based on Dr. Prentky's view that paraphilia NOS with a descriptor of Hebephilia is never an appropriate diagnosis. (<u>Id.</u> at 65-66.) Dr. Prentky was familiar with the ever-present debate over the paraphilia NOS (Hebephilia) diagnosis and was up-to-date on the newest developments in the field, including the new article by Frances and Frist. (<u>Id.</u> at 66.) Nonetheless, Dr. Prentky agreed with Dr. Phenix that paraphilia-NOS, "the wastebasket" paraphilia diagnosis, as he

46

deemed it, (_id._ at 66:23-25,) was an appropriate diagnosis with a
Hebephilia descriptor. (_Id._ at 68:6-12.)

In deciding not to diagnose Mr. Carta with paraphilia not
otherwise specified, characterized by Hebephilia, Dr. Prentky
highlighted the fact that only three of Mr. Carta's self-reported
victims were age eleven to fourteen and that most of his child
pornography interests revolved around an obsession with trading
and collection as opposed to consumption. (_Id._ at 43, 74:11-16.)
Dr. Prentky testified that Mr. Carta is most attracted to the
body type that "would be essentially a pubescent male in the age
range of fifteen to twenty." (_Id._ at 74:22-23.) According to
Dr. Prentky, "[t]he overwhelming weight of the evidence seems to
be that his preference is for young adolescents who are older
than [eleven to fourteen] . . . . [I]f you look at all of the
[victims] that we're talking about, indeed, 9 of the 13 were
either 15, 16, or 17 years old, and one apparently was 15 . . ."
(_Id._ at 76:2-7) Dr. Prentky qualified his finding by admitting
that "[a]ge is a relatively crude measure when we're talking
about this gray area of adolescence. Age is much easier when
we're talking about children or we're talking about adults; it
only becomes highly problematic when we're talking about
adolescence." Despite this ambiguity, Dr. Prentky stated that,
according to the information at hand, Mr. Carta can not be said
to have recurrent, intense sexually-arousing fantasies or urges

involving children age eleven to fourteen. (<u>Id.</u> at 108:23-109:4.)

### b) Serious Difficulty Refraining

Dr. Prentky also concluded that Mr. Carta would not have serious difficulty refraining from molesting children. (<u>Id.</u> at 27:16-20.)  This conclusion was based on Dr. Prentky's attempt to score the Static-99 actuarial instrument and his use of the "empirically-guided" risk assessment referred to as the SVR-20. (<u>Id.</u> at 81:2-4.)

With respect to the Static-99, Dr. Prentky determined that Mr. Carta could not be scored with that instrument. (<u>Id.</u> at 97:14-16.)  According to Dr. Prentky, in order to be eligible for scoring on the Static-99 the subject must have been adjudicated on at least one "Category A" offense, or an offense including a sexual battery. (<u>Id.</u> at 81.)  Although Carta has self-reported a number of Category A offenses through the SOPT, self-reported offenses inexplicably do not provide a sufficient basis for scoring the instrument. (<u>Id.</u>)

Instead, Dr. Prentky relied upon a similar instrument, the SVR-20, which has been used for over a decade, mostly in Canada. (<u>Id.</u> at 83:11-16.)  According to Prentky, "the SVR-20 is at least as good in terms of its predictive performance as the Static-99, and. . . at least one or two studies [have] actually [determined it to be] better." (<u>Id.</u> at 83:25-84:2.)  Under the first

48

"cluster" of variables set out by the SVR-20, the cluster
referring to "psychosocial adjustments," Carta received an
extremely high score. (<u>Id.</u> at 85:15-17.) These variables,
including supervision failure, nonviolent offenses, nonsexual
violent offenses, employment problems, and severe social problems
are all consistent with Carta's severe antisocial attributes.
(<u>Id.</u> at 85.) Other items, however, namely those concerning
Carta's sexual history, provided a substantially lower score;
significantly, however, this was in part because Dr. Prentky did
not score Carta's sexual crimes that had not been adjudicated.
(<u>Id.</u> at 87.) Moreover, Dr. Prentky's meetings with Carta did not
reveal distorted attitudes about his sex crimes. In fact, Dr.
Prentky testified that Carta was actually "rather embarrassed"
about his past. (<u>Id.</u> at 87:15-16.)

The SVR-20 does not yield quantitative predictions in the
way that the Static-99 and Static-2002 do. Instead, the scorer
combines the results of the risk assessment with a number of
other factors in order to form an overall opinion about whether
an offender will likely reoffend. Based on Carta's score on the
SVR-20, which Prentky deemed, in his experience, extremely low,
(<u>id.</u> at 89:19-21,) and the number of other factors present in
Carta's case, Dr. Prentky opined that Carta would not have
serious difficulty restraining from reoffending in the future.
These other factors included: 1) that there is no documented

evidence of a sexual offense until Carta was 40; 2) that his
prison sentence resulting from his conviction is his first
significant sanction for a sexual offense; 3) that after he pled
guilty to transportation of child pornography, he was released
pending sentencing and was in the community without any known
infraction; and 4) that he has a non-sexual criminal history.
(Id. at 90-91.)  Notably, the last of these factors seems to cut
against Dr. Prentky's conclusions, and Dr. Prentky recognized
that Carta's antisocial attributes along with his criminal
history contribute to his risk.  However, these considerations,
in Dr. Prentky's mind, did not overcome Carta's other
characteristics, including, most importantly, the fact that Carta
had never sexually reoffended after a criminal sanction for a
sexual offense and did not have serious disciplinary or sexual
problems in prison.  Overall, Dr. Prentky opined that Carta will
have serious difficulty in refraining from general antisocial
behavior, but he did not believe that Carta will have serious
difficulty in refraining from sexually violent conduct or child
molestation.

Further, Dr. Prentky testified that the SOTP in conjunction
with CODE have "deeply moved" Mr. Carta and have helped him
accept responsibility for his prior misconduct. (Id. at 47:5-
48:6.)  Dr. Prentky did not consider Mr. Carta's voluntary
withdrawal from the SOTP significant.  He explained that "the

literature is very, very clear that however clinically important [withdrawal] may seem to us, and it is clinically important, it has no bearing on their risk to recidivate." (<u>Id.</u> at 94:13-16.) Furthermore, Dr. Prentky doubted the propriety of considering Mr. Carta's relationship with younger program participants to be part of an offense cycle, as these kinds of relationships would be perfectly appropriate outside of an institutional setting. (<u>Id.</u> at 93-94.)

**D. Conditions of Release**

During this trial, the parties did not spend much time addressing Carta's conditions of supervision if released. At the first trial, however, the court heard testimony from a number of sources about the kinds of programs available to Carta if he is released. Carta has a three-year term of supervised release on his child pornography sentence and in addition to standard conditions of supervision, he would be subject to several special conditions imposed by the sentencing court, including required participation in mental health, sex offender, and substance abuse treatment, as well as polygraph examinations and searches of his home and computer equipment by U.S. Probation. (Ex. 25.)

At the first trial, Dr. Randall Kent Wallace, a psychologist who works for Connection, Inc., an organization that provides sex offender treatment to sex offenders in Connecticut who are supervised by the U.S. Department of Probation, testified about

Carta's likely treatment if released. (<u>Carta I</u>, Trial Tr. Day 1, 3.)  The program provides regular polygraph examinations, and helps offenders establish support systems and a plan for life after supervision. (<u>Id.</u> at 21, 28.)  The program does not cure sex offenders but, rather, seeks to help them manage behaviors (<u>Id.</u> at 39.)  Dr. Wallace did not know Carta and did not know if he would be accepted into the program at Connection. (<u>Id.</u> at 41.)

At this trial, Dr. Bard testified that if released, Carta plans to live in a transitional housing program in Hartford called Open Hearth. (Trial Tr. Day 5, 127:13-17.) The Court was provided with little information about Open Hearth, and it is not clear at this time whether it would accept Carta. (<u>Id.</u> at 127-28.)

### CONCLUSIONS OF LAW

**A.    The Second Element: Serious Mental Disorder**

I find that the government has established by clear and convincing evidence that Carta suffers from a serious mental illness, abnormality or disorder in the form of paraphilia NOS with a descriptor of Hebephilia.  In <u>Carta II</u>, the First Circuit accepted this diagnosis and remanded to this Court seemingly for the purposes of examining prong three of the sexually dangerous person test only.  Nonetheless, Carta and Dr. Bard have vigorously argued that the analysis should be reexamined in light

of new evidence in the form of articles written by the drafters of the DSM-IV.  I find this argument unpersuasive.

As the First Circuit has recognized, the Court is not bound by the precise contours of the DSM.  <u>See</u> <u>Carta II</u> at 39.  The statute allows for the commitment of individuals who have "serious mental abnormalit[ies], defect[s], <u>or</u> disorder[s]," 18. U.S.C. § 4247(a)(6)(emphasis added).  Even though there is disagreement within the psychiatric community over the propriety of the paraphilia NOS (Hebephilia) diagnosis, the government has established by clear and convincing evidence that paraphilia NOS (Hebephilia) – that is an attraction to pubescent children between the ages of 11 and 14 – is a serious mental illness, abnormality or disorder within the statutory language.  First, it has been published in a peer-reviewed journal.  Second, Pedehebephilia, a variant of paraphilia NOS (Hebephilia), is under serious consideration for inclusion in the DSM-V.  Finally, two of the three experts, including Mr. Carta's own expert, testified that paraphilia NOS (Hebephilia) was an appropriate medical diagnosis.  Moreover, because the diagnosis includes a requirement that the diagnosed individual be subject to "clinically significant distress or impairment in social, occupational, or other important areas of functioning," (Ex. 11 at 1,) I also find that this disorder is "serious" within the language of the statute.

The paraphilia NOS (Hebephilia) diagnosis also fits Mr. Carta.  Given his testimony, I find that Carta continues to be aroused to thirteen year-old children.  Further, he has been caught with thousands of images of child pornography, including many depicting young pubescent and even pre-pubescent aged children, and he has admitted that he masturbated to these materials for hours every day; most importantly, he has engaged in repeated sexual contact with thirteen year olds, including a multi-year sexual relationship with one thirteen year-old whom he groomed and manipulated into coming across the country to live with him.  Carta has even admitted that part of the reason he enjoys children of this age is precisely because of their immaturity and the fact that he feels good taking care of them.  At least some of Carta's victims must have been in the process of puberty, and his arousal to them was and remains deviant.  Furthermore, Carta's arousal pattern has caused significant distress and impairment in his life.  Not only was Carta obsessed with child pornography, but his intense attraction to young boys has caused him to form prolonged, deviant, and dysfunctional relationships with pubescent youths.  This is evident in particular in Carta's relationship with John, which was characterized by manipulation and stalking behaviors.

**B. The Third Element: Serious Difficulty Refraining**

The harder issue is whether the government has established by clear and convincing evidence that Carta will have serious difficulty refraining from sexual violence or child molestation. The statute provides minimal guidance on how I should answer this question.  On the one hand, the statutory language requires that the government establish that Carta's difficulty will be "serious."  Merely the presence of a sexual attraction to minors is insufficient to meet this prong of the test for civil commitment if the person the government seeks to commit has developed the skills necessary to overcome the urge to have sexual contact with minors without difficulty.  On the other hand, the government need not establish that the person it seeks to commit will, or even is likely to, reoffend. See <u>United States v. Hunt</u>, 643 F.Supp.2d 161, 179-81 (D. Mass. 2009).  The analysis must focus on Carta's volitional control understood in relation to his mental illness.  Making this determination, therefore, is not as simple as merely relying on recidivism rates of past offenders; it calls for an analysis of a range of different factors, including Mr. Carta's history before incarceration, his time in prison, and the opinions of experts.

The determination under this prong is also informed by the constitutional constraints on the civil commitment scheme.  In <u>Kansas v. Crane</u>, 534 U.S. 411 (2002), the Supreme Court held that in order to civilly commit someone for sexual dangerousness

"there must be proof of serious difficulty in controlling behavior." Id. at 413. The Court noted that this standard allowed courts wide discretion in relying on a number of different factors relevant to sexual dangerousness. The standard did not have "any kind of narrow or technical meaning;" nor was it demonstrable with "mathematical precision." Id. The final analysis, however, must not be just whether Mr. Carta exhibits traits shared by recidivists. Ultimately, Carta's volitional control must be "viewed in light of such features of the case as the nature of the psychiatric diagnosis, and the severity of the mental abnormality itself. . . [in such a way that] distinguish[es] [him] from the dangerous but typical recidivist convicted in an ordinary criminal case." Id.

After weighing the many different factors that bear on this analysis, I find that the government has established by clear and convincing evidence that Mr. Carta will have serious difficulty refraining from sexually molesting minors. I also find that this difficulty will arise from his underlying mental condition. The analysis begins with the actuarial instruments scored by the experts. The predicted reoffense ranges ascribed to Mr. Carta are not as high as those of other sex offenders this Court has committed under the Adam Walsh Act. See United States v. Wetmore, 766 F.Supp.2d 319, 334 (D. Mass. 2011)(Dr. Prentky scoring noting that individual's likelihood of reoffending over ten years was 35

percent); <u>United States v. Shields</u>, 597 F.Supp.2d 223, 237 (D.

Mass. 2009)(Static-99 resulted in reoffense rates of 39 percent

over five years, 45 percent over ten years, and 52 percent over

fifteen years).  Moreover, two of the experts in this case opined

that Mr. Carta would not have serious difficulty refraining from

sexually reoffending.  Nonetheless, I take seriously Dr. Phenix's

scoring of the Static-99R, which, even disregarding her choice to

put Carta in a certain offender bin, resulted in reoffense rates

of between 11 and 25 percent within five years. (Tr. Day 2, 54-

55.)  These findings demonstrate that offenders with similar

backgrounds to Carta have had serious difficulty refraining from

reoffending.

The experts' testimony on sexual dangerousness is not,

however, dispositive of the question.  In the end, I did not give

full weight to the testimony of any of the experts.  Dr. Bard's

analysis of the difficulty refraining question seemed colored by

his adamant opposition to the paraphilia NOS (Hebephilia)

diagnosis.  Dr. Phenix's testimony regarding her decision to

place Carta within a certain "bin" in order to compare him to

other similar offenders for the purposes of determining a

recidivism rate was so unpersuasive that it caused me to place

less weight on her ultimate conclusions regarding Carta's

likelihood of reoffense.  Dr. Prentky's testimony on the serious

difficulty refraining question was perhaps the most convincing,

but I found reasons to doubt his testimony as well.  I was not persuaded that Carta's self-reported crimes could not serve as a basis for scoring actuarial instruments, and it appeared that much of Dr. Prentky's conclusions were based on his own assessment that Carta has experienced considerable self-transformation while in custody awaiting a final determination of this matter.  As discussed below, I am less convinced than Dr. Prentky that this is the case.

Along with the expert testimony, I weigh a number of other factors.  The most important factor weighing in Carta's favor is the fact that there is no evidence that he has had inappropriate sexual relations after criminal sanction for a sex offense.  This includes no inappropriate sexual contact during his six months in the community between his plea in the child pornography case and his incarceration, and no sexual contact while he has been in federal incarceration.  Though most of this evidence is derived from Carta's own self-report, he has, in the past, been candid about his sexual contact.  In fact, when he first arrived at SOTP at Butner, he was reported to have been unusually forthcoming about his serious past deviant behaviors.

This factor, together with Carta's reported interest in seeking out sex offender treatment at Devens, suggests that his substantial sanction for child pornography, and his resulting time in incarceration, may have had a positive impact on his

volitional control.  Dr. Prentky noted the same after his two
fairly extensive face-to-face interactions with Mr. Carta.  He
testified that Carta seemed to have benefitted from his CORE
treatment at Allenwood, his limited sex offender treatment at
Devens, and his time in incarceration and that he no longer
expressed the cognitive distortions that he had used to excuse
his past sexual abuse.

Other factors in Carta's favor include both his age and the
fact that he is sexually aroused to majority-aged males and
females.  At the time of trial, Carta was fifty years-old placing
him on the high-end of sexual offenders.  The experts testified
about the decrease in sexual arousal experienced by men around
this age, and data on this phenomenon has led to amending the
actuarial tables to take account of the decrease in arousal after
age forty.  Furthermore, Carta remains attracted to young adult
men, providing a surrogate for sexual offending and the
possibility of a healthy and legal sexual relationship in the
future.

Still, there are a number of weighty factors that cut in
favor of commitment.  Carta's history is deeply troubling not
just because of his sexual crimes but also because of his
extreme, often despicable, anti-social behaviors, behaviors that
have caused tremendous harm to his friends, family, and lovers
and spurred non-sexual criminal conduct.  These behaviors have

led Mr. Carta to act impulsively when faced with adversity and often cause him to exhibit a volatility which I find highly concerning.

I also find that Carta has not shed all of his cognitive distortions. On the whole, I believe that he is not the same person who reoffended so frequently in the past. That said, he often spoke about how young boys, including John, with whom he had sexual contact over a number of years beginning when John was thirteen, and Seth, his daughter's boyfriend, initiated sexual contact with Carta. I found Carta's account of these sexual experiences to be highly troubling and suggestive of distorted thinking regarding his illicit sexual relationships.

Most significantly, Carta's withdrawal from the SOTP at Butner persuades me that despite Carta's testimony at trial, he has not yet acquired the tools he will need to control his deviant sexual arousal without serious difficulty. Although there is some dispute about why Carta left treatment, there is no question that his behavior reflected a concerning level of impulsiveness. Despite the close supervision and the presence of nearly round-the-clock therapeutic support, Mr. Carta was neither able to control his desire to "help" younger program participants, even though he had been told these relationships were inappropriate, nor to check his self-defeating and stubborn impulse to leave treatment. These behaviors, more than any other

evidence in the record, bear directly on Carta's lack of volitional control. Furthermore, the Court credits Dr. Wood's contemporaneous reports, which noted that Carta had not yet shed his cognitive distortions concerning his relationships with younger males. Although Carta may have experienced some growth in the few years since his stint at Butner, his changed tune is more likely the result of his intervening certification for civil commitment than a self-directed epiphany while in custody.

The government has also established that Carta will have serious difficulty refraining from child molestation <u>as a result</u> of his serious mental illness, abnormality. 18 U.S.C. § 4247(a)(6)(emphasis added); <u>see</u> <u>also</u> <u>Crane</u>, 534 U.S. at 413 (noting that civil commitment requires that a lack of volitional control be connected to a mental illness). His lack of self-control is exacerbated by his anti-social attributes and substance abuse addictions, and many of his past behaviors that I find most troubling, for example his grooming and prolonged sexual relationship with a thirteen year-old boy, likely arose from a combination of personality traits and serious mental illness. However, though Mr. Carta's ability to manage his mental illness has been hampered by his other problems, at its heart, his lack of volitional control with regard to having sexual contact with children is driven by his paraphilia NOS (Hebephilia).

**ORDER**

The government has established by clear and convincing evidence that Carta is a sexually dangerous person under 18 U.S.C. § 4247(a)(5).  He shall be committed to the custody of the Attorney General until he is no longer a sexually dangerous person under the Act.

/s/ Patti B. Saris
PATTI B. SARIS
United States District Judge